SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
JOHN A. MOE, II (Bar No. 066893)
john.moe@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

Proposed Attorneys for the Chapter 11 Debtors and
Debtors In Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re | Lead Case No. 2:18-bk-20151-ER |
| VERITY HEALTH SYSTEM OF CALIFORNIA, INC., *et al.*, | (Proposed To Be) jointly administered with: |
| Debtors and Debtors In Possession. | Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____; Case No. 18-_____ |

☒ Affects All Debtors

☐ Affects Verity Health System of California, Inc.
☐ Affects O'Connor
☐ Affects Saint Louise Regional Hospital
☐ Affects St. Francis Medical Center
☐ Affects St. Vincent Medical Center
☐ Affects Seton Medical Center
☐ Affects O'Connor Hospital Foundation
☐ Affects Saint Louise Regional Hospital Foundation
☐ Affects St. Francis Medical Center of Lynwood Foundation
☐ Affects St. Vincent Foundation
☐ Affects St. Vincent Dialysis Center, Inc.
☐ Affects Seton Medical Center Foundation
☐ Affects Verity Business Services
☐ Affects Verity Medical Foundation
☐ Affects Verity Holdings, LLC
☐ Affects De Paul Ventures, LLC
☐ Affects De Paul Ventures - San Jose Dialysis, LLC

Debtors and Debtors In Possession.

Chapter 11 Cases

**DECLARATION OF RICHARD G. ADCOCK IN SUPPORT OF EMERGENCY FIRST-DAY MOTIONS**

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 1 -

108503415\V-3

I, Richard G. Adcock, hereby state and declare as follows:

1.      I am the Chief Executive Officer of Verity Health System of California, Inc. ("VHS"). I became the Debtors' Chief Executive Officer effective January 2018. Prior thereto, I served as VHS's Chief Operating Officer since August 2017.

2.      I have extensive senior-level experience in the not-for-profit healthcare arena, especially in the areas of healthcare delivery, hospital acute care services, health plan management, product management, acquisitions, integrations, population health management, budgeting, disease management and medical devices. I have meaningful experience in both the technology and healthcare industries in the areas of product development, business development, mergers and acquisitions, marketing, financing, strategic and tactical planning, human resources, and engineering.

3.      Prior to VHS, from 2014 until 2017, I served as Executive Vice President and Chief Innovation Officer of Sanford Health, a large integrated health system headquartered in the Dakotas and is dedicated to health and healing. In this role, I was responsible for leading Sanford Health's growth and innovation, in addition to direct operational oversight of the following related entities: Sanford Research, Sanford Health Plan, Sanford Foundation (a philanthropic fundraising foundation), Sanford Frontiers (a commercial and real estate company), Profile by Sanford (a scientific weight loss program), and Sanford World Clinic (which operates clinics in multiple countries).

4.      From 2012 to 2017, I served as the President of Sanford Frontiers and was responsible for starting a new entity within Sanford Health focused on innovative ventures. From 2008 to 2012, I served as Executive Vice President of Sanford Clinic. I was responsible both for (i) working directly with the President of the Clinic to the lead team of Vice Presidents in all aspects of management, and (ii) Sanford World Clinics operations, including the design, opening and operation of several global clinics.  From 2006 to 2008, I served as the Vice President of Sanford Clinic and was responsible for leading strategic, operational and financial aspects within Sanford Clinic. From 2004 to 2006, I served as Director of Clinical Operations at Sanford

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 2 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Children's Specialty Clinic and was responsible for leading the Pediatric Subspecialty Physician program and the clinical practice through all facets of the operation.

5.      Prior to Sanford Health, I served as the Director of Engineering and Six Sigma Master Black Belt at GE Medical Systems, and before that I was the Vice President of Research and Development and the Co-Owner/Founder of Micro Medical Systems. I have a bachelor of science in business administration and a masters of business administration in healthcare management.

6.      On the date hereof (the "Petition Date"), VHS and certain of its subsidiaries (collectively, the "Debtors" or "Verity") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court").  I am knowledgeable and familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases (the "Chapter 11 Cases").

7.      Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors and Integrity Healthcare, LLC ("Integrity") or the Debtors' legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the healthcare industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

8.      I make this declaration for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of these Chapter 11 Cases and in support of the First-Day Motions (as defined below).

9.      To enable the Debtors to minimize the adverse effects of the commencement of these Chapter 11 Cases on their business, the Debtors have requested various types of relief in a number of applications and motions (each a "First Day Motion," and, collectively, the "First Day Motions"). The First-Day Motions seek relief intended to maintain the Debtors' business operations; to preserve value for the Debtors, its stakeholders, and parties in interest; and, most

108503415\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  importantly, to protect the health and wellbeing of the patients who are being treated at the

2  Hospitals (defined below) operated by the Debtors and the employees of the Debtors. Each First

3  Day Motion is crucial to the Debtors' reorganization efforts and to the health and wellbeing of the

4  patients. Any capitalized term not expressly defined herein shall have the meaning ascribed to

5  that term in the relevant First-Day Motion.

6      10.    Section I provides an overview of the Debtors and these Chapter 11 Cases.

7  Section II describes the Debtors' businesses. Section III describes the circumstances that

8  compelled the commencement of the Chapter 11 Cases. Section IV describes the Debtors'

9  corporate and capital structure. Section V describes the Debtors' sales efforts. Section VI

10  provides a summary of the First-Day Pleadings and factual bases for the relief requested therein.

11                    **I.    OVERVIEW[1]**

12      11.    Debtor VHS, a California nonprofit public benefit corporation, is the sole

13  corporate member of the following five Debtor California nonprofit public benefit corporations

14  that operate six acute care hospitals, O'Connor Hospital, Saint Louise Regional Hospital, St.

15  Francis Medical Center, St. Vincent Medical Center, Seton Medical Center, and Seton Medical

16  Center Coastside (collectively, the "Hospitals") and other facilities in the state of California.

17  Seton Medical Center and Seton Medical Center Coastside operate under one consolidated acute

18  care license.

19      12.    VHS, the Hospitals, and their  affiliated entities (collectively, "Verity Health

20  System") operate as a nonprofit health care system in the state of California, with approximately

21  1,680 inpatient beds, six active emergency rooms, a trauma center, and a host of medical

22  specialties, including tertiary and quaternary care.  The scope of the services provided by the

23  Verity Health System (defined below) is exemplified by the fact that in 2017, the Hospitals

24  provided medical services to over 50,000 inpatients and approximately 480,000 outpatients.

25      13.    The VHS affiliated entities, including the Debtors, are as follows:
        • O'Connor Hospital
26      • Saint Louise Regional Hospital

27  _____

28  [1] Capitalized terms used but not defined in this overview section shall have the meanings assigned
    to them below.

                    - 4 -

- St. Francis Medical Center
- St. Vincent Medical Center
- Seton Medical Center, including
- Seton Medical Center Coastside campus
- Verity Business Services
- Marillac Insurance Company, Ltd.
- O'Connor Hospital Foundation
- Saint Louise Regional Hospital Foundation
- St. Francis Medical Center of Lynwood Foundation
- St. Vincent Medical Center Foundation
- Seton Medical Center Foundation
- St. Vincent de Paul Ethics Corporation
- St. Vincent Dialysis Center
- De Paul Ventures, LLC
- De Paul Ventures San Jose Dialysis, LLC
- De Paul Ventures San Jose ASC, LLC
- Verity Medical Foundation
- Verity Holdings, LLC

14.     Verity Medical Foundation ("VMF"), incorporated in 2011, is a medical foundation, exempt from licensure under California Health & Safety Code § 1206(l). VMF contracts with physicians and other healthcare professionals to provide high quality, compassionate, patient-centered care to individuals and families throughout California. With more than 100 primary care and specialty physicians, VMF offers medical, surgical and related healthcare services for people of all ages at community-based, multi-specialty clinics conveniently located in areas served by the Debtor Hospitals.  VMF holds long-term professional services agreements with the following medical groups:  (a) Verity Medical Group; (b) All Care Medical Group, Inc.; (c) CFL Children's Medical Associates, Inc.; (d) Hunt Spine Institute, Inc.; (e) San Jose Medical Clinic, Inc., D/B/A San Jose Medical Group; and (f) Sports, Orthopedic And Rehabilitation Associates.

15.     Verity Holdings LLC ("Holdings"), a direct subsidiary of its sole member VHS, was created in 2016 to hold and finance Verity's interests in six medical office buildings whose tenants are primarily physicians, medical groups, healthcare providers, and certain of the VHS Hospitals. Holdings' real estate portfolio includes over 30 properties, as more fully described below.

16.     Saint Louise Regional Hospital Foundation, St. Francis Medical Center Foundation, St. Vincent Medical Center Foundation, Seton Medical Center Foundation, and

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 5 -

O'Connor Medical Center Foundation handle fundraising and grant-making programs for each of their respective Debtor Hospitals.

17.     As of August 30, 2018, the Debtors' facilities had approximately 850 patients, and are currently at approximately 50% occupancy.

18.     As of August 31, 2018, the Debtors have approximately 7,385 employees, of whom 4,733 are full-time employees.  Approximately 74% of these employees are represented by collective bargaining units.  Specifically,  72% of the Debtors' Employees – approximately 5,331 Employees in total – are represented through California Nurses Associations ("CNA"), Service Employees International Union ("SEIU"), National Union Healthcare Workers ("NUHW") and United Nurses Association of California/Union of Health Care Professionals ("UNAC").

19.     As part of the mission of Verity Health System to serve the community, VHS provides care to patients even though they may lack adequate insurance or may participate in programs that do not pay full charges.

20.     All of the Debtors' Hospitals are licensed as general acute care hospitals by the California Department of Public Health, certified to participate in the Medicare and Medicaid programs, and managed by VHS.

21.     Each of the Debtors are exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, except for Verity Holdings, LCC, DePaul Ventures, LLC, and DePaul Ventures - San Jose Dialysis, LLC.

22.     St. Francis Medical Center owns real property commonly known as: (i) 3630 E. Imperial Highway Lynwood, CA 90262, including the patient tower and all of the facilities thereon; (ii) 2700 E. Slauson Ave, Huntington Park, CA 90255, and the Huntington Park Medical Office Building thereon; and (iii) 5953 S. Atlantic Blvd. 5, Maywood, CA 90270, and Maywood Medical Office Building thereon.

23.     St. Vincent Medical Center owns real property commonly known as: (i) 2131 W 3rd Street, Los Angeles, CA 90057, including the hospital and all of the facilities located thereon; and (ii) vacant land in Salton Sea, California.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 6 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

24.     Saint Vincent Medical Foundation owns: (i) a fractional timeshare of a condominium commonly known as 2600 Avenida Del Presidente, San Clemente, CA 92672; and (ii) Lot 10 of Block 572 of Rio Grande Estates, Unit 25, Valencia, NM.

25.     O'Connor Hospital owns real property commonly known as: (i) 455 O'Connor Dr. San Jose, CA 95128, and partial interest in the medical office building thereon; (ii)  2105 Forest Ave, San Jose, CA 95128 and the acute hospital, medical office building, and all of the facilities located thereon.

26.     Saint Louise Regional Hospital owns real property commonly known as: (i) 9400 No Name Uno, Gilroy, CA 95020,  and the hospital and helipad thereon; and (ii) 705 Las Animas Road, Gilroy, CA 95020.

27.     Seton Medical Center owns (i) real property commonly known as 1900 Sullivan Avenue, Daly City, CA 94015, and the Hospital and the facilities thereon (the "<u>Daly Property</u>"), and (ii) an employee parking lot on the Daly Property.

## II.     The Debtors' Businesses

### A.     The Debtors' Current Business Operations.

28.     A description of VHS, each Hospital and its respective subsidiaries and affiliates is described below, all of which are jointly-administered Debtors in these cases.

29.     **Verity Health Systems.** As set forth above, VHS is a nonprofit regional healthcare system headquartered in El Segundo, California. VHS was originally established by the Daughters of Charity of St. Vincent de Paul, Province of the West, to support the mission of the Catholic Church through a commitment to the sick and poor. VHS operates six hospitals in California.

30.     **Verity Business Services.** VHS operates Verity Business Services ("<u>VBS</u>"), a nonprofit public benefit corporation. VBS provides support services to Verity and its affiliated hospitals including accounting, finance, patient financial services, supply chain management, and purchasing services for the entire health system.

31.     **Verity Medical Foundation.** As set forth above, VMF operates clinics and contracts with physicians to provide high quality, compassionate, patient-centered care to

- 7 -

1    individuals and families throughout California. With more than 100 primary care and specialty

2    physicians, VMF offers medical, surgical and related healthcare services for people of all ages at

3    community-based, multi-specialty clinics conveniently located in areas served by the Hospitals.

4        32.    **O'Connor Hospital.** O'Connor Hospital is a nonprofit public benefit corporation

5    that operates a 358 licensed-bed, general acute care hospital that serves residents from the greater

6    San Jose area. The hospital has an emergency department with 23 emergency treatment stations.

7    It also has 11 surgical operating rooms and two cardiac catheterization labs. The hospital offers a

8    comprehensive range of healthcare services, including emergency, cardiac, orthopedic, cancer,

9    obstetrics, and sub-acute care services.  The hospital is accredited by The Joint Commission.

