1  SAMUEL R. MAIZEL (Bar No. 189301)
   samuel.maizel@dentons.com
2  JOHN A. MOE, II (Bar No. 066893)
   john.moe@dentons.com
3  TANIA M. MOYRON (Bar No. 235736)
   tania.moyron@dentons.com
4  DENTONS US LLP
   601 South Figueroa Street, Suite 2500
5  Los Angeles, California 90017-5704
   Tel: (213) 623-9300 / Fax: (213) 623-9924
6
7  Proposed Attorneys for the Chapter 11 Debtors and
   Debtors In Possession

8           UNITED STATES BANKRUPTCY COURT

9     CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

10 In re                                    Lead Case No. 2:18-bk-20151-ER

11 VERITY HEALTH SYSTEM OF                  Jointly Administered With:
   CALIFORNIA, INC., *et al.*,              CASE NO.: 2:18-bk-20162-ER
12                                          CASE NO.: 2:18-bk-20163-ER
                                            CASE NO.: 2:18-bk-20164-ER
13      Debtors and Debtors In Possession.  CASE NO.: 2:18-bk-20165-ER
                                            CASE NO.: 2:18-bk-20167-ER
14 ☒ Affects All Debtors                    CASE NO.: 2:18-bk-20168-ER
                                            CASE NO.: 2:18-bk-20169-ER
15 ☐ Affects Verity Health System of California,  CASE NO.: 2:18-bk-20171-ER
     Inc.                                   CASE NO.: 2:18-bk-20172-ER
16 ☐ Affects O'Connor Hospital              CASE NO.: 2:18-bk-20173-ER
   ☐ Affects Saint Louise Regional Hospital CASE NO.: 2:18-bk-20175-ER
17 ☐ Affects St. Francis Medical Center     CASE NO.: 2:18-bk-20176-ER
   ☐ Affects St. Vincent Medical Center     CASE NO.: 2:18-bk-20178-ER
18 ☐ Affects Seton Medical Center           CASE NO.: 2:18-bk-20179-ER
   ☐ Affects O'Connor Hospital Foundation   CASE NO.: 2:18-bk-20180-ER
19 ☐ Affects Saint Louise Regional Hospital CASE NO.: 2:18-bk-20171-ER
     Foundation
20 ☐ Affects St. Francis Medical Center of Lynwood  Chapter 11 Cases
     Foundation                             Hon. Judge Ernest M. Robles
21 ☐ Affects St. Vincent Foundation
   ☐ Affects St. Vincent Dialysis Center, Inc.  **DEBTORS' EMERGENCY MOTION FOR ENTRY
22 ☐ Affects Seton Medical Center Foundation  OF AN ORDER AUTHORIZING DEBTORS TO
   ☐ Affects Verity Business Services        HONOR PREPETITION OBLIGATIONS TO
23 ☐ Affects Verity Medical Foundation       CRITICAL VENDORS; MEMORANDUM OF
   ☐ Affects Verity Holdings, LLC            POINTS AND AUTHORITIES IN SUPPORT
24 ☐ Affects De Paul Ventures, LLC           THEREOF**
   ☐ Affects De Paul Ventures - San Jose ASC,
25   LLC                                     [Filed Pursuant to LBR 2081-1(a)(_) and 9075-1(a)]

26      Debtors and Debtors In Possession.   [Declaration of Richard Adcock in Support of Debtors'
                                             First-Day Motions filed concurrently herewith]
27                                           EMERGENCY HEARING:
                                             Date:    September 5, 2018
28                                           Time:    10:00 a.m.
                                             Place:   Courtroom 1568

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 1 -

108915075\V-1

1

## TABLE OF CONTENTS

**Page**

EMERGENCY MOTION ........................................................................................................... 1

SUMMARY OF REQUESTED RELIEF ................................................................................ 11

ADDITIONAL INFORMATION .......................................................................................... 12

RESERVATION OF RIGHTS .............................................................................................. 13

PRAYER .............................................................................................................................. 14

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 15

I.      INTRODUCTION ...................................................................................................... 15

II.     JURISDICTION AND VENUE ................................................................................ 16

III.    STATEMENT OF FACTS ......................................................................................... 16

        A.      General Background.......................................................................................... 16

        B.      Historical Challenges ....................................................................................... 18

        C.      Critical Vendor Obligations ............................................................................ 21

IV.     RELIEF REQUESTED .............................................................................................. 30

V.      DISCUSSION ............................................................................................................ 34

VI.     CONCLUSION .......................................................................................................... 48

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

108915075\V-1

# TABLE OF AUTHORITIES

Page

**Cases**

*American Suzuki Motor Corporation*, No. 8:12-bk-22808-SC (Bankr C.D. Cal.
Nov. 7, 2012) .................................................................................................37

*Armstrong World Indus., Inc. v. James A. Phillips, Inc.* (*In re James A.Phillips,
Inc.*), 29 B.R. 391 (S.D.N.Y. 1983) ...............................................................41

*Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'Ship*,
526 U.S. 434 (1999) ................................................................................38, 48

*Burchinal v. Central Washington Bank* (*In re Adams Apple, Inc.*),
829 F.2d 1484 (9th Cir. 1987) ........................................................................41

*California Coastal Communities, Inc.*, No. 8:09-bk-21712-TA (Bankr. C.D. Cal.
Dec. 9, 2009) ..................................................................................................37

*Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-
Manville Corp.*),
60 B.R. 612 (Bankr. S.D.N.Y. 1986) ..............................................................43

*Czyzewski v. Jevic Holding Corp.*,
137 S. Ct. 973, 197 L. Ed. 2d 398 (2017) .......................................................36

*F.D.I.C. v. Faigin*,
No. CV 12–03448-DDP, 2013 WL 3389490 (C.D. Cal. July 8, 2013) ...................43

*In re Appvion, Inc.*,
No. 17-12082 (Bankr. D. Del. Oct. 30, 2017)..................................................48

*In re AWTR Liquidation Inc.*,
548 B.R. 300 (Bankr. C.D. Cal. 2016).............................................................43

*In re Brown & Cole Stores, LLC*,
375 B.R. 873 (B.A.P. 9th Cir. 2007)................................................................45

*In re CEI Roofing, Inc.*,
315 B.R. 50 (Bankr. N.D. Tex. 2004)...............................................................43

*In re Chassix Holdings, Inc.*,
Case No. 15-10578 (MEW) (Bankr. S.D.N.Y. Apr. 14, 2015)..................................45

*In re Chassix Holdings, Inc.*,
No. 15-10578 (Bankr. S.D.N.Y. Mar. 13, 2015) ..............................................39

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

*In re Chrysler LLC*,
No. 09-50002 (Bankr. S.D.N.Y. May 20, 2009) ...................................................46

*In re Downey Regional Medical Center-Hosp., Inc.*,
No. 209-BK-34714-BB (Bankr. C.D .Cal. Oct. 19, 2010)...................................37

*In re Emas Chiyoda Subsea Ltd.*,
No. 17-31146 (Bankr. S.D. Tex. Mar. 28, 2017) ................................................48

*In re Evergreen Oil, Inc.*,
No. 8:13-bk-13163 (Bankr. C.D. Cal. Apr. 10, 2013) ........................................37

*In re Geokinetics Inc.*,
No. 18-33410 (Bankr. S.D. Tex. July 16, 2018) .................................................48

*In re Goodrich Petroleum Corp.*,
No. 16-31975 (Bankr. S.D. Tex. May 12, 2016) .................................................48

*In re The Great Atlantic & Pacific Tea Co., et al.*,
No. 10-24549 (Bankr. S.D.N.Y. Dec. 14, 2010)............................................38, 45

*In re The Great Atlantic & Pacific Tea Co., et al.*,
No. 10-24549-RDD (Bankr. S.D.N.Y. Jan. 13. 2011) ...................................38, 46

*In re The Great Atlantic & Pacific Tea Co., et al.*,
No. 15-23007 (Bankr. S.D.N.Y. July 20, 2015) .................................................47

*In re Green Fleet Systems, LLC*,
No. 2:15-bk-11542-BR (Bankr. C.D. Cal. Mar. 16, 2015) ................................38

*In re GST AutoLeather, Inc.*,
No. 17-12100 (Bankr. D. Del. Nov. 13, 2017)....................................................48

*In re HDOS Enterprises*,
No. 2:14-BK-12028-NB (Bankr. C.D. Cal. Feb. 6, 2014) ..................................37

*In re Hostess Brands, Inc.*,
No. 12-22052 (Jan. 13, 2012)..............................................................................39

*In re Hostess Brands, Inc.*,
No. 12-22052 (Jan. 27, 2012)..............................................................................39

*In re Isis Foods, Inc.*,
37 B.R. 334 (W.D. Mo.), *appeal dismissed*, 738 F.2d 445 (8th Cir. 1984) ...........47

*In re Lear Corp.*
(Bankr. S.D.N.Y. July 31, 2009)........................................................................46

*In re Lear Corp.*,
No. 09-14326 (Bankr. S.D.N.Y. July 8, 2009) ...................................................46

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

*In re M&G USA Corporation*,
No. 17-12307 (Bankr. D. Del. Nov. 30, 2017)..................................................48

*In re Pomona Valley Med. Group, Inc.*,
476 F.3d 665 (9th Cir. 2007)...........................................................42, 43

*In re The Reader's Digest Ass'n, Inc.*,
No. 09-23529 (Bankr. S.D.N.Y. Aug. 25, 2009) .............................................47

*In re The Readers Digest Ass'n, Inc.*,
No. 09-23529 (Bankr. S.D.N.Y. Sept. 17, 2009) ............................................40

*In re Structuralite Plastics Corp.*,
86 B.R. 922 (Bankr. S.D. Ohio 1988) .......................................................41

*In re Tops Holding II Corporation, et al.*,
No. 18-22279-RDD (Bankr. S.D.N.Y. Mar. 22, 2018).....................................38, 41

*In re True Religion Apparel, Inc.*,
No. 17-11460 (Bankr. D. Del. July 31, 2017) ...............................................48

*In re Victor Valley Community Hospital*,
No. 6:10-bk-39537-CB (Bankr. C.D. Cal. Sept. 17, 2010)..................................37

*Mann v. GTCR Golder Rauner, L.L.C.*,
483 F. Supp. 2d 884 (D. Ariz. 2007).......................................................43

*Matter of B & W Enterprises, Inc.*,
713 F.2d 534 (9th Cir. 1983)..............................................................36

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re
Integrated Res., Inc.*),
147 B.R. 650, 656 (S.D.N.Y. 1992) *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) .............42, 43

*Unofficial Comm. of Equity Holders v. McManigle* (*In re Penick Pharm., Inc.*),
227 B.R. 229 (Bankr. S.D.N.Y. 1998) ......................................................44

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**Statutes**

11 United States Code

§ 105 ........................................................................................................16, 36, 37, 43
§ 105(a) ..............................................................................................................38, 43
§ 361 ..........................................................................................................................37
§ 362 ..........................................................................................................................37
§ 362(a) ........................................................................................................24, 35, 44
§ 363 ..............................................................................................................37, 40, 41
§ 363(b) ....................................................................................................................16
§ 363(c)(1) ..............................................................................................................45
§ 364 ..........................................................................................................................37
§ 365 ..........................................................................................................................28
§ 503 ..........................................................................................................................40
§ 503(b)(9) ......................................................................................................16, 45
§ 510 ..........................................................................................................................36
§ 549 ..........................................................................................................................40
§ 549(a) ....................................................................................................................33
§ 549(a)(2)(B) ..................................................................................................16, 46
§ 1107 ........................................................................................................................17
§ 1107(a) ..................................................................................................................43
§ 1108 ........................................................................................................................17
§ 1129(a)(9)(A) ......................................................................................................45

28 United States Code

§ 157(b)(2)(A) ........................................................................................................17
§ 157(b)(2)(O) ........................................................................................................17
§ 1334 ........................................................................................................................17
§ 1408(1) ..................................................................................................................17
§ 1408(2) ..................................................................................................................17

California Business & Professions Code

§§ 1200 *et. seq.* ............................................................................................22, 40
§§ 4000 *et. seq.* ............................................................................................22, 40

California Health & Safety Code

§ 1206(l) ..................................................................................................................18
§§ 1250 *et seq.* ....................................................................................22, 40, 42, 44
§§ 11000 *et. seq.* ..........................................................................................22, 40

**Rules and Regulations**

16 California Code of Regulations §§ 1700 *et. seq.* ..........................................22, 40

22 California Code of Regulations

§ 51207 ......................................................................................................22, 40
§§ 70001, *et seq.* ......................................................................................22, 40, 42, 44

42 Code of Federal Regulations §§ 482 *et. seq.* ..............................................22, 40

108915075\V-1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**Federal Rules of Bankruptcy Procedure**

Rule 2002 ...................................................................................................................37
Rule 4001 ...................................................................................................................37
Rule 6003(b) ..............................................................................................................16
Rule 6004(a) ..............................................................................................................16
Rule 6004(h) ..............................................................................................................16

**Local Bankruptcy Rules**

Rule 2002-1 ...............................................................................................................37
Rule 2081-1(a)(7) .......................................................................................................16
Rule 4001-2 ...............................................................................................................37
Rule 9075-1 ...............................................................................................................16

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1

**EMERGENCY MOTION**

2      Pursuant to Rules 2081-1(a)(7) and 9075-1 of the Local Bankruptcy Rules of the United

3 States Bankruptcy Court for the Central District of California (the "LBR"), Rules 6003(b),

4 6004(a) and (h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

5 sections 105, 363(b), 503(b)(9), and/or 549(a)(2)(B) of title 11 of the United States Code, 11

6 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"),[1] Verity Health System of California, Inc.

