## Appendix II

A

2017 WL 1511888
**DESIGNATED FOR ONLINE PUBLICATION**
United States Bankruptcy Court,
D. Kansas.

IN RE: LISTER–PETTER AMERICAS,
INCORPORATED, Debtor.
In re: Lister–Petter U.S. Holdings, Inc., Debtor.

Case No. 15–10502, Case No. 15–10504
|
Signed April 25, 2017
|
Filed 04/26/2017

**Attorneys and Law Firms**

W. Thomas Gilman, Edward J. Nazar, Hinkle Law Firm, L.L.C., Wichita, KS, for Debtor.

J. Michael Morris, Klenda Austerman LLC, Wichita, KS, pro se.

Richard A. Wieland, Office of U.S. Trustee, Wichita, KS, for U.S. Trustee.

**ORDER ON GORDIAN TRADING**
**LTD's MOTION FOR STAY RELIEF**

Robert E. Nugent, United States Bankruptcy Judge

**\*1**  Cause, including the lack of adequate protection of a creditor's interest in estate property, is a ground for lifting § 362(a)'s automatic stay. [1]  Collateral is inadequately protected if its value is permitted to diminish in the hands of the estate. But, in order to grant stay relief, the Court must conclude, first that the creditor has a claim to the collateral, second, that the creditor's interest has not been protected, and third, that the estate lacks a colorable defense to the validity or enforceability of the creditor's claim and that the balance of harm weighs in favor of the estate retaining the affected property while its defenses are litigated.

During his administration of this case, trustee J. Michael Morris sold all of the debtor's assets under this Court's order issued pursuant to § 363(f) and all liens then attaching to those assets have now attached to the funds in the trustee's hands. [2]  That fund has diminished over time because the Court has approved certain payments of administrative expenses and because the trustee was required by U.S. Trustee procedures to deposit the fund in a bank that not only pays no interest on it, but charges a monthly percentage service fee to hold the money. Absent other facts in this case, that diminution might suffice to lift the stay here. But there are other, more troubling issues that arise out of the alleged conduct of one of the debtor's former principals, Trevor Modell, and his affiliated entities.

Mr. Modell, a United Kingdom resident, is a director of and runs the aptly-named Gordian Trading Ltd., the post-petition assignee of a secured claim in this case. [3]  Mr. Modell has also been, and, at a relevant time, was simultaneously a director and indirect owner of the debtor, Lister Petter Americas, Inc. (LPAI) and a director and manager of Dorset Road 1, Ltd., LPAI's principal account debtor. The trustee alleges that, before this case was converted to chapter 7, Mr. Modell caused LPAI to ship over $1.5 million worth of goods to Dorset Road 1 in the United Kingdom, that Dorset Road 1 refused to pay for those goods, and that Mr. Modell placed Dorset Road 1 in a UK insolvency or liquidation proceeding. During this same time period, and while LPAI was in bankruptcy here, Modell caused Gordian to acquire the principal secured creditor's loans and security interests attaching to LPAI's assets, effectively placing him, according to the trustee, on all sides of the case. So the trustee has filed an adversary proceeding seeking *inter alia* to recover LPAI's property transferred to Dorset Road and Modell and to equitably subordinate Gordian's claim under 11 U.S.C. § 510(c). [4]  He has also objected to Gordian's claim. [5]

**\*2**  At the close of the evidentiary hearing on this motion, the Court directed the trustee to invest the sale proceeds in federally-issued securities to stop the payment of service fees. [6]  Investing these funds at interest adequately protects them for now. The Court's review and understanding of the web of interests and transactions engaged in by Gordian and Dorset (through Modell) suggests, at a minimum, a plausible case for self-dealing on the part of Modell and others amounting to conduct that would support the equitable subordination of Gordian's claims. And, as discussed below, the activities surrounding Gordian's post-petition acquisition of the debt cast enough doubt on the amount of that debt that Gordian

may be on strict proof of the validity of its claim in this case. In these circumstances, releasing these proceeds to Gordian, another United Kingdom entity, would subject the estate to greater harm than Gordian will suffer if the stay remains in place with certain conditions, including that the funds be immediately invested at interest, not at a cost. Gordian's motion for relief from the automatic stay is denied. [7]

I. Facts

A. Debtors' cases and background of debtors [8]

Lister–Petter Americas, Inc. (LPAI) filed this case under chapter 11 on March 17, 2015. Trevor Modell provided electronic signatures on both the petition and subsequently filed schedules and statements of financial affairs. [9] On the same day, LPAI's parent company, Lister–Petter U.S. Holdings, Inc. (LPUSH), also filed a chapter 11 case. The Court ordered joint administration of the cases. [10] Both debtors moved for first day orders, including the use of LPAI's principal secured creditor's cash collateral and for an order approving post-petition lending. The principal secured creditor, Embracing Solutions Limited (ESL), filed a detailed response, but ultimately agreed to some limited cash collateral use. [11] The post-petition lender, R.A. Lister Overseas Investment, Inc. (RALOI) agreed to advance the debtor an additional $200,000 as operating capital. [12] RALOI owned LPUSH and, as such, was LPAI's indirect owner. In its cash collateral motion, debtor represented that it owed "not less than" $304,000 "after application of the balance of the value of securities held in account number ending * * *017 held with UBS (Monaco) SA in the name of Bakersfield Limited." [13] The debtor filed other first day motions as well, and the Court convened a preliminary hearing on March 20, 2015. At that time, the debtor received interim relief and a final hearing was scheduled for April 9, 2015. The interim order provided for a cash collateral carve-out of $35,000 for all estate and creditor's committee professionals during the interim period before a final order could be entered. [14] The interim order also recognized that ESL's claim was secured by guaranties from several related Lister–Petter entities including Lister–Petter Investment Holdings, Ltd. (LPIH), Lister–Petter FZE (FZE), RALOI, Lister–Petter

Green Technologies Limited (LP Green), and Robert D'Aubigny. [15] The relationships among these entities will be discussed below. The interim order also set an objection deadline of April 7, 2015. On April 1, the debtor filed its schedules and statements of affairs, all electronically signed by Mr. Modell. [16] The Court entered an order on April 8, 2015 fixing the claims bar date as July 9, 2015. [17]

**\*3** On April 7, ESL filed a combined response to the various interim orders, indicating that it was negotiating with the debtor concerning extending and modifying the cash collateral order. [18] At the April 9 hearing, the parties informed the Court they would be providing an agreed second interim cash collateral order. [19] On April 13, the U.S. Trustee announced the appointment of an Unsecured Creditors Committee (the Committee). The Committee applied to employ counsel and it was preliminarily approved on April 20. On May 6, the Committee objected to the cash collateral motion, asserting that granting ESL a sweeping senior lien on all of the debtor's assets effectively eviscerated any investigation by the Committee of ESL's liens and conduct, noting that "ESL is a likely target of litigation in these cases, at the least to determine the extent and amount of its claim, and whether its claim should be equitably subordinated." [20] The Committee followed up with a motion for a Rule 2004 examination of ESL and, on May 11, ESL's counsel moved to withdraw, indicating that "[t]he reason for the withdrawal is that ESL has recently sold its loan position to Gordian Trading Limited ("Gordian") and no longer has or asserts any interest in the Debtors or their assets and is no longer a creditor of the bankruptcy estates." [21]

On May 12, 2015, the Court convened a § 105(d) status conference and a final hearing on cash collateral and other "first day" matters. At that hearing, the Court extended the interim cash collateral order again, setting a further final hearing on May 28, 2015, partly to allow counsel for the assignee, Gordian, to get up to speed in the case. That ruling was memorialized in an interim order entered on May 21. [22] At the May 28 hearing, all counsel announced that an agreed final order on cash collateral extending its use for 60 days would be submitted, along with a new cash collateral budget and a provision that the Committee would be granted 60 days after Gordian produced all of the loan documents to challenge the claim. [23] No such order was ever filed.

Instead, on June 10, the Committee moved for the appointment of a chapter 11 trustee, alleging that Trevor Modell had now positioned himself on every side of the case and had failed to instruct the debtor or its representatives to act in accordance with their fiduciary duties to the estate. [24] The next day, the U.S. Trustee moved to convert the case to chapter 7 liquidation or dismiss. [25] The debtor responded, stating it intended to promptly liquidate its assets and noting that Philip Briggs, its manager, was being paid by Dorset Road and/or Gordian, not the debtor. [26] The Court set the motions to an evidentiary hearing on June 16 and the debtor filed a separate motion to convert on June 15. Gordian filed a response assenting to the liquidation. After an evidentiary hearing on June 16, the court directed that a chapter 11 trustee be appointed and denied the motions to convert. [27] J. Michael Morris was appointed chapter 11 trustee on June 26, 2015. Mr. Morris promptly evaluated the likelihood of reorganization and, finding that wanting, set about liquidating the debtor's assets in an effort to stop rent, utility, and other operating expenses.

Pursuant to § 363(f) notices, the trustee sold the debtors' assets free and clear of liens and such liens as Gordian asserts were transferred to the proceeds in the trustee's hands. After seeking allowance of various administrative expenses related to the sales and winding up of operations, the trustee moved to convert the case to chapter 7 on November 5, 2015 and an order converting was entered on December 14. Upon being reappointed a chapter 7 trustee, Mr. Morris sought to retain the Committee's counsel as special counsel to the estate for the purpose of investigating and pursuing claims against Gordian and other parties in connection with their activities before and during the case; that application to employ was granted May 19, 2016. [28] Gordian filed this motion for stay relief for cause on August 19, 2016. [29] After allowing the parties a discovery period, this Court conducted an evidentiary hearing on February 28 and March 1, 2017 at which Messrs. Modell, Morris, and Nazar, formerly debtors' counsel, testified.

#### B. Lister–Petter, Gordian Trading, D'Aubigny, and Modell

**\*4** Robert D'Aubigny and Trevor Modell sit at the top of a pyramid of similarly-named inter-related entities (several based in offshore debtors' havens), occupying positions on all sides of this debtor. Their web of relationships understandably excites the interest of the other creditors and their representative, the trustee. The trustee has suggested that Modell has taken advantage of his positions with the debtor and its now principal secured creditor Gordian to strip the debtor's assets for the benefit of his offshore affiliates in the United Kingdom. A chronology of the matters alleged by the trustee is the best way to understand just how intertwined these various parties are.

Gordian Trading was incorporated in Great Britain as a private company on May 9, 2012. [30] James Winder was its manager, director, and sole shareholder. Trevor Modell's son Devon was a director along with Winder from 2013 on. Trevor was appointed a director of Gordian and signed on as a "consultant" in January of 2014. [31] As of 2016 the Modells and Winder remained as Gordian's three directors. [32] As of the date of the petition, Gordian owned 100% of RALOI, which owned 100% of debtor LPUSH, which in turn owns 100% of debtor LPAI. Gordian is therefore the upstream parent of debtors. [33]

Modell has a variety of business interests in the UK and runs a family business called "ELG." ELG, in turn, owns or controls an entity called Springfield which supplied component parts to Lister–Petter entities including Lister–Petter Limited (LPL) and LPAI. Debtor built and shipped small diesel engines, mostly used to power electrical generators. Modell also owns and controls Dorset Road 1, Ltd., Dorset Road 2, Ltd., and Dorset Road 3, Ltd. Dorset 3 owns MilFab Engineering, one of LPAI's unsecured creditors. Dorset 1 is LPAI's largest account debtor owing more than $1.7 million for parts shipped pre- and post-petition.

According to Modell and the debtor, the Lister–Petter entities were initially owned and controlled by Robert D'Aubigny, a resident of Monaco, and aggregated in "St. Catherine's Trust," a Guernsey, Channel Island entity. The Trust owned Lister Petter Group (LPG), parent to Lister Petter Investment Holdings (LPIH) which, in turn, owned Lister Petter Limited (LPL) and R.A. Lister Overseas Investment, Ltd. (RALOI). RALOI, in turn, owns debtors Lister

Petter United States Holdings (LPUSH) and Lister Petter Americas, Inc. (LPAI). Sometime before 2014, LPL failed to pay Springfield for shipped inventory and, in December of 2014, Lister Petter Group (LPG) was placed in a United Kingdom insolvency proceeding called "Administration"—a judicial liquidation.

In January of 2015, Modell and Gordian approached the LPG administrator offering to purchase RALOI for £1.7 million, but only paid in about £>120,000 of it due to cash flow problems in the American entities. Gordian made no payments to the administrator after July of 2015 because Modell concluded that D'Aubigny had lacked authority to execute the transfer of RALOI from Lister Petter FZE to LPIH. Nevertheless, according to Modell, he needed RALOI so that he could access LPAI's production capacity to service a contract Dorset 1 had won to supply generators in Vietnam. Philip Briggs, who appeared in this case as general manager of LPAI, testified at the cash collateral hearing that he was employed and compensated by Dorset 1 and FZE.[34] Modell and Briggs appear to have caused the debtor to ship parts to Dorset 1, but, after the bankruptcy case was filed, Dorset rejected them as defective and non-conforming.

**\*5** Modell suggested in testimony that he and D'Aubigny are fierce adversaries,[35] but the record suggests they share common interests. Modell attempted to acquire LPIH's shares in another entity, Lister Petter, Ltd. and is described in that liquidator's report as "a former director" of LPL. Moreover, it appears that Modell had been involved with the debtor LPAI for at least a year before the filing. A history of the loan that Gordian now claims to own and seeks to enforce in this motion makes that clear. According to documents that were attached to Gordian's proof of claim in this case (signed by Modell), beginning in 2008, the debtor had a $5,000,000 commercial revolving line of credit at the Citizens Bank and Trust (CBT) in Gladstone, Missouri. This loan was secured by all of the debtor's (LPAI's) assets and was guaranteed by LPIH. The loan was amended numerous times and its balance increased to $12,000,000 by June of 2013. But, by March of 2014, the parties had executed a forbearance agreement that indicated the debtor had defaulted. On March 26, the forbearance was modified to extend the maturity of the loan, reduce the available credit to $2,500,000, and to require that Modell supply a guaranty of $950,000 of the debt by April. LP Green Tech was to grant CBT a charge on all of its intellectual property. In September, the

forbearance agreement was further amended to require, among other things, that Bakersfield, an entity apparently controlled by D'Aubigny, agree to pay down the loan by liquidating securities it held in Monaco at UBS Monaco. In return for this, CBT agreed to forbear until March 31, 2015. So, at the beginning of 2015, LPAI was in forbearance status with CBT with the expectation that its debt would be reduced by £955,000 or about $1,402,000 when the securities payment cleared. Debtor had a deposit account at CBT of $639,000 and the balance of its debt was $2,600,000.

Modell was a director and in nominal control of the debtor LPAI because Gordian had entered into an agreement in January of 2015 to purchase RALOI's stock and, based upon his willingness to guarantee part of the debtor's debt, Modell had previously been involved in some way with the company. On March 3, 2015, ESL acquired the loan from CBT along with an assignment of the guaranties of FZE, LP Green Tech, RALOI, D'Aubigny, and the securities pledge of Bakersfield. Modell's guaranty is not mentioned. The Loan Sale Agreement provided that the price of the loan was $1,764,946, that CBT would make demand on the guarantors before transferring the loan, and that ESL and Robert D'Aubigny would release CBT from any claims concerning the transaction. To pay for the assignment, ESL would give CBT a promissory note for the purchase price of the loan secured by a lien on all of the assigned loan documents in ESL's hands. When CBT received the proceeds of the UBS stock securities account and the balance of the amount due under the assignment, it would release its lien. Bakersfield liquidated the securities account and transferred the proceeds on February 27, 2015 to CBT. According to Modell, after this occurred, he ran into Anthony Jaffe, one of D'Aubigny's associates and a principal of ESL, on a plane. Jaffe told him about the CBT–ESL transaction, but noted that D'Aubigny had not caused Bakersfield to pay off the assignment obligation. Modell then proposed that Gordian acquire the CBT loan from ESL. Notably, by this time, Modell was a director of the debtor LPAI. By the time the case was filed on March 17, Gordian was the indirect owner of LPAI through its acquisition of RALOI. Just ten days after the case was filed here, Gordian executed a sale agreement with ESL to purchase the CBT note for $450,000, the sale to be closed April 24. That amount was to be paid by Gordian to Mishcon de Reya, its attorneys in this case, with most of the money being transferred to CBT to pay off ESL's remaining

obligation to CBT under the March agreement, thus releasing D'Aubigny's guaranty and any obligations Jaffe might have. So, by April 24, Gordian, run by Modell, owned the principal secured claim against the debtor LPAI and owned the debtor's owner, RALOI.

Modell as director of Gordian, signed Gordian's proof of claim in LPAI's bankruptcy. [36] According to debtors' March 17, 2015 corporate resolutions authorizing the filing of these bankruptcy cases, Modell was also a director of LPAI and LPUSH and signed the voluntary petitions and schedules. He was thus a director of both LPAI and Gordian at all relevant times until he resigned as director of debtors, after Gordian had acquired the CBT loan from ESL. In the schedules that Modell signed he listed the ESL claim that Gordian acquired in the amount of $304,000 as "disputed;" in Gordian's proof of claim he listed the claim in the amount of $2,048,022.

**\*6** Modell also owned Dorset 1 which owes the debtor over $1,700,000, representing the single largest account receivable. Modell also controls all of LP Green Tech's intellectual property because one of the loan documents assigned to Gordian is the charge on that property.

The Modells resigned as directors of the debtors in June of 2015, around the time of the motions for appointment of a chapter 11 trustee and to convert or dismiss the case. Modell placed Dorset Road 1 in an administration proceeding in the UK on November 26, 2015, thwarting any effort on the part of the estate to collect the account receivable.

## C. The trustee's adversary complaint [37] and claim objection [38]

The trustee sued Modell, his son Devon Modell, and Gordian on February 24, 2017 alleging that Gordian's claim should be equitably subordinated because he says Modell's actions concerning Dorset Road's account payable and Gordian's acquisition of the CBT loan breached Modell's fiduciary duties to the bankruptcy estate and the other creditors. [39] He also claims that Gordian and the Modells are liable for the conduct of D'Aubigny and Jaffe during the time that ESL held the loan, supplying a further basis for subordination. The trustee further claims that Gordian and the Modells

caused the debtor to ship product to Dorset Road 1 and retained control of the property through their control of Dorset Road 1 during the pendency of the case, making them liable for turnover under § 542. The trustee has objected to Gordian's claim in this case, asserting that Modell's signing of debtor's bankruptcy schedules that listed the ESL claim at $304,000 amounts to a judicial estoppel of his now claiming more than $2 million for Gordian. Moreover, he asserts that the debtor should get credit for the value of the intellectual property that is subject to the CBT charge. Finally, the trustee claims the right to surcharge the proceeds of the sale to pay administrative expenses accrued and to be accrued in the case.

## D. Condition of the collateral proceeds fund

When the trustee liquidated LPAI's remaining assets, he deposited them in a trustee account at the Bank of Kansas City. From that account, he paid final sale expenses that included facilities rent, auctioneer's fees, and wages for former employees involved in organizing the sale. Pursuant to the Executive Office of the U.S. Trustee (EOUST) guidelines, chapter 7 trustee accounts can be deposited with only certain approved financial institutions that do not pay interest. Indeed, these institutions charge a monthly service fee that is based upon a percentage of the assets on deposit. As an incentive for the trustees to use these institutions, the approved banks supply trustees with accounting software. As a result, the amount on deposit has been reduced by court-ordered payments to LPAI's landlords and other direct expenses of sale. In addition, until the funds were transferred to the Court's account, the bank assessed an average monthly service fee of $1,000. This diminution and the likelihood of further administrative expenses being surcharged against Gordian form the basis for Gordian's allegation that its interest in the funds lacks adequate protection.

## II. Analysis

**\*7** Gordian, as the successor to ESL and the CBT secured loan to LPAI, contends the automatic stay should be lifted for cause under 11 U.S.C. § 362(d)(1) because its interest in the sale proceeds from the liquidation of LPAI's assets held by the trustee is not adequately protected where those funds are diminishing.

A. Stay Relief Standards and Adequate Protection

"Cause" for relief from the stay is not specifically defined by the Bankruptcy Code, but it includes the lack of adequate protection of the creditor's interest in the collateral or proceeds of the collateral that secure the debt.[40] In prosecuting its stay relief motion, Gordian has the burden of proof on the debtor's equity in the property, but the trustee has the burden of proof on all other issues.[41] The trustee therefore has the burden of proving that Gordian is adequately protected in the proceeds from the sale of debtor's assets that he holds. Here, Gordian contends that it is not adequately protected because the amount of sale proceeds continues to decline due to payment of certain administrative expenses, including the bank's monthly service fees where the funds are on deposit. The trustee counters that the funds on deposit are safe and secure and cannot be disbursed without a court order.

a. Remedying adequate protection issues

Adequate protection is a question of fact to be decided on a case-by-case basis under the totality of the circumstances.[42] The linchpin of adequate protection is value and the court must preserve the value of the collateral.[43] In addition to Gordian's alleged lien in the proceeds from the sale of LPAI's assets that secured the loan, this Court's recent directive that the trustee deposit the funds in an interest bearing account through the Court Registry Investment System (CRIS) administered by the Administrative Office of the United States Courts affords Gordian additional protection from future bank service fees and charges that would otherwise diminish the amount of funds on deposit and held by the trustee.[44] As reported by the trustee, the § 363(f) sales of LPAI's assets in September and October of 2015 grossed $787,629 and in addition, the trustee collected some accounts receivable.[45] Little transaction activity occurred in the trustee's account during 2016 except for the bank service fee charges.[46] Gordian filed its motion for stay relief on August 19, 2016 and the evidentiary hearing was held some six months later, but Gordian never sought to expedite the hearing to stop the siphoning of bank service fees—a situation over which the trustee had no control. Had Gordian done so, the Court likely would have issued

its directive to transfer the funds to CRIS much earlier. The transfer of the funds to an interest-bearing facility provides adequate protection of Gordian's interest in the deposited funds.

**\*8**  In *In re Utah Aircraft Alliance,* the Tenth Circuit Bankruptcy Appellate Panel considered a seller's motion for relief from the stay for lack of adequate protection dealing with seller's retained interest in five aircraft it sold under a prepetition sales agreement with debtor.[47] The trustee argued that seller's security interest was unperfected because it had not recorded its security interest with the Federal Aviation Administration and had a colorable defense to the seller's claim that it had a repairman's lien under state law because the seller did not continuously possess the aircraft as necessary to assert the lien. Because the trustee raised colorable defenses to dispute the seller's claim of ownership and security interest, stay relief was denied.

> At a stay hearing, the court merely determines whether the movant has a colorable claim, i.e., a facially valid security interest. It then should consider whether the objector has raised a colorable defense that, not merely offsets the movant's claim, but actually would defeat the movant's claim. In this context, the bankruptcy court limits its consideration of defenses to those that strike at the heart of the creditor's lien or that bear on the debtor's equity in the property.[48]

Here, the trustee has made a colorable claim that the amount and extent of Gordian's claim to the sale proceeds is substantially overstated or that its claim should be equitably subordinated due to the circumstances surrounding Gordian's acquiring the claim. If that claim acquired from ESL is valid and in the amount of $304,000 as debtor (Modell) represented under penalty of perjury in its bankruptcy papers, rather than the $2.048 million that Gordian now asserts in its proof of claim (also signed by Modell), Gordian is adequately protected in the sale proceeds because the funds on deposit are more than double the amount of the claim as scheduled by debtor and the estate is earning interest on those funds deposited with the court registry.[49] And if Gordian's claim is equitably

subordinated as the trustee alleges it should, it may have no interest in the sale proceeds.

Finally, the credit acquired by Gordian from ESL/CBT was further collateralized by a charge on intellectual property of debtor's affiliate LP Green Tech. [50] Modell controls all of LP Green Tech's intellectual property because one of the loan documents assigned to Gordian is the charge on that property. That intellectual property has not been accounted for nor has its value been determined. Until the intellectual property is determined to have no value, that property provides additional adequate protection. That will be sorted out in the claim objection process, and is further reason to maintain the status quo with respect to the deposited funds.

### B. Trustees' Defenses

Apart from adequate protection, courts consider a number of factors in determining whether cause exists under the totality of the circumstances for lifting the stay, including injury to the movant if the stay is not modified and the good or bad faith of the debtor. [51] The totality of the circumstances encompasses "how the parties have conducted themselves, their good or bad faith, and their motives." [52] Gordian has the initial burden to show that cause exists to lift the stay, after which the ultimate burden shifts to the trustee to demonstrate why it should remain in place. [53]

### a. Balance of harms

**\*9**  Other than delay in realizing on its cash collateral, it is difficult to conclude that Gordian suffers any harm by keeping the stay in place. With the transfer and deposit of the sale proceeds to an interest-bearing account, Gordian's interest in the sale proceeds is protected from diminution in value while the funds remain on deposit and while the parties litigate the extent of Gordian's claim and the claims asserted by the trustee against Modell and Gordian in the adversary proceeding. Lifting the stay and allowing the sale proceeds to be turned over to Gordian and Modell would be letting the horse out of the barn. The amount of Gordian's claim is in serious question, given the conflicting amounts that have been asserted by Modell while acting for LPAI and while acting for Gordian. Gordian's filed

claim may be subject to an estoppel defense. Given the difficulty in exercising jurisdiction over foreign entities and non-resident individuals, and the complex maze of interrelated companies with Modell seemingly involved in all of them in some capacity, the trustee would likely find it difficult to recover the funds if released to Gordian and Modell. Once they have the money, Gordian and Modell would lose any incentive to prosecute their claim, defend the trustee's claims, and to cooperate in the administration of this case. If the Trustee prevailed, the onus to recover these funds would be on him. The balance of harms weighs in favor of the trustee, requiring the continuation of the stay while the Court adjudicates the claims between the parties.

### b. Modell's (and Gordian's) motives and self-dealing

This factor weighs heavily on the "cause" inquiry under the circumstances of this case. As noted by the trustee, Modell was on "all sides" of this case. Gordian (Modell) acquired RALOI shortly before this case was filed and thereby gained control over the debtors. As a director of both debtors he authorized the commencement of this chapter 11 case on March 17, 2015, signing the petition and later signing the schedules filed April 1, 2015.

Modell's companies, Dorset Road and Milfab, were listed among LPAI's largest account debtors. [54] The Dorset Road account debt swelled by $1,520,457 prior to conversion of the case when Modell caused LPAI to ship goods to Dorset Road and Dorset Road refused to pay for them. Modell then placed Dorset Road in a United Kingdom insolvency proceeding or "administration."

Modell was a director of Gordian, debtors' upstream parent and an insider, when a few days after debtors filed this case it acquired the loan of LPAI's principal secured creditor ESL for $450,000. As director of debtors, Modell stated that the amount of ESL's claim was $304,000 and that the claim was disputed. As director of Gordian, Modell represented that its claim was $2.048 million. So by the end of April of 2015, Gordian (Modell) indirectly owned debtors LPAI and LPUSH and was the principal secured creditor of debtors. And Modell, through Dorset Road was LPAI's principal customer and business source and largest account debtor.

Shortly after Gordian's purchase of the ESL debt closed, Modell requested debtors' counsel to convert LPAI's case to chapter 7, "so that Gordian Trading could foreclose its security interest," and "to eliminate the standing of the Creditors' Committee to raise issues." [55] Modell also suggested that Dorset Road, LPAI's major customer, might cease business activity with LPAI, thus creating a cash flow problem for debtor. [56] Debtor's then counsel, Edward Nazar, cautioned Modell that a conversion to chapter 7 may call into question management's good faith and whether there was an ulterior motive, such as obtaining control and title to debtor's assets free of claims of unsecured creditors. This could result in suits to subordinate Gordian's claim. If management of debtor were questioned, it could also result in the appointment of a chapter 11 trustee. [57]

As it turned out, the concerns and assessment of the situation expressed by Mr. Nazar in his letter of April 30, 2015 came to fruition. The Committee sought and obtained the appointment J. Michael Morris as chapter 11 trustee on June 24, 2015, citing Modell's breach of fiduciary duties to the estate. The chapter 11 trustee proceeded with inventorying and selling the debtors' assets. On June 25, 2015, Modell resigned as a director of debtors, leaving no management of debtors in place. After completion of the sales of debtors' assets, the case was converted to chapter 7 on December 14, 2015 with Mr. Morris appointed as the chapter 7 trustee. As predicted by Mr. Nazar, the trustee's suit against Modell and Gordian followed and includes claims to equitable subordinate Gordian's claim, for turnover of the $1.5 million worth of property shipped post-petition to Dorset

Road (controlled by Modell) and never paid for, and to judicially estop Gordian from asserting a claim in excess of $304,000. The trustee has also objected to Gordian's claim.

**\*10**  This recitation of Modell's and Gordian's conduct, self-dealing, and motivation, clearly evidenced by Mr. Nazar's April 30 letter, alone is sufficient to warrant the continuation of the stay until the trustee's claim objection and his causes of action asserted in the adversary complaint are finally adjudicated by this Court. [58]

### III.  Conclusion

Where, as here, Gordian's claim is disputed and the trustee is directly attacking that secured claim, [59] the Court must first adjudicate the merits of the trustee's affirmative claims for relief before determining whether to grant relief from the stay. [60] Because the trustee's adversary complaint was only recently filed, the Court will allow a reasonable time for discovery by the parties before conducting a trial of those claims. In the meantime, Gordian's interest in the liquidation proceeds of LPAI is adequately protected by their deposit in an interest-bearing account to preserve their value, subject to my further order. Accordingly, Gordian's motion for relief from the stay is DENIED at this time.

**SO ORDERED.**

### All Citations

Slip Copy, 2017 WL 1511888, 77 Collier Bankr.Cas.2d 1446

Footnotes

1    11 U.S.C. § 362(d)(1).
2    11 U.S.C. § 363.
3    According to legend, the people of Phrygia made Gordius king and, in gratitude, he made a shrine out of his wagon, tying it with a "fast knot" to a pole—
     This was the celebrated Gordian knot, which, in after times it was said, whoever should untie should become lord of all Asia. Many tried to untie it, but none succeeded, till Alexander the Great, in his career of conquest, came to Phrygia. He tried his skill with as ill success as others, till growing impatient he drew his sword and cut the knot. When he afterwards succeeded in subjecting all Asia to his sway, people began to think that he had complied with the terms of the oracle according to its true meaning.
     THOMAS BULLFINCH, *BULLFINCH'S MYTHOLOGY* 48 (Thos. Y. Crowell Co. 1913) (1855).
4    *See J. Michael Morris, Trustee v. Gordian Trading Limited UK, et al.*, Adv. No. 17–5030 (Bankr. D. Kan.) filed February 24, 2017.
5    Claim No. 54 and Trustee's objection, Doc. 419.

In re Lister-Petter Americas, Incorporated, Slip Copy (2017)
2017 WL 1511888, 77 Collier Bankr.Cas.2d 1446

6  Doc. 429. The sum of $688,888.58 was received by the Court for deposit. *See* Bankr. D. Kan. Standing Order 16–1.

7  At the evidentiary hearing the movant Gordian Trading Limited UK appeared by Vincent Filardo, Jr. and Michael DeVincenzo of Mishcon de Reya New York LLP. The chapter 7 trustee J. Michael Morris appeared in person and by attorney Christopher A. McElgunn of Klenda Austerman LLC, Wichita, Kansas and special counsel Maria Sawczuk of Goldstein McClintock, LLLLP, Chicago, Illinois.

8  For ease of reference in these jointly administered cases, and because nearly all of the activities and transactions relate to the debtor Lister–Petter Americas, Inc., (the operating entity), the Court's reference to "debtor" herein will mean LPAI singularly or both debtors, depending on the context that it is used.

9  Doc. 67. Modell's title or office of LPAI was not specified, but according to the corporate resolutions, Modell and his son Devon are the directors of both debtors. Ex. B and C.

10 Doc. 77.

11 The original credit was extended by Citizens Bank & Trust (CBT) in 2008 and was secured by a lien on all of LPAI's assets. ESL acquired the CBT credit facility by assignment in March of 2015, shortly before debtors filed their chapter 11 cases.

12 Gordian Trading owned RALOI.

13 See Doc. 12, p. 3.

14 Doc. 45, ¶ 19.

15 *Id.* at ¶ 4.

16 Doc. 67. Debtor scheduled ESL's claim on Schedule D as disputed and in the amount of $304,000.

17 Doc. 74.

18 Doc. 71.

19 Doc. 79.

20 Doc. 128, pp. 5–6.

21 Doc. 131.

22 Doc. 147.

23 Doc. 151 (Courtroom Minute Sheet for May 28, 2015).

24 Doc. 161.

25 Doc. 165.

26 Doc. 168, ¶ 15.

27 Doc. 185.

28 Doc. 364, 375.

29 Doc. 377.

30 Ex. 1.

31 Ex. 4.

32 Ex. 3.

33 *See* Doc. 67, p. 70 (Statement of Financial Affairs, Question 18).

34 There is some dispute about who actually paid Briggs. Though the debtor asserted that Dorset Road 1 and Gordian paid him, doc. 168, Briggs testified that his compensation was due from Dorset Road 1 and Lister Petter FZE, a Dubai company owned or controlled by D'Aubigny. See Doc. 204, 47–51.

35 Modell said D'Aubigny tried to shoot him once.

36 *See* Claim No. 54–1 in the amount of $2,048,022 filed July 9, 2015.

37 Doc. 1, *Morris v. Gordian Trading Limited UK, et al. (In re Lister–Petter Americas Inc.),* Adv. No. 17–5030; Case No. 15–10502 (Bankr. D. Kan.).

38 Claim No. 54 and Trustee's objection, Doc. 419.

39 On March 17, 2017 Morris amended his complaint adding a fraudulent transfer avoidance claim based upon a $7.5 million increase in LPAI's loan with CBT on June 20, 2013. Adv. Doc. 4.

40 11 U.S.C. § 362(d)(1) ("cause" includes the lack of adequate protection).

41 § 362(g).

42 Adequate protection is a question of fact and is to be decided flexibly on a case by case basis. *MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1396–97 (10th Cir. 1987). *See also Pursifull v. Eakin,* 814 F.2d 1501, 1506 (10th Cir. 1987) (Because "cause" is not defined, relief from the stay is discretionary and must be determined on a case-by-case basis.); *In re JE Livestock, Inc.,* 375 B.R. 892, 897 (10th Cir. BAP 2007) (citing *Pursifull, supra*).

| 43 | *In re O'Connor,* 808 F.2d 1393, 1398. |
| 44 | *See* S.O. 16–1, effective October 12, 2016. |
| 45 | Doc. 292. |
| 46 | *See* Doc. 403, Trustee's Interim Report for period ending December 31, 2016 showing $690,841 as the balance of funds on hand, and showing monthly bank service fees disbursed. |
| 47 | 342 B.R. 327 (10th Cir. BAP May 19, 2006). |
| 48 | *Id.* at 332. |
| 49 | Debtor also represented in its motion to use cash collateral that its obligation under the CBT/ESL credit facility was $304,000 on the date of the petition. *See* Doc. 12, ¶ 6. |
| 50 | *See* Ex. 5, G005.162–G005.183 (Charge over Intellectual Property dated September 30, 2014). The Charge and LP Green Tech's guarantee of the LPAI debt were required as a condition of the forbearance agreement between CBT and LPAI. The assignment of the CBT loan and loan documents to ESL specifically conveyed the Charge. *See* Ex. 7 at G007.005 (# 18). |
| 51 | *In re JE Livestock, Inc.,* 375 B.R. 892, 897 (10th Cir. BAP 2007). |
| 52 | *Id.* (Debtor's refusal to propose a plan that utilized court's valuation of collateral made under § 506(a) at debtor's request for treatment of creditor's claim constituted lack of good faith in prosecuting chapter 11 case.) |
| 53 | *In re Busch,* 294 B.R. 137, 140–41 (10th Cir. BAP 2003). |
| 54 | On Schedule F filed April 1, 2015, LPAI listed the claim of Dorset Road in the amount of $390,000 and listed the claim of Milfab at $240,000. *See* Doc. 67. |
| 55 | *See* Ex. S. |
| 56 | *Id.* |
| 57 | *Id.* |
| 58 | *See* Ex. S. |
| 59 | The trustee's claims for equitable subordination under § 510(c) and avoidance of fraudulent transfer under § 548(a)(1)(B) in particular strike at the heart of Gordian's secured claim. *See* Adv. No. 17–5030, Doc. 4, Counts I, II, and V. |
| 60 | *See In re Franklin Equipment Co.,* 416 B.R. 483, 506–07 (Bankr. E.D. Va. 2009) (chapter 7 trustee's assertion that insiders' secured claim should be recharacterized from debt to equity was a defense that went directly to the heart of the insiders' claims; recharacterization of debt achieves essentially the same result as equitable subordination); *In re Poughkeepsie Hotel Assocs. Joint Venture,* 132 B.R. 287, 292 (Bankr. S.D. N.Y. 1991) (equitable subordination defense went to the heart of creditor's claim and should be adjudicated in deciding whether to grant relief from the stay); *In re Davenport,* 34 B.R. 463, 466 (Bankr. M.D. Fla. 1983) (stay relief denied until fraudulent transfer claims are adjudicated because the validity of creditor's lien was at issue). |

---

**End of Document**                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix II

B

2012 WL 4737372
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
N.D. Iowa.

In re Walter H. CARTER and Debra K. Carter.

No. 11–00759.
|
Oct. 3, 2012.

## ORDER ON MOTION FOR RELIEF FROM STAY

THAD J. COLLINS, United States Chief Bankruptcy
Judge.

*1  This matter is before the court on Creditor Estate of
Leon Jerome Heimer's Motion to Lift the Automatic Stay.
The Court held an evidentiary hearing on the Motion May
2, 2012. Nicholas T. Larson appeared for Debtors Walter
and Debra Carter. Mark L. Walk appeared for the Estate
of Leon Jerome Heimer (the "Heimer Estate"). The Court
heard the evidence and arguments and took the matter
under advisement. Both parties provided supplemental
briefs. This is a core proceeding under 28 U.S.C. § 157(b)
(2)(G).

## STATEMENT OF THE CASE

The Heimer Estate seeks relief from the automatic stay
under 11 U .S.C. § 362(d) to pursue state court remedies
against secured collateral, a 2005 Cadillac Escalade (the
"Escalade"). Before Debtors' bankruptcy filing, at the
direction of the Heimer Estate, the Mitchell County
Sheriff levied on the Escalade and took possession. The
vehicle remains in the possession of the Mitchell County
Sheriff. Debtors object to the Motion for Relief from Stay
and contend that the Escalade must be returned to the
Debtors and that the Heimer Estate cannot foreclose on
the Escalade. The Court holds that the Heimer Estate is
inadequately protected and grants the Motion for Relief
from Stay. The Court declines to address any of the other
relief requested by the parties because such requests are
not properly before the Court.

## FINDINGS OF FACT AND
## PROCEDURAL BACKGROUND

In 2005, Debtor Debra K. Carter won a 2005 Cadillac
Escalade. Debtors used the Escalade to secure a debt of
$21,299.79 on two loans with St. Ansgar State Bank (the
"Bank"). The Bank perfected its security interest against
the vehicle.

Debtors also held an open account with Jerome Heimer.
Before this bankruptcy, Heimer passed away and the
Heimer Estate took action in Iowa District Court to
collect on the open account. The Heimer Estate obtained
a money judgment against Debtors in the amount of
$30,230.74, plus costs. The Iowa District Court issued a
writ of execution to the Mitchell County Sheriff.

On March 15, 2011, the Sheriff levied on the Escalade
and scheduled the sale of the vehicle for May 6, 2011.
On March 24, 2011, the Heimer Estate paid off the
$21,299.79 balance owing to the Bank and assumed
the Bank's interest. The Bank then released its security
interest on the certificate of title. On March 26, 2011, the
Mitchell County Treasurer recorded the lien release on the
certificate of title for the Escalade. Debtors were current
on their loan payments to the Bank at that time.

On April 6, 2011, Debtors filed a Chapter 7 petition.
On Schedule C, Debtors claimed a combined $13,600.00
in exempt value on the Escalade under Iowa Code §
627.6(9)(a), which provides an individual exemption of
up to $7,000. [1]  No party objected to Debtors' claimed
exemption.

On July 20, 2011, Debtors filed a Motion to Avoid Judicial
Lien under § 522(f). The Motion argued the Heimer
Estate's lien rights resulted entirely from a judicial lien
that impaired Debtors' exemption in the Escalade. On
July 28, 2011, the Heimer Estate resisted and argued
its lien consisted of two parts: (1) a consensual security
interest it acquired from buying out the Bank, and (2) a
judicial lien from its original open account judgment. The
Estate argued that only the judicial lien partition could be
avoided under § 522(f).

*2  On July 29, 2011, the Heimer Estate filed a motion
under 11 U.S.C. § 362(d) seeking relief from the automatic
stay. The Estate requested the stay relief to satisfy its

consensual lien (acquired from the Bank) through a Sheriff's sale. It claimed relief for cause citing a lack of adequate protection. Debtors resisted for several reasons. Debtors claimed that because the Heimer Estate was originally a judgment creditor, that all of the Heimer Estate's claims—including the one purchased from the Bank during the foreclosure—should be considered avoidable judicial liens. Debtors also argued the Heimer Estate created the adequate protection issue. Finally, the Debtors argued they intend to file a Motion for Turnover or Abandonment of the Escalade.

The Court set a hearing on the Motion to Avoid Lien for August 31, 2011. The Heimer Estate filed a Motion to Continue the Initial Hearing on the Motion for Relief from Stay until after the August 31, 2011 hearing on the Motion to Avoid Lien. The Court granted the Motion to Continue. The parties presented evidence and argument on the Motion to Avoid Lien hearing on August 31, 2011. They filed post-hearing briefs. The initial hearing on relief from stay was held on Sept. 2, 2011. Final hearing was to be set after a ruling on the Motion to Avoid Lien. The Motion for Relief from Stay hearing was continued several times waiting for the Court to rule on the Motion to Avoid Lien.

When the Court ruled on the Motion to Avoid Lien, it determined that the Heimer Estate became subrogated to the rights of St. Ansgar State Bank, a consensual lien holder, when it paid off the Bank's security interest. *In re Carter,* Bankr.No. 11–00759, 2011 WL 5080153 (Bankr.N.D.Iowa Oct. 26, 2011). The Court concluded the Debtors could not avoid the lien because the Heimer Estate was a consensual lien holder and entitled to all the rights and privileges the Bank previously held. *Id.*

The Debtor appealed. The Hearing on the Motion to Lift Stay was again continued while the matter was on appeal. The Bankruptcy Appellate Panel eventually upheld the determination. *In re Carter,* 466 B.R. 468 (B.A.P. 8th Cir.2012).

After the Bankruptcy Appellate Panel's ruling, this Court scheduled the hearing on the Motion to Lift Stay for May 2, 2012. Before this hearing, the Debtors had corresponded with the Heimer Estate in an attempt to regain possession of the Escalade. The Heimer Estate acknowledged that the Escalade was property of the estate, but refused to return the non-exempt value of

the Escalade that was subject to its lien. The Heimer Estate offered to return the exempt value, if any, after the Sheriff's sale.

The parties presented evidence and arguments at the May 2, 2012 final hearing on relief from stay. The Heimer Estate presented evidence and argument that the value of its collateral inadequately protects its interest and that the Court should modify or lift the stay. The Heimer Estate presented evidence on the value of the Escalade to attempt to show lack of adequate protection. The Heimer Estate claimed the current value of the Escalade was $19,200. On cross-examination by Debtor, the Heimer Estate's own expert witness testified he would list the vehicle for sale at about $22,000 or $23,000. Debtors also presented their own evidence of the NADA price guide valuing the Escalade at a retail price of $27,337.

**\*3** Debtors argued for the first time at the hearing that the Escalade was exempt from inclusion in the bankruptcy estate, that the Heimer Estate had an affirmative duty to return the vehicle to the Debtors' possession, and if the vehicle was not returned, that the Heimer Estate could be liable for damages for violating the automatic stay. Moreover, Debtors argued it would be inequitable for the Heimer Estate to pursue a foreclosure remedy which the original creditor, St. Ansgar State Bank, had not, especially as the Debtors have maintained insurance on the vehicle and were not in default prior to the bankruptcy. The Court noted those issues were not previously pled in the Resistance to the Motion to Lift Stay. Debtors filed a post-hearing brief on May 9, 2012. It raised many of the same issues. The Heimer Estate replied on May 14, 2012.

## CONCLUSIONS OF LAW

The Heimer Estate brought a Motion for Relief from Stay under § 362(d) due to lack of adequate protection. Section 362(d)(1) allows for relief from stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." "[A]dequate protection is a question of fact." *Martin v. United States (In re Martin),* 761 F.2d 472, 474 (8th Cir.1985). In an action under § 362(d), "the party requesting relief has the burden of proof on the issue of the debtor's equity in property; and ... the party opposing such relief has the burden of proof on all other issues." 11 U.S.C. § 362(g). This means in an action under § 362(d)(1):

Once the creditor has established a prima facie case of cause under § 362(d)(1), the debtor has the burden of establishing that the creditor's interest is or will be adequately protected. The debtor must affirmatively propose the method by which it will afford adequate protection and the Court must then determine the adequacy of the debtor's proposal.

*In re Lilyerd,* 49 B.R. 109, 116 (Bankr.D.Minn.1985) (citations omitted); *see also In re Panther Mountain Land Dev., LLC,* 438 B.R. 169, 191–92 (Bankr.E.D.Ark.2010) (Once a creditor has shown "a prima face case for lack of adequate protection, ... the burden to prove creditor is adequately protected shifts to the Debtor."); *In re Gilbertson Rests. LLC,* Bankr.No. 04–00385, 04–00384, 04–00386, 04–00387, 2004 WL 1724876, at *2 (Bankr.N.D.Iowa May 20, 2004) ("Debtor has the burden of establishing that [creditor] is adequately protected.").

"[Adequate protection] is a flexible concept designed to ensure that the creditor receives the value for which it bargained." *Id.* at *2 (citing *Martin,* 761 F.2d at 474). The Eighth Circuit has summarized the concept of adequate protection as follows:

The concept of adequate protection was designed to "*insure* that the secured creditor receives the *value* for which he bargained." S.Rep. No. 989, 95th Cong., 2d Sess. 53, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5839 (emphasis added); *see also* H.R.Rep. No. 595, 95th Cong., 2d Sess. 339, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6295. Congress explicitly stated that *value* was to be considered a flexible concept "to permit the courts to adapt to varying circumstances and changing modes of financing," and that such matters "are [to be] left to case-by-case interpretation and development." H.R.Rep. No. 595 at 339, 1978 U.S.Code Cong. & Ad. News at 6295; *see also* S.Rep. No. 989 at 54, 1978 U.S.Code Cong. & Ad. News at 5840. Because Congress intended that *value* was to be determined on a case-by-case basis, that which is designed to protect value, i.e., adequate protection, must also be determined on a case-by-case basis, permitting the debtors "maximum flexibility in structuring a proposal

for adequate protection." *In re American Mariner Industries, Inc.,* 734 F.2d 426, 435 (9th Cir.1984).

**\*4** *Martin,* 761 F.2d at 474 (emphasis original).

"[A] secured creditor's interest in property is not adequately protected if the security is depreciating during the term of the stay." *U.S. Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs .,* 484 U.S. 365, 370 (1988). The classic 'adequate protection' for a secured debt, justifying continuation of the stay, is the existence of an equity cushion." *In re Micozzi,* Bankr.No. 91–1021–W, 1991 WL 11731156, at *5 (Bankr.S.D.Iowa Nov. 18, 1991). " '[T]he existence of an equity cushion, standing alone, can provide adequate protection.' " *In re Rizotto,* Bankr.No. 09–6096511, 2009 WL 2477232, at *4 (Bankr.D.Mont. Aug. 11, 2009) (quoting *Pistole v. Mellor (In re Mellor),* 734 F.2d 1396, 1400 (9th Cir.1984)). Because of the fact-specific nature of the inquiry, courts naturally differ on exactly how much of an equity cushion is required to protect the debtor. However, " '[c]ase law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection.' " *Mendoza v. Temple–Inland Mortg. Corp. (In re Mendoza),* 111 F.3d 1264, 1272 (5th Cir.1997) (quoting *In re Kost,* 102 B.R. 829, 831 (Bankr.D.Wyo.1989)); *see also In re JER/ Jameson Mezz Borrower II, LLC,* 461 B.R. 293, 305–06 (Bankr.D.Del.2011); *In re McKillips,* 81 B.R. 454, 458 (Bankr.W.D.Ill.1987) (surveying adequate protection cases and finding case law agreement on a 20% equity cushion being sufficient, 10% being insufficient, and cases conflicting in the middle).

At the same time, the lack of a sufficient equity cushion is, without more, not enough to show a lack of adequate protection. *In re Panther Mountain Land Dev., LLC,* 438 B.R. 169, 191–92 (Bankr.E.D.Ark.2010) (" '[O]ne who stands only to lose his equity cushion, largely through earning additional interest, hardly seems worse off.' " (quoting *In re Lane,* 108 B.R. 6, 8–9 (Bankr.D.Mass.1989))). If lack of an equity cushion were enough, then that would imply "the undersecured creditor always has cause to lift the stay." *Micozzi,* 1991 WL 11731156, at *5 (citing *In re Lane,* 108 B.R. 6, 8–9 (Bankr.D.Mass.1989)). Thus at a minimum, lack of adequate protection requires both the lack of an adequate equity cushion as well as the depreciation of the collateral. *In re Lane,* 108 B.R. 6, 8–9 (Bankr.D.Mass.1989) (discussing the implications of *Timbers* and finding the need for something more than a lack of an equity cushion).

In this case, Debtor failed to establish the Heimer Estate is adequately protected. The parties have presented evidence that at best shows the Heimer Estate has a very slight equity cushion. The greater weight of the evidence shows the Heimer Estate has no cushion or is now undersecured. The Court need not determine the exact amount of Debtor's equity, if any, to decide this motion. Using the estimates of the Heimer Estate's expert witness—which showed the highest credible value for the collateral—the expert provided a maximum value in the range of $22,000 to $23,000. It is undisputed the value of the Heimer Estate's secured claim was $21,299.79 as of the date of the petition. The evidence at the hearing showed that with the accrual of interest the secured claim now exceeds $23,000. Using those figures, Debtor has no equity in the vehicle and the Heimer Estate has no equity cushion. If there is any equity remaining, it is below even 10% and far from the 20% level noted by many cases as an acceptable equity cushion. *E.g., In re JER/Jameson Mezz Borrower II, LLC,* 461 B.R. at 305–06. In addition, both parties agree the value of the vehicle has declined and is continuing to decline. Thus, even at the highest price the credible evidence supports, the car is simply not worth enough to adequately protect the creditor's interest-especially in light of the declining value.

 **\*5** Debtors have failed to show the Heimer Estate is adequately protected. To the extent the Heimer Estate seeks to pursue its state law remedies, the request to lift the automatic stay under § 362(d) is granted. To the extent it requests further relief or direction from the Court, that request is denied.

A creditor's motion for the bankruptcy court to lift the automatic stay is not a request for an adjudication of rights; rather, it is a request that the bankruptcy court allow the creditor to pursue its remedies under state law. *Mullarkey v. Tamboer (In re Mullarkey),* 536 F.3d 215, 226–27 (3d Cir.2008). "The hearing for relief from stay is meant to be a summary proceeding.... [I]t is a contested matter, rather than an adversary proceeding." *Id.* at 226 (citations omitted). Therefore, " 'the hearing on a motion to lift the stay is not a proceeding for determining the merits of the underlying substantive claims, defenses, or counterclaims.' " *Id.* at 226–27 (quoting *Grella v. Salem Five Cent Sav. Bank,* 42 F.3d 26, 33 (1st Cir.1994)). [2] Due to the nature of this proceeding, this Court does not reach

the question of what remedies are available to the parties under state law.

Debtors raised a number of arguments in the hearing and post-hearing brief that were not raised in their Resistance to the Motion for Relief from Stay. Debtors suggested that the Heimer Estate violated the automatic stay through its refusal to return the vehicle to the bankruptcy estate and or to the Debtors. Debtors also claim to be entitled to possession of the vehicle. The Court expressed skepticism at the hearing whether these issues were properly raised in pleading or presented for adjudication. The Court further notes these issues do not address or otherwise contest Creditor's motion as they do not relate to the question of adequate protection.

The Debtors specifically requested in post-hearing briefing that "the Court take into account the *likelihood* of a return of property proceeding, a request for sanctions for violating Automatic Stay [sic] and Discharge Injunction, a successful lien avoidance adversary proceeding ....." and other matters. (ECF Doc. No. 70, at 4.) (emphasis added). The Court does not and cannot take threatened or even likely future action into account in ruling on a pending motion. The matters have not been raised as part of this proceeding—and are really only appropriately raised by separate motion. If properly raised, the Court will address them at that time.

The Court does, however, wish to address one matter related to these issues. Counsel for the Heimer Estate has responded to the above arguments by suggesting they are non-sensical, would be frivolous, and counsel for the Debtors would be exposing himself to sanctions for raising such arguments. The Court previously expressed disagreement with that type of characterization of Debtor's arguments—and does so again here. The Court holds only that these issues have not been raised to date—and if raised they will be addressed in full at that time.

## CONCLUSION

 **\*6** Section 362(d)(1) of the Bankruptcy Code requires the Court to lift the stay when the creditor is inadequately protected. Debtors have the burden to show the Heimer Estate is adequately protected and failed to meet their burden. The request to lift the automatic stay under § 362(d) is granted.

**WHEREFORE,** the Estate of Leon Jerome Heimer's Motion to Lift Automatic Stay (ECF Doc. No. 19.) is **GRANTED** on the terms set forth above.

**All Citations**

Not Reported in B.R., 2012 WL 4737372

Footnotes

1    The Carters applied $400.00 of their combined exemption to another vehicle.
2    Other Circuit Courts have reached the same conclusion. *See Estate Constr. Co. v. Miller & Smith Holding Co., Inc.,* 14 F.3d 213, 219 (4th Cir.1994); *In re Vitreous Steel Prods. Co.,* 911 F .2d 1223, 1230–32 (7th Cir.1990); *Johnson v. Righetti (In re Johnson),* 756 F.2d 738, 740 (9th Cir.1985), *cert. denied,* 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985); *Nat'l Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 658 (Bankr.S.D.N.Y.1991), *aff'd,* 962 F.2d 1 (2d Cir.1991).

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix II**

C

2005 WL 2589201
United States Bankruptcy Court,
E.D. Pennsylvania.

In re PLYMOUTH HOUSE HEALTH
CARE CENTER, et al., Debtors.

No. 03–19135.
|
filed June 13, 2003.
|
Plan confirmed June 15, 2004.
|
March 15, 2005.
|
last filing Sept. 14, 2005.

**Attorneys and Law Firms**

Robert Mark Bovarnick, Law Offices of Robert M. Bovarnick, Philadelphia, PA, for Ruth Hardy, (Creditor).

Lawrence J. Bunis, Margolis Edelstein, Westmont, NJ, Lead Attorney, for Financial Health Srvs. Inc., (Creditor).

Louis J. Capozzi, Jr., Capozzi & Associates, P.C., Harrisburg, PA, for Capozzi & Associates, P.C.

Joseph Digiuseppe11, City of Philadelphia Law Department, Philadelphia, PA, for City of Philadelphia.

Tiffany Diiorio, Wilkes & McHugh, P.A., Tampa, FL, Lead Attorney, for Ruth Hardy, (Creditor).

Carol Anne Ferrante, Broomall, PA, Lead Attorney, for All About Staffing, Inc., (Creditor).

David J. Gaier, McCarter & English, LLC, Philadelphia, PA, for Outlook Staffing, (Creditor).

Robert K. Ganong, C.F. Hurley Bldg., Boston, MA, Lead Attorney, for Massachusetts Div. of Unemp. Assis., (Creditor).

Robert K. Ganong, Boston, MA, Lead Attorney, for MDET, (Creditor).

Leslie B. Gaynus, Comm of PA Dept Labor & Industry, Philadelphia, PA, for Chief Counsel for the Massachusetts Division of Unemployment Assistance, (Creditor).

Bonnie R. Golub, Weir & Partners LLP, Philadelphia, PA, for Access Care, Inc., (Debtor In Possession).

Norman Perlberger, Pomerantz & Perlberger, LLP, Philadelphia, PA, for Charles Williams, (Creditor).

Wendy G. Rothman, Phila., PA, Lead Attorney, for Colonial School District, (Respondent).

Heidi R. Spivak, Udren Law Offices, P.C., Cherry Hill, NJ, for Design Studio, Inc., (Creditor).

Amy E. Vulpio, White and Williams LLP, Philadelphia, PA, for Kerschner Office Furniture, (Creditor).

James E. Wade, III, Wilkes & McHugh, P.A., Tampa, FL, Lead Attorney, for Ruth Hardy, (Creditor).

MEMORANDUM

FOX, Bankruptcy J.

**\*1** Healthcare Business Credit Corporation (referred to by the parties as "HBCC") has filed a motion seeking the allowance and payment of fees and costs pursuant to section 506(b) of the Bankruptcy Code and section 5.3(b) of the debtors' confirmed plan. These fees and costs were incurred by HBCC's counsel in representing this creditor during the pre-confirmation phase of the chapter 11 bankruptcy case. A "plan administrator," Mr. Sean P. Porrini, who has been appointed pursuant to the terms of the debtors' confirmed plan, has filed an objection to the payment of these fees costs under section 506(b). In essence, the plan administrator contends that HBCC is an undersecured creditor, and therefore is not entitled to the allowance requested. [1]

A hearing was held on the motion and the objection, and the facts are not at issue. Furthermore, each party has submitted a supporting legal memorandum. The undisputed facts may be summarized as follows.

I.

The debtors in this case are Plymouth House Health Center L.L.C. ("Plymouth"), Chateau Senior Care, L.L.C. ("Chateau"), Church Lane Senior Care, L.L.C. ("Church Lane"), Julia Ribaudo Senior Care, L.C.C.

In re Pinnacle Health Care Center, Not Reported in Fed. Rptr. (2005)
2005 WL 2589201, 44 Bankr.Ct.Dec. 118

Case 2:18-bk-20151-ER    Doc 367-17    Filed 10/01/18    Entered 10/01/18 17:55:44
Desc Appendix II    Page 20 of 122

("Julia Ribaudo"), Mill Hill Senior Care, L.L.C. ("Mill Hill") and Winthrop House Senior Care, L.L.C. ("Winthrop"). At the time of their separate bankruptcy filings in June 2003, these debtors operated various nursing home facilities, except for Mill Hill. Ultimately, these separate cases were jointly administrated and a consolidated chapter 11 plan was approved. [2]

SouthTrust Bank ("SouthTrust") loaned the debtors money during the course of their nursing home operations. As of the date of their bankruptcy filings, these debtors owed SouthTrust approximately $22.9 million. Ex. PA–1. SouthTrust filed UCC Financing Statements to perfect its security interests in the debtors' assets on August 20, 2001 for Chateau, Church Lane, Julia Ribaudo and Plymouth House. *See* Ex. HBCC–10. The UCC Financing Statements for Mill House and Winthrop were filed on September 23, 2002 and September 9, 2002 respectively. *Id.*

The financing statements are the same for each debtor, except for the identifying information. These financing statements disclose that SouthTrust has a security interest in:

> all of Debtor's right, title and interest in and to all Improvements, Equipment, Rents, Accounts, Health Care Insurance Receivables, Instruments, General Intangibles, Inventory, Money and (to the fullest extent assignable) Permits and Reimbursement Contracts, whether now owned to or hereafter at any time acquired, and including all replacements, additions, accessions and substitutions thereto; provided however, that with respect to any items which are leased and not owned by Debtor, the term "Collateral" includes the leasehold interest only of Debtor together with any options to purchase any of said items and any additional or greater rights with respect to such items which Debtor may hereafter acquire, together with all Proceeds of any of the foregoing Collateral.

**\*2** *Id.*

Subsequently, the debtors (along with IFIDA Health Care Group, Ltd.) entered into a loan and security agreement with HBCC on September 11, 2001. Ex. HBCC–1. Under the terms of this agreement, HBCC made available to the debtors $4 million in revolving loans, taking a security interest in their assets. *Id.* This agreement was later amended five times between March 6, 2002 and March 14, 2003. *Id.*

On September 14, 2001, HBCC filed UCC financing statements for all of the debtors. Ex. HBCC–3. [3] These statements acknowledge that a security interest exists in the same collateral as the SouthTrust loan, and describe that collateral as:

> All accounts and health-care insurance receivables (including without limitation the accounts) of such Debtor, whether now existing or hereafter arising or acquired; (ii) All contract rights, instruments, chattel paper, remedies, guarantees, and collateral evidencing, securing or otherwise relating to such accounts, including, without limitation all rights of enforcement and collection, now existing or hereafter acquired; (iii) All Commercial Lockboxes, all Government Lockboxes, all Collection Accounts and other accounts into which any of the Collections are deposited ... (iv) All books and records of such Debtor evidencing or relating to such accounts; (v) All information and data complied or derived by such Debtor with respect to such accounts ... and (vi) All collections, receipts and other proceeds (cash and non-cash) derived from any of the foregoing.
> *Id.*

In addition to its loan agreement with the debtors, HBCC entered into a subordination agreement with SouthTrust. SouthTrust agreed to subordinate its collateral interest to HBCC according to the following terms:

Priorities

HBCC and SouthTrust agree that, except as provided in Section 2.2 below, at all times, whether before, during or after the pendency of any bankruptcy, reorganization or other insolvency proceeding, and notwithstanding the priorities that ordinarily would result under the Uniform Commercial Code as enacted in each and every applicable jurisdiction, as amended from time to time ("UCC"), and other applicable law for the

In re Fansteel Metals Health Care Center Bankruptcy Reported Filed 10/06/1...

Case 2:18-bk-20151-ER    Doc 367-17    Filed 10/01/18    Entered 10/01/18 17:55:44
Desc Appendix II    Page 21 of 122

2005 WL 2589201, 44 Bankr.Ct.Dec. 118

order of granting or perfecting of any security interests referred to herein, *HBCC shall have a first and prior security interest in, upon and to the HBCC Collateral, and South Trust does hereby subordinate its security interest in to and to the HBCC Collateral to HBCC's security interest in and to the HBCC Collateral; provided, however, that* if HBCC allows any UCC filing or other method of perfection to lapse such that an intervening creditor subordinate to SouthTrust shall have priority over HBCC, nothing herein is intended to or shall be construed as a subordination by SouthTrust to such other creditor.

Ex. HBCC–1, ¶ 2.1 (emphasis added). [4]

The subordination agreement also stated that the "substantive" laws of the State of New Jersey shall govern "without regard to principles of conflicts of laws of such State." *See* Ex. HBCC–1, ¶ 3.9. Moreover, the subordination agreement was acknowledged by all the debtors. Ex. HBCC–1.

**\*3** At the time of the debtors' bankruptcy filing, it appears uncontested that HBCC was owed approximately $4.2 million dollars. *See* Ex. PA–1. Furthermore, for purposes the instant contested matter, it is also agreed that collateral securing both HBCC's loan and SouthTrust's loan—*i.e.,* the accounts receivables—had a face value of $8,151,776.23 as of the petition date, with $6,456,776 .23 currently collectible. *See* Ex. PA–1. Thus, both parties agree that the value of this collateral exceeds the amount owed to HBCC, but is far less than the $22.9 million owed to SouthTrust. *See* N .T. at 20–21, 25.

HBCC and the plan administrator also emphasize a particular provision of the debtors' joint confirmed plan. This plan stated in ¶ 5.3, when addressing HBCC's secured claim:

> (b) *Allowance.* On the Effective Date, HBCC shall be conclusively deemed to hold an Allowed Secured Claim in the amount of (a) the principal and accrued non-default rate interest outstanding immediately prior to the Effective Date under its loan documents, and (b) the amount of HBCC's fees and costs incurred in connection with this case allowed by order

of the Bankruptcy Court under the provisions of 506(b) of the Bankruptcy Code but not in excess of $150,000 (even if the fees and costs actually incurred by HBCC exceed such amount) or such other amount as agreed by the Plan Administrator, the Debtors, and HBCC. HBCC shall file a motion with the Bankruptyc [sic] Court requesting advance of fees and costs under Seciton [sic] 506(b) within thirty (30) days of the Effective Date. Any party including the Debtors, the Plan Administrator and/or the Liquidating Trustee may oppose the allowance of HBCC's fees under Section 506(b).

Ex. HBCC–9, ¶ 5.3(b). Indeed, the plan administrator acknowledges that "[u]nder the Debtors' Plan, $150,000 is being held in escrow and will be paid to HBCC if HBCC's 506(b) claim is allowed." Objection, ¶ 10.

The debtors' disclosure statement contained this provision involving section 506(b) and HBCC:

> Under the Plan, HBCC's claim against the Debtors will be conclusively deemed to be an allowed claim in the amount of the outstanding principal and accrued non-default interest immediately prior to the Effective Date (together with costs and charges in the amount agreed to by the Debtors and HBCC or, in the absence of agreement, as determined by the Court under section 506(b) of the Bankruptcy Code).

See Ex. HBCC–8, at 37–38.

Thus, the debtors' confirmed plan authorized the payment of post-bankruptcy interest to HBCC, which the plan administrator did not contest. The plan also capped the fees HBCC could seek under section 506(b) at $150,000. Thus, even though HBCC's motion specifies $257,256.64 in costs and fees, Ex. HBCC–6, this creditor has limited its requested allowance to the aforementioned ceiling.

The plan administrator has now objected to the payment of these fees and costs, even at the capped amount, arguing that HBCC is not "oversecured" under section 506(b). HBCC argues to the contrary, and alternatively maintains that the plan administrator is estopped from so objecting, in light of the terms of the above-quoted confirmed plan, the disclosure statement and other documents, as well as the previous unchallenged payment of postpetition interest.

**\*4** As a result, there are two questions issues by these parties in this contested matter: whether HBCC, in light of SouthTrust's subordination agreement, is an oversecured creditor entitled to reimbursement of costs and fees under section 506(b) of the Bankruptcy Code; and, if not, whether the plan administrator is now estopped from objecting to the instant 506(b) allowance. [5] (As I construe the plan administrator's objection, however, he does not challenge the reasonableness of the $150,000 now demanded by HBCC.)

If either issue is resolved in favor of the movant, its motion should be granted and the escrowed funds paid to HBCC. Alternatively, if both questions are answered negatively, the plan administrator asserts that SouthTrust has been paid in full under the terms of the confirmed plan. If so, then the escrowed funds would be payable to general unsecured creditors and not to HBCC.

I first consider whether HBCC is an oversecured creditor entitled to an allowance under section 506(b).

## II.

## A.

HBBC bases its request for allowance of counsel fees under 11 U.S .C. § 506(b). This subsection provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recover under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees,

costs, or charges provided for under the agreement under which such claim arose.

Therefore, the statute provides that only an oversecured creditor is entitled to post-bankruptcy interest, attorney's fees and costs. *See, e.g., United Savings Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 372–73 (1988); *In re F.B.F. Industries, Inc.,* 1995 WL 581935, at \*1 (E.D.Pa.1995).* Moreover, such fees and costs can only be awarded if provided for in the loan or security agreements. *See In re Auto Specialties Mfg. Co.,* 18 F.3d 358, 360 (6th Cir.1994). [6]

As noted by one treatise, section 506(b) was meant to codify " 'current law by entitling a creditor with an oversecured claim to any reasonable fees, costs or charges provided under the agreement under which the claim arose. These fees, costs, and charges are secured claims to the extent that the value of the collateral exceeds the amount of the underlying claim.' " 4 *Collier on Bankruptcy* ¶ 506.LH[3] (15th ed. rev.2004) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 356–357 (1977)); *see also In re United Merchants and Manufacturers, Inc.,* 674 F.2d 134, 138 (2d Cir.1982) ("Section 506(b), however, merely codifies pre-Code law that an oversecured creditor can assert, as part of its secured claim, its right to interest and costs arising under its credit agreement.").

A creditor is considered oversecured by section 506(b) only "to the extent that the value of [its] interest in the estate's interest in property is greater than the amount of the creditor's allowed prepetition claim." 4 *Collier on Bankruptcy* ¶ 506.04[1], at 506–102 (15th ed. rev.2004). Therefore, "[u]nder this provision, an oversecured creditor is entitled to postpetition interest on its claim only 'to the extent that such interest, when added to the principal amount of the claim,' does not 'exceed the value of the collateral.' " *Rake v. Wade,* 508 U.S. 464, 468 n. 4 (1993) (quoting *United Savings Assn. of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. at 372).

**\*5** The general rule in bankruptcy is that "interest on the debtors' obligations ceases to accrue at the beginning of proceedings." *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 163 (1946). [7] Accordingly, no postpetition interest accrues upon unsecured claims or, in light of section 506(b), upon undersecured claims. *See United Savings. Ass'n v. Timbers of Inwood Forest,*

In re Fleming, Not Reported in B.R. (2005)
2005 WL 2589201, 44 Bankr.Ct.Dec. 118

484 U.S. at 372–73 ("Since this provision [506(b) ] permits postpetition interest to be paid only out of the 'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest."). [8]

Likewise, an unsecured creditor or an undersecured creditor is not entitled to recover postpetition fees and costs arising from his claim. *See, e.g., In re Loewen Group International, Inc.,* 274 B.R. 427, 444 (Bankr.D.Del.2002) ("[L]ike post-petition interest, post-petition fees and costs may only be recovered by creditors to the extent their claims are oversecured."); *In re Woodmere Investors Ltd. Partnership,* 178 B.R. 346, 356 (Bankr.S.D.N.Y.1995) ("If no 'security cushion' exists to allow for post-petition interest, none exists for the allowance of attorney fees and costs."); *In re Saunders,* 130 B.R. 208, 214 (Bankr.W.D.Va.1991) ("An undersecured or unsecured creditor cannot recover contractual attorneys' fees for work performed postpetition.").

Accordingly, for HBCC to prevail upon its present request for an award of post-bankruptcy counsel fees, it must demonstrate that it is oversecured. *See generally In re McCoy,* 163 B.R. 206, 211–12 (Bankr.M.D.Fla.1994). As previously noted, while the plan administrator has not challenged the payment of postpetition interest to HBCC as part of the debtors' confirmed plan, [9] he now contests that HBCC is an oversecured creditor.

As earlier mentioned, a creditor is oversecured only if its interest in its collateral exceeds the amount of its debt. *See, e.g., Farmers Home Admin. v. Farmers State Bank of Hosmer,* 68 B.R. 282, 285 (D.S.D.1986) ("An oversecured creditor is a holder of an allowed secured claim which is secured by collateral of greater value than the allowed secured claim.") A creditor's interest in collateral, and so its oversecured status, is affected by the existence of prior liens. *See generally In re Indian Palms Associates, Ltd.,* 61 F.3d 197 (3d Cir.1995).

Based upon the evidentiary record, HBBC contends that it holds a first lien position in the collateral, *viz.,* the receivables, and that the value of this collateral exceeds its allowed claim. The plan administrator counters that SouthTrust holds the first lien position, and that the value of the collateral is less than the amount owed to SouthTrust. If so, then HBBC is not an oversecured

creditor. *See In re Morgan,* 225 B.R. 309, 311–12 (Bankr.E.D.Pa.1998).

As discussed above, there is no dispute regarding the value of the collateral, or the amounts owed to HBCC and SouthTrust. Therefore, this contested matter arises because the parties take opposing views regarding the effect of the subordination agreement upon HBCC's lien position. HBCC contends that the subordination agreement with SouthTrust resulted in the former replacing the latter as first lien holder of the debtors' assets. In contrast, the plan administrator maintains that the subordination agreement does not change the first lien position of SouthTrust for purpose of section 506(b). In the view of the objector, SouthTrust remained in the first lien position, but this creditor became contractually obligated under the subordination agreement to pay over any funds it would receive, up to the amount of HBCC's claim.

## B.

**\*6** In addressing their differing interpretations concerning the effect of the subordination agreement upon the application of section 506(b), both parties are aware of 11 U.S.C. § 510(a), which states: "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." [10] Thus, non-bankruptcy law, typically state law, would govern any dispute concerning the enforceability of a subordination agreement. *See In re Southeast Banking Corp.,* 156 F.3d 1114, 1121 (11th Cir.1998).

As quoted earlier, the subordination agreement involving HBCC and SouthTrust made reference to the substantive law of New Jersey. New Jersey has adopted the revised version of Article 9 of the Uniform Commercial Code, which simply provides that "[t]his chapter does not preclude subordination by agreement by a person entitled to priority." N.J.S.A. 12A: 9–339 (effective July 1, 2001). [11]

The plan administrator relies heavily upon *In re Smith,* 77 B.R. 624 (Bankr.N.D.Ohio 1987) for his contention concerning the effect of a subordination agreement. In *Smith,* Farmers Citizens Bank entered into a subordination agreement in favor of the FmHA. The

loan made by the bank was secured, but the loan made by the FmHA was unsecured. *Id.,* at 627 ("In the present case, the Bank is a secured creditor and FmHA is an unsecured creditor.")

The bank and the FmHA were each claiming entitlement to the proceeds of the bank's collateral. The *Smith* bankruptcy court applied the subordination agreement in the following manner:

> Although there has not been a great deal of litigation in this area, it appears that a subordination agreement between a secured creditor and an unsecured creditor may be given effect in the following manner. Under nonbankruptcy law, a subordination agreement may not adversely affect the rights of a creditor who is not a party to the agreement.... Thus, under § 510(a) the subordination of a secured claim may not impair the rights of the other creditors. Essentially, this is accomplished by the exchange of priorities between the parties to the agreement. The amount to be paid to the party subordinating its claim (the Bank) is determined without reference to the subordination agreement. That amount is then paid to the beneficiary of the subordination agreement (FmHA) to the extent of its valid interest through the subordination agreement, with any remaining balance going to the subordinating creditor (the Bank). The subordinating creditor then receives a claim with the same priority enjoyed by the beneficiary of the agreement, to the extent of the amount paid to the beneficiary.

*Id.* at 627 (citations omitted).

Other courts, however, have described the effect of a subordination agreement in different terms. For example, in *In re Lunan Family Restaurants,* 194 B.R. 429, 444

(Bankr.N.D.Ill.1996), the court quoted approvingly the following explanation:

> **\*7** "By executing a lien subordination agreement, the subordinating party agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse to the identified collateral until the other party's secured claim has been satisfied."

(quoting *In re Lantana Motel,* 124 B.R. 252, 256 (Bankr.S.D.Ohio 1990)); *see also In re Bank of New England Corp.,* 364 F.3d at 361 ("[S]ubordination alters the normal priority of the junior creditor's claim so that it becomes eligible to receive a distribution only after the claims of the senior creditor have been satisfied."); *In re Tri–Union Development Corp.,* 314 B.R. 611, 627 (Bankr.S.D.Tex.2004) ("Subordination is the ordering of priority of debts between creditors."); *In re Curtis Center L.P.,* 192 B.R. 648, 659 (Bankr.E.D.Pa.1996) (the subordination agreement rendered the subordinating creditor's claim unsecured, because the value of the collateral was less than the amount due the new senior lienholder).

This difference in approach may be explained by observing that "subordination agreements may be generally classified as being one of two types: debt subordinations or property interest subordinations." *In re Lantana Motel,* 124 B.R. at 255.

> In a debt subordination, the agreement provides that the subordinated creditor's right to payment and collection will be subordinate to the rights of another claimant. If the debt subordination is "complete," the subordinated creditor is barred from receiving payments until the superior debt is paid in full.

> Debt subordination should be contrasted to property interest subordination. In a property interest subordination, the agreement affects only the relative rights of parties in particular real or personal property. Property interest subordination does not concern any rights the parties may have to receive payments.

> The most common type of property interest subordination is lien subordination. By executing a lien subordination agreement, the subordinating party

agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse to the identified collateral until the other party's secured claim has been satisfied.

*Id.,* at 255–56; *accord In re Environmental Aspecs, Inc.,* 235 B.R. 378, 396 n. 6 (E.D.N.C.1999):

The *Lantana* court explained the difference between a debt subordination and a property interest subordination. In the former, the agreement "provides that the subordinated creditor's right to payment and collection will be subordinate to the rights of another claimant ... [and] the subordinated creditor is barred from receiving payments until the superior debt is paid in full." *Id.* at 255–256. In a property interest subordination, "the subordinating party agrees to demote the priority of its lien to that of another secured creditor, thereby delaying its recourse to the identified collateral until the other party's secured claim has been satisfied." Id. at 256. A property interest subordination does not limit the subordinated party's right to receive payments. *Id.* Although EAI of NC's agreements with both AAL (1996) and SouthTrust (1997) in this case essentially constituted restructuring of prior obligations and thus required regular payments by the debtors to the creditors, the subordination agreement at issue in this case is in the nature of a property interest subordination.

**\*8** With the distinction between the two types of subordination agreements in mind, the differing constructions of *Smith* and *Lunan* become understandable. *Smith* was describing the effect of a "debt subordination"; *Lunan* was explaining the effect of a "property interest subordination."

Moreover, in *Smith,* since only one party to the subordination agreement held a security interest, the parties in that case could only have entered into a debt subordination. In the instant contested matter, however, the above-quoted language of the subordination agreement between HBCC and SouthTrust clearly describes a property interest subordination, whereby HBCC would hold the first lien position on collateral and SouthTrust a second position. This type of agreement is permitted under New Jersey law. *See generally Metrobank for Sav., FSB v. National Community Bank of New Jersey,* 262 N.J.Super. 133, 140 (1993). Indeed, the New Jersey

Superior Court defined a subordination agreement in the following property interest terms:

Black's Law Dictionary, 1279 (5th ed.1979) defines subordination agreement as an "agreement by which the subordinating party agrees that its interest in real property should have a lower priority than the interest to which it is being subordinated." Thus, a subordination agreement is an agreement to accept a lower priority for a lien than would otherwise be due. See 29 *New Jersey Practice, Law of Mortgages,* § 115, at 535–40 (Roger A. Cunningham & Saul Tischler) (1975) (describing priority as affected by subordination agreements).

*Id.,* at 140; *see also* 29 *New Jersey Practice' Law of Mortgages,* § 3.29 (2d ed. 2004) (Subordination agreements "have the effect of altering the priority of interest in, or liens upon, realty.").

Therefore, I disagree with the plan administrator's contention that the subordination agreement did not effect a transposition of the respective lien positions of HBCC and SouthTrust for purposes of applying section 506(b). *See generally In re Chance Industries, Inc.,* 2002 WL 32653679, at *3 (Bankr.D.Kan.2002) ("all interested parties agreed that FFI [in whose favor there was a subordination agreement] was amply secured and likely oversecured."). Furthermore, this reordering of lien priority in estate property is consistent with decisions construing subordination agreements on issues of adequate protection under section 362(d) (1), *see In re American Sweeteners, Inc.,* 1999 WL 1068446 (Bankr.E.D.Pa.1999); *In re Curtis Center Limited Partnership,* 192 B.R. 648 (Bankr.E.D.Pa.1996); *In the Matter of Village Rathskeller, Inc.,* 147 B.R. 665, 672–73 (Bankr.S.D.N.Y.1992); *In re Nashua Trust Co.,* 73 B.R. 423, 426, 429–430 (Bankr.D.N.J.1987), and lien avoidance under section 506(d). *See In the Matter of Folendore,* 862 F.2d 1537, 1538 (11th Cir.1989) ("Due to Subordination Agreements and prior filings, the liens of the Federal Land Bank and Central Georgia Production Credit Association are superior to the lien of the United States Small Business Association."); *In re Mihalko,* 87 B.R. 357 (Bankr.E.D.Pa.1988) (subordination agreement between the parties changes their relative lien positions; therefore a lien held by the creditor benefitted by the agreement can not be avoided under § 506(d)). [12]

### III.

**\*9** Finally, the objector complains that if the effect of the subordination agreement were to allow HBCC to be treated as an oversecured creditor for purposes of section 506(b), unsecured creditors in this case will receive a smaller dividend. He observes that, absent the subordination agreement, SouthTrust would be in first lien position, and SouthTrust would be an undersecured creditor not entitled to an allowance of fees under section 506(b). Since it is generally accepted that "the enforcement of subordination agreements between creditors of the same bankrupt[ ] affects only their rights and does not interfere with or change the rights of other creditors", *In re Wyse,* 340 F.2d 719, 723 (6th Cir.1965), and since the $150,000 escrow fund would be payable to unsecured creditors if HBCC's motion were denied, the plan administrator reasons that the result sought by HBCC in this contested matter must be improper.

Of course, any potential distribution in this dispute to general unsecured creditors of the escrowed funds arises more from the terms of the consensual confirmed plan, as it dealt with SouthTrust's secured claim, than from construction of the Bankruptcy Code. Typically, an undersecured creditor, *e.g.,* SouthTrust, would receive all of the proceeds of its collateral. Thus, the dispute in this instance is uncommon.

More fundamentally, however, the plan administrator ignores the benefit to creditors that generally follow from subordination agreements. Thus, the rights of unsecured creditors were not adversely affected by the HBCC/ SouthTrust subordination agreement at issue in this contested matter.

A debtor may enter into pre-bankruptcy agreements with creditors that ultimately reduce the dividend to unsecured creditors in a subsequent bankruptcy case without impairing their rights. For example, a corporation can borrow funds from a lender and secure the loan using unencumbered corporate assets as collateral. Presumably, the loan proceeds will benefit the corporate borrower and its other creditors. The transaction would not be avoidable as a preference or fraudulent conveyance in a subsequent bankruptcy case commenced by the borrower (unless, perhaps, there was a marked disparity between the loan proceeds and the value of the security interest).

In other words, the debtor's estate received adequate consideration for the grant of the security interest. The rights of unsecured creditors were not diminished by this prepetition loan. That unsecured creditors may receive a smaller distribution in a subsequent bankruptcy case because these assets are now encumbered is no ground, by itself, to invalidate the security interest. Nor would it be a basis to deny the secured creditor an allowance under section 506(b), if the creditor so qualified.

Similarly, subordination agreements often arise because the corporate debtor needs additional funds and seeks to borrow them. The original lender either cannot or will not provide the needed cash; the second lender will only do so if its risk of non-payment is reduced. Thereupon, if the original lender agrees to subordinate its claim (for reasons involving its own self-interest), the debtor can obtain the additional funds it requires. *See generally In re Lantana Motel, L.P.,* 124 B.R. at 255–56. Use of these loan proceeds are designed to benefit the debtor's operations and, indirectly, its general creditors. Again, absent concerns addressed by the preference and fraudulent conveyance provisions, the Bankruptcy Code will uphold a valid prepetition subordination agreement, *see* 11 U.S.C. § 510(a), and will accord the two creditor parties to the subordination agreement the relief to which they are entitled under the statute. [13]

**\*10** In sum, HBCC's statutory entitlement to fees and interest as an oversecured creditor, pursuant to 11 U.S.C. § 506(b), is a component of the consideration it received for lending $4 million to the debtors in September 2001. It conditioned this loan upon priming South Trust's lien. Had it not lent these funds, unsecured creditors of these debtors could possibly have faired worse than they did under the terms of the confirmed plan. Thus, the enforcement of the subordination agreement made in September 2001, and which now permits the allowance of fees under section 506(b), does not impair the rights of unsecured creditors. It may, under these particular facts, diminish their dividend from the bankruptcy estate, but not their rights as creditors of these debtors.

Accordingly, an order shall be entered allowing HBCC's fees and costs under section 506(b) in the amount of $150,000, and authorizing the plan administrator to disburse the funds currently held in escrow for this purpose.

ORDER

AND NOW, this 15th day of March 2005, for the reasons stated in the accompanying memorandum, it is hereby ordered that the motion of Healthcare Business Credit Corporation for an allowance of costs and fees, pursuant to 11 U.S.C. § 506(b), in the amount of $150,000 is granted, and the objection of the plan administrator is overruled. The plan administrator is authorized to distribute the escrowed funds to HBCC forthwith.

**All Citations**

Not Reported in B.R., 2005 WL 2589201, 44 Bankr.Ct.Dec. 118

Footnotes

1    In light of my forthcoming analysis of section 506(b), I shall assume, without deciding, that this objection was filed solely by the plan administrator, although the pleading itself creates some doubt on this point. The objection is titled as having been made by the debtors, but states in the body that it was filed by the "Plan Administrator ... on behalf of the above debtors and their estates...." The objection is signed by the "Attorneys for the Debtors and Debtors–in–Possession." The certificate of service for this objection is submitted by "counsel for the Debtors" and refers to the "Objection of the Debtors" to HBCC's motion. The memorandum of law, though, is styled: "The Plan Administrator's Reply Memorandum in Opposition to the Allowance of HBCC's Fees and Costs Under 506(b) of the Code." This memorandum is signed by counsel for the Plan Administrator.

    Due to the judicial estoppel issue asserted by HBCC, the identity of the objector could have been material. The concept of judicial estoppel "precludes a party from asserting a position in one legal proceeding which is contrary to a position it has already asserted in another." Patriot Cinemas, Inc. v. Central Cinema Corp., 834 F.2d 208, 212 (1st Cir.1987). Thus, judicial estoppel only arises when inconsistent positions are taken by the same party, not different parties. See In re Allegheny Intern., Inc., 131 B.R. 24, 31 (W.D.Pa.1991).

    Under the terms of the debtors' confirmed plan, the plan administrator was chosen at confirmation "by the Debtors with the advice of the [Official Creditors'] Committee, HBCC and SouthTrust...." Ex. HBCC–9, ¶¶ 1.55, 6.12. The plan administrator was authorized by the confirmed plan to "prosecute objections to Claims and Requests." Id., at ¶ 6.17(f). He was also empowered to object to administrative expenses, id., at ¶ 12.1, and to engage counsel. Id., at ¶ 6.17. The person chosen as plan administrator, however, was the former chief financial officer of the debtors, Ex. PA–1, who appears to have retained debtors' bankruptcy counsel. In addition, the debtors, as well as the plan administrator, were authorized in ¶ 5.3(b) of the plan to object to HBCC's fee request; although the extent of the permitted objection is now debated by these parties.

    In some instances, a plan administrator may not be viewed as the same entity as the former chapter 11 debtor. See In re Submicron Systems Corp., 2004 WL 883391, at *3 (D.Del.2004) (knowledge of the chapter 11 debtor was not attributed to the plan administrator); In re LaBrum & Doak, LLP, 237 B.R. 275, 298–99 (Bankr.E.D.Pa.1999) (plan administrator was a distinct entity from a prepetition debtor for purposes of claim preclusion). Given my conclusion, discussed below, that HBCC was an oversecured creditor entitled to an allowance under section 506(b), I need not determine in this contested matter whether the chapter 11 debtors and the plan administrator should be considered the same party for purposes of judicial estoppel, or whether the debtors are the actual objecting parties.

2    I take judicial notice, under Fed.R.Evid. 201 (incorporated into bankruptcy cases by Bankr.R. 9017), of the docket entries of this proceeding. See Maritime Electric Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D.Ill.1993); In re Paolino, 1991 WL 284107, at *12 n. 19 (Bankr.E.D.Pa.1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir.1995).

3    The filing of the statements on this date would make HBCC "first-in-time" as to the assets of Mill House and Winthrop, but not as to the others. In his objection, the plan administrator contends that application of section 506(b) requires that the entire obligation owed to HBCC be applied to the value of only the Mill House and Winthrop collateral. Objection, at 6 n. 1. Although I do not find this position intuitive, see, e.g., In re Colonial Center, Inc., 156 B.R. 452, 461–62 (Bankr.E.D.Pa.1993); In re Mihalko, 87 B.R. 357, 363 (Bankr.E.D.Pa.1988); In re Panas, 68 B.R. 421 (Bankr.E.D.Pa.1986), I need not now consider that position.

4    Section 2.2 of the subordination agreement provided that, if there were a default by the debtors in repaying SouthTrust, SouthTrust could send notice to HBCC and SouthTrust would then have a first lien position on collateral that "accrues

or arises from and after" forty-five days after notice was sent. The primacy of HBCC's lien, however, remained in all collateral that existed prior to that forty-five day period. Ex. HBCC–1, ¶ 2.2. There is no suggestion that any assets of the debtor involved collateral covered by this provision of the subordination agreement.

In addition, section 3.3 states "[e]ach financing statement of HBCC or SouthTrust that includes any HBCC Collateral will be amended to include, and each new financing statement hereafter filed by either of them with respect to the HBCC Collateral will include, a statement that it is subject to the terms of this Subordination Agreement." The objector notes that this was never done, but does not identify any effect caused by this omission upon the outcome of this dispute.

5    In its supporting memorandum, HBCC asserts that the application of judicial estoppel is appropriate, arguing that the debtors' bankruptcy schedules, prior pleadings, prior cash collateral orders, disclosure statement, confirmed plan and payment of postpetition interest "all provide and/or strongly infer that HBCC holds a first priority lien in the HBCC Collateral and that HBCC is oversecured. The Debtors' Objection puts them in direct conflict with prior conduct and is a bad faith attempt to deny HBCC the attorneys' fees it is warranted." HBCC Memorandum, at 13. This creditor also relies upon the same documents in contending that the objector is equitably estopped, or has waived his right to object. *Id.,* at 14–19. In asserting these estoppel and waiver arguments, HBCC suggests that it may not have voted in favor of and consented to the debtors' proposed chapter 11 plan if it had understood that there could be a challenge to its entitlement to an allowance under section 506(b), except as to the reasonableness of the amount. *Id.,* at 13, 16, 18.

Although I need not decide whether the plan administrator is now barred from challenging HBCC's status as an oversecured creditor, I note that HBCC assumes an identity of interest between the plan administrator and the debtors. I also observe that estoppel issues, particularly judicial estoppel issues, typically arise in bankruptcy cases from the failure of the chapter 11 debtor to disclose information, such as the existence of an asset or claim. *See, e.g., Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414 (3d Cir.), *cert. denied,* 488 U.S. 967 (1988). Presumably, if the terms of the confirmed plan were sufficiently clear—that is, if the terms of the debtors' confirmed plan provided either for HBCC's section 506(b) allowance, or the plan administrator's right to object on the basis that the creditor was not oversecured —the binding nature of the confirmation process, *see* 11 U.S.C. § 1141(a), would supercede any prior understanding or agreement that HBCC and the debtors' might have made on this point. *See also In re Allen,* 300 F.3d 1055, 1060 (9th Cir.2002) (judicial estoppel did not bar a debtor from proposing a plan that was inconsistent with a prior agreement); *In re Envirodyne Industries, Inc.,* 183 B.R. 812, 825 (Bankr.N.D.Ill.1995) (terms of plan placed creditor on notice of debtor's claim, so judicial estoppel was inapplicable).

Thus, the more precise question posed by HBCC may not be estoppel or waiver, but the proper interpretation of section 5.3(b) of the confirmed plan. Indeed, the plan administrator views the issue as such, and expressly contends that section 5.3(b) of confirmed plan authorized his present objection. Objector's Memorandum, at 1–3. I appreciate, though, that in construing a provision of a chapter 11 plan, if it were ambiguous, one may consider other documents, such as a disclosure statement, to aid in interpretation. *See In re NVF Co.,* 309 B.R. 698, 703 (Bankr.D.Del.2004) ("At the September 23, 2003 hearing I thought that NVF's interpretation of the Plan had some appeal. However, after a thorough review of the Plan and related documents, I now conclude that a different interpretation of the Plan is plausible and more consistent with the realities of the situation."). Therefore, HBCC's reference to provisions of cash collateral orders, the approved disclosure statement, and other documents might have been germane to this dispute; however, estoppel issues are probably inapplicable. *Cf. In re Henthorn,* 2005 WL 293646 (3d Cir.2005) (non-precedential) (debtor's claim that fees were unreasonable under § 506(b) precluded by the confirmation process).

6    HBCC contends that its loan and security agreements, specifically, paragraph 9.5(a), provide that the debtors shall pay its counsel fees. *See* Ex. HBCC–1, ¶ 9.5(a), at 41. The objector does not argue to the contrary.

7    11 U.S.C. 502(b)(2) states:

   (b) Except as provided in subsections (e)(2), (f), (g), (h) and (I) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount, except to the extent that—

   (2) such claim is for unmatured interest ...

8    Section 726(a)(5) creates an exception to this general rule when all creditors will be paid in full. *See, e.g. In re Coram Healthcare Corp.,* 315 B.R. 321, 343–44 (Bankr.D.Del.2004) (allowing the payment of postpetition interest to undersecured creditors before making a distribution to the equity holders).

9    The plan administrator stated the payment of postpetition interest to HBCC "only proves that the Debtors compromised on potential claims and arguments in order to get the plan confirmed, just as HBCC agreed to cap its 506(b) claim at $150,000." Plan Administrator's Reply Memorandum at 9, n. 10.

2005 WL 2589201, 44 Bankr.Ct.Dec. 118

**10**  Prior to the enactment of section 510(a), the Third Circuit Court of Appeals held in *In the Matter of Time Sales Finance Corp.,* 491 F.2d 841 (3d Cir.1974) that in order for a senior creditor under a subordination agreement to receive post-petition interest out of the junior creditor's bankruptcy share, the subordination agreement must expressly so state. *See also In re Kingsboro Mortgage Corp.,* 514 F.2d 400, 401 (2d Cir.1975); *In the Matter of King Resources Co.,* 385 F.Supp. 1269, 1281 (D.Colo.1974). This federal common law doctrine was known as the "Rule of Explicitness." *In re Bank of New England Corp.,* 364 F.3d 355, 362 (1st Cir.2004). Some courts have concluded that the Rule of Explicitness did not survive the enactment of section 510. *See, e.g., In re Bank of New England Corp.,* 364 F.3d at 359. In this instance, neither SouthTrust nor the plan administrator has challenged HBCC's entitlement to postpetition interest. Thus, I need not consider that issue.

**11**  Current U.C.C. § 9–339 is derived from former U.C.C. § 9–316.

**12**  A creditor who is oversecured for purposes of section 362(d) or 506(d), due to a subordination agreement, should also be oversecured for purposes of section 506(b). *See also United Steelworkers of America v. North Star Steel Co., Inc.,* 5 F.3d 39, 43 (3d Cir.1993) ("[A] statute's provisions should be read to be consistent with one another, rather than the contrary.").

**13**  Indeed, within a bankruptcy case, a chapter 11 debtor may seek to borrow funds postpetition, and the post-bankruptcy lender may condition such a loan upon obtaining a first lien position upon some or all of the debtor's assets pursuant to 11 U.S.C. § 364(d). The effect of this priming lien would be to subordinate any prepetition liens. *See generally In re Swedeland Development Group, Inc.,* 16 F.3d 552, 564 (3d Cir.1994). If the chapter 11 reorganization is ultimately not successful, the effect of this postpetition borrowing may result in a smaller distribution to unsecured creditors. Such a result, albeit unfortunate, does not represent a diminishment of their rights as creditors. *Cf. In re Adams Apple, Inc.,* 829 F.2d 1484, 1490 (9th Cir.1987) ("section 364(d) ... illustrates a Congressional willingness to subordinate the interests of pre-petition creditors to the goal of rehabilitation.").

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix II**

D

2018 WL 550581
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
N.D. Texas, Dallas Division.

IN RE: BAILEY TOOL &
MANUFACTURING COMPANY, Debtor.

CASE NO. 16–30503–BJH
|
Signed January 23, 2018

**Attorneys and Law Firms**

Melissa S. Hayward, Julian Preston Vasek, Hayward &
Associates PLLC, Dallas, TX, for Debtor.

**Related to ECF No. 441**

**MEMORANDUM OPINION AND
ORDER REGARDING MOTION FOR
ALLOWANCE OF ADMINISTRATIVE CLAIM**

Harlin DeWayne Hale, United States Bankruptcy Judge

**\*1** Before the Court is the Motion for Allowance of
Administrative Claim [ECF No. 441][1] (the "**Motion**")
filed by Comerica Bank ("**Comerica**"), requesting
allowance of a $1,280,000[2] superiority administrative
expense claim pursuant to 11 U.S.C. § 507(b) (the
"**Diminution Claim**") against each of Bailey Tool &
Manufacturing Company ("**Bailey Tool**"), Cafarelli
Metals, Inc., ("**Cafarelli**"), and Hunt Hinges, Inc. ("**Hunt**"
and, collectively, the "**Debtors**") for the alleged diminution
in the value of its collateral during the pendency of the
Debtors' bankruptcy cases.[3] Hayward & Associates, LP
("**Hayward**")[4] filed the sole objection to the Motion,
alleging that Comerica is not entitled to the Diminution
Claim because the value of its collateral increased during
the pendency of the bankruptcy cases. The Court held an
evidentiary hearing to consider the Motion on November
28, 2017 (the "**Hearing**"), and the matter is now ripe for
ruling.[5]

For the reasons explained below, the Court will allow
Comerica, on an interim basis, a $177,282 superpriority

administrative expense claim pursuant to 11 U.S.C. §
507(b) against Bailey Tool, subject to final true-up after
(1) the resolution of the of the Debtors' dispute with
Republic Business Credit, LLC ("**Republic**"), discussed
below, and (2) final collection or resolution of Bailey
Tool's outstanding accounts receivable.

**I. JURISDICTION AND VENUE**

The Court has subject matter jurisdiction over the Motion
under 28 U.S.C. § 1334 and the standing order of reference
of the District Court for the Northern District of Texas.
This matter is a core proceeding as defined under 28
U.S.C. § 157(b)(2)(A), (B), and (O), and venue is proper in
this Court under 28 U.S.C. § 1408.

**II. FACTUAL AND PROCEDURAL HISTORY**

**A. The Debtors' Prepetition
Loans and Factoring Agreement**

Prior to filing for bankruptcy, the Debtors were in the
business of metal fabrication. On September 14, 2012,
Bailey Tool executed an installment note payable to
Comerica in the principal amount of $391,100.00 (as
amended, the "Installment Note"). Case No. 16–30503,
Proof of Claim 17–1 Exs. D and E. On March 28, 2013, the
Debtors executed a promissory note payable to Comerica
in the principal amount of $2,175,000.00 (as amended, the
"SBA Term Note"). *Id.* Exs. A–C. Both the Installment
Note and the SBA Term Note are secured by substantially
all of the Debtors' assets. *Id.* Exs. F, G, and I.

**\*2** In 2014, the Debtors' loans with Comerica went
into workout status. In an attempt to monetize their
accounts receivables and generate operating funds,
the Debtors each entered into an Agreement for
Purchase and Sale with Republic (collectively, the
"**Republic Factoring Agreements**"). To accommodate this
arrangement, Comerica agreed that it would subordinate
its lien on the accounts receivable that were subject to
the Republic Factoring Agreements. The Debtors and
Republic disagree on whether the Republic Factoring
Agreements were terminated, and Republic's claim paid
in full, as of the Petition Date. This disagreement,
which includes allegations that Republic is withholding
substantial funds that are property of the estate, is the
subject of an adversary proceeding currently pending
before the Court. *See Bailey Tool & Manufacturing Co.*

*v. Republic Business Credit, LLC*, Adv. Proc. No 16–3025
(the "**Republic Adversary Proceeding**").


### B. The Debtors' Bankruptcy Cases

On February 1, 2016 (the "Petition Date"), the Debtors
each filed a voluntary petition for relief under Chapter 11
of title 11 of the United States Code, 11 U.S.C. § 101 et seq.
(the "**Bankruptcy Code**"). [6] Their Chapter 11 cases were
jointly administered under the lead case of *In re Bailey
Tool & Manufacturing Company*.

During the Chapter 11 cases, the Court entered
the following orders authorizing the Debtors to use
Comerica's cash collateral and Republic's alleged cash
collateral (collectively, the "**Cash Collateral Orders**"):

- Interim Order Authorizing the Debtors to Use Cash
  Collateral through February 29, 2016 [ECF No.
  30];

- Second Interim Order Authorizing the Debtors to
  Use Cash Collateral through March 30, 2016 [ECF
  No. 113];

- Final Order Authorizing the Debtors' Use of
  Cash Collateral [ECF No. 167] (the "**Final Cash
  Collateral Order**");

- First Supplement to Final Order Authorizing the
  Debtors' Use of Cash Collateral [ECF No. 267];

- Amended Supplement to Final Order Authorizing
  the Debtors' Use of Cash Collateral [ECF No. 298];
  and

- Second Supplement to Final Order Authorizing the
  Debtors' Use of Cash Collateral [ECF No. 335].

Each of the Cash Collateral Orders contained the
following language (or substantively similar language)
granting Comerica and Republic adequate protection in
the forms of replacement liens and superpriority claims:

> **Adequate Protection**: As partial adequate protection
> to Comerica and Republic, to the extent that the
> Debtors' use of the Cash Collateral results in a decrease
> in the value of Comerica's and/or Republic's interest
> in such property, such lender is hereby granted: (i)
> automatically perfected liens (the "Adequate Protection

> Liens") on all property now owned or hereafter
> acquired by the Debtors (the "Collateral"), subject
> only to paragraph below and the lien of Sterling
> Commercial Credit, LLC (the "DIP Lender") solely
> in the Debtors' accounts; and (ii) superpriority
> administrative claims (the "Superpriority Claims")
> pursuant to Sections 361(2), 363(c)(2), 364(d)(1), 503(b)
> (1), and 507(b) of the Bankruptcy Code, junior only
> to the superpriority claim against the Debtors in
> favor of the DIP Lender. As between Republic and
> Comerica, the Adequate Protection Liens and the
> Superpriority Claims shall have the priority provided in
> the Subordination and Intercreditor Agreement dated
> February 25, 2015 between Republic, Comerica, the
> Debtors, John Buttles, and Buttolph Technology, LLC
> (the "Subordination Agreement"). Nothing in this
> order or any prior order shall be construed to grant liens
> that prime ad valorem property tax liens.

Final Cash Collateral Order ¶ 7. Pursuant to the Cash
Collateral Orders, the Debtors made monthly adequate
protection payments to Comerica totaling $90,000.
Comerica Ex. 43 at 2.

**\*3** The Court also authorized the Debtors to enter
into a postpetition financing arrangement with Sterling
Commercial Credit, LLC (the "**DIP Lender**") in the
form of the Accounts Purchase and Security Agreement,
pursuant to which the DIP Lender factored the
Debtors' postpetition accounts receivable. *See* Final Order
Authorizing Debtors to Enter Into Financing Transaction
with Sterling Commercial Credit, LLC and Providing
Adequate Protection to Comerica Bank and Republic
Business Credit, LLC [ECF No. 174] (the "**DIP Financing
Order**"). Pursuant to the DIP Financing Order:

> To secure the Obligations, [the DIP] Lender is hereby
> granted pursuant to Section 364(d) of the Code a
> first lien on the Collateral. [7] No other claims, liens or
> security interests, including but not limited to any lien
> of Republic Business Credit, LLC or Comerica, shall
> be prior to Lender's lien in the Collateral in this or any
> subsequent proceeding under the Bankruptcy Code.
> Republic Business Credit, LLC and Comerica Bank
> have or claim to have liens on the Debtors' accounts,
> and Lender's lien in such accounts is a priming lien for
> the purposes of Section 364(d) of the Code.

\* \* \*

The Obligations [owing to the DIP Lender] shall have the highest administrative priority under Section 364(c)(1) of the Code, and shall have priority over all other costs and expenses of administration, including those specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provision of the Code or otherwise (whether incurred in this case, any conversion of this case pursuant to Section 1112 of the Code, or in any other proceedings related hereto or thereto) (the "Superiority Claim").

* * *

As partial adequate protection to Comerica and Republic, to the extent that the Debtors' use of the Pre–Petition Collateral and Cash Collateral results in a decrease in the value of Comerica's and/or Republic's interest in such property, such lender is hereby granted: (i) automatically perfected liens (the "Adequate Protection Liens") on all property now owned or hereafter acquired by the Debtors, subject to the prior lien of [DIP] Lender in the Collateral and (ii) Superpriority Claims junior in priority and subordinate to the Superpriority Claim in favor of DIP Lender. As between Republic and Comerica, the Adequate Protection Liens and the Superpriority Claims shall have the priority provided in the Subordination and Intercreditor Agreement dated February 25, 2015 between Republic, Comerica, the Debtors, John Buttles, and Buttolph Technology, LLC....

DIP Financing Order ¶¶ 2.1, 2.4, and 3.5.

On January 26, 2017, the Court entered an order dissolving joint administration and converting the Debtors' cases to Chapter 7. James Cunningham was thereafter appointed Chapter 7 Trustee over the Debtors' respective estates. At the Trustee's request, the Court entered an order setting July 17, 2017 as the deadline for filing administrative claims against each Debtor's Chapter 11 estate. Comerica timely filed the Motion in the Bailey Tool case, but it did not file the Motion in the Hunt or Cafarelli cases.

## III. LEGAL ANALYSIS

### A. Preliminary Matters

Before turning to the parties' arguments, the Court must address two preliminary issues. First, despite the fact that Comerica is seeking the Diminution Claim against each Debtor, it only filed the Motion in Bailey Tool's Chapter 7 case. Although a single filing in Bailey Tool's case would be appropriate if the cases were still jointly administered, joint administration ceased when the cases converted to Chapter 7. Because of this, Comerica was required to file the Motion in each case. Comerica's failure to do so raises due process concerns that prevent this Court from allowing a superpriority administrative claim against either Hunt or Cafarelli. Accordingly, the Court will only analyze the Diminution Claim as alleged against Bailey Tool.

**\*4** Second, the Court must determine the relevant dates by which it should measure the alleged diminution in the value of Comerica's collateral. Both parties agree that the Petition Date is the starting point, but they disagree on the end date. Comerica argues that the Court should judge final value as of the dates that the Trustee liquidated its collateral during the bankruptcy case. Hayward, on the other hand, urges the Court to measure final value as of the Conversion Date, regardless of subsequent sales.

Hayward's proposed approach is notable because neither party hired an appraiser or valuation expert. Instead, each relies on documents filed with the Court, including Bailey Tool's Schedules of Assets and Liabilities [ECF No. 92] (the "**Schedules**"), Monthly Operating Reports (the "**MORs**"), and several post-conversion sale orders. If the Court were to end its analysis at the Conversion Date, the only evidence of value in the record would be Bailey Tool's Schedules and MORs. Bailey Tool's last MOR, however, covered the period of November 1–30, 2016 (nearly three months prior to the Conversion Date), and it failed to file post-conversion schedules as required by the Bankruptcy Code. Thus, under Hayward's proposal, the record would be devoid of evidence showing value as of the Conversion Date, and the Motion would fail for a lack of proof. The Court, however, declines to limit its analysis to the Conversion Date when the record contains the ultimate sales price for the subject collateral.

Based upon the record before it, the Court finds Comerica's argument persuasive. To hold otherwise

would ignore the facts that (1) the Trustee has liquidated virtually all of Bailey Tool's remaining assets through arms-length sales to third parties, and (2) under the Final Cash Collateral Order, Comerica's adequate protection did not end on the Conversion Date, but continued into the Debtors' Chapter 7 cases. *See* Final Cash Collateral Order ¶ 20 ("... the Adequate Protection Liens and Superpriority Claims granted [to Comerica and Republic] herein shall continue in these proceedings and in any successor cases. The Adequate Protection Liens and Superpriority Claims shall maintain their priority as provided by this Order.").

Thus, the Court concludes that, under the facts of this case, the relevant dates at which to measure the value of Comerica's collateral are the Petition Date and the sale date. With these preliminary matters addressed, the Court will turn to the parties' arguments.

### B. Analysis of the Diminution Claim Under 11 U.S.C. § 507(b)

Section 507(b) of the Bankruptcy Code governs whether the Diminution Claim is entitled to superpriority status. Under the statute, Comerica has the burden of proving that: (1) it was previously provided adequate protection under Bankruptcy Code §§ 362, 363, or 364, (2) notwithstanding such adequate protection, it holds a claim that is allowable under 11 U.S.C. § 507(a)(2), and (3) its § 507(a)(2) claim arose from (i) imposition of the automatic stay under § 362, (ii) Bailey Tool's use, sale, or lease of Comerica's collateral under § 363, or (iii) the granting of a senior lien under § 364(d). 11 U.S.C. § 507(b); [8] *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 865–66 (4th Cir. 1994). Superpriority status, however, only arises if the diminution is not offset by the replacement liens Comerica was granted as adequate protection under the Cash Collateral Orders and the DIP Financing Order. Only the shortfall remaining is entitled to superpriority status. *See* 4–507 Colliers on Bankruptcy Prac. 507.14 (A. Resnick & H. Sommer eds., 16th ed. 2017).

**\*5** Because it is undisputed that Bailey Tool provided Comerica adequate protection under §§ 362, 363, and/or 364 pursuant to the Cash Collateral Orders and the DIP Financing Order, Comerica has clearly met the first

requirement. Thus, this Court will only analyze the second and third requirements of the statute.

### 1. Comerica Must Have a Claim Allowable Under § 507(a)(2)

If all other requirement of the statute are met, § 507(b) grants superpriority status to claims otherwise allowable as an administrative expense under § 507(a)(2). Section 507(a)(2), in turn, requires that the claim be allowed as an administrative expense under § 503(b). As applicable here, the administrative expenses allowable under § 503(b) are the "actual, necessary costs and expenses of preserving the estate...." 11 U.S.C. § 503(b)(1)(A). This requires actual use of the creditor's property by the debtor or trustee that confers a concrete benefit to the estate. *Dobbins*, 35 F.3d at 865–66 (quoting *In re ICS Cybernetics, Inc.*, 111 B.R. 32, 36 (Bankr.N.D.N.Y.1989) ).

Here, the record clearly shows that Bailey Tool used Comerica's collateral and cash collateral to operate and fund ongoing operations while in Chapter 11. Post-conversion, the Trustee liquidated Comerica's collateral and used its cash collateral to fund the administration of the estate. In fact, no party has alleged that Comerica's collateral or cash collateral was used for anything other than the actual, necessary costs and expenses of preserving the estate. Accordingly, the second requirement of § 507(b)(2) is also met to the extent that Comerica is able to prove a qualifying diminution in the value of its collateral, to which the Court will now turn.

### 2. Whether there was a Diminution in the Value of Comerica's Collateral Caused by Either (1) Imposition of the Automatic Stay Under § 362, (2) Bailey Tool's Use, Sale or Lease of Comerica's Collateral under § 363, or (3) the Granting of a Senior Lien Under § 364(d)

In its Motion, Comerica alleges that the adequate protection it received was insufficient to protect it from a diminution in the value its collateral due to: (1) Bailey Tool's use of Comerica's cash collateral, (2) the priming lien on Bailey Tool's accounts receivable granted to the DIP Lender under the DIP Financing Order, and (3) the accrual of ad valorem taxes during the bankruptcy case. Motion ¶¶ 1–3, 23–24. The Motion, however, gives no detail regarding the value of Comerica's collateral or its

alleged diminution. Instead, Comerica simply calculates the Diminution Claim as the amount reflected in its proof of claim ($2,018,628.08) minus amounts received from sales of its collateral by each Debtor ($737,000), for a Diminution Claim of "more than $1,280,000." *Id.* ¶¶ 10–11.

Hayward, however, points to portions of Bailey Tool's Schedules and November 2016 MOR [ECF No. 368] (the "**November MOR**") to argue that the value of Comerica's collateral actually increased by over $300,000 since the Petition Date:

| Collateral | Schedule A [ECF No. 92] | November MOR [ECF No. 368] |
|---|---|---|
| Account Receivable | $448,926.33 | $862,295.00 |
| Cash | $11,172.00 | $7,003.00 |
| Bailey inventory | $619,243.00 | $478,663.00 |
| Totals: | $1,079,341.33 | $1,347,961300 |

Hayward & Associates PLLC's Objection to Comerica Bank's Motion for Allowance of Administrative Expense Claim [ECF No. 452] (the "**Objection**") ¶ 10. The Objection, however, ignores that Bailey Tool's November MOR includes both prepetition assets (over which Comerica holds a lien) and postpetition assets (to which Comerica's lien did not attach under 11 U.S.C. § 552(a),

as discussed below). Because of this, a deeper analysis is required to determine whether there was a diminution in the value of Comerica's collateral.

**\*6** Comparing Bailey Tool's Schedule A to its November MOR shows the following assets and corresponding values to which Comerica's lien attached under its prepetition security agreement:

| Category of Collateral | Schedule A [ECF No. 92] | November MOR [ECF No. 368] | Change in Value |
|---|---|---|---|
| Accounts Receivable | $448,926.33 | $862,295.00 | $413,368.67 |
| Cash on Hand | $11,172.00 | $7,003.00 | ($4,169.00) |
| Inventory | $619,243.12 | $478,663.00 | ($140,580.12) |
| Office Furniture, Fixtures, and Equipment [9] | $18,500.00 | $18,500.00 | $0 |
| Machinery, Equipment, and Vehicles | $3,882,150.00 | $3,882,150.00 | $0 |
| Real Property [10] | $828,307.81 | $828,307.81 | $0 |

| | | | |
|---|---|---|---|
| All Other Assets [11] | $452,427.52 | $452,142.32 | ($285.20) |
| Totals: | $6,260,726.78 | $6,529,061.13 | $268,334.35 |

The Court will address these categories in turn.

**a. Accounts Receivable**

Comerica alleges that it held a first lien on all of Bailey Tool's pre- and postpetition accounts receivable until the DIP Lender primed its lien, resulting in a diminution in the value of its collateral. Comerica's argument, however, fails to appreciate the effect that 11 U.S.C. § 552 had on the liens granted by its prepetition security agreement with the Debtors, which the Court will now explain.

The prepetition security agreement between Comerica and Bailey Tool covers all of the Debtors' accounts receivable and the proceeds generated by the collection of such receivables. Case No. 16–30503, Proof of Claim 17–1 Ex. G ¶ 1. Under 11 U.S.C. § 552(a), however, property acquired by a debtor after the petition date is not subject to a lien arising from a prepetition security agreement. 11 U.S.C. § 552(a). [12] Under § 552(b)(1), though, if a security agreement grants a lien on a prepetition asset and the proceeds, products, offspring, or profits of such asset, then the security interest will continue postpetition in both the asset and the proceeds, products, offspring, or profits of the asset to the extent permitted by the security agreement and applicable law. Id. § 552(b)(1). [13] Thus, depending on whether Republic and the DIP Lender have been repaid, Comerica holds either a second or a third lien on the Debtors' prepetition accounts receivable and the proceeds generated by the postpetition collection of the prepetition accounts receivable. Comerica, however, could only have a lien on the Debtors' postpetition accounts receivable if granted by the Court. Although the Court did grant Comerica a replacement lien on the Debtors' postpetition accounts receivable (junior to the DIP Lender), that lien only arises *after* Comerica proves a decrease in the value of its collateral. *See* Final Cash Collateral Order ¶ 7; DIP Financing Order ¶ 3.5. Accordingly, Comerica never held a lien on Bailey Tool's postpetition accounts receivable that the DIP Lender could prime. The DIP Financing Order did, however, grant the DIP Lender a priming lien on the prepetition accounts receivable that serve as Comerica's collateral. DIP Financing Order ¶¶ 2.1 and H.

**\*7** Because of this, the proper focus is not on the postpetition increase in Bailey Tool's accounts receivable, but on the prepetition accounts receivable collected during the bankruptcy case. Although neither party addressed this amount in their pleadings or at the Hearing, Bailey Tool's MORs show that it collected $177,282 between the Petition Date and November 30, 2016. [14] The record also reflects that Bailey Tool used these funds (Comerica's cash collateral) to operate its business and/or administer its bankruptcy estate. This use, coupled with the priming lien granted to the DIP Lender, resulted in a dollar-for-dollar diminution in the value of Comerica's collateral. Thus, the Court finds and concludes that Comerica has met its burden to prove that it holds a diminution claim in the amount of $177,282 under § 507(b), subject to later true-up as discussed below. *See* § IV, *infra*.

**b. Cash**

Bailey Tool held $11,172 in cash as of the Petition Date, which had decreased to $7,003 by November 30, 2016. *Compare* Schedule A/B [ECF No. 92] at 9 of 91, *with* November MOR [ECF No. 368] at 2 of 11. The current amount of cash held by the Trustee, however, is unknown. Moreover, there is no evidence in the record regarding the source of such cash, including whether it was (1) Comerica's prepetition collateral or the proceeds thereof (to which its lien would attach), or (2) the proceeds of postpetition accounts receivable factored by the DIP Lender (to which only Comerica's replacement lien would attach). Accordingly, although a diminution in Bailey Tool's cash may have occurred, the Court finds and concludes that Comerica has failed to prove the amount.

**c. Inventory**

A comparison of Bailey Tool's Schedules and November MOR shows a $140,580.12 decrease in inventory levels

from the Petition Date through November 30, 2016. *Compare* Schedule A/B [ECF No. 92] at 9 of 91, *with* November MOR [ECF No. 368] at 2 of 11. The Trustee subsequently liquidated Bailey Tool's inventory, but the record is devoid of evidence regarding the liquidation value. Accordingly, although it appears that a diminution in the value of Bailey Tool's inventory has occurred, the Court finds and concludes that Comerica has failed to prove the amount.

### d. Office Furniture, Fixtures, and Equipment; Machinery, Equipment, and Vehicles

Bailey Tool scheduled its office furniture, fixtures, and equipment with a value of $18,500 and its machinery, equipment, and vehicles with a value of $3,882,150, for a combined total of $3,900,650. Schedule A/B [ECF No. 92] at 9 of 91. These assets, however, were subject to senior liens held by: (1) ad valorem taxing authorities of $491,663.84, [15] and (2) various third parties of $84,391.21. Case No. 16–30503, Proof of Claim 1–3; Schedule D [ECF No. 92] at 10–14 of 91. Factoring in these amounts, the furniture, fixtures, machinery, equipment and vehicles that served as Comerica's collateral had a net value as of the Petition Date of $3,324,625 ($3,900,650 −> $491,633.84 − $84,391.21).

These assets, along with those owned by the other Debtors, were liquidated during the bankruptcy cases, resulting in Comerica receiving $347,000 of net sale proceeds. Comerica Ex. 43 at 2. Of this amount, $320,000 is attributable to the sale of Bailey Tool's assets:

> **\*8** • On May 4, 2016, the Court entered an order [ECF No. 200] authorizing the Debtors to auction various surplus assets via a third party auctioneer. Pursuant to the sale report filed June 22, 2016, the auction generated $147,359.91 in sale proceeds. Of this amount, $129,114.60 was paid to Dallas County in partial payment of ad valorem taxes, and $18,245.85 was paid to a third party creditor on account of its secured claim on specific equipment. Comerica did not receive any of the sale proceeds. Agreed Order Granting Debtors' Motion to Disburse Auction Proceeds to Secured Creditors [ECF No. 297] (the "**Disbursement Order**") at 2. Moreover, the sale-related pleadings did not break down the assets sold or the purchase price on a by-Debtor basis, so the Court is unable to determine

what portion of the sale proceeds arose from the sale of Bailey Tool's assets versus those owned by Hunt or Cafarelli.

> • On August 12, 2016, the Court entered an order [ECF No. 283] authorizing Bailey Tool to sell four pieces of equipment to a third-party purchaser for a gross price of $5,700. Dallas County received the sale proceeds in partial payment of ad valorem taxes. Disbursement Order at 2.

> • On April 28, 2017, the Court entered an order authorizing the Trustee to sell the Debtors' remaining tangible personal property for $1,051,000. Order Authorizing Sale of Property of Estate Free and Clear of Liens and Encumbrances [ECF No. 423] (the "**April Sale Order**"). According to the underlying sale motion, the sale included $3,076,050 (value per Schedules) of Bailey Tool's computers, fixtures, equipment, machinery, and tooling. Motion to Sell Property of the Estate Free and Clear of Liens and Encumbrances [ECF No. 401] at 3. The sale proceeds allocated to Bailey Tool's assets was $839,955.14. [16] *Id.* Of this amount, Comerica received $320,000. Trustee's Sale Report [ECF No. 433] at 1. The sale proceeds were sufficient to satisfy the remaining ad valorem tax claims. April Sale Order at 2.

A comparison of the net scheduled value of Comerica's prepetition liens on Bailey Tool's furniture, fixtures, machinery, equipment, and vehicles ($3,324,625) versus the sale proceeds it received ($320,000) clearly shows that there was a diminution in the value of these assets. Comerica, though, must also prove that the diminution was due to either the imposition of the automatic stay under § 362, Bailey Tool's use, sale or lease of Comerica's collateral under § 363, or the granting of a senior lien under § 364(d). Although Bailey Tool presumably used these assets while operating in Chapter 11, the record is devoid of evidence regarding the cause of the diminution in the value. Thus, the Court finds and concludes that Comerica has failed to meet the requirements set forth in § 507(b) as to this category of assets.

### e. Real Property

As part of its loan documents, Comerica held a deed of trust covering the real property and improvements located

at 904 and 906 Mercury Avenue, Duncanville, Texas (the "**Mercury Property**"), which was owned by Bailey Tool. Case No. 16–30503, Proof of Claim 17–1 Ex. F. Bailey Tool scheduled the Mercury Property with a value of $828,307.81, subject to $40,000 in ad valorem tax liens. Schedule A [ECF No. 92] at 6 of 91; Schedule D [ECF No. 92] at 11 of 91. The Trustee sold the Mercury Property for $430,000 pursuant to a sale order entered January 23, 2017 [ECF No. 383] (the "**Mercury Sale Order**"). Per the Mercury Sale Order, the purchase price represented the fair market value of the Property. *Id.* at 2. Comerica received $300,000 in net proceeds from the sale. Comerica Ex. 43 at 2. Thus, there was clearly a diminution in the value of the Mercury Property during the pendency of Bailey Tool's bankruptcy case.

**\*9**  Under § 507(b), however, Comerica must prove that the diminution was due to either the imposition of the automatic stay under § 362, Bailey Tool's use, sale or lease of the Mercury Property under § 363, or the granting of a senior lien under § 364(d). There is no evidence in the record that the diminution was a result one of these factors versus another reason, such as Bailey Tool overvaluing the Mercury Property in its Schedules or market factors that would have influenced the price regardless of the bankruptcy case. Thus, the Court finds that Comerica has failed to prove that the diminution in the value of the Mercury Property meets the requirements of § 507(b).

### f. All Other Assets

As previously explained, the category of "All Other Assets" is comprised of the Debtors' claims against Republic for wrongfully withheld funds valued at $450,000 and an employee loan valued at $2,427.52. Schedule A/B [ECF No. 92] at 7–8 of 91. According to the Trustee's initial report filed with the Court on November 17, 2017 [ECF No. 519] (the "**Initial Report**"), the Trustee has not administered either of these assets and there is nothing in the record indicating that the assets have diminished in value. Thus, the Court finds that Comerica has failed to prove these assets diminished in value during the pendency of Bailey Tool's bankruptcy case.

### C. The Parties' Arguments Regarding Ad Valorem Taxes

Comerica also argues that it is entitled to a superpriority claim equal to the ad valorem taxes that accrued during Bailey Tool's bankruptcy case. The Court finds this argument unpersuasive because the ad valorem tax liens prime Comerica's liens regardless of Bailey Tool's bankruptcy case. Because of this, Comerica is unable to prove that the accrual of ad valorem taxes resulted in a diminution in the value of its collateral due to the imposition of the automatic stay under § 362, Bailey Tool's' use, sale or lease of Comerica's collateral under § 363, or the granting of a senior lien under § 364(d). 11 U.S.C. § 507(b); *see In re Constr. Supervision Servs., Inc.*, 2015 WL 4873062, at *7 (Bankr. E.D.N.C. Aug. 13, 2015), *aff'd sub nom.* 2016 WL 2764328 (E.D.N.C. May 9, 2016) (holding creditor not entitled to superpriority claim when diminution would have occurred regardless of the bankruptcy case); *In re Mendez*, 259 B.R. 754, 758 (Bankr. M.D. Fla. 2001) ("losses that would have occurred despite the interference of the bankruptcy case are not entitled to protection under § 507(b)"); *see also* Final Cash Collateral Order ¶ 7 (granting Comerica adequate protection, but clarifying that "[n]othing in this order or any prior order shall be construed to grant liens that prime ad valorem property tax liens.").

Along a similar vein, Hayward argues that a decrease in 2016 and 2017 personal property ad valorem taxes that resulted from a postpetition settlement of the Debtors' tax protest increased the value of Comerica's collateral. *See* Order Approving Compromise [ECF No. 417] (the "**Tax Settlement Order**") (reducing the 2016 and 2017 appraisal value of Bailey Tool's business personal property). According to Hayward, the proper calculation of alleged diminution compares the value of Comerica's liens, net of all senior liens. And, because the senior ad valorem tax claims were significantly less postpetition than they were as of the Petition Date, the value of Comerica's liens increased. Although the Court agrees with Hayward's general premise, for the reason explained below, the Court finds that the reduction in personal property ad valorem taxes at issue does not compensate for the $177,282 diminution in the value of Comerica's lien on Bailey Tool's accounts receivable.

**\*10**  The Dallas Central Appraisal District assigned the business personal property ad valorem taxes owed by Bailey Tool Account Nos. x42100 and x23200. Plaintiff's Original Petition and Request for Disclosure [Adv. Proc. No. 16–3129, ECF No. 1–2] ¶ 9. The appraisal values for

the accounts were $1,629,790 and $4,421,680, respectively. *Id.* The Tax Settlement Order reduced these amounts to $680,010 and $780,500, respectively, for tax years 2016 and 2017. This resulted in Bailey Tool paying less in personal property ad valorem taxes than it otherwise would have. These tax savings, however, relate solely to business personal property, such as inventory, furniture, fixtures, machinery, equipment, and vehicles (collectively, the "**Personal Property**"). Case No. 16–30503, Proof of Claim No. 1–3; *see* TEX. PROP. TAX CODE §§ 11.01(a) ("All real and tangible personal property that this state has jurisdiction to tax is taxable unless exempt by law), 11.02 (stating that, with limited exceptions not applicable here, intangible personal property is not taxable), and 104(6) (defining intangible personal property to include accounts receivable). The Court, however, previously held that Comerica failed to prove that the diminution in Bailey Tool's Personal Property met the requirements of 11 U.S.C. § 507(b). *See* §§ III.B.2.c-d, *supra.* Because Comerica failed to prove a qualifying diminution in value of the Personal Property, any argument that tax savings on that same property offset an alleged diminution in value is moot.

### D. Whether the Collateral Shortfall was Offset by Comerica's Replacement Liens

As reflected in the Initial Report, the Trustee has fully administered all of Bailey Tool's assets, with the exceptions of (1) the $2,427.52 employee loan, (2) the ongoing collection of pre-and postpetition accounts receivable, [17] and (3) the Debtors' claim against Republic for wrongfully withheld funds, which the Schedules value at $450,000. Of these, the only asset not subject to Comerica's prepetition lien is the proceeds of postpetition accounts receivable, which are also subject to the DIP Lender's priming lien and/or Republic's senior lien, to the extent such entities have not be paid in full. Accordingly, based upon the record before it today, the Court finds that the $177,282 diminution in Comerica's collateral was not offset by the replacement liens Comerica was granted under the Cash Collateral Orders and the DIP Financing Order (the "**Interim Diminution Claim**"). The amount of

the Interim Diminution Claim will likely change, however, as the Trustee continues to administer Bailey Tool's remaining assets.

## IV. CONCLUSION

For the reasons explained above, the Court finds and concludes that there has been a failure in Comerica's adequate protection and that some portion of the $177,282 Interim Diminution Claim is entitled to superpriority status. The Court, however, is unable to determine the amount at this time because of the Trustee's ongoing collection of both pre- and postpetition accounts receivable and the pending Republic Adversary Proceeding. [18] Thus, the Court will allow Comerica, on an interim basis, a superpriority claim under 11 U.S.C. § 507(b) of $177,282, which reflects the proceeds from Bailey Tool's postpetition collection and use of the prepetition accounts receivable that serve as Comerica's collateral.

**\*11** The Interim Diminution Claim, however, will be subject to a true-up between the Trustee and Comerica as additional accounts receivable are collected and the Republic Adversary Proceeding concluded. Upon final true-up, Comerica shall file a Notice with this Court that contains the final superpriority diminution claim agreed to by the Trustee and Comerica (the "**Agreed Diminution Claim**"). [19] Hayward shall have 21 days to file an objection to the Agreed Diminution Claim. If Hayward fails to timely object, Comerica shall upload an order allowing the Agreed Diminution Claim on a final basis. If Hayward timely objects and the parties are unable to reach a resolution, Hayward, Comerica, and the Trustee shall file a joint status report with the Court setting forth their respective positions and requesting a status conference. At the status conference, the Court will establish a scheduling order with respect to a further evidentiary hearing.

## SO ORDERED

## All Citations

Slip Copy, 2018 WL 550581

---

Footnotes

1    "ECF No." refers to the docket sheet in the case of *In re Bailey Tool & Manufacturing Co.*, 16–30503–BJH–7.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    9

2   The Motion contains conflicting amounts. The body of the Motion requests a superpriority claim of $1,609,348.45, while the prayer requests $1,280,000. At the Hearing, Comerica's counsel clarified that the correct amount is $1,280,000. Hr'g Audio Tr. (11/28/17) 9:04–05.

3   Although the Motion also requests allowance of a superpriority administrative claim against debtor Bailey Shelter L.P., Comerica's counsel withdrew such request on the record at the Hearing. Hr'g Audio Tr. (11/28/17) 9:05. Accordingly, Bailey Shelter L.P.'s bankruptcy case is not relevant to this Memorandum Opinion and Order.

4   Hayward served as the Debtors' counsel during their Chapter 11 cases and holds a pre-conversion claim for attorneys' fees.

5   This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law in accordance with Federal Rules of Bankruptcy Procedure 7052 and 9014. Any finding of fact more properly considered a conclusion of law, or any conclusion of law more properly considered a finding of fact, should be so considered.

6   The Debtors' respective bankruptcy cases are *In re Bailey Tool and Manufacturing*, 16–30503, *In re Hunt Hinges, Inc.*, 16–30504, and *In re Cafarelli Metals, Inc.*, 16–30507.

7   The DIP Financing Order defines "Collateral" as "all of the Debtors' now existing and hereafter arising accounts as defined in the Uniform Commercial Code." *Id.* ¶ H.

8   11 U.S.C. 507(b) states:

    If the trustee, under section 362, 363, or 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protection, such creditor has a claim allowable under subsection (a)(2) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

9   Bailey Tool's February MOR lumps the Schedule A/B categories of (1) Office Furniture, Fixtures, and Equipment, (2) Machinery, Equipment, and Vehicles, and (3) Real Property into the category Property, Plant, and Equipment. *Compare* Schedule A/B [ECF No. 92] at 9 of 91, *with* November MOR [ECF No. 2 of 10.

10  The real property and improvements located at 904 Mercury Avenue, Duncanville, Texas.

11  "All Other Assets" is comprised of (1) $425,000 in research and development tax credits, (2) a $2,427.52 employee loan, and (3) $450,000 in funds that the Debtors allege are being improperly held by Republic. Schedule A/B [ECF No. 92] at 7–8 of 91. *See also* November MOR [ECF No. 123 at 3 of 10]. Because Comerica's lien would not attach to a tax credit, that amount is excluded from the above table.

12  11 U.S.C. § 552(a) states that:

    (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

13  11 U.S.C. § 552(b)(1) states, in relevant part, that:

    ... if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise

14  *See* ECF Nos. 368 (February 2016) at 5, line 3 ($65,857 collected), 190 (March 2016) at 5, line 3 ($111,425 collected), 214 (April 2016) at 6, line 3 ($0 collected), 235 (May 2016) at 6, line 3 ($0 collected), 284 (June 2016) at 6, line 3 ($0 collected), 296 (July 2016) at 6, line 3 ($0 collected), 310 (August 2016) at 6, line 3 ($0 collected), 331 (October 2016) at 6, line 3 ($0 collected), and 368 (November 2016) at 6, line 3 ($0 collected).

15  Bailey Tool scheduled these same tax claims for $533,171.66. Schedule D [ECF No. 92] at 12 of 91. The difference between the claims as filed and scheduled is not material to this Court's ruling.

16  In the April Sale Order, Comerica reserved its right to, among other things, challenge the Trustee's allocation of the purchase price as between the Debtors.

17  A comparison of Bailey Tool's Schedules and MORs show that it values the uncollected prepetition accounts receivable at $271,644.

18  With respect to the Republic Adversary Proceeding, Hayward argues that Comerica has agreed to limit its lien on litigation proceeds to the first $180,000 received, as reflected by the Order Approving Compromise and Settlement Under Rule

9019 [ECF No. 444] (the "**Settlement Order**"). The Settlement Order was entered in resolution of Comerica's objection to the Trustee's request to employ special litigation counsel to prosecute the Republic Adversary Proceeding at a 40% contingency fee, plus expenses. Comerica objected because the 40% contingency was a flat percentage that did not account for the possibility that the litigation may settle soon after special litigation counsel was employed. In resolution of this objection, the Trustee sought Court approval of a settlement with Comerica, which is reflected in the Settlement Order. The relevant portion of the Settlement Order reads as follows:

> The Trustee and Special Litigation Counsel agree, in compromise and settlement, that the first One Hundred and Eighty Thousand Dollars ($180,000.00) or ten percent (10%) of the gross recovery (whichever is greater) collected from the litigation to be pursued by Special Litigation Counsel on behalf of the Trustee against RBC shall be paid to Comerica without any contingent fee or costs of the litigation being subtracted therefrom.

*Id.* ¶ E. There is no language in the Settlement Order or the underlying motion indicating that Comerica agreed to waive its lien on any other litigation proceeds that fall under the terms of its prepetition security agreement. Instead, the settlement addressed Comerica's concern that an early settlement of the Republic Adversary Proceeding would result in special litigation counsel receiving a disproportionate share of the litigation proceeds.

19 If the Trustee and Comerica are unable to reach an agreement, Comerica and the Trustee shall file a joint status report with the Court setting forth their respective positions and requesting a status conference. At the status conference, the Court will establish a scheduling order with respect to a further evidentiary hearing.

---

**End of Document**                                 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix II

E

2012 WL 13033641

Editor's Note: Additions are indicated by Text and deletions by ~~Text~~ .

Only the Westlaw citation is currently available.
United States Bankruptcy Court,
D. Delaware.

IN RE: ALLIED SYSTEMS

HOLDINGS, INC., et al., [1] Debtor.

Case No. 12–11564 (CSS) (Jointly Administered)
|
Signed July 12, 2012

**Attorneys and Law Firms**

Jeffery W. Cavender, Ezra H. Cohen, Michael E. Johnson, Jeffrey W. Kelley, Carolyn Peterson Richter, Troutman Sanders LLP, Atlanta, GA, Mark D. Collins, Robert Charles Maddox, Brendan Joseph Schlauch, Robert J. Stearn, Jr., Marisa A. Terranova, Marisa A. Terranova, Richards, Layton & Finger, P.A., Christopher M. Samis, Whiteford Taylor & Preston LLC, Wilmington, DE, Stephen R. Woods, Ogletree Deakins Nash Smoak & Stewart PC, Greenville, SC, for Debtors.

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c) (3), 364(d)(1), 364(e), 503(b) and 507(a), FED. R. BANKR. P. 2002, 4001 AND 9014 AND DEL. BANKR. L.R. 4001–2: (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED DIP FINANCING AND (B) USE CASH COLLATERAL; (II) GRANTING SUPERPRIORITY LIENS AND PROVIDING FOR SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS; AND (IV) MODIFYING AUTOMATIC STAY**

THE HONORABLE CHRISTOPHER S. SONTCHI, UNITED STATES BANKRUPTCY JUDGE

**\*1**  Allied Systems Holdings, Inc. ("Holdings", [2] Allied Systems, Ltd. (L.P.) ("Systems") and their U.S. and Canadian subsidiaries (collectively, the "Debtors"),

having moved on June 11, 2012 (the "Motion") for an interim order (the "Interim Order") and a final order (the "Final Order") authorizing them to, among other things, (i) incur post-petition secured indebtedness, (ii) grant superpriority security interests and superpriority claims, and (iii) grant adequate protection, pursuant to sections 105(a), 362, 363(c), 364(c), (d), and (e), 503(b) and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001–2 of the Delaware Bankruptcy Local Rules (the "Local Rules"); a hearing on the Motion having been held on June 12, 2012 (the "Interim Hearing") and this Court having entered the Interim Order on June 12, 2012 and having entered an amended interim order (the "Amended Interim Order") on June 26, 2012; a final hearing on the Motion having been held on July 12, 2012 (the "Final Hearing"); and based upon all of the pleadings filed with this Court, the evidence presented at the Interim Hearing and the Final Hearing and the entire record herein; and the Court having heard and resolved or overruled all objections to the relief requested in the Motion; and the Court having noted all appearances at the Final Hearing; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and after due deliberation and consideration, sufficient cause appearing therefore, **IT IS HEREBY FOUND:** [3]

A.  Petition Date. On May 17, 2012 (the "Petition Date"), involuntary petitions pursuant to chapter 11 of the Bankruptcy Code were filed against Holdings and Systems by certain creditors (the "Petitioning Creditors"). Holdings and Systems consented to the entry of an order for relief on June 10, 2012 (the "Consent Date"). All of the other Debtors filed voluntary petitions for relief on the same date. The Debtors' cases under chapter 11 are collectively referred to herein as the "Chapter 11 Cases." The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in any of the Chapter 11 Cases. On June 19, 2012, the United States Trustee appointed a statutory committee of unsecured creditors (the "Committee").

B.  Jurisdiction; Venue. This Court has core jurisdiction over the Chapter 11 Cases and the Debtors' property

pursuant to 28 U.S.C. §§ 157(b)(2)(D) and 1334. Venue for the Chapter 11 Cases is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

**\*2** C. <u>Notice</u>. Proper notice under the circumstances has been given by the Debtors of the Motion, the Interim Hearing and the Final Hearing pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001–2.

D. <u>Debtors' Stipulations</u>. In entering into the DIP Financing Agreement (as defined below) and as consideration therefor, subject to the rights of non-Debtor parties as set forth in the provisions of paragraph 12 below, the Debtors acknowledge, represent, stipulate, and agree that:

(i) <u>Prepetition Loan Documents</u>. Holdings and Systems are borrowers under (a) that certain Amended and Restated First Lien Secured Super–Priority Debtor In Possession and Exit Credit and Guaranty Agreement (the "<u>Prepetition First Lien Loan Agreement</u>"), dated as of May 15, 2007 (as amended by that certain Limited Waiver and Amendment No. 1 to Credit Agreement and Pledge and Security Agreement, dated as of May 29, 2007, that certain Amendment No. 2 to Credit Agreement, dated as of June 12, 2007, that certain Amendment No. 3 to Credit Agreement, dated as of April 17, 2008, that certain Amendment No. 4 to Credit Agreement dated as of August 21, 2009 and as otherwise amended through the Consent Date), by and among Holdings and Systems, as borrowers, their subsidiaries identified therein, as guarantors, the lenders party thereto from time to time (collectively, and together with such lenders' successors and assigns, the "<u>Prepetition First Lien Lenders</u>"), Goldman Sachs Credit Partners L.P., as lead arranger and syndication agent, and The CIT Group/ Business Credit, Inc. ("<u>CIT</u>"), as administrative agent and collateral agent (in either or both of such capacities, and together with its successors in either or both of such capacities, the "<u>Prepetition First Lien Agent</u>") and (b) that certain Second Lien Secured Super–Priority Debtor In Possession and Exit Credit and Guaranty Agreement (the "<u>Prepetition Second Lien Loan Agreement</u>"), dated as of May 15, 2007 (as amended by that certain Limited Waiver and Amendment No. 1 to Credit Agreement and Pledge and Security Agreement, dated as of May 29, 2007, that certain Amendment No. 2 to Credit Agreement, dated as of June 12, 2007, that certain Amendment No. 3 to Credit Agreement, dated as of April 17, 2008

and as otherwise amended through the Consent Date), by and among Holdings and Systems, as borrowers, their subsidiaries identified therein, as guarantors, the lenders party thereto from time to time (collectively, and together with such lenders' successors and assigns, the "<u>Prepetition Second Lien Lenders</u>," and together with the Prepetition First Lien Lenders, the "<u>Prepetition Lenders</u>"), Goldman Sachs Credit Partners L.P., as lead arranger and syndication agent, and The Bank of New York Mellon, as administrative agent and collateral agent (in such capacity and together with its successors in either or both of such capacities, the "<u>Prepetition Second Lien Agent</u>," together with the Prepetition First Lien Agent, the "<u>Prepetition Agents</u>," and the Prepetition Second Lien Agent collectively with the Prepetition Lenders and the Prepetition First Lien Agent, the "<u>Prepetition Secured Parties</u>"). CIT resigned as the Prepetition First Lien Agent on or about April 19, 2012. To date, no successor has been appointed and the "Requisite Lenders," as such term is defined in the Prepetition First Lien Loan Agreement (the "<u>Prepetition First Lien Requisite Lenders</u>") have the powers accorded to the Prepetition First Lien Agent pursuant to the terms of the Prepetition First Lien Loan Agreement. Accordingly, as used herein, the term "<u>Prepetition First Lien Agent</u>" shall be deemed to mean the Prepetition First Lien Requisite Lenders until a successor First Lien Agent to CIT is appointed, if ever. The term "<u>Prepetition Loan Documents</u>" means, collectively, the Prepetition First Lien Loan Agreement, the Prepetition Second Lien Loan Agreement, the Prepetition Intercreditor Agreement (as defined below) and all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination or intercreditor agreements, instruments, amendments, and any other agreements or documents executed and/or delivered pursuant thereto or in connection therewith.

**\*3** (ii) <u>Prepetition Indebtedness</u>. For purposes of this Final Order, the term (a) "<u>Prepetition First Lien Debt</u>" shall mean all "Obligations" as defined in the Prepetition First Lien Loan Agreement and other amounts owed by the Borrowers or the Guarantors as of the Consent Date to the Prepetition First Lien Agent and the Prepetition First Lien Lenders under the Prepetition First Lien Loan Agreement and the other Prepetition Loan Documents related thereto, (b) "<u>Prepetition Second Lien Debt</u>" shall mean all "Obligations" as defined in the Prepetition Second Lien Loan Agreement and other amounts owed by the Borrowers and the Guarantors

as of the Consent Date to the Prepetition Second Lien Agent and Prepetition Second Lien Lenders under the Prepetition Second Lien Loan Agreement and the other Prepetition Loan Documents related thereto, and (c) "Prepetition Secured Debt" shall mean the Prepetition First Lien Debt and the Prepetition Second Lien Debt. As of the Consent Date, (A) the aggregate principal amount of the Prepetition First Lien Debt outstanding was not less than $244,021,526, plus accrued and unpaid interest, fees, costs, and expenses; (B) the aggregate principal amount of the Prepetition Second Lien Debt outstanding was not less than $30,000,000, plus accrued and unpaid interest, fees, costs, and expenses; (C) all of the Prepetition Secured Debt is unconditionally due and owing by the Debtors to the respective Prepetition Secured Parties; and (D) all claims in respect of the Prepetition Secured Debt and all Prepetition Lender Liens (as defined below) are not subject to any avoidance, reductions, set off, offset, disallowance, recharacterization, subordination (whether equitable, contractual or otherwise and except as set forth in the Prepetition Intercreditor Agreement (as defined below)), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any other applicable law or regulation by any person or entity.

(iii) Prepetition Liens. To secure the Prepetition Secured Debt, the Debtors and certain of their affiliates granted (i) the Prepetition First Lien Agent, for its own benefit and the benefit of the Prepetition First Lien Lenders, valid, binding, continuing, enforceable, and properly perfected first priority liens and security interests (the "Prepetition First Liens") upon and in substantially all of the real, personal and mixed property and assets of the Debtors and such affiliates (the "Prepetition Collateral"), and (ii) the Prepetition Second Lien Agent, for its own benefit and the benefit of the Prepetition Second Lien Lenders, valid, binding, continuing, enforceable, and properly perfected second priority liens and security interests (the "Prepetition Second Liens," and together with the Prepetition First Liens, the "Prepetition Lender Liens") upon and in all or substantially all of the Prepetition Collateral. As of the Consent Date, the Prepetition Lender Liens were senior and had priority over all other security interests and liens on the Debtors assets other than any non-avoidable, valid, enforceable and perfected liens and security interests in the Debtors' assets that existed as of the Petition Date (as defined below) in favor of third parties holding liens or security interests that are superior in priority, after giving effect to any existing subordination

arrangements, to the Prepetition First Liens and are not otherwise subject to subordination under contract, the Bankruptcy Code or otherwise applicable law. Pursuant to that certain Intercreditor Agreement, dated as of May 15, 2007 (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "Prepetition Intercreditor Agreement"), by and among Holdings, Systems, the other grantors party thereto and the Prepetition Agents, the Prepetition Second Liens are subject and subordinate in priority to the Prepetition First Liens. As of the Consent Date, there were no perfected liens on or security interests in the Prepetition Collateral except for the Prepetition Lender Liens, the Existing Priority Liens (as defined below) and other "Permitted Liens" as such term is defined in the Prepetition First Lien Credit Agreement.

(iv) No Claims. As of the Petition Date, no claims of any Debtor exist against any of Prepetition Secured Parties arising from or relating to any of the Prepetition Loan Documents, any loans or financial accommodations made thereunder or any of the other transactions contemplated thereby.

E. Purpose and Necessity of Financing. The Debtors require the DIP Loan to fund, among other things, ongoing working capital requirements and administrative costs and for other purposes permitted by this Final Order. The Debtors' "cash collateral," as such term is defined in Bankruptcy Code section 363(a) (the "Cash Collateral"), is insufficient to fund the Debtors' on-going business needs and administrative costs. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under Bankruptcy Code section 503, or other financing under Bankruptcy Code sections 364(c) or (d), on equal or more favorable terms than those set forth in the DIP Financing Agreement based on the totality of the circumstances. Moreover, a loan facility in the amount provided by DIP Financing Agreement is not available to the Debtors without granting superpriority claims and priming liens pursuant to the Bankruptcy Code, as provided in this Final Order and the DIP Financing Agreement. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the DIP Financing Agreement represents the best financing package available to them at this time and is in the best interests of the estates and their creditors.

**\*4**   F. Use of Cash Collateral. The Debtors also require the continued use of Cash Collateral to operate their businesses. Without the continued use of Cash Collateral, the Debtors will not be able to meet their cash requirements for working capital needs. The Prepetition Agents and the DIP Agent do not consent (or are not deemed to consent) to the use of Cash Collateral except on the terms and conditions, and for the purposes, specified herein. The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain such consent or non-objection of such parties and to adequately protect their interests in the Prepetition Collateral.

G. Good Cause. The continued ability of the Debtors to obtain sufficient working capital and liquidity and use of Cash Collateral under this Final Order is vital to the Debtors estates and creditors, and in particular, to the ability of the Debtors to preserve their businesses and restructure their indebtedness under the Bankruptcy Code. The continued liquidity to be provided under the DIP Financing Agreement and through the use of Cash Collateral will enable the Debtors to continue to operate their businesses in the ordinary course and preserve their value. Good cause has, therefore, been shown for the relief sought in the Motion.

H. Good Faith. The DIP Financing Agreement has been negotiated in good faith and at arm's-length by and among the Debtors, the DIP Agent and the DIP Lenders. Any DIP Loan and/or other financial accommodations made to the Debtors by the DIP Agent and the DIP Lenders pursuant to the Interim Order and this Final Order and/or the DIP Financing Agreement shall be deemed to have been extended by the DIP Agent and the DIP Lenders in good faith, as that term is used in Bankruptcy Code section 364(e), and the DIP Agent and the DIP Lenders shall be entitled to all protections afforded thereunder. The terms of this Final Order and the DIP Financing Agreement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. In entering into the DIP Financing Agreement and committing to continue to make the DIP Loan, the DIP Agent and the DIP Lenders are relying on the terms of this Final Order as an integrated whole, including without limitation paragraph 22 hereof.

I. Exigent Circumstances.

(i) The Debtors requested immediate entry of the Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2) in order to avoid immediate and irreparable harm to the Debtors, their estates and their businesses. The Motion, the Interim Order, the Amended Interim Order and this Final Order comply with Local Bankruptcy Rule 4001–2. Pursuant to the Interim Order and the Amended Interim Order, this Court authorized the Debtors to borrow up to $10,000,000 (the "Maximum Interim Borrowing") under the DIP Loan to fund the amounts contemplated by the budget and initial approved cash projections attached to the Interim Order as Exhibit A (as such budget may be amended with the consent of the DIP Agent, the "Approved Budget"). The Approved Budget is an integral part of this Final Order and has been relied upon by the DIP Agent, the DIP Lenders and the Prepetition Secured Parties in deciding to consent, or not otherwise object, to the entry of this Final Order.

(ii) This Court concluded that immediate entry of the Interim Order was in the best interests of the Debtors' estates and creditors as its implementation would, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing business and further enhance the Debtors' prospects for a successful restructuring.

**\*5**   (iii) This Court further concludes that the Debtors have an immediate and critical ongoing need to obtain post-petition financing under the DIP Loan and to continue to use Cash Collateral in order to, among other things, finance the ordinary costs of their operations, maintain business relationships with vendors, suppliers and customers, make payroll, make capital expenditures, and satisfy other working capital and operational needs. The Debtors continued access to sufficient working capital and liquidity through the incurrence of post-petition financing under the DIP Loan and the continued use of Cash Collateral under the terms of this Final Order is vital to the preservation and maintenance of the going concern value of the Debtors' estates. Consequently, without continued access to the DIP Loan and continued use of Cash Collateral, to the extent authorized pursuant to this Final Order, the Debtors and their estates would suffer immediate and irreparable harm.

Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing and the Final Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED:**

1. <u>Disposition</u>. The Motion is granted on a final basis, subject to the terms set forth herein. Any objections to the Motion that have not previously been withdrawn or resolved are hereby overruled on their merits. This Final Order shall be valid and binding on all parties-in-interest, and effective immediately upon entry notwithstanding the possible application of Bankruptcy Rules 6003(b), 6004(a), 6004(h), 7062, and 9014. All actions taken in connection with or in reliance on the Interim Order or the Amended Interim Order, as the case may be, are hereby reaffirmed in full as if taken in connection with or in reliance on this Final Order.

2. <u>Authorization</u>. Upon entry of this Final Order, the Debtors are authorized, on a final basis, to: (i) enter into and perform their obligations under that certain Senior Secured Super–Priority Debtor in Possession Credit and Guaranty Agreement dated as of June 11, 2012 (as amended, restated or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Financing Agreement") (an executed copy of the DIP Financing Agreement is attached hereto as Ex. B), by and among Holdings and Systems, as borrowers (in such capacity, the "Borrowers"), certain of the Debtors, as guarantors (the "Guarantors"), Yucaipa American Alliance Fund II, LLC ("Yucaipa") as agent (in such capacity, the "DIP Agent"), and the persons and entities from time to time party thereto as lenders (the "DIP Lenders"); (ii) obtain postpetition delayed draw term loans (the "DIP Loan")[4] under the DIP Financing Agreement in an aggregate principal amount not to exceed $20,000,000; and (iii) use Cash Collateral and the proceeds of the DIP Loan for the purposes set forth on the Approved Budget and subject to the terms and conditions set forth herein and in the DIP Financing Agreement; <u>provided</u> the Debtors shall first use Cash Collateral before using proceeds of the DIP Loan in accordance with the terms of the DIP Financing Agreement; and <u>provided further</u> that, notwithstanding anything to the contrary contained in the DIP Financing Agreement or this Final Order, any claim, demand, obligation or liability for

severance or termination compensation or benefits for any employee or officer of any Debtor that arose or accrued before, on or after the Consent Date may be paid by any of the Debtors with proceeds of the DIP Loan or Cash Collateral only with the prior consent of the DIP Agent, which consent may be given or withheld in its sole discretion. The DIP Financing Agreement (including the documents, agreement and instruments described in paragraph 5(a) below) shall constitute legal, valid, and binding obligations of the Debtors, enforceable against the Debtors, their successors and assigns (including, without limitation, any successor trustee or other estate representative in any Chapter 11 Case or subsequent chapter 7 or chapter 11 case (each, a "Successor Case")) in accordance with their terms. The Debtors are hereby authorized to pay (whether through Cash Collateral or the DIP Loan) interest, fees, expenses and any other amounts required or allowed to be paid in accordance with the Interim Order, the Amended Interim Order, this Final Order and/or the DIP Financing Agreement, as applicable.

**\*6** 3. <u>Termination of Postpetition Credit and Cash Collateral Usage</u>. Notwithstanding anything in this Final Order to the contrary (but without prejudice to any other right of the DIP Agent and/or the DIP Lenders under this Final Order of the DIP Financing Agreement to terminate or suspend their obligation to make the DIP Loan), the DIP Lenders' obligation to make the DIP Loan and the consent of the DIP Agent and the Prepetition Agents to the use of Cash Collateral shall automatically terminate without any further action by this Court, the DIP Agent, any of the Prepetition Secured Parties or any other person or entity, upon the earliest to occur of (the "Termination Date"): (i) the date of final indefeasible payment and satisfaction in full in cash of the DIP Loan and the termination of the loan commitments under the DIP Financing Agreement; (ii) the effective date of any plan of reorganization or liquidation in any of the Chapter 11 Cases; (iii) the consummation of the sale or other disposition of all or substantially all of the assets of the Debtors; and (iv) subject to paragraphs 18(b)iii and 18(d) of this Final Order with respect to the use of Cash Collateral, immediately upon delivery of a Termination Notice (as defined below).

4. <u>Fees and Expenses</u>.

(a) The Debtors shall pay the DIP Agent's and the DIP Lenders' reasonable costs, fees and expenses incurred in connection with the consideration, investigation, negotiation, documentation, consummation, administration, amendment and enforcement of the DIP Loan and any Cash Collateral order and participation in the Chapter 11 Cases (in their capacities as DIP Agent and DIP Lenders), including without limitation, legal, accounting, appraisal, investigation, audit, inspection, insurance, title insurance, and other similar fees and costs (the "DIP Expenses"). Except as set forth in paragraph 4(b) below, the DIP Agent or the professional or firm seeking payment of a DIP Expense (an "Expense Claimant") shall submit a written invoice for any DIP Expense (in summary form, certifying that fees and charges have been incurred in connection with the DIP Financing Agreement, the DIP Loan or the use of Cash Collateral or otherwise in connection with the Interim Order, the Amended Interim Order and/or this Final Order, and setting forth hours, billing rates and timekeepers only and otherwise redacted to preserve privileges) to the Debtors, with a copy to the United States Trustee, counsel for the Debtors, counsel for the Committee and counsel for the Petitioning Creditors. If no written objection stating with specificity the basis for the objection (an "Objection") is received by the DIP Agent or such Expense Claimant within 10 days after delivery of such invoice, the Debtors shall promptly pay such DIP Expense. If an Objection is received by the DIP Agent or such Expense Claimant within such 10–day period, the Debtors shall pay that portion, if any, of the DIP Expense that was not disputed. If the DIP Agent and/or the Expense Claimant are unable consensually to resolve an Objection with the objecting party, then this Court shall determine the disputed portion of such DIP Expense. Except as otherwise set forth in the preceding sentence or as may otherwise be hereafter ordered by the Court, no DIP Expense shall be subject to Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no Expense Claimant shall be required to file any interim or final fee application or request for payment with the Court. To the extent the Debtors fail to pay any undisputed or resolved DIP Expense, the DIP Agent or the Expense Claimant shall be permitted to (i) apply any amounts held in escrow or retainer (whether obtained prior to or after the Consent Date) to such unpaid DIP Expense without further Court approval; and/or (ii) file a motion with this Court

seeking an order compelling the Debtors to pay such DIP Expense.

(b) Notwithstanding the foregoing, DIP Expenses payable under Section 10.3 of the DIP Financing Agreement shall be governed solely by the DIP Financing Agreement and shall not be subject to any Objection or the procedures related to an Objection described in paragraph 4(a) above.

**\*7** 5. Authority to Execute and Deliver Necessary Documents. The Debtors are authorized, on a final basis, to enter into, execute and deliver to the DIP Agent any and all documents, agreements and instruments that are contemplated by, related to or to be delivered pursuant to or in connection with the DIP Financing Agreement or this Final Order or that are reasonably requested by the DIP Agent to evidence or effectuate any of the transactions or other matters contemplated by or set forth in the DIP Financing Agreement or this Final Order, each as may be amended hereafter from time to time (the documents, instruments and agreements referenced in this paragraph 5, collectively, shall be included in the definition of the "DIP Financing Agreement").

6. Amendments, Consents, Waivers, and Modifications. Following notice to the Committee, the Debtors may enter into non-material amendments, waivers or modifications of or consents to the DIP Financing Agreement with the prior written consent of the DIP Agent, which consent shall be granted or withheld in the DIP Agent's sole discretion; provided, however, that any material amendment, waiver, modification or consent shall require the approval of this Court; provided, further that, for avoidance of doubt, the Debtors are authorized pursuant to this Final Order to enter into such amendments as are necessary to conform the DIP Financing Agreement to this Final Order. Copies of all amendments, waivers, modifications, whether or not material, shall be provided by Debtors to counsel to the Petitioning Creditors and counsel to the Committee.

7. DIP Lenders' Superpriority Claims. The DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, on a final basis, allowed superpriority administrative expense claims (the "Superpriority Claims") pursuant to Bankruptcy Code section 364(c)(1) for the DIP Loan.

8. Postpetition Liens. To secure the DIP Loan and subject to the provisions of paragraph 10, the DIP Agent is hereby granted, on a final basis, for the benefit of itself and the DIP Lenders, valid, enforceable, non-avoidable and fully perfected, first priority priming liens on and security interests in (collectively, the "Postpetition Liens") all Prepetition Collateral, all other property, assets and interests in property and assets of the Debtors (or any successor trustee or other estate representative in any Chapter 11 Case or Successor Case) and all other "property of the estate (within the meaning of the Bankruptcy Code) of the Debtors (or any successor trustee or other estate representative in any Chapter 11 Case or Successor Case), of any kind or nature whatsoever, real, personal or mixed, tangible or intangible now existing or hereafter acquired or created, including, without limitation, all accounts, inventory, goods, contracts, contract rights, investment property, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, all other intellectual property, general intangibles, payment intangibles, rights, interests, intercompany notes and obligations, tax or other refunds, insurance proceeds, letters of credit, letter-of-credit rights, supporting obligations, documents, titled vehicles, machinery and equipment, real property (including all facilities), fixtures, leases (and proceeds from the disposition thereof), all of the (x) issued and outstanding capital stock entitled to vote (within the meaning of Treas. Reg. Section 1.956–2(c)(2)), (y) issued and outstanding capital stock not entitled to vote (within the meaning of Treas. Reg. Section 1.956–2(c)(2)) of each subsidiary of each Debtor and (z) capital stock of all other Persons that are not Subsidiaries directly owned by each Debtor (subject, in the case of (x), (y) and (z), to any express limitations set forth in the DIP Financing Agreement), money, investment property, deposit accounts, all commercial tort claims and other causes of action (other than Avoidance Actions (as defined below) of the Debtors), Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above (collectively, the "Collateral"). Notwithstanding the foregoing or any provisions to the contrary contained in this Final Order or the DIP Financing Agreement, where the DIP Agent has been granted a security interest hereunder in any shares or other equity interests in the capital stock ("ULC Shares") of an issuer that is an unlimited company, unlimited liability company or unlimited liability corporation under the laws of Canada or any of its provinces or political subdivisions (each, a "ULC"), the Debtor that owns such ULC Shares will remain the sole registered and beneficial owner of such ULC Shares until such time as such ULC Shares are effectively transferred into the name of the DIP Agent or any of its successors or assigns (in either case, a "ULC Beneficiary") or any other person or entity on the books and records of the applicable ULC. Nothing in this Final Order or the DIP Financing Agreement is intended to, and nothing in this Final Order or the DIP Financing Agreement shall, constitute the DIP Agent, any other ULC Beneficiary or any other person or entity other than the applicable debtor, a member or shareholder of a ULC for the purposes of the Companies Act (Nova Scotia), the Business Corporations Act (Alberta), the Business Corporations Act (British Columbia) and any other present or future laws governing ULCs (the "ULC Laws") (whether listed or unlisted, registered or beneficial), until such time as notice is given to such Debtor and further steps are taken pursuant hereto or thereto so as to register the DIP Agent, any other ULC Beneficiary or such other person or entity, as specified in such notice, as the holder of the ULC Shares.

**\*8** 9. Adequate Protection for Prepetition Secured Parties. The Debtors acknowledge and stipulate that the Prepetition Secured Parties are entitled, pursuant to Bankruptcy Code sections 361, 363(e), and 364(d)(1), to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in exchange for the Debtors' use of such Prepetition Collateral, to the extent of the aggregate diminution in value, if any, of, respectively, the Prepetition First Lien Lenders interest in the Prepetition Collateral and the Prepetition Second Lien Lenders' interest in the Prepetition Collateral, including, without limitation, any such diminution resulting from or attributable to, any or all of the Carve–Out, the imposition of the automatic stay, the use of Cash Collateral, any sale, lease or use by the Debtors, physical deterioration, or other decline in value of any other Prepetition Collateral, and the priming of the Prepetition Secured Debt by the Postpetition Liens. As adequate protection, the Prepetition Agents are hereby granted on a final basis (i) valid, enforceable, binding, non-avoidable and fully perfected postpetition security interests and liens (the "Adequate Protection Liens") on all of the Collateral, and (ii) priority superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code (the "Adequate Protection Priority Claims").

(a) Without limiting the foregoing, the Prepetition Secured Parties shall have all of the rights accorded to them under sections 503 and 507(b) of the Bankruptcy Code in respect of the adequate protection provided herein.

(b) [Reserved].

(c) The Prepetition Secured Parties have consented, or are deemed to have consented, to the adequate protection and the priming provided for herein; provided, however, that the consent of the Prepetition Secured Parties to the priming, the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Final Order and such consent shall not be deemed to extend to any other replacement financing or debtor in possession financing other than the DIP Loan; and provided, further, that in the event of the occurrence of the Termination Date, nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing concerning the continued use of Prepetition Collateral (including Cash Collateral) by the Debtors.

10. Perfection and Priority of Liens and Claims: Other Rights.

(a) The Postpetition Liens and, except as otherwise set forth in this Final Order, the Adequate Protection Liens shall not at any time be made subject or subordinate to, or made pari passu with, any other lien, security interest or claim existing as of the Consent Date, or created under Bankruptcy Code sections 363 or 364(d). Notwithstanding the provisions in this paragraph and paragraphs 5, 8 and 9, the Postpetition Liens and Adequate Protection Liens shall remain subject to the valid, perfected, enforceable and non-avoidable liens that are senior to the liens held by the Prepetition Secured Parties under the Prepetition First Lien Loan Agreement (the "Existing Priority Liens") and the Carve–Out.[5] In furtherance of the foregoing, the Postpetition Liens and the Adequate Protection Liens shall at all times be senior to, among other things, (i) the rights of the Debtors in any Chapter 11 Cases and any successor trustee or other estate representative in any Chapter 11 Case or Successor Case, (ii) the liens and security interests of any party holding prepetition liens or security interests junior or subordinate to the Prepetition Lender Liens, (iii) any intercompany claim of or against any Debtor, and (iv) any prepetition

lien that is determined to be avoidable pursuant to sections 544, 545, 547, 548, 551 and/or 553 of the Bankruptcy Code or otherwise; provided, however, the Adequate Protection Liens shall be junior and subordinate in all respects to the Postpetition Liens, and the Adequate Protection Liens of the Prepetition Second Lien Agent shall be junior and subordinate in all respect to the Adequate Protection Liens of the Prepetition First Lien Agent.

*9 (b) Except as otherwise expressly set forth in this subparagraph (b), the Superpriority Claims and the Adequate Protection Priority Claims shall have priority over any and all other administrative claims against the Debtors or their estates (whether in the Chapter 11 Cases or in any Successor Case), now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under Bankruptcy Code sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113, and 1114 or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, that (i) the Superpriority Claims and the Adequate Protection Priority Claims shall be subject and subordinate to the payment of the Carve–Out, (ii) the Superiority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof other than any proceeds or property recovered solely on account of claims or causes of action arising under chapter 5 of the Bankruptcy Code, if any, including any federal or state fraudulent transfer law cause of action incorporated by section 544, (the "Avoidance Actions"), (iii) the Adequate Protection Priority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof including, without limitation, any proceeds or property recovered in connection with or on account of any Avoidance Actions, (iv) except with respect to proceeds and property recovered solely on account of Avoidance Actions, the Adequate Protection Priority Claims shall be subject and subordinate to the Superpriority Claims, and (v) the Adequate Protection Priority Claims of the Prepetition Second Lien Agent and the Prepetition Second Lien Lenders shall be subject and subordinate to the Adequate Protection Priority Claims of the Prepetition First Lien Agent and the Prepetition First Lien Lenders. In furtherance and not in limitation of the foregoing, the Superpriority Claims and the Adequate Protection Claims shall at all times be senior

to, among other things, (x) the rights of the Debtors in the Chapter 11 cases and any successor trustee or other estate representative in any Chapter 11 case or successor case, and (y) any intercompany claim of or against any Debtor.

(c) No liens, claims, interests or priority status (other than with respect to the Carve–Out and the Existing Priority Liens as described herein), having, as applicable, a lien or administrative priority superior to or *pari passu* with that of the Postpetition Liens, the Superpriority Claims, the Adequate Protection Liens or the Adequate Protection Priority Claims granted by this Final Order, and no liens on or with respect to the Avoidance Actions or the proceeds or property recovered on account thereof shall be granted while any portion of the DIP Loan or the Prepetition Secured Debt remains outstanding, or any loan commitment under the DIP Financing Agreement or Prepetition Loan Documents remains in effect, without the prior Liens of the Prepetition Second Lien Agent; and (ii) no defect in any such act shall affect or impair the validity, perfection, enforceability or priority of the liens granted hereunder.

(f) In lieu of obtaining or filing any Non–Bankruptcy Lien Document, each of the DIP Agent and the Prepetition Agents may, but shall not be obligated to, file a true and complete copy of this Final Order in any place at which any such Non–Bankruptcy Lien Document would or could be filed, together with a description of Collateral or Prepetition Collateral, as applicable, and any such filing by the DIP Agent or a Prepetition Agent shall have the same effect as if such Non–Bankruptcy Lien Document had been filed or recorded immediately upon entry of the Interim Order.

(g) The Postpetition Liens, Superpriority Claims, and other rights and remedies granted under this Final Order to the DIP Agent shall continue in the Chapter 11 Cases and in any Successor Case, and such Postpetition Liens, Superpriority Claims, and other rights and remedies shall maintain their respective priorities as provided in this Final Order until the DIP Loan has been indefeasibly paid in full and completely satisfied and the DIP Lenders' commitments have been terminated in accordance with the DIP Financing Agreement.

(h) The DIP Agent, for and on behalf of the DIP Lenders, shall have the right to "credit bid" the allowed amount of the DIP Loan during any sale of any of the Debtors'

assets pledged as Collateral, including without limitation in connection with any sale pursuant to section 363 of the Bankruptcy Code or included as part of a plan of reorganization subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

**\*10** 11. Carve–Out.

(a) The Borrowers shall make deposits into the Professional Fee Reserve (as defined in the DIP Financing Agreement) on or prior to the fifth day and on the twentieth day of every month from which withdrawals shall be taken for the payment of professional fees in accordance with the DIP Financing Agreement. From and after the date of the Termination Notice (as defined below), amounts withdrawn from the Professional Fee Reserve may only be applied to pay fees covered by the Carve–Out (as defined below). Upon the occurrence and during the continuation of an Event of Default, [6] payments on account of the Postpetition Liens and the Superpriority Claims shall be subject and subordinate only to payment of: (i) any amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and to the clerk of the Bankruptcy Court (it being understood that any such amount shall not be subject to any of the caps set forth in this paragraph 11(a)); (ii) allowed and unpaid fees and expenses that are owed to the attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Debtors pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503 or 1103 (collectively, the "Debtor Professionals") (x) incurred from the Consent Date to the date of notice (such notice, the "Termination Notice") from the DIP Agent to the Debtors and the Committee that an Event of Default has occurred (such fees and expenses, whether allowed before or after the Termination Notice, the "Debtors' Pre–Termination Allowed Fees," and including, without limitation, any monthly fees and any completion fee (the "Rothschild Completion Fee") earned by Rothschild, Inc. prior to the Termination Notice) in an amount of up to (but no more than) $1,400,000 in the aggregate excluding the Rothschild Completion Fee (the "Debtors' Pre–Termination Expense Cap"); and (y) incurred after the date of the Termination Notice, the "Debtors' Post–Termination Allowed Fees" (such period, the "Post–Termination Notice Period") in an amount of up to (but no more than) $200,000 in the aggregate (the "Debtors' Post–Termination Expense Cap," and such cap together with the Debtors' Pre–Termination Expense

Cap, the "Debtor Professional Expense Cap"); (iii) subject to paragraph 12(c), allowed and unpaid fees and expenses that are owed to the attorneys, accountants and other professionals retained in the Chapter 11 Cases by the Committee pursuant to Bankruptcy Code sections 328, 330, 331, 363, 503 or 1103 (collectively, the "Committee Professionals," and together with the Debtor Professionals, the "Estate Professionals") (x) incurred from the Consent Date to the date of the Termination Notice (such fees and expenses, whether allowed before or after the Termination Notice, the "Committee's Pre–Termination Allowed Fees," and together with the Debtor's Pre–Termination Allowed Fees, the "Pre–Termination Allowed Fees") in an amount of up to (but no more than) $745,250 in the aggregate (the "Committee Pre–Termination Expense Cap") and (y) incurred during the Post–Termination Notice Period (the "Committee's Post–Termination Allowed Fees," and together with the Debtors Post–Termination Allowed Fees, the "Post–Termination Allowed Fees"), in an amount of up to (but no more than) $100,000 in the aggregate the "Committee Post–Termination Expense Cap," and together with the Committee Pre–Termination Expense Cap, the "Committee Expense Cap"); and (iv) allowed and unpaid fees of the information officer designated pursuant to the Canadian Supplemental Order (as defined in the DIP Financing Agreement) that are incurred from the Consent Date to the date of delivery of the Termination Notice. The fees and expenses described in clauses (i) through (iv) of the preceding sentence are referred to herein as the "Carve–Out."

 **11**  (b) Notwithstanding anything to the contrary in paragraph 11(a), the Debtor Professional Expense Cap and the Committee Professional Expense Cap shall be reduced on a dollar-for-dollar basis by the amount of any retainers held by, respectively, the Debtors' professional and the Committee's professionals as of the date of the Termination Notice. In addition, for purposes of the Carve–Out, Allowed Professional Fees (i) shall include only those fees and expenses that are owed pursuant to the terms of the applicable Estate Professional's engagement letter or other agreement of engagement and (ii) shall not include any success fee, transaction fee, or other similar fee whether or not set forth in such Estate Professional's engagement letter or other agreement other than as expressly set forth in paragraph 11(a). Following the delivery of a Termination Notice, (w) any payment made to any Estate Professional from any source on account

of Allowed Professional Fees shall reduce the Carve–Out (and to the extent made on account of a Post–Termination Allowed Fee, the Debtor written consent of the DIP Agent, the Prepetition First Lien Agent and, subject to the terms of the Prepetition Intercreditor Agreement, the Prepetition Second Lien Agent.

(d) The Postpetition Liens and the Adequate Protection Liens shall be and hereby are effective, binding and perfected immediately upon entry of this Final Order without further action by any of the Debtors, the other grantors, the DIP Agent, the DIP Lenders or the Prepetition Secured Parties. None of the Debtors, the DIP Agent, the DIP Lenders or the Prepetition Secured Parties shall be required to enter into, obtain, file or record, as applicable, any mortgage, security agreement, pledge agreement, financing agreement, financing statement, deed of trust, leasehold mortgage, notice of lien or similar instrument (including any trademark, copyright, trade name or patent assignment filing with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or any filing with any other federal agency/authority), landlord waiver, mortgagee waiver, bailee waiver, warehouseman waiver, licensor consent, or other filing, consent, agreement or instrument (each, a "Non–Bankruptcy Lien Document") in any jurisdiction to the fullest extent allowed by law, such that no additional steps need be taken by the DIP Agent, the DIP Lenders or any of the Prepetition Secured Parties to evidence or perfect the Postpetition Liens or Adequate Protection Liens or establish the priority or realize the benefit thereof (except as otherwise expressly set forth in this Final Order).

(e) Each of the DIP Agent and the Prepetition Agents may, but shall not be obligated to, enter into, obtain, file or record any Non–Bankruptcy Lien Document that it deems in its sole discretion to be necessary or desirable, in which case: (i) all such documents shall be deemed to have been recorded and filed immediately upon entry of the Interim Order; provided, however, that any documents evidencing the Postpetition Liens shall be deemed to have been recorded and filed immediately prior to any documents evidencing Adequate Protection Liens, and the Adequate Protection Liens of the Prepetition First Lien Agent shall be deemed to have been recorded and filed immediately prior to the documents evidencing any Adequate Protection Professional Fee Cap or the Committee Professional Fee

Cap, as applicable) on a dollar-for-dollar basis, (x) any payment made to, respectively, any Debtor Professional or any Committee Professional from any source on account of the Debtors' Pre–Termination Allowed Fees or the Committee's Pre–Termination Allowed Fees shall reduce, as applicable, the Debtor Pre–Termination Fee Cap or the Committee Pre–Termination Expense Cap on a dollar-for-dollar basis, (y) any payment made to, respectively, any Debtor Professional or any Committee Professional from any source on account of any Post–Termination Allowed Fees shall reduce, as applicable, the Debtor Post–Termination Expense Cap or the Committee Post–Termination Expense Cap on a dollar-for-dollar basis, and (z) no Allowed Professional Fee shall be paid from the proceeds of the DIP Loan or Collateral (including Cash Collateral) to any Estate Professional holding a retainer until such time as that retainer has been reduced to zero by application of such retainer to the Allowed Professional Fees of such Estate Professional.

**\*12** (c) Except for Committee Challenge Fees (as defined below), no portion of the Carve–Out may be used for any Challenge Action (as defined below).

12. <u>Challenge Period and Investigation Rights</u>.

(a) Proceeds of the DIP Loan, the Collateral and the Prepetition Collateral (including, without limitation, Cash Collateral) shall not be used by any person or entity, including the Debtors (or any successor trustee or other estate representative in any Chapter 11 Case or Successor Case), but excluding the Committee subject to the limitations set forth below, in connection with the investigation, pursuit or assertion of, or joinder in, any claim, cause of action, defense, counterclaim, proceeding, application, motion, objection, defense or other contested matter or discovery against any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties (or any officers, directors, employees, agents, representatives, legal advisors and attorneys, financial advisors and accountants, consultants, other professionals, members, managers, partners, shareholders, owners, subsidiaries, predecessors in interest or affiliates of each the foregoing (collectively, the "<u>Related Parties</u>")), the purpose of which is to seek, or the result of which would be, to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding, recharacterizing or subordinating, in whole or in part, any claim, indebtedness, liens and/or security interests of any

of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties; (y) objecting to or commencing any action that prevents or affirmatively delays the exercise by any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties of any of their respective rights and remedies under any agreement or document or the Interim Order, the Amended Interim Order or this Final Order; or (z) seeking any affirmative legal or equitable remedy against any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties.

(b) Notwithstanding anything herein to the contrary, the Committee and other non-Debtor parties-in-interest (including without limitation, the Pension Benefit Guaranty Corporation) shall have the right to file a complaint pursuant to Bankruptcy Rule 7001, or assert (through appropriate filings with the Court) a setoff, claim, offset or defense that seeks to invalidate, subordinate, recharacterize or otherwise challenge any of the Prepetition Lender Liens, Prepetition Secured Claims or the actions taken by any Prepetition Secured Party in its capacity as such (a "<u>Challenge Action</u>"); <u>provided</u>, <u>however</u>, that (i) any Challenge Action by any non-Debtor parties-in-interest other than the Committee and any Challenge Action by the Committee or the Petitioning Creditors challenging the perfection of any lien must be brought on or before the later to occur of (A) seventy-five (75) days after the Consent Date and (B) sixty (60) days after the formation of the Committee, and (ii) all other Challenge Actions by the Committee or the Petitioning Creditors must be brought no later than (150) days after the formation of the Committee (collectively, the "<u>Challenge Period</u>"). If no Challenge Action is filed before the end of the applicable Challenge Period, the Committee, all holders of claims and interests and all other parties-in-interest shall be forever barred from bringing or taking any Challenge Action on behalf of themselves, the Debtors or these estates, and the Debtors' stipulations made in paragraph D, above and the release (as set forth below in paragraph 13) shall be binding on all parties-in-interest. If a Challenge Action is timely brought on or before the expiration of the applicable Challenge Period (such date, the "<u>Challenge Period Termination Date</u>"), only those causes of action, claims, offsets, setoff and defenses expressly included in such Challenge Action shall be preserved, and any and all other Challenge Actions and any causes of action, claims, offsets, setoffs and defenses not expressly brought during the Challenge Period in such Challenge Action shall be forever barred. Nothing

in this Final Order vests or confers on any entity (as such term is defined in the Bankruptcy Code), including the Committee or any other statutory committee appointed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates; provided, however, in the event that the Committee, or the Petitioning Creditors, as applicable prior to the Challenge Period Termination Date, files a motion with the Court seeking standing to bring a Challenge Action (a "Standing Motion"), which motion sets forth with specificity the claims and causes of action that the Committee or the Petitioning Creditors, as applicable, intend to bring in such Challenge Action (the "Specified Challenges"), then the Challenge Period Termination Date only with respect to the Committee or the Petitioning Creditors, as applicable (and no other entity) and only with respect to the Specified Challenges will be tolled until five (5) days after the date on which the Court enters an order granting or denying the Standing Motion.

**\*13** (c) In the event of a timely and successful Challenge Action, this Court shall fashion the appropriate remedy with respect to the applicable Prepetition Secured Party(ies). For avoidance of doubt, the foregoing shall not preclude (i) the Petitioning Creditors from continuing to prosecute that certain action entitled *BDCM Opportunity Fund II, LP, et al. v. Yucaipa American Alliance Fund I, LP, et al.,* filed January 18, 2012 and pending in the Supreme Court of the State of New York for the County of New York (the "Petitioning Creditor Action") or (ii) Yucaipa from asserting any claims, crossclaims or counterclaims against any of the Petitioning Creditors.

(d) The Committee shall be permitted to spend up to (but no more than) $80,000 in the aggregate of proceeds of the DIP Loan and Cash Collateral in investigating, taking discovery with respect to, filing and prosecuting any and all Challenge Actions (the "Committee Challenge Fees").

(e) If a trustee is appointed pursuant to Bankruptcy Code section 702 or 1104 prior to the end of the then-extant Challenge Period, the trustee shall have until the later of the end of the Challenge Period and 10 days after his or her appointment to file any Challenge Action. The appointment of a trustee shall not extend the Challenge Period for any other party.

(f) The Challenge Period may be extended by the Court by (i) motion filed prior to the Challenge Period Termination

Date and upon notice and a showing of good cause, or (ii) by stipulation by the DIP Agent and the Prepetition First Lien Agent in their respective sole discretion.

13. Releases.

(a) Subject to the rights set forth in paragraph 12 above, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in any Chapter 11 Case or Successor Case), forever and irrevocably (i) release, discharge, and acquit the DIP Agent, each of the DIP Lenders, in their capacity as DIP Lenders, and each of their respective former, current or future Related Parties, solely in each of their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating to the negotiation and execution of the DIP Financing, the Interim Order, the Amended Interim Order, this Final Order and/or the negotiation of the terms hereof or thereof and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability of the Postpetition Liens and Superpriority Claims.

(b) Subject to the rights set forth in paragraph 12 above, the Debtors, on behalf of themselves and their estates (including any successor trustee or other estate representative in any Chapter 11 Case or Successor Case), forever and irrevocably (i) release, discharge, and acquit each of Prepetition Secured Parties, in its capacity as such, and each of its respective former, current or future Related Parties, each in its capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, with respect to or relating, as applicable, to the Prepetition Secured Debt, the Prepetition Lender Liens, the Prepetition Loan Documents, the Debtors attempts to restructure the Prepetition Secured Debt, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the Prepetition Lender Liens or any secured or unsecured claims arising from the Prepetition Secured Debt, and (ii)

waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability of any of the Prepetition Secured Debt and the Prepetition Lender Liens.

**\*14** 14. Limitation on Additional Surcharges. No action, inaction or acquiescence by any of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, including funding the Debtors' ongoing operations under this Final Order, shall be deemed to be, or shall be considered as evidence of, any alleged consent by any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to a charge against the Collateral or the Prepetition Collateral pursuant to Bankruptcy Code sections 105(a), 506(c) and 552(b), and no such costs, fees or expenses shall be so charged against the Collateral or Prepetition Collateral without the prior written consent of the DIP Agent (in the case of the Collateral) and the Prepetition First Lien Agent (in the case of the Prepetition Collateral), such consent to be granted or withheld in the respective party's sole and absolute discretion. The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to, as applicable, the Collateral or the Prepetition Collateral. In addition, without limiting the foregoing, the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code. shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral.

15. Application of Collateral Proceeds.

(a) To the extent required by this Final Order or the DIP Financing Agreement, after the occurrence of an Event of Default and until such time as the DIP Loan has been repaid in full in cash, the Debtors are hereby authorized to remit to the DIP Agent, for the benefit of the DIP Lenders, one-hundred percent (100%) of all collections on, and proceeds of, the Collateral, including as a result of sales in and outside the ordinary course of business, and all other cash or cash equivalents which shall at any time on or after the Consent Date come into the possession or control of the Debtors (whether from sales, licenses, condemnation and casualty events or other

transfers of assets), or to which the Debtors shall become entitled at any time, and the automatic stay provisions of Bankruptcy Code section 362 are hereby modified to permit the DIP Agent and the DIP Lenders to retain and apply all collections, remittances, and proceeds of the Collateral in accordance with this Final Order and the DIP Financing Agreement to the DIP Loan, first to fees, costs and expenses owed under the DIP Financing Agreement (including the Carve–Out), then to interest, and then to principal.

(b) Pursuant to the DIP Financing Agreement, net cash proceeds from any sale, transfer or other disposition of asserts or property (other than inventory in the ordinary course of business) by the Debtors and the other credit parties shall be promptly paid to the DIP Agent and applied to the repayment of the DIP Loan.

16. Access to Collateral; Reports and Other Information.

(a) Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Agent contained in this Final Order or the DIP Financing Agreement, or otherwise available at law or in equity, upon five (5) business days' written notice to the Debtors, the U.S. Trustee, counsel to the Committee, counsel to the Petitioning Creditors, and any landlord, lienholder, licensor or other third party owner of any leased or licensed premises or intellectual property that an Event of Default has occurred and is continuing, the DIP Agent may, unless otherwise provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in its businesses without interference from lienholders or licensors thereunder, subject to such lienholders or licensors rights under applicable law. Nothing herein shall require the Debtors, the DIP Agent or the DIP Lenders to assume any lease or license under Bankruptcy Code Section 365 as a condition

to the rights afforded to the DIP Agent and the DIP Lenders in this paragraph.

**\*15** (b) The Debtors (and/or their legal or financial advisors) shall cooperate, confer with, and deliver to the DIP Agent and DIP Lenders (and their respective legal and financial advisors), all financial reports, budgets, forecasts, and all other legal or financial documentation, pleadings, and/or filings (together, the "Documentation") that are required to be provided to the DIP Agent, the DIP Lenders, and/or the DIP Agent's legal and financial advisors pursuant to the DIP Financing Agreement or are reasonably requested by any of them. The Debtors shall further deliver to the Petitioning Creditors, CIT, and to counsel to the Committee (or their respective legal and financial advisors), subject in each case to the execution of a non-disclosure or confidentiality agreement satisfactory to the Debtors or Debtors' satisfaction with any other duty of confidentiality owed by such person or entity, all Documentation required to be provided to the DIP Agent or DIP Lenders pursuant to the DIP Financing Agreement (including without limitation Section 5.1 thereof).

17. Cash Management Systems. The Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Financing Agreement, this Final Order, and the order of this Court approving the maintenance of the Debtors' cash management system, provided, however, that such order is on terms and conditions acceptable to the DIP Agent and such order is not inconsistent with the terms specified herein and/or the DIP Financing Agreement.

18. Automatic Stay Modified.

(a) The automatic stay is modified as to the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to allow implementation of the provisions of this Final Order without further notice or order of the Court. The automatic stay is also modified as to the Debtors, the DIP Agent and the DIP Lenders to allow any and all actions necessary or desirable to seek recognition of the Chapter 11 Cases in Canada and to take any and all actions necessary or desirable to enforce or implement any orders entered by any Canadian court in connection therewith, including, without limitation, filing any registration to preserve or perfect any existing or future security interest or in connection with the charges created under the

Interim Order, the Amended Interim Order, this Final Order or registering any existing or future claim for any lien.

(b) In addition to the foregoing, but subject to the provisions of subparagraphs (c), (d) and (e) hereof, the automatic stay provisions of Bankruptcy Code section 362 hereby are, to the extent applicable, vacated, and modified on a final basis to the extent necessary to allow the DIP Agent and DIP Lenders:

i. whether or not an Event of Default has occurred, to require all cash, checks or other collections or proceeds from Collateral received by the Debtors to be deposited in accordance with the requirements of the DIP Financing Agreement, and to apply any amounts so deposited and other amounts paid to or received by any DIP Agent or the DIP Lenders in accordance with any requirements of the DIP Financing Agreement;

ii. upon the occurrence of an Event of Default and after giving five (5) business days' prior notice (the "Waiting Period") to the Debtors and their counsel, counsel to the Committee, counsel to the Prepetition First Lien Agent, counsel to the Petitioning Creditors and the United State Trustee of the DIP Lenders' decision to exercise rights and remedies provided for in the DIP Financing Agreement, this Final Order or under other applicable bankruptcy and nonbankruptcy law (including the right to setoff funds in accounts maintained by the Debtors with any of the DIP Lenders or the DIP Agent to repay the DIP Loan), to exercise such rights and remedies without further notice to or approval of the Court or any other party in interest; provided, however, that the DIP Agent and/or DIP Lenders shall not be entitled to relief from stay to take possession of or foreclose on any Collateral on account of an Event of Default under Section 8.1(s), 8.1(t) or 8.1(z) of the DIP Financing Agreement except pursuant to a further order of this Court; and

**\*16** iii. immediately upon the occurrence of an Event of Default, without providing any prior notice thereof, (A) the DIP Agent, for the benefit of the DIP Lenders, may charge interest at the default rates pursuant to the DIP Financing Agreement, (B) neither the DIP Agent nor any of the DIP Lenders shall have any further obligation to provide financing under the DIP Financing Agreement, this Final Order or otherwise, or to permit release to

the Debtors of proceeds of loans that were previously funded, and may, in their sole discretion, terminate all commitments with respect to the DIP Loan, and (C) after the expiration of the Waiting Period and subject to the provision of this paragraph 18 (b) hereof, terminate the Debtors' authorization to use Cash Collateral;

(c) During the Waiting Period, the Debtors shall not use any Cash Collateral or any DIP Loan proceeds to pay any expenses except those expressly set forth in the Approved Budget.

(d) Notwithstanding anything to the contrary contained in this paragraph 18, the Debtors' authorization to use Cash Collateral shall automatically terminate fifteen (15) days after the occurrence of an Event of Default under Section 8.1(s), 8.1(t) or 8.1(z) of the DIP Financing Agreement unless either (i) such authorization is extended by further order of this Court after notice to the DIP Agent and the Prepetition First Lien Agent and a hearing or (ii) the DIP Agent and Prepetition First Lien Agent consent in writing (which consent may be given or withheld in each of their sole discretion) to the continued use of Cash Collateral. During such fifteen (15) day period, and subject to paragraph 11(a) and 12(d), the Debtors shall not use any Cash Collateral or any DIP Loan proceeds to pay any fees or expenses of any Estate Professional or any expenses not expressly set forth in the Approved Budget.

(e) This Court shall retain jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Final Order and relating to the application, re-imposition or continuance of the automatic stay of Bankruptcy Code section 362(a), use of Cash Collateral, or other injunctive relief requested.

19. Prepetition Intercreditor Agreement. Pursuant to Bankruptcy Code section 510, the Prepetition Intercreditor Agreement shall remain in full force and effect in the Chapter 11 Cases and in any subsequent proceedings under the Bankruptcy Code, including, without limitation, a Successor Case. Notwithstanding anything to the contrary contained in this Final Order, the Prepetition Lender Liens, the Adequate Protection Liens and the Adequate Protection Priority Claims shall be subject to the terms of the Prepetition Intercreditor Agreement. Notwithstanding anything to the contrary contained herein or in the DIP Financing Agreement, all rights and obligation of the Prepetition Secured Parties

and the Debtors under the Prepetition Intercreditor Agreement (including, without limitation, Section 2 of the Prepetition Intercreditor Agreement) are hereby expressly reserved.

20. Successors and Assigns. The DIP Financing Agreement and the provisions of this Final Order shall be binding upon the Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, and each of their respective successors and assigns including, without limitation, any trustee, responsible officer, estate administrator or representative, or similar person appointed in a case for any of the Debtors under any chapter of the Bankruptcy Code. Without limiting the foregoing and for the avoidance of doubt, and except as set forth in the Prepetition Intercreditor Agreement, the DIP Agent, the DIP Lenders and the Prepetition Secured Creditors shall have no obligation to permit the use of Cash Collateral or other proceeds of Collateral or extend any financing to any chapter 7 trustee or any other estate representative or representative appointed for any of the Debtors' estates.

*17  21. Binding Nature of Agreement. The rights, remedies, powers, privileges, liens, and priorities of the DIP Agent and the DIP Lenders provided for in this Final Order and in the DIP Financing Agreement shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order), by any plan of reorganization or liquidation in the Chapter 11 Cases, by the dismissal or conversion of the Chapter 11 Cases or in any Successor Case under the Bankruptcy Code without the consent of the DIP Agent unless the DIP Loan has first been indefeasibly paid in full in cash and completely satisfied and the commitments terminated in accordance with this Final Order and the DIP Financing Agreement. Except to the extent permitted or required herein or by the Prepetition Intercreditor Agreement, the rights, remedies, powers, privileges, liens, and priorities of the Prepetition Secured Parties granted herein shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation order), by any plan of reorganization or liquidation in the Chapter 11 Cases, by the dismissal or conversion of the Chapter 11 Cases or in any Successor Case.

22. Subsequent Reversal or Modification. This Final Order is entered pursuant to Bankruptcy Code section 364 and Bankruptcy Rules 4001(b) and (c), granting the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, on a final basis, all protections afforded by Bankruptcy Code section 364(e). If any or all of the provisions of the Interim Order, the Amended Interim Order or this Final Order are hereafter reversed, modified, vacated or stayed (whether on appeal or otherwise), that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, as applicable, prior to the date of receipt by the DIP Agent, the DIP Lenders and the Prepetition Secured Parties of written notice of the effective date of such action, (ii) any fees, costs, expenses and other amounts earned by and/or paid to the DIP Agent and the DIP Lenders pursuant to the Interim Order, the Amended Interim Order, this Final Order or the DIP Financing Agreement prior to the date of receipt by the DIP Agent and the DIP Lenders of written notice of the effective date of such action, (iii) the validity and enforceability of any lien, claim or priority authorized or created under the Interim Order, the Amended Interim Order, this Final Order or pursuant to the DIP Financing Agreement, or (iv) the ability to enforce any rights or remedies contained herein. Notwithstanding any such reversal, stay, modification or vacatur, any postpetition indebtedness, obligation or liability incurred by the Debtors to any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties prior to written notice to the DIP Agent, the DIP Lenders and the Prepetition Secured Parties of the effective date of such action, shall be governed in all respects by the original provisions of this Final Order and the DIP Financing Agreement, as applicable, and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges, and benefits granted herein and, as to the DIP Agent and the DIP Lenders, in the DIP Financing Agreement with respect to all such indebtedness, obligations or liability.

23. Restriction on Use of Lender's Funds. Except with respect to the Committee Challenge Fees, no proceeds from the DIP Loan, Collateral, Cash Collateral (including any prepetition retainer funded with Prepetition Secured Debt), or Prepetition Collateral or the Carve–Out may be used by the Debtors, the Committee, any trustee or other estate representative appointed in any Chapter 11

Case or Successor Case or any other person or entity to: (a) seek or obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Lenders, except for the purpose of indefeasible repayment of the DIP Loan in full and in cash; or (b) investigate any Challenge Actions (as outlined in paragraph 12 above).

*18  24. Collateral Rights. In the event that any party who has both received notice of the Final Hearing and holds a lien or security interest in Collateral or Prepetition Collateral that is junior and/or subordinate to any of the Postpetition Liens, the Adequate Protection Liens or the Prepetition Lender Liens in such Collateral or Prepetition Collateral receives or is paid the proceeds of such Collateral or Prepetition Collateral, or receives any other payment with respect thereto from any other source, prior to indefeasible payment in full in cash and the complete satisfaction of (i) the DIP Loan under the DIP Financing Agreement and termination of the loan commitments thereunder in accordance with the DIP Financing Agreement and (ii) the Prepetition Secured Debt under the Prepetition Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such Prepetition Collateral or other Collateral in trust for the DIP Agent, DIP Lenders and the Prepetition Secured Parties (subject to the terms of the Prepetition Intercreditor Agreement), and shall immediately turnover such proceeds for application, in the following order: (a) to the DIP Agent for application to the DIP Loan under the DIP Financing Agreement until paid in full in cash; (b) to the Prepetition First Lien Agent for application to the Prepetition First Lien Debt under the Prepetition First Lien Loan Documents until paid in full in cash; and (c) to the extent such payment consists solely of Prepetition Second Lien Collateral, to the Prepetition Second Lien Agent for application to the Prepetition Second Lien Debt under the Prepetition Second Lien Loan Agreement until paid in full in cash.

25. Plan of Reorganization or Liquidation. No plan of reorganization or liquidation may be confirmed in any of these Chapter 11 Cases unless, in connection and concurrently with the effective date of such plan, the plan provides for the indefeasible payment in full, in cash, and in complete satisfaction of the DIP Loan, and the loan commitments under the DIP Financing Agreement and

this Final Order are terminated on or before the effective date of such plan.

26. Sale/Conversion/Dismissal. Unless otherwise agreed by the DIP Agent, neither the Debtors nor any trustee will file a motion seeking a sale of all or substantially all of the assets of the Debtors under Bankruptcy Code section 363 (a "363 Substantial Asset Sale") unless (i) the proceeds of such sale are used to indefeasibly pay in full and completely satisfy in cash the DIP Loan and (ii) the loan commitments under the DIP Financing Agreement and this Final Order are terminated in accordance therewith on the closing date of such sale. If an order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, (i) the claims and Liens (including, without limitation, the Postpetition Liens, the Superpriority Claims, the Adequate Protection Liens and the Adequate Protection Claims) granted pursuant to this Final Order to or for the benefit of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until, as applicable, all DIP Financing Obligations, Prepetition First Lien Debt and/or Prepetition Second Lien Debt shall have been indefeasibly paid in full in cash (and that such claims and liens shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and Liens. The provisions set forth in clauses (i) and (ii) of the preceding sentence shall be deemed (in accordance with sections 104 and 349(b) of the Bankruptcy Code) to be incorporated by this reference in any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise, unless such provisions are expressly set forth therein.

27. No Waiver. This Final Order shall not be construed in any way as a waiver or relinquishment of any rights that any of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.

28. Setoff and Recoupment. Notwithstanding anything to the contrary contained herein (but subject to the terms of the Prepetition Intercreditor Agreement), nothing in this Final Order shall limit or impair the nature, extent, validity and/or priority of the rights against the Debtors, if any, of any party-in-interest in the Chapter 11 Cases under Bankruptcy Code sections 546(c), 545 and 553 and/or the equitable doctrine of recoupment.

*19 29. Priority of Terms. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Financing Agreement, the Motion, the Interim Order, the Amended Interim Order, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Final Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the Motion or the DIP Financing Agreement, the terms and provisions of this Final Order shall govern.

30. Indefeasible payment. Subject to the investigatory period provisions of paragraph 12, for purposes of this Final Order, when payment in cash is received by the DIP Agent, that payment shall be considered indefeasibly made.

31. No Third Party Beneficiary. Except as explicitly set forth herein with respect to the Carve–Out, no rights are created hereunder for the benefit of any third party, any creditor, any party in a Successor Case or any direct, indirect or incidental beneficiary, and no third parties shall be deemed to be third party beneficiaries of this Final Order.

32. Adequate Notice. Adequate notice under the circumstances has been given to (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel for the DIP Agent; (iii) counsel for BDCM Opportunity Fund II, LP, Black Diamond CLO 2005–1 Adviser L.L.C., Spectrum Investment Partners LP and The CIT Group/ Business Credit, Inc., as well as the other lenders under the Prepetition First Lien Loan Agreement for whom the Debtors have current contact information; (iii) The Bank of New York Mellon, in its capacity as administrative agent and collateral agent under the Prepetition Second Lien Loan Agreement; (iv) the Debtors' twenty (20) largest unsecured creditors listed in the Debtors' consolidated list of creditors (excluding insiders); (v) Bank of America, Fidelity National Bank, J.P. Morgan Chase Bank and Bank of Nova Scotia, which are the banks with which the Debtors maintain their primary banking relationships; and (vi) all other persons requesting notices. Pursuant to Bankruptcy Rule 4001, no further notice of the request

for the relief granted at the Final Hearing is required. The Debtors shall promptly mail copies of this Final Order to the noticed parties, any known party affected by the terms of this Final Order, and any other party requesting notice after the entry of this Final Order.

33. Entry of Final Order; Effect. This Final Order shall take effect immediately upon execution hereof, notwithstanding the possible application of Bankruptcy Rules 6004(g), 7062, 9014, or otherwise, and the Clerk of this Court is hereby directed to enter this Final Order on the Court's docket in the Chapter 11 Cases.

34. Retention of Jurisdiction. This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Final Order and/or the DIP Financing Agreement.

35. Binding Effect of Final Order. The terms of this Final Order shall be binding on any trustee appointed under chapter 7 or chapter 11 of the Bankruptcy Code or other fiduciary or other estate representative hereafter appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtors; provided that, except to the extent expressly set forth in this Final Order, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or other proceeds of Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

**\*20** 36. Nothing herein shall be deemed to alter, modify or waive the Debtors' obligations under applicable Canadian law.

37. Any amendment, stay, reversal or modification of this Final Order without the consent of the DIP Agent (which may be withheld in the DIP Agent's sole discretion) shall be an Event of Default under the DIP Financing Agreement and the Final Order.

### All Citations

Slip Copy, 2012 WL 13033641

## Footnotes

1   The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58–0360550); Allied Automotive Group, Inc. (58–2201081); Allied Freight Broker LLC (59–2876864); Allied Systems (Canada) Company (90–0169283); Allied Systems, Ltd. (L.P.) (58–1710028); Axis Areta, LLC (45–5215545); Axis Canada Company (87568828); Axis Group, Inc. (58–2204628); Commercial Carriers, Inc. (38–0436930); CT Services, Inc. (38–2918187); Cordin Transport LLC (38–1985795); F.J. Boutell Driveaway LLC (38–0365100); GACS Incorporated (58–1944786); Logistic Systems, LLC (45–4241751); Logistic Technology, LLC (45–4242057); QAT, Inc. (59–2876863); RMX LLC (31–0961359); Transport Support LLC (38–2349563); and Terminal Services LLC (91–0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

2   Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion and if not defined in the Motion, in the DIP Financing Agreement (as defined below).

3   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

4   The term "DIP Loan" shall include all principal, interest, fees, expenses and other obligations (including, without limitation, all "Obligations" as such term is defined in the DIP Financing Agreement and all DIP Expenses (as defined below)) that are at any time owed by any Borrower or Guarantor to the DIP Agent or the DIP Lenders in connection with the DIP Loan, the DIP Financing Agreement or this Final Order.

5   For avoidance of doubt, nothing in this Final Order is intended to alter the priority of any possessory security interest of or validity of any lien held by Chartis (defined below) as of the date of this Final Order in cash collateral held pursuant to that certain Payment Agreement for Insurance and Risk Management Services, between Allied Systems Holdings, Inc. and National Union Fire Insurance Company of Pittsburgh, Pa., on behalf of itself and certain affiliates ("Chartis"), dated January 1, 2006, as well as any policies, schedules, addenda, letters of credit, surety bonds and related agreements governing the Insurance Program (as defined therein) through and including January 1, 2013, as may be extended or modified from time to time.

6    As used herein, "Event of Default" shall mean an Event of Default as such term is defined in the DIP Financing Agreement (as modified pursuant to this Final Order) or any default by any of the Debtors of any of their obligations under this Final Order except to the extent that the DIP Agent and/or the DIP Lenders are not permitted to exercise rights or remedies hereunder on account of such default except, as applicable, upon the giving of notice by the DIP Agent and/or the expiration of a specified period of time, in which event, an Event of Default shall occur immediately upon the giving of such notice or the expiration of such period.

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Appendix II

F

2011 WL 6296789 (Bkrtcy.D.Del.) (Trial Order)
United States Bankruptcy Court, D. Delaware.

In re: GRACEWAY PHARMACEUTICALS, LLC, et al.,[1] Debtors.

No. 11-13036 (PJW).
September 30, 2011.

Joint Administration Requested

**Final Order (I) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361,362,363 and 364 and (III) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 11 U.S.C. § 364**

Chapter 11

Related Docket No. 15 & 52

**(*"Final DIP Order"*)**

Upon the motion, dated September 29, 2011, (the *"DIP Motion"*), of Graceway Pharma Holding Corp. (*"Parent"*), Graceway Holdings, LLC (*"Holdings"*), Graceway Pharmaceuticals, LLC (the *"Borrower"*), and the other debtors in possession (collectively, the *"Debtors"*) in the above-referenced Chapter 11 cases (the *"Chapter 11 Cases"* and each of the Chapter 11 Cases upon either appointment of any trustee or any other estate representative or conversion to a case under Chapter 7 of the Bankruptcy Code (as defined below) and any other proceedings related to the Chapter 11 Cases, a *"Successor Case"*), seeking entry of an interim order (the *"Interim Order"*) and this final order (this *"Final Order"*) pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(3), 364(d)(1), 364(e), 507 and 552 of Chapter 11 of title 11 of the United States Code (as amended, the *"Bankruptcy Code"*), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the *"Bankruptcy Rules"*) and Rules 2002-1 and 4001-2 of the Local Bankruptcy Rules for the District of Delaware (the *"Local Rules"*), that, among other things[2]:

(i) authorizes the Debtors to use Prepetition Collateral (as defined below), including, without limitation, "cash collateral," as such term is defined in Section 363 of the Bankruptcy Code (the *"Cash Collateral"*), in which the Prepetition Secured Parties (as defined below) have a Lien or other interest, whether existing on the Petition Date (as defined below), arising pursuant to this Final Order or otherwise;

(ii) authorizes the Borrower to obtain, and authorizes each of the other Debtors (other than Parent) unconditionally to guarantee, jointly and severally, the Borrower's obligations in respect of, senior secured postpetition financing, which if approved would consist of $6,000,000 in aggregate principal amount of intercompany term loans (the *"Intercompany Loan"*) from Graceway Canada Company (*"Graceway Canada"* and in its capacity as lender under the Intercompany Loan, the *"Postpetition Lender"*) to the Borrower;

(iii) grants, as of the Petition Date and in accordance with the relative priorities set forth herein, the Prepetition Secured Parties' Adequate Protection (as defined below);

In re Graceway Pharmaceuticals, LLC, Not Reported in B.R. (2011)
2011 WL 6296789 (Bkrtcy.)

Case 2:18-bk-20151-ER    Doc 367-17    Filed 10/01/18    Entered 10/01/18 17:55:44
Desc Appendix II    Page 64 of 122

(iv) authorizes the Borrower and each of the other Debtors to grant to the Postpetition Lender the DIP Protections (as defined below);

(v) modifies the automatic stay imposed by Section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of this Final Order and subject in all respects to the Debtors' rights under paragraph 14 herein; and

(vi) waives any applicable stay (including under Bankruptcy. Rule 6004) and provides for immediate effectiveness of this Final Order.

Having considered the DIP Motion, the *Declaration of Gregory C. Jones in Support of Chapter 11 Petitions and First Day Motions* (the *"First Day Declaration"*), the evidence submitted or proffered at the hearing to consider the entry of the Interim Order (the *"Interim Hearing"*), and the evidence submitted or proffered at the hearing to consider the entry of this Final Order (the *"Final Hearing"*); and in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d) and 9014 and Local Rules 4001-2 and 2002-1, notice of the DIP Motion and the Final Hearing having been provided in a sufficient manner; a Final Hearing having been held and concluded on November 7, 2011; and it appearing that approval of the relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED [3], that:

A. *Petition Date.* On September 29, 2011, (the *"Petition Date"*), each of the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this *"Court"*). The Debtors have continued in the management and operation of their business and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. On October 12, 2011, the United States Trustee for the District of Delaware (the *"U.S. Trustee"*) appointed the Official Committee of Unsecured Creditors in the Chapter 11 Cases pursuant to Section 1102 of the Bankruptcy Code (the *"Committee"*). No trustee or examiner has been appointed in the Chapter 11 Cases.

B. *Jurisdiction and Venue.* This Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are Sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rules 2002-1 and 4001-2.

C. *Notice.* The Final Hearing was held pursuant to the authorization of Bankruptcy Rule 4001 and Local Rule 4001-2(b). Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or hand delivery, on September 29, 2011, to certain parties in interest, including: (i) the United States Trustee for the District of Delaware; (ii) financing counsel to the First Lien Agent (as defined below); (iii) special restructuring and bankruptcy counsel to the First Lien Agent; (iv) counsel to the Second Lien Agent (as defined below); (v) the administrative agent for the lenders under the Debtors' prepetition unsecured mezzanine credit facility; (vi) the creditors listed on the Debtors' consolidated list of 30 largest unsecured creditors, as filed with the Debtors' chapter 11 petitions; (vii) the Food and Drug Administration; (viii) the Internal Revenue Service; (ix) the U.S. Public Health Service; (x) the Centers for Medicare and Medicaid Services; (xi) all parties requesting notice pursuant to Bankruptcy Rule 2002; and (xii) each entity with an interest in the Prepetition Collateral (as defined below). The aforementioned notices are appropriate under the circumstances, and no other or further notice of the DIP Motion, the relief requested therein and the Final Hearing is required for entry of this Final Order.

D. *Debtors' Stipulations Regarding the Prepetition Secured Credit Facilities.* Without prejudice to the rights of parties in interest to the extent set forth in paragraph 7 below, the Debtors admit, stipulate, acknowledge and agree (paragraphs D(i) through D(ix) hereof shall be referred to herein collectively as the *"Debtors' Stipulations")* as follows:

(i) *First Lien Credit Facility.* Pursuant to that certain First Lien Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the *"First Lien Credit Agreement")*, among, *inter alia,* Holdings, the Borrower, the lenders party thereto (collectively, the *"First Lien Lenders")*, and Bank of America, N.A. (*"BofA"*), as administrative agent for the First Lien Lenders and collateral agent for the First Lien Claimholders (as defined in the Intercreditor Agreement (as defined below), without giving effect to any cap provided for therein) (BofA, in such capacity, the *"First Lien Agent")*, Swing Line Lender and L/C Issuer, the First Lien Agent, the First Lien Lenders, the Swing Line Lender and the L/C Issuer agreed to extend certain loans to, and issue letters of credit for the account of, the Borrower. The First Lien Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the First Lien Credit Documents (as defined in the Intercreditor Agreement), are collectively referred to herein as the *"First Lien Documents"* (as the same may be amended, restated, supplemented or otherwise modified from time to time). All obligations of the Debtors arising under the First Lien Credit Agreement, together with any other First Lien Obligations (as defined in the Intercreditor Agreement without giving effect to any cap provided for therein), shall collectively be referred to herein as the *"First Lien Obligations."*

(ii) *Second Lien. Credit Facility.* Pursuant to that certain Second Lien Credit Agreement dated as of May 3, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the *"Second Lien Credit Agreement")*, among, *inter alia,* Holdings, the Borrower, the lenders party thereto (collectively, the *"Second Lien Lenders")* and Deutsche Bank Trust Company Americas (*"DB"*), as administrative agent for the Second Lien Lenders and collateral agent for the Second Lien Claimholders (as defined in the Intercreditor Agreement) (the Second Lien Claimholders and First Lien Claimholders collectively, the *"Prepetition Secured Parties")* (DB, in such capacity, the *"Second Lien Agent")*, the Second Lien Agent and the Second Lien Lenders agreed to extend certain loans to the Borrower. The Second Lien Credit Agreement, along with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the Second Lien Credit Documents (as defined in the Intercreditor Agreement), are collectively referred to herein as the *"Second Lien Documents"* (as the-same may be amended, restated, supplemented or otherwise modified from time to time). All obligations of the Debtors arising under the Second Lien Credit Agreement, together with any other Second Lien Obligations (as defined in the Intercreditor Agreement), shall collectively be referred to herein as the *"Second Lien Obligations"* and, together with the First Lien Obligations, the *"Prepetition Obligations."*

(iii) *First Priority Liens and First Lien Collateral.* Pursuant to the Collateral Documents (as such documents are amended, restated, supplemented or otherwise modified from time to time, the *"First Lien Collateral Documents")*, by and between each of the Debtors (other than Parent) and the First Lien Agent, each Debtor (other than Parent) granted to the First Lien Agent, for the benefit of the First Lien Claimholders, to secure the First Lien Obligations, a valid, binding, enforceable and perfected first priority continuing security interest in substantially all of such Debtor's assets and property (which for the avoidance of doubt includes Cash Collateral) and all proceeds thereof, collateral therefor, income, royalties and other payments due and payable with respect thereto and supporting obligations relating thereto, in each case whether then owned or existing or thereafter acquired or arising (the *"First Priority Liens")*. All collateral granted or pledged by the Debtors (other than Parent) pursuant to any First Lien Collateral Document or any other First Lien Document, including, without limitation, the Collateral (as defined in the First Liens Credit Agreement), and all prepetition and postpetition proceeds thereof shall collectively be referred to herein as the *"First Lien Collateral."*

(iv) *Second Priority Liens and Second Lien Collateral.* Pursuant to the Collateral Documents (as defined in the Second Lien Credit Agreement) (as such documents are amended, restated, supplemented or otherwise modified from time to time, the *"Second Lien Collateral Documents")*, by and between each of the Debtors (other than Parent) and the Second Lien Agent, each Debtor (other than Parent) granted to the Second Lien Agent, for the benefit of the Second Lien Claimholders, to secure the Second Lien Obligations, a valid, binding, enforceable and perfected second priority

continuing security interest in substantially all of such Debtor's assets and property (which for the avoidance of doubt includes Cash Collateral) and all proceeds thereof, collateral therefor, income, royalties and other payments due and payable with respect thereto and supporting obligations relating thereto, in each case whether then owned or existing or thereafter acquired or arising (the *"Second Priority Liens"* and, together with the First Priority Liens, the *"Prepetition Liens"*). All collateral granted or pledged by the Debtors (other than Parent) pursuant to any Second Lien Collateral Document or any other Second Lien Document, including, without limitation, the Collateral (as defined in the Second Lien Credit Agreement), and all prepetition and postpetition proceeds thereof shall collectively be referred to herein as the *"Second Lien Collateral"* and, together with the First Lien Collateral, the *"Prepetition Collateral."*

(v) *Intercreditor Agreement.* Pursuant to the Intercreditor Agreement, dated as of May 3, 2007 (the *"Intercreditor Agreement"* and, together with the First Lien Documents and the Second Lien Documents, the *"Prepetition Documents"*), among Holdings, the Borrower, the First Lien Agent, the Second Lien Agent and BofA as Control Agent, the Second Priority Liens are subject and subordinate on the terms contained in the Intercreditor Agreement to the First Priority Liens.

(vi) *First Priority Liens and First Lien Obligations.* (I) The First Priority Liens (a) are valid, binding, enforceable, and perfected Liens that have attached to the First Lien Collateral, (b) were granted to, or for the benefit of, the First Lien Claimholders, as applicable, for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination or other legal or equitable relief adversely affecting the First Priority Liens, in each case, pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein) and (d) are subject and subordinate in all respects only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below) and (C) the Prepetition Prior Liens (as defined below) and (II) (w) the First Lien Obligations constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable First Lien Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses or counterclaims to any of the First Lien Obligations exist, (y) no portion of the First Lien Obligations or any payments made to any or all of the First Lien Claimholders is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or any other "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the.Bankruptcy Code or applicable non-bankruptcy law and (z) the Guaranty of each Guarantor continues in full force and effect notwithstanding any use of the Prepetition Collateral, including, without limitation the Cash Collateral, permitted hereunder, or the Intercompany Loan.

(vii) *Second Priority Liens and Second Lien Obligations.* (I) The Second Priority Liens (a) are valid, binding, enforceable, and perfected Liens that have attached to the Second Lien Collateral, (b) were granted to, or for the benefit of, the Second Lien Claimholders, as applicable, for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination or other legal or equitable relief adversely affecting the Second Priority Liens, in each case, pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein) and (d) are subject and subordinate in all respects only to (A) the DIP Liens, (B) the Carve-Out, (C) the Prepetition Prior Liens and (D) the First Priority Liens (pursuant to the terms of the Intercreditor Agreement), and (II) (w) the Second Lien Obligations constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Second Lien Documents (other than in respect of the stay of enforcement arising from Section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Second Lien Obligations exist, (y) no portion of the Second Lien Obligations or any payments made to any or all of the Second Lien Claimholders is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or any other "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law and (z) the Guaranty (as defined in the Second Lien Credit Agreement) of each Guarantor (as defined in the Second Lien Credit Agreement) continues in full force and effect notwithstanding any use of the Prepetition Collateral, including, without limitation the Cash Collateral, permitted hereunder, or the Intercompany Loan.

(viii) *Amounts Owed under Prepetition Documents.* As of the Petition Date, the Debtors were truly and justly indebted (i) to the First Lien Claimholders pursuant to the First Lien Documents, without defense, counterclaim or offset of any kind, in respect of loans made and letters of credit issued by the First Lien Agent, the First Lien Lenders, the L/C Issuer and the Swing Line Lender in the aggregate principal amount of not less than $430,698,397.58, including, without limitation, an undrawn letter of credit in the amount of $350,000.00, *plus* all accrued or, subject to Section 506(b) of the Bankruptcy Code, hereafter accruing, and unpaid interest thereon, and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the First Lien Documents) now or hereafter due under the First Lien Credit Agreement and the other First Lien Documents and (ii) to the Second Lien Claimholders pursuant to the Second Lien Documents, without defense, counterclaim or offset of any kind, in respect of loans made by the Second Lien Agent and Second Lien Lenders in the aggregate principal amount of not less than $330,000,000, *plus* all accrued and unpaid interest thereon and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Second Lien Documents), in each case, due under the Second Lien Credit Agreement and the other Second Lien Documents as of the Petition Date.

(ix) *Release of Claims.* The Debtors have conducted a full and complete investigation and have concluded (for themselves but not on behalf of their estates) that they do not possess any valid Secured Party Releasee Claims (as defined below) against any of the Secured Party Releasees (as defined below). Subject to the rights of parties in interest to the. extent set forth in paragraph 7 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released the First Lien Agent, First Lien Claimholders, the Second Lien Agent and the Second Lien Claimholders, together with their respective affiliates, agents, attorneys, financial advisors, consultants, officers, directors, and employees (all of the foregoing, collectively, the *"Secured Party Releasees"*) of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment, or other offset rights against any and all of the Secured Party Releasees, whether arising at law or in equity, with respect to the First Lien Obligations, First Priority Liens, Second Lien Obligations and Second Priority Liens, as applicable, including, without limitation, (I) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to Section 105 or Chapter 5 of the Bankruptcy Code, or under any other similar provisions of applicable state or federal law, and (II) any right or basis to challenge or object to the amount, validity, or enforceability of the First Lien Obligations or Second Lien Obligations, as applicable, or the validity, enforceability, priority, perfection or non-avoidability of the First Priority Liens or Second Priority Liens, as applicable, securing the First Lien Obligations or Second Lien Obligations, as applicable (all of the foregoing, the *"Secured Party Releasee Claims"*).

E. *Need to Use the Prepetition Collateral (including, without limitation, the Cash Collateral) and to Obtain Intercompany Loan.*

(i) The Debtors have an immediate need to use the Prepetition Collateral, including, without limitation, the Cash Collateral, and obtain the Intercompany Loans, to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. The Debtors' access to sufficient working capital and liquidity through the use of the Cash Collateral and borrowing the Intercompany Loan is of vital importance and in the best interest of the Debtors' estates.

(ii) As demonstrated by evidence introduced at the Interim Hearing and Final Hearing on this Motion prior to the entry of this Final Order, the Debtors are unable to obtain (A) financing on more favorable terms from a source other than the Postpetition Lender, (B) adequate unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense, and (C) secured credit allowable under Sections 364(c) and (d) of the Bankruptcy Code, in each case, without (1) granting to the Postpetition Lender the rights, remedies, privileges, benefits and protections provided herein, including, without limitation, the DIP Liens and the DIP Super-Priority Claims (as defined below, and together

with the DIP Liens, the *"DIP Protections"*) and (2) providing the Prepetition Secured Parties the adequate protection more fully described in paragraph F below.

F. *Adequate Protection for Prepetition Secured Parties.* The First Lien Agent and certain First Lien Lenders holding a majority of the First Lien Obligations and that have consented to the use of the Prepetition Collateral, including, without limitation, the Cash Collateral (the *"Majority First Lien Lenders"*), have negotiated in good faith regarding the Debtors' use of the Prepetition Collateral, including, without limitation, the Cash Collateral, to fund the administration of the Debtors' estates and maintain the continued operation of their businesses. The First Lien Agent and Majority First Lien Lenders have agreed to permit the Debtors to use the Prepetition Collateral, including, without limitation, the Cash Collateral, for the period through the Cash Collateral Termination Date (as defined below), subject to the terms and conditions set forth herein. In addition, the Intercompany Loan contemplated hereby provides for a priming of the Prepetition Liens pursuant to Section 364(d) of the Bankruptcy Code. The Prepetition Secured Parties are entitled to the adequate protection set forth herein pursuant to Sections 361, 362, 363 and 364 of the Bankruptcy Code for the Diminution in Value (as defined below) of the Prepetition Collateral. Based on the DIP Motion and on the record presented to this Court at the Interim Hearing and the Final Hearing, the terms of the proposed adequate protection arrangements, the use of the Prepetition Collateral, including, without limitation, the Cash Collateral and the Intercompany Loan, in each case, contemplated hereby are fair and reasonable and reflect the Debtors' prudent exercise of business judgment.

G. *Limited Consent.* The consent of the First Lien Agent and Majority First Lien Lenders to (i) the priming of the First Priority Liens by the DIP Liens is limited to the financing presently before this Court, with Graceway Canada as lender, and shall not, and shall not be deemed to, extend to any other postpetition financing or to any modified version of the Intercompany Loan and (ii) the Debtors' use of the Prepetition Collateral, including, without limitation, the Cash Collateral, is limited to use of the Prepetition Collateral, including, without limitation, the Cash Collateral, pursuant to the terms of this Final Order and shall not, and shall not be deemed to, extend to any other use of the Prepetition Collateral, including, without limitation, the Cash Collateral. Nothing in this Final Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the First Lien Agent or any First Lien Claimholder are or will be adequately protected with respect to any non-consensual postpetition financing or use of Prepetition Collateral, including, without limitation, the Cash Collateral.

H. *Section 552(b).* In light of the subordination of the Prepetition Liens to (i) in the case of the First Lien Claimholders, the Carve-Out and DIP Liens, and (ii) in the case of the Second Lien Claimholders, the. Carve-Out, DIP Liens and Adequate Protection Replacement Liens (as defined below) granted to the First Lien Agent for the benefit of the First Lien Claimholders, each of the First Lien Claimholders and Second Lien Claimholders is entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply.

I. *Business Judgment and Good Faith Pursuant to Section 364(e).* Based on the record presented to this Court by the Debtors, it appears that:

(i) Graceway Canada has indicated a willingness to provide postpetition secured financing via the Intercompany Loan to the Borrower in accordance with this Final Order.

(ii) The terms and conditions of the Intercompany Loan pursuant to this Final Order are fair, reasonable and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and consideration.

(iii) The Intercompany Loan was negotiated in good faith among the Debtors and the Postpetition Lender and shall be deemed to have been extended by the Postpetition Lender for valid business purposes and uses and in good faith,

as that term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by Section 364(e) of the Bankruptcy Code, and the DIP Liens and the DIP Super-Priority Claims shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event this Final Order or any other order or any provision hereof or thereof is vacated, reversed, amended or modified, on appeal or otherwise.

J. *Relief Essential; Best Interest.* Absent granting.the relief set forth in this Final Order, the Debtors' estates and their ability successfully to operate their businesses will be immediately and irreparably harmed. Consummation of the Intercompany Loan and authorization of the use of Prepetition Collateral, including, without limitation, the Cash Collateral, in accordance with this Final Order is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.

NOW, THEREFORE, on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the First Lien Agent, the Majority First Lien Lenders and the Postpetition Lender to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

IT IS ORDERED that:

1. *Motion Granted.* The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Final Order. Any objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2. *Use of the Prepetition Collateral (including, without limitation, the Cash Collateral) and Authorization to Incur Intercompany Loan.* To enable the Debtors to continue to operate their business, the Debtors are hereby authorized to use the Prepetition Collateral, including, without limitation, the Cash Collateral, and the Borrower is hereby authorized to borrow and use the proceeds of the Intercompany Loan, in each case, only in accordance with the terms and conditions of this Final Order, including, without limitation, the Approved Budget and Budget Covenants (in each case, as defined below). Any amount repaid under the Intercompany Loan may not be reborrowed.

3. *Approved Budget; Budget Covenants; Events of Default.*

(a) *Approved Budget.* Attached hereto as *Exhibit A* is (i) a rolling weekly cash flow budget from and including the Petition Date through and including January 27, 2012 (the *"Pre-Sale Approved Budget"*) and (ii) a rolling monthly cash flow budget from and including January 28, 2012 through and including June 30, 2012 (the *"Wind-Down Approved Budget"* and together with the Pre-Sale Approved Budget, the *"Approved Budget"*), in each case, (A) as may be amended or modified from time to time with the consent of the First Lien Agent and the Approving Majority First Lien Lenders (as defined below) and (B) reflecting on a line-item basis the Debtors' projected (1) aggregate cash receipts, (2) disbursements (including, without limitation, professional fees and capital expenditures) and (3) cash on hand (collectively, *"Aggregate Liquidity"*), in each case, on a weekly or monthly basis, as applicable; *provided,* that if (x) the Debtors shall have filed plans of reorganization or liquidation in the Chapter 11 Cases that are reasonably acceptable to the First Lien Agent and Approving Majority First Lien Lenders and the Court shall have entered an order approving the Debtors' disclosure statement in connection with such plans of reorganization or liquidation, in each case, on or before June 30, 2012 and (y) the Debtors are using reasonable best efforts to confirm such plans of reorganization or liquidation, the Wind-Down Approved Budget shall automatically be extended to include the period from and including June 30, 2012 to and including July 31, 2012; *provided,* however, that the Debtors shall be prohibited from using Prepetition Collateral, including, without limitation, Cash Collateral, pursuant to such extended Wind-Down Approved Budget in excess of the amounts provided under the Wind-Down Approved Budget through and including June 30, 2012.

(b) *Budget Covenants.*

(i) From and including the Petition Date to and including January 27, 2012, for each 8-week period set forth in the Pre-Sale Approved Budget, tested weekly on a rolling basis by reference to the Pre-Sale Variance Report (as defined below), commencing with the 8-week period ending November 25, 2011, the aggregate disbursements (including, without limitation, professional fees (but excluding the First Lien Professional Fees (as defined below) and the Committee's professional fees permitted under the Pre-Sale Approved Budget and the amounts budgeted therefor) and capital expenditures) by the Debtors shall not exceed one hundred fifteen percent (115%) of the aggregate amount of disbursements budgeted for each such 8-week period pursuant to the Pre-Sale Approved Budget. The Debtors shall provide to the Postpetition Lender, a duly appointed representative of Graceway Canada (the *"Canadian Representative"*), the First Lien Agent, the Second Lien Agent and the Committee, so as actually to be received on or prior to the Thursday following the end of each week, commencing with the Thursday following the fourth week after the Petition Date, a variance report (a *"Pre-Sale Variance Report"*) certified by the chief executive officer, chief financial officer, treasurer, controller or general counsel of the Borrower (each an *"Authorized Officer"*), in form acceptable to the Postpetition Lender, the First Lien Agent and the Approving Majority First Lien Lenders, each, in their respective sole discretion, setting forth (A) the actual cash receipts and aggregate disbursements (including, without limitation, professional fees (including, without limitation, the First Lien Professional Fees and the Committee's professional fees permitted under the Pre-Sale Approved Budget) and capital expenditures) for such immediately preceding calendar week and the Aggregate Liquidity as of the end of such calendar week (*provided, however,* that the initial Pre-Sale Variance Report provided by the Debtors in accordance with the terms of this Final Order shall set forth actual cash receipts and aggregate disbursements (including, without limitation, professional fees (including, without limitation, the First Lien Professional Fees and the Committee's professional fees permitted under the Pre-Sale Approved Budget) and capital expenditures) for each immediately preceding calendar week since the Petition Date and the Aggregate Liquidity as of the end of each such calendar week) and (B) with respect to each 8-week period commencing with the 8-week period ending on the Friday of the eighth week after the Petition Date, the variance in dollar amounts and percentage terms of the actual aggregate disbursements (including, without limitation, professional fees (but excluding the First Lien Professional Fees and the Committee's professional fees permitted under the Pre-Sale Approved Budget and the amounts budgeted therefor) and capital expenditures) from those reflected for the corresponding period in the Pre-Sale Approved Budget.

(ii) From and including January 28, 2012 through and including June 30, 2012 (or, if the Wind-Down Approved Budget is extended in accordance with paragraph 3(a) above, July 31, 2012), for each period from January 28, 2012 through the end of each month thereafter set forth in the Wind-Down Approved Budget, tested at the end of each such month on a cumulative basis by reference to the Wind-Down Variance Report (as defined below) (it being understood that (I) the period from and including January 28, 2012 to and including January 31, 2012 shall be included in the period tested at the end of February 2012 and (II) an amount equal to the aggregate amount of all budgeted disbursements incurred but not paid during the 8-week period ending January 27, 2012 under the Pre-Sale Approved Budget (if any) shall be added to the "Designated Account, excl Wind Down Expenses" line item in the Wind-Down Approved Budget for the month of February 2012 [4] ), the aggregate disbursements (including, without limitation, professional fees (but excluding the First Lien Professional Fees and the Committee's professional. fees permitted under the Wind-Down. Approved Budget and the amounts budgeted therefor) and capital expenditures) by the Debtors shall not exceed one hundred ten percent (110%) of the aggregate amount of disbursements budgeted for each such cumulative period pursuant to the Wind-Down Approved Budget. The Debtors shall provide to the Postpetition Lender, the Canadian Representative, the First Lien Agent, the Second Lien Agent and the Committee, so as actually to be received on or prior to the fourth business day immediately following the end of each month, commencing with the fourth business day of March 2012, a variance report (a *"Wind-Down Variance Report"*) certified by an Authorized Officer, in form acceptable to the Postpetition Lender, the First Lien Agent and the Approving Majority First Lien Lenders, each, in their respective sole discretion, setting forth (A) the actual cash receipts and aggregate disbursements (including, without limitation, professional fees (including, without limitation, the First Lien Professional Fees and the Committee's professional fees permitted under the Wind-Down Approved Budget) and capital expenditures) for such immediately preceding month and the Aggregate Liquidity as of the end of such immediately preceding month, and (B) with respect to each such cumulative period, the variance in dollar amounts and percentage terms of the actual aggregate disbursements (including, without limitation,

Case 2:18-bk-20151-ER    Doc 367-17    Filed 10/01/18    Entered 10/01/18 17:55:44
Desc Appendix II    Page 71 of 122

In re Graceway Pharmaceuticals, LLC, Not Reported in B.R. (2012)
2012 WL 4510789 (Bankr. D. Del.)

professional fees (but excluding the First Lien Professional Fees and the Committee's professional fees permitted under the Wind-Down Approved Budget and the amounts budgeted therefor) and capital expenditures) from those reflected for the corresponding period in the Wind-Down Approved Budget.

(iii) The proceeds of the Intercompany Loan (subject to paragraph 5(a) below) and the Cash Collateral shall be used only as follows: (A) prior to the Cash Collateral Termination Date, solely for payment of the disbursements set forth in the Approved Budget subject to the terms and conditions of this Final Order (including, without limitation, any variance permitted under this paragraph 3(b)) and (B) on or after the Cash Collateral Termination Date, solely (x) to fund (1) unpaid fees required to be paid in these Chapter 11 Cases to the clerk of this Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), whether arising prior to or after the delivery of the Carve-Out Trigger Notice (as defined below), in an amount equal to $201,250, (2) any unpaid amounts incurred and earned prior to the occurrence of the Cash Collateral Termination Date under each of the Debtors' Professionals Carve-Out Cap (as defined below) and Committee Professionals Carve-Out Cap (as defined below), (3) the Debtors' Professionals Post Carve-Out Cap (as defined below) and Committee Professionals Post Carve-Out Cap (as defined below) and (4) the Expense Reimbursement Amount (as defined in the Asset Purchase Agreement (as defined in the DIP Motion)) (the aggregate of such amounts in clauses (1), (2), (3) and (4) above, the *"Maximum Carve-Out Amount"*) (it being understood that such unpaid fees required to be paid in these Chapter 11 Cases to the clerk of this Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), the pre-funded amounts incurred and earned prior to the occurrence of the Cash Collateral Termination Date under each of the Debtors' Professionals Carve-Out Cap and Committee Professionals Carve-Out Cap, the pre-funded amounts in respect of the Debtors' Professionals Post Carve-Out Cap and Committee Professionals Post Carve-Out Cap and the Expense Reimbursement Amount shall be escrowed in accordance with paragraph 8(e) below and paid, as applicable, to the clerk of the Court or to the office of the U.S. Trustee when such amounts are due, to the applicable retained professionals only if and when such amounts are incurred, earned and allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code) and to the Buyer (as defined in the Asset Purchase Agreement) solely in accordance with the terms of the Asset Purchase Agreement and the Bidding Procedures Order (as defined in the Asset Purchase Agreement) and (y) to pay the First Lien Professional Fees.

The undertakings of the Debtors provided for in this paragraph 3(b) shall be collectively referred to herein as the *"Budget Covenants."*

(c) *Events of Default.* Subject to paragraph 14(b) below, upon the occurrence of any Event of Default (as defined below), the consensual Cash Collateral use arrangement contained in this Final Order shall terminate automatically without any further notice or action (including, without limitation, further notice, motion or application to, order of or hearing before this Court) unless the occurrence of such Event of Default is waived in writing at any time by at least two First Lien Lenders holding in aggregate a majority of the then outstanding First Lien Obligations held by the Consenting First Lien Lenders (as defined in the Sale Support Agreement, dated as of September 28, 2011 (the *"Sale Support Agreement"*), entered by and among the Debtors, Graceway Canada and the First Lien Lenders from time to time party thereto) (the *"Approving Majority First Lien Lenders"*). Each of the following events shall constitute an event of default (collectively, the *"Events of Default"*):

(i) on or prior to January 27, 2012, with respect to each of the following line items in the Pre-Sale Approved Budget, the payment by the Debtors of any disbursements in excess of the cumulative amount budgeted for each such line item in the Pre-Sale Approved Budget plus fifteen percent (15%) of each such cumulative budgeted amount: (i) "Payroll & Benefits", (ii) "R&D, Licensing & Regulatory", (iii) "Advertising & Promotions and Sales Expenses", (iv) "Corporate, Occupancy, Utilities & Other Expenses", (v) "Ropes & Gray", (vi) "Edwards Angell Palmer & Dodge", (vii) "Hogan Lovells US LLP", (viii) "Other Non-Restructuring Professionals" and (ix) "CapEx";

(ii) after January 27, 2012, with respect to the "Wind Down Expenses - Corporate, Employee & Other" line item in the Wind-Down Approved Budget, the payment by the Debtors of any disbursements in excess of the cumulative amount

budgeted for such line item in the Wind-Down Approved Budget plus ten percent (10%) of each such cumulative budgeted amount;

(iii) any violation of the Budget Covenants;

(iv) (A) the entry of an order by any court invalidating, disallowing or limiting in any respect, as applicable, either (1) the enforceability, priority, or validity of the First Priority Liens or Adequate Protection Replacement Liens, in each case, securing the First Lien Obligations or (2) any of the First Lien Obligations or Adequate Protection Super-Priority Claims (as defined below) granted to the First Lien Claimholders or (B) with respect to any of the foregoing, any Debtor's application for, consent to, or acquiescence in, any such relief;

(v) the incurrence by any Debtor after the Petition Date of indebtedness that is (A) secured by a security interest, mortgage or other Lien on all or any portion of the Prepetition Collateral which is equal or senior to any security interest, mortgage or other Lien of the First Lien Agent and the First Lien Claimholders, as applicable, or (B) entitled to priority administrative expense status which is equal or senior to that granted to the First Lien Agent and First Lien Claimholders, as applicable, herein, except, in each case, (x) any such indebtedness used to refinance the First Lien Obligations in full and (y) the Intercompany Loan;

(vi) the entry of a final order by this Court (other than the Final Order) granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on or security interest in any Prepetition Collateral with a value in excess of $250,000 or (B) with respect to any Lien on or the granting of any Lien on any Prepetition Collateral to any state or local environmental or regulatory agency (in each case with a value in excess of $250,000);

(vii) reversal, vacatur, stay or modification (without the express prior written consent of the Postpetition Lender, the First Lien Agent and the Approving Majority First Lien Lenders, in their respective sole discretion) of this Final Order;

(viii) (A) the entry by this Court of an order, or the filing by the Debtors of a motion with this Court which seeks the entry of an order, accomplishing (x) the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (y) the dismissal, termination, stay or modification of one or more of the Chapter 11 Cases or (B) with respect to any of the foregoing, any Debtor's application for, consent to, or acquiescence in, any such relief;

(ix) the entry by this Court of an order, or the filing by the Debtors of a motion with this Court, which seeks the entry of an order, accomplishing the appointment of an interim or permanent trustee, receiver or examiner with expanded powers to operate or manage the financial affairs, business or reorganization of any Debtor in one or more of the Chapter 11 Cases;

(x) any material breach by any Debtor of any of their obligations, representations, warranties or covenants set forth in this Final Order (except as covered by any other Event of Default under this paragraph 3(c)) or the Asset Purchase Agreement, as applicable, which material breach is not cured on or within five (5) Business Days after the giving of written notice. of such breach to the Debtors;

(xi) any material breach by Graceway Canada of any of its obligations, representations, warranties or covenants set. forth in the Asset Purchase Agreement, as applicable, which material breach is not cured on or within five (5) Business Days after the giving of written notice of such breach to the Debtors;

(xii) the failure to make adequate protection payments or pay professional fees, costs and expenses of the First Lien Agent, in each case, when and as provided for under this Final Order;

(xiii) the Debtors fail to file the Sale Motion (as defined in the DIP Motion) on or within three (3) Business Days following the Petition Date seeking approval of the Bidding Procedures (as defined in the Asset Purchase Agreement) and Sale (as defined in the DIP Motion) in this Court;

(xiv) the Debtors fail to obtain entry by this Court of (a) the Bidding Procedures Order within forty-five (45) days after the Petition Date or (b) the Sale Order (as defined in the Asset Purchase Agreement) by January 2, 2012;

(xv) (a) the termination of the Asset Purchase Agreement other than in connection with acceptance of an Alternative Transaction (as defined in the Asset Purchase Agreement) that is acceptable to the Postpetition Lender and Approving Majority First Lien Lenders in their respective sole discretion, (b) the amendment or modification of, or filing of a pleading by any Debtor seeking to amend or modify, the Asset Purchase Agreement or any documents related thereto (including, without limitation, the Bidding Procedures, Bidding Procedures Order or Sale Order), in a manner not acceptable to the Postpetition Lender and Approving Majority First Lien Lenders in their respective sole discretion or (c) execution of definitive documents in respect of an Alternative Transaction that are not acceptable to the Postpetition Lender and Approving Majority First Lien Lenders in their respective sole discretion;

(xvi) the failure to consummate the Sale on or before January 27, 2012;

(xvii) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Sale;

(xviii) the filing by any Debtor of any stand-alone plan of reorganization or liquidation (or the announcement of any Debtor's support of any such plan filed by any other party) prior to consummation of the Sale; and

(xix) the entry by this Court of an order, or the filing by the Debtors of a motion with this Court which seeks the entry of an order, authorizing the use of Cash Collateral for any purpose other than to pay the First Lien Obligations in full or as permitted in this Final Order.

*provided, however,* that the consensual use arrangement of Prepetition Collateral, including, without limitation, Cash Collateral, described in this Final Order shall, unless it shall have terminated earlier pursuant to the terms hereof, terminate on June 30, 2012 (unless extended automatically in accordance with paragraph 3(a) or by consent of the Approving Majority First Lien Lenders). The earliest date upon which the consensual Cash Collateral use arrangement described in this Final Order is terminated pursuant to this paragraph 3(c) shall be referred to herein as the *"Cash Collateral Termination Date."* In the event this Final Order terminates pursuant to this clause (c), the Adequate Protection Collateral (as defined below) will be used to fund the Maximum Carve-Out Amount pursuant to paragraph 8 below and to satisfy the Intercompany Loan pursuant to paragraph 5(d) before being used to satisfy any other obligation, including, without limitation, the First Lien Obligations.

(d) *Payments on Account of Prepetition Obligations.* Without limiting the foregoing, the Debtors shall not be permitted to make any payments on account of any prepetition debt or obligation prior to the effective date of a Chapter 11 plan or plans with respect to any of the Debtors, except (i) as set forth in this Final Order; (ii) as provided in the first day orders, which first day orders shall be in form and substance reasonably acceptable to the Postpetition Lender, First Lien Agent and Majority First Lien Lenders; and (iii) as provided in the other motions, orders and requests for relief filed by the Debtors, each in form and substance reasonably acceptable to the Postpetition Lender, First Lien Agent and Approving Majority First Lien Lenders.

(e) Enforceable Obligations. Subject to the rights of parties in interest to the extent set forth in paragraph 7 below, no obligation, payment, transfer or grant of security under this Final Order shall be stayed, restrained, voidable, avoidable

or recoverable under the Bankruptcy Code or under. any applicable law (including, without limitation, under Sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4. *Adequate Protection for Prepetition Secured Parties.* The Prepetition Secured Parties shall receive the following adequate protection (collectively referred to as the *"Prepetition Secured Parties' Adequate Protection"*):

(a) *Adequate Protection Replacement Liens.* To the extent of the diminution in value of the respective interests of the Prepetition Secured Parties in the respective Prepetition Collateral, including, without limitation, the Cash Collateral, from and after the Petition Date, calculated in accordance with Section 506(a) of the Bankruptcy Code, resulting from the use, sale or lease by the Debtors of the applicable Prepetition Collateral, including, without limitation, the Cash Collateral, the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out and the imposition or enforcement of the automatic stay of Section 362(a) (collectively, *"Diminution in Value"*) (in addition to (but without, duplication of) any claim for Diminution in Value that may arise during the course of the Chapter 11 Cases, the First Lien Claimholders shall have a valid, binding and enforceable claim for Diminution in Value equal to the aggregate amount of the Prepetition Collateral, including, without limitation, the Cash Collateral, used to pay the fees and expenses of the Debtors' Professionals (as defined below) and Committee Professionals (as defined below) and the expenses of the Committee Members (as defined -below), in each case, in connection with the Chapter 11 Cases or. any Successor Case and in accordance with this Final Order), the First Lien Agent and Second Lien Agent, as applicable, for the benefit of the First Lien Claimholders and Second Lien Claimholders, as applicable, are hereby granted, subject to the terms and conditions set forth below, pursuant to Sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, replacement Liens upon all property of the Debtors, now existing or hereafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the First Lien Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, seventy-five percent (75%) of the net proceeds realized from the Debtors' claims and causes of action under Sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (such claims and causes of action, together with the Section 549 Actions (as defined below), *"Avoidance Actions"*), one hundred percent (100%) of the net proceeds realized from the Debtors' claims or causes of action under Section 549 of the Bankruptcy Code (such claims and causes of action, the *"Section 549 Actions"*), rights under Section 506(c) of the Bankruptcy Code, all other Prepetition Collateral and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or. mixed, now existing or hereafter acquired or created, and all rents,.. products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing (all of the foregoing collateral collectively referred to as the *"Adequate Protection Collateral"* and such adequate protection replacement liens, the *"Adequate Protection Replacement Liens"*). The Adequate Protection Replacement Liens on such Adequate Protection Collateral shall be subject and subordinate only to (i) the DIP Liens, (ii) the Prepetition Prior Liens, (iii) the payment of the Carve-Out and (iv) with respect to the Adequate Protection Replacement Liens granted to the Second Lien Agent for the benefit of the Second Lien Claimholders only, the Adequate Protection Replacement Liens granted to the First Lien Agent for the benefit of the First Lien Claimholders. For the avoidance of doubt, the Adequate Protection Replacement Liens granted to the Second Lien Agent for the benefit of the Second Lien Claimholders shall be subordinated to the Adequate Protection

Replacement Liens granted to the First Lien Agent for the benefit of the First Lien Claimholders on the same basis as the Second Priority Liens are subordinated to the First Priority Liens under the Intercreditor Agreement.

(b) *Adequate Protection Super-Priority Claims.* To the extent of Diminution in Value, the First Lien Claimholders and Second Lien Claimholders are hereby granted allowed super-priority administrative claims (such adequate protection super-priority claims, the *"Adequate Protection Super-Priority Claims")* against each of the Debtors pursuant to Sections 361, 363(e), 364(d)(1) and 507(b) of the Bankruptcy Code, which shall have priority, subject only to (i) the DIP Super-Priority Claims, (ii) the payment of the Carve-Out and (iii) with respect to the Adequate Protection Super-Priority Claims granted to the Second Lien Claimholders, the Adequate Protection Super-Priority Claims granted to the First Lien Claimholders, over all administrative expense claims, adequate. protection and other diminution claims, unsecured claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment. The Adequate Protection Super-Priority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates (other than twenty-five percent (25%) of the net proceeds of the Avoidance Actions (other than Section 549 Actions) or as may otherwise be agreed by the First Lien Claimholders) and all proceeds thereof, *provided, however,* that (i) to the extent the Cash Collateral Termination Date shall have occurred, the Maximum Carve-Out Amount shall be funded and the Intercompany Loan shall be paid in full (including all accrued and previously capitalized interest thereon) in cash pursuant to paragraph 5(d) before any payments shall be made on account of the Adequate Protection Super-Priority Claims and (ii) to the extent the Cash Collateral Termination Date shall not have occurred, all amounts set forth in section 4(b) of the Sale Support Agreement shall be funded (provided, the Sale shall have been consummated) and the Intercompany Loan shall be paid in full (including all accrued and previously capitalized interest thereon) in cash pursuant to paragraph 5(d) before any payments shall be made on account of the Adequate Protection Super-Priority Claims, in each case, in accordance with the terms of this Final Order. Other than as provided in this Final Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the Adequate Protection Replacement Liens and the Adequate Protection Super-Priority Claims.

(c) *Adequate Protection Payments, Professional Fees and Information.* As further adequate protection, and in consideration, and as a requirement, for obtaining the consent of the First Lien Agent and Majority First Lien Lenders to the entry of this Final Order and the Debtors' consensual use of the Prepetition Collateral, including, without limitation, the Cash Collateral, as provided herein, the Debtors shall (i) within three (3) Business Days of the date of entry of the Interim Order pay to the First Lien Agent a cash amount equal to $973,838.09; *provided* that such payment is subject to disgorgement in the event that all of the First Priority Liens are determined to be invalid by this Court in a final and non-appealable order, (ii) timely pay in cash all reasonable out of pocket fees, costs and expenses of the First Lien Agent (including, without limitation, payment in advance of the agency fee required to be paid pursuant to Section 2.11(c) of the First Lien Credit Agreement) and its professionals, including, without limitation, Morgan, Lewis & Bockius LLP, as financing counsel, Wachtell, Lipton, Rosen & Katz, as special restructuring and bankruptcy counsel, DLA Piper LLP, as local counsel, one foreign counsel and one financial advisor (collectively, the *"First Lien Professional Fees")*, in each case, on a regular monthly basis during the Chapter 11 Cases, without further notice, motion or application to, order of, or hearing before, this Court; *provided* that after consummation of the Sale, if the proceeds of the Sale are not sufficient to satisfy the claims of the First Lien Claimholders in full, the First Lien Agent shall pay such fees and expenses from proceeds of the Sale that would otherwise be distributed to the First Lien Agent for the benefit of the First Lien Claimholders withheld for such purpose, and (iii) deliver to the First Lien Agent, the Second Lien

Agent, the Committee and their respective advisors all information, reports, documents and other material that they may reasonably request, either directly or through their professionals (it being understood that the First Lien Agent, the Second Lien Agent and their respective advisors shall be permitted in their sole discretion to distribute such information, reports, documents and other material to the First Lien Claimholders and Second Lien Claimholders, as applicable, upon request). Notwithstanding anything contained herein or otherwise, (A) all such professional fees (in each case, as described above) pursuant to this Final Order shall be subject to recharacterization and reapplication pursuant to further order of this Court if and to the extent the First Lien Obligations are determined by this Court to be undersecured and (B) the Debtors shall not be obligated to reimburse any Prepetition Secured Party with respect to the defense of Claims and Defenses (as defined below) in the event such Claims and Defenses are asserted pursuant to paragraph 7 of this Final Order.

(d) *Notice of Professional Fees.* None of the fees, costs and expenses incurred by professionals engaged by the First Lien Agent shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; *provided,* that such professionals shall submit copies of their respective professional fee invoices to the Debtors, the U.S. Trustee, counsel for the Postpetition Lender and counsel for the Committee (and any subsequent trustee of the Debtors' estates). Such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential or privileged information, and the provision of such invoices shall not constitute any waiver of any privilege (including, without limitation, the attorney-client privilege) or of any benefits of the attorney work product doctrine. The Debtors, the U.S. Trustee, the Postpetition Lender and the Committee (and any subsequent trustee of the Debtors' estates) may object to the reasonableness or necessity of the particular items or categories of the fees, costs and expenses included in any professional fee invoice submitted by such professionals; *provided* that, any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on the applicable professional, the First Lien Agent and the Debtors no later than ten (10) days after delivery of the applicable professional fee invoice to the objecting party and (ii) it describes with particularity the specific basis for the objection. Any hearing on an objection to payment of any fees, costs and expenses set forth in such professional fee invoice shall be limited to the reasonableness or necessity of the particular items or categories of the fees, costs and expenses which are the subject of such objection. All such unpaid fees, costs and expenses that have not been disallowed by this Court on the basis of an objection filed by the Debtors, the U.S. Trustee, the Postpetition Lender or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute First Lien Obligations and shall be secured by the Adequate Protection Collateral as specified in this Final Order. The Debtors shall pay in accordance with the terms and conditions of this Final Order the undisputed fees, costs and expenses reflected on any professional fee invoice no later than ten (10) Business Days after the submission thereof, or, in the case of any fees, cost and expenses timely objected to by the Debtors, the U.S. Trustee, the Postpetition Lender or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof, no later than ten (10) Business Days after such objection has been resolved by this Court.

(e) *Right to Seek Additional Adequate Protection.* Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties. However, subject to the terms of the Intercreditor Agreement, any Prepetition Secured Party may request further or different adequate protection, and the Debtors or any other party in interest may (subject to the Intercreditor Agreement) contest any such request; *provided* that any such further or different adequate protection shall at all times be subordinate and junior to the DIP Super-Priority Claims and DIP Liens of the Postpetition Lender granted under this Final Order.

(f) *Consent to Priming and Adequate Protection.* The First Lien Agent and the Majority First Lien Lenders consent to the use of the Prepetition Collateral, including, without limitation, the Cash Collateral, the Prepetition Secured Parties' Adequate Protection and the priming provided for herein; *provided, however,* that such consent is expressly conditioned upon the entry of this Final Order and shall not be deemed to extend to any other replacement financing or debtor-in-

possession financing other than the Intercompany Loan or any other use of the Prepetition Collateral, including, without limitation, the Cash Collateral other than as specified herein; and *provided, further,* that (I) such consent shall be of no force and effect in the event this Final Order is not entered or is entered and subsequently reversed, vacated, stayed or modified (unless such reversal, vacatur, stay or modification is acceptable to the First Lien Agent and the Approving Majority First Lien Lenders, in their sole discretion) and (II) in the event of the occurrence of the Cash Collateral Termination Date, nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing concerning the continued use of the Prepetition. Collateral, including, without limitation, the Cash Collateral, by the Debtors.

5. *Intercompany Loan.*

(a) *Tranches.* The Intercompany Loan shall consist of a tranche A intercompany term loan in aggregate principal amount equal to $3,800,000 (the *"Tranche A Intercompany Loan"*) and a tranche B intercompany term loan in aggregate principal amount equal to $2,200,000 (the *"Tranche B Intercompany Loan"*). The Borrower shall borrow the Tranche A Intercompany Loan and Tranche B Intercompany Loan, in each case, no later than the third day after the entry by the Court of the Interim Order. The Borrower is hereby authorized, and agrees, to use the proceeds of (i) the Tranche A Intercompany Loan only in accordance with the terms and conditions of this Final Order, including, without limitation, the Approved Budget and Budget Covenants and (ii) the Tranche B Intercompany Loan only in accordance with the terms and conditions of this Final Order, including, without limitation, the Approved Budget and Budget Covenants, and with the prior written consent of the Approving Majority First Lien Lenders (it being understood that the Approving Majority First Lien Lenders shall be deemed to have consented to the Debtors' use of the proceeds of the Tranche B Intercompany Loan to pay the Expense Reimbursement Amount if approved by the Court pursuant to the Bidding Procedures Order and due and payable pursuant to the terms of the Asset Purchase Agreement).

(b) *Interest and Fees.* Interest on the outstanding principal amount of the Intercompany Loan shall be capitalized and added thereto until the outstanding principal amount (including all previously capitalized interest) is paid in full on the Maturity Date (as defined below) Interest shall accrue at 4.75% per annum. Interest shall be capitalized quarterly, commencing with the Debtors' fiscal quarter ending December 31, 2011... No fees, costs, expenses or other charges shall accrue or be payable in connection with the Intercompany Loan.

(c) *Maturity.* The Intercompany Loan shall mature and be paid in full (including all accrued and previously capitalized interest thereon) in cash on the earlier of September 30, 2012 or the closing of the Sale (the *"Maturity Date"*).

(d) *Remedies.* Failure to pay the entire principal amount of the Intercompany Loan to the Postpetition Lender on the Maturity Date shall constitute a default under the Intercompany Loan (an *"Intercompany Loan Default"*). The Debtors shall cure any Intercompany Loan Default within three (3) Business Days following receipt of notice of such default, *provided,* that, if the Debtors fail to cure the Intercompany Loan Default, the Postpetition Lender may seek an emergency hearing before this Court for the sole purpose of determining whether an Intercompany Loan Default has occurred and seeking relief from the automatic stay to exercise its rights and remedies with respect to the DIP Collateral (as defined below) in accordance with this Final Order and applicable law.

(e) *DIP Liens.* As security for the Intercompany Loan, pursuant to Section 364(d)(1) of the Bankruptcy Code the Debtors hereby grant to the Postpetition Lender a perfected first priority, senior priming Lien (the *"DIP Liens"*) on, without duplication, all Adequate Protection Collateral (including, without limitation, Cash Collateral) and one hundred percent (100%) of the net proceeds of Avoidance Actions (the *"DIP Collateral"*) that is senior and priming to (A) the Prepetition Liens, (B) the Adequate Protection Replacement Liens and (C) any Liens that are junior to the Prepetition Liens, after giving effect to any intercreditor or subordination agreements (the Liens referenced in clauses (A), (B) and (C), collectively, the *"Primed Liens"*). The DIP Liens shall immediately and without any further action by any Person, be

valid, binding, permanent, perfected, continuing, enforceable and non-avoidable upon the date this Court enters this Final Order.

(f) *DIP Lien Priority.* Notwithstanding anything to the contrary contained in this Final Order, for the avoidance of doubt, the DIP Liens granted to the Postpetition Lender shall in each and every case be first priority senior Liens that (i) are subject only to (A) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that (I) after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens and (II) are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement are senior in priority to the Prepetition Liens (collectively, the *"Prepetition Prior Liens"*) and (B) the Carve-Out (to the extent provided in the provisions of this Final Order), and (ii) except as provided in sub-clause (i) of this clause (f), are senior to all prepetition and postpetition Liens of any other person or entity (including, without limitation, the Primed Liens). The DIP Liens and the DIP Super-Priority Claims (A) shall not be subject to Sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under Section 551 of the Bankruptcy Code or (y) any other intercompany or affiliate Liens of the Debtors, and (C) shall be valid and enforceable in any Successor Case and/or upon the dismissal of any of the Chapter 11 Cases.

(g) *Super-Priority Administrative Claim Status.* In addition to the DIP Liens granted herein, effective immediately upon entry of this Final Order the Intercompany Loan shall constitute an allowed super-priority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Super-Priority Claims), unsecured claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment (the *"DIP Super-Priority Claims"*). The DIP Super-Priority Claims shall for purposes of Section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under Section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and their estates and all proceeds thereof after funding of either (i) the Maximum Carve-Out Amount to the extent the Cash Collateral Termination Date shall have occurred or (ii) all amounts set forth in section 4(b) of the Sale Support Agreement to the extent the Cash Collateral Termination Date shall not have occurred and the Sale shall have been consummated, in each case, in accordance with the terms of this Final Order. Other than as provided in this Final Order with respect to the Carve-Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens and the DIP Super-Priority Claims.

6. *Automatic Postpetition Lien Perfection.* This Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the Adequate Protection Replacement Liens and the DIP Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the Adequate Protection Replacement Liens and the DIP Liens or to entitle the Adequate Protection Replacement Liens and the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, each of the First Lien Agent, the Second Lien Agent and the Postpetition Lender, as applicable (in the case of the First Lien Agent and Second Lien Agent, solely with respect to the Adequate Protection Replacement Liens and in the case of the Postpetition Lender, solely with respect to the DIP Liens), may, in its sole discretion, file financing statements, mortgages, security agreements, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or

documents shall be deemed to have been filed or recorded on the Petition Date. The applicable Debtors shall execute and deliver to each of the First Lien Agent, the Second Lien Agent and the Postpetition Lender, as applicable, all such financing statements, mortgages, notices and other documents as such party may reasonably request to evidence and confirm the contemplated priority of the Adequate Protection Replacement Liens or DIP Liens, as applicable, granted pursuant hereto. Without limiting the foregoing, each of the First Lien Agent, the Second Lien Agent and the Postpetition Lender, as applicable, in its sole discretion, may file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other Adequate Protection Collateral or DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable Adequate Protection Collateral or DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the Prepetition Secured Parties or Postpetition Lender, as applicable, in accordance with the terms of this Final Order. To the extent that the First Lien Agent or Second Lien Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any First Lien Document or Second Lien Document, the Postpetition Lender shall also be deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such First Lien Loan Document or Second Lien Loan Document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received first for its benefit and second, subsequent to payment in full of the Intercompany Loan, for the benefit of the Prepetition Secured Parties. The First Lien Agent or Second Lien Agent, as applicable, shall serve as agent for the Postpetition Lender for purposes of perfecting its Liens on all Adequate Protection Collateral that is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

7. *Reservation of Certain Third Party Rights and Bar of Challenges and Claims.* The Debtors' Stipulations shall be binding upon the Debtors and Graceway Canada in all circumstances, subject to the rights of other parties in interest only to the extent set forth in this paragraph 7. The Debtors' Stipulations shall be binding upon each such other party in interest, including the Committee and any Chapter 7 trustee or Chapter 11 trustee, unless (i) the Committee or any other party in interest (other than the Debtors or Graceway Canada) obtains the prior (and not *nunc pro tunc*) consent of this Court to commence and actually commences, or, if the Chapter 11 Cases are converted to cases under Chapter 7 and a Chapter 7 trustee is appointed and/or elected, or if a Chapter 11 trustee is appointed, in either case prior to the expiration of the applicable Challenge Period (as defined below), such Chapter 7 trustee or Chapter 11 trustee, as applicable, actually commences, on or before January 19, 2012 (with respect to the Committee) (provided, however, that the Committee must commence any Claims and Defenses (as defined below) challenging the nature, extent, perfection, validity or priority of any or all of the liens or security interests asserted by the First Lien Claimholders or Second Lien Claimholders (such Claim and Defense, a *"Challenge"*) no later than the earlier of December 20, 2011 and the date the Sale is consummated) or December 14, 2011 (with respect to any other party in interest) (each such time period, as applicable, shall be referred to as a *"Challenge Period,"* and the date that is the last calendar day of each applicable Challenge Period, in the event that no objection or challenge is raised during such Challenge Period, shall be referred to as a *"Challenge Period Termination Date"*), (x) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Debtors' Stipulations, or (y) a contested matter or adversary proceeding against any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Obligations, or the actions or inactions of any or all. of the Prepetition Secured Parties arising out. of or related to the Prepetition Obligations, or otherwise, including, without limitation, any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim or defense to the Prepetition Obligations (including but not limited to those under Sections 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against

any or all of the Prepetition Secured Parties) (the objections, challenges, actions and claims referenced in clauses (x) and (y), collectively, the *"Claims and Defenses"*), and (ii) such duly authorized plaintiff or movant obtains a final and non-appealable judicial ruling in its favor in any such timely and properly commenced contested matter or adversary proceeding; *provided,* that as to the Debtors, for themselves and not their estates, and Graceway Canada, for itself and not its estate, all such Claims and Defenses are irrevocably waived and relinquished as of the Petition Date. If a Chapter 7 trustee or a Chapter 11 trustee is appointed or elected, as applicable, in each case prior to December 14, 2011, the Challenge Period Termination Date with respect to such trustee only shall be the later of(i) December 14, 2011 and (ii) the date that is twenty (20) days after the date on which such trustee is first appointed. Until the applicable Challenge Period Termination Date, any party in interest (other than the Debtors and Graceway Canada, but including the Committee) may assert any applicable Claims and Defenses. If no Claims and Defenses with respect to the First Lien Claimholders or First Lien Obligations have been timely authorized and asserted in any such adversary proceeding or contested matter in accordance with this paragraph 7, then, upon the applicable Challenge Period Termination Date, and for all purposes in these Chapter 11 Cases and any Successor Case, (i) all payments made to the First Lien Claimholders pursuant to the Interim Order and this Final Order or otherwise shall not be subject to any counterclaim, set-off, recoupment, subordination, recharacterization, defense or avoidance, (ii) any and all.such Claims and Defenses by. any party in interest shall be deemed to be forever released, waived and barred with respect to the First Lien Claimholders, (iii) the First Lien Obligations shall be permanently deemed to be an allowed claim, and (iv) the Debtors' Stipulations with respect to the First Lien Claimholders, including, without limitation, the release provisions therein, shall be binding on all parties in interest, including the Committee and any Chapter 7 or Chapter 11 trustee. If no Claims and Defenses with respect to the Second Lien Claimholders or Second Lien Obligations have been timely asserted in any such adversary proceeding or contested matter in accordance with this paragraph 7, then, upon the applicable Challenge Period Termination Date, and for all purposes in these Chapter 11 Cases and any Successor Case, (i) any and all such Claims and Defenses by any party in interest shall be deemed to be forever released, waived and barred with respect to the Second Lien Claimholders and (ii) the Debtors' Stipulations with respect to the Second Lien Claimholders, including, without limitation, the release provisions therein, shall -be binding on all parties in interest, including the Committee and any Chapter 7 or Chapter 11 trustee. Notwithstanding the foregoing, to the extent any Claims and Defenses are timely asserted in any such adversary proceeding or contested matter, (x) the Debtors' Stipulations and the other provisions in clauses (i) through (iv) or clauses (i) and (ii), as applicable, in the immediately preceding sentences shall nonetheless remain binding and preclusive on the Committee (and any subsequent Chapter 7 trustee or Chapter 11 trustee of the Debtors' estates) and on any other party in interest from and after the applicable Challenge Period Termination Date, except solely with respect to the party in interest timely being authorized to assert and actually asserting such Claims and Defenses to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) or clauses (i) and (ii), as applicable, in the immediately preceding sentences were expressly challenged in such timely adversary proceeding or contested matter, and (y) any portion of the Debtors' Stipulations or other provisions in clauses (i) through (iv) or clauses (i) and (ii), as applicable, in the immediately preceding sentences that is the subject of a timely authorized and filed Claim and Defense shall become binding and preclusive on such party in interest timely being authorized to assert and actually asserting such Claims and Defenses to the extent set forth in any final and non-appealable judicial order resolving such Claim and Defense. Each applicable Challenge Period in respect of the First Lien Obligations may be extended by written agreement of the First Lien Agent and the Majority First Lien Lenders, and in respect of the Second Lien Obligations may be extended by written agreement of the Second Lien Agent and the Required Lenders (as defined in the Second Lien Credit Agreement), as applicable, in their sole discretion without further order of the Court. Nothing in this Final Order vests or confers on any person or entity, including the Committee, standing or authority to pursue any Claims and Defenses or other cause of action belonging to any or all of the Debtors or their estates, including, without limitation, any Claims and Defenses or other claim against any Prepetition Secured Parties. Local Rule 9006-2 shall not apply to extend the applicable Challenge Period for the Committee or any other party in interest.

8. *Carve-Out.* Subject to the terms and conditions contained in this paragraph 8, each of the DIP Liens, DIP Super-Priority Claims, Prepetition Liens, Prepetition Obligations, Adequate Protection Replacement Liens and Adequate Protection Super-Priority Claims shall be subject and subordinate to payment of the Carve-Out (as defined below):

In re Gateway Pharmaceuticals, LLC, 2018 WL 6230789 (2018)

(a) For purposes of this Final Order, *"Carve-Out"* means (i) all unpaid fees required to be paid in these Chapter 11 Cases to the clerk of this Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), whether arising prior to or after the delivery of the Carve-Out Trigger Notice (as defined below); (ii) all reasonable and documented unpaid fees and expenses, including, without limitation, success fees, of professionals retained by the Debtors in these Chapter 11 Cases (collectively, the *"Debtors' Professionals"*) that are incurred and earned prior to the delivery by the First Lien Agent of a Carve-Out Trigger Notice, have been or are subsequently allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code, do not exceed the cumulative amount budgeted for each such Debtors' Professional in the applicable line item therefor in the Approved Budget and remain unpaid after application of any retainers (each such budgeted amount, a *"Debtors' Professionals Carve-Out Cap"*); (iii) all reasonable and documented unpaid fees and expenses of professionals retained by the Committee in these Chapter 11 Cases (collectively, the *"Committee's Professionals"*) and all reasonable and documented unpaid expenses of the members of such Committee (*"Committee Members"*) that are, in each case, incurred and earned prior to the delivery by the First Lien Agent of a Carve-Out Trigger Notice arid have been or are subsequently allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code, in an aggregate amount (for both Committee Members and the Committee's Professionals) not to exceed $1,000,000 (the *"Committee Professionals Carve-Out Cap"*); (iv) all reasonable and documented unpaid fees and expenses, including, without limitation, success fees, of the Debtors' Professionals that are incurred and/or earned on or after the delivery by the First Lien Agent of a Carve-Out Trigger Notice, that are allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code and remain unpaid after application of any retainers, in an aggregate amount not to exceed the sum of (A) if not paid prior to delivery by the First Lien Agent of a Carve-Out Trigger Notice, the Sale Transaction Fee due and owing to Lazard Frères & Co. LLC (*"Lazard"*) as defined in and pursuant to the terms of that certain engagement letter, dated March 12, 2010, between Lazard and the Borrower (the *"Lazard Success. Fee"*) and (B) $1,250,000 (the *"Debtors' Professionals Post Carve-Out Cap"*); (v) all reasonable and documented unpaid fees and expenses of the Committee Professionals that are incurred and/or earned on or after the delivery by the First Lien Agent of a Carve-Out Trigger Notice and are allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code, in an aggregate amount not to exceed $50,000 (the *"Committee Professionals Post Carve-Out Cap* and together with the Debtors' Professionals Carve-Out Cap, the Debtors' Professionals Post Carve-Out Cap and Committee Professionals Carve-Out Cap, the *"Carve-Out Cap"*); and (vi) payment of the Expense Reimbursement Amount solely in accordance with the terms of the Asset Purchase Agreement and the Bidding Procedures Order (clauses (i) through (vi), collectively, the *"Carve-Out"*). The term *"Carve-Out Trigger Notice"* shall mean a written notice delivered by the First Lien Agent to the Debtors' lead counsel, counsel for the Postpetition Lender, the U.S. Trustee, counsel for the Second Lien Agent, and counsel to the Committee appointed in these Chapter 11 Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default, expressly stating that the Carve-Out is invoked.

(b) Any payments actually made pursuant to Bankruptcy Code Sections 327, 328, 330, 331, 363, 503, 1103 or otherwise to Debtors' Professionals or Committee's Professionals shall in the case of any payments made on account of any fees and expenses described in clauses (iii), (iv) and (v) of the definition of Carve-Out, reduce the applicable Carve-Out Cap on a dollar-for-dollar basis.

(c) In the case of the Debtors' Professionals (other than Latham & Watkins LLP and Alvarez & Marsal North America, LLC), any and all retainers shall be applied no later than the date on which the Sale is consummated, it being understood, for the avoidance of doubt, that any retainer received by any Debtors' Professional (including Latham & Watkins LLP and Alvarez & Marsal North America, LLC) shall be counted against, and shall not be in addition to, the aggregate amount budgeted for such Debtors' Professional in the Approved Budget.

(d) Notwithstanding any provision in this paragraph 8 to the contrary or otherwise, no portion of the Carve-Out, Cash Collateral, Prepetition Collateral, Adequate Protection Collateral, DIP Collateral or proceeds of the Intercompany Loan shall be utilized for the payment of professional fees and disbursements to the extent restricted under paragraph 15 hereof.

(e) Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Committee, any other official or unofficial committee in these Chapter 11 Cases, or of any other person or entity, or shall affect the right of any Prepetition Secured Party to object to the allowance and payment of such fees and expenses.

(f) On the Cash Collateral Termination Date, if any, the Debtors shall use the proceeds of the Intercompany Loan (subject to paragraph 5(a) above) and Cash Collateral (including, for the avoidance of doubt, proceeds of any liquidated Adequate Protection Collateral) to fund an amount equal to the unused portion of the Maximum Carve-Out Amount into an interest-bearing reserve escrow at a financial institution reasonably acceptable to the First Lien Agent (the *"Carve-Out Escrow Account"*) in full and complete satisfaction of the Postpetition Lender's, First Lien Agent's, Second Lien Agent's, First Lien Claimholders' and Second Lien Claimholders' obligations in respect of the Carve-Out; *provided, however,* that any unused amounts held in the Carve-Out Escrow Account shall continue to be subject to the DIP Liens, Adequate Protection Replacement Liens and Prepetition Liens in accordance with the terms hereof. The funds held in the Carve-Out Escrow. Account shall only be used by the Debtors to pay such amounts if and when incurred, earned and allowed by this Court under Sections 105(a), 330 and 331 of the Bankruptcy Code (and, with respect to payment the Expense Reimbursement Amount, solely in accordance with the terms of the Asset Purchase Agreement and the Bidding Procedures Order). For the avoidance of doubt, (i) the portion of the Carve-Out Escrow Account pertaining to the period prior to the delivery of the Carve-Out Trigger Notice allocated to each applicable retained professional shall be limited to the amount set forth in the Approved Budget for such professional, (ii) (except for the Lazard Success Fee, which shall be allocated to Lazard) the portion of the Carve-Out Escrow Account pertaining to the Debtors' Professionals Post Carve-Out Cap shall be allocated to each applicable retained Debtors' professional based upon the amount set forth in the Approved Budget for such professional for the period prior to the delivery of a Carve-Out Trigger Notice divided by the total amount set forth in the Approved Budget for all of the Debtors' professionals during the period prior to the delivery of a Carve-Out Trigger Notice and (iii) the portion of the Carve-Out Escrow Account pertaining to the Committee Professionals Post Carve-Out Cap shall be allocated to each applicable retained Committee professional based upon the amount set forth in the Approved Budget for such professional for the period prior to the delivery of a Carve-Out Trigger Notice divided by the total amount set forth in the Approved Budget for all of the Committee professionals during the period prior to the delivery of a Carve-Out Trigger Notice.

9. *Waiver of Section 506(c) Claims.* As a further condition to the Debtors' use of the Prepetition Collateral, including, without limitation, the Cash Collateral, and to the payment of the Carve-Out to the extent provided herein, no costs or expenses of administration of the Chapter 11 Cases or any Successor Case (including, without limitation, any costs and expenses of preserving or disposing of property securing the Prepetition Obligations) shall be charged against or recovered from or against any or all of the Prepetition Secured Parties, the Adequate Protection Collateral, the DIP Collateral, the Prepetition Collateral, and the Cash Collateral, in each case, pursuant to Section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the First Lien Agent and the Majority First Lien Lenders and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the First Lien Claimholders.

10. *After-Acquired Property.* The "equities of the case" exception of Section 552 of the Bankruptcy Code shall not apply.

11. *Protection of First Lien Secured Parties' Rights.*

(a) Unless the First Lien Agent and Approving Majority First Lien Lenders shall have provided their prior written consent, there shall not be entered in these proceedings, or in any Successor Case, any order (other than the Interim Order and this Final Order) which authorizes the obtaining of credit or the incurrence of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the Adequate Protection Collateral and/or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with the Adequate Protection Replacement Liens granted to the First Lien Agent for the benefit of the First Lien Claimholders and the

Adequate Protection Super-Priority Claims granted to the First Lien Claimholders (except the Intercompany Loan and any such indebtedness used to refinance the First Lien Obligations in full).

(b) The Debtors (and/or their legal and financial advisors) will (i) maintain books, records and accounts to the extent and as required by the First Lien Documents, (ii) cooperate with, consult with, and provide to the First Lien Agent and the Majority First Lien Lenders all such information as required or allowed under the First Lien Documents or the provisions of this Final Order, (iii) permit representatives of the First Lien Agent and Majority First Lien Lenders such rights to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and consult with respect to, the Debtors' respective affairs, finances, properties, business operations and accounts with the Debtors' respective officers, employees and independent public accountants and (iv) permit the First Lien Agent, the Majority First Lien Lenders and their respective representatives, to consult with the Debtors' management and advisors on matters concerning the general status of the Debtors' businesses, financial condition and operations.

12. *Cash Collection.* From and after the date of the entry of the Interim Order, all collections and proceeds of any DIP Collateral, Adequate Protection Collateral or Prepetition Collateral or services provided by any Debtor and all Cash Collateral which shall at any time come into the possession, custody or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same bank accounts into which the collections and proceeds of the Prepetition Collateral were deposited under the First Lien Documents (or in such other accounts as are designated by First Lien Agent from time to time).

13. *Disposition of Collateral.* Except for the Sale and as otherwise permitted under this Final Order, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Prepetition Collateral, Adequate Protection Collateral or DIP Collateral outside of the ordinary course of business without the prior written consent of the First Lien Agent and the Majority First Lien Lenders (with. respect to the Prepetition Collateral and Adequate Protection Collateral) or Postpetition Lender (with respect to the DIP Collateral), as applicable, (and no such consent shall be implied from any other action, inaction or acquiescence by the First Lien Agent or any First Lien Lender or any order of this Court). Upon any sale or disposition of substantially all of the Adequate Protection Collateral, (i) to the extent the Cash Collateral Termination Date shall have occurred, the Maximum Carve-Out Amount shall be funded and the Intercompany Loan shall be paid in full pursuant to paragraph 5(d) before any payments shall be made on account of the First Lien Obligations and (ii) to the extent the Cash Collateral Termination Date shall not have occurred, all amounts set forth in section 4(b) of the Sale Support Agreement shall be funded and the Intercompany Loan shall be paid in full pursuant to paragraph 5(d) before any payments shall be made on account of the First Lien Obligations.

14. *Relief from Automatic Stay.*

(a) Any automatic stay otherwise applicable to the First Lien Claimholders is hereby modified, without requiring prior notice to or authorization of this Court, to the extent necessary to permit the Approving Majority First Lien Lenders to exercise the following remedies immediately upon the occurrence and during the continuance of an Event of Default (subject to the limitations set forth in this Paragraph 14): (i) declare a termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral, including Cash Collateral derived solely from the proceeds of Adequate Protection Collateral, and to use Prepetition Collateral other than in the ordinary course (any such declaration to be made to the Debtors, the Postpetition Lender, counsel to the Committee and the United States Trustee and to be referred to herein as a *"Termination Declaration"* and the date on which the earliest of any such Termination Declaration occurs being herein referred to as the *"Termination Declaration Date"*) and/or (ii) reduce any claim to judgment.

(b) During the five (5) Business Day period after the Termination Declaration Date, the Debtors and the Committee shall be entitled to an emergency hearing before the Court for the sole purpose of contesting whether an Event of

In re Graceway Pharmaceuticals, LLC, Not Reported in B.R. (2011)

Default has occurred and Section 105 of the Bankruptcy Code may not be invoked by the Debtors in an effort to restrict or preclude any First Lien Lender from exercising any rights or remedies set forth in this Final Order. Unless during such period the Court determines that an Event of Default has not occurred and/or is not continuing, this Final Order shall automatically terminate (or, if the Approving Majority First Lien Lenders shall have specified, in their sole discretion, in the Termination Declaration that the Prepetition Collateral, including, without limitation, Cash Collateral, use arrangement set forth herein shall instead be reduced or restricted, such use arrangement shall be so reduced or restricted) at the end of such five (5) Business Day period in accordance with paragraph 3(c), without further notice or order. During such five (5) Business Day period, the Debtors may not use Cash Collateral except to pay payroll and other expenses critical to keep the business of the Debtors operating, in each case, in accordance with the Approved Budget.

(c) The automatic stay imposed under Bankruptcy Code Section 362(a) is hereby modified pursuant to the terms of this Final Order as necessary to (i) permit the Debtors to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Prepetition Secured Parties and the Postpetition Lender under this Final Order, (ii) authorize the Postpetition Lender to retain and apply payments hereunder in connection with an Intercompany Loan Default and (iii) otherwise implement and effectuate the provisions of this Final Order.

15. *Restriction on Use of Proceeds.* Notwithstanding. anything herein to the contrary, no proceeds from the Intercompany Loan, Adequate Protection Collateral, DIP Collateral, Cash Collateral (including any prepetition retainers funded by any or all of the Prepetition Secured Parties), Prepetition Collateral, or any portion of the Carve-Out may be used by any of the Debtors, the Committee, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, or any other person, party or entity to (or to pay any professional fees and disbursements incurred in connection therewith) (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code Section 364(c) or (d), or otherwise, other than the Intercompany Loan or loans used to refinance the First Lien Obligations in full; or (b) investigate (except as set forth below), assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any or all of the Prepetition Secured Parties and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Claims and Defenses or any Avoidance Actions, in each case, with respect to the Prepetition Secured Parties; (ii) any so-called "lender liability" claims and causes of action with respect to the Prepetition Secured Parties; (iii) any action with respect to the validity, enforceability, priority and extent of the Prepetition Obligations, or the validity, extent, perfection and priority of the Prepetition Liens or the Adequate Protection Replacement Liens (or the value of any of the Prepetition Collateral or Adequate Protection Collateral); (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Liens, the Adequate Protection Replacement Liens or the other Prepetition Secured Parties' Adequate Protection; and/or (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the Prepetition Secured Parties hereunder or the Prepetition Documents; *provided, however,* up to $65,000 in the aggregate of the Committee Professionals Carve-Out Cap and Committee Professionals Post Carve-Out Cap, any Adequate Protection Collateral, any Prepetition Collateral and any Cash Collateral may be used by the Committee to investigate (but not prosecute) the extent, validity and priority of the Prepetition Obligations, the Prepetition Liens or any other claims against the Prepetition Secured Parties so long as such investigation occurs no later than the earlier of December 20, 2011 and the date the Sale is consummated.

16. *Proofs of Claim.* The First Lien Agent, the First Lien Claimholders, the Second Lien Agent and the Second Lien Claimholders will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein. The Debtors' Stipulations in paragraph D herein shall be deemed to constitute a timely filed proof of claim for the First Lien Agent, the First Lien Claimholders, the Second Lien Agent and the Second Lien Claimholders, as applicable. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, the First Lien Agent for the benefit of itself and the other

First Lien Claimholders and the Second Lien Agent for the benefit of itself and the other Second Lien Claimholders is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or Successor Cases for any claim allowed herein or otherwise.

17. *Preservation of Rights Granted under the Final Order.*

(a) *No Non-Consensual Modification or Extension of.Final Order.* The Debtors shall not seek, and it shall constitute an Event of Default (resulting, among other things, in the termination of the Debtors' right to use the Prepetition Collateral, including, without limitation, the Cash Collateral and the immediate maturity of the Intercompany Loan) if there is entered (except as otherwise provided herein) an order amending, supplementing, extending or otherwise modifying this Final Order without the prior written consent of the First Lien Agent and the Majority First Lien Lenders, and no such consent shall be implied by any other action, inaction or acquiescence.

(b) *Dismissal.* If any order dismissing any of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that (i) the Prepetition Secured Parties' Adequate Protection and DIP Protections shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all Prepetition Secured Parties' Adequate Protection or the Intercompany Loan, as applicable, have been paid in full in cash or are otherwise satisfied in full (and that the Prepetition Secured Parties' Adequate Protection and DIP Protections shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) to the extent allowed by applicable law this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Prepetition Secured Parties' Adequate Protection and DIP Protections.

(c) *Modification of Final Order.* Based on the findings set forth in this Final Order and in accordance with Section 364(e) of the Bankruptcy Code, which is applicable to the Intercompany Loan contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed by a subsequent order of this Court or any other court, the Postpetition Lender shall be.entitled to the protections provided in Section 364(e) of the Bankruptcy Code.

(d) *Survival of Final Order.* The provisions of this Final Order, any actions taken pursuant hereto, the Prepetition Secured Parties' Adequate Protection, the DIP Protections and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any of the Prepetition Secured Parties or the Postpetition Lender shall survive, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization or liquidation in any Chapter 11 Case, converting any Chapter 11 Case to a case under Chapter 7, dismissing any of the Chapter 11 Cases, withdrawing of the reference of any of the Chapter 11 Cases or any Successor Case or providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in this Court, or terminating the joint administration of these Chapter 11 Cases or by any other act or omission. The terms and provisions of this Final Order, including the Prepetition Secured Parties' Adequate Protection, the DIP Protections and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any of the Prepetition Secured Parties or Postpetition Lender, shall continue in full force and effect notwithstanding the entry of any such order, and the Prepetition Secured Parties' Adequate Protection and DIP Protections shall continue in these proceedings and in any Successor Case, and shall maintain their respective priorities as provided by this Final Order.

18. *Other Rights and Obligations.*

(a) *Binding Effect.* Subject to paragraph 7 above, the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, (i) the Prepetition Secured Parties, the Committee, the Debtors and the Postpetition Lender and their respective successors and assigns, (ii) any

Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for the estate of any of the.Debtors, (iii) an examiner appointed pursuant to Section 1104 of the Bankruptcy Code and (iv) any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors, in each case, whether in any of the Chapter 11 Cases, in any Successor Cases, or upon dismissal of any such Chapter 11 Case or Successor Case; *provided, however,* that the Prepetition Secured Parties shall have no obligation to permit the use of Prepetition Collateral, including, without limitation, the Cash Collateral, by any Chapter 7 or Chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Chapter 11 Case or Successor Case, other than the Debtors in accordance with the terms hereof.

(b) *No Waiver.* The failure of the First Lien Claimholders to seek relief or otherwise exercise their rights and remedies under this Final Order, the First Lien Documents or otherwise (or any delay in seeking or exercising same) shall not constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise. Except as expressly provided herein, nothing contained in this Final Order (including, without limitation, the authorization of the use of any Prepetition Collateral, including, without limitation, Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any First Lien Claimholder, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion). Except as prohibited by this Final Order and the First Lien Documents, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, the ability of the First Lien Claimholders under the Bankruptcy Code or under non-bankruptcy law to (i) request conversion of the Chapter. 11 Cases to cases under Chapter 7, dismissal of the Chapter 11 Cases, or the appointment of a trustee in the Chapter 11 Cases, (ii) propose, subject to the provisions of Section 1121 of the Bankruptcy Code, any Chapter 11 plan or plans with respect to any of the Debtors, or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the First Lien Claimholders. Except to the extent otherwise expressly provided in this Final Order, neither the commencement of the Chapter 11 Cases nor the entry of this Final Order shall limit or otherwise modify the rights and remedies of the First Lien Claimholders with respect to non-Debtor entities or their respective assets, whether such rights and remedies arise under the First Lien Documents, applicable law, or equity.

(c) *No Third Party Rights.* Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary. The First Lien Claimholders shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates, in either case on account of their permitting the use of the Prepetition Collateral, including, without limitation, the Cash Collateral, or their exercising any rights or remedies as and when permitted pursuant to this Final Order.

(d) *No Marshaling.* Neither the First Lien Claimholders nor the Postpetition Lender shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Adequate Protection Collateral or the Prepetition Collateral, as applicable.

(e) *Amendments.* Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of all the Debtors and the First Lien Agent (after having obtained the approval of the Majority First Lien Lenders) and, except as provided herein, approved by this Court; *provided, however,* that any waiver, modification or amendment of any of the provisions hereof relating to the Intercompany Loan shall also be signed by or on behalf of the Postpetition Lender.

(f) *Inconsistency.* In the event of any inconsistency between the terms and conditions of the Prepetition Documents and the terms and conditions of this Final Order, the provisions of this Final Order shall govern and control.

(g) *Enforceability.* This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, Local Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Final Order.

(h) *Headings.* Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

(i) Any reports or notices required to be given by the Debtors under this Final Order shall concurrently be provided to counsel for the Committee.

19. *[Reserved].*

20. *Retention of Jurisdiction.* The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

Dated: November 7, 2011

Wilmington, Delaware

<<signature>>

UNITED STATES BANKRUPTCY JUDGE

Footnotes

1    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Graceway Pharma Holding Corp., a Delaware corporation (9175), Case No. 11-13037 (PJW); Graceway Holdings, LLC, a Delaware limited liability company (2502), Case No. 11-13038 (PJW); Graceway Pharmaceuticals, LLC, a Delaware limited liability company (5385), Case No. 11-13036 (PJW); Chester Valley Holdings, LLC, a Delaware limited liability company (9457), Case No. 11-13039 (PJW); Chester Valley Pharmaceuticals, LLC, a Delaware limited liability company (3713), Case No. 11-13041 (PJW); Graceway Canada Holdings, Inc., a Delaware corporation (6663), Case No. 11-13042 (PJW); and Graceway International, Inc., a Delaware corporation (2399), Case No. 11-13043 (PJW). The mailing address for Graceway Pharmaceuticals, LLC is 340 Martin Luther King Jr. Blvd., Suite 500, Bristol, TN 37620 (Attn: John Bellamy). On October 4, 2011, Graceway Canada Company filed an application in the Ontario Superior Court of Justice (Commercial List) pursuant to the *Courts of Justice Act,* R.S.O. 1990, c. C. 43.

2    Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the First Lien Credit Agreement (as defined below).

3    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

4    The Wind-Down Approved Budget currently contains an estimate for such amount

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix II**

G

2009 WL 7226692
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Delaware.

In re TRUE TEMPER SPORTS,

INC., et al., Debtors. [1]

No. 09–13446 (PJW).
|
Oct. 30, 2009.

**Attorneys and Law Firms**

Marion M. Quirk, Cole, Schotz, Meisel, Forman & Leonard, Wilmington, DE, for Debtors.

*FINAL ORDER (1) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364*

PETER J. WALSH, United States Bankruptcy Judge.

**\*1** Upon the motion, dated October 8, 2009, (the "**DIP Motion**"), of True Temper Sports, Inc. ("**True Temper Sports**" or "**Borrower**"), True Temper Corporation ("**Holdings**") and True Temper Sports–PRC Holdings ("**PRC**"), as debtors and debtors in possession (collectively, the "**Debtors**"), in the above-referenced cases (the "**Cases**"), seeking entry of a final order (this "**Final Order**") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 365, 507 and 552 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001–2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), that, among other things:

(i) authorizes the Borrower to obtain, and authorizes each of Holdings and PRC (collectively, "**Guarantors**")

to guarantee, jointly and severally, the Borrower's obligations in respect of, senior secured postpetition financing, which if approved on a final basis, would consist of:

(a) a senior secured, super priority, non-amortizing revolving credit facility of up to $10 million in aggregate principal amount (the "**Revolving DIP Loans**" and such credit facility, the "**Revolving DIP Facility**") pursuant to the terms of (x) this Final Order and the interim order approving the DIP Facilities (as defined below) that was previously entered by this Court on October 9, 2009 (Docket No. 53) (the "**Interim Order**"), (y) that certain Senior Secured Super–Priority Debtor–In–Possession Credit Agreement in substantially the form attached to the DIP Motion (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**") [2] among Borrower, Holdings, General Electric Capital Corporation ("**GECC**") as sole lead arranger, sole bookrunner and sole syndication agent (in such capacity, "**DIP Arranger**") and as administrative agent and co-collateral agent (in such capacities, and including any successor administrative agent and co-collateral agent, the "**Revolving DIP Administrative Agent**") for itself and certain other financial institutions as revolving lenders (the "**Revolving DIP Lenders**" and together with the Revolving DIP Administrative Agent, collectively, the "**Revolving DIP Secured Parties**") and Credit Suisse, acting through its Cayman Islands Branch ("**Credit Suisse**"), as term agent and co-collateral agent (in such capacities, and including any successor administrative and co-collateral agent, the "**Roll Up DIP Administrative Agent**" and together with the Revolving DIP Administrative Agent, the "**DIP Administrative Agents**") for the Roll Up DIP Lenders (as defined below and together with the Revolving DIP Lenders, collectively, the "**DIP Lenders**") (the DIP Arranger, the Revolving DIP Administrative Agent, the Roll Up DIP Administrative Agent, and any other documentation agent, administrative agent, collateral agent, co-agent and other agents (and successor agents) for the DIP Lenders in respect of the DIP Facilities, collectively, the "**DIP Agents**") and together with the DIP Lenders and any letter of credit issuing banks, collectively, the "**DIP Secured Parties**"), and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement) (together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**"); and

**\*2** (b) a roll up of $80 million of the Prepetition First Lien Indebtedness (as defined below) (the holders of such rolled up Prepetition First Lien Indebtedness, the "**Roll Up DIP Lenders**", and together with the Roll Up DIP Administrative Agent, collectively, the "**Roll Up DIP Secured Parties**") and such rolled-up Prepetition First Lien Indebtedness, the "**Roll Up DIP Loans**" and together with the Revolving DIP Loans, collectively, the "**DIP Loans**", and such credit facility, the "**Roll Up DIP Facility,**" and together with the Revolving DIP Facility, collectively, the "**DIP Facilities**"), subject to the terms and conditions of this Final Order, the Interim Order and the DIP Loan Documents (all DIP Loans (including all Roll Up DIP Loans) made to or for the benefit or account of, and all guaranties issued by, the respective Debtors pursuant to the DIP Loan Documents, the Interim Order and this Final Order, and all other obligations and liabilities of the Debtors arising under the DIP Loan Documents, the Interim Order and this Final Order, including, without limitation, all Obligations as defined in the DIP Credit Agreement, collectively, the "**DIP Obligations**");

(ii) approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(iii) authorizes each Debtor to grant (x) to the DIP Administrative Agents, for the benefit of itself and the other DIP Secured Parties, Liens on all of the Collateral (as defined below) pursuant to sections 364(c) and (d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) but shall be junior to any valid, enforceable and non-avoidable Liens that are (A) in existence on the Petition Date, (B) either perfected as of the Petition Date or perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and (C) senior in priority to the Prepetition Liens pursuant to applicable law, and (y) to the DIP Secured Parties super-priority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, including Avoidance Actions (as defined below), and proceeds thereof;

(iv) authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), including, without limitation, Cash Collateral in which the Prepetition Secured Parties (as defined below) and/or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Final Order, the Interim Order or otherwise;

(v) grants, as of the Petition Date and in accordance with the relative priorities set forth herein, certain adequate protection (x) to the Prepetition First Lien Secured Parties, consisting of, among other things, First Priority Adequate Protection Liens (as defined below) and current payment of accrued and unpaid prepetition and postpetition interest at the default rate and reimbursable fees and expenses, and (y) to the Prepetition Second Lien Secured Parties consisting of, among other things, Second Priority Adequate Protection Liens (as defined below);

**\*3** (vi) vacates the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents, the Interim Order and this Final Order; and

(vii) waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of the Interim Order and this Final Order.

Having considered the DIP Motion, the Declaration of Jason A. Jenne in Support of Chapter 11 Petitions and First Day Pleadings, the DIP Credit Agreement, the evidence submitted at the interim hearing on the DIP Motion (the "**Interim Hearing**") and the evidence submitted at the final hearing on the DIP Motion (the "**Final Hearing**"); and the Interim Order having been entered on October 9, 2009; and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d) and 9014 and all applicable Local Rules, due and proper notice of the DIP Motion, the Interim Hearing and the Final Hearing having been given; the Interim Hearing having been held and concluded on October 9, 2009 and the Final Hearing having been held and concluded on October 30, 2009; and it appearing that approval of the final relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' business; and after

due deliberation and consideration, and for good and
sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND
ADJUDGED** [3] **, that:**

A. *Petition Date.* On October 8, 2009 (the "**Petition
Date**"), the Debtors filed voluntary petitions for relief
under chapter 11 of the Bankruptcy Code with the United
States Bankruptcy Court for the District of Delaware (the
"**Court**"). The Debtors have continued in the management
and operation of their business and property as debtors-
in-possession pursuant to sections 1107 and 1108 of the
Bankruptcy Code. No statutory committee of unsecured
creditors, trustee or examiner has been appointed in the
Cases.

B. *Jurisdiction and Venue.* This Court has core jurisdiction
over the Cases, the DIP Motion and the parties and
property affected hereby pursuant to 28 U.S.C. § 157(b)
and 1334. Venue for the Cases and proceedings on the
DIP Motion is proper before this Court pursuant to 28
U.S.C. §§ 1408 and 1409. The statutory predicates for the
relief sought herein are sections 105, 361, 362, 363, 364 and
507 of the Bankruptcy Code and Bankruptcy Rules 2002,
4001, 6004 and 9014 and the Local Bankruptcy Rules.

C. *Notice.* The Final Hearing is being held pursuant to
the authorization of Bankruptcy Rule 4001. In accordance
with the Interim Order, notice of the entry of the
Interim Order and of the Final Hearing, together with
a copy of the Interim Order, have been served by the
Debtors, by United States mail, first-class postage pre-
paid, on October 10, 2009, to certain parties in interest,
including: (i) the Office of the United States Trustee, (ii)
the United States Securities and Exchange Commission,
(iii) the Office of the United States Attorney for the
District of Delaware, (iv) the Internal Revenue Service,
(v) those entities or individuals included on the Debtors'
list of largest unsecured creditors on a consolidated
basis, (vi) counsel to the respective Prepetition Agents (as
defined below), (vii) the Prepetition Agents, (viii) counsel
to the DIP Agents, (ix) the Pension Benefit Guaranty
Corporation, and (x) the Prepetition Indenture Trustee.
In addition, notice of entry of the Interim Order and
of the Final Hearing was served by the Debtors by facsimile,
overnight mail or United States express mail, postage
pre-paid, on October 26, 2009, to the additional parties
that received notice of the Interim Hearing. Under the

circumstances, such notice of DIP Motion, the Interim
and Final Hearings, and the entry of the Interim Order
and the Final Order constitutes due and sufficient notice
thereof and complies with Bankruptcy Rule 4001(b), (c)
and (d) and the Local Bankruptcy Rules, and no further
notice of the relief sought at the Interim Hearing or the
Final Hearing and the relief granted herein is necessary or
required.

**\*4** D. *Debtors' Stipulations Regarding the Prepetition
First Lien Credit Facility.* Without prejudice to the
rights of parties in interest to the extent set forth
in Paragraph 6 below, the Debtors admit, stipulate,
acknowledge and agree (Paragraphs D(i) through D(v)
hereof shall be referred to herein collectively as the
"Debtors' Stipulations") as follows:

(i) *Prepetition First Lien Credit Facility.* As of the Petition
Date, True Temper Sports as borrower, and Holdings,
as guarantor, the financial institutions parties thereto
from time to time as lenders (the "**Prepetition First Lien
Lenders**"), and Credit Suisse as administrative agent for
the Prepetition First Lien Lenders (in such capacity, and
including any successor agents, the "**Prepetition First Lien
Administrative Agent**") and as collateral agent for the
Prepetition First Lien Lenders (in such capacity, and
including any successor agents, the "**Prepetition First Lien
Collateral Agent**" and together with the Prepetition First
Lien Administrative Agent, and any other documentation
agent, administrative agent, collateral agent, co-agent
and other agents for the Prepetition First Lien Lenders
in respect of the Prepetition First Lien Credit Facility
(as defined below), collectively, the "**Prepetition First
Lien Agents**" and together with the Prepetition First
Lien Lenders (collectively, the "**Prepetition First Lien
Secured Parties**"), were parties to that certain Amended
and Restated Credit Agreement, dated as of March
27, 2006 (Docket No. 41) (as amended, restated,
supplemented or otherwise modified prior to the Petition
Date, the "**Prepetition First Lien Credit Agreement**" and
together with the other Loan Documents (as defined in
the Prepetition First Lien Credit Agreement), in each
case as amended, restated, supplemented or otherwise
modified prior to the Petition Date, collectively, the
"**Prepetition First Lien Loan Documents**" and the credit
facility contemplated therein, the "**Prepetition First Lien
Credit Facility**"). As of the Petition Date, the aggregate
outstanding principal amount of the loans, letters of credit
and other Obligations (as defined in the Prepetition First

Lien Credit Agreement) arising under the Prepetition First Lien Loan Documents was no less than approximately $104 million plus all accrued and unpaid interest, costs, expenses, fees (including reimbursable attorney and other advisor fees and expenses), other charges (in each case, to the extent reimbursable under the Prepetition First Lien Loan Documents) and other obligations owing to the Prepetition First Lien Secured Parties or affiliates thereof, including, without limitation, any amounts under any Specified Hedging Agreement (as defined in the Prepetition First Lien Credit Agreement) (all Obligations under, and as defined in the Prepetition First Lien Credit Agreement, together with any other amounts owing by the applicable Debtors under the Prepetition First Lien Loan Documents, collectively, the "**Prepetition First Lien Indebtedness**").

**\*5** (ii) *Prepetition First Liens and Prepetition First Collateral.* The Prepetition First Lien Indebtedness is secured by Liens granted to, or for the benefit of, Prepetition First Lien Secured Parties (the "**Prepetition First Liens**") on substantially all of the personal and real property of the Debtors, as further described and defined in the Prepetition First Lien Loan Documents, which for the avoidance of doubt includes Cash Collateral (the "**Prepetition First Lien Collateral**"). As of the Petition Date, (I) the Prepetition First Liens (w) are valid, binding, enforceable, and perfected Liens, (x) were granted to, or for the benefit of, the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value, (y) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the lien subordination contemplated herein), and (z) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve–Out (as defined below), and (C) valid, perfected and unavoidable Liens permitted under the applicable Prepetition First Lien Loan Documents, but only to the extent that such Liens are permitted by the applicable Prepetition First Lien Loan Documents to be senior to or *pari passu* with the applicable Prepetition First Liens, and (II)(x) the Prepetition First Lien Indebtedness constitutes legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (y) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Prepetition First Lien

Indebtedness exists, and (z) no portion of the Prepetition First Lien Indebtedness or any payments made to any or all of the Prepetition First Lien Secured Parties is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(iii) *Prepetition Intercreditor Agreement: Subordination of Prepetition Note Indebtedness to Prepetition First Lien Indebtedness* . Holdings, Borrower, the Prepetition First Lien Administrative Agent and the Prepetition Second Lien Administrative Agent (as defined below) are parties to that certain Intercreditor Agreement dated as of January 22, 2007 (Docket No. 41) (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Intercreditor Agreement**"), which sets forth subordination, intercreditor and other provisions governing the relative priorities of Prepetition First Lien Credit Facility and the Prepetition Second Lien Credit Facility (as defined below) The Debtors admit, stipulate and agree that the Prepetition Intercreditor Agreement was entered into in good faith and is fair and reasonable to the parties thereto and enforceable in accordance with the terms thereof. Pursuant to the Prepetition Indenture, the Prepetition Note Indebtedness is subordinated in right of payment to the Prepetition First Lien Indebtedness.

**\*6** (iv) *Release of Claims.* Subject to the reservation of rights set forth in Paragraph 6 below, each Debtor and its estate shall be deemed to have waived, discharged and released the Prepetition First Lien Secured Parties, together with their respective affiliates, agents, attorneys, financial advisors, consultants, officers, directors and employees (all of the foregoing, the "**Prepetition First Lien Secured Party Releasees**") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment or other offset rights against any and all of the Prepetition First Lien Secured Party Releasees, whether arising at law or in equity, including, without limitation, (I) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, and (II) any right or basis to challenge or object to the amount, validity or enforceability of the Prepetition First Lien Indebtedness, or the validity, enforceability, priority or

non-avoidability of the Prepetition First Liens securing the Prepetition First Lien Indebtedness.

(v) *Prepetition First Lien Indebtedness Oversecured.* The aggregate value of the Prepetition First Lien Collateral exceeds the aggregate amount of the Prepetition First Lien Indebtedness, and accordingly, the Prepetition First Lien Secured Parties' respective claims in respect of the Prepetition First Lien Indebtedness are allowable in full as secured claims.

E. *Prepetition Second Lien Credit Facility and Prepetition Note Indebtedness.*

(i) *Prepetition Second Lien Credit Facility.* As of the Petition Date, True Temper Sports as borrower, and Holdings and certain wholly-owned subsidiaries of True Temper Sports, as guaranto[s], the financial institutions parties thereto from time to time as lenders (the "**Prepetition Second Lien Lenders**"), and Law Debenture Trust Company of New York, as administrative agent for the Prepetition Second Lien Lenders (in such capacity, and including any successor agents, the "**Prepetition Second Lien Administrative Agent**") and as collateral agent for the Prepetition Second Lien Lenders (in such capacity, and including any successor agents, the "**Prepetition Second Lien Collateral Agent**" and together with the Prepetition Second Lien Administrative Agent, collectively, the "**Prepetition Second Lien Agents**" and together with the Prepetition Second Lien Lenders and any other documentation agent, administrative agent, collateral agent, co-agent and other agents for the Prepetition Second Lien Lenders in respect of the Prepetition Second Lien Credit Facility, collectively, the "**Prepetition Second Lien Secured Parties**" and together with the Prepetition First Lien Secured Parties, collectively, the "**Prepetition Secured Parties**"; the Prepetition First Lien Agents and Prepetition Second Lien Agents, collectively, the "**Prepetition Agents**"), were parties to that certain Credit Agreement, dated as of January 22, 2007 (Docket No. 41) (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Second Lien Credit Agreement,**" and together with the other Loan Documents (as defined in the Prepetition Second Lien Credit Agreement), in each case as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Second Lien Loan Documents**" and together with the Prepetition First Lien Loan Documents, collectively, the "**Prepetition Loan Documents**"; the credit

facility contemplated by the Prepetition Second Lien Credit Agreement, the "**Prepetition Second Lien Credit Facility**" and together with the Prepetition First Lien Credit Facility, the "**Prepetition Credit Facilities**"). The Prepetition Second Lien Secured Parties assert that as of the Petition Date, the aggregate outstanding principal amount of the loans, letters of credit and other Obligations (as defined in the Prepetition Second Lien Credit Agreement) arising under the Prepetition Second Lien Loan Documents was no less than approximately $45 million plus all accrued and unpaid interest, costs, expenses, fees (including reimbursable attorney and other advisor fees and expenses), other charges (in each case, to the extent reimbursable under the Prepetition Second Lien Loan Documents) and other obligations owing to the Prepetition Second Lien Secured Parties or affiliates thereof (all Obligations under, and as defined in the Prepetition Second Lien Credit Agreement, together with any other amounts owing by the applicable Debtors under the Prepetition Second Lien Loan Documents, collectively, the "**Prepetition Second Lien Indebtedness**").

**\*7** (ii) *Prepetition Second Liens and Prepetition Second Lien Collateral.* The Prepetition Second Lien Secured Parties assert that the Prepetition Second Lien Indebtedness is secured by Liens granted to, or for the benefit of, the Prepetition Second Lien Secured Parties (the "**Prepetition Second Liens**" and together with the Prepetition First Liens, the "**Prepetition Liens**") on certain personal and real property of certain Debtors, as further described and defined in the Prepetition Second Lien Loan Documents, which for the avoidance of doubt includes Cash Collateral (the "**Prepetition Second Lien Collateral**" and together the Prepetition First Lien Collateral, collectively, the "**Prepetition Collateral**").

(iii) *Prepetition Indenture and Prepetition Notes.* True Temper Sports, as issuer, PRC, as guarantor, and The Bank of New York as indenture trustee (the "**Prepetition Indenture Trustee**") are parties to that certain Indenture dated as of March 15, 2004 (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Indenture**") pursuant to which True Temper Sports issued those certain 8 3/8% Senior Subordinated Notes due 2011 (together with all other Notes as defined in the Prepetition Indenture, collectively, the "**Prepetition Notes**" and together with the Prepetition Indenture and other agreements, documents, notes, certificates and other instruments executed and/

or delivered with, to, or in favor of any or all of the Prepetition Note Parties, collectively, the "**Prepetition Note Documents**"; the holders of the Prepetition Notes, collectively, the "**Prepetition Noteholders**" and together with the Prepetition Indenture Trustee, the "**Prepetition Note Parties**"). The Prepetition Note Parties assert that as of the Petition Date, the aggregate outstanding principal amount of Notes was approximately $125 million plus all accrued and unpaid interest, costs, expenses, fees (including reimbursable attorney and other advisor fees and expenses), other charges (in each case, to the extent reimbursable under the Prepetition Note Documents) and other obligations owing to the Prepetition Note Parties or affiliates thereof (all obligations and indebtedness under the Prepetition Note Documents, collectively, the "**Prepetition Note Indebtedness**"). The Prepetition Note Indebtedness is unsecured.

F. *Findings Regarding the DIP Facilities.*

(i) *Need for Postpetition Financing.* The Debtors have an immediate need to obtain the DIP Facilities and use Cash Collateral, among other things, to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operation needs. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facilities is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

**\*8** (ii) *No Credit Available on More Favorable Terms.* The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents. The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors (i) granting to the DIP Secured Parties the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents, including, without limitation, the DIP Liens and the DIP Super–Priority Claims (as defined below) and (ii) allowing the Prepetition First Lien Lenders to provide Roll Up DIP Loans on the terms

set forth herein and in the DIP Loan Documents (all of the foregoing described in clauses (i) and (ii) above, including the DIP Liens and the DIP Super–Priority Claims, collectively, the "**DIP Protections**").

G. *Adequate Protection for Prepetition Secured Parties.* The Prepetition Agents have negotiated in good faith regarding the Debtors' use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses. The Prepetition Agents for their respective Prepetition Secured Parties have agreed to permit the Debtors to use the Prepetition Collateral, including the Cash Collateral, for the period through the Cash Collateral Termination Date (as defined below), subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 363(m) of the Bankruptcy Code. All of the Prepetition Secured Parties are entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code for any Diminution in Value (as defined below). Based on the DIP Motion and on the record presented to the Court at the Interim Hearing and the Final Hearing, the terms of the proposed adequate protection arrangements and use of the Cash Collateral are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the Prepetition Agents' consent thereto. Each of the Prepetition First Lien Agent and the Prepetion First Lien Lenders consented to the entry of this Final Order and relief provided herein. Pursuant to the PSA (as defined below), Prepetition Second Lien Lenders holding approximately 87% in aggregate amount of claims in respect of the Prepetition Second Lien Indebtedness consented to the entry of this Final Order and the relief provided herein, and pursuant to the terms of the Prepetition Second Lien Credit Agreement, the consents of such Prepetition Second Lien Lenders are binding on all Prepetition Second Lien Lenders. With respect to those Prepetition Secured Parties that have not consented to the entry of this Final Order, the prepetition liens and security interests of such parties are adequately protected pursuant to the terms this Final Order.

**\*9** H. *Section 552.* In light of the subordination of their Liens and super-priority administrative claims to (i) the Carve–Out in the case of the DIP Secured Parties, and (ii) the Carve–Out and the DIP Liens in the case of

the Prepetition Secured Parties, each of the DIP Secured Parties and the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

### I. *Business Judgment and Good Faith Pursuant to Section 364(e).*

(i) The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facilities to the Borrower in accordance with the DIP Loan Documents, the Interim Order and this Final Order.

(ii) The terms and conditions of the DIP Facilities (including the Roll Up DIP Facility) pursuant to the DIP Loan Documents, the Interim Order and this Final Order, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

(iii) The DIP Facilities and DIP Loan Documents were negotiated in good faith and at arms' length among the Debtors and the DIP Secured Parties with the assistance and counsel of their respective advisors, and all of the DIP Obligations (including the Roll Up DIP Loans) shall be deemed to have been extended by the DIP Secured Parties and their affiliates for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Liens, the DIP Super–Priority Claims and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event the Interim Order, this Final Order or any other order or any provision hereof or thereof is vacated, reversed, amended or modified, on appeal or otherwise.

### J. *Relief Essential; Best Interest.*

For the reasons stated above, the Debtors have requested entry of this Final Order pursuant to Bankruptcy Rule 4001(b) (2) and 4001(c)(2) and the Local Bankruptcy Rules. Absent granting the relief set forth in this Final Order, the Debtors' estates and their ability to successfully reorganize will be immediately and irreparably harmed. Consummation of the DIP Facilities and authorization of the use of Cash Collateral in accordance with this Final Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates consistent with their fiduciary duties.

**NOW, THEREFORE,** on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition Secured Parties and the DIP Secured Parties to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

**\*10  IT IS ORDERED that:**

**1.** *Motion Granted.* The DIP Motion is granted in accordance with the terms and conditions set forth in this Final Order and the DIP Loan Documents. Any objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

**2.** *DIP Loan Documents and DIP Protections.*

(a) *Approval of DIP Loan Documents.* The Debtors are expressly and immediately authorized to establish the DIP Facilities (to the extent any such DIP Facilities have not been established pursuant to authorization in the Interim Order), to execute, deliver and perform under the DIP Loan Documents (to the extent any such DIP Loan Documents have not been executed, delivered or performed pursuant to authorization in the Interim Order) and to incur the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Loan Documents (including, without limitation, the conversion of $80 million of the Prepetition First Lien Indebtedness to Roll Up DIP Loans), and to execute, deliver and perform under all other instruments, certificates, agreements and documents (to the extent any such instruments, certificates, agreements and documents have not been executed, delivered or performed pursuant to authorization in the Interim Order) which may be required or necessary for the performance by the applicable Debtors under the DIP Facilities and the creation and perfection of the DIP Liens described in, and provided for, by this Final Order, the Interim Order and the DIP Loan Documents. The Debtors are hereby authorized, and upon execution of the DIP Credit Agreement, directed to do and perform all acts, pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become

due pursuant to the DIP Loan Documents, the Interim
Order and this Final Order, including, without limitation,
all closing fees, administrative fees, commitment fees,
letter of credit fees and reasonable attorneys', financial
advisors' and accountants' fees and disbursements arising
under the DIP Loan Documents, the Interim Order and
this Final Order, which amounts shall not be subject
to further approval of this Court and shall be non-
refundable; provided, however, that the payment of
the fees and expenses of the Lender Professionals (as
defined below) shall be subject to the provisions of
Paragraph 20(a). Upon their execution and delivery, the
DIP Loan Documents shall represent valid and binding
obligations of the applicable Debtors enforceable against
such Debtors in accordance with their terms. Each officer
of a Debtor acting singly is hereby authorized to execute
and deliver each of the DIP Loan Documents, such
execution and delivery to be conclusive of their respective
authority to act in the name of and on behalf of the
Debtors.

(b) *Authorization to Incur DIP Obligations.* To enable
the Debtors to continue to operate their business, and
subject to the terms and conditions of this Final Order and
the DIP Loan Documents, including, without limitation,
the budget-related covenants contained in the DIP Credit
Agreement (as the same may be modified, supplemented
or updated from time to time, the "**Budget Covenants**"),
the Borrower is hereby authorized to (i) borrow under
the Revolving DIP Facility in an aggregate outstanding
principal amount not to exceed $10,000,000, and (ii) incur
the Roll Up DIP Loans. All DIP Obligations of the
Borrower shall be unconditionally guaranteed by each of
the Guarantors on a joint and several basis, in each case
as further provided in the DIP Loan Documents.

 **\*11**  (c) *Application of DIP Facilities and DIP Collateral
Proceeds.* The proceeds of the DIP Facilities and DIP
Collateral (in each case net of any amounts used to pay
fees, costs and expenses pursuant to, and in accordance
with, the DIP Loan Documents, the Interim Order and
this Final Order) shall be used in accordance with the
terms and conditions of the DIP Loan Documents,
the Interim Order and this Final Order, including,
without limitation, the Budget Covenants, solely for (i)
working capital; (ii) other general corporate purposes
of the Debtors (including intercompany loans and
investments solely to the extent permitted by the DIP
Loan Documents, the Interim Order and this Final

Order); (iii) payment of any related transaction costs, fees,
costs and expenses; and (iv) the costs of administration
of the Cases. Without limiting the foregoing, the Debtors
shall not be permitted to make any payments on account
of any prepetition debt or obligation prior to the effective
date of the Plan (as defined below) or any other Chapter
11 plan or plans with respect to any of the Debtors, except
with respect to the prepetition obligations as set forth in
the Interim Order, this Final Order or as other provided
in the First Day Orders (as defined in the DIP Credit
Agreement), (which First Day Orders shall be in form and
substance acceptable to the DIP Agents) or as otherwise
provided in the DIP Credit Agreement. A copy of the
Initial Approved Budget is attached to the Interim Order
as Exhibit A.

(d) *Conditions Precedent.* The DIP Secured Parties shall
have no obligation to make any DIP Loan or other
extension of credit or financial accommodation in respect
of the DIP Facilities or otherwise unless and until all
conditions precedent to the making of any such DIP Loan
or other extension of credit or financial accommodation
under the DIP Loan Documents, the Interim Order and
this Final Order have been satisfied in full or waived by the
requisite DIP Secured Parties in accordance with the DIP
Loan Documents, the Interim Order and this Final Order.

(e) *DIP Liens.* Effective as of the Petition Date,
and subject to the relative priorities among the DIP
Facilities, the Adequate Protection Super–Priority Claims
and Adequate Protection Replacement Liens, and the
Prepetition Credit Facilities, in each case as set forth
more fully in this Final Order (including in Paragraphs
2(e) and (f)), the DIP Administrative Agents (as provided
in the DIP Loan Documents and for itself and the
ratable benefit of the other DIP Secured Parties) are
hereby granted the following Liens (which, subject to
the provisions of Paragraph 6 hereof with respect to
the DIP Obligations in respect of the Roll Up DIP
Facility, shall immediately, and without any further
action by any Person, be valid, binding, permanent,
perfected, continuing, enforceable and non-avoidable)
on all property of the Debtors, now existing or
hereinafter acquired, including, without limitation, all
cash and cash equivalents (whether maintained with any
of the DIP Agents or otherwise), and any investment
in such cash or cash equivalents, money, inventory,
goods, accounts receivable, other rights to payment,
intercompany loans and other investments, investment

property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries (subject to the restriction set forth below), tax refunds, insurance proceeds, commercial tort claims, membership interests and other equity ownership interests, in joint ventures (collectively, the "**Joint Venture Entities**") (subject to the restrictions set forth below), all other Collateral (as defined in the DIP Credit Agreement) and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements and cash and noncash proceeds of all of the foregoing; *provided, however,* that notwithstanding any provision herein or in any DIP Loan Document to the contrary, no Debtor organized under U.S. law shall be required to pledge in excess of 65% of the voting capital stock of its direct foreign subsidiaries or any of the capital stock of its indirect foreign subsidiaries (all of the foregoing collateral collectively referred to as the "**DIP Collateral,**" and all such Liens granted to the DIP Administrative Agents as provided in the DIP Loan Documents and for the ratable benefit of the DIP Secured Parties pursuant to this Final Order, the Interim Order and the DIP Loan Documents, the "**DIP Liens**"):

   **\*12** (I) pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, non-avoidable, first priority Lien on all unencumbered DIP Collateral, including, without limitation, the Debtors'\* claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law and the proceeds thereof ("**Avoidance Actions**"), whether received by judgment, settlement or otherwise;

   (II) pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior Lien upon all DIP Collateral that is subject to (x) valid, enforceable, non-avoidable and perfected Liens in existence on the Petition Date that, after giving effect to any intercreditor or subordination agreement, are senior in priority to

the Prepetition Liens, (y) Liens in favor of AFCO Premium Credit LLC ("**AFCO**") with respect to any and all unearned premiums and dividends (but not loss payments) which may become payable under the financed insurance policies listed on insurance premium financing agreement between the Debtors and AFCO, and (z) valid, enforceable and non-avoidable Liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and after giving effect to any intercreditor or subordination agreement, are senior in priority to the Prepetition Liens, other than, in the case of clause (II)(x) or (II)(z), Liens which are expressly stated to be primed by the Liens to be granted to the DIP Administrative Agents described in clause (III) below (subject to such exception, the "**Prepetition Senior Liens**"); and

(III) pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming Lien on all DIP Collateral (including, without limitation, Cash Collateral) that is senior to (x) the existing respective Liens in favor of the applicable Prepetition Secured Parties and securing the Prepetition First Lien Indebtedness or the Prepetition Second Lien Indebtedness, as applicable or (y) any existing Liens in favor of any other person or entity (other than the Prepetition Senior Liens), including, without limitation, all Liens junior to the Prepetition First Liens or the Prepetition Second Liens (the Liens referenced in clauses (x) and (y), collectively, the "**Primed Liens**"), which Primed Liens, together with any Liens granted on or after the Petition Date to provide adequate protection in respect of any Primed Liens, shall be primed by and made subject and subordinate to the perfected first priority senior priming DIP Liens.

(f) *DIP Lien Priority.* Notwithstanding anything to the contrary contained in this Final Order, the Interim Order or the other DIP Loan Documents, and for the avoidance of doubt, the DIP Liens granted to the DIP Administrative Agents for the DIP Secured Parties shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Senior Liens and to the extent provided in the provisions of this Final Order, the Interim Order and the DIP Loan Documents, shall also be subject to the Carve–Out, and (ii) except as provided in clause (i), are senior to all other prepetition and postpetition Liens of any other person or entity (including, without limitation, the Primed Liens and the

Adequate Protection Replacement Liens). The DIP Liens and the DIP Super–Priority Claims (i) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (ii) shall not be subordinate to, or pari passu with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, or (y) any intercompany or affiliate Liens of the Debtors, and (iii) subject to the provisions of Paragraph 6 hereof, shall be valid and enforceable against any trustee or any other estate representative appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "Successor Case"), and/or upon the dismissal of any of the Cases.

**\*13** (g) *Relative Lien Priority of DIP Facilities.* Notwithstanding anything to the contrary herein, all Letters of Credit (as defined in Prepetition First Lien Credit Agreement) shall be deemed to constitute Letters of Credit, as defined in, and as issued in connection with the DIP Credit Agreement, and accordingly, from and after the Petition Date all L/C Exposure in respect of such Letters of Credit shall constitute part of the DIP Obligations in respect of the Revolving DIP Credit Facility and be ratably allocable to the Revolving DIP Lenders in accordance with the terms of the DIP Loan Documents, and upon closing of the DIP Facilities, none of the Prepetition First Lien Lenders and Roll Up DIP Lenders shall have any further liability with respect to such L/C Exposure; *provided, however,* that nothing herein shall alter any such parties' obligations as the issuer of any Letters of Credit. Notwithstanding anything to the contrary herein, the relative rights and priorities of the Revolving DIP Secured Parties and the Roll Up DIP Secured Parties in respect of the DIP Collateral shall be as provided in the DIP Credit Agreement.

(h) *Enforceable Obligations.* The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the applicable Debtors, which DIP Obligations shall be enforceable against such Debtors, their estates and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms. Subject to the provisions of Paragraph 6 hereof with respect to the DIP Obligations in respect of the Roll Up DIP

Facility, no obligation, payment, transfer or grant of security under the DIP Credit Agreement, the other DIP Loan Documents, the Interim Order or this Final Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise) counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(i) *Super–Priority Administrative Claim Status.* In addition to the DIP Liens granted herein, effective as of the Petition Date, subject to Paragraph 15 hereof, all of the DIP Obligations shall constitute allowed super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve–Out to the extent specifically provided in the DIP Loan Documents, the Interim Order and this Final Order, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Super–Priority Claims), unsecured claims and all other claims against the applicable Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other nonconsensual Lien, levy or attachment (the "**DIP Super–Priority Claims**"). Subject to Paragraph 15 hereof, the DIP Super–Priority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each other Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, 100% of the capital stock of any first tier foreign subsidiary of any Debtor and all Avoidance Actions. Other than as provided in

the DIP Credit Agreement, the Interim Order and this Final Order with respect to the Carve–Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens and the DIP Super–Priority Claims or the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder. The DIP Super–Priority Claims granted hereunder to the Roll Up DIP Secured Parties shall be immediately junior in priority and subject to the DIP Super–Priority Claims of the Revolving DIP Secured Parties.

**\*14**  (j) *Events of Default for Breach of Plan Support Agreement and Plan Confirmation Timetable.* Any breach by the Debtors of (i) their covenants and other undertakings in that certain Equity Commitment and Plan Support Agreement dated as of September 29, 2009 (the "**PSA**") by and among the Debtors, certain investors and certain Prepetition Secured Parties or (ii) the timetable and other covenants set forth in Section 5.13 of the DIP Credit Agreement for the filing, confirmation and consummation of the Plan (as defined in the PSA) shall constitute an immediate Event of Default under the DIP Credit Agreement.

### 3. *Authorization to Use Cash Collateral and Proceeds of DIP Facilities.*

Subject to the terms and conditions of this Final Order, the Interim Order and the DIP Loan Documents, including without limitation, the Budget Covenants, (a) each applicable Debtor is authorized to use proceeds of DIP Loans from and after the Closing Date (as defined in the DIP Credit Agreement), and (b) each applicable Debtor is authorized to use all Cash Collateral, and each Debtor shall be enjoined and prohibited from any time using proceeds of DIP Loans or Cash Collateral except in accordance with the terms and conditions of this Final Order, the Interim Order and the DIP Loan Documents. The Prepetition Secured Parties are directed to promptly turn over to the Revolving DIP Administrative Agent until Payment in Full of the Revolving DIP Obligations and then to the Roll Up DIP Agent all Cash Collateral received or held by them that had not been applied to the Prepetition First Lien Indebtedness or Prepetition Second Lien Indebtedness, as

applicable, prior to the Petition Date; *provided, however,* that the Prepetition Secured Parties are granted adequate protection for any aggregate postpetition Diminution in Value of their respective prepetition interests in the applicable Prepetition Collateral as hereinafter set forth. The applicable Debtors' right to use proceeds of DIP Loans, DIP Collateral, Prepetition Collateral and Cash Collateral shall terminate (i) automatically upon the occurrence of the Maturity Date, or (ii) immediately upon notice to such effect by the applicable DIP Administrative Agent to the Debtors after the occurrence and during the continuance of an Event of Default (the applicable termination date specified in clause (i) or (ii) above, the "**Cash Collateral Termination Date**").

4. *Adequate Protection for Prepetition Secured Parties.* As adequate protection for the respective interests of the Prepetition Secured Parties in the respective Prepetition Collateral (including Cash Collateral) for, and in an aggregate amount equal to, the diminution in value (collectively, "**Diminution in Value**") of such interests from and after the Petition Date, calculated in accordance with section 506(a) of the Bankruptcy Code, whether or not resulting from the use, sale or lease by the Debtors of the applicable Prepetition Collateral (including Cash Collateral), the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve–Out, the imposition or enforcement of the automatic stay of section 362(a) or otherwise, the Prepetition Secured Parties shall receive the following adequate protection (collectively referred to as the "**Prepetition Secured Parties' Adequate Protections**"):

**\*15**  (a) *Adequate Protection Replacement Liens.* Solely to the extent of any aggregate postpetition Diminution in Value of the prepetition interests of the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties, as applicable, in the applicable Prepetition Collateral, the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, senior replacement Liens upon all of the DIP Collateral, including any Avoidance Actions (the adequate protection replacement liens granted to the Prepetition First Lien Secured Parties, the "**First Priority Adequate Protection Replacement Liens**" and the adequate protection replacement liens granted to the Prepetition Second Lien Secured Parties, the "**Second Priority**

**Adequate Protection Replacement Liens,**" and together with the First Priority Adequate Protection Replacement Liens, collectively, the "**Adequate Protection Replacement Liens**") which Adequate Protection Replacement Liens on such DIP Collateral shall be subject and subordinate to the DIP Liens, the Permitted Senior Liens, and the payment of the Carve–Out to the extent expressly provided in the DIP Loan Documents, the Interim Order and this Final Order, and shall have the relative priorities set forth in Paragraph 4(g).

(b) *Adequate Protection Super–Priority Claims.* Solely to the extent that their respective Adequate Protection Replacement Liens have failed to provide adequate protection, and in such event solely to the extent of any applicable Diminution in Value not adequately protected by such Adequate Protection Replacement Liens, the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties are hereby granted, subject to the payment of the DIP Super–Priority Claims and the Carve Out to the extent provided herein and in the DIP Loan Documents, allowed super-priority administrative claims (the adequate protection super-priority claims granted to the Prepetition First Lien Secured Parties, the "**First Priority Adequate Protection Super–Priority Claims**" and the adequate protection super-priority claims granted to the Prepetition Second Lien Secured Parties, the "**Second Priority Adequate Protection Super– Priority Claims,**" and together with the First Priority Adequate Protection Super–Priority Claims, collectively, the "**Adequate Protection Super–Priority Claims**") as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the DIP Super–Priority Claims and payable from and having recourse to all to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, 100% of the capital stock of any first tier foreign subsidiary of any Debtor and all Avoidance Actions; *provided, however,* that (i) the respective Adequate Protection Super–Priority Claims of the Prepetition Secured Parties shall have the relative priorities set forth in Paragraph 4(g) hereof, and (ii) the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Super–Priority Claims unless and until (x) all DIP Obligations have indefeasibly been paid in full in cash or, in the case of letters of credit or other DIP Obligations which survive termination, cash collateralized, in each case, in accordance with the DIP Loan Documents, the Interim Order and this Final Order

(or, in the case of the Roll Up DIP Facility, provided the treatment set forth in the Plan, if confirmed and effective, or as otherwise allowed under section 1129(a) of the Bankruptcy Code, this Final Order, the Interim Order and the DIP Loan Documents) and (y) all Revolving Credit Commitments under the DIP Loan Documents have been irrevocably terminated (the conditions described in clauses (ii)(x) and (ii)(y), collectively, "**Paid in Full**" or "**Payment in Full**") and (iii) the Adequate Protection Super–Priority Claims granted to the Prepetition First Lien Secured Parties or the Prepetition Second Lien Secured Parties may be impaired pursuant to the Plan or any other Chapter 11 plan of reorganization in the Cases with the vote of the applicable class of the holders of such claims that satisfies the requirements of Section 1126 of the Bankruptcy Code. Subject to the relative priorities set forth above, the Adequate Protection Super–Priority Claims against each Debtor shall be against each Debtor on a joint and several basis.

**\*16** (c) *Adequate Protection Payments.* In addition to the foregoing, the Prepetition First Lien Secured Parties shall receive from the Debtors, promptly after receipt of invoices therefor, additional adequate protection in the forms of (i) immediate cash payment of all accrued and unpaid prepetition interest (at the applicable default rate of interest) and all accrued unpaid reimbursable fees, costs and expenses, in each case as provided for, and to the extent permitted, in the Prepetition First Lien Loan Documents; and (ii) cash payment as and when due of all interest (at the applicable default rate of interest) and, subject to the provisions of Paragraph 20(a) hereof, all reimbursable fees, costs and expenses (including, without limitation, the fees and expenses of counsel and the fees, expenses and transaction fee for financial advisors), in each case as provided for, and to the extent permitted, in the Prepetition First Lien Loan Documents and retention agreements permitted thereunder, during the period from and including the Petition Date through and including the Cash Collateral Termination Date, and without the need to file (or for the applicable professionals to file) any applications for payment of same. In addition to the foregoing, subject to the provisions of Paragraph 20(a) hereof, the Prepetition Second Lien Secured Parties shall receive cash payment as and when due of all reimbursable fees, costs and expenses of the Second Lien Agent in an aggregate amount not to exceed $25,000, in each case as provided for, and to the extent permitted, in the Prepetition Second Lien

Loan Documents and retention agreements permitted thereunder, during the period from and including the Petition Date through and including the Cash Collateral Termination Date and without the need to file (or for the applicable professionals to file) any applications for payment of same (all payments referenced in this sentence and the immediately preceding sentence, collectively, the "**Adequate Protection Payments**"). The invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential or sensitive information and subject to a full reservation of all applicable privileges and work product doctrine).

(d) *Monitoring of Prepetition Collateral.* The Prepetition First Lien Agents shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors, which consultants and advisors shall be given reasonable access for purposes of monitoring the businesses of the Debtors and the value of the DIP Collateral and/or Prepetition Collateral,

(e) *Financial Reporting.* The Debtors shall concurrently provide the Prepetition Agents with copies of all written reports that are provided to the DIP Agents pursuant to the DIP Loan, the Interim Order and this Final Order.

(f) *Right to Seek Additional Adequate Protection.* Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties. However, any Prepetition Secured Party may request further or different adequate protection, and the Debtors or any other party in interest may contest any such request; provided that any such further or different adequate protection shall at all times be subordinate and junior to the claims and Liens of the DIP Secured Parties granted under this Final Order, the Interim Order and the DIP Loan Documents and that any such further or different adequate protection granted to the Prepetition Second Lien Secured Parties shall at all times be subordinate and junior to the claims and Liens of the Prepetition First Lien Secured Parties granted under this Final Order, the Interim Order and the Prepetition First Lien Loan Documents.

**\*17** (g) *Priorities Among Prepetition Secured Parties.* Notwithstanding anything to the contrary herein or in any other order of this Court, in determining the relative priorities and rights of the Prepetition Secured Parties (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the Prepetition Secured Parties' Adequate Protections and the Adequate Protection Liens), (i) the Second Priority Adequate Protection Replacement Liens and the Second Priority Adequate Protection Super–Priority Claims shall be immediately junior in priority and subject to the First Priority Adequate Protection Replacement Liens and the First Priority Adequate Protection Replacement Liens, respectively, and (ii) all other such relative priorities and rights shall continue to be governed by the Prepetition Loan Documents and the Prepetition Intercreditor Agreement.

(h) *Consent to Priming and Adequate Protection.* Pursuant to the PSA, the Prepetition First Lien Administrative Agent and the requisite Prepetition First Lien Lenders and the requisite Prepetition Second Lien Lenders, in each case, on behalf of all Prepetition First Lien Secured Parties or all Prepetition Second Lien Secured Parties, as the case may be, consent to the adequate protection and the priming provided for herein; *provided, however,* that the consent of the Prepetition Secured Parties to the priming of their Prepetition Liens, the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Final Order and such consent shall not be deemed to extend to any other replacement financing or debtor in possession financing other than the DIP Facilities provided under the DIP Loan Documents; and *provided, further,* that such consent shall be of no force and effect in the event this Final Order is not entered and the DIP Loan Documents and DIP Facilities as set forth herein are not approved; and *provided, further,* that in the event of the occurrence of the Maturity Date, nothing herein shall alter the burden of proof set forth in the applicable provisions of the Bankruptcy Code at any hearing concerning the continued use of Prepetition Collateral (including Cash Collateral) by the Debtors.

5. ***Automatic Postpetition Lien Perfection.*** This Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens and the Adequate Protection Replacement Liens without the necessity of (a) filing or recording

any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Replacement Liens or to entitle the DIP Liens and the Adequate Protection Replacement Liens to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Agents and Prepetition Agents (in the latter case, solely with respect to the Adequate Protection Replacement Liens) may, each in their sole discretion, file financing statements, mortgages, security agreements, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time and on the Petition Date. The applicable Debtors shall execute and deliver to the DIP Agents and/or the Prepetition Agents, as applicable, all such financing statements, mortgages, notices and other documents as such parties may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and the Adequate Protection Replacement Liens, as applicable, granted pursuant hereto. Without limiting the foregoing, each of the DIP Agents and Prepetition Agents, each in its discretion, may file (to the extent not filed pursuant to authorization of the Interim Order) a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order. To the extent that any Prepetition Agent is the secured party under any account control agreements, listed as loss payee under any of the Debtors' insurance policies or is the secured party under any Prepetition Loan Document, each DIP Administrative Agent shall also be deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies and the secured party under each such Prepetition Loan Document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured parties in accordance with the DIP Loan Documents and second, subsequent to indefeasible Payment in Full of all DIP Obligations, for the benefit of the Prepetition Secured Parties. Each Prepetition Agent shall serve as agent for the DIP Administrative Agents for purposes of perfecting their respective Liens on all DIP Collateral that is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

**\*18**  6. ***Reservation of Certain Third Party Rights and Bar of Challenges and Claims.*** **Subject to the reservation of rights set forth in this Paragraph, the Debtors' Stipulations shall be binding upon the Debtors in all circumstances. The Debtors' Stipulations shall be binding upon each other party in interest, unless any such other party in interest other than the Debtors (or if the Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Cases) commences, by the earlier of (x) the date specified in the applicable Local Rules or (y) the initial deadline set by the Court for objections to the confirmation of any plan of reorganization for the Debtors (such time period established by the earlier of clauses (x) and (y) shall be referred to as the "Challenge Period,"** and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period, shall be referred to as the "**Challenge Period Termination Date**"), (i) a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Debtors' Stipulations, or (ii) a contested matter or adversary proceeding against any or all of the Prepetition First Lien Secured Parties in connection with or related to the Prepetition First Lien Indebtedness (including, without limitation, the roll-up of $80 million such Prepetition First Lien Indebtedness into the Roll Up DIP Loans), or the actions or inactions of any of the Prepetition First Lien Secured Parties arising out of or related to the Prepetition First Lien Indebtedness or otherwise, including, without limitation, any claim against the Prepetition First Lien Secured Parties in the nature of a "lender liability" causes of action, setoff, counterclaim or defense to the Prepetition First Lien Indebtedness (including but not limited to those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition First Lien Secured Parties) (the objections, challenges, actions and claims referenced in clauses (a)(i) and (ii), collectively, the "**Claims and Defenses**"); provided that

as to the Debtors, for themselves and not their estates, all such Claims and Defenses are irrevocably waived and relinquished as of the Petition Date. If no Claims and Defenses have been timely asserted in any such adversary proceeding or contested matter, then, upon the Challenge Period Termination Date, and for all purposes in these Cases and any Successor Case, (i) all payments made to the Prepetition First Lien Secured Parties pursuant to this Final Order or otherwise shall not be subject to counterclaim, set-off, subordination, recharacterization, defense or avoidance, (ii) any and all such Claims and Defenses by any party in interest shall be deemed to be forever released, waived and barred, (iii) the Prepetition First Lien Indebtedness shall be deemed to be an allowed secured claim within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations, including the release provisions therein, shall be binding on all parties in interest. Notwithstanding the foregoing, to the extent any Claims and Defenses are timely asserted in any such adversary proceeding or contested matter, (i) the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on, if applicable, any chapter 7 trustee in any Successor Case, and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such adversary proceeding or contested matter, and (ii) any portion of the Debtors' Stipulations or other provisions in clauses (i) through (iv) in the immediately preceding sentence that is the subject of a timely field Claim and Defense shall become binding and preclusive on, if applicable, any chapter 7 trustee in any Successor Case, and on any other party in interest to the extent set forth in any order of the Court resolving such Claim and Defense. The Challenge Period in respect of the Prepetition First Lien Credit Facility may be extended by written agreement of the Prepetition First Lien Agents in their sole discretion or pursuant to Court order for cause shown. Nothing in this Final Order vests or confers on any person or entity standing or authority to pursue any cause of action belonging to any or all of the Debtors or their estates, including, without limitation, any Claim and Defense or other claim against any Prepetition First Lien Secured Parties or the DIP Secured Parties.

*19 7. *Carve Out.* Subject to the terms and conditions contained in this Paragraph 7, each of the DIP Liens, DIP Super–Priority Claims, Prepetition Liens, Adequate Protection Replacement Liens and Adequate Protection Super–Priority Claims shall be subject and subordinate to payment of the Carve–Out (as defined below) solely in the event of the delivery of a Carve–Out Trigger Notice (as defined below) after the occurrence and during the continuance of an Event of Default under, and as defined in, the DIP Loan Documents:

(a) For purposes of this Final Order, "**Carve–Out**" means (i) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), whether arising prior to or after the delivery of the Carve–Out Trigger Notice; (ii)(x) all unpaid fees and expenses incurred by professionals retained by the Debtors in these Cases (collectively, the "**Professionals**") that are incurred prior to the delivery by the applicable DIP Administrative Agent of a Carve–Out Trigger Notice (as defined below) and are allowed by the Court under sections 105(a), 330 and 331 of the Bankruptcy Code or otherwise, and that remain unpaid after application of available funds remaining in the Debtors' estates for such creditors and (y) in an aggregate amount not to exceed $500,000 (the "**Carve–Out Cap**"), all unpaid and allowed fees and expenses of Professionals that are incurred after the delivery of a Carve–Out Trigger Notice and that remain unpaid after application of available funds remaining in the Debtors' estates for such creditors (clauses (i), (ii)(x) and (ii)(y), collectively, the "**Carve–Out**"). The term "**Carve–Out Trigger Notice**" shall mean a written notice delivered by either DIP Administrative Agent to the Debtors' lead counsel, the other DIP Administrative Agent, and the U.S. Trustee appointed in these Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default under the DIP Loan Documents, expressly stating that the Carve–Out (and the Carve–Out Cap) is invoked.

(b) Following the delivery of the Carve–Out Trigger Notice after the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, any payments actually made pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503 or 1103 or otherwise, to such Professionals shall (i) not be paid from the proceeds of any DIP Loan, DIP Collateral, Prepetition Collateral or Cash Collateral until such time as all retainers, if any,

held by such Professionals have been reduced to zero, and (ii) in the case of any payments made on account of any fees and expenses described in clause (ii)(y) of the definition of Carve–Out, reduce the Carve–Out Cap on a dollar-for-dollar basis. So long as no Carve–Out Trigger Notice has been delivered, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. §§ 328, 330 and 331, as the same may be due and payable, and any such compensation and expenses previously paid, or accrued but unpaid, prior to the delivery of the Carve–Out Trigger Notice shall not reduce the Carve–Out or the Carve–Out Cap.

**\*20** (c) The DIP Revolving Administrative Agent shall be entitled to establish and maintain reserves against borrowing availability under the DIP Facilities on account of the Carve–Out in accordance with the terms of the DIP Credit Agreement.

(d) Notwithstanding any provision in this Paragraph 7 to the contrary, no portion of the Carve–Out, Cash Collateral, Prepetition Collateral, DIP Collateral or proceeds of the DIP Facilities shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 14 hereof.

(e) Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any other official or unofficial committee in these Cases, or of any other person or entity, or shall affect the right of any DIP Secured Party or any Prepetition Secured Party to object to the allowance and payment of such fees and expenses.

8. *Waiver of Section 506( c) Claims.* As a further condition of the DIP Facilities and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and their consent to the payment of the Carve–Out to the extent provided herein), no costs or expenses of administration of the Cases or any Successor Case shall be charged against or recovered from or against any or all of the DIP Secured Parties, the Prepetition First Lien Secured Parties, the DIP Collateral, the Prepetition First Lien Collateral and the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agents or the Prepetition First Lien Agents, as the case may be, and no such consent shall be

implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties and the Prepetition First Lien Secured Parties.

9. *After–Acquired Property.* Except as otherwise provided in this Final Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date including, without limitation, in respect of the Prepetition Credit Facilities, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date which is not subject to subordination under the Bankruptcy Code or other provisions or principles of applicable law.

10. *Protection of DIP Secured Parries' Rights.*
(a) Until such time that all DIP Obligations have been Paid in Full, each Prepetition Secured Party shall (i) not exercise any right or remedy relating to the DIP Collateral, including without limitation, seeking relief from the automatic stay, seeking any sale, realization upon repossession or liquidation of any property, or taking any action to foreclose upon or recover in connection with the Liens granted in respect of the Prepetition First Lien or Second Lien Credit Facilities (including, without limitation, the Prepetition Liens and the Adequate Protection Replacement Liens), or otherwise exercise remedies against any DIP Collateral, (ii) be deemed to have consented to any and all releases of DIP Collateral authorized under the DIP Loan Documents or otherwise consented to by the requisite DIP Secured Parties (provided that the Liens of the Prepetition Secured Parties attach to the proceeds of any disposition of such released DIP Collateral with the same priorities as provided herein), and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of Lien or similar instruments, or otherwise take any action to perfect their Liens on the DIP Collateral unless, solely as to this clause (iii) and solely with respect to the Adequate Protection Replacement Liens, any DIP Agent files financing statements or other documents to perfect the Liens granted pursuant to this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable Liens as of the Petition Date.

**\*21**  (b) Unless the requisite DIP Secured Parties under the DIP Loan Documents shall have provided their prior written consent or all DIP Obligations have been indefeasibly Paid in Full (or will be indefeasibly Paid in Full upon entry of a final, non-appealable order approving indebtedness described in clause (ii) of this subsection (b)), there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with (x) the DIP Liens, DIP Super–Priority Claims and other DIP Protections granted pursuant to this Final Order to the DIP Secured Parties or (y) the Prepetition First Liens, the First Priority Adequate Protection Replacement Liens, the First Priority Adequate Protection Super–Priority Claims and the other Prepetition Secured Parties\* Adequate Protections granted to the Prepetition First Lien Secured Parties; or (ii) the use of Cash Collateral for any purpose other than to indefeasibly Pay in Full the DIP Obligations or as otherwise permitted in the DIP Loan Documents, the Interim Order and this Final Order.

(c) The Debtors (and/or their legal and financial advisors in the case of clauses (ii) through (iv) below) will (i) maintain books, records and accounts to the extent and as required by the DIP Loan Documents, (ii) cooperate, consult with, and provide to the DIP Agents all such information as required or allowed under the DIP Loan Documents or the provisions of the Interim Order or this Final Order, (iii) permit representatives of the DIP Agents such rights to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees and independent public accountants as and to the extent required by the DIP Loan Documents, and (iv) permit representatives of the DIP Agents to consult with the Debtors' management and advisors on matters concerning the general status of the Debtors' businesses, financial condition and operations.

11. *Cash Collection.* Cash collections (including, but not limited to, payments from customers with respect to accounts receivable) constituting proceeds of DIP Collateral shall be directed to lock-box and/or deposit accounts ("**Cash Collection Accounts**") pursuant to blocked account agreements in form and substance acceptable to, and in favor of, any Prepetition First Lien Agent or any DIP Administrative Agent pursuant to a structure reasonably satisfactory to the DIP Agents and in compliance with the Cash Management Order (as defined below). Upon the direction of the applicable DIP Administrative Agent at any time after the occurrence of an Event of Default, all proceeds in the Cash Collection Accounts shall be remitted to the Revolving DIP Administrative Agent until Payment in Full of the Revolving DIP Obligations and then to the Roll Up DIP Agent for application to the DIP Obligations, and the DIP Administrative Agents shall take all action that is necessary or appropriate to effectuate the foregoing. Unless otherwise agreed to in writing by the DIP Administrative Agents, the Debtors shall maintain no accounts except those identified in any order of the Court approving the Debtors' cash management system (the "**Cash Management Order**"). The Debtors and the financial institutions where the Debtors' cash collection accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit funds in such Cash Collection Accounts upon receipt of any direction to that effect from the applicable DIP Administrative Agent. The Debtors are authorized to incur obligations and liabilities for treasury, depositary or cash management services, including without limitation, overnight overdraft services, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services provided on a postpetition basis by any financial institution at which any Cash Collection Account is maintained; *provided, however,* that (i) any Lien securing any such obligations shall be junior to the DIP Lien on the funds in the cash collection accounts at such financial institution, and (ii) except to the extent otherwise required by the Court, nothing herein shall require any DIP Secured Party or Prepetition Secured Party to incur any overdrafts or provide any such services or functions to the Debtors.

**\*22** 12. *Disposition of DIP Collateral.* The Debtors shall not sell, transfer, lease, encumber or otherwise dispose

of any portion of the DIP Collateral without the prior written consent of the requisite DIP Secured Parties under the DIP Loan Documents (and no such consent shall be implied from any other action, inaction or acquiescence by any DIP Secured Party or any order of this Court), except for sales of inventory in the ordinary course of business or except as otherwise permitted in the DIP Loan Documents, the Interim Order and this Final Order and approved by the Court to the extent required under applicable bankruptcy law. Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral shall be remitted to the Revolving DIP Administrative Agent until Payment in Full of the Revolving DIP Obligations and then to the Roll Up DIP Agent for application to the DIP Obligations in accordance with the terms of the DIP Loan Documents.

13. *Events of Default.*

(a) *Rights and Remedies Upon Event of Default.* Any automatic stay otherwise applicable to the DIP Secured Parties is hereby modified, without requiring prior notice to or authorization of, this Court, to the extent necessary to permit the DIP Secured Parties to exercise (i) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under this Final Order, the Interim Order and the DIP Loan Documents other than those rights and remedies against the DIP Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the continuance of an Event of Default and the giving of five business days' prior written notice (the "**Enforcement Notice**") to the Debtors (with a copy to the United States Trustee, the Prepetition Agents and the Prepetition Indenture Trustee), all rights and remedies against the DIP Collateral provided for in any DIP Loan Documents or applicable law (including, without limitation, the right to set off against accounts maintained by the Debtors with any DIP Agent, any other DIP Secured Party, any Prepetition Secured Party or any of their respective affiliates); *provided, however,* that notwithstanding anything to the contrary in clause (ii) above, immediately following the giving of an Enforcement Notice by the applicable DIP Administrative Agent; (w) the Debtors shall deliver and cause the delivery of the proceeds of DIP Collateral to the Revolving DIP Administrative Agent until Payment in Full of the Revolving DIP Obligations and then to the Roll Up DIP Agent as provided in the DIP Loan Documents; (x) the

applicable DIP Administrative Agent shall apply such proceeds in accordance with the provisions of the DIP Loan Documents; (y) the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of the DIP Obligations and the payment of the Carve–Out, as provided herein and in the applicable DIP Loan Documents; and (z) any obligation otherwise imposed on any or all of the DIP Agents and the other DIP Secured Parties to provide any loan, advance or other financial accommodation to the Debtors pursuant to the DIP Facilities shall immediately be suspended. Following the giving of an Enforcement Notice by the applicable DIP Administrative Agent, the Debtors shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether an Event of Default has occurred, and section 105 of the Bankruptcy Code may not be invoked by the Debtor or any other party in interest to restrict or preclude any DIP Secured Party from exercising any rights or remedies set forth in this Final Order, the Interim Order or the DIP Loan Documents. If the Debtors do not contest the right of the DIP Secured Parties to exercise their rights and remedies based upon whether an Event of Default has occurred within such five business-day time period or if the Debtors do timely contest the occurrence of an Event of Default and the Court after notice and hearing declines to find that no such Event of Default has occurred, the automatic stay, as to the DIP Secured Parties, shall automatically terminate at the end of such notice period.

**\*23** (b) Subject to the provisions of Paragraph 13(a), upon the occurrence of an Event of Default, the DIP Agents and the other DIP Secured Parties are authorized to exercise their rights and remedies and to proceed against any or all of the DIP Collateral under or pursuant to the DIP Loan Documents, the Interim Order, this Final Order and applicable law, including without limitation, exercising any of the Debtors' rights with respect to the Debtors' interests in the Joint Venture Entities and the Debtors' interests in leaseholds, including without limitation, selling, leasing or otherwise transferring any of the Debtors' interests in any Joint Venture Entity or leasehold notwithstanding any contractual provision that would otherwise prohibit, restrict, condition or delay any or all of the DIP Agents and the other DIP Secured Parties from taking any such action. All proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties shall be turned over to the Revolving DIP Administrative Agent until Payment in

Full of the Revolving DIP Obligations and then to the Roll Up DIP Agent for application to the DIP Obligations under, and in accordance with the provisions of, the DIP Loan Documents; provided, that in the event of liquidation of the Debtors' estates after an Event of Default and the termination of the Revolving Credit Commitments, the unused amount of the Carve–Out shall be funded into a segregated account exclusively (i) first, from proceeds of any unencumbered assets of the Debtors, and (ii) then from Cash Collateral received by any DIP Agent subsequent to the date of termination of the Revolving Credit Commitments and prior to the distribution of any such Cash Collateral to any other parties in interest.

(c) The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (i) permit the Debtors to grant the Adequate Protection Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Prepetition Secured Parties and the DIP Secured Parties under the DIP Loan Documents, the DIP Facilities, the Interim Order and this Final Order, (ii) authorize the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments hereunder, and (iii) otherwise to the extent necessary to implement and effectuate the provisions of this Final Order.

14. *Restriction on Use of Proceeds.* Notwithstanding anything herein to the contrary, no proceeds from the DIP Facilities, DIP Collateral or proceeds thereof, Cash Collateral (including any prepetition retainer funded by the Prepetition Lenders), Prepetition Collateral or proceeds thereof, or any portion of the Carve–Out may be used by any of the Debtors, any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, or any other person, party or entity to (or to pay any professional fees and disbursements incurred in connection therewith) (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Secured Parties; (b) investigate (except as set forth below), assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Secured Parties, the Prepetition Secured

Parties, and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Claims and Defenses, any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of the DIP Obligations and/or the Prepetition First Lien or Second Lien Indebtedness, or the validity, extent, and priority of the DIP Liens, the Prepetition Liens, or the Adequate Protection Replacement Liens (or the value of any of the Prepetition Collateral or DIP Collateral); (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the other DIP Protections, the Prepetition Liens, the Adequate Protection Replacement Liens or the other Prepetition Secured Parties' Adequate Protections; (v) except to contest the occurrence or continuation of any Event of Default as permitted in Paragraph 13(a), any action seeking, or having the effect of, preventing, hindering or otherwise delaying any or all of the DIP Secured Parties' and the Prepetition Secured Parties' assertion, enforcement or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Loan Documents, the Prepetition Loan Documents, the Interim Order or this Final Order; and/or (vi) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties hereunder or under the DIP Loan Documents or the Prepetition Loan Documents.

*24 15. *Limitations in Respect of the Roll Up DIP Loans.* The full amount of the Roll Up DIP Loans will not be required to be repaid in cash on the Maturity Date, but instead shall be treated (i) in the manner set forth in the Plan, or (ii) in any other manner acceptable to the holders of Roll Up DIP Loans representing at least two-thirds in amount and more than one-half in number of all Roll Up DIP Loans (such holders, the "**Requisite Roll Up DIP Lenders**"). Notwithstanding the foregoing, if the Plan has not been confirmed and become effective by the outer date specified in the DIP Credit Agreement (or such later date to which the requisite DIP Secured Parties have agreed in writing), and unless the Requisite Roll Up DIP Lenders otherwise agree in writing, all DIP Obligations in respect

of the Roll Up DIP Facility shall become due and payable in full in cash.

16. [Intentionally omitted].

17. ***Proofs of Claim.*** The DIP Secured Parties and the Prepetition First Lien Secured Parties shall not be required to file proofs of claim evidencing the DIP Obligations, the DIP Protections or the Prepetition First Lien Indebtedness, as applicable, in the Cases or in any Successor Case.

18. ***Preservation of Rights Granted under the Final Order.***

(a) *No Non–Consensual Modification or Extension of Final Order.* Unless all DIP Obligations shall have been indefeasibly been Paid in Full, the Debtors shall not seek, and it shall constitute an Event of Default (resulting, among other things, in the termination of the Debtors' right to use Cash Collateral), if there is entered (i) an order amending, supplementing, extending or otherwise modifying this Final Order or (ii) an order converting or dismissing any of the Cases, in each case, without the prior written consent of the DIP Agents, and no such consent shall be implied by any other action, inaction or acquiescence.

(b) *Dismissal.* If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), to the fullest extent permitted by law, that the DIP Protections, the Prepetition Secured Parties' Adequate Protections and shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations have been indefeasibly Paid in Full and all Prepetition Secured Parties' Adequate Protections have been indefeasibly paid in full in cash or otherwise satisfied in full (and that all DIP Protections, Prepetition Secured Parties' Adequate Protections shall, notwithstanding such dismissal, remain binding on all parties in interest).

(c) *Modification of Final Order.* Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facilities contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed by a

subsequent order of this Court or any other court, the DIP Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur or stay shall affect (i) the validity, priority or enforceability of any DIP Protections, Prepetition Secured Parties' Adequate Protections granted or incurred prior to the actual receipt of written notice by the DIP Agents or the Prepetition Agents, as the case may be, of the effective date of such reversal, modification, vacatur or stay or (ii) the validity or enforceability of any Lien or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations, Prepetition Secured Parties' Adequate Protections. Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral or any DIP Obligations, Prepetition Secured Parties' Adequate Protections incurred or granted by the Debtors prior to the actual receipt of written notice by the DIP Agents or Prepetition Agents, as applicable, of the effective date of such reversal, modification, vacatur or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Secured Parties, the Prepetition Secured Parties shall be entitled to all of the DIP Protections, Prepetition Secured Parties' Adequate Protections, as the case may be, and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order and pursuant to the DIP Loan Documents with respect to all uses of Cash Collateral and all DIP Obligations and Prepetition Secured Parties' Adequate Protections.

**\*25** (d) *Survival of Final Order.* The provisions of this Final Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, and all of the DIP Protections, Prepetition Secured Parties' Adequate Protections, and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties, Prepetition Secured Parties shall survive, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization in any Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Case or providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court, or terminating the joint administration of these Cases or by any other act or omission. The terms and provisions of this Final

Order, including all of the DIP Protections, Prepetition Secured Parties' Adequate Protections and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties, Prepetition Secured Parties, shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections, Prepetition Secured Parties' Adequate Protections shall continue in these proceedings and in any Successor Case, and shall maintain their respective priorities as provided by this Final Order. Subject to the provisions of this Final Order, the Interim Order and the DIP Loan Documents that permit the treatment of the DIP Obligations under the Roll Up DIP Facility pursuant to the Plan or any other Chapter 11 plan with respect to any of the Debtors, the DIP Obligations shall not be discharged by the entry of an order confirming the Plan or any other such Chapter 11 plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

19. *Affiliate Payments; Inter–Debtor Borrowings.* Except as otherwise set forth in the Approved Budget or as otherwise agreed in writing by the DIP Agents and the requisite DIP Secured Parties in their sole discretion, and subject to the remainder of this Paragraph, no Debtor shall make any loans, advances, distributions, transfers or other payments of any kind whatsoever to any other Debtor or any Affiliate. All intercompany claims arising from any permitted postpetition loans, advances, distributions, transfers or other payments from any Debtor to another Debtor shall constitute administrative expense claims against the estate of the applicable borrowing Debtor, and shall be junior and subordinate to the DIP Obligations and the Prepetition First Lien Indebtedness and shall be subject to the DIP Liens, the DIP Super–Priority Administrative Claims, the Prepetition First Liens and the Adequate Protection Super–Priority Administrative Claims.

20. *Other Rights and Obligations.*
(a) *Expenses.* As provided in the DIP Loan Documents, the applicable Debtors will pay all reasonable expenses incurred by the DIP Agents (including, without limitation, the reasonable fees and disbursements of all counsel for GECC and Credit Suisse and any internal or third-party appraisers, consultants and auditors advising any DIP Agent) in connection with the preparation, execution, delivery and administration of the DIP Loan Documents, the Interim Order, this Final Order and any other

agreements, instruments, pleadings or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated. Payment of such fees shall not be subject to allowance by this Court. Copies of invoices submitted to the Debtors by professionals for the DIP Agents and the Prepetition First Lien Agents (collectively, the "**Lender Professionals**") shall be forwarded by the Debtors to the U.S. Trustee and such other parties as the Court may direct. The invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses (without limiting the right of the various professionals to redact privileged, confidential or sensitive information). If the Debtors or the U.S. Trustee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten (10) days of receipt of such invoices, the Debtors or U.S. Trustee, as the case may be, shall file and serve on such Lender Professionals an objection with the Court (the "**Fee Objection**") limited to the issue of reasonableness of such fees and expenses. The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order the undisputed fees, costs and expenses reflected on any invoice to which a Fee Objection has been timely filed.

**\*26** (b) *Binding Effect.* The provisions of this Final Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases, including, without limitation, the DP Secured Parties, the Prepetition Secured Parties, the Prepetition Note Parties, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; *provided, however,* that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(c) *No Waiver.* Neither the failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Final Order, the Interim Order, the Prepetition Loan Documents or otherwise (or any delay in seeking or exercising same), nor the failure of the DIP Secured Parties to seek relief or otherwise exercise their respective rights and remedies under this Final Order, the Interim Order, the DIP Loan Documents or otherwise (or any delay in seeking or exercising same), shall constitute a waiver of any of such parties* rights hereunder, thereunder, or otherwise. Except as expressly provided herein, nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Prepetition Secured Party or any DIP Secured Party, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion). Except as prohibited by this Final Order and the PSA, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the Prepetition Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law, to (i) request conversion of the Cases to cases under Chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code and the PSA, any Chapter 11 plan or plans with respect to any of the Debtors, or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties, respectively. Except to the extent otherwise expressly provided in this Final Order, neither the commencement of the Cases nor the entry of this Final Order shall limit or otherwise modify the rights and remedies of the Prepetition Secured Parties with respect to non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition Credit Facilities, applicable law or equity.

**\*27** (d) *No Third Party Rights.* Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary. In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order, the Interim Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates.

(e) *No Marshaling.* Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

(f) *Amendments.* The Debtors are authorized and empowered, without further notice and hearing or approval of this Court, to amend, modify, supplement or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case unless such amendment, modification, supplement or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of all of the DIP Lenders in respect of the DIP Facilities, (iii) changes the Maturity Date, or (iv) add or amend (in any respect unfavorable to the Debtors) any Event of Default or any financial covenant. No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of all the Debtors and the DIP Agents (after having obtained the approval of the requisite DIP Secured Parties as provided in the DIP Loan Documents) and, except as provided herein, approved by this Court.

(g) *Inconsistency.* In the event of any inconsistency between the terms and conditions of the DIP Loan Documents, the Interim Order and this Final Order, the provisions of this Final Order shall govern and control.

(h) *Enforceability.* This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable nunc pro tunc to the Petition Date immediately upon execution hereof Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and

there shall be no stay of execution or effectiveness of this Final Order.

(i) *Headings.* Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

**\*28** (j) *Retention of Jurisdiction.* The Bankruptcy Court has and will retain jurisdiction to enforce this Final Order according to its terms.

**All Citations**

Not Reported in B.R., 2009 WL 7226692

Footnotes

1    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: True Temper Sports, Inc. (2620), True Temper Corporation (4519), and True Temper Sports–PRC Holdings, Inc. (6895). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 8275 Tournament Drive, Suite 200, Memphis, Tennessee 38125.

2    Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the DIP Credit Agreement.

3    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**Appendix II**

H

2009 WL 7698528
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Delaware.

In re GOODY'S, LLC, et al., Debtors.

No. 09–10124 CSS.
|
March 3, 2009.

**Attorneys and Law Firms**

Jaime Luton, M. Blake Cleary, Margaret Whiteman Greecher, Matthew Barry Lunn, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Debtors.

Bradford J. Sandler, Pachulski Stang Ziehl & Jones LLP, Raymond Howard Lemisch, Benesch Friedlander Coplan & Aronoff, LL, Wilmington, DE, for Creditor Committee.

**FINAL ORDER (1) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION AND (III) MODIFYING THE AUTOMATIC STAY**

CHRISTOPHER S. SONTCHI, Bankruptcy Judge.

**\*1** THIS MATTER having come before the Court upon the motion of Goody's, LLC, and its direct and indirect subsidiaries, each as a debtor and debtor in possession (collectively the "*Borrowers*" or the "*Debtors*")[1] to (I) Authorize the Temporary Use of Cash Collateral, (II) Grant Adequate Protection and (III) Modify the Automatic Stay (the "*Motion*"), seeking entry of, among other things, this final order (this "*Final Order*").

The Court having considered the Motion, the Declaration of David G. Peek in Support of Chapter 11 Petitions and First Day Relief dated January 13, 2009, as amended on January 15, 2009, the exhibits attached thereto, the evidence submitted or adduced and the arguments of counsel made at the first interim hearing held on January 15, 2009 (the "*First Interim Hearing*"), the second interim hearing held on January 20, 2009 (the "*Second Interim Hearing*"), the third interim hearing held on February 5, 2009 (together with the First Interim Hearing and Second Interim Hearing, the "*Interim Hearings*"), and the final

hearing held on March 3, 2009 (the "*Final Hearing*"): and the Court having entered orders granting the relief requested in the Motion on an interim basis on January 15, 2009 (the "*First Interim Order*"), January 20, 2009 (the "*Second Interim Order*"), and February 5, 2009 (the "*Third Interim Order*") (collectively, the "*Interim Orders*"); and notice of the Final Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and 9014 and the Interim Orders; and the Final Hearing to consider the relief requested in the Motion on a final basis having been held and concluded; and all objections, if any, to entry of this Final Order having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the relief requested in the Motion on a final basis is fair and reasonable and in the best interests of the Debtors, their estates, and their creditors and equity holders, and is essential for the operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM AND FINAL HEARINGS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

A. There is a continuing need for the use of cash collateral of the Prepetition Secured Lenders (as defined herein);

B. Goody's, LLC has entered into that certain Agency Agreement dated January 6, 2009 with a joint venture of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC (the "*Agency Agreement*"). On January 20, 2009, the Court entered an order granting the Debtors' Motion to Assume Agency Agreement and for Related Relief (the "*Sale Motion*"), and authorizing the Debtors to assume the Agency Agreement;

C. The Borrowers have represented that they have, or had, valid, prior outstanding secured obligations as follows:

**\*2** (i) *Prepetition Revolver Obligations.* Pursuant to that certain Credit Agreement dated as of October 20, 2008 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, the "*Prepetition Revolver Credit Agreement*" and together with all other loan, guaranty, security and other documents executed in connection therewith, the "*Prepetition*

*Revolver Credit Documents* ") among the Borrowers, Goody's Parent LLC (the "*Guarantor*"). General Electric Capital Corporation, as Agent, Existing L/C Issuer, New L/C Issuer and Lender (the "*Prepetition Revolver Agent*"). GE Capital Markets, Inc., as Lead Arranger and Bookrunner, and the lenders that are parties thereto from time to time (collectively, together with the Prepetition Revolver Agent, the "*Prepetition Revolver Lenders*"), the Debtors were indebted to the Prepetition Revolver Lenders for monies borrowed and approximately $15 million in face amount of letters of credit, together with interest, fees, expenses, and all other "Obligations" as defined in the Prepetition Revolver Credit Documents (the "*Prepetition Revolver Obligations*"). On or about January 22, 2009 (the "*Repayment Date*"), the Prepetition Revolver Obligations were paid in full in cash and all letters of credit under the Prepetition Revolver Credit Agreement were cash collateralized by the Debtors;

(ii) *Prepetition Term Loan Obligations.* Pursuant to that certain Amended and Restated Term Loan Agreement dated as of October 20, 2008 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, the "*Prepetition Term Loan Agreement*" and together with all other loan, guaranty, security and other documents executed in connection therewith, the "*Prepetition Term Loan Credit Documents*", and together with the Prepetition Revolver Credit Documents, the "*Prepetition Senior Credit Documents*"), among the Borrowers, Guarantor, GB Merchant Partners, LLC, as Agent (the "*Prepetition Term Loan Agent*", and together with the Prepetition Revolver Agent, the "*Prepetition Senior Agents*") and the lenders that are parties thereto from time to time (collectively, together with the Prepetition Term Loan Agent, the "*Prepetition Term Loan Lenders*". and collectively with the Prepetition Revolver Lenders, the "*Prepetition Senior Secured Lenders*"), the Debtors were indebted to the Prepetition Term Loan Lenders in a principal amount of at least $10 million, together with interest, fees, expenses, and all other "Obligations" as defined in the Prepetition Term Loan Documents (the "*Prepetition Term Loan Obligations*" and together with the Prepetition Revolver Obligations, the "*Prepetition Senior Secured Obligations*"). On or about the Repayment Date, the principal, interest, fees, and expenses under the Prepetition Term Loan Agreement were paid in full in cash;

(iii) *Prepetition Tranche C Obligations* Pursuant to that certain Tranche C Credit Agreement dated as of October 20, 2008 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, the "*Prepetition Tranche C Loan Agreement*" and together with all other loan, guaranty, security and other documents executed in connection therewith, the "*Prepetition Tranche C Credit Documents*"), among the Borrowers, Guarantor, PGDYS Lending LLC, as Agent (the "*Prepetition Tranche C Agent*") and the lenders that are parties thereto from time to time (collectively, together with the Prepetition Tranche C Agent, the "*Prepetition Tranche C Lenders*"), the Debtors are indebted to the Prepetition Tranche C Lenders in a principal amount of at least $20 million, together with interest, fees, expenses, and all other "Obligations" as defined in the Prepetition Tranche C Credit Documents (the "*Prepetition Tranche C Obligations*"); and

**\*3** (iv) *Prepetition Tranche D Obligations.* Pursuant to that certain Tranche D Credit Agreement dated as of October 20, 2008 (as amended, supplemented, restated, or otherwise modified prior to the Petition Date, the "*Prepetition Tranche D Loan Agreement*" and together with all other loan, guaranty, security and other documents executed in connection therewith, the "*Prepetition Tranche D Credit Documents*", and together with the Prepetition Tranche C Credit Documents, the "*Prepetition Junior Credit Documents*", and together with the Prepetition Senior Credit Documents, the "*Prepetition Credit Documents*"), among the Borrowers, Guarantor, PGDYS Lending LLC, as Agent (the "*Prepetition Tranche D Agent*", and together with the Prepetition Tranche C Agent, the "*Prepetition Junior Agents*", and together with the Prepetition Senior Agents, the "*Prepetition Agents*") and the lenders that are parties thereto from time to time (collectively, together with the Prepetition Tranche D Agent, the "*Prepetition Tranche D Lenders*", and collectively with the Prepetition Tranche C Lenders, the "*Prepetition Junior Lenders*", and together with the Prepetition Senior Secured Lenders, the "*Prepetition Secured Lenders*"), the Debtors are indebted to the Prepetition Tranche D Lenders in a principal amount of at least $15 million, together with interest, fees, expenses, and all other "Obligations" as defined in the Prepetition Tranche D Credit Documents (the "*Prepetition Tranche D Obligations*", and together

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

with the Prepetition Senior Secured Obligations and the Prepetition Tranche C Obligations, the "*Prepetition Secured Obligations* "); and

D. The Prepetition Secured Obligations were incurred in connection with exit financing (the "*Exit Facility* ") approved by the United States Bankruptcy Court for the District of Delaware in cases jointly administered under Case No. 08–11133(CSS) (the "*First Bankruptcy* ") pursuant to that certain Proposed Findings Of Fact, Conclusions Of Law And Order Confirming The Second Amended Joint Plan Of Reorganization Proposed By Goody's Family Clothing, Inc. Its Subsidiary Debtors And The Official Committee Of Unsecured Creditors ordered by the Court on October 7, 2008 (the "*Confirmation Order* ") finding, among other things, that the commitment letters and the documents granting collateral security required thereunder were legal, valid, binding and authorized obligations of the Debtors (defined in the Confirmation Order as the "*Reorganized Debtors* ") and enforceable in accordance with their terms, with all creditors (existing and thereafter) bound thereby;

E. Prior to the Petition Date, in connection with the Exit Facility, the Debtors granted valid, nonavoidable security interests in and liens (the "*Prepetition Liens* ") upon substantially all of their assets (the "*Prepetition Collateral* ") to the Prepetition Agents for the benefit of themselves and the Prepetition Secured Lenders; and

 **\*4**  F. The Prepetition Agents have represented and the Debtors have waived their rights to challenge that such Prepetition Liens upon the Prepetition Collateral have been perfected; and

G. The Debtors represent that as of the Petition Date, the value of the Prepetition Collateral exceeded the amount of the Prepetition Senior Secured Obligations and, accordingly, that the claims of the Prepetition Senior Secured Lenders were oversecured; and

H. The Prepetition Junior Tranche C Agent has asserted and the Debtors have waived the right to challenge that as of the Petition Date, the value of the Prepetition Collateral exceeded the amount of the Prepetition Tranche C Obligations and, accordingly, that the claims of the Prepetition Tranche C Lenders are oversecured; and

I. The Debtors have represented that, from and after the Repayment Date, all of the Debtors' cash, including the cash in their deposit accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes the "Cash Collateral" (as defined in section 363(a) of the Bankruptcy Code) of the Prepetition Agents and Prepetition Secured Lenders; and

J. The Prepetition Junior Lenders have agreed to allow the Debtors to continue to use their Cash Collateral as specified in this Final Order, with the consent of the Prepetition Agents and Prepetition Secured Lenders.

NOW, THEREFORE, the Court having jurisdiction over this matter; and no other or further notice being necessary to afford the relief set forth herein; and it appearing that entry of this Final Order is in the best interests of the Debtors and their estates and creditors;

IT IS HEREBY ORDERED that:

1. All objections to the Motion and entry of this Final Order to the extent not withdrawn or resolved are hereby overruled;

2. Subject to the terms and conditions of this Final Order the Debtors shall be entitled to use Cash Collateral of all Prepetition Junior Lenders from and after the Petition Date through and including August 1, 2009 (the "*Termination Date* "), *provided* that any use of Cash Collateral shall be in accordance with the budget approved by the Prepetition Junior Agents and attached hereto as Exhibit A (the "*Budget* ");

3. The Prepetition Senior Secured Obligations are deemed to be Allowed Secured Claims pursuant to Sections 502 and 506 of the Bankruptcy Code in accordance with the Confirmation Order authorizing the incurring of these obligations;

4. As adequate protection of the interests of the Prepetition Secured Lenders in the Prepetition Collateral for any diminution in value caused by the use of Cash Collateral, the use, sale or lease of any other Prepetition Collateral, the subordination of the Prepetition Liens to the Carve–Out (as defined herein) or the imposition of the automatic stay, the Debtors were authorized by the First Interim Order to grant and have granted to the Prepetition Secured Lenders (and such grant was,

by the Second Interim Order and Third Interim Order, and hereby is ratified, confirmed and approved on a final basis) valid, continuing, and automatically perfected first priority security interests and replacement liens (the "*Adequate Protection Liens*") in and upon all of the Debtors' properties and assets, real [3] or personal, whether acquired before or after the Petition Date, whether now owned and existing or hereafter acquired, created or arising, and all products and proceeds thereof, and all accessions thereto, substitutions and replacements therefore, and wherever located, and all assets acquired by the Debtors' estates on or after the Petition Date (collectively, the "*Postpetition Collateral*", and together with the Prepetition Collateral, the "*Collateral*"). The Adequate Protection Liens shall include causes of action under section 549 of the Bankruptcy Code and the proceeds thereof, but shall not include other causes of action under chapter 5 of the Bankruptcy Code and shall be subject only to (a) the Carve Out; (b) existing valid, enforceable, non-avoidable liens that were, as a matter of law, senior to the liens of the Prepetition Agents and Prepetition Secured Lenders as of the Petition Date; and (c) the quarterly fees payable to the United States Trustee and Clerk of the Court pursuant to 28 U.S.C. § 1930 and shall otherwise be senior to all other liens, claims, or interests in or to the Collateral, *provided however* that

**\*5**  (i) the Adequate Protection Liens granted to the Prepetition Senior Agents and Prepetition Senior Secured Lenders shall be and remain senior at all times to the Adequate Protection Liens and prepetition liens of the Prepetition Junior Agents and Prepetition Junior Lenders,

(ii) the Adequate Protection Liens granted to the Prepetition Revolver Agent and Prepetition Revolver Lenders shall be senior to the Adequate Protection Liens and prepetition liens of the Prepetition Term Loan Agent and Prepetition Term Loan Lenders in accordance with the Intercreditor Agreement (as defined herein) with respect to all types of Collateral as to which the liens of the Prepetition Revolver Agent and Prepetition Revolver Lenders had priority as of the Petition Date ("*Revolver Priority Collateral*"): and

(iii) the Adequate Protection Liens granted to the Prepetition Term Loan Agent and Prepetition Term Loan Lenders shall be senior to the Adequate

Protection Liens and prepetition liens granted to the Prepetition Revolver Agent and Prepetition Revolver Lenders in accordance with the Intercreditor Agreement with respect to all types of Collateral as to which the Prepetition Term Loan Agent and Prepetition Term Loan Lenders had priority as of the Petition Date ("*Term Loan Priority Collateral*"). The Adequate Protection Liens shall be automatically and properly perfected, valid and enforceable upon entry of this Final Order without the need for any filing, recordation, or other action whatsoever by any Prepetition Agent or any Prepetition Secured Lender that might otherwise be required under applicable non-bankruptcy law;

6. The Adequate Protection Liens shall be enforceable against and binding upon the Debtors, their estates and any successors thereto, including without limitation, any trustee or other estate representative appointed or elected in the Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, "*Successor Cases*"); *provided* that except as expressly set forth herein (or upon the prior written consent of the Prepetition Agents), the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases or any Successor Cases, and the Adequate Protection Liens shall be valid and enforceable against any trustee appointed or elected in any of the Cases or any Successor Cases, or upon the dismissal of any of the Cases or Successor Cases; *and provided further* that the Adequate Protection Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code, nor shall any lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code be made *pari passu* with or senior to the Adequate Protection Liens;

7. The security interests and liens granted to the Prepetition Secured Lenders pursuant this Final Order shall not be subordinated to or made *pari passu* with any other lien, security interest or administrative claim under Section 364 of the Bankruptcy Code or otherwise, except for the Carve Out, unless otherwise ordered by the Court after notice and hearing;

**\*6**  8. As additional adequate protection, the Prepetition Secured Lenders were each granted pursuant to the First Interim Order (and such grant was, by the Second Interim

Order and Third Interim Order, and hereby is ratified, confirmed and approved on a final basis), as and to the extent provided in section 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any Successor Cases (collectively, the "*Superpriority Claims* "), which shall be junior only to the Carve Out. Except for the Carve Out, the Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code; *provided however that*

> (i) the Superpriority Claims granted to the Prepetition Senior Agents and Prepetition Senior Secured Lenders shall be and remain senior at all times to the Superpriority Claims and prepetition claims of the Prepetition Junior Agents and Prepetition Junior Lenders;

> (ii) the Superpriority Claims of the Prepetition Revolver Agent and Prepetition Revolver Lenders shall be senior to the Superpriority Claims of the Prepetition Term Loan Agent and Prepetition Term Loan Lenders with respect to Revolver Priority Collateral; and

> (iii) the Superpriority Claims of the Prepetition Term Loan Agent and Prepetition Term Loan Lenders shall be senior to the Superpriority Claims of the Prepetition Revolver Agent and Prepetition Revolver Lenders with respect to Term Loan Priority Collateral;

9. As additional adequate protection for the Prepetition Senior Secured Lenders, the Debtors were authorized and directed to provide, in addition to the payments made pursuant to the First Interim Order (which payments are hereby ratified, confirmed and approved on a final basis) adequate protection payments to the Prepetition Senior Secured Lenders (the "*Senior Adequate Protection Payments* "), in the form of and in the following order of payment: (a) on the Repayment Date, (i) indefeasible payment in full in cash of the Prepetition Revolver Obligations, the cancellation, backing, or cash collateralization of all letters of credit under the Prepetition Revolver Credit Agreement, and the funding

of the Revolver Indemnity Account (as defined herein), (ii) funding of the Bank Products Indemnity Account (as defined herein); and (iii) indefeasible payment in full in cash of the Prepetition Term Loan Obligations and the funding of the Term Loan Indemnity Account (as defined herein); (b) ongoing payment of the fees, costs and expenses of the Prepetition Senior Agents, including, without limitation, the reasonable fees and expenses of legal and other professionals retained by the Prepetition Senior Agents; and (c) payments of interest at the default rate, fees and other amounts due under the Prepetition Senior Credit Documents, at the times specified therein;

**\*7** 10. As additional adequate protection for the Prepetition Tranche C Lenders, upon the occurrence of the Repayment Date, the Debtors were authorized and directed, subject to any limitations in the Intercreditor Agreement (defined below), to provide adequate protection payments to the Prepetition Tranche C Lenders (the "*Tranche C Adequate Protection Payments* "), in the form of: (i) payments of interest at the default rate, fees and other amounts due under the Prepetition Tranche C Credit Documents, at the times specified therein; and (ii) ongoing payment of the fees, costs and expenses of the Prepetition Tranche C Agent, including, without limitation, the reasonable fees and expenses of legal and other professionals retained by the Prepetition Tranche C Agent;

11. Prepetition Indemnity Accounts.

(a) *Revolver Indemnity Account.* On or about the Repayment Date, the Debtors established an account in the control of the Prepetition Revolver Agent (the "*Revolver Indemnity Account* "), into which, upon the payment in full in cash of all Prepetition Revolver Obligations and the cancellation, backing, or cash collateralization of all letters of credit under the Prepetition Revolver Credit Documents, $250,000 was deposited as additional security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the Prepetition Revolver Agent and Prepetition Revolver Lenders under the Prepetition Revolver Credit Documents (the "*Revolver Indemnity Obligations* "). The Revolver Indemnity Account shall terminate upon the earlier to occur of (i) expiration of the Challenge Period (as defined herein) if, as of such date, no party has filed or asserted against the Prepetition Revolver Agent or any Prepetition Revolver Lender an adversary

proceeding, cause of action, objection, claim, defense or other challenge as contemplated in Paragraph 18 herein and (ii) delivery by the Statutory Committee to the Prepetition Revolver Agent of irrevocable written notice (a "*No–Action Notice*") that the Statutory Committee will not file or assert a Challenge (as defined herein) against the Prepetition Revolver Agent and Prepetition Revolver Lenders. The Prepetition Revolver Agent and Prepetition Revolver Lenders were granted (and such grant is hereby ratified, confirmed and approved) a first priority lien on the Revolver Indemnity Account to secure the Revolver Indemnity Obligations and other Prepetition Revolver Obligations and the Prepetition Term Agent and Prepetition Term Lenders were (and such grant is hereby ratified, confirmed and approved) granted a second priority lien on the Revolver Indemnity Account to secure the Prepetition Term Loan Obligations. If the amounts on deposit in the Revolver Indemnity Account are insufficient to pay all such Revolver Indemnity Obligations, the Prepetition Revolver Agent reserves the right to recover any deficiency from the Debtors and their estates therefor and shall retain all rights under the Prepetition Liens and any other adequate protection granted hereunder as security for such deficiency.

**\*8** (b) *Term Loan Indemnity Account.* On or about the Repayment Date, the Debtors established an account in the control of the Prepetition Term Loan Agent (the "*Term Loan Indemnity Account*"), into which, upon the payment in full in cash of all Prepetition Term Loan Obligations, $250,000 was deposited as additional security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the Prepetition Term Loan Agent and Prepetition Term Loan Lenders under the Prepetition Term Loan Credit Documents (the "*Term Loan Indemnity Obligations*"): *provided, however,* that the Term Loan Indemnity Account shall terminate upon the earlier to occur of (i) expiration of the Challenge Period (as defined herein) if, as of such date, no party has filed or asserted against the Prepetition Term Loan Agent or any Prepetition Term Loan Lender an adversary proceeding, cause of action, objection, claim, defense or other challenge as contemplated in Paragraph 18 herein and (ii) delivery by the Statutory Committee to the Prepetition Term Loan Agent of a No–Action Notice that the Statutory Committee will not file or assert a Challenge (as defined herein) against the Prepetition Term Loan Agent and Prepetition Term Loan Lenders. The Prepetition Term Loan Agent and Prepetition Term

Loan Lenders were granted (and such grant is hereby ratified, confirmed and approved) a first priority lien on the Term Loan Indemnity Account to secure the Term Loan Indemnity Obligations and other Prepetition Term Loan Obligations and the Prepetition Revolver Agent and Prepetition Revolver Lenders were granted (and such grant is hereby ratified, confirmed and approved) a second priority lien on the Term Loan Indemnity Account to secure the Prepetition Revolver Obligations. If the amounts on deposit in the Term Loan Indemnity Account are insufficient to pay all such Term Loan Indemnity Obligations, the Prepetition Term Loan Agent reserves the right to recovery any deficiency from the Debtors and their estates therefor and shall retain all rights under the Prepetition Liens and any other adequate protection granted hereunder as security for such deficiency.

(c) *Bank Products Indemnity Account.* On or about the Repayment Date, the Debtors established an account in the control of Bank of America, N.A. (the "*Bank Products Indemnity Account*"), into which $250,000 was deposited as security for obligations of the Debtors to Bank of America, N.A. arising out of the provision of bank products (including ACH exposure and purchase cards), whether prepetition or postpetition (the "*Bank Products Obligations*"). Bank of America, N.A, was granted (and such grant is hereby ratified, confirmed and approved) a first priority lien on the Bank Products Indemnity Account, the Prepetition Revolver Agent, for the benefit of itself and the Prepetition Revolver Lenders, was granted (and such grant is hereby ratified, confirmed and approved) a second priority lien on the Bank Products Indemnity Account and the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders was granted (and such grant is hereby ratified, confirmed and approved) a third priority lien on the Bank Products Indemnity Account. In the event that any Bank Products Obligations are not paid when due, Bank of America, N.A. may, without further notice or order of this Court, charge the Bank Products Indemnity Account for any such unpaid Bank Products Obligations. If the amounts on deposit in the Bank Products Indemnity Account are insufficient to pay all such Bank Products Obligations, Bank of America N.A. reserves the right to recovery any deficiency from the Debtors and their estates therefor and shall retain all rights under the Prepetition Liens and any other adequate protection granted hereunder as security for such deficiency. At such time as all Bank Products

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

have been terminated and Bank of America N.A. has determined, in its reasonable judgment, that no further liability of the Debtors exists or may arise on account thereof, Bank of America shall return any unused portion of the Bank Products Indemnity Account;

 **\*9** 12. Any proceeds from the Agency Agreement or Cash Collateral remaining in the Debtors' estate after payment of (i) the Senior Adequate Protection Payments (including indefeasible payment in full in cash of the Prepetition Senior Secured Obligations, the cancellation, backing, or cash collateralization of all letters of credit under the Prepetition Revolver Credit Agreement, and the funding of the Revolver Indemnity Account, Term Loan Indemnity Account and the Bank Products Indemnity Account); and (ii) the Tranche C Adequate Protection Payments, shall be not be distributed or otherwise used by the Debtors for any purpose pending further order of the Court after notice and hearing;

13. The following agreements shall continue to be in full force and effect:

(i) that certain Intercreditor Agreement, dated as of October 20, 2008 (the "*Intercreditor Agreement* ") that governs (and which all parties shall continue to be bound by and subject to) the respective rights, interests, obligations, priority, and the positions of the Prepetition Revolver Agent, Prepetition Revolver Lenders, Prepetition Term Loan Agent and Prepetition Term Loan Lenders; and

(ii) that certain Subordination Agreement dated October 20, 2008 among the Prepetition Revolver Agent, the Prepetition Term Loan Agent, the Prepetition Tranche C Agent and Prepetition Tranche D Agent (the "*Subordination Agreement* ") which governs (and which all parties shall continue to be bound by and subject to) the respective rights, interests, obligations, priority, and the positions of the Prepetition Senior Agents and Prepetition Senior Secured Lenders and the Prepetition Tranche C Agent, Prepetition Tranche C Lenders, Prepetition Tranche D Agent and Prepetition Tranche D Lenders;

14. This Final Order shall be sufficient and conclusive evidence of the priority, perfection, attachment, and validity of all of the Adequate Protection Liens, which shall, by virtue of this Final Order, constitute valid and automatically perfected security interests without

the necessity of creating, filing, recording, or serving any mortgages, deeds of trust, assignments, financing statements, or other documents that might otherwise be required under federal or state law in any jurisdiction or the taking of any other action to validate or perfect the Adequate Protection Liens;

15. As used in this Final Order, the term "*Carve Out* " means the following expenses: (i) statutory fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and (ii) $3,200,000, less the allowed and paid professional fees and disbursements ("*Allowed Professional Fees* ") incurred by the Debtors and any statutory committee for any professionals (the "*Case Professionals* ", *provided* that and the term "Case Professionals" shall not include any liquidation consultant including, without limitation, the Agent pursuant to the Agency Agreement) retained by a final order of the Court (which order has not been vacated, stayed, or appealed) by the Debtors and any statutory committee under sections 327 or 1103(a) of the Bankruptcy Code) (the "*Case Professional Carve Out* ") *provided, further,* that from and after the Repayment Date, the Prepetition Senior Secured Lenders have, and shall have, no continuing obligations hereunder, other than any obligations pursuant to the Revolver Indemnity Account, Term Loan Indemnity Account or Bank Products Indemnity Account. The Carve Out shall be senior in priority to the Prepetition Liens, the Adequate Protection Liens, and the Superpriority Claims. The Carve Out shall not attach to the Prepetition Indemnity Accounts described in paragraph 11 hereof. No payment of any Carve Out amount shall reduce any Prepetition Secured Obligations;

 **\*10** 16. The Prepetition Secured Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Cases or any Successor Cases. Nothing in this Final Order or otherwise shall be construed (i) to obligate the Prepetition Secured Lenders in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement, (ii) to increase the Carve Out if actual Allowed Professional Fees are higher in fact than $3,200,000, (iii) as consent to the allowance of any professional fees or expenses of any Case Professionals, or (iv) to affect the right of the Prepetition Secured Lenders

to object to the allowance and payment of such fees and expenses;

17. The Cash Collateral and the Case Professionals Carve Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) against the Prepetition Agents or the Prepetition Secured Lenders or seeking relief that would impair their rights and remedies under the Prepetition Secured Obligations or this Final Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any statutory committee in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief that would impair the ability of the Prepetition Agents or the Prepetition Secured Lenders to recover on the Prepetition Obligations or seeking affirmative relief against them, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Prepetition Obligations, (iii) for monetary, injunctive or other affirmative relief against any Prepetition Secured Lenders or their respective collateral that would impair the ability of the Prepetition Secured Lenders to recover on the Prepetition Obligations or seeking affirmative relief against them, or (iv) preventing, hindering or otherwise delaying the exercise by the Prepetition Secured Lenders of any rights and/or remedies under this Final Order, the Prepetition Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the Prepetition Secured Lenders upon any of the Collateral; (b) to make any distribution under a plan of reorganization in any of the Cases; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Prepetition Secured Lenders, unless otherwise ordered by the Court; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the Prepetition Secured Lenders, (e) for using or seeking to use any insurance proceeds constituting Collateral without the prior consent of the Prepetition Secured Lenders; (f) for incurring Indebtedness (as defined in the Prepetition Credit Documents) outside the ordinary

course of business without the prior consent of the Prepetition Secured Lenders; (i) for objecting to or challenging in any way the claims, liens, or interests (including interests in the Collateral) held by or on behalf of any Prepetition Agent or Prepetition Lender; (j) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against any Prepetition Agent or Prepetition Lender; (k) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the Prepetition Obligations or any other rights or interests of any Prepetition Agent or Prepetition Lender; or (1) for preventing, hindering or otherwise delaying the exercise by any Prepetition Agent or Prepetition Lender of any rights and remedies granted under this Final Order. Notwithstanding the foregoing, the Cash Collateral and the Case Professionals Carve Out may be used by any statutory committee to investigate the Prepetition Obligations, the Prepetition Liens and/or a potential Challenge (as that term is defined herein), provided that no more than $75,000 in the aggregate may be spent from the aforementioned sources on such investigations. Effective as of the Repayment Date, the rights and benefits of the Prepetition Senior Secured Lenders in this paragraph shall, and hereby do, inure to the benefit of the Prepetition Junior Lenders;

**\*11** 18. The rights of a statutory committee and any other party in interest granted standing by the Court (other than the Debtors), shall not be prejudiced to seek to object to or to challenge the Debtors' stipulations as set forth herein, as to:

(a) the perfection of the mortgage, security interests, and liens of any Prepetition Senior Secured Lenders or the amount of any Prepetition Senior Secured Lender's claims;

(b) the validity, extent, priority, or perfection of the mortgage, security interests, and liens of any Prepetition Junior Lender; and

(c) the validity, allowability, priority, full secured status or amount of the Prepetition Junior Obligations;

A party, including any statutory committee, must commence, as appropriate, a contested matter or

adversary proceeding raising such objection or challenge, including, without limitation, any claim against any Prepetition Senior Secured Lenders and the Prepetition Junior Lenders in the nature of a setoff, counterclaim or defense to the applicable Prepetition Obligations (each, a "*Challenge* ") within the earlier of: (i) with respect to any statutory committee, sixty (60) calendar days from the date of formation of the statutory committee, and (ii) with respect to other parties in interest with requisite standing other than the Debtors or any statutory committee, seventy-five (75) calendar days following the date of entry of the First Interim Order (together, the "*Challenge Period* "). Upon the earlier of (i) the occurrence of the expiration of the Challenge Period (the "*Challenge Period Termination Date* ") and (ii) receipt of a No–Action Notice by the applicable Prepetition Agent, as to any Prepetition Agent or Prepetition Lender against whom a Challenge has not been properly commenced: (A) any and all such Challenges by any party (including, without limitation, any statutory committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed in any Successor Case), shall be deemed to be forever waived, released and barred and (B) all of the Debtors' stipulations, waivers, releases, affirmations and other stipulations and representations set forth herein as to the priority, extent, validity, amount and secured status as to each of the Prepetition Senior Secured Lenders' and the Prepetition Junior Lenders' claims, liens, and interests (including, without limitation, those contained in Paragraphs C, D, E, F, G, H, and I herein) shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases;

19. The Debtors and the Prepetition Secured Lenders are hereby authorized and directed to perform all acts, take any action, and execute and comply with the terms of such other documents, instruments, and agreements, as the Prepetition Secured Lender may require as evidence of and for the protection of the Prepetition Collateral, Cash Collateral, and the Postpetition Collateral, or that may be otherwise deemed necessary by the Prepetition Secured Lenders to effectuate the terms and conditions of this Final Order;

**\*12** 20. Until the Termination Date, the Debtors shall maintain the cash management system in effect as of the date hereof;

21. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the Prepetition Junior Agents; *provided, however,* that the Debtors are permitted to sell, transfer, convey, assign or otherwise dispose of any Collateral (i) constituting the sale of Inventory (as defined in the Prepetition Credit Documents) in the ordinary course of business, (ii) in accordance with the assumption of the Agency Agreement as consented to by the Prepetition Agents, or (iii) as further ordered by the Court;

22. The Prepetition Agents and Prepetition Secured Lenders shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral;

23. No costs or expenses of administration which have been or may be incurred in the Debtors' cases at any time shall be charged against any Prepetition Agent or Prepetition Lender, or any of their respective claims or the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the applicable Prepetition Agent or Prepetition Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by any such agents or lenders. The Prepetition Agents and Prepetition Secured Lenders are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Agents or Prepetition Secured Lenders with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral;

24. The automatic stay of 11 U.S.C. § 362 is hereby vacated and modified only to the extent necessary to permit the Debtors, the Prepetition Agents, and the Prepetition Secured Lenders to commit all acts and take all actions necessary to implement this Final Order;

25. Notwithstanding anything herein to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (i) the Prepetition Agents' or any Prepetition Secured

Lender's, right to seek any other or supplemental relief in respect of any Debtor, including the right to seek additional adequate protection (without prejudice to any other person's right to object to or otherwise oppose such additional adequate protection); (ii) any of the rights of any Prepetition Agent or Prepetition Secured Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (a) request modification of the automatic stay of section 362 of the Bankruptcy Code, (b) request dismissal of any of the Cases or Successor Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (c) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans;

*13  26. Based on the record at the Interim Hearings, the Prepetition Agents and Prepetition Secured Lenders each have acted in good faith in connection with this Final Order and their reliance on this Final Order is in good faith;

27. Effective as of the Repayment Date, the Prepetition Tranche C Agent and Prepetition Tranche C Lenders shall be, and are, entitled to enforce any rights or benefits provided to the Prepetition Senior Agents or Prepetition Senior Secured Lenders as provided under this Final Order;

28. Effective as of the Repayment Date, the Prepetition Tranche D Agent and Prepetition Tranche D Lenders shall be, and are, entitled to enforce any rights or benefits provided to the Prepetition Tranche C Agent or Prepetition Tranche C Lenders as provided under this Final Order;

29. Any actions taken pursuant hereto shall survive entry of any order that may be entered converting to the Cases to Chapter 7 or dismissing any of the Cases; and

30. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Final Order.

**All Citations**

Not Reported in B.R., 2009 WL 7698528

Footnotes

1   The Borrowers are: Goody's, LLC, New SYDOOG LLC, New Trebor of TN, LLC, New GOFAMCLO LLC, New Goody's Giftco, LLC, New Goody's MS, L.P., New GFCTX, L.P, New Goody's IN, L.P., New GFCTN, L.P., New GFCGA, L.P., New Goody's Holding TN, LLC, New Goody's TNDC, L.P., New Goody's ARDC, L.P., and New Goody's Retail MS, L.P.
2   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, as appropriate. See Fed. R. Bankr.P. 7052.
3   With respect to leaseholds that were not subject to valid leasehold mortgages in favor of the Prepetition Agents as of the Petition Date, the Adequate Protection Liens (as defined herein) extend only to the proceeds of leased real property and are not direct liens on those leases.

End of Document                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.