SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
JOHN A. MOE, II (Bar No. 066893)
john.moe@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

Proposed Attorneys for the Chapter 11 Debtors and
Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>VERITY HEALTH SYSTEM OF CALIFORNIA, INC., *et al.*,<br><br>Debtors and Debtors In Possession.<br><br>☒ Affects All Debtors<br><br>☐ Affects Verity Health System of California, Inc.<br>☐ Affects O'Connor Hospital<br>☐ Affects Saint Louise Regional Hospital<br>☐ Affects St. Francis Medical Center<br>☐ Affects St. Vincent Medical Center<br>☐ Affects Seton Medical Center<br>☐ Affects O'Connor Hospital Foundation<br>☐ Affects Saint Louise Regional Hospital Foundation<br>☐ Affects St. Francis Medical Center of Lynwood Foundation<br>☐ Affects St. Vincent Foundation<br>☐ Affects St. Vincent Dialysis Center, Inc.<br>☐ Affects Seton Medical Center Foundation<br>☐ Affects Verity Business Services<br>☐ Affects Verity Medical Foundation<br>☐ Affects Verity Holdings, LLC<br>☐ Affects De Paul Ventures, LLC<br>☐ Affects De Paul Ventures - San Jose Dialysis, LLC<br><br>Debtors and Debtors In Possession. | Lead Case No. 2:18-bk-20151-ER<br><br>Jointly Administered With:<br>Case No. 2:18-bk-20162-ER<br>Case No. 2:18-bk-20163-ER<br>Case No. 2:18-bk-20164-ER<br>Case No. 2:18-bk-20165-ER<br>Case No. 2:18-bk-20167-ER<br>Case No. 2:18-bk-20168-ER<br>Case No. 2:18-bk-20169-ER<br>Case No. 2:18-bk-20171-ER<br>Case No. 2:18-bk-20172-ER<br>Case No. 2:18-bk-20173-ER<br>Case No. 2:18-bk-20175-ER<br>Case No. 2:18-bk-20176-ER<br>Case No. 2:18-bk-20178-ER<br>Case No. 2:18-bk-20179-ER<br>Case No. 2:18-bk-20180-ER<br>Case No. 2:18-bk-20181-ER<br><br>Hon. Ernest M. Robles<br><br>Chapter 11 Cases<br><br>**DEBTORS' NOTICE OF MOTION AND MOTION TO REJECT, PURSUANT TO 11 U.S.C. § 365(A), PROFESSIONAL SERVICES AGREEMENT WITH ALL CARE MEDICAL GROUP, INC. AND RELATED EXECUTORY CONTRACTS AND UNEXPIRED LEASE *NUNC PRO TUNC*; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF STEPHEN CAMPBELL, M.D.**<br><br>Hearing:<br>Date: October 24, 2018<br>Time: 10:00 a.m.<br>Place: Courtroom 1568<br>U.S. Bankruptcy Court<br>Los Angeles, CA 90012 |

109018393\V-6

**TO THE HONORABLE ERNEST M. ROBLES, UNITED STATES BANKRUPTCY JUDGE, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE CALIFORNIA ATTORNEY GENERAL, THE OFFICE OF THE UNITED STATES TRUSTEE, ALL CARE MEDICAL GROUP, INC. AND ITS COUNSEL, THE SLAUSON LANDLORD, THE MANAGED CARE COUNTERPARTIES, AND OTHER PARTIES TO THE ALL CARE AGREEMENTS (ALL AS DEFINED HEREIN):**

**PLEASE TAKE NOTICE** that at the above-referenced date, time and location, Verity Health System of California, Inc., a California nonprofit benefit corporation and the Debtor herein ("VHS"), and the above-referenced affiliated debtors (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Cases"), will move the Court for entry of an order, pursuant to 11 U.S.C. § 365(a), authorizing Debtor Verity Medical Foundation ("VMF")[1] to reject those certain agreements listed on Exhibit A to the accompanying Memorandum of Points and Authorities (collectively, the "All Care Agreements"),[2] to the extent they are executory, unexpired and constitute legal obligations of one or more Debtors, including the following:

