SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

Proposed Attorneys for the Chapter 11 Debtors and
Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

In re

VERITY HEALTH SYSTEM OF
CALIFORNIA, INC., *et al.*,

    Debtors and Debtors In
Possession.

☒ Affects All Debtors

☐ Affects Verity Health System of
California, Inc.
☐ Affects O'Connor Hospital
☐ Affects Saint Louise Regional
Hospital
☐ Affects St. Francis Medical
Center
☐ Affects St. Vincent Medical
Center
☐ Affects Seton Medical Center
☐ Affects O'Connor Hospital
Foundation
☐ Affects Saint Louise Regional
Hospital Foundation
☐ Affects St. Francis Medical
Center of Lynwood Foundation
☐ Affects St. Vincent Foundation
☐ Affects St. Vincent Dialysis
Center, Inc.
☐ Affects Seton Medical Center
Foundation
☐ Affects Verity Business Services
☐ Affects Verity Medical
Foundation
☐ Affects Verity Holdings, LLC
☐ Affects De Paul Ventures, LLC
☐ Affects De Paul Ventures  - San
Jose Dialysis, LLC

    Debtors and Debtors In
Possession.

Lead Case No. 2:18-bk-20151-ER

Jointly Administered With:
CASE NO.: 2:18-bk-20162-ER
CASE NO.: 2:18-bk-20163-ER
CASE NO.: 2:18-bk-20164-ER
CASE NO.: 2:18-bk-20165-ER
CASE NO.: 2:18-bk-20167-ER
CASE NO.: 2:18-bk-20168-ER
CASE NO.: 2:18-bk-20169-ER
CASE NO.: 2:18-bk-20171-ER
CASE NO.: 2:18-bk-20172-ER
CASE NO.: 2:18-bk-20173-ER
CASE NO.: 2:18-bk-20175-ER
CASE NO.: 2:18-bk-20176-ER
CASE NO.: 2:18-bk-20178-ER
CASE NO.: 2:18-bk-20179-ER
CASE NO.: 2:18-bk-20180-ER
CASE NO.: 2:18-bk-20171-ER

Chapter 11 Cases

Hon. Ernest M. Robles

**OMNIBUS REPLY TO OBJECTIONS TO MOTION OF DEBTORS FOR (I) ENTRY OF ORDER (1) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR STALKING HORSE BIDDER AND FOR PROSPECTIVE OVERBIDDERS TO USE, (2) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES AND STALKING HORSE BID PROTECTIONS, (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES, (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST AND BEST BIDDER AND (5) APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) AUTHORIZING THE SALE OF PROPERTY FREE AND CLEAR OF ALL CLAIMS, LIENS AND ENCUMBRANCES [RELATED DKT. NOS. 365, 437,439, 444, 445, 450, 452, 458, 460, 465 and 490]**

**Hearing:**
**Date: October 24, 2018**
**Time: 10:00 am Pacific**
**Location: Courtroom 1568**

- 1 -

109363714\V-9

# TABLE OF CONTENTS

**Page**

I.    Preliminary Statement ................................................................................................ 1

II.    Summary of Objections and Debtors Response ...................................................... 3

III.    Argument ................................................................................................................... 5

    A.    Response to the UCC's Limited Objection. ............................................. 5

    B.    Bankruptcy Code § 1113 does not Prohibit the Sales Process from
          Continuing and the Debtors will Continue to Work with the Unions during
          this Process. ................................................................................................ 10

    C.    The Debtors will Continue to Keep the PBGC and All Pension Plan
          Representatives (including the RPHE) Informed of All Offers and will
          Continue to Welcome Buyers Who Wish to Assume Pension Obligations ........... 14

    D.    Cigna Seeks Protections that Are Over-Burdensome and Not Consistent
          with Bidding Procedures Approved Regularly in this Court and Bankruptcy
          Courts Across the Country. ......................................................................... 17

    E.    The FCC's Objection Is Premature and Will Be Addressed at the
          Appropriate Time ....................................................................................... 18

IV.    Prayer ....................................................................................................................... 18

109363714\V-9

1

## TABLE OF AUTHORITIES

2

3                                                                                    **Page(s)**

4    **Cases**

5    *In re Agripac, Inc.*, No. 699–60001,
        *slip. op.* (Bankr. D. Or. Apr. 2, 1999) ........................................................................12

6
7    *In re Alpha Nat. Res., Inc.*,
        552 B.R. 314 (Bankr. E.D. Va. 2016) ..........................................................................13

8    *Am. Flint Glass Workers Union v. Anchor Resolution Corp.*,
        197 F.3d 76 (3d Cir. 1999) ...........................................................................................12
9

10   *Chicago Dist. Council of Carpenters Pension Fund v. Cotter*,
        914 F. Supp. 237 (N.D. Ill. 1996) .................................................................................12

11
     *Cottle v. Storer Communications, Inc.*,
12      849 F.2d 570 (11th Cir. 1988) ........................................................................................5

13   *CRTF Corp. v. Federated Department Stores*,
        683 F.Supp. 422 (S.D.N.Y. 1988). Bankruptcy ............................................................5
14

15   *In re CXM, Inc.*,
        307 B.R. 94 (Bankr. N.D. Ill. 2004) ...............................................................................6

16
     *In re Dan River, Inc.*,
17      No. 04-10990 (Bankr. N.D. Ga. Dec. 17, 2004) .............................................................6

18   *In re Family Snacks, Inc.*,
        257 B.R. 884 (B.A.P. 8th Cir. 2001)................................................................10, 11, 13
19

20   *In re Financial News Network, Inc.*,
        931 F.2d 217 (2d Cir. 1991)...........................................................................................8

21
     *In re Integrated Resources, Inc.*,
22      147 B.R. 650 (S.D.N.Y. 1992).....................................................................................5, 8

