1   SAMUEL R. MAIZEL (Bar No. 189301)
    samuel.maizel@dentons.com
2   TANIA M. MOYRON (Bar No. 235736)
    tania.moyron@dentons.com
3   DENTONS US LLP
    601 South Figueroa Street, Suite 2500
4   Los Angeles, California 90017-5704
    Tel: (213) 623-9300 / Fax: (213) 623-9924
5
6   Attorneys for the Chapter 11 Debtors and
    Debtors In Possession

7
                **UNITED STATES BANKRUPTCY COURT**
8           **CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

9   In re                                        Lead Case No. 2:18-bk-20151-ER

10  VERITY HEALTH SYSTEM OF                      Jointly Administered With:
    CALIFORNIA, INC., *et al.*,
11                                               Case No. 2:18-bk-20162-ER
            Debtors and Debtors In Possession.   Case No. 2:18-bk-20163-ER
12                                               Case No. 2:18-bk-20164-ER
    ☒ Affects All Debtors                        Case No. 2:18-bk-20165-ER
13                                               Case No. 2:18-bk-20167-ER
    ☐ Affects Verity Health System of California, Inc.   Case No. 2:18-bk-20168-ER
14  ☐ Affects O'Connor Hospital                  Case No. 2:18-bk-20169-ER
    ☐ Affects Saint Louise Regional Hospital     Case No. 2:18-bk-20171-ER
15  ☐ Affects St. Francis Medical Center         Case No. 2:18-bk-20172-ER
    ☐ Affects St. Vincent Medical Center         Case No. 2:18-bk-20173-ER
16  ☐ Affects Seton Medical Center               Case No. 2:18-bk-20175-ER
    ☐ Affects O'Connor Hospital Foundation       Case No. 2:18-bk-20176-ER
17  ☐ Affects Saint Louise Regional Hospital     Case No. 2:18-bk-20178-ER
        Foundation                               Case No. 2:18-bk-20179-ER
18  ☐ Affects St. Francis Medical Center of Lynwood   Case No. 2:18-bk-20180-ER
        Foundation                               Case No. 2:18-bk-20181-ER
19  ☐ Affects St. Vincent Foundation
    ☐ Affects St. Vincent Dialysis Center, Inc.  Hon. Judge Ernest M. Robles
20  ☐ Affects Seton Medical Center Foundation
    ☐ Affects Verity Business Services           **DEBTORS' MEMORANDUM IN SUPPORT OF ENTRY**
21  ☐ Affects Verity Medical Foundation          **OF ORDER (1) APPROVING SALE OF CERTAIN ASSETS**
    ☐ Affects Verity Holdings, LLC               **TO SANTA CLARA COUNTY FREE AND CLEAR OF**
22  ☐ Affects De Paul Ventures, LLC              **ALL ENCUMBRANCES; (2) APPROVING DEBTORS'**
    ☐ Affects De Paul Ventures - San Jose ASC, LLC   **ASSUMPTION AND ASSIGNMENT OF CERTAIN**
23                                               **UNEXPIRED LEASES AND EXECUTORY CONTRACTS**
            Debtors and Debtors In Possession.   **AND DETERMINING CURE AMOUNTS AND**
24                                               **APPROVING DEBTORS' REJECTION OF THOSE**
                                                 **UNEXPIRED LEASES AND EXECUTORY CONTRACTS**
25                                               **WHICH ARE NOT ASSUMED AND ASSIGNED; (3)**
                                                 **WAIVING THE 14-DAY STAY PERIODS SET FORTH IN**
26                                               **BANKRUPTCY RULES 6004(H) AND 6006(D); AND (4)**
                                                 **GRANTING RELATED RELIEF;  DECLARATION OF**
27                                               **JAMES MOLONEY IN SUPPORT THEREOF**

                                                 Hearing:
                                                 Date:       December 19, 2018
                                                 Time:       10:00 am
28                                               Location:   Courtroom 1568
                                                             255 E. Temple St., Los Angeles, CA

*Left margin vertical text:* DENTONS US LLP / 601 SOUTH FIGUEROA STREET, SUITE 2500 / LOS ANGELES, CALIFORNIA 90017-5704 / (213) 623-9300

# TABLE OF CONTENTS

**Page(s)**

I.  STATEMENT OF FACTS ..................................................................................................... 1

    A.  The Bid Procedures Order ................................................................................. 1

    B.  Marketing Efforts ............................................................................................. 2

    C.  The Principal Terms of the SCC APA .............................................................. 4

II.  ARGUMENT ................................................................................................................... 8

    A.  The Court Should Authorize the Debtors to Sell the Purchased Assets to SCC in Accordance with the Terms of the APA ................................................ 8

    B.  Section 363(f) of the Bankruptcy Code Permits the Debtors' Sale of the Purchased Assets to SCC Free and Clear of Any and All Interests and Liens. ................................................................................................................ 14

    C.  The Court Should Authorize the Debtors to Assume and Assign to SCC All of the Assumed Contracts that SCC Designates. .......................................... 17

    D.  The Court Should Waive the Fourteen-Day Waiting Periods Set Forth in Bankruptcy Rules 6004(h) and 6006(d). ......................................................... 22

III.  CONCLUSION ............................................................................................................... 22

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abbotts Dairies of Pa., Inc.*,
  788 F.2d 143 (3d Cir. 1986)..................................................................................8, 12, 13

*In re AEG Acquisition Corp.*,
  127 B.R. 34 (Bankr. C.D. Cal. 1991), *aff'd* 161 B.R. 50 (9th Cir. B.A.P. 1993) ....................18

*In re Alpha Indus., Inc.*,
  84 B.R. 703 (Bankr. D. Mont. 1988) ................................................................................13

*In re Apex Oil Co.*,
  92 B.R. 847 (Bankr. E.D. Mo. 1988) ................................................................................13

*In re Atlanta Packaging Prods., Inc.*,
  99 B.R. 124 (Bankr. N.D. Ga. 1988) ................................................................................12

*In re Bowman*,
  194 B.R. 227 (Bankr. D. Ariz. 1995*)* ................................................................................18

*In re Cent. Fla. Metal Fabrication, Inc.*,
  190 B.R. 119 (Bankr. N.D. Fla. 1995) ................................................................................17

*Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*,
  391 B.R. 25 (9th Cir. B.A.P.  2008)................................................................................15

*Coastal Indus., Inc. v. U.S. Internal Revenue Serv. (In re Coastal Indus., Inc.)*,
  63 B.R. 361 (Bankr. N.D. Ohio 1986) ................................................................................12

*Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*,
  722 F.2d 1063 (2d Cir. 1983)................................................................................8

*In re Continental Airlines, Inc.*,
  780 F.2d 1223 (5th Cir. 1986)................................................................................9

*In re Continental Country Club, Inc.*,
  114 B.R. 763 (Bankr. M.D. Fla. 1990) ................................................................................18

*In re Delaware and Hudson Ry. Co.*,
  124 B.R. 169 (D. Del. 1991)................................................................................8, 11

*In re Embers 86th St. Inc.*,
  184 B.R. 892 (Bankr. S.D.N.Y. 1995) ................................................................................8

*In re Exennium, Inc.*,
  715 F.2d 1401 (9th Cir. 1983)................................................................................13

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

iii

*In re Filtercorp, Inc.*,
    163 F.3d 570 (9th Cir. 1998).................................................................................13

*In re Grand Slam U.S.A., Inc.*,
    178 B.R. 460 (E.D. Mich. 1995).............................................................................16

*In re Grumman Indus., Inc.*,
    467 B.R. 694 (S.D.N.Y. 2012)...............................................................................4

*In re Gucci*,
    193 B.R. 411 (S.D.N.Y. 1996)........................................................................17, 18

*In re Gulf States Steel, Inc. of Ala.*,
    285 B.R. 497 (Bankr. N.D. Ala. 2002) ...................................................................16

*In re Healthco Int'l Inc.*,
    174 B.R. 174 (Bankr. D. Mass. 1994)....................................................................16

*In re Hunt Energy Co., Inc.*,
    48 B.R. 472 (Bankr. N.D. Ohio, 1985)...................................................................17

*In re Huntington, Ltd.*,
    654 F.2d 578 (9th Cir. 1981)...................................................................................9

*In re Indus. Valley Refrig. and Air Cond. Supplies, Inc.*,
    77 B.R. 15 (Bankr. E.D. Pa. 1987)........................................................................13

