SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

Attorneys for the Chapter 11 Debtors and
Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| In re | Lead Case No. 2:18-bk-20151-ER |
| VERITY HEALTH SYSTEM OF CALIFORNIA, INC., *et al.*, | Jointly Administered With:<br>Case No. 2:18-bk-20162-ER<br>Case No. 2:18-bk-20163-ER<br>Case No. 2:18-bk-20164-ER |
| Debtors and Debtors In Possession. | Case No. 2:18-bk-20165-ER<br>Case No. 2:18-bk-20167-ER |
| ☒ Affects All Debtors | Case No. 2:18-bk-20168-ER<br>Case No. 2:18-bk-20169-ER |
| ☐ Affects Verity Health System of California, Inc. | Case No. 2:18-bk-20171-ER<br>Case No. 2:18-bk-20172-ER<br>Case No. 2:18-bk-20173-ER |
| ☐ Affects O'Connor Hospital<br>☐ Affects Saint Louise Regional Hospital<br>☐ Affects St. Francis Medical Center<br>☐ Affects St. Vincent Medical Center<br>☐ Affects Seton Medical Center<br>☐ Affects O'Connor Hospital Foundation<br>☐ Affects Saint Louise Regional Hospital Foundation | Case No. 2:18-bk-20175-ER<br>Case No. 2:18-bk-20176-ER<br>Case No. 2:18-bk-20178-ER<br>Case No. 2:18-bk-20179-ER<br>Case No. 2:18-bk-20180-ER<br>Case No. 2:18-bk-20181-ER |
| ☐ Affects St. Francis Medical Center of Lynwood Foundation | Hon. Judge Ernest M. Robles |
| ☐ Affects St. Vincent Foundation<br>☐ Affects St. Vincent Dialysis Center, Inc.<br>☐ Affects Seton Medical Center Foundation<br>☐ Affects Verity Business Services<br>☐ Affects Verity Medical Foundation<br>☐ Affects Verity Holdings, LLC<br>☐ Affects De Paul Ventures, LLC<br>☐ Affects De Paul Ventures - San Jose Dialysis, LLC | **DEBTORS' NOTICE OF MOTION AND MOTION FOR THE ENTRY OF (I) AN ORDER (1) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR STALKING HORSE BIDDER AND FOR PROSPECTIVE OVERBIDDERS; (2) APPROVING AUCTION SALE FORMAT, BIDDING PROCEDURES AND STALKING HORSE BID PROTECTIONS; (3) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; (4) SCHEDULING A COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER; AND (5) APPROVING PROCEDURES RELATED TO THE ASSUMPTION OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (II) AN ORDER (A) AUTHORIZING THE SALE OF PROPERTY FREE AND CLEAR OF ALL CLAIMS, LIENS AND ENCUMBRANCES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| Debtors and Debtors In Possession. | **Hearing:**<br>Date: [TBD]<br>Time: [TBD]<br>Location: Courtroom 1568<br>255 E. Temple St., Los Angeles, CA |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

109967730\V-4

**PLEASE TAKE NOTICE** that at the above referenced date, time and location, Verity Health System of California, Inc., a California nonprofit public benefit corporation and the Debtor herein ("Verity"), and the above-referenced affiliated debtors, the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Debtors"), will move (the "Motion"), pursuant to §§ 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure and Rules 6004-1(b) and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR"), for the entry of:

I.    An order (the "Bidding Procedures Order"):

(1)    approving the form of the Asset Purchase Agreement, dated January 8, 2018 (the "Stalking Horse APA") between (i) Verity, Verity Holdings, LLC, a California limited liability company ("Verity Holdings"), St. Francis Medical Center, a California nonprofit public benefit corporation ("St. Francis Medical Center"), St. Vincent Medical Center, a California nonprofit public benefit corporation ("St. Vincent Medical Center"), St. Vincent Dialysis Center, Inc., a California nonprofit public benefit corporation ("St. Vincent Dialysis Center") and Seton Medical Center, a California nonprofit public benefit corporation ("Seton Medical Center"), on the one hand; and (ii) Strategic Global Management, Inc., a California corporation ("the "Stalking Horse Purchaser"), on the other hand, a true and correct copy of which is attached as **Exhibit A** hereto; pertaining to a sale of substantially all assets of St. Francis Medical Center, St. Vincent Medical Center, St. Vincent Dialysis Center and Seton Medical Center (the "Purchased Assets") to be used by (a) the Stalking Horse Purchaser as the stalking horse bidder for the Purchased Assets, and (b) any prospective overbidders (each an "Overbidder" and collectively, the "Overbidders") who seek to participate in a hoped for auction sale ("Auction") of the Purchased Assets;

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

(2)   approving the format, bidding procedures, and stalking horse bid protections (the "Bidding Procedures"), relating to the proposed Auction described below and in the attached Memorandum of Points and Authorities (the "Memorandum");

(3)   approving the form of notice to be provided by the Debtors to their creditors and to be provided by the Debtors' investment banker to prospective Overbidders;

(4)   scheduling the Auction for April 8, 2019 and April 9, 2019, and a hearing (the "Sale Hearing") on April 17, 2019, at 10:00 a.m. (subject to the availability of the Court), before the Court to consider approval of the sale of the Purchased Assets to the highest bidder;

(5)   establishing procedures for the assumption and assignment to the Successful Bidder (as defined below) of executory contracts and unexpired leases in connection with the Sale and approving the form and manner of notice related thereto; and

II.   An order (the "Sale Order") authorizing the Sale to the Successful Bidder, free and clear of all claims, liens and encumbrances; and

III.   Granting related relief.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based on this Notice of Motion and Motion, the Memorandum, the Declaration of Richard G. Adcock and the Declaration of James Moloney (to be filed prior to the hearing on the Motion), the *Declaration of Richard G. Adcock In Support of Emergency First-Day Motions* [Docket No. 8], supporting statements, arguments and representations of a counsel who will appear at the hearing on the Motion, the record in this case, and any other evidence properly brought before the Court in all other matters of which this Court may properly take judicial notice.

**PLEASE TAKE FURTHER NOTICE** that any party opposing or responding to the Motion must file and serve the response ("Response"), pursuant to LBR 9013-1(f), on the moving party and the United States Trustee not later than fourteen (14) days before the date designated for the hearing.  A Response must be a complete written statement of all reasons in opposition

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    thereto or in support, declarations and copies of all evidence on which the responding party

2    intends to rely, and any responding memorandum of points and authorities.

3         **PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the failure to

4    file and serve a timely objection to the Motion may be deemed by the Court to be consent to the

5    relief requested herein.

6

7    Dated:  January 17, 2019                    DENTONS US LLP
                                                  SAMUEL R. MAIZEL
8                                                 TANIA M. MOYRON

9                                                 By    */s/ Tania M. Moyron*
                                                        *Tania M. Moyron*
10
                                                  Attorneys for the Chapter 11 Debtors and
11                                                Debtors In Possession

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4                              - 3 -

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .......................................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................................... 1

III. STATEMENT OF FACTS .......................................................................................... 2

    A.   GENERAL BACKGROUND ............................................................................ 2

    B.   FACTS RELEVANT TO MOTION ................................................................. 6

    C.   BIDDING PROCEDURES ................................................................................ 7

        a.   Provisions Governing Qualifications of Bidders ..................................... 7

        b.   Due Diligence ............................................................................................ 8

        c.   Provisions Governing Qualified Bids ....................................................... 8

        d.   Bid Deadline ............................................................................................ 11

        e.   Credit Bidding ......................................................................................... 12

        f.   Evaluation of Competing Bids ............................................................... 12

        g.   No Qualified Bids .................................................................................... 13

        h.   Auction Process ....................................................................................... 13

        i.   Selection of Successful Bid .................................................................... 16

        j.   Return of Deposits .................................................................................. 17

        k.   Back-Up Bidder ...................................................................................... 17

        l.   Break-Up Fee .......................................................................................... 18

        m.   Sale Hearing ............................................................................................ 19

    D.   NOTICE PROCEDURES ................................................................................ 21

    E.   PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF
        ASSIGNED CONTRACTS AND LEASES ................................................... 22

    F.   THE PRIMARY TERMS OF THE STALKING HORSE APA ................... 24

IV.  ARGUMENT ............................................................................................................. 29

    A.   APPROVAL OF THE BIDDING PROCEDURES IS APPROPRIATE
        AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND
        STAKEHOLDERS. .......................................................................................... 29

    B.   THE BREAK-UP FEE HAS A SOUND BUSINESS PURPOSE AND IS
        NECESSARY TO PRESERVE THE VALUE OF THE DEBTORS'
        ESTATES. ......................................................................................................... 31

    C.   THE PROCEDURE FOR ASSUMPTION AND ASSIGNMENT OF
        CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES
        IS APPROPRIATE .......................................................................................... 34

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

|   | D. | APPROVAL OF THE SALE IS WARRANTED UNDER § 363 | 35 |
|---|----|-----------------------------------------------|----|
|   | E. | RELIEF FROM THE 14-DAY WAITING PERIOD UNDER RULES 6004(H) AND 6006(D) IS APPROPRIATE | 42 |
|   | F. | THE APPLICABLE REQUIREMENTS OF LBR 6004-1 HAVE BEEN SATISFIED | 43 |
| V. |   | CONCLUSION | 43 |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re 995 Fifth Ave. Assocs.*,
96 B.R. 24 (Bankr. S.D.N.Y. 1989) ........................................................................................31

*In re Abbotts Dairies of Pa., Inc.*,
788 F.2d 143 (2d Cir. 1986) ...................................................................................................36

*In re America West Airlines, Inc.*,
166 B.R. 908 (Bankr. D. Ariz. 1994) .....................................................................................31

*In re ARSN Liquidating Corp. Inc.*,
2017 WL 279472 (Bankr. D.N.H. Jan. 20, 2017) ..................................................................39

*In re Atlanta Packaging Prods., Inc.*,
99 B.R. 124 (Bankr. N.D. Ga. 1988) ................................................................................29, 30

*In re Bon Ton Rest. & Pastry Shop, Inc.*,
53 B.R. 789 (Bankr. N.D. Ill. 1985)........................................................................................34

*Burtch v. Ganz (In re Mushroom Transp. Co.)*,
382 F.3d 325 (3d Cir. 2004) ...................................................................................................30

*In re Bygaph, Inc.*,
56 B.R. 596 (Bankr. S.D.N.Y. 1986) .................................................................................34, 38

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,
181 F.3d 527 (3d Cir. 1999)...............................................................................................30, 31

*Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*,
103 B.R. 524 (Bankr. D.N.J. 1989).........................................................................................34

*In re Case Engineered Lumber, Inc.*,
No. 09–22499 (Bankr. N.D. Ga. Sept. 1, 2009 ......................................................................32

*In re Christ Hospital*,
502 B.R. 158 (Bankr. D.N.J. 2013).........................................................................................39

*Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983)..................................................................................................36

*Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
60 B.R. 612 (Bankr. S.D.N.Y. 1986).......................................................................................36

*In re CXM, Inc.*,
307 B.R. 94 (Bankr. N.D. Ill. 2004)........................................................................................32

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*In re Dan River, Inc.*,
   No. 04-10990 (Banker. N.D. Ga. Dec. 17, 2004) ..................................................32

*In re Delaware & Hudson Ry. Co.*,
   124 BR. 169 (D. Del. 1991) ................................................................................36

*In re Dundee Equity Corp.*,
   1992 Bankr. LEXIS 436 (Bankr. S.D.N.Y. Mar. 6, 1992).....................................37

*In re Energytec, Inc.*,
   739 F.3d 215 (5th Cir. 2013)...............................................................................41

*In re Ewell*,
   958 F.2d 276 (9th Cir. 1992)...............................................................................41

*Folger Adam Security v. DeMatteis/MacGregor JV*,
   209 F.3d 252 (3d Cir. 2000)...........................................................................38, 40

*Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*,
   107 F.3d 558 (8th Cir. 1997)...........................................................................30, 36

*In re Gardens Regional Hospital and Medical Center, Inc.*,
   567 B.R. 820 (Bankr. C.D. Cal. 2017).................................................................38

*GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*,
   331 B.R. 251 (N.D. Tex. 2005)............................................................................36

*In re Grumman Olson Indus. Inc.*,
   467 B.R. 694 (S.D.N.Y 2012)..............................................................................39

*In re Hupp Indus.*,
   140 B.R. 191 (Bankr. N.D. Ohio 1997) ...............................................................31

*In re La Paloma Generating, Co.*,
   2017 WL 5197116 (Bankr. D. Del. Nov. 9, 2017)................................................38

*In re Lajijani*,
   325 B.R. 282 (B.A.P. 9th Cir. 2005).....................................................................36

*In re Lake Burton Dev., LLC*,
   2010 WL 5563622 (Bankr. N.D. Ga. Mar. 18, 2010)............................................32

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
   837 F.2d 89 (2d Cir. 1988)..................................................................................40

*In re Marrose Corp.*,
   1992 WL 33848 (Bankr. S.D.N.Y. 1992) .............................................................31

*Meyers v. Martin (In re Martin)*,
   91 F.3d 389 (3d Cir. 1996)..................................................................................35

109967730\V-4

*Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*,
930 F.2d 1132 (6th Cir. 1991)..................................................................................38

*In re Natco Indus., Inc.*,
54 B.R. 436 (Bankr. S.D.N.Y. 1985) .........................................................................34

*The Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*,
195 B.R. 716 (Bankr. N.D. Ind. 1996).......................................................................40

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*,
78 F.3d 18 (2d Cir. 1996)............................................................................................33

*Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*,
147 B.R. 650 (S.D.N.Y. 1992)............................................................30, 31, 32, 36

*Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*,
973 F.2d 141 (2d Cir. 1992)........................................................................................36

*Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*,
846 F.2d 1170 (9th Cir. 1988).....................................................................................41

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*,
4 F.3d 1095 (2d Cir. 1993)..........................................................................................33

*Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.)*,
163 F.3d 570 (9th Cir. 1998).......................................................................................41

*PBBPC, Inc. v. OPK Biotech, LLC (In re PBBPC, Inc.)*,
484 B.R. 860 (1st Cir. B.A.P. 2013) ..........................................................................39

*In re S.N.A. Nut Co.*,
186 B.R. 98 (Bankr. N.D. Ill. 1995)............................................................................31

*In re T Asset Acquisition Company, LLC*,
No. 09-31853 (Bankr. C.D. Cal. Jan. 28, 2010) (J. Robles) .....................................32

*In re Tama Beef Packing Inc.*,
321 B.R. 469 (8th Cir. BAP 2005)..............................................................................32

*In re Titusville Country Club*,
128 B.R. 396 (W.D. Pa. 1991) ....................................................................................36

*In re Tougher Indus.*,
2013 WL 1276501 (Bankr. N.D.N.Y. Mar. 27, 2013)................................................39

*In re Trans World Airlines, Inc.*,
322 F.3d 283 (3d Cir. 2001).................................................................................39, 40

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*,
   551 B.R. 631 (N.D. Ala. 2016) ........................................................................................39

*In re Vista Marketing Group Ltd.*,
   557 B.R. 630 (Bankr. N.D. Ill. 2016) .............................................................................39

*WBO P'ship v. Va. Dep't of Med. Assistance Servs. (In re WBO P'ship)*,
   189 B.R. 97 (Bankr. E.D. Va. 1995) ...............................................................................39

*In re Women First Healthcare, Inc.*,
   332 B.R. 115 (Bankr. D. Del. 2005) ...............................................................................32

*In re WPRV-TV, Inc.*,
   143 B.R. 315 (D.P.R. 1991) .............................................................................................36

## Statutes

11 United States Code
   § 101 .................................................................................................................................2
   § 105(a) .....................................................................................................................28, 37
   § 363 ......................................................................................................................*passim*
   § 363(b) ...........................................................................................................................41
   § 363(b)(1) ................................................................................................................28, 35
   § 363(f) ................................................................................................................37, 38, 39, 40
   § 363(m) ....................................................................................................................28, 41
   § 365(a) ...........................................................................................................................33
   § 365(f)(2) ................................................................................................................33, 34
   § 1107 ...............................................................................................................................2
   § 1108 ...............................................................................................................................2

28 United States Code
   § 157 .................................................................................................................................1
   § 157(b)(2) .......................................................................................................................1
   § 1334 ...............................................................................................................................1
   § 1408 ...............................................................................................................................1
   § 1409 ...............................................................................................................................1

Bankruptcy Code
   Chapter 5 ........................................................................................................................28
   Chapter 11 ..................................................................................................................1, 39
   § 365 .................................................................................................19, 22, 28, 34
   § 365(f)(1) ......................................................................................................................35
   § 503(b) ....................................................................................................................28, 31

Coal Act ...............................................................................................................................39, 40

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

## **Rules and Regulations**

Bankruptcy Rules
    Rule 2002 .............................................................................................................21, 28
    Rule 6004 .......................................................................................................28, 29, 35
    Rule 6004(f) ................................................................................................................29
    Rule 6004(h) .........................................................................................................41, 42
    Rule 6006(d) .........................................................................................................41, 42

## **Other Authorities**

*Collier on Bankruptcy P.* 6004.11 ...............................................................................42

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Verity Health System of California, Inc., a California nonprofit public benefit corporation and the Debtor herein ("Verity"), and the above-referenced affiliated debtors, the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Debtors"), seek entry of an order: (a) designating Strategic Global Management, Inc. ("SGM" or the "Stalking Horse Purchaser") as the stalking-horse bidder for St. Francis Medical Center, St. Vincent Medical Center, St. Vincent Dialysis Center, Seton Medical Center (collectively, the "Hospitals"), and related assets (collectively, the "Purchased Assets"), at a price of approximately $610 million ($420 million allocated to St. Francis Medical Center, $120 million allocated to St. Vincent Medical Center and $70 million allocated to Seton Medical Center and Seton Coastside combined), plus payment of Cure Costs (defined below) associated with any Assumed Leases and/or Assumed Contracts (the "Cash Consideration," and collectively, the "Stalking Horse Bid"); (b) setting bid procedures to establish guidelines for parties interesting in making an overbid; (c) scheduling an auction to be held on April 8, 2019 and April 9, 2019; and (d) scheduling a sale hearing for the Court to approve the winning bidder.

The Debtors have vigorously marketed the Purchased Assets and believe that the Stalking Horse Bid represents a fair market value for the Purchased Assets. Moreover, SGM is a buyer who will maintain the healthcare characteristics of St. Francis Medical Center, St. Vincent Medical Center, St. Vincent Dialysis Center and Seton Medical Center, continuing patient care for the communities served by the Hospitals and healthcare providers. Nonetheless, the Debtors are hopeful that there will be an auction which may result in overbids. Based on the foregoing, and for the reasons set forth below in greater detail, the Debtors respectfully request that the Court grant the Motion.

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

### III.    STATEMENT OF FACTS

#### A.    GENERAL BACKGROUND

1.    On August 31, 2018 ("Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[1]  Since the commencement of their cases, the Debtors have been operating their businesses as debtors in possession pursuant to §§ 1107 and 1108.

2.    Debtor VHS, a California nonprofit public benefit corporation, is the sole corporate member of five Debtor California nonprofit public benefit corporations that operate six acute care hospitals, including the Hospitals and other facilities in the state of California.  *See Declaration of Richard G. Adcock In Support of Emergency First-Day Motions* [Docket No. 8] (the "Adcock First-Day Declaration").

3.    St. Francis Medical Center ("St. Francis") owns real property commonly known as: (i) 3630 E. Imperial Highway Lynwood, CA 90262, including the patient tower and all of the facilities thereon; (ii) 2700 E. Slauson Ave, Huntington Park, CA 90255, and the Huntington Park Medical Office Building thereon; and (iii) 5953 S. Atlantic Blvd. 5, Maywood, CA 90270, and Maywood Medical Office Building thereon.  *See* Adcock First-Day Declaration.

4.    St. Francis (i) operates a 384 licensed bed, general acute care hospital located at 3630 East Imperial Highway in Lynwood, California; (ii) has an  emergency department with 46 licensed emergency treatment stations and is designated a Level II Trauma Center; (iii) has nine surgical operating rooms and three cardiac catheterization labs for inpatient and outpatient cardiac catheterization services; (iv) offers a comprehensive range of services, including emergency and trauma care, neonatal intensive, cardiovascular, oncology, pediatrics, behavioral health, and maternity and child services; and (v) offers various outpatient services, including ambulatory surgical services, laboratory services, imaging services, infusion therapy, nuclear medicine services, respiratory therapy, and physical therapy. Other outpatient services are provided at the following clinics: Orthopedics Clinic, Wound Care Clinic, Industrial Clinic, Lynwood Clinic,

---

[1] All references to section or chapter herein are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, as amended. All references to Rules are to the Federal Rules of Bankruptcy Procedure.

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES , CALIFORNIA  90017-5704
(213) 623-9300

Downey Clinic , and Huntington Park Clinic.  St. Francis is accredited by The Joint Commission.  *See* Adcock First-Day Declaration.

5.      As of the Petition Date, St. Francis employed approximately 2,017 employees, of which 1,583 are full-time, 136 are part time, and 298 are per diem. St. Francis was incorporated in 1983 and is governed by a Board of Trustees.  *See* Adcock First-Day Declaration.

6.      St. Vincent Medical Center ("St. Vincent") owns real property commonly known as: (i) 2131 W 3rd Street, Los Angeles, CA 90057, including the hospital and all of the facilities located thereon; and (ii) vacant land in Salton Sea, California.  St. Vincent was founded as the first hospital in Los Angeles in 1856. In 1971, a new facility was constructed at St. Vincent's current location at 2131 West Third Street, Los Angeles, CA 90057.  It has expanded to a 366 licensed bed, regional acute care, tertiary referral facility, specializing in cardiac care, cancer care, total joint and spine care, and multi-organ transplant services. St. Vincent serves both local residents and residents from Los Angeles, San Bernardino, Riverside, and Orange Counties. As a provider of healthcare services for a high percentage of elderly patients, many of the St. Vincent Medical Center's services and programs are focused on the treatment of various chronic diseases. *See* Adcock First-Day Declaration.

7.      As of the Petition Date, St. Vincent employed approximately 1,099 employees, of which 897 are full-time, 42 are part time and 160 are per diem. *See* Adcock First-Day Declaration.

8.      St. Vincent is the sole corporate member of the St. Vincent Dialysis Center, located on the hospital's campus. The St. Vincent Dialysis Center provides dialysis services for kidney disease patients, including hemodialysis and isolated ultrafiltration treatments as part of St. Vincent's end-stage renal disease program. *See* Adcock First-Day Declaration.

9.      Seton Medical Center ("Seton") owns (i) real property commonly known as 1900 Sullivan Avenue, Daly City, CA 94015, and the hospital and the facilities thereon (the "Daly Property"), and (ii) an employee parking lot on the Daly Property. Seton Medical Center was originally founded as Mary's Help Hospital by the Daughters of Charity of St. Vincent De Paul in 1893. The original facility was destroyed in the San Francisco Earthquake of 1906, and by 1912,

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Mary's Help Hospital reopened a new facility in San Francisco. In 1965, the hospital was moved to its current location at 1900 Sullivan Avenue in Daly City. The hospital was renamed Seton Medical Center in 1983, is currently licensed for 357 beds and serves residents from San Francisco and San Mateo areas. Seton has an emergency department with 18 licensed treatment stations. It also has 13 surgical operating rooms and three cardiac catheterization labs. Of the hospital's 83 licensed skilled nursing beds, 39 are in suspense, and the remaining 44 beds are utilized as subacute care beds. Additionally, the hospital has 24 licensed acute psychiatric beds which have been placed in suspense. The hospital has a broad spectrum of medical services, including cancer, cardiac, emergency, surgical, rehabilitation, respiratory, orthopedic, and sub-acute care. The hospital is accredited by The Joint Commission. Seton Medical Center and Seton Coastside share a consolidated license. *See* Adcock First-Day Declaration.

10.    Seton also operates Seton Medical Center Coastside ("Seton Coastside") located at 600 Marine Blvd, Moss Beach, CA 94038.    Seton Coastside was founded as Moss Beach Rehabilitation Hospital in 1970. In 1980, the City of Half Moon Bay acquired ownership of the hospital and signed an agreement for Daughters of Charity to manage operations of the hospital and rename it St. Catherine's Hospital. In 1993, St. Catherine's Hospital became Seton Coastside when it became integrated with Seton Medical Center. Today, Seton Coastside is licensed for 116 skilled nursing beds and five general, acute-care beds. Seton Coastside also operates the only 24-hour "standby" Emergency Department along the 55-mile stretch between Santa Cruz and Daly City. Under a consolidated license, Seton Medical Center and Seton Coastside share the same Board of Directors, executive leadership team, charity care policies, and union collective bargaining agreements. *See* Adcock First-Day Declaration.

11.    As of the Petition Date, Seton Medical Center and Seton Coastside employed approximately 1,340 employees, of which 516 are full-time, 551 are part time and 273 are per diem. *See* Adcock First-Day Declaration.

12.    Verity Holdings, LLC ("Holdings") is a direct subsidiary of its sole member VHS and was created in 2016 to hold and finance VHS' interests in four medical office buildings whose tenants are primarily physicians, medical groups, healthcare providers, and certain of the

- 4 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    VHS Hospitals.  Holdings' real estate portfolio includes more than 15 properties.  Holdings is the

2    borrower on approximately $66.2 Million of non-recourse financing secured by separate deeds of

3    trust and revenue and accounts pledges, including the rents on each medical office building.  *See*

4    Adcock First-Day Declaration.

5          13.    Previously, the Hospitals were owned by the Daughters of Charity Healthcare

6    System ("<u>DCHS</u>").  Despite continuous efforts to improve operations, operating losses continued

7    to plague the health system due to, among other things, mounting labor costs, low reimbursement

8    rates and the ever-changing healthcare landscape. In 2013, DCHS actively solicited offers for its

9    hospitals.  *See* Adcock First-Day Declaration.

10          14.    In early 2014, DCHS announced that they were beginning a process to evaluate

11    strategic alternatives for the health system.  Throughout 2014, DCHS explored offers to sell their

12    hospital system, including the Hospitals, and, in October of 2014, they entered into an agreement

13    with Prime Healthcare Services and Prime Healthcare Foundation (collectively, "<u>Prime</u>") to sell

14    the health system. However, to keep the hospitals open, DCHS needed to borrow $125 Million to

15    mitigate immediate cash needs during the sales process; in other words, to allow DCHS to

16    continue to operate until the sale could be consummated. In early 2015, the California Attorney

17    General consented to the sale to Prime, subject to conditions on that sale that were so onerous that

18    Prime terminated the transaction.  *See* Adcock First-Day Declaration.

19          15.    In 2015, DCHS again marketed their health system for sale, and, again, focused on

20    offers that maintained the health system as a whole, and assumed all the obligations.  In July

21    2015, the DCHS Board of Directors selected BlueMountain Capital Management LLC

22    ("<u>BlueMountain</u>"), a private investment firm, to recapitalize its operations and transition

23    leadership of the health system in the restructured Verity Health System (the "<u>BlueMountain</u>

24    <u>Transaction</u>").

25          16.    In connection with the BlueMountain Transaction, BlueMountain agreed to make a

26    capital infusion of $100 Million to the health system, arrange loans for another $160 Million to

27    the health system, and manage operations of the health system, with an option to buy the health

28    system at a future time. In addition, the parties entered into a System Restructuring and Support

- 5 -

109967730\V-4

1    Agreement (the "<u>Restructuring Agreement</u>"), DCHS's name was changed to Verity Health

2    System.

3    17.    On December 3, 2015, the California Attorney General approved the

4    BlueMountain Transaction, subject to conditions.  Despite BlueMountain's infusion of cash and

5    retention of various consultants and experts to assist in improving cash flow and operations, the

6    health system did not prosper.

7    18.    In July 2017, NantWorks, LLC ("<u>NantWorks</u>") acquired a controlling stake in

8    Integrity Healthcare, LLC.  NantWorks brought in a new CEO, CFO, and COO. NantWorks

9    loaned another $148 Million to the Debtors.

10    19.    Despite the infusion of capital and new management, it became apparent that the

11    problems facing the Verity Health System were too large to solve without a formal court

12    supervised restructuring. Thus, despite VHS' great efforts to revitalize its Hospitals and

13    improvements in performance and cash flow, the legacy burden of more than a billion dollars of

14    bond debt and unfunded pension liabilities, an inability to renegotiate collective bargaining

15    agreements or payor contracts, the continuing need for significant capital expenditures for seismic

16    obligations and aging infrastructure, and the general headwinds facing the hospital industry, made

17    success impossible.  Losses continue to amount to approximately $175 Million annually on a cash

18    flow basis.

