GREGORY A. BRAY (Bar No. 115367)
gbray@milbank.com
MARK SHINDERMAN (Bar No. 136644)
mshinderman@milbank.com
JAMES C. BEHRENS (Bar No. 280365)
jbehrens@milbank.com
MILBANK, TWEED, HADLEY & McCLOY LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000/Facsimile: (213) 629-5063

*Counsel for the Official Committee of
Unsecured Creditors of Verity Health System of
California, Inc., et al.*

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>VERITY HEALTH SYSTEM OF CALIFORNIA, INC., *et al.*,<br><br>Debtors and Debtors In Possession.<br><br>---<br><br>Affects:<br><br>☑ All Debtors<br>☐ Verity Health System of California, Inc.<br>☐ Saint Louise Regional Hospital<br>☐ St. Francis Medical Center<br>☐ St. Vincent Medical Center<br>☐ Seton Medical Center<br>☐ O'Connor Hospital Foundation<br>☐ Saint Louise Regional Hospital Foundation<br>☐ St. Francis Medical Center of Lynwood Foundation<br>☐ St. Vincent Foundation<br>☐ St. Vincent Dialysis Center, Inc.<br>☐ Seton Medical Center Foundation<br>☐ Verity Business Services<br>☐ Verity Medical Foundation<br>☐ Verity Holdings, LLC<br>☐ De Paul Ventures, LLC<br>☐ De Paul Ventures - San Jose Dialysis, LLC<br><br>Debtors and Debtors In Possession. | Lead Case No. 18-20151-ER<br>Jointly Administered With:<br>Case No.: 18-20162-ER<br>Case No.: 18-20163-ER<br>Case No.: 18-20164-ER<br>Case No.: 18-20165-ER<br>Case No.: 18-20167-ER<br>Case No.: 18-20168-ER<br>Case No.: 18-20169-ER<br>Case No.: 18-20171-ER<br>Case No.: 18-20172-ER<br>Case No.: 18-20173-ER<br>Case No.: 18-20175-ER<br>Case No.: 18-20176-ER<br>Case No.: 18-20178-ER<br>Case No.: 18-20179-ER<br>Case No.: 18-20180-ER<br>Case No.: 18-20181-ER<br><br>Chapter 11 Cases<br><br>Hon. Ernest M. Robles<br><br>**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' LIMITED OBJECTION TO DEBTORS' SALE MOTION [DKT. 1279]** |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

OBJECTION .......................................................................................................................... 2

    I.    Proposed Break-Up Fee Should Not Be Approved at Level Proposed ............................................................................................ 2

    II.   Termination of Stalking Horse Bid and Back-Up Bidder Obligations .................................................................................................. 8

    III.  Stalking Horse Bidder Should Not Be "Consultation Party" for "Additional Auction Rule" Purposes ................................................................. 9

    IV.  Stalking Horse Bidder Should Not Have Right to Terminate Stalking Horse Bid Where Hospitals Have Been Sold "Free and Clear" of Additional Conditions Imposed Attorney General Pursuant to Section 363(f) of Bankruptcy Code ................................................................................ 11

RESERVATION OF RIGHTS ............................................................................................. 12

CONCLUSION ..................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Am. W. Airlines, Inc.*,
    166 B.R. 908 (Bankr. D. Ariz. 1994)..................................................................................3

*Beebe v. Pacific Realty Trust*,
    578 F. Supp. 1128 (D. Or. 1984) ......................................................................................5

*In re Blixseth*,
    2010 WL 716198 (Bankr. D. Mont. Feb. 23, 2010) ........................................................12

*In re Case Engineered Lumber, Inc.*,
    No. 09–22499 (Bankr. N.D. Ga. Sept. 1, 2009)................................................................5

*In re Chem Rx Corp.*,
    Case No. 10-11567-MFW (Bankr. D. Del. Oct. 6, 2010)..................................................4

*Cottle v. Storer Commc'n, Inc.*,
    849 F.2d 570 (11th Cir. 1988) ..........................................................................................5

