SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
PATRICK C. MAXCY (Pro Hac Vice)
patrick.maxcy@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

Attorneys for the Chapter 11 Debtors and
Debtors In Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

In re

VERITY HEALTH SYSTEM OF
CALIFORNIA, INC., *et al.*,

     Debtors and Debtors In Possession.

☒ Affects All Debtors

☐ Affects Verity Health System of California, Inc.
☐ Affects O'Connor Hospital
☐ Affects Saint Louise Regional Hospital
☐ Affects St. Francis Medical Center
☐ Affects St. Vincent Medical Center
☐ Affects Seton Medical Center
☐ Affects O'Connor Hospital Foundation
☐ Affects Saint Louise Regional Hospital Foundation
☐ Affects St. Francis Medical Center of Lynwood Foundation
☐ Affects St. Vincent Foundation
☐ Affects St. Vincent Dialysis Center, Inc.
☐ Affects Seton Medical Center Foundation
☐ Affects Verity Business Services
☐ Affects Verity Medical Foundation
☐ Affects Verity Holdings, LLC
☐ Affects De Paul Ventures, LLC
☐ Affects De Paul Ventures - San Jose ASC, LLC

     Debtors and Debtors In Possession.

Lead Case No. 2:18-bk-20151-ER

Jointly Administered With:
CASE NO.: 2:18-bk-20162-ER
CASE NO.: 2:18-bk-20163-ER
CASE NO.: 2:18-bk-20164-ER
CASE NO.: 2:18-bk-20165-ER
CASE NO.: 2:18-bk-20167-ER
CASE NO.: 2:18-bk-20168-ER
CASE NO.: 2:18-bk-20169-ER
CASE NO.: 2:18-bk-20171-ER
CASE NO.: 2:18-bk-20172-ER
CASE NO.: 2:18-bk-20173-ER
CASE NO.: 2:18-bk-20175-ER
CASE NO.: 2:18-bk-20176-ER
CASE NO.: 2:18-bk-20178-ER
CASE NO.: 2:18-bk-20179-ER
CASE NO.: 2:18-bk-20180-ER
CASE NO.: 2:18-bk-20171-ER

Chapter 11 Cases

Hon. Judge Ernest M. Robles

**DEBTORS' NOTICE AND MOTION TO APPROVE (I) SETTLEMENT AND ASSET PURCHASE AGREEMENT BY AND BETWEEN DEBTORS VERITY MEDICAL FOUNDATION AND VERITY HEALTH SERVICES OF CALIFORNIA, INC., SILICON VALLEY MEDICAL DEVELOPMENT, LLC AND SAN JOSE MEDICAL GROUP, (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES TO SILICON VALLEY MEDICAL DEVELOPMENT, LLC, AND (III) REJECTION OF CERTAIN LEASES; DECLARATION OF RICHARD G. ADCOCK IN SUPPORT THEREOF**

HEARING:
Date:    March 19, 2019
Time:    10:00 a.m.
Place:    Courtroom 1568
            255 E. Temple Street, Los Angeles, CA 90012

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**PLEASE TAKE NOTICE** that, at **10:00 am (prevailing Pacific Time), on March 19, 2019**, before the Honorable Ernest M. Robles, in Courtroom 1568 of the United States Bankruptcy Court for the Central District of California, Roybal Federal Building, 255 E. Temple Street, Los Angeles, CA  90012, Verity Health System Of California, Inc. ("VHS") and the above-referenced affiliated debtors and debtors in possession in the above captioned chapter 11 bankruptcy cases (collectively, the "Debtors"), shall move for the entry of an order approving that certain Settlement and Asset Purchase Agreement between the Debtors Verity Medical Foundation ("VMF") and VHS, Silicon Valley Medical Development, LLC, a California limited liability company and wholly owned entity of El Camino Hospital ("Silicon Valley"), and San Jose Medical Group, a California professional corporation ("SJMG"), substantially in the form of the Settlement and Asset Purchase Agreement (the "Agreement") attached to the annexed Memorandum as **Exhibit 1**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors file this Motion, pursuant to 11 U.S.C. §§ 105, 363 and 365 and Rule 9019 of the Federal Rules of Bankruptcy Procedure, seeking an order (i) approving the Agreement, (ii) authorizing VMF to sell the assets of VMF's medical Clinics (defined herein) (as more specifically defined in the Agreement, the "Purchased Assets") free and clear of any interest in such Purchased Assets, (ii) authorizing the assumption and assignment of the Designated Contracts and Assigned Leases (defined herein) to Silicon Valley, and (iii) authorizing the rejection of the Rejected Leases (defined herein).

Silicon Valley is prepared to purchase the Purchased Assets by way of a private sale, which will generate funds for the estates and allow the Clinics to continue to serve patients in the community.  Silicon Valley intends to continue to operate the Clinics.

The terms of this Agreement result from a series of meetings, discussions and evaluations between Silicon Valley, SJMG and the Debtors and professional advisors.  The Debtors believe that this settlement is fair and reasonable and, therefore, is in the best interests of creditors.  The Agreement releases all claims between SJMG and VMF, provides that SJMG shall pay VMF $104,963.83 prior to closing as satisfaction of the SJMG Note (more specifically defined in the Agreement) and provides that Silicon Valley shall purchase certain assets of the Clinics for an aggregate purchase price of $1,270,000.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110250566\V-8

1    **PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Notice of Motion

2    and Motion and the attached Memorandum of Points and Authorities, the *Declaration of Richard*

3    *G. Adcock in Support of First-Day Motions*, filed August 31, 2018 (the "First-Day Declaration")

4    [Docket No. 8] and the attached Declaration of Richard G. Adcock (the "Adcock Declaration").

5        **PLEASE TAKE FURTHER NOTICE** that any party opposing or responding to the

6    Motion must file a response (the "Response") with the Bankruptcy Court and serve a copy of it upon

7    the moving party and the United States Trustee not later than 14 days before the date designated for

8    the hearing. A Response must be a complete written statement of all reasons in opposition to the

9    Motion or in support, declarations and copies of all evidence on which the responding party intends

10   to rely, and any responding memorandum of points and authorities.

11       **PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the failure to file

12   and serve a timely objection to the Motion may be deemed by the Court to be consent to the relief

13   requested herein.

14

15   Dated:  February 26, 2019                DENTONS US LLP
                                              SAMUEL R. MAIZEL
16                                            TANIA M. MOYRON

17

18                                            By    */s/ Tania M. Moyron*
                                                    Tania M. Moyron
19
                                              Attorneys for the Chapter 11 Debtors and
20                                            Debtors In Possession

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110250566\V-8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................ 1

II. JURISDICTION AND VENUE ........................................... 1

III. BACKGROUND .............................................................. 2

    A.   General Background ................................................ 2

    B.   VMF and the SJMG Agreement ............................. 2

    C.   Summary of Agreement ......................................... 3

IV. ARGUMENT .................................................................. 6

    A.   THE COURT SHOULD APPROVE THE AGREEMENT UNDER RULE 9019 ................................ 6

    B.   THE COURT SHOULD AUTHORIZE THE PRIVATE SALE TO PROCEED ............................... 8

        1.   Section 363(b) .............................................. 8

        2.   Section 363(f) ............................................ 10

    C.   THE COURT SHOULD APPROVE THE ASSUMPTION AND ASSIGNMENT OF DESIGNATED CONTRACTS AND ASSIGNED LEASES TO SILICON VALLEY ................................ 11

    D.   THE COURT SHOULD APPROVE THE REJECTION OF THE REJECTED LEASES .................... 12

V. CONCLUSION .............................................................. 14

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Abbotts Dairies of Pa., Inc.*,
  788 F.2d 143 (3d Cir. 1986) ...................................................................................................9

*In re AEG Acquisition Corp.*,
  127 B.R. 34 (Bankr. C.D. Cal. 1991), *aff'd*, 161 B.R. 50 (B.A.P. 9th Cir. 1993) ...................11

*Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp., Inc.)*,
  476 F.3d 665 (9th Cir. 2007) ...........................................................................................11, 13

*In re Bowman*,
  194 B.R. 227 (Bankr. D. Ariz. 1995) .....................................................................................11

*In re Chi-Feng Huang*,
  23 B.R. 798 (B.A.P. 9th Cir. 1982) ........................................................................................11

*Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*,
  722 F.2d 1063 (2d Cir. 1983) ..................................................................................................9

*Consumer Advocacy Group, Inc. v. Kintetsu Enters. of Amer.*,
  141 Cal. App. 4th 46 (Cal. 2006) ............................................................................................7

*In re Delaware and Hudson Ry. Co.*,
  124 B.R. 169 (D. Del. 1991) ...................................................................................................9

*In re Embers 86th Street. Inc.*,
  184 B.R. 892 (Bankr. S.D.N.Y. 1995) ...................................................................................12

*In re Energy Cooperative, Inc.*,
  886 F.2d 921 (7th Cir. 1989) ..................................................................................................6

*In re Gardens Reg. Hosp. and Med. Ctr., Inc. ("In re Gardens")*,
  567 B.R. 802 (Bankr. C.D. Cal. 2017) ....................................................................................9

*In re Hertz*,
  536 B.R. 434 (Bankr. C.D. Cal. 2015) ...................................................................................11

*In re Huntington, Ltd.*,
  654 F.2d 578 (9th Cir. 1981) ..................................................................................................9

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*,
  141 F.3d 490 (3d Cir. 1998) ...................................................................................................8

*In re Martin (Myers v. Martin)*,
  91 F.3d 389 (3d Cir. 1996) .....................................................................................................9

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*Martin v. Kane (In re A & C Props.)*,
    784 F.2d 1377 (9th Cir. 1986), *cert. denied sub nom, Martin v. Robinson*, 479
    U.S. 854 (1986) .............................................................................................................6, 7

*In re MF Global, Inc.*,
    535 B.R. 596 (Bankr. S.D.N.Y. 2015) ..........................................................................9

*In re Mickey Thompson Entm't Grp., Inc.*,
    292 B.R. 415 (B.A.P. 9th Cir. 2003)...............................................................................7

*N.L.R.B. v. Bildisco & Bildisco*,
    465 U.S. 513, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984) ............................................13

*In re Nepsco, Inc.*,
    36 B.R. 25 (Bankr. D. Me. 1983) ....................................................................................8

*Titusville Country Club v. Pennbank (In re Titusville Country Club)*,
    128 B.R. 396 (Bankr. W.D. Pa. 1991) ............................................................................9

*In re Trans World Airlines, Inc.*,
    No. 01-00056 (PJW), 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001) .....................8

*United States v. McInnes*,
    556 F.2d 436 (9th Cir. 1977)..........................................................................................7

*In re Walsh Constr., Inc.*,
    669 F.2d 1325 (9th Cir. 1992).........................................................................................7

*In re Walter*,
    83 B.R. 14 (B.A.P. 9th Cir. 1988)...................................................................................9

*Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*,
    839 F.2d 610 (9th Cir. 1988)........................................................................................6, 7

*In re Zarate*,
    2015 WL 8482887 (B.A.P. 9th Cir. Dec. 9, 2015).........................................................7

**Statutes**

11 United States Code
    § 105...............................................................................................................................1
    § 363...........................................................................................................................1, 13
    § 363(b)...........................................................................................................................8
    § 363(b)(1).......................................................................................................................8
    § 363(f)........................................................................................................................8, 10
    § 363(f)(1)......................................................................................................................10
    § 363(f)(2)......................................................................................................................10
    § 363(f)(5)......................................................................................................................10
    § 365...............................................................................................................................1
    § 365(a).....................................................................................................................11, 12

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

iii

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

§ 365(b)(1)................................................................................11
§ 365(f)(1).................................................................................11
§ 365(f)(2).................................................................................11
§ 1107........................................................................................2
§ 1108........................................................................................2

28 United States Code
§ 157...........................................................................................1
§ 157(b)(2)(B)............................................................................1
§ 1334.........................................................................................1
§ 1408.........................................................................................1
§ 1409.........................................................................................1

California Health & Safety Code
§ 1206(b).....................................................................................2
§ 1206(l)......................................................................................2

Internal Revenue Code
§ 501(c)(3)...............................................................................2, 3

**Rules and Regulations**

Federal Rules of Bankruptcy Procedure
Rule 2002.....................................................................................1
Rule 6004.....................................................................................1
Rule 6004(f)(1)............................................................................8
Rule 9019....................................................................1, 6, 8, 13
Rule 9019(a)................................................................................6

110250566\V-8

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The Debtors, by and through their undersigned counsel, hereby file this Memorandum of Points and Authorities in support of their motion (the "Motion"), pursuant to §§ 105, 363 and 365[1] and Rule 9019, for the entry of an order (i) approving the Settlement and Asset Purchase Agreement (the "Agreement"), dated February 15, 2019, between Verity Medical Foundation ("VMF"), Verity Health System of California, Inc. ("VHS"), Silicon Valley Medical Development, LLC, a California limited liability company and wholly owned entity of El Camino Hospital ("Silicon Valley") and San Jose Medical Group, a California professional corporation ("SJMG") (collectively, the "Parties"), a copy of which is attached hereto as **Exhibit 1**, (ii) authorizing VMF to sell certain assets of the Clinics (defined herein) (as more specifically defined in the Agreement, the "Purchased Assets") free and clear of any interest in such Purchased Assets, (iii) approving the assumption and assignment of the Designated Contracts and Assigned Leases (defined herein) to Silicon Valley and (iv) authorizing the rejection of the Rejected Leases (defined herein).  For the reasons set forth below, the Debtors respectfully request that the Court grant the Motion.

## II.

## JURISDICTION AND VENUE

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory predicates for the relief requested herein are §§ 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 9019.

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.  All "LBR" references are to the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California.

110250566\V-8

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**III.**

**BACKGROUND**

**A.    General Background**

1.    On August 31, 2018 ("Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Since the commencement of their cases, the Debtors have been operating their businesses as debtors in possession pursuant to §§ 1107 and 1108.

2.    Debtor VHS, a California nonprofit public benefit corporation, is the sole corporate member of the following five Debtor California nonprofit public benefit corporations that operate six acute care hospitals, O'Connor Hospital, Saint Louise Regional Hospital, St. Francis Medical Center, St. Vincent Medical Center, Seton Medical Center, and Seton Medical Center Coastside (collectively, the "Hospitals") and other facilities in the state of California. Seton Medical Center and Seton Medical Center Coastside operate under one consolidated acute care license.  Declaration of Richard Adcock in Support of Emergency First Day Motions, at 4, ¶ 11.  [Docket No. 8.]

3.    VHS, the Hospitals, and their affiliated entities (collectively, "Verity Health System") operate as a nonprofit health care system, with approximately 1,680 inpatient beds, six active emergency rooms, a trauma center, eleven medical office buildings, and a host of medical specialties, including tertiary and quaternary care.  First-Day Decl., at 4, ¶ 12.

4.    Each of the Debtors is exempt from federal income taxation as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986 (the "IRC"), except for Verity Holdings, LLC, DePaul Ventures, LLC, and DePaul Ventures - San Jose Dialysis, LLC.  First-Day Decl., at 6, ¶ 21.

5.    On September 17, 2018, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors in these cases.  [Docket No. 197.]

**B.    VMF and the SJMG Agreement**

6.    Debtor VMF, incorporated in 2011, is a medical foundation, exempt from (a) licensure under California Health & Safety Code § 1206(l), and (b) federal income taxation as an organization described in section 501(c)(3) of the IRC.  First-Day Decl., at 5, ¶ 14.  VMF contracts with physicians and other healthcare professionals to provide high quality, compassionate, patient-

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  centered care to individuals and families throughout California. *Id*. With more than 100 primary

2  care and specialty physicians, VMF offers medical, surgical and related healthcare services for

3  people of all ages at community-based, multi-specialty clinics conveniently located in areas served

4  by the Hospitals.  *Id*.

5      7.    VMF holds a long-term professional services agreement with SJMG (the "<u>PSA</u>").

6  Declaration of Richard Adcock, attached hereto, at ¶ 4.   SJMG is a California professional

7  corporations that employs and contracts with physicians (such as nurse practitioners and physician's

8  assistants) who are directly engaged in the provision of professional medical services.  *Id*.

9      8.    Under the PSA, SJMG  provides professional medical services to the VMF medical

10  clinics listed on Exhibit A to the Agreement (the "<u>Clinics</u>").  Adcock Declaration, ¶ 5.  Each of the

11  Clinics are subject to real property leases which are listed on Exhibit A to the Agreement.   *Id*.

12      **C.    <u>Summary of Agreement</u>**

13      9.    The Agreement terminates the PSA and releases all claims between SJMG and VMF

14  (including any rejection damages claims arising from the termination of the PSA and any other

15  claims arising under the PSA), except for any claims explicitly preserved under the Agreement, and

16  provides that SJMG shall pay VMF $104,963.83 prior to closing in full satisfaction of the SJMG

17  Note (more specifically defined in the Agreement).   Adcock Declaration, ¶ 6.   The agreements

18  reached, as result of the discussions among and between the Debtors, Silicon Valley, SJMG and

19  certain other parties, are incorporated in the Agreement.  *Id*.

20      10.    The Agreement also provides for the purchase of the Purchased Assets of the Clinics

21  by Silicon Valley, by way of private sale and subject to Bankruptcy Court approval. Adcock

22  Declaration, ¶ 7. After closing of the sale, Silicon Valley intends to continue to operate the Clinics.

23  *Id*. The principal terms of the Agreement can be summarized as follows:[2]

24      a.  VMF agrees to sell to Silicon Valley and Silicon Valley agrees to purchase certain
          assets identified in the Agreement (the "<u>Purchased Assets</u>") located at the Clinics,
25          and to enter into certain related agreements.

26

27

28      [2]  This is a summary only. Reference should be made to the complete Agreement attached hereto as **<u>Exhibit 1</u>**. The
          terms of the Agreement shall control over the terms of this summary in all instances.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

b.  Silicon Valley agrees to pay an aggregate purchase price for the Purchased Assets of $1,270,000.00 (the "Purchase Price"). The Purchase Price shall be delivered by Silicon Valley to VMF (or its designee) on or before the Closing Date by wire transfer account(s) as may be designated by VMF.

c.  The contracts listed on Exhibit D to the Agreement (the "Designated Contracts") shall be assumed and assigned to Silicon Valley, effective as of the Closing Date. On or before the Closing Date, Silicon Valley shall pay all cure costs associated with a Designated Contract, if any, in the amounts listed on Exhibit D directly to the counter-party to a Designated Contract that is assumed and assigned pursuant to the Agreement. To the extent that cure costs for Designated Contracts exceeds the amounts listed in Exhibit D, in the aggregate, VMF shall be responsible to pay the amount by which the actual cure costs exceed the aggregate amount listed in Exhibit D.

d.  On the Closing Date, VMF shall reject the real property leases associated with the Clinics listed in Exhibit A to the Agreement (the "Rejected Leases") and assign to Silicon Valley those certain leases designated for assignment on Exhibit A to Silicon Valley (the "Assigned Leases"). Except for the Assigned Leases, Silicon Valley shall use its best efforts to negotiate and enter into all new leases from the landlords or sub-landlords for any continued occupancy of the Clinics beyond the Closing Date (the "New Leases"). VMF shall use reasonable efforts to assist Silicon Valley in entering into New Leases. On or before the Closing Date, Silicon Valley shall pay all cure costs, if any, associated with an Assigned Lease in the amounts listed on Exhibit A directly to the counter-party to an Assigned Lease that is assumed and assigned pursuant to the Agreement. To the extent that cure costs for Assigned Leases exceeds the amounts listed in Exhibit A, in the aggregate, VMF shall be responsible to pay the amount by which the actual cure costs exceed the aggregate amount listed in Exhibit A.

e.  On the Closing Date, SJMG shall assign and Silicon Valley shall assume and accept assignment of the contracts listed on Exhibit J to the Agreement (the "SJMG Assigned Contracts") effective as of the Closing Date. VMF and SJMG agree to work with Silicon Valley to assign all of SJMG's interest, to the extent assignable or transferable, in and to all SJMG Assigned Contracts along with all security deposits held by counterparties to the SJMG Assigned Contracts or by SJMG, and all claims, causes of action, rights and defenses against counterparties to the SJMG Assigned Contracts, through mutually agreeable written assignment and assumption agreements prior to the Closing Date.

f.  On the Closing Date, SJMG and Seller hereby agree that (a) the PSA, and (b) any other agreements between SJMG or any physicians working at the Clinics, on the one hand, and any VHS affiliate, on the other hand, including all medical directorship agreements (collectively, the "Terminated Agreements"), are hereby terminated by mutual agreement and without liability to the parties thereto, and shall therefore have no further force and effect.

g.  VMF and VHS shall authorize Verity Medical Group, P.C. ("VMG") to enter into termination and settlement agreements ("Physician Termination Agreements") with

those physicians listed on Exhibit K to the Agreement (the "GPC Physicians") who will transition to SJMG. Such Physician Termination Agreements shall (i) terminate the physician's employment with VMG; (ii) be executed by VMG and each physician prior to the Closing Date; and (iii) release VMG, VMF and other VHS affiliates of all claims arising under the physician's employment agreement as of the Closing Date, regardless of when such claim arose. As a condition to closing, SJMG shall have entered into employment agreements with those physicians who have entered into Physician Termination Agreements.

h.  Silicon Valley shall have no obligation to offer employment, hire or otherwise retain any employees or contractors at the Clinics (collectively, the "Support Personnel"). VMF shall issue all WARN notices to such Support Personnel as is necessary and appropriate. Silicon Valley shall not be responsible for any accrued but unused Paid Time Off ("PTO") credited to the Support Personnel immediately prior to the Closing Date and shall not be responsible for any payments for unused PTO to such employees.

i.  VMF and Silicon Valley shall enter into a Transition Services Agreement whereby VMF will provide support in the assignment of Designated Contracts, agreements and leases (including payer agreements), payer communication, medical records transfer and patient communication, prior-to and post-closing (the "TSA").

j.  VMF and SJMG entered into that certain Promissory Note in the amount of $150,000, dated August 1, 2018, as amended (the "SJMG Note"), of which $104,963.83 remains unpaid. As a condition to closing, on or before the Closing Date, SJMG shall pay VMF $104,963.83 by wire transfer in satisfaction of the SJMG Note. Such payment shall completely satisfy SJMG's obligations under the SJMG Note and extinguish VMF's right to recover any additional payment thereunder.

k.  VMF and SJMG agree, each on behalf of itself, its representatives, successors and assigns and anyone claiming by, through or for anyone making a claim on such Party's behalf, to irrevocably and unconditionally waive, **RELEASE** and **FOREVER DISCHARGE** the other Party hereto from any and all liability, actions, causes of actions, common law claims, statutory claims under state or federal law that such releasing Party may now or hereafter have against another Party hereto and/or have on account of, arising out of, or in connection with all interactions, transactions or contracts, express or implied, between such Parties hereto, except as specifically preserved.

l.  VHS and VMF, on the one hand, and SJMG, on the other, agree that the general releases contained in the Agreement, shall, without limitation, release (i) all claims of SJMG against VMF, VHS and their affiliates arising under the PSA, including without limitation, (x) any "rejection damages" arising from the termination of the PSA; (y) any claims for amounts owed to SJMG under the PSA as set forth in that certain proof of claim numbers 707, 708, 712, and 716; and (z) any claims for alleged breach of the PSA and/or negligence arising under the PSA; and (ii) all claims of VHS and/or VMF against SJMG and its affiliates arising under the PSA, including without limitation, any claims for alleged overpayments to SJMG under the PSA. For the avoidance of doubt, nothing in Sections 3.3 and 3.4 of the Agreement shall

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110250566\V-8

1   release SJMG's obligation under the SJMG Note.  Notwithstanding SJMG's release of claims under the PSA as contained in the Agreement, VMF shall make regularly scheduled payments to SJMG arising under the PSA through and including March 31, 2019; provided, however, that SJMG expressly waives any right and all rights, title and interest in and to any payments that would otherwise be payable by VMF or VHS under the PSA after March 31, 2019.