10        33.    **O'Connor Foundation.** O'Connor Foundation was incorporated in 1983 and is

11    governed by a Board of Trustees. Charitable donations and endowments help fund the acquisition

12    of new equipment, the expansion of O'Connor Hospitals' facilities, healthcare services, and

13    community outreach programs. O'Connor Hospital is the sole corporate member of O'Connor

14    Foundation. As of May 31, 2018, O'Connor Hospital Foundation had a balance of $1,123,644.15

15    in temporarily restricted assets and a balance of approximately $334,802.20 in permanently

16    restricted assets for the purpose of funding the cardiac catheterization lab capital, wound care

17    services, surgical services, and various other programs.

18        34.    **St. Vincent Medical Center.** St. Vincent Medical Center was founded as the first

19    hospital in Los Angeles in 1856. In 1971, a new facility was constructed at the Hospital's current

20    location at 2131 West Third Street, Los Angeles, CA 90057. The hospital has expanded to a 366

21    licensed bed, regional acute care, tertiary referral facility, specializing in cardiac care, cancer

22    care, total joint and spine care, and multi-organ transplant services. The Hospital serves both local

23    residents and residents from Los Angeles, San Bernardino, Riverside, and Orange Counties. As a

24    provider of healthcare services for a high percentage of elderly patients, many of the hospital's

25    services and programs are focused on the treatment of various chronic diseases.

26        35.    **St. Vincent Foundation.** St. Vincent Foundation was incorporated in 1989 as a

27    nonprofit public benefit corporation. Charitable donations and endowments raised by St. Vincent

28    Foundation help fund the acquisition of new equipment, the expansion of the Hospital's facilities,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108503415\V-3

healthcare services, and community outreach programs. St. Vincent Foundation raises funds through grants, special events, and individual donors. St. Vincent is governed by a Board of Trustees, and St. Vincent Medical Center is the sole corporate member of the Foundation. St. Vincent, as well as St. Vincent Foundation, holds donor-restricted funds. As of May 31, 2018, St. Vincent Foundation had a balance of approximately $1,590,149.89 in temporarily restricted assets and a balance of approximately $136,159 in board designated temporarily restricted assets for the purpose of funding programs such as bone mineral density research, transportation for low-income patients, the organ transplantation program, and oncology research and treatment.

36.   **St. Vincent Dialysis Center.** St. Vincent Medical Center is the sole corporate member of the St. Vincent Dialysis Center, located on the Hospital's campus. The St. Vincent Dialysis Center provides dialysis services for kidney disease patients, including hemodialysis and isolated ultrafiltration treatments as part of the Hospital's end-stage renal disease program.

37.   **St. Francis.** St. Francis Medical Center was established in 1945 and gained sponsorship from Daughters of Charity, Province of the West, in 1981. The hospital provides comprehensive healthcare services and operates one of the busiest emergency trauma centers in Los Angeles County. The Hospital serves 1.2 million residents of Southeast Los Angeles, located in the communities of Lynwood, South Gate, Downey, Huntington Park, Bell Gardens, Maywood, and Compton. As a provider of healthcare services for many Medi-Cal and uninsured patients, the hospital receives significant Disproportionate Share Hospital funding. St. Francis operates a 384 licensed bed, general acute care hospital located at 3630 East Imperial Highway in Lynwood, California. The hospital has an  emergency department with 46 licensed emergency treatment stations and is designated a Level II Trauma Center. It also has nine surgical operating rooms and three cardiac catheterization labs for inpatient and outpatient cardiac catheterization services. The hospital offers a comprehensive range of services, including emergency and trauma care, neonatal intensive, cardiovascular, oncology, pediatrics, behavioral health, and maternity and child services. In addition to the inpatient programs and services, the Hospital also offers various outpatient services, including ambulatory surgical services, laboratory services, imaging services, infusion therapy, nuclear medicine services, respiratory therapy, and physical therapy.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 9 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    Other outpatient services are provided at the following clinics: Orthopedics Clinic, Wound Care

2    Clinic, Industrial Clinic, Lynwood Clinic, Downey Clinic , and Huntington Park Clinic. The

3    Hospital is accredited by The Joint Commission.

4        38.    **St. Francis Medical Center Foundation.** St. Francis Medical Center is the sole

5    corporate member of St. Francis Medical Center Foundation. St. Francis Medical Center

6    Foundation was incorporated in 1983 as a nonprofit public benefit corporation and is governed by

7    a volunteer Board of Trustees. Charitable donations and endowments help fund the acquisition of

8    new equipment, the expansion of the Hospital's facilities, healthcare services, and community

9    outreach programs. St. Francis Foundation raises funds through grants, special events, and

10   individual donors.  As of May 31, 2018, St. Francis Foundation had a balance of $656,118.24 in

11   temporarily restricted assets for the purpose of funding programs such as the Children's

12   Counseling Center, nurse education, and the annual Women's Luncheon in support of

13   mammogram equipment. The Foundation also funds Health Benefit Resource Center, Healthy

14   Communities Initiative, and Trauma Recovery.

15       39.    **Seton Medical Center.** Seton Medical Center was originally founded as Mary's

16   Help Hospital by the Daughters of Charity of St. Vincent De Paul in 1893. The original facility

17   was destroyed in the San Francisco Earthquake of 1906, and by 1912, Mary's Help Hospital

18   reopened a new facility in San Francisco. In 1965, the hospital was moved to its current location

19   at 1900 Sullivan Avenue in Daly City. The hospital was renamed Seton Medical Center in 1983,

20   is currently licensed for 357 beds and serves residents from San Francisco and San Mateo areas.

21   Seton Medical Center has an emergency department with 18 licensed treatment stations. It also

22   has 13 surgical operating rooms and three cardiac catheterization labs. Of the Hospital's 83

23   licensed skilled nursing beds, 39 are in suspense, and the remaining 44 beds are utilized as sub-

24   acute care beds. Additionally, the hospital has 24 licensed acute psychiatric beds which have been

25   placed in suspense. The hospital has a broad spectrum of medical services, including cancer,

26   cardiac, emergency, surgical, rehabilitation, respiratory, orthopedic, and sub-acute care.  The

27   hospital is accredited by The Joint Commission.  Seton Medical Center and Seton Coastside share

28   a consolidated license.

108503415\V-3

40.    **Seton Coastside.** Seton Coastside was founded as Moss Beach Rehabilitation Hospital in 1970. In 1980, the City of Half Moon Bay acquired ownership of the hospital and signed an agreement for Daughters of Charity to manage operations of the hospital and rename it St. Catherine's Hospital. In 1993, St. Catherine's Hospital became Seton Coastside as it became integrated with Seton Medical Center. Today, Seton Coastside is licensed for 116 skilled nursing beds and five general, acute-care beds. Seton Coastside also operates the only 24-hour "standby" Emergency Department along the 55-mile stretch between Santa Cruz and Daly City. Under a consolidated license, Seton Medical Center and Seton Coastside share the same Board of Directors, executive leadership team, charity care policies, and union collective bargaining agreements.

41.    **Seton Foundation.** Seton Foundation, governed by a Board of Trustees, raises funds through grants, special events and individual donors. Charitable donations and endowments raised by Seton Foundation help fund the acquisition of new equipment and the expansion of facilities at the Seton Medical Center and Seton Coastside. Seton is the sole corporate member of the Seton Foundation. As of May 31, 2018, Seton Foundation had a balance of $2,693,778.66 million in temporary restricted assets and a balance of $ 2,717,591 million in permanently restricted assets for the purpose of funding programs such as oncology, the San Francisco Heart & Vascular Institute, and women and delivery services.

42.    **Saint Louise Hospital.** Saint Louise Hospital opened in 1989 in the Morgan Hill area of Santa Clara County.  In December 1999, the Daughters of Charity of St. Vincent de Paul relocated the hospital to Gilroy and renamed it Saint Louise Regional Hospital. Today, the Hospital's 93-bed facility and 24-hour emergency department provide services to the residents of southern Santa Clara County, including Morgan Hill, San Martin, and Gilroy.  Saint Louise Regional Hospital operates a 93 licensed bed, general acute care hospital located at 9400 No Name Uno, Gilroy, California 95020. The Hospital has an emergency department with eight licensed emergency treatment stations. The Hospital also has five surgical operating rooms for inpatient and outpatient surgical procedures. Ten of the Hospital's 21 licensed skilled nursing

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

beds are in suspense. The Hospital provides comprehensive healthcare services including cancer, emergency, rehabilitation, and surgical care. The Hospital is accredited by The Joint Commission.

43.    Saint Louise Regional Hospital owns and operates the De Paul Urgent Care Center. The De Paul Urgent Care Center is located in Morgan Hill, and offers patients non-emergency medical services seven days a week. The De Paul Urgent Care Center treats non-life threatening cases, such as minor injuries and lacerations, strep throat, sinus infections, rashes, nausea, vomiting, colds, flu, and fever.

44.    **Saint Louise Foundation.** Saint Louise Foundation, governed by a Board of Trustees, raises funds through grants, special events, and individual donors. Charitable donations and endowments raised by Saint Louise Foundation help fund the acquisition of new equipment and the expansion of the Hospital's facilities. Saint Louise is the sole corporate member of Saint Louise Foundation. As of May 31, 2018, Saint Louise Regional Hospital Foundation had a balance of approximately $561,486.86 in temporarily restricted assets.

45.    **De Paul Ventures, LLC.** De Paul Ventures, LLC is a wholly-owned and operated holding company of Verity that was formed in August 2010 for the purpose of investing in a freestanding surgery center and other healthcare entities.

46.    **DePaul Ventures - San Jose Dialysis, LLC.**  In April, 2013, DePaul Ventures, LLC, formed DePaul Ventures - San Jose Dialysis, LLC ("Dialysis").  Dialysis is a general and limited partner of Priday Dialysis, LLC, a healthcare center specializing in end-stage renal disease treatment.  Dialysis shares an interest in Priday Dialysis with Total Renal Care, Inc., which is a subsidiary of DaVita.

47.    **Verity Holdings, LLC.** As set forth above, Holdings is a direct subsidiary of its sole member VHS and was created in 2016 to hold and finance Verity's interests in six medical office buildings whose tenants are primarily physicians, medical groups, healthcare providers, and certain of the VHS Hospitals. Holdings' real estate portfolio includes over 30 properties, including, but not limited to, apartment buildings, parking lots, and condominiums. Holdings is the borrower on approximately $66.2 million of non-recourse financing secured by separate deeds of trust and revenue and accounts pledges, including the rents on each medical office building

(collectively "MOB Financing").

48.    **Non-Debtor VHS Entities.** The Debtors' have an interest in the entities described below that are not filing chapter 11.

49.    Marillac Insurance Company, LTD. ("Marillac"), a wholly-owned subsidiary of VHS, was incorporated in the Cayman Islands on December 9, 2003, as an exempted company and was granted an Unrestricted Class "B" Insurer's License effective December 15, 2003, which it holds subject to the provisions of the Insurance Law of the Cayman Islands. On November 1, 2012, The Insurance Law, 2010 (the "Law") became effective. Under such law, Class B licenses were changed from "restricted" and "unrestricted," as they had been described in previous revisions of the law, into three separate classes "(i)," "(ii)" and "(iii)." Insurers writing at least 95% of net premiums with their related business (in this case VHS) fell into Class B(i). The Company was granted a Class B(i) license, effective April 2, 2015. Marillac provides insurance coverage to VHS and its affiliates.

50.    St. Vincent De Paul Ethics Corporation does not hold any assets and is a nondebtor entity. St. Francis Medical Center is its sole corporate member.

51.    VHoldings MOB, LLC ("VHoldings") is currently an inactive subsidiary of VHS and has no assets or obligations. It was created as a "special purpose entity" for a proposed financing that did not materialize. As part of the proposed transaction structure, four additional LLCs were established in which, VHoldings was the sole member of each.  The four additional LLCs were dissolved on January 23, 2017.

52.    De Paul Ventures – San Jose ASC, LLC ("San Jose ASC"), was formed in February 2011, by De Paul Ventures, LLC (which is a filing entity), and owns a 25% interest as a limited partner in a partnership with Physician Surgery Services, dba Advanced Surgery Center, a freestanding surgery center in San Jose.  San Jose ASC's only asset is a sale contract, pursuant to which it receives payments of $125,000 every other month.  Postpetition, San Jose ASC will continue to forward to VHS the $125,000 received every other month.  Once all payments are received, the Debtors will dissolve San Jose.

53.    Robert F. Kennedy Medical Center is a nonprofit public benefit corporation that

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

operated a 229-bed general acute care hospital and served residents in Hawthorne, California, until December 31, 2004. Robert F. Kennedy Medical Center Foundation is a nonprofit public benefit corporation that raised funds for the Robert F. Kennedy Medical Center.

54.     O'Connor Health Center I is a California limited partnership, formed in January 1996 ("OCH1").  O' Connor Hospital is a limited partner in OCH1 and the general partner is OCH Forest 1, LP.  OCH1 owns certain real property at 455 O'Connor Drive, San Jose, California.  Such property is leased by O'Connor Hospital.

55.     Sports Medical Management, Inc. has no assets or obligations.

**B.     Integrity's Management of Debtors.**

56.     As set forth above, Integrity was formed in 2015 to carry out the management services under the Management Agreement, for which Integrity is paid a monthly management fee. Through June 30, 2017, Integrity was wholly owned by BlueMountain. In July 2017, NantWorks, LLC ("NantWorks"), acquired a majority stake in Integrity from BlueMountain. There were no significant changes to the terms of the Restructuring Agreement or the California Attorney General requirements as a result of this transaction.