7 ("VHS") and the above-referenced affiliated debtors, the debtors and debtors in possession in the

8 above-captioned chapter 11 bankruptcy case (collectively, the "Debtors"), hereby move, on an

9 emergency basis (the "Motion"), for the entry of an interim order authorizing, but not directing,

10 the Debtors to continue to pay and/or honor the prepetition claims (after an interim hearing, in an

11 interim amount of up to $5 Million and only as needed to avoid immediate and irreparable harm),

12 and for the entry of a final order within thirty (30) days after filing the above-captioned chapter

13 11 bankruptcy case (the "Final Order", together with the Interim Order, the "Critical Vendors

14 Order") authorizing, but not directing, the Debtors to continue to pay and/or honor the prepetition

15 claims (after a final hearing, in an amount up to an additional $15 Million, for a total of up to $20

16 Million and only as needed to avoid immediate and irreparable harm), of their most critical

17 vendors in the Debtors' discretion and in the ordinary course of the Debtors' business, pursuant to

18 a carefully-designed Protocol (defined below) overseen by a core, centralized team consisting of

19 senior members of Debtors' management and professional advisors, and subject to certain Terms

20 and Conditions (defined below). In support of the Motion, the Debtors have separately filed the

21 Declaration of Richard Adcock in Support of Debtors' First-Day Motions (the "Adcock

22 Declaration"). The Debtors request that the relief sought herein be granted on an emergency basis

23 because they will suffer immediate and irreparable harm without the relief requested in this

24 Motion.

25      The Debtors operate a nonprofit safety-net health care system that provides medical care

26 for over 300,000 patients per year.  The Debtor operates six general acute care hospitals and

27

28 [1] All references to "§" and "section" herein are to sections of the Bankruptcy Code.

- 1 -

108915075\V-1

numerous outpatient medical clinics, including St. Francis Medical Center in Lynwood (a Level II Trauma Center), St. Vincent Medical Center in Los Angeles, O'Connor Hospital in San Jose, St. Louise Regional Hospital in Gilroy, Seton Medical Center in Daly City, and Seton Coastside in Moss Beach.  Collectively, the hospitals have 1,680 inpatient beds, six active emergency rooms, dialysis services, imaging services, labor and delivery services and neonatal services, among others.  The Debtors employ more than 6,000 healthcare providers and administrative staff statewide and contract with hundreds of physicians and medical groups to ensure critical medical services are available to communities served by the hospitals.

The Debtors and the communities their hospitals serve are in a vulnerable position.  The availability of life-saving care and treatment could immediately stop if the Debtors are unable to ensure the continual flow of the supplies and services that make their medical care possible, including medical supplies, blood supplies, medical equipment, physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, and information technology support.  Debtors and their inpatients and outpatients ("Patients") face irreparable harm without the granting of this Motion.

Additionally, local, state, and federal law requires Debtors ensure contracts with and services from various healthcare providers, as well as adequate drugs, supplies and medical equipment.  For example, because the Debtors' hospitals are licensed by the California Department of Public Health and certified to participate in the Medicare and Medicaid programs, the Debtors must comply with all hospital licensing and certification requirements, including those found in the Health and Safety Code and in Title 22 of the California Code of Regulations, as well as the applicable Medicare conditions of participation and corresponding Medicaid (i.e., Medi-Cal) requirements. *See, e.g.*, Cal. Health & Safety Code §§ 1250 *et seq.*; 22 Cal. Code Regs §§ 70001, *et seq.*; 22 Cal. Code Regs. § 51207; 42 C.F.R. §§ 482 *et. seq.* In addition to complying with these overarching requirements, the Debtors must monitor and comply with all of the other licensing and operational requirements that apply to the different service lines and programs offered by the hospitals, including, for example, those applicable to the hospital pharmacies and

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES , CALIFORNIA  90017-5704
(213) 623-9300

- 2 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

laboratories. *See, e.g.*, Cal. Bus. & Prof. Code §§ 1200 *et. seq.*, Cal. Bus. & Prof. Code §§ 4000 *et. seq.*, Cal. Health & Safety Code §§ 11000 *et. seq.*, 16 Cal. Code Regs. §§ 1700 *et. seq.* These extensive, comprehensive regulations and requirements can only be fulfilled through uninterrupted access to essential goods and services. Thus, in order to ensure essential medical care and treatment is available to the vulnerable communities served by the Debtors' hospitals – such as Debtor's Level II Trauma Center that serves the inner city of Los Angeles – it is imperative the Debtors are able to rely on a consistent, quality supply of essential services and goods, including medical supplies, blood supplies, medical equipment, physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, and information technology support and other medical suppliers and service providers that are "critical" to Patient care and the Debtors' businesses (the "Critical Vendors").

The Debtors' Critical Vendors include the following categories of providers: (i) uncompensated care contract physicians and on-call coverage physicians (collectively, the "Uncompensated Care and On-Call Coverage Physicians"); (ii) medical directors (the "Medical Directors"); (iii) medical staff officers and leadership positions ("Medical Leadership"); (iv) physicians providing teaching services ("Physician Educators"); (v) medical services providers (the "Medical Services Providers"); (vi) medical supplies and medical equipment providers (collectively, the "Medical Supplies and Equipment Providers"); (vii) medical staffing agencies and hospital-based services providers (collectively, the "Clinical Staffing"); (viii) non-medical services providers (the "Non-Medical Services Providers"); (ix) information technology services providers (the "IT Services Providers"); and (x) various employee benefits providers (the "Benefits Providers").

The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their Estates. To that end, the Debtors and their advisors have engaged in an extensive process of reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business

108915075\V-1

relationships—which, if lost, could materially harm the Debtors' Patients, the Debtors' businesses, reduce their enterprise value, and/or impair their restructuring process—all in an effort to identify only those most critical vendors using their business judgment (the "Protocol"). Such Protocol is on-going.

During the Protocol process, the Debtors have deemed certain vendors as critical because each of these Critical Vendors meets the following criteria: (a) the vendor is essential to Patient care, supports maintaining the Debtors' business in full compliance with all of the numerous legal requirements for operating general acute care hospitals in the state of California, including California's Title 22, and allows the Debtors to continue to provide essential and life-saving patient care and services while maintaining their business postpetition until the reorganization and/or sale of the Debtors' assets for the benefit of creditors; (b) the vendor is indispensable for providing vital goods or services (such as blood products or surgical implants), replacing said vendor would be prohibitively expensive, or said vendor is otherwise critical to prevent the diversion of management and key personnel (who would be nearly impossible to replace during the extensive transitional period);[2] (c) the vendor holds an unpaid prepetition claim for the provision of vital goods or services; (d) the Debtors believe the vendor will refuse to deliver vital goods or services without payment of the prepetition claim and the automatic stay imposed by § 362(a) will be inadequate to address the issue; (e) cash on delivery is unlikely to provide the requisite incentive for the vendor to continue providing goods or services; (f) the Debtors lack a long-term contractual relationship with the vendor that would oblige the vendor to continue the prepetition relationship, and the Debtors are otherwise without adequate leverage to compel performance on commercially reasonable terms; and (g) the Debtors will suffer immediate and irreparable harm if the vendor is not specially incentivized to continue providing essential goods or services. The Debtors' will use commercially reasonable efforts to require the vendor to sign a postpetition agreement with normalized terms and conditions that contractually bind the vendor to

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

---

[2] Additionally, the Debtors acknowledge that while some of these Critical Vendors are not the only vendors in the area that provide these vital goods or services, switching to other providers at this critical juncture will incur substantial time, energy, and unnecessary distraction during the extensive transitional period.

108915075\V-1

1    continue providing essential goods and services postpetition (the "Critical Vendor Agreement").

2    A brief description of each category of Critical Vendors follows.

3    **i.    Uncompensated Care and On-Call Coverage Physicians**

4    The Debtors require the service of various physicians who provide care to patients who

5    lack the ability to compensate the Debtors for their medical treatment ("Uncompensated Care

6    Contract Physicians") and the physicians who provide on-call services to cover the Debtors' six

7    active emergency departments, one of which is an essential Level II Trauma Center ("On-Call

8    Coverage Physicians"). The Uncompensated Care Contract Physicians provide life-saving

9    medical care and treatment for Patients who would not otherwise be able to afford physician

10    services, including trauma patients needing emergency surgeries, infants in Debtor's neonatal

11    intensive care unit and cardiac patients needing immediate STEMI services for serious

12    myocardial infarctions.  Through the On-Call Coverage Physicians, Debtors ensure that specialty

13    physician services are available at all times for all Patients (regardless of ability to pay) for

14    emergency situations, such as trauma, cardiac arrest and labor and delivery.   The On-Call

15    Coverage Physicians include a broad range of specialties, such as (i) urology; (ii) general surgery;

16    (iii) orthopedics; (iv) cardiology; (v) neurosurgery; (vi) thoracic surgery; (vii) cardiac surgery;

17    (viii) radiation oncology; (ix) neurology, (x) psychiatry; (xi) nephrology; (xii) gastroenterology;

18    (xiii) pediatric surgery; and (xiv) obstetrics. Due to the strong economy and the tight labor market

19    for professionals with expertise, Uncompensated Care and On-Call Coverage Physicians have a

20    vast array of working opportunities available to them, and to the extent the Debtors are unable to

21    ensure payment for prepetition claims, these Uncompensated Care and On-Call Coverage

22    Physicians will work at other hospitals, resulting in a devastating impact on the communities

23    served by the Debtors' hospitals and irreparable harm to the smooth transition into chapter 11 and

24    preservation and maximization of value for the benefit of the Debtors' creditors.

25    **ii.    Medical Directors**

26    The Debtors require the services of various physicians who serve as Medical Directors. As

27    Medical Directors, it is their responsibility to ensure the hospital provides quality Patient care

28    efficiently and in compliance with state and federal laws, rules and regulations. These Medical

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 5 -

108915075\V-1

1   Directors supervise and coordinate the On-Call Coverage Physicians and provide vital operating

2   and administrative services, such as supervision of medical departments and programs, including

3   (i) the Long Term & Sub-Acute Unit; (ii) Advanced Wound Care; (iii) the Comprehensive Spine

4   Care Program; (iv) the Stroke Program; (v) Cardiac & Pulmonary Rehabilitation; (vi) Oncology;

5   (vii) Non-Invasive Cardiology; (viii) Radiation Therapy; (ix) the Intensive Care Unit and

6   Neonatal Intensive Care Unit; (x) the Antimicrobial Stewardship Program; (xi) Interventional

7   Neurology; (xii) the Bioethics Program; (xiii) the Catherization Laboratory; (xiv) the Skilled

8   Nursing Facility; (xv) the Stroke Program; (xvi) Thoracic Surgery; (xvii) the Dialysis Center; and

9   (xviii) Nuclear Medicine and Vascular Laboratory. The Medical Directors also are vital for

10  program quality, oversight, and risk management. There are approximately 60 physicians serving

11  as Medical Directors. Similar to the Uncompensated Care and On-Call Coverage Physicians, and

12  due to the strong economy and the tight labor market for professionals with expertise, Medical

13  Directors are in demand and have a vast array of working opportunities available to them. To the

14  extent the Debtors are unable to ensure payment for prepetition claims to Medical Directors, these

15  Medical Directors will work at other hospitals, resulting in a devastating impact on the

16  communities served by the Debtors' hospitals and irreparable harm to the smooth transition into

17  chapter 11 and preservation and maximization of value for the benefit of the Debtors' creditors.

18  **iii.    Medical Leadership**

19         The Debtors require the services of various physicians who serve as medical staff officers

20  and in other leadership positions, as required by each Hospital's accreditation with The Joint

21  Commission (the "TJC").  Accreditation by the TJC is essential for each Hospital's certification

22  under the Medicare and Medi-Cal programs.  Each Hospital's Medical Leadership includes a

23  Chief and Vice Chief of Staff and Department Chairs as required by Medical Staff Bylaws, by

24  TJC and by Title 22.

25         These medical staff leaders are essential to ensure quality medical services and risk

26  management.  Without these physicians, who can easily find competitive opportunities elsewhere,

27  the quality of medical services may decline, and cause irreparable harm to the Debtors' chapter

28  11 Case.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

#### iv.    Physician Educators

The Debtors require the services of various physicians who provide teaching services in the Debtors' graduate medical education (the "GME") program.  The GME program trains physicians – so-called, interns, residents, and fellows – and such physicians provide needed staffing for Debtors' hospitals.  Physician Educators are in high demand because they are so highly skilled – these physicians must not only be experts in their fields but must also meet the stringent qualifications under the government's GME requirements.  Without the Physician Educators, Debtor would lose its GME program.  The GME Program is a required program for the Level II Trauma Center that provides trauma services to the inner city of Los Angeles. To the extent the Debtors are unable to ensure payment for prepetition claims to Physician Educators, these in-demand Physician Educators will work at other hospitals, resulting in a devastating impact on the Debtors' patients, and the community served by the Debtor's hospital and irreparable harm to the smooth transition into chapter 11 and preservation and maximization of value for the benefit of the Debtors' creditors.