- Professional Services Agreement between VMF f/k/a DCHS Medical Foundation and All Care Medical Group, Inc. ("All Care"), dated December 31, 2012 (the "All Care PSA"), attached as Exhibit B to the accompanying Memorandum of Points and Authorities;

- Lease Agreement, dated October 1, 2010, between Southeast Medical Center, LLC and All Care for the property located at 2675 East Slauson Avenue, Huntington Park, California (the "Slauson Clinic Site"); as amended and assigned pursuant to that certain Assignment and Amendment of Lease, dated December 31, 2012, among Southeast Medical Center, LLC, and Slauson Associates of Huntington Park, LLC (together, the "Slauson Landlord"), All Care as tenant, and VMF (as DCHS Medical Foundation) as assignee; as further amended by that certain Second Amendment to Lease, dated April 1, 2017, between the Slauson Landlord and VHS[3] as tenant (the "Slauson Lease"), attached together as Exhibit C to the accompanying Memorandum of Points and Authorities;

---

[1] To the extent VHS constitutes a party to or in interest with VMF under these agreements, the Debtors seek relief on its behalf as well.

[2] To the extent the Debtors have not been able to identify other executory contracts or unexpired leases ancillary to the agreements listed on the exhibit, in an abundance of caution, the Debtors seek to reject those agreements as well.

[3] The Debtors believe that this was a clerical error, as VMF (and not VHS) was the new name of DCHS Medical Foundation, as restructured; and VMF is understood by the parties to be the party in interest to the Slauson Lease.

- 1 -

109018393\V-6

- Various managed care agreements entered into between All Care and, respectively, California Physicians' Service, d/b/a Blue Shield of California ("Blue Shield"), CIGNA HealthCare of California, Inc. ("CIGNA"), Easy Choice Health Plan ("Easy Choice"), Health Net of California, Inc. ("Health Net," and the agreements with Blue Shield, CIGNA, Easy Choice and Health Net, as assigned to VMF, the "Assigned Managed Care Agreements," each attached to the Memorandum of Points and Authorities at Exhibits D through G), Beech Street Corporation ("Beech Street"), Blue Cross of California and Affiliates d/b/a Anthem Blue Cross ("Anthem"), Health Value Management, Inc. d/b/a ChoiceCare Network ("ChoiceCare"), Integrated Health Plan ("IHP"), Interplan Corporation ("Interplan"), MultiPlan, Inc. ("MultiPlan") and United Healthcare ("UHC," and the Assigned Managed Care Agreements together with the agreements with Beech Street, Anthem, ChoiceCare, IHP, Interplan, MultiPlan, the "Managed Care Agreements");[4] and

- The contracts that were to be assigned to VMF pursuant to that certain Asset Purchase Agreement, dated December 31, 2012, between All Care and DCHS Medical Foundation (the "APA"),[5] and are still active, as listed in Exhibit A to the accompanying Memorandum of Points and Authorities (collectively with the All Care PSA and the Managed Care Agreements, the "All Care Contracts").[4]

The Debtors have determined, in their business judgment, that the All Care Agreements are a significant burden on the Debtors' estates, and thus, that rejection of the agreements is in the best interest of their estates. Pursuant to 11 U.S.C. § 365(g)(1), the Debtors also seek that the rejection of (1) the Slauson Lease be retroactive to the date of this Notice of Motion, and (2) the All Care Contracts be retroactive to the petition date, August 31, 2018.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Richard G. Adcock in Support of First-Day Motions, filed August 31, 2018 (the "First-Day Declaration") [Docket No. 8], the attached Declaration of Stephen Campbell, M.D. (the "Campbell Declaration"), supporting statements, arguments and representations of counsel who will appear at the hearing on the Motion, the record in this case, and any other evidence properly brought before the Court in all other matters of which this Court may properly take judicial notice.

---

However, again, to the extent VHS constitutes a party to or in interest with VMF under the Slauson Lease, the Debtors seek relief on its behalf as well.

[4] In the abundance of caution and confidentiality, because no Debtor has been made a party to these agreements, no copy is attached. However, the agreements are described with sufficient specificity in Exhibit A to provide notice to the counterparties of the Debtors' intentions.

[5] The APA is not executory.