23   *In re Journal Register Co.*,
        488 B.R. 835 (Bankr. S.D.N.Y. 2013) ..........................................................................12
24

25   *In re Karykeon*,
        435 B.R. 663 (Bankr. C.D. Cal. 2010) ..........................................................................13

26
     *In re Lady H Coal Co., Inc.*,
27      193 B.R. 233 (Bankr. S.D. W. Va. 1996) ......................................................................12

28

109363714\V-9

*In re Lake Burton Dev., LLC*,
    No. 09-22830 (Bankr. N.D. Ga. Apr. 1, 2010) ...................................................................6

*In re Maxwell Newspapers, Inc.*,
    981 F.2d 85 (2d Cir. 1992)..............................................................................................12

*In re Moline Corp.*,
    144 B.R. 75 (Bankr. N.D. Ill. 1992)................................................................................15

*In re Pomona Valley Med. Group, Inc.*,
    476 F.3d 665 (9th Cir. 2007).................................................................................15, 16, 17

*In re Stein Henry Co., Inc.*,
    1992 WL 122902 (Bankr. E.D. Pa. June 1, 1992) ...........................................................12

*In re Texas Rangers Baseball Partners*,
    431 B.R. 706 (Bankr. N.D. Tex. 2010) ...........................................................................7, 8

*In re TreeSource Indus., Inc.*,
    363 F.3d 994 (9th Cir. 2004)...........................................................................................15

*United Mine Workers of Am. 1974 Pension Plan & Tr. v. Walter Energy, Inc.*,
    579 B.R. 603 (N.D. Ala. 2016) .......................................................................................10

*United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*,
    551 B.R. 631 (N.D. Ala. 2016) .......................................................................................10

*In re Walter Energy, Inc.*,
    542 B.R. 859 (Bankr. N.D. Ala. 2015) .......................................................................10, 11

*In re Women First Healthcare, Inc.*,
    332 B.R. 115 (Bankr. D. Del. 2005) ..................................................................................6

**Statutes**

11 United States Code
    § 365(g)(1) .....................................................................................................................15

Bankruptcy Code Section 363.................................................................................................1, 13

Bankruptcy Code Section 1113............................................................................................ *passim*

ERISA .........................................................................................................................................15

ERISA
    § 4201 .............................................................................................................................15

ERISA Title IV ...........................................................................................................................15

UCC ..................................................................................................................................... *passim*

109363714\V-9

1

**Rules and Regulations**

2

*Order (1)* ..................................................................................................................1

3

*Order (A)* .................................................................................................................1

4

**Other Authorities**

5

Lynn M. LoPucki & Joseph W. Doherty, Bankruptcy Fire Sales, 106 MICH. L.
    REV. 1, 35 (2007) ................................................................................................8

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

109363714\V-9

Verity Health System Of California, Inc. and the above-referenced affiliated debtors (collectively, the "Debtors"), the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Cases"), file this omnibus reply (the "Reply") to the objections (the "Objections") filed by Official Committee of Unsecured Creditors (the "UCC") [Dkt. No. 490], the Pension Benefit Guaranty Corporation ("PBGC") [Dkt. No. 439], the Federal Communications Commission (the "FCC") [Dkt. No. 437], Premier, Inc. ("Premier") [Dkt. No. 444], Service Employees International Union, United Healthcare Workers-West ("SEIU-UHW") [Dkt. No. 450]; OHC Forest 1, LLP ("OHC") [Dkt. No. 452]; International Union of Operating Engineers, Stationary Engineers Local 39 ("Local 39") [Dkt. No. 458], the Retirement Plan for Hospital Employees ("RPHE") [Dkt. No. 460] Cigna Healthcare of California, Inc. and Life Insurance Company of North America (together "Cigna") [Dkt. No. 445] and the California Nurses Association ("CNA") [Dkt. No. 465] (collectively, CNA, the UCC, PBGC, FCC, Premier, OHC, Local 39, RPHE, Cigna, and SEIU-UHW are referred to as the "Objectors" and individually an "Objector") to the Debtors' *Motion for the Entry of (I) an Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and for Prospective Overbidders to Use, (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections, (3) Approving Form of Notice to be Provided to Interested Parties, (4) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest Bidder and (5) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and (II) an Order (A) Authorizing the Sale of Property Free and Clear of All Claims, Liens and Encumbrances* (the "Sale Procedures Motion") [Dkt. No. 365], and respectfully state the following:

## I.    PRELIMINARY STATEMENT

The Sale Procedures Motion seeks authority from this Court permitting the Debtors to sell two hospitals and related assets located in Santa Clara County, California — Saint Louise Medical Center and O'Connor Medical Center (collectively, the "Hospitals") — pursuant to Section 363 of the Bankruptcy Code.  To facilitate the sale of the Hospitals, the Sale Procedures Motion requests entry of an order: (a) establishing the County of Santa Clara, a political

- 1 -

subdivision of the State of California ("Santa Clara County"), as the stalking horse bidder for the Hospitals, as more completely described in the Sale Procedures Motion, at a price of approximately $235 million; (b) setting bid procedures to establish guidelines for parties interested in making an overbid; (c) setting an auction to be held in late November 2018; (d) setting a hearing for the Court to approve the winning bidder; and (e) approving procedures for the assumption and assignment of executory contracts and leases in connection with the sale.