*In re Integrated Resources, Inc.*,
    135 B.R. 746 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992)........................12

*In re Karpe*,
    84 B.R. 926 (Bankr. M.D. Pa. 1988).................................................................7, 8

*In re Klein Sleep Prods., Inc.*,
    78 F.3d 18 (2d. Cir. 1996).....................................................................................17

*Lubrizol Enters. v. Richmond Metal Finishers*,
    756 F.2d 1043 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986)........................18

*In re M Capital Corp.*,
    290 B.R. 743 (9th Cir. B.A.P. 2003).....................................................................13

*In re Martin (Myers v. Martin)*,
    91 F.3d 389 (3d Cir. 1996).....................................................................................8

*P.K.R. Convalescent Ctrs, Inc. v. Commonwealth of Va., Dep't of Med. Assistance
    Serv. (In re P.K.R. Convalescent Ctrs., Inc.)*,
    189 B.R. 90 (Bankr. E.D. Va. 1995).......................................................................5

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

*In re Perroncello*,
    170 B.R. 189 (Bankr. D. Mass. 1994) ................................................................................16

*In re Prime Motors Inns*,
    124 B.R. 378 (Bankr. S.D. Fla. 1991) ...............................................................................18

*In re Rock Indus. Mach. Corp.*,
    572 F.2d 1195 (7th Cir. 1978) ...........................................................................................13

*In re Sandy Ridge Dev. Corp.*,
    881 F.2d 1346 (5th Cir. 1989) ...........................................................................................17

*Scherer v. Fed. Nat'l Mortgage Ass'n (In re Terrace Chalet Apartments, Ltd.)*,
    159 B.R. 821 (Bankr. N.D. Ill. 1993) ................................................................................16

*In re Schipper (Fulton State Bank v. Schipper)*,
    933 F.2d 513 (7th Cir. 1991) ...............................................................................................8

*In re Shary*,
    152 B.R. 724 (Bankr. N.D. Ohio 1993) .............................................................................14

*Titusville Country Club v. Pennbank (In re Titusville Country Club)*,
    128 B.R. 396 (Bankr. W.D. Pa. 1991) ................................................................................9

*In re Walter*,
    83 B.R. 14 (9th Cir. B.A.P. 1988) ..................................................................................9, 10

*In re Wilde Horse Enters.*,
    136 B.R. 830 (Bankr. C.D. Cal. 1991) .........................................................................12, 13

**Statutes**

11 U.S.C.

§ 363 ..............................................................................................................................2, 11, 23

§ 363(b) .........................................................................................................................8, 9 , 10, 12

§ 365(b)(1) ...........................................................................................................................14, 15

§ 363(f) .....................................................................................................................................8, 14

§ 363(f)(1)-(5) ...............................................................................................................................4

§ 363(f)(2) ...................................................................................................................................15

§ 363(f)(3) .............................................................................................................................15, 16

§ 363(f)(5) .............................................................................................................................15, 17

§ 363(m) ...................................................................................................................................7, 13

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

§ 365(b)(1)(A) ...................................................................................................................18, 19

§ 365(f)(1) ................................................................................................................................18

§ 365(f)(2) ................................................................................................................................18

§ 1129(a)(3)-(b)(1) ..................................................................................................................13

§ 1129(b)(1) .............................................................................................................................13

§ 1129(b)(2) .............................................................................................................................13

§ 1129(b)(2)(A) .......................................................................................................................13

§ 1129(b)(2)(A)(i)(II) ..............................................................................................................13

§ 1129(b)(2)(A)(iii) .................................................................................................................13

**Rules and Regulations**

Federal Rules of Bankruptcy Procedure

Rule 2002 .................................................................................................................................11

Rule 6004(a) ......................................................................................................................11, 12

Rule 6004(c) .............................................................................................................................11

Rule 6004(h) ............................................................................................................................22

Rule 6006(d) ............................................................................................................................22

109826544\V-2

## MEMORANDUM

Verity Health System of California, Inc. ("VHS") and the above-referenced affiliated debtors, the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy case (collectively, the "Debtors"), file this Memorandum in support of the entry of an order of the Court (the "Sale Order") approving the sale of the Debtors' two hospitals in Santa Clara County (Saint Louise Medical Center and O'Connor Medical Center) and related assets (the "Assets") to the County of Santa Clara, a political subdivision of the State of California ("SCC"), in accordance with the terms of the Asset Purchase Agreement ("APA"), attached as Exhibit A to the Sale and Bidding Procedures Motion (defined herein).  In connection therewith, the Debtors also seek the Court's approval of the Debtors' assumption and assignment to SCC of those unexpired leases and executory contracts that SCC wishes to assume (defined in the APA as the "Assumed Contracts").  SCC has not yet identified for the Debtors which of executory contracts and unexpired leases that SCC desires to have assigned to it (*i.e.*, the "Assumed Contracts"), and SCC shall make that determination by December 12, 2018.   For all the reasons set forth herein and those in the Sale and Bidding Procedures Motion (as defined below), the Debtors respectfully request that the Court enter the Sale Order.

## I.    STATEMENT OF FACTS

### A.    The Bid Procedures Order.

1.    On October 1, 2018, the Debtors filed the Debtors' *Notice Of Motion And Motion for the Entry of (I) an Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and For Prospective Overbidders to Use, (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections, (3) Approving Form of Notice to be Provided to Interested Parties, (4) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest Bidder and (5) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and (II) an Order (A) Authorizing the Sale of Property Free and Clear of All Claims, Liens and Encumbrances* (the "Sale and Bidding Procedures Motion") [Docket No. 365].

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

2.      The Court held a hearing on the Sale and Bidding Procedures Motion and thereafter entered an order on October 31, 2018, approving the Sale and Bidding Procedures Motion (the "Bidding Procedures Order") [Docket No. 724].  SCC served as the Stalking Horse Bidder under the terms of the Bidding Procedures Order.    The Bidding Procedures Order also approved the APA, dated October 1, 2018, between VHS, Verity Holdings, LLC, a California limited liability company, O'Connor Hospital, a California nonprofit public benefit corporation, and Saint Louise Regional Hospital, a California nonprofit public benefit corporation, on the one hand; and SCC, on the other hand, to be used by SCC as the stalking horse purchaser of the Assets.

3.      The Bidding Procedures Order established a deadline of November 30, 2018, at 4:00 p.m. (PST), for bidders to submit partial bids for the Assets and a deadline of December 5, 2018, at 4:00 p.m. (PST), to submit full bids for the Assets (each a "Bid Deadline").  An auction of the Assets was also scheduled to take place on December 11, 2018 and December 12, 2018.

**B.      Marketing Efforts**

4.      In June 2018, the Debtors engaged Cain Brothers, a division of KeyBanc Capital Markets ("Cain"), to identify potential buyers of some or all of the Verity hospitals and related assets and commenced discussions with those potential buyers. *See Declaration of James Moloney* (the "Moloney Declaration"), annexed hereto as **Exhibit A**, ¶ 4. Cain prepared a Confidential Investment Memorandum and organized an online data site to share information with potentially buyers and contacted over 110 strategic and financial buyers beginning in July 2018 to solicit their interest in exploring a transaction regarding the Debtors and has advanced significantly towards achieving sales.

5.      By August 2018, as a result of its ongoing and broad marketing process, Cain had received 11 Indications of Interest, and continued to develop potential sales. Moloney Declaration, ¶ 4.  The Debtors, in consultation with Cain and its other advisors, selected SCC's offer from one or more potential stalking horse bidder(s) to acquire the Assets through a sale under § 363 of the Bankruptcy Code. The APA was the result of extensive negotiations and

109826544\V-2

documentation between the Debtors and SCC.  Moloney Declaration, ¶ 6.  Under the APA, as the stalking horse purchaser, SCC submitted an opening bid to purchase the Assets for $235 million.

6.    Cain continued to actively market the Assets after the APA was signed.  Moloney Declaration, ¶ 5. As a part of this process, Cain vigilantly monitored interest and continued to communicate with parties that had expressed interest and that Cain had identified as potential bidders - either as partial or aggregate bidders.  *Id*.  Cain's marketing process was meant to identify and shepherd any bidders who could contribute to a competitive auction in addition to SCC's stalking horse bid.  *Id*.  Cain sent a total of fifty Non-Disclosure Agreements ("NDAs") to potential bidders, and twenty-five parties executed NDAs and were granted access to a data room containing information about the Assets. Moloney Declaration, ¶ 6. Seven parties submitted proposals to purchase, in the aggregate or in full, the Assets (the "Proposal Parties").  *Id*.  The proposals varied from real estate proposals to purchasing the hospitals as going concerns, etc.  *Id*. Cain has stayed in contact with the Proposal Parties regarding the Bidding Procedures Order and submitting bids for the Assets throughout this case, including after the APA was signed and after the Bidding Procedure Order was entered.  *Id*.