19    20.    Prior to the Petition Date, the Debtors engaged in substantial efforts to market and

20    sell their assets. In June 2018, the Debtor engaged Cain Brothers, a division of KeyBanc Capital

21    Markets ("<u>Cain</u>"), to identify potential buyers of some or all of the Verity hospitals and related

22    assets and commenced discussions with those potential buyer.

23    **B.    <u>FACTS RELEVANT TO MOTION</u>**

24    21.    Cain prepared a Confidential Investment Memorandum (the "<u>CIM</u>") and organized

25    an online data site to share information with potentially buyers and contacted over 110 strategic

26    and financial buyers beginning in July 2018 to solicit their interest in exploring a transaction

27    regarding the Debtors.

28    22.    By August 2018, as a result of its ongoing and broad marketing process, Cain had

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 6 -

received 11 Indications of Interest ("IOI"), and postpetition Cain continued to develop potential sales. The Debtors, in consultation with Cain and its other advisors, selected SGM's offer from one or more stalking horse bidder(s) to acquire the Purchased Assets through a sale under § 363.

23.    Additional background facts on the Debtors, including an overview of the Debtors' business, information on the Debtors' capital structure and additional events leading up to these chapter 11 cases, are contained in the First-Day Declaration.

24.    On September 14, 2018, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Official Committee") in these chapter 11 Cases. [Docket No. 197].

## C.    BIDDING PROCEDURES

25.    As indicated above, a true and correct copy of the Stalking Horse APA, entered into between certain Debtors (Verity, Verity Holdings, St. Francis Medical Center, St. Vincent Medical Center, St. Vincent Dialysis Center and Seton Medical Center) and the Stalking Horse Purchaser, is attached hereto as **Exhibit A**. The bidding procedures (the "Bidding Procedures") are referenced, in part, in Article 6 of the Stalking Horse APA and set forth in a separate scheduled attached thereto.

26.    Set forth below are the Bidding Procedures to be employed in connection with the sale of (i) the Purchased Assets, and (ii) the assets not otherwise enumerated in the Stalking Horse APA but associated with the ownership or operation of the Hospitals (the "Other Assets").

### a.    Provisions Governing Qualifications of Bidders

27.    Unless otherwise ordered by the Court or as set forth in these procedures, in order to participate in the bidding process, each person, other than the Stalking Horse Purchaser, who wishes to participate in the bidding process must deliver, prior to the Bid Deadline (defined herein), the following to the Debtors:

    a)  a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or and/or the Other Assets or otherwise participating in connection with such bid; and

    b)  an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtors) in form and substance satisfactory to the Debtors and which shall inure to the benefit

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

of any purchaser of the Purchased Assets and/or the Other Assets; without limiting the foregoing, each such confidentiality agreement shall contain standard non-solicitation provisions.

28.     A bidder that delivers the documents and information described above and that the Debtors determine, after consultation with the Official Committee of Unsecured Creditors, the Prepetition Secured Creditors,[2] and any other party deemed appropriate within the business judgment of the Debtors (collectively, the "Consultation Parties") in their reasonable business judgment, is likely (based on availability of financing, experience, and other considerations) to be able to consummate the sale, will be deemed a potential bidder ("Potential Bidder").

### b.    Due Diligence

29.     The Debtors will afford any Potential Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, deem appropriate, in their reasonable discretion. The due diligence period shall extend through and including the relevant Bid Deadline; provided, however, that any bid submitted under these procedures shall be irrevocable until at least the selection of the Successful Bidder(s) (defined herein) and any Back-Up Bidder(s) (defined herein).

### c.    Provisions Governing Qualified Bids

30.     A bid submitted by a Potential Bidder will be considered a Qualified Bid (each, a "Qualified Bid," and each such Potential Bidder thereafter a "Qualified Bidder") only if the bid complies with the following requirements:

a)     it states that the applicable Qualified Bidder offers to purchase, in cash, some or all of the Purchased Assets and/or the Other Assets;

b)     it identifies with particularity the portion of the Purchased Assets and/or the Other Assets the Qualified Bidder is offering to purchase;

c)     it allocates with specificity the portion of the purchase price offered that the Qualified Bidder attributes to St. Francis Medical Center, St. Vincent Medical

---

[2] As such term is defined in the *Final Order (I) Authorizing Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* (the "Final DIP Order") [Docket No. 409].

- 8 -

Center, and Seton Medical Center, and Seton Coastside, and each of the Other Assets, respectively;[3]

d) it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder then the offer shall remain irrevocable until the earliest of (i) the closing of the transaction with the Successful Bidder, (ii) in the case of the Successful Bidder, a termination of the Qualified Bid pursuant to the terms of the Successful Bidder Purchase Agreement and (iii) with respect to the Back-up Bidder, the time specified in paragraph 44 below;

e) it includes confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal governance and shareholder approvals have been obtained prior to the bid;

f) it sets forth each third-party, regulatory and governmental approval required for the Qualified Bidder to consummate the transaction and the time period within which the Qualified Bidder expects to receive such approvals and establishes a substantial likelihood that the Qualified Bidder will obtain such approvals by the stated time period;

g) it includes a duly authorized and executed copy of a purchase or acquisition agreement in the form of the Stalking Horse APA (a "Purchase Agreement"), including the purchase price for some or all of the Purchased Assets and/or the Other Assets, or both, expressed in U.S. Dollars, together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse APA ("Marked Agreement");

h) it is not subject to any financing contingency and includes written evidence of a firm ability to have the funding necessary to consummate the proposed transaction, that will allow the Debtors to make a reasonable determination, in consultation with the Consultation Parties, as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Purchase Agreement;

i) if the bid is for all of the Purchased Assets, it must have a value to the Debtors, in the Debtors' exercise of its reasonable business judgment, after consultation with its advisors and the Consultation Parties, that is greater than or equal to the sum of the value offered under the Stalking Horse APA, plus (i) the amount of the Break-Up Fee ($21,350,000.00); (ii) the amount of the expense reimbursement ($2,000,000.00); and (iii) $7,000,000.00 (the "Initial Bidding Increment," and, together with the Break-Up Fee and the Expense Reimbursement, the "Minimum Qualified Bid");

---

[3] For the avoidance of doubt, such allocation shall not be binding on the Debtors, their estates or any Consultation Party.

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

j)      if the bid is a partial bid (the "<u>Partial Bid</u>"), [4] the terms of paragraph (i) immediately above shall not apply but the terms of paragraph (o) below concerning the Good Faith Deposit shall expressly apply in order to be a bid qualified to participate in the Partial Bid Auction (as defined below) (each, a "<u>Partial Bid Auction Qualified Bid</u>").  In the event that the Debtors aggregate Partial Bids, the Partial Bid purchasers' responsibility for the Break-Up Fee, the Expense Reimbursement, and the Initial Bidding Increment shall be reasonably allocated to each Partial Bid purchaser, and in no event shall the Stalking Horse Purchaser be entitled to more than one Break-Up Fee and/or Expense Reimbursement;

k)      it identifies with particularity which (i) executory contracts and unexpired leases the Qualified Bidder wishes the Debtors to assume and assign to it, and (ii) Purchased Assets and/or Other Assets, subject to purchase money liens or the like, the Qualified Bidder wishes to acquire and therefore pay the associated purchase money financing;

l)      it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of future performance with respect to executory contracts and unexpired leases the Qualified Bidder wishes the Debtors to assume and assign to it;

m)      it includes an acknowledgement and representation that the Qualified Bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets and/or Other Assets prior to making its offer and that the offer is not subject to any further due diligence or the need to raise capital/financing to consummate the proposed transaction; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets and/or Other Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets and/or Other Assets or the completeness of any information provided in connection therewith or with the relevant Auction (defined below), except as expressly stated in the Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

o)      unless it is a Credit Bid (as defined below), it is accompanied by a (i) good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form of cash or cash equivalent acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to (a) 20% of purchase price for bids under $5 million; (b) for bids greater than $5 million and less than $100 million, the greater of: (i) $1 million or (ii) 10% of purchase price; (c) for bids greater than $100 million, the greater of (i) $10 million or (ii) 5% of purchase price (collectively, the "<u>Good Faith Deposit</u>"), which Good Faith Deposit shall, be forfeited if such bidder is the Successful Bidder and breaches its obligation to close; and (ii) if the

---

[4] A Partial Bid shall mean a bid for less than all of the Purchased Assets.

109967730\V-4

Qualified Bid is a bid made by a secured creditor of the Debtors (a "<u>Credit Bid Bidder</u>") who intends to make a credit bid (each, a "<u>Credit Bid Bid</u>"), evidence of (a) the basis for and property covered by such Credit Bid Bidder's secured claim, (b) the amount of such Credit Bid Bidder's claim that is secured by the property in question, (c) whether it is the senior secured claim on the property (x) prepetition and (y) as of the date of the request to be a Qualified Bidder, as well as (d) evidence of the resolution of any Challenge to such Credit Bid Bidder's secured claim within the meaning of the Final DIP Order.

p)    it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Debtors;

r)    it identifies the person(s) and their title(s) who will attend the relevant Auction, and confirms that such person(s) have authority to make binding Overbids (defined below) at such Auction

s)    it contains such other information reasonably requested by the Debtors; and

t)    it is received prior to the Bid Deadline.

31.    The Debtors, in consultation with the Consultation Parties (who shall receive copies of the Purchase Agreements relating to any bids cast pursuant to these Bidding Procedures as soon as reasonably practicable), may qualify any bid that meets the foregoing requirements as a Qualified Bid. Notwithstanding the foregoing, the Stalking Horse Purchaser is deemed a Qualified Bidder and the Stalking Horse APA is deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auctions, and the Sale.

32.    The Debtors shall notify the Consultation Parties, the Stalking Horse Purchaser, all Qualified Bidders and the Notice Parties in writing as to whether or not any bids constitute Qualified Bids (and with respect to each Qualified Bidder that submitted a bid as to whether such Qualified Bidder's bid constitutes a Qualified Bid) and provide copies of the Purchase Agreements relating any such Qualified Bid to the Consultation Parties, the Stalking Horse Purchaser and such Qualified Bidders, and the Notice Parties on the earlier of (1) the date that any bid other than the Stalking Horse Bid has been deemed a Qualified Bid, or (2) two business days prior to the Partial Bid Auction.

d.    <u>**Bid Deadline**</u>

33.    In order to be eligible to participate in the Auction, a Qualified Bidder that desires

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors:  Dentons US LLP, 601 S. Figueroa Street, Suite 2500, Los Angeles, CA 90017 (Attn: Tania M. Moyron (tania.moyron@dentons.com)); (ii) the Debtors' Investment Banker: Cain Brothers, a division of KeyBanc Capital Markets, 1 California Street, Suite 2400, San Francisco, CA 94111 (Attn: James Moloney (jmoloney@cainbrothers.com)); (iii) counsel to the Official Committee: Milbank, Tweed, Hadley & McCloy LLP, 2029 Century Park East, 33rd Floor, Los Angeles, CA 90067 (Attn: Gregory A. Bray (gbray@milbank.com); (iv) counsel to the Master Trustee and Series 2005 Bond Trustee: Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111 (Attn: Daniel S. Bleck and Paul Ricotta (dsbleck@mintz.com, pricotta@mintz.com)); (v) counsel to the Series 2015 and Series 2017 Notes Trustee: Maslon, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402 (Attn: Clark Whitmore (clark.whitmore@maslon.com)), so as to be received by the Notice Parties not later than March 29, 2019, at 4:00 p.m. (prevailing Pacific Time) for partial bids (the "Partial Bid Deadline") or April 3, 2019, at 4:00 p.m. (prevailing Pacific Time) for full bids (the "Bid Deadline").

### e.  Credit Bidding

34.    Any party with a valid, properly perfected security interest in any of the Purchased Assets and/or Other Assets (which is not subject to a pending Challenge within the meaning of the Final DIP Order) may credit bid for such Purchased Assets and/or Other Assets in connection with the Sale in accordance with and pursuant to § 363(k), except as otherwise limited by the Debtors for cause; provided, however, that any party seeking to credit bid may not credit bid unless such bid provides that all secured creditors with security interests on such Purchased Assets and/or Other Assets that are senior to such junior security interest are to be paid in cash in connection with such junior creditor's bid. Any credit bids made by secured creditors shall not impair or otherwise affect the Stalking Horse Purchaser's entitlement to the benefits of the Bidding Procedures and related protections granted under the Bidding Procedures Order.

### f.  Evaluation of Competing Bids

35.    A Qualified Bid will be valued based upon several factors including, without

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

limitation: (i) the amount of such bid; (ii) the risks and timing associated with consummating such bid; (iii) any proposed revisions to the form of Stalking Horse APA; and (iv) any other factors deemed relevant by the Debtors in their reasonable discretion, in consultation with the Consultation Parties, including the amount of cash included in the bid.

### g.    No Qualified Bids

36.    If the Debtors do not receive any Qualified Bids other than the Stalking Horse APA, the Debtors will not hold an auction and the Stalking Horse Purchaser will be named the Successful Bidder for the Purchased Assets. If the Debtors receive one or more qualified Partial Bid Auction Qualified Bids and, after the Partial Bid Auction contemplated by paragraphs 37 and 38 below (and Section H in the Bidding Procedures Schedule 6.1(b)(3) annexed to the Stalking Horse APA), the Debtors will determine, in consultation with the Consultation Parties, if there are any Partial Bidders that will not be qualified to participate at the Full Bid Auction

### h.    Auction Process

37.    If the Debtors receive one or more Partial Bid Auction Qualified Bids as set forth above, the Debtors will conduct separate auctions of each asset or combinations thereof (each, a "Partial Bid Auction"). Any Partial Bidder holding a Partial Bid Auction Qualified Bid shall be entitled to bid on any assets in any Partial Bid Auction(s). The procedures below for the Full Bid Auction shall apply to the Partial Bid Auction, except as where otherwise indicated.  The Debtors will conduct the Partial Bid Auction(s), which shall be transcribed, on April 8, 2019 at 10:00 a.m. (prevailing Pacific Time) at the offices of Dentons US LLP, 601 South Figueroa Street, Suite 2500, Los Angeles, CA 90017, or such other location as shall be timely communicated to all entities entitled to attend the Auction.

38.    The Partial Bid Auction Qualified Bids determined by the Debtors, in consultation with the Consultation Parties, at the Partial Bid Auction(s) (as set forth above) to be eligible to participate at the Full Bid Auction, including (without limitation) the highest and best bids for each asset (the "Winning Partial Bids") shall be permitted to participate in the Full Bid Auction (as defined below) of the Purchased Assets and/or the Other Assets, except that:

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

(a) If the Partial Bids, at the conclusion of the Partial Bid Auction, include all four APA Facilities and exceed, in the aggregate, the Purchase Price in the Stalking Horse APA, there will be a Full Bid Auction (as defined below) and (1) the Stalking Horse Purchaser may overbid in the aggregate for all four APA Facilities, or (2) the Stalking Horse Purchaser may bid for less than the four APA Facilities and be entitled to a pro-rata Break-Up Fee for the APA Facilities which the Stalking Horse Purchaser does not acquire, as specified in the Stalking Horse APA at Section 6.26 (b)(2);

(b) If the Partial Bids do not include all four APA Facilities, and if there are no other Qualified Full Bids, then Seller, in its discretion, after consultation with the Consultation Parties, may choose, at the conclusion of the Partial Bid Auction, (1) to have no Full Bid Auction and the Stalking Horse Purchaser will purchase the four APA Facilities pursuant to the Stalking Horse APA, or (2) if the Debtor and Consultation Parties deem the aggregate designated Winning Partial Bid(s) to be sufficient to warrant leaving one or more APA Facilities behind (the "Remaining Facility"), the Stalking Horse Purchaser shall have the option of (i) acquiring the Remaining Facility at the allocated price in the Stalking Horse APA, (ii) overbidding one or more of the Partial Bids, or (iii) terminating the Stalking Horse APA. In either event, the Stalking Horse Purchaser shall be entitled to the Break-Up Fee for all of the APA Facilities not acquired by the Stalking Horse Purchaser.

39.    If the Debtors receive, in addition to the Stalking Horse APA, one or more Qualified Full Bids (and/or a combination of Winning Partial Bids from the Partial Bid Auction(s) seeking, on aggregate basis, to purchase all or substantially all of the Purchased Assets and/or the Other Assets), the Debtors will conduct a full bid auction of the Purchased Assets and/or the Other Assets (the "Full Bid Auction"), which shall be transcribed, on April 9, 2019 (the "Full Bid Auction Date"), at 10:00 a.m. (prevailing Pacific Time), at the offices of Dentons US LLP, 601 South Figueroa Street, Suite 2500, Los Angeles, CA 90017, or such other location as shall be timely communicated to all entities entitled to attend the Auction.

The Full Bid Auction shall be conducted in accordance with the following procedures:

a)    only the Debtors, the Stalking Horse Purchaser, Qualified Bidders who have timely submitted a Qualified Bid, the U.S. Trustee, and the Consultation Parties, and their respective advisors, and other parties who request and receive authority to attend the auction in advance from the Debtors may attend the Auction;

b)    only the Stalking Horse Purchaser and the Qualified Bidders who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction;

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

c)    each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

d)    all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (defined herein) at the relevant Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the relevant Auction; provided that all Qualified Bidders wishing to attend the relevant Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the relevant Auction in person;

e)    the Debtors, after consultation with the Consultation Parties, and the Stalking Horse Purchaser, may employ and announce at the relevant Auction additional procedural rules that are (i) reasonable under the circumstances for conducting the relevant Auction, (ii) in the best interest of the Debtors' estates; provided, however, that rules (i) are disclosed to the Stalking Horse Purchaser and each Qualified Bidder participating in the Auction, and (ii) are not inconsistent with the Bid Protections, the Stalking Horse APA, the Bankruptcy Code, or any order of the Court entered in connection herewith;

f)    bidding at the relevant Auction will begin with a bid determined by the Debtors after consulting with the Consultation Parties as being the then highest and best bid which will be announced by the Debtors prior to the commencement of the Auction (the "Baseline Bid").  The Auction will continue in bidding increments to be determined in the discretion of the Debtors, in consultation with the Consultation Parties (each a "Overbid"), and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Qualified Bids and are in attendance at the Auction (including, without limitation, Winning Partial Bids), as well as to the Notice Parties;

g)    the initial Overbid, if any, shall provide for total consideration to Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount.  Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (i) cash and/or (ii) in the case of a Qualified Bidder (including, without limitation, with respect to any Winning Partial Bids) that is a Credit Bid Bidder that has a valid and perfected lien (not subject to a Challenge within the meaning the Final DIP Order) on any of the Purchased Assets and/or the Other Assets, a Credit Bid of up to the full amount of such Credit Bidder's allowed perfected lien, subject to § 363(k) and any other restrictions set forth herein; and

h)    at the Full Bid Auction, the Stalking Horse Purchaser may, subject to the terms and conditions set forth herein, elect to bid for the Purchased Assets as described in the Bid Procedures Order.  In the alternative, the Stalking Horse Purchaser, and any bidder with a Qualified Full Bid, (a) may elect to bid against any one or more of the Winning Partial Bidders for the assets subject to the relevant Partial Bid(s), in lieu of seeking to acquire such Purchased Assets and/or Other Assets by means of the Stalking Horse Bid or another Qualified Full Bid; and (b) if successful with its Overbids for such assets, replace the Winning Partial Bidder(s) as the proponent of the relevant Winning Partial Bids or Aggregate Winning Partial Bid as to such

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 15 -

assets.  In the event that the Stalking Horse Purchaser or another bidder so elects, and as long as the Stalking Horse Purchaser or another bidder so bids, the Winning Partial Bidders must continue to present qualified Winning Partial Bids (i.e., bids as to which the aggregate of all still pending Winning Partial Bids is greater than or equal to the then Prevailing Highest Bid) for the Purchased Assets and/or the Other Assets in each round to continue to bid as Winning Partial Bidders in the Full Bid Auction.  In addition, the Debtors may elect, in their discretion, after consultation with the Consultation Parties, to allow Partial Bidders to bid for all or substantially all the Purchased Assets and/or the Other Assets subject to augmenting its Good Faith Deposit, as necessary, or to allow proponents of Full Bids to bid for less than all or substantially all of the Purchased Assets and/or the Other Assets in any given round of the Auction, provided that in any given round there is a Full Bid or an Aggregate Partial Bid that is superior to Prevailing Highest Bid that is then subject to acceptance by the Debtors and binding on the Stalking Horse Purchaser or another Qualified Bidder.  In all events, (i) any such Overbid shall continue to comply with all of the requirements for Qualified Bids set forth in Section C of these Bidding Procedures; and (ii) the bidder submitting such a modified Qualified Bid or Qualified Partial Bid shall furnish to the Debtors and the Consultation Parties, within twenty-four (24) hours of the conclusion of the Auction, a revised Purchase Agreement and Marked Agreement showing all amendments and modifications to the Stalking Horse APA and the Sale Order.

### i.    Selection of Successful Bid

40.    Prior to the conclusion of the relevant Auction, the Debtors, in consultation with the Consultation Parties, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer or offers are the highest or otherwise best from among the Qualified Bids submitted at the relevant Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and communicate to the Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid.  The determination of the Successful Bid by the Debtors at the conclusion of the relevant Auction shall be subject to approval by the Court.  If selected, at the conclusion of the Partial Bid Auction, as the Winning Partial Bidder or the Back-Up Bidder in accordance with by paragraphs 37 and 38 above (and Section H in the Bidding Procedures Schedule 6.1(b)(3) annexed to the Stalking Horse APA), then such party or parties, prior to the Full Bid Auction, shall increase its Good Faith Deposit in the amount set forth in above in paragraph 30, subsection (o), or as determined by the Seller in consultation with the Consultation Parties; provided, however, if a party or parties are bidding on all four APA Facilities, the deposit

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

will be no less than $30,000,000. If selected as the Successful Bidder or the Back-Up Bidder at the conclusion of the Full Bid Auction, each of the Successful Bidder and the Back-Up Bidder shall, within forty-eight (48) hours, increase its Good Faith Deposit to the sum of five percent (5%) of the Successful Bid or Back-Up Bid, as applicable. If the Successful Bidder fails to increase the Good Faith Deposit within forty-eight (48) hours of the Auction conclusion date (the "Final Deposit"), then (1) the Successful Bidder forfeits its Good Faith Deposit, and (2) the Successful Bid is nullified (i.e., the Back-Up Bidder becomes the Successful Bidder in the amount of its last bid).

41.     Unless otherwise agreed to by the Debtors and the Successful Bidder, within two (2) business days after the conclusion of the relevant Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Within forty-eight (48) hours following the conclusion of the relevant Auction, the Debtors shall file a notice identifying the Successful Bidder(s) and Back-Up Bidders with the Court and shall serve such notice by fax, email, or if neither is available, by overnight mail to all counterparties whose contracts are to be assumed and assigned.

42.     The Debtors will sell the Purchased Assets and (to extent included in an Overbid) the Other Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing and satisfaction of any other closing conditions set forth in the Successful Bidder's Purchase Agreement.

**j.    Return of Deposits**

43.     All deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder (defined herein) no later than five (5) business days following the conclusion of the Auction.

**k.    Back-Up Bidder**

44.     If an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment, in consultation with the Consultation Parties, at the relevant Auction shall be

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

1   required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and

2   irrevocable for thirty (30) business days after the entry of the Sale Order (the "Thirty-Day

3   Period").   If during the Thirty-Day Period, the Successful Bidder fails to consummate the

4   approved sale because of a breach or failure to perform on the part of such Successful Bidder, the

5   Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be

6   authorized, but not required, to consummate the sale with the Back-Up Bidder without further

7   order of the Court provided that the Back-Up Bidder shall thereafter keep such bid open and

8   irrevocable in accordance with the terms of the Back-Up Bidder APA; provided further, however,

9   that if the Back-Up Bidder is the Stalking Horse Purchaser, the Debtors will be authorized and

10  required to consummate the sale to the Stalking Horse Purchaser.  If, after the Thirty-Day Period,

11  the Successful Bidder has failed to consummate the approved sale, the Back-Up Bidder may

12  elect, at its discretion, to remain as the Back-Up Bidder until (a) the sale closes, (b) the Successful

13  Bidder defaults, or (c) the Back-Up Bidder elects to terminate its participation as Back-Up

14  Bidder.  For the avoidance of doubt, after the Thirty-Day Period, if the Successful Bidder fails to

15  consummate the approved sale because of a breach or failure to perform on the part of such

16  Successful Bidder, the Back-Up Bidder will not be contractually obligated to be the Back-Up

17  Bidder, and will have the option to either (i) be entitled to terminate its Back-Up Bidder APA and

18  the return of its deposit, or (ii) remain as the Back-up Bidder, in which event, there will be no re-

19  opening of the auction.

20                  **l.      Break-Up Fee**

21          45.     In recognition of this expenditure of time, energy, and resources, the Debtors have

22  agreed that if the Stalking Horse Purchaser is not the Successful Bidder as to the Purchased

23  Assets, the Debtors will pay the Stalking Horse Purchaser at closing of the sale of the Purchased

24  Assets an amount in cash equal to three and a half percent (3.5%) of the Cash Consideration

25  ($21,350,000.00), plus reimbursement of reasonably documented reasonable costs and expenses

26  in an amount not to exceed $2,000,000.00.  The Break-Up Fee shall be payable at closing of the

27  sale from the sale proceeds.

28          46.     If the Stalking Horse APA is terminated because the Stalking Horse Purchaser is

109967730\V-4

1 | not selected as the Successful Bidder or the Back-Up Bidder at Auction (or the Stalking Horse
2 | Purchaser is selected as the Back-Up Bidder but the sale of the Purchased Assets is consummated
3 | and closed with another entity), the Debtors shall pay to the Stalking Horse Purchaser the Break-
4 | Up Fee by wire transfer of immediately available funds immediately upon, and contemporaneous
5 | with, the closing of the sale of the Purchased Assets from the first cash proceeds thereof. The
6 | Break-Up Fee shall constitute an administrative expense claim with priority under § 507(a) in
7 | favor of the Stalking Horse Purchaser.

8 | 47. The Debtors acknowledge that the provision of the Break-Up Fee is an integral
9 | part of the Stalking Horse APA and are a material and necessary inducement for the Stalking
10 | Horse Purchaser to enter into the Stalking Horse APA and to consummate the transactions
11 | contemplated therein. In the event that the payment of the Breakup Fee (including any costs of
12 | collection) becomes due and payable to the Stalking Horse Purchaser, and such amounts are
13 | actually paid to the Stalking Horse Purchaser, such amounts will constitute liquidated damages
14 | (and not a penalty). In light of the difficulty of accurately determining actual damages with
15 | respect to the foregoing, the right to any such payment of the Breakup Fee (and any related
16 | collection costs) and the return of the Deposit to the Stalking Horse Purchaser constitute a
17 | reasonable estimate of the damages that will compensate the Stalking Horse Purchaser in the
18 | circumstances in which such fees and reimbursements are payable for the efforts and resources
19 | expended and the opportunities foregone while negotiating the Stalking Horse APA and in
20 | reliance on the Stalking Horse APA and on the expectation of the consummation of the
21 | transactions contemplated therein. The Debtors believe that the entry into this Stalking Horse
22 | APA provides value to the Debtors' estates and bankruptcy cases by, among other things,
23 | inducing other Qualified Bidders to submit higher or better offers for the Purchased Assets.

24 | **m.** **Sale Hearing**

25 | 48. The Debtors will seek entry of the Sale Order, at the Sale Hearing on April 17,
26 | 2019, at 10:00 a.m. (or at another date and time convenient to the Court), to approve and
27 | authorize the sale transaction to the Successful Bidder(s) on terms and conditions determined in
28 | accordance with the Bidding Procedures.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 19 -

109967730\V-4

49.    At the Sale Hearing, the Debtors will seek Court approval of the Sale to the Successful Bidder (or, in the event the Successful Bidder fails to close, the Back-Up Bidder), free and clear of all liens, claims, interests, and encumbrances pursuant to § 363, with all liens, claims, interests, and encumbrances to attach to the sale proceeds with the same validity and in the same order of priority as they attached to the Purchased Assets (and to the extent included in the Successful Bid, the Other Assets prior to the Sale), including the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Executory Contracts and Leases pursuant to § 365. The Debtors will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtors' estates and all interested parties, and satisfies the standards necessary to approve a sale of the Purchased Assets and/or the Other Assets.