*In re Crowthers McCall Pattern, Inc.*,
    114 B.R. 877 (Bankr. S.D.N.Y. 1990)...............................................................................5

*In re CXM, Inc.*,
    307 B.R. 94 (Bankr. N.D. Ill. 2004) ..................................................................................4

*In re Dan River, Inc.*,
    No. 04-10990 (Bankr. N.D. Ga. Dec. 17, 2004)...............................................................5

*In re Dura Automotive Sys., Inc.*,
    2007 WL 7728109 (Bankr. D. Del. Aug. 15, 2007) .......................................................12

*In re Edwards*,
    228 B.R. 552 (Bankr. E.D. Pa. 1998) .............................................................................12

*In re FirstEnergy Solutions Corp.*,
    Case No. 18-50757-AHK (Bankr. N.D. Ohio Aug. 3, 2018) ............................................3

*In re Lake Burton Dev., LLC*,
    No. 09-22830 (Bankr. N.D. Ga. April 1, 2010) ................................................................5

*In re Leiner Health Prods. Inc.*,
    Case No. 08-10446 (KJC) (Bankr. D. Del. May 30, 2008) ..............................................4

*Meadow v. Gottlieb* (*In re Teddi of Cal.*),
 2007 WL 7541016 (B.A.P. 9th Cir. Mar. 26, 2007) ..................................................................12

*In re NEC Holdings Corp.*,
 Case No. 10-11890 (PJW) (Bankr. D. Del. Jul 30, 2010) ............................................................4

*Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*,
 147 B.R. 650 (S.D.N.Y. 1992) ................................................................................................4, 8

*In re Phila. Newspapers*,
 2009 WL 3242292 (Bankr. E.D. Pa. Oct. 8, 2009) ...................................................................11

*In re Promise Healthcare Group LLC*,
 Case No. 18-12491 (CSS) (Bankr. D. Del. Dec. 4, 2018) ...................................................6, 7, 8

*In re Reliant Energy Channelview LP*,
 594 F.3d 200 (3d Cir. 2010) ....................................................................................................3, 8

*Samjens Partners I v. Burlington Indus.*,
 663 F. Supp. 614 (S.D.N.Y. 1987) ..............................................................................................5

*In re Sea Island Co.*,
 No. 10-21034-JSD, 2010 WL 4393269 (Bankr. S.D. Ga. Sept. 15, 2010) ..................................4

*In re T Asset Acquisition Co., LLC*,
 No. 09-31853 (Bankr. C.D. Cal. Jan. 28, 2010) (J. Robles) ........................................................4

*In re Tama Beef Packing Inc.*,
 321 B.R. 469 (B.A.P. 8th Cir. 2005) .......................................................................................5, 6

*In re Twenver, Inc.*,
 149 B.R. 954 (Bankr. D. Colo. 1992) .........................................................................................5

*In re Women First Healthcare, Inc.*,
 332 B.R. 115 (Bankr. D. Del. 2005) ...........................................................................................5

**Statutes**

11 U.S.C. § 363(f) ..............................................................................................................12, 13

The Official Committee of Unsecured Creditors of Verity Health System of California, Inc., *et al*. (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), hereby files this limited objection (the "Objection") to the *Motion for the Entry of (I) an Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and for Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice to Be Provided to Interested Parties, (4) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest Bidder; and (5) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and (II) an Order Authorizing the Sale of Property Free and Clear of all Claims, Liens and Encumbrances* [Docket No. 1279] (the "SGM Sale Motion"), and in support thereof represents as follows:

## PRELIMINARY STATEMENT

1. The Committee is, as it was with respect to the Santa Clara Sale,[1] generally supportive of the sale (the "SGM Sale") of St. Francis Medical Center, St. Vincent Medical Center, St. Vincent Dialysis Center, Seton Medical Center (collectively, the "Hospitals") to Strategic Global Management, Inc. ("SGM" or the "Stalking Horse Purchaser") on the terms set forth in the Stalking Horse APA (the "Stalking Horse Bid"). The Committee, however, does have concerns, as set forth herein, about certain provisions relating to the protections afforded to the Stalking Horse Purchaser and the auction process itself. These aspects of the Bidding Procedures Order and the Bidding

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in (i) the Sale Motion; or (ii) the *Motion for the Entry of (I) an Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and for Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice to Be Provided to Interested Parties, (4) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest Bidder; and (5) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and (II) an Order Authorizing the Sale of Property Free and Clear of all Claims, Liens and Encumbrances* [Docket No. 365] (the "Santa Clara Sale Motion").