11.   The Debtors believe that the Agreement is fair and equitable and in the best interests of the estate.  Adcock Declaration, ¶ 8.  The Agreement generates $1.27 million of funds for the estates, it also resolves all claims held by SJMG against the Debtors, including those arising under the PSA, relieves the Debtors' estates from any rejection damages that would have arisen had the PSA been rejected instead of terminated by the Agreement, provides for repayment of the SJMG Note, and it allows the Clinic to continue to serve patients in the community.  *Id.*

**IV.**

**ARGUMENT**

**A.    THE COURT SHOULD APPROVE THE AGREEMENT UNDER RULE 9019**

Rule 9019 provides that the Court may approve a compromise or settlement. Fed. R. Bankr. P. 9019(a).  In determining the fairness, reasonableness and adequacy of a proposed settlement, the Court must consider the following factors: "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises." *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986), *cert. denied sub nom, Martin v. Robinson*, 479 U.S. 854 (1986).  The purpose of a compromise agreement between a debtor and a creditor is to allow the parties to avoid the expenses and burdens associated with litigation. *Id*. This Court has great latitude in approving compromise agreements as long as it finds that the compromise is fair and equitable. *Id*. at 1382; s*ee also Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir. 1988). Generally, the benchmark in determining the propriety of a settlement is whether the settlement is in the best interests of the estate and its creditors. *In re Energy Cooperative, Inc.*, 886 F.2d 921, 927 (7th Cir. 1989). To be approved, the settlement need not represent the highest possible return to the estate, but merely must fall within the range of

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

6

110250566\V-8

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    "reasonableness." *In re Walsh Constr., Inc.*, 669 F.2d 1325, 1328 (9th Cir. 1992). In making this

2    determination, the bankruptcy court need not conduct a trial or even a "mini-trial" on the merits. *Id.*

3        The law strongly encourages compromise. *Consumer Advocacy Group, Inc. v. Kintetsu*

4    *Enters. of Amer.*, 141 Cal. App. 4th 46, 62 (Cal. 2006); *United States v. McInnes*, 556 F.2d 436, 440

5    (9th Cir. 1977) ("We are committed to the rule that the law favors and encourages compromise

6    settlements."). Additionally, compromises are favored in bankruptcy so as to minimize litigation

7    and expedite a bankruptcy estate's administration. *See In re A & C Props.*, 784 F.2d at 1381.

8    Bankruptcy courts therefore have "great latitude" to approve a debtor's compromises and

9    settlements. *Woodson*, 839 F.2d at 620; In re *Mickey Thompson Entm't Grp., Inc.*, 292 B.R. 415

10    (B.A.P. 9th Cir. 2003). An approved settlement will "be in the best interests of the estate" if it is

11    "reasonable, given the particular circumstances of the case." *Mickey Thompson Entm't Grp.*, 292

12    B.R. at 420. Finally, "court[s] generally give[] deference to a [debtor's] business judgment in

13    deciding whether to settle a matter," although the debtor "has the burden of persuading the

14    bankruptcy court that the compromise is fair and equitable and should be approved." *Id.*; *see also*

15    *In re Zarate*, 2015 WL 8482887, at *8 (B.A.P. 9th Cir. Dec. 9, 2015) ("[T]he [debtor] must be

16    permitted to use his business acumen and judgment in the best interest of the estate.").

17        Here, the Debtors exercised their reasonable business judgment in agreeing to the

18    Agreement, which is in the best interests of the estates.  The consummation of the Agreement

19    eliminates disputes arising under the PSA between SJMG and the Debtors and also provides for

20    repayment of the SJMG Note.  Adcock Declaration, ¶ 9.  But for the Settlement, the Debtors and

21    SJMG may have engaged in lengthy litigation regarding amounts owed by or to SJMG under the

22    PSA.  *Id.*  In particular, the Debtors made demands on SJMG for alleged overpayments under the

23    PSA and SJMG asserted claims against the Debtors for alleged unpaid amounts owed under the PSA

24    and for negligence.  *Id.*   The litigation of these claims and counter-claims would be costly and their

25    outcome uncertain.  *Id.*

26        In addition, the Agreement will result in SJMG's retention of certain physicians.  Adcock

27    Declaration, ¶ 10.  If not for the Agreement, upon rejection of the PSA, VMG would terminate the

28    employment of these physicians.  *Id.*  By retaining those physicians that enter into termination

1   agreements with VMG, SJMG will assume certain employment related costs and alleviates the

2   estates from termination costs related to those physicians.  *Id*.  The Agreement thus meets the

3   requirements of  Rule 9019 and the applicable precedents in the Ninth Circuit.

4   **B.**      **THE COURT SHOULD AUTHORIZE THE PRIVATE SALE TO PROCEED**

5          A debtor in possession can sell assets outside of the ordinary course of business through a

6   private sale in a Chapter 11 case.  More specifically, private sales are expressly authorized under

7   the Bankruptcy Rules. *See* Fed. R. Bankr. P. 6004(f)(1).  Additionally, as described below, most

8   courts considering private sales in Chapter 11 pre-confirmation have assessed them under a

9   "business judgment" standard and asked whether the contemplated sale is in the best interest of the

10  bankruptcy estate.  Thus, to the extent that Agreement involves a sale of Purchased Assets, the

11  Debtors also seek approval of the sale of the Purchased Assets to Silicon Valley in accordance with

12  §§ 363(b) and (f).

13         **1.**      **Section 363(b)**

14         Section 363(b)(1) provides that a debtor in possession may sell property of the estate "other

15  than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). "All sales

16  not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr.

17  P. 6004(f)(1).  *See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 498 (3d Cir.

18  1998); *see also In re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *4

19  (Bankr. D. Del. Apr. 2, 2001) ("[I]t is worth noting that a § 363(b) sale transaction does not require

20  an auction procedure.  The auction procedure has developed over the years as an effective means

21  for producing an arm's length fair value transaction.").  As set forth in *In re Nepsco, Inc.*, 36 B.R.

22  25, 26-27 (Bankr. D. Me. 1983):

23              [C]urrent Bankruptcy Rule [6004(f)(1)] provides that *all* sales not in
                the ordinary course of business may be private or by public auction.
24              If the sale is private, all creditors receive notice of the terms and
                conditions of the sale and the time fixed for filing objections. [] If no
25              objections are filed, the trustee may proceed with the sale without
                either a hearing or a court order. [] Clearly, the thrust of this statutory
26              scheme is to provide maximum flexibility to the trustee, subject to the
                oversight of those for whose benefit he acts, *i.e.*, the creditors of the
27              estate.   This scheme also promotes Congress' intent of keeping
                bankruptcy judges out of the administrative aspect of bankruptcy
28              cases . . . .

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

8

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    As a general proposition, to approve a use, sale or lease of property other than in the ordinary

2    course of business, the Court must find "some articulated business justification." *See, e.g., In re*

3    *Gardens Reg. Hosp. and Med. Ctr., Inc. ("In re Gardens")*, 567 B.R. 802, 825 (Bankr. C.D. Cal.

4    2017); *In re Martin (Myers v. Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper (Fulton*

5    *State Bank v. Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991)); *In re Abbotts Dairies of Pa., Inc*., 788

6    F.2d 143 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp*. and

7    requiring good faith); *Comm. of Equity SEC Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d

8    1063, 1070 (2d Cir. 1983); *In re Delaware and Hudson Ry. Co*., 124 B.R. 169 (D. Del. 1991)

9    (concluding that the Third Circuit adopted the "sound business judgment" test in the *Abbotts Dairies*

10   decision). Similarly, in the Ninth Circuit, "cause" exists for authorizing a sale of estate assets if it is

11   in the best interest of the estate, and a business justification exists for authorizing the sale. *In re*

12   *Huntington, Ltd*., 654 F.2d 578 (9th Cir. 1981); *In re Walter*, 83 B.R. 14, 19-20 (B.A.P. 9th Cir.

13   1988).

14   In determining whether a sale satisfies the business judgment standard, courts have held that:

15   (1) there be a sound business reason for the sale; (2) accurate and reasonable notice of the sale be

16   given to interested persons; (3) the sale yield an adequate price (i.e., one that is fair and reasonable);

17   and (4) the parties to the sale have acted in good faith. *In re Walter*, 83 B.R. at 19-20; *see also*

18   *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr.

19   W.D. Pa. 1991).

20   In *In re MF Global, Inc*., 535 B.R. 596 (Bankr. S.D.N.Y. 2015), the bankruptcy court

21   approved a private sale of assets under the business judgment standard where only a single purchaser

22   expressed interest in purchasing the assets and it was familiar with the rights which it would be

23   assigned. *Id*. at 606. The trustee also demonstrated, among other things, that the interested parties

24   received adequate and reasonable notice and both parties to the sale proceeded in good faith.

25   Consequently, the court found that the trustee and debtor had presented "uncontroverted evidence"

26   that the private sale "reflects the appropriate exercise of their sound business judgment" where the

27   agreement was negotiated extensively, no party objected to the proposed sale, and there was no

28   dispute about the adequacy of the consideration.

9

1   Here, the Debtors exercised their "sound business judgment" in making a decision to sell the

2   Purchased Assets to Silicon Valley in a private sale.  The Debtors engaged in extensive, arms-length

3   negotiations with Silicon Valley and its advisors over the terms of the Agreement.   Adcock

4   Declaration, ¶ 11.  The $1,270,000 of proceeds from the sale will generate funds for the benefit of

5   the estate.  *Id.*  Also, as part of the consideration for the Agreement, Silicon Valley will assume the

6   obligations under the Designated Contracts and Assigned Leases, thus relieving the estates of

7   rejection damages associated with the rejection of the Assigned Leases and Designated Contracts.

8   *Id.*  A failure to consummate a sale of the Purchased Assets to Silicon Valley would result in virtually

9   no return to the estates for the Purchased Assets and the rejection of the PSA, the Assigned Leases

10  and Designated Contracts, causing the estates to incur additional claims.  *Id.*  Accordingly, there is

11  no question that the proposed sale of the Purchased Assets to Silicon Valley is in the best interests

12  of the Debtors' estates.  *Id.*

13      **2.      <u>Section 363(f)</u>**

14  Pursuant to § 363(f) , a debtor's assets may be sold free and clear of any and all liens, claims,

15  interests and other encumbrances if any one of the following conditions are satisfied: (1) applicable

16  nonbankruptcy law permits sale of such property free and clear of such interest; (2) such entity

17  consents; (3) such interest is a lien and the price at which such property is to be sold is greater than

18  the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such

19  entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such

20  interest. 11 U.S.C. § 363(f).

21      In this instance, the Purchased Assets may be sold free and clear of all Interests pursuant to

22  §§ 363(f)(1), (f)(2) or (f)(5).  For example, any secured creditors' liens will attach to the proceeds

23  of sale in the same priority that the secured creditors held a security interest in the Purchased Assets

24  being sold.  Furthermore, parties with a potential interest in the Purchased Assets will receive notice

25  of the proposed transaction and the lack of objection to the sale should be deemed consent to the

26  sale under § 363(f)(2).

27      Thus, in accordance with § 363(f), the transfer of the Purchased Assets to Silicon Valley will

28  be a legal, valid, enforceable and effective transfer of the Purchased Assets, and will vest Silicon

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

10

1  Valley with all right, title, and interest in the Purchased Assets free and clear of all liens, claims,

2  encumbrances and interests.

3  **C.** **THE COURT SHOULD APPROVE THE ASSUMPTION AND ASSIGNMENT OF**

4  **DESIGNATED CONTRACTS AND ASSIGNED LEASES TO SILICON VALLEY**

5  Barring exceptions not relevant here, § 365(a) authorizes a debtor in possession, "subject to

6  the Court's approval, ... [to] assume or reject any executory contract or unexpired lease of the

7  debtor." A debtor in possession may assume or reject executory contracts and unexpired leases for

8  the benefit of the estate. *Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med.*

9  *Grp., Inc.)*, 476 F.3d 665, 671 (9th Cir. 2007); *In re Chi-Feng Huang*, 23 B.R. 798, 801 (B.A.P. 9th

10  Cir. 1982) ("The primary issue is whether rejection would benefit the general unsecured creditors.").

11  In reviewing a debtor in possession's decision to assume or reject an executory contract or unexpired

12  lease, a bankruptcy court should apply the "business judgment test" to determine whether it would

13  be beneficial to the estate to assume it. *See In re Hertz*, 536 B.R. 434, 442 (Bankr. C.D. Cal. 2015);

14  *Pomona Valley Med. Grp.*, 476 F.3d at 670. The business judgment standard requires that the Court

15  follow the business judgment of the debtor unless that judgment is the product of "bad faith, whim,

16  or caprice." *Pomona Valley Med. Grp.*, 476 F.3d at 670 (quoting *Lubrizol Enters. v. Richmond Metal*

17  *Finishers*, 756 F.2d 1043, 1047 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986)).

18  Pursuant to § 365(f)(2), a debtor may assign its executory contracts and unexpired leases,

19  provided the debtor first assumes such executory contracts and unexpired leases in accordance with

20  § 365(b)(1), and provides adequate assurance of future performance by the assignee. Pursuant to §

21  365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any

22  existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements

23  for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of

24  future performance under the contract or lease. 11 U.S.C. § 365(b)(1); *see also In re Bowman*, 194

25  B.R. 227, 230 (Bankr. D. Ariz. 1995); *In re AEG Acquisition Corp.*, 127 B.R. 34, 44 (Bankr. C.D.

26  Cal. 1991), *aff'd*, 161 B.R. 50 (B.A.P. 9th Cir. 1993). Pursuant to § 365(f)(1), a debtor may assign

27  an executory contract or unexpired lease pursuant to § 365(f)(2) notwithstanding any provision in

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

11

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  such executory contract or unexpired lease that prohibits, restricts or conditions the assignment of

2  such executory contract or unexpired lease.

3      The assumption and assignment of executory contracts and unexpired leases furthers the

4  goals of chapter 11 of promoting reorganization by balancing the debtor's interest in maximizing

5  the value of its estate against the contracting party's interest in receiving the benefit of its bargain

6  and being protected against default by the debtor after assumption has occurred. *In re Embers 86th*

7  *Street. Inc.*, 184 B.R. 892, 896 (Bankr. S.D.N.Y. 1995).

8      Here, the Debtors seek the Court's authority to assume and assign to Silicon Valley, pursuant

9  to the terms of the Agreement, all of the Designated Contracts and Assigned Leases upon the Closing

10  Date.  Silicon Valley shall pay the cure costs, if any, associated with each Designated Contract and

11  Assigned Lease, in the amounts listed on Exhibits A and D, directly to each contract counter-party

12  on or prior to the Closing Date.  Adcock Declaration, ¶ 12.  If the actual cure costs exceed the

13  aggregate amount listed on Exhibits A and D, the Debtors shall be responsible to pay the excess

14  amount of actual cure costs.  *Id.*

15      The assignment of the Designated Contracts and Assigned Leases to Silicon Valley is

16  necessary to effectuate the sale of the Purchased Assets to Silicon Valley so that Silicon Valley can

17  continue to operate the Clinics. Adcock Declaration, ¶ 13.  Thus, the Debtors have exercised their

18  reasonable business judgment in assuming and assigning the Designated Contracts and Assigned

19  Leases to Silicon Valley.  *Id.*

20      During the course of negotiations on the Agreement, Silicon Valley has simultaneously

21  engaged in discussions with the counter-parties to the Designated Contracts and Assigned Leases

22  for a continuing relationship under the Designated Contracts and Assigned Leases.  Adcock

23  Declaration, ¶ 14.

24  **D.    THE COURT SHOULD APPROVE THE REJECTION OF THE REJECTED**

25  **LEASES  AND EXECUTORY CONTRACTS**

26      The Debtors also seek the Court's authority to reject all of the Rejected Leases associated

27  with the Clinics, except for the Assigned Leases.  The Debtors also seek authority to reject those

28  executory contracts, if any, that are not assigned to Silicon Valley as Designated Contracts (the

1   "Rejected Contracts"). Section 365(a) authorizes a debtor in possession, "subject to the Court's

2   approval, . . . [to] assume or reject any executory contract or unexpired lease of the debtor."  11

3   U.S.C. § 365(a) (made applicable by § 1107(a)).  In reviewing a debtor in possession's decision to

4   assume or reject an executory contract or unexpired lease, a bankruptcy court should apply the

5   "business judgment test" to determine whether to approve the assumption or rejection.  *See N.L.R.B.*

6   *v. Bildisco & Bildisco*, 465 U.S. 513, 523, 104 S. Ct. 1188, 1194, 79 L. Ed. 2d 482 (1984)

7   (recognizing that the business judgment rule is used in reviewing motions to reject executory

8   contracts); *Pomona Valley Med. Grp.,* 476 F.3d at 670. The business judgment standard requires

9   that the bankruptcy court "presume that the debtor-in-possession acted prudently, on an informed

10  basis, in good faith, and in the honest belief that the action taken was in the best interests of the

11  bankruptcy estate." *Pomona Valley Med. Grp*., 476 F.3d at 670.  As a result, the bankruptcy court

12  should approve rejection "unless it finds that the debtor-in-possession's conclusion that rejection

13  would be 'advantageous is so manifestly unreasonable that it could not be based on sound business

14  judgment, but only on bad faith, or whim or caprice.'" *Id*. (quoting *Lubrizol Enters.*, 726 F.2d at

15  1047).

16         Here, the Debtors' decision to reject the Rejected Leases and Rejected Contracts

17  indisputably falls within their sound business judgment.  Each of the Rejected Leases and Rejected

18  Contracts are real property leases or executory contracts associated with the Clinics which are not

19  being assigned to Silicon Valley.  Adcock Declaration, ¶ 15.  Following the closing of the sale of

20  the Purchased Assets to Silicon Valley, the Clinics will be operated by Silicon Valley, not the

21  Debtors. *Id*.  Thus, because the Rejected Leases and Rejected Contracts are not being assigned to

22  Silicon Valley and because the Debtors will not operate the Clinics after closing of the sale, there is

23  not benefit to the Debtors' estates to remain obligated under the Rejected Leases and Rejected

24  Contracts. *Id*.  Accordingly, rejection of the Rejected Leases and Rejected Contracts as of the

25  closing of the sale of the Purchased Assets to Silicon Valley is in the estates' best interests, and such

26  a decision falls squarely within the Debtors' sound business judgment.  *Id*.

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110250566\V-8

**V.**

**CONCLUSION**

For all the reasons set forth herein, the Debtors request the Court enter an order (i) approving the Agreement pursuant to Rule 9019, (ii) authorizing the private sale of the Purchased Assets to Silicon Valley, under § 363, free and clear of all liens, claims, encumbrances and interests, (iii) approving the assumption and assignment of the Designated Contracts and Assigned Leases to Silicon Valley and (iv) approving the rejection of the Rejected Leases and Rejected Contracts.

Dated:  February 26, 2019

DENTONS US LLP
SAMUEL R. MAIZEL
TANIA M. MOYRON

By     /s/ Tania M. Moyron
        Tania M. Moyron

Attorneys for the Chapter 11 Debtors and
Debtors In Possession

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110250566\V-8

## DECLARATION OF RICHARD G. ADCOCK

I, Richard G. Adcock, declare, that if called as a witness, I would and could competently testify thereto, of my own personal knowledge, as follows:

1.     I am the Chief Executive Officer of Verity Health System of California, Inc. ("VHS"). I became the Debtors' Chief Executive Officer effective January 2018. Prior thereto, I served as VHS's Chief Operating Officer since August 2017.

2.     Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the healthcare industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.     This Declaration is in support of the *Debtors' Notice And Motion To Approve (I) Settlement And Asset Purchase Agreement By And Between Debtors Verity Medical Foundation And Verity Health Services Of California, Inc., Silicon Valley Medical Development, LLC and San Jose Medical Group, (II) Assumption and Assignment of Certain Contracts and Leases to Silicon Valley Medical Development, LLC, and (III) Rejection of Certain Leases* ("Motion") and for all other purposes permitted by law.

4.     Verity Medical Foundation ("VMF") holds a long-term professional services agreement with San Jose Medical Group ("SJMG") (the "PSA").  SJMG is a California professional corporations that employs and contracts with physicians (such as nurse practitioners and physician's assistants) who are directly engaged in the provision of professional medical services.

5.     Under the PSA, SJMG  provides professional medical services to the VMF medical clinics listed on Exhibit A to the Agreement (the "Clinics").  Each of the Clinics are subject to real property leases which are listed on Exhibit A to the Settlement and Asset Purchase Agreement between VMF, VHS, Silicon Valley Medical Development, LLC ("Silicon Valley") and SJMG (the "Agreement").

6.     The Agreement terminates the PSA and releases all claims between SJMG and VMF (including any rejection damages claims arising from the termination of the PSA and any other

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

110250566\V-8

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

claims arising under the PSA), except for any claims explicitly preserved under the Agreement, and provides that SJMG shall pay VMF $104,963.83 prior to closing in full satisfaction of the SJMG Note (more specifically defined in the Agreement).  The agreements reached, as result of the discussions among and between the Debtors, Silicon Valley, SJMG and certain other parties, are incorporated in the Agreement.

7.    The Agreement also provides for the purchase the Purchased Assets (as defined in the Agreement) of the Clinics by Silicon Valley, by way of private sale and subject to Bankruptcy Court approval. After closing of the sale, Silicon Valley intends to continue to operate the Clinics.