57.     On a monthly basis, VHS records management fee expense and makes payments to Integrity associated with the management services received under the Management Agreement. During the initial fiscal year which ended June, 2016, the monthly management fee was determined based on a specified percentage of trailing 12 month operating revenues for VHS. Such management fees are adjusted each succeeding fiscal year based on changes in the consumer price index. VHS defers payment for a portion of management fees based on its days' cash on hand over the most recent 90 day period. All deferred management fees accrue interest at 2.82% per annum to the extent such amounts are not paid in the fiscal year that services are received. Such deferred management fees are contingently payable based on the terms of the Management Agreement, which include annual calculations of excess cash on hand.

**C.     Verity's Employees.**

58.     As set forth above, altogether, the Debtors employ approximately 7,385 employees (the "Employees") – 6,907 excluding VMF and 478 under VMF.  Almost three-quarters of the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108503415\V-3

Debtors' Employees – approximately 5,488 Employees in total – are represented through CNA, SEIU, California Licensed Vocational Nurses' Association, and The International Union of Operating Engineers, Stationary Local No. 39, AFL-CIO.

59.    For W-2 tax and payroll purposes, the Debtors are divided into eight employers:

(a)    VHS, which covers the Systems Office and the Philanthropic Foundations, and as of the Petition Date employed approximately 294 employees, of which 289 are full-time, 3 are part time and 2 are employed on a per diem basis;

(b)    Verity Business Services, which as of the Petition Date employed approximately 307 employees, of which 285 are full-time, 11 are part time and 11 are per diem;

(c)    O'Connor Hospital, which as of the Petition Date employed approximately 1,370 employees, of which 586 are full-time, 441 are part time and 343 are per diem;

(d)    Saint Louise Regional Hospital, which as of the Petition Date employed approximately 480 employees, of which 153 are full-time, 159 are part time and 168 are per diem;

(e)    St. Francis Medical Center, which as of the Petition Date employed approximately 2,017 employees, of which 1,583 are full-time, 136 are part time and 298 are per diem;

(f)    St. Vincent Medical Center, which as of the Petition Date employed approximately 1,099 employees, of which 897 are full-time, 42 are part time and 160 are per diem;

(g)    Seton Medical Center, which includes Seton Medical Center Coastside, and as of the Petition Date employed approximately 1,340 employees, of which 516 are full-time, 551 are part time and 273 are per diem; and

(h)    VMF, which as of the Petition Date employed approximately 478 employees, of which 424 are full-time, 15 are part-time and 39 are per diem.

60.    The Debtors' Employees are represented by the following unions with the respective contractual obligations: (i) SEIU-UHW (Non-Nursing Service Employees) at St. Francis Medical Center, St. Vincent Medical Center, O'Connor Medical Center, Saint Louise Regional Hospital; (ii) SEIU-UHW (Non-Nursing Service Employees) at Verity Medical Foundation; (iii) NUHW (Non-Nursing Service Employees) at Verity Medical Foundation; (iv) NUHW (Non-Nursing Service Employees) at Seton Medical Center, Seton Medical Center Coastside; (v) CAN (Nurses) St.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 15 -

1  Vincent, O'Connor, St. Louise, Seton, Seton Coastside; (vi) UNAC (Nurses) at St. Francis; (vii)

2  CLVNA (Licensed Vocational Nurses) (O'Connor); (viii) Local 20 (Clinical Laboratory Scientists)

3  O'Connor, St. Louise, Seton; (ix) Local 39 (Stationary and Bio-medical Engineers) and O'Connor, St.

4  Louise, Seton.

5  **D.**    **Pension and Other Postretirement Benefit Plans.**

6      61.    VHS maintains two single employer defined benefit pension plans and participates

7  in two multi-employer defined benefit pension plans. The defined benefit pension plans have

8  been frozen for all employees, except members of the CNA at certain facilities. Defined benefit

9  pension plan benefits are generally based on age, years of service, and employee compensation.

10  In addition, VHS and VMF maintain several defined contribution retirement plans for employees.

11      62.    The significant multiemployer defined benefit pension plan is the Retirement Plan

12  for Hospital Employees ("RPHE"). The VHS entities that participate in the RPHE are Seton

13  Medical Center, Seton Medical Center Coastside, O'Connor Hospital, Saint Louise Regional

14  Hospital, and Verity Business Services. The RPHE is frozen as to these facilities, other than with

15  respect to CNA members at O'Connor Hospital, Saint Louise Regional Hospital and Seton

16  Medical Center. Benefits under the RPHE are generally based on years of service and employee

17  compensation. Contributions to the RPHE are based on actuarially determined amounts by the

18  RPHE Board of Trustees to meet benefits to be paid to plan participants and satisfy IRS funding

19  requirements. VHS recorded benefit expenses of approximately $20.46 million and $17.22

20  million in cash contributions to the RPHE for the fiscal years ended June 30, 2017 and 2016,

21  respectively. The VHS contributions accounted for approximately 43% and 40% of total

22  contributions made to the RPHE for the fiscal years ending June 30, 2017 and 2016, respectively.

23  Of the estimated remaining $4.79 million for 2018 and expected $12.68 million for 2019, VHS

24  contributions to RPHE, approximately $3.15 million and $7.63 million, respectively, is for make-

25  up of underfunded amounts that arose prior to VHS' acquisition from the Daughters of Charity

26  Health System ("DCHS"). As of July 31, 2018, there were no unpaid contribution installment

27  obligations owed by VHS to the RPHE.

28      63.    In addition to the RPHE, Verity assumed in the Daughters of Charity restructuring

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    certain obligations under a multiemployer plan commonly referred to as Stationary Engineers

2    Local 39 Pension Plan (the "Local 39 Plan").   As of July 31, 2018, there were no unpaid

3    contributions due on the Local 39 Plan.

4          64.    VHS maintains two single-employer defined benefit pension plans (the "Verity A

5    & B Plans").   VHS personnel at St. Francis Medical Center, St. Vincent Medical Center,

6    O'Connor Hospital, Saint Louise Regional Hospital, and the VHS system office are eligible to

7    participate in these plans.   However, only CNA members continue to earn new benefits under the

8    Verity Plan A; the Verity Plan B is completely frozen with no ongoing benefit accruals.   VHS

9    contributed approximately $41.68 million and $9.92 million during the fiscal years ended June

10   30, 2017 and 2016, respectively.   Of the estimated remaining $10.12 million for 2018 and

11   expected $35.53 million for 2019 VHS contributions to Verity Plan A, approximately $8.10

12   million and $28.05 million, respectively, is for make-up of underfunded amounts that arose prior

13   to VHS' acquisition from the Daughters of Charity.   As of July 31, 2018, there were no unpaid

14   contribution installment obligations owed by VHS to the Verity A & B Plans.

15         65.    VHS and VMF also maintain several active defined contribution retirement plans

16   for eligible employees; eligibility for and benefits under the defined contribution retirement plans

17   vary according to facility, union status, and employee classification/hire date.   These defined

18   contribution plans include the Verity Health System Supplemental Retirement Plan (TSA), the

19   Verity Health System Supplemental Retirement Plan (401(a)), the Verity Health System

20   Retirement Account (RPA), the Verity Medical Foundation 401(k) Plan, the Verity Medical

21   Foundation Management Bargaining Unit Employees 401(k) Plan for represented employees and

22   the Verity Health System Executive Long-Term Savings Plan (457(b)) Plan for nonrepresented

23   employees.   These defined contribution plans are funded from employee and/or employer

24   contributions generally on a payroll by payroll basis.   In addition to the above active defined

25   contribution plans, there are several small, frozen ancillary retirement plans.   During the fiscal

26   years ended June 30, 2017 and 2016, the employer's contribution expense for defined

27   contribution plans was approximately $18.48 million and $21.75 million respectively.   As of July

28   31, 2018, there were no unpaid employer contributions owed on any of these defined contribution

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  plans other than unpaid contributions for current and recent payroll cycles consistent with

2  ordinary administrative practices.

3    66.  VHS also maintains an early retiree health insurance program (the Postretirement

4  Healthcare Plan), which provides medical benefits to eligible retirees from early retirement to age

5  65 only.  The postretirement health care benefits are determined based on age and years of

6  service.  Certain employees at O'Connor Hospital, St. Louise Regional Hospital, Seton Medical

7  Center, and Seton Medical Center Coastside are eligible to participate in this plan. The

8  Postretirement Healthcare Plan is an unfunded plan.  VHS contributed $50,000 and $58,000 to the

9  Postretirement Healthcare Plan during the fiscal years ended June 30

10  **E.**  **Insurance Policies**

11    67.  The Debtors maintain various insurance policies issued by several insurance

12  carriers (collectively, the "Insurance Carriers").  Collectively, these policies provide for coverage

13  for, among other things: storage tank liability, commercial property, workers' compensation and

14  employers liability, commercial automobile, helipad liability & non-owned aircraft liability,

15  sexual misconduct and molestation liability, D&O liability, general liability, and professional

16  liability (collectively, the "Insurance Policies").[2]

17    68.  Significant insurance is issued to the Debtors by its captive insurer Marillac.  VHS

18  is the sole owner of Marillac.  The policies issued by Marillac cover professional and general

19  liability (both at the primary and excess level) and additional excess coverage as to automobile

20  liability, heliport and non-owned aircraft liability, employer's liability and certain other general

21  liability.  Marillac also issued a Deductible Liability Protection Policy which provides coverage

22  for the deductible obligations on the Debtors' workers' compensation policy issued by Old

23  Republic Insurance Company ("Old Republic").

24    69.  Most of the Debtors' Insurance Policies will expire between September 5, 2018

25  and July 1, 2019.  The Debtors have begun negotiating renewals, extensions and/or entries into

26  new insurance policies with respect to the expiring Insurance Policies.

27

28  [2] The Insurance Policies include six (6) CA DHS patient Trust Bonds, which have an annual premium in the
aggregate of $1,100 that was paid in full in December 2017 and will not come due for renewal until December 2018.

108503415\V-3

70.    In certain instances, the Debtors pay premiums for their Insurance Policies in full at the beginning of the policy and in other instances in quarterly installments.  The total annual premium due for Insurance Policies is approximately $18,647,036.  Of that amount, the Debtors pay $2,637,071 at the time of inception, and the remaining $16,009,965 is paid in quarterly installments.  As of the Petition Date, there are no outstanding unpaid premiums due.  The total amount of annual insurance premiums which will come due postpetition is $10,043,085.

*a.    Self-Insured Retentions*

71.    The Debtors maintain self-insured retentions of $250,000 per claim under their D&O liability coverage, $350,000 per claim under their employment practices coverage, $50,000 per claim under their fiduciary liability coverage, $100,000 per claim under their crime coverage, and $50,000 per claim under their sexual misconduct and molestation liability coverage (the "Self-Insured Retentions" or "SIRs").  A SIR is a loss amount that the insured is obligated to pay before the insurer's coverage obligation is triggered.

72.    The Debtors' Self-Insured Retentions are administered so that the Debtors pay directly for the losses under each policy as they are incurred up to the amounts of the Self-Insured Retentions.  Such SIRs due prepetition have been paid.  For the last year, no SIR amounts have been due for (a) the D&O liability coverage, (b) the employment practices coverage, (c) the fiduciary liability coverage, and (d) the crime coverage.  There have also been no SIR amounts incurred under the sexual misconduct and molestation liability policy last year.

*b.    Deductibles*

73.    The Debtors maintain a workers' compensation insurance policy with Old Republic with a $500,000 deductible for each claim.  Old Republic provides coverage under the policy up to $1 million for each claim.  On average, the monthly invoice amounts for deductibles (including ALAE) incurred under the workers' compensation policy is between $400,000 and $650,000, which are timely paid by Marillac under the Deductible Liability Protection Policy.

74.    The deductibles included in the Debtors' other Insurance Policies are:

- Storage Tank Liability - ACE American Insurance Company (Chubb) - $5,000 per Storage Tank Incident;

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 19 -

108503415\V-3

- Storage Tank Liability - Tokio Marine Specialty Insurance Company (Philadelphia) - $25,000 per Confirmed Release;

- Commercial Property - American Guarantee and Liability Insurance Company (Zurich) - $100,000 Basic Policy Deductible;

- Commercial Automobile - National Union Fire Insurance Company of Pittsburg, PA (AIG) - $1,000 Comprehensive, $1,000 Collision;

- Helipad Liability & Non-Owned Aircraft Liability - StarNet Insurance Company (Berkley Aviation) - $1,000 Physical Damage per Occurrence; and

- General Liability - Chubb - $10,000 per Occurrence.

75.    The Debtors expect their prepetition deductible obligations, other than those deductibles owed under the workers' compensation policy (which are paid by Marillac, a non-debtor), to be minimal.