#### v.    Medical Services Providers

The Debtors require the services of various Medical Services Providers, including providers of surgical anesthesia coverage, organ harvesting and organ matching services, medical equipment sanitization, diagnostic interventional cardiology services, interventional neuroradiology, imaging services, advanced wound care, pathology and laboratory services, dialysis services, lithotripsy services, sterile compounding services, rehabilitation staffing and management services, subacute management services, psychiatric management services, hospitalist services, intensivist program services, medical screening services, and medical instrument repair services. These services are vital to the Debtors' ability to continue offering life-saving care and treatment at their hospitals. The Debtor and the communities served by the Debtors' hospitals will suffer immediate irreparable harm should the Court deny the Debtors' request to include the Medical Services Providers as Critical Vendors subject to payment on prepetition claims.

#### vi.    Medical Supplies and Equipment Providers

1    The Debtors require the use of various medical supplies and medical equipment,

2   including, blood and plasma, heart valves, coronary intervention products, defibrillators,

3   laparoscopic and minimally invasive surgical supplies, neurosurgical supplies and neurology

4   devices, other surgical medical products, bone substitute biologics, regenerative vascular grafts,

5   vaccinations and other pharmaceuticals, nuclear medicines, medical gases, anesthesia medical

6   equipment, laboratory medical supplies, radiation equipment, gastrointestinal supplies, cochlear

7   implants, orthopedic implants, spinal implants, intraocular lenses and ophthalmology supplies,

8   sterilization equipment and products, and fetal monitoring systems. Equipment includes

9   biomedical repair tools and equipment, patient beds and stretchers, vital sign monitoring, infusion

10  pumps, medication supply stations, gastro-intestinal lab equipment, cardiac catherization lab

11  equipment, operating room equipment, imaging equipment, laboratory equipment, pharmacy

12  dispensing equipment, and transplant program equipment. The medical supplies and medical

13  equipment the Debtors receive from the Medical Supplies and Equipment Providers are vital to

14  the Debtors' ability to continue offering life-saving care and treatment at their hospitals. The

15  patients and the communities served by the Debtors' hospitals will suffer immediate irreparable

16  harm should the Court deny the Debtors' request to include the Medical Supplies and Equipment

17  Providers as Critical Vendors.

18  **vii.    Clinical Staffing**

19    The Debtors require various medical staffing agencies to provide numerous personnel

20  essential to operating hospitals, including nurses, nurse practitioners, physicians assistants,

21  professional technicians such as, imaging technicians, surgical technicians, sterile processing

22  technicians and interim clinical/management staff, coders, and admission department staff.   The

23  ability to access staffing agencies is particularly important for nursing services because Debtors

24  must comply with the California mandatory nurse-to-patient ratios; in other words, Debtors are

25  required to increase nurse staffing depending upon daily patient census.   This is not always

26  possible to do solely through nurse-employees.   Nurse staffing agencies are also important

27  because it is difficult to recruit experienced staff for short-term assignments (e.g., single day) or

28  during busier times (e.g., flu season).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 8 -

1    Moreover, many of the Clinical Staffing who provide physicians, nurses, nurse

2    practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical

3    technicians, sterile processing technicians and interim clinical/management staff, coders, and

4    admission department staff to the Debtors will not staff the Debtors' hospitals if there is any

5    interruption or delay in the payment of the amounts due to them. Given the Debtors' reliance on

6    the medical services provided by the Clinical Staffing to provide Patient care and otherwise fulfill

7    the Debtors' daily medical services needs, and the fact that the Clinical Staffing can simply shift

8    their services to another employer, it is crucial that the Debtors be authorized to pay any

9    prepetition amounts due to the Clinical Staffing as Critical Vendors in the ordinary course of

10    business.

11    **viii.    Non-Medical Services Providers**

12    The Debtors require services of various non-medical service providers, including, but not

13    limited to, those who provide services such as payroll tax services, financial audit services, billing

14    services, cost reporting services, revenue cycle management services, consulting and education

15    services for various required national, state, and local accreditations and mandates, environmental

16    services, record retention services, building maintenance services, medical equipment

17    maintenance services, management services, and other similar services, as well as to seismic

18    contractors. Seismic contractors are designers, engineers, suppliers and constructors who are

19    engaged in the statutory work of retrofitting hospital structures to meet the SB1953 and

20    subsequent amendments that are required to be completed by December 31, 2019. Delay of the

21    projects will cause the Debtors to miss the regulated deadlines risking California Department of

22    Public Health license and suspension of such. These non-medical services are vital to the

23    Debtors' day-to-day operations — including patient care — and the Debtors' ability to comply

24    with regulatory requirements set by the State of California legislature, and the Debtors will suffer

25    immediate irreparable harm should the Court not grant the Debtors' request to include the Non-

26    Medical Services Providers as Critical Vendors.

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

ix.    **IT Services Providers**

The Debtors require use of various information technology services, including, but not limited to, those who provide services such as diagnostic technology, interoperability between devices, risk management and software services, revenue cycle management billing software and services, teleradiology services, customer relationship management, networking solutions services, multi-function copiers, voice over internet protocol system services, hosting services for applications, and point of care data management system services. Critical patient care systems such as electronic health record systems and enterprise resource planning systems must be maintained to ensure continuity of patient care. These information technology services are vital to the quality of patient care and the Debtors' day-to-day operations, and the Debtor will suffer immediate irreparable harm should the Court not grant the Debtors' request to include the IT Services Providers as Critical Vendors subject to payment on prepetition claims.

x.    **Benefits Providers**

The Debtors have incentivized their employees to continue working through the continuation of company-subsidized benefits, such as workers compensation, medical, dental, vision, short term and long term care, leave of absence, and life insurance. If the Debtors are not permitted to pay any prepetition premium amounts due to these Benefits Providers, the employees' insurance coverage will be jeopardized and the employees will likely seek employment elsewhere. Specifically, any disruption to payment of the employee benefits in the ordinary course (and in the Debtors' discretion), would adversely affect the Debtors' goals in this Case because such events are likely to cause some employees to terminate their employment with the Debtors, will cause all employees to be distracted from their duties to care for the Patients and the operations of the Hospitals, and will inevitably hurt employee morale at a particularly sensitive time for all employees, resulting in severe repercussions on the Debtors' ability to provide Patient care, and to preserve their assets and administer the Estates, to the detriment of all constituencies. Since the Debtors do not have the ability to quickly or cost-effectively replace their employees who provide vital medical and non-medical services on a daily basis, it is critical that the Debtors be allowed to continue these benefits in order to retain their employees and

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 10 -

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  maintain their business operations to preserve the full value of their assets for the benefit of their

2  creditors. Therefore, the Court should include Benefits Providers as Critical Vendors.

3  **SUMMARY OF REQUESTED RELIEF**

4  By this Motion, the Debtors seek authority to continue to pay and/or honor the prepetition

5  claims of the Uncompensated Care and On-Call Coverage Physicians, the Medical Directors, the

6  Medical Leadership, Physician Educators, the Medical Services Providers, the Medical Supplies

7  and Equipment Providers, the Clinical Staffing, the Non-Medical Services Providers, the IT

8  Services Providers, and the Benefits Providers as Critical Vendors, up to $20 Million (the

9  "Critical Vendor Cap"), with (i) an interim amount of up to $5 Million and only as needed to

10  avoid immediate and irreparable harm; and (ii) an additional amount of up to $15 Million and

11  only as needed to avoid immediate and irreparable harm, as set forth in the Declaration of Richard

12  Adcock in Support of the Emergency Motions filed concurrently herewith (the "Adcock

13  Declaration"), and in the Debtors' discretion and in the ordinary course of the Debtors' business,

14  and pursuant to the Protocol. The amounts proposed to be paid to the Critical Vendors are already

15  provided for in the Debtors' operating budget (the "Budget") submitted in connection with the

16  Debtors' motion for authority to use cash collateral and to obtain debtors in possession financing

17  from the Debtors' senior secured lender (the "Cash Collateral Motion") which is supported by the

18  Declaration of Anita M. Chou (the "Chou Declaration") filed concurrently herewith.

19  As a safeguard to the Debtors' Patients, other creditors, and the Estates, the Debtors

20  propose certain terms and conditions (the "Terms and Conditions") of the payment to the Critical

21  Vendors if a Critical Vendor, after signing the Critical Vendor Agreement, thereafter refuses to

22  supply the critical goods or services to the Debtor throughout the course of the bankruptcy

23  proceeding, as provided under the Critical Vendor Agreement (the "Defaulting Vendor"). These

24  Terms and Conditions allow the Debtors:  (i) to deem such payment to the Defaulting Vendor as a

25  voidable postpetition transfer pursuant to § 549(a); and (ii) to demand the immediate return of any

26  and all payments made to the Defaulting Vendor pursuant to this Motion, to the extent that the

27  aggregate amount of such payments exceeds the postpetition obligations then outstanding without

28  giving effect to alleged setoff rights, recoupment rights, adjustments, or setoffs of any type

- 11 -

108915075\V-1

1    whatsoever, and the Defaulting Vendor's prepetition claim shall be reinstated in such an amount

2    as to restore the Debtors and the Defaulting Vendor to their original positions, as if the Critical

3    Vendor Agreement had never been entered into and the payment of the Defaulting Vendor's

4    prepetition claim had not been made. In short, the Debtors will return the parties to their positions

5    immediately prior to the entry of the order approving the relief sought herein.

6         The Debtors also request that all applicable banks and other financial institutions be

7    authorized to receive, process, honor, and pay all checks presented for payment of, and to honor

8    all fund transfer requests made by the Debtors related to, the claims that the Debtors request

9    authority to pay in this Motion, regardless of whether the checks were presented or fund transfer

10    requests were submitted before or after the Petition Date, provided, however, that:  (i) funds are

11    available in the Debtors' accounts to cover the checks and fund transfers; and (ii) all of the banks

12    and other financial institutions are authorized to rely on the Debtors' designation of any particular

13    check as approved by the attached proposed order.

14         The Debtors respectfully submit that the relief requested herein is necessary and

15    appropriate to ensure a smooth transition into chapter 11, to normalize and maintain existing

16    relationships with the Debtors' Critical Vendors during the turbulent early stages of this

17    bankruptcy case, and to preserve and maximize value for the benefit of the Debtors' creditors.

18    One of the keys to the Debtors' successful reorganization will be maintaining harmonious

19    relationships with their employees, medical services providers, most critical vendors, and

20    customers, and preserving the going-concern value of the Debtors' business. As set forth in the

21    attached Memorandum of Points and Authorities, the relief requested in this Motion is essential to

22    those objectives.

23                                    **ADDITIONAL INFORMATION**

24         This Motion is based upon LBR 2081-1(a)(7) and 9075-1, Bankruptcy Rules 6003(b),

25    6004(a) and (h), and §§ 105, 363(b), 503(b)(9), and 549(a)(2)(B), the attached Memorandum of

26    Points and Authorities, and Adcock Declaration filed concurrently herewith, the arguments and

27    statements of counsel to be made at the hearing on the Motion, and other admissible evidence

28    properly brought before the Court.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 12 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Counsel to the Debtors will serve this Motion, the attached Memorandum of Points and Authorities, the Adcock Declaration and the Notice of First-Day Motions on:  (i) the Office of the United States Trustee; (ii) the Secured Creditors and DIP Lenders; (iii) the 50 largest general unsecured creditors appearing on the list filed in accordance with Bankruptcy Rule 1007(d); (iv) the United States of America, and the State of California; and (v) parties that file with the Court and serve upon the Debtors requests for notice of all matters in accordance with Bankruptcy Rule 2002(i). To the extent necessary, the Debtors request that the Court waive compliance with LBR 9075-1(a)(6) and approve service (in addition to the means of services set forth in such LBR) by overnight delivery. Among other things, the Notice of Emergency Motions will provide that any opposition or objection to the Motion may be presented at any time before or at the hearing regarding the Motion, but that failure to timely object may be deemed by the Court to constitute consent to the relief requested herein.

In the event that the Court grants the relief requested by the Motion, the Debtors shall provide notice of the entry of the order granting such relief upon each of the foregoing parties and any other parties in interest as the Court directs. The Debtors submit that such notice is sufficient and that no other or further notice be given.

**RESERVATION OF RIGHTS**

Nothing contained herein is intended or shall be construed as:  (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute the amount of, basis for, or validity of any claim against the Debtors; (iii) a waiver of any claims or causes of action which may exist against any creditor or interest holder; or (iv) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between the Debtors and any third party under § 365. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

108915075\V-1

# **PRAYER**

**WHEREFORE**, the Debtors respectfully request that this Court hold an emergency hearing on the Motion and issue an Interim Order:

(1)     affirming the adequacy of the notice given;

(2)     granting the Motion in the interim;

(3)     authorizing, but not directing, the Debtors to continue to pay and/or honor the prepetition claims (up to $5 Million) of the Critical Vendors, in the ordinary course of the Debtors' business, in the Debtors' discretion, and in accordance with the Protocol and the Budget; and

(4)     granting such other and further relief as the Court deems just and proper under the circumstances.