**PLEASE TAKE FURTHER NOTICE** that any party opposing or responding to the Motion must file a response (the "Response") with the Bankruptcy Court and serve a copy of it upon the moving party and the United States Trustee not later than 14 days before the date designated for the hearing. A Response must be a complete written statement of all reasons in opposition to the Motion or in support, declarations and copies of all evidence on which the responding party intends to rely, and any responding memorandum of points and authorities.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the failure to file and serve a timely objection to the Motion may be deemed by the Court to be consent to the relief requested herein.

Dated: October 3, 2018

DENTONS US LLP
SAMUEL R. MAIZEL
JOHN A. MOE, II
TANIA M. MOYRON

By  /s/Tania M. Moyron
        Tania M. Moyron

Proposed Attorneys for the Chapter 11 Debtors and Debtors In Possession

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 3 -

109018393\V-6

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The Debtors, by and through their undersigned counsel, hereby file this Memorandum of Points and Authorities in support of their motion (the "Motion") to reject the All Care Agreements pursuant to 11 U.S.C. § 365(a). The Motion should be granted because the All Care Agreements are unduly burdensome to the Debtors' bankruptcy estates (the "Estates"). Absent rejection, the All Care PSA alone, which is not scheduled to expire for another fourteen years, potentially requires VMF to pay approximately $1.45 million per year (or approximately $20.3 million over the remaining term). The Slauson Lease, which has more than four years left on its term, costs VMF an additional almost $46,000 per month (almost $550,000 per year or more than $2.3 million over the remaining term) in base rent. Over fiscal year 2018, the All Care Agreements have resulted in a net loss of $1.24 million, which over the course of the remaining All Care PSA term, would amount to a more than $17 million loss. These obligations are therefore a materially significant burden to the Estates. As such, rejecting the All Care Agreements is in the best interest of the Estates and the Debtors are permitted to reject the All Care Agreements as a legitimate exercise of their business judgment pursuant to 11 U.S.C. § 365(a).

## II.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of the Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for this Motion is 11 U.S.C. § 365(a).

- 1 -

109018393\V-6

## III.

## **STATEMENT OF FACTS**

**A.     General Background**

1.     On August 31, 2018 ("Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[6] The Cases are currently being jointly administered before the Bankruptcy Court [Docket No. 17]. Since the commencement of their Cases, the Debtors have been operating their businesses as debtors in possession pursuant to §§1107 and 1108.

2.     Debtor VHS, a California nonprofit public benefit corporation, is the sole corporate member of the following five Debtor California nonprofit public benefit corporations that operate six acute care hospitals: O'Connor Hospital, Saint Louise Regional Hospital, St. Francis Medical Center, St. Vincent Medical Center, Seton Medical Center, and Seton Medical Center Coastside (collectively, the "Hospitals") and other facilities in the state of California. Seton Medical Center and Seton Medical Center Coastside operate under one consolidated acute care license.

3.     VHS, the Hospitals, and their affiliated entities (collectively, "Verity Health System") operate as a nonprofit health care system, with approximately 1,680 inpatient beds, six active emergency rooms, a trauma center, eleven medical office buildings, and a host of medical specialties, including tertiary and quaternary care. First-Day Decl., at 4, ¶ 12. On the Petition Date, the Debtors had approximately 850 inpatients. *Id.* at 6, ¶ 17. The scope of the services provided by the Verity Health System is exemplified by the fact that in 2017, the Hospitals provided medical services to over 50,000 inpatients and approximately 480,000 outpatients. *Id.*, at 4, ¶ 12.

4.     Each of the Debtors is exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, except for Verity Holdings, LLC, DePaul Ventures, LLC, and DePaul Ventures - San Jose Dialysis, LLC.

---

[6] All references to "§" or "section" herein are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, as amended.

5.    On September 14, 2018, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors in these Cases.

**B.    The All Care Agreements**

6.    Debtor VMF, incorporated in 2011, is a medical foundation, exempt from (a) licensure under California Health & Safety Code § 1206(l), and (b) federal income taxation as an organization described in section 501(c)(3) of the Internal Revenue Code of 1986.  VMF contracts with physicians and other healthcare professionals to provide high quality, compassionate, patient-centered care to individuals and families throughout California.  With more than 100 primary care and specialty physicians, VMF offers medical, surgical and related healthcare services for people of all ages at community-based, multi-specialty clinics conveniently located in areas served by the Hospitals.