The proposed sale of the Hospitals pursuant to the procedures described in the Sale Procedures Motion is the result of a vigorous marketing effort by the Debtors and their advisors and embodies the results of intense negotiations among the Debtors, Santa Clara County and other stakeholders to obtain the highest and best offer for the Hospitals.  Not only does Santa Clara County have the financial wherewithal to complete the purchase, but the Debtors believe that Santa Clara County is well-positioned to maintain the healthcare characteristics of the Hospitals and continue the Debtors' mission of providing patient care for the communities served by the Hospitals.  Nonetheless, the Debtors are hopeful for additional bids from potential competing purchasers for the Hospitals in order to bring the highest and best consideration for the benefit of the Debtors' bankruptcy estates.  To that end, the sale and bidding procedures embodied in the Sale Procedures Motion, which are consistent with sale procedures adopted in many other bankruptcy cases (including in cases before this Court), are intended to foster a competitive auction process and provide an opportunity for potential purchasers to offer bids in excess of Santa Clara County's.  At the same time, recognizing the time, expense and effort already expended by Santa Clara County to enter into the stalking-horse agreement with the Debtors for the benefit of the sale process, the proposed sale procedures offer reasonable bidding protections to Santa Clara County to compensate it in the event that it is not ultimately chosen as the successful purchaser for the Hospitals.  For the reasons detailed in the Sale Procedures Motion, the Debtors submit that the bidding and sale procedures proposed for the auction and sale of the Hospitals are reasonable and necessary under the circumstances.  Moreover, the procedures are consistent with sale and bidding procedures approved in this District and in other bankruptcy cases throughout the country and, therefore, should be approved.

- 2 -

## II.    SUMMARY OF OBJECTIONS AND DEBTORS RESPONSE

This Reply is an omnibus response to the Objections filed by the Objectors identified above.  In addition to the Objections addressed in this Reply, the Debtors also received objections to the Sale Procedures Motion from the U.S. Department of Health and Human Services and Centers for Medicare and Medicaid Services ("HHS") and the Attorney General of California also filed objections. [Dkt. Nos. 447, 463.]  Due to the unique issues raised by HHS and the Attorney General of California, those objections will be addressed by a separate reply.[1]

Certain of the Objections -- specifically, those filed by Premier and OCH -- do not object to the relief sought in the Sale Procedures Motion, but merely reserve rights or "conditionally object" based upon possible future events or as additional information is provided.  For example, Premier asserts that certain of its contracts with the Debtors may not be assumed and assigned absent its consent and reserves all rights should the Debtors' attempt to assume and assign the contracts.  [See Dkt. No. 444, p. 3.]  Similarly, OCH "conditionally objects" to the proposed sale to the extent the sale would alter its rights under certain joint venture agreements with the Debtors.  [See Dkt. No. 452, pp. 6-8.]  Because nothing in the Sale Procedures Motion would impair the rights of Premier or OCH at this time, their rights to object on the grounds raised in their Objections are fully preserved and need not be addressed further here.  However, for the avoidance of doubt, nothing in this Reply should be deemed a waiver of any of the Debtors' rights or arguments against Premier, OCH or to any other Objector, and the Debtors expressly reserve any and all rights.

The remainder of the Objections are categorized as follows:  (i) the Objection of the UCC to certain of the proposed bidding procedures and protections for the stalking horse bidder, Santa Clara County; (ii) the Objections filed by PBGC, Local 39, CNA, RPHE and SEIU-UHW, objecting to any potential rejection of collective bargaining agreements pursuant to a sale of the

---

[1] Verity MOB Financing LLC and Verity MOB Financing II LLC (collectively, "MOB Financing Entities") also filed a limited objection and reservation of rights to the Sale Procedures Motion to preserve their rights in the event that the MOB Financing Entities and the Debtors are unable prior to the hearing on the Sale Procedures Motion to resolve certain issues under discussion.  [Dkt. No. 500.] The Debtors remain in discussions with the MOB Financing Entities and hope to resolve any remaining issues in advance of the hearing on October 24, 2018.

109363714\V-9

1   Hospitals and asserting certain rights under Section 1113 of the Bankruptcy Code; and (iii)

2   Objections of the FCC and Cigna, raising certain objections specific to their contracts.  Except for

3   the Objection filed by the UCC, very few of the remaining Objections directly address the

4   bidding and sale procedures proposed in the Sale Procedures Motion.  Instead, those Objectors

5   largely raise issues that only ripen (if at all) upon designation (or lack of designation, as the case

6   may be) of certain contracts, collective bargaining agreements or other leases and agreements for

7   assumption and assignment to the to the successful purchaser of the Hospitals.

8           To be clear, the Sale Procedures Motion does not propose to assume or reject any specific

9   contract or lease.  The procedures, however, proposed in the Sale Procedures Motion would

10  establish the procedures by which the Debtors must designate executory contracts and leases for

11  assumption and assignment and set the requirements for counter-parties to object to the

12  assumption or assignment of their executory contracts, whether on the basis of asserted cure

13  amounts, lack of adequate protection or otherwise.  *See* Sale Procedures Motion, ¶¶ 52-59.  Thus,

14  all rights of the Objectors to assert an objection to the proposed assumption and assignment of

15  their contracts and leases are fully preserved.  Until the Debtors and successful purchaser

16  designate executory contracts and leases for assumption and assignment an objection involving a

17  particular contract or lease is premature.  Moreover, the Sale Procedures Motion is also not the

18  appropriate time and place to raise issues related to the Debtors ability to reject collective

19  bargaining agreements, particularly when no such rejection has been proposed at this time.

20  Accordingly, to the extent any of the Objections are considered more than simply a reservation of

21  rights, such Objection should be overruled and the Court should enter the order approving the

22  Sale Procedures Motion.

23  ///

24  ///

25

26

27

28

- 4 -

# III.    ARGUMENT

## A.    Response to the UCC's Limited Objection.

The UCC does not object to a sale of Hospitals, but raises various objections to the Sale Procedures Motion, focusing on the allegedly unreasonable Break-Up Fee, Expense Reimbursement and bid increments in the Stalking Horse APA.[2]

### i.    The Proposed Break-Up Fee is Reasonable

The Stalking Horse APA proposes that Santa Clara County is entitled to a Break-Up Fee of 4% of the Purchase Price as compensation for Santa Clara County's diligence and negotiation efforts, payable at closing of the sale if Santa Clara County is not the Successful Bidder. (Stalking Horse APA, § 6.2.4.)  The UCC agrees that Santa Clara County should be entitled to a Break-Up Fee, but that the proposed Break-Up Fee is too high in this case.  [*See* Dkt. No. 490, ¶¶ 3-8.]  Specifically, the UCC proposes that the Break-Up Fee be reduced to an amount that is 3% of the Purchase Price.  [*Id*. at ¶ 8.]