7.    Additionally, after the Bidding Procedures Order was entered, Cain sent a direct email communication to over 170 interested buyers Cain had identified and over 600 individual email addresses.   Moloney Declaration, ¶ 7. This communication contained key information about the Assets, the auction, the Bid Deadline and other deadlines, a hyperlink to access the Bidding Procedures Order and contact information for a Cain individual to discuss questions and interest further.   *Id*.  Cain continued to populate the data room it had opened with new and relevant information as it became available.  *Id*.

8.    Early in Cain's marketing process, a potential bidder ("Alternate Bidder A") submitted an indication of interest to purchase the Assets.  After the Sale and Bidding Procedures Motion was filed, Cain continued to substantively communicate with Alternate Bidder A. Alternate Bidder A indicated that they were not likely to submit a bid under the Bidding Procedures, but remained interested and in contact up to the Bid Deadline.  However, Alternate Bidder A did not submit a bid.  Moloney Declaration, ¶ 8.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

3

109826544\V-2

9.      Cain also actively followed-up with another potential partial asset bidder ("Alternate Bidder B") that had expressed interest in purchasing one, but not both, of the Santa Clara County hospitals.  Cain provided this Alternate Bidder B information to guide its diligence. However, after performing its diligence, Alternate Bidder B did not place a bid.  Moloney Declaration, ¶ 9.

10.      Ultimately, no party emerged willing to place a bid for the Assets, whether partial or aggregate, under the Bidding Procedures Order. Moloney Declaration, ¶ 10.  Also, no party requested an extension of time to bid past the Bid Deadline.  *Id*. Accordingly, under the terms of the APA and the Bidding Procedures Order, no auction was held and the Debtors declared SCC as the prevailing purchaser of the Assets.

## C.      The Principal Terms of the SCC APA[1]

11.      The primary terms of the APA are set forth below:[2]

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **APA Parties** | Verity Health System of California, Inc., Verity Holdings, LLC, O'Connor Hospital, and Saint Louise Regional Hospital ("Sellers"). <br> County of Santa Clara, a political subdivision of the State of California ("Purchaser"). |
| **Consideration** <br> **APA § 1.1** | As consideration for the sale of the Assets, Purchaser shall pay to Sellers an aggregate purchase price equal to Two Hundred Thirty-Five Million Dollars ($235,000,000), subject to adjustment as described in the Stalking Horse APA. |
| **Purchased Assets; Avoidance Actions** | "Assets" shall mean all assets, businesses, real property, personal property, equipment, supplies, software, contracts, leases, licenses/permits, books, records, offices, facilities, and all other tangible and intangible property (a) whatsoever and wherever located that is owned, leased, or used primarily in |

[1]      The following is a summary of the terms of the APA.  In the event of any inconsistencies between the provisions of the APA and the summary set forth herein, the terms of the APA shall govern.

[2]      The summary of the terms contained in this Motion highlights some of the material terms of the APA.  This summary is qualified in its entirety by reference to the provisions of the APA. In the event of any inconsistencies between the provisions of the APA and the summary set forth herein, the terms of the APA shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the APA.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **APA § 1.8** | connection with the Businesses by O'Connor Hospital or Saint Louise Regional Hospital, (b) located in Santa Clara County, California that is owned, leased, or used primarily in connection with the Businesses by Verity Holdings, LLC, and (c) whatsoever and wherever located that is owned, leased, or used by Verity Health System of California, Inc. primarily in connection with the Businesses, in each case, except for the Excluded Assets. The "Assets" further include all owned real property assets and interests of each Seller with respect to real property located in Santa Clara County, California. |
| **Excluded Assets**<br>**APA § 1.9** | "Excluded Assets" include cash, cash equivalents and investments; all Benefit Plans and the assets of all Benefit Plans; Contracts and Leases which are not assumed; inventory and assets disposed of by any Seller in the ordinary course of business after the Signing Date but prior to the Effective Time; all claims, counterclaims, and causes of action of each Seller or each Seller's bankruptcy estate; all insurance policies and contracts and coverages obtained by any Seller or listing a Seller as insured party, a beneficiary or loss payee; all bank accounts of each Seller (except as otherwise provided); all tax refunds of each Seller; and all accounts and interest thereupon, notes and interest thereupon and other receivables of Sellers. |
| **Assumed Liabilities**<br>**APA § 1.10** | "Assumed Obligations" include all Assumed Contracts and Assumed Leases and all liabilities and obligations arising thereunder on and after the Effective Time, but not including any Cure Costs; all liabilities and obligations arising out of or relating to any act, omission, event, or occurrence connected with the use, ownership, or operation by Purchaser of the Businesses or any of the Assets on or after the Effective Time; all unpaid real and personal property taxes that are attributable to the Assets after the Effective Time, subject to prorations; and all liabilities and obligations arising on or following the Effective Time relating to utilities being furnished to the Assets, subject to prorations. |
| **Excluded Liabilities**<br>**APA § 1.11** | Purchaser shall not assume or become responsible for any duties, obligations, or liabilities of any Seller other than the Assumed Obligations. |
| **Assumption of Transferred Contracts and Assignment**<br>**APA § 1.12.2** | At the Closing and pursuant to § 365 of the Bankruptcy Code and the Sale Order, Sellers shall assume and immediately assign to Purchaser, and as of the Effective Time, Purchaser shall assume from Sellers, the Assumed Contracts and the Assumed Leases; provided, however, Purchaser shall only assume the liabilities that arise thereunder with respect to events or periods on and after the Effective Time and that do not relate to any failure to perform or other breach, default, or violation by any Seller on or prior to the Closing Date. |
| **Payment of Cure Costs**<br>**APA § 4.7** | Sellers, upon assumption, shall pay the Cure Costs for each Assumed Contract and Assumed Lease so that each such Assumed Contract and Assumed Lease may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of Section 365 of the Bankruptcy Code. |
| **Employment Provisions**<br>**APA § 5.3** | Subject to standard hiring practices of Purchaser, Purchaser agrees to offer provisional employment, effective as of the Effective Time, to substantially all employees of O'Connor Hospital or Saint Louise Regional Hospital who are listed on Schedule 5.3.1 who are actively employed and in good standing with |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | a Hospital Seller as of Closing. |
| **Agreements with Management**<br><br>**APA § 5.3.1** | Purchaser shall make decisions with respect to hiring Seller Employees who served in a management role prior to or as of Closing on a case-by-case basis, but Purchaser shall not be obligated hereunder to offer to employ any of such individuals. |
| **Good Faith Deposit**<br><br>**APA § 1.2** | Purchaser made a good faith deposit in the amount of Twenty-Three Million Five Hundred Thousand Dollars ($23,500,000) (the "Deposit") with the Escrow Agent after the entry of the Bidding Procedures Order.  Upon Closing, the Deposit shall be credited against the Purchase Price. |
| **Closing and Other Deadlines**<br><br>**APA § 1.4, 6.2.9** | The Closing Date shall occur within five (5) business days following the satisfaction or waiver of the conditions precedent to Closing set forth in in Articles 7 and 8 of the Stalking Horse APA.<br><br>The Stalking Horse APA contains the following future Sale Milestones:<br><br>- On or before the date that is ninety (90) days after the Signing Date, the Bankruptcy Court shall have entered the Sale Order.<br><br>- On or before the date that is one hundred five (105) days after the Signing Date, the Closing shall have occurred. |
| **Conduct of Business Prior to Closing**<br><br>**APA § 4.10** | On and after the Signing Date and until the Effective Time, Sellers shall continue to operate the Businesses as presently operated, and consistent with such operation, comply in all material respects with all applicable legal and contractual obligations of any Seller, use commercially reasonable efforts to preserve the goodwill of Sellers' suppliers, patients, physicians, and others with whom Sellers have business relationships, maintain inventories of goods and supplies at levels necessary for the normal operation of the Hospitals, make and continue to make or cause to be made all repairs, restoration, replacements, and maintenance that may be necessary or appropriate to maintain the Assets, use commercially reasonable efforts to retain the services of the Seller Employees, and preserve each Seller's rights under the Assumed Contracts and Assumed Leases. |
| **Record Retention**<br><br>**APA § 11.3** | From the Closing Date until seven (7) years after the Closing Date or such longer period as required by law (the "Document Retention Period"), Purchaser shall keep and preserve all medical records, patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets.<br><br>After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents, Purchaser shall provide written notice to Sellers of Purchaser's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal. |
| **Bid Protections** | The "Bid Protections" shall collectively mean the Breakup Fee and the |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **APA § 6.2.4** | Expense Reimbursement.<br><br>The "Breakup Fee" shall mean a breakup fee in the amount totaling Nine Million Four Hundred Thousand Dollars ($9,400,000).<br><br>The "Expense Reimbursement" shall mean reasonably documented reasonable costs and expenses incurred by Purchaser related to its due diligence, and pursuing, negotiating, and documenting the transaction(s) contemplated by the Stalking Horse APA.<br><br>The Bid Protections shall be payable pursuant to the terms of the Stalking Horse APA in the event that the Stalking Horse APA is terminated due to Sellers' consummation of an Alternative Transaction and/or under such other conditions specified in the Stalking Horse APA. |
| **Buyer's Termination Rights**<br><br>**APA §§ 9.1, 9.2** | If, prior to or as of the Closing Date, any portion of the Assets have suffered loss or damage on account of fire, flood, wind, hurricane, earthquake, accident, act of war, terrorist act, civil commotion, or other cause or event (whether or not similar to the foregoing), and such casualty is a Material Casualty (*i.e.* estimated repair costs of such damage exceeds $11,750,000), Purchaser shall have the right to terminate the Stalking Horse APA by giving at least five (5) days' prior written notice to Sellers.<br><br>The Stalking Horse APA may be terminated at any time prior to Closing by Purchaser if a material breach of the Stalking Horse APA has been committed by Sellers or if the Closing has not occurred on or before February 28, 2019 (the "Termination Date"), if the Termination Date has not been extended by mutual consent of the Sellers and Purchaser.<br><br>The Stalking Horse APA may also be terminated by Purchaser or Sellers in the event that Purchaser is not the Successful Bidder at the Auction and Purchaser has not been selected by the Sellers as the Back-Up Bidder at the Auction. |
| **Requested Findings as to Good Faith, Successor Liability; Waiver of Automatic Stay**<br><br>**APA § 6.2.6** | The Sale Order shall contain findings of fact and conclusions of law that the transactions contemplated herein are undertaken by Purchaser and Sellers at arm's length, without collusion and that Purchaser has acted in "good faith" within the meaning and entitled to the protections of Sections 363(m) and 363(n) of the Bankruptcy Code.<br><br>The Sale Order shall also provide for a sale of the Assets free and clear of all claims, Excluded Liabilities, and liens (including any successor liability) to the maximum extent permitted by law and within the meaning of, and in compliance with, § 363(f) of the Bankruptcy Code.<br><br>The Sale Order shall also provide for the waiver of the automatic stay provisions of Bankruptcy Rules 6004 and 6006. |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