**n.**    **Reservation.**

50.    The Debtors reserve the right, as they may determine in their discretion and in accordance with their business judgment to be in the best interest of their estates, in consultation with their professionals and the Consultation Parties to: (i) modify the Bidding Procedures to discontinue incremental bidding and then require that any and all bidders or potential purchasers submit their sealed, highest and best offer for the Purchased Assets and/or the Other Assets; (ii) determine which Qualified Bid is the highest or otherwise best bid and which is the next highest or otherwise best bid; (iii) waive terms and conditions set forth herein with respect to all Potential Bidders; (iv) impose additional terms and conditions with respect to all Potential Bidders; (v) extend the deadlines set forth herein; (vi) continue or cancel an Auction and/or Sale Hearing in open court without further notice; and (vii) implement additional procedural rules that the Debtors determine, in their reasonable business judgment and in consultation with the Consultation Parties will better promote the goals of the bidding process; provided that such modifications are disclosed to each Qualified Bidder participating in the Auction; provided, however, and notwithstanding the foregoing, these Bid Procedures shall not be modified so as to alter, extinguish or modify any rights or interests of the Stalking Horse Purchaser expressly set forth herein or in the Stalking Horse APA.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**D.    NOTICE PROCEDURES**

51.    The Debtors propose that any objections to the Sale (other than an Assumption Objection (defined herein) which shall be governed by the procedures set forth below) (a "Sale Objection"), must: (i) be in writing; (ii) comply with the Rules and the LBR; (iii) set forth the specific basis for the Sale Objection; (iv) be filed with the Court at 255 East Temple St. (Attn: Judge E. Robles), Los Angeles, CA 90012, together with proof of service, on or before the Sale Objection Deadline set forth in the Bidding Procedures Order; and (v) be served, so as to be actually received on or before the Sale Objection Deadline, upon the Notice Parties.  If a Sale Objection is not filed and served on or before the Sale Objection Deadline, the Debtors request that the objecting party be barred from objecting to the Sale and not be heard at the Sale Hearing, and this Court may enter the Sale Order without further notice to such party. The Debtors also request that the Court approve the form of the Procedures Notice, substantially in the form of Exhibit 3 to the Bidding Procedures Order. The Debtors will serve a copy of the Procedures Notice on the Notice Parties and all parties which the Debtors are require to serve pursuant to LBR 6004-1(b)(3) and the *Order Granting Emergency Motion of Debtors for Order Limiting Scope of Notice* [Docket No. 132] (the "Procedures Notice Parties").

52.    The Debtors propose to file with the Court and serve the Procedures Notice within one (1) business day following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties. The Procedures Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request in writing to Dentons US LLP, Attn: Tania M. Moyron, 601 S. Figueroa St., Suite 2500, Los Angeles, CA 90017 or by emailing tania.moyron@dentons.com or calling (213) 623-9300.

53.    The Debtors submit that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, Auction and Sale, and Sale Hearing to the Debtors' creditors and other parties in interests as well as to those who have expressed an interest or are likely to express an interest in bidding on the Purchased Assets.  Based on the foregoing, the Debtors respectfully request that

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

1    this Court approve these proposed notice procedures.

2    **E.    PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF ASSIGNED CONTRACTS AND LEASES**

3

4        54.    As noted above, the Debtors will seek to assume and assign certain contracts and

5    leases to be identified in the Purchase Agreement(s) (collectively, the "Assumed Executory

6    Contracts").

7        55.    At least initially, the Assumed Executory Contracts will be those contracts and

8    leases that the Debtors believe may be assumed and assigned as part of the orderly transfer of the

9    Purchased Assets. The Successful Bidder(s) may choose to exclude (or to add) certain contracts

10   or leases to the list of Assumed Executory Contracts, subject to further notice.

11       56.    In the interim, the Debtors will file with the Court and serve the cure notice,

12   substantially in the form of Exhibit 4 (the "Cure Notice") to the Bidding Procedures Order, (along

13   with a copy of this Motion) upon each counterparty to the Assumed Executory Contracts.  The

14   Cure Notice will state the date, time and place of the Sale Hearing as well as the date by which

15   any objection to the assumption and assignment of Assumed Executory Contracts (including the

16   Cure Amount (defined below)) must be filed and served.  The Cure Notice also will identify the

17   amounts, if any, that the Debtors believe are owed to each counterparty to an Assumed Executory

18   Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").  To

19   the extent there is a contract subsequently added to the list of contracts to be assumed by the

20   Successful Bidder pursuant to the Successful Bidder's Purchase Agreement selected at the

21   Auction, this Motion constitutes a separate motion to assume and assign that contract to the

22   Successful Bidder pursuant to § 365; each such contract will be listed in the Successful Bidder's

23   Purchase Agreement, and will be given a separate Cure Notice filed and served by overnight

24   delivery within five (5) business days of the conclusion of the Auction and announcement of the

25   Successful Bidder.

26       57.    The inclusion of a contract, lease, or other agreement on the Cure Notice shall not

27   constitute or be deemed a determination or admission by the Debtors and their estates or any

28   other party in interest that such contract, lease, or other agreement is, in fact, an executory

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights

2    with respect thereto shall be reserved.

3        58.    If a Contract or Lease is assumed and assigned pursuant to Court Order, then

4    unless the Assumed Executory Contract counterparty properly files and serves an objection to the

5    Cure Amount contained in the Cure Notice by the Assumption Objection Deadline (defined

6    below), the Assumed Executory Contract counterparty will receive at the time of the Closing of

7    the sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure

8    Notice, if any. If an objection is filed by a counterparty to an Assumed Executory Contract, the

9    Debtors propose that such objection must set forth a specific default in the executory contract or

10    unexpired lease, claim a specific monetary amount that differs from the amount, if any, specified

11    by the Debtors in the Cure Notice, and set forth any reason why the counterparty believes the

12    executory contract or unexpired lease cannot be assumed and assigned to the Successful Bidder.

13        59.    If any counterparty objects for any reason to the assumption and assignment of an

14    Assumed Executory Contract (including to a Cure Amount) (an "Assumption Objection"), the

15    Debtors propose that the counterparty must file the objection and serve it so as to be actually

16    received on or before the Assumption Objection Deadline established in the Bidding Procedures

17    Order, provided, however, as to any Successful Bidder who is not the Stalking Horse Purchaser,

18    any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of

19    the Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide

20    adequate assurance of future performance under the Assumed Executory Contract.  After receipt

21    of an Assumption Objection, the Debtors will attempt to reconcile any differences in the Cure

22    Amount or otherwise resolve the objection with the counterparty.  In the event that the Debtors

23    and the counterparty cannot resolve an Assumption Objection, and the Court does not otherwise

24    make a determination at the Sale Hearing regarding an Assumption Objection related to a Cure

25    Amount, the Debtors shall segregate from the sale proceeds any disputed Cure Amounts pending

26    the resolution of any such Cure Amount disputes by the Court or mutual agreement of the parties.

27        60.    The Successful Bidder shall be responsible for satisfying any requirements

28    regarding adequate assurance of future performance that may be imposed under §365(b) in

109967730\V-4

connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any counterparty to any Assumed Executory Contract shall not excuse the Successful Bidder from performance of any and all of its obligations pursuant to the Successful Bidder's Purchase Agreement.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contacts pursuant to § 365(b) at the Sale Hearing.  Cure Amounts disputed by any counterparty will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court.

61.    Except to the extent otherwise provided in the Successful Bidder's Purchase Agreement, the Debtors and the Debtors' estates shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts pursuant to § 365(k).

## F.    THE PRIMARY TERMS OF THE STALKING HORSE APA

62.    The Stalking Horse APA contemplates the sale of the Purchased Assets to the Stalking Horse Bidder, subject to higher or better bids, on the following material terms:[5]

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **APA Parties** | Verity Health System of California, Verity Holdings, LLC, St. Francis Medical Center, St. Vincent Medical Center, St. Vincent Dialysis Center and Seton Medical Center ("Sellers"). |
|  | Strategic Global Management, Inc. ("Purchaser"). |
| **Consideration APA § 1.1** | Six Hundred Ten Million Dollars ($610,000,000), which shall be allocated as follows: Four Hundred Twenty Million Dollars ($420,000,000) to St. Francis Medical Center, One Hundred Twenty Million Dollars ($120,000,000) to St. Vincent Medical Center and Seventy Million Dollars ($70,000,000) to Seton Medical Center for Seton Medical Center and Seton Coastside, plus assumption of the Assumed Liabilities, provided, that if the California Attorney General's approval does not include a requirement that Seton Hospital remain open as an acute care hospital or that Seton Coastside Hospital remain open as a skilled nursing facility, then an amount to be determined by |

---

[5] The summary of the terms contained in this Motion highlights some of the material terms of the Stalking Horse APA.  This summary is qualified in its entirety by reference to the provisions of the Stalking Horse APA.  In the event of any inconsistencies between the provisions of the Stalking Horse APA and the summary set forth herein, the terms of the Stalking Horse APA shall govern.  Unless otherwise defined in the summary set forth in the accompanying text, capitalized terms shall have the meanings ascribed to them in the Stalking Horse APA.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | Purchaser, in its sole discretion, of such Cash Consideration shall be re-allocated from St. Francis to Seton; plus payment of Cure Costs associated with any Assumed Leases and/or Assumed Contracts. |
| **QAF Adjustment** **APA § 1.1(c), 1.1(d)** | At Closing, Sellers shall credit against the cash consideration, the amount by which payments received by Sellers under QAF IV and QAF V between the Signing Date and Closing exceed the sum of (i) fees paid under QAF IV and QAF V during such period plus (ii) the amount of fees which are unpaid and owing as of the Closing in respect of invoices received by Sellers prior to Closing under QAF IV and QAF V (the "Net QAF Reduction Amount"), or Purchaser shall pay Sellers (as an increase to the cash consideration) the amount by which the sum of (i) fees paid under QAF IV and QAF V between the Signing Date and Closing plus (ii) the amount of fees which are unpaid and owing as of Closing in respect of invoices received by Sellers prior to Closing under QAF IV and QAF V exceeds payments received under QAF IV and QAF V during such period (the "Net QAF Increase Amount"). |
| **Assets; Avoidance Actions** **APA § 1.7** | In each case, solely to the extent used primarily in the conduct of the Business, "Assets" shall mean (a) all of the tangible personal property owned by such Seller and used by such Seller in the operation of the Hospital of such Seller, or in the case of St. Vincent Dialysis Center, the operation of its dialysis business, including equipment, furniture, fixtures, machinery, vehicles, office furnishings and leasehold improvements; (b) all of such Seller's rights, to the extent assignable or transferable, in and to all Licenses; (c) all of such Seller's right, title and interest in and to the Owned Real Property and all of such Seller's interest, to the extent assignable or transferable, in and to the Assumed Leases; (d) all of such Seller's right, title and interest in and to any and all Assumed Contracts; (e) all claims, rights, interests and proceeds with respect to amounts overpaid by such Seller to any third party health plans with respect to periods prior to the Effective Time, except with respect to any causes of action or proceeds thereof arising under Chapter 5 of the Bankruptcy Code other than with respect to Assumed Contracts and Assumed Leases; (f) all Inventory; (g) all Prepaids; (h) all operating manuals, files and computer software, including all patient records, medical records, employee records, financial records, equipment records, construction plans and specifications and medical and administrative libraries; (i) all systems, servers, computers, hardware, firmware, middleware, telecom equipment, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation; (j) all Measure B trauma funding received after the Signing Date; (k) all Accounts Receivable; (l) all rights, claims and causes of action of such Seller arising out of the Accounts Receivable acquired by Purchase; (m) all regulatory settlements, rebates, adjustments, refunds or group appeals; (n) all casualty insurance proceeds arising in respect of casualty losses occurring after the Signing Date in connection with the ownership or operation of the Assets; (o) all surpluses arising out of any risk pools, shared savings program or accountable care organization arrangement; (p) all transferable unclaimed property of any Person in Sellers' possession as of the Closing Date; (q) all warranties in favor of the Hospitals or Sellers; (r) certain intellectual property rights, as further described in the Transition Services |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | Agreement; (s) all goodwill; (t) all rights and interest in the telephone and facsimile numbers and uniform resource locaters; (u) all Medicare and Medi-Cal provider agreements and lockbox accounts identified on Schedule 1.7(u) to the Stalking Horse APA; (v) all documents, records, correspondence, work papers and other documents, other than patient records, relating to the Accounts Receivable; (w) the Purchased Verity Holdings Assets; (x) except for the Excluded Assets, any other asset owned by the Seller; (y) all of Seton's interest in and to the PACE Obligations; and (z) all QAF V and subsequent QAF program payments received after the Closing (e.g., QAF VI and QAF VII). |
| **Excluded Assets** **APA § 1.8** | "Excluded Assets" include cash, cash equivalents and investments; all Seller Plans and the assets of all Seller Plans; all contracts and leases that are not Assumed Contracts or Assumed Leases; inventory and assets disposed of by any Seller in the ordinary course of business after the Signing Date but prior to the Effective Time; all claims, counterclaims, and causes of action of each Seller or each Seller's bankruptcy estate; (except as otherwise provided) all insurance policies and contracts and coverages obtained by any Seller or listing a Seller as insured party, a beneficiary or loss payee; all Utility Deposits; all bank accounts of each Seller (except as otherwise provided); all tax refunds of each Seller; all QAF IV and QAF V payments actually received prior to the Signing Date. |
| **Assumed Obligations** **APA § 1.9** | "Assumed Obligations" include all Assumed Contracts and Assumed Leases and all liabilities and obligations arising thereunder on and after the Effective Time, including any related Cure Costs; all liabilities and obligations arising out of or relating to any act, omission, event, or occurrence connected with the use, ownership, or operation by Purchaser of the Hospital or any of the Assets on or after the Effective Time; all unpaid real and personal property taxes that are attributable to the Assets after the Effective Time, subject to prorations; and all liabilities and obligations arising on or following the Effective Time relating to utilities being furnished to the Assets, subject to prorations and all accrued vacation and other paid time off, to the extent assumed under Section 1.1(a)(ii). |
| **Excluded Liabilities** **APA § 1.10** | Purchaser shall not assume or become responsible for any duties, obligations, or liabilities of any Seller other than the Assumed Obligations. |
| **Assumption of Transferred Contracts and Assignment** **APA § 1.11** | Not later than seven (7) days prior to the date of the Auction (i) Purchaser shall notify each Seller in writing of which Evaluated Contracts are to be assumed by such Seller and assigned to Purchaser, and (ii) Purchaser shall notify each Seller in writing signed and dated by Purchaser of which Evaluated Contracts are to be rejected by such Seller (collectively, the "Rejected Contracts"). Each Seller shall file such motions in the Bankruptcy Court and take such other actions as are reasonably necessary to ensure that final and non-appealable orders (x) assuming and assigning the respective Assumed Contracts or Assumed Leases applicable to such Seller to Purchaser are entered, and (y) |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | rejecting the Rejected Contracts are entered.  With respect to each Assumed Lease, the applicable Seller shall execute and deliver to Purchaser an Assignment and Assumption of Lease.  Notwithstanding anything to the contrary set forth in this Agreement, the Rejected Contracts shall constitute part of the Excluded Assets pursuant to, and as defined in, this Agreement.<br><br>At Closing and pursuant to an order of the Bankruptcy Court, each Seller will assume and immediately assign to Purchaser the leases of such Seller for Leased Real Property and the Tenant Leases. |
| **Good Faith Deposit**<br><br>**APA § 1.2** | Purchaser has made a good faith deposit in the amount of Thirty Million Dollars ($30,000,000.00) (the "Deposit") by wire transfers to an account designated by Sellers.  The Deposit shall be non-refundable in all events, except in the event Purchaser is not the winning bidder at the Auction, in the event Purchaser terminates the Stalking Horse APA if a stay of the sale order has not been vacated on or before 180 days following issuance of such stay, or in the event Purchaser has terminated the Stalking Horse APA pursuant to Section 9.1 (other than Section 9.1(b)).  Upon Closing, the Deposit will be credited against the Purchase Price. |
| **Closing Date**<br><br>**APA § 1.3** | The Closing Date shall occur within ten (10) business days following the satisfaction or waiver of the conditions precedent to Closing set forth in Articles 7 and 8 of the Stalking Horse APA. |
| **Employment Provisions**<br><br>**APA § 5.3** | Purchaser agrees to make offers of employment, effective as of the Effective Time, to substantially all employees (the "Hospital Employees") who, immediately prior to the Effective Time are: (i) employees of either Seller; (ii) employees of any affiliate of either Seller which employs individuals at the Hospital and are listed on Schedule 5.3; or (iii) employed by an affiliate of either Seller and are listed on Schedule 5.3.<br><br>Any of the Hospital Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "Hired Employees."  All employees who are Hired Employees shall cease to be employees of the applicable Seller or its affiliates as of the Effective Time. |
| **Payment of Cure Costs**<br><br>**APA § 5.8** | Purchaser, upon assumption, shall pay the Cure Costs for each Assumed Contract and Assumed Lease so that each such Assumed Contract and Assumed Lease may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code. |
| **Break-Up Fee and Minimum Bid**<br><br>**APA § 6.1** | Any full overbids must be in a minimum amount of Six Hundred Ten Million Dollars ($610,000,000.00), plus Cure Costs and the Break-Up Fee, and accompanied by a deposit in the form of cash or a cashier's check in the amount of Thirty Million Dollars ($30,000,000.00).<br><br>The "Break-Up Fee" shall mean a breakup fee in the amount totaling three and |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| Stalking Horse APA Provision | Summary Description |
|---|---|
| | a half percent (3.5%) of the Cash Consideration (or $21,350,000.00) plus reimbursement of reasonably documented reasonable costs and expenses incurred by Purchaser related to its due diligence, and pursuing, negotiating, and documenting the transactions contemplated by this Agreement in an amount not to exceed $2,000,000.00; provided, however, that in the event that the Purchaser is successful in acquiring some but not all of the Assets, the Break-Up Fee shall be paid pro rata to the percentage of Assets actually purchased by the Purchaser, based on the allocation of the Purchase Price as described in Section 1.1(a)(i) of the Stalking Horse APA.<br><br>The Break-Up Fee will be subject to Bankruptcy Court approval and shall be deemed to be an allowed expense of the kind specified in § 503(b) of the Bankruptcy Code to be paid solely from the proceeds of an alternate transaction, pursuant to the Sale Order.  Purchaser shall be allowed to credit bid the Break-Up Fee in any overbids that Purchaser may elect to make with respect to the Assets. |
| **Requested Findings as to Good Faith,**<br><br>**APA § 6.1** | Each Seller agrees to proceed in good faith to obtain Bankruptcy Court approval of the sale contemplated herein with a determination that Purchaser is a good faith purchaser pursuant to § 363(m) and to file such declarations and other evidence as may be required to support a finding of good faith. |
| **Buyer's Termination Rights**<br><br>**APA § 9.1** | The Stalking Horse APA may be terminated by Purchaser if it is not satisfied with either (i) the results of its due diligence examination of the Hospitals, or (ii) the contents of any schedule or exhibit that was not completed and attached to the Stalking Horse APA, but which has been provided to Purchaser after the Signing Date, and Purchaser has notified Seller of its election to terminate the Agreement under Section 9.1(c) on or prior to January 8, 2019, by Purchaser if a material breach of the Agreement has been committed by Sellers and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Sellers to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser and by Purchaser or Sellers or if the Closing has not occurred on or before December 31, 2019.<br><br>The Stalking Horse APA may also be terminated by Purchaser if satisfaction of any condition in Article 8 has not occurred by December 31, 2019 or becomes impossible and Purchaser has not waived such condition in writing.<br><br>The Stalking Horse APA may also be terminated by Purchaser if the Bankruptcy Court enters an order dismissing the Bankruptcy Case or fails to approve the sale of the Assets to Purchaser. |

109967730\V-4

| Stalking Horse APA Provision | Summary Description |
|---|---|
| **Record Retention**<br><br>**APA § 10.2** | From the Closing Date until seven (7) years after the Closing Date or such longer period as required by law (the "<u>Document Retention Period</u>"), Purchaser shall keep and preserve all medical records, patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets.<br><br>After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents, Purchaser shall provide written notice to Sellers of Purchaser's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal. |
| **Limitation on Liability**<br><br>**APA § 11.1** | If Purchaser commits any material default under the APA, Sellers shall have the right to sue for damages; provided, however that the amount of such damages shall never exceed $60,000,000.00.  For the avoidance of doubt, Sellers shall have no right to sue for specific performance under the APA. |

## IV.    ARGUMENT

### A.    APPROVAL OF THE BIDDING PROCEDURES IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND STAKEHOLDERS.

Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate [.]" 11 U.S.C. § 363(b)(1). Section 105(a) provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Rules</u>") govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under § 363.

With respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale. Fed. R. Bankr. P. 6004(f). LBR 6004-1 provides, in pertinent part, as follows:

**(b)    Motion for Order Establishing Procedures for the Sale of Estate Property.**

(2) <u>Contents of Notice [of a Sale Procedure Motion].</u> The notice must describe the proposed bidding procedures and include a copy of the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

proposed purchase agreement. If the purchase agreement is not available, the moving party must describe the terms of the sale proposed, when a copy of the actual agreement will be filed with the court, and from whom it may be obtained. The notice must describe the marketing efforts undertaken and the anticipated marketing plan, or explain why no marketing is required. […]

(3) <u>Service of the Notice and Motion</u>. The moving party must serve the motion and notice of the motion and hearing by personal delivery, messenger, telephone, fax, or email to the parties to whom notice of the motion is required to be given by the FRBP or by these rules, any other party that is likely to be adversely affected by the granting of the motion, and the United States trustee. The notice of hearing must state that any response in opposition to the motion must be filed and served at least 1 day prior to the hearing, unless otherwise ordered by the court. […]

(6) <u>Break-Up Fees</u>. If a break-up fee or other form of overbid protection is requested in the Sale Procedure Motion, the request must be supported by evidence establishing: (A) That such a fee is likely to enhance the ultimate sale price; and (B) The reasonableness of the fee. […]

LBR 6004-1(b).

Neither the Bankruptcy Code nor the Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale. Nonetheless, as one court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Additionally, courts have long recognized the need for competitive bidding at hearings; "[c]ompetitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is 'to maximize bidding, not restrict it.'" *Id.*; *see also Burtch v. Ganz (In re Mushroom Transp. Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor's fiduciary duties included maximizing and protecting the value of the estate's assets); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate and, therefore, are appropriate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*Energy, Inc.*), 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide benefit to debtor's estate); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (such sale procedures "encourage bidding and to maximize the value of the Assets").

Here, the Bidding Procedures are designed to promote the paramount goal of any proposed sale of property of the Debtors' estates: maximizing the value of sale proceeds received by the estates. The Bidding Procedures provide for an orderly and appropriately competitive process through which interested parties may submit offers to purchase the Purchased Assets and/or the Other Assets. Specifically, the Debtors, with the assistance of their advisors, have structured the Bidding Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Purchased Assets and/or the Other Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to consummate a timely Sale. Accordingly, the Bidding Procedures should be approved because, under the circumstances, they are reasonable, appropriate and in the best interests of the Debtors, their estates, creditors, and all parties in interest.

**B.     THE BREAK-UP FEE HAS A SOUND BUSINESS PURPOSE AND IS NECESSARY TO PRESERVE THE VALUE OF THE DEBTORS' ESTATES.**

The Debtors submit that the Break-Up Fee is a normal and oftentimes necessary component of sales outside the ordinary course of business under § 363 of the Bankruptcy Code. In particular, such a protection encourages a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See, e.g., Integrated Resources*, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid, for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

A proposed bidding incentive, such as the Break-Up Fee, should be approved when it is in the best interests of the estate. *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of § 503(b) govern in the bankruptcy context).

In evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *In re Integrated Resources, Inc.*, 147 B.R. at 662 (where the Court heard testimony that the average breakup fee in the industry is 3.3%). Break-up fees in the same general range as the Break-Up Fee have been routinely approved in the context of bankruptcy sales. *See In re CXM, Inc.*, 307 B.R. 94, 103–04 (Bankr. N.D. Ill. 2004) (court approved break-up fee in amount equal to the actual expenses that the stalking horse incurred in connection with its bid to buy the Sale Assets, subject to a maximum cap of $200,000, which equaled 3% of the cash purchase price); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 118 (Bankr. D. Del. 2005) (court approved break-up fee that equaled 4.7% percent of the purchase price*; In re Dan River, Inc.*, No. 04-10990 (Banker. N.D. Ga. Dec. 17, 2004) (court approved break-up fee equal to 5.3% of the cash purchase price); *In re Lake Burton Dev., LLC,*

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   2010 WL 5563622, *43 (Bankr. N.D. Ga. Mar. 18, 2010) (court approved break-up fee equal to

2   4.75% of cash purchase price); *In re Case Engineered Lumber, Inc.*, No. 09–22499 (Bankr.

3   N.D.Ga. Sept. 1, 2009)(J. Brizendine) (approving break-up fee equal to 3.5% of the cash purchase

4   price); *In re Tama Beef Packing Inc.*, 321 B.R. 469, 498 (8th Cir. BAP 2005) (noting that the

5   bankruptcy court correctly concluded that break-up fees are "usually limited to one to four perfect

6   of the purchase price").   Notably, this Court has also approved break-up fees within the range of

7   the Break-Up Fee. *See In re Verity Health System of California, Inc.*, No. 18-20151 (Bankr. C.D.

8   Cal. Oct. 30, 2018) (J. Robles) (approving break-up fee equal to 4% of the cash purchase price);

9   *In re T Asset Acquisition Company, LLC*, No. 09-31853 (Bankr. C.D. Cal. Jan. 28, 2010) (J.

10   Robles) (approving break-up fee equal to 3% of the cash purchase price).

11         The Debtors submit that all of the bidding procedures the Debtors are seeking to have the

12   Court approve, including the proposed Break-Up Fee to the Stalking Horse Purchaser, satisfies all

13   three of the useful functions set forth above: (1) to attract or retain a potentially successful bid; (2)

14   to establish a bid standard or minimum for other bidders to follow; and (3) to attract additional

15   bidders. The proposed break-up fee of 3.5% of the purchase price is well within the percentage

16   parameters that have been approved by many other courts. Thus, the Debtors believe that the

17   proposed Break-Up Fee is fair and reasonably compensates the Stalking Horse Purchaser for

18   taking actions that will benefit the Debtors' estates.   The Break-Up Fee compensates the Stalking

19   Horse Purchaser for diligence and professional fees incurred in negotiating the terms of the

20   Stalking Horse APA on an expedited timeline.

21         Additionally, the Debtors do not believe that the Break-Up Fee will have a chilling effect

22   on the sale process.   Rather, the Stalking Horse Purchaser will increase the likelihood that the best

23   possible price for the Purchased Assets will be received, by permitting other qualified bidders to

24   rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing

25   qualified bidders to utilize the Stalking Horse APA as a platform for negotiations and

26   modifications in the context of a competitive bidding process.

27         Finally, the Break-Up Fee will be paid only if, among other things, the Debtors enter into

28   a transaction for the Purchased Assets with a bidder other than the Stalking Horse Purchaser.

109967730\V-4

1    Accordingly, no Break-Up Fee will be paid unless a higher and better offer is achieved and

2    consummated. In sum, the Break-Up Fee is reasonable under the circumstances and will enable

3    the Debtors to maximize the value for the Purchased Assets while limiting any chilling effect in

4    the sale process.

**C.    THE PROCEDURE FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN
       EXECUTORY CONTRACTS AND UNEXPIRED LEASES IS APPROPRIATE**

Section 365(a) provides that, subject to the court's approval, a trustee "may assume or

reject any executory contracts or unexpired leases of the debtor."  11 U.S.C. § 365(a).  Upon

finding that a trustee has exercised its sound business judgment in determining to assume an

executory contract or unexpired lease, courts should approve the assumption under § 365(a).  *See*

*Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.)*, 78 F.3d 18, 25 (2d Cir. 1996); *see also*

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099

(2d Cir. 1993).