Procedures, which the Committee believes are not consistent with applicable precedent and market terms and practice, stand in the way of the Debtors' maximizing sale proceeds for their estates.

2.  The Committee has been and remains in discussions with the Debtors and the Stalking Horse Purchaser in an attempt to resolve the issues raised by this Objection. In this connection, the Committee views itself as the constituency with the most at economic stake in further maximizing the proceeds of the SGM Sale through the proposed auction process because, taking into account the proceeds of the Santa Clara Sale and the anticipated proceeds of the instant Stalking Horse Bid, the expectation is that the Prepetition Secured Creditors and the DIP Lenders will be paid in full on their allowed claim. In the event the Committee cannot resolve consensually the issues raised herein, it respectfully requests that the Court order that the Bid Protections and the Bidding Procedures be amended to address the Committee's concerns.

## **OBJECTION**

### I. Proposed Break-Up Fee Should Not Be Approved at Current Level

3.  The Stalking Horse Bid contemplates the payment to the Stalking Horse of a Break-Up Fee in the amount of $21,350,000, or 3.5% of the Purchase Price ($610,000,000) (the "SGM Break-Up Fee"). Payment to the Stalking Horse Bidder of a break-up fee of this magnitude is, in the Committee's view, not necessary to garner SGM's participation at the Auction and, even if it were, it is in an amount higher than warranted (i) based on a comparison to fees paid in other similar transactions; (ii) as a matter of law; and (iii) as set forth below, in light of arguments recently made by SGM in connection with a comparable section 363 sale in another chapter 11 case.

4.  *Lack of Necessity*. The payment of so large a break-up fee to SGM should not be authorized by the Court because such a payment is, in the Committee's view, likely not necessary to ensure a robust auction for the Hospitals. Courts have generally only approved "break-up fees" where it has been shown that such fees are necessary to encourage bidding and enhance the

price ultimately received by the debtor. In *In re Am. W. Airlines, Inc.*, 166 B.R. 908, 913 (Bankr. D. Ariz. 1994) (declining to approve break-up fee because relevant assets "ha[d] been thoroughly marketed and . . . the proposed break-up fee w[ould] not induce further bidding or bidding generally.")

5. Here, as recounted in the SGM Sale Motion and elsewhere, the Hospitals have effectively been on the auction block for the past five years, and, in the 2014 version of the Debtors' and their predecessors' sale efforts, the three leading contenders for the Debtors' assets were SGM, the current Stalking Horse Purchaser, and Prime Healthcare Services, Inc. and Prospect Medical Holdings, Inc., two other potential acquirers that have also participated actively in the current sale process and are expected to appear and bid at the Auction.[2] Given this level of interest, and likelihood that the 2019 auction will be a reprise of the well-attended and (if not for the conditions imposed by the Attorney General) successful 2014 auction, it could be credibly argued that there was, and continues to be, no need to compensate SGM, or any other proposed stalking horse purchaser, with a break-up fee of the magnitude proposed in the SGM Sale Motion.