8.    I believe that the Agreement is fair and equitable and in the best interests of the estate. The Agreement generates $1.27 million of funds for the estates, it also resolves all claims held by SJMG against the Debtors, including those arising under the PSA, relieves the Debtors' estates from any rejection damages that would have arisen had the PSA been rejected in instead of terminated by the Agreement, provides for repayment of the SJMG Note, and it allows the Clinic to continue to serve patients in the community.

9.    The consummation of the Agreement eliminates disputes arising under the PSA between SJMG and the Debtors and also provides for repayment of the SJMG Note.  But for the Settlement, the Debtors and SJMG may have engaged in lengthy litigation regarding amounts owed by or to SJMG under the PSA.  In particular, the Debtors made demands on SJMG for alleged overpayments under the PSA and SJMG asserted claims against the Debtors for alleged unpaid amounts owed under the PSA and for negligence.  The litigation of these claims and counter-claims would be costly and their outcome uncertain.

10.    In addition, the Agreement will result in SJMG's retention of certain physicians.  If not for the Agreement, upon rejection of the PSA, Verity Medical Grouip, P.C. ("VMG") would terminate the employment of these physicians.  By retaining those physicians, that enter into termination agreements with VMG, SJMG will assume certain employment related costs and alleviates the estates from termination costs related to those physicians.

11.    The Debtors engaged in extensive, arms-length negotiations with Silicon Valley and its advisors over the terms of the Agreement. The $1,270,000 of proceeds from the sale will generate

16

funds for the benefit of the estate.  Also, as part of the consideration for the Agreement, Silicon Valley will assume the obligations under the Designated Contracts (listed on Exhibit D to the Agreement) and Assigned Leases (listed on Exhibit A to the Agreement), thus relieving the estates of rejection damages associated with the rejection of the Assigned Leases and Designated Contracts. A failure to consummate a sale of the Purchased Assets to Silicon Valley would result in virtually no return to the estates for the Purchased Assets and the rejection of the PSA, the Assigned Leases and Designated Contracts, causing the estates to incur additional claims.  Accordingly, I have concluded that the proposed sale of the Purchased Assets to Silicon Valley is in the best interests of the Debtors' estates.

12.    The Debtors also seek the Court's authority to assume and assign to Silicon Valley, pursuant to the terms of the Agreement, all of the Designated Contracts and Assigned Leases upon the Closing Date.  Silicon Valley shall pay the cure costs, if any, associated with each Designated Contract and Assigned Lease, in the amounts listed on Exhibits A and D to the Agreement, directly to each contract counter-party on or prior to the Closing Date.  If the actual cure costs exceed the aggregate amount listed on Exhibits A and D, the Debtors shall be responsible to pay the excess amount of actual cure costs.

13.    The assignment of the Designated Contracts and Assigned Leases to Silicon Valley is necessary to effectuate the sale of the Purchased Assets to Silicon Valley so that Silicon Valley can continue to operate the Clinics. Thus, the Debtors have exercised their reasonable business judgment in assuming and assigning the Designated Contracts and Assigned Leases to Silicon Valley.

14.    During the course of negotiations on the Agreement, Silicon Valley has simultaneously engaged in discussions with the counter-parties to the Designated Contracts and Assigned Leases for a continuing relationship under the Designated Contracts and Assigned Leases.

15.    Each of the Rejected Leases (listed on Exhibit A to the Agreement) are real property leases of the Clinics which are not being assigned to Silicon Valley.  Similarly, all rejected Contracts, if any, are contracts which are not being assigned to Silicon Valley. Following the closing of the sale of the Purchased Assets to Silicon Valley, the Clinics will be operated by Silicon Valley,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

17

not the Debtors.  Thus, because the Rejected Leases and Rejected Contracts are not being assigned to Silicon Valley and because the Debtors will not operate the Clinics after closing of the sale, there is not benefit to the Debtors' estates to remain obligated under the Rejected Leases and Rejected Contracts.  Accordingly, I believe that the rejection of the Rejected Leases and Rejected Contracts as of the closing of the sale of the Purchased Assets to Silicon Valley is in the estates' best interests.

I declare under penalty of perjury and of the laws in the United States of America, the foregoing is true and correct.

Executed this 26th day of February, 2019, at Los Angeles, California.


[SIGNATURE PAGE TO BE SUBMITTED]
_____
RICHARD G. ADCOCK

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

110250566\V-8

# EXHIBIT 1

## SETTLEMENT AND ASSET PURCHASE AGREEMENT

This **SETTLEMENT AND ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of February 15, 2019, is by and between Silicon Valley Medical Development, LLC, a California limited liability company and wholly owned entity of El Camino Hospital ("Buyer"); Verity Medical Foundation, a California nonprofit public benefit corporation ("VMF"); Verity Health System of California, Inc., a California nonprofit public benefit corporation ("VHS" and collectively with VMF, "Seller"); and San Jose Medical Clinic, Inc. d/b/a San Jose Medical Group, a California professional corporation ("SJMG"). Buyer, Seller, and SJMG, may each be referred to herein as a "Party," and collectively as the "Parties."

**WHEREAS,** Seller and their affiliated debtors (collectively, the "Debtors") have filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court") under lead Case No. 2:18bk-20151-ER (the "Bankruptcy Case");

**WHEREAS,** SJMG and VMF are parties to a certain Professional Services Agreement dated April 1, 2012, as amended (the "PSA"), under which SJMG provides professional medical services to VMF medical clinics listed on Exhibit A (the "Clinics") and at Debtors' hospitals;

**WHEREAS,** Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, certain assets;

**WHEREAS,** Buyer and SJMG intend to enter into agreements under which SJMG will transition its professional medical services from Seller to Buyer and its affiliates; and in order to effectuate such transition, SJMG and Seller desire to enter into certain agreements and to resolve certain disputes between VHS and VMF, on the one hand, and SJMG, on the other hand, as more fully described below;

**WHEREAS,** the Parties intend to effectuate the sale of the Purchased Assets (defined below) and the settlement of claims and disputes contemplated by this Agreement by seeking approval of the Agreement by the Bankruptcy Court pursuant to a motion filed under Federal Rule of Bankruptcy Procedure 9019, incorporating a request for approval of the sale under Section 363 of the Bankruptcy Code (the "Settlement and Sale Motion").

**NOW, THEREFORE,** in consideration of the foregoing and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

## ARTICLE I - PURCHASE OF ASSETS

Section 1.1.    Parties to Article I. For the purposes of this Article I, SJMG shall not be deemed a "Party".

Section 1.2.    Purchased Assets.    Subject to final approval of the transactions contemplated by this Agreement by the Bankruptcy Court and upon the terms and subject to the

4828-5181-1719.11

conditions contained in this Agreement, Seller will sell to Buyer and Buyer will purchase from Seller on the Closing Date (as defined in <u>Section 1.4</u> below) the following interest, rights and other assets of Seller (collectively, the "<u>Purchased Assets</u>") free and clear of any and all lien, pledge, mortgage, deed of trust, security interest, charge, claim, easement, enrichment, or other similar encumbrance or restrictions as permitted under Section 363 of the Bankruptcy Code (collectively the "<u>Encumbrances</u>"):

    A.   <u>Clinics' Purchased Assets</u>.  The following interests, rights and other assets of Seller to the extent such assets are used exclusively in the operations of the Clinics:

    i   all of the tangible personal property owned by Seller and used exclusively in the operation of the Clinics, including equipment, furniture, machinery and office furnishings as listed on <u>Exhibit B</u> (the "<u>Tangible Assets</u>");

    ii   all of the following to the extent used exclusively in the operation of the Clinics, legally transferrable and not subject to prior consent of any third party: operating manuals, forms, files, books, records, documents and computer software, including, without limitation, all patient records in electronic form, equipment records, electronic medical records, all as listed on <u>Exhibit C</u> (collectively the "<u>Books and Records</u>");

    iii   all inventories of supplies, drugs (to the extent legally transferrable), food, janitorial and office supplies and other disposables and consumables located at the Clinics (the "<u>Inventory</u>");

    iv   all of Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) exclusively with respect to the operation of the Clinics that have been designated by Buyer as a contract to be assumed pursuant to <u>Section 2.1</u> and listed on <u>Exhibit D</u>, which exhibit shall list any cure costs associated with such contracts (the "<u>Designated Contracts</u>");

    v   the extent used exclusively with respect to the operation of the Clinics, all of Seller's web sites, URLs, and social media accounts, including but not limited to, Facebook and LinkedIn as listed on <u>Exhibit E</u> ("<u>Websites</u>");

    vi   Seller's right, title and interest in and to the telephone and facsimile numbers used with respect to the operation of the Clinics as listed on <u>Exhibit F</u> ("<u>Phone and Fax Numbers</u>");

    vii   the right to use any trademarks, service marks, trademark and service mark registrations and registration applications, trade names, trade name registrations, logos, domain names, trade dress, copyrights, copyright registrations, website content, know- how, trade secrets and the corporate or company names of the Clinics, together with all rights to sue and recover damages for infringement, dilution, misappropriation or other violation or conflict associated with any of the foregoing as listed on <u>Exhibit G</u> ("<u>IP</u>"); and

viii    all goodwill of the Clinics.

Section 1.3.    <u>Excluded Assets</u>. Notwithstanding anything to the contrary in <u>Section 1.2</u>, Seller shall retain all interests, rights and other assets owned directly or indirectly by it (or any of such Seller's affiliates) which are not among the Purchased Assets, including, without limitation, the following interests, rights and other assets of Seller (collectively, the "<u>Excluded Assets</u>"):

A.    cash, cash equivalents and short-term investments, provided that any cash or cash equivalents generated by the services, goods, products and supplies provided by or performed by Buyer, its principals, staff and agents after the Closing Date shall not be deemed to fall within the definition of Excluded Assets; and

B.    all accounts and interest thereupon, notes and interest thereupon and other receivables of such Seller, including, without limitation, accounts, notes or other amounts receivable, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, in each case arising from the rendering of services or provision of goods, products or supplies to outpatients at the Clinics, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided prior to the Closing Date whether payable by Medicare, Medicaid, or any other payor (including an insurance company), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source (collectively, "<u>Accounts Receivable</u>") generated on or before the Closing Date.

Section 1.4.    <u>Closing Date</u>. Subject to the satisfaction or waiver of the conditions set forth herein, the consummation of the transactions contemplated by this Agreement, which have been approved by the Bankruptcy Court, shall take place within five (5) business days following the satisfaction or waiver of all other conditions to Closing set forth in <u>Section 5.1</u>, at the offices of Dentons US LLP, 601 South Figueroa St., Suite 2500, Los Angeles, CA 90017-5704 (or on such other date at such other time and place as the parties shall agree in writing) (the "<u>Closing Date</u>"). Unless otherwise agreed in writing by Seller and Buyer, the Closing Date shall occur on April 1, 2019. Regardless of the actual time of the closing on the Closing Date, the closing shall be deemed effective as of the first moment in time on the Closing Date.

Section 1.5.    <u>Purchase Price</u>. In consideration of the sale, conveyance, transfer and delivery of the Purchased Assets, and subject to the terms and conditions herein, in addition to the Assumed Liabilities (defined below), Buyer agrees to pay an aggregate purchase price for the Purchased Assets of $1,270,000 (the "<u>Purchase Price</u>"). The Purchase Price shall be delivered by Buyer to Seller (or its designee) on or before the Closing Date by wire transfer to such account(s) as may be designated by Seller.

Section 1.6.    <u>Liabilities</u>. Buyer and Seller each acknowledge and agree that Buyer is purchasing only the Purchased Assets and assuming only the liabilities set forth in <u>Sections 1.2</u> and <u>1.8</u> as of the Closing Date (collectively, the "<u>Assumed Liabilities</u>"), and Buyer is not assuming any other liabilities of Seller (all such other liabilities, including but not limited to any taxes incurred by Seller at any time, and Seller's accounts receivable being retained by Seller, collectively "<u>Excluded Liabilities</u>"). Seller acknowledges and agrees that Seller shall remain

3

liable and obligated to discharge and perform all of the Excluded Liabilities and the Assumed Liabilities to the extent arising after the commencement of the Bankruptcy Case and prior to the Closing Date, but only to the extent as required by the Bankruptcy Code.  For the avoidance of doubt, except as set forth in Section 2.1 below, Seller shall not be liable or obligated for any cure amounts owed on account of a Designated Contract or Assigned Lease.

Section 1.7.  <u>Bill of Sale and Assignment and Assumption Agreement</u>.  On the Closing Date, Buyer and Seller shall enter into a bill of sale in substantially the form set forth on <u>Exhibit H</u> attached hereto (the "<u>Bill of Sale</u>").  On the Closing Date, Buyer and Seller shall enter into the assignment and assumption agreement in substantially the form set forth on <u>Exhibit I</u> attached hereto (the "<u>Assignment and Assumption Agreement</u>").

Section 1.8.  <u>Real Property</u>.  Effective on the Closing Date, Seller shall reject those certain real property leases designated for rejection on <u>Exhibit A</u> hereto (the "<u>Rejected Leases</u>") and assign to Buyer those certain leases designated for assignment on <u>Exhibit A</u> hereto (the "<u>Assigned Leases</u>").  <u>Exhibit A</u> shall also include any cure costs associated with the Assigned Leases.  Except for the Assigned Leases, Buyer shall use its best efforts to negotiate and enter into all new leases from the landlords or sub-landlords for any continued occupancy of the Clinics beyond the Closing Date (the "<u>New Leases</u>"). As described in <u>Section 1.10</u>, Seller shall use reasonable efforts to assist Buyer in entering into New Leases.

Section 1.9.  <u>Employment</u>.  Buyer shall have no obligation to offer employment, hire or otherwise retain any employees or contractors at the Clinics (collectively, the "<u>Support Personnel</u>"). Seller shall issue all WARN notices to such Support Personnel as is necessary and appropriate.  Buyer shall not be responsible for any accrued but unused Paid Time Off ("<u>PTO</u>") credited to the Support Personnel immediately prior to the Closing Date and shall not be responsible for any payments for unused PTO to such employees.  For the avoidance of doubt, nothing herein shall be interpreted as an agreement by the Seller to assume PTO or any other employment related liability or obligations for any individual who is not an employee of Seller including, but not limited to, any PTO or employment related liabilities for physicians employed by SJMG.

Section 1.10.  <u>Transition Services Agreement</u>.  VMF and Buyer shall enter into a Transition Services Agreement whereby VMF will provide support in the assignment of Designated Contracts, agreements and leases (including payor agreements), payor communication, medical records transfer and patient communication, prior-to and post-closing (the "<u>TSA</u>").

Section 1.11.  <u>Communications</u>.  Buyer and Seller shall work together in good faith to create a plan of communications to Clinics' patients and payors.  Prior to the issuance of written communication to Clinics' patients or payors, Seller and Buyer shall have the right to review and comment on and provide final approval of the form and substance of any such communication.

Section 1.12.  <u>Disclaimer of Warranties; Release and Waiver of Claims</u>.

A.  THE PURCHASED ASSETS TRANSFERRED TO BUYER WILL BE SOLD BY SELLER AND PURCHASED BY BUYER IN THEIR PHYSICAL CONDITION ON THE CLOSING DATE, "AS IS, WHERE IS AND WITH ALL

4

FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLER INCLUDED IN THE PURCHASED ASSETS, THE ASSUMED LIABILITIES ARE BEING ACQUIRED OR ASSUMED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS AND WITH ALL EXISTING LIENS, WHETHER KNOWN OR UNKNOWN.   ALL OF THE TANGIBLE PURCHASED ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE CLOSING DATE.

B.     Buyer acknowledges that Buyer will be examining, reviewing and inspecting all matters which in Buyer's judgment bear upon the Purchased Assets, Seller, the Clinics, the business of the Clinics and their value and suitability for Buyer's purposes and is relying solely on Buyer's own examination, review and inspection of the Purchased Assets and Assumed Liabilities.

C.     Buyer acknowledges that the representations and warranties of Seller contained in <u>Section 4.1</u> are the sole and exclusive representations and warranties made by Seller to Buyer.

## ARTICLE II - TRANSFER AND TERMINATION OF CERTAIN AGREEMENTS

Section 2.1.    <u>Assignment of Contracts from Seller to Buyer</u>.  Seller seeks to assign and Buyer seeks to assume and accept assignment of the Designated Contracts listed on <u>Exhibit D</u> hereto effective as of the Closing Date.  Buyer reserves the right to amend <u>Exhibit D</u> to add additional Designated Contracts until the day which is not later than fourteen (14) days prior to the hearing to approve the Settlement and Sale Motion.  Buyer reserves the right to remove Designated Contracts from <u>Exhibit D</u> at any time until the hearing to approve the Settlement and Sale Motion. Seller shall provide notice to counter-parties to the Designated Contracts of the Seller's intent to assume and assign the Designated Contracts and the cure costs as listed on <u>Exhibit D</u>, if any, for such Designated Contracts.  On the Closing Date, Buyer shall pay, or be contractually obligated to pay by agreement with the contract counter-party, all cure costs associated with a Designated Contract or Assigned Lease directly to the counter-party to the Designated Contract or Assigned Lease that is assumed and assigned pursuant to this Agreement. To the extent that cure costs for Designated Contracts or Assigned Leases exceeds the amounts listed in <u>Exhibit D</u> or <u>Exhibit A</u>, in the aggregate, Seller shall be responsible to pay the amount by which the actual cure costs exceed the aggregate amount listed in <u>Exhibit D</u> and <u>Exhibit A</u>.

Section 2.2.    <u>Assignment of Contracts from SJMG to Buyer</u>.  SJMG seeks to assign and Buyer seeks to assume and accept assignment of the contracts listed on <u>Exhibit J</u> hereto (the "<u>SJMG Assigned Contracts</u>") effective as of the Closing Date.  Seller and SJMG agree to work with Buyer to assign all of SJMG's interest, to the extent assignable or transferable, in and to all

SJMG Assigned Contracts along with all security deposits held by counterparties to the SJMG Assigned Contracts or by SJMG, and all claims, causes of action, rights and defenses against counterparties to the SJMG Assigned Contracts, through mutually agreeable written assignment and assumption agreements prior to the Closing Date.

Section 2.3.    Termination of Certain Agreements.    On the Closing Date, SJMG and Seller hereby agree that (a) the PSA, and (b) any other agreements between SJMG or any physicians working at the Clinics, on the one hand, and any VHS affiliate, on the other hand, including all medical directorship agreements (collectively, the "Terminated Agreements"), are hereby terminated by mutual agreement and without liability to the parties thereto (including, without limitation, any claims for "rejection damages"), and shall therefore have no further force and effect.    Additionally, Seller shall authorize Verity Medical Group, P.C. ("VMG") to enter into termination and settlement agreements ("Physician Termination Agreements") with those physicians listed on Exhibit K ("GPC Physicians") and who will transition to SJMG.    Such Physician Termination Agreements shall (i) terminate the physician's employment with VMG; (ii) be executed by VMG and each physician prior to the Closing Date; and (iii) release VMG, Seller, and other VHS affiliates of all claims arising under the physician's employment agreement as of the Closing Date, regardless of when such claim arose.    As a condition to closing, SJMG shall have entered into employment agreements with those physicians who have entered into Physician Termination Agreements.

## ARTICLE III - SETTLEMENT AND RELEASE

Section 3.1.    Parties to Article III.    For the purposes of this Article III, Buyer shall not be deemed a "Party".

Section 3.2.    Repayment of the SJMG Note.    VMF and SJMG entered into that certain Promissory Note in the amount of $150,000, dated August 1, 2018, as amended (the "SJMG Note"), of which $104,963.83 remains unpaid.    As a condition to closing, on or before the Closing Date, SJMG shall pay VMF $104,963.83 by wire transfer in satisfaction of the SJMG Note.    Such payment shall completely satisfy SJMG's obligations under the SJMG Note and extinguish VMF's right to recover any additional payment thereunder.

Section 3.3.    General Release.    In consideration of promises in this Agreement, and as a material inducement to Seller and SJMG entering into this Agreement, the Seller and SJMG agree, each on behalf of itself, its representatives, successors and assigns and anyone claiming by, through or for anyone making a claim on such Party's behalf, to irrevocably and unconditionally waive, **RELEASE** and **FOREVER DISCHARGE** the other Party hereto from any and all liability, actions, causes of actions, common law claims, statutory claims under state or federal law that such releasing Party may now or hereafter have against another Party hereto and/or have on account of, arising out of, or in connection with all interactions, transactions or contracts, express or implied, between such Parties hereto, except as specifically preserved.

Section 3.4.    Releases Specific to SJMG, VMF and VHS: VHS and VMF, on the one hand, and SJMG, on the other, agree that the general releases contained in Section 3.3, shall, without limitation, release (i) all claims of SJMG against VMF, VHS and their affiliates arising under the PSA, including without limitation, (x) any "rejection damages" arising from the termination of the PSA; (y) any claims for amounts owed to SJMG under the PSA as set forth in

those certain proof of claim numbers 707, 708, 712, and 716; and (z) any claims for alleged breach of the PSA and/or negligence arising under the PSA; and (ii) all claims of VHS and/or VMF against SJMG and its affiliates arising under the PSA, including without limitation, any claims for alleged overpayments to SJMG  under the PSA.  For the avoidance of doubt, nothing in Sections 3.3 and 3.4 shall release SJMG's obligation under the SJMG Note.  Notwithstanding SJMG's release of claims under the PSA as contained herein, VMF shall make regularly scheduled payments to SJMG arising under the PSA through and including March 31, 2019; provided, however, that SJMG expressly waives any and all rights, title and interest in and to any payments that would otherwise be payable by VMF or VHS under the PSA after March 31, 2019.

Section 3.5.    With respect to the claims identified and released pursuant to Sections 3.3 and 3.4 of this Agreement, Seller and SJMG hereby waive and releases any and all rights under Section 1542 of the California Civil Code as said statute pertains to the claims being released hereunder. California Civil Code Section 1542 reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER INTERIM SETTLEMENT WITH THE DEBTOR."

> SJMG and Seller expressly agrees that this Agreement shall extend and apply to all unknown, unsuspected and unanticipated damages within the scope of the releases set forth herein, as well as those that are now disclosed.

## ARTICLE IV - REPRESENTATIONS AND WARRANTIES AND COVENANTS OF THE PARTIES

Section 4.1.    <u>Representations and Warranties of Seller</u>. VMF and VHS, jointly and severally, represent and warrant to Buyer as follows:

A.    Seller has full power and authority to enter into this Agreement, to perform its obligations hereunder and carry out the transactions contemplated herein. No additional internal consents (other than Bankruptcy Court approval for this Agreement) are required in order for Seller to perform its obligations and agreements hereunder.