*c.*    *Letter of Credit*

76.    The Debtors provide a $34,087,296 letter of credit to Old Republic as security for all of the Debtors' obligations, as required under their workers' compensation policy.  Marillac is the account party on the letter of credit, and the letter of credit is fully secured by Marillac's assets - $34,087,296 of liquid securities.  Pursuant to the Program Agreement Endorsement to the workers' compensation policy, Old Republic may draw upon the letter of credit to reimburse Old Republic for payment of the Debtors' deductible obligations or for payment of other obligations of the Debtors under the workers' compensation policy, if not paid by Marillac.  Old Republic may also draw down the $34,087,296 letter of credit in full upon the Debtors' insolvency or filing of a bankruptcy petition.

77.    The Debtors expect that Marillac will continue to honor its policy to insure the Debtors' obligations under the workers' compensation policy, and that Old Republic will not be harmed by the Debtors' chapter 11 filing.

*d.*    *Claims Administration Agreements*

78.    The Debtors have entered into administrative services contracts with Sedgwick Claims Management Services, Inc. ("Sedgwick"), for administration of claims submitted under

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   the Debtors' workers' compensation policy as well as their professional and general liability

2   policy.

3       79.     The Debtors pay Sedgwick an annual estimated fee of $702,000 which is paid in

4   quarterly installments of $175,000 for services provided by Sedgwick under the Debtor's

5   workers' compensation policy. The actual fees owed to Sedgwick are based on the staffing

6   necessary for Sedgwick to provide claims services and are calculated by taking the actual

7   program salaries, bonuses and temporary expenses multiplied by the salary multiplier. Sedgwick

8   will periodically provide an accounting to determine the actual fees incurred. The Debtors are

9   entitled to a credit if the amount of actual fees owed to Sedgwick are less than the estimated fees

10  paid. On the other hand, Sedgwick bills the Debtors for the additional actual fee owed if the

11  actual fee amount is higher than the estimated fees.

12      80.     With respect to administration of their professional and general liability policy, the

13  Debtors pay Sedgwick $3,545 per claim and suit file, $1,825 per Potentially Compensable Event

14  ("PCE") where an investigation has been requested, $275 for a PCE where an investigation has

15  not been requested pursuant to this agreement. Fees are paid monthly as files are assigned to

16  Sedgwick by the Debtors. Debtors also pay Sedgwick a program management fee of $1,250 each

17  month.

18  **F.    Recent Financial Results.**

19      81.     As of June 30, 2018, Verity's consolidated unaudited financial statements reflected

20  total assets of approximately $847 million and total liabilities of approximately $1,278 billion.

21  **III.    The Need For Chapter 11 Relief And The Events Leading To The Commencement
            Of These Chapter 11 Cases**

22

23  **A.    Historical Challenges.**

24      82.     The Hospitals and VMF were originally owned and operated by the Daughters of

25  Charity of St. Vincent de Paul, Province of the West (the "Daughters of Charity"), to support the

26  mission of the Catholic Church through a commitment to the sick and poor. The Daughters of

27  Charity began their healthcare mission in California in 1858 with the opening of Los Angeles

28  Infirmary, now known as St. Vincent Medical Center. The Daughters of Charity expanded its

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 21 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

hospitals to San Jose in 1889 and San Francisco in 1893. The Daughters of Charity ministered to ill, poverty-stricken individuals for more than 150 years.

83.    In March 1995, the Daughters of Charity merged with Catholic Healthcare West ("CHW"). In June 2001, the Daughters of Charity Health System ("DCHS") was formed. In October 2001, the Daughters of Charity withdrew from CHW. In 2002, DCHS commenced operations and was the sole corporate member of the Hospitals, which at that time were California nonprofit religious corporations.

84.    Between 1995 and 2015, the Daughters of Charity and DCHS struggled to find a solution to continuing operating losses, either through a sale of some or all of the hospitals or a merger with a more financially sound partner.  All these efforts failed.  During these efforts, however, the health system's losses continued to mount. In 2005, DCHS issued $364 million in bonds to refinance existing debt and to fund future capital expenditures.  Three years later, in 2008, they issued another $143 million in bonds to refinance existing debt.

85.    Between 2012 and 2014, DCHS participated in an affiliation with Ascension Health Alliance ("Ascension") in an effort to create greater operating efficiencies.  Ascension is the largest Catholic health system in the world and the largest non-profit health system in the United States with facilities in 23 states and the District of Columbia.  The affiliation between DCHS and Ascension failed.

86.    Despite continuous efforts to improve operations, operating losses continued to plague the health system due to, among other things, mounting labor costs, low reimbursement rates and the ever-changing healthcare landscape.  In 2013, DCHS actively solicited offers for O'Connor Hospital, St. Louise Regional Hospital, Seton Medical Center and Seton Medical Center Coastside.  In 2013, to avoid failing debt covenants, the Daughters of Charity Foundation, an organization separate and distinct from DCHS, donated $130 million to DCHS to allow it to retire the 2008 Bonds in the total amount of $143.7 million.

87.    In early 2014, DCHS announced that they were beginning a process to evaluate strategic alternatives for the health system. Throughout 2014, DCHS explored offers to sell their health system and, in October of 2014, they entered into an agreement with Prime Healthcare

- 22 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Services and Prime Healthcare Foundation (collectively, "<u>Prime</u>") to sell the health system. However, to keep the hospitals open, DCHS, needed to borrow another $125 million to mitigate immediate cash needs during the sale process; in other words, to allow DCHS to continue to operate until the sale could be consummated. Notably, DCHS' goal in the transaction was to basically maintain the status quo; their guiding principles for the sale included protecting existing pensions, repaying all their bond debt, continuation of all collective bargaining agreements, maintenance of existing contracts for patient services, and obtaining promises for substantial capital expenditures. In early 2015, the California Attorney General consented to the sale to Prime, subject to conditions on that sale that were so onerous that Prime terminated the transaction.

88. In 2015, DCHS again marketed their health system for sale, and, again, focused on offers that maintained the health system as a whole, and assumed all the obligations. In July 2015, the DCHS Board of Directors selected BlueMountain Capital Management LLC ("<u>BlueMountain</u>"), a private investment firm, to recapitalize its operations and transition leadership of the health system to the new Verity Health System (the "<u>BlueMountain Transaction</u>").

89. In connection with the BlueMountain Transaction, BlueMountain agreed to make a capital infusion of $100 million to the hospital system, arrange loans for another $160 million to the health system, and manage operations of the health system, with an option to buy the health system at a future time. In addition, the parties entered into a System Restructuring and Support Agreement (the "<u>Restructuring Agreement</u>"), DCHS's name was changed to Verity Health System, and Integrity was formed to carry out the management services under a new management agreement.

90. DCHS requested the California Attorney General's consent to enter into the Restructuring Agreement and the BlueMountain Transaction. According to report prepared by MDS Consulting, an expert consulting firm retained to prepare healthcare impact reports for the AG, DCHS outlined the following reasons why the BlueMountain Transaction was either necessary or desirable:

- 23 -

- The current structure and sponsorship of DHCS was no longer plausible as a result of cash flow projections and dire financial conditions.

- In July and August of 2014, DCHS obtained a short-term financing bridge loan in the amount of $125 million to mitigate the immediate cash needs for an estimated period of time long enough to allow for the transaction to close. Repayment of the funds was due on December 15, 2015, at which time if the full amount was not repaid, DCHS would be at risk of defaulting on both their 2014 and 2005 Revenue Bonds.

- Without bankruptcy protection or additional financial support, DHCS could not continue hospital operations if there is a default.

91.     On December 3, 2015, the California Attorney General approved the BlueMoutain Transaction, subject to conditions.  The Attorney General conditions were imposed for periods ranging from 5 to 15 years. Generally, the terms of conditions (collectively, the "Conditions") included: (1) limits on transfers of control; (2) maintenance of specific health services and specific bed counts; (3) required participation in Medicare and Medi-Cal programs; (4) required levels of community benefit programs; (5) required levels of charity care; (6) maintenance of certain county payor contracts; (7) requirements for local governing boards; (8) requirements for medical staff compliance; and (9) an annual attestation of compliance with the AG conditions.

92.     Under the Restructuring Agreement, VHS, O'Connor Hospital, Saint Louise Regional Hospital, St. Francis Medical Center, St. Vincent Medical Center, Seton Medical Center and Seton Medical Center Coastside, all of whom are members of the Obligated Group (as defined below), were converted from religious corporations to public benefit corporations.

93.     Despite BlueMountain's infusion of cash and retention of various consultants and experts to assist in improving cash flow and operations, the health system did not prosper.

94.     In July 2017, NantWorks, LLC acquired a controlling stake in Integrity. NantWorks brought in a new CEO, CFO, and COO.  NantWorks loaned another $148 million to the Debtors.

95.     Despite the infusion of capital and new management, it became apparent that the problems facing the Verity Health System were too large to solve without a formal court supervised restructuring. Thus, despite VHS' great efforts to revitalize its Hospitals and improvements in performance and cash flow, the legacy burden of more than a billion dollars of bond debt and unfunded pension liabilities, an inability to renegotiate collective bargaining

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 24 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

agreements or payor contracts, the continuing need for significant capital expenditures for seismic obligations and aging infrastructure, and the general headwinds facing the hospital industry, make success impossible.  Losses continue to amount to approximately $175 million annually on a cash flow basis.

96.    Based on the foregoing, and while VHS has made improvements to the existing system, the Debtors have commenced these chapter 11 cases to protect the original legacy of the Daughters of Charity to the maximum extent possible by retiring debt incurred over the past 18 years and freeing the hospital facilities and work force to continue to operate as hospitals under new ownership and leadership without the accumulated crisis of the past. To do that requires the bankruptcy court supervised sale of some or all of the hospitals and related facilities, and the comprehensive resolution of the Debtors financial obligations through a court approved plan of reorganization.

97.    The goals of the Debtors' restructuring are to maintain the Debtors' business operations; preserve the going-concern value of the Debtors' businesses, its stakeholders, and parties in interest; and, most importantly, to protect the health and wellbeing of the patients who are treated at the Hospitals and the jobs of the Debtors' approximately 7,000 employees.

**B.    Current Fiscal Crisis.**

98.    As described above, the fiscal crisis is the confluence of various factors and historical challenges. Below are a few of the most significant and expected funding requirements in the immediate future.

*a.  Payor Rates.*

99.    Verity is paid below market rates through its payor contracts with health plans. Verity's contracts are 20-43% below market.  These below market rates would make it difficult for any hospital to break even.  Summarized below is illustrative data, highlighting Verity's rates as a percentage of Medicare relative to the market rates.

///

///

<u>Managed Care Rates Expressed as a Percent of Medicare Rates (Combined Inpatient and Outpatient)</u>

| | BlueCross | | | BlueShield | | | United | | |
|---|---|---|---|---|---|---|---|---|---|
| | Verity | Market | % Difference | Verity | Market | % Difference | Verity | Market | % Difference |
| SFMC | 193% | 223% | -15% | 193% | 226% | -17% | 198% | 237% | -20% |
| SVMC | 139% | 206% | -48% | 156% | 202% | -29% | 139% | 195% | -40% |
| OCH | 164% | 237% | -44% | 229% | 244% | -6% | 151% | 242% | -60% |
| SMC | 207% | 252% | -22% | 235% | 254% | -8% | 228% | 262% | -15% |
| SLRH | 202% | 280% | -38% | 204% | 280% | -37% | 159% | 289% | -82% |
| **Average** | | | **-34%** | | | **-20%** | | | **-43%** |

**b. *Labor Rates.***

100.    Payroll costs in the last twelve months have increased nearly $65,000,000 partially related to Verity's union contracts (~5% increases year over year forward).

**c. *Pension Obligations.***

101.    Under the Pension Plans (as defined above), there are expected pension funding requirements in the next year of over $66 million. Only ~$20M relates to current year costs. In other words, most is funding the underfunded status of the plans.

**d. *IT Investment.***

102.    VHS' system requires IT investment in the amount of nearly $50 million over the next year alone. There is outdated electronic health records and enterprise resource planning (i.e., human resources, supply chain management, inventory management, etc.). Further, VHS needs significant upgrades to its IT assets in order to modernize its Hospitals and remain able to continue providing quality patient care services.  For example, VHS needs to (i) immediately replace its outdated local area and wireless networking equipment with modern equipment to enable reliable access by all VHS system users (estimated cost $15 million over a one-year implementation period), (ii) replace VHS' obsolete clinical systems — including its medical record systems and financial systems — in order to provide up-to-date patient records, improved clinical planning, care management, and better charge control (estimated cost $220 million over a period of two years), and (iii) replace and upgrade such other information technology hardware and software, including for imaging clinics, that are necessary for operating a full range of healthcare services.

108503415\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*e.   Seismic and Energy Requirements.*

103.     The Verity system requires seismic and energy expenditures of over $150 million over the next few years. By way of example, there are significant improvements (including demolishment of certain buildings) required by 2020 to St. Vincent Medical Center, Seton Medical Center, and O'Connor Medical Center. There are additional improvement required by 2030 to St. Vincent, Seton Medical Center, O'Connor Medical Center, and St. Louise Regional Hospital.   These seismic improvement deadlines are part of the conditions imposed by the Attorney General in the BlueMountain Transaction, as well as mandated by the California Office of Statewide Health Planning and Development (OSHPD).