**WHEREFORE**, the Debtors also respectfully request that this Court hold a final hearing on the Motion and issue a Final Order:

(1)     affirming the adequacy of the notice given;

(2)     granting the Motion in its entirety;

(3)     authorizing, but not directing, the Debtors to continue to pay and/or honor the prepetition claims (up to a total of $20 Million) of the Critical Vendors, in the ordinary course of the Debtors' business, in the Debtors' discretion, and in accordance with the Protocol and the Budget; and

(4)     granting such other and further relief as the Court deems just and proper under the circumstances.

Dated:  August 31, 2018

DENTONS US LLP
SAMUEL R. MAIZEL
JOHN A. MOE, II
TANIA M. MOYRON

By___/s/ Tania M. Moyron_____
       Tania M. Moyron

Proposed Attorneys for the Chapter 11 Debtors and Debtors In Possession

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  INTRODUCTION

Pursuant to Rules 2081-1(a)(7) and 9075-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "LBR"), Rules 6003(b), 6004(a) and (h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and sections 105, 363(b), 503(b)(9), and/or 549(a)(2)(B) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"),[3] Verity Health System of California, Inc. ("VHS") and the above-referenced affiliated debtors, the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy case (collectively, the "Debtors"), hereby move, on an emergency basis (the "Motion"), for the entry of an interim order (substantially in the form attached hereto as **Exhibit "A"**, the "Interim Order") authorizing, but not directing, the Debtors to continue to pay and/or honor the prepetition claims (after an interim hearing, in an interim amount of up to $5 Million and only as needed to avoid immediate and irreparable harm), and for the entry of a final order within 30 days after filing the above-captioned chapter 11 bankruptcy case (the "Final Order", together with the Interim Order, the "Critical Vendors Order") authorizing, but not directing, the Debtors to continue to pay and/or honor the prepetition claims (after a final hearing, in an amount up to an additional $15 Million, for a total of up to $20 Million and only as needed to avoid immediate and irreparable harm), of their most critical vendors in the Debtors' discretion and in the ordinary course of the Debtors' business, pursuant to a carefully-designed Protocol (defined below) overseen by a core, centralized team consisting of senior members of Debtors' management and professional advisors, and subject to certain Terms and Conditions (defined below). In support of the Motion, the Debtors have separately filed the Declaration of Richard Adcock in Support of Debtors' First-Day Motions (the "Adcock Declaration"). The Debtors request that the relief sought herein be granted on an emergency basis because they will suffer immediate and irreparable harm without the relief requested in this Motion.

---

[3] All references to "§" and "section" herein are to sections of the Bankruptcy Code.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over these cases pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

2.    Venue of the Debtors' chapter 11 cases is proper pursuant to 28 U.S.C. § 1408(1) and (2).

## III.    STATEMENT OF FACTS

### A.    General Background

1.    On August 31, 2018 ("Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since the commencement of their cases, the Debtors have been operating their businesses as debtors in possession pursuant to §§ 1107 and 1108.

2.    Debtor VHS, a California nonprofit public benefit corporation, is the sole corporate member of the following five Debtor California nonprofit public benefit corporations that operate six acute care hospitals, O'Connor Hospital, Saint Louise Regional Hospital, St. Francis Medical Center, St. Vincent Medical Center, Seton Medical Center, and Seton Medical Center Coastside (collectively, the "Hospitals") and other facilities in the state of California. Seton Medical Center and Seton Medical Center Coastside operate under one consolidated acute care license.

3.    VHS, the Hospitals, and their affiliated entities (collectively, "Verity Health System") operate as a nonprofit health care system, with approximately 1,680 inpatient beds, six active emergency rooms, a trauma center, eleven medical office buildings, and a host of medical specialties, including tertiary and quaternary care.

4.    The VHS affiliated entities, including the Debtors and non-debtor entities, are as follows:

- O'Connor Hospital
- Saint Louise Regional Hospital
- St. Francis Medical Center
- St. Vincent Medical Center
- Seton Medical Center, including

- •    Seton Medical Center Coastside campus
- •    Verity Business Services
- •    Marillac Insurance Company, Ltd.
- •    O'Connor Hospital Foundation
- •    Saint Louise Regional Hospital Foundation
- •    St. Francis of Lynwood Medical Center Foundation
- •    St. Vincent Medical Center Foundation
- •    Seton Medical Center Foundation
- •    St. Vincent de Paul Ethics Corporation
- •    St. Vincent Dialysis Center
- •    De Paul Ventures, LLC
- •    De Paul Ventures - San Jose Dialysis, LLC
- •    De Paul Ventures - San Jose ASC, LLC
- •    Verity Medical Foundation
- •    Verity Holdings, LLC

5.     Verity Medical Foundation ("VMF"), incorporated in 2011, is a medical foundation, exempt from licensure under California Health & Safety Code § 1206(l). VMF contracts with physicians and other healthcare professionals to provide high quality, compassionate, patient-centered care to individuals and families throughout California. With more than 100 primary care and specialty physicians, VMF offers medical, surgical and related healthcare services for people of all ages at community-based, multi-specialty clinics conveniently located in areas served by the Debtor Hospitals. VMF holds long-term professional services agreements with the following medical groups: (a) Verity Medical Group; (b) All Care Medical Group, Inc.; (c) CFL Children's Medical Associates, Inc.; (d) Hunt Spine Institute, Inc.; (e) San Jose Medical Clinic, Inc., D/B/A San Jose Medical Group; and (f) Sports, Orthopedic and Rehabilitation Associates.

6.     Verity Holdings, LLC ("Holdings") is a direct subsidiary of its sole member VHS and was created in 2016 to hold and finance VHS' interests in four medical office buildings whose tenants are primarily physicians, medical groups, healthcare providers, and certain of the VHS Hospitals. Holdings' real estate portfolio includes more than 15 properties. Holdings is the borrower on approximately $66.2 Million of non-recourse financing secured by separate

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 17 -

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

deeds of trust and revenue and accounts pledges, including the rents on each medical office building.

7.    O'Connor Hospital Foundation, Saint Louise Regional Hospital Foundation, St. Francis of Lynwood Medical Center Foundation, St. Vincent Medical Center Foundation, and Seton Medical Center Foundation handle fundraising and grant-making programs for each of their respective Debtor Hospitals.

8.    As of August 31, 2018, the Debtors have approximately 7,385 employees, of whom 4,733 are full-time employees. Approximately 74% of these employees are represented by collective bargaining units. A majority of the employees are represented by either the Service Employees International Union (approximately 39% of employees) or California Nurses Associations (approximately 22% of employees).

9.    Each of the Debtors is exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, except for Verity Holdings, LLC, DePaul Ventures, LLC, and DePaul Ventures - San Jose Dialysis, LLC.

10.    To date, no official committee or examiner has been appointed by the Office of the United States Trustee in these chapter 11 Cases.

**B.    Historical Challenges**

1.    The Hospitals and VMF were originally owned and operated by the Daughters of Charity of St. Vincent de Paul, Province of the West (the "<u>Daughters of Charity</u>"), to support the mission of the Catholic Church through a commitment to the sick and poor. The Daughters of Charity began their healthcare mission in California in 1858 and they ministered to ill, poverty-stricken individuals for more than 150 years. In March 1995, the Daughters of Charity merged with Catholic Healthcare West ("<u>CHW</u>"). In June 2001, Daughters of Charity Health System ("<u>DCHS</u>") was formed, and in October 2001, the Daughters of Charity withdrew from CHW. In 2002, DCHS commenced operations and was the sole corporate member of the Hospitals, which at that time were California nonprofit religious corporations.

- 18 -

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

2.      Between 1995 and 2015, the Daughters of Charity and DCHS struggled to find a solution to continuing operating losses, either through a sale of some or all of the hospitals or a merger with a more financially sound partner. All these efforts failed. During these efforts, however, the health system's losses continued to mount, and the health system borrowed more than $500 Million—including through a 2008 bond issuance (the "2008 Bonds")—to fund operations, acquire assets, fund needed capital improvements and/or refinance existing debt.

3.      Despite continuous efforts to improve operations, operating losses continued to plague the health system due to, among other things, mounting labor costs, low reimbursement rates and the ever-changing healthcare landscape. In 2013, DCHS actively solicited offers for O'Connor Hospital, St. Louise Regional Hospital, Seton Medical Center and Seton Medical Center Coastside. In 2013, to avoid failing debt covenants, the Daughters of Charity Foundation, an organization separate and distinct from DCHS, donated $130 Million to DCHS to allow it to retire the 2008 Bonds in the total amount of $143.7 Million.

4.      In early 2014, DCHS announced that they were beginning a process to evaluate strategic alternatives for the health system.  Throughout 2014, DCHS explored offers to sell their hospital system and, in October of 2014, they entered into an agreement with Prime Healthcare Services and Prime Healthcare Foundation (collectively, "Prime") to sell the health system. However, to keep the hospitals open, DCHS needed to borrow another $125 Million to mitigate immediate cash needs during the sales process; in other words, to allow DCHS to continue to operate until the sale could be consummated. In early 2015, the California Attorney General consented to the sale to Prime, subject to conditions on that sale that were so onerous that Prime terminated the transaction.

5.      In 2015, DCHS again marketed their health system for sale, and, again, focused on offers that maintained the health system as a whole, and assumed all the obligations.  In July 2015, the DCHS Board of Directors selected BlueMountain Capital Management LLC ("BlueMountain"), a private investment firm, to recapitalize its operations and transition

108915075\V-1

leadership of the health system to the new Verity Health System (the "BlueMountain Transaction").

6.    In connection with the BlueMountain Transaction, BlueMountain agreed to make a capital infusion of $100 Million to the health system, arrange loans for another $160 Million to the health system, and manage operations of the health system, with an option to buy the health system at a future time. In addition, the parties entered into a System Restructuring and Support Agreement (the "Restructuring Agreement"), DCHS's name was changed to Verity Health System, and Integrity Healthcare, LLC ("Integrity") was formed to carry out the management services under a new management agreement.

7.    On December 3, 2015, the California Attorney General approved the BlueMountain Transaction, subject to conditions.  Despite BlueMountain's infusion of cash and retention of various consultants and experts to assist in improving cash flow and operations, the health system did not prosper.

8.    In July 2017, NantWorks, LLC ("NantWorks") acquired a controlling stake in Integrity.  NantWorks brought in a new CEO, CFO, and COO. NantWorks loaned another $148 Million to the Debtors.

9.    Despite the infusion of capital and new management, it became apparent that the problems facing the Verity Health System were too large to solve without a formal court supervised restructuring. Thus, despite VHS' great efforts to revitalize its Hospitals and improvements in performance and cash flow, the legacy burden of more than a billion dollars of bond debt and unfunded pension liabilities, an inability to renegotiate collective bargaining agreements or payor contracts, the continuing need for significant capital expenditures for seismic obligations and aging infrastructure, and the general headwinds facing the hospital industry, make success impossible. Losses continue to amount to approximately $175 Million annually on a cash flow basis.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 20 -

10.    Additional background facts on the Debtors, including an overview of the Debtors' business, information on the Debtors' capital structure and additional events leading up to these chapter 11 cases, are contained in the Declaration of Richard G. Adcock.

### C.    Critical Vendor Obligations

As life-saving medical service providers, the Debtors are situated in a vulnerable position. Their entire mission could immediately unravel, irreparably harming the Debtors and their patients (the "Patients") absent the continual flow of vital medical services, medical supplies, medical equipment, physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, admission department staff, as well as non-medical services and information technology support.

Additionally, local, state, and federal law places certain compliance requirements on the Debtors.  For example, as the operator of hospitals licensed under California state law and certified to participate in the Medicare and Medicaid programs, the Debtors must comply with all hospital licensing and certification requirements, including those found in the Health and Safety Code and in Title 22 of the California Code of Regulations, as well as the applicable Medicare conditions of participation and corresponding Medicaid requirements. *See, e.g.*, Cal. Health & Safety Code §§ 1250 *et seq.*; 22 Cal. Code Regs §§ 70001, *et seq.*; 22 Cal. Code Regs. § 51207; 42 C.F.R. §§ 482 *et. seq.* In addition to complying with these overarching requirements, the Debtors must monitor and comply with all of the other licensing and operational requirements that apply to the different service lines and programs offered by the hospitals, including, for example, those applicable to the hospital pharmacies and laboratories. *See, e.g.*, Cal. Bus. & Prof. Code §§ 1200 *et. seq.*, Cal. Bus. & Prof. Code §§ 4000 *et. seq.*, Cal. Health & Safety Code §§ 11000 *et. seq.*, 16 Cal. Code Regs. §§ 1700 *et. seq.* These extensive, comprehensive regulations and requirements can only be fulfilled through continued, uninterrupted access to essential goods and services. Thus, in order to ensure the timely and proper care of the Patients and maintain ongoing business operations, it is imperative the Debtors are able to rely on a

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 21 -

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

consistent, quality supply of various physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, admission department staff, as well as certain medical supplies, medical equipment, and services provided by vendors, suppliers and/or service-providers that are "critical" to Patient care and the Debtors' businesses (the "Critical Vendors").