7.    VMF holds long-term professional services agreements with six medical groups,[7] including All Care, a California professional corporation that employs and contracts with physicians (such as nurse practitioners and physician's assistants) who are directly engaged in the provision of professional medical services.  On December 31, 2012, pursuant to the APA, VMF (as DCHS Medical Foundation) and All Care entered into the All Care PSA, under which All Care agreed to provide professional medical services to the VMF medical clinic (the "Clinic"), with principal place of business at 400 Race Street, San Jose, California 95126, at the patient-rendering Slauson Clinic Site.  All Care leases the Slauson Clinic Site pursuant to the Slauson Lease.  Pursuant to the APA, All Care also assigned to VMF its obligations under other agreements (e.g., for maintenance and managed care).  These contracts and lease are unexpired and executory.

　　　　*i.    The All Care PSA*

8.    On December 31, 2012, DCHS Medical Foundation, now known as VMF, and All Care entered into the All Care PSA. Under the All Care PSA, the parties "intend[ed] . . . to create

---

[7] VMF also has professional services agreements, and related contracts and leases, with (a) Verity Medical Group; (b) Sports, Orthopedic and Rehabilitation Associates; (c) CFL Children's Medical Associates, Inc.; (d) Hunt Spine Institute, Inc.; and (e) San Jose Medical Clinic, Inc., D/B/A San Jose Medical Group.

- 3 -

109018393\V-6

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

a sustainable clinical enterprise that is integrated and that supports, benefits and furthers the charitable purposes of [VMF] and the purposes of [All Care] and that facilitates the recruitment and retention of qualified and skilled physicians and other health care professionals to achieve the missions of each organization." All Care PSA, p. 1. Among other things, the agreement aimed to "establish an exclusive relationship between [the parties] pursuant to which [All Care] shall provide to or on behalf of [VMF] physician services and other services described [therein]"; "support access to medical care through [the C]linic[]"; and "advance medical sciences and the training and education of physicians, and work toward achieving the community service objectives of [VMF] through the active support of medical research and health education." *Id.*

9. Under the All Care PSA, All Care provides VMF with professional, educational and research services. *Id.* at § 1.1. VMF has "overall responsibility for the operation of the Clinics, including, but not limited to, providing or arranging for the provision of, at its sole cost and expense, facilities, equipment, furniture, [non-physician] personnel, administrative and management services and supplies as necessary and appropriate for the operation of the Clinics and the provision of services . . . ." *Id.* at § 3.1 (Overview); *see also* §§ 3.3 (Non-Physician Personnel), 3.4 (Financial Responsibility; Budget), 3.5 (Ancillary Services), 3.7 (Marketing and Public Relations Services), 3.8 (Management and Clinical Information System), 3.9 (Security, Maintenance, Medical Waste Disposal and Laundry Services), 3.10 (Research and Education Activities), 3.11 (Charitable Activities) and 3.12 (Administrative Responsibilities). VMF is also responsible for compensation and maintaining a certain level of insurance coverage. *Id.* at §§ 7.1, 8.1, 8.2. Both parties have indemnification obligations. *Id.* at § 8.6.

10. Additionally, although not a party to the All Care PSA, VHS[8] f/k/a DCHS is meant to "have overall responsibility for negotiating managed care contracts and health care agreements for and on behalf of" VMF; and All Care, VMF and VHS are meant to "work cooperatively and in good faith to negotiate and finalize agreements that are beneficial for the shared organizations and the overall [VHS] strategy with a focus on maximizing the revenue available through such

---

[8] To the extent VHS constitutes a party to or in interest with VMF, the Debtors seek relief on its behalf as well.

agreements." *Id.* at § 3.6. VMF is also supposed to perform its marketing services "in partnership with" VHS. *Id.* at § 3.7.

11. The PSA has an initial term of twenty years, with an automatic renewal mechanism. *Id.* at § 10.1. It provides for early termination by either party for material breach, insolvency or failure to agree on revised agreement. *Id.* at § 10.2. VMF can also terminate for patient safety or crime. *Id.* The All Care PSA is governed by the laws of California. *Id.* at § 14.16.