Outside of bankruptcy, break-up fees are considered presumptively valid as an exercise of the seller's business judgment.  *See, e.g., Cottle v. Storer Communications, Inc*., 849 F.2d 570 (11th Cir. 1988); *CRTF Corp. v. Federated Department Stores*, 683 F.Supp. 422 (S.D.N.Y. 1988).  Bankruptcy courts have also followed this rule and approved break-up fees as a valid exercise of the debtor's reasonable business judgment.  *See, e.g, In re Integrated Resources, Inc*., 147 B.R. 650, 657 (S.D.N.Y. 1992).  Here, the Debtors exercised their reasonable business judgment in deciding to agree to the Break-Up Fee.  The court should not decrease the proposed Break-Up Fee and allow the UCC to substitute their judgment for the reasonable business judgment of the Debtors.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Sale Procedures Motion.

109363714\V-9

1    Also, as discussed in the Sale Procedures Motion, there are many cases across the country

2  where a Break-Up Fee of above 3% has been approved by the bankruptcy court.  *See In re*

3  *Women First Healthcare, Inc*., 332 B.R. 115, 118, (Bankr. D. Del. 2005) (court approved Break-

4  Up Fee and Expense Reimbursement that equaled 4.7% percent of the purchase price); *In re Dan*

5  *River, Inc*., No. 04-10990 (Bankr. N.D. Ga. Dec. 17, 2004) (court approved Break-Up Fee equal

6  to 5.3% of the cash purchase price); *In re Lake Burton Dev., LLC*, No. 09-22830 (Bankr. N.D.

7
8  Ga. Apr. 1, 2010) (court approved Break-Up Fee equal to 4.75% of cash purchase price).

9    The UCC also contends that the proposed Break-Up Fee should be lowered because Santa

10 Clara County in this case "is already on the scene, well-acquainted with the St. Louise and

11 O'Connor assets, and highly motivated to keep the lights on at both hospitals." [Dkt. No. 490, ¶

12
13 8.]  However, the UCC does not cite any authority that provides that a proposed stalking-horse

14 purchaser is entitled to a lower break-up fee because the purchaser has an interest in keeping the

15 business operating or is familiar with the assets to be sold at auction.  While Santa Clara County

16 may be familiar with the St. Louise and O'Connor assets, this does not mean that Santa Clara

17 County has already performed the due diligence required to submit an opening bid to purchase the

18 Hospitals.  The Break-Up Fee, which was negotiated as part of the overall Stalking Horse APA,

19
20 was necessary to incentivize Santa Clara County to perform the requisite due diligence to submit

21 an opening bid.  That bid, in turn, will establish a minimum bid for other bidders to follow and

22 will attract additional bidders to the sale because they will not have to perform the same level of

23 diligence already completed by Santa Clara County.  Accordingly, the Court should approve the

24 4% Break-Up Fee proposed in the Sale Procedures Motion.

25 ///

26 ///

27
28

*ii.     The Proposed Expense Reimbursement is Reasonable*

The UCC contends that the allegedly "unlimited" Expense Reimbursement provision is inappropriate in this case and that the proposed Expense Reimbursement should be capped at $500,000. [Dkt. No. 490, ¶¶ 1, 11.]

Santa Clara County has agreed to a cap on the Expense Reimbursement. In particular, Santa Clara County agrees to clarify that the sum of the Break-Up Fee and Expense Reimbursement in the aggregate will not exceed 5% of the Purchase Price under the Stalking Horse APA. Thus, the Expense Reimbursement will be capped at $2.35 million.

Also, while some courts have imposed a cap on Expense Reimbursement provisions to prevent a bidder from "seek[ing] to enhance its recovery by proving up excessive costs,"[3] the Sales Procedure Motion and the Stalking Horse APA provides for certain limitations to prevent the payment of any unjustified expenses to Santa Clara County. Specifically, the Stalking Horse APA provides that the Expense Reimbursement means "reasonably documented reasonable costs and expenses incurred by Purchaser related to its due diligence, and pursuing, negotiating, and documenting the transaction(s) contemplated by the Stalking Horse APA." Stalking Horse APA, § 6.2.4. Thus, all of Santa Clara County's costs and expenses must be reasonable and be reasonably documented before it can be reimbursed under the Expense Reimbursement provision.

If any expenses are considered to be unreasonable or not reasonably documented, the Debtors have the right to contest the reimbursement of the expense. In fact, the Sale Procedures Motion provides for a specific procedure to address any portion of the Expense Reimbursement that is being contested. To the extent that any portion of the Expense Reimbursement is being contested as provided in the Stalking Horse APA, the Debtors "shall (a) promptly pay the undisputed portion of the expense claimed by [Santa Clara County], and (b) set aside the disputed

---

[3] *See In re Texas Rangers Baseball Partners*, 431 B.R. 706, 715 (Bankr. N.D. Tex. 2010).

109363714\V-9

portion of such expense in a separate interest bearing account for the sole benefit of [Santa Clara County] pending the resolution of such dispute." *See* Stalking Horse APA, § 9.4. The Bankruptcy Court retains jurisdiction to resolve any dispute regarding a contested Expense Reimbursement request. *See* Stalking Horse APA, § 16.3.