7

## II.    ARGUMENT

### A.    The Court Should Authorize The Debtors To Sell The Purchased Assets To SCC In Accordance With The Terms Of The APA.

Section 363(b) of the Bankruptcy Code[3] provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the state." 11 U.S.C. § 363(b).  To approve a use, sale or lease of property other than in the ordinary course of business, the Court must find "some articulated business justification." *See, e.g., In re Gardens Regional Hospital and Medical Center, Inc.* ("*In re Gardens*"), 567 B.R. 802, 825 (Bankr. C.D. Cal. 2017); *In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing In re Schipper (Fulton State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); *In re Delaware and Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991) (concluding that the Third Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision). Similarly, in the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is in the best interest of the estate, and a business justification exists for authorizing the sale. *In re Huntington, Ltd.*, 654 F.2d 578 (9th Cir. 1981); *In re Walter*, 83 B.R. 14, 19-20 (9th Cir. B.A.P. 1988).

In determining whether a sale satisfies the business judgment standard, courts have held that: (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the sale be given to interested persons; (3) the sale yield an adequate price (*i.e.*, one that is fair and reasonable); and (4) the parties to the sale have acted in good faith. *Titusville Country Club v.*

---

[3]    All references to "§" or "sections" herein are to sections of the Bankruptcy Code, 11 U.S.C. § 101 et. seq. as amended.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

1  *Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *see also In*

2  *re Walter*, 83 B.R. at 19-20.

3      The Debtors submit that their proposed sale of the Assets to SCC clearly satisfied each of

4  these four criteria, is consistent with the terms of the APA, and demonstrates that the Debtors'

5  business judgment to proceed with the proposed sale of the Assets to SCC in accordance with the

6

7  terms of the APA is sound.

8      **1.**    **Sound Business Purpose.**

9      There must be some articulated business justification, other than appeasement of major

10  creditors, for using, selling or leasing property out of the ordinary course of business before the

11  bankruptcy court may order such disposition under § 363(b). *In re Gardens*, 567 B.R. at 825; *In*

12  *re Lionel Corp.*, 722 F.2d at 1070.  The court  in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R.

13  14, 19 (9th Cir. B.A.P. 1988), established  a flexible case-by-case test to determine whether the

14

15  business purpose for a proposed sale justifies disposition of property of the estate under § 363(b).

16  In *Walter*, the court, adopting the reasoning of the Fifth Circuit in *In re Continental Airlines, Inc.*,

17  780 F.2d 1223 (5th Cir. 1986) and the Second Circuit *in In re Lionel Corp., supra*, articulated the

18  standard to be applied under § 363(b) as follows:

19

20      Whether the proffered business justification is sufficient depends on the case. As
the Second Circuit held in *Lionel*, the bankruptcy judge should consider all salient
factors pertaining to the proceeding and, accordingly, act to further the diverse

21  interests of the Debtor, creditors and equity holders, alike. He might, for example,
look to such relevant facts as the proportionate value of the asset to the estate as a

22  whole, the amount of elapsed time since the filing, the likelihood that a plan of
reorganization will be proposed and confirmed in the near future, the effect of the

23  proposed disposition on future plans of reorganization, the proceeds to be
obtained from the disposition vis-a-vis any appraisals of the property, which of

24  the alternatives of use, sale or lease the proposal envisions and, most importantly
perhaps, whether the asset is increasing or decreasing in value. This list is not

25  intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

26  *In Re Walter*, 83 B.R. at 19-20 (*citing In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th

27  Cir. 1986)).

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

9

1      The facts pertaining to the Debtors' proposed sale of the Assets to SCC clearly

2  substantiate the Debtors' business decision that such contemplated sale serves the best interests of

3  the Debtors' estates, their creditors and shareholders and merits the approval of the Court.

4      The Debtors incur significant operational losses at their hospitals, and continued

5  operations are simply not financially viable. *See Declaration of Richard Adcock in Support of*

6  *Emergency First-Day Motions*, at ¶ 95 [Docket No. 8]. The Debtors' Board of Directors

7  therefore concluded that the best course of action to preserve the Debtors' Hospitals as going

8  concerns, serve the charitable mission of the Debtors and the original legacy of the Daughters of

9  Charity, preserve jobs and maximize the recovery for creditors, was to sell the Debtors' Hospitals,

10  as going concerns, in a bankruptcy court supervised sale. *Id.* ¶ 96.

11      As discussed *supra*, the Debtors engaged in a comprehensive marketing process to sell the

12  Assets over a period of several months prior to and during the bankruptcy case using Cain, a

13  highly regarded investment bank. The Debtors are confident that their proposed asset sale to SCC

14  is the best option available to the Debtors to maximize the value of the Assets and recovery for

15  their creditors and shareholders. Despite Cain's vigorous attempts to market the Assets, SCC's

16  stalking-horse bid was the best and only offer the Debtors received. The Debtors believe that

17  SCC's offer represents a fair market value for the assets. Also, SCC is a buyer who will maintain

18  the healthcare characteristics of both Saint Louise Medical Center and O'Connor Hospital,

19  continuing patient care for the communities served by the hospitals. Therefore, the Debtors

20  submit that their proposed asset sale is justified by sound business purposes, satisfying the first

21  requirement for a sale under § 363(b).