Pursuant to § 365(f)(2), a trustee may assign an executory contract or unexpired lease of

nonresidential real property if:

(A)    the trustee assumes such contract or lease in accordance with the provisions of this
        section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease
        is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

The meaning of "adequate assurance of future performance" depends on the facts and

circumstances of each case, and should be given "practical, pragmatic construction."  *See Carlisle*

*Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see*

*also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of

future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re*

*Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single

solution will satisfy every case, the required assurance will fall considerably short of an absolute

guarantee of performance.").

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 34 -

Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

The Debtors and the Successful Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness, and ability of the Successful Bidder to perform under the contracts or leases.  The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate assurance of future performance under the contracts or leases, as required by § 365(b)(1)(C).

In addition, the Debtors submit that the cure procedures set forth herein are appropriate, reasonably calculated to provide notice to any affected party, and afford the affected party to opportunity to exercise any rights affected by the Motion, and consistent with § 365.  To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Successful Bidder's Purchase Agreement.  Except as otherwise limited by § 365 of the Bankruptcy Code, any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to § 365(f)(1) of the Bankruptcy Code.

Accordingly, the Debtors submit that the cure procedures for effectuating the assumption and assignment of the Assumed Executory Contracts as set forth herein are appropriate and should be approved.

**D.    APPROVAL OF THE SALE IS WARRANTED UNDER § 363**

As discussed above, § 363(b)(1) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

- 35 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### i.    The Sale of the Assets is Authorized by § 363 as a Sound Exercise of the Debtors' Business Judgment

In accordance with Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors have determined that the Sale of the Purchased Assets and/or the Other Assets by public auction will enable it to obtain the highest and best offer for these assets (thereby maximizing the value of the estate) and is in the best interests of the Debtors' creditors.   In particular, the Stalking Horse APA is the result of comprehensive arms' length negotiations for the Sale of the Purchased Assets and/or the Other Assets and the Sale pursuant to the terms of the Stalking Horse APA, subject to higher or otherwise better offers at the Auction, will provide a greater recovery for the Debtors' creditors than would be provided by any other existing alternative.  The Debtors similarly have determined in their business judgment that a sale of the Purchased Assets and/or the Other Assets through a competitive, public auction is the best way to maximize the value of those assets.

Sections 363 provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b). Although § 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so.  *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Pa., Inc*., 788 F.2d 143 (2d Cir. 1986); *In re Titusville Country Club*, 128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Ry. Co*., 124 BR. 169, 176 (D. Del. 1991); *see also Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *Committee of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g., In re Food Barn Stores, Inc*., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of

109967730\V-4

the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the. . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (*quoting In re Atlanta Packaging Prods., Inc*., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).   As long as the sale appears to enhance a debtor's estate, court approval of a debtor's decision to sell should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code.    *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd*., 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005); *In re WPRV-TV, Inc*., 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.   Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference.").

Applying § 363, the proposed Sale of the Purchased Assets and/or the Other Assets should be approved. As set forth above, the Debtors have determined that the best method of maximizing the recovery of the Debtors' creditors would be through the Sale of the Purchased Assets.   As assurance of value, bids will be tested through the Auction consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bidding Procedures approved by the Court.   Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process—the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

In addition to the Debtors' prior marketing efforts, the Debtors' investment banker has been contacting potential interested parties and has assembled a data room which is available upon the execution of an appropriate confidentiality agreement.   There is a limited universe of potential acquirers of the Purchased Assets, and the Debtors and their advisors have been in active discussions with many of these potential purchasers.

109967730\V-4

ii.    **The Sale of the Debtors' Assets Free and Clear of Liens and Other Interests is Authorized by § 363(f) of the Bankruptcy Code**

The Debtors further submit that it is appropriate to sell the Purchased Assets free and clear of liens pursuant to § 363(f), with any such liens attaching to the sale proceeds of the Purchased Assets to the extent applicable.  Section 363(f) authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)    applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

This provision is supplemented by § 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

Because § 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Debtor's Assets "free and clear" of liens and interests.  *In re Dundee Equity Corp.*, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.*"); In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that § 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of § 363(f) is met).

The Debtors believe that at least one of the tests of § 363(f) of the Bankruptcy Code is satisfied with respect to the transfer of the Purchased Assets and/or the Other Assets pursuant to

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   the Stalking Horse APA. Additionally, at least § 363(f)(2) will be met in connection with the

2   transactions proposed under the Purchase Agreement because each of the parties holding liens on

3   the Purchased Assets and/or the Other Assets will consent or, absent any objection to this motion,

4   will be deemed to have consented to the Sale.  Any lienholder also will be adequately protected

5   by having its liens, if any, in each instance against the Debtors or their estates, attach to the sale

6   proceeds ultimately attributable to the Purchased Assets and/or the Other Assets in which such

7   creditor alleges an interest, in the same order of priority, with the same validity, force and effect

8   that such creditor had prior to the Sale, subject to any claims and defenses the Debtors may

9   possess with respect thereto.  Accordingly, § 363(f) authorizes the transfer and conveyance of the

10  Purchased Assets free and clear of any such claims, interests, liabilities, or liens.

11          Although § 363(f) provides for the sale of assets "free and clear of any interests," the term

12  "any interest" is not defined anywhere in the Bankruptcy Code.  *Folger Adam Security v.*

13  *DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000).   Courts have interpreted "any

14  interest" expansively  to include not only in rem interests in property, but also other obligations

15  that are "connected to or arise from the property being sold" or that could "potentially travel with

16  the property being sold."  *In re Gardens Regional Hospital and Medical Center, Inc.*, 567 B.R.

17  820, 825 (Bankr. C.D. Cal. 2017) (California Attorney General imposed conditions are an

18  "interest in property" that can be stripped off the assets through a sale under § 363); *In re La*

19  *Paloma Generating, Co.*, 2017 WL 5197116, *4 (Bankr. D. Del. Nov. 9, 2017) (holding that

20  emission surrender obligations created by California regulations and statutes and enforced by the

21  California Air Resources Board are an interest in property which can be cut off by a § 363 sale)

22  *See also In re Trans World Airlines, Inc.*, 322 F.3d 283, 285, 288 (3d Cir. 2001) (holding that

23  plaintiff's interests in travel vouchers that were issued to settle employment discrimination are an

24  interest under § 363 because they arise from the property being sold); *PBBPC, Inc. v. OPK*

25  *Biotech, LLC (In re PBBPC, Inc.)*, 484 B.R. 860, 867-870 (1st Cir. B.A.P. 2013) (holding that

26  debtor's assets could be sold free and clear of Commonwealth of Massachusetts's right to treat a

27  purchaser of substantially all of the assets of chapter 11 debtor as a "successor employer" to

28  which debtor's experience rating could be imputed to determine purchaser's unemployment

109967730\V-4

insurance contribution); *In re ARSN Liquidating Corp. Inc.*, 2017 WL 279472, *5 (Bankr. D.N.H. Jan. 20, 2017) (Nat'l Council on Compensation Ins. violated sale order by imputing debtor's workers' compensation experience rating to buyer in setting buyer's workers' compensation experience rating); *In re Vista Marketing Group Ltd.*, 557 B.R. 630, 635-39 (Bankr. N.D. Ill. 2016) (free and clear language in sale order prevented a state sanitary district from asserting claim against asset purchaser for connection fee surcharge that was calculated based entirely on debtor's use of the district's sewer facilities); *United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631, 641 (N.D. Ala. 2016) (sale under § 363 cuts off Coal Act obligations despite language in Act imposing successor liability on buyer); *In re Christ Hospital*, 502 B.R. 158, 76-79 (Bankr. D.N.J. 2013) (section 363 sales cut off tort claims against purchaser of nonprofit hospital); *In re Tougher Indus.*, 2013 WL 1276501 at **6-9 (Bankr. N.D.N.Y. Mar. 27, 2013) (holding that debtor's assets could be sold free and clear of New York State Department of Labor's right to use the debtor's experience rating to access the buyer's tax liability as successor to the debtor); *In re Grumman Olson Indus. Inc.*, 467 B.R. 694, 702–03 (S.D.N.Y 2012) ("Section 363(f) can be used to sell property free and clear of claims that could otherwise be assertable against the buyer of the assets under the common law doctrine of successor liability"); *WBO P'ship v. Va. Dep't of Med. Assistance Servs. (In re WBO P'ship)*, 189 B.R. 97, 104–05 (Bankr. E.D. Va. 1995) (holding that Commonwealth of Virginia's right to recapture depreciation is an "interest" as that term is used in § 363(f))

In the case of *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in rem interests in property," the trend in modern cases is towards "a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property.'" *Id*. at 289 (*citing* 3 Collier on Bankruptcy, ¶ 363.06[1] (L. King, 15th rev. ed. 1988)). As determined by the Fourth Circuit in *In re Leckie Smokeless Coal Co*., the scope of § 363(f) is not limited to *in rem* interests. 99 F.3d 573, 581-582 (4th Cir. 1996) (holding that coal mine operators could sell their assets free and clear of their obligations to a benefits plan and fund

109967730\V-4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    under the Coal Act). Thus, debtors "could sell their assets under § 363(f) free and clear of

2    successor liability that otherwise would have arisen under federal statute." *Folger*, 209 F.3d at

3    258 (*citing Leckie*, 99 F.3d at 582).

4          Courts have consistently held that a buyer of a debtor's assets pursuant to a § 363 sale

5    takes such assets free from successor liability resulting from pre-existing claims. *See The Ninth*

6    *Avenue Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996)

7    (stating that a bankruptcy court has the power to sell assets free and clear of any interest that

8    could be brought against the bankruptcy estate during the bankruptcy); *MacArthur Company v.*

9    *Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988)

10    (channeling of claims to proceeds consistent with intent of sale free and clear under § 363(f)). The

11    purpose of an order purporting to authorize the transfer of assets free and clear of all "interests"

12    would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against

13    the purchaser arising from the Debtors' pre-sale conduct.   Under § 363(f), the purchaser is

14    entitled to know that the Purchased Assets and/or the Other Assets are not infected with latent

15    claims that will be asserted against the purchaser after the proposed transaction is completed.

16    Accordingly, consistent with the above-cited case law, the order approving the Sale should state

17    that the Successful Bidder is not liable as a successor under any theory of successor liability, for

18    claims that encumber or relate to the Purchased Assets and/or the Other Assets.

19         **iii.**    **The Successful Bidder Should be Afforded All Protections Under § 363(m) as**

20                     **A Good Faith Purchaser**

21          Section 363(m) protects a good-faith purchaser's interest in property purchased from the

22    debtor's estate notwithstanding that the sale conducted under § 363(b) is later reversed or

23    modified on appeal.  Specifically, § 363(m) states that:

24              The reversal or modification on appeal of an authorization under
[section 363(b)] . . . does not affect the validity of a sale . . . to an entity

25              that purchased . . . such property in good faith, whether or not such entity
knew of the pendency of the appeal, unless such authorization and such

26              sale were stayed pending appeal.

27    11 U.S.C.  § 363(m). Section 363(m) "codifies Congress's strong preference for finality and

28    efficiency" in bankruptcy proceedings.  *In re Energytec, Inc*. 739 F.3d 215, 218-19 (5th Cir.

2013).  The Ninth Circuit has repeatedly held that, under § 363(m), "[w]hen a sale of assets is made to a good faith purchaser, it may not be modified or set aside unless the sale was stayed pending appeal." *Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.)*, 163 F.3d 570, 576 (9th Cir. 1998) ; *In re Ewell*, 958 F.2d 276, 282 (9th Cir. 1992) ("Because the Buyer was a good faith purchaser, under 11 U.S.C. § 363(m) the sale may not be modified or set aside on appeal unless the sale was stayed pending appeal."); *Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d 1170, 1172 (9th Cir. 1988) ("Finality in bankruptcy has become the dominant rationale for our decisions […]").

The selection of the Successful Bidder will be the product of arms' length, good faith negotiations in an anticipated competitive purchasing process.  The Debtors intend to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of § 363(m).

## E.    RELIEF FROM THE 14-DAY WAITING PERIOD UNDER RULES 6004(H) AND 6006(D) IS APPROPRIATE

Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."   The Debtors request that the Order be effective immediately by providing that the 14-day stays under Rules 6004(h) and 6006(d) are waived.

The purpose of Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, *Collier* suggests that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *Collier on Bankruptcy*, ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Furthermore, *Collier* provides that if an objection is filed and overruled, and the objecting

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

1    party informs the court of its intent to appeal, the stay may be reduced to the amount of time

2    actually necessary to file such appeal. *Id.*

3        The Debtors hereby request that the Court waive the 14-day stay periods under Rules

4    6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay

5    period to the minimum amount of time needed by the objecting party to file its appeal.

6    **F.    THE APPLICABLE REQUIREMENTS OF LBR 6004-1 HAVE BEEN SATISFIED**

7        Here all of the applicable requirements of LBR 6004-1(b) pertaining to the Motion and the

8    request therein to approve the Bidding Procedures have been satisfied. First, as required by LBR

9    6004-1(b)(2), the Notice of Motion describes the proposed Bidding Procedures and includes a

10   copy of the Stalking Horse APA. Second, as required by LBR 6004-1(b)(2), the Notice of the Bid

11   Procedures Motion and this Memorandum describe marketing efforts undertaken and the

12   anticipated marketing of the Purchased Assets through the deadline for prospective Overbidders

13   to submit bids for the Auction. Third, the Debtors provided notice of the Notice of Motion,

14   Motion, and this Memorandum pursuant to LBR 6004-1(b)(3) and the *Order Granting*

15   *Emergency Motion of Debtors for Order Limiting Scope of Notice* [Docket No. 132]. Therefore,

16   the Debtors submit that service of the Notice of Motion, Motion, and this Memorandum by such

17   means was adequate and appropriate.

18                              **V.    CONCLUSION**

19        **WHEREFORE**, the Debtors respectfully request that the Court enter an order: (i)

20   granting the relief requested herein; and (ii) granting such other and further relief as the Court

21   may deem proper.

22   Dated:  January 17, 2019                    DENTONS US LLP
                                                  SAMUEL R. MAIZEL
23                                                TANIA M. MOYRON

24                                                By   */s/ Tania M. Moyron*
25                                                      Tania M. Moyron

26                                                Attorneys for the Chapter 11 Debtors and
                                                  Debtors In Possession
27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

109967730\V-4

# EXHIBIT A

FINAL VERSION

**ASSET PURCHASE AGREEMENT**

**By and Among**

**Verity Health System of California, Inc., Verity Holdings, LLC,**

**St. Francis Medical Center, St. Vincent Medical Center, St. Vincent Dialysis Center, Inc., Seton Medical Center**

**and**

**Strategic Global Management, Inc.**

**Dated January 8, 2019**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING .............. 2

1.1      Purchase Price ................................................................................... 2
1.2      Deposit ............................................................................................. 3
1.3      Closing Date ..................................................................................... 4
1.4      Items to be Delivered by Sellers at Closing ..................................... 4
1.5      Items to be Delivered by Purchaser at Closing ................................ 5
1.6      Prorations and Utilities .................................................................... 6
1.7      Transfer of Assets of Sellers ........................................................... 7
1.8      Excluded Assets ............................................................................. 10
1.9      Assumed Obligations ..................................................................... 13
1.10     Excluded Liabilities ....................................................................... 14
1.11     Designation of Assumed Contracts and Assumed Leases ............... 14
1.12     Disclaimer of Warranties; Release.................................................. 15

ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF SELLERS............................ 16

2.1      Authorization ................................................................................. 16
2.2      Binding Agreement ........................................................................ 16
2.3      Organization and Good Standing; No Violation .............................. 16
2.4      Contracts ........................................................................................ 16
2.5      Brokers and Finders ....................................................................... 17
2.6      Seller Knowledge ........................................................................... 17
2.7      Non-Contravention ......................................................................... 17
2.8      Compliance with Legal Requirements............................................. 17
2.9      Required Consents .......................................................................... 17
2.10     Environmental Matters.................................................................... 17
2.11     Title ................................................................................................ 18
2.12     Certain Other Representations with Respect to the Hospitals .......... 18
2.13     Financial Statements ...................................................................... 18
2.14     Legal Proceedings .......................................................................... 19
2.15     Employee Benefits ......................................................................... 19
2.16     Personnel........................................................................................ 19
2.17     Insurance ........................................................................................ 19
2.18     Accounts Receivable ...................................................................... 20
2.19     Payer Contracts .............................................................................. 20
2.20     Excluded Individuals ...................................................................... 20

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 20

3.1      Authorization ................................................................................. 20
3.2      Binding Agreement ........................................................................ 20
3.3      Organization and Good Standing.................................................... 20
3.4      No Violation.................................................................................... 21
3.5      Brokers and Finders ....................................................................... 21
3.6      Representations of Sellers............................................................... 21

-i-

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---:|
| 3.7 | Legal Proceedings | 21 |
| 3.8 | No Knowledge of a Seller's Breach | 21 |
| 3.9 | Ability to Perform | 22 |
| 3.10 | Purchaser Knowledge | 22 |
| 3.11 | Investigation | 22 |

## ARTICLE 4 COVENANTS OF SELLERS .......... 22

| | | |
|---|---|---:|
| 4.1 | Access and Information; Inspections | 22 |
| 4.2 | Cooperation | 23 |
| 4.3 | Other Bidders | 23 |
| 4.4 | Sellers' Efforts to Close | 24 |
| 4.5 | Termination Cost Reports | 24 |
| 4.6 | Conduct of the Business | 24 |
| 4.7 | Contract With Unions | 25 |

## ARTICLE 5 COVENANTS OF PURCHASER .......... 25

| | | |
|---|---|---:|
| 5.1 | Purchaser's Efforts to Close | 26 |
| 5.2 | Required Governmental Approvals | 26 |
| 5.3 | Certain Employee Matters | 27 |
| 5.4 | Excluded Assets | 27 |
| 5.5 | Waiver of Bulk Sales Law Compliance | 28 |
| 5.6 | Attorney General | 28 |
| 5.7 | Conduct Pending Closing | 28 |
| 5.8 | Cure Costs | 28 |
| 5.9 | Operating Covenant | 28 |
| 5.10 | HSR Filing | 28 |
| 5.11 | Contract with Unions | 29 |

## ARTICLE 6 SELLERS' BANKRUPTCY AND BANKRUPTCY COURT APPROVAL .......... 29

| | | |
|---|---|---:|
| 6.1 | Bankruptcy Court Approval; Overbid Protection and Break-Up Fee | 29 |
| 6.2 | Appeal of Sale Order | 30 |

## ARTICLE 7 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS .......... 31

| | | |
|---|---|---:|
| 7.1 | Signing and Delivery of Instruments | 31 |
| 7.2 | No Restraints | 31 |
| 7.3 | Performance of Covenants | 31 |
| 7.4 | Governmental Authorizations | 31 |
| 7.5 | Attorney General Provisions | 31 |
| 7.6 | Bankruptcy Court Approval | 31 |
| 7.7 | HSR Act | 31 |
| 7.8 | CSCDA Acknowledgement | 31 |

## ARTICLE 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER .......... 32

| | | |
|---|---|---:|
| 8.1 | Governmental Authorizations | 32 |

109394840\V-21

# TABLE OF CONTENTS

(continued)

Page

| | | |
|---|---|---|
| 8.2 | Bankruptcy Court Approval | 32 |
| 8.3 | Signing and Delivery of Instruments | 32 |
| 8.4 | Performance of Covenants | 32 |
| 8.5 | No Restraints | 32 |
| 8.6 | Attorney General Provisions | 32 |
| 8.7 | Medicare and Medi-Cal Provider Agreements | 33 |
| 8.8 | HSR Act | 33 |

**ARTICLE 9 TERMINATION** ... 33

| | | |
|---|---|---|
| 9.1 | Termination | 33 |
| 9.2 | Termination Consequences | 35 |

**ARTICLE 10 POST-CLOSING MATTERS** ... 35

| | | |
|---|---|---|
| 10.1 | Excluded Assets | 35 |
| 10.2 | Preservation and Access to Records After the Closing | 35 |
| 10.3 | Closing of Financials | 37 |
| 10.4 | Medical Staff | 38 |
| 10.5 | Shared Intangible Assets | 38 |

**ARTICLE 11 DEFAULT, TAXES AND COST REPORTS** ... 38

| | | |
|---|---|---|
| 11.1 | Purchaser Default | 38 |
| 11.2 | Seller Default | 38 |
| 11.3 | Tax Matters; Allocation of Purchase Price | 38 |
| 11.4 | Cost Report Matters | 39 |

**ARTICLE 12 MISCELLANEOUS PROVISIONS** ... 39

| | | |
|---|---|---|
| 12.1 | Further Assurances and Cooperation | 39 |
| 12.2 | Successors and Assigns | 40 |
| 12.3 | Governing Law; Venue | 40 |
| 12.4 | Amendments | 40 |
| 12.5 | Exhibits, Schedules and Disclosure Schedule | 40 |
| 12.6 | Notices | 40 |
| 12.7 | Headings | 41 |
| 12.8 | Publicity | 41 |
| 12.9 | Fair Meaning | 42 |
| 12.10 | Gender and Number; Construction; Affiliates | 42 |
| 12.11 | Third Party Beneficiary | 42 |
| 12.12 | Expenses and Attorneys' Fees | 42 |
| 12.13 | Counterparts | 42 |
| 12.14 | Entire Agreement | 42 |
| 12.15 | No Waiver | 43 |
| 12.16 | Severability | 43 |
| 12.17 | Time is of the Essence | 43 |

109394840\V-21

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is made and entered into as of the 8th day of January, 2019 (the "**Signing Date**") by and among Verity Health System of California, Inc., a California nonprofit public benefit corporation ("**Verity**"), Verity Holdings, LLC, a California limited liability company ("**Verity Holdings**"), St. Francis Medical Center, a California nonprofit public benefit corporation ("**St. Francis**"), St. Vincent Medical Center, a California nonprofit public benefit corporation ("**St. Vincent**"), St. Vincent Dialysis Center, Inc., a California nonprofit public benefit corporation ("**St. Vincent Dialysis**"), and Seton Medical Center, a California nonprofit public benefit corporation ("**Seton**" and together with St. Francis Medical Center, St. Vincent Medical Center and St. Vincent Dialysis, collectively, the "**Hospital Sellers**") (Verity, Verity Holdings, St. Francis, St. Vincent, St. Vincent Dialysis and Seton are each referred to herein individually as a "**Seller**" and collectively as the "**Sellers**"), and Strategic Global Management, Inc., a California corporation ("**Purchaser**").

## R E C I T A L S:

A.      St. Francis engages in the business of the operation of the hospital known as St. Francis Medical Center, located at 3630 E. Imperial Highway, Lynwood, CA 90262, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by St. Francis (collectively, the "**St. Francis Hospital**").

B.      St. Vincent engages in the business of the operation of the hospital known as St. Vincent Medical Center, located at 2131 W 3rd Street, Los Angeles, CA 90057, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by St. Vincent (collectively, the "**St. Vincent Hospital**").

C.      Seton engages in the business of the operation of two general acute care hospitals under a single license, consisting of: (i) the hospital known as Seton Medical Center, located at 1900 Sullivan Avenue, Daly City, CA 94015, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by Seton (collectively, the "**Seton Hospital**") and (ii) the hospital known as Seton Medical Center Coastside, located at 600 Marine Blvd, Moss Beach, CA 94038, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by Seton (collectively, the "**Seton Coastside Hospital**" and together with the St. Francis Medical Center Hospital, the St. Vincent Medical Center Hospital and the Seton Hospital, the "**Hospitals**"; the business of the operation of the Hospitals is referred to herein as the "**Businesses**").

D.      Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser, the assets described in <u>Section 1.7</u> below (the "**Assets**") owned by Sellers and used with respect to the Businesses, for the consideration and upon the terms and conditions contained in this Agreement.

1

E.     Sellers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**"), lead Case No. 2:18-bk-201510ER, jointly administered or to be jointly administered with their affiliates (the "**Bankruptcy Cases**").

F.     The parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets approved by the Bankruptcy Court pursuant to Section 363 of Title 11 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

## ARTICLE 1

### SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING

1.1     Purchase Price.

(a)     Subject to the terms and conditions of this Agreement, the purchase price ("**Purchase Price**") shall consist of the following:

(i)     Cash payment to Sellers (the "**Cash Consideration**") of Six Hundred Ten Million Dollars ($610,000,000.00), which shall be allocated Four Hundred Twenty Million Dollars ($420,000,000) to St. Francis Medical Center, One Hundred Twenty Million Dollars ($120,000,000) to St. Vincent Medical Center, and Seventy Million Dollars ($70,000,000) to Seton for Seton Hospital and Seton Coastside Hospital, provided, that if the CA AG's approval does not include a requirement that Seton Hospital remain open as an acute care hospital or that Seton Coastside Hospital remain open as a skilled nursing facility, then an amount to be determined by Purchaser, in its sole discretion, of such Cash Consideration shall be re-allocated from St. Francis to Seton;

(ii)     Assumption of Sellers' accrued vacation and other paid time off as of the Closing, to be provided only with respect to Hired Employees (as defined in Section 5.3(a)) in the form of credited vacation and PTO, subject to compliance with applicable law and regulation, including consent of such employees if required;

(iii)     Assumption of all liabilities of Seton as Obligated Party and Property Owner under the (i) Agreement to Pay Assessment and Finance Improvements dated May 17, 2017 with California Statewide Communities Development Authority ("**CSCDA**") and (ii) Agreement to Pay Assessment and Finance Improvements dated May 18, 2017 with CSCDA (collectively

2

the "**Special Assessments**") each associated with of the Property Assessed Clean Energy ("**PACE**") (seismic and clean energy) loans (collectively the "**PACE Obligations**"); and

(iv)    Payment of Cure Costs (defined below) associated with any Assumed Leases and/ or Assumed Contracts and assumption of the other Assumed Obligations (as defined below).

(b)    Purchaser (i) is acquiring the Assets and (ii) is only assuming (x) the PACE Obligations and (y) the Assumed Obligations (as defined below).

(c)    At the Closing, Purchaser shall pay to Sellers, by wire transfer of immediately available funds to the accounts specified by Sellers to Purchaser in writing, an aggregate amount equal to the Cash Consideration, minus the Net QAF Reduction Amount (defined below), if any, plus the Net QAF Increase Amount (defined below), if any, plus any amounts (x) held by the PACE Trustee as an interest or fee reserve on account the PACE Obligations on the Closing Date and (y) remitted to CSCDA by Seton pursuant to the Special Assessments from and after the date of execution of this Agreement by Buyer up to and including the Closing Date, minus the Deposit (defined below).

(d)    For purposes of this Agreement, the "**QAF Program**" means the California Department of Health Care Services Hospital Quality Assurance Fee Programs IV ("**QAF IV**") and V ("**QAF V**"). During the period prior to Closing, Sellers shall pay any fees owing under QAF IV and QAF V, and Sellers shall be entitled to retain all payments received under QAF IV and QAF V. At Closing, Sellers shall credit to the Cash Consideration the amount by which payments received under QAF IV and QAF V between the Signing Date and Closing exceed the sum of (i) fees paid under QAF IV and QAF V during such period plus (ii) the amount of fees which are unpaid and owing as of the Closing in respect of invoices received by Sellers prior to Closing under QAF IV and QAF V (the "**Net QAF Reduction Amount**"), as provided above in Section 1.1(c). At Closing, Purchaser shall pay Sellers (as an increase to the Cash Consideration) the amount by which the sum of (i) fees paid under QAF IV and QAF V between the Signing Date and Closing plus (ii) the amount of fees which are unpaid and owing as of Closing in respect of invoices received by Sellers prior to Closing under QAF IV and QAF V exceeds payments received under QAF IV and QAF V during such period (the "**Net QAF Increase Amount**"), as provided above in Section 1.1(c).

(e)    Purchaser shall, prior to Closing, be permitted to communicate with holders of secured debt of the Sellers regarding the possible assumption by Purchaser of all or a portion of such debt at the Closing. If Purchaser agrees to assume any such debt at the Closing, Purchaser and Sellers shall  negotiate an appropriate credit to the Purchase Price for such assumption of debt.