6. *Comparable Transactions*. However, accepting the Debtors' business judgment that some form of break-up fee was necessary here, the 3.5% fee upon which the Debtors have agreed with the Stalking Horse Purchaser is simply too high. As demonstrated in the Declaration submitted by Cynthia A. Nelson in connection with the Santa Clara Sale, the general benchmark for break-up fees in transactions of this type is approximately 3% (*i.e.*, $18,300,000 in this instance). (Declaration of Cynthia A. Nelson (the "First Nelson Declaration") ¶ 8-9, Ex. A [Docket No. 491]); *see e.g.*, *In re Reliant Energy Channelview LP*, 594 F.3d 200, 203 (3d Cir. 2010) (affirming denial of 3.2% break-up fee due to risk of chilling the bid process); *In re FirstEnergy Solutions Corp.*, Case No. 18-50757-AHK (Bankr. N.D. Ohio Aug. 3, 2018) (Docket No. 1098)

---

[2] SGM Sale Motion ¶ 14; *Declaration of Kyrsten B. Skogstad in Support of California Nurses Association Objection to Debtors' Motion for the Entry of (I) an Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and for Prospective Overbidders Etc.* [Docket No. 1360], Ex. B (Houlihan Lokey summary of preliminary bids for 2014 auction).

(approving 3% break-up fee); *In re Sea Island Co.*, No. 10-21034-JSD, 2010 WL 4393269, at *3 (Bankr. S.D. Ga. Sept. 15, 2010) (approving 3% breakup fee); *In re Chem Rx Corp.*, Case No. 10-11567-MFW (Bankr. D. Del. Oct. 6, 2010) (Docket No. 390) (approving 2% breakup fee); *In re NEC Holdings Corp.*, Case No. 10-11890 (PJW) (Bankr. D. Del. Jul 30, 2010) (Docket No. 303) (approving break-up fee and expense reimbursement of approximately 3.5% of the stalking horse purchase price); *In re Leiner Health Prods. Inc.*, Case No. 08-10446 (KJC) (Bankr. D. Del. May 30, 2008) (Docket No. 358) (approving break-up fee and expense reimbursement of 3%). There is no reason to approve a higher break-up fee in this case.

7. ***Controlling Precedent.*** The precedent on which the Debtors and the Stalking Horse Purchaser rely to argue for higher break-up fee levels does not require a different result. As originally noted in the First Nelson Declaration and as continues to be the case, most of the decisions cited by the Debtors involve transactions that were materially smaller in size, with correspondingly lower break-up fee and little to no analysis, and, thus, are not truly precedential for current purposes. (First Nelson Decl. ¶ 9.)

8. Indeed, the majority of the cases to which the Debtors point (including this Court's *T Asset* decision) weigh in favor of either a 3% (for which the Committee argues) or lower break-up fee. *See In re T Asset Acquisition Co., LLC*, No. 09-31853 (Bankr. C.D. Cal. Jan. 28, 2010) (J. Robles) (approving break-up fee equal to 3% of the cash purchase price); *In re CXM, Inc.*, 307 B.R. 94, 103–04 (Bankr. N.D. Ill. 2004) (court approved break-up fee in amount equal to the actual expenses that the stalking horse incurred in connection with its bid to buy the Sale Assets, subject to a maximum cap of $200,000, which equaled 3% of the cash purchase price); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R.

650, 662 (S.D.N.Y. 1992) (testimony proffered that average breakup fee in industry was 3.3%, but granting break-up fee equal to only 1.6% of "proposed purchase price of $565 million").[3]

9.  The five cases that the Debtors contend support break-up fees in excess of 3%—*In re Women First Healthcare, Inc.*, 332 B.R. 115, 118 (Bankr. D. Del. 2005)*; In re Dan River, Inc.*, No. 04-10990 (Bankr. N.D. Ga. Dec. 17, 2004); *In re Lake Burton Dev., LLC*, No. 09-22830 (Bankr. N.D. Ga. April 1, 2010); *In re Case Engineered Lumber, Inc.*, No. 09–22499 (Bankr. N.D. Ga. Sept. 1, 2009); and *In re Tama Beef Packing Inc.*, 321 B.R. 469, 498 (B.A.P. 8th Cir. 2005)—are readily distinguishable.