B.    Seller has good and marketable title to all of the Purchased Assets, and, subject to Bankruptcy Court approval of the Agreement, is entitled to transfer the Purchased Assets free and clear of any liens or encumbrance or restriction on transfer as set forth in Section 363 of the Bankruptcy Code.

C.    This Agreement has been duly and validly executed and delivered by Seller and, assuming due and valid execution by Buyer, this Agreement constitutes a valid and binding obligation of Seller enforceable in accordance with its terms subject to (a) applicable Bankruptcy Court approval and bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

7

D.      Seller is a non-profit corporation duly organized, validly existing and in good standing under the laws of the State of California.  Seller has all necessary power and authority to own, operate and lease its properties and to carry on its businesses as now conducted.

E.      Neither the execution and delivery by Seller of this Agreement nor the consummation of the transactions contemplated hereby by Seller nor compliance with any of the material provisions hereof by Seller, will violate, conflict with or result in a breach of any material provision of Seller's articles of incorporation or bylaws or any other organizational documents of Seller or any contract, lease or other instrument by which Seller is bound;  (b) require any approval or consent of, or filing with, any governmental agency or authority (other than approval from the Bankruptcy Court), (c) violate any law, rule, regulation, or ordinance to which Seller is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Seller is subject.

F.      <u>Exhibit D</u> contains any and all cure costs (as of the specific dates provided therein) that are associated with each Designated Contract and such amounts are true and correct, to the best of Seller's knowledge as of the applicable dates listed on <u>Exhibit D</u>.

G.      <u>Exhibit A</u> contains any and all cure costs (as of the specific dates provided therein) that are associated with each Assigned Lease and such amounts are true and correct, to the best of Seller's knowledge as of the applicable dates listed on <u>Exhibit A</u>.

Section 4.2.      <u>Representations and Warranties of Buyer.</u>  Buyer represents and warrants to Seller as follows:

A.      Buyer has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby.  No additional internal consents are required in order for Buyer to perform its obligations and agreements hereunder.

B.      This Agreement has been duly and validly executed and delivered by Buyer and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of Buyer enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

C.      Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of California, is or will be duly authorized to transact business in the State of California, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

D.      Neither the execution and delivery by Buyer of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Buyer will (a) violate, conflict with or result in a breach of any material provision of the Articles of Organization, Limited Liability Company

8

Agreement or other organizational documents of Buyer or any contract, lease or other instrument by which Buyer is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Buyer is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Buyer is subject.

E.    Buyer acknowledges that it is purchasing the Purchased Assets on an "AS IS, WHERE IS" basis, and that Buyer is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement. Buyer further acknowledges that Seller is only making the representations and warranties contained in <u>Section 4.1</u> and Seller is not making any representations or warranties herein relating to the Purchased Assets or the operation of the Clinics on and after the Closing Date.

Section 4.3.    <u>Representations and Warranties of SJMG.</u>  SJMG represents and warrants to Seller and Buyer as follows:

A.    SJMG has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby. No additional internal consents are required in order for SJMG to perform its obligations and agreements hereunder.

B.    This Agreement has been duly and validly executed and delivered by SJMG and, assuming due and valid execution by Seller, this Agreement constitutes a valid and binding obligation of SJMG enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

C.    SJMG is a professional corporation duly formed, validly existing and in good standing under the laws of the State of California, is or will be duly authorized to transact business in the State of California, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

D.    Neither the execution and delivery by SJMG of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by SJMG will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of SJMG or any contract, lease or other instrument by which SJMG is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which SJMG is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which SJMG is subject.

E.    SJMG acknowledges that Buyer is purchasing the Purchased Assets on an "AS IS, WHERE IS" basis, and that SJMG is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of Seller other than as expressly set forth in this Agreement. SJMG further acknowledges that Seller is not

4828-5181-1719.11

making any representations or warranties herein relating to the Purchased Assets or the operation of the Clinics on and after the Closing Date.

Section 4.4.    <u>Covenants of All Parties</u>.

     A.     Upon the terms and subject to the conditions set forth in this Agreement, each of the Parties agrees to use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement.

     B.     Seller will use its reasonable best efforts to cause or obtain the satisfaction of the conditions applicable to Seller specified in <u>Sections 5.1(A)</u> and <u>5.1(C)</u> below. Buyer will use its reasonable best efforts to cause or obtain the satisfaction of the conditions applicable to Buyer specified in <u>Sections 5.1(A)</u> and <u>5.1(B)</u> below. SJMG will use its reasonable best efforts to cause or obtain the satisfaction of the conditions applicable to SJMG specified in <u>Sections 5.1(A), 5.1(B),</u> and <u>5.1(C)</u> below.

     C.     All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby including, without limitation, the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the Party incurring such costs and expenses.

     D.     Seller shall exercise reasonable efforts to obtain a "Sale Order" approving this Agreement, subject to its obligations in respect of any better and higher offer for Seller's assets in accordance with the Bankruptcy Code. For purposes of this Agreement, the term "<u>Sale Order</u>" shall mean an order of the Bankruptcy Court authorizing the settlements proposed herein and sale of the Purchased Assets to Buyer pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure and Section 363 of the Bankruptcy Code consistent with this Agreement and in a form reasonably satisfactory to Buyer.

     E.     Seller shall seek an order from the Bankruptcy Court retaining jurisdiction over all matters relating to claims against Seller as debtor solely in the Bankruptcy Court.

     F.     In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Seller shall immediately notify Buyer and SJMG of such appeal or stay request and shall provide to Buyer and SJMG promptly a copy of the related notice of appeal or order of stay.  Seller shall also provide Buyer and SJMG with written notice of any motion or application filed in connection with any appeal from either of such orders. In the event of an appeal of the Sale Order, Seller shall be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal.

Section 4.5.    <u>Website Direction</u>.  As a material inducement to Buyer to enter into this Agreement, as of the Closing Date and for a period of six (6) months after the Closing Date, Seller shall provide clear information on Seller's websites stating that Seller is no longer providing services at the Clinics and the relocation of SJMG physicians and GPC Physicians to providing services at SVMD's clinic locations.  Prior to the posting of such message on the

10

Closing Date, Buyer shall have the right to review and comment on and provide final approval of the statement.

Section 4.6.   Amendment for Real Estate.   In the event that: (a) the Bankruptcy Court and Sale Order do not authorize the assumption and assignment to Buyer of each of the Assigned Leases (provided that Buyer has paid or agreed to pay all cure costs) , or (b) prior to Closing, Seller is unable to obtain the New Leases, then Parties shall enter into an amendment to this Agreement to modify the terms of the Purchase Price and Purchased Assets, and any related terms thereto, to remove the inclusion of such Clinic location (either at the Assigned Lease location or the New Lease location) and any tangible assets in connection with such Clinic location.

## ARTICLE V - CONDITIONS AND TERMINATION

Section 5.1.   Conditions to the Obligations of the Parties.

A.   Conditions to Each Party's Obligations. The respective obligations of each Party to effect the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following conditions:

i   No court or other governmental entity having jurisdiction over Seller, SJMG or Buyer, or any of their respective subsidiaries, shall have enacted, issued, promulgated, enforced or entered any law, rule, regulation, executive order, decree, injunction or other order (whether temporary, preliminary or permanent) which is then in effect and has the effect of making the transactions contemplated by this Agreement illegal.

ii   The Bankruptcy Court shall have entered the Sale Order, which Sale Order shall not have been reversed or subject to any stay and shall be in a form and substance reasonably acceptable to the Buyer.

iii   VMG shall have entered into Physician Termination Agreements described in Section 2.3 above, and such Physician Termination Agreements shall contain a full release of any and all claims that such physician may assert against VMG or Seller arising from such physician's termination.

iv   As described in Section 2.3, SJMG shall have entered into employment agreements with those physicians who have entered into Physician Termination Agreements.

v   SJMG and Buyer shall have entered into a professional services agreement.

vi   SJMG shall have paid the SJMG Note as set forth in Section 3.2 above.

vii   Buyer shall have delivered to Seller the Purchase Price as set forth in Section 1.5 above.

11

viii    Seller and Buyer shall have entered into the Bill of Sale and the Assignment and Assumption Agreement as set forth in <u>Section 1.7</u> above.

ix    Buyer shall pay, or be contractually obligated to pay, all cure costs listed on <u>Exhibit D</u> that are associated with the Designated Contracts and all cure costs listed on <u>Exhibit A</u> that are associated with the Assigned Leases directly to the counter-party to the Designated Contract or Assigned Lease (as applicable) that is assumed and assigned pursuant to this Agreement. Further, pursuant to <u>Section 2.1</u>, to the extent that cure costs for Designated Contracts or Assigned Leases exceeds the amounts listed in <u>Exhibit D</u> or <u>Exhibit A</u>, in the aggregate, Seller shall have paid the amount by which the actual cure costs exceed the aggregate amount listed in <u>Exhibit D</u> and <u>Exhibit A</u> directly to the counter-party to the Designated Contract or Assigned Lease (as applicable).

x    Buyer shall have entered into the New Leases as set forth in <u>Section 1.8</u> above.

xi    VMF and Buyer shall have entered into the TSA as set forth in <u>Section 1.10</u> above.

xii    Any and all third party consents required in connection with assignment of the Designated Contracts and the SJMG Assigned Contracts shall have been obtained.

xiii    SJMG shall have assigned the SJMG Assigned Contracts to Buyer in a form satisfactory to Buyer, in its sole discretion.

xiv    Evidence of extended reporting period coverage ("<u>Tail Coverage</u>"), providing for extended reporting periods for claims made after the Closing Date in respect of events occurring prior to the Closing Date for the medical care of patients of Seller, SJMG, and GPC Physicians shall be delivered to Buyer.  Such Tail Coverage will insure against professional and general liabilities of Seller, SJMG, and GPC Physicians relating to all periods prior to the Closing Date with respect to the provision of professional medical services at the Clinics or other of Seller's locations at which physicians that are employed by or contracted with SJMG or GPC Physicians provided services.  Such Tail Coverage shall have the effect of converting Seller's applicable current professional and general liability insurance into "occurrence based" coverage.

xv    Per <u>Section 5.12(A)</u>, either: (1) the County of Santa Clara will have vacated the Clinics and removed any and all of its equipment from the Clinics prior to the Closing Date, or (2) Buyer and the County of Santa Clara will have entered into a written agreement with respect to lab services provided the Clinics.

xvi    Buyer, Seller, and SJMG shall agree on all Exhibits attached hereto.

12

B.      Conditions to Obligation of Seller. The obligation of Seller to effect the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the condition that Buyer and SJMG shall have performed in all material respects each of their covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date, including payment of the Purchase Price, and each of the representations and warranties of Buyer and SJMG contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date.

C.      Conditions to Obligations of Buyer.  The obligations of Buyer to effect the transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the condition that Seller and SJMG shall have performed in all material respects each of its covenants and agreements contained in this Agreement required to be performed on or prior to the Closing Date, and each of the representations and warranties of Seller and SJMG contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date as if made on and as of such date.

Section 5.2.      Conditions to be Fulfilled prior to or on March 24, 2019.

A.      Prior to or on March 24, 2019, Buyer shall either have: (i) entered into a written agreement with the County of Santa Clara with respect to lab services provided the Clinics, or (ii) directed Seller to have the County of Santa Clara to vacate the Clinics and removed any and all of its equipment from the Clinics prior to the Closing Date.

B.      Notwithstanding anything in this Agreement to the contrary, in the event that:

(i)  the actions in Section 5.2(A) above have not been taken by the Buyer; or

(ii) any of the conditions to closing set forth in Sections 5.1(A)(i)-(v) and 5.1(A)(x)-(xvi) have not been fulfilled on or before March, 24, 2019,

unless such condition is waived by both Seller and Buyer in writing, either Seller or Buyer shall have the right, in its sole discretion, to declare this Agreement null and void and the Agreement shall have no further effect, each party to bear its own costs.

Section 5.3.      Termination.  This Agreement may be terminated in writing at any time prior to the Closing Date:

A.      By Buyer, if the Closing Date does not occur prior to or on April 1, 2019, and such failure is not due to a breach by Buyer other than due to Buyer's breach of this Agreement;

B.      By Seller, (i) if the Closing Date does not occur prior to or on April 1, 2019, and such failure is not due to a breach by Seller; other than due to Seller's breach of this Agreement; or

4828-5181-1719.11

C.    By Buyer or Seller if, before the Closing Date, the other Party is in material breach of any representations, warranty, covenant or agreement contained herein and has not cured the same.

Section 5.4.    <u>Effect of Termination</u>.  In the event this Agreement is terminated by one Party, it shall be terminated in its entirety for all Parties.

**ARTICLE VI - MISCELLANEOUS**

Section 6.1.    <u>Entire Agreement; Modification</u>. This Agreement, including the schedules and exhibits hereto, constitutes the entire agreement and understanding of the Parties with respect to the transactions contemplated hereby, supersedes any and all prior agreements and understandings relating to the subject matter hereof (including any letter of intent) and may not be modified, amended or terminated except in writing signed by the Parties.

Section 6.2.    <u>Governing Law</u>.    This Agreement and the agreements executed in connection herewith shall be governed by the laws of the State of California (regardless of the laws that might otherwise govern under applicable principles of conflicts of law of the State of California) as to all matters including, but not limited to, matters of validity, construction, effect, performance and remedies.

Section 6.3.    <u>Jurisdiction</u>.  Each party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement and the transactions contained in or contemplated by this Agreement exclusively in (a) the Bankruptcy Court so long as the Chapter 11 Case remains open and (b) after the close of the Chapter 11 Case (if the Chapter 11 Case is not reopened) or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Central District of California or any California State court sitting in Los Angeles County (together with the Bankruptcy Court, the "<u>Chosen Courts</u>"), and solely in connection with claims arising under this Agreement or the transactions contemplated hereby (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto, and (iv) agrees that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with this Agreement.

Section 6.4.    <u>Dispute Resolution</u>.  So long as the Bankruptcy Case remains open, the parties may enforce this Agreement in the Bankruptcy Court and hereby consent to the Bankruptcy Court's jurisdiction with respect to all such matters.

Section 6.5.    <u>Further Assurances</u>.  From time to time after the closing, at Buyer's request, and without further consideration from Buyer, Seller shall execute and deliver such other instruments of conveyance and transfer and take such other actions as Buyer reasonably may require to convey, transfer to and vest in Buyer and to put Buyer in possession of the Purchased Assets.

Section 6.6.    <u>Waiver of Compliance; Consents</u>.  Any failure of Seller, SJMG, or Buyer to comply with any obligation, covenant, agreement or condition herein may be waived in

writing by such Party, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.   Whenever this Agreement requires or permits consent by or on behalf of any Party hereto, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 6.6.

Section 6.7.   Expenses.   Each Party will pay its own legal, accounting and other expenses incurred by such Party or on its behalf in connection with this Agreement and the transactions contemplated herein.

Section 6.8.   Miscellaneous.   This Agreement and all of the provisions hereof and the other documents or agreements contemplated hereby shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder or under any of the other documents or agreements contemplated hereby shall be assigned by any Party without the written consent of the other Parties.   This Agreement constitutes the product of the negotiation of the Parties hereto and the enforcement hereof shall be interpreted in a neutral manner, and not more strongly for or against any Party based upon the source of the draftsmanship hereof.   This Agreement may be executed in separate counterparts, each of which when so executed shall be an original, but all of such counterparts shall together constitute but one and the same instrument.   The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.   This Agreement, which term as used throughout includes the exhibits hereto, embodies the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein.   There are no restrictions, promises, representations, warranties, covenants or undertakings other than those expressly set forth or referred to herein.   This Agreement supersedes all prior agreements and understandings between the Parties with respect to such subject matter.

Section 6.9.   Publicity.   Prior to the issuance of a press release by any Party, the non-releasing Parties shall have the right to review and comment on and provide final approval of the form and substance of any press release or other public disclosure that such Party is named in and is materially related to this Agreement or any other transaction contemplated hereby.

Section 6.10.   Notices.   All notices required by this Agreement shall be in writing, and shall be deemed effective when personally delivered; when mailed by certified or registered mail, return receipt requested; or when deposited with a comparably reliable postal delivery service (such as Federal Express) or other courier service, or sent by facsimile or other electronic transmission system, addressed to the other Party as follows:

If to Buyer:                      Silicon Valley Medical Development, Inc.
                                  c/o Jill Gordon, Nixon Peabody LLP
                                  300 South Grand Ave. Suite 4100
                                  Los Angeles, CA 90071

4828-5181-1719.11

If to Seller:                    Verity Health System
                                 2040 East Mariposa Avenue
                                 El Segundo, CA 90245
                                 Attention: Elspeth Paul, General Counsel

If to SJMG:                      Teresa V. Pahl
                                 Hanson Bridgett LLP
                                 425 Market Street, 26th Floor
                                 San Francisco, CA 94105

The above contact information may be changed by a notice delivered as set forth in this
Section 6.10.

    Section 6.11.  Corporate Practice of Medicine.  Nothing contained herein is intended to
constitute the use of a medical license for the practice of medicine by anyone other than a
licensed physician; aid any corporation to practice medicine when in fact such corporation is not
authorized to practice medicine; or do any other act or create any other arrangements in violation
of applicable law.

    Section 6.12.  Health Law.  Each party enters into this Agreement with the intent of
conducting their relationship in full compliance with applicable state, local and federal law
including without limitation, the Code, federal Medicare and Medicaid laws, and 42 U.S.C.
Section 1395nn and applicable regulations.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

4828-5181-1719.11

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the Closing Date.

**SELLER:**

VERITY MEDICAL FOUNDATION


By: _____
Name: Rich Adcock
Title:   President


**VHS:**

VERITY    HEALTH    SYSTEM    OF
CALIFORNIA, INC.



By: _____
Name: Rich Adcock
Title:   Chief Executive Officer

**BUYER:**

SILICON    VALLEY    MEDICAL
DEVELOPMENT, LLC

By: _____
Name: Bruce Harrison
Title:   President


**CLINICS:**

SAN JOSE MEDICAL GROUP


By: _____
Name:
Title:

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the Closing Date.

**SELLER:**

VERITY MEDICAL FOUNDATION


By: _____
Name: Rich Adcock
Title:  President


**VHS:**

VERITY    HEALTH    SYSTEM    OF
CALIFORNIA, INC.


By: _____
Name: Rich Adcock
Title:  Chief Executive Officer


**BUYER:**

SILICON    VALLEY    MEDICAL
DEVELOPMENT, LLC

By: _____
Name: Bruce Harrison
Title:  President


**CLINICS:**

SAN JOSE MEDICAL GROUP

By: *Osama Lam MD*
Name: *Osama Lam, MD*
Title: *President*

**<u>Exhibit List</u>**

**Exhibit A – Clinic Locations (with Rejected Leases and New Leases designations)**
**Exhibit B – Tangible Assets**
**Exhibit C – Books and Records**
**Exhibit D – Designated Contracts**
**Exhibit E – Website**
**Exhibit F – Phone and Fax Numbers**
**Exhibit G – IP**
**Exhibit H – Bill of Sale**
**Exhibit I – Assignment and Assumption Agreement**
**Exhibit J – Assigned Contracts**
**Exhibit K – GPC Physicians**

**EXHIBITS**

**To**

**SETTLEMENT AND ASSET PURCHASE AGREEMENT**

**By and Among**

**Verity Medical Foundation,**

**Verity Health System of California, Inc.,**

**San Jose Medical Clinic, Inc. d/b/a San Jose Medical Group**

**and**

**Silicon Valley Medical Development, LLC,**

**wholly owned entity of El Camino Hospital**

**Dated February 15, 2019**

 

      **Each of the parties to the Settlement and Asset Purchase Agreement, by and among Verity Medical Foundation, Verity Health System of California, Inc., San Jose Medical Clinic, Inc. d/b/a San Jose Medical Group, and Silicon Valley Medical Development, LLC, hereby acknowledge and agree that each of the exhibits and attachments included herein remain subject to further modification, amendment, and revision by the parties.**

## Exhibit A

### Clinic Locations (with Rejected Leases and New Leases Designations)

| | Clinic Name | Location | Contract Description | Intended Disposition of Lease | Cure Amount |
|---|---|---|---|---|---|
| 1. | Good Samaritan Clinic | 2585 Samaritan Drive Suite 302 San Jose, CA, 95124 | Lease between Samaritan Properties, LLC and San Jose Medical Group, dated December 27, 2013, amended by Amendment 1 dated August 25, 2016 | New Lease To Be Negotiated | - |
| | Good Samaritan Clinic | 2585 Samaritan Drive Suite 105 San Jose, CA, 95124 | Lease between Samaritan Properties, LLC and San Jose Medical Group, dated April 1, 2012, amended by Amendment 1 dated August 25, 2016 | New Lease To Be Negotiated | - |
| | Good Samaritan Clinic | 2585 Samaritan Drive Suite 300 San Jose, CA, 95124 | N/A | New Lease To Be Negotiated | - |
| 2. | Morgan Hill Medical Associates | 18550 DePaul Drive, Suites 207 and 208, Morgan Hill, CA, 95037 | Lease between Saint Louise Regional Hospital and Brian Joyce, MD (original tenant), dated October 15, 2004, amended by amendment 1, dated October 15, 2005, Amendment 2, dated October 31, 2007, Amendment 3, dated October 31, 2009, Amendment 4, dated October 31, 2012. Assigned to Verity Medical Foundation through an Assignment of Lease and Consent, dated December 31, 2012, amended by Amendment 5, dated October 14, 2014, Amendment 6, dated December 21, 2015, Amendment 7, dated June 15, 2016, and Amendment 8, dated October 1, 2016. Amendment 8 adds Suite 207 to the definition of premises. | New Lease To Be Negotiated | - |

1

| | | | | | |
|---|---|---|---|---|---|
| **3.** | Gilroy Primary Care | 9360 No Name Uno Suite 125 Gilroy CA, 95020 | Office Lease between South Valley Medical Plaza, LLC and VMF dated March 7, 2017 | To be assigned | $0.00 |
| **4.** | McKee Clinic | 227 North Jackson Avenue, Suite No. 1 San Jose, CA, 95116 | Lease between Medical Office Buildings of California, LLC and Verity Medical Foundation, dated June 19, 2017, as amended by Amendment 1, dated June 19, 2017 | To be assigned | $0.00 |
| | McKee Clinic | 227 North Jackson Avenue, Suite No. 1 on the First and Second Floor, San Jose, CA, 95116 | Lease between Medical Office Buildings of California, LLC and San Jose Medical Group Management, Inc., dated March 21, 1994, as amended by Amendment 1, dated October 21, 2002, Amendment 2, dated July 1, 2004, Amendment 3, dated May 22, 2006; Assigned to DCHS Medical Foundation by San Jose Medical Group via Assignment of Lease and Consent dated April 26, 2012. | New Lease To Be Negotiated | - |
| **5.** | Willow Glen Clinic | 625 Lincoln Avenue, San Jose, CA, 95126 | Lease between Sobrato Group and San Jose Medical Group Management Inc., and San Jose Medical Group, amended by Amendment 1, dated November 15, 1996, Amendment 2, dated April 30, 1997, Amendment 3 dated March 27, 1998. Assigned to S1 52 LLC, as successor landlord, and DCHS Medical Foundation, as successor tenant, via Landlord's Consent to Assignment, dated August 30, 2013, and amended by Amendment 4, as between SI 52, LLC and VMF dated October 10, 2016 | To be assigned | $0.00 |