*f.   Medical Equipment.*

104.     The Verity system requires over $100 million in medical equipment expenditures over a period of several years.

**C.     Working Capital Shortages.**

105.     The Debtors, like other hospitals serving similar communities, rely on HQAF, DSH and other government support to help bridge the gap between what they get reimbursed by Medicare and Medi-Cal and their cost of providing care. The Hospital Quality Assurance Fee (HQAF), established in 2010, provides funding for supplemental payments to California hospitals that serve Medi-Cal and uninsured patients. The program has been very successful, providing billions of dollars in supplemental payments to California hospitals.  The Medicare and Medi-cal programs also provide funding to hospitals that treat indigent patients through the Disproportionate Share Hospital (DSH) programs, under which facilities are able to receive at least partial compensation. Under the Patient Protection and Affordable Care Act of 2010 (ACA, P.L. 111-148, as amended), Congress would have reduced federal DSH allotments beginning in 2014, to account for the decrease in uncompensated care anticipated under health insurance coverage expansion. However, several pieces of legislation have been enacted since 2010 have since delayed the ACA's Medicaid DSH reduction schedule. Unfortunately, both HQAF and DSH have proven difficult to rely on, as payments are reduced and delayed.

106.     Relying on the HQAF payments has led to working capital shortages due to delays

108503415\V-3

in approval and receiving less than expected amounts. For example:

- *14-Month Delay*: QAF 5 FFS (service period 1/1/17 –6/30/19) was not approved until Dec. 2017 and the Debtors did not start receiving payments until the end of Feb. 2018 (14-month delay);

- *Potential 24 Month Delay*: QAF 5 HMO is likely not going to be approved until the end of 2018 (potentially a 24-month delay on receiving funds);

- *Receiving less than Expected*: through the first 4 cycles of QAF 5 FFS, the Debtors have received anywhere from 69.2-93.9% of expected payments.

**D.      Attorney General Requirements.**

107.    As set forth above, as part of approving the Restructuring Agreement, the AG placed certain operational restrictions on VHS and each of the Hospitals, which include certain minimum annual requirements for charity care, community benefits, and capital expenditures among other mandates. Taken separately, most of these conditions would not have contributed to the Debtors' failure to thrive. However, the cumulative effect of the conditions was to lock the Debtors into a failing business model, dictating both minute details of business operations, as well as denying the Debtors the ability to repurpose facilities.  For example, SMC could better serve the community by operating as a much-needed long-term post-acute care facility, rather than as one of the many acute care hospitals in a saturated service area.

108.    The AG's conditions also compelled the expenditure of millions of dollars to provide charity care  even though the number of uninsured people in California has steadily decreased since passage of the Affordable Care Act.  Also, as a result of a shortfall in the fiscal year 2017 charity care requirement for certain hospitals, VHS was required to make an additional contribution to the Retirement Plans of $7,619,000 in October 2017.

109.    The AG's conditions denied the Debtor the benefits of the marketplace.  For example, the conditions required Verity to enter into contracts with certain entities.  Because those entities were well aware of the AG's requirement that Verity contract with them or be in default, Verity had no bargaining power with those entities or payors.

**E.      Increased Cap Volumes.**

110.    The Debtors have capitation contracts with health plans. Capitation is a flat periodic payment per enrollee paid to a healthcare provider; it is the sole reimbursement for

- 28 -

108503415\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

providing services to a defined population. Under capitation, fixed payments are made to providers regardless of the volume of services rendered, so providers like the Debtors bear the risk that the costs of providing service, including opportunity costs (profits), might exceed the capitation payment. Capitation completely reverses the actions that providers must take to ensure financial success; under capitation, the keys to profitability are to work more efficiently and decrease volume. The Debtors have seen a significant increase in volume from capitated populations and therefore are bearing the loss from that increased volume.

## IV.    Corporate And Capital Structure

### A.    Corporate Structure.

111.    As set forth above, VHS is a California nonprofit public benefit corporation and the sole member of O'Connor Hospital, St. Francis Medical Center, St. Vincent Medical Center, Seton Medical Center, Verity Business Services, Verity Medical Foundation, Verity Holdings, LLC, and DePaul Ventures, LLC.

112.    As set forth above, each Debtor Hospital is the sole member of the Debtor nonprofit public benefit corporation that handles its fundraising and grant-making programs: St. Francis Medical Center Foundation, St. Vincent Foundation, Seton Medical Center Foundation, Saint Louise Regional Hospital Foundation, and O'Connor Hospital Foundation (collectively, the "Philanthropic Foundations").

113.    St. Vincent Medical Center is the sole Member of St. Vincent Dialysis Center, Inc.

114.    VHS is the sole member of DePaul Ventures, LLC. DePaul Ventures, LLC, is the sole Member of DePaul Ventures-San Jose ASC, LLC, and of DePaul Ventures-San Jose Dialysis, LLC.

///

///

///

///

///

///

108503415\V-3

115. The following graphic depicts Verity's prepetition organizational structure:



116. Each Debtor entity has its own management and governance structure. Under the leadership of the Daughters of Charity, each Hospital operated independently except that all employees were under the same pension plans. After the transition of operations and leadership to VHS, there has been a systemizing of operations, so that functions that were being performed at each of the Debtors are being transitioned and performed by VHS and being standardized, such as pharmacy operations, credentialing, IT, case management, etc.

117. As set forth above, VMF offers medical, surgical and related healthcare services for people of all ages at community-based, multi-specialty clinics conveniently located in areas served by Verity hospitals. The following graphic depicts VMF's structure that is comprised of, among other things, professional service agreements with seven medical groups that provide physicians to VMF's clinics:

///

//

//

//

//

//

108503415\V-3



118.    As stated above, I am the CEO. The remainder of the senior management follows:

| Name | Position |
| --- | --- |
| Chief Financial Officer | Anita Chou |
| Chief Operating Officer | Anthony Armada |
| Chief Medical Officer | Tirso del Junco, Jr. M.D. |

119.    VHS is governed by a 7-member Board (the "VHS Board of Directors"), the membership of which follows:

| Name | Position |
| --- | --- |
| Dr. Ernest Agatstein | Director |
| James Barber | Director |
| Terry Belmont | Secretary |
| Jack Krouskup | Chairman |
| Charles B. Patton | Director |
| Christobel Selecky | Director |
| Andrew Pines | Vice Chair |

///

///

///

///

///

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 31 -

120.    Verity Holdings, LLC, De Paul Ventures, LLC, and De Paul - San Jose Dialysis, LLC, are all limited liability companies that do not have Boards of Directors.  The sole Member of Verity Holdings, LLC, and De Paul Ventures, LLC, is VHS.  The sole member of De Paul Ventures - San Jose Dialysis, LLC, is De Paul Ventures, LLC.  I am the President and Eleanor Ramirez and Art Huber were appointed Vice Presidents of Verity Holdings, LLC, on November 17, 2017.  I am the managing member for De Paul Ventures, LLC.  Dr. Tirso del Junco, Jr., is the managing member for De Paul Ventures - San Jose Dialysis, LLC.

**B.**    **Capital Structure.**

121.    As more fully set forth in the declaration of Anita Chou in support of the Debtors' *Emergency Motion Of Debtors For Interim And Final Orders (A) Authorizing The Debtors To Obtain Post Petition Financing (B) Authorizing The Debtors To Use Cash Collateral And (C) Granting Adequate Protection To Prepetition Secured Creditors Pursuant To 11 U.S.C. §§ 105, 363, 364, 1107 And 1108*, VHS, Verity Business Services ("VBS"), the Hospitals, and one operating division are jointly obligated parties on approximately $461.4 million of outstanding secured debt consisting of: (a) $259.4 million outstanding tax exempt revenue bonds, Series 2005 A, G and H issued by the California Statewide Communities Development Authority (the "2005 Bonds"), which loaned the bond proceeds to VHS to provide funds for capital improvements and to refinance certain tax exempt bonds previously issued in 2001 by the DCHS, a religious not-for-profit enterprise and VHS's reorganization predecessor; and (b) $202 million outstanding tax exempt revenue notes, Series 2015  A, B, C, and D and Series 2017 issued by the California Public Finance Authority, which loaned the proceeds to VHS to provide working capital (the "Working Capital Notes").  Wells Fargo Bank, N.A. ("Wells Fargo") is the Bond Trustee and UMB Bank National Association ("UMB Bank") is the successor Master Trustee  and for the prepetition secured 2005 Bonds. U.S. Bank, National Association ("U.S. Bank") is the Note Trustee and also the Collateral Agent for the Working Capital Notes.

122.    Except for the taxable Series 2015C Working Capital Notes, the 2005 Bonds and the Working Capital notes are all tax exempt, meaning interest on the bonds is not taxable to the holders so long as the issuer maintains its qualified tax exempt status and the proceeds of the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

bonds were used for the tax exempt purposes for which they were originally intended.  The Series 2005 A Bonds are comprised four term bonds maturing on July 1, 2024, 2030 and 2035 bearing interest at 5.75% (Series 2005A-2024), (Series 2005A-2030), (Series 2005A-2035) and one maturing July 1, 2039 bearing interest at 5.50% (Series 2005A-2039).  The Series 2005G term bond matures on July 1, 2022 and bears interest at 5.50%.  The Series 2005H- term bond matures on July 1, 2025 and bears interest at 5.75%.   The Working Capital Notes mature on June 10, 2019 (Series 2015A, Series 2015B, Series 2015C and Series 2015D) and on December 10, 2020 (Series 2017A, 2017B).  Series 2015A and B and Series 2017 and 2017B  bear interest at 7.25%, while the Series 2015D carries an 8.75% interest rate and Series 2015C accrues interest at 9.5%.

123.    As set forth above, Holdings, a direct subsidiary of its sole member Verity, was created in 2016 to hold and finance Verity's interests in six medical office buildings whose tenants are primarily physician and other practicing medical groups and certain of the Verity Hospitals.  Holdings is the borrower on approximately of $66 million on two series of non-recourse financing secured by separate deeds of trust, revenue and accounts pledges, including lease rents on each medical buildings (collectively "MOB Financing").  The MOB Financings bear interest at a variable interest rate based on equal to One Month LIBOR plus a spread of 5.0% with a floor of 6.23%.  The secured lenders for the MOB Financings are affiliates of NantWorks, LLC, which is an affiliate of Integrity.

124.    During May 2017, the California Statewide Communities Development Authority issued $20 million of limited obligation tax exempt bonds, pursuant to the CaliforniaFIRST Clean Fund Program in five series all with the same maturity date of September 2, 2047 (the "Clean Fund Bonds") as the conduit issuer for the benefit and obligation of Verity.  The purpose of the bond funding was to assist with clean energy construction efforts of the Seaton Medical Center and are secured by Seton Medical Center's voluntary agreement to special tax assessments by Daley City.  No other Debtor is liable for repayment of the Clean Fund Bonds.  Wilmington Trust National Association ("WTNA") is the Trustee holding the construction funds, and a pre funded capitalized interest fund and is the collateral agent for collection of the special tax assessments for use in paying interest and principal on the Clean Fund Bonds. Interest on the Clean Fund Bonds

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

accrues at 6.4%. The special assessment runs for a period which is the shorter of 30 years or the early full defeasement of the Clean Fund Bonds.

125.    Also in September 2017, the California Statewide Communities Development Authority issued a single series $20 million of limited obligation tax exempt bonds   pursuant to the CaliforniaFIRST Program for the purpose of assisting with clean energy and seismic improvement construction at Seton Medical Center ("NR2 Petros Bonds"). The NR2 Petros Bonds also mature on September 2, 2047, but carry an interest rate of 6.45%. The NR2 Petros Bonds are also California tax exempt and are secured by a special Daly City tax assessment on Seton Medical Center property.  No other Debtor is liable for repayment of the NR2 Petros Bonds.  The special assessment runs for a period which is the shorter of 30 years or the early full defeasement of the NR2 Petros Bonds.  WTNA is the Trustee holding the seismic improvement funds, as well as a pre-funded interest payment fund.

126.    NantCapital also provided $40 million of unsecured debt financing for Verity as reflected in two $20 million unsecured notes (the "Unsecured Notes"). The Unsecured Notes are balloon notes with interest and principal payable at maturity in 2020 and carry annual compounded interest rates of 7.25%.

**C.    Unsecured Debt.**

127.    The Debtors have approximately $500 million in total unsecured debt, including disputed, unliquidated or contingent claims, which are comprised of claims made by vendors of goods and services, cost report payables, pension obligations, management fees, and incurred but not reported third party claims.

**V.    Sale Efforts**

128.    Prior to the Petition Date, the Debtors engaged in substantial efforts to market and sell their assets. In June 2018, the Debtor engaged Cain Brothers, a division of KeyBanc Capital Markets ("Cain"), to identify potential buyers of some or all of the Verity hospitals and related assets and commenced discussions with those potential buyer.

129.    Cain prepared a Confidential Investment Memorandum (the "CIM") and organized an online data site to share information with potentially buyers and contacted over 110 strategic

- 34 -

1   and financial buyers beginning in July 2018 to solicit their interest in exploring a transaction

2   regarding the Debtors and has advanced significantly towards achieving sales.

3        130.    In August 2018, as a result of its ongoing and broad marketing process, Cain has

4   received 11 Indications of Interest ("IOI") to date, and expects to receive additional proposals on

5   or near the end of August.  Shortly after the Petition Date, the Debtors, in consultation with Cain

6   and its other advisors, anticipate selecting an offer from one or more stalking horse bidder(s) to

7   acquire some or substantially all of the Debtors' assets through a sale under § 363 of the

8   Bankruptcy Code.

9                           **V.**    **First-Day Pleadings**

10       131.    The Debtors request that the relief described below in the First-Day Motions be

11   granted, as each request constitutes a critical element in achieving the successful restructuring of

12   the Debtors for the benefit of its patients, creditors and the communities they serve.