The Debtors' Critical Vendors include the following categories of providers: (i) uncompensated care contract physicians and on-call coverage physicians (collectively, the "Uncompensated Care and On-Call Coverage Physicians"); (ii) medical directors (the "Medical Directors"); (iii) medical staff officers and leadership positions ("Medical Leadership"); (iv) physicians providing teaching services ("Physician Educators"); (v) medical services providers (the "Medical Services Providers"); (vi) medical supplies and medical equipment providers (collectively, the "Medical Supplies and Equipment Providers"); (vii) medical staffing agencies and hospital-based services providers (collectively, the "Clinical Staffing"); (viii) non-medical services providers (the "Non-Medical Services Providers"); (ix) information technology services providers (the "IT Services Providers"); and (x) various employee benefits providers (the "Benefits Providers").

The Debtors are mindful of their fiduciary obligations to seek to preserve and maximize the value of their Estates. To that end, the Debtors and their advisors have engaged in an extensive process of reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practices to identify business relationships—which, if lost, could materially harm the Debtors' Patients, the Debtors' businesses, reduce their enterprise value, and/or impair their restructuring process—all in an effort to identify only those most critical vendors using their business judgment (the "Protocol"). Such Protocol is on-going.

108915075\V-1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES , CALIFORNIA  90017-5704
(213) 623-9300

During the Protocol process, the Debtors have deemed certain vendors as critical because each of these Critical Vendors meets the following criteria:  (a) the vendor is essential to Patient care, supports maintaining the Debtors' business in full compliance with California's Title XII requirements for operating general acute care hospitals in the state of California, and allows the Debtors to continue to provide needed patient care and services and  maintain their business postpetition until reorganization and/or sale of the Debtors' assets for the benefit of creditors; (b) the vendor is indispensable for providing vital goods or services (such as blood products or surgical implants), replacing said vendor would be prohibitively expensive, or said vendor is otherwise critical to prevent the diversion of management and key personnel to solicit other vendors to provide comparable goods or services and to prevent other unnecessary distraction during the extensive transitional period;[4] (c) the vendor holds an unpaid prepetition claim for the provision of goods or services; (d) the Debtors believe the vendor will refuse to deliver goods or provide services without payment of the prepetition claim and the automatic stay imposed by § 362(a) will be inadequate to address the issue; (e) cash on delivery is unlikely to provide the requisite incentive for the vendor to continue providing goods or services; (f) the Debtors lack a long-term contractual relationship with the vendor that would oblige the vendor to continue the prepetition relationship, and the Debtors are otherwise without adequate leverage to compel performance on commercially reasonable terms; and (g) the Debtors will suffer immediate and irreparable harm if the vendor is not specially incentivized to continue providing essential goods or services. The Debtors' will use commercially reasonable efforts to require the vendor to sign a postpetition agreement with normalized terms and conditions that contractually bind the vendor to

---

[4] Additionally, the Debtors acknowledge that while some of these Critical Vendors are not the only vendors in the area that provide these vital goods or services, switching to other providers at this critical juncture will incur substantial time, energy, and unnecessary distraction during the extensive transitional period.

- 23 -

108915075\V-1

continue providing essential goods and services postpetition (the "Critical Vendor Agreement").

A brief description of each category of Critical Vendors follows.

### i.    Uncompensated Care and On-Call Coverage Physicians

The Debtors require the service of various physicians who provide care to patients who lack the ability to compensate the Debtors for their medical treatment (individually, "Uncompensated Care Contract Physicians") and the physicians who provide on-call services to cover the Debtors' six active emergency departments, one of which is an essential Level II Trauma (individually, "On-Call Coverage Physicians"). The Uncompensated Care Contract Physicians routinely provide the following vital Patient services:  (i) Emergency Room coverage; (ii) surgical procedures for any Patient who is uninsured or underinsured; (iii) psychiatry; and (iv) cardiac services. The On-Call Coverage Physicians make themselves available to the Debtors for certain periods of time to ensure that a specialist is available at all times for emergency situations, including such emergent conditions as cardiac arrest and immediate trauma. The On-Call Coverage Physicians routinely provide the following areas of expertise:  (i) urology; (ii) general surgery; (iii) orthopedics; (iv) cardiology; (v) neurosurgery; (vi) thoracic surgery; (vii) cardiac surgery; (viii) radiation oncology; (ix) neurology, (x) psychiatry; (xi) nephrology; (xii) gastroenterology; (xiii) pediatric surgery; and (xiv) obstetrics. Due to the strong economy and the tight labor market for professionals with expertise, Uncompensated Care and On-Call Coverage Physicians have a vast array of working opportunities available to them, and to the extent the Debtors are unable to ensure payment for prepetition claims, these Uncompensated Care and On-Call Coverage Physicians will work at other hospitals, resulting in a devastating impact on Patient care and irreparable harm to the smooth transition into chapter 11 and preservation and maximization of value for the benefit of the Debtors' creditors.

### ii.    Medical Directors

The Debtors require the sevices of various physicians who serve as Medical Directors. As Medical Directors, it is their responsibility to ensure the hospital provides quality Patient care

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 24 -

efficiently and according to local, state, and federal mandates in order to ensure Patient care. These Medical Directors supervise and coordinate the On-Call Coverage Physicians, provide vital operating and administrative services, such as supervision of certain departments or programs, including but not limited to, (i) the Long Term & Sub-Acute Unit; (ii) Advanced Wound Care; (iii) the Comprehensive Spine Care Program; (iv) the Stroke Program; (v) Cardiac & Pulmonary Rehabilitation; (vi) Oncology; (vii) Non-Invasive Cardiology; (viii) Radiation Therapy; (ix) the Intensive Care Unit and Neonatal Intensive Care Unit; (x) the Antimicrobial Stewardship Program; (xi) Interventional Neurology; (xii) the Bioethics Program; (xiii) the Catherization Laboratory; (xiv) the Skilled Nursing Facility, the Stroke Program; (xv) Thoracic Surgery; (xvi) the Dialysis Center; and (xvii) Nuclear Medicine and Vascular Laboratory. They also are vital for program quality, oversight, and risk management. There are approximately 60 physicians serving as Medical Directors. Similar to the Uncompensated Care and On-Call Coverage Physicians, and due to the strong economy and the tight labor market for professionals with expertise, Medical Directors are in demand and have a vast array of working opportunities available to them. To the extent the Debtors are unable to ensure payment for prepetition claims to Medical Directors, these Medical Directors will work at other hospitals, resulting in a devastating impact on Patient care and irreparable harm to the smooth transition into chapter 11 and preservation and maximization of value for the benefit of the Debtors' creditors.

### iii.    **Medical Leadership**

The Debtors require the services of various physicians who serve as medical staff officers and in other leadership positions, as required by each Hospital's accreditation with The Joint Commission (the "TJC"). Medical Leadership includes the Chiefs of Staff and all Department Chairs required by each of the Debtors' Medical Staff Bylaws, and by Title 22, including physician oversight for cardiology, pulmonary, laboratory, stroke, and ST-elevation myocardial infarction departments. The Chief Medical Officers are essential to ensure quality and risk oversight. Without these physicians, who can easily find competitive opportunities elsewhere, the Debtors' will suffer irreparable harm to the Debtors' chapter 11 Case.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 25 -

108915075\V-1

#### iv. <u>Physician Educators</u>

The Debtors require the services of various physicians who provide teaching services in the Debtors' graduate medical education (the "GME") program, a legal requirement with which the Debtors must comply. The GME program simultaneously provides:  (i) training for interns, residents, and fellows until they become independent and licensed phsysicians; and (ii) access to healthcare for elderly and impoverished Patients. Physician Educators are in high demand because the State of California mandates that every teaching hospital support the efforts to provide access to high quality healthcare to its most vulnerable population. To maintain Level II Trauma status, the Debtors must maintain the GME program. Therefore, Physician Educators are vital to maintaining the Debtors' teaching hospital status and affording access to healthcare, both of which are key to the Debtors' Patient care and ongoing operations and/or potential sale of its assets for the benefit of its creditors and the Estates.

#### v. <u>Medical Services Providers</u>

The Debtors require the services of various Medical Services Providers, including, but not limited to, those who provide services such as surgical anesthesia coverage, organ harvesting and organ matching services, medical equipment sanitization, diagnostic interventional cardiology services, interventional neuroradiology, imaging services, advanced wound care, pathology and laboratory services, dialysis services, lithotripsy services, sterile compounding services, rehabilitation staffing and management services, subacute management services, psychiatric management services, hospitalist services, intensivist program services, medical screening services, and medical instrument repair services. These services are vital to the Debtors. The Debtor will suffer immediate irreparable harm should the Court deny the Debtors' request to include the Medical Services Providers as Critical Vendors subject to payment on prepetition claims.

#### vi. <u>Medical Supplies and Equipment Providers</u>

The Debtors require the use of various medical supplies and medical equipment, including, but not limited to, blood and plasma, heart valves, coronary intervention products,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 26 -

108915075\V-1

defibrillators, laparoscopic and minimally invasive surgical supplies, neurosurgical supplies and neurology devices, other surgical medical products, bone substitute biologics, regenerative vascular grafts, vaccinations and other pharmaceuticals, nuclear medicines, medical gases, anesthesia medical equipment, laboratory medical supplies, radiation equipment, gastrointestinal supplies, cochlear implants, orthopedic implants, spinal implants, intraocular lenses and ophthalmology supplies, sterilization equipment and products, and fetal monitoring systems. Equipment includes medical equipment rentals, biomedical repair tools and equipment, patient beds and stretchers, vital sign monitoring, infusion pumps, medication supply stations, gastro-intestinal lab equipment, cardiac catherization lab equipment, operating room equipment, imaging equipment, laboratory equipment, pharmacy dispensing equipment, and transplant program equipment. The medical supplies and medical equipment the Debtors receive from the Medical Supplies and Equipment Providers are vital to the Debtors. The Debtors will suffer immediate irreparable harm should the Court not grant the Debtors' request to include the Medical Supplies and Equipment Providers as Critical Vendors subject to payment on prepetition claims.

**vii.**    **Clinical Staffing**

The Debtors require various medical staffing agencies and other hospital-based services providers to provide nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, and admission department staff.

Additionally, regarding the provision of nurses, the staffing supplementation is essential because: (1) California has a mandatory statutory nurse to patient ratio, and so the Debtors are required by law to meet certain ratios in order to operate on a daily basis; and (2) it is difficult to recruit experienced staff—as opposed to recent graduates—for short-term assignments. Indeed, these staffing agencies provide the requisite "registry" nurses who take short single-day assignments and "traveler" nurses who take longer-term assignments to fill in during busier seasons—*e.g.*, flu season—and understaffed periods—*e.g.*, during nurses strikes of represented

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

nurses—where the Debtors may not otherwise have sufficient numbers of nurses between their core and per diem nurses.

Moreover, many of the Clinical Staffing who provide physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, and admission department staff to the Debtors will not staff the Debtors' business if there is any interruption or delay in the payment of the amounts due to them. Given the Debtors' reliance on the medical services provided by the Clinical Staffing to provide Patient care and otherwise fulfill the Debtors' daily medical services needs, and the fact that the Clinical Staffing can simply shift their services to a medical services company, it is crucial that the Debtors be authorized to pay any prepetition amounts due to the Clinical Staffing as Critical Vendors in the ordinary course of business.

viii.    **Non-Medical Services Providers**

The Debtors require services of various non-medical service providers, including, but not limited to, those who provide services such as payroll tax services, financial audit services, billing services, cost reporting services, revenue cycle management services, consulting and education services for various required national, state, and local accreditations and mandates, environmental services, record retention services, building maintenance services, medical equipment maintenance services, management services, and other similar services, as well as to seismic contractors. Seismic contractors are designers, engineers, suppliers and constructors who are engaged in the statutory work of retrofitting hospital structures to meet the SB1953 and subsequent amendments that are required to be completed by December 31, 2019. Delay of the projects will cause the Debtors to miss the regulated deadlines risking California Department of Public Health license and suspension of such. These non-medical services are vital to the Debtors' day-to-day operations and the Debtors' ability to comply with regulatory requirements set by the State of California legislature, and the Debtors will suffer immediate irreparable harm

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 28 -

108915075\V-1

should the Court not grant the Debtors' request to include the Non-Medical Services Providers as Critical Vendors.

### ix.    IT Services Providers

The Debtors require use of various information technology services, including, but not limited to, those who provide services such as diagnostic technology, interoperability between devices, risk management and software services, revenue cycle management billing software and services, teleradiology services, customer relationship management, networking solutions services, multi-function copiers, voice over internet protocol system services, hosting services for applications, and point of care data management system services. Critical patient care systems such as electronic health record systems and enterprise resource planning systems must be maintained to ensure continuity of patient care. These information technology services are vital to the Debtors' day-to-day operations, and the Debtor will suffer immediate irreparable harm should the Court not grant the Debtors' request to include the IT Services Providers as Critical Vendors subject to payment on prepetition claims.