12. In exchange for providing professional services under the All Care PSA, VMF is contractually obliged to pay All Care base compensation measured in work relative value units, as published by the Centers for Medicare and Medicaid Services. Thus far in 2018, this obligation has amounted to approximately $96,000 per month, with an additional $25,000 per month paid in benefits, for a total annual spend of $1.45 million. Meanwhile, taking into account reduced revenues, VMF has lost net $1.242 million under this arrangement over the 2018 fiscal year.

### ii. The Slauson Lease

13. On October 1, 2015, All Care entered into the Slauson Lease with the Slauson Landlord to lease the Clinic Site. On December 31, 2012, with the Slauson Landlord's consent, All Care assigned the Slauson Lease to DCHS Medical Foundation. On April 1, 2017, the parties entered into a second amendment. By this time, DCHS Medical Foundation had changed its name to VMF; but the second amendment indicates the contracting party as VHS. The Debtors believe this is a clerical error as VMF not only is the successor name of DCHS Medical Foundation, but also performs all obligations under the Slauson Lease and is understood by the Slauson Landlord and All Care as the relevant contracting party.

14. The Slauson Lease covers those certain premises of the Clinic Site, which includes a medical building, landscaping areas, garage, adjacent parking lots and other appurtenances, which total approximately 33,000 square feet. The monthly base rent is approximately $46,000.

15. The term of the Slauson Lease expires on December 31, 2022, which means remaining rent under the lease amounts to more than $2.3 million.

- 5 -

109018393\V-6

### *iii. The Managed Care Agreements*

16. All Care had entered into the Managed Care Agreements with various managed care organizations, including Blue Shield, CIGNA (both as CIGNA and as Connecticut General Life Insurance), Easy Choice, Health Net, Beech Street, Anthem, ChoiceCare, IHP, Interplan, and MultiPlan, whose Managed Care Agreements are still active. The Managed Care Agreements are revenue-producing contracts that create the revenue streams feeding All Care's operation under the All Care PSA.

17. As mentioned above, the All Care PSA charges VHS with "overall responsibility for negotiating managed care contracts and health care agreements for and on behalf of" VMF; and envisions that All Care, VMF and VHS "work cooperatively and in good faith to negotiate and finalize agreements that are beneficial for the shared organizations and the overall [VHS] strategy with a focus on maximizing the revenue available through such agreements." All Care PSA at § 3.6. The All Care PSA also provides that "[r]egardless of whose name the contracts are in, revenues from all such contracts shall be the sole property of VMF." *Id.*[9]

18. Some of the Managed Care Agreements remain in All Care's name, while only some others have been formally assigned by All Care to VMF. VMF currently performs obligations under all of them.

### *iv. The Vendor Agreements*

19. Under the APA, All Care agreed to assign several vendor contracts to VMF to support the maintenance of the Clinic Site. A schedule of these contract counterparties is included in Exhibit A hereto.

## IV.

## **DISCUSSION**

**A.    The Debtors Have the Right to Reject the All Care Agreements Pursuant to § 365(a)**

Section 365(a) authorizes a debtor in possession, "subject to the Court's approval, . . . [to] assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a)

---

[9] The All Care PSA also provides for third-party payor arrangements. *See* All Care PSA at § 7.4. However, the parties are not enrolled in these but rather rely on the Managed Care Agreements to fund the All Care PSA.

(made applicable by § 1107(a)).  A debtor in possession may assume or reject executory contracts for the benefit of its estate and its creditors.  *Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp., Inc.)*, 476 F.2d 665, 671 (9th Cir. 2007); *In re Chi-Feng Huang*, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982) ("The primary issue is whether rejection would benefit the general unsecured creditors.").  "The purpose of the power to reject is to augment the estate of the debtor."  *Chi-Feng Huang*, 23 B.R. at 800 (quoting Krasnowiecki, The Impact of the New Bankruptcy Reform Act on Real Estate Development and Financing, 53 Am. Bankr. L.J. 363, 382 (1979)).