Given the agreed to cap on the Expense Reimbursement and limitations on Santa Clara County's ability to seek reimbursement of its costs and expenses under the Stalking Horse APA, the Court should find that the proposed Expense Reimbursement provision is reasonable.

iii.    *The Proposed Bid Increments are Reasonable*

The UCC also requests that the Court reduce the bidding increment amount proposed in the Sale Procedures Motion from $7,500,000 to $5 million. [Dkt. No. 490, ¶ 17.] The UCC contends that the proposed bidding increment is too large and that it may chill the bidding at auction. [*Id*. at ¶¶ 15-16.]

The proposed bid increment amount of $7,500,000 is only 3.2% of the $235,000,000 Purchase Price. Similar bid increment amounts have been approved as reasonable in other cases. *See, e.g., Integrated Resources, Inc*., 135 B.R. 746, 752 (Bankr. S.D.N.Y. 1992), aff'd, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (approving overbid amount of $15 million or 7.8% of the $190 million purchase price); *In re Texas Rangers Baseball Partners*, 431 B.R. 706 (Bankr. N.D. Tex. 2010) (approved overbid amount was $15 million or 2.9% of the $520 million purchase price); *In re Financial News Network, Inc*., 931 F.2d 217 (2d Cir. 1991) (approving initial overbid of $10 million or 9.5% of the $105 million purchase price).[4]

---

[4] Also, according to a study conducted by professors Lynn M. LoPucki and Joseph W. Doherty of bankruptcy sales and reorganizations, the average bid increment included in the sale procedures was 3.7% of the purchase price. See Lynn M. LoPucki & Joseph W. Doherty, Bankruptcy Fire Sales, 106 MICH. L. REV. 1, 35 (2007).

- 8 -

Also, the bid increment was agreed to in the Debtors' reasonable business judgment so that the initial overbid would cover the cost of the Break-Up Fee and Expense Reimbursement and be above the Purchase Price offered by Santa Clara County.  The bid increment amount was negotiated in good faith between the Debtors and Santa Clara County and ensures that any overbid will surpass the amount of bid protections to provide additional value to the estates.

Accordingly, because this bid increment amount was agreed to by the Debtors in their business judgment and is consistent with the amounts of overbids approved in cases across the country, this Court should find the bid increment amount reasonable.[5]

> iv.    *The UCC's Remaining Objections Are Already Addressed in the Sale Procedures Motion or Will be Addressed Prior to Closing of the Sale*

The UCC's Objection also requests that the Court not authorize payment of the Break-Up Fee or Expense Reimbursement until (i) the Board of Supervisors of the County of Santa Clara approves the sale, and (ii) the 45-day period following the Signing Date for Santa Clara County to complete its diligence investigation expires.  [Dkt. No. 490, ¶ 13 (*citing* Stalking Horse APA, §§ 8.15 and 8.19).]

Nothing in the Sale Procedures Motion entitles Santa Clara County to payment of the Break-Up Fee or Expense Reimbursement until the Santa Clara County completes its due diligence or the diligence period expires pursuant to Stalking Horse APA § 8.19 and the Board of Supervisors of the County of Santa Clara approves the sale of the Hospitals to Santa Clara County.  Moreover, Santa Clara County has acknowledged and clarified that if it exercises its general due diligence out under § 8.19 of the Stalking Horse APA or if the County of Santa Clara does not approved the sale pursuant to § 8.15 of the Stalking Horse APA, it will not be entitled to

---

[5] Also, while the initial overbidder must submit a bid that is equal to the Break-Up Fee plus the bid increment amount, the Break-Up Fee and the bid increment together equal only 7.2% of the Purchase Price.  As reflected by the cases cited herein, this initial overbid amount is also reasonable.

- 9 -

receive payment of the Break-Up Fee or Expense Reimbursement.    The Debtors also do not propose payment of the Break-Up Fee or Expense Reimbursement in advance of due diligence completion.

The UCC's Objection also contends that the bidding procedures should be amended to require that Santa Clara County and any other potential bidder allocate which portion of its bid relates to the purchase of the De Paul property.    [Dkt. No. 490, ¶¶ 18-20.]    This Objection, however, is already addressed in the Stalking Horse APA.    Sections 14.3.2 and 1.1.1 of the Stalking Horse APA already contemplates that Santa Clara County will provide schedules allocating the purchase price among the Hospital assets and an allocation of the purchase price among the various seller entities.    Such schedules must be completed by November 15th, which is prior to the contemplated date of the auction.    Therefore, Santa Clara County will allocate which portion of its bid relates to the purchase of the De Paul property owned by Verity Holdings, LLC by November 15th.

**B.    Bankruptcy Code § 1113 does not Prohibit the Sales Process from Continuing and the Debtors will Continue to Work with the Unions during this Process.**

SEIU-UHW, CNA and Local 39 (collectively referred to as the "Union Objectors") seek denial of the Motion and to block the sales process from continuing based on the assertion that Debtors have yet to obtain relief under Bankruptcy Code § 1113 to reject or modify their respective collective bargaining agreements ("CBAs").[6]    The Union Objectors' argument is contrary to the law and unwarranted for several reasons.

The sales process does not prevent *any* bidder from seeking to assume any obligation or contract, including collective bargaining agreements.    In fact, the Debtors have consistently expressed a preference to all potential buyers that they assume the existing CBAs.    Here, the

---

[6] *Objection Filed by Creditor Pension Benefit Guaranty Corporation* [Docket No. 439]; *Objection Filed by Creditor SEIU United Healthcare Workers* [Docket No. 450]; *Objection Filed by Creditor Stationary Engineers Local 39* [Docket No. 458]    *Limited Objection Filed by Creditor Retirement Plan for Hospital Employees* [Docket No. 460 Oct. 10, 2018].