22      **2.    Accurate and Reasonable Notice**

23      In connection with a proposed sale under § 363, "four pieces of information must be

24  presented to the creditors. The notice should: place all parties on notice that the debtor is selling

25  its business; disclose accurately the full terms of the sale; explain the effect of the sale as

26  terminating the debtor's ability to continue in business; and explain why the proposed price is

27  reasonable and why the sale is in the best interest of the estate." *In re Delaware*, 124 B.R. at 180.

28  A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

10

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  filing objections. *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D. Pa. 1988).  The purpose of the

2  notice is to provide an opportunity for objections and hearing before the court if there are

3  objections. *Id*.

4      On October 31, 2018, the Debtors served a *Notice of Sale Procedures, Auction Date and

5  Sale Hearing* [Dkt. No. 729] on the following parties: (i) the Office of the United States Trustee;

6  (ii) counsel to the Committee of Unsecured Creditors; (iii) any parties requesting notices in this

7  case pursuant to Bankruptcy Rule 2002; (iv) all Potential Bidders; (i) all parties known by the

8  Debtors to assert a lien on any of the Assets; (vi) all persons known or reasonably believed to

9  have asserted an interest in any of the Assets; (vii) all non-Debtor parties to any contracts and

10 leases to be assumed; (viii) the Office of the United States Attorney for the Central District of

11 California; (ix) the Office of the California Attorney General; (x) the Office of the California

12 Secretary of State; (xi) all taxing authorities having jurisdiction over any of the Assets, including

13 the IRS; and (xii) all environmental authorities having jurisdiction over any of the Assets.  (*See*

14 Certificate of Service, Dkt. No. 787.) Also, as explained above, the Bidding Procedures Order

15 was entered by the Court and has been provided to all known prospective bidders by Cain. The

16 Debtors will also serve this Memorandum on the same parties in advance of the Sale Hearing.

17     The Debtors submit that the foregoing satisfies the requirements of the APA and of

18 Bankruptcy Rules 6004(a) and (c), which provide as follows:

19     "(a) ... Notice of a proposed ... sale ... of property ... not in the ordinary course of
       business shall be given pursuant to Rule 2002(a)(2),(c)(1),(i) and (k) ... (c) ... A
20     motion for authority to sell property free and clear of liens or other interests shall
       be made in accordance with Rule 9014 and shall be served on the parties who
21     have liens or other interests in the property to be sold. The notice required by
       subdivision (a) of this rule shall include the date of the hearing on the motion and
22     the time within which objections may be filed and served on the debtor in
       possession..."
23

24 Fed. R. Bankr. P. 6004(a)(c).

25     **3.**    **Fair and Reasonable Price.**

26     In order to be approved under § 363(b), the purchase price must be fair and reasonable.

27 *Coastal Indus., Inc. v. U.S. Internal Revenue Serv. (In re Coastal Indus., Inc.)*, 63 B.R. 361, 368

28 (Bankr. N.D. Ohio 1986).  However, the Debtors also realize that "[their] main responsibility, and

109826544\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

the primary concern of the bankruptcy court, is the maximization of the value of the asset sold."
In *re Integrated Resources, Inc.*, 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650
(S.D.N.Y. 1992). "It is a well-established principle of bankruptcy law that the objective of
bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the highest price or
greatest overall benefit possible for the estate." *In re Atlanta Packaging Prods., Inc.*, 99 B.R.
124, 131 (Bankr. N.D. Ga. 1988); *see also In re Wilde Horse Enterprises*, 136 B.R. 830, 841
(Bankr. C.D. Cal. 1991) ("In any sale of estate assets, the ultimate purpose is to obtain the highest
price for the property sold").

The marketing and sale process undertaken by Cain and the Debtors was designed to
insure that the highest price possible was obtained for the Assets.  While the offer submitted by
SCC, which served as the stalking-horse bid, was the only offer the Debtors received for the
Assets, the Debtors believe that SCC's offer to purchase the Assets for $235 million represents
the fair market value for the Assets and will provide a substantial benefit to the Debtors' estates.
Accordingly, the Court should find that the sale price to SCC is fair and reasonable.

**4.  Good Faith.**

When a bankruptcy court authorizes a sale of assets pursuant to § 363(b)(1), it is required
to make a finding with respect to the "good faith" of the purchaser. *In re Abbotts Dairies*, 788
F.2d at 149. Such a procedure ensures that § 363(b)(1) will not be employed to circumvent the
creditor protections of chapter 11, and as such, it mirrors the requirement of § 1129, that the
bankruptcy court independently scrutinizes the debtor's reorganization plan and makes a finding
that it has been proposed in good faith. *Id*. at 150.

"Good faith" encompasses fair value, and further speaks to the integrity of the transaction.
*In re Wilde Horse Enters.*, 136 B.R. at 842. With respect to the debtor's conduct in conjunction
with the sale, the good faith requirement "focuses principally on the element of special treatment
of the Debtor's insiders in the sale transaction." *See In re Indus. Valley Refrig. and Air Cond.
Supplies, Inc.*, 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987).  With respect to the buyer's conduct, this
Court should consider whether there is any evidence of "fraud, collusion between the purchaser
and other bidders or the [debtor], or an attempt to take grossly unfair advantage of other bidders."

109826544\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  *In re Abbotts Dairies*, 788 F.2d at 147; *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th

2  Cir. 1978); *In re Wilde Horse Enters., Inc.*, 136 B.R. at 842; *In re Alpha Indus., Inc.*, 84 B.R. 703,

3  706 (Bankr. D. Mont. 1988).  In short, "[l]ack of good faith is generally determined by fraudulent

4  conduct during the sale proceedings." *In re Apex Oil Co.*, 92 B.R. 847, 869 (Bankr. E.D. Mo.

5  1988) (*citing In re Exennium, Inc.*, 715 F.2d 1401, 1404-05 (9th Cir. 1983)); *see also In re M*

6  *Capital Corp.*, 290 B.R. 743 (B.A.P. 9th Cir. 2003).

7       In *In re Filtercorp, Inc.*, 163 F.3d 570 (9th Cir. 1998), the Ninth Circuit set forth the

8  following test for determining whether a buyer is a good faith purchaser:

9       A good faith buyer "is one who buys 'in good faith' and 'for value.'" [citations

10      omitted.] [L]ack of good faith is [typically] shown by 'fraud, collusion between
       the purchaser and other bidders or the trustee, or an attempt to take grossly unfair

11      advantage of other bidders.'" [citations omitted.]

12  *Filtercorp*, 163 F.3d at 577.

13      The Ninth Circuit made clear in *Filtercorp* that this standard for determining good faith is

14  applicable even when the buyer is an insider.  Neither SCC nor any of SCC's representatives or

15  affiliates is an "insider" of the Debtors.  The Debtors are not aware of any fraud, collusion or

16  attempt to take unfair advantage of other potential bidders. Additionally, the APA was intensively

17  negotiated at arm's length with all parties involved acting in good faith. Based on the foregoing,

18  the Debtors submit that the Court should find that SCC constitutes a good faith purchaser entitled

19  to all of the protections afforded by § 363(m).

20      **B.**    **Section 363(f) of the Bankruptcy Code Permits the Debtors' Sale of the
              Purchased Assets to SCC to Be Free and Clear of Any and All Interests and
21            Liens.**

22      The Debtors have requested that, under § 363(f), the proposed sale be effected "free and

23  clear" of encumbrances, interests or liens in the Assets.  11 U.S.C. § 363(f); *see also In re*

24  *Grumman Indus., Inc.*, 467 B.R. 694, 702 (S.D.N.Y. 2012) (discussing generally "free and clear"

25  provision in § 363(f)). Section 363(f) "empowers the trustee to sell the debtor's assets 'free and

26  clear of any interest in such property of an entity other than the estate.'"  The Bankruptcy Code

27  does not define the phrase "interest in ... property" for purposes of § 363(f).    *In re Gardens*, 567

28  at 825.  The Third Circuit has held that the phrase "interest in ... property" is "intended to refer to

109826544\V-2

obligations that are connected to, or arise from, the property being sold." *Id.* (citing *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 259 (3d Cir. 2000)).  Courts have held that interests in property include monetary obligations arising from the ownership of property, even when those obligations are imposed by statute. *Id.* (citing *Mass. Dep't of Unemployment Assistance v. OPK Biotech, LLC (In re PBBPC, Inc.)*, 484 B.R. 860 (1st Cir. BAP 2013); *United Mine Workers of Am. Combined Benefit Fund v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 581)).