1.2    Deposit. Purchaser, by wire transfer to an account designated by Sellers has made a good faith deposit in the amount of Thirty Million Dollars ($30,000,000) on the date hereof (the "**Deposit**"). The Deposit shall be non-refundable in all events, except as provided in Section 6.1(b) or Section 6.2, or in the event Purchaser has terminated this Agreement pursuant to Section 9.1 (other than Section 9.1(b)) or as set forth in Section 9.2, in which case Seller shall immediately return the Deposit to Purchaser with all interest earned thereon. Upon Closing, the Deposit will

3

be credited against the Purchase Price.  Pending the Closing, or until this Agreement is terminated, the Deposit shall be deposited in an interest bearing account, with interest credited to Purchaser, at a federally-insured financial institution mutually acceptable to Purchaser and Sellers.  In addition, on the Signing Date, Purchaser shall deliver to Sellers executed letters from its financing sources, in form and substance satisfactory to Sellers in their discretion.

1.3    Closing Date.    The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at 10:00 a.m. local time at the offices of Dentons US LLP, 601 South Figueroa St., Suite 2500, Los Angeles, CA 90017-5704 (the day on which Closing actually occurs, the "**Closing Date**") promptly but no later than ten (10) business days following the satisfaction or waiver of the conditions set forth in ARTICLE 7 and ARTICLE 8, other than those conditions that by their nature are to be satisfied at Closing but subject to fulfillment or waiver of those conditions.  The Closing shall be deemed to occur and to be effective as of 11:59 p.m. Pacific time on the Closing Date (the "**Effective Time**").

1.4    Items to be Delivered by Sellers at Closing.    At or before the Closing, Sellers shall deliver, or cause to be delivered, to Purchaser the following:

1.4.1    a Bill of Sale substantially in the form of **Exhibit 1.4.1** attached hereto (the "**Bill of Sale**"), duly executed by each Seller, with respect to the Assets;

1.4.2    Real Estate Assignment and Assumption Agreements (the "**Real Estate Assignments**") in the form of **Exhibit 1.4.2** attached hereto with respect to (i) the Leased Real Property, and (ii) the Tenant Leases, each duly executed by each Seller;

1.4.3    a Quitclaim Deed (the "**Deed**") in the form of **Exhibit 1.4.2** attached hereto with respect to the real property listed in Schedule 1.4.3, together with all plant, buildings, structures, installments, improvements, fixtures, betterments, additions and constructions in progress situated thereon (collectively, the "**Owned Real Property**") duly executed by each Seller;

1.4.4    an Assumption Agreement (the "**Assumption Agreement**") in the form of **Exhibit 1.4.2** attached hereto with respect to the Assumed Obligations duly executed by each Seller;

1.4.5    favorable original certificates of good standing, of each Seller, issued by the State of California, dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

1.4.6    a duly executed certificate of an officer of each Seller certifying to Purchaser (i) the incumbency of the officers of such Seller on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (ii) the due adoption and text of the resolutions or consents of the Board of Directors of such Seller authorizing (I) the transfer of the Assets and transfer of the Assumed Obligations by such Seller to Purchaser and (II) the due execution, delivery and performance of this Agreement and all additional documents contemplated

4

by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

      1.4.7   a certified copy of the Sale Order (as defined below);

      1.4.8   a Transition Services Agreement (the "**Transition Services Agreement**") in form and substance satisfactory to Sellers and Purchaser, in their reasonable discretion, granting to Sellers use of certain assets, systems and personnel identified in such agreement solely in connection with Sellers' wind-down of the Businesses, the completion of the Bankruptcy Cases and the dissolution of Sellers (and following completion of such wind-down, Bankruptcy Cases and dissolution of Sellers, such Transition Services Agreement shall automatically terminate);

      1.4.9   acknowledgements by CSCDA and the PACE Trustee that Purchaser is the Successor Property Owner and Obligated Party under the PACE  Obligations and releases of the Sellers from any and all claims arising or accruing prior to the Closing Date, and

      1.4.10   any such other instruments, certificates, consents or other documents which Purchaser and Sellers mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

     1.5   <u>Items to be Delivered by Purchaser at Closing</u>.  At or before the Closing, Purchaser shall deliver or cause to be delivered to Sellers the following:

      1.5.1   payment of the Cash Consideration subject to credits or plus payment to Sellers of all amounts as provided under <u>Section 1.6</u>;

      1.5.2   evidence of payment of all Cure Costs required hereunder to be paid by Purchaser;

      1.5.3   a duly executed certificate of the Secretary of Purchaser certifying to Sellers (a) the incumbency of the officers of Purchaser on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions of the Board of Directors of Purchaser authorizing the execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

      1.5.4   favorable original certificate of good standing, of Purchaser, issued by the California Secretary of State dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

      1.5.5   the Bill of Sale, duly executed by Purchaser;

      1.5.6   the Real Estate Assignment(s), duly executed by Purchaser;

      1.5.7   the Assumption Agreement, duly executed by Purchaser;

1.5.8    the License Agreement referenced in Section 1.7(q);

1.5.9    the Transition Services Agreement; and

1.5.10    any such other instruments, certificates, consents or other documents which Purchaser and Sellers mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.6    Prorations and Utilities.  All items of income and expense listed below with respect to the Assets shall be prorated in accordance with the principles and the rules for the specific items set forth hereafter:

1.6.1    All transfer, conveyance, sales, use, stamp, similar state and local taxes arising from the sale of the Assets hereunder shall be the responsibility of, and allocated to, Purchaser.

1.6.2    Other than the Utility Deposits (defined below), which are governed by Section 1.8(j), and other than with respect to Cure Costs payable by Purchaser, the following costs and expenses shall be prorated based upon the payment period (*i.e.*, calendar or other tax fiscal year) to which the same are attributable: all real estate and personal property lease payments, real estate and personal property taxes, real estate assessments, other than the PACE Special Assessments and other similar charges against real estate, and power and utility charges (collectively, the "**Prorated Charges**") on the Assets.  Each Seller shall pay its respective portion at or prior to the Closing (or Purchaser shall receive credit for) of any unpaid Prorated Charges attributable to periods or portions thereof occurring prior to the Effective Time, and Purchaser shall assume as an Assumed Liability or, to the extent previously paid by any Seller, pay to such Seller at the Closing all Prorated Charges attributable to periods or portions thereof occurring from and after the Effective Time.  In the event that as of the Closing Date the actual tax bills for the tax year or years in question are not available and the amount of taxes to be prorated as aforesaid cannot be ascertained, then rates, millages and assessed valuation of the previous year, with known changes, shall be used.  The parties agree that if the real estate and personal property tax prorations are made based upon the taxes for the preceding tax period, the prorations shall be re-prorated after the Closing.  As to power and utility charges, "final readings" as of the Closing Date shall be ordered from the utilities; the cost of obtaining such "final readings," if any, shall be paid by Purchaser.

1.6.3    Sellers shall be entitled to all rents and other payments under Tenant Leases accruing for the period prior to the Effective Time ("**Pre Effective Time Lease Amounts**"), and Purchaser shall be entitled to all rents and other payments under tenant leases accruing for the period after the Effective Time ("**Post Effective Time Lease Amounts**" and together with the Pre Effective Time Lease Amounts, the "**Lease Amounts**").  All Lease Amounts that are collected prior to the Closing shall be prorated as of the Closing in accordance with the immediately preceding sentence.  All Lease Amounts that are accrued but uncollected as of the Closing (including, without limitation, rents and other payments accrued prior to the Closing but payable in arrears after the Closing) (collectively, the "**Unpaid Amounts**") shall belong to Sellers, and Purchaser shall, upon receipt of said rents and other payments, receive the same in trust for Sellers and shall promptly remit any of such amounts to the applicable Seller within ten (10) days after

6

Purchaser's receipt of same. For the avoidance of doubt, all rental payments received after Closing shall be first applied to any amounts owed to the Sellers under this Section 1.6.3.

1.6.4    All prorations and payments to be made under the foregoing provisions shall be agreed upon by Purchaser and Sellers prior to the Closing and shall be binding upon the parties; provided, however, with respect to the Unpaid Amounts, in the event any proration, apportionment or computation shall prove to be incorrect for any reason, then either the applicable Seller or Purchaser shall be entitled to an adjustment to correct the same, provided that said party makes written demand on the party from whom it is entitled to such adjustment within thirty (30) calendar days after the erroneous payment or computation was made, or such later time as may be required, in the exercise of due diligence, to obtain the necessary information for proration. This Section 1.6 shall survive Closing.

1.7    **Transfer of Assets of Sellers**.  On the Closing Date and subject to the terms and conditions of this Agreement, each Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all liens, claims, interests and encumbrances other than the Permitted Exceptions (defined below), and Purchaser shall acquire, all of each Seller's right, title and interest in and to only the following assets and properties, as such assets shall exist on the Closing Date, in each case (notwithstanding anything else in this Agreement) solely to the extent used primarily in the conduct of the Businesses and to the extent not included among the Excluded Assets, such transfer being deemed to be effective at the Effective Time:

(a)    all of the tangible personal property owned by such Hospital Seller, or to the extent assignable or transferable by each Hospital Seller, leased, subleased or licensed by such Hospital Seller, and used by such Seller in the operation of the Hospital of such Hospital Seller, including equipment, furniture, fixtures, machinery, vehicles, office furnishings and leasehold improvements (the "**Personal Property**");

(b)    all of such Hospital Seller's rights, to the extent assignable or transferable, to all Medicare and Medi-Cal provider agreements, permits, approvals, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to such Seller for use in the operation of the Hospital of such Hospital Seller (the "**Licenses**"), including, without limitation, the Licenses and Medicare/Medi-Cal Provider Agreements set forth on **Schedule 1.7(b)**, except to the extent Purchaser elects, in its discretion, not to take assignment of any such Licenses;

(c)    all of such Hospital Seller's interest in and to the Owned Real Property and all of such Hospital Seller's interest, to the extent assignable or transferable, in and to all of the following (the "**Assumed Leases**"): (i) personal property leases with respect to the operation of the Hospital of such Hospital Seller (including leases for assets described in Section 1.7(i), (ii) the real property leases for all real property leased by such Hospital Seller and set forth on **Schedule 1.7(c)(ii)** (the "**Leased Real Property**"), and (iii) the real property leased or subleased by such Seller to a third party and set forth on **Schedule 1.7(c)(iii)** (the "**Tenant Leases**");

(d)    all of such Hospital Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect

7

to the operation of the Hospital of such Hospital Seller that have been designated by Purchaser as a contract to be assumed pursuant to <u>Section 1.11</u> (the "**Assumed Contracts**");

(e)    other than the Excluded Settlements and Actions (defined below), all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by such Seller to any third party health plans with respect to periods prior to the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by such Seller or such Seller's consultants), except with respect to any causes of action or proceeds thereof arising under Chapter 5 of the Bankruptcy Code other than with respect to Assumed Contracts and Assumed Leases and other items described in <u>Section 1.8(h)</u>;

(f)    to the extent assignable or transferable, all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (i) located at the Hospital of such Seller or (ii) used in the operation of the Hospital of such Seller (the "**Inventory**") except as set forth in <u>Section 1.8(e)</u>;

(g)    other than Utility Deposits, all prepaid rentals, deposits, prepayments (excluding prepaid insurance and prepaid taxes) and similar amounts relating to the Assumed Contracts and/or the Assumed Leases, which were made with respect to the operation of the Hospital of such Hospital Seller (the "**Prepaids**");

(h)    to the extent assignable or transferrable, all of the following that are not proprietary to such Seller and/or owned by or proprietary to such Hospital Seller's affiliates: operating manuals, files and computer software with respect to the operation of the Hospital of such Hospital Seller, including, without limitation, all patient records, medical records, employee records, financial records, equipment records, construction plans and specifications, and medical and administrative libraries; *provided*, *however*, that any patient records and medical records which are not required by law to be maintained by such Hospital Seller as of the Effective Time shall be an Excluded Asset;

(i)    to the extent assignable or transferrable (and if leased, to the extent the associated lease is transferrable), including any assignment which is made effective pursuant to the Sale Order where the consent of a third party is required pursuant to the terms of an applicable agreement but not obtained, all systems, servers, computers, hardware, firmware, middleware, telecom equipment, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation owned, leased or licensed by Sellers and used by Sellers with respect to the operations of the Hospitals;

(j)    all Measure B trauma funding received after the Signing Date to be paid related to service periods ending on or after the Signing Date (pro rated between Purchaser and Sellers for any such payments covering service periods which include days both before and after the Signing Date based upon the number of days in the relevant payment period before the Signing Date (for the account of Sellers) and after the Signing Date (for the account of Purchaser));

(k)    Except for as stated in <u>Section 1.7(j)</u>, all accounts and interest thereupon, notes and interest thereupon and other receivables of such Seller, including, without limitation,

8

accounts, notes or other amounts receivable, disproportionate share payments and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, and Seller Cost Report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital of such Seller, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by such Seller prior to the Effective Time whether payable by Medicare, Medicaid, or any other payor (including an insurance company), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source (collectively, "**Accounts Receivable**");

(l)        all rights, claims and causes of action of such Seller to the extent related to and/or to the extent arising out of the Accounts Receivable acquired by Purchaser at the Closing;

(m)        other than the Excluded Settlements and Actions, all regulatory settlements, rebates, adjustments, refunds or group appeals, including without limitation pursuant to all cost reports filed by Sellers for payment or reimbursement from government payment programs and other payors with respect to periods after the Signing Date;

(n)        other than the Excluded Settlements and Actions, all casualty insurance proceeds arising in respect of casualty losses occurring after the Signing Date in connection with the ownership or operation of the Assets;

(o)        other than the Excluded Settlements and Actions, all surpluses arising out of any risk pools, shared savings program or accountable care organization arrangement to which any Seller is party on the Closing Date, in each case to the extent Purchaser assumes the underlying contract relating to such risk pools, shared savings program or accountable care organization arrangement;

(p)        all transferable unclaimed property of any Person in Sellers' possession as of the Closing Date, including, without limitation, property which is subject to applicable escheat laws;

(q)        to the extent assignable or transferable by Sellers without out-of-pocket expense to Sellers, all warranties (including warranties of any manufacturer or vendor) on or in connection with the Assets (including the Personal Property) in favor of the Hospitals or Sellers;

(r)        the right to use the names "St. Francis Medical Center", "St. Vincent Medical Center", "Seton Medical Center" and "Seton Medical Center Coastside", including any trademarks, service marks, trademark and service mark registrations and registration applications, trade names, trade name registrations, logos, domain names, trade dress, copyrights, copyright registrations, website content, know- how, trade secrets and the corporate or company names of Sellers and the names of the Hospitals, together with all rights to sue and recover damages for infringement, dilution, misappropriation or other violation or conflict associated with any of the foregoing; at the Closing, Purchaser will execute and deliver to Sellers the Transition Services Agreement granting to Sellers an unlimited, royalty free, irrevocable license to use any and all of the foregoing solely in connection with the wind-down of the Businesses, the completion of the

9

Bankruptcy Cases and the dissolution of Sellers (and following completion of such wind-down, Bankruptcy Cases and dissolution of Sellers, such license shall automatically terminate);

(s)      all goodwill of the Hospital of such Hospital Seller evidenced by or associated with any of the Assets;

(t)      to the extent transferable or assignable, such Hospital Seller's right or interest in the telephone and facsimile numbers and uniform resource locaters used with respect to the operation of the Hospital of such Hospital Seller;

(u)      each such Hospital Seller's Medicare and Medi-Cal provider agreements and lockbox account(s) identified on **Schedule 1.7(u)**;

(v)      all documents, records, correspondence, work papers and other documents, other than patient records, primarily relating to the Accounts Receivable;

(w)      with respect to Verity Holdings, the assets represented by the assessor's parcel numbers (APN's) listed in **Schedule 1.7(w)** hereof (the "**Purchased Verity Holdings Assets**");

(x)      except for the Excluded Assets, to the extent assignable or transferable, and subject to the Permitted Exceptions, any other assets owned by such Hospital Seller (which are not otherwise specifically described above in this Section 1.7) that are used in the operation of the Hospital of such Hospital Seller;

(y)      all of Seton's interest in and to the PACE Obligations; and

(z)      all QAF V and subsequent QAF program payments received after the Closing (e.g., QAF VI and QAF VII).

As used herein, the term "**Permitted Exceptions**" means (i) the Assumed Obligations; (ii) the PACE Obligations; (iii) liens for taxes not yet due and payable (iv) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property; (v) other imperfections of title or encumbrances, if any, which are not monetary in nature and that are not, individually or in the aggregate, material to the business of the Hospital; (vi) any agreements made with any governmental authority in order to obtain any consent or approval, including, without limitation, in connection with the Medicare and Medi-Cal provider agreements; and (vii) other imperfections of title or encumbrances that are expressly identified on **Schedule 1.7** hereof.

1.8      Excluded Assets.  Notwithstanding anything to the contrary in Section 1.7, each Seller shall retain all interests, rights and other assets owned directly or indirectly by it (or any of such Seller's affiliates) which are not among the Assets, including, without limitation, the following interests, rights and other assets of such Seller (collectively, the "**Excluded Assets**"):

(a)      cash, cash equivalents and short-term investments;

10

(b)    all Seller Plans (defined below) and the assets of all Seller Plans and any asset that would revert to the employer upon the termination of any Seller Plan, including, without limitation, any assets representing a surplus or overfunding of any Seller Plan;

(c)    all contracts that are not Assumed Contracts;

(d)    all leases that are not Assumed Leases;

(e)    the portions of Inventory, Prepaids, and other assets disposed of, expended or canceled, as the case may be, by such Seller after the Signing Date and prior to the Effective Time in the ordinary course of business;

(f)    assets owned and provided by vendors of services or goods to the Hospital of such Hospital Seller;

(g)    all of such Seller's organizational or corporate record books, minute books, tax returns, tax records and reports, data, files and documents, including electronic data related thereto;

(h)    all claims, counterclaims and causes of action of such Seller or such Seller's bankruptcy estate (including parties acting for or on behalf of such Seller's bankruptcy estate, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Cases), including, without limitation, rights of recovery or set-off of every kind and character against third parties, causes of action arising out of any claims and causes of action under chapter 5 of the Bankruptcy Code and any related claims, counterclaims and causes of action under applicable non-bankruptcy law, and any rights to challenge liens asserted against property of such Seller's bankruptcy estate, including, but not limited to, liens attaching to the Purchase Price paid to such Seller, and the proceeds from any of the foregoing;

(i)    other than casualty insurance proceeds described in Section 1.7(m), all insurance policies and contracts and coverages obtained by such Seller or listing such Seller as insured party, a beneficiary or loss payee, including prepaid insurance premiums, and all rights to insurance proceeds under any of the foregoing, and all subrogation proceeds related to any insurance benefits arising from or relating to Assets prior to the Closing Date;

(j)    all deposits made with any entity that provides utilities to the Hospital (the "**Utility Deposits**");

(k)    all rents, deposits, prepayments, and similar amounts relating to any contract or lease that is not an Assumed Contract or Assumed Lease;

(l)    all non-transferrable unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat laws;

(m)    all other bank accounts of such Sellers not listed on **Schedule 1.7(u)**;

11

(n)    all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection;

(o)    the rights of such Seller to receive mail and other communications with respect to Excluded Assets or Excluded Liabilities;

(p)    all director and officer insurance;

(q)    all tax refunds of such Seller;

(r)    all documents, records, operating manuals and film pertaining to the Hospital that the parties agree that such Seller is required by law to retain;

(s)    all patient records and medical records which are not required by law to be maintained by such Seller as of the Effective Time;

(t)    all documents, records, correspondence, work papers and other patient records that may not be transferred under applicable law, and any other documents, records, or correspondence (including with respect to any employees) that may not be transferred under applicable law;

(u)    any rights or documents relating to any Excluded Liability or other Excluded Asset;

(v)    any rights or remedies provided to such Seller under this Agreement and each other document executed in connection with the Closing;

(w)    any (i) personnel files for employees of such Seller who are not hired by Purchaser; (ii) other books and records that such Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the business of the Hospital as conducted before the Closing or that relate to any of the Assets; (iii) documents which such Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents). With respect to documents necessary to prepare cost reports, Purchaser shall receive the original document and such Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(x)    all deposits or other prepaid charges and expenses paid in connection with or relating to any other Excluded Assets;

(y)    all rights, claims and causes of action of such Seller to the extent related to and/or to the extent arising out of the receivables identified in **Schedule 1.8(y)** and rights to settlements and retroactive adjustments, if any, whether arising under a Seller Cost Report or otherwise, for any reporting periods ending on or prior to the Effective Time, whether open or closed, arising from or against the United States government under the terms of the Medicare

12

program or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services);

(z)     all pre-Closing settlements or settlements pursuant to adversary proceedings in the Bankruptcy Cases, including, without limitation, any proceedings identified in Section 1.8(h) or 1.8(y) (together with the items identified in Section 1.8(h) and 1.8(y), the "**Excluded Settlements and Actions**");

(aa)     for the avoidance of doubt, all QAF IV and QAF V payments actually received prior to the Signing Date;

(bb)     all assets of Verity Holdings other than the Purchased Verity Holdings Assets and all assets of any of the tenants located in the leased premises of the purchased Verity Holdings properties; and

(cc)     any assets identified in **Schedule 1.8(cc)**.

1.9     Assumed Obligations.  On the Closing Date, each Seller shall assign, and Purchaser shall assume and agrees to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations of such Seller and only the following liabilities and obligations (collectively, the "**Assumed Obligations**"):

(a)     the Assumed Contracts and all liabilities of such Seller under the Assumed Contracts, including related Cure Costs;

(b)     the Assumed Leases and all liabilities of such Seller under the Assumed Leases, including related Cure Costs;

(c)     all liabilities and obligations arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Purchaser of the Hospital or any of the Assets on or after the Effective Time;

(d)     all accrued vacation and other paid time off, to the extent assumed under Section 1.1(a)(ii);

(e)     all liabilities and obligations of such Seller related to the Hired Employees arising on or following the Effective Time;

(f)     all unpaid real and personal property taxes, if any, that are attributable to the Assets after the Effective Time, subject to the prorations provided in Section 1.6;

(g)     all liabilities and obligations relating to utilities being furnished to the Assets, subject to the prorations provided in Section 1.6;

(h)     any documentary, sales and transfer tax liabilities of such Seller incurred as a result of the consummation of the transaction contemplated by this Agreement;

(i)     all liabilities or obligations provided for in Section 5.3;

13

(j)    any obligations or liabilities Purchaser may desire or need to assume in order to have the Certifications/Licenses/Permits identified on Schedule 1.7(b) reissued to Purchaser, as well as any liabilities or obligations associated with Sellers' Medicare and Medi-Cal provider agreements, but only to the extent assumed by Purchaser, and any Medi-Cal liabilities or obligations needed to support ongoing Hospital Quality Assurance Fee Program payments; and

(k)    any other obligations and liabilities identified in **Schedule 1.9(k)**.

1.10    Excluded Liabilities.  Purchaser shall not assume or become responsible for any duties, obligations or liabilities of any Seller that are not assumed by Purchaser pursuant to the terms of this Agreement, the Bill of Sale, the Assumption Agreement or the Real Estate Assignment(s) (the "**Excluded Liabilities**"), and each Seller shall remain fully and solely responsible for all of such Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Assets or the Hospital unless assumed by Purchaser under this Agreement, in the Bill of Sale, the Assumption Agreement or in the Real Estate Assignment(s).

1.11    Designation of Assumed Contracts and Assumed Leases.

(a)    Except as provided in Section 1.11(b), all contracts and leases will be subject to evaluation by Purchaser for assumption or rejection (collectively "**Evaluated Contracts**").  Not later than seven (7) days prior to the date of the auction for the Assets (i) Purchaser shall notify each Seller in writing of which Evaluated Contracts are to be assumed by such Seller and assigned to Purchaser and (ii) Purchaser shall notify each Seller in writing signed and dated by Purchaser of which Evaluated Contracts are to be rejected by such Seller (collectively, the "**Rejected Contracts**"); provided, that Purchaser shall have the right to designate additional Evaluated Contracts for assumption up to thirty (30) days prior to Closing. Each Seller shall file such motions in the Bankruptcy Court and take such other actions as are reasonably necessary to ensure that final and non-appealable orders are entered (x) assuming and assigning the respective Assumed Contracts or Assumed Leases applicable to such Seller to Purchaser and (y) rejecting the Rejected Contracts.  With respect to each Assumed Lease, the applicable Seller shall execute and deliver to Purchaser an Assignment and Assumption of Lease.  Notwithstanding anything to the contrary set forth in this Agreement, the Rejected Contracts shall constitute part of the Excluded Assets pursuant to, and as defined in, this Agreement.

(b)    At Closing and pursuant to an order of the Bankruptcy Court, each Seller will assume and immediately assign to Purchaser the leases of such Seller for Leased Real Property and the Tenant Leases.

(c)    Notwithstanding the foregoing, Purchaser's obligation to consummate the transactions contemplated by this Agreement are not contingent upon the assumption, assignment or rejection of any contract or lease, or on the amount of any payment or other performance needed to cure any default thereunder.

1.12    Disclaimer of Warranties; Release.

(a)    THE ASSETS TRANSFERRED TO PURCHASER WILL BE SOLD BY SELLERS AND PURCHASED BY PURCHASER IN THEIR PHYSICAL CONDITION AT THE EFFECTIVE TIME, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND WITH RESPECT TO THE LEASED REAL PROPERTY WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, INCLUDING, WITHOUT LIMITATION, THE LAND, THE BUILDINGS AND THE IMPROVEMENTS. ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLERS INCLUDED IN THE ASSETS AND THE ASSUMED OBLIGATIONS ARE BEING ACQUIRED OR ASSUMED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS. ALL OF THE TANGIBLE ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE EFFECTIVE TIME.

(b)    Purchaser acknowledges that Purchaser will be examining, reviewing and inspecting all matters which in Purchaser's judgment bear upon the Assets, the Sellers, the Hospitals, the business of the Hospitals and their value and suitability for Purchaser's purposes and is relying solely on Purchaser's own examination, review and inspection of the Assets and Assumed Obligations. Purchaser releases each Seller and its affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the business of the Hospitals or the Assets, or their suitability for any purpose whatsoever. Purchaser further acknowledges that the representations and warranties of Sellers contained in ARTICLE 2 of this Agreement are the sole and exclusive representations and warranties made by Sellers to Purchaser (including with respect to the Hospitals, the Assets and the Assumed Obligations) and shall expire, and be of no further force or effect after January 8, 2019 (the period from the Signing Date until January 8, 2019, the "**Final Diligence Period**"), except that the Sale Order Date Representations shall expire, and be of no further force or effect upon the Sale Order Date, and in each case Sellers shall not have any liability in respect of any breach thereof following such expiration.

15

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby represents, warrants and covenants to Purchaser, severally (and not jointly) with respect to such Seller that the following matters are true and correct as of the Signing Date and as of the last day of the Final Diligence Period, except as would not have a material adverse effect upon the Hospitals, taken as a whole (a "**Material Adverse Effect**") and except as disclosed in the disclosure schedule, as may be amended pursuant to the terms of this Agreement (the "**Disclosure Schedule**"), provided that the representations and warranties set forth in Sections 2.1 (Authorization), 2.2 (Binding Agreement), 2.3 (Organization and Good Standing; No Violation), 2.8 (Compliance with Legal Requirements), 2.9 (Required Consents), 2.11 (Title) and 2.14 (Legal Proceedings) (the "**Sale Order Date Representations**") shall also be made as of immediately prior to the entry of the Sale Order (the "**Sale Order Date**"):

2.1    Authorization.  Such Seller has all necessary corporate power and authority to enter into this Agreement and, subject to Bankruptcy Court approval, to carry out the transactions contemplated hereby.

2.2    Binding Agreement.  This Agreement has been duly and validly executed and delivered by such Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of such Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.  Except for such corporate actions which have been taken on or before the date hereof, no other corporate action on the part of Sellers is necessary to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby and thereby.

2.3    Organization and Good Standing; No Violation.

(a)    Such Seller is an entity duly organized, validly existing and in good standing under the laws of the State of California.  Such Seller has all necessary power and authority to own, operate and lease its properties and to carry on its businesses as now conducted.

(b)    Neither the execution and delivery by such Seller of this Agreement nor the consummation of the transactions contemplated hereby by such Seller nor compliance with any of the material provisions hereof by such Seller, will violate, conflict with or result in a breach of any material provision of such Seller's articles of incorporation or bylaws or any other organizational documents of such Seller.