10.  Most significantly, the transactions at issue in each of these cases are materially smaller and less complex. In *Women First Healthcare*, the stalking horse bid at issue was for $1.75 million and the break-up fee approved in the amount of $50,000; in *Dan River*, the proposed purchase price was $10.5 million and the break-up fee approved in the amount of $500,000; in *Lake Burton*, the value of the transaction was $9.3 million and the break-up fee in the amount of $500,000; and in *Case Engineered Lumber*, the value of the transaction was $712,000 and the break-up fee in the amount of $25,000. In none of these cases, moreover, did the relevant courts proffer any analysis as the propriety of the fees approved; indeed, there are no reported decisions in the *Dan River*, *Lake Burton,* and the *Case Engineered Lumber* cases, and the published *Women's First Healthcare* decision does not address the break-up fee issue.

---

[3] Other courts have granted even lower break-up fees, as the Debtors should be well aware based upon the precedents on which they relied in connection with the Santa Clara Sale, but do not cite in connection with the SGM Sale. *See, e.g.*, *In re Twenver, Inc.*, 149 B.R. 954, 957 (Bankr. D. Colo. 1992) (stating that breakup fees of 1% to 2% are found to be reasonable in the majority of cases approving such fees); *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570 (11th Cir. 1988) ($18 million termination fee approved using business judgment rule where fee was 1.16% of sale price); *Samjens Partners I v. Burlington Indus.*, 663 F. Supp. 614 (S.D.N.Y. 1987) (breakup fee calculated as 2% of the value of the company was "not so onerous as to end the auction"); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving $500,000 break-up fee in a $45 million sale – 1.11%); *Beebe v. Pacific Realty Trust*, 578 F. Supp. 1128 (D. Or. 1984) (termination fee calculated as 1% of the transaction was reasonable).

5

11.     The *Tama Beef* case is even less apposite. Apart from the fact that it related to the payment of a $4,896 break-up fee on a transaction valued at $153,000, the Eighth Circuit BAP, revisiting the decision of a prior BAP panel, ultimately concluded that *Tama Beef* was not a "break-up fee" case at all, and that the prior panel's "break-up fee discussion was superfluous." *Tama Beef*, 321 B.R. at 498. The relevant claim, the *Tama Beef* court acknowledged, "was not a break-up fee; rather, it was simply a claim for an administrative expense" relating to a stalking horse bidder seeking "reimbursement of its actual expenses," and, in the process, the BAP transformed the lower court's observation that break-up fees are "usually limited to one to four percent of the purchase price" into pure *dicta*. *Id.* In light of all the foregoing, these cases—the only ones to which the Debtors can point to support the 3.5% break-up fee as to which they seek approval—must be regarded as non-precedential outliers.

12.     ***SGM Promise Healthcare Arguments***. Most significantly, based upon arguments it recently made in opposition to a bidding procedures order proposed in *In re Promise Healthcare Group LLC*, Case No. 18-12491 (CSS) (Bankr. D. Del. Dec. 4, 2018), SGM—the Stalking Horse Purchaser in these cases—agrees with all of the foregoing limitations on the scope and amount of break-up fees. In that case, SGM argued that the aggregate Bid Protections ($2,524,500 as a break-up fee and $2,000,000 as an expense reimbursement) were "excessive" because "[t]ogether, they constitute[d] almost 5.4% of the Stalking Horse Bidder's nominal Purchase Price of $84,150,000 before adjustments, and more than 5.8% of the Stalking Horse Bidder's expected $77.5 million Purchase Price after adjustments." *Objection of Strategic Global Management, Inc. to Motion for the Entry of (I) an Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and for Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice to Be Provided to Interested Parties, (4) Scheduling a Court Hearing to Consider Approval of the Sale*

6

*to the Highest Bidder; and (5) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and (II) an Order Authorizing the Sale of Property Free and Clear of all Claims, Liens and Encumbrances* ¶12 [Docket No. 158] ("SGM/Promise Objection").

13.     In support of the SGM/Promise Objection, SGM pointed to the First Nelson Declaration, which was filed in these cases in connection with the Santa Clara Sale, as a "recent study" of "break-up fees and expense reimbursements in bankruptcy cases" that demonstrated that the aggregate Bid Protections in *Promise Healthcare* case were "extremely high." (*Id*. ¶ 13.) SGM contended that "the study of break-up fees and expense reimbursements compiled . . . for bankruptcy sales ranging from $50 million and $250 million from 2017 to the present" contained in the First Nelson Declaration showed that "the median break-up fee is 3%, and the median expense reimbursement is $500,000." (*Id*.)