2

**Exhibit B – Tangible Assets**

|  | Location ID | Asset ID | Asset Description | Asset Class ID |
|---|---|---|---|---|
| 1. | Willow Glen (50) | COMP0017 | RadConnect System | COMPUTER |
| 2. | Willow Glen (50) | COMP0018 | Portable Laser Barcode | COMPUTER |
| 3. | Willow Glen (50) | COMP0046 | ICONNECT ACCESS 3.2.2 SOFTWAR (MERGE HC) | COMPUTER |
| 4. | Willow Glen (50) | COMP0052 | BARCO NIO 21.3 3MP MONITOR (CDW) | COMPUTER |
| 5. | Willow Glen (50) | COMP0077 | RIS Upgrade to ICO10 Version | COMPUTER |
| 6. | Willow Glen (50) | COMP0088 | SAMSUNG 401N LED 1080P 120 CMR | COMPUTER |
| 7. | Willow Glen (50) | COMP0284 | DESKTOP TC M910Q | COMPUTER |
| 8. | Willow Glen (50) | COMP081 | Dell R720 Server | COMPUTER |
| 9. | Willow Glen (50) | COMP155 | HP LASERJET ENTERPRISE M604N | COMPUTER |
| 10. | Willow Glen (50) | EQUIP0010 | Phone System | EQUIP NONMED |
| 11. | Willow Glen (50) | FURN0012 | Chairs & Stools | FURNITURE |
| 12. | Willow Glen (50) | FURN0013 | Furniture & Fixtures | FURNITURE |
| 13. | Willow Glen (50) | FURN0014 | Seats for 1st Floor, Waiting room | FURNITURE |
| 14. | Willow Glen (50) | FURN0015 | UltraSound Chair | FURNITURE |
| 15. | Willow Glen (50) | FURN0016 | Used Office Furniture, X-Ray Dept. | FURNITURE |
| 16. | Willow Glen (50) | FURN0017 | Waiting Room Furniture | FURNITURE |
| 17. | Willow Glen (50) | FURN0018 | Waiting Room Furniture WG | FURNITURE |
| 18. | Willow Glen (50) | FURN0024 | EXAM ROOM CURTAINS | FURNITURE |
| 19. | Willow Glen (50) | MED0035 | Cystoscope Endo Flexible video | EQUIP MED |
| 20. | Willow Glen (50) | MED0037 | Acuson Sequoia Ultrasound System | EQUIP MED |
| 21. | Willow Glen (50) | MED0038 | ATL Ultrasound, X-ray | EQUIP MED |

3

| 22. | Willow Glen (50) | MED0039 | Bone Densitometry Machine | EQUIP MED |
|-----|------------------|---------|---------------------------|-----------|
| 23. | Willow Glen (50) | MED0041 | Mammo Ready Rack Kodak M6B-90 Sec.-WG | EQUIP MED |
| 24. | Willow Glen (50) | MED0042 | M-IV Platinum Mammography Equipment | EQUIP MED |
| 25. | Willow Glen (50) | MED0043 | Ultrasound Serial #114713-WG | EQUIP MED |
| 26. | Willow Glen (50) | MED0044 | UltraSound, X-Ray | EQUIP MED |
| 27. | Willow Glen (50) | MED0046 | DXR Konica SRX 201, X-Ray | EQUIP MED |
| 28. | Willow Glen (50) | MED0047 | DXR Radiograph, X-Ray | EQUIP MED |
| 29. | Willow Glen (50) | MED0048 | Imation Equipment, X-Ray | EQUIP MED |
| 30. | Willow Glen (50) | MED0049 | PACS Digital Radiology Equipment | EQUIP MED |
| 31. | Willow Glen (50) | MED0050 | Purchasing of Entire X-Ray Dept. | EQUIP MED |
| 32. | Willow Glen (50) | MED0051 | X-ray Machine TDI-01443 | EQUIP MED |
| 33. | Willow Glen (50) | MED0052 | Zeron Medical Equip., X-Ray | EQUIP MED |
| 34. | Willow Glen (50) | MED0053 | Cardiology Treadmill | EQUIP MED |
| 35. | Willow Glen (50) | MED0054 | Treadmill  2000 Series System | EQUIP MED |
| 36. | Willow Glen (50) | MED0055 | EMG Nuerology Equipment-WG | EQUIP MED |
| 37. | Willow Glen (50) | MED0056 | Optivantage DH, Suspension Syst Kit | EQUIP MED |
| 38. | Willow Glen (50) | MED0057 | Bucky Table, X-Ray | EQUIP MED |
| 39. | Willow Glen (50) | MED0058 | Exam Tables | EQUIP MED |
| 40. | Willow Glen (50) | MED0059 | MED36 Original Valuation Before Lease | EQUIP MED |
| 41. | Willow Glen (50) | MED0060 | MED45 Valuation Amount Before Lease | EQUIP MED |
| 42. | Willow Glen (50) | MED0066 | Digital Radiography System EVP Plus | EQUIP MED |
| 43. | Willow Glen (50) | MED0070 | LCD Monitor 3 Mega Pixel | EQUIP MED |
| 44. | Willow Glen (50) | MED0081 | PACSSCAN FILM SYSTEM - EDGE | EQUIP MED |

4

| 45. | Willow Glen (50) | MED0098 | EKG 8300 AHA LTR (MCKESSON) | EQUIP MED |
|---|---|---|---|---|
| 46. | Willow Glen (50) | MED0099 | STRETCHER HYDROLIC (MCKESSON) | EQUIP MED |
| 47. | Willow Glen (50) | MED0100 | TABLE, POWER BASE (MCKESSON) | EQUIP MED |
| 48. | Willow Glen (50) | MED0101 | SCREENER VISION (MCKESSON) | EQUIP MED |
| 49. | Willow Glen (50) | MED0107 | LENSTAR LS 900 | EQUIP MED |
| 50. | Willow Glen (50) | MED0112 | GE MED SYSTEM ULTRASOUND | EQUIP MED |
| 51. | Willow Glen (50) | MED0113 | DEFIBRILLATOR LIFEPAK 20E W/L | EQUIP MED |
| 52. | Willow Glen (50) | MED0130 | X-RAY MACHINE (TETRA) | EQUIP MED |
| 53. | Willow Glen (50) | MED0131 | ODESSEY HF RADIOGRAPHIC (TETRA) | EQUIP MED |
| 54. | Willow Glen (50) | MED0132 | RECORDER COLOR LABELER (TETRA) | EQUIP MED |
| 55. | Willow Glen (50) | MED0133 | CARESTREAM CR LASER IMAGER (TETRA) | EQUIP MED |
| 56. | Willow Glen (50) | MED0136 | PACSCAN ULTRASOUND (TETRA) | EQUIP MED |
| 57. | Willow Glen (50) | MED0137 | SELINIA MAMOGRAPHY (TETRA) | EQUIP MED |
| 58. | Willow Glen (50) | MED0138 | NEW CADWELL SIERRA ASCENT | EQUIP MED |
| 59. | Willow Glen (50) | | QUANTUM QT-750 X-RAY MACHINE | EQUIP MED |
| 60. | Willow Glen (50) | | GENDEX  MC-150 X-RAY MACHINE | EQUIP MED |
| 61. | Willow Glen (50) | | TOSHIBA R&F ROOM (FLUORO NOT OPERABLE) | EQUIP MED |
| 62. | Willow Glen (50) | | HOLOGIC DIMENSIONS 2D MAMMOGRAPHY MACHINE | EQUIP MED |
| 63. | Willow Glen (50) | | GE LUNAR BONE DENSITY MACHINE | EQUIP MED |
| 64. | Willow Glen (50) | | SEQUOIA ULTRASOUND MACHINE | EQUIP MED |

5

| 65. | Willow Glen (50) | | GE LUNAR BONE DENSITY MACHINE | EQUIP MED |
|---|---|---|---|---|
| 66. | Willow Glen (50) | | GE QXI 4 SLICE CT (NOT OPERABLE) | EQUIP MED |
| 67. | Willow Glen (50) | | CARESTREAM CR READER | EQUIP MED |
| 68. | Willow Glen (50) | | CARESTREAM 975 MULTIPLATE CR READER | EQUIP MED |
| 69. | Willow Glen (50) | | CARESTREAM FILM PRINTER 5950 | EQUIP MED |
| 70. | Willow Glen (50) | | MALLINCKRODT CEILING MOUNT INJECTER FOR CT | EQUIP MED |
| 71. | Willow Glen (50) | | LAMP WELCK ALLYN (SPOT LIGHT LAMP FOR SONOHYSTERGRAMS) | EQUIP MED |
| 72. | Willow Glen (50) | | MAMMOGRAPHY VIEWING STATION 5MG MONITORS(3) | EQUIP MED |
| 73. | Willow Glen (50) | | 4 STOOLS IN X-RAY ROOMS | EQUIP MED |
| 74. | Willow Glen (50) | | IV PUMP (10) | EQUIP MED |
| 75. | Willow Glen (50) | | IV POLES (8) | EQUIP MED |
| 76. | Willow Glen (50) | | EXAM CHAIR (6) | EQUIP MED |
| 77. | Willow Glen (50) | | RECLINER CHAIR (5) | EQUIP MED |
| 78. | Willow Glen (50) | | WALL MOUNTED BP OPTH. AND OTOSCOPE (34) | EQUIP MED |
| 79. | Willow Glen (50) | | EXAM TABLE (34) | EQUIP MED |
| 80. | Willow Glen (50) | | VAGINAL LIGHT (11) | EQUIP MED |
| 81. | Willow Glen (50) | | MAYO STAND (44) | EQUIP MED |
| 82. | Willow Glen (50) | | GOOSE LAMP (8) | EQUIP MED |
| 83. | Willow Glen (50) | | PULSE OXIMETER (13) | EQUIP MED |
| 84. | Willow Glen (50) | | DIGITAL THERMOMETER (34) | EQUIP MED |
| 85. | Willow Glen (50) | | NEBULIZER (16) | EQUIP MED |

6

| 86. | Willow Glen (50) | | EKG MACHINE (6) | EQUIP MED |
|---|---|---|---|---|
| 87. | Willow Glen (50) | | AUTOCLAVE (2) | EQUIP MED |
| 88. | Willow Glen (50) | | DEFIBRILLATOR (2) | EQUIP MED |
| 89. | Willow Glen (50) | | DIGITAL SCALE (9) | EQUIP MED |
| 90. | Willow Glen (50) | | DIGITAL BP MONITOR | EQUIP MED |
| 91. | Willow Glen (50) | | LARYNGOSCOPE (2) | EQUIP MED |
| 92. | Willow Glen (50) | | GURNEY | EQUIP MED |
| 93. | Willow Glen (50) | | ANOSCOPE LIGHT (2) | EQUIP MED |
| 94. | Willow Glen (50) | | OPTHALMIC BURR | EQUIP MED |
| 95. | Willow Glen (50) | | MAGNIFYING GLASSES | EQUIP MED |
| 96. | Willow Glen (50) | | TONOMETERS (2) | EQUIP MED |
| 97. | Willow Glen (50) | | PORTABLE SUCTION (2) | EQUIP MED |
| 98. | Willow Glen (50) | | CRASH CART (2) | EQUIP MED |
| 99. | Willow Glen (50) | | AVAYA 1010 (2) | EQUIP NON MED |
| 100. | Willow Glen (50) | | CISCO SWITCHES (2) | EQUIP NON MED |
| 101. | Willow Glen (50) | | EXTREME UPS (2) | EQUIP NON MED |
| 102. | Willow Glen (50) | | 1140 E VOIP PHONES (28) | EQUIP NON MED |
| 103. | Willow Glen (50) | | 2616  TDM PHONES (10) | EQUIP NON MED |
| 104. | Willow Glen (50) | | 2008  TDM PHONES (39) | EQUIP NON MED |
| 105. | Willow Glen (50) | | ANALOG TDM (9) | EQUIP NON MED |
| 106. | Good Samaritan (20) | COMP0016 | Multi User MD-Reports GI Software System | COMPUTER |
| 107. | Good Samaritan (20) | COMP0054 | FUJITSU SCANNER  (CDW) | COMPUTER |
| 108. | Good Samaritan (20) | COMP0270 | DESKTOP TC M910Q | COMPUTER |
| 109. | Good Samaritan (20) | COMP141 | DELL LATITUDE 5580, BTX | COMPUTER |

7

| 110. | Good Samaritan (20) | COMP143 | INTERNAL US/INTERNATIONAL QWERTY BACKIT | COMPUTER |
|---|---|---|---|---|
| 111. | Good Samaritan (20) | COMP145 | FIXED HARWARD CONFIGURATION | COMPUTER |
| 112. | Good Samaritan (20) | COMP147 | CUSTOMER KIT, DELL DOCK TYPE C 180W | COMPUTER |
| 113. | Good Samaritan (20) | COMP159 | DELL LATITUDE 5580, BTX | COMPUTER |
| 114. | Good Samaritan (20) | COMP161 | DELL LATITUDE 5280, CTO | COMPUTER |
| 115. | Good Samaritan (20) | COMP163 | INTERNAL US/INTERNATIONAL QWERTY BACKIT | COMPUTER |
| 116. | Good Samaritan (20) | COMP165 | FIXED HARDWARE CONFIGURATION | COMPUTER |
| 117. | Good Samaritan (20) | COMP167 | CUSTOMER KIT, DELL DOCK TYPE C - 180W | COMPUTER |
| 118. | Good Samaritan (20) | COMP170 | DELL PROFESSIONAL BRIEFCASE 15.6 | COMPUTER |
| 119. | Good Samaritan (20) | COMP19 | DELL LATITUDE 5280 CTO | COMPUTER |
| 120. | Good Samaritan (20) | EQUIP0024 | SV ELECTRIC | EQUIP NONMED |
| 121. | Good Samaritan (20) | FURN0004 | GSM Furniture | FURNITURE |
| 122. | Good Samaritan (20) | FURN0005 | Waiting Room Furniture | FURNITURE |
| 123. | Good Samaritan (20) | FURN0006 | Waiting Room Furniture | FURNITURE |
| 124. | Good Samaritan (20) | FURN0007 | Waiting Room Furniture | FURNITURE |
| 125. | Good Samaritan (20) | MED0003 | EC10C5 Prostate Transducer | EQUIP MED |
| 126. | Good Samaritan (20) | MED0008 | ATL UM-4 + Ultrasound System | EQUIP MED |
| 127. | Good Samaritan (20) | MED0009 | IM Medical Equiptment | EQUIP MED |
| 128. | Good Samaritan (20) | MED0010 | Medical Equipment | EQUIP MED |
| 129. | Good Samaritan (20) | MED0011 | SonoSite M Turbo OB Ultrasound System | EQUIP MED |
| 130. | Good Samaritan (20) | MED0012 | Tables & Defibrillators | EQUIP MED |

8

| 131. | Good Samaritan (20) | MED0014 | ElectroCardiograph | EQUIP MED |
|---|---|---|---|---|
| 132. | Good Samaritan (20) | MED0015 | Microscope OPMI 1FC | EQUIP MED |
| 133. | Good Samaritan (20) | MED0069 | Quantum Q-Rad DS-3 System Package | EQUIP MED |
| 134. | Good Samaritan (20) | MED0185 | MONITOR VITAL SPOT, STAND 7 & CUFFS | EQUIP MED |
| 135. | Good Samaritan (20) | | EXAM TABLES (55) | EQUIP MED |
| 136. | Good Samaritan (20) | | STOOL (49) | EQUIP MED |
| 137. | Good Samaritan (20) | | MAYO STAND (37) | EQUIP MED |
| 138. | Good Samaritan (20) | | LIGHT SOURCE / FREESTANDING LIGHT (7) | EQUIP MED |
| 139. | Good Samaritan (20) | | EKG MACHINE (5) | EQUIP MED |
| 140. | Good Samaritan (20) | | THERMOMETER (4) | EQUIP MED |
| 141. | Good Samaritan (20) | | AUTOCLAVE | EQUIP MED |
| 142. | Good Samaritan (20) | | ATTEST STEAM INDICATOR MACHINE | EQUIP MED |
| 143. | Good Samaritan (20) | | O2 STAND & PORT | EQUIP MED |
| 144. | Good Samaritan (20) | | FIRST AID KIT | EQUIP MED |
| 145. | Good Samaritan (20) | | DISASTER KIT | EQUIP MED |
| 146. | Good Samaritan (20) | | WALL MOUNT BP / OTOSCOPE | EQUIP MED |
| 147. | Good Samaritan (20) | | CHAIRS (52) | EQUIP MED |
| 148. | Good Samaritan (20) | | REFRIGERATOR | EQUIP MED |
| 149. | Good Samaritan (20) | | TABLE (20) | EQUIP MED |
| 150. | Good Samaritan (20) | | MICROWAVE | EQUIP MED |
| 151. | Good Samaritan (20) | | COFFEE MAKER | EQUIP MED |
| 152. | Good Samaritan (20) | | WHEEL CHAIR (3) | EQUIP MED |
| 153. | Good Samaritan (20) | | 3 SHELF ROLLING CART (2) | EQUIP MED |

9

| 154. | Good Samaritan (20) | | METAL CART (7) | EQUIP MED |
|------|---------------------|--|----------------|-----------|
| 155. | Good Samaritan (20) | | BP CART WITH O2 AND TEMP (5) | EQUIP MED |
| 156. | Good Samaritan (20) | | CABINET (6) | EQUIP MED |
| 157. | Good Samaritan (20) | | FLOROSCAN | EQUIP MED |
| 158. | Good Samaritan (20) | | SCALES (15) | EQUIP MED |
| 159. | Good Samaritan (20) | | OXYGEN TANK (6) | EQUIP MED |
| 160. | Good Samaritan (20) | | CRYO TANK (2) | EQUIP MED |
| 161. | Good Samaritan (20) | | COLOPOSCOPE | EQUIP MED |
| 162. | Good Samaritan (20) | | U/S MACHINE (4) | EQUIP MED |
| 163. | Good Samaritan (20) | | LEEP MACHINE (2) | EQUIP MED |
| 164. | Good Samaritan (20) | | NEBULIZER (5) | EQUIP MED |
| 165. | Good Samaritan (20) | | ZEISS 50 OPMI BIONOCULAR | EQUIP MED |
| 166. | Good Samaritan (20) | | CONMED / HYFRECATOR 2000 (2) | EQUIP MED |
| 167. | Good Samaritan (20) | | SPHYGOMOMANOMETER (2) | EQUIP MED |
| 168. | Good Samaritan (20) | | SCOPES (4) | EQUIP MED |
| 169. | Good Samaritan (20) | | AVAYA 1010 (3) | EQUIP NONMED |
| 170. | Good Samaritan (20) | | CISCO SWITCHES (2) | EQUIP NONMED |
| 171. | Good Samaritan (20) | | UPS EXTREME (2) | EQUIP NONMED |
| 172. | Good Samaritan (20) | | AVAYA 1140 E VoIP PHONES (19) | EQUIP NONMED |
| 173. | Good Samaritan (20) | | NORTEL 2616  TDM PHONES (27) | EQUIP NONMED |
| 174. | Good Samaritan (20) | | NORTEL 2008  TDM PHONES (28) | EQUIP NONMED |
| 175. | Good Samaritan (20) | | NORTEL ANALOG TDM (8) | EQUIP NONMED |
| 176. | McKee (40) | COMP0078 | Barracuda Backup Server 890 | COMPUTER |
| 177. | McKee (40) | COMP0090 | Cisco Catalyst Network Switches | COMPUTER |
| 178. | McKee (40) | COMP0100 | Fujitsu Scanner | COMPUTER |

10

| 179. | McKee (40) | COMP0271 | DESKTOP TC M910Q | COMPUTER |
| 180. | McKee (40) | EQUIP0009 | Telephone System | EQUIP NONMED |
| 181. | McKee (40) | EQUIP0031 | TELEPHONE SYSTEM | EQUIP NONMED |
| 182. | McKee (40) | FURN0008 | Furniture & Fixtures | FURNITURE |
| 183. | McKee (40) | FURN0009 | Tables | FURNITURE |
| 184. | McKee (40) | FURN0010 | Waiting Room Furniture | FURNITURE |
| 185. | McKee (40) | FURN0011 | Medical Records Shelving | FURNITURE |
| 186. | McKee (40) | FURN0023 | EXAM ROOM CURTAIN TRACKS | FURNITURE |
| 187. | McKee (40) | MED0022 | Digital Imaging Winstation XP System | EQUIP MED |
| 188. | McKee (40) | MED0024 | Retinal Camera TRC-50EX | EQUIP MED |
| 189. | McKee (40) | MED0025 | Viridis 532nm Green Laser | EQUIP MED |
| 190. | McKee (40) | MED0026 | Visual Field Machine-McKee | EQUIP MED |
| 191. | McKee (40) | MED0027 | YAG Laser | EQUIP MED |
| 192. | McKee (40) | MED0029 | Fluoroscan Minil C-Arm-McKee | EQUIP MED |
| 193. | McKee (40) | MED0030 | Q-RAD X-Ray Machine | EQUIP MED |
| 194. | McKee (40) | MED0031 | Used X-Ray Equipment | EQUIP MED |
| 195. | McKee (40) | MED0032 | Auto Refractor Keratometer | EQUIP MED |
| 196. | McKee (40) | MED0033 | Ophthalmology Equipment | EQUIP MED |
| 197. | McKee (40) | MED0034 | Podiatry Chair | EQUIP MED |
| 198. | McKee (40) | MED0061 | GE Ultrasound System | EQUIP MED |
| 199. | McKee (40) | MED0067 | Digital Radiography System Basic Bundle | EQUIP MED |
| 200. | McKee (40) | MED0068 | GE Ultrasound System 2 | EQUIP MED |
| 201. | McKee (40) | MED0077 | VISUCAM FUNDUS CAMERA | EQUIP MED |
| 202. | McKee (40) | MED0082 | R2SYS-2200 CENOVA 2D 6U SYSTEM | EQUIP MED |