13   **A.**     **Administrative Motions.**

14       132.    In the *Motion of Debtors for Entry of an Order Directing the Joint Administration*

15   *of their Related Chapter 11 Cases* (the "Joint Administration Motion"),  the Debtors request entry

16   of an order directing joint administration of these chapter 11 cases for procedural purposes

17   pursuant to Bankruptcy Rule 1015(b) and that the Court maintain one file and one docket for all

18   of the chapter 11 cases under the lead case, Verity Health System of California, Inc.

19       133.    Joint administration of the chapter 11 cases will provide significant administrative

20   efficiencies without harming the substantive rights of any party in interest. Many of the motions,

21   hearings and orders that will be filed in the chapter 11 cases almost certainly will affect each of

22   the Debtors. The entry of an order directing joint administration of the chapter 11 cases will

23   reduce fees and costs by avoiding duplicative filings, objections, notices, and hearings, and will

24   allow all parties in interest to monitor the chapter 11 cases with greater ease and efficiency. The

25   relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates,

26   their creditors, and all other parties in interest and will enable the Debtors to continue to operate

27   their businesses in chapter 11 with the least disruption.

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108503415\V-3

134.    In the *Ex Parte Motion For Entry Of Order Extending Time To File Schedules Of Assets And Liabilities, Schedules Of Executory Contracts And Unexpired Leases, And Statements Of Financial Affairs* (the "Schedules and SOFA Motion"), as set forth in the declaration of Anita M. Chou, the Debtors request entry of an order granting additional time to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs. As a consequence of the size and complexity of the Debtors' business operations, the number of creditors likely to be involved in these chapter 11 cases, the numerous critical operational matters that the Debtors' management and employees must address, a 30-day extension (without prejudice to further extensions) is necessary and appropriate.

135.    In the *Debtors' Emergency Motion (A) Approving the Debtors  Filing a Consolidated List of Fifty Largest General Unsecured Creditors For All Cases; (B) Approving The Debtors Filing A Consolidated Master Mailing Matrix For All Cases; and (C) Permitting the Debtors' Claims And Noticing Agent To Maintain The Master Mailing Matrix,* the Debtors seek entry of an order approving each Debtor having filed in its respective case:  a consolidated list of the fifty largest general unsecured creditors for all eighteen Debtors and a consolidated Master Mailing Matrix for all 17 Debtors; and permitting the Debtor's claims and Noticing Agent (Kurztman Carson Consultants) to maintain and update the Master Mailing Matrix. There are 17 entities that are Debtors in these chapter 11 cases.  As of the Petition Date, the Debtors estimate that they have over $1 billion in liabilities and they have over 20,000-40,000 potential creditors and parties in interest (on a consolidated basis) in these chapter 11 cases.  Many of the Debtors' creditors overlap.  As such, requiring the Debtors to prepare individual Top 20 Lists of Creditors and individual Mailing Matrixes for each Debtor would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error of information already on computer systems maintained by the Debtors or their agents.

**B.    Operational Motions Requesting Immediate Relief.**

136.    The Debtors intend to ask for immediate relief with respect to the following First Day Pleadings and, therefore, will present these motions at the First Day Hearing.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108503415\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

a. **Emergency Motion Of Debtors For Interim And Final Orders (A) Authorizing The Debtors To Obtain Post Petition Financing (B) Authorizing The Debtors To Use Cash Collateral And (C) Granting Adequate Protection To Prepetition Secured Creditors Pursuant To 11 U.S.C. §§ 105, 363, 364, 1107 And 1108 (the "_Cash Collateral/DIP Motion_").**

137.    By way of the Cash Collateral/DIP Motion, and as set forth in the Declaration of Anita M. Chou (the "Chou Declaration"), Chief Financial Officer of VHS ("Chou Decl."), in support of the Cash Collateral/DIP Motion, the Debtors move, on an emergency basis, for entry of an interim order (substantially in the form attached as Exhibit "A" to the Chou Declaration, the "Interim Order") and a final order (the "Final Order" and together with the Interim Order, the "DIP Orders") (i) (a) authorizing the Debtors to enter into a senior secured, superpriority debtor in possession financing facility with Ally Bank, a subsidiary of Ally Financial, Inc., (the "DIP Lender"), in an (a) interim amount not to exceed $30,000,000 and only as needed to avoid immediate and irreparable harm, and (b) after a final hearing, amount up to $185,000,000 (as amended, modified or otherwise in effect from time to time, the "DIP Facility"), substantially on the terms set forth in the Chou Declaration and the Debtors In Possession Facility Agreement, attached as Exhibit "1" to the proposed Interim Order (as amended, supplemented, or otherwise modified and in effect from time to time, the "DIP Facility Agreement," and together with all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to or in favor of the DIP Lender, (the "DIP Financing Agreements"), and (b) granting the DIP Liens and the DIP Superpriority Claims (in each case, as defined below); (ii) authorizing the interim use of Cash Collateral (as defined below) on the terms set forth in the Interim Order; (iii) granting "adequate protection" to UMB Bank, N.A., as successor Master Trustee for the Prepetition Secured Revenue Bonds, Series 2005 A, G and H ("2005 Bonds") , U.S. Bank National Association ("U.S. Bank"), as the Collateral Agent and Note Trustee for the Series 2015 A, B, C, and D and the Series 2017 A and B Revenue Notes (collectively, the "Working Capital Notes") and MOB Financing LLC and MOB Financing II LLC as holders of security interests in Verity Holdings prepetition accounts, including rents arising from the prepetition MOB Financing (described below) in the form of Adequate Protection Payments and Replacement Liens, each as defined in the Chou Decl.; (iv) modifying the automatic stay as imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Facility and the DIP Orders; and (v) scheduling an interim hearing to approve the proposed Interim Order and a final hearing with respect to the relief requested herein (the "<u>Final Hearing</u>").

138.   Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Financing Agreements to which it is a party and to perform its obligations thereunder.

139.   Absent granting emergency access to the Debtors' cash collateral, the Debtors will not be able to made payroll or  meet other obligations critical to the maintenance of safe facilities and the delivery of effective acute care services for its patients and staff during the week ending September 7, 2018.  Absent emergency access to postpetition financing, the Debtors will lose vendor support for critical postpetition deliveries of goods and services further burdening the Debtors use of cash. Absent entry of an interim order granting the requested relief, the very existence of the Hospitals will be threatened and the ability of the Hospitals to survive as long term going concerns, whether or not owned by the Debtors, will be irreparably harmed.

*b.   Emergency Motion Of Debtors For Entry Of Order: (I) Authorizing The Debtors To (A) Pay Prepetition Employee Wages And Salaries, And (B) Pay And Honor Employee Benefits And Other Workforce Obligations; And (II) Authorizing And Directing The Applicable Bank To Pay All Checks And Electronic Payment Requests Made By The Debtors Relating To The Foregoing; Memorandum Of Points And Authorities In Support Thereof (the "<u>Wage Motion</u>").*

140.   By the Wage Motion, the Debtors move the Court for entry of an order (i) authorizing the Debtors, in their discretion, to (a) pay prepetition employee wages and salaries, and (b) pay and honor employee benefits and other workforce obligations (including remitting withholding obligations, maintaining workers' compensation and benefits programs, paying related administration obligations, making contributions to retirement plans, and paying reimbursable employee expenses) (collectively, the "<u>Employee Obligations</u>"); and (ii) authorizing and directing the applicable bank to pay all checks and electronic payment requests made by the Debtors relating to the foregoing.

141.   <u>Wages</u>.   The Employees are paid their wages and salaries (the "<u>Wages</u>") bi-weekly, in arrears, either five or six days after the end of every 14-day pay period, through direct deposit or by check.  The Debtors' average bi-weekly gross payroll is approximately

- 38 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

$25,394,994, which includes approximately $463,907 for executive payroll, $3,726,816 for withholding obligations (relating to various taxes, claims and other obligations) and $208,476 for retirement plan contribution matching. Under a bifurcated, constant pay cycle, Employees were last paid on August 24 and 30, 2018. The next routine payroll dates covering all Employees' accrued and unpaid prepetition Wages are scheduled for September 7, 13 and 14, 2018, and expected to include approximately $15,353,375 that is attributable to prepetition Wages (the "Requested Prepetition Payroll"), which the Debtors seek authority to pay by the Wage Motion. The Debtors do not believe payments of Wages to any individual Employee will exceed the $12,850 cap under § 507(a).

142. _Withholding and Union Obligations_. In the ordinary course of their business, the Debtors routinely withhold from the Wages certain amounts that the Debtors are required to transmit to third parties for purposes such as Social Security and Medicare, federal and state or local income taxes, contributions to the Debtors' benefit plans, savings and retirement plan contributions, union claims, garnishment, child support or other similar obligations pursuant to court order or law (collectively, the "Withholding Obligations"). The Debtors owe approximately $3,726,816 for Withholding Obligations in connection with the Requested Prepetition Payroll, which the Debtors seek authority to pay by the Wage Motion. The Debtors are also required to make certain Union-specific contributions, which are currently accrued and unpaid in the amount of $85,089 on account of prepetition Wages, which the Debtors seek authority to pay by the Wage Motion.

143. _Bonuses_. Certain Employees are eligible to receive sign-on, retention and incentive bonuses. Payout opportunity is based on Employee position, title and location (i.e., Hospital or Systems Office). The Debtors do not, by the Wage Motion, seek permission to pay any bonuses to continuing Employees but do seek the authority, in the Debtors' discretion, to pay the Employees for contractually agreed bonuses that accrued within the 180 days prior to the Petition Date when their services with the Debtors are terminated so long as the total of the payments already then made for prepetition Employee Obligations and the bonuses does not exceed the statutory limit for priority claims of $12,850.

- 39 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

144.    Reimbursement Obligations.    The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors.  Such expenses typically include, but are not limited to, business-related travel expenses (including mileage), business meals, relocation allowances, tuition reimbursement, and other items specified in the CBAs.  Based on historical experience, the Debtors anticipate that, as of the Petition Date, the Debtors owe an estimated $30,200 in Reimbursement Obligations to their Employees, which they seek authority to pay by the Wage Motion.  The Debtors further seek to continue to pay Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors' business.

145.    Paid Time Off and Extended Sick Leave.    Full-time and part-time Employees become eligible to receive employment benefits beginning the first of the month following 30 days of employment (when they become "Eligible Employees").  *Per diem* Employees are not Eligible Employees.  The Debtors provide Eligible Employees with Paid Time Off ("PTO") and Extended Sick Leave ("ESL"), which are accrued annually and in increasing rates over successive years.  PTO is time off due to vacation, holiday, personal or incidental sick time.  ESL kicks in (a) immediately where the Eligible Employee is admitted for surgery, (b) after a 3-day waiting period for a workers' compensation  injury, and (c) after a 7-day waiting period if workers' compensation is not implicated.  As of the Petition Date, the Debtors are carrying approximately $36.6 million on their books for 789,942 hours of accrued and unused PTO.  Eligible Employees are permitted to cash out their unused PTO on one or two occasions during the year depending on the relevant Hospital or CBA.  As of the Petition Date, the Debtors are carrying approximately $17.5 million on their books for 372,000 hours of accrued and unused ESL.  Some CBAs permit Eligible Employees to cash out a portion of their unused ESL at retirement.  By the Wage Motion, the Debtors seek authority to honor their existing PTO and ESL policies to the extent it would permit continuing Employees to use their prepetition accrued leave in the ordinary course of business, and going forward.  The Debtors are not, by the Wage Motion, seeking permission to cash out any accrued and unused PTO or ESL of continuing Employees but do seek the authority, in the Debtors' discretion, to pay the Employees for unused PTO and/or ESL, as permitted per

- 40 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  Hospital policy and relevant CBA terms, that accrued within the 180 days prior to the Petition

2  Date so long as the total of the payments for prepetition Employee Obligations does not exceed

3  the statutory limit for priority claims of $12,850.