### x.    Benefits Providers

The Debtors have incentivized their employees to continue working through the continuation of company-subsidized benefits, such as workers compensation, medical, dental, vision, short term and long term care, leave of absence, and life insurance. If the Debtors are not permitted to pay any prepetition premium amounts due to these Benefits Providers, the employees' insurance coverage will be jeopardized and the employees will likely seek employment elsewhere. Specifically, any disruption to payment of the employee benefits in the ordinary course (and in the Debtors' discretion), would adversely affect the Debtors' goals in this Case because such events are likely to cause some employees to terminate their employment with the Debtors, will cause all employees to be distracted from their duties to care for the Patients and the operations of the Hospitals, and will inevitably hurt employee morale at a particularly sensitive time for all employees, resulting in severe repercussions on the Debtors' ability to provide Patient care, and to preserve their assets and administer the Estates, to the detriment of all

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 29 -

108915075\V-1

constituencies. Since the Debtors do not have the ability to quickly or cost-effectively replace their employees who provide vital medical and non-medical services on a daily basis, it is critical that the Debtors be allowed to continue these benefits in order to retain their employees and maintain their business operations to preserve the full value of their assets for the benefit of their creditors. Therefore, the Court should include Benefits Providers as Critical Vendors.

## IV.  **RELIEF REQUESTED**

By this Motion, the Debtors seek authority to continue to pay and/or honor the prepetition claims of the Uncompensated Care and On-Call Coverage Physicians, the Medical Directors, the Medical Leadership, the Physician Educators, the Medical Services Providers, the Medical Supplies and Equipment Providers, the Clinical Staffing, the Non-Medical Services Providers, the IT Services Providers, and the Benefits Providers as Critical Vendors, up to $20 Million (the "Critical Vendor Cap"), with (i) an interim amount of up to $5 Million and only as needed to avoid immediate and irreparable harm; and (ii) an additional amount of up to $15 Million and only as needed to avoid immediate and irreparable harm—as mentioned in the Declaration of Richard Adcock in Support of the Emergency Motions filed concurrently herewith (the "Adcock Declaration"), and in the Debtors' discretion and in the ordinary course of the Debtors' business, and pursuant to a carefully-designed Protocol overseen by a core, centralized team consisting of senior members of Debtors' management and professional advisors. Specifically, the Debtors seek entry of an interim order (substantially in the form attached hereto as **Exhibit "A"**, the "Interim Order") authorizing, but not directing, the Debtors to continue to pay and/or honor the prepetition claims (after an interim hearing, in an interim amount of up to $5 Million and only as needed to avoid immediate and irreparable harm), and entry of a final order within thirty (30) days after filing the above-captioned chapter 11 bankruptcy cases (the "Final Order", together with the Interim Order, the "Critical Vendors Order") authorizing, but not directing, the Debtors to continue to pay and/or honor the prepetition claims (after a final hearing, in an amount up to an additional $15 Million, for a total of up to $20 Million and only as needed to avoid immediate and irreparable harm), of their Critical Vendors. The amounts proposed to be paid to the Critical

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Vendors are already provided for in the Debtors' operating budget (the "Budget") submitted in connection with the Debtors' motion for authority to use cash collateral and to obtain debtors in possession financing from the Debtors' senior secured lender (the "Cash Collateral Motion") which is supported by the Declaration of Anita M. Chou (the "Chou Declaration") filed concurrently herewith.

Regarding the Protocol, there shall be a Critical Vendor Cap of $20 Million, which will be the most the Debtors may pay to the Critical Vendors. The Debtors, at their discretion, using their business judgment, and pursuant to the Protocol, shall pay the Critical Vendors, subject to certain accountability requirements (the "Accountability Requirements"). The Accountability Requirements shall include: (i) filing under seal a report on a monthly basis that details the Critical Vendor payments (the "Interim Critical Vendors Report"), with a final report filed under seal once the cap has been met (the "Final Critical Vendors Report"), with viewing privileges only for the Debtors, the Official Committee of Unsecured Creditors, and the United States Trustee, to include: (a) a list of the Critical Vendors; (b) the amount paid to each individual Critical Vendor; (c) a description of the supplies or services provided to the Debtors; and (d) an explanation for how each payment was determined by the carefully-designed Protocol overseen by a core, centralized team consisting of senior members of Debtors' management and professional advisors;[5] (ii) an *in camera* hearing during which the Court may review the foregoing information in the presence of the Debtors, the Official Committee of Unsecured Creditors, and the United States Trustee; and (iii) if there is an objection to any payment by any party in interest, such objection may be heard by this Court at a hearing in open court. Furthermore, to ensure timely payment to Critical Vendors, the Debtors propose that the Interim Order be issued, subject to final approval by the Court in the Final Order, each of which provides authorization for the Debtors to make rolling payment of (i) an interim amount of up to $5

---

[5] Due to the sensitive nature of certain confidential proprietary data, this material will be filed under seal. Furthermore, the Debtors believe that keeping the identity of potential Critical Vendors confidential may assist in reducing the number of prepetition claims that must be paid in order to continue receiving critical goods and services. Accordingly, a schedule of Critical Vendors will not be made publicly available.

108915075\V-1

Million; and (ii) an additional final amount of up to $15 Million, towards the prepetition claims (up to the Critical Vendor Cap) to Critical Vendors.

As a safeguard to the Debtors' Patients, other creditors, and the Estates, the Debtors propose certain terms and conditions (the "Terms and Conditions") of the payment to the Critical Vendors if a Critical Vendor, after signing the Critical Vendor Agreement, thereafter refuses to supply the critical goods or services to the Debtor throughout the course of the bankruptcy proceeding, as provided under the Critical Vendor Agreement (the "Defaulting Vendor"). These Terms and Conditions allow the Debtors:  (i) to deem such payment to the Defaulting Vendor as a voidable postpetition transfer pursuant to § 549(a); and (ii) to demand the immediate return of any and all payments made to the Defaulting Vendor pursuant to this Motion, to the extent that the aggregate amount of such payments exceeds the postpetition obligations then outstanding without giving effect to alleged setoff rights, recoupment rights, adjustments, or setoffs of any type whatsoever, and the Defaulting Vendor's prepetition claim shall be reinstated in such an amount as to restore the Debtors and the Defaulting Vendor to their original positions, as if the Critical Vendor Agreement had never been entered into and the payment of the Defaulting Vendor's prepetition claim had not been made. In short, the Debtors will return the parties to their positions immediately prior to the entry of the order approving the relief sought herein.

The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtors related to, the claims that the Debtors request authority to pay in this Motion, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, provided, however, that:  (i) funds are available in the Debtors' accounts to cover the checks and fund transfers; and (ii) all of the banks and other financial institutions are authorized to rely on the Debtors' designation of any particular check as approved by the attached proposed Interim Order.

The Debtors respectfully submit that the relief requested herein is necessary and appropriate to ensure a smooth transition into chapter 11 and maintain high-quality patient care,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 32 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

to normalize and maintain existing relationships with the Debtors' Critical Vendors during the turbulent early stages of this bankruptcy case, and to preserve and maximize value for the benefit of the Debtors' creditors. One of the keys to the Debtors' successful sales or reorganization will be maintaining harmonious relationships with their employees, medical services providers, most critical vendors, and customers, and preserving the quality of patient care and ultimately the going-concern value of the Debtors' business. The Debtors rely heavily upon these supplies and services provided by the Critical Vendors to fulfill the Debtors' daily medical services needs.

Failure to make payment to the Critical Vendors on their prepetition claims will result in harm to the Debtors' Patients, as well as the Debtors being unable to fulfill their medical services needs, resulting in a substantial loss of revenue. Accordingly, it is crucial that the Debtors be authorized to continue to pay and/or honor the prepetition claims—in (i) an interim amount of up to $5 Million; and (ii) an additional final amount of up to $15 Million, for a total amount of $20 Million—to the Critical Vendors, in the ordinary course of the Debtors' business and at the Debtors' discretion, pursuant to the Protocol, and pursuant to the Interim Order and the Final Order.

As noted in the Adcock Declaration, the Debtors intend to market and sell some or all of their assets, therefore, the Debtors need to maintain their business operations and preserve the value of their assets, which in turn, requires the Debtors to preserve their existing relationships with their Critical Vendors and to retain their employees.

Additionally, the Debtors anticipate that the mere filing of their bankruptcy cases will raise concerns among the Debtors' Patients, vendors, employees, and other parties in interest within the medical services industry. The Debtors' vendors will understandably be concerned that the Debtors will not be able to continue paying the amounts due to them, and the Debtors' Patients will be concerned that the Debtors will not be able to fulfill their medical services, due to the Debtors' financial condition. The Debtors' vendors and Patients may therefore look to shift their business elsewhere, and the automatic stay imposed by § 362(a) will be inadequate to address the issue. The Debtors believe that the most effective way to counter these perceptions

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

and concerns within their industry is to continue to make payments to their most critical vendors, in the ordinary course of their business, in accordance with the Debtors' Protocol, the Interim Order, and the Budget submitted with the Cash Collateral Motion filed concurrently herewith, at least in the immediate term.6

The Debtors' Budget already includes the proposed payments to the Critical Vendors, which payments are set forth in **Exhibit "2"** to the Chou Declaration. The Debtors' goals in these chapter 11 cases are to facilitate an orderly administration of their bankruptcy cases and to maintain efficient and seamless operations for the benefit of the Patients who seek medical care in the hospitals, medical centers, and clinics operated by the Debtors in order to maximize the value of their assets for the benefit of all stakeholders. Accordingly, it is imperative to the accomplishment of the Debtors' goals in these cases that the Debtors minimize any adverse impact of the chapter 11 filing on the Debtors' workforce, on the Patients, on the operations of the Hospitals, and on the orderly administration of these Cases.

Accordingly, the Debtors respectfully request that the Court grant the Motion.

## V.    DISCUSSION

By this Motion, the Debtors seek to protect their Patients and preserve and maintain their relationships with their Critical Vendors, employees, physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, and admission department staff during the turbulent early stages of their bankruptcy case in order to preserve the reputation of the Debtors' business and the value of the Debtors' assets. Such action has been recognized as a legitimate practice in bankruptcy proceedings by the Supreme Court. *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985, 197 L. Ed. 2d 398 (2017) (listing critical vendor orders that allow payment of essential supplier prepetition invoices as legitimate exceptions to the

---

6 A true and correct copy of the Budget is attached as an exhibit to the Debtors' Cash Collateral Motion filed concurrently herewith.

- 34 -

108915075\V-1

common priority scheme).[7] Indeed, the Supreme Court reasoned that critical vendor orders supported "significant Code-related objectives." *Id.* In *Jevic*, the Supreme Court offered several appropriate considerations for courts in determining whether to grant motions for payment of critical vendors:  (a) preserve the debtor as a going concern; (b) make the disfavored creditors better off; (c) promote the possibility of a confirmable plan; (d) restore the status quo *ante*; or (e) protect reliance interests. *Id.*[8] Granting the Debtors' Motion will meet these objectives, and is authorized pursuant to the Court's powers under § 105(a). 11 U.S.C. § 105 ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].").

Furthermore, bankruptcy judges in this district have routinely granted similar critical vendors motions. *See, e.g.*, Order (A) Authorizing the Debtor to Pay Prepetition Claims of Emergency Room Doctors, Medical Director Doctors, and Nursing Registries who are Critical Service Providers and (B) Directing the Applicable Bank to Pay All Checks and Electronic Payment Requests Made by the Debtor Relating to the Foregoing, *In re Victor Valley Community Hospital*, No. 6:10-bk-39537-CB (Bankr. C.D. Cal. Sept. 17, 2010) (No. 34); Final DIP Order (A) Authorizing Debtor to Obtain Postpetition Financing; (B) Granting Superpriority Expense Claims and Security Interests; and (C) Granting Other Relief Under 11 U.S.C. §§ 105, 361, 362, 363 and 364, F.R.B.P. 2002 and 4001; and LBRs 2002-1 and 4001-2 at 14, 33, *In re Downey Regional Medical Center-Hosp., Inc.*, No. 2009-BK-34714-BB (Bankr. C.D. Cal. Oct. 19, 2009) (No. 148) (J. Bluebond) (allowing for process to pay "critical vendor claims"); Order Authorizing The Debtor To Pay Prepetition Claims Of Critical Vendors, at 2, *American Suzuki Motor Corporation*, No. 8:12-bk-22808-SC (Bankr C.D. Cal. Nov. 7, 2012) (No. 69) (J. Clarkson) ("The Debtor is authorized, but not directed, to pay in its sole discretion the prepetition claims of Critical Vendors

---

[7] Some have misconstrued *Matter of B & W Enterprises, Inc.*, 713 F.2d 534 (9th Cir. 1983) as prohibiting Critical Vendors Motions altogether. Such notions are contrary to the Supreme Court's analysis in *Jevic*. Instead, *B & W Enterprises, Inc.* should be narrowly construed:  the debtor may not use 11 U.S.C. § 510 to subvert the Bankruptcy Code's priority scheme without evidence of misconduct by the creditor not receiving payment on prepetition expenses. *Matter of B & W Enterprises, Inc.*, 713 F.2d at 537.