Section 365 does not provide a definition of what constitutes an executory contract.  However, the Ninth Circuit has adopted the standard *Countryman* definition of an executory contract, which is a contract "under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  *See, e.g., In re Robert L. Helms Constr. & Dev. Co., Inc.*, 139 F.3d 702, 705 (9th Cir. 1998)

Here, both VMF and All Care have material unperformed obligations under the All Care PSA, which remains in effect until 2027, unless terminated early.  Thus, in that time, All Care has continuing obligations to provide physician, research and education services, and VMF has several continuing obligations ranging from paying the compensation for those services to administratively supporting the operation of the Clinic Site.  Similarly, both VMF (or All Care)[10] and the counterparties to the Managed Care Agreements and the vendor agreements have continuing material obligations for the remainder of their terms.  Based on the foregoing, there is no dispute that the All Care Contracts are executory.  *See Pomona Valley Med. Gp.*, 476 F.3d at 669 (agreement by which a primary care physician and certified cardiologist provided primary or basic medical services to patients in debtor's network was validly rejected as an executory contract); *In re Hardeman Cnty. Hosp. Dist.*, 540 B.R. 229, 244 (Bankr. N.D. Tex. 2015)

---

[10] Given that VMF is not a formal party to all the All Care Contracts, the Debtors reserve all rights to argue that the obligations thereunder are not *their* legal obligation.  In an abundance of caution and to provide immediate notice of their intentions, the Debtors seek to reject all the All Care Contracts to the extent they may be considered to belong to the Debtors.

- 7 -

109018393\V-6

(unexpired contract whereby county provided emergency medical services to debtor was an executory contract).

### B. Rejection of the All Care Agreements Is Within the Debtors' Sound Business Judgment

In reviewing a debtor in possession's decision to assume or reject an executory contract, a bankruptcy court should apply the "business judgment test" to determine whether to approve the assumption or rejection. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (recognizing that the business judgment rule is used in reviewing motions to reject executory contracts); *Pomona Valley Med. Grp.*, 476 F.2d at 670.

The business judgment standard requires that the bankruptcy court "presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *Pomona Valley Med. Grp.*, 476 F.2d at 670. As a result, the bankruptcy court should approve assumption "unless it finds that the debtor-in-possession's conclusion that rejection would be 'advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.'" *Id.* (quoting *Lubrizol Enters. v. Richmond Metal Finishers*, 726 F.2d 1043, 1047 (4th Cir. 1985)).

The Motion should be granted because the Debtors' decision to reject the All Care Agreements indisputably falls within their sound business judgment. Rejecting the All Care Agreements will allow the Debtors to save at least $2 million over the next year in spend (not to mention other loss on account of reduced revenue under the total arrangement) – a minimum of $167,000 per month of these Cases – which savings will benefit VMF, the other Debtors, their Estates and their creditors. At the same time, the Debtors will not miss any material benefit of the agreements as, in large part, the physicians employed or contracted by All Care pursuant to the All Care PSA (the "All Care Physicians") historically have treated patients at the Clinic Site or at other hospitals outside the Verity Health System, without referring patient care to (or revenue at) the Hospitals. Accordingly, rejection is in the Estates' best interest, and such a decision falls squarely within the Debtors' sound business judgment. *See, e.g., In re Health Plan of the*

- 8 -

109018393\V-6

*Redwoods*, 286 B.R. 779, at 780 (Bankr. N.D. Cal. 2002) (granting rejection to "put an end to continuing losses which have resulted from the contract" and "allow the debtor to significantly reduce its overhead").

Although cited to throughout this Motion, a concentrated look at *In re Pomona Valley Medical Group, Inc.* is particularly instructive. In that case, the debtor sought to reject a medical provider agreement with a primary care physician and certified cardiologist who provided primary and basic medical care services to patients within the debtor's network. 476 F.3d at 668. The debtor justified its decision to reject the provider agreement as an effort "to reduce costs by limiting the number of physicians in its network and severing relationships with physicians . . . who created financial burdens by ordering treatment and tests [the debtor] considered unnecessary." *Id.* at 670. The court granted the debtor's motion, finding that "the rejection of the Agreement was in the best interests of the bankruptcy estate and its creditors." *Id.* at 671.