109363714\V-9

1   winning bidder(s) may agree to assume such contractual obligations.  If so, there may be no

2   reason to modify or reject the CBAs.  Thus, the Court should overrule these objections as

3   premature and permit the sale process to continue as requested.

4        The fact that the stalking horse bidder -- Santa Clara County -- does not seek to assume

5   the subject CBAs or that other bidders also may not desire these agreements, does not render the

6   sales process to be in violation of §1113.  To the contrary, should the Debtors determine that the

7   highest and best bid includes assumption of CBAs, they will seek approval of such assumption in

8   accordance with the Bankruptcy Code.  If the highest and best bid(s) does not seek outright

9   assumption of the CBAs, the Debtors will seek requisite consent to reject or modify them and,

10  absent consent, will follow all applicable requirements of the Bankruptcy Code.[7]  However, to

11  require the Debtors to seek and obtain relief under Bankruptcy Code § 1113 now, before approval

12  of the Sale Procedures Motion, is unwarranted and contrary to law.  *See In re Walter Energy, Inc*.,

13  542 B.R. 859, 884 (Bankr. N.D. Ala. 2015)[8] ("neither § 1113 nor 1114 require completion of

14  negotiations before filing [a sale] motion"); *In re Family Snacks, Inc.*, 257 B.R. 884, 895–96

15  (B.A.P. 8th Cir. 2001) ("there is nothing in the language of § 1113 that dictates when an

16  application to reject must be made [and] the timing of such action is governed, not by § 1113, but

17  by § 365(d)(2), which allows a debtor to defer such a decision until confirmation of a plan")

18  (facts involved sale motion filed before § 1113 motion).

19       Similarly, the Union Objectors' request to prohibit the sales process from continuing

20  unless all bidders are required to assume all CBAs would unnecessarily chill this sales process

21  and damage the cases more generally.  Were the Debtors to accede to such demand, not only

22  could this actually harm workers whom the Objecting Unions currently represent (and whom

23  Santa Clara believes can be represented under new County union contracts) but injure other

24

25  [7] The Debtors recognize that some, but not all CBAs contain successor clauses.  Among the CBAs that do not include

26  such a successor clause the proposed CBAs with Local 39.

27  [8] aff'd sub nom. *United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631 (N.D. Ala.
    2016) and aff'd sub nom. *United Mine Workers of Am. 1974 Pension Plan & Tr. v. Walter Energy, Inc.,* 579 B.R. 603

28  (N.D. Ala. 2016).

- 11 -

stakeholders.  Such creditors could justifiably assert that the Debtors would be violating their duty of maximizing the sales process for the benefit of all creditors.  As explained by the Eighth Circuit BAP in rejecting an argument similar to that now being raised by the Union Objectors, pre-auction relief is not mandated by § 1113 and requiring it would effectively give unions an improper veto right.  The Court stated:

> When a debtor is selling on a going concern basis, the union urges . . . the only meaningful time the court can make a decision on rejection is prior to the sale. ***We see no basis for such a distinction, unless it is to give the union veto power over a going concern sale which, as we know from experience, is often the best way to reap the greatest benefit for all creditors***. . . In an auction setting, for sure, negotiations for rejection would be virtually impossible.  It is difficult to accept the argument that § 1113 was designed to give a union the power to so strangle a debtor's attempts to reorganize through liquidation.  We see no principled reason to limit a debtor's right to reject a CBA to a case where the application to reject comes before an asset sale.

*Family Snacks*, 257 B.R. at 897 (***emphasis added***); *Walter*, 542 B.R. at 890 (union "is not entitled to a veto power over a going concern sale when the undisputed evidence establishes that it is the best way to maximize value for all creditors and provide the best chance for future employment for the Debtors' employees. . . [instead] its purpose is to prevent the Debtors from unilaterally rejecting the . . . CBA, [and] to encourage negotiations . . .").

The cases cited by the Union Objectors do not support their requested procedural bar and are readily distinguishable to the current cases.  Here there is no plan pending, condition precedent mandating rejection or basis to contend that rejection is *a fait accompli*.  To the contrary, there is no plan and the Motion expressly invites other bids.  *Compare In re Stein Henry Co., Inc.*, 1992 WL 122902, at *2 (Bankr. E.D. Pa. June 1, 1992)  (issue concerned confirmation of bankruptcy plan, not initiation of sale process); *Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 81–82 (3d Cir. 1999) (case dealt with assumption (not rejection) and ruling based upon the requirement that contracts must be assumed *cum onere;* contrasts with the situation here where sale process is just beginning and Debtors are not precluding assumption

- 12 -

1    or rejection of CBAs); *Chicago Dist. Council of Carpenters Pension Fund v. Cotter,* 914 F. Supp.

2    237, 240 (N.D. Ill. 1996) (plan confirmation case - debtor argued CBA rejected *post-facto* after

3    plan confirmation where CBA was not assumed); *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 241

4
5    (Bankr. S.D. W. Va. 1996) (debtors bound selves to APA where CBA would not be assigned
     instead of leaving open possibility of assumption or rejection).

6

7        The unpublished decision of *In re Agripac, Inc., No. 699–60001, slip. op.*, (Bankr. D. Or.

8    Apr. 2, 1999), is similarly distinguishable and unpersuasive.   There, the debtors sought

9    assumption of a modified collective bargaining agreement to a definitive purchaser.   Here, in

10   contrast, other bids are not only permitted, but encouraged.

11
     At least two of the cases relied on by Union Objectors permitted a sale to continue
12

13   notwithstanding the assertion of a § 1113 violation.   *In re Journal Register Co.,* 488 B.R. 835,

14   840 (Bankr. S.D.N.Y. 2013) (discussing § 1113(f) *in dicta* in general that a sale cannot constitute

15   a rejection or modification without § 1113 compliance but allowing sale to go forward); *In re*

16   *Maxwell Newspapers, Inc.*, 981 F.2d 85, 91 (2d Cir. 1992) (allowing sale process to go forward

17   that could alter CBA with continued negotiations and consultation under § 1113 framework).   In

18
19   sum, none of the cases relied on by the Union Objectors support their request for Motion denial;
     to the contrary, applicable authority supports the Debtors' approach and proposed sale process.