The alternative five conditions spelled out in § 363(f) under which a sale free and clear may be authorized are the following:

> (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2)  such entity [the holder of the interest] consents;
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4)  such interest is in bona fide dispute; or
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5) (2012); *see In re Shary*, 152 B.R. 724, 725 (Bankr. N.D. Ohio 1993) (stating the five conditions in § 363(f) are disjunctive and sale is proper where trustee can prove existence of any of the five conditions).  The Debtors submit that one or more of the tests of  § 363(f) are clearly satisfied with respect to the Debtors' proposed sale of the Assets to SCC free and clear of all liens.

**1.    The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. § 363(f)(2).**

Section 363(f)(2) of the Bankruptcy Code authorizes a sale to be free and clear of an interest if the interest holder consents to the sale. Here, all secured claimants that hold liens secured by the Assets have consented to the proposed sale to SCC.  Thus, the sale is authorized pursuant to § 363(f)(2).

In addition, the Debtors submit that they have also satisfied at least one of the other possible conditions of § 363(f) for a free and clear sale to enable the Debtors to deliver the Assets to SCC free and clear of all liens.

**2.    The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. § 363(f)(3).**

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

14

109826544\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Section 363(f)(3) of the Bankruptcy Code permits a sale free and clear of an interest in property specifically where the interest is a lien, and where the sale price exceeds the aggregate value of all liens.  Here, the Assets are encumbered by approximately $78,534,075 of prepetition secured debt (as allocated to O'Connor Hospital and Saint Louise Regional Hospital), while the Purchase Price, to be paid at closing, is $235 million.  Thus, the purchase price exceeds the aggregate amount of all claims held by creditors who hold a lien or security interest in the property being sold.  *Clear Channel Outdoor, Inc. v. Knupfer* (*In re PW, LLC*), 391 B.R. 25, 40 (B.A.P. 9th Cir. 2008).  Accordingly, the sale is also authorized pursuant to § 363(f)(3).

**3.    The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. § 363(f)(5).**

Section 363(f)(5) permits a sale of property free and clear of liens and interests if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5); *P.K.R. Convalescent Ctrs., Inc. v. Commonwealth of Va., Dep't of Med. Assistance Serv. (In re P.K.R. Convalescent Ctrs., Inc.)*, 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing sale of nursing home assets under § 363(f)(5) over objection of the Department of Medical Assistance Service where its interest was reducible to a claim and subject to a hypothetical money satisfaction).

Section 363(f)(5) has generally been interpreted to mean that if, under applicable law, the holder of the lien or interest could be compelled to accept payment in exchange for its interest, the trustee (or debtor in possession) may take advantage of that right by replacing the holder's lien or interest with a payment or other adequate protection. Collier on Bankruptcy, ¶ 363.06 [6] (15th ed. rev. 2003) ("Collier"). Applicable nonbankruptcy law may recognize a monetary satisfaction when the lienholder is to be paid in full out of the proceeds of the sale or otherwise. *Id*. Thus, for example, a sale free of a first mortgage might be approved when the proceeds are sufficient to pay in full the first mortgage and the second mortgagee has consented to the sale. However, § 363(f)(5) does not require full payment to the lien or interest holder if the trustee can demonstrate the existence of another legal or equitable proceeding by which the holder may be compelled to accept less than full satisfaction of the secured debt. *In re Grand Slam U.S.A., Inc.*, 178 B.R. 460, 461-62 (E.D. Mich. 1995) (holding that the "money satisfaction" language in

109826544\V-2

§363(f)(5) does not require full payment to the lien holder); *In re Healthco Int'l Inc.*, 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994) (construing "money satisfaction of such interest" to mean a payment constituting less than full payment of the underlying debt because any lien can always be discharged by full payment of the underlying debt pursuant to §363(f)(3)); *Scherer v. Fed. Nat'l Mortgage Ass'n (In re Terrace Chalet Apartments, Ltd.)*, 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993).

Courts have held that chapter 11 cramdown is a typical "legal proceeding" by which an entity may be compelled to accept less than full money satisfaction and which will permit the sale of creditor's collateral free and clear of interest under § 363(f)(5). *In re Gulf States Steel, Inc. of Alabama*, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002) (holding that the liens or interests identified in the sale motion could be compelled to accept a money satisfaction in a cramdown plan of reorganization in a chapter 11 case); *In re Terrace Chalet Apartments, LTD.*, 159 B.R. at 829 (finding that § 1129(b)(2) cramdown is such a provision); *In re Perroncello*, 170 B.R. 189 (Bankr. D. Mass. 1994); Collier, ¶ 363.06[6][a]; *but see In re PW, LLC*, 391 B.R. 25, 46 (B.A.P. 9th Cir. 2008). Thus, the trustee can sell property free and clear of a creditor's lien it if demonstrates it can cramdown the creditor's interest pursuant to § 1129(b)(2).

In addition to the legal arguments set forth above, the ability of a debtor to "cramdown" a secured creditor under  § 1129(b)(1) and (2) also constitutes a "legal proceeding," pursuant to which a secured creditor could be compelled to accept a money satisfaction. *See In re Grand Slam, U.S.A. Inc.,* 178 B.R. 460, 462 (E.D. Mich. 1995). Section 1129(b)(2)(A) allows cramdown of a secured creditor, provided that it receives "the indubitable equivalent" of its claim. A debtor can cramdown a secured creditor if it demonstrates (1) the debtor is not unfairly discriminating against the secured creditor, § 1129(b)(1); (2) it is acting in good faith, § 1129(a)(3)-(b)(1); and (3) the secured creditor is receiving the actual value of its claim, § 1129(b)(2)(A)(i)(II), § 1129(b)(2)(A)(iii).  *See also In re Sandy Ridge Dev. Corp.*, 881 F.2d 1346, 1350 (5th Cir. 1989) (holding that "indubitable equivalent" of a secured creditor's interest is the actual value of the claim).   In *In re Hunt Energy Co., Inc.*, 48 B.R. 472, 485 (Bankr. N.D. Ohio, 1985), the court found that a lien which attaches to the proceeds of a sale would necessarily be reduced by

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

16

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    subsequent valuation at a hearing under § 506(a) to meet the "indubitable equivalence"

2    requirements of section 1129(b)(2)(A). Once  § 1129(b)(2)(A) is satisfied, the lienholder would

3    be compelled through the cramdown process to accept such money satisfaction as dictated by the

4    cramdown provisions. *Id*.

5    All of the above requirements for cramdown are met in this proposed transaction. The sale

6    of the Assets to SCC was negotiated and is being conducted in good faith. The secured creditors

7    with valid liens against the Assets are being treated fairly and in accordance with their respective

8    lien priorities, so there is no unfair discrimination present in the proposed sale. Finally, any such

9    secured creditors will receive the actual value of their secured claim as measured by § 506(a).

10    Based upon all of the foregoing, all creditors of the Debtors, including all secured

11    creditors of the Debtors, could be compelled, in a legal or equitable proceeding, to accept a

12    money satisfaction of their interest. The Debtors' proposed sale of the Assets to SCC should

13    therefore be free and clear of all interests and liens pursuant to § 363(f)(5).

14    **C.    The Court Should Authorize the Debtors to Assume and Assign to SCC All of the Assumed Contracts that SCC Designates.**

15    Barring exceptions not herein relevant, §§ 365(a) and 1107(a) authorize a debtor in

16    possession, "subject to the Court's approval, ... [to] assume or reject any executory contract or

17    unexpired lease of the debtor."  A debtor in possession may assume or reject executory contracts

18    for the benefit of the estate.  *In re Klein Sleep Prods, Inc*., 78 F.3d 18, 25 (2d. Cir. 1996); *In re*

19    *Central Fla. Metal Fabrication, Inc*., 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); *In re Gucci*,

20    193 B.R. 411, 415 (S.D.N.Y. 1996). In reviewing a debtor in possession's decision to assume or

21    reject an executory contract, a bankruptcy court should apply the "business judgment test" to

22    determine whether it would be beneficial to the estate to assume it. *In re Continental Country*

23    *Club, Inc*., 114 B.R. 763, 767 (Bankr. M.D. Fla. 1990); *see also In re Gucci*, 193 B.R. at 415.