2.4    Contracts.  Except as set forth in Schedule 2.4, upon entry of the Sale Order and Purchaser's payment of the Cure Costs, to Seller's knowledge, Seller is not in material breach or default of the Assumed Contracts or Assumed Leases.  No provision of this Section 2.4 shall apply to any failure to obtain consents to the assignment of the Assumed Contracts and Assumed Leases from third parties to the Assumed Contracts and Assumed Leases for which consent is required to

assign the Assumed Contracts and Assumed Leases to Purchaser (the "**Contract and Lease Consents**").

2.5    <u>Brokers and Finders</u>.  Except as set forth on <u>Schedule 2.5</u>, neither such Seller nor any affiliate thereof, nor any officer or director thereof, have engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder.

2.6    <u>Seller Knowledge</u>.  References in this Agreement to "Sellers' knowledge or "the knowledge of Sellers" means the actual knowledge of the Chief Executive Officer or Chief Financial Officer of the applicable Seller, without independent research.  No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

2.7    <u>Non-Contravention</u>.    Neither the execution and delivery by Sellers of this Agreement and each Ancillary Agreement nor performance of any of the material provisions hereof by Sellers, will violate, conflict with or result in a breach of any material provisions of the articles of incorporation or bylaws of Sellers.

2.8    <u>Compliance with Legal Requirements</u>. Except as set forth in <u>Schedule 2.8</u>, to the knowledge of Sellers: each Seller, with respect to the operation of the Hospitals, is in material compliance with all applicable laws, statutes, ordinances, orders, rules, regulations, policies, guidelines, licenses, certificates, judgments or decrees of all judicial or governmental authorities (federal, state, local, foreign or otherwise) (collectively, "**Legal Requirements**").  Except as set forth in <u>Schedule 2.8</u>, to the knowledge of Sellers, none of the Sellers, with respect to the operation of the Hospitals, has been charged in writing with or been given written notice of or is under investigation with respect to, any material violation of, or any obligation to take material remedial action under, any applicable Legal Requirements.

2.9    <u>Required Consents</u>. Except as set forth in <u>Schedule 2.9</u>, and other than in connection with any Licenses, any provider agreements (including any such agreements with a governmental authority) and the CA AG (defined below), Sellers are not a party to or bound by, nor are any of the Assets subject to, any mortgage, or any material lien, deed of trust, material lease, or material contract or any material order, judgment or decree which, after giving effect to the Sale Order (a) will require the consent of any third party to the execution of this Agreement or (b) will require the consent of any third party to consummate the transactions contemplated by this Agreement.

2.10    <u>Environmental Matters</u>.

(a)    Sellers have provided Purchasers with the Phase I Environmental Site Assessments set forth in said <u>Schedule 2.10(a)</u>.

(b)    Except as disclosed in <u>Schedule 2.10(b)</u>, to the knowledge of Sellers, the operations of the Hospitals are not in material violation of any applicable limitations, restrictions, conditions, standards, prohibitions, requirements and obligations of Environmental Laws and related orders of any court or any other governmental authority.

(c)      For the purposes of this Section, the term "**Environmental Laws**" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the storage, treatment and disposal of medical and biological waste. For purposes of this Agreement, the term "**Hazardous Substances**" shall mean (i) any hazardous or toxic waste, substance, or material defined as such in (or for the purposes of) any Environmental Laws, (ii) asbestos-containing material, (iii) medical and biological waste, (iv) polychlorinated biphenyls, (v) petroleum products, including gasoline, fuel oil, crude oil and other various constituents of such products, and (vi) any other chemicals, materials or substances, exposure to which is prohibited, limited or regulated by any Environmental Laws.

2.11    Title.  Prior to December 21, 2018, Sellers have delivered at their own expense (i) for all the Real Property preliminary title reports issued by First American Title Insurance Company (the "**Title Commitments**"), (ii) for all of the Real Property all underlying title documents listed on the Title Commitments (the "**Underlying Title Documents**"), and (iii) for all of the Hospitals an as-built ALTA Surveys (the "**Surveys**", and collectively with the Title Commitment and the Underlying Title Documents, the "**Title Documents**").

2.12    Certain Other Representations with Respect to the Hospitals.

(a)      Except as set forth in Schedule 2.12, all Licenses which are material and necessary to the operation of the Hospitals or the Hospitals by Sellers are valid and in good standing and Sellers are in compliance with the terms and conditions of all such Licenses in all material respects, in each case except where the failure to be valid and in good standing or in compliance would not have a material adverse effect on the Assets or the Hospitals. Except as set forth in Schedule 2.12, as of the Closing Date Sellers will have any and all material Licenses required under Legal Requirements to conduct the Hospitals as presently conducted by Sellers, except where the failure to have any such License would not have a material adverse effect on the Assets or the Hospitals. To the knowledge of Sellers, no loss or expiration of any License is pending or threatened.

(b)      Sellers are certified for participation in the Medicare, Medi-Cal and TRICARE programs and any other federal or state health care reimbursement programs in which they participate, and have current and valid provider agreements with each such program, except where the failure to be so certified or have such provider agreements would not have a material adverse effect.

(c)      Sellers have not been excluded from Medicare, Medi-Cal or any federal or state health care reimbursement program, and, to the knowledge of Sellers, there is no pending or threatened exclusion action by a governmental authority against Sellers.

2.13    Financial Statements.

(a)      Schedule 2.13(a) hereto contains the following financial statements (the "Historical Financial Statements"): (i) the unaudited balance sheets of the Sellers as of June 30,

18

2018; (ii) unaudited income statements of the Sellers for the twelve-month periods ended June 30, 2018; (iii) the audited consolidated income statements of Sellers for the years ended 2016 and 2017; and (iv) the unaudited consolidated balance sheet of Sellers as of June 30, 2018.

(b)    the income statements contained in the Historical Financial Statements present, fairly in all material respects the results of the operations of the Sellers as of and for the periods covered therein and, except as set forth on Schedule 2.13(b), the balance sheets contained in the Historical Financial Statements (i) are true, complete and correct in all material respects; (ii) present, fairly in all material respects the financial condition of the Sellers as of the dates indicated thereon; and (iii)  to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods covered, except as disclosed therein.

2.14    Legal Proceedings. Except as set forth on Schedule 2.14, and except for any and all cases and/or pleadings filed or to be filed in the Bankruptcy Court, which shall be available through Sellers' claims and noticing agent's website at http://www.kcclcc.com/VERITYHEALTH/, to the knowledge of Sellers, there are no material claims, proceedings or investigations pending or threatened with respect to the ownership of the Assets or the operation of the Hospitals or the Hospitals by Sellers before any governmental authority. Except as set forth on Schedule 2.14, and other than any action or proceeding brought in the Bankruptcy Court, to the knowledge of Sellers, Sellers are not subject to any government order with respect to the ownership or operation by Sellers of the Hospitals or the other Assets or the Hospitals and are in substantial compliance with respect to each such government order.

2.15    Employee Benefits.  Schedule 2.15(a) contains a list of (i) each pension, profit sharing, bonus, deferred compensation, or other retirement plan or arrangement of Seller with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee pension benefit plan" as defined in Section 3(2) of ERISA, (ii) each medical, health, disability, insurance or other plan or arrangement of Seller with respect to the operation of the Hospital, whether oral or written,  which constitutes an "employee welfare benefit plan" as defined in Section 3(1) of ERISA, and (iii) each other employee benefit or perquisite provided by Seller with respect to the operation of the Hospital, in which any employee of Seller participates in his capacity as such (collectively, the "**Seller Plans**").

2.16    Personnel.  Schedule 2.16 sets forth a complete list (as of the date set forth therein) of names, positions and current annual salaries or wage rates and scheduled bonus, and the accrued paid time off pay of all employees of Sellers (including employees of the Hospitals and employees of Verity and Verity Holdings) immediately prior to December 21, 2018, whether such employees are full time employees, part-time employees, on short-term or long-term disability or on leave of absence pursuant to Sellers's policies, the Family and Medical Leave Act of 1993 or other similar Legal Requirements (the "**Hospital Employees**") and indicating whether the Hospital Employee is full- time or part-time.  Sellers shall have the right to update to Schedule 2.16(a) to reflect changes in employment status or new hires and terminations occurring after December 21, 2018 by providing a revised schedule to Purchase no later than five (5) Business Days before the date scheduled for the Closing.Insurance.  Schedule 2.17 contains a list of all material insurance maintained by Sellers with respect to the Assets and the Businesses, as of the Signing Date.

19

2.18    Accounts Receivable. To the knowledge of Sellers, all Accounts Receivable included in the Assets at Closing result from the bona fide provision of products or services in the ordinary course of business. All Sellers Accounts Receivable are currently deposited, either electronically or manually, into the bank accounts listed on Schedule 4.25(b).

2.19    Payer Contracts. To the knowledge of Sellers, and subject to Section 365 of the Bankruptcy Code, Schedule 2.19 sets forth a complete list of all written contracts with private third party payers including insurance companies and HMOs ("**Payer Contracts**"). Sellers have provided Purchasers with a true and correct copy of all material Payer Contracts, whether or not entered into in the ordinary course of business, or otherwise required to be disclosed on Schedule 2.20, in each case together with all amendments thereto.

2.20    Excluded Individuals. Except as set forth on Schedule 2.20, to the knowledge of Sellers: neither Sellers, Hospitals nor any director, officer or employee of Sellers or Hospitals (a) was, is or is proposed to be, suspended, excluded from participation in, or sanctioned under, any federal or state health care program (including, without limitation, Medicare and Medicaid) (an "**Excluded Individual**"); (b) has been convicted of any criminal offense related to the delivery of any medical or health care services or supplies, or related to the neglect or abuse of patients; (c) has failed to maintain its current License to provide the services required to be provided by it to or on behalf of Sellers and Hospitals; or (d) is unable to obtain or maintain liability insurance consistent with commercially reasonable industry practices.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Sellers as to the following matters as of the Signing Date and, except as otherwise provided herein, shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date:

3.1    Authorization. Purchaser has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby. No additional internal consents are required in order for Purchaser to perform its obligations and agreements hereunder.

3.2    Binding Agreement. This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Sellers, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

3.3    Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of California, is or will be duly

authorized to transact business in the State of California, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

3.4    <u>No Violation</u>.    Except as set forth in **Schedule 3.4**, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Purchaser is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

3.5    <u>Brokers and Finders</u>.    Neither Purchaser nor any affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

3.6    <u>Representations of Sellers</u>.    Purchaser acknowledges that it is purchasing the Assets on an "AS IS, WHERE IS" basis (as more particularly described in <u>Section 1.12</u>), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of any Seller other than as expressly set forth in this Agreement.  Purchaser further acknowledges that no Seller is making any representations or warranties herein relating to the Assets or the operation of the Hospital on and after the Effective Time.

3.7    <u>Legal Proceedings</u>.    Except as described on **Schedule 3.7**, there are no claims, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened relating to or affecting Purchaser or any affiliate of Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, business condition (financial or otherwise) of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.  Neither Purchaser nor any affiliate of Purchaser is subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any affiliate of Purchaser which materially adversely affects the condition (financial or otherwise), operations or business of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

3.8    <u>No Knowledge of a Seller's Breach</u>.    Neither Purchaser nor any of its affiliates has knowledge of any breach of any representation or warranty by any Seller or of any other condition or circumstance that would give Purchaser a right to terminate this Agreement pursuant to <u>Section 9.1(c)</u>.  If information comes to Purchaser's attention on or before the Closing Date (whether through a Seller or otherwise and whether before or after the Signing Date) which indicates that Sellers have breached any of its representations and warranties under this Agreement, then the effect shall be as if the representations and warranties had been modified in this Agreement in accordance with the actual state of facts existing prior to the Effective Time such that there will be no breach under Sellers' representations and warranties in relation to such information; *provided*, *however*, that Purchaser must immediately notify Sellers if any such breach comes to its attention

21

on or before the Closing Date, and Purchaser's failure to so notify Sellers shall constitute a waiver by Purchaser of Sellers' breach, if any, of any representation or warranty. If any such information comes to Purchaser's attention on or before the Closing Date (whether through a Seller or otherwise, including through updated schedules, and whether before or after the Signing Date) that would give Purchaser a right to terminate this Agreement pursuant to <u>Section 9.1(c)</u>, Purchaser must immediately notify Sellers if any such information comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Sellers shall constitute a waiver of such right in relation to the relevant breach.

3.9    <u>Ability to Perform</u>.  Purchaser has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

3.10    <u>Purchaser Knowledge</u>.  References in this Agreement to "Purchaser's knowledge" or "the knowledge of Purchaser" means the actual knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Operating Officer of Purchaser, without independent research. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

3.11    <u>Investigation</u>.  Purchaser has been afforded reasonable access to, and has been provided adequate time to review, the books, records, information, operations, facilities and personnel of each Seller and the Hospital for purposes of conducting a due diligence investigation of each Seller and the Hospital.  Purchaser has conducted a reasonable due diligence investigation of each Seller and the Hospital and has received satisfactory answers to all inquiries it has made respecting each Seller and the Hospital and has received all information it considers necessary to make an informed business evaluation of each Seller and the Hospital.  In connection with its due diligence investigation of each Seller and the Hospital, Purchaser has not relied upon any books, records, information, operations, facilities and personnel provided by any Seller, including in making its determination to enter into this Agreement and/or consummate the transactions contemplated hereby.

## ARTICLE 4

## COVENANTS OF SELLERS

4.1    <u>Access and Information; Inspections</u>.

4.1.1    From the Signing Date through the Effective Time, (a) each Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonable access during normal business hours at Seller's corporate headquarters in El Segundo, California to, and the right to inspect, the books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital of such Seller and the plant and property of the Hospital of such Seller at the Hospital of such Seller and (b) each Seller shall furnish Purchaser with such additional financial and operating data and other information in such Seller's possession

as to businesses and properties of the Hospital of such Seller as Purchaser or its representatives may from time to time reasonably request; *provided*, *however*, that such Seller is not obligated to disclose information which is proprietary to such Seller and would not be essential to the ongoing operation of the Hospital of such Seller by Purchaser; *provided*, *further*, that all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and such Seller.  Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of any Seller or the Hospital.

4.1.2    Notwithstanding anything contained herein, no Seller shall be required to provide Purchaser or its representatives or agents access to or disclose information where such access or disclosure would violate the rights of its patients, jeopardize the attorney-client or similar privilege with respect to such information or contravene any law, judgment, fiduciary duty or contract entered into prior to or on the date of this Agreement with respect to such information.

4.2    Cooperation.

4.2.1    Each Seller shall reasonably cooperate with Purchaser and its authorized representatives and attorneys:  (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Purchaser's efforts to effectuate the assignment of Assumed Contracts to Purchaser as of the Closing Date.  Except as may be otherwise requested by a Seller in order to comply with applicable law or regulatory guidance, notwithstanding anything contained herein, other than Bankruptcy Court orders and authorizations, it shall be Purchaser's sole responsibility (including payment of any fees, expenses, filings costs or other amounts) to obtain the Contract and Lease Consents, as well as all governmental consents, approvals, assignments, authorizations, clearances and licenses required to (x) carry out the transactions contemplated by this Agreement, including but not limited to medical licenses and/or (y) transfer any of the Assets, including any Licenses.  To the extent Purchaser needs certain information and data which is in the possession of a Seller in order for Purchaser to complete Purchaser's license and permit approval applications, Purchaser shall receive, upon request, reasonable assistance from such Seller in connection with the provision of such information.

4.2.2    Notwithstanding any provision to the contrary contained in this Agreement (including Section 8.7), no Seller shall be obligated to obtain the approval or consent to the assignment, to Purchaser, of any Assumed Contracts or Assumed Leases, from any party to any of the Assumed Contracts or Assumed Leases even if any such contract or lease states that it is not assignable without such party's consent.

4.3    Other Bidders.  Purchaser expressly acknowledges and agrees that each Seller has an obligation to seek out and determine the best and highest offer reasonably available for such

Seller's assets in accordance with the Bankruptcy Code, and nothing herein shall amend, modify, alter, diminish or affect such obligation.

4.4     Sellers' Efforts to Close.  Each Seller shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Purchaser's obligations under this Agreement to the extent that such Seller's action or inaction can control or materially influence the satisfaction of such conditions; provided, however, that such Seller shall not be required to pay or commit to pay any amount to (or incur any obligation in favor of) any person (other than filing or application fees).

4.5     Termination Cost Reports.  Each Seller shall file all Medicare, Medi-Cal and any other termination cost reports required to be filed as a result of the consummation of (a) the transfer of the Assets of such Seller to Purchaser and (b) the transactions contemplated by this Agreement with respect to such Seller, provided that Purchaser shall fund reasonable costs and expenses of preparation, filing and audit of such reports.  Purchaser shall permit each Seller access to all Hospital books and records to prepare such reports and shall assist such Seller in the process of preparing, filing, and reviewing the termination cost reports.  All such termination cost reports shall be filed by the applicable Seller in a manner that is consistent with current laws, rules and regulations.  Each Seller shall be responsible for filing governmental cost reports for the period of January 1, 2019 through the Closing Date.  Purchaser shall be responsible for its own cost report filings relating to the Hospitals beginning on the day immediately following the Effective Time.

4.6     Conduct of the Business.  From the Signing Date until the Closing, or the earlier termination of this Agreement, without the prior written consent of Purchaser, Sellers shall, with respect to the ownership of the Assets and the operation of the Hospitals, use commercially reasonable efforts to, in each case except as would not have a Material Adverse Effect (except as otherwise noted):

(a)     without regard to Material Adverse Effect, carry on Sellers' ownership of the Assets and the operation of the Hospitals consistent with past practice, but subject to the Bankruptcy Cases and Sellers' obligations and actions in connection therewith;

(b)     maintain in effect the insurance and equipment replacement coverage with respect to the Assets;

(c)     if and as permitted by the Bankruptcy Court, pay any bonuses payable under the Key Employee Retention Plan and Key Employee Incentive Plan of Sellers;

(d)     maintain the Assets in materially the same condition as at present, ordinary wear and tear excepted;

(e)     perform its obligations under all contracts with respect to the Assets in compliance with the Bankruptcy Code;

(f)     following entry of the Sale Order, permit and allow reasonable access by Purchaser and its representatives (which shall include the right to send written materials, all of which shall be subject to Sellers' reasonable approval prior to delivery) to make offers of post-

Closing employment to any of Sellers' personnel (including access by Purchasers and their representatives for the purpose of conducting open enrollment sessions for Purchasers' employee benefit plans and programs) and to establish relationships with physicians, medical staff and others having business relations with Sellers;

(g)    with respect to material deficiencies, if any, cited by any governmental authority (other than the Attorney General of the State of California and other than with respect to Seismic requirements) or accreditation body in the most recent surveys conducted by each, cure or develop and timely implement a plan of correction that is acceptable to such governmental authority or such accreditation body;

(h)    timely file or cause to be filed all material reports, notices and tax returns required to be filed and pay all required taxes as they come due;

(i)    without regard to Material Adverse Effect, beginning on February 21, 2019 and in accordance with the Sellers' budget under their debtor in possession financing, timely pay any fees that are or become due and payable under QAF IV and QAF V;

(j)    comply in all material respects with all Legal Requirements (including Environmental Laws) applicable to the conduct and operation of the Hospitals; and

(k)    without regard to Material Adverse Effect, maintain all material approvals, permits and environmental permits relating to the Hospitals and the Assets.

4.7    <u>Contract With Unions</u>.  Representatives of Sellers who are parties to collective bargaining agreements and Purchaser shall meet and confer from time to time as reasonably requested by either party to discuss strategic business options and alternative approaches in negotiating each collective bargaining agreement.  The applicable Sellers and Purchaser shall each participate in all union negotiations related to any specific collective bargaining agreement. Promptly following the Signing Date, applicable Sellers shall use commercially reasonable efforts to initiate discussions with Purchaser and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union.  The applicable Sellers will not unreasonably withhold, condition or delay approval or implementation of any successfully renegotiated collective bargaining agreement. The parties recognize that an applicable Seller's failure to secure a modification to any collective bargaining agreement, or to conclude a successor collective bargaining agreement shall not be a breach of Sellers' obligation under this Agreement, provided that if the unions refuse to negotiate, or otherwise are not timely, reasonable or realistic in renegotiating, the collective bargaining agreements during the period between the Signing Date and the Closing Date, Sellers and Purchaser will jointly consider, and negotiate mutually in good faith, alternative approaches that may be available and/or necessary to reduce Sellers' labor cost structure, including, but not limited to, seeking to reject the collective bargaining agreement(s).

**ARTICLE 5**

**COVENANTS OF PURCHASER**

25

5.1     <u>Purchaser's Efforts to Close</u>.  Purchaser shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in <u>ARTICLE 7</u> and <u>ARTICLE 8</u> to its or Sellers' obligations under this Agreement to the extent that Purchaser's action or inaction can control or materially influence the satisfaction of such conditions.  Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement, Purchaser shall be permitted to communicate and meet with (a) counter-parties to the agreements and contracts of the Hospitals, included those included in Assumed Obligations, regarding the terms and conditions under which they may be assumed and assigned to Purchaser, and (b) applicable governmental and regulatory authorities regarding prospective compliance with regulatory requirements and related issues; so long as, in the case of each of (a) and (b) (i) such communications and meetings do not interfere with the operation of the Businesses or the conduct of the Bankruptcy Cases and (ii) any communications or meetings with any governmental authority are approved in advance by Sellers as to timing and content (and Sellers are copied on such communications and afforded the opportunity to participate in such meetings).

5.2     <u>Required Governmental Approvals</u>.

(a)     Purchaser, at its sole cost and expense (a) shall use its best efforts to secure, as promptly as practicable before the Closing Date, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled (and provide Sellers copies of all materials relating to such consents, approvals, authorizations, clearances and licenses upon submission and all materials received from third parties in connection with such consents, approvals, authorizations, clearances and licenses upon receipt), and (b) will provide such other information and communications to governmental and regulatory authorities as any Seller or such authorities may reasonably request.  Purchaser will provide Sellers periodic and timely updates regarding all such consents, approvals, authorizations, clearances and licenses. Purchaser is responsible for all filings with and requests to governmental authorities necessary to enable Purchaser to operate the Hospital at and after the Effective Time.  Purchaser shall, promptly, but no later than thirty (30) business days after the entry of the Sale Order or sooner if required by applicable governmental or regulatory authorities, file all applications, licensing packages and other similar documents with all applicable governmental and regulatory authorities which are a prerequisite to obtaining the material licenses, permits, authorizations and provider numbers described in <u>Section 8.1</u>.  Purchaser shall be entitled, but not obligated, to obtain the Contract and Lease Consents.  Purchaser shall be entitled, but not obligated, to solicit and obtain estoppel certificates from any third party to any Leased Real Property.  Purchaser's failure to obtaining any or all of the Contract and Lease Consents or estoppel certificates as of the Closing Date shall not be a condition precedent to either party's obligation to close the transactions contemplated by this Agreement.

(b)     Purchaser and Sellers agree that because the change of ownership and regulatory approval process in connection with the transactions contemplated by this Agreement may take an extended period of time, Purchaser and Sellers agree to an initial closing effective upon the approval of the court and upon the approval of the transaction by the CA AG (as defined below) in accordance with Sections 7.5 and 8.6, at which time the Assets (less the portion of the Assets constituting drugs or other pharmacy assets) will be sold to Purchaser and immediately leased back

26

to Sellers, with a concurrent management agreement entered into at that time upon terms mutually agreeable to the parties in their reasonable business judgment.  The Sale Leaseback Agreement and Interim Management Agreement will terminate at the Closing when the Purchaser is issued the Licenses necessary to operate the Hospitals directly (namely, the Hospital Licenses and pharmacy permits).

     5.3   <u>Certain Employee Matters</u>.

     (a)   Purchaser agrees to make offers of employment, effective as of the Effective Time, to substantially all persons (whether such persons are full time employees, part-time employees, on short-term or long-term disability or on leave of absence, military leave or workers compensation leave) (the "**Hospital Employees**") who, immediately prior to the Effective Time are: (i) employees of any Seller; (ii) employees of any affiliate of any Seller which employs individuals at the Hospital and are listed on **Schedule 5.3**; or (iii) employed by an affiliate of any Seller and are listed on **Schedule 5.3**.  For the avoidance of doubt, the Hospital Employees shall not include any employees of Verity or any other affiliate of Seller unless such individual is listed on **Schedule 5.3**.  Any of the Hospital Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "**Hired Employees**."  All employees who are Hired Employees shall cease to be employees of the applicable Seller or its affiliates as of the Effective Time.

     (b)   Purchaser shall give all Hired Employees full credit for paid time off pay to such employees as of the Closing Date by crediting such employees the time off reflected in the employment records of the applicable Seller and/or any of its affiliates immediately prior to the Effective Time, subject to compliance with applicable law and regulation, including consent of such employees if required.

     (c)   After the Closing Date, Purchaser's human resources department will give reasonable assistance to each Seller and its affiliates with respect to such Seller's and such Seller's affiliates' post-Closing administration of such Seller's and such Seller's affiliates' pre-Closing employee benefit plans for the Hospital Employees.  Within five (5) days after the Closing Date, Purchaser shall provide to each Seller a list of all the Hospital Employees who were offered employment by Purchaser but refused such employment along with a list of all Hired Employees (which such list Purchaser shall periodically update).

     (d)   With respect to any collective bargaining agreements or labor contract with respect to any employees, Purchaser shall comply with the applicable laws and bankruptcy court orders relating to collective bargaining agreements or labor contracts.

     (e)   The provisions of this <u>Section 5.3</u> are solely for the benefit of the parties to this Agreement, and no employee or former employee or any other individual associated therewith or any employee benefit plan or trustee thereof shall be regarded for any purpose as a third party beneficiary of this Agreement, and nothing herein shall be construed as an amendment to any employee benefit plan for any purpose.

     5.4   <u>Excluded Assets</u>.  As soon as practicable after the Closing Date, Purchaser shall deliver to each Seller or such Seller's designee any Excluded Assets of such Seller found at the

Hospital on and after the Effective Time, without imposing any charge on any Seller for Purchaser's storage or holding of same on and after the Effective Time.

5.5     Waiver of Bulk Sales Law Compliance.  Purchaser hereby waives compliance by Sellers with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Assets are located and all other laws applicable to bulk sales and transfers.

5.6     Attorney General.  Promptly after entry of the Sale Order, but in any event within ten (10) calendar days, Purchaser shall, at its sole cost and expense, make any notices or other filings with the Attorney General of the State of California (the "**CA AG**").  Each Seller shall reasonably cooperate with Purchaser in such notices or other filings.

5.7     Conduct Pending Closing.  Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement pursuant to its terms, unless Sellers shall otherwise consent in writing, Purchaser shall not take any action or fail or omit to take any action which would cause any of Purchaser's representations and warranties set forth in ARTICLE 4 to be inaccurate or untrue as of the Closing.

5.8     Cure Costs.  Purchaser, upon assumption, shall pay the Cure Costs for each Assumed Contract and Assumed Lease so that each such Assumed Contract and Assumed Lease may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code.  For purposes of this Agreement, "**Cure Costs**", means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of the Assumed Contracts and Assumed Leases to Purchaser as provided herein.

5.9     Operating Covenant.  Purchaser shall act in good faith and use Purchaser's commercially reasonable efforts to serve the medical needs of each Hospital's service area.

5.10    HSR Filing.  Purchaser and each Seller will as promptly as practicable, and in any event no later than five business days after the date of the Sale Order, file with the Federal Trade Commission and the Department of Justice the notification and report forms required for the transactions contemplated hereby and any supplemental information that may be reasonably requested in connection therewith pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), which notification and report forms and supplemental information will comply in all material respects with the requirements of the HSR Act.  Purchaser shall pay all filing fees required with respect to the notification, report and other requirements of the HSR Act.  Each of Purchaser and Sellers shall furnish to the other such information and assistance as the other shall reasonably requires in connection with the preparation and submission to, or agency proceedings by, any governmental authority under the HSR Act, and each of Purchaser and Sellers shall keep the other promptly apprised of any communications with, and inquires or requests for information from, such governmental authorities.  Purchaser shall take such action (including divestitures or hold separate arrangements) as may be required by any governmental authority in order to resolve with the minimum practicable delay any objections such governmental authorities may have to  the transactions contemplated by this Agreement under the HSR Act.