14.     On the basis of the First Nelson Declaration and a second "fee study," SGM argued that the "proposed break-up fee" in the *Promise Healthcare* case of $2,524,500, "which was 3.3% of the Stalking Horse Bidder's expected $77.5 million Purchase Price after adjustments," should be reduced to $2,325,000, "which was 3% of the Stalking Horse Bidder's expected $77.5 million Purchase Price after adjustments." (*Id.* ¶ 14.)

15.     The SGM/Promise Objection was sustained in part, with the Court, responding to both SGM's and the *Promise Healthcare* official committee's objection, by recalculating the "adjusted" purchase price as $69 million and limiting the break-up fee to 3% of that reduced amount, or $2.07 million. In light of SGM's own representations to this effect, the amount of the Break-Up Fee to which SGM is entitled in these cases should be reduced from $21,350,000, which is 3.5% of the Stalking Horse Bidder's "expected $610 million Purchase Price after adjustments," to $18,300,000, which is 3% of such adjusted Purchase Price.

16. Indeed, if a 3% break-up fee is all that SGM believes was "necessary" for Los Angeles Downtown Medical Center as the stalking horse in *Promise Healthcare*, no more should be "necessary" for SGM to serve as the Stalking Horse Purchaser in this case. *See Reliant Energy*, 594 F.3d at 206 (party requesting break-up fee must show that fee is actually "necessary to preserve the value of the estate"); *In re Integrated Res. Inc.*, 147 B.R. at 662 (purpose of break-up fee is to "attract or retain a potentially successful bid"). Thus, the Committee would not object to the SGM Break-Up Fee to extent it is reduced to an amount equal to 3% of the Purchase Price, or $18,300,000.

## II. Termination of Stalking Horse Bid and Back-Up Bidder Obligations

17. The Committee also objects to the SGM Sale Motion because the "partial bid" process it proposes, as drafted, does not clearly provide that the Stalking Horse Purchaser cannot terminate its Stalking Horse Bid prior to the determination of the Successful Bidder at the conclusion of the Auction.

18. The source of the Committee's concern is the following provision (Clause (iii), in particular) relating to a circumstances where the "Winning Partial Bids" do not include bids for all four assets currently subject to the Stalking Horse Bid:

> If the Partial Bids do not include all four APA Facilities, and if there are no other qualified full bids, then Seller, in its discretion, will either choose (1) to have no auction and the Stalking Horse Purchaser will purchase the four APA Facilities pursuant to the Stalking Horse APA, or (2) if the Debtor and Consultation Parties deem the aggregate Winning Partial Bid(s) to be sufficient to warrant leaving one or more APA Facilities behind (the "Remaining Facility"), the Stalking Horse Purchaser shall have the option of (i) acquiring the Remaining Facility at the allocated price in the Stalking Horse APA, (ii) overbidding one or more of the Partial Bids, or (ii) terminating the Stalking Horse APA. In either event, the Stalking Horse Purchaser shall be entitled to the Break-Up Fee for all of the APA Facilities not acquired by the Stalking Horse Purchaser.

(Bidding Procedures § II.H(b).)

8

19. The Committee is concerned that this provision creates an ambiguity that could permit the Stalking Horse Purchaser to terminate its bid prior to the conclusion of the Auction process. Thus, prior to disposition of the SGM Sale Motion, the Bidding Procedures should be amended to make clear that the Stalking Horse Purchaser will remain committed to the Stalking Horse Bid until the Auction has concluded and the Debtors, following the Bidding Procedures, have selected a Successful Bid.

20. In addition, the proposed Bidding Procedures do not clearly require the Stalking Horse Purchaser to act as the Back-Up Bidder, both as to Partial Bids and Full Bids. The Committee requests that the Bidding Procedures be revised to require the Stalking Horse Bidder to abide, as is customary in chapter 11 sale processes of this type, by its back-up bidder obligations. (Declaration of Cynthia A. Nelson, dated January 28, 2019 (the "Second Nelson Declaration") ¶¶ 11-13.)