11

| 203. | McKee (40) | MED0111 | PUMP - VISTA BASIC INFUSION | EQUIP MED |
|------|------------|---------|------------------------------|-----------|
| 204. | McKee (40) | MED0114 | TABLE POWER BASE WITH RECEP | EQUIP MED |
| 205. | McKee (40) | MED0127 | PRACTICE ACQUISITION - FMA | EQUIP MED |
| 206. | McKee (40) | MED0128 | PRACTICE ACQUISITION - FMA | EQUIP MED |
| 207. | McKee (40) | MED0129 | X-RAY MACHINE (TETRA) | EQUIP MED |
| 208. | McKee (40) | MED0134 | LASER IMAGER (TETRA) | EQUIP MED |
| 209. | McKee (40) | MED0135 | SELENIA TUNGSTEN MAMO (TETRA) | EQUIP MED |
| 210. | McKee (40) | MED0140 | ECG CP150 INTERPRETIVE | EQUIP MED |
| 211. | McKee (40) | MED0212 | CIRRUS INSTRUMENT ANGIOPEX | EQUIP MED |
| 212. | McKee (40) | | QUANTUM ODYSSEY X-RAY MACHINE | EQUIP MED |
| 213. | McKee (40) | | SHIMADZU X-RAY MACHINE | EQUIP MED |
| 214. | McKee (40) | | HOLOGIC SELENIA MAMMOGRAPHY MACHINE 2D | EQUIP MED |
| 215. | McKee (40) | | CARESTREAM CR READER | EQUIP MED |
| 216. | McKee (40) | | CARESTREAM FILM PRINTER 5950 | EQUIP MED |
| 217. | McKee (40) | | 2 STOOLS | EQUIP MED |
| 218. | McKee (40) | | AUTOCLAVE (4) | EQUIP MED |
| 219. | McKee (40) | | OXYGEN TANK (9) | EQUIP MED |
| 220. | McKee (40) | | NITROGEN TANK | EQUIP MED |
| 221. | McKee (40) | | MAYO STAND (43) | EQUIP MED |
| 222. | McKee (40) | | EXAM TABLE (49) | EQUIP MED |
| 223. | McKee (40) | | OPTH. AND OTOSCOPE (40) | EQUIP MED |
| 224. | McKee (40) | | STOOL (62) | EQUIP MED |
| 225. | McKee (40) | | PATIENT CHAIR (120) | EQUIP MED |

4813-5557-6713.2

| 226. | McKee (40) | | OFFICE CHAIR (15) | EQUIP MED |
|---|---|---|---|---|
| 227. | McKee (40) | | VAGINAL LIGHT | EQUIP MED |
| 228. | McKee (40) | | XRAY LIGHT BOX (9) | EQUIP MED |
| 229. | McKee (40) | | SCALE (18) | EQUIP MED |
| 230. | McKee (40) | | BP MACHINES (18) | EQUIP MED |
| 231. | McKee (40) | | EKG MACHINE (5) | EQUIP MED |
| 232. | McKee (40) | | STORAGE CUBE (15) | EQUIP MED |
| 233. | McKee (40) | | LIGHT BOX (15) | EQUIP MED |
| 234. | McKee (40) | | LEEP MACHINE | EQUIP MED |
| 235. | McKee (40) | | LARGE MICROSCOPE | EQUIP MED |
| 236. | McKee (40) | | CAUTERY MACHINE | EQUIP MED |
| 237. | McKee (40) | | CAST SAWS (2) | EQUIP MED |
| 238. | McKee (40) | | MINI FRIDGE (11) | EQUIP MED |
| 239. | McKee (40) | | RECLINERS (3) | EQUIP MED |
| 240. | McKee (40) | | WATER MACHINE | EQUIP MED |
| 241. | McKee (40) | | EYE WASH STATION | EQUIP MED |
| 242. | McKee (40) | | IV STAND (4) | EQUIP MED |
| 243. | McKee (40) | | OVERHEAD PROJECTOR | EQUIP MED |
| 244. | McKee (40) | | OCT MACHINE WITH PRINTER | EQUIP MED |
| 245. | McKee (40) | | LASER MACHINE | EQUIP MED |
| 246. | McKee (40) | | LASER PROTECTIVE GLASSES (2) | EQUIP MED |
| 247. | McKee (40) | | KERATOMETER (6) | EQUIP MED |
| 248. | McKee (40) | | KEELER (WALL MOUNTER)  (6) | EQUIP MED |
| 249. | McKee (40) | | SLIT LAMP WITH TONOMETER (6) | EQUIP MED |
| 250. | McKee (40) | | AUTO REFRACTOR (6) | EQUIP MED |

13

| 251. | McKee (40) | | MIRRORS (MULTIPLES) | EQUIP MED |
|---|---|---|---|---|
| 252. | McKee (40) | | REINTOSCOPE, OTHALMOSCOPE, TRANSILLUMINATOR IN CHARGING STATION (6) | EQUIP MED |
| 253. | McKee (40) | | ELECTRICAL SURGICAL GENERATOR | EQUIP MED |
| 254. | McKee (40) | | TELEVISION | EQUIP NON MED |
| 255. | McKee (40) | | DVD PLAYER | EQUIP NON MED |
| 256. | McKee (40) | | AVAYA 1010 (3) | EQUIP NON MED |
| 257. | McKee (40) | | AASM (1) | EQUIP NON MED |
| 258. | McKee (40) | | ASBC  (1) | EQUIP NON MED |
| 259. | McKee (40) | | AT&T SIP (1) | EQUIP NON MED |
| 260. | McKee (40) | | UPS (2) | EQUIP NON MED |
| 261. | McKee (40) | | 1140 E VoIP PHONES (21) | EQUIP NON MED |
| 262. | McKee (40) | | 2616  TDM PHONES (27) | EQUIP NON MED |
| 263. | McKee (40) | | 2008  TDM PHONES (46) | EQUIP NON MED |
| 264. | McKee (40) | | ANALOG TDM (9) | EQUIP NON MED |
| 265. | Morgan Hill (57) | COMP153 | MS OFFICE HOME & BUS 2016 WIN | COMPUTER |
| 266. | Morgan Hill (57) | COMP160 | DELL LATITUDE 5580, BTX | COMPUTER |
| 267. | Morgan Hill (57) | COMP164 | INTERNAL US/INTERNATIONAL QWERTY BACKIT | COMPUTER |
| 268. | Morgan Hill (57) | COMP166 | FIXED HARDWARE CONFIGURATION | COMPUTER |
| 269. | Morgan Hill (57) | COMP168 | CUSTOMER KIT, DELL DOCK TYPE C - 180W | COMPUTER |
| 270. | Morgan Hill (57) | COMP171 | DELL PROFESSIONAL BRIEFCASE 15.6 | COMPUTER |
| 271. | Morgan Hill (57) | | LENOVO THINKPAD T470 (3) | COMPUTER |

14

| 272. | Morgan Hill (57) | MED0161 | MONITOR VITAL SPOT OXI TEMP W | EQUIP MED |
|---|---|---|---|---|
| 273. | Morgan Hill (57) | MED0171 | PODIATRY TABLE | EQUIP MED |
| 274. | Morgan Hill (57) | MED0172 | PODIATRY TABLE | EQUIP MED |
| 275. | Morgan Hill (57) | | EXAM TABLE (13) | EQUIP MED |
| 276. | Morgan Hill (57) | | WALL MOUNTED BP OPTH. AND OTOSCOPE (11) | EQUIP MED |
| 277. | Morgan Hill (57) | | MAYO STAND (13) | EQUIP MED |
| 278. | Morgan Hill (57) | | STOOL (16) | EQUIP MED |
| 279. | Morgan Hill (57) | | FLOOR LAMP (7) | EQUIP MED |
| 280. | Morgan Hill (57) | | HYFRECATOR | EQUIP MED |
| 281. | Morgan Hill (57) | | SPECULUM LIGHT (2) | EQUIP MED |
| 282. | Morgan Hill (57) | | DEFIBRILATOR | EQUIP MED |
| 283. | Morgan Hill (57) | | REFRIGERATOR (3) | EQUIP MED |
| 284. | Morgan Hill (57) | | AUTOCLAVE (2) | EQUIP MED |
| 285. | Morgan Hill (57) | | METAL CART (5) | EQUIP MED |
| 286. | Morgan Hill (57) | | CAST SAW - ELECTRIC | EQUIP MED |
| 287. | Morgan Hill (57) | | PODIATRY CHAIR (2) | EQUIP MED |
| 288. | Morgan Hill (57) | | SCALES (7) | EQUIP MED |
| 289. | Morgan Hill (57) | | OXIMETER (2) | EQUIP MED |
| 290. | Morgan Hill (57) | | LIGNITRO CONTAINERS (2) | EQUIP MED |
| 291. | Morgan Hill (57) | | EKG MACHINE | EQUIP MED |
| 292. | Morgan Hill (57) | | COMPUTER (3) | EQUIP MED |
| 293. | Morgan Hill (57) | | SCANNER (3) | EQUIP MED |
| 294. | Morgan Hill (57) | | NEBULIZER (10) | EQUIP MED |
| 295. | Morgan Hill (57) | | AVAYA | EQUIP NON MED |

4813-5557-6713.2

| 296. | Morgan Hill (57) | | APC 1500 | EQUIP NON MED |
|------|------------------|--|----------|---------------|
| 297. | Morgan Hill (57) | | AVAYA 1140 E VOIP PHONES (19) | EQUIP NON MED |
| 298. | Gilroy Primary (29) | COMP0096 | FUJITSU SCANNER | COMPUTER |
| 299. | Gilroy Primary (29) | COMP0102 | BOX NUC Kits | COMPUTER |
| 300. | Gilroy Primary (29) | COMP117 | DELL LATITUDE D5270, CTO | COMPUTER |
| 301. | Gilroy Primary (29) | COMP118 | DELL LATITUDE E5270 FLEX 1 | COMPUTER |
| 302. | Gilroy Primary (29) | COMP119 | E-PORT PLUS | COMPUTER |
| 303. | Gilroy Primary (29) | COMP120 | DELL LATITUDE E5570, CTO | COMPUTER |
| 304. | Gilroy Primary (29) | COMP121 | CUS, DS, IS, WE15, US, 130W | COMPUTER |
| 305. | Gilroy Primary (29) | COMP122 | KIT-DELL URBAN BRIEFCASE 15 | COMPUTER |
| 306. | Gilroy Primary (29) | | LENOVO T470 | COMPUTER |
| 307. | Gilroy Primary (29) | EQUIP0040 | GILROY CABELING PROJECT (ADVANCED.COM) | EQUIP NONMED |
| 308. | Gilroy Primary (29) | FURN0025 | VARIOUS FURNITURES (TABLES/CHAIRS/SOFA) | FURNITURE |
| 309. | Gilroy Primary (29) | FURN0026 | LeverLift Slider | FURNITURE |
| 310. | Gilroy Primary (29) | MED0143 | MONITOR VITAL SIGNS LXI W/NIB | EQUIP MED |
| 311. | Gilroy Primary (29) | MED0144 | ECG BURDICK 280 INTERP 200 EC | EQUIP MED |
| 312. | Gilroy Primary (29) | MED0145 | SCALE, HND RAIL W/HT ROD & CART, ECG | EQUIP MED |
| 313. | Gilroy Primary (29) | | CISCO 7965 G PHONE SETS (7) | EQUIP MED |
| 314. | Gilroy Primary (29) | | EXAM TABLES (4) | EQUIP MED |
| 315. | Gilroy Primary (29) | | WALL MOUNTED OPTH. AND OTOSCOPE (3) | EQUIP MED |
| 316. | Gilroy Primary (29) | | PORTABLE STOOL (3) | EQUIP MED |
| 317. | Gilroy Primary (29) | | VAGINAL LIGHT | EQUIP MED |
| 318. | Gilroy Primary (29) | | TONOMETER | EQUIP MED |

16

| 319. | Gilroy Primary (29) | | GOOSE LAMP | EQUIP MED |
|------|---------------------|--|------------|-----------|
| 320. | Gilroy Primary (29) | | MAYO STAND | EQUIP MED |
| 321. | Gilroy Primary (29) | | DIGITAL THERMOMETER (3) | EQUIP MED |
| 322. | Gilroy Primary (29) | | NEBULIZER | EQUIP MED |
| 323. | Gilroy Primary (29) | | NITROGEN CANISTER | EQUIP MED |
| 324. | Gilroy Primary (29) | | PULSE OXIMETER | EQUIP MED |
| 325. | Gilroy Primary (29) | | PORTABLE BP CUFFS | EQUIP MED |
| 326. | Gilroy Primary (29) | | REFRIGERATOR | EQUIP MED |
| 327. | Gilroy Primary (29) | | WHEELCHAIR | EQUIP MED |

17

## Exhibit C – Books and Records

(a) Operating manuals, forms, files, books, records, and documents:

All VMF books, records, operating manuals, forms, files, documents, equipment records, and financial data related to the Clinics and other customary business records maintained in the normal course of business in California.  All San Jose Medical Group books, records, operating manuals, forms, files, documents, equipment records, and financial data related and other customary business records maintained in the normal course of business in California.

All VMF working papers, draft tax returns, and other customary tax preparatory material related to the Clinics maintained in the normal course of business in California. All San Jose Medical Group working papers, draft tax returns, and other customary tax preparatory material maintained in the normal course of business in California.

(b) Patient Records in the Electronic Form and Electronic Medical Records:
Patient records in electronic form for primary care and specialty physicians (medical, surgical and related healthcare services) for the Clinics located in the following locations:

NTT DATA, Plano Tech Center: 2300 W Plano Pkwy, Plano, TX 75075
GE Data Center: 200 West Tower Ave., Milwaukee, WI 53223

(c) Patient Records in the Paper Form:

Patient records in paper form for primary care and specialty physicians (Medical, surgical and related healthcare services) for the Clinics located with SourceHOV Healthcare, Inc. at 2860 Zanker Road, #105, San Jose, CA, 95134

18

4813-5557-6713.2

## Exhibit D – Designated Contracts

| | Agreement Name and Parties | Type | Cure Costs |
|---|---|---|---|
| 1. | **Recruitment Agreement between Adaptive Medical Partners and Verity Medical Foundation, applicable to Gilroy and Morgan Hill locations, dated February 22, 2018** | Vendor | $0.00 |
| 2. | **Master Services Agreement between ADP, LLC, and Verity Medical Foundation, dated 1/25/2017** | Vendor | $0.00 |
| 3. | **Adaptive Medical Partners Recruitment Agreement with Verity Medical Foundation, applicable to Gilroy and Morgan Hill locations, dated February 22, 2018** | Vendor | -- |
| 4. | **California Delegated Master Management Agreement between Aetna Health of California and DCHS Medical Foundation, dated October 1, 2015** | Payor | $23,596.14 |
| 5. | **Physician Group Agreement between Aetna and Verity Medical Foundation, dated September 1, 2016** | Payor | -- |
| 6. | **HMO IPA/Medical Group Provider Agreement between DCHS Medical Foundation and California Physicians' Service, d.b.a. Blue Shield of California, dated October 1, 2013 and effective November 1, 2013** | Payor | $1,318.00 |
| 7. | **Physician Services Agreement between Verity Medical Foundation and CFM Medical Group, Inc. dated July 9, 2018** | Vendor | $0.00 |
| 8. | **Agreement for Physician Locum Tenens Coverage, Fees in Confirmation, between Verity Medical Foundation, and CompHealth, dated June 14, 2018** | Vendor | $0.00 |
| 9. | **Equipment Rental/Services Agreement between Deanza Water Conditioning and Verity Medical, dated July 11, 2016** | Vendor | $0.00 |
| 10. | **Equipment Rental/Services Agreement between Deanza Water Conditioning and Verity Medical Group, dated March 31, 2017 (Gilroy)** | Vendor | -- |
| 11. | **Equipment Rental/Services Agreement between Deanza Water Conditioning and Verity Medical, dated January 1, 2018 (Gilroy)** | Vendor | -- |
| 12. | **Services Agreement between ERI Economic Research Institute, Inc. and [VMF], dated [DATE]** | Vendor | $0.00 |
| 13. | **Contract Agreement between Verity Medical Foundation and Exclusively RNS, LLC, dated April 1, 2016** | Vendor | $0.00 |
| 14. | **CVTY Provider Agreement between Coventry Health Care and DCHS effective as of June 1, 2013** | Payor | $0.00 |
| 15. | **CareAdvantage Medical Services Agreement between San Mateo Health Commission and DCHS Medical Foundation, dated March 1, 2014** | Payor | $0.00 |

4813-5557-6713.2

| 16. | Medi-Cal Medical Services Agreement between San Mateo Health Commission and DCHS Medical Foundation, dated March 1, 2014 | Payor | -- |
|---|---|---|---|
| 17. | Master Agreement between ImageFirst of San Francisco, LLC, and Verity Health System dated June 21, 2017 | Vendor | $0.00 |
| 18. | HealthSmart Participating Provider Agreement by and between Interplan Health Group and HealthSmart Preferred Care II, LP, and DCHS Medical Foundation, dated April 1, 2013 | Payor | $0.00 |
| 19. | Interior Plant Rental with Maintenance Contract between Verity Medical Foundation and Kim Parker Plants, Inc., dated [  ], 1996 | Vendor | $0.00 |
| 20. | Facility Staffing Agreement between Verity Health System and Maxim Healthcare Services dba Maxim Staffing Solutions, dated September 20, 2018 | Vendor | $0.00 |
| 21. | Agreement between Onmark, Inc., A McKesson Specialty Health Organization and DCHS Medical Foundation, dated March 6, 2014 | Vendor | $0.00 |
| 22. | Advertising Agreement between MedCenterDisplay, LLC and Verity Medical Foundation, dated January 23, 2018 | Vendor | $0.00 |
| 23. | Physician Coverage Services Agreement between DCHS Medical Foundation and Neuroscience Institute, dated October 27, 2014 | Vendor | $204.54 |
| 24. | Primary Care & Specialty Provider Agreement between Northern California Physicians Network d/b/a Northern California Advantage Medical Group, and Verity Medical Foundation, dated April 1, 2016 | Payor | $84.49 |
| 25. | Terms and Conditions for Paragard Direct between Paragard Direct and Verity Medical Foundation, dated January 24, 2004 | Vendor | $39.62 |
| 26. | Physician Group Agreement between Individual Practice Association Medical Group of Santa Clara County, Inc. and San Jose Good Samaritan Medical Group, Inc., dated February 1, 2003, assigned by SJMG to DCHS on November 1, 2012 | Payor | $0.00 |
| 27. | Document Storage Services Agreement between DCHS and Source HOV Healthcare, Inc., dated January 1, 2013 | Vendor | $0.00 |
| 28. | Master Services Agreement between DCHS and Deliverex Acquisition Corp., dated January 1, 2013 | Vendor | -- |
| 29. | Master Services Agreement between Stericycle, Inc. and DCHS Medical Foundation, dated November 1, 2013 | Vendor | $0.00 |
| 30. | Provider Agreement by and between the County of Santa Clara dba Valley Health Plan and Verity Medical Foundation, dated June 1, 2017 | Payor | $0.00 |
| 31. | Call Coverage Agreement between VMF and San Jose Gastroenterology, Inc., dated October 1, 2016 | Downstream Provider | -- |

| 32. | **Call Coverage Agreement between Mohammad Said Al Hasan, MD and VMF, dated February 22, 2018** | Downstream Provider | -- |
|---|---|---|---|
| 33. | **Health Care Services Agreement between Krikor Barournian, MD and SJMG, dated February 2, 1998; Assigned to DCHS Medical Foundation via an Assignment of Contract and Consent dated April 1, 2012** | Downstream Provider | -- |
| 34. | **Health Care Services Agreement between Joanabel Cepe, MD and SJMG, dated February 1, 2003; Assigned to DCHS Medical Foundation via an Assignment of Contract and Consent dated April 1, 2012** | Downstream Provider | -- |
| 35. | **Health Care Services Agreement between DCHS Medical Foundation and San Jose Nephrology Medical Practice dba San Jose Nephrology, dated August 1, 2014** | Downstream Provider | -- |
| 36. | **Specialty Care Physician Services Agreement between SJMG and Richard S. Eng, MD, dated November 7, 1990; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 37. | **Specialty Care Physician Services Agreement between SJMG and Richard Esquivel, L-AC, dated April 1, 2003; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 38. | **Health Care Services Agreement between Edward Guarino MD and San Jose Medical Group, dated March 1, 2004; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 39. | **Health Care Services Agreement between Robin Hays and San Jose Medical Group, dated July 25, 1997; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 40. | **Specialist Services Agreement between Bruce R. Huffer, Orthopaedic and Fracture Clinic, and San Jose Medical Group, dated December 16, 1992; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 41. | **Health Care Services Agreement between Marybeth Hughes MD and San Jose Medical Group, dated May 1, 2005; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 42. | **Health Care Services Agreement between Mary Jane Hutchins, MD and San Jose Medical Group, dated November 1, 2007; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 43. | **Health Care Services Agreement between Nobuko M. Ito, and San Jose Medical Group, dated September 26, 2001; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |

21

| | | | |
|---|---|---|---|
| 44. | **Call Coverage Agreement between VMF and Mehrnaz Jamali, MD, dated September 1, 2017** | Downstream Provider | -- |
| 45. | **Health Care Services Agreement between Dae-Wook Kang, MD, and San Jose Medical Group, dated January 1, 2009; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 46. | **Specialist Services Agreement between Vincent Lepore, MD, and San Jose Medical Group, dated November 15, 1990** | Downstream Provider | -- |
| 47. | **Health Care Services Agreement between Tommy Lin OD, and San Jose Medical Group, dated June 24, 1999; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 48. | **On-Call Coverage Services Agreement between Nicholas Monaco, MD and DCHS Medical Foundation, dated July 1, 2015** | Downstream Provider | -- |
| 49. | **Call Coverage Agreement between VMF and Devang Shah, MD, dated February 22, 2018** | Downstream Provider | -- |
| 50. | **Health Care Services Agreement between Nimisha Shah MD, and Verity Medical Foundation, dated September 1, 2016** | Downstream Provider | -- |
| 51. | **Specialist Services Agreement between Rischel Yeh OD, and San Jose Medical Group, dated July 1, 2004; Assigned to DCHS Medical Foundation through an Assignment of Contract and Consent, dated April 1, 2012** | Downstream Provider | -- |
| 52. | **Sublease between Stanford Health Care and Verity Health System of California, Inc. dated June 20, 2017** | Tenant | -- |
| 53. | | **Total** | **$174,501.67** |