4  146.  Health Benefits.  The Debtors offer Eligible Employees the opportunity to

5  participate in a number of insurance and benefit programs, including, among other things, medical,

6  dental and vision plans, life insurance, short-term and long-term disability insurance, workers'

7  compensation, retirement plans and other insurance plans and benefits.  As of the Petition Date,

8  the Debtors owed (a) approximately $3,162,816 to Healthnow as third-party administrator on

9  account of accrued and unpaid prepetition claims against the self-insured medical plans; (b)

10  approximately $48,060 to Cigna and Delta Dental for accrued and unpaid prepetition claims

11  against the self-insured dental plans; (c) approximately $60,150 to VSP for accrued and unpaid

12  prepetition claims on account of the self-insured vision plans.  By the Wage Motion, the Debtors

13  seek authority to pay these prepetition claims.  The Debtors believe that they are current on the

14  administration fees and premiums related to the health plans to pay their portion of any premiums

15  or administration fees for the health plans that accrued and remain unpaid as of the Petition Date,

16  and to turn over to Blue Shield of California any amounts sufficient to satisfy the portion of the

17  accrued and unpaid prepetition premiums to be paid by the Employees in connection with the

18  payment of the Wages and Withholding Obligations.  By the Wage Motion, the Debtors also seek

19  authority to continue to pay, in their discretion and in the ordinary course of their business, the

20  administration fees, premiums for and claims under the health plans incurred postpetition.  The

21  Debtors further seek, by the Wage Motion, to continue to perform any obligations under

22  Continuation Health Coverage (COBRA) in respect to former employees.

23  147.  Life, Disability and Workers' Compensation.  The Debtors offer Eligible

24  Employees premium-based group life insurance and accidental death and dismemberment

25  insurance ("AD&D") through UNUM; premium based short term ("STD") and long term

26  disability coverage ("LTD") through Cigna; workers' compensation insurance through Old

27  Republic Insurance; and an employee assistance program through Optum.  The Debtors are also

28  are obligated to Cigna on account of claims under the Federal Medical Leave Act (FMLA) and

- 41 -

California Family Rights Act (CFRA). The Debtors believe that they are current on all the above mentioned insurance policies and claims obligations. To the extent they are not, however, the Debtors seek authority, by the Wage Motion, in their discretion, to pay any accrued and unpaid prepetition premiums and related charges and to continue these benefits postpetition and to deliver the Employees' portion of any accrued and unpaid prepetition premiums to the corresponding administrators.

148. <u>Retirement Plans</u>. As described in further detail above, the Debtors offer eligible Employees the opportunity to participate in various retirement plans, including defined benefit plans and defined contribution plans. By the Wage Motion, the Debtors seek authority to pay their matching contributions that accrued and remain unpaid as of the Petition Date for the retirement plans and to deliver the Employee contributions in connection with the payment of Wages and Withholding Obligations described above. The Debtors also seek authority, by the Wage Motion, to continue to pay, in their discretion and in the ordinary course of their business, matching contributions for the retirement plans incurred postpetition.

149. <u>Miscellaneous Plans</u>. The Debtors also offer their eligible Employees the opportunity to participate in a "Cafeteria Plan" through Alliant Choice Plus, which includes voluntary critical care insurance, pet insurance, auto and home insurance. The healthcare reimbursement account and dependent care reimbursement account are administered through Healthnow, and long-term care is administered through UNUM. All of these programs are 100% funded by the Employees and are paid for through payroll deductions. By the Wage Motion, the Debtors request authority to continue to honor these programs, in their discretion, and to continue distributing to third-parties the payments for these programs in connection with the payment of Wages and Withholding Obligations as described above, including the distributions of payments that are for prepetition amounts due.

150. The Debtors believe that substantially all of its Employees rely exclusively on their compensation to pay their daily living expenses. Also, the Employee Benefit Programs are a critical component of the Employees' total compensation package. It is imperative to the accomplishment of the Debtors' goals in this case that the Debtors minimize any adverse impact

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 42 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

of the chapter 11 filing on the Debtors' workforce, patients, operations, and orderly administration of these Cases.  Any disruption to payment of the payroll in the ordinary course, or to the continued implementation of employee programs in the Debtors' discretion, would adversely affect the Debtors' goals in this case because such events are likely to cause some employees to terminate their employment with the Debtors, will cause employees to be distracted from their duties to care for the patients, and will hurt employee morale at a particularly sensitive time for all employees.  Failure to honor the Employee Obligations could have severe repercussions on the Debtors' ability to preserve its assets and administer its estate, to the detriment of all constituencies.  Accordingly, as set forth in the Wage Motion, the Debtors request authority to continue paying the Employees and administering the Employee Benefit Programs and any obligations related to the foregoing (subject to the Budget and any applicable payment caps) in the ordinary course of business.

      ***c.***     ***Emergency Motion Of Debtors For Authority To: (1) Continue Using Existing Cash Management System, Bank Accounts And Business Forms; (2) Implement Changes To The Cash Management System In The Ordinary Course Of Business; (3) Continue Intercompany Transactions; (4) Provide Administrative Expense Priority For Postpetition Intercompany Claims; And (5) Obtain Related Relief; Memorandum Of Points And Authorities In Support Thereof (the "Cash Management Motion").***

      151.    By the Cash Management Motion, the Debtors move the Court for the entry of an order authorizing them, subject to the terms of the DIP Orders and DIP Financing Agreements to: (1) continue to use their cash management system, including the continued maintenance of their existing bank accounts (three of which include passive investing) and business forms; (2) implement changes to their cash management system in the ordinary course of business, including opening new or closing existing bank accounts; (3) continue to perform under and honor intercompany transactions in the ordinary course of business, in their business judgment and at their sole discretion; (4) provide administrative expense priority for postpetition intercompany claims, all as set forth in more detail below; and (5) obtain related relief.

      152.    The Debtors further request, by the Cash Management Motion, that the Court authorize the financial institutions at which the Debtors maintain various bank accounts to (a) continue to maintain, service and administer the Debtors' bank accounts, and (b) debit the bank

108503415\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

accounts in the ordinary course of business on account of (i) wire transfers or checks drawn on the bank accounts, or (ii) undisputed service charges owed to the banks for maintenance of the Debtors' cash management system, if any.

153.    The Debtors currently have 63 accounts (the "Accounts") with five commercial banks and one investment bank (collectively the "Banks").  The Debtors request authority to continue utilizing the Accounts, subject to the terms of the DIP Orders and DIP Financing Agreements.  Requiring the Debtors to close certain of the Accounts and open new ones will disrupt the Debtors' cash flow – and, ultimately, impact patient care – because (i) the depositors (some of which are governmental agencies) will not respond quickly to the change and will likely continue to send deposits to the original deposit account, and (ii) the Debtors have certain obligations (including for debt, pension and defined contribution) that they pay exclusively by electronic funds transfer and changes to the payment accounts have the potential of slowing down these crucial payments.  Closing the Accounts will also increase the work of the Debtors' accounting personnel, who are already dealing with the many and varied issues related to these Cases.  Closing the Accounts and opening new ones under the circumstances described in the corresponding Memorandum of Points and Authorities would needlessly cost the Debtors time and money at a time when they are trying to conserve both, and would result in no discernible benefit to the Debtors' bankruptcy estates.

154.    The Debtors also request in the Cash Management Motion authority to continue using their business forms without the designation "Debtors in Possession" on them *for a limited time*.  The Debtors' forms are either electronically printed or can be electronically altered.  The Debtors seek the authority of this Court to utilize their electronically generated forms without the "Debtors in Possession" designation until the adjustments to the software can be initiated and existing stock is exhausted.

155.    Subject to the DIP Orders and DIP Financing Agreements, by the Cash Management Motion, the Debtors request that the Court authorize them to continue using their cash management system in connection with the continued use of Accounts and continued use of

108503415\V-3

1    the Debtors' business forms; in furtherance thereof, the Debtors further request that the Court

2    authorize and direct the Banks to continue honoring the Debtors' transactions.

3        ***d.        Emergency Motion Of Debtors For Order (A) Prohibiting Utilities From***

***Altering, Refusing, Or Discontinuing Service And (B) Determining Adequate Assurance Of***

4    ***Payment For Future Utility Services (the "Utilities Motion").***

5        156.    By the Utilities Motion, the Debtors move the Court for the entry of an order

6    authorizing them to (i) prohibiting utilities (collectively, the "Utility Companies" and

7    individually, a "Utility Company") from altering, refusing, or discontinuing service without

8    further order of the Court; and (ii) determining adequate assurance of payment for future utility

9    services. The Debtors receive essential utility services from several Utility Companies.

10   Furthermore, the Debtors seek a determination that:  (i) a deposit made by the Debtors to each

11   Utility Company in an amount equal to the average monthly invoice for prepetition services

12   provided to the Debtors by such Utility Company (the "Deposit"); (ii) the ability of any Utility

13   Company to obtain an initial hearing on the adequacy of the Deposit; and (iii) the ability of any

14   Utility Company to obtain an expedited hearing regarding further adequate assurance if the

15   Debtors fail to cure a post-petition payment default within twenty (20) days after written notice of

16   such default, constitute adequate assurance of payment for future utility services.

17       157.    As life-saving medical service providers, the Debtors are situated in a vulnerable

18   position—without the continual flow of vital services of Utility Companies, the mission of the

19   Debtors' business would unravel, irreparably harming the Debtors and their patients who seek

20   medical care in the hospitals, medical centers, and clinics operated by the Debtors. Thus, I believe

21   that in order to ensure the timely and proper care of the patients and maintain ongoing business

22   operations, it is imperative the Debtors are able to rely on a consistent supply of these services.

23       158.    Specifically, uninterrupted electricity, gas, telephone, and similar services are

24   essential to the Debtors' provision of medical services to the Debtors' patients. Any interruption,

25   however brief, to utility services to the Debtors' business will result in a serious disruption of the

26   Debtors' business operations and dramatically affect patient care. Therefore, I believe that it is

27   critical that the Court prohibit the Utility Companies from altering, refusing or discontinuing

28   service to the Debtors without further order of this Court. The Deposit for each of the Utility

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 45 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Companies, coupled with the streamlined mechanism for requesting further adequate assurance will provide adequate assurance of payment to the Utility Companies as well as safeguard the Debtors' continuing operations.

159.    The Debtors are current on payment to the Utility Companies. Further, the Debtors have sufficient cash to pay their postpetition utility bills as they come due and have specifically budgeted for such payments in the Debtors' operating budget submitted in connection with the Debtors' Cash Collateral Motion.

### e.    Debtors' Emergency Motion For Entry Of An Order Authorizing Debtors To Honor Prepetition Obligations To Critical Vendors (the "Critical Vendors Motion").

160.    By the Critical Vendors Motion, the Debtors move the Court for the entry of an order authorizing, but not directing, the Debtors to continue to pay and/or honor the prepetition claims, up to $20 million (the "Critical Vendor Cap"), with (i) an interim amount of up to $5 Million, and (ii) an additional amount of up to $15 Million, of their most critical vendors, in the Debtors' discretion and in the ordinary course of the Debtors' business, pursuant to a carefully-designed Protocol (defined below) overseen by a core, centralized team consisting of senior members of Debtors' management and professional advisors, and subject to the terms and conditions. The Debtors will suffer irreparable harm without the relief requested in Critical Vendors Motion.

161.    As life-saving medical service providers, the Debtors are situated in a vulnerable position in that their entire mission would immediately unravel, irreparably harming the Debtors and their patients without the continual flow of vital medical services, medical supplies, medical equipment, physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, admission department staff, as well as non-medical services, information technology support, and/or benefits.

162.    Additionally, local, state, and federal law places certain compliance requirements on the Debtors.  For example, as the operator of hospitals licensed under California state law and certified to participate in the Medicare and Medicaid programs, the Debtors must comply with all

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    hospital licensing and certification requirements, including those found in the Health and Safety

2    Code and in Title 22 of the California Code of Regulations, as well as the applicable Medicare

3    conditions of participation and corresponding Medicaid requirements. In addition to complying

4    with these overarching requirements, the Debtors must monitor and comply with all of the other

5    licensing and operational requirements that apply to the different service lines and programs

6    offered by the hospitals, including, for example, those applicable to the hospital pharmacies and

7    laboratories. These extensive, comprehensive requirements can only be fulfilled through

8    continued, uninterrupted access to various goods and services. Thus, in order to ensure the timely

9    and proper care of the patients and maintain ongoing business operations, it is imperative the

10   Debtors are able to rely on a consistent, quality supply of various physicians, nurses, nurse

11   practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical

12   technicians, sterile processing technicians and interim clinical/management staff, coders,

13   admission department staff, as well as certain medical supplies, medical equipment, and services

14   provided by vendors, suppliers and/or service-providers that are "critical" to the Debtors'

15   businesses (the "Critical Vendors").

16        163.    The Debtors' Critical Vendors include the following categories of providers:

17   (i) uncompensated care contract physicians and on-call coverage physicians (collectively, the

18   "Uncompensated Care and On-Call Coverage Physicians"); (ii) medical directors (the "Medical

19   Directors"); (iii) medical staff officers and leadership positions ("Medical Leadership");

20   (iv) physicians providing teaching services ("Physician Educators"); (v) medical services

21   providers (the "Medical Services Providers"); (vi) medical supplies and medical equipment

22   providers (collectively, the "Medical Supplies and Equipment Providers"); (vii) medical staffing

23   agencies and hospital-based services providers (collectively, the "Clinical Staffing"); (viii) non-

24   medical services providers (the "Non-Medical Services Providers"); (ix) information technology

25   services providers (the "IT Services Providers"); and (x) various employee benefits providers (the

26   "Benefits Providers").

27

28

164.    The Debtors require the use of various physicians, the Uncompensated Care and On-Call Coverage Physicians, who provide care to patients who lack the ability to compensate the Debtors for their medical treatment (individually, "Uncompensated Care Contract Physicians") and the physicians who provide on-call services to cover the Debtors' daily on-call needs (individually, "On-Call Coverage Physicians"), all in order to ensure patient care. The Uncompensated Care Contract Physicians routinely provide the following vital services:  (i) Emergency Room coverage; (ii) surgical procedures for any Patient who is uninsured or underinsured; (iii) psychiatry; and (iv) cardiac services. The On-Call Coverage Physicians make themselves available to the Debtors for certain periods of time to ensure that a specialist is available at all times for emergency situations, including such emergent conditions as cardiac arrest and immediate trauma. The On-Call Coverage Physicians routinely provide the following areas of expertise:  (i) urology; (ii) general surgery; (iii) orthopedics; (iv) cardiology; (v) neurosurgery; (vi) thoracic surgery; (vii) cardiac surgery; (viii) radiation oncology; (ix) neurology, (x) psychiatry; (xi) nephrology; (xii) gastroenterology; (xiii) pediatric surgery; and (xiv) obstetrics.