[8] This list is non-exhaustive.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in the ordinary course of the Debtor's business relating to undisputed prepetition claims that the Debtor, in its business judgment, determines is necessary and appropriate for the operation of its business); Final Order Authorizing: 1) the Debtors to Pay Prepetition Lien Claimants; and 2) Certain Financing Institutions to Honor All Related Checks and Electronic Payment Request at 2, *California Coastal Communities, Inc.*, No. 8:09-bk-21712-TA (Bankr. C.D. Cal. Dec. 9, 2009) (No. 87) (J. Albert) (granting "critical vendor" motion and authorizing vendors "to continue supplying goods and services to the Debtors on the same trade terms given to them prior to the Petition Date or upon such other agreed trade terms as the Debtor may recommend"); Order Granting Evergreen Oil, Inc.'s Emergency Motion For Entry Of An Order Authorizing Debtor To Honor Pre-Petition Obligations To Critical Vendors And To Continue Vendor Programs at 2, *In re Evergreen Oil, Inc.*, No. 8:13-bk-13163 (Bankr. C.D. Cal. Apr. 10, 2013) (No. 32) (J. Clarkson) (granting critical vendors motion); Order Granting Debtor's Emergency First Day Motion for an Order Authorizing Debtor to Pay Pre-Petition Claims of Certain Critical Vendors at 2, *In re HDOS Enterprises*, No. 2:14-BK-12028-NB (Bankr. C.D. Cal. Feb. 6, 2014) (No. 66) (J. Bason) (granting critical vendors motion); Order Granting Motion For Entry Of An Order Authorizing Debtor To Honor Pre-Petition Obligations To Critical Vendors, *In re Green Fleet Systems, LLC*, No. 2:15-bk-11542-BR (Bankr. C.D. Cal. Mar. 16, 2015) (No. 81) (J. Russell) (granting critical vendors motion).

Allowing a debtor to honor prepetition obligations under §105(a) authority is appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).

Moreover, the amount of the Critical Vendor Cap is reasonable—up to $20 Million. In other cases of similar magnitude but with much less at stake than the lives of Patients, such as for grocery chains like In re The Great Atlantic & Pacific Tea Co., et. al and In re Tops Holding II Corporation, et. al., courts have allowed significantly higher amounts. See Final Order

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and Section 503(b)(9) Claims, Approving Related Procedures, and Granting Related Relief, I*n re The Great Atlantic & Pacific Tea Co., et al.*, No. 10-24549-RDD (Bankr. S.D.N.Y. Jan. 13. 2011) (No. 504) (authorizing payment of up to $62 Million to critical vendors); Order signed Authorizing Debtors to Pay Certain Prepetition Obligations to Critical Vendors, Approving Related Procedures and Granting Related Relief at 3, *In re Tops Holding II Corporation, et al.*, No. 18-22279-RDD (Bankr. S.D.N.Y. Mar. 22, 2018) (No. 181) (authorizing payment of up to $36 Million to critical vendor cap).

Recognizing that, as here, payment of certain prepetition claims may be required to achieve legislative goals of preserving going concern value and maximizing the property available to satisfy creditors, bankruptcy courts have granted relief consistent with the relief requested herein for similarly-situated debtors. *See, e.g.*, Interim Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and Section 503(b)(9) Claims, Approving Related Procedures, and Granting Related Relief, *In re The Great Atlantic & Pacific Tea Co., et al.,* (Bankr. S.D.N.Y. Dec. 14, 2010) (No. 55) (interim and final orders authorizing payment of up to $62 Million on account of claims held by critical vendors); Interim Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) And 503(b)(9) (i) Authorizing, But Not Directing, Debtors to Pay Prepetition Obligations of Critical Vendors, and (ii) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers and Order Pursuant to 11 U.S.C. §§ 503(b)(9) And 105(a) (i) Approving Procedures for the Assertion, Resolution, and Satisfaction of Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9) and (ii) Prohibiting Vendors from Pursuing Such Claims Outside the Procedures at 4, *In re Chassix Holdings, Inc.*, No. 15-10578 (Bankr. S.D.N.Y. Mar. 13, 2015) (No. 85) (interim order authorizing payment of up to $5 Million on account of claims held by critical vendors); Order Approving Procedures for the Assertion, Resolution, and Satisfaction of Claims Asserted and Prohibiting Vendors from Pursuing Such Claims Outside the Procedures, *In re Chassix Holdings, Inc.*, No. 15-10578 (Bankr. S.D.N.Y. Apr. 14, 2015) (No. 275) (final order authorizing payment of up to $40 Million on account of

- 37 -

claims held by critical vendors) (citing Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 503(b)(9) for Entry of Order (I) Authorizing, But Not Directing, Debtors to Pay Prepetition Obligations of Critical Vendors, and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers at 12, *id.* (Bankr. S.D.N.Y. Mar. 12, 2015) (No. 24)); Interim Order Authorizing the Debtors to Pay the Pre-petition Claims of Certain Essential Suppliers and Service Providers and Granting Certain Related Relief; *In re Hostess Brands, Inc.*, No. 12-22052 (Jan. 13, 2012) (No. 76) (interim and final orders authorizing payment of up to $14 Million on account of claims held by critical vendors); Order Granting Motion of Debtors and Debtors in Possession, Pursuant to Sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, for Interim and Final Orders Authorizing Them to Pay the Prepetition Claims of Certain Essential Suppliers and Service Providers and Granting Certain Related Relief, *In re Hostess Brands, Inc.*, No. 12-22052 (Jan. 27, 2012) (No. 196) (interim and final orders authorizing payment of up to $14 Million on account of claims held by critical vendors); Final Orders Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and Lien Claimants, Approving Related Procedures and Authorizing and Directing All Financial Institutions to Honor All Related Payment Requests at 3, *In re The Readers Digest Ass'n, Inc.*, No. 09-23529 (Bankr. S.D.N.Y. Sept. 17, 2009) (No. 91) (authorizing payment of up to $25 Million to critical vendors).

The Debtors also move under §§ 363, 503, and/or 549, as more fully discussed below.

Moreover, local, state, and federal law places certain compliance requirements on the Debtors, which can only be fulfilled through continued, uninterrupted access to various goods and services these Critical Vendors provide. More specifically, as outlined above, as the operator of hospitals licensed under California state law and certified to participate in the Medicare and Medicaid programs, the Debtors must comply with all hospital licensing and certification requirements, including those found in the Health and Safety Code and in Title 22 of the California Code of Regulations, as well as the applicable Medicare conditions of participation and corresponding Medicaid requirements. *See, e.g.*, Cal. Health & Safety Code §§ 1250 *et seq.*; 22

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

1   Cal. Code Regs §§ 70001, *et seq.*; 22 Cal. Code Regs. § 51207; 42 C.F.R. §§ 482 *et. seq.* In
2   addition to complying with these overarching requirements, the Debtors must monitor and
3   comply with all of the other licensing and operational requirements that apply to the different
4   service lines and programs offered by the hospitals, including, for example, those applicable to
5   the hospital pharmacies and laboratories. *See, e.g.*, Cal. Bus. & Prof. Code §§ 1200 *et. seq.*, Cal.
6   Bus. & Prof. Code §§ 4000 *et. seq.*, Cal. Health & Safety Code §§ 11000 *et. seq.*, 16 Cal. Code
7   Regs. §§ 1700 *et. seq.* These extensive, comprehensive requirements must be met in order to
8   ensure that the Hospitals can continue to operate in a compliant fashion, delivering quality health
9   care to the patients and communities they service. The Debtors require the assistance of its
10  Critical Vendors in order to do so. It is imperative the Debtors are able to rely on a consistent,
11  quality supply of the Critical Vendors.

12          i.          **Section 363 Allows the Debtors to Honor Critical Vendor's Prepetition**
13                      **Claims Under the Business Judgment Rule**

14          Section 363, which permits a debtor in possession to use, sell, or lease estate property,
15  provides authority for the Debtors to continue to pay and/or honor the prepetition claims (up to
16  the Critical Vendor Cap)—with (i) an interim amount of up to $5 Million; and (ii) an additional
17  amount of up to $15 Million, for a total of $20 Million—of the Critical Vendors, in the amounts
18  set forth in the Budget attached to the Chou Declaration, in the ordinary course of the Debtors'
19  business and in the Debtors' discretion, and pursuant to the Protocol. Under § 363 a court may
20  authorize a debtor in possession to expend funds outside the ordinary course of business where, in
21  the debtor's judgment, the expenditure is in the best interest of the bankruptcy estate. *See e.g.*,
22  Order signed Authorizing Debtors to Pay Certain Prepetition Obligations to Critical Vendors,
23  Approving Related Procedures and Granting Related Relief at 3, *In re Tops Holding II*
24  *Corporation, et al.*, (Bankr. S.D.N.Y. Mar. 22, 2018) (No. 181) (authorizing the debtors under §
25  363 to use their sole reasonable business judgment to pay critical vendors up to a $36 Million
26  critical vendor cap).

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Other courts have reached similar conclusions in other factual scenarios related to prepetition debts. For example, the Ninth Circuit Court of Appeals has permitted the payment of prepetition debts when necessary for rehabilitation. *See Burchinal v. Central Washington Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987) ("Cases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts."). Similarly, in *In re Structuralite Plastics Corp.*, 86 B.R. 922, 932 (Bankr. S.D. Ohio 1988), the court found that payment of prepetition claims was justified where otherwise the Debtors' rehabilitative effort would have been immediately aborted. *See also Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A.Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on § 363 to allow contractor to pay prepetition claims for suppliers).

The Debtors have determined, in the exercise of their business judgment, that continuing to pay and/or honor the prepetition claims (up to the Critical Vendor Cap) of the Critical Vendors in the amounts set forth in the Budget attached to the Chou Declaration, in the Debtors' discretion and pursuant to the Protocol, is in the overwhelming best interests of their Estates. Granting the Debtors the authority to pay and/or honor such prepetition claims (up to the Critical Vendor Cap) greatly benefits the Estates by preserving the Debtors' relationships with their most critical vendors and employees, without whom the Debtors cannot adequately provide medical services or comply with statutory requirements necessary for certification, and by maintaining the value of the company, so that the Debtors can continue business operations while they continue upon a marketing and sale process for their business.

Simply put, if the Debtors are not permitted to continue making and/or honoring the prepetition claims of the Critical Vendors, the Debtors will not be able to provide medical services or meet the requirements of local, state, and federal law, such as the federal Medicare program, California's Title XII requirements, or 22 Cal. Code Regs §§ 70001, *et seq.*, Cal. Health & Safety Code §§ 1250 *et seq.*, and the Debtors will be unable to generate sufficient revenue to

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

continue their business operations. This, in turn, will drastically and negatively impact the value of the Debtors' business as a going-concern (and correspondingly, the value of the Debtors' assets), jeopardize the Debtors' ability to sell their business and assets, and potentially eliminate the Debtors' ability to successfully reorganize in this case.

The decision to pay Critical Vendors is a valid exercise of the Debtors' business judgment. The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See, e.g.*, *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *accord In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) ("in evaluating the [business] decision, the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate.").

Moreover, if "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. Of Asbestos-Related Litigants v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *F.D.I.C. v. Faigin*, No. CV 12–03448-DDP, 2013 WL 3389490, at *5 (C.D. Cal. July 8, 2013) ("The California business judgment rule . . . establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest.") (citations omitted). Courts should decline to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions are attributable to any "rational business purpose." *Integrated*, 147 B.R. at 656 (quoting *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 436 (S.D.N.Y. 1988)); *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665; *In re AWTR Liquidation Inc.*, 548 B.R. 300, 314

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

(Bankr. C.D. Cal. 2016) ("The effect of the business judgment rule is to raise the burden of proof from ordinary negligence to gross negligence—"i.e., failure to exercise even slight care."); *Mann v. GTCR Golder Rauner, L.L.C.,* 483 F. Supp. 2d 884, 902 (D. Ariz. 2007) ("because the business judgment rule is a powerful presumption, it can only be rebutted in those rare cases where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.") (citations omitted).

### ii.    Section 105 Empowers the Court to Grant Critical Vendor Relief

Section 105 relief is necessary here for the Debtors to carry out their fiduciary duties under § 1107(a). Section 105(a) empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105. Section 1107(a) "contains an implied duty of the debtor-in-possession" to "protect and preserve the estate, including an operating business' going-concern value," on behalf of a debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle* (*In re Penick Pharm., Inc.*), 227 B.R. 229, 232–33 (Bankr. S.D.N.Y. 1998) ("[U]pon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee.").

As life-saving medical service providers, the Debtors are in a vulnerable position—without the continual flow of vital medical services, medical supplies, medical equipment, physicians, nurses, nurse practitioners, physicians assistants, professional technicians such as, imaging technicians, surgical technicians, sterile processing technicians and interim clinical/management staff, coders, admission department staff, as well as non-medical services, information technology support, and/or benefits, the entire mission of the Debtors' business would immediately unravel, irreparably harming the Debtors and their Patients.