Reducing VMF's expenses by rejecting the All Care Agreements is within the sound business judgment of the Debtors because "the benefits of rejecting the [All Care Agreements] far outweigh any benefits to the [D]ebtor[s] from [their] continuation," and "there is a reasonable likelihood that the general creditors of the estate will derive substantial or significant benefit from the proposed rejection." *See In re Turbowind, Inc.*, 42 B.R. 579, 585 (Bankr. S.D. Cal. 1984). "Since the debtor has the right under the Bankruptcy Code to reject the contract, the court's discretion is limited once it has determined that the debtor is exercising sound business judgment." *Health Plan of the Redwoods*, 286 B.R. at 780. Consequently, because the Debtors' rejection of the All Care Agreements is manifestly reasonable and within their sound business judgment, the Court should grant the Motion.

### C. Rejection Should Be *Nunc Pro Tunc*

Section 365 provides that "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease . . . immediately before the date of the filing of the petition . . . ." 11 U.S.C. § 365(g)(1); *see also Bildisco*, 465 U.S. at 530; *Pomona Valley Med. Gp.*, 476 F.3d at 671 n.7; *Aslan v. Sycamore Inv. Co. (In re Aslan)*, 909 F.2d 367, 371-72

(9th Cir. 1990). In other words, the relief requested herein is statutorily authorized as *nunc pro tunc* to the Petition Date for the All Care Contracts.

As for the All Care Lease, the Bankruptcy Court "has the equitable power, in suitable cases, to order a rejection to operate retroactively." *Pac. Shores Dev., LLC v. At Home Corp. (In re At Home Corp.)*, 392 F.3d 106, 1065 (9th Cir. 2004) (quoting *Thinking Machines Corp. v. Mellon Financial Services Corp. # 1 (In re Thinking Machines Corp.),* 67 F.3d 1021, 1029 (1st Cir.1995)). The Ninth Circuit has recognized "that the retroactive date may be earlier than the date on which the landlord retakes possession of the premises," including "as of the date on which the debtor filed its motion seeking to reject them." *Id.* at 1065-66.

Specifically, the Ninth Circuit has identified four non-exclusive factors to be considered by a bankruptcy court in determining whether "exceptional circumstances" warrant retroactive rejection: (1) the debtor's immediate filing of a motion to reject; (2) a debtor's prompt action in setting that motion for hearing; (3) whether the debtor received any benefits under the contract or lease; and (4) the non-debtor party to the contract or lease's conduct and motivation in opposing a retroactive rejection of the contract or lease. *Id.* at 1072.

Here, first, the Debtors have sought rejection as quickly as possible after the Petition Date, both because they are so burdensome and to provide the counterparties with as much notice as was practical of the Debtors' intentions. The only reason that the Motion is being filed even this far into the Cases is that the Debtors have been attempting to negotiate a global settlement with All Care (including to provide for easy transition of equipment and non-physician staff), but have thus far been unsuccessful, and it is against the Estates' best interests for the Debtors to hold onto the burden of the All Care Agreements any longer. But the Slauson Landlord has been on notice since before the Petition Date of the Debtors' desire and intention to terminate the Slauson Lease.

Second, although the LBR allow a motion to reject to be filed without immediately setting it for hearing and instead merely providing interested parties with the opportunity to request a hearing, the Debtors have promptly set this Motion for this Court's first available hearing date (following proper notice under the LBR) precisely to resolve the matter as expeditiously as possible. Third, as has been stated, course of dealing has shown that the Debtors do not derive

- 10 -

109018393\V-6

material benefits under the All Care Agreements, and certainly not enough to overcome their detriment to the Estates. It is worth noting that should the Debtors terminate any obligations they may have under the Slauson Lease, All Care and the patients they serve will continue to occupy the leased premises with or without VMF's support. In fact, the Slauson Landlord is himself one of the All Care Physicians. Accordingly, the Debtors submit that authorizing rejection of the All Care Lease *nunc pro tunc* to the date of this Motion is appropriate.

## V.

## CONCLUSION

**WHEREFORE**, for all the foregoing reasons and such additional reasons as may be advanced at or prior to the hearing on this Motion, the Debtors respectfully request that this Court enter an order authorizing them to reject[11] the All Care Agreements, *nunc pro tunc*, and granting such other and further relief as is just and proper under the circumstances.