20

21        Notwithstanding that Union Objectors' objections are without merit, the Debtors will

22   continue to work with them (and all employee representatives) to achieve a transfer of the

23   Hospitals in a manner that is in the best interest of all constituents.   The Debtors are committed --

24   indeed obligated -- to invite other bids and to select the "highest and best" offer for its facilities.

25   Offers assuming the CBAs or modified CBAs will be given appropriate weight and deference.

26
27   The Debtors also will keep the Union Objectors apprised of the Sale Process and will provide
     potential bidders with any information the Union Objectors wish to provide.   The Debtors will

28

109363714\V-9

consult with the Union Objectors during the sales process and have no objection to the unions directly communicating with the bidders.  To the extent that a bidder does not wish to assume a CBA, the Debtors will inform that applicable union representative of that fact.

All of these proposed actions conform with § 1113's spirit and requirements.  *In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 335–36 (Bankr. E.D. Va. 2016) (debtor complied with 1113 when it "facilitated negotiations between the UMWA and the Stalking Horse Bidder directly" and "submitted proposals, responded to information requests, and were willing to meet with the union frequently throughout the negotiations."); *Family Snacks*, 257 B.R. at 898 ("the Debtor can make [the] showing [required to reject under § 1113] before, at, or after the asset sale, and thereby satisfy the requirements for rejection of the CBA, § 1113 should not be read to preclude the Debtor from doing so after the § 363 asset sale in this case.").  Similar conduct also reflects what this Court held to be adequate for § 1113 purposes in *In re Karykeon*, 435 B.R. 663 (Bankr. C.D. Cal. 2010) (approved sale after finding that Debtor conduct, including relaying union's demands to purchaser (who rejected them), met requirements of §1113).

For these reasons, the objections raised by the Union Objections to the Sale Motion should be overruled and the Motion granted.

**C.    The Debtors will Continue to Keep the PBGC and All Pension Plan Representatives (including the RPHE) Informed of All Offers and will Continue to Welcome Buyers Who Wish to Assume Pension Obligations**

The PBGC, in its capacity as the statutory guarantor of the Verity A Plan and Verity B Plan (both single employer defined benefits plans), the RPHE, (which is the largest multiemployer plan in which Debtors participate) and CNA (collectively referred to with PBGC and RPHE as the "Pension Objectors") raise concerns relating to the potential impact of the sale on pension obligations.  The Pension Objectors ostensibly seek information and clarification, which the Debtors believe is sufficiently addressed by the proposed sale process.

- 14 -

1   Notwithstanding, the Debtors are compelled to respond to certain assertions raised by the Pension

2   Objectors.

3       First, the PBGC asserts that the Debtors have "foreclosed" the fact that a buyer may wish

4   to assume pension plans.  This is not accurate.  Although the stalking horse bidder has stated it

5   does not wish to assume the Verity A and B Plans (or the RPHE), and other buyers have

6   expressed similar reservation, the Debtors have not and will not discourage any bidder from

7   assuming pension obligations.  To the contrary, like the CBAs, the Debtors have expressed their

8
9   preference that buyers assume pension obligations.  Thus, the Debtors have not "foreclose[d] the

10  possibility that a potential bidder may wish to assume all or part of the [p]ension [p]lans'

11  liabilities as part of a Qualified Bid."  [Dkt. No. 439, at 6.]

12      Second, the Debtors have repeatedly stated that in assessing highest and best offers, they

13  will consider all forms of consideration, including assumption of pension liabilities.  As such, it is

14  unnecessary for the Court to mandate particular language providing whether or not a bidder will

15  assume particular liabilities.  In fact, given the scope of pension liabilities, it would be remarkable

16
17  if any Qualified Bidder's bid fails to indicate whether or not it seeks to assume such liabilities.

18  To the extent the issue of assumption in a bid is ambiguous, however, the Debtors will promptly

19  seek clarification.

20
21      With respect to production of information to the Pension Objectors, the Debtors have

22  responded to all information requests by the PBGC, RPHE and others with interests in pension

23  plans and will continue to provide information moving forward.  In fact, any party willing to

24  execute a nondisclosure agreement acceptable to the Debtors already has been permitted access to

25  the sale data room created in this case.  Therefore, an order mandating producing such

26  information is unnecessary.

27
28

- 15 -

Also without merit is the suggestion that a withdrawal from the RPHE and Verity A Plan could be found to be improper because it will create large prepetition claims. Should the Debtors seek to withdraw from the RPHE, the Debtors' judgment will be governed by the requirements of the Bankruptcy Code and related case authority.[9] Under § 365, rejection is permitted if a debtor establishes, under its business judgment, that rejection is in the interest of the Bankruptcy estates. 11 U.S.C. § 365(g)(1); *see also In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007). By its very nature, rejection constitutes breach, and breaches result in rejection damages that can be large. This is common to all bankruptcies, and such damages are treated as general unsecured claims. *See In re TreeSource Indus., Inc.*, 363 F.3d 994, 998 (9th Cir. 2004) ("Resulting damage action for. . [rejection]. . .is treated as a pre-petition general unsecured claim for rejection damages"). Further, potential harm to the nondebtor counterparty is not a basis to deny rejection that otherwise benefits the estate - and instead, only the impact to the debtor is considered. *Ponoma*, 476 F.3d at 670-71. Here, should it come to pass that the winning bidder does not desire to assume pension plans, the Debtors will demonstrate that such rejection of such plans falls within the debtors business judgment and any party with standing can seek to challenge that decision at that time.[10]