24    The business judgment standard requires that the court follow the business judgment of the debtor

25    unless that judgment is the product of bad faith, whim, or caprice.  *In re Prime Motors Inns*, 124

26    B.R. 378, 381 (Bankr. S.D. Fla. 1991) (*citing Lubrizol Enterprises v. Richmond Metal Finishers*,

27    756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986)).

28

1    Pursuant to § 365(f)(2), a debtor may assign its executory contracts and unexpired leases,

2    provided the debtor first assumes such executory contracts and unexpired leases in accordance

3    with §365(b)(1), and provides adequate assurance of future performance by the assignee.

4    Pursuant to § 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor

5    to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to

6    such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide

7    adequate assurance of future performance under the contract or lease. 11 U.S.C. § 365(b)(1); *see

8    also In re Bowman*, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995*); In re AEG Acquisition Corp*., 127

9    B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd* 161 B.R. 50 (B.A.P. 9th Cir. 1993). Pursuant to §

10    365(f)(1), a debtor may assign an executory contract or unexpired lease pursuant to § 365(f)(2)

11    notwithstanding any provision in such executory contract or unexpired lease that prohibits,

12    restricts or conditions the assignment of such executory contract or unexpired lease.

13    The assumption and assignment of executory contracts furthers the goals of chapter 11 of

14    promoting reorganization by balancing the debtor's interest in maximizing the value of its estate

15    against the contracting party's interest in receiving the benefit of its bargain and being protected

16    against default by the debtor after assumption has occurred. *In re Embers 86th Street. Inc*., 184

17    B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

18    Here, the Debtors are seeking to assume and assign to SCC all of the Debtors' executory

19    contracts and unexpired leases that SCC designates. A cure notice listing all of the known

20    executory contracts and unexpired leases related to Saint Louise Medical Center and O'Connor

21    Medical Center (the "Cure Notice"), along with the Debtors' belief as to all outstanding cure

22    amounts owing by the Debtors to the other parties to those executory contracts and unexpired

23    leases (the "Cure Amounts"), was filed on November 12, 2018 [Dkt. No. 810] and served on all

24    counterparties to the listed executory contracts and unexpired leases.  A supplement to the Cure

25    Notice (listing additional executory contracts and leases and revised Cure Amounts) was later

26    filed on December 6, 2018 [Dkt. No. 998] and served on all counterparties to the listed executory

27    contracts and unexpired leases.   SCC has not yet identified for the Debtors which of the Debtors'

28

109826544\V-2

1    executory contracts and unexpired leases that SCC desires to have assigned to it (*i.e.*, the

2    "Assumed Contracts").  SCC is required to make that designation by December 12, 2018.

3        As a result of the foregoing, the Debtors are seeking the Court's authority to assume and

4    assign to SCC all of the Debtors' executory contracts and unexpired leases that SCC wants to

5    have assigned to it and to fix the required Cure Amounts that would need to be paid to the other

6    parties to the executory contracts and unexpired leases to enable compliance with the provisions

7    of § 365(b)(1)(A) at the Cure Amounts set forth in the Cure Notice unless the other parties to the

8    executory contracts and unexpired leases file a timely objection to the Cure Notice and the Court

9    determines that the required Cure Amount is different than the amount set forth in the Cure

10   Notice.  Within five (5) business days after the filing of this Memorandum, the Debtors shall

11   serve a separate Cure Notice which identifies the executory contracts and unexpired leases that

12   will be assumed by SCC, and the amount of the cure payment due on each, by overnight mail.

13       **1.    Potential Disputes Regarding Assignment of Certain Agreements to SCC.**

14           ***i.    Department of Health Care Services Objection***

15       The Debtors and the Department of Health Care Services (the "Department") have been

16   negotiating for a consensual resolution of the issues raised in the Sale and Bidding Procedures

17   Motion and the Department's Objection to the Sale and Bidding Procedures Motion (the "DHCS

18   Objection") [Dkt. No. 906] with regard to the transfer of the Medi-Cal Provider Agreements from

19   the Debtors to SCC.  Although the parties have made significant progress towards a consensual

20   resolution of the issues, and are hopeful that such a resolution will be reached, the Debtors and

21   the Department need additional time to continue to negotiate.  The Debtors and the Department

22   are discussing an agreement providing that, no later than 4:00 p.m. (Pacific Time), on January 18,

23   2019, the Debtors will file either (a) a notice of a resolution of the issues regarding the transfer of

24   the Medi-Cal Provider Agreement or (b) a reply to the objection of the DHCS Objection.  A

25   hearing would then be held on the issues raised regarding the transfer of the Medi-Cal Provider

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

1    Agreement on January 30, 2019, at 10:00 a.m. (Pacific Time), and all parties' rights would be

2    reserved until that hearing.

3              ii.        *Centers for Medicare and Medicaid Services Objection*

4              The Debtors and the United States Department of Health and Human Services through its

5    agency the Centers for Medicare and Medicaid Services ("CMS") have been negotiating for a

6    consensual resolution of the issues raised in the Sale and Bidding Procedures Motion and the

7    CMS Objection to the Sale and Bidding Procedures Motion (the "CMS Objection") [Docket No.

8    447] with regard to the transfer of the Medicare Provider Agreements from the Debtors to

9    SCC. Although the Debtors and CMS have made significant progress towards a consensual

10   resolution of the issues, and are hopeful that such a resolution will be reached, the parties need

11   additional time to continue to negotiate. Therefore, the Debtors and CMS have agreed that, no

12   later than 4:00 p.m. (Pacific Time), on January 18, 2019, either (a) the Debtors will file a notice

13   of a resolution of the issues regarding the transfer of the Medicare Provider Agreement or (b) the

14   U.S. Department of Health & Human Services will file an objection to the sale and the proposed

15   transfer of the Medicare Provider Agreement. If necessary, the Debtors will file any reply to the

16   objection no later than 4:00 p.m. (Pacific Time), on January 25, 2019, and a hearing will be held

17   on the issues raised regarding the transfer of the Medicare Provider Agreement on January 30,

18   2019, at 10:00 a.m. (Pacific Time); all parties' rights are reserved until that hearing.

19             iii.       *California Attorney General Objection*

20             SCC and the California Attorney General (the "CAG") have been negotiating for a

21   consensual resolution of the issues raised in the Sale and Bidding Procedures Motion and the

22   CAG Objection to the Sale and Bidding Procedures Motion (the "CAG Objection") [Docket No.

23   463] with regard to the applicability of any or all of the extant conditions which the CAG asserts

24   remain binding on SCC (the "AG Conditions"). The Debtors are informed and believe that SCC

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

and the CAG have reached an agreement in principal on the issues with regard to the AG Conditions, but require more time to finalize the terms of such an agreement.  Therefore, the Debtors, CAG and SCC are discussing an agreement that provides that, no later than 4:00 p.m. (Pacific Time), on January 18, 2019, the Debtors will file either (a) notice of a resolution of the issues regarding the applicability of the AG Conditions, or (b) notice that no resolution was reached and a hearing will be required on the applicability of the AG Conditions.   A hearing would then be held on the issues raised regarding the continued applicability of the AG Conditions on the Debtors and/or SCC, in particular whether some or all of the AG Conditions are an interest in property which is eliminated under § 363, on January 30, 2019, at 10:00 a.m. (Pacific Time), and all parties' rights would be reserved until that hearing.

### iv.    *Collective Bargaining Agreements*

The Debtors and various unions whose Collective Bargaining Agreements ("CBAs") are implicated by the proposed Sale have met to discuss the impact of the proposed sale on those CBAs.  The Debtors anticipate filing motions (the "CBA Motions"), pursuant to § 1113, to reject and/or modify those CBAs prior to the hearing on the proposed Sale on December 19, 2018.   Under the terms of the APA, SCC is not assuming any collective bargaining agreements (the "CBAs") that cover employees at Saint Louise Regional Hospital and O'Connor Hospital. The Debtors are required to have resolution of the status of the CBAs that cover employees at Saint Louise Regional Hospital and O'Connor Hospital prior to SCC closing on the proposed Sale pursuant to the APA.  The Debtors propose that the hearing on the CBA Motions occur no later than January 30, 2019.

### D.    **The Court Should Waive the Fourteen-Day Waiting Periods Set Forth in Bankruptcy Rules 6004(h) and 6006(d).**

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property [...] is stayed until the expiration of fourteen days after entry of the

Court order, unless the Court orders otherwise.  Bankruptcy Rule 6006(d) has a similar provision with respect to an order approving of a debtor's assumption and assignment of unexpired leases and executory contracts.