5.11    Contract with Unions.    Representatives of Sellers who are parties to collective bargaining agreements and Purchaser shall meet and confer from time to time as reasonably requested by either party to discuss strategic business options and alternative approaches in negotiating each collective bargaining agreement.  The applicable Sellers and Purchaser shall each participate in all union negotiations related to any specific collective bargaining agreement. Promptly following the Signing Date, applicable Sellers shall use commercially reasonable efforts to initiate discussions with Purchaser and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union.  The applicable Sellers will not unreasonably withhold, condition or delay approval or implementation of any successfully renegotiated collective bargaining agreement to be assumed by Purchaser. The parties recognize that an applicable Seller's failure to secure a modification to any collective bargaining agreement, or to conclude a successor collective bargaining agreement shall not be a breach of Sellers' obligation under this Agreement.  In addition, Sellers may, in their discretion, seek to reject any or all of the collective bargaining agreement(s).

## ARTICLE 6

## SELLERS' BANKRUPTCY AND BANKRUPTCY COURT APPROVAL

6.1    Bankruptcy Court Approval; Overbid Protection and Break-Up Fee.

(a)    Sellers and Purchaser acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases are subject to Bankruptcy Court approval, and that this Agreement is subject to termination in its entirety in the event any Seller receives a better and higher offer for the Assets in accordance with the Bankruptcy Code and subject to the terms stated herein.

(b)    Promptly following the execution of this Agreement by all parties, the Seller shall file a motion with the Bankruptcy Court (the "**Sales Procedures Motion**"), the content of which shall be subject to the reasonable approval by Purchaser, for entry of an order approving bid procedures and overbid protections containing substantially the following terms and conditions:

(1) the Seller shall not accept any offer to sell the Assets subject to this Agreement ("**Overbid**") to another purchaser ("**Overbidder**") unless that offer exceeds the Purchase Price by an amount sufficient to pay the Break-Up Fee and such offer includes the purchase of substantially all Assets subject of this Agreement;

(2) in the event that an overbidder (and not the Purchaser) is the successful bidder for the purchase of the Assets (the "**Alternate Transaction**") and the Alternative Transaction is approved by the Bankruptcy Court, (a) the Deposit, and any interest earned thereon, shall be returned to Purchaser immediately upon the entry of such sale order, and (b) Purchaser shall be paid a break-up fee of three and one-half percent (3.5%) of the Cash Consideration ($21,350,000.00) plus reimbursement of reasonably documented reasonable costs and expenses incurred by Purchaser related to its due diligence, and pursuing, negotiating, and documenting the transactions contemplated by this Agreement in an amount not to exceed $2,000,000.00 ( (the "**Break-Up Fee**"); provided, however, that in the event that

29

the Purchaser is successful as to some but not all of the Assets, the Break-Up Fee shall be reduced pro rata to the percentage of Assets not actually purchased by the Purchaser, based on the allocation of the Purchase Price as described in Section 1.1(a)(i), as compared to the Assets which were the subject of this Agreement.; and

(3) The Break-Up Fee shall be deemed to be an allowed expense of the kind specified in Section 503(b) of the Bankruptcy Code to be paid solely from the proceeds of the Alternate Transaction, pursuant to the Sale Order.  The Break-Up Fee shall not be paid if the Alternate Transaction was pursued due to a material breach by the Purchaser or the Purchaser's failure or refusal to consummate the transaction after the satisfaction or waiver of all closing conditions.

The Sales Procedures Motion will contain bid procedures as set forth in the bid procedures attached hereto as **Schedule 6.1(b)(3)**.

If Sellers fails to obtain Bankruptcy Court approval for the Sales Procedures Motion by no later than four weeks after the end of the Final Diligence Period, Purchaser shall have the right to terminate this Agreement, without recourse or liability, and Seller shall immediately thereafter return to Purchaser the Deposit and any interest earned thereon.

(c)      Each Seller shall at the Sale Hearing exercise reasonable efforts to obtain a "Sale Order" approving this Agreement, subject to its obligations in respect of any better and higher offer for such Seller's assets in accordance with the Bankruptcy Code.  For purposes of this Agreement, the term "**Sale Order**" shall mean an order of the Bankruptcy Court authorizing the sale of the Assets (including the assumption and assignment of the Assumed Contracts and Assumed Leases) to Purchaser consistent with this Agreement and in a form reasonably satisfactory to Purchaser.

(d)      Each Seller agrees to proceed in good faith to obtain Bankruptcy Court approval of the sale contemplated herein with a determination that Purchaser is a good faith purchaser pursuant to Bankruptcy Code section 363(m) and to file such declarations and other evidence as may be required to support a finding of good faith.

(e)      Each Seller shall seek an order from the Bankruptcy Court retaining jurisdiction over all matters relating to claims against such Seller as debtor solely in the Bankruptcy Court.

6.2      Appeal of Sale Order.  In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Sellers shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay.  Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.  In the event of an appeal of the Sale Order, Sellers shall be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal; provided, however, Purchaser, at its option, shall have the right to participate as a party in interest in such appeal. In the event a stay is issued by any appellate court, including the United States District Court, which prevents the sale from closing, as scheduled, Purchaser shall have the right to terminate this Agreement if such stay is not vacated on or before

30

45 days from the date of the stay is issued, and Purchaser shall be entitled to the prompt return of the Deposit and any interest earned thereon.

## ARTICLE 7

### CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

Sellers' obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Sellers in whole or in part at or prior to the Closing:

7.1    Signing and Delivery of Instruments.  Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement.

7.2    No Restraints.    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

7.3    Performance of Covenants.  Purchaser shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

7.4    Governmental Authorizations.  Purchaser shall have obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits and authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies).

7.5    Attorney General Provisions.  The conditions to Purchaser's obligations to close set forth in Section 8.6 shall have been satisfied.

7.6    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order.

7.7    HSR Act.  The applicable waiting period under the HSR Act shall have expired or been earlier terminated.

7.8    CSCDA Acknowledgement.  The CSCDA and PACE Trustee shall have executed acknowledgements in form and substance acceptable to Sellers that Purchaser is the Successor Property Owner and Obligated Party under the PACE  Obligations, and releases of the Sellers from any and all claims arising or accruing prior to the Closing Date.

31

## ARTICLE 8

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

8.1    Governmental Authorizations.    Except as otherwise set forth in this Agreement, Purchaser and Sellers shall have obtained licenses, permits and authorizations from governmental agencies or governmental bodies that are required for the purchase, sale and operation of the Hospitals, including without limitation approval of the CA AG (subject to Section 8.6), except in such case where failure to obtain such license, permit or authorizations from a governmental agency or governmental body does not have a Material Adverse Effect.

8.2    Bankruptcy Court Approval.    The Bankruptcy Court shall have entered the Sale Order and made a finding that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

8.3    Signing and Delivery of Instruments.    Sellers shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement.

8.4    Performance of Covenants.    Sellers shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Sellers on or prior to the Closing Date; *provided*, *however*, this condition will be deemed to be satisfied unless (a) Sellers were given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within fifteen (15) business days after receipt of such notice and (b) the respects in which such obligations, covenants, agreements and conditions have not been performed have had or would have a Material Adverse Effect.

8.5    No Restraints.    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

8.6    Attorney General Provisions.    Purchaser recognizes that the transactions contemplated by this Agreement may be subject to review and approval of the CA AG.  Purchaser agrees to close the transactions contemplated by this Agreement so long as any conditions imposed by the CA AG are substantially consistent with the conditions set forth in Schedule 8.6.  In the event the CA AG imposes conditions on the transactions contemplated by this Agreement which are not as set forth on Schedule 8.6 (the **"Additional Conditions"**), Sellers shall have the opportunity to file a motion with the Bankruptcy Court seeking the entry of an order finding that

32

the Additional Conditions are an "interest in property" for purposes of 11 U.S.C. § 363(f), and that the Assets can be sold free and clear of the Additional Conditions.  If Sellers obtain such an order, from the Bankruptcy Court or another court, Purchaser shall have a period of 21 business days from the entry of such order to determine, in Purchaser's sole and absolute discretion, and in consultation with Purchaser's financing sources, whether to proceed to consummate the transactions contemplated by this Agreement.  If Purchaser determines not to proceed, Purchaser shall have the right to terminate this Agreement and receive the return of its Good Faith Deposit.

8.7    Medicare and Medi-Cal Provider Agreements.  Sellers shall transfer their Medicare provider agreements pursuant to a settlement agreement with the Centers for Medicare and Medicaid Services (**"CMS"**) and shall transfer their Medi-Cal provider agreements pursuant to a settlement agreement with the California Department of Health Care Services (**"DHCS"**), which such settlement agreements shall result in: (i) resolution of all outstanding financial defaults under any of Sellers' Medicare and Medi-Cal provider agreements and (ii) full satisfaction, discharge, and release of any claims under the Medicare or Medi-Cal provider agreements, whether known or unknown, that CMS or DHCS, as applicable, has against the Seller or Purchaser for monetary liability arising under the Medicare or Medi-Cal provider agreements before the Effective Time; provided, however, that Purchaser acknowledges that it will succeed to the quality history associated with the relevant Medicare or Medi-Cal provider agreements assigned and shall be treated, for purposed of survey and certification issues as if it is the relevant Seller and no change of ownership occurred.

8.8    HSR Act.  The applicable waiting period under the HSR Act shall have expired or been earlier terminated.

# ARTICLE 9

# TERMINATION

9.1    Termination.  This Agreement may be terminated at any time prior to Closing:

(a)    by the mutual written consent of the parties;

(b)    by Sellers if a material breach of this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Sellers or (ii) cured by Purchaser to the reasonable satisfaction of Sellers within fifteen (15) business days after service by Sellers upon Purchaser of a written notice which describes the nature of such breach;

(c)    by Purchaser if, in its sole and absolute discretion, it is not satisfied with either (i) the results of its due diligence examination of the Hospitals, or (ii) the contents of any schedule or exhibit that was not completed and attached to this Agreement, but which has been provided to Purchaser after the Signing Date, and Purchaser has notified Seller of its election to terminate the Agreement under this Section 9.1(c) on or prior to January 8, 2019, which notice may be given by facsimile or email correspondence; provided, that for the avoidance of doubt, following expiration of the Final Diligence Period, notwithstanding anything else in this Agreement, Purchaser shall not be entitled to terminate this Agreement (or not Close) as a result of the breach of any representation or warranty made by Sellers (or any of them) other than the

33

breach of a Sale Order Date Representation, but in each case solely to the extent such breach of a Sale Order Date Representation would result in a Material Adverse Effect; provided, further, that any dispute between Purchaser and Sellers as to whether a Material Adverse Effect has occurred for any purpose under this Agreement shall be exclusively settled by a determination made by the Bankruptcy Court;

(d)    by Purchaser if a material breach of this Agreement has been committed by Sellers and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Sellers to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser upon Sellers of a written notice which describes the nature of such breach;

(e)    by Purchaser if satisfaction of any of the conditions in ARTICLE 8 has not occurred by December 31, 2019 or becomes impossible, and Purchaser has not waived such condition in writing (provided that the failure to satisfy any of the applicable condition or conditions in Sections 8.1 through 8.5 inclusive has occurred by reason other than (i) through the failure of Purchaser to comply with its obligations under this Agreement or (ii) Sellers' failure to provide their closing deliveries on the Closing Date as a result of Purchaser not being ready, willing and able to close the transaction on the Closing Date); provided that upon the imposition of Additional Conditions by the CA AG, Section 8.6 must be satisfied or waived by Purchaser by no later than sixty (60) days thereafter.

(f)    by Sellers if satisfaction of any of the conditions in ARTICLE 7 has not occurred by December 31, 2019 or becomes impossible, and Sellers have not waived such condition in writing (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Sellers to comply with their obligations under this Agreement or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date as a result of Sellers not being ready, willing and able to close the transaction on the Closing Date);

(g)    by either Purchaser or Sellers if the Bankruptcy Court enters an order dismissing the Bankruptcy Cases or fails to approve the Sales Procedures Motion by the date specified in Section 6.1(b);

(h)    by Sellers if, in connection with the Bankruptcy Cases, any Seller accepts an Alternate Transaction and pays the Break-Up Fee;

(i)    by either Purchaser or Sellers if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before December 31, 2019; or

(j)    by Purchaser if a force majeure event (such as acts of God, storms, floods, landslides, earthquakes, lightning, riots, fires, pandemics, sabotage, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities, other national or international calamity, one or more acts of terrorism, or failure of energy sources) shall have occurred between the Signing Date and Closing Date, which event is reasonably likely to have a Material Adverse Effect.

9.2    <u>Termination Consequences</u>.    If this Agreement is terminated pursuant to <u>Sections 6.1(b)</u>, <u>6.2</u> or <u>9.1</u>: (a) all further obligations of the parties under this Agreement shall terminate (other than Purchaser's right to receive the Break-Up Fee if applicable), provided that the provisions of <u>ARTICLE 12</u>, shall survive; and (b) each party shall pay only its own costs and expenses incurred by it in connection with this Agreement; provided, in the case of any termination based on <u>Sections 9.1(b)</u> or <u>(d)</u> the consequences of such termination shall be determined in accordance with <u>ARTICLE 11</u> hereof.    In addition, if this Agreement is terminated pursuant to <u>Sections 6.1(b)</u>, <u>6.2</u> or <u>9.1</u> (other than <u>Section 9.1(b)</u>), Seller shall immediately return the Deposit to Purchaser with all interest earned thereon.    Each Party acknowledges that the agreements contained in this <u>Section 9.2</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

## ARTICLE 10

## POST-CLOSING MATTERS

10.1    <u>Excluded Assets</u>.

Subject to <u>Section 10.2</u> hereof, any Excluded Asset (or proceeds thereof) (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by the Bankruptcy Court, which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall, within five (5) business days following receipt, be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to the applicable Seller.  Purchaser (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to any Seller under this <u>Section 10.1</u> against, nor the right to contest its obligation to transfer, assign and convey to any Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against any Seller.  If Purchaser does not remit any monies included in the Excluded Assets (or proceeds thereof) to the applicable Seller in accordance with the first sentence of this <u>Section 10.1</u>, such withheld funds shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "**Excluded Asset Due Date**") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to the applicable Seller.

10.2    <u>Preservation and Access to Records After the Closing</u>.

(a)    From the Closing Date until seven (7) years after the Closing Date or such longer period as required by law (the "**Document Retention Period**"), Purchaser shall keep and preserve all medical records (including, without limitation, electronic medical records), patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets.  Purchaser will afford to the representatives of Sellers, any of their affiliates, the Official Committee of the Unsecured Creditors of the Sellers, Sellers' estate representative or any liquidating trustee of the Sellers' bankruptcy estate ("**Seller Parties**"), including their counsel and accountants, full and complete access to, and copies (including, without limitation, color laser copies) of, such records

with respect to time periods prior to the Effective Time (including, without limitation, access to records of patients treated at the Hospital prior to the Effective Time) during normal business hours after the Effective Time, to the extent reasonably needed by any Seller Party for any lawful purpose. Purchaser acknowledges that, as a result of entering into this Agreement and operating the Hospital, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality. Purchaser shall abide by any such rules and regulations relating to the confidential information it acquires. Purchaser shall maintain the patient and medical staff records at the Hospital in accordance with applicable law and the requirements of relevant insurance carriers. After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents described in this Section 10.2(a), Purchaser shall provide written notice to Sellers of Purchaser's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal. Any of the Seller Parties shall have the right, at its sole cost, to take possession of such documents during such forty-five (45) calendar day period. If any of the Seller Parties does not take possession of such documents during such forty-five (45) calendar day period, Purchaser shall be free to destroy or otherwise dispose of such documentation upon the expiration of such forty-five (45) calendar day period.

(b)    Provided that Purchaser shall not incur any out of pocket costs, Purchaser shall give full cooperation to the Seller Parties and their insurance carriers in connection with the administration of Sellers' estate, including, without limitation, in connection with all claims, actions, causes of action or audits relating to the Excluded Assets, Excluded Liabilities or pre-Closing operation of the Sellers or the Hospital that any Seller Party may elect to pursue, dispute or defend, in respect of events occurring prior to the Effective Time with respect to the operation of the Hospital. Such cooperation shall include, without limitation, making the Hired Employees available for interviews, depositions, hearings and trials and other assistance in connection with the administration of Sellers' estate and such cooperation shall also include making all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done without payment of any fees or expenses to Purchaser or to such employees); provided that Purchaser shall not be required to incur any out of pocket costs in association therewith. In addition, Sellers and their affiliates shall be entitled to remove from the Hospital originals of any such records, but only for purposes of pending litigation involving the persons to whom such records refer, as certified in writing prior to removal by counsel retained by Sellers or any of their affiliates in connection with such litigation. Any records so removed from the Hospital shall be promptly returned to Purchaser following Sellers' or their applicable affiliate's use of such records.

(c)    In connection with (i) the transition of the Hospital pursuant to the transaction contemplated by this Agreement, (ii) Sellers' rights to the Excluded Assets, (iii) any claim, audit, or proceeding, including, without limitation, any tax claim, audit, or proceeding and (iv) the Sellers' obligations under the Excluded Liabilities, Purchaser shall after the Effective Time give Sellers access during normal business hours to Purchaser's books, personnel, accounts and records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital as representatives of Sellers and their affiliates may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of the Hospital.

(d)     Purchaser and its representatives shall be given access by Sellers during normal business hours to the extent reasonably needed by Purchaser for business purposes to all documents, records, correspondence, work papers and other documents retained by Sellers pertaining to any of the Assets prior to the Effective Time (excluding confidential employee information, privileged materials and patient records), all in such manner as to not interfere unreasonably with Sellers.  Such documents and other materials shall be, at Sellers' option, either (i) copied by Sellers for Purchaser at Purchaser's expense, or (ii) removed by Purchaser from the premises, copied by Purchaser and promptly returned to Sellers.

(e)     Purchaser shall comply with, and be solely responsible for, all obligations under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164) promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 with respect to the operation of the Hospital on and after the Effective Time.

(f)     Purchaser shall cooperate with Sellers, on a timely basis and as reasonably requested by Sellers, in connection with the provision of all data of the Hospital and other information required by Sellers for reporting to HFAP for the remainder of the quarterly period in which the Closing has occurred.

(g)     To the maximum extent permitted by law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including without limitation, documents relating to the operations of any of the Hospital or any of the Hospital's committees prior to the Effective Time, prior to any disclosure of such documents, Purchaser shall notify Sellers and shall provide Sellers with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

(h)     Provision of Benefits of Certain Contracts.  Notwithstanding anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract or Assumed Lease, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would constitute a breach thereof or in any way negatively affect the rights of Sellers or Purchaser, as the assignee of such Assumed Contract or Assumed Lease, as the case may be, thereunder.  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, Sellers will cooperate with Purchaser in any reasonable arrangement designed to both (a) provide Purchaser with the benefits of or under any such Assumed Contract or Assumed Lease, and (b) cause Purchaser to bear all costs and obligations of or under any such Assumed Contract or Assumed Lease.  Further, notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Account Receivable the assignment of which is either prohibited by law or by the terms of any contract with a payor without the consent of such payor.  Any payments received by Sellers after the Closing Date from patients, payors, clients, customers, or others who are the obligors on Accounts Receivables transferred to Purchaser as a part of the Assets on the Closing Date shall be paid over to Purchaser within ten (10) business days after receipt by Seller.

10.3    Closing of Financials.  Provided that Purchaser shall not incur any out of pocket costs, Purchaser shall cause the individual acting as the chief financial officer of the Hospital after the Effective Time (the "**Post-Effective Time CFO**") to cooperate with Sellers' representatives in

order to complete the standardized closing of Sellers' financial records through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "**Closing of Financials**").  Purchaser shall cause the Post-Effective Time CFO to use his or her good faith efforts to cooperate with Sellers' representatives in order to complete the Closing of Financials by no later than the date which is thirty (30) calendar days after the Closing Date. The Post-Effective Time CFO and other appropriate personnel shall be reasonably available to Sellers for a period of no less than one hundred eighty (180) calendar days after the Closing Date to assist Sellers in the completion of Sellers' post-Closing audit, such assistance not to interfere unreasonably with such Post-Effective Time CFO's other duties.

10.4    <u>Medical Staff</u>.  To ensure continuity of care in the community, Purchaser agrees that the Hospital's medical staff members in good standing as of the Effective Time shall maintain medical staff privileges at the Hospital as of the Effective Time.  On and after the Effective Time, the medical staff will be subject to the Hospital's Medical Staff Bylaws then currently in effect, provided that such Bylaws are in compliance with all applicable laws and regulations and contain customary obligations.

10.5    <u>Shared Intangible Assets</u>.  In the event and to the extent that certain intangible Assets transferred by Sellers have been used to operate businesses of Verity or Verity Holdings or their affiliates which are not being sold to Purchaser ("**Shared Intangible Assets**") and such Shared Intangible Assets continue to be used by Verity or Verity Holdings or their affiliates to operate such businesses after Closing, Verity and Verity Holdings retain the rights to continue to use such Assets notwithstanding their sale to Purchaser.  Purchaser shall reasonably cooperate with Verity and Verity Holdings and their affiliates to give effect to such rights and shall provide Verity and Verity Holdings and their affiliates such documentation, records and information and reasonable access to such systems as necessary for Verity and Verity Holdings and their affiliates to continue to operate such businesses; all in such manner as not to reasonably interfere with the operations of the Hospitals; provided, however, Purchaser shall not be required to incur any out-of-pocket costs in association therewith unless reimbursed by Verity and Verity Holdings and their affiliates.

# ARTICLE 11

## DEFAULT, TAXES AND COST REPORTS

11.1    <u>Purchaser Default</u>.  If Purchaser commits any material default under this Agreement, Sellers shall have the right to sue for damages; provided, however that the amount of such damages shall never exceed $60,000,000.00.  For the avoidance of doubt, Sellers shall have no right to sue for specific performance under this Agreement.

11.2    <u>Seller Default</u>.  If Sellers commit any material default under this Agreement, Purchaser shall have the right to demand and receive a refund of the Deposit, and Purchaser may, in addition thereto, pursue any rights or remedies that Purchaser may have under applicable law, including the right to sue for damages or specific performance.

11.3    <u>Tax Matters; Allocation of Purchase Price</u>.

(a)    After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax liabilities or potential tax liabilities attributable to Sellers with respect to the operation of the Hospital for all periods prior to the Effective Time and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof.  The parties shall also make available to each other to the extent reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters and as Sellers reasonably may request in connection with the completion of any post-Closing audits of the Hospital.

(b)    The Purchase Price (including any liabilities that are considered to be an increase to the Purchase Price for United States federal income Tax purposes) shall be allocated among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder as set forth in **Schedule 11.3(b)** (such schedule the "**Allocation Schedule**").  The Allocation Schedule shall be for Sellers' and Purchaser's tax purposes only, and shall not limit the Sellers' creditors in any way.

11.4    <u>Cost Report Matters</u>.

(a)    Consistent with <u>Section 4.5</u>, Sellers shall, at Purchaser's expense, prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medicaid, and other third party payors which settle on a cost report basis (the "**Seller Cost Reports**").

(b)    Upon reasonable notice and during normal business office hours, Purchaser will cooperate reasonably with Sellers in regard to Sellers' preparation and filing of the Seller Cost Reports.  Such cooperation shall include, at no cost to Sellers, obtaining access to files at the Hospital and Purchaser's provision to Sellers of data and statistics, and the coordination with Sellers pursuant to reasonable notice of Medicare and Medicaid exit conferences or meetings. Sellers shall have no obligations after the Effective Time with respect to Seller Cost Reports except for preparation and filing thereof.

## ARTICLE 12

## MISCELLANEOUS PROVISIONS

12.1    <u>Further Assurances and Cooperation</u>.  Sellers shall execute, acknowledge and deliver to Purchaser any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by Purchaser at any time and shall take any and all other actions reasonably requested by Purchaser at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Purchaser, the Assets.  After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

12.2    Successors and Assigns.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; *provided, however,* that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties which consent shall not be unreasonably withheld or delayed, except that Purchaser may, without the prior written consent of Sellers, assign all or any portion of its rights under this Agreement to one or more of its affiliates prior to the Closing Date.

12.3    Governing Law; Venue.  This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of California (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens.

12.4    Amendments.  This Agreement may not be amended other than by written instrument signed by the parties hereto.

12.5    Exhibits, Schedules and Disclosure Schedule.  The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein.  From the Signing Date until the Closing, the parties agree that Sellers may update the Disclosure Schedule as necessary upon written notice to Purchaser, and the applicable representation and warranty shall thereafter be deemed amended for all purposes by such updated Disclosure Schedule.  Notwithstanding the foregoing, but subject to Section 9.2(c), should any exhibit or schedule not be completed and attached hereto as of the Signing Date, Sellers and Purchaser shall promptly negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Sellers and Purchaser in their reasonable discretion prior to being attached hereto.  Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply. The headings, if any, of the individual sections of the Disclosure Schedule are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement.  The Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article III merely for convenience, and the disclosure of an item in one section of the Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such disclosure, notwithstanding the presence or absence of an appropriate section of the Disclosure Schedule with respect to such other representations or warranties or an appropriate cross reference thereto.

12.6    Notices.  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5)

calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

<table>
<tr><td>If to Sellers:</td><td>Verity Health System of California, Inc.<br>2040 East Mariposa St.<br>El Segundo, CA 90245<br>Attention: Rich Adcock, CEO<br>Telephone: 424-367-0630</td></tr>
<tr><td>With copies to:<br>(which copies shall<br>not constitute notice)</td><td>Dentons US LLP<br>601 South Figueroa St., Suite 2500<br>Los Angeles, CA 90017-5704<br>Attention:  Samuel R. Maizel, Esq.<br>Telephone: 213-892-2910<br>Facsimile: 213-623-9924</td></tr>
<tr><td>If to Purchaser:</td><td>Strategic Global Management, Inc.<br>9 KPC Parkway, Suite 301<br>Corona, CA 92879<br>Attention:  William E. Thomas<br>Facsimile: 951-782-8850</td></tr>
<tr><td>With copies to:<br>(which copies shall<br>not constitute notice)</td><td>Levene, Neale, Bender, Yoo & Brill L.L.P.<br>10250 Constellation Blvd., Suite 1700<br>Los Angeles, CA   90067<br>Attention: Gary E. Klausner, Esq.<br>Facsimile: 310-229-1244<br><br>and<br> Loeb & Loeb LLP<br>10100 Santa Monica Blvd., Suite 2200<br>Los Angeles, California 90067<br>Attention: Allen Z. Sussman, Esq.<br>Facsimile: 310-919-3934</td></tr>
</table>

or at such other address as one party may designate by notice hereunder to the other parties.

12.7    Headings.  The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

12.8    Publicity.  Prior to the Closing Date, Sellers and Purchaser shall consult with each other as to the form and substance of any press release or other public disclosure materially related

to this Agreement or any other transaction contemplated hereby and each shall have the right to review and comment on the other's press releases prior to issuance; *provided*, *however*, that nothing in this Section 12.8 shall be deemed to prohibit either Sellers or Purchaser from making any disclosure that its counsel deems necessary or advisable in order to satisfy either party's disclosure obligations imposed by law subject to reasonable prior notice to the other party thereof.

12.9    Fair Meaning.  This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

12.10    Gender and Number; Construction; Affiliates.  All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable.  Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."  Any reference in this Agreement to an "affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with a second Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  A "Person" shall mean any natural person, partnership, corporation, limited liability company, association, trust or other legal entity.

12.11    Third Party Beneficiary.  None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement, except for the parties' successors and permitted assigns, and except for any liquidating trustee or plan administrator for Sellers' estate.

12.12    Expenses and Attorneys' Fees.  Except as otherwise provided in this Agreement, each party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby are consummated.  The parties expressly agree that all sales, transfer, documentary transfer and similar taxes, fees, surcharges and the like in connection with the sale of the Assets shall be borne by Purchaser.  If any action is brought by any party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover its court costs and reasonable attorneys' fees.

12.13    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto.  The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

12.14    Entire Agreement.  This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding

between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "**Superseded Agreements**"), which Superseded Agreements shall be of no further force or effect; provided, that notwithstanding the foregoing, the letter Confidentiality Agreement dated July 12, 2018 between Purchaser and Cain Brothers, a division of KeyBanc Capital Markets Inc., on behalf of Sellers and their related entities shall not be a Superseded Agreement and shall continue in full force in effect in accordance with its terms.