### III. Stalking Horse Bidder Should Not Be "Consultation Party" for "Additional Auction Rules" Purposes

21. In addition, the Committee objects to the SGM Sale Motion because it impermissibly grants "consultation party" status to the Stalking Horse Purchaser with respect to "additional auction rules." (Bidding Procedures § II(H)(e).) While the Committee acknowledges that the Stalking Horse Purchaser should be entitled to protect any material rights and prerogatives it negotiated as to its own bid in the Stalking Horse APA, it should not be permitted to exercise any greater control over the auction process, or the rights of the Debtors, the Committee, or any other Qualified Bidder with respect thereto.

22. The Bidding Procedures, however, suggests that this may not be the case by providing as follows:

> the Debtors, <u>after consultation with the Consultation Parties **and the Stalking Horse Purchaser**</u>, may employ and announce at the relevant Auction additional procedural rules that are (i) reasonable under the circumstances for

9

> conducting the relevant Auction~~;~~, (ii) in the best interest of the Debtors'
> estates; and (ii) are not inconsistent with the Bid Protections, the Stalking
> Horse APA, the Bankruptcy Code, or any order of the Court entered in
> connection herewith.

(Bidding Procedures § II(H)(e).)

23. The addition of the Stalking Horse Purchaser, who has not been designated as a "Consultation Party" for any other purpose, to this "Additional Auction Rules" provision arguably gives the Stalking Horse Purchaser a greater voice with respect to how the Auction is to be conducted in connection with matters that may not be related to its own bid. (Second Nelson Decl. ¶¶ 7-9.) Indeed, since the provision already provides that no "additional auction rule" can be "inconsistent with the Stalking Horse APA," it is difficult to fathom the why and wherefore of such a Debtor/Stalking Horse Purchaser "consultation," if it were not undertaken to alter or affect the rights of others (*e.g.*, to alter bidding or information rules with respect to other Qualified Bidders that might directly or indirectly benefit the Stalking Horse Purchaser).

24. Granting the Stalking Horse Purchaser such a "consultation" right could only result in bidding by other Qualified Bidders being chilled due to concerns that the Stalking Horse Purchaser has been granted a preferential status that could tilt the playing field in its favor. (Second Nelson Decl. ¶ 8); *see In re Phila. Newspapers*, 2009 WL 3242292, at *4 (Bankr. E.D. Pa. Oct. 8, 2009) ("Bid Procedures should be designed to encourage a fair, open and competitive sale of the Debtors' assets"); *Meadow v. Gottlieb* (*In re Teddi of Cal.*), 2007 WL 7541016, at *4 (B.A.P. 9th Cir. Mar. 26, 2007) (concluding "proposed bidding procedures" must not be "vague, ambiguous, and designed to chill, rather than encourage, competitive bidding"); *In re Dura Automotive Sys., Inc.*, 2007 WL 7728109, at * 90 (Bankr. D. Del. Aug. 15, 2007) ("[C]ourts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales."); *In re Edwards,* 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to

facilitate an open and fair public sale designed to maximize value for the estate."); *In re Blixseth*, 2010 WL 716198, at *9 (Bankr. D. Mont. Feb. 23, 2010) (bidding procedures that did not encourage competitive bidding and favored an insider rejected by court).

25. The same objectives can be achieved, as the Committee has suggested to the Debtors and the Stalking Horse Purchaser, by providing that the key economic terms of the Stalking Horse Bid (*e.g.*, price, currency, bid protections, and material conditions) cannot be altered without the consent of the Stalking Horse Purchaser. The proviso that the Stalking Horse Purchaser appended to the end of Article VII goes too far by providing that "the Bid Procedures shall not be modified so as to alter, extinguish or modify *any rights or interests* of the Stalking Horse Purchaser expressly set forth herein or in the Stalking Horse APA." (Bidding Procedures § VII (emphasis added).) However, subject to the outcome of ongoing discussions, the Committee would be amenable to consideration of a no-alteration-without-consent list limited to relevant economic terms in Articles VI and VIII of the Stalking Horse APA.