22

**<u>Exhibit E</u> – Website**

www.sanjosemed.com

23

**Exhibit F – Phone and Fax Numbers**

**Mckee Clinic**

| NAME | PHONE | TYPE | TN |
|---|---|---|---|
| **Branch Manager** | | | |
| **Tersea Timbreza** | 408-347-2060 | 2616 | 016 1 04 07 |
| FAX | 408-347-2191 | 500 | 016 0 02 15 |
| **Clinic Supervisor** | | | |
| **Kimberly Loperena** | 408-347-2064 | VoIP 1140 | 068 0 02 31 |
| FAX | 408-347-2060 | 500 | 016 0 02 08 |
| **ENDOCRINOLOGY** | **408-278-3003** | SDN | |
| **DR Charles Bruhn** | 408-347-2012 | 2616 | 020 0 02 04 |
| Olga Zarasky, RN | 408-347-2013 | 2008 | 016 1 09 05 |
| Griselda Hernandez, MA | 408-347-2054 | 2008 | 016 1 04 03 |
| Mary Richardson RN, CDE | 408-347-2079 | 2616 | 016 1 09 03 |
| Taisiya Kupriyanova., RD, CDE | 408-347-2011 | 2616 | 016 1 08 12 |
| Eric Bello, PSR | 408-347-2368 | VoIP 1140 | 68 0 02 16 |
| HOT LINE | 408-347-2152 | 2008 MCR | 016 1 04 09 |
| FAX | 408-347-2196 | 500 | 16 0 03 03 |
| **GASTROENTEROLOGY** | **408-278-3003** | SDN | |
| **Dr. Kansara** | 408-347-2009 | 2616 | 016 1 04 01 |
| Sara Granade, MA | 408-347-2061 | 2616 | 16 1 04 08 |
| Ruby Villaneda, PSR | 408-347-2056 | VoIP 1140 | 068 0 02 28 |
| HOTLINE | 408-347-2018 | 2008 | 016 1 07 01 |

24

| | | | |
|---|---|---|---|
| FAX | 408-347-2001 | 500 | 016 0 04 09 |
| **OBGYN** | **408-278-3003** | SDN | |
| **Dr. Newman** | 408-347-2084 | 2616 | 016 1 08 04 |
| Otilia Chavez, MA | 408-347-2083 | 2008 | 016 1 07 11 |
| Edith Ramirez, PSR | 408-347-2183 | VoIP 1140 | 068 0 02 17 |
| HOTLINE | 408-347-2152 | 2008 | 016 1 04 09 |
| FAX | 408-347-2410 | 500 | 016 0 03 06 |
| **OPHTHALMOLOGY** | **408-347-2070** | SDN | |
| **Dr. Chechelnitsky** | 408-347-2072 | 2616 | 016 1 03 15 |
| Marilou Leocadio, OT | 408-347-2126 | 2008 | 016 1 09 04 |
| Ferris Coughlan, OT | 408-347-2075 | 2008 | 016 1 08 13 |
| Mary Criado, MA | 408-347-2071 | 2008 | 016 1 06 05 |
| Veronica Castillon, OT | 408-347-2037 | 2616 | 016 1 07 13 |
| Kristine Haag, OT | 408-347-2044 | 2044 | 016 1 03 02 |
| Manny Mendoza, PSR | 408-347-2171 | VoIP 1140 | 068 0 02 03 |
| Ann Martinez, PSR | 408-347-2174 | VoIP 1140 | 068 0 02 02 |
| HOTLINE | 408-347-2154 | 2008 | 020 0 01 03 |
| FAX | 408-347-2193 | 500 | 016 0 04 01 |
| **ORTHOPEDICS** | **408-347-2090** | SDN | |
| **Dr. Bhuva** | 408-347-2098 | 2616 | 016 1 04 11 |
| Diane Dempsey, Ortho Tech | 408-347-2053 | 2616 | 016 1 08 06 |
| | | 2008 | 016 1 10 07 |

25

4813-5557-6713.2

| | | | |
|---|---|---|---|
| April Aguilar, SS | 408-347-2074 | VoIP 1140 | 068 0 02 11 |
| **Dr. Iyengar** | 408-347-2138 | 2008 | 016 1 08 14 |
| Manpreet Kaur, Ortho Tech | 408-357-1007 | 2616 | 020 0 01 01 |
| Cheri Felisilda, SS | 408-357-1037 | VoIP 1140 | 064 0 02 16 |
| Lynn Tu, PSR | 408-347-2337 | VoIP 1140 | 068 0 02 09 |
| HOTLINE | 408-347-2164 | 2008 | 020 0 02 02 |
| FAX | 408-347-2188 | 500 | 016 0 03 04 |
| **PEDIATRICS** | **408-278-3003** | SDN | |
| **Dr. Malik** | 408-357-1029 | 2616 | 016 1 07 00 |
| **Dr. Lee** | 408-357-1032 | 2616 | 016 1 07 00 |
| Crystal Anderson, RN | 408-347-2333 | 2008 | 016 1 10 01 |
| PSR | 408-347-2056 | VoIP 1140 | 068 0 02 28 |
| HOTLINE | 408-347-2018 | 2008 | 016 1 07 01 |
| FAX | 408-347-2192 | 500 | 084 0 00 12 |
| **PODIATRY** | **408-347-2360** | SDN | |
| **Dr.Sandi Matarangas** | 408-347-2028 | 2616 | 020 0 02 08 |
| **Dr. Verrette** | 408-347-2156 | 2616 | 020 0 01 13 |
| Kevin Doss, Ortho Tech | 408-347-2077 | 2616 | 016 1 10 12 |
| Michelle Gail, MA | 408-347-2096 | 2008 | 016 1 04 04 |
| Liz Angeles, MA | 408-347-2178 | 2008 | 020 0 01 00 |
| Jaspreet Kaur, MA | 408-347-2088 | 2008 | 016 1 04 12 |
| April Aguilar, SS | 408-347-2074 | VoIP 1140 | 068 0 02 11 |

26

| | | | |
|---|---|---|---|
| Rosy Rodriguez, PSR | 408-347-2347 | VoIP 1140 | 068 0 02 10 |
| Open, PSR | 408-347-2172 | VoIP 1140 | 068 0 02 21 |
| HOTLINE | 408-347-2163 | ACDN | QUEUE 2090 HOTLINE |
| FAX | 408-347-2410 | 500 | 016 0 03 06 |
| **PULMONOLOGY** | **408-347-2081** | SDN | |
| **Dr. Veronica Ortiz** | 408-347-2029 | 2008 | 016 1 07 02 |
| Rhea Garza, MA | 408-347-2026 | 2008 | 016 1 03 13 |
| Eric Bello, PSR | 408-347-2368 | VoIP 1140 | 068 0 02 16 |
| HOTLINE | 408-347-2152 | 2008 | 016 1 04 09 |
| FAX | 408-347-2196 | 500 | 016 0 03 03 |
| **RHEUMATOLOGY** | **408-278-3003** | SDN | |
| **Dr. Sundaramurthy** | 408-357-1362 | 2616 | 016 1 05 12 |
| Sharlaine Inzunza., MA | 408-357-1363 | 2008 | 016 1 06 13 |
| Ann Martinez, PSR | 408-347-2174 | VoIP 1140 | 068 0 02 02 |
| HOTLINE | 408-347-2154 | 2008 | 020 0 01 03 |
| FAX | 408-347-2193 | 500 | 016 0 04 01 |
| **RADIOLOGY** | **408-347-2051** | SDN | |
| Lisa Sheedy, Rad Tech | 408-347-2059 | 2008 | 016 1 06 10 |
| Sylvia Ramirez, PSR | 408-347-2052 | VoIP 1140 | 072 0 02 16 |
| **MEDICAL RECORDS** | **408-347-2040** | SDN | |
| Cheryl Hansen | 408-347-2045 | 2008 | 016 1 05 14 |
| Marilyn Agustin | 408-347-2042 | 2008 | 016 1 03 06 |

27

| | | | |
|---|---|---|---|
| Rosie Cuevas | 408-347-2047 | 2008 | 016 1 06 03 |
| FAX | 408-347-2402 | 500 | 016 0 02 00 |
| **RECORDS RELEASE** | **408-347-2038** | SDN | |
| Davina Lopez | 408-347-2048 | VoIP 1140 | 068 0 02 13 |
| Denise Bridges | 408-347-2153 | VoIP 1140 | 068 0 02 14 |
| FAX | 408-347-2194 | 500 | 016 0 04 02 |
| **PRIMARY CARE IM/FP** | **408-278-3003** | SDN | |
| **Dr. Lopez** | 408-347-2122 | 2616 | 016 1 03 01 |
| Alicia Hernandez, MA | 408-347-2003 | 2008 | 016 1 03 03 |
| **Dr. Sharma** | 408-347-2338 | 2616 | 016 1 06 14 |
| Millie Garcia, MA | 408-347-2301 | 2008 | 016 1 03 00 |
| **Dr. Shah** | 408-347-2049 | 2008 | 016 1 09 06 |
| Monica Martinez, MA | 408-347-2062 | 2008 | 016 1 09 01 |
| **Dr. Feldman** | 408-347-2004 | 2616 | 016 1 05 11 |
| Perla Gonzalez, MA | 408-347-2005 | 072 0 02 06 | 068 0 02 26 |
| **Dr. Lam** | 408-347-2008 | 2616 | 016 1 06 08 |
| Brenda Miranda, MA | 408-347-2007 | 2008 | 020 0 02 00 |
| **Dr. Weinstock** | 408-347-2308 | 2616 | 016 1 08 02 |
| Janette Perez, MA | 408-347-2309 | VoIP 1140 | 072 0 02 06 |
| Evanielle Parinas, PSR | 408-347-2103 | VoIP 1140 | 068 0 02 20 |
| Cris Padilla, PSR | 408-347-2112 | VoIP 1140 | 068 0 02 05 |
| Suzie Salazar, PSR | 408-347-2104 | VoIP 1140 | 068 0 02 19 |

28

| | 408-347-2150 | 2008 | 020 0 01 02 |
|---|---|---|---|
| HOTLINE | | | |
| FAX | 408-347-2189 | 500 | 016 0 03 00 |
| **BRANCH STAFF** | | | |
| Alex Hernandez, MA | 408-347-2119 | VoIP 1140 | 076 0 03 18 |
| **OCH LAB** | | | |
| LAB TECH | 408-347-2145 | 2008 | 016 1 03 07 |
| LAB TECH | 408-347-2145 | 2008 | 016 1 03 10 |
| FAX | 408-347-2160 | 500 | 016 0 02 11 |

29

4813-5557-6713.2

**Good Samaritan Clinic**

| NAME | PHONE | TYPE | TN |
|---|---|---|---|
| **Branch Manager** | | | |
| **Andrea Martinez** | 408-357-1248 | 2616 | 028 0 02 00 |
| FAX | 408-357-1277 | 500 | 028 0 05 07 |
| **Clinic Supervisor** | | | |
| **Gina Nehf** | 408-357-1280 | 2616 | 024 1 10 05 |
| **Operations Manager/ Safety Officer** | | | |
| **Beth Ruf RN** | 408-357-1085 | 2616 | 028 0 02 04 |
| **Family Practice IM West** | **408-278-3003** | SDN | |
| **Dr. Cummings** | 408-357-1328 | 2616 | 024 1 07 04 |
| Melissa Alvarado, MA | 408-357-1320 | 2008 | 024 1 08 09 |
| **Dr. Piplani** | 408-357-1036 | 2616 | 024 1 04 03 |
| Dr. Piplani's MA | 408-357-1337 | 2008 | 024 1 04 08 |
| Martha Ortiz-Carrasco PSR | 408-357-1331 | VoIP 1140 | 064 0 02 20 |
| Diane Ramos PSR | 408-357-1253 | VoIP 1140 | 064 0 02 21 |
| Ramona Torres PSR | 408-357-1232 | VoIP 1140 | 064 0 02 04 |
| HOTLINE | 408-357-1207 | 2008 | 024 1 07 10 |
| FAX | 408-357-1296 | 500 | 028 0 04 14 |
| **Family Practice IM EAST** | **408-278-3003** | SDN | |
| **Dr. Husain** | 408-357-1224 | 2616 | 028 0 02 14 |
| Mary Acevedo, MA | 408-357-1013 | 2008 | 024 1 08 05 |
| **Dr. Komshian** | 408-357-1368 | 2616 | 024 1 05 05 |
| Blanca Hurtado, MA | 408-357-1317 | 2008 | 024 1 06 05 |

| | | | |
|---|---|---|---|
| **Dr. Aziz** | 408-357-1301 | 2008 | 024 1 07 05 |
| Anthony Apodaca, MA ( Temp) | 408-357-1321 | 2008 | 024 1 06 09 |
| Maritza Chavez, PSR | 408-357-1215 | VoIP 1140 | 064 0 02 12 |
| Sandra Castaneda, PSR | 408-357-1219 | VoIP 1140 | 064 0 02 14 |
| Allison Tudela, PSR | 408-357-1428 | VoIP 1140 | 064 0 02 15 |
| HOTLINE | 408-357-1211 | 2008 | 024 1 09 00 |
| FAX | 408-357-1265 | 500 | 028 0 04 06 |
| **Rheumatology** | **408-278-3003** | SDN | |
| **Dr. Sundaramurthy** | 408-357-1362 | 2616 | 028 0 01 02 |
| Sharlaine Inzunza, MA | 408-357-1363 | 2008 | 024 1 08 00 |
| **Podiatry** | **408-347-2360** | SDN | |
| Dr. Smith | 408-357-2078 | 2616 | 024 1 05 04 |
| Maribel Mendez, MA | 408-357-1075 | 2616 | 024 1 04 04 |
| **Gastroenterology** | **408-357-1020** | SDN | |
| **Dr. Savur** | 408-357-1058 | 2616 | 024 1 09 07 |
| Jennifer Davidson, MA ( Temp) | 408-357-1083 | 2008 | 028 0 02 01 |
| Denise Stead, PSR | 408-357-1209 | VoIP 1140 | 064 0 02 18 |
| Kimberlie Hansen, SS | 408-357-1087 | 2008 | 024 1 08 15 |
| HOTLINE | 408-357-1067 | 2008 | 024 1 09 04 |
| FAX | 408-357-1266 | 500 | 028 0 05 00 |
| **Orthopedics** | **408-357-1090** | SDN | |
| **Dr.Iyengar** | 408-357-1206 | 2616 | 024 1 05 02 |
| Manpreet Kaur, Ortho Tech | 408-357-1007 | 2008 | 024 1 05 12 |

| | 408-357-1038 | 2008 | 024 1 05 06 |
|---|---|---|---|
| Ana Anderson, MA | 408-357-1038 | 2008 | 024 1 05 06 |
| Christell Givens,PSR ( LOA) | 408-357-1091 | VoIP 1140 | 064 0 02 17 |
| Cheri Felisilda, Surgery Scheduler | 408-357-1037 | VoIP 1140 | 064 0 02 16 |
| HOTLINE | 408-357-1095 | 2008 | 024 1 05 11 |
| FAX | 408-357-1052 | 500 | 028 0 04 11 |
| **Pulmonology** | **408-357-1090** | SDN | |
| **Dr. Huang** | 408-357-1318 | 2616 | 028 0 02 08 |
| Maria Pantoja, MA | 408-357-1365 | 2008 | 028 0 02 03 |
| Denise Stead, PSR | 408-357-1209 | VoIP 1140 | 064 0 02 18 |
| Kimberlie Hansen, SS | 408-357-1087 | 2008 | 024 1 08 15 |
| HOTLINE | 408-357-1226 | 2008 | 024 1 09 01 |
| FAX | 408-357-1503 | ACDN | FWD IM WEST 1296 |
| **Endocrinology** | **408-278-3003** | SDN | |
| **Dr. Bruhn (W & F)** | 408-357-1082 | 2616 | 024 1 10 00 |
| **Dr. Borau (Tue & Th)** | 408-357-1051 | 2616 | 024 1 04 09 |
| Gricelda Hernandez, MA ( W&F) | 408-357-1341 | 2008 | 024 1 10 07 |
| Olga Zaraysky, RN (W&F) | 408-357-1493 | 2616 | 024 1 05 13 |
| Rena Schwartzberg, PSR | 408-357-1261 | VoIP 1140 | 064 0 02 03 |
| Amanda Nguyen, PSR | 408-357-1267 | VoIP 1140 | 068 0 02 22 |
| Open, PSR ( Temp) | 408-357-1482 | VoIP 1140 | 064 0 02 09 |
| HOTLINE | 408-357-1063 | ACDN | FWD  PULMO 1226 |
| FAX | 408-357-1503 | ACDN | FWD IM WEST 1296 |
| **Diabetes Ed/Dietician** | **408-347-2348** | SDN | |

| | | | |
|---|---|---|---|
| Taisiya Kupriyanova RD, Dietician / Taisiya RD, Dietician | | 2008 | 024 1 05 08 |
| HOTLINE | 408-357-1063 | ACDN | FWD  PULMO 1226 |
| FAX | 408-357-1503 | ACDN | FWD IM WEST 1296 |
| **OBGYN** | **408-357-1480** | SDN | |
| **Dr. Kearns** | 408-357-1257 | 2616 | 024 1 07 13 |
| Lina Duarte, MA | 408-357-1298 | 2008 | 024 1 06 06 |
| **Dr. Poppens** | 408-357-1466 | 2616 | 024 1 06 14 |
| DR Poppin, MA | 408-357-1459 | 2008 | 024 1 10 13 |
| Open, PSR (Temp) | 408-357-1482 | VoIP 1140 | 064 0 02 09 |
| Rena Schwartzberg, PSR | 408-357-1261 | VoIP 1140 | 064 0 02 03 |
| Amanda Nguyen, PSR | 408-357-1267 | VoIP 1140 | 068 0 02 22 |
| HOTLINE | 408-357-1401 | 2008 | 024 1 09 05 |
| FAX | 408-357-1491 | ACDN | FWD ENDO 1503 |
| **Pediactrics** | **408-357-1030** | SDN | |
| **Dr. Lee** | 408-357-1032 | 2616 | 024 1 04 05 |
| Yeremy Lobato, MA | 408-357-1023 | 2008 | 024 1 06 08 |
| **Dr. Malik** | 408-357-1029 | 2616 | 028 0 01 05 |
| Ramona Torres, PSR | 408-357-1232 | VoIP 1140 | 064 0 02 04 |
| Martha Ortiz-Carrasco | 408-357-1331 | VoIP 1140 | 064 0 02 20 |
| Diane Ramos | 408-357-1253 | VoIP 1140 | 064 0 02 21 |
| FAX | 408-357-1097 | ACDN | FWD IM WEST 1296 |
| **ENT** | **408-357-1250** | SDN | |
| **Dr. Ruffy** | 408-357-1244 | 2616 | 024 1 05 09 |

| | | | |
|---|---|---|---|
| Dora Mongkoul, RN | 408-357-1245 | 2008 | 024 1 07 07 |
| Danielle Pina, PSR | 408-357-1247 | VoIP 1140 | 064 0 02 00 |
| Ann Nicolosi, MA | 408-357-1243 | VoIP 1140 | 064 0 02 01 |
| HOTLINE | 408-357-1254 | 2008 | 024 1 06 00 |
| FAX | 408-357-1251 | 500 | 028 0 04 02 |
| **Radiology** | **408-278-3370** | SDN | |
| Reiko Yoshida RT | 408-357-1249 | 2008 | 028 0 01 03 |
| Christine, SS | 408-357-1255 | VoIP 1140 | 072 0 02 17 |
| FAX | 408-357-1295 | 500 | 028 0 05 06 |
| **Med Records** | 408-357-1040 | | |
| Pricilla Marquez | 408-357-1048 | 2008 | 024 1 09 10 |
| Tany Afshari | 408-357-1047 | 2008 | 024 1 04 11 |