165.    Due to the strong economy and the tight labor market for professionals with expertise, Uncompensated Care and On-Call Coverage Physicians have a vast array of working opportunities available to them, and to the extent the Debtors are unable to ensure payment for prepetition claims, these Uncompensated Care and On-Call Coverage Physicians will work at other hospitals, resulting in a devastating impact on patient care and irreparable harm to the smooth transition into chapter 11 and preservation and maximization of value for the benefit of the Debtors' creditors.

166.    Further, the Debtors require the use of various physicians who serve as Medical Directors. As Medical Directors, it is their responsibility to ensure the hospital runs smoothly and efficiently and according to local, state, and federal mandates in order to ensure patient care. These Medical Directors supervise and coordinate the On-Call Coverage Physicians, provide vital operating and administrative services, such as (i) the Long Term & Sub-Acute Unit; (ii) Advanced Wound Care; (iii) the Comprehensive Spine Care Program; (iv) the Stroke Program;

- 48 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

(v) Cardiac & Pulmonary Rehabilitation; (vi) Oncology; (vii) Non-Invasive Cardiology; (viii) Radiation Therapy; (ix) the Intensive Care Unit and Neonatal Intensive Care Unit; (x) the Antimicrobial Stewardship Program; (xi) Interventional Neurology; (xii) the Bioethics Program; (xiii) the Catherization Laboratory; (xiv) the Skilled Nursing Facility, the Stroke Program; (xv) Thoracic Surgery; (xvi) the Dialysis Center; and (xvii) Nuclear Medicine and Vascular Laboratory. They also are vital for program quality, oversight, and risk management. There are approximately 60 physicians serving as Medical Directors. Similar to the Uncompensated Care and On-Call Coverage Physicians. I believe they also are vital for program quality, oversite, and risk management. There are approximately 68 physicians serving as Medical Directors.

167.    Similar to the Uncompensated Care and On-Call Coverage Physicians, and due to the strong economy and the low labor market for professionals with expertise, Medical Directors are in demand and have a vast array of working opportunities available to them. To the extent the Debtors are unable to ensure payment for prepetition claims to Medical Directors, these Medical Directors will work at other hospitals, resulting in a devastating impact on patient care and irreparable harm to the smooth transition into chapter 11 and preservation and maximization of value for the benefit of the Debtors' creditors.

168.    Debtors require the use of various physicians who serve as medical staff officers and in other leadership positions, as required by each Hospital's accreditation with The Joint Commission (the "TJC"). Medical Leadership includes the Chiefs of Staff and all Department Chairs required by each of the Debtors' Medical Staff Bylaws, and by Title 22, including physician oversight for cardiology, pulmonary, laboratory, stroke, and ST-elevation myocardial infarction departments. The Chief Medical Officers are essential to ensure quality and risk oversight. Without these physicians, who I believe can easily find competitive opportunities elsewhere, the Debtors' day-to-day programs will cease to function, resulting in a significant impact on patient care and other irreparable harm to the Debtors' Chapter 11 Cases.

169.    The Debtors require the use of various physicians, the Physician Educators, who provide teaching services in the Debtors' graduate medical education (the "GME") program, a legal requirement with which the Debtors must comply. The GME program simultaneously

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  provides: (i) training for interns, residents, and fellows until they become independent and

2  licensed practitioners; and (ii) access to healthcare for elderly and impoverished patients.

3  Physician Educators are in high demand because the State of California mandates that every

4  teaching hospital support the efforts to provide access to high quality healthcare to its most

5  vulnerable population. To maintain Level 2 Trauma status, the Debtors must maintain the GME

6  program. Therefore, the Physician Educators are vital to maintaining the Debtors' teaching

7  hospital status and affording access to healthcare, both of which are key to the Debtors' Patient

8  care, ongoing operations, and/or potential sale of its assets for the benefit of its creditors and the

9  Estates.

10      170.    Debtors require the use of various Medical Services Providers, including, but not

11  limited to, those who provide services such as surgical anesthesia coverage, organ harvesting and

12  organ matching services, medical equipment sanitization, diagnostic interventional cardiology

13  services, interventional neuroradiology, imaging services, advanced wound care, pathology and

14  laboratory services, dialysis services, lithotripsy services, sterile compounding services,

15  rehabilitation staffing and management services, subacute management services, psychiatric

16  management services, hospitalist services, intensivist program services, medical screening

17  services, and medical instrument repair services. These services are vital to the Debtors' day-to-

18  day operations, in particular with regard to Patient care, and the Debtor will suffer immediate

19  irreparable harm should the Court not grant the Debtors' request to include the Medical Services

20  Providers as Critical Vendors.

21      171.    Debtors require the use of various medical supplies and medical equipment from

22  the Medical Supplies and Equipment Providers, including, but not limited to, blood and plasma,

23  heart valves, coronary intervention products, defibrillators, laparoscopic and minimally invasive

24  surgical supplies, neurosurgical supplies and neurology devices, other surgical medical products,

25  bone substitute biologics, regenerative vascular grafts, vaccinations and other pharmaceuticals,

26  nuclear medicines, medical gases, anesthesia medical equipment, laboratory medical supplies,

27  radiation equipment, gastrointestinal supplies, cochlear implants, orthopedic implants, spinal

28  implants, intraocular lenses and ophthalmology supplies, sterilization equipment and products,

and fetal monitoring systems. Equipment includes medical equipment rentals, biomedical repair tools and equipment, patient beds and stretchers, vital sign monitoring, infusion pumps, medication supply stations, gastro-intestinal lab equipment, cardiac catherization lab equipment, operating room equipment, imaging equipment, laboratory equipment, pharmacy dispensing equipment, and transplant program equipment. The medical supplies and medical equipment the Debtors receive from the Medical Supplies and Equipment Providers are vital to the Debtors' day-to-day operations, to maintain Patient care, and the Debtors will suffer immediate irreparable harm should the Court not grant the Debtors' request to include the Medical Supplies and Equipment Providers as Critical Vendors.

172. The Debtors also require the Clinical Staffing, which are various medical groups, staffing agencies, and other hospital-based services providers, to meet critical thresholds of physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, and admission department staff servicing patients in emergency and non-emergency room situations. The provision of physicians, nurses, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, and admission department staff is vital to service the Debtors' six active emergency rooms, trauma center, and the multiple medical specialty units providing tertiary and quaternary care.

173. Additionally, regarding the provision of nurses, the staffing supplementation is essential because: (1) California has a mandatory statutory nurse to patient ratio, and so the Debtors are required by law to meet certain ratios in order to operate on a daily basis; and (2) it is difficult to recruit experienced staff—as opposed to recent graduates—for short-term assignments. Indeed, these staffing agencies provide the requisite "registry" nurses who take short single-day assignments and "traveler" nurses who take longer-term assignments to fill in during busier seasons—*e.g.*, flu season—and understaffed periods—*e.g.*, during nurses strikes of represented nurses—where the Debtors may not otherwise have sufficient numbers of nurses between their core and per diem nurses.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 51 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

174.     Moreover, many of the Clinical Staffing who provide physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, and admission department staff to the Debtors will not staff the Debtors' business if there is any interruption or delay in the payment of the amounts due to them. Given the Debtors' reliance on the medical services provided by the Clinical Staffing to provide Patient care and otherwise fulfill the Debtors' daily medical services needs, and the fact that the Clinical Staffing can simply shift their services to a medical services company, it is crucial that the Debtors be authorized to pay any prepetition amounts due to the Clinical Staffing as Critical Vendors in the ordinary course of business.

175.     The Debtors require use of Non-Medical Services Providers, including, but not limited to, those who provide services such as payroll tax services, financial audit services, billing services, cost reporting services, revenue cycle management services, consulting and education services for various required national, state, and local accreditations and mandates, environmental services, record retention services, building maintenance services, medical equipment maintenance services, management services, and other similar services, as well as to seismic contractors. Seismic contractors are designers, engineers, suppliers and constructors who are engaged in the statutory work of retrofitting hospital structures to meet the SB1953 and subsequent amendments that are required to be completed by December 31, 2019. Delay of the projects will cause the Debtors to miss the regulated deadlines, risking the Debtors' California Department of Public Health license and suspension of such. These non-medical services are vital to the Debtors' day-to-day operations, particular with regard to Patient care, and the Debtor's ability to comply with regulatory requirements set by the State of California legislature, and the Debtor will suffer immediate irreparable harm should the Court not grant the Debtors' request to include the Non-Medical Services Providers as Critical Vendors.

176.     The Debtors require use of various IT Services Providers who provide information technology services, including, but not limited to, those who provide services such as diagnostic technology, interoperability between devices, risk management and software services, revenue

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    cycle management billing software and services, teleradiology services, customer relationship

2    management, networking solutions services, multi-function copiers, voice over internet protocol

3    system services, hosting services for applications, and point of care data management system

4    services. Critical patient care systems such as electronic health record systems and enterprise

5    resource planning systems must be maintained to ensure continuity and Patient care. I believe

6    these information technology services are vital to the Debtors' day-to-day operations, in particular

7    with regard to Patient care, and the Debtor will suffer immediate irreparable harm should the

8    Court not grant the Debtors' request to include the IT Services Providers as Critical Vendors.

9        177.    The Debtors require certain Benefits Providers because the Debtors have

10   incentivized their employees to continue working through the continuation of company-

11   subsidized benefits, such as workers compensation, medical, dental, vision, short term and long

12   term care, leave of absence, and life insurance. If the Debtors are not permitted to pay any

13   prepetition premium amounts due to these Benefits Providers, the employees' insurance coverage

14   will be jeopardized and the employees will likely seek employment elsewhere. Specifically, I

15   believe any disruption to payment of the employee benefits in the ordinary course (and in the

16   Debtors' discretion), would adversely affect the Debtors' goals in this Case because such events

17   are likely to cause some employees to terminate their employment with the Debtors, will cause all

18   employees to be distracted from their duties to care for the patients and the operations of the

19   hospitals, and will inevitably hurt employee morale at a particularly sensitive time for all

20   employees, resulting in severe repercussions on the Debtors' ability to provide Patient care, and

21   to preserve their assets and administer the Estates, to the detriment of all constituencies. Since the

22   Debtors do not have the ability to quickly or cost-effectively replace their employees who provide

23   vital medical and non-medical services on a daily basis, it is critical that the Debtors be allowed

24   to continue these benefits in order to retain their employees and maintain their business

25   operations to preserve the full value of their assets for the benefit of their creditors. Therefore, the

26   Court should include Benefits Providers as Critical Vendors.

27       178.    I, along with the Debtors, am mindful of the Debtors' fiduciary obligations to seek

28   to preserve and maximize the value of their Bankruptcy Estate. To that end, the Debtors and their

108503415\V-3

advisors have engaged in an intense process of reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business relationships—which, if lost, could materially harm the Debtors' patients, the Debtors' businesses, reduce their enterprise value, and/or impair their restructuring process—all in an effort to identify only those most critical vendors using their business judgment (the "Protocol"). Such Protocol is on-going; however, the amounts proposed to be paid to the Critical Vendors are already provided for in the Debtors' operating budget submitted in connection with the Debtors' Cash Collateral Motion.

179.    Indeed, during the Protocol process, the Debtors and I have deemed certain vendors as critical because each of these Critical Vendors meets the following criteria:  (a) the vendor is essential to patient care, supports maintaining the Debtors' business in full compliance with California's Title XII requirements for operating general acute care hospitals in the state of California, and allows the Debtors to maintain their business postpetition until reorganization and/or sale of the Debtors' assets for the benefit of creditors; (b) the vendor is indispensable for providing vital goods or services, replacing said vendor would be prohibitively expensive, or said vendor is otherwise critical to prevent the diversion of management and key personnel to solicit other vendors to provide comparable goods or services and to prevent other unnecessary distraction during the extensive transitional period; (c) the vendor holds an unpaid prepetition claim for the provision of goods or services; (d) the vendor will refuse to deliver goods or provide services without payment of the prepetition claim and the automatic stay imposed by section 362(a) will be inadequate to address the issue; (e) cash on delivery is unlikely to provide the requisite incentive for the vendor to continue providing goods or services; (f) the Debtors lack a long-term contractual relationship with the vendor that would oblige the vendor to continue the prepetition relationship, and the Debtors are otherwise without adequate leverage to compel performance on commercially reasonable terms; and (g) the Debtors will suffer immediate and irreparable harm if the vendor is not specially incentivized to continue providing goods or services. The Debtors will use commercially reasonable efforts to require the vendor to sign a

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 54 -

1  postpetition agreement with normalized terms and conditions that contractually bind the vendor to

2  continue providing goods and services postpetition.

3      I declare under penalty of perjury that, to the best of my knowledge and after reasonable

4  inquiry, the foregoing is true and correct.

5      Executed this 31st of August 2018, at Los Angeles, California.

6

7

8                                                        Richard G. Adcock

9

10

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

108503415\V-3