Additionally, failure to grant the relief requested by this Motion could result in the Debtors' inability to meet certain requirements set forth by local, state, and federal law. *See, e.g.,*

108915075\V-1

22 Cal. Code Regs §§ 70001, et seq.; Cal. Health & Safety Code §§ 1250 et seq. Furthermore, the Critical Vendors in this case have little incentive to continue services with the Debtors should the Court fail to grant the Debtors' Motion, and indeed, many have indicated as much. And, the automatic stay of § 362(a) is inadequate to address the issue. In support of the Motion, however, is the fact that even the most disfavored creditors will be as well off, if not better well off, if the Court grants the Debtors' Motion.

As noted above, the Debtors intend to market and sell their Hospitals and other assets as a going concern. Therefore, it is critical that, while the Debtors proceed with an expedited marketing and sale process for their Hospitals and other assets, the Debtors maintain their medical and business operations and preserve the value of their assets. The Debtors can only do so by continuing to retain their employees or contractors, operate their medical facilities, or meet their Patients' daily medical services needs and statutory compliance requirements in the ordinary course of business, which the Debtors simply cannot do without the services and goods provided by the Critical Vendors.

###    iii.    Section 503(b)(9) Allows for Prepetition Payment on Goods Received within Twenty (20) Days Prior to Petition Date

Alternatively, § 503(b)(9) provides administrative priority for the "value of any goods received by the debtor within twenty (20) days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business." *See also In re Brown & Cole Stores, LLC*, 375 B.R. 873, 878 (B.A.P. 9th Cir. 2007) (recognizing that § 503(b)(9) applies to critical vendors supplying goods). These claims must be paid in full for the Debtors to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A).

In fact, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation. As administrative claims incurred in the ordinary course of business, the Debtors submit that they may pay such claims in accordance with their business judgment pursuant to § 363(c)(1). Courts have regularly authorized the payment of claims arising under § 503(b)(9) in the ordinary course of business. *See, e.g.*, Order Pursuant to 11 U.S.C. §§ 503(b)(9) and 105(a) (i) Approving Procedures for the Assertion, Resolution, and Satisfaction of Claims Asserted

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 43 -

108915075\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Pursuant to 11 U.S.C. § 503(b)(9) and (ii) Prohibiting Vendors from Pursuing Such Claims Outside the Procedures at 4, *In re Chassix Holdings, Inc.*, No. 15-10578 (Bankr. S.D.N.Y. Apr. 14, 2015) (No. 275) (authorizing debtors to pay vendors' claims entitled to priority under § 503(b)(9) "in the ordinary course if the Debtors determine it is in the estates' best interests to do so"); Interim Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and Section 503(b)(9) Claims, Approving Related Procedures, and Granting Related Relief, *In re The Great Atlantic & Pacific Tea Co., et al.,* No. 10-24549 (Bankr. S.D.N.Y. Dec. 14, 2010) (No. 55) (interim and final orders authorizing payment of claims entitled to administrative priority pursuant to § 503(b)(9) up to $5 Million); Final Order Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and Section 503(b)(9) Claims, Approving Related Procedures, and Granting Related Relief, *In re The Great Atlantic & Pacific Tea Co., et al.,* (Bankr. S.D.N.Y. Jan. 13. 2011) (No. 504) (interim and final orders authorizing payment of claims entitled to administrative priority pursuant to § 503(b)(9) up to $5 Million); Interim Order Authorizing, But Not Directing, Payments Of Pre-Petition Claims Of Certain Critical Vendors And Administrative Claim Holders And Granting Related Relief; *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. July 8, 2009) (No. 68) (interim and final orders authorizing payment of claims entitled to administrative priority pursuant to § 503(b)(9) up to $23.15 Million and $46.3 Million, respectively); Final Order Authorizing, But Not Directing, Payments of Prepetition Claims of Certain Critical Vendors and Administrative Claimholders and Granting Related Relief, *In re Lear Corp.*, (Bankr. S.D.N.Y. July 31, 2009) (No. 245) (interim and final orders authorizing payment of claims entitled to administrative priority pursuant to § 503(b)(9) up to $23.15 Million and $46.3 Million, respectively); Final Order Authorizing the Debtors to Pay the Prepetition Claims of Certain Essential Suppliers and Administrative Claimholders, Continuing the Debtors' Troubled Supplier Program and Granting Certain Related Relief at 6, *In re Chrysler LLC*, No. 09-50002 (Bankr. S.D.N.Y. May 20, 2009) (No. 1318) (authorizing debtors to pay uncapped "claims of any creditors or claimants entitled to administrative priority pursuant to section 503(b)(9) . . .

108915075\V-1

in the ordinary course of the Debtors' businesses and on such terms and conditions as the Debtors deem appropriate," subject to the terms of debtors' DIP facility).

Thus, payment of the Medical Supplies and Equipment Providers' claims for supplies received by the Debtors within 20 days prior to the Petition Date must be allowed as administrative expenses, and this Court should allow the Debtors to pay these claims in accordance with the relief requested in this Motion.

### iv.   Section 549 Provides the Court Authority to Approve Postpetition Transfers of Property Such as Payment to Critical Vendors

Finally, § 549(a)(2)(B), which governs postpetition transfers, provides in part that "the trustee may avoid a transfer of property of the estate made after the commencement of the case; and [] that is not authorized [] by the court." 11 U.S.C. § 549(a)(2)(B). Therefore, it logically follows that the Court may authorize certain postpetition payments to satisfy prepetition debts. In fact, as one district court noted:  "[i]t would appear that proposed transfers [to pay prepetition claims] could be presented in advance to a bankruptcy court for its approval and would thereafter be insulated from attack[.]" *In re Isis Foods, Inc.*, 37 B.R. 334, 336 n.3 (W.D. Mo.), *appeal dismissed*, 738 F.2d 445 (8th Cir. 1984).

In this case, honoring the prepetition claims of the Debtors' Critical Vendors will have no negative impact on the payment of other creditors' claims. In fact, honoring the prepetition claims of the Critical Vendors will only maintian the quality of Patient care, improve the Debtors' chances of successfully reorganizing or selling assets, and repaying their other creditors. Any benefit to the Estates that could be gained by not paying the Critical Vendors' claims would be more than outweighed by the detriment to the Estates caused by the loss of the Debtors' relationships with such Critical Vendors. As noted above, if the Critical Vendors refuse to provide any further services or goods, the Debtors will not be able to retain their employees, operate their business, or—most imortantly—fulfill their Patients' daily medical services needs. Indeed, the Debtors will not be able to generate sufficient revenue to maintain the quality of patient care and otherwise continue their business operations. This, in turn, will put Patients at risk, cripple the Debtors' business operations, and potentially squash any chance of

- 45 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
consummating a sale of the Debtors' business as a going concern for maximum value and any

chance for the Debtors to successfully reorganize in this case.

3

### v.    Policy Considerations for Granting this Motion

4
In cases of similar magnitude filed in the Southern District of New York, Delaware, and

5
Texas bankruptcy courts routinely grant debtors' motions to pay and/or honor the prepetition

6
claims of the critical vendors in the debtors' discretion and in the ordinary course of the debtors'

7
business pursuant to similar protocols as the Protocal proposed herein. *See, e.g.*, Transcript at 35,

8
*In re The Reader's Digest Ass'n, Inc.*, No. 09-23529 (Bankr. S.D.N.Y. Aug. 25, 2009) (No. 34);

9
*see also* Transcript at 56, *In re The Great Atlantic & Pacific Tea Co., et al.,* No. 15-23007 (Bankr.

10
S.D.N.Y. July 20, 2015) (No. 667) (approving interim critical vendor relief where the process was

11
supervised by "senior people who understand the tension involved in paying prepetition debt as

12
against the net benefit to the debtor of having critical supplies in essence for their stores").

13
Furthermore, allowing the Debtors to pay the Critical Vendor Claims, pursuant to all or

14
some of the above-referenced provisions, is especially appropriate where, as here, doing so is

15
consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving

16
going concern value and maximizing the value of property available to satisfy creditors. *See Bank*

17
*of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999). Indeed,

18
reflecting the recognition that payment of prepetition claims of certain essential suppliers and

19
vendors is, in fact, both critical to a debtor's ability to preserve going-concerns and maximize

20
creditor recovery—thereby increasing prospects for a successful reorganization and/or sale—

21
courts have regularly granted relief consistent with that which the Debtors are seeking in this

22
Motion. Final Order (I) Authorizing, But Not Directing, Debtors to Pay Pre-Petition Claims of

23
Critical Vendors and (II) Authorizing and Directing Financial Institutions to Honor and Process

24
Related Checks and Transfers, *In re Geokinetics Inc.*, No. 18-33410 (Bankr. S.D. Tex. July 16,

25
2018) (No. 196); Final Order (I) Authorizing Debtors To Pay Certain Prepetition Claims of

26
Critical Vendors and (II) Granting Related Relief, *In re GST AutoLeather, Inc.*, No. 17-12100

27
(Bankr. D. Del. Nov. 13, 2017) (No. 254); Order (FINAL) Authorizing the Debtors to Pay

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 46 -

Prepetition Claims of Certain Critical Vendor, *In re M&G USA Corporation*, No. 17-12307 (Bankr. D. Del. Nov. 30, 2017) (No. 292); Order (Final) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors, *In re Appvion, Inc.*, No. 17-12082 (Bankr. D. Del. Oct. 30, 2017) (No. 210); Order [FINAL] (A) Authorizing Debtors to Pay Certain Prepetition Claims of Critical Vendors and (B) Granting Related Relief, *In re True Religion Apparel, Inc.*, No. 17-11460 (Bankr. D. Del. July 31, 2017) (No. 233); Order Granting Motion for Payment of Critical Vendors, *In re Emas Chiyoda Subsea Ltd.*, No. 17-31146 (Bankr. S.D. Tex. Mar. 28, 2017) (No. 173); Order Granting Motion For Authority To Pay Or Honor Pre-Petition Obligations To Certain Critical Vendors, *In re Goodrich Petroleum Corp.*, No. 16-31975 (Bankr. S.D. Tex. May 12, 2016) (No. 165).

Moreover, as noted above, the amounts proposed to be paid to the Debtors' most critical vendors, up to the Critical Vendor Cap—as mentioned in the Declaration of Richard Adcock in Support of the Emergency Motions filed concurrently herewith—in the Debtors' discretion and in the ordinary course of the Debtors' business, and pursuant to the Protocol, have already been included in the Budget that has been approved by the Debtors' senior secured lender, as set forth in the Chou Declaration. Accordingly, the Debtors have the financial ability to make the payments proposed to be made to the Debtors' most critical vendors, and such payments will not render the Debtors' Estates administratively insolvent.

For the reasons noted above, the Debtors' ability to pay and/or honor the prepetition claims (up to the Critical Vendor Cap) of the Critical Vendors is instrumental to the Debtors' maintenance of the quality of patient care and reorganization efforts and is in the best interests of the Estates and their creditors. Any disruption in the Debtors' ability to pay and/or honor such claims (up to the Critical Vendor Cap) would undoubtedly cause immediate and irreparable harm to the value of the Debtors' business and assets, and potentially eradicate any chance for the Debtors to consummate a sale of their business and assets. To avoid this result, the Debtors should be permitted to pay and/or honor the prepetition claims of the Critical Vendors, as listed in

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 47 -

1
2
the exhibits to the Chou Declaration, in the Debtors' discretion and in the ordinary course of the
Debtors' business, and in accordance with the Protocol, terms, and conditions set forth herein.

3

## VI.    CONCLUSION

4
5
**WHEREFORE**, the Debtors respectfully request that this Court hold an emergency
hearing on the Motion and issue an Interim Order:

6
7
(1)    affirming the adequacy of the notice given;

(2)    granting the Motion in the interim;

8
9
10
11
(3)    authorizing, but not directing, the Debtors to continue to pay and/or honor the
prepetition claims (up to $5 Million) of the Critical Vendors, in the ordinary course of the
Debtors' business, in the Debtors' discretion, and in accordance with the Protocol and the Budget;
and

12
13
(4)    granting such other and further relief as the Court deems just and proper under the
circumstances.

14
15
**WHEREFORE**, the Debtors also respectfully request that this Court hold a final hearing
on the Motion and issue a Final Order:

16
17
(1)    affirming the adequacy of the notice given;

(2)    granting the Motion in its entirety;

18
19
20
21
(3)    authorizing, but not directing, the Debtors to continue to pay and/or honor the
prepetition claims (up to a total of $20 Million) of the Critical Vendors, in the ordinary course of
the Debtors' business, in the Debtors' discretion, and in accordance with the Protocol and the
Budget; and

22
23
(4)    granting such other and further relief as the Court deems just and proper under the
circumstances.

24
25
26
27
28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 48 -

108915075\V-1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Dated:  August 31, 2018

DENTONS US LLP
SAMUEL R. MAIZEL
JOHN A. MOE, II
TANIA M. MOYRON


By_____/s/ Tania M. Moyron_____
        Tania M. Moyron

Proposed Attorneys for the Chapter 11
Debtors and Debtors In Possession

- 49 -

108915075\V-1