Dated: October 3, 2018

DENTONS US LLP
SAMUEL R. MAIZEL
JOHN A. MOE, II
TANIA M. MOYRON


By   /s/Tania M. Moyron
         Tania M. Moyron

Proposed Attorneys for the Chapter 11 Debtors and Debtors In Possession

---

[11] Nothing in this Motion precludes or otherwise affects one or more Debtors from asserting any claim it may have against All Care or any other party to an All Care Agreement, either by affirmative action, by recoupment, setoff or as another defense.

- 11 -

109018393\V-6

# DECLARATION OF STEPHEN CAMPBELL, M.D.

I, Stephen Campbell, declare, that if called as a witness, I would and could competently testify thereto, of my own personal knowledge, as follows:

1. I am the Chief of Physician Operations for Verity Health System.[1] I became the Debtors' Chief of Physician Operations effective March 5, 2018. As Chief Physician Officer, I lead the overall clinic operations of Verity Medical Foundation ("VMF"). I provide medical oversight, expertise and leadership to ensure clinical quality is at the highest level, while optimizing the delivery of affordable quality healthcare services, with an unparalleled patient and family experience.

2. I have over twenty years of clinical experience with over ten years in leadership roles prior thereto, including as a family physician in Washington and Minnesota and as the Chief Quality Officer for the Mayo Clinic – Southwest Minnesota Region, which included six hospitals and 27 clinics.

3. I received my medical degree at University of British Columbia in Vancouver, British Columbia, and completed my residency in family medicine at University of Alberta in Edmonton, Alberta.

4. Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the healthcare industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

5. This Declaration is in support of the Debtors' *Notice of Motion and Motion to Reject Pursuant to 11 U.S.C. § 365(a), Professional Services Agreement and Development Agreement with All Care Medical Group, Inc. and Related Executory Contracts and Unexpired Lease Nunc Pro Tunc* ("Motion")[2] and for all other purposes permitted by law.

---

[1] As defined in the Motion (defined below), the "Verity Health System" includes Verity Health System of California, Inc. ("VHS"), five California nonprofit public benefit corporations that operate six acute care hospitals, and their affiliated entities.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

- 1 -

109018393

6. VMF and All Care Medical Group, Inc. ("All Care") entered into the Professional Services Agreement on or about December 31, 2012 ("All Care PSA"). A true and correct copy of the All Care PSA is attached as Exhibit B to the Memorandum of Points and Authorities.

7. In exchange for providing professional services under the All Care PSA, VMF is contractually obligated to pay All Care base compensation measured in work relative value units, as published by the Centers for Medicare and Medicaid Services. Based on the compensation and benefits paid thus far in 2018, absent early termination, this obligation amounts to approximately $20.3 million over the remaining term.

8. Under the All Care PSA, VMF and even VHS are obliged to provide other support in furtherance of the agreements, including space, equipment, supplies, non-physician personnel, and various administrative and management services as appropriate for All Care's provision of services. Provision of these services further divert necessary resources away from the company. Included in this is the Slauson Lease, which, absent early termination, would cost VMF more than $2.3 million over the remaining term.

9. The remaining All Care Agreements are all incidental to the All Care PSA – from the Slauson Lease for the Clinic Site out of which the All Care Physicians treat patients, to the Managed Care Agreements that provide the revenue stream for the Clinic Site, to the other miscellaneous vendor contracts that support the operation of the Clinic Site. None of these agreements provide a material benefit to the Estates – either on a standalone basis or collectively with each other. In fact, considering its reduced revenues, VMF has suffered a $1.242 million loss over the 2018 fiscal year on account of its arrangements with All Care.

10. Based on the foregoing, VMF has determined, in its business judgment, that the All Care Agreements are burdensome, and that rejection of the All Care Agreements is in the best interest of their estates.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

I declare under penalty of perjury and of the laws in the United States of America, the foregoing is true and correct.

Executed this 3rd day of October, 2018, at Los Angeles, California.

_____
STEPHEN CAMPBELL, M.D.

109018393