---

[9] While the Debtors may need to obtain relief under § 1113 to seek rejection of pension plans under § 365, the issue of contract rejection is otherwise governed by § 365 to "fill in the gaps" left by § 1113. *In re Moline Corp.*, 144 B.R. 75, 78–79 (Bankr. N.D. Ill. 1992). The PBGC asserts that the only way the Debtor may terminate the Verity A and B single employer plans is pursuant to ERISA. Because this issue is not before the Court, the Debtors reserve the right to address it if and when the matter becomes relevant and ripe. It also should be noted that there is nothing under ERISA that prohibits a debtor from unilaterally withdrawing from a multiemployer pension plan. Although a debtor's withdrawal from a multiemployer plan may subject the debtor to withdrawal liability under § 4201 of ERISA, nothing in ERISA or the Bankruptcy Code prohibits a debtor from withdrawing from a multiemployer plan. Title IV of ERISA specifies the consequences of an employer's withdrawal from a multiemployer plan but does not prohibit or restrict an employer from withdrawing from a plan in accordance with the terms of a collective bargaining agreement. Therefore, a debtor in bankruptcy may need to modify the collective bargaining agreement under § 1113 of the Bankruptcy Code to effectuate a withdrawal from a multiemployer plan, but there is no ERISA authority that prevents a debtor's right to withdraw from a multiemployer plan once such relief is obtained.

[10] CNA's assertion as to per nurse contributions is not relevant to the pending Sale Procedures Motion. Notwithstanding, the Debtors note that they have already established, without contest, that contribution amounts in

**D.**    **Cigna Seeks Protections that Are Over-Burdensome and Not Consistent with Bidding Procedures Approved Regularly in this Court and Bankruptcy Courts Across the Country.**

The Cigna entities are parties to certain hospital services agreements (the "Cigna Provider Agreements") issued by Cigna Health Care of California, Inc. ("Cigna CA") and group benefits agreements issued by Life Insurance Company of North America ("LINA"). Like many of the Objectors addressed above, the Cigna contracts have not yet been designated for assumption and assignment and, to the extent that the Cigna Objection asserts an objection to a yet to be proposed cure amount or an objection to a rejection that has yet to take place, Cigna's Objection is premature. However, Cigna also makes certain unsupported (and unsupportable) demands for protections in the assumption and assignment procedures. Among them, Cigna demands that "unequivocal, irrevocable notice of the Debtors' decision as to whether one or both of the Cigna Provider Agreements will be assumed as part of the [sale of the Hospitals] must be provided at least sixty (60) days prior to the Effective Date of the Sale of each respective Hospital." [Dkt. 445, at p. 5]. Cigna also demands at least a ten day notice of the proposed assumption and assignment of LINA contracts. [*Id*.] Furthermore, Cigna demands the proposed purchaser provide information to support adequate assurance of future performance at least ten days in advance of a sale hearing. [*Id.* at 6.]

Not surprisingly, Cigna does not cite a single case or any supporting authority for the remarkable proposition that the sale of the Hospitals should be delayed for up to two months if the Debtors and purchaser propose assumption and assignment of Cigna contracts. Nor does Cigna offer any support for its adequate assurance demands. Not only is Cigna's demand for

2019 relating to active CNA employees accruing benefits totals $1,704,170 for the RPHE and $4,403,294 for the Verity Plan A. *See Omnibus Response to Objections to Emergency Motion of Debtors for Entry of Order: (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages and Salaries, and (B) Pay and Honor Employee Benefits and Other Workforce Obligations; and (II) Authorizing and Directing the Applicable Bank to Pay All Checks and Electronic Payment Requests Made By the Debtors Relating to the Foregoing* [Dkt. No. 310], Exhibit 1 (Declaration of Carlos Del La Parra). The Debtors do not, at this time, concede the accuracy of any other calculation for

- 17 -

extraordinary notice of the assumption and assignment of contracts contrary to established precedent in virtually all (if not actually all) bankruptcy cases, delaying the sale of the Hospitals for up two months so that Cigna can consider whether to object to a proposed assumption and assignment of its contracts would surely put the entire bankruptcy case at risk given the strict time requirements the Debtors are under from DIP lenders and potential purchasers.

As described more fully in the Sale Procedures Motion, the assumption and assignment procedures set forth therein are customary and reasonable in light of the proposed sale procedures. Cigna has not offered any support for the extraordinary divergence from customary practice it requests and its Objections should be overruled.

### E.     The FCC's Objection Is Premature and Will Be Addressed at the Appropriate Time

The FCC seeks assurance that, before certain wireless licenses issued and regulated by the FCC are assumed and assigned to the successful purchaser, appropriate government approvals will be obtained. To that end, the FCC has proposed specific language that it requests be included in an order regarding the sale. As with the Objections discussed above, because the licenses allegedly issued and regulated by the FCC have not yet been designated for assumption and assignment, the FCC objection is premature. However, the Debtors assure the FCC that its rights to object to the proposed assumption and assignment of the subject licenses are fully preserved and commit to work with the FCC to address its concerns in the event that any licenses issued and regulated by the FCC are proposed for assumption and assignment.

### IV.     CONCLUSION

WHEREFORE, for the reasons set forth in the Sale Procedures Motion and this pleading, the Debtors respectfully request that the Court (i) grant the Sale Procedures Motion on a final basis, (ii) overrule the Objections and (iii) grant to the Debtors such other and further relief as the Court may deem proper.

- 18 -

109363714\V-9

1

2  Dated:  October 17, 2018

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
SAMUEL R. MAIZEL
TANIA M. MOYRON


By_____*/s/ Tania M. Moyron*_____
        Tania M. Moyron

Proposed  Attorneys  for  the  Chapter  11
Debtors and Debtors In Possession

- 19 -

109363714\V-9