For all of the reasons set forth above, the Debtors believe that selling the Assets to SCC in accordance with the timeline provided in the APA and the Bidding Procedures Order is in the best interests of the Debtors' estates, their creditors and shareholders. In order to facilitate the most expeditious Closing possible, the Debtors request that the Sale Order be effective immediately upon entry by providing that the fourteen-day waiting periods of Bankruptcy Rule 6004(h) and 6006(d) are waived.

### III.    CONCLUSION

For all these reasons, the Court should enter the Sale Order and grant all of the other relief requested in this Memorandum.

Dated:  December 12, 2018

DENTONS US LLP
SAMUEL R. MAIZEL
TANIA M. MOYRON


By    /s/ Tania M. Moyron
        Tania M. Moyron

Attorneys for the Chapter 11 Debtors and Debtors In Possession

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109826544\V-2

1

### JAMES M .MOLONEY

2          1.      I am a managing director of Cain Brothers ("Cain"), which is a division of

3    KeyBanc Capital Markets Inc., a wholly-owned broker/dealer subsidiary of KeyCorp and an

4    affiliate of KeyBank National Association.  I am located in Cain's San Francisco office which is

5    located at One California Street, Suite 2400, San Francisco, California.  Mr. Carsten Beith and I

6    are the co-heads of Cain's Health Systems Mergers & Acquisition group.   I am over the age of

7    18 and competent to testify as to the facts set forth herein and will do so if called upon.

8          2.      Except as otherwise stated, all facts contained within this Declaration are based

9    upon my personal knowledge, from information gathered from other employees within the

10   Debtors' organization, my review of relevant documents, or my opinion based upon my

11   experience concerning the operations of the Debtors.

12         3.      I submit this Declaration in support of the *Debtors' Memorandum in Support of*

13   *Entry of Order (1) Approving Sale of Certain Assets to Santa Clara County Free and Clear of All*

14   *Encumbrances; (2) Approving of Debtors' Assumption and Assignment of Certain Unexpired*

15   *Leases and Executory Contracts and Determining Cure Amounts and Approving of Debtors'*

16   *Rejection of Those Unexpired Leases and Executory Contracts which are not Assumed and*

17   *Assigned (3) Waiving the 14-Day Stay Periods Set Forth in Bankruptcy Rules 6004(h) and*

18   *6006(d) and (4) Granting Related Relief* (the "Memorandum").  As a part of this Declaration, I

19   fully incorporate my Declaration submitted on October 3, 2018 [Docket No. 394]. [4]   All

20   capitalized terms not defined herein have the meaning ascribed to them in the Memorandum.

21         4.      Prior to the Petition Date, the Debtors engaged in substantial efforts to market and

22   sell their assets. In June 2018, the Debtors engaged Cain  to assist in identifying potential buyers

23

24   [4] *Declaration Of James Moloney In Support Of Debtors Notice Of Motion And Motion For The*
     *Entry Of (I) An Order (1) Approving Form Of Asset Purchase Agreement For Stalking Horse*
25   *Bidder And For Prospective Overbidders To Use, (2) Approving Auction Sale Format, Bidding*
     *Procedures And Stalking Horse Bid Protections, (3) Approving Form Of Notice To Be Provided*
26   *To Interested Parties, (4) Scheduling A Court Hearing To Consider Approval Of The Sale To The*
     *Highest Bidder And (5) Approving Procedures Related To The Assumption Of Certain Executory*
27   *Contracts And Unexpired Leases; And (II) An Order (A) Authorizing The Sale Of Property Free*
28   *And Clear Of All Claims, Liens And Encumbrances.*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

23

109826544\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

of some or all of the Verity hospitals and related assets and commenced discussions with those potential buyers.  Cain prepared a Confidential Investment Memorandum and organized an online data site to share information with potentially buyers and contacted over 110 strategic and financial buyers beginning in July 2018 to solicit their interest in exploring a transaction regarding the Debtors and has advanced significantly towards achieving sales.  By August 2018, as a result of its ongoing and broad marketing process, Cain had received 11 Indications of Interest. The Debtors, in consultation with Cain and its other advisors, selected Santa Clara County's (the "County") offer from one or more potential stalking horse bidder(s) to acquire the Assets through a sale under § 363 of the Bankruptcy Code.  I and Mr. Beith have been leading the sale efforts on behalf of Verity, including in the Debtors' selection of the County as the Stalking Horse Bidder for the Debtors' hospitals and related assets in Santa Clara County.

5.    After the Petition Date, the Court granted the Debtors' *Application to Employ Cain Brother, A Division of Key Bank Capital Market Inc.* [Docket Nos. 346, 746] and authorized the Debtors to employ Cain as an investment banker to, among other things, assist in the marketing of the Debtors' assets.  Cain has continued to actively market the Debtors' Assets since the County executed the APA, in accordance with the Order entered on October 31, 2018  [Docket No. 724] (the "Bidding Procedures Order").[5]  As a part of this process, Cain has monitored interest and continued to communicate with parties that had expressed interest and that had been identified as potential bidders—either as partial or aggregate bidders.  This marketing process was meant to identify and shepherd any bidders who could contribute to a competitive Auction in addition to the Stalking Horse Bid.

6.    Cain has sent a total of fifty Non-Disclosure Agreements ("NDAs"), and twenty five parties executed NDAs and were granted access to a data room containing information about

---

[5] *Order (1) Approving Form Of Asset Purchase Agreement For Stalking Horse Bidder And For Prospective Overbidders To Use, (2) Approving Auction Sale Format, Bidding Procedures And Stalking Horse Bid Protections, (3) Approving Form Of Notice To Be Provided To Interested Parties, (4) Scheduling A Court Hearing To Consider Approval Of The Sale To The Highest Bidder And (5) Approving Procedures Related To The Assumption Of Certain Executory Contracts And Unexpired Leases; And Authorizing The Sale Of Property Free And Clear Of All Claims, Liens And Encumbrances*.

109826544\V-2

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

the Assets (the "Data Room").  Seven parties submitted proposals to purchase, in the aggregate or in full, the Assets (the "Proposal Parties").  These proposals included proposals to (i) acquire the real estate assets of one campus; (ii) acquire only O'Connor Hospital, Saint Louise Regional Medical Center and the DePaul Campus and related assets ("Santa Clara Assets"); and (iii) acquire Santa Clara Assets in conjunctions with all other hospital and related assets of Verity Health.  Cain has stayed in contact with the Proposal Parties regarding the Bidding Procedures Order throughout these cases, including after the APA was signed and after the Bidding Procedures Order was entered.    The APA was the result of extensive negotiations and documentation between the Debtors and the County.

7.      Additionally, after the Bidding Procedures Order was entered, Cain sent a direct email communication to over 170 interested buyers Cain had identified and over 600 individual email addresses.  This communication contained key information about the Assets, the Auction, the Bidding Deadline and other deadlines, a hyperlink to access the Bidding Procedures Order and contact information for a Cain individual to discuss questions and interest further.  Cain continued to populate the Data Room with new and relevant information as it became available.

8.      Cain continued to communicate with a potential bidder ("Alternate Bidder A") that had submitted an indication of interest early in Cain's marketing process.  Alternate Bidder A indicated that they were not likely to submit a bid under the Bidding Procedures, but Cain still remained in contact up to the Bid Deadline.  However, Alternate Bidder A did not submit a bid.

9.      Cain also actively followed-up with a potential partial asset bidder ("Alternate Bidder B") that had expressed interest in purchasing one, but not both, of the Hospitals.  Cain provided this bidder with information to guide its diligence and made itself available to address issues raised.  However, after performing its diligence, Alternate Bidder B did not place a bid.

10.     No party emerged willing to place a bid for the Assets, whether partial or aggregate, under the Bidding Procedures Order.  No party has requested an extension of time to bid.

11.     I am not aware of any collusion or improper dealings that have taken place between Cain, the Debtors, the County, any potential bidders or interested parties, or any other

109826544\V-2

1   person in connection with the sale.  Cain, moreover, is receiving no consideration or fee from or

2   on behalf of the County for the sale.  I am also not aware of any fact or circumstance indicating

3   that the County has not acted in good faith in pursuing the Sale.

4         I declare under penalty of perjury under the laws of the United States of America that the

5   foregoing is true and correct.

6         Executed this 12th day of December, 2018 in San Francisco, California.

7

8

9               JAMES M. MOLONEY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300