12.15   <u>No Waiver</u>.   Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition.   The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance.   The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

12.16   <u>Severability</u>.   If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12.17   <u>Time is of the Essence</u>.   Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

*[Signature Page Follows]*

43

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

**STRATEGIC GLOBAL
MANAGEMENT, INC.,**
a California corporation

Signature By: _____
Print Name: KAL P. CHAUDHURI
Title: CHAIRMAN & CEO
Date: JANUARY 9, 2019

**SELLERS:**

**ST. FRANCIS MEDICAL CENTER,**
a California nonprofit public benefit
corporation

Signature By: _____
Print Name: _____
Title: _____
Date: _____

**ST. VINCENT MEDICAL CENTER,**
a California nonprofit public benefit
corporation

Signature By: _____
Print Name: _____
Title: _____
Date: _____

44

**ST. VINCENT DIALYSIS CENTER, INC.**
a California nonprofit public benefit corporation

Signature By:_____
Print Name:_____
Title:_____
Date:_____

**SETON MEDICAL CENTER,**
a California nonprofit public benefit corporation

Signature By:_____
Print Name:_____
Title:_____
Date:_____

**VERITY HOLDINGS, LLC,**
a California limited liability company

Signature By:_____
Print Name:_____
Title:_____
Date:_____

**VERITY HEALTH SYSTEM OF CALIFORNIA, INC.,**
a California nonprofit public benefit corporation

Signature By:_____
Print Name:_____
Title:_____
Date:_____

45

## SCHEDULE 6.1(b)(3)

### (Bidding Procedures)

### BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures")[1] to be employed in connection with the sale of (i) the assets (the "Purchased Assets") enumerated in the Stalking Horse APA (as defined below), including, but not limited to, St Francis Medical Center, St. Vincent Medical Center, and Seton Medical Center (including Seton Coastside) (collectively, the "APA Facilities"); and (ii) assets not otherwise enumerated in the APA, but associated with the ownership or operation of the APA Facilities and available for purchase (the "Other Assets"), in connection with the chapter 11 cases pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), jointly administered as case number 2:18-bk-20151-ER, in the form to be approved by the Bankruptcy Court, by Order dated _____ __, 2019 (the "Bidding Procedures Order").

The Debtors entered into that certain Asset Purchase Agreement, dated January 8, 2019 between the Debtors, on the one hand, and Strategic Global Management, Inc., a California corporation (the "Stalking Horse Purchaser") on the other hand, pursuant to which the Stalking Horse Purchaser shall acquire the Purchased Assets on the terms and conditions specified therein (together with the schedules and related documents thereto, the "Stalking Horse APA"). The sale transaction pursuant to the Stalking Horse APA is subject to competitive bidding as set forth herein. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the *Debtors' Notice of Motion and Motion for the Entry of (I) an Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and for Prospective Overbidders to Use, (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections, (3) Approving Form of Notice to be Provided to Interested Parties, (4) Scheduling a Hearing to Consider Approval of the Sale to the Highest Bidder, (5) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and (II) an Order Authorizing the Sale of Property Free and Clear of All Claims, Liens and Encumbrances* (the "Sale Motion") or the Bidding Procedures Order.

## I.    ASSETS TO BE SOLD

The Debtors seek to complete a sale of substantially all assets of APA Facilities, including both the Purchased Assets and the Other Assets (the "Sale").  The Stalking Horse APA will serve as the "stalking-horse" bid for the Purchased Assets.

## II.    THE BIDDING PROCEDURES

In order to ensure that the Debtors receive the maximum value for the Purchased Assets and/or the Other Assets, they intend to hold a sale process for the Purchased Assets and/or the Other Assets pursuant to the procedures and on the timeline proposed herein.

---

[1] Unless otherwise defined, all capitalized terms shall have the meanings ascribed to them in the Stalking Horse APA.

### A.    Provisions Governing Qualifications of Bidders

Unless otherwise ordered by the Court or as set forth in these procedures, in order to participate in the bidding process, each person, other than the Stalking Horse Purchaser, who wishes to participate in the bidding process must deliver, prior to the Bid Deadline (defined herein), the following to the Debtors:

a)    a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or and/or the Other Assets or otherwise participating in connection with such bid; and

b)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtors) in form and substance satisfactory to the Debtors and which shall inure to the benefit of any purchaser of the Purchased Assets and/or the Other Assets; without limiting the foregoing, each such confidentiality agreement shall contain standard non-solicitation provisions.

A bidder that delivers the documents and information described above and that the Debtors determine, after consultation with the Official Committee of Unsecured Creditors, the Prepetition Secured Creditors, and any other party deemed appropriate within the business judgment of the Debtors (collectively, the "Consultation Parties") in their reasonable business judgment, is likely (based on availability of financing, experience, and other considerations) to be able to consummate the sale, will be deemed a potential bidder ("Potential Bidder").

### B.    Due Diligence

The Debtors will afford any Potential Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, deem appropriate, in their reasonable discretion. The due diligence period shall extend through and including the relevant Bid Deadline; provided, however, that any bid submitted under these procedures shall be irrevocable until at least the selection of the Successful Bidder(s) (defined herein) and any Back-Up Bidder(s) (defined herein).

### C.    Provisions Governing Qualified Bids

A bid submitted by a Potential Bidder will be considered a Qualified Bid (each, a "Qualified Bid," and each such Potential Bidder thereafter a "Qualified Bidder") only if the bid complies with the following requirements:

a)    it states that the applicable Qualified Bidder offers to purchase, in cash, some or all of the Purchased Assets and/or the Other Assets;

b)    it identifies with particularity the portion of the Purchased Assets and/or the Other Assets the Qualified Bidder is offering to purchase;

c)    it allocates with specificity the portion of the purchase price offered that the Qualified Bidder attributes to St. Francis Medical Center, St. Vincent Medical

2

Center, Seton Medical Center, and Seton Coastside, and each of the Other Assets, respectively;[2]

d)    it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder and the Back-Up Bidder, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder then the offer shall remain irrevocable until the earliest of (i) the closing of the transaction with the Successful Bidder, (ii) in the case of the Successful Bidder, a termination of the Qualified Bid pursuant to the terms of the Successful Bidder Purchase Agreement and (iii) with respect to the Back-Up Bidder, the time specified in Section II (K) below;

e)    it includes confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal governance and shareholder approvals have been obtained prior to the bid;

f)    it sets forth each third-party, regulatory and governmental approval required for the Qualified Bidder to consummate the transaction and the time period within which the Qualified Bidder expects to receive such approvals and establishes a substantial likelihood that the Qualified Bidder will obtain such approvals by the stated time period;

g)    it includes a duly authorized and executed copy of a purchase or acquisition agreement in the form of the Stalking Horse APA (a "Purchase Agreement"), including the purchase price for some or all of the Purchased Assets and/or the Other Assets, or both, expressed in U.S. Dollars, together with all exhibits and schedules thereto, together with copies marked  to show any amendments and modifications to the Stalking Horse APA ("Marked Agreement");

h)    it is not subject to any financing contingency and includes written evidence of a firm ability to have the funding necessary to consummate the proposed transaction, that will allow the Debtors to make a reasonable determination, in consultation with the Consultation Parties, as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Purchase Agreement;

i)    if the bid is for all of the Purchased Assets, it must have a value to the Debtors, in the Debtors' exercise of its reasonable business judgment, after consultation with its advisors and the Consultation Parties, that is greater than or equal to the sum of the value offered under the Stalking Horse APA, plus (i) the amount of the Break-Up Fee ($21,350,000.00); (ii) the amount of the Expense Reimbursement ($2,000,000.00); and (iii) $7,000,000.00 (the "Initial Bidding Increment," and, together with the Break-Up Fee and the Expense Reimbursement, the "Minimum Qualified Bid");

---

[2] For the avoidance of doubt, such allocation shall not be binding on the Debtors, their estates or any Consultation Party.

3

j)    if the bid is a partial bid (the "Partial Bid"),[3] the terms of paragraph (i) immediately above shall not apply but the terms of paragraph (o) below concerning the Good Faith Deposit shall expressly apply in order to be a bid qualified to participate in the Partial Bid Auction (as defined below) (each, a "Partial Bid Auction Qualified Bid").  In the event that the Debtors aggregate Partial Bids, the Partial Bid purchasers' responsibility for the Break-Up Fee, the Expense Reimbursement, and the Initial Bidding Increment shall be reasonably allocated to each Partial Bid purchaser, and in no event shall the Stalking Horse Purchaser be entitled to more than one Break-Up Fee and/or Expense Reimbursement;

k)    it identifies with particularity which (i) executory contracts and unexpired leases the Qualified Bidder wishes the Debtors to assume and assign to it, and (ii) Purchased Assets and/or Other Assets, subject to purchase money liens or the like, the Qualified Bidder wishes to acquire and therefore pay the associated purchase money financing;

l)    it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of future performance with respect to executory contracts and unexpired leases the Qualified Bidder wishes the Debtors to assume and assign to it;

m)    it includes an acknowledgement and representation that the Qualified Bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets and/or Other Assets prior to making its offer and that the offer is not subject to any further due diligence or the need to raise capital/financing to consummate the proposed transaction; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets and/or Other Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets and/or Other Assets or the completeness of any information provided in connection therewith or with the relevant Auction (defined below), except as expressly stated in the Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

o)    unless it is a Credit Bid (as defined below), it is accompanied by a (i) good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form of cash or cash equivalent acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to: (a) 20% of purchase price for bids under $5 million; (b) for bids greater than $5 million and less than $100 million, the greater of: (i) $1 million or (ii) 10% of purchase price; (c) for bids greater than $100 million, the greater of (i) $10 million or (ii) 5% of purchase price (collectively, the "Good Faith Deposit"), which Good Faith Deposit shall, be forfeited if such bidder

---

[3] A Partial Bid shall mean a bid for less than all of the Purchased Assets.

is the Successful Bidder and breaches its obligation to close; and (ii) if the Qualified Bid is a bid made by a secured creditor of the Debtors (a "<u>Credit Bid Bidder</u>") who intends to make a credit bid (each, a "<u>Credit Bid Bid</u>"), evidence of (a) the basis for and property covered by such Credit Bid Bidder's secured claim, (b) the amount of such Credit Bid Bidder's claim that is secured by the property in question, (c) whether it is the senior secured claim on the property (x) prepetition and (y) as of the date of the request to be a Qualified Bidder, as well as (d) evidence of the resolution of any Challenge to such Credit Bid Bidder's secured claim within the meaning of the Final DIP Order.

p)    it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Debtors;

r)    it identifies the person(s) and their title(s) who will attend the relevant Auction, and confirms that such person(s) have authority to make binding Overbids (defined below) at such Auction

s)    it contains such other information reasonably requested by the Debtors; and

t)    it is received prior to the Bid Deadline.

The Debtors, in consultation with the Consultation Parties (who shall receive copies of the Purchase Agreements relating to any bids cast pursuant to these Bidding Procedures as soon as reasonably practicable), may qualify any bid that meets the foregoing requirements as a Qualified Bid. Notwithstanding the foregoing, the Stalking Horse Purchaser is deemed a Qualified Bidder and the Stalking Horse APA is deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auctions, and the Sale.

The Debtors shall notify the Consultation Parties, the Stalking Horse Purchaser, all Qualified Bidders and the Notice Parties in writing as to whether or not any bids constitute Qualified Bids (and with respect to each Qualified Bidder that submitted a bid as to whether such Qualified Bidder's bid constitutes a Qualified Bid) and provide copies of the Purchase Agreements relating any such Qualified Bid to the Consultation Parties, the Stalking Horse Purchaser and such Qualified Bidders, and the Notice Parties on the earlier of: (1) the date that any bid other than the Stalking Horse Bid has been deemed a Qualified Bid, or (2) two business days prior to the Partial Bid Auction.

**D.    <u>Bid Deadline</u>**

In order to be eligible to participate in the Auction, a Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors:  Dentons US LLP, 601 S. Figueroa Street, Suite 2500, Los Angeles, CA 90017 (Attn: Tania M. Moyron (tania.moyron@dentons.com)); (ii) the Debtors' Investment Banker: Cain Brothers, a division of KeyBanc Capital Markets, 1 California Street, Suite 2400, San Francisco, CA 94111 (Attn: James Moloney (jmoloney@cainbrothers.com)); (iii) counsel to the Official Committee: Milbank, Tweed, Hadley & McCloy LLP, 2029 Century Park East, 33rd Floor, Los Angeles, CA 90067 (Attn: Gregory A. Bray (gbray@milbank.com); (iv) counsel to the Master Trustee and Series 2005 Bond Trustee: Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,

P.C., One Financial Center, Boston, MA 02111 (Attn: Daniel S. Bleck and Paul Ricotta (dsbleck@mintz.com, pricotta@mintz.com)); (v) counsel to the Series 2015 and Series 2017 Notes Trustee: Maslon, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402 (Attn: Clark Whitmore (clark.whitmore@maslon.com)), so as to be received by the Notice Parties not later than March 29, 2019, at 4:00 p.m. (prevailing Pacific Time) for partial bids (the "Partial Bid Deadline") or April 3, 2019, at 4:00 p.m. (prevailing Pacific Time) for full bids (the "Bid Deadline").

### E.    Credit Bidding

Any party with a valid, properly perfected security interest in any of the Purchased Assets and/or Other Assets (which is not subject to a pending Challenge within the meaning of the Final DIP Order) may credit bid for such Purchased Assets and/or Other Assets in connection with the Sale in accordance with and pursuant to § 363(k), except as otherwise limited by the Debtors for cause; provided, however, that any party seeking to credit bid may not credit bid unless such bid provides that all secured creditors with security interests on such Purchased Assets and/or Other Assets that are senior to such junior security interest are to be paid in cash in connection with such junior creditor's bid. Any credit bids made by secured creditors shall not impair or otherwise affect the Stalking Horse Purchaser's entitlement to the benefits of the Bidding Procedures and related protections granted under the Bidding Procedures Order.

### F.    Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation: (i) the amount of such bid; (ii) the risks and timing associated with consummating such bid; (iii) any proposed revisions to the form of Stalking Horse APA; and (iv) any other factors deemed relevant by the Debtors in their reasonable discretion, in consultation with the Consultation Parties, including the amount of cash included in the bid.

### G.    No Qualified Bids

If the Debtors do not receive any Qualified Bids other than the Stalking Horse APA, the Debtors will not hold an auction and the Stalking Horse Purchaser will be named the Successful Bidder for the Purchased Assets. If the Debtors receive one or more qualified Partial Bid Auction Qualified Bids and, after the Partial Bid Auction contemplated by Section (H) of these Bidding Procedures, the Debtors will determine, in consultation with the Consultation Parties, if there are any Partial Bidders that will not be qualified to participate at the Full Bid Auction

### H.    Auction Process

If the Debtors receive one or more Partial Bid Auction Qualified Bids as set forth above, the Debtors will conduct separate auctions of each asset or combinations thereof (each, a "Partial Bid Auction"). Any Partial Bidder holding a Partial Bid Auction Qualified Bid shall be entitled to bid on any assets in any Partial Bid Auction(s). The procedures below for the Full Bid Auction shall apply to the Partial Bid Auction, except as where otherwise indicated.  The Debtors will conduct the Partial Bid Auction(s), which shall be transcribed, on April 8, 2019 at 10:00 a.m. (prevailing Pacific Time) at the offices of Dentons US LLP, 601 South Figueroa Street, Suite 2500, Los

Angeles, CA 90017, or such other location as shall be timely communicated to all entities entitled to attend the Auction.

The Partial Bid Auction Qualified Bids determined by the Debtors, in consultation with the Consultation Parties, at the Partial Bid Auction(s) (as set forth above) to be eligible to participate at the Full Bid Auction, including (without limitation) the highest and best bids for each asset (the "Winning Partial Bids"), shall be permitted to participate in the Full Bid Auction (as defined below) of the Purchased Assets and/or the Other Assets; except that:

> (a)    If the Partial Bids, at the conclusion of the Partial Bid Auction, include all four APA Facilities and exceed, in the aggregate, the Purchase Price in the Stalking Horse APA, there will be a Full Bid Auction  (as defined below) and (1) the Stalking Horse Purchaser may overbid in the aggregate for all four APA Facilities, or (2) the Stalking Horse Purchaser may bid for less than the four APA Facilities and be entitled to a pro-rata Break-Up Fee for the APA Facilities which the Stalking Horse Purchaser does not acquire, as specified in the Stalking Horse APA at Section 6.26 (b)(2);

> (b)    If the Partial Bids do not include all four APA Facilities, and if there are no other Qualified Full Bids, then Seller, in its discretion, after consultation with the Consultation Parties, may choose, at the conclusion of the Partial Bid Auction, (1) to have no Full Bid Auction, and the Stalking Horse Purchaser will purchase the four APA Facilities pursuant to the Stalking Horse APA, or (2) if the Debtor and Consultation Parties deem the aggregate designated Winning Partial Bid(s) to be sufficient to warrant leaving one or more APA Facilities behind (the "Remaining Facility"), the Stalking Horse Purchaser shall have the option of (i) acquiring the Remaining Facility at the allocated price in the Stalking Horse APA, (ii) overbidding one or more of the Partial Bids, or (iii) terminating the Stalking Horse APA. In either event, the Stalking Horse Purchaser shall be entitled to the Break-Up Fee for all of the APA Facilities not acquired by the Stalking Horse Purchaser.

If the Debtors receive, in addition to the Stalking Horse APA, one or more Qualified Full Bids (and/or a combination of Winning Partial Bids from the Partial Bid Auction(s) seeking, on aggregate basis, to purchase all or substantially all of the Purchased Assets and/or the Other Assets), the Debtors will conduct a full bid auction of the Purchased Assets and/or the Other Assets (the "Full Bid Auction"), which shall be transcribed, on April 9, 2019 (the "Full Bid Auction Date"), at 10:00 a.m. (prevailing Pacific Time), at the offices of Dentons US LLP, 601 South Figueroa Street, Suite 2500, Los Angeles, CA 90017, or such other location as shall be timely communicated to all entities entitled to attend the Auction.

The Full Bid Auction shall be conducted in accordance with the following procedures:

> a)    only the Debtors, the Stalking Horse Purchaser, Qualified Bidders who have timely submitted a Qualified Bid, the U.S. Trustee, and the Consultation Parties, and their

respective advisors, and other parties who request and receive authority to attend the auction in advance from the Debtors may attend the Auction;

b)    only the Stalking Horse Purchaser and the Qualified Bidders who have timely submitted Qualified Bids will be entitled to make any subsequent bids at the Auction;

c)    each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

d)    all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (defined herein) at the relevant Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the relevant Auction; provided that all Qualified Bidders wishing to attend the relevant Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the relevant Auction in person;

e)    the Debtors, after consultation with the Consultation Parties and the Stalking Horse Purchaser, may employ and announce at the relevant Auction additional procedural rules that are (i) reasonable under the circumstances for conducting the relevant Auction, (ii) in the best interest of the Debtors' estates; provided, however, that rules (i) are disclosed to the Stalking Horse Purchaser and each Qualified Bidder participating in the Auction, and (ii) are not inconsistent with the Bid Protections, the Stalking Horse APA, the Bankruptcy Code, or any order of the Court entered in connection herewith;

f)    bidding at the relevant Auction will begin with a bid determined by the Debtors after consulting with the Consultation Parties as being the then highest and best bid which will be announced by the Debtors prior to the commencement of the Auction (the "Baseline Bid").  The Auction will continue in bidding increments to be determined in the discretion of the Debtors, in consultation with the Consultation Parties (each a "Overbid"), and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Qualified Bids and are in attendance at the Auction (including, without limitation, Winning Partial Bids), as well as to the Notice Parties;

g)    the initial Overbid, if any, shall provide for total consideration to Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount.  Additional consideration in excess of the amount set forth in the respective Baseline Bid must include: (i) cash and/or (ii) in the case of a Qualified Bidder (including, without limitation, with respect to any Winning Partial Bids) that is a Credit Bid Bidder that has a valid and perfected lien (not subject to a Challenge within the meaning the Final DIP Order) on any of the Purchased Assets and/or the Other Assets, a Credit Bid of up to the full amount of such Credit Bidder's allowed perfected lien, subject to § 363(k) and any other restrictions set forth herein; and

i)      at the Full Bid Auction, the Stalking Horse Purchaser may, subject to the terms and conditions set forth herein, elect to bid for the Purchased Assets as described in the Bid Procedures Order.  In the alternative, the Stalking Horse Purchaser, and any bidder with a Qualified Full Bid, (a) may elect to bid against any one or more of the Winning Partial Bidders for the assets subject to the relevant Partial Bid(s), in lieu of seeking to acquire such Purchased Assets and/or Other Assets by means of the Stalking Horse Bid or another Qualified Full Bid; and (b) if successful with its Overbids for such assets, replace the Winning Partial Bidder(s) as the proponent of the relevant Winning Partial Bids or Aggregate Winning Partial Bid as to such assets.  In the event that the Stalking Horse Purchaser or another bidder so elects, and as long as the Stalking Horse Purchaser or another bidder so bids, the Winning Partial Bidders must continue to present qualified Winning Partial Bids (i.e., bids as to which the aggregate of all still pending Winning Partial Bids is greater than or equal to the then Prevailing Highest Bid) for the Purchased Assets and/or the Other Assets in each round to continue to bid as Winning Partial Bidders in the Full Bid Auction.  In addition, the Debtors may elect, in their discretion, after consultation with the Consultation Parties, to allow Partial Bidders to bid for all or substantially all the Purchased Assets and/or the Other Assets subject to augmenting its Good Faith Deposit, as necessary, or to allow proponents of Full Bids to bid for less than all or substantially all of the Purchased Assets and/or the Other Assets in any given round of the Auction, provided that in any given round there is a Full Bid or an Aggregate Partial Bid that is superior to Prevailing Highest Bid that is then subject to acceptance by the Debtors and binding on the Stalking Horse Purchaser or another Qualified Bidder.  In all events, (i) any such Overbid shall continue to comply with all of the requirements for Qualified Bids set forth in Section C of these Bidding Procedures; and (ii) the bidder submitting such a modified Qualified Bid or Qualified Partial Bid shall furnish to the Debtors and the Consultation Parties, within twenty-four (24) hours of the conclusion of the Auction, a revised Purchase Agreement and Marked Agreement showing all amendments and modifications to the Stalking Horse APA and the Sale Order.

**I.**      <u>Selection of Successful Bid</u>

Prior to the conclusion of the relevant Auction, the Debtors, in consultation with the Consultation Parties, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer or offers are the highest or otherwise best from among the Qualified Bids submitted at the relevant Auction (one or more such bids, collectively the "<u>Successful Bid</u>" and the bidder(s) making such bid, collectively, the "<u>Successful Bidder</u>"), and communicate to the Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid.  The determination of the Successful Bid by the Debtors at the conclusion of the relevant Auction shall be subject to approval by the Court.

If selected, at the conclusion of the Partial Bid Auction, as the Winning Partial Bidder or the Back-Up Bidder in accordance with Section H above, then such party or parties, prior to the Full Bid Auction, shall increase its Good Faith Deposit in the amount set forth in Section II(C)(o), or as determined by the Seller in consultation with the Consultation Parties; provided, however, if a party or parties are bidding on all four APA Facilities, the deposit will be no less than $30,000,000.

If selected as the Successful Bidder or the Back-Up Bidder at the conclusion of the Full Bid Auction, each of the Successful Bidder and the Back-Up Bidder shall, within forty-eight (48) hours, increase its Good Faith Deposit to the sum of five percent (5%) of the Successful Bid or Back-Up Bid, as applicable. If the Successful Bidder fails to increase the Good Faith Deposit within forty-eight (48) hours of the Auction conclusion date (the "Final Deposit"), then (1) the Successful Bidder forfeits its Good Faith Deposit, and (2) the Successful Bid is nullified (i.e., the Back-Up Bidder becomes the Successful Bidder in the amount of its last bid).

Unless otherwise agreed to by the Debtors and the Successful Bidder, within two (2) business days after the conclusion of the relevant Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments, and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Within forty-eight (48) hours following the conclusion of the relevant Auction, the Debtors shall file a notice identifying the Successful Bidder(s) and Back-Up Bidders with the Court and shall serve such notice by fax, email, or if neither is available, by overnight mail to all counterparties whose contracts are to be assumed and assigned.

The Debtors will sell the Purchased Assets and (to extent included in an Overbid) the Other Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Court at the Sale Hearing and satisfaction of any other closing conditions set forth in the Successful Bidder's Purchase Agreement.

## J.    Return of Deposits

All deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder (defined herein) no later than five (5) business days following the conclusion of the Auction.

## K.    Back-Up Bidder

If an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment, in consultation with the Consultation Parties, at the relevant Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable for thirty (30) business days after the entry of the Sale Order (the "Thirty-Day Period"). If during the Thirty-Day Period, the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Court provided that the Back-Up Bidder shall thereafter keep such bid open and irrevocable in accordance with the terms of the Back-Up Bidder APA; provided further, however, that if the Back-Up Bidder is the Stalking Horse Purchaser, the Debtors will be authorized and required to consummate the sale to the Stalking Horse Purchaser.

If, after the Thirty-Day Period, the Successful Bidder has failed to consummate the approved sale, the Back-Up Bidder may elect, at its discretion, to remain as the Back-Up Bidder until (a) the sale closes, (b) the Successful Bidder defaults, or (c) the Back-Up Bidder elects to terminate its

participation as Back-Up Bidder.  For the avoidance of doubt, after the Thirty-Day Period, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will not be contractually obligated to be the Back-Up Bidder, and will have the option to either (i) be entitled to terminate its Back-Up Bidder APA and the return of its deposit, or (ii) remain as the Back-up Bidder, in which event, there will be no re-opening of the auction.

## L.    Break-Up Fee

In recognition of this expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Purchaser is not the Successful Bidder as to the Purchased Assets, the Debtors will pay the Stalking Horse Purchaser at closing of the sale of the Purchased Assets the Break-Up Fee and the Expense Reimbursement as set forth in the Stalking Horse APA.

## III.    Sale Hearing

The Debtors will seek entry of the Sale Order, at the Sale Hearing on April 17, 2019, at 10:00 a.m. (or at another date and time convenient to the Court), to approve and authorize the sale transaction to the Successful Bidder(s) on terms and conditions determined in accordance with the Bidding Procedures.  The Debtors may submit and present such additional evidence, as they may deem necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable, and in the best interest of the Debtors' estates and all interested parties, and satisfies the standards necessary to approve a sale of the Purchased Assets."

## IV.    Sale Order

The Sale Order will provide Court approval of (i) the Sale to the Successful Bidder, free and clear of all liens, claims, interests, and encumbrances, pursuant to 11 U.S.C. § 363, with the proceeds of the Sale deposited in accordance with Paragraph 4 of the Final DIP Order, with all liens, claims, interests, and encumbrances to attach to the sale proceeds with the same validity and in the same order of priority as they attached to the Purchased Assets prior to the Sale, including, without limitation, the liens and security interests of the DIP Lender and each of the Prepetition Secured Creditors under the relevant agreements, applicable law and the Final DIP Order, and (ii) the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Executory Contracts and Leases pursuant to 11 U.S.C. § 365.

## VII.    Reservation

The Debtors reserve the right, as they may determine in their discretion and in accordance with their business judgment to be in the best interest of their estates, in consultation with their professionals and the Consultation Parties to: (i) modify the Bidding Procedures to discontinue incremental bidding and then require that any and all bidders or potential purchasers submit their sealed, highest and best offer for the Purchased Assets and/or the Other Assets; (ii) determine which Qualified Bid is the highest or otherwise best bid and which is the next highest or otherwise best bid; (iii) waive terms and conditions set forth herein with respect to all Potential Bidders; (iv)

impose additional terms and conditions with respect to all Potential Bidders; (v) extend the deadlines set forth herein; (vi) continue or cancel an Auction and/or Sale Hearing in open court without further notice; and (vii) implement additional procedural rules that the Debtors determine, in their reasonable business judgment and in consultation with the Consultation Parties will better promote the goals of the bidding process; provided that such modifications are disclosed to each Qualified Bidder participating in the Auction; provided, however, and notwithstanding the foregoing, these Bid Procedures shall not be modified so as to alter, extinguish or modify any rights or interests of the Stalking Horse Purchaser expressly set forth herein or in the Stalking Horse APA.

**SCHEDULES 1.4.3 TO 11.3(b) TO BE SUBMITTED**