### IV. Stalking Horse Bidder Should Not Have Right to Terminate Stalking Horse Bid Where Hospitals Have Been Sold "Free and Clear" of Additional Conditions Imposed Attorney General Pursuant to Section 363(f) of Bankruptcy Code

26. Finally, the Stalking Horse Purchaser should not have the right to terminate the Stalking Horse Bid if, in response to the imposition of "additional conditions" by the Attorney General, the Debtors seek and obtain authority to sell the Hospitals "free and clear" of such conditions pursuant to section 363(f) of the Bankruptcy Code.

27. However, Section 8.6 of the Stalking Horse APA Code grants just such a right to the Stalking Horse Purchaser, by providing as follows:

> **Attorney General Provisions**. Purchaser recognizes that the transactions contemplated by this Agreement may be subject to review and approval of the CA AG. Purchaser agrees to close the transactions contemplated by this Agreement so long as any conditions imposed by the CA AG are substantially consistent with the conditions set forth in Schedule 8.6. In the event the CA

11

> AG imposes conditions on the transactions contemplated by this Agreement which are not as set forth on Schedule 8.6 (the "Additional Conditions"), Sellers shall have the opportunity to file a motion with the Bankruptcy Court seeking the entry of an order finding that the Additional Conditions are an "interest in property" for purposes of 11 U.S.C. § 363(f), and that the Assets can be sold free and clear of the Additional Conditions. ***If Sellers obtain such an order, from the Bankruptcy Court or another court, Purchaser shall have a period of 21 business days from the entry of such order to determine, in Purchaser's sole and absolute discretion, and in consultation with Purchaser's financing sources, whether to proceed to consummate the transactions contemplated by this Agreement. If Purchaser determines not to proceed, Purchaser shall have the right to terminate this Agreement and receive the return of its Good Faith Deposit.***

(Stalking Horse APA § 8.6 (emphasis added).)

28.     The Stalking Horse Purchaser's concern with being compelled to close its purchase of the Hospitals subject to additional conditions imposed by the Attorney General and to which it did not agree is—all other considerations aside—understandable. Its concern with closing when these conditions have been stripped away through the use of section 363(f) is not. The Committee is in discussions with the Debtors and the Stalking Horse Purchaser about this provision, which appeared for the first time in the filed version of the Stalking Horse APA, and such discussions will hopefully shed further light on its rationale and operation. However, in its current form, it appears to grant to the Stalking Horse Purchaser so broad a termination right as to render its obligations under the Stalking Horse APA illusory. It cannot be approved without a fuller showing as to the need and basis for its inclusion in the Stalking Horse APA.

## **RESERVATION OF RIGHTS**

29.     The Committee expressly reserves all rights, claims, defenses, and remedies, including, without limitation, to supplement and amend this Objection, to raise further and other concerns with regard to the Sale Motion and the final form of Bidding Procedures Order, and to introduce evidence prior to or at any hearing regarding the Motion in the event that the Committee's objections are not resolved prior to such hearing. This reservation of rights expressly applies to the

Schedules to the Stalking Horse APA, which have not yet been filed, and any other matters relevant to the SMG Sale Motion and SGM Sale that have not yet been determined or disclosed. Discussions between the Debtors and the Committee's professionals are ongoing and, as such, additional items of concern may come to light.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that this Court (i) grant the motion subject to the conditions set forth herein; and (ii) grant such other and further relief as may be just and proper.

DATED: January 28, 2019              MILBANK, TWEED, HADLEY & McCLOY LLP

                                                           */s/ Gregory A. Bray*
                                                           GREGORY A. BRAY
                                                           MARK SHINDERMAN
                                                           JAMES C. BEHRENS

                                                           Counsel for the Official Committee of
                                                           Unsecured Creditors of Verity Health System of
                                                           California, Inc., et al.