**Willow Glen Clinic**

| NAME | PHONE | TYPE | TN |
|---|---|---|---|
| **Branch Manager** | | | |
| **Kim Salazar** | 408-278-3325 | 2616 | 012 1 07 04 |
| FAX | 408-278-3324 | 500 | 012 0 05 09 |
| **Clinic Supervisor** | | | |
| **OPEN** | 408-278-3345 | 2008 | 012 1 02 14 |
| **IM North** | **408-278-3003** | SDN | |
| **Dr Wong** | 408-278-3780 | 2616 | 012 1 09 08 |
| **Dr Beverly** | 408-278-3342 | 2008 | 012 1 06 01 |
| Alyissa MA | 408-278-3344 | 2008 | 012 1 03 01 |
| **Dr Pascua** | 408-278-3634 | 2616 | 012 1 08 07 |
| Monica F. MA | 408-278-3617 | 2008 | 012 1 01 08 |
| Christina PSR | 408-278-3610 | VoIP 1140 | 072 0 02 05 |
| Emma M. PSR | 408-278-3655 | VoIP 1140 | 072 0 02 08 |
| **OPEN DR** | 408-278-3305 | 2616 | 012 1 06 08 |
| HOTLINE | 408-278-3667 | 2008 | 012 1 02 15 |
| FAX | 408-278-3693 | 500 | 012 0 06 12 |
| **IM South** | **408-278-3003** | SDN | |
| **Dr Nguyen** | 408-278-3128 | 2616 | 012 1 04 15 |
| Araceli l. MA | 408-278-3328 | 2008 | 012 1 03 02 |
| **Dr Morgan** | 408-278-3626 | 2008 | 012 1 03 06 |
| Sylvia MA | 408-278-3094 | 2008 | 012 1 05 07 |
| **Dr Wang** | 408-278-3185 | 2008 | 012 1 09 13 |

| | 408-278-3063 | 2008 | 012 1 01 00 |
|---|---|---|---|
| Jasmine J. MA | 408-278-3063 | 2008 | 012 1 01 00 |
| Renee B. PSR | 408-278-3211 | VoIP 1140 | 072 0 02 02 |
| Jackie G. PSR | 408-278-3212 | VoIP 1140 | 072 0 02 00 |
| Destiny A. PSR | 408-278-3213 | VoIP 1140 | 072 0 02 01 |
| **OPEN DR** | 408-278-3226 | 2616 | 012 1 02 12 |
| OPEN MA | 408-278-3385 | 2008 | 12 1 04 09 |
| HOTLINE | 408-278-3677 | 2008 | 012 1 01 10 |
| FAX | 408-278-3391 | ACDN | FWD 3396 |
| **Cardiology** | **408-278-3645** | SDN | |
| **Dr Parikh** | 408-278-3352 | 2616 | 012 1 07 01 |
| Elaine D. MA | 408-278-3321 | 2008 | 012 1 07 10 |
| **Dr. Wu** | 408-278-3157 | 2616 | 012 1 08 14 |
| Paula MA | 408-278-3257 | 2008 | 012 1 08 09 |
| Judith C RN | 408-278-3357 | 2008 | 012 1 05 15 |
| Angela V. PSR | 408-278-3312 | VoIP 1140 | 072 0 02 04 |
| Elizabeth PSR | 408-278-3178 | VoIP 1140 | 064 0 02 24 |
| Nuclear RM | 408-278-3258 | 2616 | 012 1 08 00 |
| Nuclear RM | 408-278-3258 | 2616 | 012 1 06 00 |
| Echo Rm | 408-278-3237 | 2008 | 012 1 03 08 |
| OPEN PSR | 408-278-3625 | VoIP 1140 | 072 0 02 03 |
| HOTLINE | 408-278- | 2008 | 012 1 05 10 |
| FAX | 408-278-3131 | 500 | 012 0 03 00 |
| **General Surgury** | **408-278-3650** | SDN | |

| | | | |
|---|---|---|---|
| Dr Tranduc | 408-278-3624 | VoIP 1140 | 076 0 03 29 |
| Armandeep RN | 408-278-3235 | VoIP 1140 | 076 0 03 28 |
| Nikki PSR | 408-278-3668 | VoIP 1140 | 076 0 03 30 |
| FAX | 408-0278-3291 | 500 | 084 0 00 08 |
| **Pulmonology** | **408-278-3310** | SDN | |
| **Dr Filuk** | 408-278-3314 | 2616 | 012 1 08 11 |
| Paula MA | 408-278-3257 | 2008 | 012 1 08 09 |
| Elizabeth PSR | 408-278-3178 | VoIP 1140 | 064 0 02 24 |
| Angela V. PSR | 408-278-3312 | VoIP 1140 | 072 0 02 04 |
| Lizette PSR | 408-278-3178 | VoIP 1140 | 064 0 02 24 |
| FAX | 408-278-3294 | ACDN | FWD 3131 |
| **Desease State Management/RN Educators** | **408-347-2348** | SDN | |
| Infusion | 408-278-2168 | 2008 | 012 1 08 08 |
| Caroline Landines Pharm D | 408-278-2114 | 2008 | 012 1 08 01 |
| Tamara B RN | 408-278-2168 | 2008 | 012 1 08 08 |
| Michele B Tech PD / Lisa Padilla Pharm Tech | 408-278-2220 | 2008 | 012 1 08 10 |
| FAX | 408- | 500 | 012 0 05 08 |
| **Oncology** | **408-347-2190** | SDN | |
| **Dr Agarwal** | 408-347-2332 | 2616 | 012 1 08 12 |
| Amber MA | 408-347-2031 | 2008 | 012 1 08 13 |
| Connie B. PSR | 408-278-2116 | VoIP 1140 | 068 0 02 12 |
| HOTLINE | 408-347-2162 | 2008 | 012 1 08 06 |

| | | | |
|---|---|---|---|
| FAX | 408-347-2197 | 500 | 012 0 05 08 |
| **Podaitry** | **408-347-2360** | SDN | |
| Dr Smith | 408-347-2078 | 2616 | 012 1 04 05 |
| Maribell | 408-278-3054 | 2008 | 012 1 09 15 |
| FAX | 408-278-3391 | ACDN | FWD 3396 |
| **Neurology** | **408-278-3611** | CDN | |
| **Dr Ngo** | 408-278-3028 | VoIP 1140 | 072 0 02 28 |
| Claudia MA | 408-278-3053 | VoIP 1140 | 064 0 02 06 |
| Evelyn PSR | 408-278-3614 | VoIP 1140 | 072 0 02 19 |
| FAX | 408-278-3693 | 500 | 012 0 06 12 |
| **Radiology** | **408-278-3370** | SDN | |
| **Hellen Manager** | 408-278-3341 | 2616 | 012 1 03 00 |
| Front desk | 408-278-3389 | 2616 | 012 1 05 11 |
| Laura SS | 408-278-3373 | VoIP 1140 | 072 0 02 12 |
| Sharon SS | 408-278-3377 | VoIP 1140 | 072 0 02 14 |
| Open SS | 408-278-3372 | VoIP 1140 | 076 0 02 28 |
| Open SS | 408-278-3142 | VoIP 1140 | 076 0 02 22 |
| Desireee MRI Scheduler | 408-278-3303 | VoIP 1140 | 072 0 02 18 |
| Oscar FE/Records,CDs/Films | 408-278-3066 | 2008 | 012 1 07 14 |
| Oscar FE/Records,CDs/Films | 408-278-3066 | 2008 | 012 1 07 13 |
| Radiology File Rm | 408-278-3511 | ACDN | fwd 3530 FileRM |
| FAX | 408-278-3378 | 500 | 012 0 04 08 |
| **AUC** | **408-278-3620** | SDN | |

| | | | |
|---|---|---|---|
| **Alena Diel Manager** | 408-278-3203 | VoIP 1140 | 064 0 02 10 |
| Alena D. FAX | 408-278-3691 | 500 | 012 0 04 11 |
| AUC PSR | 408-278-3608 | VoIP 1140 | 072 0 02 09 |
| AUC PSR | 408-278-3607 | VoIP 1140 | 072 0 02 10 |
| Nurses Station | 408-278-3623 | VoIP 1140 | 072 0 03 06 |
| Nurses Station | 408-278-3623 | VoIP 1140 | 072 0 03 09 |
| Nurses Station | 408-278-3623 | VoIP 1140 | 072 0 03 08 |
| Nurses Station | 408-278-3623 | VoIP 1140 | 072 0 03 07 |
| **Medical Records** | | | |
| Sue nelson | 408-278-3144 | 2008 | 012 1 02 00 |
| Joanne Gonzalez | 408-278-3139 | 2008 | 012 1 04 03 |
| Sandra Duarte | 408-278-3146 | 2008 | 012 1 02 07 |

**Morgan Hill Medical Clinic**

| NAME | PHONE | TYPE | TN |
|---|---|---|---|
| **Branch Manager** | | | |
| **Kay Musich** | 408-347-2240 | VoIP 1140 | 072 0 3 27 |
| **Morgan Hill Medical** | **408-776-8040** | **SDN** | |
| **Thomkins FNP** | 408-347-2247 | VoIP 1140 | 072 0 3 19 |
| **Nalawaldi MD** | 408-347-2250 | VoIP 1140 | 72 0 3 16 |
| **Bennet DO** | 408-347-2244 | VoIP 1140 | 72 0 3 24 |
| Karen PSR | 408-347-2241 | VoIP 1140 | 072 0 3 26 |
| Olivia PSR | 408-347-2245 | VoIP 1140 | 072 0 3 22 |
| Charley MA | 408-347-2242 | VoIP 1140 | 072 0 3 05 |
| Nayeli MA | 408-347-2243 | VoIP 1140 | 072 0 3 23 |
| Paula MA | 408-347-2246 | VoIP 1140 | 72 0 3 20 |
| FAX | 408-776-9089 | 500 | 1MB Frontier |
| **Morgan Hill Pediactrics** | 409-347-2030 | | |
| **Mazeke-kelly MD** | 408-347-2036 | VoIP 1140 | |
| Lisa PSR | 408-347-2032 | VoIP 1140 | |
| Christina MA | 408-347-2034 | VoIP 1140 | |
| Fax | 408-347-2192 | VoIP 1140 | MHM |

**Gilroy Primary Care Clinic**

| NAME | PHONE | TYPE | TN |
|---|---|---|---|
| **GILROY PRIMARY CARE CLINIC** | **408-852-4888** | **FWD to 3003** | **Race st** |
| **Roger Lucero, MD** | 408-852-4894 | Cisco | Hosp Network |
| **Amirummul Nusairee, MD** | 408-852-4893 | Cisco | Hosp Network |
| Monica PSR | 408-852-4891 | Cisco | Hosp Network |
| Linda PSR | 408-852-4896 | Cisco | Hosp Network |
| Cindy MA | 408-852-4892 | Cisco | Hosp Network |
| Emma MA | 408-852-4889 | Cisco | Hosp Network |
| Fax | 408-842-4448 | 1mb | Frontier |

**Miscellaneous**

| Phone Number | Description |
| --- | --- |
| 408-278-3000 | Main Operator |
| 408-278-3003 | Appointment line |

## **Exhibit G – IP**

None.

## EXHIBIT H

### BILL OF SALE

This Bill of Sale (this "Bill of Sale") is made and entered into as of this 1st day of April, 2019, by and among by and among Silicon Valley Medical Development, LLC, a California limited liability company ("Buyer"); Verity Medical Foundation, a California nonprofit public benefit corporation ("VMF"); and Verity Health System of California, Inc., a California nonprofit public benefit corporation ("VHS" together with VMF, "Seller").  Seller and Buyer may each be referred to herein as a "Party," and collectively as the "Parties."

The Parties are entering into this Bill of Sale pursuant to that certain Settlement and Asset Purchase Agreement entered into by the Parties as of [_____, 2019] (the "Purchase Agreement").  Capitalized terms used herein that are not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.  By this instrument, the Parties, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

1. **Sale and Assignment**.  Subject to the terms of the Purchase Agreement, effective as of the Closing, Seller hereby sells, assigns, transfers, conveys, and delivers to Buyer, and Buyer accepts and acquires from Seller, all of Seller's right, title and interest in and to the Purchased Assets as described in Section 1.2 of the Purchase Agreement.

2. **Miscellaneous Provisions**.

   (a)    Purchase Agreement.  This Bill of Sale is executed and delivered in connection with the Purchase Agreement.  Notwithstanding anything herein to the contrary, nothing herein shall in any way alter or waive the promises, agreements, and covenants set forth in the Purchase Agreement, and in the event of a conflict between the terms of this Bill of Sale and the Purchase Agreement, the Purchase Agreement shall control.

   (b)    Notices.  All notices or other communications or deliveries provided for hereunder shall be given as provided in the Purchase Agreement.

   (c)    Successors in Interest.  This Bill of Sale and all of the provisions hereof shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto permitted under the Purchase Agreement.

   (d)    Governing Law; Venue.  This Bill of Sale shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of California (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Bill of Sale, and consent to the exclusive jurisdiction of, the Bankruptcy Court, and thereafter, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Bill of Sale, and consent to the exclusive jurisdiction of, the courts in Los Angeles

County, California.  The Parties hereby consent to the jurisdiction of such courts and waive their right to challenge any proceeding involving or relating to this Bill of Sale on the basis of lack of jurisdiction over the person or forum non conveniens.

(e)     <u>Counterparts</u>.  This Bill of Sale may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, **binding** on all of the Parties.  The Parties agree that signatures to this Bill of Sale created by the signer by **electronic** means shall be valid and effective to bind the Party so signing, and signatures transmitted by facsimile or electronic pdf shall be deemed originals for all purposes hereof and that a Party may produce such copies, without the need to produce original signatures, to prove the existence of this Bill of Sale in any proceeding brought hereunder.

(f)     <u>Amendment</u>.  This Bill of Sale may not be amended or altered except by a written instrument executed by all of the Parties.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Bill of Sale has been duly executed as of the date first written above.

**VMF:**

VERITY MEDICAL FOUNDATION

By: _____

Name:  Rich Adcock

Title:   Chief of Physician Operations

**VHS:**

VERITY  HEALTH  SYSTEM  OF  CALIFORNIA, INC.

By: _____

Name:  Rich Adcock

Title:   Chief Executive Officer

**BUYER:**

SILICON VALLEY MEDICAL DEVELOPMENT, LLC

By:_____

Name:  Bruce Harrison

Title:   President

11

## EXHIBIT I

### ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Assignment") is dated April 1, 2019 (the "Effective Date"), by and by and among by and among Silicon Valley Medical Development, LLC, a California limited liability company ("Assignee"); Verity Medical Foundation, a California nonprofit public benefit corporation ("VMF"); and Verity Health System of California, Inc., a California nonprofit public benefit corporation (together with VMF, "Assignor"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in that certain Asset Purchase Agreement dated as of February 15, 2019 (the "Agreement"), by and among the Assignor and Assignee.

**RECITALS**

A.     In connection with the consummation of the transactions contemplated by the Agreement, Assignor desires to assign to Assignee all of its right, title and interest in, to and under each of the Designated Contracts as more specifically set forth in the Agreement, and Assignee desires to acquire the same.

B.     In partial consideration for the assignment of the Designated Contracts, the Agreement requires Assignee to assume and agree to pay, perform, discharge or otherwise satisfy the Liabilities of Assignor under the Designated Contracts.

**AGREEMENT**

Incorporating the recitals set forth above, the parties hereby agree as follows:

1.     Assignment.  Subject to the terms and conditions set forth in the Agreement, for valuable consideration received from Assignee, Assignor does hereby grant, bargain, convey, sell, assign, transfer and deliver to Assignee all of its right, title and interest in, to and under the Designated Contracts it is party to, and Assignor hereby assigns to Assignee all of the Liabilities of Assignor under the Designated Contracts.

2.     Assumption.  Subject to the terms and conditions set forth in the Agreement, Assignee hereby accepts the Designated Contracts and accepts and assumes, and agrees to pay, perform, discharge or otherwise satisfy in accordance with their respective terms, the Liabilities of Assignor under the Designated Contracts.

3.     Further Assurances.  Assignor hereby covenants with Assignee that Assignor and its successors and assigns will, in a timely manner, do, execute, acknowledge and deliver, or will cause to be done, executed, acknowledged and delivered, all such further acts, transfers, assignments, conveyances and assurances for the better selling, transferring, assigning, assuring, conveying and confirming unto Assignee the Designated Contracts and the other interests and rights assigned hereby in accordance with the terms of this Assignment as Assignee shall reasonably request.

12

4. <u>Governing Law</u>.  This Assignment shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of California (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Bill of Sale, and consent to the exclusive jurisdiction of, the Bankruptcy Court, and thereafter, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Bill of Sale, and consent to the exclusive jurisdiction of, the courts in Los Angeles County, California.  The Parties hereby consent to the jurisdiction of such courts and waive their right to challenge any proceeding involving or relating to this Bill of Sale on the basis of lack of jurisdiction over the person or forum non conveniens.

5. <u>Instrument of Conveyance Only</u>.  This Assignment is being made by Assignor and Assignee pursuant to the requirements of the Agreement, the terms and conditions of which are incorporated herein by this reference, and this Assignment shall be subject to such terms and conditions.  Except for the actual conveyance of the Designated Contracts as set forth in <u>Section 1</u> of this Assignment and the assumption of the Liabilities of Assignor under the Designated Contracts as set forth in <u>Section 2</u> of this Assignment, nothing set forth in this Assignment is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations or liabilities of the Assignor or Assignee beyond that set forth in the Agreement.  In the event of any conflict, ambiguity or discrepancy between the terms or conditions of the Agreement and this Assignment, the terms and conditions of the Agreement shall be controlling in all respects.

6. <u>Counterparts; Amendment</u>.  This Assignment may be executed in counterparts including via facsimile and electronic mail with scan attachment, each of which shall be deemed an original and all of which together shall constitute one document.  This Assignment may not be changed, modified, discharged or terminated orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors and assigns.

7. <u>Signatures</u>.  This Assignment may be executed and delivered by facsimile or PDF, and upon the delivery of such signature, said signature will be deemed to have the same effect as if the original signature had been delivered to the other party.

8. <u>Successors and Assigns</u>.  This Assignment shall bind and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

*(Remainder of this page intentionally left blank)*

13

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Assumption Agreement to be executed and delivered as of the day and year first above written.


**ASSIGNOR:**

By: _____
Name: _____
Its: _____


By: _____
Name: _____
Its: _____


**ASSIGNEE:**

By: _____
Name: _____
Its: _____

4813-5557-6713.2

**Exhibit J – Assigned Contracts**

| | Agreement Name | Category | Cure Amount |
|---|---|---|---|
| 1. | **Healthcare Service Agreement between Angelica Textile Services Inc., and San Jose Medical Group, dated April 23, 2004, for Willow Glen Clinic, Good Samaritan Branch, and McKee Center** | Vendor | $0.00 |
| 2. | **Anesthesiology Services Agreement between SJMG and Associated Anesthesiologists Medical Group, Inc. dated August 19, 1993** | Vendor | $0.00 |
| 3. | **Commercial Alarm Installation and Services Agreement between San Jose Medical Group and Bay Alarm, dated May 24, 2011 for 2585 Samaritan Drive; 227 North Jackson Ave; 400 Race Street; 625 Lincoln Avenue** | Vendor | $0.00 |
| 4. | **Medical Services Agreement between Blue Cross of California and San Jose Medical Group, Inc. dated January 1, 1997** | Payor | $0.00 |
| 5. | **CompuSafe Service Customer Agreement, between Brinks US, and San Jose Medical Group, dated March 23, 2009** | Vendor | $0.00 |
| 6. | **Administrative Services Contract between Cigna Health and Life Insurance and San Jose Medical Group, effective September 1, 2018** | Vendor | $0.00 |
| 7. | **Capitated Physician Group Services Agreement between Cigna Healthcare of California and SJMG entered into on March 1, 1999** | Payor | $0.00 |
| 8. | **Coastal Healthcare Administrators Delegated Credentialing Medical Group Agreement, by and between Coastal Healthcare Administrators, Inc., and San Jose Medical Group dated July 1, 2010** | Payor | $0.00 |
| 9. | **Coventry Health Care Nation Network Inc., Participating Provider Agreement between First Health Group Corp. (referred to as First Health and as a Coventry Company) and SJMG effective March 1, 2008** | Payor | $2,351.00 |
| 10. | **Specialty Pharmaceuticals Agreement between San Jose Medical Group and DrugSource, Inc. dated April 26, 2007** | Vendor | $1,042.51 |
| 11. | **Contract between Ellex, Inc. and San Jose Medical Group, dated 12/15/2017** | Vendor | $913.90 |
| 12. | **Master Client Agreement between Frank, Rimmerman Consulting, LLC, and San Jose Medical Group, dated August 29, 2005** | Vendor | $756.22 |
| 13. | **ResMed Sleep and Ventilation Program, Equipment Rental Form held by San Jose Medical Group for location at 625 Lincoln Avenue** | Vendor | -- |
| 14. | **California Template Provider Participation Agreement between Health Net of California and SJMG entered into as of January 1, 2007** | Payor | $0.00 |
| 15. | **Interplan Physician Participation Agreement for IPA, Medical Group and Physician Associations between Interplan and SJMG effective May 16, 2002** | Payor | $0.00 |

15

| | | | |
|---|---|---|---|
| 16. | **Specialist Services Agreement between Obstetrix Medical Group, and San Jose Medical Group, dated January 1, 2001** | Vendor | $0.00 |
| 17. | **Health Care Services Agreement between SJMG and SKAND Corporation, dated June 1, 2008** | Vendor | $0.00 |
| 18. | **Equipment Rental/Services Agreement between Deanza Water Conditioning and SJMG—Jackson, dated June 23, 2016** | Vendor | -- |
| 19. | **PacifiCare of California Medical Group/IPA Services Agreement between PacifiCare of California and SJMG effective February 1, 2001** | Payor | $0.00 |
| 20. | **Blue Shield of California Physician Member Group Agreement for Managed Care between Blue Shield of California and SJMG, effective July 1, 1993** | Payor | $1,035.00 |
| 21. | **Coastal Healthcare Administrators Delegated Credentialing Medical Group Agreement, by and between Coastal Healthcare Administrators, Inc., and San Jose Medical Group dated July 1, 2010** | Payor | $711.60 |
| 22. | **CareMore Health Plan Medical Group Health Services Agreement between CareMore Health Plan and SJMG, dated February 12, 2008, effective January 1, 2009** | Payor | $540.74 |
| 23. | **MPI Participating Group Practice Agreement between MultiPlan, Inc. and SJMG effective June 1, 1998** | Payor | $281.56 |
| 24. | **MPI Participating Facility Agreement between MultiPlan, Inc. and San Jose Medical Group Endoscopy Suite (SJMG) effective April 1, 2013.** | Payor | -- |
| 25. | **Coventry Health Care Nation Network Inc., Participating Provider Agreement between First Health Group Corp. (referred to as First Health and as a Coventry Company) and SJMG effective March 1, 2008.** | Payor | |
| 26. | **Terms and Conditions between San Jose Medical Group and GE Healthcare** | Downstream Provider | -- |
| 27. | **Provider Health Care Services Agreement between SJMG and Bay Mobile Care, Inc., dated July 1, 2001** | Downstream Provider | -- |
| 28. | **Physician Coverage Agreement between SJMG and Ali Bassiri, MD, dated April 22, 2005** | Downstream Provider | -- |
| 29. | **Physician Employment Agreement between Martin Binesh, MD and SJMG, dated May 10, 2018** | Downstream Provider | -- |
| 30. | **Health Care Services Agreement between Tatyana Borodulin, MD and SJMG, dated February 1, 2003** | Downstream Provider | -- |
| 31. | **Health Care Services Agreement between SJMG and Joseph A. Cu, dated April 17, 1995** | Downstream Provider | -- |
| 32. | **Specialty Services Agreement between SJMG and Sunil S. Dhawan, MD, dated July 1, 1993** | Downstream Provider | -- |
| 33. | **Services Agreement between SJMG and Terrence R. Dwyre MD, Inc., dated July 26, 1993** | Downstream Provider | -- |
| 34. | **Health Care Services Agreement between SJMG and Patricia Ferrari, MD, dated May 1, 2005** | Downstream Provider | -- |

16

4813-5557-6713.2

| | | | |
|---|---|---|---|
| 35. | **Employment Agreement between Thanh-Tam Nguyen, DO, and San Jose Medical Group, dated July 14, 2014** | Downstream Provider | -- |
| 36. | **Health Care Services Agreement between Tam Hoang Nguyen, DO, and San Jose Medical Group, dated January 1, 2009** | Downstream Provider | -- |
| 37. | **Health Care Services Agreement between Arash Padidar, MD, and San Jose Medical Group, dated January 1, 2005** | Downstream Provider | -- |
| 38. | **Health Care Services Agreement between Pediatrix Medical Group, and San Jose Medical Group, dated February 1, 2001** | Downstream Provider | -- |
| 39. | **Independent Contractor Agreement between SJMG and Nimisha Shah MD, dated May 10, 2018** | Downstream Provider | -- |
| 40. | **Employment Agreement between Shashi Sharma, MD, and SJMG, dated January 22, 1992** | Downstream Provider | -- |
| 41. | **Specialty Care Physician Services Agreement between SJMG and Jeffrey Coe, M.D., dated September 15, 2003** | Downstream Provider | -- |
| | | **Total** | **$66,021.00** |

17

## Exhibit K – GPC Physicians

| Agreement | Party | Counter Party |
|---|---|---|
| | | |
| Physician Employee Agreement, dated August 1, 2018 | Verity Medical Group, P.C. | Roger Lucero, M.D., an individual |
| Physician Employee Agreement, dated April 3, 2017 | Verity Medical Group, P.C. | Amirummul Nusairee, M.D., an individual |

18