1  SAMUEL R. MAIZEL (Bar No. 189301)
   samuel.maizel@dentons.com
2  TANIA M. MOYRON (Bar No. 235736)
   tania.moyron@dentons.com
3  CLAUDE D. MONTGOMERY
   claude.montgomery@dentons.com (admitted *pro hac vice*)
4  DENTONS US LLP
5  601 South Figueroa Street, Suite 2500
   Los Angeles, California 90017-5704
6  Tel:  (213) 623-9300 / Fax:  (213) 623-9924
7  Attorneys for the Chapter 11 Debtors and
   Debtors In Possession

8

9                  **UNITED STATES BANKRUPTCY COURT**

10          **CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

11  In re                                    Lead Case No. 2:18-bk-20151-ER

12  VERITY HEALTH SYSTEM OF               Jointly Administered With:
    CALIFORNIA, INC., *et al.*,           Case No. 2:18-bk-20162-ER
13                                         Case No. 2:18-bk-20163-ER
          Debtors and Debtors In Possession.  Case No. 2:18-bk-20164-ER
14                                         Case No. 2:18-bk-20165-ER
                                           Case No. 2:18-bk-20167-ER
15  ☒ Affects All Debtors                  Case No. 2:18-bk-20168-ER
    ☐ Affects Verity Health System of California,   Case No. 2:18-bk-20169-ER
16      Inc.                               Case No. 2:18-bk-20171-ER
    ☐ Affects O'Connor Hospital           Case No. 2:18-bk-20172-ER
17  ☐ Affects Saint Louise Regional Hospital  Case No. 2:18-bk-20173-ER
    ☐ Affects St. Francis Medical Center   Case No. 2:18-bk-20175-ER
18  ☐ Affects St. Vincent Medical Center   Case No. 2:18-bk-20176-ER
    ☐ Affects Seton Medical Center         Case No. 2:18-bk-20178-ER
19  ☐ Affects O'Connor Hospital Foundation  Case No. 2:18-bk-20179-ER
    ☐ Affects Saint Louise Regional Hospital  Case No. 2:18-bk-20180-ER
20      Foundation                         Case No. 2:18-bk-20181-ER
    ☐ Affects St. Francis Medical Center of
21      Lynwood Foundation                 Chapter 11 Cases
    ☐ Affects St. Vincent Foundation
22  ☐ Affects St. Vincent Dialysis Center, Inc.  Hon. Ernest M. Robles
    ☐ Affects Seton Medical Center Foundation
23  ☐ Affects Verity Business Services     **DEBTORS' NOTICE AND MOTION FOR APPROVAL**
    ☐ Affects Verity Medical Foundation    **OF COMPROMISE WITH PREMIER INC. PURSUANT**
24  ☐ Affects Verity Holdings, LLC         **TO FEDERAL RULE OF BANKRUPTCY PROCEDURE**
    ☐ Affects De Paul Ventures, LLC        **9019 AND BANKRUPTCY CODE § 365;**
25  ☐ Affects De Paul Ventures - San Jose   **DECLARATIONS OF ANITA CHOU AND DAVID**
        Dialysis, LLC                      **GALFUS IN SUPPORT THEREOF**
26
          Debtors and Debtors In Possession.   Hearing:
27                                         Date:     May 21, 2019
                                           Time:     10:00 a.m.
28                                         Location: Courtroom 1568
                                                     255 E. Temple St., Los Angeles, CA

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

**PLEASE TAKE NOTICE** that at the above referenced date, time and location, Verity Health System of California, Inc., a California nonprofit benefit corporation and a debtor herein, and the above-referenced affiliated debtors, the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "<u>Debtors</u>"), will request approval of the settlement agreement (the "<u>Settlement Agreement</u>") between the Debtors, on the one hand, and Premier, Inc., Premier Services, LLC ("<u>Premier GP</u>"), Premier Healthcare Alliance, L.P. ("<u>Premier LP</u>"), Premier Healthcare Solutions, Inc. ("<u>PHSI</u>") and each of Premier, Inc.'s other subsidiaries (collectively and including Premier GP, Premier LP and PHSI, "<u>Premier</u>"), on the other hand.

**PLEASE TAKE NOTICE** that, generally, the Settlement Agreement pertains to assumption of certain of Premier's prepetition executory contracts with the Debtors and cure of Premier's prepetition claims in relation thereto and the Debtors' and Premier's ongoing business relationship.  The Settlement Agreement provides (i) for the satisfaction of Premier's claims and the Debtors' counterclaims, (ii) resolves issues regarding Premier's and the Debtors' post-petition relationship, and (iii) enables the Debtors to recover value from the current and future disposition of certain limited partnership interests that may approximate $7.4 million before payment of cure costs.  The principal terms of the Settlement Agreement are set forth in the accompanying Memorandum Of Points And Authorities (the "<u>Memorandum</u>") and in full detail in the Settlement Agreement attached hereto as **Exhibit "A**.**"**  The Debtors submit that the Settlement Agreement is in the best interests of the estates and creditors and should be approved.

**PLEASE TAKE FURTHER NOTICE** that this Motion is based on this Notice of Motion and Motion, the Memorandum, the *Declaration of Richard G. Adcock in Support of First-Day Motions*, filed August 31, 2018 [Docket No. 8], the attached Declarations of Anita Chou and David Galfus, supporting statements, arguments and representations of counsel who will appear at the hearing on the Motion, the record in this case, and any other evidence properly brought before the Court in all other matters of which this Court may properly take judicial notice.

**PLEASE TAKE FURTHER NOTICE** that in accordance with Local Bankruptcy Rule 9013-1(f), any response or opposition to the Motion (the "<u>Response</u>") must be in writing in the

form required by Local Bankruptcy Rule 9013-1(f), must be filed with the Court and served on counsel for the Committee, counsel for the Debtors, Counsel for Premier, mmortimer@sycr.com, and the United States Trustee at least fourteen (14) days prior to the date of the hearing on the Motion.

PLEASE TAKE FURTHER NOTICE that, pursuant to Local Bankruptcy Rule for the United States Bankruptcy Court for the Central District of California 9013-1(h), the failure to file and serve a timely objection to the Motion may be deemed by the Court to be consent to the relief requested herein.

Dated: April 29, 2019

DENTONS US LLP
SAMUEL R. MAIZEL
TANIA R. MOYRON
CLAUDE D. MONTGOMERY


By     /s/  Tania M. Moyron
        Tania M. Moyron

Attorneys    for    Debtors    and    Debtors    In Possession

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1

## TABLE OF CONTENTS

Page

I. INTRODUCTION ......................................................................................................................1

II. JURISDICTION ......................................................................................................................2

III. STATEMENT OF FACTS....................................................................................................2

    A.    General Background...........................................................................................2

    B.    Premier and the Debtors' Business Relationship and Agreements ...........................3

    C.    The LP Agreement. ..............................................................................................5

    D.    The GPO Participation Agreement and Tax Receivable Agreement. ......................5

    E.    The Subscription Agreement..............................................................................6

    F.    The Disputed Distributions ...............................................................................6

    G.    Post-petition Amounts Due and Owing. ...........................................................7

    H.    Premier's Proof of Claim and Cure Objection. ................................................8

    I.    The Negotiations and Settlement Agreement...................................................11

IV. ARGUMENT ......................................................................................................................17

V. CONCLUSION ......................................................................................................................27

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Communications Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) ...................................................................22

*In re AEG Acquisition Corp.*,
    127 B.R. 34 (Bankr. C.D. Cal. 1991), *aff'd*, 161 B.R. 50 (B.A.P. 9th Cir. 1993) ...................26

*Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp., Inc.)*,
    476 F.3d 665 (9th Cir. 2007) ..............................................................................25, 26

*In re Blair*,
    538 F.2d 849 (9th Cir. 1976) ................................................................................18, 22

*In re Bowman*,
    194 B.R. 227 (Bankr. D. Ariz. 1995) ...........................................................................26

*Matter of Carla Leather, Inc.*,
    44 B.R. 457 (Bankr. S.D.N.Y. 1984) .........................................................................18

*In re Charter Communications*,
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) .....................................................................24, 25

*In re Chi-Feng Huang*,
    23 B.R. 798 (B.A.P. 9th Cir. 1982) .........................................................................25

*Citizens Bank of Maryland v. Strumpf*,
    516 U.S. 16 (1995) ...........................................................................................20

*In re Hertz*,
    536 B.R. 434 (Bankr. C.D. Cal. 2015) ......................................................................26

*In re Lawrence & Erausquin, Inc.*,
    124 B.R. 37 (Bankr. N.D. Ohio 1990) .......................................................................21

*In re Lee Way Holding Co.*,
    120 B.R. 881 (Bankr. S.D. Ohio 1990) .....................................................................18

*In re Lehman Bros. Holdings, Inc.*,
    433 B.R. 101 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. In re Lehman Bros.
    Holdings Inc.*, 445 B.R. 130 (S.D.N.Y. 2011) .............................................................20

Lubrizol Enters. v. Richmond Metal Finishers,
    756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986) ...............................26

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

*In re Marples,*
    266 B.R. 202 (Bankr. D. Idaho 2001) ...............................................................................23

*Martin v. Kane (In re A & C Properties),*
    784 F.2d 1377 (9th Cir. 1986), cert. denied 479 U.S. 854 (1986) ................................17, 18, 23

*In re MF Glob. Inc.,*
    466 B.R. 244 (Bankr. S.D.N.Y. 2012) ..............................................................................24

*Newman v. Stein,*
    464 F.2d 689 (2d Cir. 1972)..............................................................................................18

*In re Orexigen Therapeutics, Inc.,*
    596 B.R. 9 (Bankr. D. Del. Nov. 3, 2018) .......................................................................20

*Otto Preminger Films, Ltd. v. Qintex Entm't, Inc. (In re Qintex Entm't, Inc.),*
    950 F.2d 1492 (9th Cir. 1991)...........................................................................................21

*In re Partsearch Techs., Inc.,*
    453 B.R. 84 (Bankr. S.D.N.Y. 2011) ..............................................................................21

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
    390 U.S. 414, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968) ......................................................22

*In re Sabine Oil & Gas Corp.,*
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ............................................................................17

*In re Tribune Co.,*
    464 B.R. 208 (Bankr. D. Del. 2011) ................................................................................18

*In re Tribune Co.*
    464 B.R. 126 (Bankr. D. Del. 2011) ................................................................................18

*In re Tribune Media Co.,*
    587 B.R. 606 (D. Del. 2018) ............................................................................................18

*United States v. Alaska Nat'l Bank (In re Walsh Constr., Inc.),*
    669 F.2d 1325 (9th Cir. 1982).....................................................................................17, 18, 22

*In re W.T. Grant & Co.,*
    699 F.2d 599 (2nd Cir. 1983) ..........................................................................................18

*In re Woodson,*
    839 F.2d 610 (9th Cir. 1988).............................................................................................17

*In re Yellowstone Mountain Club, LLC,*
    460 B.R. 254 (Bankr. D. Mont. 2011)...............................................................................22

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

iii

**Statutes**

Judiciary and Judicial Procedure, 28 U.S.C.
§ 1334 ............................................................................................................2
§ 1408 ............................................................................................................2
§ 1409 ............................................................................................................2
§ 157(b) ..........................................................................................................2

United States Bankruptcy Code, 11 U.S.C.
§§ 101–1532 ..................................................................................................1
§ 1107 ............................................................................................................2
§ 1108 ............................................................................................................2
§ 362 ............................................................................................................20
§ 362(a) ..........................................................................................................7
§ 365 ...........................................................................................1, 8, 21, 25
§ 365(a) ........................................................................................................25
§ 365(b)(1) ...................................................................................................26
§ 365(c)(1) ..............................................................................................10, 21
§ 365(e)(2) ...................................................................................................21
§ 542(a) ..........................................................................................................7
§ 549 ..............................................................................................................6
§ 550 ..............................................................................................................6

**Rules and Regulations**

Federal Rules of Bankruptcy Procedure
Rule 9019 ........................................................................................ *passim*
Rule 9019(a) ................................................................................................17

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Verity Health System of California, Inc., a California nonprofit benefit corporation and a debtor herein ("VHS"), and the above-referenced affiliated debtors, the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Debtors"), request approval of the settlement agreement (the "Settlement Agreement," attached hereto as **Exhibit "A"**) between the Debtors, on the one hand, and Premier, Inc., Premier Services, LLC ("Premier GP"), Premier Healthcare Alliance, L.P. ("Premier LP"), Premier Healthcare Solutions, Inc. ("PHSI") and each of Premier, Inc.'s other subsidiaries (collectively and including Premier GP, Premier LP and PHSI, "Premier") (together, the Debtors and Premier are the "Parties") under Rule 9019 and all transactions provided thereunder, pursuant to Rule 9019 and § 365 of the Bankruptcy Code.[1]

The Settlement Agreement comprehensively and favorably resolves a series of pre- and postpetition disputes between Premier and the Debtors over the Parties' performance and obligations primarily under seven different contracts. The Settlement Agreement allows the Parties to receive substantial consideration and benefits under the agreements (and Premier has provided material value to the Debtors both before and after the petition date) as they wind-down their relationship, as opposed to engaging in risky, complex, lengthy and expensive litigation that would interfere with the Debtors' business and maintenance of their cases (which would have little relative upside regarding collection for the Debtors). The Debtors extensively negotiated the Settlement Agreement with Premier, and designed it to limit the Debtors' financial and commercial exposure while allowing the Debtors to leverage their upside advantage. Most notably, the Settlement Agreement nets the payments to be made to Premier as cure for the assumption of certain agreements between Premier and the Debtors, against the value to be

---

[1] All references to § herein are to sections of the Bankruptcy Code, 11 U.S.C. §§ 101–1532; all references to "Rules" are to provisions of the Federal Rules of Bankruptcy Procedure.

4842-9062-6709v2/105514-0001

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1  received by the Debtors from the monetization of VHS's limited partner unit interests in Premier

2  LP through their exchange or sale.

3      The Settlement Agreement also provides for Premier's agreement, *inter alia,* to remit

4  $609,146 in disputed funds it presently holds, to continue certain valuable purchasing and solution

5  services during the Debtors' liquidation of their operating assets, to permit the exchange or sale of

6  the Debtors' limited partnership units with an anticipated value of approximately $7.4 million

7  before payment of cure costs and to continue to make periodic cash distributions to the Debtors

8  under certain Premier Agreements.  In essence, the Settlement Agreement allows the parties to end

9  their relationship with a value driven process instead of litigation.

10     Based on the foregoing, and for the reasons set forth in greater detail below, the Debtors

11 respectfully request that the Court approve the Settlement Agreement.

12                                      **II.**

13                                 **JURISDICTION**

14     This Court has jurisdiction over this Motion under 28 U.S.C. § 1334.  This is a core

15 proceeding pursuant to 28 U.S.C. § 157(b) and may be heard and determined by the Bankruptcy

16 Court.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

17                                      **III.**

18                              **STATEMENT OF FACTS**

19 A.    **General Background.**

20     1.    On August 31, 2018 ("Petition Date"), the Debtors each filed a voluntary petition

21 for relief under chapter 11 of title 11 of the Bankruptcy Code.  Since the commencement of their

22 cases, the Debtors have been operating their businesses as debtors in possession pursuant to §§

23 1107 and 1108.

24     2.    On the Petition Date, Debtor VHS, a California nonprofit public benefit

25 corporation, was the sole corporate member of the following five Debtor California nonprofit

26 public benefit corporations that operated six acute care hospitals:  O'Connor Hospital, Saint

27 Louise Regional Hospital, St. Francis Medical Center, St. Vincent Medical Center, Seton Medical

28 Center, and Seton Medical Center Coastside (collectively, the "Hospitals") and other facilities in

the state of California. *Declaration of Richard G. Adcock in Support of First-Day Motions*, filed August 31, 2018 (the "First-Day Decl.") [Docket. No. 8], at 4, ¶ 11.

3.    VHS, the Hospitals, and their affiliated entities (collectively, "Verity Health System") operated (and continue, in part, to operate) as a nonprofit health care system, with, as of the Petition Date, approximately 1,680 inpatient beds, six active emergency rooms, a trauma center, eleven medical office buildings, and a host of medical specialties, including tertiary and quaternary care. First-Day Decl., at 4, ¶ 12.  On the Petition Date, the Debtors had approximately 850 inpatients. *Id.* at 6, ¶ 17.  The scope of the services provided by the Verity Health System is exemplified by the fact that, in 2017, the Hospitals provided medical services to over 50,000 inpatients and approximately 480,000 outpatients. *Id.*, at 4, ¶ 12.

**B.    Premier and the Debtors' Business Relationship and Agreements**

4.    Premier, Inc. is a public company primarily owned by hospitals, health systems and other healthcare organizations located in the United States, as well as public stockholders. Premier is a leading healthcare improvement company, uniting an alliance of thousands of U.S. hospitals and over 100,000 other providers.  Premier utilizes integrated data and analytics, supply chain solutions, and advisory and other services and collaborates with members to co-develop long-term innovations that reinvent and improve the way care is delivered to patients.  Premier delivers value through a comprehensive technology-enabled platform that offers supply chain services, clinical, financial, operational and population health software-as-a-service informatics products, advisory services and performance improvement collaborative programs.  As explained below, VHS is one of Premier's healthcare owners.

5.    Premier is an independent third party with no insider or personal connection to the Debtors except for their services vendor relationship and the Debtors' less than one percent (1%) limited partnership interest in Premier LP.

6.    The Debtors conducted substantial prepetition business (including in the 20 days before the Petition Date with Premier), and, consequently, as discussed, *infra*, Premier also has asserted prepetition claims in excess of $3.1 million against the Debtors, some of which are long standing dating back to 2017. The Parties have significant disputes between them relating, *inter alia*,

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

3

1    to the Premier prepetition claims.

2    7.    Prior to the Petition Date, the Debtors and Premier entered into multiple

3    agreements (together, the "Premier Agreements," which are listed in the attached Declaration of

4    Anita Chou (the Chou Decl.) at ¶ 11), including the principal seven agreements below:

5    (a)    The Amended and Restated Limited Partnership Agreement, effective as of

6          October 1, 2013, as amended, by and among Premier LP, Premier GP and the

7          limited partners of Premier LP party thereto (including VHS) (the "Limited

8          Partners") (the "LP Agreement") (attached as Exhibit 2 to the Chou Decl.);

9    (b)    The GPO Participation Agreement, effective as of October 1, 2013, by and between

10          Premier LP and VHS (the "GPO Participation Agreement") (attached as Exhibit 3

11          to the Chou Decl.);

12    (c)    The Performance Suite Solutions Subscription Agreement, dated November 14,

13          2011, by and between PHSI and VHS (as amended, the "Subscription Agreement")

14          (attached under seal as Exhibit 4 to the Chou Decl.);

15    (d)    The Exchange Agreement, effective as of October 1, 2013, by and among Premier,

16          Inc., Premier LP, and the Limited Partners (the "Exchange Agreement") (attached

17          as Exhibit 5 to the Chou Decl.);

18    (e)    The Tax Receivable Agreement, effective as of October 1, 2013, by and among

19          Premier, Inc. and the Limited Partners (the "Tax Receivable Agreement") (attached

20          as Exhibit 6 to the Chou Decl.);

21    (f)    The Registration Rights Agreement, effective as of October 1, 2013, by and among

22          Premier, Inc. and the Limited Partners (attached as Exhibit 7 to the Chou Decl.);

23          and

24    (g)    The Voting Trust Agreement, effective as of October 1, 2013, by and among

25          Premier, Inc., Premier LP, the Limited Partners, and defined as Stockholders

26          therein, and Wells Fargo Delaware Trust Company, N.A., as trustee (the "Voting

27          Trust Agreement") (attached as Exhibit 8 to the Chou Decl.).

28

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

4

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

**C.      The LP Agreement.**

8.      Pursuant to the LP Agreement, VHS holds certain Class B Common Units ("Units"), reflecting its Limited Partner interest in Premier LP.  As of the Petition Date, VHS held 222,809 of such Units.   Pursuant to the LP Agreement and the Exchange Agreement, approximately 74,270 of the Units are exchangeable for a like amount of Class A Common Stock in Premier, Inc. (the "Tradable Stock") starting on October 31 of each year for a seven-year period (which commenced in October 2013).  VHS's remaining Units are scheduled to vest for exchange on the following schedule which matures in October 2020: October 31, 2018 (74,270 Units), October 31, 2019 (74,270 Units) and October 31, 2020 (74,269 Units).  Chou Decl. ¶ 5. Premier has consistently asserted that as a condition to, and concurrent with, each exchange and the sale of any Tradable Stock obtained pursuant to the LP Agreement, VHS is required to pay Premier any amounts due and owing under the Premier Agreements.

9.      In the ordinary course, VHS typically sells its Tradable Stock in the public market as it receives shares in each periodic exchange of the Units under the LP Agreement and Exchange Agreement and in connection with such sale, pays Premier any amounts then outstanding under any of the Premier Agreements.  Chou Decl. at ¶ 12.

10.     The ability of the Units to vest each year is contingent upon, among other things, VHS remaining a Limited Partner of Premier LP and remaining a member in Premier's GPO purchasing program (as a "Premier Member") under the GPO Participation Agreement.  Chou Decl. at ¶ 13.

11.     Under the LP Agreement, Units are subject to redemption in the event of a "Termination Event" (which Premier has asserted could include VHS's inability to perform under the GPO purchasing program following a sale of its Hospitals).  Premier has estimated that the redemption value of the Debtors' not yet vested October 2019 and October 2020 Units is approximately $340,499.  The redemption of unvested Units would provide VHS with far less value than what VHS could obtain through the market in the sale of its Tradable Stock at current prices. Chou Decl. at ¶ 14.

**D.      The GPO Participation Agreement and Tax Receivable Agreement.**

5

12.    In addition to the Units interests that VHS holds, VHS and Premier LP are also party to the GPO Participation Agreement and the Tax Receivable Agreement pursuant to which VHS is entitled to certain periodic distributions in exchange for, among other things, (i) VHS's continued participation, at a certain agreed-upon level, in Premier's purchasing program under the GPO Participation Agreement, and (ii) VHS's continuation as a Limited Partner in Premier LP. VHS's participation in the purchasing program under the GPO Participation Agreement requires that VHS maintain a level of purchasing which then entitles VHS to receive certain distribution payments based upon its level of participation. Chou Decl. at ¶ 15.

**E.    The Subscription Agreement.**

13.    Pursuant to the Subscription Agreement, Premier provides VHS and its Hospitals with valuable access to nonexclusive license rights to certain of Premier's proprietary intellectual property through Premier's technology programs and systems.  These systems include programs that help to manage patient healthcare information and important medical records management for physicians.  VHS, in turn, reimburses Premier a monthly fee based upon the services and solutions provided. Chou Dec. ¶ 16.

**F.    The Disputed Distributions**

14.    Some of these GPO Participation Agreement distributions accrued or were payable within the ninety (90) days prior to the Petition Date, but were not distributed to VHS and are currently being held by Premier (the "Prepetition Distributions").  The Debtors have asserted that the Prepetition Distributions are due to the Debtors and are recoverable as an avoidable preference under §§ 549 and 550.  Premier has asserted that it has certain defenses to such claims, including allegedly superior rights and interests in the Prepetition Distributions, including by way of setoff, recoupment and/or rights in such distributions by way of the GPO Participation Agreement, the LP Agreement and the other integrated agreements, which render the Prepetition Distributions unavoidable or not  property of the VHS Debtors' estates.

15.    Subsequent to the Petition Date, additional distributions accrued under the GPO Participation Agreement, which have not been distributed to VHS and are currently being held by Premier (the "Postpetition Distributions").  As with the Prepetition Distributions, Premier has

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

6

1   asserted that it has rights and interests in the Postpetition Distributions that preclude the Debtors'

2   interests in such funds. The Debtors have asserted that Premier's holding of the Postpetition

3   Distributions constituted a violation of the automatic stay under § 362(a),  a breach under the

4   Premier Agreements and was subject to turnover pursuant to § 542(a).  With respect to the

5   Prepetition Distributions and Postpetition Distributions, which total $609,146, (collectively, the

6   "Disputed Distributions"), Premier has asserted that (a) the rights of the Parties in such

7   distributions are in *bona fide* dispute, and (b) Premier has been holding such Disputed

8   Distributions in escrow pending resolution of the Parties disputes thereto.

9   **G.      Post-petition Amounts Due and Owing.**

10      16.     Subsequent to the Petition Date, Premier has continued to provide valuable

11  information technology, group purchasing and other solutions to VHS and certain of the VHS

12  Debtors pursuant to the Premier Agreements, and the Debtors have paid certain of Premier's

13  submitted invoices in the ordinary course.  Specifically, the Debtors continue to utilize Premier's

14  services to operate their Hospitals pursuant to the GPO Purchasing Agreement and the Subscription

15  Agreement. Pursuant to the terms of the Subscription Agreement, the Debtors have continued to

16  utilize services for which amounts due to PHSI continue to accrue on a monthly basis at the rate of

17  approximately $117,456 as an administrative expense.  Chou Decl. at ¶ 21.  These services include

18  services that Premier has agreed to provide, under the Subscription Agreement, to VHS, that have

19  enabled VHS to transition the sale of O'Connor Hospital and Saint Louis Regional Hospital and

20  related assets to Santa Clara County (the "SCC Sale") [Docket No. 1153].

21      17.     Premier has submitted invoices for the postpetition delivery of goods and services

22  to one or more of the Debtors which remain unpaid in the ordinary course in the amount of

23  $126,610.94, which amount is due and owing to Premier under the Premier Agreements for

24  postpetition services benefiting the chapter 11 estates as administrative expense(s). Chou Decl. ¶

25  20.

26      18.     The Debtors have advised Premier that they wish to continue to utilize Premier's

27  services under the Premier Agreements going forward, particularly as the Debtors facilitate the

28  sale and transfer of their remaining Hospitals.  Pursuant to the Settlement Agreement, certain

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

agreements, such as the GPO Participation and Subscription Agreement will continue for so long as the Debtors operate the Hospitals or provide transition services to the Buyers of their Hospitals. Other agreements, such as the LP Agreement, the Exchange Agreement, Tax Receivable Agreement, Voting Trust Agreement, and Registration Rights Agreement will continue only for so long as the Debtors hold Class B Units in Premier LP.

19.    On or about December 5, 2018, and again on or about March 19, 2019, pursuant to § 2.2 of the Exchange Agreement, VHS timely executed and submitted Notices of Exchange by which VHS provided a notice to Premier of VHS's intent to exchange 74,270 of its Units for Tradable Stock, and requested such exchange to occur, respectively, on January 31, 2019 and April 30, 2019, pursuant to the LP Agreement and Exchange Agreement. Chou Decl. ¶ 23.

20.    At the time of the Debtors' delivery of the Notices of Exchange, pre and postpetition amounts remained due and owing to Premier under the Premier Agreements, including the undisputed portion of the Premier Prepetition Claim. Chou Decl. ¶ 24.

21.    Since the Petition Date, Premier has consistently disputed and continues to dispute VHS's ability to exchange its Units under the LP Agreement and Exchange Agreement unless and until the Premier Agreements are assumed with Premier's consent (and all defaults thereunder cured, including the payment of the Premier Prepetition Claim) (defined below), and all conditions to such exchange are met, including VHS's payment to Premier of all post-petition amounts due and owing under the Premier Agreements.  Premier also disputes VHS's rights to any Tradable Stock pursuant to an exchange unless the LP Agreement, Exchange Agreement and related Premier Agreements are assumed pursuant to § 365.

**H.    Premier's Proof of Claim and Cure Objections.**

22.    Premier asserts claims against the Debtors in the amount of no less than $3.1 million (the "Premier Prepetition Claim") that Premier alleges is due and owing under the Premier Agreements as of the Petition Date and which must be paid as a "cure" prior to any assumption, or assumption and assignment, of the Premier Agreements.  On or about March 28, 2019, Premier Inc., Premier GP, PHSI and Premier LP, each filed separate proofs of claim in the amount of $3,122,167.78, plus any and all additional damages, fees, costs and/or expenses incurred by

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

8

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

Premier under the Premier Agreements against VHS and each of the VHS Debtors[2] (collectively, the "Proof of Claim") in the VHS Debtors' Chapter 11 Cases in relation to the Premier Prepetition Claim.

23.    Premier asserts that the Premier Prepetition Claim includes amounts that remain due and owing for valuable services and solutions that Premier rendered and/or performed for the VHS Debtors pre-petition, and that the services and solutions provided more than fully complied with Premier's obligations under the Premier Agreements – thereby obligating VHS to compensate Premier.  The Debtors acknowledge that Premier has provided certain compensable pre and post-petition services, but the Debtors dispute the amount and grounds for allowance for the Premier Prepetition Claim.

24.    Throughout the Debtors' cases and in connection with the Debtors' sales of its Hospitals, Premier has consistently maintained that any assumption or assumption and assignment of the Premier Agreements, whether in the context of a sale of the Debtors' Hospitals or otherwise, would first require the payment of the Premier Prepetition Claim and Premier's consent to any assumption and assignment.  This is particularly the case as the Premier Agreements are enterprise agreements, and in some cases enterprise licenses, entered into as between VHS and Premier, rather than any particular Hospital or other Debtor and given that the Premier Agreements include rights to intellectual property licenses, partnership interests and personal services from Premier.

25.    On October 10, 2018, Premier filed a *Reservation of Rights of Premier, Inc. and its Subsidiaries in Relation to the Debtors' Motion for Approval of Bidding Procedures and the Sale of O'Connor Hospital, Saint Louise Regional Hospital and Related Assets* (the "SCC Reservation") regarding the SCC Sale  [Docket No. 444].

26.    On October 17, 2018, the Debtors replied to the SCC Reservation [Docket No. 561] and stated: "[b]ecause nothing in the [Debtors' SCC Sale bidding procedures motion] would impair the rights of Premier … at this time, their rights to object on the grounds raised in their Objections are fully preserved and need not be addressed further here.  However, for the

---

[2] See Exhibit B to Settlement Agreement.

1    avoidance of doubt, nothing in this Reply should be deemed a waiver of any of the Debtors' rights

2    or arguments against Premier [.]" *Id.* at 3.

3        27.    On December 14, 2018, Premier filed a subsequent *Reservation of Rights of*

4    *Premier, Inc. and its Subsidiaries in Relation to the Debtors' Motion for Approval of Bidding*

5    *Procedures and the Sale of O'Connor Hospital, Saint Louise Regional Hospital and Related*

6    *Assets* [Docket No. 1068] (the "Second SCC Reservation") and stated:

7        Based upon 11 U.S.C. § 365(c)(1) and binding Ninth Circuit
    precedent, the Debtors cannot assume and assign the Premier
8        Agreements, or transfer any rights under the Premier Agreements in
    connection with the Sale or otherwise, without Premier's consent.
9        *See, e.g., Otto Preminger Films, Ltd. v. Qintex Entm't, Inc. (In re*
    *Qintex Entm't, Inc.)*, 950 F.2d 1492 (9th Cir. 1991) and *Perlman v.*
10       *Catapult Ent. (In re Catapult Ent.)*, 165 F.3d 747 (9th Cir. 1998).
    The Debtors have not yet sought Premier's consent and Premier has
11       not yet granted its consent.

12       28.    On December 17, 2018, Premier filed its *Objection of Premier, Inc. and its*

13   *Subsidiaries to Proposed Assumption and Assignment of Contracts, and Cure Amounts* [Docket

14   No. 1093] and objected to the SCC Sale by arguing that (i) the Debtors could not assume and

15   assign Premier's SCC-related contracts absent Premier's consent and (ii) the Debtors would be

16   obligated to pay Premier at least $3.1 million in cure costs, instead of the Debtors' proposed

17   amount of $2.4 million.

18       29.    On February 28, 2019, the SCC Sale closed, pursuant to which none of the Premier

19   Agreements were sought to be assumed and assigned to SCC.

20       30.    On March 29, 2019, Premier filed its *Objection of Premier, Inc. and its*

21   *Subsidiaries to Proposed Assumption and Assignment of Contracts, and Cure Amounts* [Docket

22   No. 1954][3] objecting to a sale of St. Francis Medical Center, St. Vincent Medical Center, Seton

23   Medical Center, and Seton Medical Center Coastside and related assets to Strategic Global

24   Management, Inc. (the "SGM Sale") arguing, *inter alia*, that the Premier contracts related to the

25   SGM Sale were integrated and non-assumable and non-assignable without consent and that the

26   Debtors were required to provide a cure amount of "in excess of $3.2 million."

27   _____

28   [3] Premier titled its Objections with the same or similar titles throughout these cases.

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1    31.    On April 5, 2019, Premier filed its *Objection of Premier, Inc. and its Subsidiaries*

2    *to Proposed Assumption and Assignment of Contracts, and Cure Amounts* [Docket No. 2066],

3    with the same objections as previously advanced and arguing that the Debtors must assume or

4    assume and assign the Premier Agreements "*in toto*."

5    32.    On April 5, 2019, the Debtors filed an omnibus reply to the objection filed by

6    Premier and other objections and proposed that all objections related to cure amounts and adequate

7    assurance be continued to June 5, 2019 [Docket No. 2065]. On April 11, 2019, the parties entered

8    into a stipulation regarding the same [Docket No. 2183].  Based on the foregoing, on April 15,

9    2019, the Court continued Premier's SGM Sale related objections to a hearing to take place on

10    June 5, 2019, at 10:00 a.m. [Docket No. 2183].

11    33.    As set forth in the objections, Premier asserts claims against the Debtors in the

12    amount of no less than $3.1 million (the "Premier Prepetition Claim") as due and owing under the

13    Premier Agreements as of the Petition Date.  On or about March 28, 2019, Premier Inc., Premier

14    GP, PHSI and Premier LP, filed a total of 68 separate proofs of claim in the amount of

15    $3,122,167.78, plus any and all additional damages, fees, costs and/or expenses incurred by

16    Premier under the Premier Agreements against VHS and each of the VHS Debtors[4] (collectively,

17    the "Proof of Claim") in the VHS Debtors' Chapter 11 Cases in relation to the Premier Prepetition

18    Claim.

19    34.    The Settlement Agreement serves to resolve all of these disputes regarding the

20    Premier Agreements, while also facilitating the Debtors' continued use of the Premier

21    Agreements.[5]

22    **I.**    **The Negotiations and Settlement Agreement.**

23    35.    Since the Petition Date, Premier has been a valuable and reliable vendor for the

24    Debtors.  However, from the outset of these cases, there was a disagreement as to the amounts due

25    to Premier.  The Debtors filed schedules listing a disputed $2.6 million due to Premier and its

26    _____

27    [4] See Exhibit B to Settlement Agreement.

28    [5] The Debtors do not seek to assign any of the Premier Agreements in connection with the SGM Sale.

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

11

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

affiliates. At all times, Premier has insisted the prepetition amount due to it exceeded $3.1 million. Chou Decl. ¶ 7.

36.    As part of the negotiations with Premier, the Debtors and their professionals conducted a thorough analysis of the prepetition and postpetition commercial history between the Parties, the Debtors' exposure, the possibility of collection, and the consequences of withdrawing, terminating or continuing under the Premier Agreements and whether the Debtors could obtain the services and solutions provided under the Premier Agreements.  Galfus Decl. at ¶ 6. While the Parties' dispute over Premier's prepetition claim precluded the Debtors' ability to come to an agreement on assumption of the Premier Agreements, the Debtors concluded that terminating the Premier Agreements would be burdensome given the Debtors' resources and the nature of these cases.  Galfus Decl. ¶ 5.  At the same time, the Parties began discussions regarding a potential resolution to the Parties' overall disputes, including with respect to the Premier Prepetition Claim and the exchange of the Units.  Galfus Decl. ¶ ¶ 6-7.

37.    Because of the Debtors' ownership in Premier and the Debtors planned liquidations in these cases, the Debtors financial advisor, Berkeley Research Group LLC ("BRG"), began a review and valuation process of the Premier Class A Common Stock to seek to determine its trading history and potential net future value to the Debtors' estates.  Galfus Decl. at ¶ 8.  BRG determined that even at a share price of $33 per share (the share price at or around April 26, 2019), the realizable value of the Tradable Stock was estimated to approximately $7.4 million.  Galfus Decl. at ¶ 8.  Given the fluctuation, the Debtors' professionals set out to develop a proposal to recognize the value of the Tradable Stock for the Debtors' estates, in the most efficient and cost beneficial manner. *Id.*

38.    At the same time, the Debtors also performed a legal analysis to assess both Parties' potential liability, including under the Premier Agreements, under common and statutory law, including for avoidance actions and automatic stay liability.  Chou Decl. at ¶¶ 3, 27.  The Debtors also weighed and discussed the potential to assign the Premier Agreements to buyers. *Id.* However, neither of the Debtors' stalking horse bidders for the SCC or SGM Sale had an interest in taking assignment of the Premier Agreements. In addition, the Debtors were not willing to pay

1    the $3.1 million cure amount that Premier asserted was due and owing in order to confirm access

2    to the exchange process under the LP Agreement.  *Id.*

3        39.    The Parties have since engaged in extensive negotiations that have spanned over

4    several months, exchanged multiple copies of drafts of term sheets and agreements, and now wish

5    to enter into this Agreement to resolve their disputes, as well as any and all claims they may hold

6    against the other.  Chou Decl. at ¶ 31.  The Settlement Agreement resolves the current disputes

7    between the Parties and contemplates, among other things, that the Debtors will be able to:

8        (a)    preserve and continue their relationship with Premier under the Premier

9        Agreements to the benefit of hospital operations and the sale process;

10       (b)    resolve their dispute in relation to their agreements, the substantial unsecured

11       claims filed in the amount of $3.1 million against each of the respective Debtors, the

12       Disputed Distributions and the Units exchanges, and avoids potentially significant,

13       protracted and costly litigation in relation to that dispute;

14       (c)    realize the substantial value and worth of the Debtors' currently exchangeable

15       Units, by permitting an exchange to occur on April 30, 2019, subject to final approval of

16       the Settlement Agreement;

17       (d)    receive periodic distributions under the GPO Participation Agreement and the Tax

18       Receivable Agreement;

19       (e)    realize the substantial value and worth of the October 2019 and October 2020

20       Units, by virtue of VHS's ability to sell the Units to current Limited Partners, and

21       potentially sell to other parties acceptable to Premier GP;

22       (f)    realize the substantial value in the future Units to be exchanged into Tradable

23       Stock, for sale on the open market by virtue of Premier's waiver of certain rights to redeem

24       such Units in light of Termination Events the Debtors are likely to hit, thereby providing

25       value to the Debtors' estates in the form of saleable public stock; and

26       (g)    obtain significant recovery, through the sale of Tradable Stock (consistent with the

27       Parties' ordinary practice under the LP Agreement and other Premier Agreements), and

28       funding the cure payments set forth in the Settlement Agreement by virtue of such sale.

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

13

40.    In light of the material benefits to be derived from the Settlement Agreement, the Debtors have determined, in the exercise of their sound business judgment, that it is in the best interest of the estates and their creditors to avoid the delay, uncertainty and expense of litigation and to resolve their disputes in accordance with the terms set forth in the Settlement Agreement. Chou Decl. at ¶ 30.

41.    The Settlement Agreement is incorporated herein in full.  In summary, the principal terms of the Settlement Agreement provide (and for the avoidance of doubt, the below is a summary, and the Settlement Agreement itself controls the Parties' agreement):[6]

(a)    The April 30, 2019 Exchange.    VHS shall exchange 74,270 of its Units for Tradable Stock on April 30, 2019 (the "April 2019 Exchange") and waives and shall not assign or exercise any right of first refusal under the LP Agreement and Exchange Agreement related to this exchange.  Settlement Agreement at §§2(a), (b).

(b)    Effective Date Approvals/Payments.    VHS will assume the Premier Agreements as of the Execution Date of the Settlement Agreement and shall pay Premier a cure amount of $2,000,000 in two payments ($1.7 million (the "First Premier Payment") and $300,000 (the "Second Premier Payment")).  The First Premier Payment will likely occur in June, 2019 (following approval of the Settlement Agreement), and the Second Premier Payment will likely occur in January 2020 (the First Premier Payment and the Second Premier Payment, the "Premier Payments").  Neither payment will come from the proceeds of the sale of Hospital assets of the Debtors, but instead will be derived from the exchange of Units pursuant to the terms of the LP Agreement and this Settlement Agreement. Settlement Agreement at §§3(c)(i), 4(e), 11.

(c)    Post-Effective Date Payments.

    i.    Simultaneous with Premier's receipt of the First Premier Payment on the First Payment Date, Premier shall remit to VHS, without setoff or recoupment, the Disputed Distributions plus any additional accrued and all unpaid funds

---

[6] All capitalized terms not otherwise defined herein shall have the same meaning as in the Settlement Agreement.

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

then due and owing to VHS under the Premier Agreements and shall continue to make distributions under the Premier Agreements, subject to conditions. Settlement Agreement at §4(a)-(c).

ii. VHS shall have the ability to sell, for cash, its Units (the "Remaining Units"), or exchange such Remaining Units (if not sold) for Tradable Stock, subject to conditions.  The Settlement Agreement provides for VHS to make the Premier Payments and other payments from and tied to this consideration. Settlement Agreement at §§4(d), (f), (h).

iii. VHS shall pay Premier any unpaid invoices due and owing under the Premier Agreements after the final contemplated exchange in October, 2020. Settlement Agreement at §4(g).

(d)    Modifications and Amendments to the Premier Agreements.

i.   The GPO Participation Agreement shall terminate upon the later of (a) the transitioning of the Debtors' Hospitals to new buyers, (b) the expiration or earlier termination of the last agreement under which the Debtors operate or manage their Hospitals for any buyer, or (c) the date upon which the Debtors' cease of operations of the Hospitals (the "Operations Termination Date"). Settlement Agreement at § 5(a).

ii.  The Subscription Agreement shall terminate upon the later of (a) the Operations Termination Date, or (b) the expiration or earlier termination of the last transition services agreement between the purchaser of any of the Debtors' Hospitals.  Settlement Agreement at § 5(b).

iii. Until then, VHS shall make monthly payments under these agreements under a reduced amount of $112,000/month. Settlement Agreement at § 5(d).

iv. Premier waives specific rights it may have had regarding certain termination clauses for the GPO Participation Agreement and the Subscription Agreement.  Settlement Agreement at § 5(c).

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

v.  The Premier Agreements, other than the GPO Participation Agreement and the Subscription Agreement, shall terminate upon the earlier of the exchange of units in October 2020 or the sale and transfer of its Remaining Units. Settlement Agreement at § 5(f).

(e)  Premier consents to VHS' assignment of its rights under the LP Agreement to certain parties, including current Limited Partners.  Settlement Agreement at §§ 4(h); 7.

(f)  The Debtors do not intend to assign the Premier Agreement to any Buyer of its Hospitals.  However, the Debtors will be permitted to continue to utilize Premier services under the GPO Participation Agreement and Subscription Agreement as the Debtors transition post-closing pursuant to operating agreements or transition services agreements with buyers of their Hospitals.  Premier also will permit the Debtors to assign their interests to the October 2019 and October 2020 Units to a liquidating trust pursuant to the terms of a confirmed chapter 11 plan of liquidation, or if the Debtors decide to propose that in a plan of reorganization. Settlement Agreement at §§5, 7.

(g)  The Parties fully release each other, and Premier will withdraw its Proof of Claim. Settlement Agreement at §9, 14.

(h)  The Parties will bear their own costs and fees.  Settlement Agreement at §13.

(i)  <u>Conditions Precedent</u>

i.  The effectiveness of the Settlement Agreement (the "<u>Effective Date</u>") is conditioned upon the timely filing of this Motion on or before April 29, 2019, with a hearing to be scheduled no later than May 24, 2019 and an order entered by this Court by May 31, 2019, and this order becoming final by June 21, 2019. Settlement Agreement at § 11.

ii.  The Settlement Agreement is also conditioned upon the exchange of VHS's initial 74,270 Units being exchanged on April 30, 2019. Settlement Agreement at § 11(c).

16

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1    (j)    <u>Reservation of Rights.</u>  The Settlement Agreement also provides that Premier's

2    agreement to execute the April 2019 Exchange is conditioned upon the execution

3    of the Settlement Agreement, and a reservation of rights of Premier should the

4    Settlement Agreement not be approved.  Settlement Agreement at § 31.

5    42.    The Debtors, including their Chief Financial Officer and BRG, have determined

6    that entering into the Settlement Agreement is in the best interests of the estates for the reasons set

7    forth below and in the attached supporting Declarations.  Chou Decl, at ¶ 30 Galfus Decl. at ¶ 9.

8    **IV.**

9    **ARGUMENT**

10   **A.    The Settlement Agreement is Fair, Reasonable and Equitable**.

11   Rule 9019(a) provides that "[o]n motion by the [debtor in possession] and after hearing on

12   notice to creditors […], the court may approve a compromise or settlement." "The bankruptcy

13   court has great latitude in approving compromise agreements" under its discretion.  *See e.g.*, *In re*

14   *Woodson*, 839 F.2d 610, 620 (9th Cir. 1988).  "[C]ompromises are favored because they minimize

15   costly litigation and further parties' interests in expediting the administration of the bankruptcy

16   estate." *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 256 (Bankr. S.D.N.Y. 2016).

17   "The purpose of a compromise agreement [under Rule 9019] is to allow the [debtor in

18   possession] and the creditors to avoid the expenses and burdens associated with litigating sharply

19   contested and dubious claims." *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1380-81

20   (9th Cir. 1986), cert. denied 479 U.S. 854 (1986).  Accordingly, in approving a settlement

21   agreement, the Court need not conduct an exhaustive investigation of the claims sought to be

22   compromised.  *See United States v. Alaska Nat'l Bank (In re Walsh Constr., Inc.)*, 669 F.2d 1325,

23   1328 (9th Cir. 1982).  Rather, it is sufficient that the Court find that the settlement was negotiated

24   in good faith and is reasonable, fair, and equitable.  *See In re A & C Properties*, 784 F.2d at 1381.

25   The Ninth Circuit has identified the following factors for consideration in determining

26   whether a proposed settlement agreement is reasonable, fair, and equitable:

27   •    the complexity of the litigation involved, and the expense, inconvenience, and

28   delay necessarily attending it and the probability of success in the litigation;

17

1    • the difficulties, if any, to be encountered in the matter of collection;

2    • the paramount interest of the creditors and a proper deference to their reasonable

3    views in the premises.

4    *In re A & C Properties*, 784 F.2d at 1381 (the "*A & C* Factors").

5    A court should not substitute its own judgment for the judgment of the debtor in

6    possession. *Matter of Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984). A court, in

7    reviewing a proposed settlement, is not to decide the numerous questions of law and fact but rather

8    to canvass the issues to determine whether the settlement falls below the lowest point in the range

9    of reasonableness. *In re Tribune Co.*, 464 B.R. 126, 158 (Bankr. D. Del. 2011) ("the settlement

10   need only be above the "lowest point in the range of reasonableness") on reconsideration in part,

11   464 B.R. 208 (Bankr. D. Del. 2011), *aff'd sub nom., In re Tribune Media Co.*, 587 B.R. 606 (D.

12   Del. 2018); *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2nd Cir. 1983); *accord Newman v. Stein*,

13   464 F.2d 689, 693 (2d Cir. 1972). The court should not conduct a "mini-trial" on the merits of the

14   underlying cause of action. *In re Walsh Const., Inc.*, 669 F.2d at 1328; *In re Blair*, 538 F.2d 849

15   (9th Cir. 1976). "It is well established that compromises are favored in bankruptcy." *In re Lee

16   Way Holding Co.*, 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990); *In re Blair*, 538 F.2d at 851.

17   The Debtors believe that the Settlement Agreement is reasonable, fair and equitable and is

18   in the best interests of the estates under the *A & C Factors*.

19   **(a)    The complexity of the litigation involved, and the expense, inconvenience,
         and delay necessarily attending it, and the probability of success in the
20       litigation.**

21   Without this Settlement Agreement, the immediate and certain economic benefits

22   identified by Ms. Chou and Mr. Galfus would evaporate. *See* Chou Decl. ¶ 29; Galfus Decl. ¶ 8.

23   Instead, the Debtors would be forced into protracted, complex litigation with Premier, with little

24   upside, and the Debtors would have expended time, money and resources. "Litigation" in this

25   context, whether in court or through arbitration, would involve Premier asserting its Proof of

26   Claim and its administrative claim as a setoff in an amount in excess of $3.1 million even if it

27   were determined the Debtors were entitled to undertake the exchange of limited partnership units

28   without the consent of Premier plus the unpaid value of goods and services to the Debtors.

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

18

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1    Premier also would  most likely move for termination remedies under its Agreements through the

2    same litigation. Given that termination remedies under the Premier Agreements include the

3    redemption of the as-yet-unexchanged Units for the Tradable Stock of Premier, Inc., the risk

4    (including the significant delay in obtaining liquidation of the exchangeable Units VHS currently

5    holds) would have outweighed any benefit to such litigation.  While the Debtors would likely

6    counter with amounts to offset and recover under avoidance and automatic stay remedies, and also

7    potentially counter terminating the Premier Agreements along with the assertion of exiting limited

8    partner rights under applicable law, the economic value recoveries under such strategies would be

9    uncertain.  Litigation would also end the parties' otherwise productive business relationship in a

10   protracted, messy manner. The complexity of the Settlement Agreement itself, with carefully

11   worded obligations across multiple Premier Agreements synthesized into a single document of

12   two plus year period of payments, conditions and obligations demonstrates just how intense and

13   arduous full litigation would be if the Settlement Agreement is not approved.

14          This litigation would also not be quick and would most likely run past key milestones for

15   the Debtors in their cases. It would involve two, primary tracks, both which would take significant

16   time and require extended effort and cost: (i) fact discovery and extrapolation regarding Premier

17   and the Debtors' performance under their Premier Agreements, and (ii) research and motion

18   practice to fully litigate and determine the full contractual duties between the Parties under all the

19   Premier Agreements as a whole under multiple alternative fact universes (i.e. before or after an

20   alleged material breach, etc.).  While the Debtors claim the Disputed Distributions are property of

21   the Debtors' estates, Premier asserts that exercise of its property rights in the Disputed

22   Distributions would not be subject to the automatic stay, and that they would only be exercising

23   control of their own property, including by virtue of the rights to such property provided to

24   Premier under the Premier Agreements.  Premier continually has asserted that it is holding the

25   Disputed Distributions in escrow subject to the enforcement of its rights in such amounts.  In

26   taking that position, Premier asserts that it may well rely on the Supreme Court's statement that it

27   is a "false premise that [some withholdings] t[ake] something from [a debtor], or exercise

28

1    dominion over property that belonged to respondent" and violate the automatic stay." *Citizens*

2    *Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995).

3    　　　Premier also asserts that any enforcement of their rights to the Disputed Distributions

4    would be in the nature of a recoupment under a single integrated transaction (Premier has noted

5    that a number of the Premier Agreements were executed on the same day, and that their terms are

6    interrelated – including as to termination events) and that their actions were justified and not

7    constrained by the automatic stay because recoupment may not be limited to prepetition claims

8    and thus may be employed to recover across the petition date.  Premier asserts that the following

9    authority supports its position.  *See Ellis v. IPC (USA), Inc. (In re Pettit Oil Co.)*, 2016 Bankr.

10   LEXIS 3895 at *11 (Bankr. W.D. Wa. Nov. 3, 2016); *In re Greater Se. Cmty. Hosp. Corp.* I, 327

11   B.R. 26, 37 (Bankr. D.D.C. 2005) (recoupment "rights of a party to an executory contract … grow

12   out of the same transaction").  Given that a number of the Premier Agreements were executed on

13   the same day in connection with Premier's reorganization in 2013, were integral to the

14   reorganization and Premier's continued relationships with its Limited Partners, including VHS,

15   and are interrelated by cross-defaults and termination provisions (including liquidated damages

16   provisions in some of the Premier Agreements that entitle Premier to retain distributions following

17   a default), VHS's rights in the Disputed Distributions and related future distributions could be at

18   risk in any related dispute.

19   　　　By contrast, the Debtors would argue that the Disputed Distributions, whether subject to

20   escrow or not, represent conversions of payables and setoffs barred by § 362.  The Debtors would

21   further counter that the Disputed Distributions are not recoupments, but attempted setoffs in part

22   because of (a) the presence of different obligations to different Premier entities, and (b) the

23   interposition of pre and postpetition consideration.  *In re Orexigen Therapeutics, Inc.*, 596 B.R. 9,

24   18 (Bankr. D. Del. Nov. 3, 2018) ("Furthermore, McKesson is the parent corporation and MPRS is

25   its subsidiary corporation. They are legally distinct entities. Thus, their corporate structure poses

26   another issue preventing McKesson from affecting a triangular setoff.");  *In re Lehman Bros.*

27   *Holdings, Inc.,* 433 B.R. 101, 107 (Bankr. S.D.N.Y. 2010), *aff'd sub nom. In re Lehman Bros.*

28   *Holdings Inc.*, 445 B.R. 130 (S.D.N.Y. 2011) ("Here, mutuality is lacking because the funds in the

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

20

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1    Swedbank Account were deposited post-petition, while LBHI's indebtedness to Swedbank arose

2    pre-petition under the ISDA Master Agreements."). This is a central dispute of the Parties which

3    would require substantial factual and legal analysis and briefing were it to be litigated.

4    Further, the Parties have a significant dispute over VHS's ability to exchange its Units

5    under the LP Agreement and Exchange Agreement absent assumption of the Premier Agreements,

6    with Premier's consent, and cure of any amounts due thereunder.    Premier's position has

7    continued to be that certain of the Premier Agreements, pursuant to §§365(c)(1) and 365(e)(2) of

8    the Bankruptcy Code are contracts that are non-assignable under applicable non-bankruptcy law,

9    and therefore are not capable of being assumed by the Debtors absent Premier's consent.

10    The Debtors have consistently maintained that the Units are property of the Debtors'

11    estates and that the Debtors have rights under the Premier Agreements even in the absence of

12    assumption of any of the Premier Agreements. However, Premier asserts that the Premier

13    Agreements, or at least some of the Premier Agreements, are intellectual property licenses,

14    partnership agreements and personal service contracts governed under §§365(c)(1), 365(e)(2).

15    Premier has argued that, absent assumption the Debtors have no rights. *See, e.g., Otto Preminger*

16    *Films Ltd. v. Qintex Entm't Inc. (In re Qintext Entm't Inc.),* 950 F.2d 1492, 1495 (9th Cir. 1991)

17    ("An executory contract does not become an asset of the estate until it is assumed pursuant to

18    section 365 of the Code.").    Given the amounts at stake for Premier on its Premier Prepetition

19    Claim, and the amounts at stake for the Debtors in exchanging the Units and obtaining the

20    Tradable Stock, both parties would fiercely litigate this dispute.

21    Moreover, given the complexity of the litigation interposed with the fact that the Debtors

22    are in the largest healthcare case in the country right now, attorneys' fees and costs (which would

23    most likely run well into the six figures for each side) to bring this matter to full fruition would be

24    high compared to the total gain and exposure. *In re Lawrence & Erausquin, Inc.*, 124 B.R. 37, 39

25    (Bankr. N.D. Ohio 1990) (approving Rule 9019 settlement where "[i]f all the issues which have

26    been raised in this case were to be litigated by the Trustee, the litigation would be time consuming,

27    burdensome, somewhat risky, and would quite possibly cost the estate more than it would generate

28    for the payment of unsecured creditors."); *see also  In re Partsearch Techs., Inc.*, 453 B.R. 84, 105

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1   (Bankr. S.D.N.Y. 2011) (approving Rule 9019 agreement where "the risks of litigation here appear

2   to be significant because of the substantial time and expense required to conduct a trial.").

3       Based on the foregoing, the Debtors seek to settle their disputes with Premier because it is

4   in the best interests of their estates and creditors, given the immediate and tangible economic

5   benefits that will be obtained by the Debtors solely in the context of such settlement—in addition

6   to the savings to the Debtors' estates of avoiding potentially costly litigation.   In light of the

7   rationality of Premier, Premier's leverage and good faith arguments, and the need for the Debtors

8   and Premier to continue to work together in these cases the Debtors are best served by the

9   Settlement Agreement, not litigation.

10      The Debtors and their counsel have determined that this is not an open and shut dispute

11  worth litigating to verdict, and the Debtors are entitled to deference in this decision.   *In re Walsh*

12  *Const., Inc.*, 669 F.2d at 1328; *In re Blair*, 538 F.2d 849; *see also In re Yellowstone Mountain*

13  *Club, LLC*, 460 B.R. 254, 265 (Bankr. D. Mont. 2011) (*citing A& C Properties*, 784 F.2d 1381)

14  ("rather than an exhaustive investigation or a mini-trial on the merits, this court need only find that

15  the settlement was negotiated in good faith and is reasonable, fair and equitable"). Here, the

16  economic benefits of settlement greatly outweigh even the favorable risks of such litigation.   *In re*

17  *Adelphia Communications Corp.*, 327 B.R. 143, 163 (Bankr. S.D.N.Y. 2005), adhered to on

18  reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005) (approving settlement of claims where

19  debtor was to pay $715 million even where court found there "there [was] quite a high probability

20  that [the debtor] would ultimately prevail on at least some of its claims," because "that litigation"

21  had already "been hotly contested [through] numerous legal and factual defenses" by the

22  counterparty against the debtors' claims and where debtors were not likely to "win quickly," given

23  the "complexities of [the] situation," and concluding that "even a successful outcome in such

24  litigation likely would take substantial time [and the] the Settlement Agreements eliminate these

25  risks.").

26      The Settlement Agreement represents the type of rational, negotiated solution that Rule

27  9019 encourages, and the Court should approve it.   *See generally Protective Comm. for Indep.*

28  *Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 434, 88 S. Ct. 1157, 1168, 20

1   L. Ed. 2d 1 (1968) ("Litigation and delay are always the alternative to settlement, and whether that

2   alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable

3   outcome of litigation.").

4           **(b)      The difficulties, if any, to be encountered in the matter of collection.**

5           Premier's willingness and ability to exert contractual and legal rights along with

6   commercial leverage with respect to the Disputed Distributions and Premier's continued

7   objections to the exchange of the Units, demonstrates the difficulty of collection for the Debtors if

8   they were to pursue their claims in full in litigation and were to obtain a favorable judgment.

9   There are multiple avenues of recoupment, setoff, termination and other measures to prevent or

10  frustrate collection efforts through the layers of the Premier Agreements, even if a judgment were

11  to be obtained.   Premier's counsel's diligence in objecting in these Chapter 11 Cases also

12  demonstrates that collection would be difficult, contested, and expensive.   Premier and the

13  Debtors' interwoven contractual relationship makes it exceedingly difficult for one party to

14  cleanly collect from the other without a resolution and a Settlement Agreement firmly establishing

15  rights and obligations between the Parties.   The Settlement Agreement allows the Parties to wind

16  down their business relationship through measured contractual modifications and  set payments

17  utilizing to a large extent public market funds is in the best interests of the estates.

18          **(c)      The paramount interest of the creditors and a proper deference to their
19                     reasonable views in the premises.**

20          Generally, the final *A & C* Factor requires a court to take into account "not only the desire

21  of creditors to obtain the maximum possible recovery, but also their competing desire that

22  recovery occur in the least amount of time.   This factor is heavily interwoven with considerations

23  of expense, delay, and risk," and the Debtors fully incorporate their discussion above.   *In re*

24  *Marples*, 266 B.R. 202, 207 (Bankr. D. Idaho 2001).

25          The paramount interest of creditors strongly weighs in favor of approving the Settlement

26  Agreement because the Settlement Agreement provides for an orderly wind-down of an important,

27  complex business relationship, effectively limits the Debtors' exposure against Premier's claims

28  and allows the Debtors to leverage their potential counterclaims in an efficient, beneficial manner.

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

23

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1   The Debtors' estates are not served through drawn-out litigation with a sophisticated set of

2   companies that the Hospitals desire to continue to utilize. *In re MF Glob. Inc.*, 466 B.R. 244, 251

3   (Bankr. S.D.N.Y. 2012) (approving under Rule 9019 where "the Settlement Agreement will

4   resolve all claims between the Parties related to the Property and will save the costs of further

5   litigation [and was the] result of arms-length negotiations and good-faith dealings among the

6   Parties."). Recognizing this, the Parties negotiated firmly between their principals and

7   professionals and reached the Settlement Agreement.

8       The Debtors' creditors are protected and served by the Settlement Agreement because the

9   Settlement Agreement protects the interests of the estates through its carefully negotiated and

10  calibrated terms. The Debtors, recognizing their cases are liquidating ones, negotiated the

11  Settlement Agreement, under their business judgment, for the best interests of their creditors. *In*

12  *re Charter Communications*, 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009) ("[w]hile the "approval

13  of a settlement rests in the Court's sound discretion, the debtor's business judgment should not be

14  ignored."). The Settlement Agreement:

15      • limits the Debtors' administrative expense exposure (in terms of (i) dollars, i.e. the

16          cure amount will be allowed for $2 million instead of the asserted Premier

17          Prepetition Claim of $3.1 million and (ii) risk, by tying the payment of such

18          moneys to the Debtors' recoveries from the liquidation of the Tradable Stock, and

19          (iii) time pressure, such as the Debtors satisfying the second installment of the Cure

20          amount invoices from the October 2019 Exchange);

21      • allows the Debtors to obtain access to capital, to assert and preserve their rights

22          under the Bankruptcy Code through the remitting of the Disputed Distributions

23          ($609,146) and by Premier agreeing to make future distributions under the Premier

24          Agreements, and by lowering the Debtors' monthly obligations under the

25          Subscription Services Agreement to $112,000 from approximately $117,456.

26      • provides for the Debtors to harvest consideration from the Premier Agreements for

27          the Debtors' obligations under the Settlement Agreement by tying certain payments

28          from the Debtors to the liquidation of Tradable Stock, and given that the asserted

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

termination remedies under the Premier Agreements include the redemption of the as-yet-unexchanged Units for approximately $340,499, as opposed to the potential of realizing $7.4 million before payment of cure costs from the Tradable Stock of Premier, Inc., the risk appears to outweigh the benefit to such litigation;

- prevents a premature and acrimonious termination of the Premier Agreements *inter alia*, resulting from the sale of the Hospitals and the mere existence of the exchange dispute, and sees Premier beneficially agree to a limited waiver of its prospective termination rights (*see In re Charter Communications*, 419 B.R. at 255 ("The settlement has been proposed because of the extreme difficulty in obtaining the benefits of [the agreement] through litigation [itself].") (approving agreement));

- and allows for the Debtors to continue to utilize information technology, group purchasing and other solutions for their Hospitals to continue their business; specifically, the Settlement Agreement permits the Debtors continued access to the services, licenses and goods provided by Premier utilized by the Hospitals prior to the sale and the Debtors post sale pursuant to existing or to be negotiated transition services or post-sale operating agreements. *Id.*

**B.      The Assumption of the Premier Agreements is of Significant Benefit to the Estates.**

As described above, the Debtors believe that the assumption of the Premier Agreements pursuant to the Settlement Agreement is a decision well within the reasonable business judgment of the Debtors pursuant to Section 365 of the Bankruptcy Code. Section 365(a) authorizes a debtor in possession, "subject to the Court's approval . . . [to] assume or reject any executory contract or unexpired lease of the debtor." A debtor in possession may assume or reject executory contracts and unexpired leases for the benefit of the estate. *Agarwal v. Pomona Valley Med. Grp., Inc. (In re Pomona Valley Med. Grp., Inc.),* 476 F.3d 665, 671 (9th Cir. 2007); *In re Chi-Feng Huang*, 23 B.R. 798, 801 (B.A.P. 9th Cir. 1982) ("The primary issue is whether rejection would benefit the general unsecured creditors.").

As explained above, as part of the Settlement Agreement, the Debtors are proposing to assume all of the Premier Agreements. Certain of those agreements, such as the GPO Participation

and Subscription Agreement will continue for so long as the Debtors operate the Hospitals or provide transition services to the Buyers of their Hospitals. Other agreements, such as the LP Agreement, the Exchange Agreement, Tax Receivable Agreement, Voting Trust Agreement, and Registration Rights Agreement will continue only for so long as the Debtors hold Class B Units in Premier LP. Chou Decl. ¶ 22. In reviewing a debtor in possession's decision to assume or reject an executory contract or unexpired lease, a bankruptcy court should apply the "business judgment test" to determine whether it would be beneficial to the estate to assume it. *See In re Hertz,* 536 B.R. 434, 442 (Bankr. C.D. Cal. 2015); *Pomona Valley Med. Grp.*, 476 F.3d at 670. The business judgment standard requires that the Court follow the business judgment of the debtor unless that judgment is the product of "bad faith, whim, or caprice." *Id*. at 670 (quoting Lubrizol Enters. v. Richmond Metal Finishers, 756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986)).

Pursuant to § 365(b)(1), assumption of executory contracts and unexpired leases requires a debtor to: (a) cure any existing defaults under such agreements; (b) compensate all non-debtor parties to such agreements for any actual pecuniary loss resulting from the defaults; and (c) provide adequate assurance of future performance under the contract or lease. 11 U.S.C. § 365(b)(1); *see also In re Bowman*, 194 B.R. 227, 230 (Bankr. D. Ariz. 1995); *In re AEG Acquisition Corp.*, 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd*, 161 B.R. 50 (B.A.P. 9th Cir. 1993).

Here, the Debtors seek authority to assume the Premier Agreements, as modified, *nunc pro tunc* to April 29, 2019. As explained by the Debtors' CFO, assumption of all of the Premier Agreements unquestionably benefits the Debtors' estates. Chou Decl. ¶ 22. While the Debtors are required to cure the defaults under the Premier Agreements, the Debtors are doing so through the liquidation of the Tradable Stock they will receive in the April 2019 Exchange, plus they will receive the Disputed Distributions with a combined net positive benefit after paying the First Premier Payment in excess $1.2 million to the Debtors' estates. Galfus Decl. ¶ 8.

Moreover, assumption of the Premier Agreements and the payment of the cure obligation satisfies the conditions precedent to the Debtors' ability to convert its Units into Tradable Stock,

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

26

1  particularly in relation to the October 2019 and October 2020 Units, such that the Debtors can sell

2  the Tradable Stock on the open market and generate returns for the benefit of the Debtors' estates.

3  In other words, the cure payment allows the Debtors to convert a virtually illiquid asset to a liquid

4  asset worth millions of dollars. At the same time, assumption of the Premier Agreements and

5  payment of the cure obligations, also authorizes the Debtors to continue getting the benefits of

6  Premier's valuable licenses and services, as well as periodic payments to the Debtors' estates

7  through the GPO Participation Agreement and Tax Receivable Agreement.    Further, the

8  modifications to the Premier Agreements allow the agreements to terminate when they are no

9  longer useful to the Debtors, without the Debtors incurring additional liabilities from the early

10 termination of such agreements. The Debtors have exercised their reasonable business judgment in

11 assuming the Premier Agreements as modified. Chou Decl. ¶ 30; Galfus Decl. ¶ 9.

**V.**

**<u>CONCLUSION</u>**

14         Based on the foregoing, the Debtors request the (i) the entry of an order granting the

15 Motion, and (ii) granting such other and further relief as is just and proper.

17 Dated:  April 29, 2019                          DENTONS US LLP
                                                   SAMUEL R. MAIZEL
18                                                 TANIA R. MOYRON
                                                   CLAUDE D. MONTGOMERY
19
                                                   By:  _____/s/ *Tania M. Moyron*_____
20                                                          TANIA M. MOYRON

21                                                 Attorneys for Debtors and Debtors In Possession

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

## DECLARATION OF ANITA CHOU

I, Anita Chou, declare, that if called as a witness, I would and could competently testify thereto, of my own personal knowledge, as follows:

1.      I am the Chief Financial Officer ("CFO") of Verity Health System of California, Inc. ("VHS"). I became VHS' acting CFO on August 20, 2018 and on August 29, 2018, the board of directors appointed me as the CFO. Prior to my appointment as acting CFO, I served as the VHS SVP Hospital Finance, with oversight responsibilities over all of Verity Health System hospitals' CFOs from February 1, 2018 until August 19, 2018, and as the St Vincent Medical Center CFO from March 2016 to February 2018. My career has included three years at Prospect Medical Holdings from March 2013 to March 2016 in various senior level corporate finance positions including Hospital System CFO, ten years as the controller for three different hospital and hospital systems (e.g., Saint John's Health Center & Affiliates, Valley Presbyterian Hospital, and USC Kenneth Norris Jr. Cancer Hospital), and three years as a Financial Market Analyst for El Camino Hospital. I received my Masters in Health Administration from the University of Southern California in 2005, and my Bachelor of Science from University of California, San Diego in 1998.

2.      Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the healthcare industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.      This Declaration is in support of the *Debtors' Notice And Motion For Approval of Compromise With Premier, Inc. Pursuant to Federal Rule of Bankruptcy Procedure 9019 and § 365 of the Bankruptcy Code* ("Motion") and for all other purposes permitted by law. All capitalized terms not otherwise defined herein shall have the same meaning as in the Motion.

4.      Premier Inc. ("Premier") is primarily owned by hospitals, health systems and other healthcare organizations located in the United States, as well as public stockholders. Premier is a leading healthcare improvement company, uniting an alliance of thousands of U.S. hospitals and

over 100,000 other providers. Premier utilizes integrated data and analytics, supply chain solutions, and advisory and other services and collaborates with members to co-develop long-term innovations that reinvent and improve the way care is delivered to patients. Premier delivers value through a comprehensive technology-enabled platform that offers supply chain services, clinical, financial, operational and population health software-as-a-service informatics products, advisory services and performance improvement collaborative programs.

5.    As of the Petition Date, VHS held 222,809 Class B Common Units as limited partnership interests in Premier LP. Such units were exchangeable for a like amount of Class A common stock on a vesting schedule as follows: October 31, 2018 (74,270 Units), October 31, 2019 (74,270 Units) and October 31, 2020 (74,269 Units).

6.    The Debtors conducted substantial pre-petition business (including in the 20 days before the date the Debtors' Chapter 11 cases were filed (the "Petition Date")) with Premier and the Debtors' relationship with Premier is substantial. Premier also has substantial pre-petition claims against the Debtors, some of which are long standing dating back to 2017 and the subject of dispute by the Debtors. The Debtors continue to utilize Premiers services to operate its hospitals pursuant to a GPO Participation Agreement ("GPO") and Performance Suite Solutions Subscription Agreement, ("Subscription Agreement"). The Debtors wish to continue to utilize the services of Premier and its affiliates (the "Premier Parties") going forward.

7.    Since the Petition Date, Premier has been a valuable vendor for the Debtors. However, the Debtors filed schedules listing a disputed $2.6 million due to Premier and its affiliates. At all times, Premier has insisted the prepetition amount due to it exceeded $3.1 million.

8.    Given that the sale of the Debtors' hospitals was a component to their planned liquidation of their estates, and in light of the important nature of the Premier Agreements to the continued operations of the Debtors' Hospitals, the Debtors sought to continue their relationship with Premier notwithstanding the Parties' disputes.

9.    Premier and its affiliates have filed sixty eight (68) proofs of claim each in the amount of $3,122,167.78 plus any and all additional damages, fees, costs and/or expenses incurred by Premier under the Premier Agreements.

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

10. An accurate list of all the proofs of claim filed by Premier and its affiliates is attached my Declaration as Exhibit 1.

11. The Debtors and the Premier Parties are parties to the following pre-petition agreements, all of which I attach true and correct copies of to this Declaration as described below:

(a) The Amended and Restated Limited Partnership Agreement, effective as of October 1, 2013, as amended, by and among Premier LP, Premier GP and the limited partners (including VHS) of Premier LP party thereto (the "LP Agreement") (attached to my Declaration as Exhibit 2);

(b) The GPO Participation Agreement, effective as of October 1, 2013, by and between Premier LP and VHS (the "GPO Participation Agreement") (attached to my Declaration as Exhibit 3);

(c) The Performance Suite Solutions Subscription Agreement, dated November 14, 2011, by and between PHSI and VHS (as amended, the "Subscription Agreement") (attached under seal to my Declaration as Exhibit 4);

(d) The Exchange Agreement, effective as of October 1, 2013, by and among Premier, Inc., Premier LP, and the limited partners (including VHS) of Premier LP party thereto (the "Exchange Agreement") (attached to my Declaration as Exhibit 5)[7];

(e) The Tax Receivable Agreement, effective as of October 1, 2013, by and among Premier, Inc. and the limited partners (including VHS) of Premier LP party thereto (the "Tax Receivable Agreement") (attached to my Declaration as Exhibit 6);

(f) The Registration Rights Agreement, effective as of October 1, 2013, by and among Premier, Inc. and the limited partners (including VHS) of Premier LP party thereto (attached to my Declaration as Exhibit 7)[8]; and

(g) The Voting Trust Agreement, effective as of October 1, 2013, by and among Premier, Inc., Premier LP, the limited partners (including VHS) of Premier LP

---

[7] This is a publically available document.

[8] NTD- Publically Available document.

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1      party thereto, and defined as Stockholders therein, and Wells Fargo Delaware Trust

2      Company, N.A., as trustee (the "<u>Voting Trust Agreement</u>") (attached to my

3      Declaration as Exhibit 8);

4   (h)   The Letter Agreement, dated as of July 1, 2017, by and between PHSI and VHS,

5      including all exhibits (attached under seal to my Declaration as Exhibit 9);

6   (i)   Verity Health System Fair Market Valuation Engagement Form, dated as of July 3,

7      2017, by and between PHSI and VHS (attached under seal to my Declaration as

8      Exhibit 10);

9   (j)   Verity Health System Fair Market Valuation Engagement Form, dated as of July

10      28, 2017, by and between PHSI and VHS (attached under seal to my Declaration as

11      Exhibit 11);

12   (k)   Verity Health System Fair Market Valuation Engagement Form, dated as of

13      January 9, 2018, by and between PHSI and VHS (attached under seal to my

14      Declaration as Exhibit 12);

15   (l)   Verity Health System Fair Market Valuation Engagement Form, dated as of May

16      14, 2018, by and between PHSI and VHS (attached under seal to my Declaration as

17      Exhibit 13);.

18   (m)   Business Associates Agreement, dated as of October 1, 2010, by and between St.

19      Vincent Medical Center and PHSI, Premier LP and certain related subsidiaries as

20      stated therein (attached under seal to my Declaration as Exhibit 14);

21   (n)   Business Associates Agreement, dated as of October 1, 2010, by and between

22      O'Connor Hospital and PHSI, Premier LP and certain related subsidiaries as stated

23      therein (attached under seal to my Declaration as Exhibit 15);

24   (o)   Business Associates Agreement, dated as of October 1, 2010, by and between Saint

25      Louise Regional Hospital and PHSI, Premier LP and certain related subsidiaries as

26      stated therein (attached under seal to my Declaration as Exhibit 16);

27   (p)   Business Associates Agreement, dated as of October 1, 2010, by and between St.

28      Francis Medical Center and PHSI, Premier LP and certain related subsidiaries as

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1    stated therein (attached under seal to my Declaration as Exhibit 17);

2    (q)    Business Associates Agreement, dated as of October 1, 2010, by and between

3    Seton Medical Center, Seton Medical Center Coastside and PHSI, Premier LP and

4    certain related subsidiaries as stated therein (attached under seal to my Declaration

5    as Exhibit 18);

6    (r)    The Business Associates Subcontractor Agreement, dated as of October 1, 2010, by

7    and between PHSI, Premier LP, certain related subsidiaries as set forth therein and

8    VHS (attached under seal  to my Declaration as Exhibit 19).

9        12.    In the ordinary course, VHS typically sells the Tradeable Stock in the public

10    market as it receives shares in each periodic exchange of the Units under the LP Agreement and

11    Exchange Agreement, and in connection with such sale, pays Premier any amounts then

12    outstanding under any of the Premier Agreements.

13        13.    The ability of the Units to vest each year is contingent upon, among other things,

14    VHS remaining a Limited Partner of Premier LP and remaining a member in Premier's GPO

15    purchasing program (as a "Premier Member") under the GPO Participation Agreement.

16        14.    Under the LP Agreement, Units are subject to redemption in the event of a

17    "Termination Event" (which Premier has asserted could include VHS's inability to perform under

18    the GPO purchasing program following a sale of its Hospitals).  Premier has estimated that the

19    redemption value of the Debtors' not yet vested October 2019 and October 2020 Units to be

20    approximately only $340,499.  Thus, Redemption of unvested Units would provide VHS with a

21    value far less than the expected market value from the sale of its Tradable Stock.

22        15.    Under the GPO Participation Agreement VHS is entitled to certain periodic

23    distributions in exchange for, among other things, (i) VHS's continued participation, at a certain

24    agreed-upon level, in Premier's purchasing program under the GPO Participation Agreement and

25    (ii) VHS's continuation as a Limited Partner in Premier LP.  VHS's participation in the purchasing

26    program under the GPO Participation Agreement requires that VHS maintain a level of purchasing

27    which then entitles VHS to receive certain distribution payments based upon its level of

28    participation.  Premier has asserted that to the extent that VHS's ability to comply with the GPO

1    Participation Agreement ceases, a termination event under the GPO Participation Agreement (and

2    also the LP Agreement) could be immediately triggered.

3        16.    Pursuant to the Subscription Agreement, Premier provides VHS and its Hospitals

4    with valuable access to nonexclusive license rights to certain of Premier's proprietary intellectual

5    property through Premier's technology programs and systems.  These systems include programs

6    that help to manage patient healthcare information and important medical records management for

7    physicians.  VHS, in turn, reimburses Premier a monthly fee based upon the services and solutions

8    provided.

9        17.    Within the ninety (90) days prior to the Petition Date, Premier withheld amounts

10    due to VHS under the Premier Agreements (the "Prepetition Withheld Amount"), which the

11    Debtors have asserted was recoverable as an avoidable preference under §§ 549 and 550.

12        18.    On multiple occasions subsequent to the Petition Date, Premier withheld amounts

13    due to VHS under the Premier Agreements (the "Postpetition Withheld Amounts"), each of which

14    the Debtors have asserted constituted an independent violation of the automatic stay under §

15    362(a), a breach  under the Premier Agreements and subject to turnover to pursuant to § 542(a).

16        19.    The Postpetition Withheld Amounts and the Prepetition Withheld Amounts total

17    $609,146, without interest (the "Disputed Distributions").

18        20.    Premier has submitted invoices for the postpetition delivery of goods and services

19    to one or more of the Debtors which remains unpaid in the ordinary course in the amount of

20    $126,610.94, which amount is due and owing to Premier under the Premier Agreements as an

21    administrative expense(s).

22        21.    Pursuant to the terms of the Subscription Agreement and subsequent to the SCC

23    Sale, the Debtors continued to utilize services for which amounts due to PHSI continue to accrue

24    on a monthly basis at the rate of $117,456 as an administrative expense (the "Monthly

25    Subscription Agreement Fee").

26        22.    The Debtors have advised Premier that they wish to continue to utilize Premier's

27    services under the Premier Agreements until the closing of their remaining Hospitals, as the

28    Debtors facilitate the sale and transfer of their remaining Hospitals. Under the Settlement

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1  Agreement, certain agreements, such as the GPO Participation and Subscription Agreement and

2  directly related service agreements will continue for so long as the Debtors operate the Hospitals

3  or provide transition services to the Buyers of their Hospitals.  Other agreements, such as the LP

4  Agreement, the Exchange Agreement, Tax Receivable Agreement, Voting Trust Agreement, and

5  Registration Rights Agreement will continue only for so long as the Debtors hold Class B Units in

6  Premier LP.

7          23.     On December 5, 2018, and again on March 19, 2019, pursuant to § 2.2 of the

8  Exchange Agreement, VHS timely executed and submitted Notices of Exchange on forms

9  provided by Premier by which VHS purported to provide a notice to Premier of VHS's intent to

10  exchange 74,270 of its Class B Common Units in Premier LP (the "Units"), for Premier, Inc.

11  Class A Common Stock (the "Tradable Stock"), and requested such exchange to occur,

12  respectively, on January 31, 2019 and April 30, 2019 pursuant to the LP Agreement and Exchange

13  Agreement.

14          24.     At the time of the Debtors' delivery of the Notices of Exchange, pre and

15  postpetition amounts remained due and owing to Premier under the Premier Agreements,

16  including the undisputed portion of the Premier Prepetition Claim.

17          25.     Premier has advised that in the event of termination of the LP Agreement, VHS

18  would be required to redeem its October 2019 and October 2020 Units at a value   of

19  approximately $340,499.

20          26.     Premier disputes VHS's ability to exchange its Units under the LP Agreement and

21  Exchange Agreement unless and until *all* the Premier Agreements are assumed (and all defaults

22  thereunder cured, including the payment of the Premier Prepetition Claim), and all conditions to

23  such exchange are met, including VHS's payment to Premier of all post-petition amounts due and

24  owing under the Premier Agreements.

25          27.     I determined, in my business judgment, that whatever claims the estates may be

26  able to assert against Premier for avoidance and recovery of pre-petition payments did not

27  outweigh the benefits to the estates of Premier's continued supply and services, which are useful

28  to the Debtors' Hospital operations, and the ability to effectuate the exchange Units under the LP

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

34

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

Agreement for Tradeable Stock on a one for one basis pursuant to the terms of the LP Agreement and the Exchange Agreement.  Further, the Debtors also performed a legal analysis to assess both Parties' potential liability, including under the Premier Agreements, under common and statutory law, including for avoidance actions and automatic stay liability.  The Debtors also weighed and discussed the potential to assign the Premier Agreements to buyers.  However, neither of the Debtors' stalking horse bidders for the SCC or SGM Sale had an interest in taking assignment of the Premier Agreements. In addition, the Debtors were not willing to pay the $3.1 million cure amount that Premier asserted was due and owing in order to confirm access to the exchange process under the LP Agreement.

28.    The Debtors entered into the Settlement Agreement attached as Exhibit A to the Motion.  The Debtors have made formal requests for the exchange of 74,270 of VHS Units in two separate Notices of Exchange Dated December 5, 2018 and March 19, 2019.  Premier has disputed each such demand asserting (a) that it had rights under section 7.5 of the LP Agreement, as well as under its legal setoff and recoupment rights, in the event of an exchange; (b) that VHS was obligated to pay all amounts due to Premier, which amounted to in excess of $3.1 million, in order to have the right to exchange its Units pursuant to section 7.5 of the LP Agreement; and (c) that until the LP Agreement was assumed with Premier's consent, VHS would be unable to exchange its exercisable Units for Tradable Stock, or its future Units for Tradable Stock.

29.    The Debtors benefit under the Settlement Agreement. First, it resolves complex financial entitlement and setoff issues without the cost of litigation between experienced counsel on both sides.  Second, while the actual market share price of Premier stock may fluctuate, the deal provides Verity with the initial expected recovery of approximately $750,000 net of the cure costs paid to Premier from the share exchange of Units into Tradeable Stock, and over time, the Settlement Agreement is expected to provide an additional $5 million from exchanges of Units at current prices. Third, it provides for the certainty of current and future exchanges of Class B units into Class A common shares of Premier, without fear of termination due to the sale of the Hospitals, the expected discontinued use of the GPO and/or Subscription Agreement prior to October 2020 or the assignment of the Debtors' rights to a post plan confirmation liquidating trust

or comparable vehicle. Fourth, it permits the Debtors continued access to the services, intellectual property licenses and goods (through the GPO Participation Agreement and Subscription Agreement) provided by the Premier Parties, all of which is utilized by the Hospitals prior to the sales and will be used by the Debtors post sales pursuant to existing or to be negotiated transition services or post-sale operating agreements. Fifth, the Settlement Agreement lowers the monthly price of the Subscription Agreement to $112,000 from approximately $117,456. Sixth, it provides for the recovery of the Disputed Distributions (as defined in the Motion) in the amount of $609,146. Seventh and most importantly, it lowers the maximum cure cost for prepetition amounts due and owing from an asserted number substantially in excess of $3.1 million to $2.0 million, ties the payment of such moneys to the Debtors' recoveries from the exchange of Class B Units for Premier Class A common shares, while eliminating a material unsecured claim.

30.    I believe that the Settlement Agreement is reasonable, fair and equitable and is in the overwhelming best interests of the Debtors' estates.

31.    The Settlement Agreement is a product of extensive negotiations between the Parties that have spanned over several months, involving the exchange multiple copies of drafts of term sheets and agreements.

I declare under penalty of perjury and of the laws in the United States of America, the foregoing is true and correct.

Executed this 29th day of April, 2019, at Los Angeles, California.

_____
ANITA CHOU

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

# EXHIBIT 1

Premier Parties' Proofs of Claim

| Claim No. | Date Filed | Claimant | Debtor | Debtor Case No. |
|---|---|---|---|---|
| 4177 | 3/28/2019 | Premier Healthcare Solutions, Inc. | Verity Business Services | 18-20173 |
| 4178 | 3/28/2019 | Premier Healthcare Solutions, Inc. | Verity Health System of California, Inc. | 18-20151 |
| 4179 | 3/28/2019 | Premier Healthcare Solutions, Inc. | De Paul Ventures - San Jose Dialysis, LLC | 18-20181 |
| 4180 | 3/28/2019 | Premier Healthcare Solutions, Inc. | De Paul Ventures, LLC | 18-20176 |
| 4181 | 3/28/2019 | Premier Healthcare Solutions, Inc. | O'Connor Hospital | 18-20168 |
| 4182 | 3/28/2019 | Premier Healthcare Solutions, Inc. | O'Connor Hospital Foundation | 18-20179 |
| 4183 | 3/28/2019 | Premier Healthcare Solutions, Inc. | Saint Louise Regional Hospital Foundation | 18-20172 |
| 4184 | 3/28/2019 | Premier Healthcare Solutions, Inc. | Seton Medical Center | 18-20167 |
| 4185 | 3/28/2019 | Premier Healthcare Solutions, Inc. | Seton Medical Center Foundation | 18-20175 |
| 4186 | 3/28/2019 | Premier Healthcare Solutions, Inc. | St. Francis Medical Center | 18-20165 |
| 4187 | 3/28/2019 | Premier Healthcare Solutions, Inc. | Verity Holdings, LLC | 18-20163 |
| 4188 | 3/28/2019 | Premier Healthcare Solutions, Inc. | Verity Medical Foundation | 18-20169 |
| 4189 | 3/28/2019 | Premier Healthcare Solutions, Inc. | St. Francis Medical Center of Lynwood Foundation | 18-20178 |
| 4190 | 3/28/2019 | Premier Healthcare Solutions, Inc. | St. Louise Regional Hospital | 18-20162 |
| 4191 | 3/28/2019 | Premier Healthcare Solutions, Inc. | St. Vincent Dialysis Center, Inc. | 18-20171 |
| 4192 | 3/28/2019 | Premier Healthcare Solutions, Inc. | St. Vincent Foundation | 18-20180 |
| 4193 | 3/28/2019 | Premier Healthcare Solutions, Inc. | St. Vincent Medical Center | 18-20164 |
| 4740 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | Verity Health System of California, Inc. | 18-20151 |
| 4741 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | De Paul Ventures - San Jose Dialysis, LLC | 18-20181 |
| 4742 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | De Paul Ventures, LLC | 18-20176 |
| 4744 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | O'Connor Hospital | 18-20168 |
| 4745 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | O'Connor Hospital Foundation | 18-20179 |
| 4746 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | Saint Louise Regional Hospital Foundation | 18-20172 |
| 4747 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | Seton Medical Center | 18-20167 |
| 4749 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | Seton Medical Center Foundation | 18-20175 |

110827807

| Claim No. | Date Filed | Claimant | Debtor | Debtor Case No. |
|---|---|---|---|---|
| 4750 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | St. Francis Medical Center | 18-20165 |
| 4751 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | St. Francis Medical Center of Lynwood Foundation | 18-20178 |
| 4752 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | St. Louise Regional Hospital | 18-20162 |
| 4753 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | St. Vincent Dialysis Center, Inc. | 18-20171 |
| 4755 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | St. Vincent Foundation | 18-20180 |
| 4756 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | St. Vincent Medical Center | 18-20164 |
| 4757 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | Verity Business Services | 18-20173 |
| 4758 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | Verity Medical Foundation | 18-20169 |
| 4759 | 3/28/2019 | Premier, Inc., for itself and its consolidated subsidiaries | Verity Holdings, LLC | 18-20163 |
| 4760 | 3/28/2019 | Premier Healthcare Alliance, L.P. | Verity Business Services | 18-20173 |
| 4761 | 3/28/2019 | Premier Healthcare Alliance, L.P. | O'Connor Hospital | 18-20168 |
| 4762 | 3/28/2019 | Premier Healthcare Alliance, L.P. | Verity Health System of California, Inc. | 18-20151 |
| 4763 | 3/28/2019 | Premier Healthcare Alliance, L.P. | De Paul Ventures, LLC | 18-20176 |
| 4764 | 3/28/2019 | Premier Healthcare Alliance, L.P. | De Paul Ventures - San Jose Dialysis, LLC | 18-20181 |
| 4765 | 3/28/2019 | Premier Healthcare Alliance, L.P. | St. Louise Regional Hospital | 18-20162 |
| 4766 | 3/28/2019 | Premier Healthcare Alliance, L.P. | O'Connor Hospital Foundation | 18-20179 |
| 4767 | 3/28/2019 | Premier Healthcare Alliance, L.P. | Saint Louise Regional Hospital Foundation | 18-20172 |
| 4768 | 3/28/2019 | Premier Healthcare Alliance, L.P. | St. Francis Medical Center of Lynwood Foundation | 18-20178 |
| 4769 | 3/28/2019 | Premier Healthcare Alliance, L.P. | Seton Medical Center Foundation | 18-20175 |
| 4770 | 3/28/2019 | Premier Healthcare Alliance, L.P. | Seton Medical Center | 18-20167 |
| 4771 | 3/28/2019 | Premier Healthcare Alliance, L.P. | St. Francis Medical Center | 18-20165 |
| 4772 | 3/28/2019 | Premier Healthcare Alliance, L.P. | St. Vincent Dialysis Center, Inc. | 18-20171 |
| 4773 | 3/28/2019 | Premier Healthcare Alliance, L.P. | St. Vincent Medical Center | 18-20164 |
| 4774 | 3/28/2019 | Premier Healthcare Alliance, L.P. | St. Vincent Foundation | 18-20180 |
| 4775 | 3/28/2019 | Premier Healthcare Alliance, L.P. | Verity Holdings, LLC | 18-20163 |
| 4776 | 3/28/2019 | Premier Healthcare Alliance, L.P. | Verity Medical Foundation | 18-20169 |

| Claim No. | Date Filed | Claimant | Debtor | Debtor Case No. |
|---|---|---|---|---|
| 4777 | 3/28/2019 | Premier Services, LLC | St. Louise Regional Hospital | 18-20162 |
| 4778 | 3/28/2019 | Premier Services, LLC | Verity Medical Foundation | 18-20169 |
| 4779 | 3/28/2019 | Premier Services, LLC | Verity Holdings, LLC | 18-20163 |
| 4780 | 3/28/2019 | Premier Services, LLC | Verity Business Services | 18-20173 |
| 4781 | 3/28/2019 | Premier Services, LLC | St. Vincent Medical Center | 18-20164 |
| 4782 | 3/28/2019 | Premier Services, LLC | St. Vincent Foundation | 18-20180 |
| 4783 | 3/28/2019 | Premier Services, LLC | St. Vincent Dialysis Center, Inc. | 18-20171 |
| 4784 | 3/28/2019 | Premier Services, LLC | St. Francis Medical Center of Lynwood Foundation | 18-20178 |
| 4785 | 3/28/2019 | Premier Services, LLC | St. Francis Medical Center | 18-20165 |
| 4786 | 3/28/2019 | Premier Services, LLC | Seton Medical Center Foundation | 18-20175 |
| 4787 | 3/28/2019 | Premier Services, LLC | De Paul Ventures, LLC | 18-20176 |
| 4788 | 3/28/2019 | Premier Services, LLC | Saint Louise Regional Hospital Foundation | 18-20172 |
| 4789 | 3/28/2019 | Premier Services, LLC | Seton Medical Center | 18-20167 |
| 4790 | 3/28/2019 | Premier Services, LLC | O'Connor Hospital | 18-20168 |
| 4791 | 3/28/2019 | Premier Services, LLC | O'Connor Hospital Foundation | 18-20179 |
| 4792 | 3/28/2019 | Premier Services, LLC | De Paul Ventures - San Jose Dialysis, LLC | 18-20181 |
| 4793 | 3/28/2019 | Premier Services, LLC | Verity Health System of California, Inc. | 18-20151 |

110827807

# EXHIBIT 2

**Exhibit 10.1**

---

**PREMIER HEALTHCARE ALLIANCE, L.P.**

**A California Limited Partnership**

---

**AMENDED AND RESTATED**
**LIMITED PARTNERSHIP AGREEMENT**

THE LIMITED PARTNERSHIP INTERESTS IN PREMIER HEALTHCARE ALLIANCE, L.P. HAVE NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH INTERESTS MUST BE ACQUIRED FOR INVESTMENT ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH (I) THE SECURITIES ACT, ANY APPLICABLE SECURITIES LAWS OF ANY STATE AND ANY OTHER APPLICABLE SECURITIES LAWS, (II) THE TERMS AND CONDITIONS OF THIS LIMITED PARTNERSHIP AGREEMENT, AND (III) ANY OTHER TERMS AND CONDITIONS AGREED TO IN WRITING BETWEEN THE GENERAL PARTNER AND THE APPLICABLE LIMITED PARTNER.  PURCHASERS AND OTHER TRANSFEREES OF SUCH LIMITED PARTNERSHIP INTERESTS WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT OR ACQUISITION FOR AN INDEFINITE PERIOD OF TIME.

## TABLE OF CONTENTS

1.   DEFINITIONS                                                                    2

2.   FORMATION AND PURPOSE                                                          9

     2.1   Continuation of Limited Partnership                                      9
     2.2   Name                                                                     9
     2.3   Purpose; Powers                                                         10
     2.4   Certificates                                                            10
     2.5   Principal Office                                                        10

3.   MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS                                   10

     3.1   Partners                                                                10
     3.2   Partner Interests and Units                                            10
     3.3   Repurchase of Class B Common Units                                     11
     3.4   Exchange of Class B Common Units                                       12
     3.5   Authorization and Issuance of Additional Units                        12
     3.6   Capital Contributions                                                  13
     3.7   Admission of New Limited Partners                                      13
     3.8   Outstanding Capital Contribution Obligations of Founding Limited Partners  14
     3.9   Additional Class A Common Units to Premier                            14

4.   CAPITAL ACCOUNTS                                                              16

     4.1   Allocations                                                            16
     4.2   Capital Accounts                                                       16
     4.3   Revaluations of Assets and Capital Account Adjustments                16
     4.4   Additional Capital Account Adjustments                                17
     4.5   Additional Capital Account Provisions                                 17

5.   DISTRIBUTIONS AND ALLOCATIONS OF PROFIT AND LOSS                             17

     5.1   General Partner Determination                                          17
     5.2   Distributions                                                          18
     5.3   No Violation                                                           18
     5.4   Withholdings                                                           18
     5.5   Property Distributions and Installment Sales                          19
     5.6   Net Profit or Net Loss                                                19
     5.7   Regulatory Allocations                                                19

i

5.8     Tax Allocations: Code Section 704(c) and Unrealized Appreciation or Depreciation     20

6.     STATUS, RIGHTS AND POWERS OF LIMITED PARTNERS     20

6.1     Limited Liability     20
6.2     Return of Distributions of Capital     20
6.3     No Management or Control     21
6.4     Specific Limitations     21
6.5     Limited Partner Voting     21
6.6     Required Consents     21
6.7     Limited Partner Compensation; Expenses; Loans     22

7.     DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF THE GENERAL
PARTNER     22

7.1     General Partner     22
7.2     Resignation     22
7.3     Authority of the General Partner     22
7.4     Reliance by Third Parties     23
7.5     Set-Off     23

8.     DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF OFFICERS AND
AGENTS     23

8.1     Officers, Agents     23
8.2     Appointment     24
8.3     Tenure     24
8.4     Vacancies     24
8.5     Resignation and Removal     24
8.6     Compensation     24
8.7     Delegation     24

9.     BOOKS, RECORDS, ACCOUNTING AND REPORTS     24

9.1     Books and Records     24
9.2     Delivery to Limited Partner, Inspection     25
9.3     Accounting; Fiscal Year     25
9.4     Reports     25
9.5     Filings     26
9.6     Non-Disclosure     26

ii

9.7     Restrictions on Receipt                                          27

10.    TAX MATTERS PARTNER                                              27

       10.1   Tax Matters Partner                                       27
       10.2   Indemnity of Tax Matters Partner                          27
       10.3   Tax Returns                                               27
       10.4   Tax Elections                                             27
       10.5   Tax Information                                           28

11.    TRANSFER OF INTERESTS                                            28

       11.1   Restricted Transfer                                       28
       11.2   Termination of Partnership                                28
       11.3   Consent                                                   28
       11.4   Withdrawal of Partner                                     28
       11.5   Noncomplying Transfers Void                               28
       11.6   Amendment of Exhibit 3.1                                  29

12.    DISSOLUTION OF COMPANY                                           29

       12.1   Events of Dissolution                                     29
       12.2   Liquidation                                               29
       12.3   No Action for Dissolution                                 29
       12.4   No Further Claim                                          29

13.    INDEMNIFICATION                                                  29

       13.1   General                                                   29
       13.2   Exculpation                                               30
       13.3   Persons Entitled to Indemnity                             30
       13.4   Indemnification Agreements                                30
       13.5   Duties of the General Partner                             31
       13.6   Interested Transactions                                   31
       13.7   Fiduciary and Other Duties                                31

14.    REPRESENTATIONS AND COVENANTS BY THE LIMITED PARTNERS            31

       14.1   Due Organization and Authority                            31
       14.2   Investment Intent                                         32
       14.3   Securities Regulation; Accredited Investor Status         32
       14.4   Knowledge and Experience                                  32
       14.5   Economic Risk                                             32

iii

14.6   Investment Company Status                                          32
14.7   Purchasing Information                                            32
14.8   Information                                                       33
14.9   Binding Agreement                                                 33
14.10  Tax Position                                                      33
14.11  Licenses and Permits                                             33

15.    AMENDMENTS TO AGREEMENT                                           33

15.1   Amendments                                                        33
15.2   Corresponding Amendment of Certificate                            33
15.3   Binding Effect                                                    34

16.    GENERAL                                                           34

16.1   Successors; Governing Law; Etc.                                   34
16.2   Notices                                                           34
16.3   Power of Attorney                                                 34
16.4   Execution of Documents                                            34
16.5   Consent to Jurisdiction                                           35
16.6   WAIVER OF JURY TRIAL                                              36
16.7   Arbitration                                                       36
16.8   Severability                                                      36
16.9   Table of Contents, Headings                                       36
16.10  No Third-Party Rights                                             37

iv

**PREMIER HEALTHCARE ALLIANCE, L.P.**
**AMENDED AND RESTATED**
**LIMITED PARTNERSHIP AGREEMENT**

This Amended and Restated Limited Partnership Agreement (this " **Agreement** ") of Premier Healthcare Alliance, L.P. is made as of September 25, 2013 and effective as of the Effective Date (as defined below), by and among Premier Services, LLC (the " **General Partner** "), a Delaware limited liability company and wholly-owned subsidiary of Premier, Inc., a newly-formed Delaware corporation (" **Premier** "), as general partner, and the Limited Partners (as defined below), and will be effective as of the Effective Date.

**RECITALS**

WHEREAS, Premier Purchasing Partners, L.P., a California limited partnership (" **Premier LP** ") is engaged in the business of operating and managing healthcare group purchasing and other healthcare-related programs and investments for the benefit of its partners and to otherwise assist the partners in providing superior healthcare services in their communities; and

WHEREAS, the parties hereto desire to continue Premier LP under the new name "Premier Healthcare Alliance, L.P.", on the terms and conditions and for the purposes set forth below;

WHEREAS, the General Partner and the Limited Partners accordingly desire to amend and restate in its entirety Premier LP's Third Amended and Restated Agreement of Limited Partnership (the " **Prior Agreement** "), on the terms contained in this Agreement;

WHEREAS, pursuant to a Contribution Agreement dated as of the Effective Date, the stockholders of Premier, Inc., a Delaware corporation (the " **Corporation** "), are contributing all of the Corporation's issued and outstanding capital stock to Premier LP on the Effective Date in exchange for limited partnership interests in Premier LP (the " **Contribution** ") and the Corporation will thereby become a wholly owned subsidiary of Premier LP and change its name to "Premier Healthcare Solutions, Inc.";

WHEREAS, pursuant to a Unit Put/Call Agreement of even date herewith (the " **Unit Put/Call Agreement** "), on the Effective Date Premier is purchasing Class B Common Units in Premier LP (" **Class B Common Units** ") from the Founding Limited Partners (as defined below) and the Corporation and is purchasing newly-issued Class A Common Units in Premier LP (" **Class A Common Units** ") directly from Premier LP (the Class A Common Units and the Class B Common Units are referred to collectively as the " **Common Units** "), using the proceeds from an initial public offering (the " **IPO** ") of Premier's Class A Common Stock, par value $0.01 per share (the " **Class A Common Stock** "), and contributing all of its Common Units to the General Partner, which will become the general partner of Premier LP (all of the foregoing corporate transactions collectively, the " **Reorganization** ");

WHEREAS, as part of the Reorganization, the Founding Limited Partners are entering into an Exchange Agreement with Premier and Premier LP of even date herewith (the " **Exchange Agreement** ") providing for the exchange, from time to time, of their remaining

Class B Common Units for (a) Class A Common Stock, or cash, or a combination of both and (b) payments under a Tax Receivable Agreement being entered into between Premier and the Founding Limited Partners of even date herewith (the " **Tax Receivable Agreement** "), and in conjunction therewith the Founding Limited Partners and Premier are entering into a Registration Rights Agreement of even date herewith (the " **Registration Rights Agreement** "); and

WHEREAS, the General Partner and the Limited Partners (collectively, as further defined below, the " **Partners** ") desire to enter into this Agreement to provide for, among other things, the management of the business and affairs of Premier LP, the allocation of profits and losses among the Partners, the respective rights and obligations of the Partners to each other and to Premier LP, and certain other matters.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the Partners, each intending to be legally bound, enter into this Agreement.

## 1.    DEFINITIONS

For purposes of this Agreement: (a) references to "Articles," "Sections" and "Exhibits" are to Articles, Sections and Exhibits of this Agreement unless explicitly indicated otherwise, (b) references to statutes include all rules and regulations thereunder, and all amendments and successors thereto from time to time; and (c) the word "including" shall be construed as "including without limitation."

" **Accountants** " means Ernst & Young, LLP, or such other national accounting firm designated by the General Partner from time to time.

" **Act** " means the California Uniform Limited Partnership Act of 2008 (Cal. Corp. Code § 15900, et seq.).

" **Agreement** " means this Limited Partnership Agreement, dated as of the date hereof, effective as of the Effective Date, as amended from time to time.

" **Asset Value** " of any property of Premier LP means its adjusted basis for federal income tax purposes unless:

(a)    the property was accepted by Premier LP as a contribution to capital at a value different from its adjusted basis, in which event the initial Asset Value for such property shall mean the gross fair market value of the property agreed to by Premier LP and the contributing Partner; or

(b)    as a consequence of the issuance of additional Units or the redemption of all or part of the Interest of a Partner, the property of Premier LP is revalued in accordance with **Section 4.3.**

As of any date, references to the "then prevailing Asset Value" of any property shall mean the Asset Value last determined for such property less the depreciation, amortization and cost

2

48

recovery deductions taken into account in computing Net Profit or Net Loss in fiscal periods subsequent to such prior determination date.

" **Capital Account** " is defined in **Section 4.2.**

" **Capital Contribution** " means with respect to any Partner, the sum of (i) the amount of money plus (ii) the fair market value of any other property (net of liabilities assumed or to which the property is subject) contributed to Premier LP with respect to the Interest held by such Partner pursuant to this Agreement.

" **Certificate of Limited Partnership** " means the Certificate of Limited Partnership of Premier LP, and any amendments thereto and restatements thereof, filed on behalf of Premier LP with the California Secretary of State pursuant to Section 15902.01 of the Act.

" **Class** " means the classes into which the Interests in Premier LP created in accordance with  **Section 3.2**  may be classified or divided from time to time by the General Partner in its sole discretion pursuant to the provisions of this Agreement. As of the date of this Agreement there are two classes of Units:  Class A Common Units and Class B Common Units.  Subclasses within a Class shall not be separate Classes for purposes of this Agreement. For all purposes hereunder and under the Act, only such Classes expressly established under this Agreement, including by the General Partner in accordance with this Agreement, shall be deemed to be a class or group of Interests in Premier LP.  For the avoidance of doubt, to the extent that the General Partner holds Interests of any Class, the General Partner shall not be deemed to hold a separate Class of such interests from any other Partner because it is the General Partner.

" **Class A Common Stock** " is defined in the Recitals.

" **Class A Common Units** " is defined in the Recitals **.**

" **Class B Common Stock** " means Class B Common Stock, par value $0.000001 per share, of Premier.

" **Class B Common Units** " is defined in the Recitals.

" **Class B Unit Redemption Amount** " means the lower of (i) the sum of (A) a Terminating Limited Partner's capital account balance immediately prior to the Reorganization (but excluding any appreciation in consequence of the Reorganization) and (B) the book value of the Terminating Limited Partner's stock in the Corporation immediately prior to the Contribution (but excluding any appreciation in consequence of the Reorganization), multiplied by (C) a fraction, the numerator of which is seven minus the number of full years following the commencement of such Partner's ownership of Class B Common Units and the denominator of which is seven or (ii) the Fair Market Value of such Unvested Units (using the principles set forth in the definition of "Deemed Per-Unit Value of the Class B Common Units") as of the Termination Date, payable in accordance with **Section 3.3** .

" **Code** " means the Internal Revenue Code of 1986, as amended.

" **Common Units** " is defined in the Recitals.

3

" **Competing Business** " means a business, or a Person conducting or controlling a business, that directly or indirectly competes with the business of Premier LP or its Related Entities anywhere in the United States.

" **Confidential Information** " is defined in **Section 9.6.**

" **Contribution** " is defined in the Recitals.

" **control** " means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract (written or oral) or otherwise; and the terms "controlling," "controlled by" and "under common control with" shall have meanings correlative to the foregoing.

" **Determination Date** " is defined in the definition of Deemed Per-Unit Value of the Class B Common Units.

" **Deemed Per-Unit Value of the Class B Common Units** " means the deemed value of each Class B Common Unit based on the market value (the " **Fair Market Value** ") of one share of Class A Common Stock determined as follows:

(a)      If Class A Common Stock is traded on a national securities exchange, then such Fair Market Value shall be the average of the closing prices of a share of such Class A Common Stock on such exchange over the 20 trading days ending three days prior to the Exchange Notice Date (as such term is defined below) (the " **Determination Date** ");

(b)      If Class A Common Stock is traded on the over-the-counter system, then such Fair Market Value shall be the average of the closing bid and ask prices of a share of such Class A Common Stock over the 20 trading days prior to the Determination Date; and

(c)      If there is then no public market for the Class A Common Stock, then such Fair Market Value shall be the highest price per share which could be obtained from a willing buyer (not a current employee or director) for a share of Class A Common Stock sold from authorized but unissued shares, as determined in good faith by the General Partner;

provided , however , that if Premier LP shall be party to a merger or other consolidation in which Premier LP is not the surviving party, the Fair Market Value of each Class B Common Unit shall be deemed to be the value received by the holders of the Class B Common Units for each such Class B Common Unit pursuant to such merger or other consolidation.

If closing prices or closing bid and ask prices are no longer reported by a securities exchange or other trading system, the closing price or closing bid and ask price shall be that which is reported by such securities exchange or other trading system at 4:00 p.m. New York City time on the applicable trading day.

" **Distribution** " means cash or property (net of liabilities assumed or to which the property is subject) distributed to a Partner in respect of the Partner's Interest.

4

"**Early Termination Rate**" means the long-term Applicable Federal Rate published by the Internal Revenue Service in accordance with section 1274(d) of the Code.

"**Effective Date**" means the date on which the closing of the IPO occurs.

"**Eligible Organization**" means any entity that is not a healthcare provider but which is eligible for participation in the Premier Program.

"**Exchange Agreement**" is defined in the Recitals.

"**Exchange Notice Date**" means the date that is at least 30 business days prior to the Quarterly Exchange Date (or 55 business days prior to a Quarterly Exchange Date (as such term is defined in the Exchange Agreement) in conjunction with a Company-Directed Offering (as such term is defined in the Registration Rights Agreement)).

"**Fair Market Value**" is defined in the definition of Deemed Per-Unit Value of the Class B Common Units.

"**Fiscal Year**" means the fiscal year of Premier LP, which shall be Premier LP's taxable year as determined under Regulations Section 1.441-1 or Section 1.441-2 and the Regulations under Section 706 of the Code, or such other Fiscal Year as determined by the General Partner in compliance with such Regulations.

"**Founding Limited Partners**" means the Limited Partners of Premier LP as of the Effective Date and the stockholders of the Corporation that become Limited Partners as of the Effective Date.  Any Founding Limited Partner who Transfers all of such Founding Limited Partner's Units shall cease to be a Founding Limited Partner and shall no longer have the rights afforded a Founding Limited Partner under this Agreement.

"**GAAP**" means generally accepted accounting principles in effect in the United States of America from time to time.

"**General Partner**" means Premier Services, LLC.  The term "General Partner" shall also include any Person to which Premier Services, LLC may in the future Transfer Units and other Securities held by it or which Premier Services, LLC may in the future admit to Premier LP as an additional General Partner.

"**GPO Participation Agreement**" means the GPO Participation Agreement of even date herewith entered into between Premier LP and each Limited Partner.

"**Indemnification Agreement**" is defined in **Section 13.4.**

"**Indemnified Persons**" is defined in **Section 13.1.**

"**Interest**" means, with respect to any Partner as of any time, such Partner's partnership interest in Premier LP, together with such Partner's rights and obligations with respect thereto set forth in this Agreement.

5

"**IPO**" has the meaning set forth in the Recitals.

"**Limited Partner**" means each Partner other than the General Partner.

"**Member Facilities**" means the acute and non-acute health care providers and other Eligible Organizations that are Owned, Leased or Managed by, or Affiliated with, a Premier Member.  Any Member Facility that ceases to be Owned, Leased or Managed by, or Affiliated with a Premier Member shall cease to be a "Member Facility" for purposes of this Agreement as of the effective date of the termination of such relationship (e.g., consummation of sale transaction, termination of sponsorship, etc.).

"**Net Profit**" and "**Net Loss**" of Premier LP for each Fiscal Year or relevant part thereof means Premier LP's taxable income or loss for federal income tax purposes for such period (including all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code) with the following adjustments:

(a)      Tax gain or loss attributable to the disposition of property of Premier LP with an Asset Value different than the adjusted basis of such property for federal income tax purposes shall be computed with respect to the Asset Value of such property, and any tax gain or loss not included in Net Profit or Net Loss shall be taken into account and allocated for federal income tax purposes among the Partners pursuant to **Section 5.8** .

(b)      Depreciation, amortization or cost recovery deductions with respect to any property with an Asset Value that differs from its adjusted basis for federal income tax purposes shall be computed in accordance with Asset Value, and any depreciation allowable for federal income tax purposes shall be allocated in accordance with **Section 5.8.**

(c)      Any items that are required to be allocated pursuant to **Section 5.7** shall not be taken into account in determining Net Profit or Net Loss.

"**New Limited Partner**" is defined in **Section 3.7.1** .

"**Officer**" is defined in **Section 8.1** .

"**Options**" is defined in **Section 3.9.3(a)** .

"**Owned, Leased or Managed by, or Affiliated with**" means (a) each acute and non-acute health care provider with respect to which Member directly or indirectly:  (i) holds (A) a majority of the equity interests or corporate membership interests in such provider or the power to appoint a majority of such provider's governing body or (B) a significant equity interest (which may be less than a majority of the total equity) sufficient to enable operational control and such provider is willing to designate Premier LP as its primary group purchasing organization; (ii) leases and operates such provider; or (iii) manages such provider in whole or in part (including, at a minimum, the supplies purchasing function); and (b) each acute and non-acute health care provider and other Eligible Organization which Member has sponsored for participation in the Premier Program, if such entity is not otherwise described in subsection (a) above.

6

" **Ownership Interest** " means any capital stock, share, partnership interest, membership interest, unit of participation, joint venture interest of any kind or other similar interest (however designated) in any Person and any option, warrant, purchase right, conversion right or exchange right or other contractual obligation which would entitle any Person to acquire any such interest in such Person or otherwise entitle any Person to share in the equity, profit, earnings, losses or gains of such Person (including stock appreciation, phantom stock, profit participation or other similar rights).

" **Partner** " means each Person listed on **Exhibit 3.1** on the date hereof (including the General Partner) and each other Person hereafter admitted as a Partner in accordance with the terms of this Agreement and the Act.  In the event that a New Limited Partner is admitted, Premier LP shall revise **Exhibit 3.1** accordingly.  The Partners shall constitute the "partners" (as such term is defined in the Act) of Premier LP.  Any reference in this Agreement to any Partner shall include such Partner's Successors in Interest to the extent such Successors in Interest have become Substituted Partners in accordance with the provisions of this Agreement.  Except as otherwise set forth herein or in the Act, the Partners shall constitute a single class or group of members of Premier LP for all purposes of the Act and this Agreement.

" **Percentage Interest** " of a Partner as of a particular time shall mean the percentage that the number of Common Units then held by such Partner represents of the total number of Common Units then outstanding.

" **Permitted Transfers** " means Transfers by the General Partner and Transfers pursuant to the Exchange Agreement.

" **Person** " means any individual, corporation, limited liability company, partnership, trust, joint stock company, business trust, unincorporated association, joint venture, governmental authority or other entity or organization of any nature whatsoever or any group of two or more of the foregoing which are Related Entities.

" **Post-IPO Class B Common Units** " means the total number of Class B Common Units beneficially owned by the Founding Limited Partners immediately following the consummation of the IPO (or, in the event that any over-allotment option granted to the underwriters of the IPO is exercised in whole or in part, then such term shall refer to the total number of Class B Common Units beneficially owned by the Founding Limited Partners immediately following the closing of the final exercise of such option) and the transactions contemplated by the Unit Put/Call Agreement.

" **Premier Member** " means any entity that participates in the Premier Program.

" **Premier Program** " means the group purchasing programs conducted by Premier LP and its Related Entities, pursuant to which Premier Members are entitled to purchase Products and Services under the terms of the Premier Program Contracts negotiated with Vendors.

" **Premier Program Contracts** " means the purchasing agreements between Vendors and Premier LP, for the purchase by Premier Members of Products and Services (including any

7

enhancements of Premier Program Contracts negotiated by, or on behalf of, any Member Facility).

"**Premier Program Purchases** " means, with respect to any Limited Partner, the aggregate purchases of Products and Services by such Limited Partner and its Member Facilities through Premier Program Contracts during a given Fiscal Year.

"**Prior Agreement** " is defined in the Recitals.

"**Products and Services** " means the equipment, products, supplies and services available to Premier Members pursuant to Premier Program Contracts.

"**Registration Rights Agreement** " is defined in the Recitals.

"**Regulation D** " means Regulation D under the Securities Act.

"**Regulations** " means the Treasury regulations, including temporary regulations, promulgated under the Code.

"**Regulatory Allocations** " is defined in **Section 5.7** .

"**Related Entity** " when used with respect to another Person means any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, such other Person.  In addition, Related Entities of a Partner shall be deemed to include all of its directors, managers, officers and employees in their capacities as such.

"**Securities** " is defined in **Section 3.5** .

"**Securities Act** " means the Securities Act of 1933, as amended, and the rules, regulations and interpretations promulgated pursuant thereto.

"**Specified Partner Rights** " means the rights of a Partner or with respect to an Interest, or benefits accorded to such Partner or with respect to such Interest, pursuant to **Section 6.6** (Required Consents) and **Article 9** (Books, Records Accounting and Reports); provided , however , that the obligations of such Partner or with respect to such Interest in such designated section or otherwise in this Agreement shall not be included in the definition of "Specified Partner Rights."

"**Substituted Partner** " means any Person that has been admitted to Premier LP as a Partner by virtue of such Person receiving all or a portion of a Partner's Interest from a Partner or an Assignee and not from Premier LP.

"**Successor in Interest** " means any trustee, custodian, receiver or other Person acting in any bankruptcy or reorganization proceeding with respect to, assignee for the benefit of the creditors of, trustee or receiver, or current or former officer, director or partner, or other fiduciary acting for or with respect to the dissolution, liquidation or termination of, or other executor, administrator, committee, legal representative or other successor or assign of, any Partner, whether by operation of law or otherwise.

8

"**Supplemental Capital Contribution Amount**" means a per annum amount equal to a New Limited Partner's Capital Contribution multiplied by the 12-month London Inter-Bank Offered Rate as of the date of such Capital Contribution plus 100 basis points.

"**Tax Distribution**" is defined in **Section 5.2.1**.

"**Tax Matters Partner**" is defined in **Section 10.1**.

"**Tax Receivable Agreement**" is defined in the Recitals.

"**Terminating Limited Partner**" is defined in **Section 3.3**.

"**Termination Date**" is defined in **Section 3.3**.

"**Termination Event**" is defined in **Section 3.3**.

"**Transfer**" means a sale, assignment, pledge, encumbrance, abandonment, disposition or other transfer.

"**Transferee**" is defined in **Section 11.2**.

"**Units**" is defined in **Section 3.2.**

"**Unit Put/Call Agreement**" is defined in the Recitals **.**

"**Unvested Units**" is defined in **Section 3.3**.

"**Vendor**" means a supplier of Products and Services under a Premier Program Contract.

"**Vested Premier Shares**" is defined in **Section 3.9.3(b)**.

"**Voting Trust Agreement**" means that certain Voting Trust Agreement of even date herewith pursuant to which the Limited Partners will deposit their Class B Common Stock into a depository trust.

## 2.  FORMATION AND PURPOSE

2.1     Continuation of Limited Partnership.  The parties hereto hereby continue Premier LP previously formed as a limited partnership under the California Revised Limited Partnership Act.  The rights and liabilities of the Partners shall be determined pursuant to the Act and this Agreement.  To the extent that the rights or obligations of any Partner are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2     Name.  The name of Premier LP is hereby changed to "**Premier Healthcare Alliance, L.P.**"  The business of Premier LP may be conducted under that name or, upon compliance with applicable laws, any other name that the General Partner deems appropriate.  The General Partner shall file, or shall cause to be filed, any fictitious name certificates and similar filings, and any amendments thereto, that the General Partner considers appropriate.

9

2.3        Purpose; Powers .

(a)        General Purpose .  The principal business of Premier LP is to operate and manage healthcare group purchasing and other healthcare-related programs, services and investments for the benefit of its Partners, and to otherwise assist Premier Members in providing high quality and cost-effective healthcare in their communities.

(b)        Powers .  Notwithstanding the foregoing, the nature of the business or purposes to be conducted or promoted by Premier LP is to engage in any lawful act or activity for which limited partnerships may be formed under the Act.  Premier LP may engage in any and all activities necessary, desirable or incidental to the accomplishment of the foregoing.  Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing Premier LP to possess any purpose or power, or to do any act or thing, forbidden by law to a limited partnership formed under the laws of the State of California.

(c)        Partnership Action .  Subject to the provisions of this Agreement and except as prohibited by the Act, (i) Premier LP may, with the approval of the General Partner, enter into and perform its obligations under any and all documents, agreements and instruments, all without any further act, vote or approval of any Partner and (ii) the General Partner may authorize any Person (including any Partner or Officer) to enter into and perform its obligations under any document on behalf of Premier LP.

2.4        Certificates .  The General Partner and such other Persons as may be designated from time to time by the General Partner are hereby designated as authorized persons, within the meaning of the Act, to execute, deliver and file any amendments or restatements of the Certificate of Limited Partnership or any certificate of cancellation of the Certificate of Limited Partnership and any other certificates and any amendments or restatements thereof necessary for Premier LP to qualify to do business in a jurisdiction in which Premier LP may wish to conduct business.

2.5        Principal Office .  The principal executive office of Premier LP shall be located at such place as the General Partner shall establish, and the General Partner may from time to time change the location of the principal executive office of Premier LP to any other place within or outside the State of California.  The General Partner may establish and maintain such additional offices and places of business of Premier LP, either within or outside the State of California, as it deems appropriate.  The records required to be maintained by the Act shall be maintained at one of Premier LP's principal offices, except as required by the Act.

## 3.    MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS

3.1        Partners .  The Partners of Premier LP are as listed on **Exhibit 3.1 ,** as from time to time amended and supplemented so that it sets forth the then-current list of Partners and the number of Units held by each such Partner.

3.2        Partner Interests and Units .  Interests in Premier LP shall be represented by units (" **Units** ") or such other Ownership Interests as the General Partner may establish in its sole discretion in accordance with the terms hereof.  As of the Effective Date the Units will be

10

comprised of two Classes, designated as Class A Common Units and Class B Common Units.  Ownership of Units shall not be certificated and shall be evidenced solely by the books and records of Premier LP as governed by this Agreement.

(a)    Class A Common Units are Units initially held only by the General Partner (and by Premier prior to its contribution to the General Partner of Class A Common Units acquired from Premier LP pursuant to the Unit Put/Call Agreement) and represent an interest in the distributions of Premier LP *pari passu* with the Class B Common Units as a Class. The interest in profits and distributions of the Class A Common Units is determined based on the allocation methodology set forth in this Agreement.  The number of Class A Common Units held by the General Partner on the Effective Date will be shown on **Exhibit 3.1** .  When Premier purchases Class B Common Units from Limited Partners and the Corporation pursuant to the Unit Put/Call Agreement or receives Class B Common Units from Limited Partners pursuant to the exercise by the Limited Partners of rights under the Exchange Agreement, such Class B Common Units shall be contributed by Premier to the General Partner and converted to an equal number of Class A Common Units automatically by operation of this Agreement and without further action by any Person.

(b)    Class B Common Units are Units held only by Limited Partners and, as a Class, represent an interest in the distributions in Premier LP *pari passu* with the Class A Common Units. The interest in profits and distributions of the holder of particular Class B Common Units is determined based on the allocation methodology set forth in this Agreement. The number of Class B Common Units held by each Limited Partner on the Effective Date will be shown on **Exhibit 3.1** .

3.3    Repurchase of Class B Common Units .  Notwithstanding anything in this Agreement to the contrary, Class B Common Units held by any Founding Limited Partner that are not eligible (as of the Termination Date) for exchange pursuant to **Section 3.4** below (" **Unvested Units** ") are subject to repurchase upon the occurrence of a Termination Event.  Upon becoming aware that a Termination Event has occurred, Premier LP shall have the option, in its sole discretion, to redeem all of the Unvested Units then held by such Founding Limited Partner (referred to hereinafter as a " **Terminating Limited Partner** ") at a purchase price equal to the Class B Unit Redemption Amount. Such Terminating Limited Partner shall cease to be a Partner effective as of the date Premier LP gives notice to the Terminating Limited Partner of its redemption of such Class B Common Units (the " **Termination Date** ").  Premier LP shall pay to such Terminating Limited Partner the Class B Unit Redemption Amount in exchange for and in full satisfaction of the Terminating Limited Partner's entire interest in the Unvested Units under this **Section 3.3** .  The Class B Unit Redemption Amount shall be paid, at the sole discretion of the General Partner, by delivery within thirty (30) business days after the Termination Date of (x) a five-year, unsecured, non-interest bearing term promissory note in favor of the Terminating Limited Partner, (y) a cashier's check or wire transfer of immediately available funds in an amount equal to the present value, discounted at the Early Termination Rate, of the Class B Unit Redemption Amount otherwise payable upon the maturity of the promissory note described in clause (x), or (z) payment on such other terms mutually agreed upon by the General Partner and the Terminating Limited Partner. A " **Termination Event** " shall be deemed to have occurred with respect to a holder of Unvested Units upon any of the following events: (i) such

11

holder ceases to be a Premier Member; (ii) any event which under the Act or this Agreement causes such holder to cease to be a Limited Partner, except a Transfer which is permitted or approved under the provisions of this Agreement; (iii) such holder ceases to be a party to a GPO Participation Agreement in effect with Premier LP (provided, that, the General Partner may waive this Termination Event, in its sole discretion, if a Related Entity of such holder is a party to a GPO Participation Agreement in effect with Premier LP); or (iv) such holder shall become a Related Entity of, or affiliated with, a Competing Business.

3.4    Exchange of Class B Common Units .  Founding Limited Partners shall only be entitled to exchange Class B Common Units after the one-year anniversary of the last day of the calendar month in which Premier consummates the IPO and such exchange shall be in accordance with the terms of the Exchange Agreement.  Further, Founding Limited Partners may only exchange Class B Common Units as follows:  (a) each Founding Limited Partner may exchange up to one-seventh of its initial allocation of Class B Common Units (subject to adjustments pursuant to **Section 3.9.4** ) each year (which right shall be cumulative; for example, a Founding Limited Partner that elects not to exchange any Class B Common Units during the first two years after the one-year anniversary of the last day of the calendar month in which Premier consummates the IPO shall be permitted to exchange up to three-sevenths of its initial allocation of Class B Common Units during the third year after the one-year anniversary of the last day of the calendar month in which Premier consummates the IPO) and (b) each Founding Limited Partner may exchange any Class B Common Units acquired by such Founding Limited Partner through the exercise of a right of first refusal under Section 2.2 of the Exchange Agreement at any time.  New Limited Partners may exchange Class B Common Units at any time in accordance with the terms of the Exchange Agreement.  Notwithstanding anything in this Agreement to the contrary, upon the occurrence of a Termination Event, a Terminating Limited Partner (which term shall include, for purposes of this **Section 3.4,** a New Limited Partner) shall be required to exchange all Class B Common Units held by such Limited Partner that are eligible (as of the Termination Date) for exchange pursuant to this Section, in accordance with the terms of the Exchange Agreement, on the next exchange date following the Termination Date.

3.5    Authorization and Issuance of Additional Units .  The General Partner may issue additional Class A Common Units and Class B Common Units or establish and issue other Classes of Units, other Ownership Interests in Premier LP or other Premier LP securities (collectively, " **Securities** ") from time to time with such rights, obligations, powers, designations, preferences and other terms, which may be senior to or otherwise different from any then-existing or future Securities, as the General Partner shall determine from time to time in its sole discretion, without the vote or consent of any other Partner or any other Person, including (a) the right of such Securities to share in Net Profit and Net Loss or items thereof, (b) the right of such Securities to share in Premier LP distributions, (c) the rights of such Securities upon dissolution and liquidation of Premier LP, (d) whether, and the terms and conditions upon which, Premier LP may or shall be required to redeem such Securities (including sinking fund provisions), (e) whether such Securities are issued with the privilege of conversion or exchange and, if so, the terms and conditions of such conversion or exchange, (f) the terms and conditions upon which such Securities will be issued, evidenced by certificates or assigned or transferred, (g) the terms and conditions of the issuance of such Securities (including, without limitation, the amount and form of consideration, if any, to be received by Premier LP in respect thereof, the General Partner being expressly authorized, in its sole discretion, to cause Premier LP to issue Securities

12

for less than fair market value to the extent otherwise permitted by law) and (h) the right, if any, of the holder of such Securities to vote on Premier LP matters, including matters relating to the relative designations, preferences, rights, powers and duties of such Securities. The General Partner, without the vote or consent of any other Partner or any other Person, is authorized (x) to issue any Securities of any such newly-established Class or any existing Class and (y) to amend this Agreement to reflect the creation of any such new Class, the issuance of Securities of such Class, and the admission of any Person as a Partner which has received Securities of any such Class. Except as expressly provided in this Agreement to the contrary, any reference to "Units" shall include the Class A Common Units, the Class B Common Units, and any other Classes of Units that may be established in accordance with this Agreement.

3.6     Capital Contributions . Each Partner's Capital Contribution, if any, whether in cash or in kind, and the number of Units issued to such Partners, shall be as set forth in the books and records of Premier LP. Any in-kind Capital Contributions shall be effected by a written assignment or such other documents as the General Partner shall direct. Any Partner making an in-kind Capital Contribution agrees from time to time to do such further acts and execute such further documents as the General Partner may direct to perfect Premier LP's interest in such in-kind Capital Contribution.

3.7     Admission of New Limited Partners .

3.7.1     New Limited Partners . Except for a Transferee that receives Units in a Permitted Transfer, a new Limited Partner (a " **New Limited Partner** ") may be admitted only upon the approval of the General Partner in its sole discretion. Each New Limited Partner shall make such Capital Contribution (if any) and shall receive Units and shall otherwise be admitted upon such terms and conditions required by this Agreement. Admission of a New Limited Partner (including a New Limited Partner holding Units received in a Permitted Transfer) is conditioned upon the execution of a Joinder in the form attached hereto as **Exhibit 3.7** . Upon such admission of a New Limited Partner, the General Partner shall amend **Exhibit 3.1** to reflect the Units owned by such Limited Partner.

3.7.2     New Class B Common Unitholders . In addition to the requirements set forth in **Section 3.7.1** above, each New Limited Partner that receives Class B Common Units shall be required to (a) enter into a GPO Participation Agreement (except as otherwise approved by the General Partner in its sole discretion, to the extent that (i) a Related Entity of such New Limited Partner has a GPO Participation Agreement in effect with Premier LP or (ii) such New Limited Partner is a Member Facility of another Limited Partner), the Exchange Agreement, the Tax Receivable Agreement, the Registration Rights Agreement and the Voting Trust Agreement; and (b) contribute to Premier LP a Capital Contribution in an amount equal to one percent (1%) of the New Limited Partner's projected annual purchasing volume under its GPO Participation Agreement, which projection shall be determined by the General Partner in its sole discretion following consultation with the prospective New Limited Partner. The Capital Contribution of such New Limited Partner shall be paid upon admission in cash, underlined provided , that upon mutual agreement of such New Limited Partner and the General Partner, such New Limited Partner may contribute its Capital Contribution over time

13

together with the Supplemental Capital Contribution Amounts accrued thereon (such payments collectively referred to as a "**Capital Contribution Obligation**") or in an alternative manner approved by the General Partner in its sole discretion. Payments on a Capital Contribution Obligation of a New Limited Partner shall be made by such New Limited Partner every calendar quarter no later than the date on which a tax distribution is made pursuant to **Section 5.2.1** below, in an amount equal to the lesser of (x) five (5%) of such Capital Contribution Obligation or (y) the distributions made pursuant to **Section 5.2.1** by Premier LP to such New Limited Partner on such date. In addition, such Capital Contribution Obligation of a New Limited Partner shall be paid by such New Limited Partner to the extent of one hundred percent (100%) of any distribution to such New Limited Partner made pursuant to **Section 5.2.2** below, on the date of any such distribution. Such Capital Contribution Obligation shall be paid by such New Limited Partner in full upon the earlier of (a) five years or (b) a Transfer or exchange by such New Limited Partner of all of its Class B Common Units. Each New Limited Partner hereby authorizes the General Partner to apply funds that would otherwise be distributable to such New Limited Partner (including without limitation the Class B Unit Redemption Amount) to satisfy such Capital Contribution Obligation. Notwithstanding anything in this Agreement to the contrary, a Capital Contribution Obligation which is credited to any New Limited Partner as a Capital Contribution shall be credited solely for accounting purposes and for purposes of allocating Net Profits and Net Losses, and Regulations Section 1.704-1(b)(2)(iv)(d)(2) shall apply for all other purposes. The number of Class B Common Units issued to a New Limited Partner pursuant to this **Section 3.7.2** shall be equal to the amount of such New Limited Partner's Capital Contribution *divided by* the Deemed Per-Unit Value of the Class B Common Units.

3.8    <u>Outstanding Capital Contribution Obligations of Founding Limited Partners</u> . All "Contribution Loans" and "New Partner Loans" (as those terms are defined in the Prior Agreement) outstanding as of the Effective Date shall be paid on the same terms applicable to Capital Contribution Obligations as set forth in **Section 3.7.2** above; provided, that no Supplemental Capital Contribution Amounts will accrue with respect to Contribution Loans. Each Founding Limited Partner hereby authorizes the General Partner to apply funds that would otherwise be distributable to such Founding Limited Partner (including without limitation the Class B Unit Redemption Amount) to satisfy the foregoing payment obligations.

3.9    <u>Additional Class A Common Units to Premier</u> .

3.9.1    <u>Follow-On Offerings</u> . If Premier at any time issues additional Class A Common Stock pursuant to a primary public offering registered under the Securities Act (other than the IPO and any exercises by the underwriters of their option to purchase additional shares with respect thereto) or in a private placement (but excluding exchanges under the Exchange Agreement), the net proceeds received by Premier with respect to such shares, if any, shall be concurrently transferred to Premier LP and Premier LP shall issue Class A Common Units registered in the name of the General Partner based on the Fair Market Value of the Class A Common Stock at the time of such transfer.

3.9.2    <u>Repurchases</u> . If Premier at any time repurchases or redeems a share of Class A Common Stock, including, without limitation, with respect to the repurchase of

14

any unvested restricted stock awards or units or other restricted equity compensation or with respect to repurchases or redemptions made in the public market or in privately negotiated transactions, Premier LP shall, simultaneously with such repurchase or redemption, redeem one Class A Common Unit registered in the name of the General Partner for every share of Class A Common Stock repurchased or redeemed by Premier, upon the same terms and for the same price (but not including any commissions, fees or taxes) as each share of Class A Common Stock is repurchased or redeemed by Premier.

3.9.3   Incentive Equity .

(a)  In connection with the exercise of options pursuant to any Premier equity incentive plan (" **Options** "), Premier shall acquire additional Class A Common Units from Premier LP (which Class A Common Units shall be contributed by Premier to the General Partner upon receipt).  Premier shall exercise its rights under this **Section  3.9.3(a)** by giving written notice to Premier LP and all Limited Partners.  The notice shall specify the net number of shares of Class A Common Stock issued by Premier pursuant to exercise of the Options.  Premier LP shall issue in turn the Class A Common Units to which Premier is entitled under this **Section 3.9.3(a)** . The number of additional Class A Common Units that Premier shall be entitled to receive under this **Section  3.9.3(a)** shall be equal to the net number of shares of Class A Common Stock issued by Premier pursuant to the exercise of the Options.  In consideration of the Class A Common Units issued by Premier LP to Premier under this **Section 3.9.3(a)** , Premier shall contribute to Premier LP the net cash consideration, if any, received by Premier in exchange for the shares of Class A Common Stock issued pursuant to exercise of the Options.

(b)  In connection with the grant of Class A Common Stock pursuant to a Premier equity incentive plan (including, without limitation, the issuance of restricted and non-restricted Class A Common Stock, the payment of bonuses in the form of Class A Common Stock, the issuance of Class A Common Stock in settlement of stock appreciation rights or otherwise), other than through the exercise of Options as contemplated in **Section 3.9.3(a),** Premier shall deliver a notice to Premier LP and all Limited Partners specifying the date on which shares of such Class A Common Stock are vested under applicable law (" **Vested Premier Shares** "). The notice shall specify the number of Vested Premier Shares.  Premier LP shall (i) issue to Premier a number of Class A Common Units equal to the number of Vested Premier Shares (which Class A Common Units shall be contributed by Premier to the General Partner upon receipt), and (ii) if applicable and notwithstanding **Section 5.2** hereof, make a special distribution to the General Partner in respect of such Class A Common Units in an amount equal to any dividends paid or payable by Premier in respect of such Vested Premier Shares that accrued prior to vesting.  Premier shall contribute to Premier LP any cash consideration received by Premier in respect of such Vested Premier Shares.

3.9.4   Recapitalizations .  Premier LP shall undertake all actions, including without limitation, a reclassification, distribution, division, combination or recapitalization, with respect to the Units, to (a) maintain at all times a one-to-one ratio between the number of Class A Common Units owned by the General Partner and the

15

number of outstanding shares of Class A Common Stock, disregarding, for purposes of maintaining the one-to-one ratio, the Class B Common Stock and any Premier treasury stock, preferred stock or other securities of Premier that are not convertible into or exercisable or exchangeable for Class A Common Stock and (b) maintain the substantive economic ownership interests between and among the Partners, including the General Partner, in the event of any reclassification, distribution, division, combination or recapitalization.  In the event of any issuance, transfer, cancellation or repurchase of Class A Common Stock by Premier in connection with the immediately preceding sentence, Premier LP shall engage in a concurrent issuance, transfer, cancellation or repurchase of an identical number of Class A Common Units with respect to the General Partner to preserve such one-to-one ratio, and, subject to **Section 3.9.3** , to the extent that Premier has paid or received any net consideration in connection with any such transaction, Premier LP shall pay to or receive from Premier, as the case may be, such net consideration.  For avoidance of doubt, the General Partner shall take all actions required to ensure that the total number of issued and outstanding Class A Common Units and Class B Common Units shall at all times exactly match the number of issued and outstanding Class A Common Stock and Class B Common Stock, respectively.

## 4.  CAPITAL ACCOUNTS

4.1    Allocations .  The Net Profit and Net Loss of Premier LP and any items of income, gain, deduction or loss that are specially allocated in any fiscal period shall be allocated among the Partners as provided in **Article 5** .

4.2    Capital Accounts .  A separate account (each a " **Capital Account** ") shall be established and maintained for each Partner for each Class held by the Partner which:

(a)    shall be increased by (i) the amount of cash and the fair market value of any other property contributed by such Partner to Premier LP as a Capital Contribution (net of liabilities secured by such property or that Premier LP assumes or takes the property subject to) and (ii) such Partner's share of the Net Profit (or items of income or gain) of Premier LP and

(b)    shall be reduced by (i) the amount of cash and the fair market value of any other property distributed to such Partner (net of liabilities secured by such property or that the Partner assumes or takes the property subject to) and (ii) such Partner's share of the Net Loss (or items of deductions or loss) of Premier LP.

It is the intention of the Partners that the Capital Accounts of Premier LP be maintained in accordance with the provisions of Section 704(b) of the Code and the Regulations thereunder and that this Agreement be interpreted consistently therewith. A Partner's capital account for income tax reporting purposes shall be the sum of the Partner's Capital Accounts maintained as set forth above.

4.3    Revaluations of Assets and Capital Account Adjustments .  Unless otherwise determined by the General Partner, immediately preceding the issuance of additional Units in exchange for cash, property or services to a new or existing Partner and upon the redemption of

16

all or a portion of a Partner's Ownership Interest in Premier LP, the then-prevailing Asset Values of Premier LP shall be adjusted to equal their respective gross fair market values, as determined in good faith by the General Partner, and any increase in the net equity value of Premier LP (Asset Values less liabilities) shall be credited to the Capital Accounts maintained in respect of the Common Units of the Partners in the same manner as Net Profits are credited under **Section 5.6.1** (or any decrease in the net equity value of Premier LP shall be charged in the same manner as Net Losses are charged under **Section 5.6.1** ).  Accordingly, as of the date of issuance of additional Units or the redemption of all or a portion of a Partner's Ownership Interest in Premier LP, the Capital Accounts of Partners will reflect both realized and unrealized gains and losses through such date and the net fair market value of the equity of Premier LP as of such date.

4.4     Additional Capital Account Adjustments .  Any income of Premier LP that is exempt from federal income tax shall be credited to the Capital Accounts of the Partners in the same manner as Net Profits are credited under **Section 5.6** when such income is realized.  Any expenses or expenditures of Premier LP which may neither be deducted nor capitalized for tax purposes (or are so treated for tax purposes) shall be charged to the Capital Accounts of the Partners in the same manner as Net Losses are charged under **Section 5.6** .  If Premier LP is subject to an election under Section 754 of the Code or any comparable election under applicable state and local tax law to provide a special basis adjustment upon the transfer of an Interest in Premier LP or the distribution of property by Premier LP, Capital Accounts shall be adjusted to the limited extent required by the Regulations under Section 704 of the Code following any such transfer or distribution.

4.5     Additional Capital Account Provisions .  No Partner shall have the right to demand a return of all or any part of such Partner's Capital Contributions.  Any return of the Capital Contributions of any Partner shall be made solely from the assets of Premier LP and only in accordance with the terms of this Agreement.  No interest shall be paid to any Partner with respect to such Partner's Capital Contributions or Capital Account.  In the event that all or a portion of the Units of a Partner are transferred in accordance with this Agreement, the Transferee of such Units shall also succeed to all or the relevant portion of the Capital Account of the transferor.  For purposes of the preceding sentence, the portion of the Capital Account to which the Transferee succeeds shall be the percentage of the transferor's total Capital Account as the Percentage Interest being transferred bears to the total Percentage Interest of the transferor immediately prior to such transfer.  Units held by a Partner may not be transferred independently of the Interest to which the Units relate.

## 5.     **DISTRIBUTIONS AND ALLOCATIONS OF PROFIT AND LOSS**

5.1     General Partner Determination .  The General Partner shall determine the timing and the aggregate amount of any Distributions to Partners; provided , however , that unless the General Partner determines that a Tax Distribution made under **Section 5.2.1** will cause Premier LP to violate a covenant of Premier LP's then-existing financing agreements or the Act, the General Partner shall make a Tax Distribution not later than the dates specified in **Section 5.2.1.**

17

5.2    <u>Distributions</u> .  Distributions from Premier LP to its Partners shall be made only after allocating the Net Profit or Net Loss of Premier LP through the date as of which the Distribution is being charged to the Capital Accounts of the Partners.  Such Distributions shall be made in the following order (except that no Partner shall be entitled to receive a Distribution that would create or increase a deficit balance in such Partner's Capital Account unless the Capital Accounts of all Partners have previously been reduced to zero):

5.2.1    <u>Tax Distributions in Respect of Common Units</u> .  Subject to **Section 5.1** , Premier LP shall distribute to all Partners prior to the 60th day after the end of each calendar quarter cash in an aggregate amount equal to a percentage of the allocations of taxable income made or expected to be made pursuant to this **Article 5** for such quarter equal to the effective combined federal, state and local income tax rate then payable by Premier, taking into account the benefit of deducting state and local income taxes for federal income tax purposes and any benefit of the dividends received deduction but not taking into account the effect of any increase in basis under Sections 743 or 734 of the Code (the " **Tax Distribution** ").  Each Tax Distribution in respect of income allocated to the holders of Common Units shall be made to the General Partner and to the holders of Class B Common Units in the aggregate in proportion to Common Units held at the end of such quarter.  Each Tax Distribution made to the holders of Class B Common Units in the aggregate shall be divided among such holders in accordance with the Allocation and Distribution Methodology set forth in **Exhibit 5** , as amended from time to time.

5.2.2    <u>Other Distributions in Respect of Common Units</u> .  Next, Premier LP shall distribute to the Partners cash in an aggregate amount, if any, determined at the General Partner's sole discretion.  Each Distribution under this **Section 5.2.2** shall be made to the General Partner and to the holders of Class B Common Units in the aggregate in proportion to Common Units held at the end of the quarter in which such Distribution is declared.  Each Distribution under this **Section 5.2.2** made to the holders of Class B Common Units in the aggregate shall be divided among such holders in accordance with the Allocation and Distribution Methodology set forth in **Exhibit 5** , as amended from time to time.

5.3    <u>No Violation</u> .  Notwithstanding any provision to the contrary contained in this Agreement, Premier LP shall not make a Distribution to any Partner on account of such Partner's Interest in Premier LP if such Distribution would violate Section 15905.08 of the Act or other applicable law.

5.4    <u>Withholdings</u> .  All amounts withheld pursuant to the Code or any federal, state, local or foreign tax law with respect to any payment, distribution or allocation to a Partner shall be treated as amounts paid to such Partner.  Each Partner hereby authorizes the General Partner to withhold from Distributions to Partners, or with respect to allocations to Partners and in each case to pay over to the appropriate federal, state, local or foreign government any amounts required to be so withheld.  The General Partner shall allocate any such amounts to the Partners in respect of whose Distribution or allocation the tax was withheld and shall treat such amounts as actually distributed to such Partners.

18

5.5      Property Distributions and Installment Sales . If any assets of Premier LP shall be distributed in kind pursuant to this **Article 5** , such assets shall be distributed to the Partners entitled thereto in the same proportions as the Partners would have been entitled to cash Distributions. To the extent not otherwise recognized by Premier LP, the difference between the fair market value of any property distributed in kind to the Partners and the then-prevailing Asset Value of such property shall be taken into account in determining Net Profit and Net Loss and determining the Capital Accounts of the Partners. If any assets are sold in transactions in which, by reason of Section 453 of the Code, gain is realized but not recognized, such gain shall be taken into account when realized in computing gain or loss of Premier LP for purposes of allocation of Net Profit or Net Loss under this **Article 5** and, if such sales shall involve substantially all the assets of Premier LP, Premier LP shall be deemed to have been dissolved and terminated notwithstanding any election by the Partners to continue Premier LP for purposes of collecting the proceeds of such sales.

5.6      Net Profit or Net Loss .

     5.6.1      Allocations of Net Profit and Net Loss . The Net Profit and Net Loss of Premier LP for any relevant fiscal period shall be allocated and credited to the Capital Accounts of the General Partner and of the Limited Partners holding Class B Common Units in the aggregate, in proportion to the numbers of Common Units held. Allocations made to the holders of Class B Common Units in the aggregate shall be divided among such holders in accordance with the Allocation and Distribution Methodology set forth in **Exhibit 5** , as in effect from time to time.

     5.6.2      Interpretation . The Partners intend for the allocation provisions set forth in this Agreement to comply with Section 704(b) of the Code and the Regulations thereunder and to appropriately reflect the Partners' rights to Distributions as set forth in **Sections 5.2** and **12.2** , and Premier LP shall interpret the provisions in accordance with such intent and make such adjustments in Capital Accounts and allocations as may be necessary to effect such intent.

5.7      Regulatory Allocations . Notwithstanding **Section 5.6** , although the Partners do not anticipate that events will arise that will require application of this **Section 5.7** , provisions governing the allocation of taxable income, gain, loss, deduction and credit (and items thereof) are included in this Agreement as may be necessary to provide that Premier LP's allocation provisions contain a so-called "Qualified Income Offset" and comply with all provisions relating to the allocation of so-called "Nonrecourse Deductions" and "Partner Nonrecourse Deductions" and the chargeback thereof as set forth in the Regulations under Section 704(b) of the Code (the " **Regulatory Allocations** "); provided , however , that the Partners intend that all Regulatory Allocations that may be required shall be offset by other Regulatory Allocations or special allocations of items so that each Partner's share of the Net Profit, Net Loss and capital of Premier LP will be the same as it would have been had the events requiring the Regulatory Allocations not occurred. For this purpose the General Partner, based on the advice of Premier LP's auditors or tax counsel, is hereby authorized to make such special curative or remedial allocations of tax items as may be necessary to minimize or eliminate any economic distortions that may result from any required Regulatory Allocations.

19

5.8      Tax Allocations: Code Section 704(c) and Unrealized Appreciation or Depreciation .

     5.8.1      Contributed Assets .  In accordance with Section 704(c) of the Code, income, gain, loss and deduction with respect to any property contributed to Premier LP with an adjusted basis for federal income tax purposes different from its initial Asset Value shall, solely for tax purposes, be allocated among the Partners so as to take into account such difference in the manner required by Section 704(c) of the Code and the applicable Regulations.

     5.8.2      Revalued Assets .  If upon the acquisition of additional Units in Premier LP by a new or existing Partner, or upon the redemption of all or a portion of a Partner's Ownership Interest in Premier LP, the Asset Value of any of the assets of Premier LP is adjusted pursuant to **Section 4.3** , subsequent allocations of income, gain, loss and deduction with respect to such assets shall, solely for tax purposes, be allocated among the Partners so as to take into account such adjustment in the same manner as under Section 704 (c) of the Code and the applicable Regulations.

     5.8.3      Elections and Limitations .  The allocations required by this **Section 5.8** are solely for purposes of federal, state and local income taxes and shall not affect the allocation of Net Profits or Net Losses among Partners or any Partner's Capital Account. All tax allocations required by this **Section 5.8** shall be made using the so called "traditional method" described in Regulations Section 1.704-3(b).

     5.8.4      Allocations .  Except as noted above, all items of income, deduction and loss shall be allocated for federal, state and local income tax purposes in the same manner as such items are allocated for purposes of calculating Net Profits and Net Losses.

## 6.      **STATUS, RIGHTS AND POWERS OF LIMITED PARTNERS**

     6.1      Limited Liability .  Except as otherwise provided by the Act, the debts, obligations and liabilities of Premier LP, whether arising in contract, tort or otherwise, shall be solely the debts, expenses, obligations and liabilities of Premier LP, and no Limited Partner shall be obligated personally for any such debt, expense, obligation or liability of Premier LP solely by reason of being a Limited Partner.  All Persons dealing with Premier LP shall have recourse solely to the assets of Premier LP for the payment of the debts, obligations or liabilities of Premier LP.  In no event shall any Limited Partner be required to make up any deficit balance in such Limited Partner's Capital Account upon the liquidation of such Limited Partner's Interest or otherwise.

     6.2      Return of Distributions of Capital .  Except as otherwise expressly required by law, a Limited Partner, in such capacity, shall have no liability for obligations or liabilities of Premier LP in excess of (a) the amount of such Limited Partner's Capital Contributions, (b) such Limited Partner's share of any assets and undistributed profits of Premier LP and (c) to the extent required by law, the amount of any Distributions wrongfully distributed to such Limited Partner.  Except as required by law, no Limited Partner shall be obligated by this Agreement to return any Distribution to Premier LP or pay the amount of any Distribution for the account of Premier LP

20

or to any creditor of Premier LP; provided , however , that if any court of competent jurisdiction holds that, notwithstanding this Agreement, any Limited Partner is obligated to return or pay for the account of Premier LP or to any creditor of Premier LP any part of any Distribution, such obligation shall bind such Limited Partner alone and not any other Partner.  The provisions of the immediately preceding sentence are solely for the benefit of the Partners and shall not be construed as benefiting any Person not part of this Agreement.  The amount of any Distribution returned to Premier LP by a Limited Partner or paid by a Limited Partner for the account of Premier LP or to a creditor of Premier LP shall be added to the account or accounts from which it was subtracted when it was distributed to such Limited Partner.

6.3     No Management or Control .  Except as expressly provided in this Agreement, no Limited Partner shall take part in or interfere in any manner with the management of the business and affairs of Premier LP or have any right or authority to act for or bind Premier LP.

6.4     Specific Limitations .  No Limited Partner shall have the right or power to (a) withdraw or reduce such Limited Partner's Capital Contribution, except as a result of the dissolution of Premier LP or as otherwise provided by law or in this Agreement, (b) make voluntary Capital Contributions or to contribute any property to Premier LP other than cash, except as provided in this Agreement, (c) bring an action for partition against Premier LP or any Premier LP assets, (d) cause the termination and dissolution of Premier LP, except as set forth in this Agreement or (e) upon the Distribution of its Capital Contribution require that property other than cash be distributed in return for its Capital Contribution.  Each Limited Partner hereby irrevocably waives any such rights.

6.5     Limited Partner Voting .  Except as otherwise set forth in this Agreement, all powers of the Limited Partners shall be exercised in accordance with **Section 7.3** by the appointment of the General Partner.

6.6     Required Consents .  Notwithstanding the grant of authority to the General Partner pursuant to **Section 7.3** and notwithstanding any other provision of this Agreement:  (i) the prior written consent of a majority in interest of each Class of Ownership Interests held by Limited Partners shall be required to approve any merger of Premier LP; and (ii) so long as the total number of Units held by the Founding Limited Partners equals or exceeds 20% of the Post-IPO Partnership Units, none of the following actions shall be taken by Premier LP without the prior written consent of a majority in interest of the Units then held by the Founding Limited Partners:

(a)     without limiting **Section 15.1** , any amendment, modification, supplement or restatement of or to this Agreement, other than an amendment, modification, supplement or restatement (i) being executed solely to reflect any dilution in the Partners' Interests resulting from the issuance of Units as contemplated by **Article 3** or (ii) being executed solely to reflect the acceptance of a New Limited Partner pursuant to **Article 11** ; provided , that any such amendment, modification, supplement or restatement treats all Partners ratably based on their Percentage Interests; or

(b)     the dissolution, liquidation or winding up of Premier LP.

21

6.7     Limited Partner Compensation; Expenses; Loans .

(a)   No Limited Partner shall receive any salary, fee or draw for services rendered to or on behalf of Premier LP except as provided under a separate written agreement between Premier LP and such Limited Partner or a policy approved by the General Partner.  Except as otherwise approved, permitted or contemplated by or pursuant to a policy approved by the General Partner, no Limited Partner shall be reimbursed for any expenses incurred by such Limited Partner on behalf of Premier LP.

(b)   Any Limited Partner or Related Entity may, to the extent approved by the General Partner, lend or advance money to Premier LP (it being understood that no such loan or advance shall be deemed to take place in the ordinary course of business).  If any Limited Partner or Related Entity shall make any such permitted loan or loans to Premier LP or advance money on Premier LP's behalf, the amount of any such loan or advance shall not be treated as a contribution to the capital of Premier LP but shall be a debt due from Premier LP.  Unless otherwise agreed by the lending Limited Partner or Related Entity and Premier LP and approved by the General Partner, the amount of any such loan or advance by a lending Limited Partner or Related Entity shall be repayable out of Premier LP's cash and shall bear interest at a rate not in excess of the prime rate established, from time to time, by any major bank selected by the General Partner for loans to its most creditworthy commercial borrowers, plus up to two percent per annum as agreed upon by the General Partner and the Limited Partner and on such other terms and conditions no less favorable to Premier LP than if such lending Limited Partner or Related Entity had been an independent third party.  None of the Limited Partners or their Related Entities shall be obligated to make any loan or advance to Premier LP.

**7.     DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES
AND DUTIES OF THE GENERAL PARTNER**

7.1     General Partner .  Premier LP shall be managed by the General Partner.

7.2     Resignation .  The General Partner may resign at any time.  Such resignation shall be made in writing and shall take effect at the time specified therein or, if no such time be specified in such written resignation, then at the time of receipt of such written resignation by the President or the Secretary of Premier LP.  The acceptance of a resignation shall not be necessary to make it effective unless expressly so provided in such resignation.

7.3     Authority of the General Partner .  Subject to the provisions of this Agreement that require the consent or approval of one or more Limited Partners, the General Partner shall have the exclusive power and authority to manage the business and affairs of Premier LP and to make all decisions with respect thereto.  Except as otherwise expressly provided in this Agreement, the General Partner or Persons designated by the General Partner, including officers and agents appointed by the General Partner, shall be the only Persons authorized to execute documents which shall be binding on Premier LP.  To the fullest extent permitted by California law, but subject to any specific provisions hereof granting rights to Limited Partners, the General Partner shall have the power to perform any acts, statutory or otherwise, with respect to Premier LP or this Agreement, which would otherwise be possessed by the Partners under California law, and the Partners shall have no power whatsoever with respect to the management of the business and affairs of Premier LP.  Without limiting the foregoing provisions of this **Section   7.3,** the General

22

Partner shall have the sole power to manage or cause the management of Premier LP, including, without limitation, the power and authority to effectuate the sale, lease, transfer, exchange or other disposition of any, all or substantially all of the assets of Premier LP (including, without limitation, the exercise or grant of any conversion, option, privilege or subscription right or any other right available in connection with any assets at any time held by Premier LP) or the conversion of Premier LP pursuant to Article 11 of the Act.  Notwithstanding anything in this Agreement to the contrary, Premier LP's Group Purchasing Policy and Recruitment and Retention Policy may only be modified with the approval of a majority of the General Partner's Board of Managers after consultation with applicable Premier stockholder committees.

7.4    <u>Reliance by Third Parties</u> .  Any Person dealing with Premier LP or the Partners may rely upon a certificate signed by the General Partner as to (a) the identity of the Partners, (b) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by Partners or are in any other manner germane to the affairs of Premier LP, (c) the Persons which are authorized to execute and deliver any instrument or document of or on behalf of Premier LP, (d) the authorization of any action by or on behalf of Premier LP by the General Partner or any officer or agent acting on behalf of Premier LP, (e) any act or failure to act by Premier LP or (f) as to any other matter whatsoever involving Premier LP or the Partners.

7.5    <u>Set-Off</u> .

(a)    In addition to any rights Premier LP may have as a matter of law or otherwise, the General Partner shall have the right (but will not be obligated) without prior notice to a Limited Partner or any other Person to set-off or apply any obligation of such Limited Partner owed to Premier LP or its Related Entities (whether or not matured or contingent and whether or not arising under this Agreement) against any obligation of Premier LP owed to such Limited Partner (whether or not matured or contingent and whether or not arising under this Agreement), including, without limitation, Premier LP's obligation to pay such Limited Partner any amounts under **Sections 3.3** or **5.2** of this Agreement or Section 4.1 of the GPO Participation Agreement

(b)    In the event that the operation of this **Section 7.5** results in any Limited Partner owing a net amount to Premier LP or its Related Entities, such Limited Partner shall be unconditionally obligated to pay such amount to Premier LP or to such Related Entity concurrently with the consummation of any exchange or sale of Class B Common Units beneficially held by such Limited Partner.  Any such payment shall be made by certified or bank cashiers' check or wire transfer of immediately available funds.

## 8.    DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF OFFICERS AND AGENTS

8.1    <u>Officers, Agents</u> .  The General Partner shall have the power to appoint officers and agents to act for Premier LP with such titles, if any, as the General Partner deems appropriate and to delegate to such officers or agents such of the powers as are granted to the General Partner hereunder, including the power to execute documents on behalf of Premier LP, as the General Partner may in its sole discretion determine.  The officers so appointed may include, without limitation, Persons holding titles such as Chairman, President, Chief Executive

23

69

Officer, Chief Operating Officer, Chief Financial Officer, Vice President, Treasurer, Secretary, Assistant Treasurer and Assistant Secretary (each such appointee, an " **Officer** "). Unless the authority of such an officer is limited or specified in the document appointing such officer or in such officer's employment agreement or is otherwise specified or limited by the General Partner, any officer so appointed shall have the same authority to act for Premier LP as a corresponding officer of a California corporation would have to act for a California corporation in the absence of a specific delegation of authority and as more specifically set forth in this **Article 8** .

8.2      Appointment . The officers may be appointed by the General Partner at any time, and the General Partner may delegate to any officer the power to elect or appoint any other officer or any agents. Officers must be natural persons.

8.3      Tenure . Each officer shall hold office until such officer's respective successor is chosen and qualified unless a different period shall have been specified by the terms of such officer's election or appointment or until such officer sooner dies, resigns, is removed or becomes disqualified. Each agent shall retain such agent's authority at the pleasure of the General Partner or the officer by whom such agent was appointed or by the officer who then holds such agent's appointive power.

8.4      Vacancies . If the office of any officer becomes vacant, any Person empowered to elect or appoint such officer may choose a successor therefor. Each such successor shall hold office for such officer's unexpired term and until such successor is chosen and qualified or until such successor sooner dies, resigns, is removed or becomes disqualified.

8.5      Resignation and Removal . The General Partner may at any time remove any officer either with or without cause. The General Partner may at any time terminate or modify the authority of any agent. Any officer may resign at any time by delivering such officer's resignation in writing to the General Partner. Such resignation shall be effective upon receipt unless specified to be effective at some other time and without in either case the necessity of its being accepted unless the resignation shall so state.

8.6      Compensation . An officer shall receive such compensation as may be determined from time to time by General Partner or as otherwise provided in a written employment agreement.

8.7      Delegation . Unless prohibited by the General Partner, an officer appointed by the General Partner may delegate in writing some or all of the duties and powers of such Person's management position to other Persons. An officer who delegates the duties or powers of an office remains subject to the standard of conduct for an officer with respect to the discharge of all duties and powers so delegated.

## 9.    BOOKS, RECORDS, ACCOUNTING AND REPORTS

9.1      Books and Records . The books and records of Premier LP shall reflect all Premier LP's transactions and shall be appropriate and adequate for Premier LP's business. Premier LP shall maintain at its principal office or such other office as the General Partner shall determine all of the following:

24

(a)    a current list of the full name and last known business or residential address of each Partner;

(b)    information regarding the amount of cash and a description and statement of the agreed value of all other property and services contributed by each Partner and which each Partner has agreed to contribute in the future, and the date on which each Partner became a Partner of Premier LP;

(c)    a copy of the Certificate of Limited Partnership and this Agreement, including any amendments thereto, together with executed copies of any powers of attorney pursuant to which the Certificate of Limited Partnership or this Agreement or any such amendments have been executed;

(d)    copies of Premier LP's federal, state and local income tax and information returns and reports;

(e)    the financial statements of Premier LP; and

(f)    Premier LP's books and records.

9.2    Delivery to Limited Partner, Inspection.    Upon the request of any Limited Partner for any purpose reasonably related to such Limited Partner's Interest, the General Partner shall allow the Limited Partner and its designated representatives or agents, upon at least two business days prior written notice to the General Partner and during reasonable business hours, to examine Premier LP's books and records for such purpose, including, without limitation, books and records related to the Premier Program, at the Limited Partner's sole cost and expense. A Limited Partner requesting such an examination of Premier LP's books and records may also request, and the General Partner shall endeavor to cause, representatives of Premier LP and the independent certified public Accountants for Premier LP to be made available to discuss such books and records. In addition, each Limited Partner shall have the right to obtain from Premier LP such other information regarding Premier LP's affairs and financial condition as is just and reasonable. The foregoing rights shall be subject to such reasonable standards as may be established by the General Partner from time to time. The rights and privileges set forth in this **Section 9.2** shall not apply (a) to any assignee of a Limited Partner except to the extent required by the Act or (b) to any Limited Partner employed by, retained by, affiliated with or controlled by a Competing Business at the time of request or examination.

9.3    Accounting; Fiscal Year .  Premier LP will prepare its financial reports in accordance with GAAP.  The General Partner may, without any further consent of the Limited Partners (except as specifically required by the Code), apply for IRS consent to, and otherwise effect a change in, Premier LP's Fiscal Year.

9.4    Reports .

(a)    General .  The General Partner shall be responsible for causing the preparation of financial reports of Premier LP and the coordination of financial matters of Premier LP with Premier LP's Accountants.

25

(b)    <u>Periodic and Financial Reports</u> .  Premier LP shall maintain and provide to each Partner upon request the following financial statements prepared, in each case in accordance with GAAP; <u>provided</u> , <u>however</u> , that items or entries in such financial statements that relate to Capital Contributions, Net Profits and Net Losses and other allocations, Distributions or Capital Accounts shall be construed, determined and reported to Partners in accordance with this Agreement.

(i)    As soon as reasonably practicable following the end of each Fiscal Year (and in any event not later than ninety (90) days after the end of such Fiscal Year), a balance sheet of Premier LP as of the end of such Fiscal Year and the statements of operations, and cash flows for such Fiscal Year, together with appropriate notes to such financial statements, Partners' Capital Accounts and changes therein, all of which shall be audited and certified by Premier LP's Accountants, and in each case setting forth in comparative form the corresponding figures for Premier LP (to the extent then in existence) for the immediately preceding Fiscal Year.

(ii)    As soon as reasonably practicable following the end of each of the first three fiscal quarters of each Fiscal Year and following the end of each of the first eleven months of each Fiscal Year (and in any event not later than forty-five (45) days after the end of such fiscal quarter or month, as the case may be), an unaudited balance sheet of Premier LP as of the end of such fiscal quarter or month, as the case may be and the unaudited statements of operations and cash flows for such fiscal quarter or month, as the case may be, and for the Fiscal Year to date, in each case setting forth in comparative form the corresponding figures for Premier LP (to the extent then in existence) for the prior Fiscal Year's fiscal quarter or month, as the case may be, and the fiscal quarter or month, as the case may be, just completed.

(c)    <u>Other Reports</u> .  The General Partner shall cause to be delivered promptly to the Limited Partners such other information as is customarily provided to stockholders or limited partners, such as reports of adverse developments, management letters and press releases.

9.5    <u>Filings</u> .  At Premier LP's expense, the General Partner shall cause the income tax returns for Premier LP to be prepared and timely filed with the appropriate authorities and to have prepared and to furnish to each Limited Partner such information with respect to Premier LP (including without limitation a Schedule setting forth such Limited Partner's distributive share of Premier LP's income, gain, loss, deduction and credit as determined for federal income tax purposes) as is necessary to enable such Limited Partner to prepare such Limited Partner's federal and state income tax returns.  The General Partner, at Premier LP's expense, shall also cause to be prepared and timely filed with appropriate federal and state regulatory and administrative authorities all reports required to be filed by Premier LP with such authorities under then-current applicable laws, rules and regulations.

9.6    <u>Non-Disclosure</u> .  Each Partner agrees that, except as otherwise consented to by the General Partner, all non-public information furnished to such Partner pursuant to this

26

Agreement or otherwise regarding Premier LP or its business that is not generally available to the public (" **Confidential Information** ") will be kept confidential and will not be disclosed by such Partner, or by any of such Partner's agents, representatives or employees, in any manner, in whole or in part, except that (a) each Partner shall be permitted to disclose such Confidential Information to such Partner's agents, representatives and employees who need to be familiar with such information in connection with such Partner's investment in Premier LP and who are charged with an obligation of confidentiality, (b) each Partner shall be permitted to disclose Confidential Information to the extent required by law, so long as such Partner shall have first provided Premier LP a reasonable opportunity to contest the necessity of disclosing such information and (c) each Partner shall be permitted to disclose Confidential Information to the extent necessary for the enforcement of any right of such Partner arising under this Agreement.  Notwithstanding the foregoing, each Partner may disclose to its tax and legal advisors, to the extent necessary, the tax treatment and tax structure of the Reorganization and all materials of any kind (including opinions or other tax analyses) that are provided by Premier LP to the Partner relating to such tax treatment and tax structure.

       9.7    <u>Restrictions on Receipt</u> .  The rights of Limited Partners to receive reports or to request information pursuant to this **Article 9** shall be subject to **Section 3.3** .

## 10.  TAX MATTERS PARTNER

       10.1    <u>Tax Matters Partner</u> .  The General Partner shall act as the tax matters partner within the meaning of and pursuant to Regulations Sections 301.6231(a)(7)-1 and -2 or any similar provision under state or local law and in such capacity is referred to as the " **Tax Matters Partner** ".

       10.2    <u>Indemnity of Tax Matters Partner</u> .  Premier LP shall indemnify and reimburse the Tax Matters Partner for all expenses (including legal and accounting fees) incurred as Tax Matters Partner pursuant to this **Article 10** in connection with any administrative or judicial proceeding with respect to the tax liability of the Partners attributable to Interest in Premier LP.

       10.3    <u>Tax Returns</u> .  Unless otherwise directed by the General Partner, all tax returns of Premier LP shall be reviewed and signed by an independent certified public accountancy firm or other paid preparer.

       10.4    <u>Tax Elections</u> .  The General Partner shall, without any further consent of the Partners being required (except as specifically required herein), cause Premier LP to make any and all elections for federal, state, local and foreign tax purposes, including, without limitation, any election, if permitted by applicable law (i) to make the election provided for in Code Section 6231(a)(1)(B)(ii) or take any other action necessary to cause the provisions of Code Sections 6221 through 6231 to apply to Premier LP, (ii) to take any action necessary or appropriate to continue the election made by Premier LP pursuant to Code Section 754 or comparable provisions of state, local or foreign law as in effect at the Effective Date, including making a new or a protective Section 754 election, to assure such Section 754 election is and remains effective and that such Section 754 election is not revoked without the consent of all Partners, and to adjust the basis of property pursuant to Code Sections 734(b) and 743(b), or comparable provisions of state, local or foreign law, in connection with Transfers of Interests and Premier LP

27

distributions, (iii) to extend the statute of limitations for assessment of tax deficiencies against the Partners with respect to adjustments to Premier LP's federal, state, local or foreign tax returns and, (iv) to the extent provided in Code Sections 6221 through 6231 and similar provisions of federal, state, local or foreign law, to represent Premier LP and the Partners before taxing authorities or courts of competent jurisdiction in tax matters affecting Premier LP or the Partners in their capacities as Partners, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters (including agreements or other documents that bind the Partners with respect to such tax matters or otherwise affect the rights of Premier LP and the Partners).

10.5    Tax Information . Tax information shall be delivered to each Partner as soon as practicable after the end of each Fiscal Year of Premier LP but not later than 30 days prior to the due date of the applicable tax return (including extensions). Upon request, Premier LP shall make such additional information available as shall be reasonably requested by any Partner in order for such Partner to be able to complete its tax returns.

## 11.  **TRANSFER OF INTERESTS**

11.1    Restricted Transfer . Except for Permitted Transfers, no Partner shall Transfer all or any part of its Units, or the economic or other rights that comprise such Partner's Interest, unless such Transfer is first approved by the General Partner. In no event will a Partner be permitted to Transfer all or any of its Units, or all or any part of the economic or other rights that comprise such Partner's Interest, to a Competing Business. Premier LP shall maintain a record of the ownership of Units which shall initially be as set forth on **Exhibit 3.1** and which shall be amended from time to time to reflect Transfers of Units. Subject to restrictions on the transferability of Units as set forth herein, Units shall be Transferred by delivery to Premier LP of an instruction by the registered owner of a Unit requesting registration of Transfer of such Units and the recording of such Transfer in the records of Premier LP.

11.2    Termination of Partnership . No Partner shall resign or withdraw from Premier LP except that, subject to the restrictions set forth in this **Article 11** , any Partner may Transfer its Units in Premier LP to a transferee (a " **Transferee** ") and such Transferee may become a Partner in place of the Partner assigning such Units.

11.3    Consent . Each Partner hereby agrees that, upon satisfaction of the terms and conditions of this **Article 11** with respect to any proposed Transfer, the Person proposed to be the Transferee in such Transfer may be admitted as a Partner.

11.4    Withdrawal of Partner . If a Partner Transfers all of its Units pursuant to **Section 11.1** and the Transferee of such Units is admitted as a Partner, the Partner transferring such Units shall cease to be a Partner of Premier LP immediately following such admission (which shall be effective on the effective date of the Transfer or such other date as may be specified). From and after such Transfer, such Partner shall not be entitled to any Distributions or any other rights associated with an Interest in Premier LP.

11.5    Noncomplying Transfers Void . Any Transfer in contravention of this **Article 11** shall be void and of no effect and shall not bind nor be recognized by Premier LP.

28

11.6     Amendment of Exhibit 3.1 .  In the event of the admission of any New Limited Partner or Transferee as a Partner of Premier LP, the General Partner shall promptly amend **Exhibit 3.1** to reflect such admission.

## 12.  **DISSOLUTION OF COMPANY**

12.1     Events of Dissolution .  Premier LP shall be dissolved upon the occurrence of any of (a) the entry of a decree of judicial dissolution under Section 15908.02 of the Act, (b) subject to **Section 6.6** , the written determination of Partners holding two-thirds of the Units or (c) the disposition of all of Premier LP's assets.

12.2     Liquidation .  Upon dissolution of Premier LP for any reason, Premier LP shall immediately commence to wind up its affairs.  A reasonable period of time shall be allowed for the orderly termination of Premier LP's business, discharge of Premier LP's liabilities and distribution or liquidation of Premier LP's remaining assets so as to enable Premier LP to minimize the normal losses attendant to such liquidation process.  Premier LP's property and assets or the proceeds from the liquidation thereof shall be distributed so as not to contravene the Act and shall be distributed to the holders of Class A Common Units and Class B Common Units in the aggregate in proportion to Common Units outstanding.  Distributions to the holders of Class B Common Units in the aggregate shall be made among such holders in proportion to Class B Common Units held except to the extent otherwise provided in **Section 5.2.1** .  A full accounting of the assets and liabilities of Premier LP shall be taken and a statement thereof shall be furnished to each Partner promptly after the Distribution of all of the assets of Premier LP.  Such accounting and statement shall be prepared under the direction of the General Partner.

12.3     No Action for Dissolution .  The Partners acknowledge that irreparable damage would be done to the goodwill and reputation of Premier LP if any Partner should bring an action in court to dissolve Premier LP under circumstances where dissolution is not required by **Section 12.1** .  This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Interests of all Partners.  Accordingly, except where the General Partner has failed to liquidate Premier LP as required by **Section 12.2** , each Partner hereby waives and renounces its right to initiate legal action to seek dissolution of Premier LP or to seek the appointment of a receiver or trustee to liquidate Premier LP.

12.4     No Further Claim .  Upon dissolution, each Partner shall have recourse solely to the assets of Premier LP for the return of such Partner's capital, and if Premier LP's property remaining after payment or discharge of the debts and liabilities of Premier LP (including debts and liabilities owed to one or more of the Partners), is insufficient to return the aggregate Capital Contributions of each Partner, such Partner shall have no recourse against Premier LP, the General Partner or any other Partner.

## 13.  **INDEMNIFICATION**

13.1     General .  To the fullest extent permitted by law, Premier LP shall indemnify, defend and hold harmless each Partner, including the Tax Matters Partner in such Partner's capacity as such, and each such Person's officers, directors, partners, members, shareholders and employees, and the employees and officers of Premier LP (all indemnified persons being referred

29

to as " **Indemnified Persons** " for purposes of this **Article 13** ), from any liability, loss or damage incurred by the Indemnified Person by reason of any act performed or omitted to be performed by the Indemnified Person on behalf of Premier LP (except for acts prohibited under **Section 6.3** ) or by reason of the fact that the Indemnified Person is or was serving at the request of Premier LP as an officer, director, partner, trustee, employee, representative or agent of another Person from liabilities or obligations of Premier LP imposed on such Indemnified Person by virtue of such Person's position with Premier LP and from any liability, loss or damage arising from any breach by Premier LP of any of the representations, warranties and covenants of Premier LP contained herein, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss or damage; provided , however , that if the liability, loss or damage arises out of any action or inaction of an Indemnified Person, indemnification under this **Section 13.1** shall be available only if (a) either (i) the Indemnified Person, at the time of such action or inaction, determined in good faith that its course of conduct was in, or not opposed to, the best interests of Premier LP or (ii) in the case of inaction by the Indemnified Person, the Indemnified Person did not intend its inaction to be harmful or opposed to the best interests of Premier LP and (b) such action or inaction did not constitute fraud or willful misconduct by the Indemnified Person; provided , further , that indemnification under this **Section 13.1** shall be recoverable only from the assets of Premier LP and not from any assets of the Partners.  Premier LP shall pay or reimburse reasonable attorneys' fees of an Indemnified Person as incurred, provided that such Indemnified Person executes an undertaking, with appropriate security if requested by the General Partner, to repay the amount so paid or reimbursed in the event of a final non-appealable determination by a court of competent jurisdiction that such Indemnified Person is not entitled to indemnification under this **Article 13** .

13.2     Exculpation .  No Indemnified Person shall be liable, in damages or otherwise, to Premier LP or to any Partner for any loss that arises out of any act performed or omitted to be performed by the Indemnified Person pursuant to the authority granted by this Agreement if (a) either (i) the Indemnified Person, at the time of such action or inaction, determined in good faith that such Indemnified Person's course of conduct was in, or not opposed to, the best interests of Premier LP or (ii) in the case of inaction by the Indemnified Person, the Indemnified Person did not intend such Indemnified Person's inaction to be harmful or opposed to the best interests of Premier LP and (b) the conduct of the Indemnified Person did not constitute fraud or willful misconduct by such Indemnified Person.

13.3     Persons Entitled to Indemnity .  Any Person who is an "Indemnified Person" at the time of any action or inaction in connection with the business of Premier LP shall be entitled to the benefits of this **Article 13** as an "Indemnified Person" with respect thereto, regardless of whether such Person continues to be an "Indemnified Person" at the time of such Indemnified Person's claim for indemnification or exculpation hereunder.

13.4     Indemnification Agreements .  In the event that Premier enters into an indemnification agreement (" **Indemnification Agreement** ") in the form attached hereto as **Exhibit 13.4** with any of the directors, officers, employees or agents of Premier or persons who serve, at the request of Premier, as the directors, officers, employees or agents of any Affiliate (as defined in the Indemnification Agreement), Premier LP shall reimburse Premier for all expense incurred by Premier under such agreements.

30

13.5    Duties of the General Partner . Without limiting applicability of any other provision of this Agreement, (including, without limitation, the other provisions of this **Article 13** , which shall control notwithstanding anything to the contrary in this **Section 13.5** ), the following provisions shall be applicable to the General Partner:

(a)    The General Partner shall have the benefit of the business judgment rule to the same extent as if the General Partner were a director of a California corporation; and

(b)    The General Partner shall have the same duties of care and loyalty as the General Partner would have if the General Partner was a director of a California corporation but in no event shall the General Partner be liable for any action or inaction for which exculpation is provided under **Section 13.2** .

13.6    Interested Transactions . To the fullest extent permitted by law, the General Partner shall not be deemed to have breached its duty of loyalty to Premier LP or the Limited Partners (and the General Partner shall not be liable to Premier LP or to the Limited Partners for breach of any duty of loyalty or analogous duty) with respect to any action or inaction in connection with or relating to any transaction that was approved in accordance with **Section 6.6** .

13.7    Fiduciary and Other Duties .

13.7.1    Limitation of Duties . An Indemnified Person acting under this Agreement shall not be liable to Premier LP or to any other Indemnified Person for such Indemnified Person's good-faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they limit the duties (including fiduciary duties) and liabilities of an Indemnified Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Indemnified Person.

13.7.2    Waiver of Corporate Opportunity Doctrine . Notwithstanding any other provision of this Agreement or otherwise applicable law, whenever in this Agreement an Indemnified Person is permitted or required to make a decision (a) in his, her or its discretion or under a grant of similar authority, the Indemnified Person shall be entitled to consider only such interests and factors as such Indemnified Person desires, including his, her or its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting Premier LP or any other Person, or (b) in his, her or its good faith or under another express standard, the Indemnified Person shall act under such express standard and shall not be subject to any other or different standards.

## 14.    **REPRESENTATIONS AND COVENANTS BY THE LIMITED PARTNERS**

Each Limited Partner hereby represents and warrants to, and agrees with, the General Partner, the other Limited Partners and Premier LP as follows:

14.1    Due Organization and Authority . Such Limited Partner is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation. Such Limited Partner has the necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder and the execution, delivery and

31

performance of this Agreement has been duly authorized by all necessary action.  This Agreement constitutes the legal, valid, and binding obligation of such Limited Partner.

14.2    Investment Intent .  Such Limited Partner is acquiring such Limited Partner's Units with the intent of holding such Units for investment for such Limited Partner's own account and without the intent or a view of participating directly or indirectly in any distribution of such Units within the meaning of the Securities Act or any applicable state securities laws.

14.3    Securities Regulation; Accredited Investor Status .  Such Limited Partner acknowledges and agrees that such Limited Partner's Interest is being issued in reliance on one or more exemptions from registration under the Securities Act and one or more exemptions contained in applicable state securities laws and that such Limited Partner's Interest cannot and will not be sold or transferred except in a transaction that is exempt under the Securities Act and applicable state securities laws or pursuant to an effective registration statement under the Securities Act and applicable state securities laws.  Such Limited Partner understands that the Units have not been registered under the Securities Act on the grounds that its acquisition of Units is exempt under Section 4(2) of such Act as not involving a public offering and represents and warrants that it is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act.  Such Limited Partner further understands that no securities administrator of any state or the Federal government has made any finding or determination relating to the fairness of acquiring such Limited Partner's Interest and that no securities administrator of any state or the Federal government has or will recommend or endorse any offering of the Units.  Such Limited Partner understands that such Limited Partner has no contractual right for the registration under the Securities Act of such Limited Partner's Interest for public sale and that, unless such Limited Partner's Interest is registered under the Securities Act or an exemption from such registration is available, such Limited Partner's Interests may be required to be held indefinitely.

14.4    Knowledge and Experience .  Such Limited Partner has such knowledge and experience in financial, tax and business matters as to enable such Limited Partner to evaluate the merits and risks of such Limited Partner's investment in Premier LP and to make an informed investment decision with respect thereto.

14.5    Economic Risk .  Such Limited Partner is aware that acquisition of such Limited Partner's Interest involves a high degree of risk which may result in the loss of the total amount of such Limited Partner's investment, and no assurances have been made regarding the economic or tax consequence which may result from owning such Limited Partner's Interest, nor has any assurance been made that existing laws may not be modified in the future in a manner which adversely affects such consequences.

14.6    Investment Company Status .  Such Limited Partner is not, and none of its Affiliates is, nor will Premier LP as a result of such Partner holding an Interest be, an "investment company" as defined in, or subject to regulation or registration under, the Investment Company Act of 1940.

14.7    Purchasing Information .  Such Limited Partner confirms that all documents, agreements, books and records pertaining to Premier LP, its Premier Program Purchases and the

32

allocation and distribution provisions of this Agreement have been made available to such Limited Partner.

14.8    Information .  Such Limited Partner has received all documents, books and records pertaining to an investment in Premier LP as has been requested by such Limited Partner.  Such Limited Partner has had a reasonable opportunity to ask questions of and receive answers concerning Premier LP, and all such questions have been answered to such Limited Partner's satisfaction.

14.9    Binding Agreement .  Such Limited Partner has all requisite power and authority to enter into and perform its obligations under this Agreement and this Agreement is and will remain such Limited Partner's valid and binding agreement, enforceable in accordance with its terms (subject, as to the enforcement of remedies, to any applicable bankruptcy, insolvency or other laws affecting the enforcement of creditors rights).

14.10    Tax Position .  Unless such Limited Partner provides prior written notice to Premier LP, such Limited Partner will not take a position on such Limited Partner's federal income tax return, in any claim for refund or in any administrative or legal proceeding that is inconsistent with this Agreement or with any information return filed by Premier LP.

14.11    Licenses and Permits .  Such Limited Partner will cooperate in providing such information, in signing such documents and in taking any other action as may reasonably be requested by Premier LP in connection with obtaining any foreign, federal, state or local license or permit needed to operate Premier LP's business or the business of any entity in which Premier LP invests.

## 15.  AMENDMENTS TO AGREEMENT

15.1    Amendments .  This Agreement may be modified or amended with the prior written consent of the General Partner, subject to **Section 6.6** .  Notwithstanding the foregoing, **Section 6.6** and this **Section 15.1** may not be amended without the approval of a majority in interest of the Units held by the Limited Partners, and other provisions of this Agreement may not be amended without the approval of a majority in interest of the Units held by the Limited Partners if the amendment (a) would reduce the Limited Partners' Interests or would reduce the allocation to the Limited Partners of Net Profit or Net Loss, or would reduce the Distributions of cash or property to Limited Partners from that which is provided or contemplated herein, unless such amendment treats all Limited Partners ratably based on their Interests and such amendment is being executed to reflect (i) any dilution in such Limited Partner's Interest resulting from the issuance of Units contemplated by **Article 3** or (ii) the acceptance of a new Limited Partner pursuant to **Article 11** or (b) would increase such Person's obligation to make Capital Contributions or obligation with respect to other liabilities.  All amendments to this Agreement will be sent to each Limited Partner promptly after the effectiveness thereof.

15.2    Corresponding Amendment of Certificate .  The General Partner shall cause to be prepared and filed any amendment to the Certificate of Limited Partnership that may be required to be filed under the Act as a consequence of any amendment to this Agreement.

33

15.3    Binding Effect .  Any modification or amendment to this Agreement pursuant to this **Article 15** shall be binding on all Partners.

## 16.  **GENERAL**

16.1    Successors; Governing Law; Etc.   This Agreement (a) shall be binding upon the executors, administrators, estates, heirs and legal successors of the Partners, (b) shall be governed by and construed in accordance with the laws of the State of California and (c) may be executed in more than one counterpart, all of which together shall constitute one agreement.  The waiver of any of the provisions, terms or conditions contained in this Agreement shall not be considered as a waiver of any of the other provisions, terms or conditions hereof.

16.2    Notices.   All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon personal delivery or receipt (which may be evidenced by a return receipt if sent by registered mail or by signature if delivered by courier or delivery service), addressed (a) if to any Limited Partner, at the most recent address for such Limited Partner maintained in Premier LP's records and (b) if to Premier LP or to the General Partner, at 13034 Ballantyne Corporate Place, Charlotte, North Carolina, 28277, Attention: Chief Executive Officer.

16.3    Power of Attorney .  Each Limited Partner hereby irrevocably appoints the General Partner as such Limited Partner's true and lawful representative and attorney-in-fact, each acting alone, in such Limited Partner's name, place and stead (a) to make, execute, sign and file all instruments, documents and certificates which, from time to time, may be required to set forth any amendment to this Agreement or which may be required by this Agreement (including, among others, the Exchange Agreement) or by the laws of the United States of America, the State of California or any other State in which Premier LP shall determine to do business or any political subdivision or agency thereof and (b) to execute, implement and continue the valid and subsisting existence of Premier LP or to qualify and continue Premier LP as a foreign limited partnership in all jurisdictions in which Premier LP may conduct business.  Such power of attorney is coupled with an interest and shall survive and continue in full force and effect notwithstanding the subsequent withdrawal from Premier LP of any Limited Partner for any reason and shall survive and shall not be affected by the disability, incapacity, bankruptcy or dissolution of any such Limited Partner.  No power of attorney granted in this Agreement shall revoke any previously granted power of attorney.

16.4    Execution of Documents .  From time to time after the date of this Agreement, upon the request of the General Partner, each Limited Partner shall perform, or cause to be performed, all such additional acts, and shall execute and deliver, or cause to be executed and delivered, all such additional instruments and documents, as may be required to effectuate the purposes of this Agreement.  Each Limited Partner, by the execution of this Agreement or by agreeing in writing to be bound by this Agreement, irrevocably constitutes and appoints the General Partner or any Person designated by the General Partner to act on such Limited Partner's behalf for purposes of this **Section 16.4** as such Limited Partner's true and lawful attorney-in-fact with full power and authority in such Limited Partner's name and stead to execute, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out this Agreement, including:

34

(a)   all certificates and other instruments (specifically including counterparts of this Agreement), and any amendment thereof, that the General Partner deems appropriate to qualify or to continue Premier LP as a limited partnership in any jurisdiction in which Premier LP may conduct business or in which such qualification or continuation is, in the opinion of the General Partner, necessary to protect the limited liability of the Limited Partners;

(b)   all amendments to this Agreement adopted in accordance with the terms hereof and all instruments that the General Partner deems appropriate to reflect a change or modification of Premier LP in accordance with the terms of this Agreement; and

(c)   all conveyances and other instruments that the General Partner deems appropriate to reflect the dissolution of Premier LP.

The appointment by the General Partner or any Person designated by the General Partner to act on its behalf for purposes of this **Section 16.4** as such Limited Partner's attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that each of the Limited Partners under this Agreement will be relying upon the power of the General Partner to act as contemplated by this Agreement in any filing and other action by him, her or it on behalf of Premier LP, and shall survive the bankruptcy, dissolution, death, adjudication of incompetence or insanity of any Limited Partner giving such power and the transfer or assignment of all or any part of such Limited Partner's Interests, provided , however , that in the event of a Transfer by a Limited Partner of all of its Interest, the power of attorney given by the transferor shall survive such assignment only until such time as the Transferee shall have been admitted to Premier LP as a Substituted Limited Partner and all required documents and instruments shall have been duly executed, filed and recorded to effect such substitution.

16.5    Consent to Jurisdiction .  Each of the parties hereto agrees that all actions, suits or proceedings arising out of or based upon this Agreement or the subject matter hereof shall be brought and maintained exclusively in the federal courts located in the State of North Carolina, County of Mecklenburg.  Each of the parties hereto hereby by execution hereof (i) hereby irrevocably submits to the jurisdiction of the federal courts located in the State of North Carolina, County of Mecklenburg for the purpose of any action, suit or proceeding arising out of or based upon this Agreement or the subject matter hereof and (ii) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such action, suit or proceeding, any claim that such party is not subject personally to the jurisdiction of the above-named court, that such party is immune from extraterritorial injunctive relief or other injunctive relief, that such party's property is exempt or immune from attachment or execution, that any such action, suit or proceeding may not be brought or maintained in one of the above-named courts should be dismissed on the grounds of forum non conveniens, should be transferred to any court other than one of the above-named courts, should be stayed by virtue of the pendency of any other action, suit or proceeding in any court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by any of the above-named court.  Each of the parties hereto hereby consents to service of process in any such suit, action or proceeding in any manner

35

permitted by the laws of the State of North Carolina, agrees that service of process by registered or certified mail, return receipt requested, at the address specified in or pursuant to **Section 16.2** hereof is reasonably calculated to give actual notice and waives and agrees not to assert by way of motion, as a defense or otherwise, in any such action, suit or proceeding any claim that service of process made in accordance with **Section 16.2** hereof does not constitute good and sufficient service of process.  The provisions of this **Section 16.5** shall not restrict the ability of any party hereto to enforce in any court any judgment obtained in the federal courts located in the State of North Carolina, County of Mecklenburg.

16.6    <u>WAIVER OF JURY TRIAL</u> .  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, PREMIER LP AND EACH PARTNER HEREBY WAIVES AND COVENANTS THAT EACH OF IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.

16.7    <u>Arbitration</u> .  Any controversy or dispute with respect to the matters set forth herein shall be submitted to arbitration in the State of North Carolina, County of Mecklenburg before the American Arbitration Association under the commercial arbitration rules of said Association.  Any award or decision obtained from any such arbitration proceeding shall be final and binding on the parties, and judgment upon any award thus obtained may be entered in any court having jurisdiction thereof.  To the fullest extent permitted by law, no action at law or in equity based upon any claim arising directly out of this Agreement shall be instituted in any court by any Limited Partner except (a) an action to compel arbitration pursuant to this **Section 16.7** or (b) an action to enforce an award obtained in an arbitration proceeding in accordance with this **Section 16.7** .

16.8    <u>Severability</u> .  If any provision of this Agreement is determined by a court to be invalid or unenforceable, such determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein.  Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

16.9    <u>Table of Contents, Headings</u> .  The table of contents and headings used in this Agreement are used for administrative convenience only and do not constitute substantive matter to be considered in construing this Agreement.

36

16.10    <u>No Third-Party Rights</u> .  Except for the provisions of **Section 7.4** , the provisions of this Agreement are for the benefit of Premier LP, the General Partner and the Limited Partners and no other Person (including creditors of Premier LP), shall have any right or claim against Premier LP, the General Partner or any Limited Partner by reason of this Agreement or any provision hereof or be entitled to enforce any provision of this Agreement; <u>provided</u> , that, any beneficial owner of Units, whether such Units are held through a depository trust, custodial arrangement or otherwise, shall have direct rights of action under the terms of this Agreement.

[REMAINDER OF THIS PAGE BLANK]

37

IN WITNESS WHEREOF, the parties hereto have executed this Limited Partnership Agreement as of the date set forth above.

**GENERAL PARTNER**

**PREMIER SERVICES, LLC**

By:   /s/Craig McKasson
      Name: Craig McKasson
      Title: Chief Financial Officer

**LIMITED PARTNERS**

**EACH OF THE LIMITED PARTNERS LISTED ON
EXHIBIT 3.1 ATTACHED HERETO**

By:  Premier Plans, LLC, as attorney-in-fact pursuant to the Special
Power of Attorney executed by each of the Limited Partners

By:   /s/Craig McKasson
      Name: Craig McKasson
      Title: Chief Financial Officer

38

## EXHIBIT 3.7

## FORM OF JOINDER

Reference is made to the Premier Healthcare Alliance, L.P. Amended and Restated Limited Partnership Agreement among the Partners party thereto, as the same may be amended from time to time, a copy of which is attached hereto (the " **LP Agreement** ").  Capitalized terms used but not defined herein shall be used herein as defined in the LP Agreement.

The undersigned, in order to become the owner of _____ Class B Common Units (the " **Acquired Units** ") of Premier Healthcare Alliance, L.P., a California limited partnership (" **Premier LP** "), hereby agrees that by the undersigned's execution hereof:  (a) the undersigned is a Limited Partner party to the LP Agreement subject to all of the restrictions, conditions and obligations applicable to owners of Class B Common Units set forth in the LP Agreement; and (b) all of the Acquired Units (and any and all Class B Common Units of Premier LP issued in respect thereof) are and will remain subject to all of the rights, restrictions, conditions and obligations applicable to such Class B Common Units as set forth in the LP Agreement.  This Joinder shall take effect and shall become a part the LP Agreement immediately upon execution hereof.

Executed as of the date set forth below under the laws of the State of California.

[                                    ]

By: _____
      Name:
      Title:

Address:

Date:

Accepted:

Premier Healthcare Alliance, L.P.

By:    Premier Services, LLC, its general partner

By: _____
      Name:
      Title:

Date:

1

## EXHIBIT 5

## ALLOCATION AND DISTRIBUTION METHODOLOGY

Capitalized terms have the meanings assigned to them in the LP Agreement unless otherwise defined in this **Exhibit 5** .

**Definitions for Exhibit 5**

" **After-Tax Net Profit** " means Net Profit multiplied by the percentage by which the percentage used in determining the Tax Distribution for such Fiscal Quarter is less than 100%.

" **Business Unit** " means a line of business conducted by Premier LP or its subsidiaries for which separate revenue is calculated in the normal course of Premier LP's business.

" **Business Unit Owner Participation** " for a Limited Partner with respect to a Business Unit in a Period means the Gross Revenue attributable to transactions engaged in by the Limited Partner and its Member Facilities with the Business Unit during the Period, in each case multiplied by the Relative Revenue Factor for the Business Unit.

" **Fiscal Quarter** " means each successive three-month period of the Fiscal Year.

" **Gross Revenue** " for a Period with respect to a Business Unit means the gross revenue of the Business Unit for the Period, determined according to standard accounting practices in Premier LP's industry and consistent with the past accounting principles and practices followed by Premier LP. Payment obligations to Premier Members pursuant to contractual sharing provisions shall not be taken into account in determining Gross Revenue.

" **Non-GPO Owner Participation** " for a Limited Partner for a Period means the sum of such Limited Partner's Business Unit Owner Participation amounts for the Period for all Business Units other than the Premier LP Business Unit.

" **Period** " means the Fiscal Quarter for which the allocation or distribution is attributable, except as otherwise provided herein or determined by the General Partner.

" **Premier LP Business Unit** " means the Business Unit comprised of Premier LP's direct business operations.

" **Premier LP Owner Participation** " for a Limited Partner for a Period means such Limited Partner's Business Unit Owner Participation amount for the Period for the Premier LP Business Unit.

" **Relative Participation** " for a Limited Partner for a Period means:  (a) in the case of Premier LP, the percentage derived by dividing such Limited Partner's Premier LP Owner Participation for the Period by the Total Premier LP Owner Participation for the Period; and (b) in the case of all other Business Units, the percentage derived by dividing such Limited Partner's Non-GPO Owner Participation for the Period by the Total Non-GPO Owner Participation for the Period.

2

" **Relative Revenue Factor** " of a Business Unit for a Period means 1.0 in the case of Premier LP and, in the case of each other Business Unit, the number determined by the General Partner to take into account the revenue of such Business Unit, the relationship of such Business Unit with other Business Units, and such other facts and circumstances as are determined appropriate by the General Partner.

" **Total Non-GPO Owner Participation** " for a Period means the sum of the Non-GPO Owner Participation amounts for all Limited Partners for the Period.

" **Total Premier LP Owner Participation** " for a Period means the sum of the Premier LP Owner Participation amounts for all Limited Partners for the Period.

**Determination of Relative Revenue Factors**

The Relative Revenue Factors assigned to each such Business Unit shall be as set forth in a separate notice provided by the General Partner to the Limited Partners concurrently with the execution of the Agreement. On or before the beginning of each Fiscal Year, the General Partner shall notify the Limited Partners of the Relative Revenue Factors that will be used in determining Non-GPO Owner Participation and Premier LP Owner Participation during such Fiscal Year.

**Allocation of Net Profit and Net Loss**

Net Profit and Net Loss allocated to the holders of Class B Common Units in the aggregate under **Section 5.6.1** in any Period shall be allocated among such holders in two tranches (referred to in this Exhibit as " **Tranche A** " and " **Tranche B** "). Tranche A will consist of: (a) the amount of total Net Profit (if any) allocated to the holders of Class B Common Units in the aggregate for the Period (other than Net Profit attributable to dispositions not in the ordinary course of business) *multiplied by* the tax rate used in determining the Tax Distribution for the Period under **Section 5.2.1** *plus* (b) an amount of the total Net Profit (other than Net Profit attributable to dispositions not in the ordinary course of business) equal to the distribution made to the holders of Class B Common Units in the aggregate under **Section 5.2.2** for the Period that are designated by the General Partner in its sole discretion as Tranche A distributions. Tranche A will be tentatively allocated among such holders such that (x) the portion of Tranche A derived from the Premier LP Business Unit is allocated to each holder in proportion to such holder's Relative Participation percentage for the Premier LP Business Unit and (y) the portion of Tranche A derived from all other Business Units is allocated to each holder in proportion to such holder's Relative Participation percentage for such other Business Units, and in each case shall be computed as if no Class B Common Units had been exchanged by any holder of Class B Common Units under **Section 3.4** since the Effective Date (the aggregate of each such allocation under clauses (x) and (y), with respect to a holder of Class B Common Units, a " **Tentative Tranche A Allocation** "). The Tentative Tranche A Allocation to each holder of Class B Common Units would then be increased or decreased, as applicable, by an amount equal to Tranche A *divided by* the total number of Post-IPO Class B Common Units, *multiplied by* the net cumulative number of Class B Common Units acquired or disposed of by such holder after the Effective Date (each such adjusted Tentative Tranche A Allocation, an " **Adjusted Tranche A Allocation** "). Tranche B will consist of all of the remaining Net Profit or Net Loss allocated to

3

the holders of Class B Common Units in the aggregate under **Section 5.6.1** in the Period and any portion of the distributions made to the holders of Class B Common Units in the aggregate under **Section 5.2.2** for such Period that are designated by the General Partner, in its sole discretion, as Tranche B distributions, and will be allocated among such holders in proportion to Common Units held (subject to any offset as described in the paragraph immediately below).

In the event that any holder of Class B Common Units has a reduction in its Tentative Tranche A Allocation for any Period that exceeds the amount of such holder's Tentative Tranche A Allocation for such Period (such excess, an "**Excess Downward Adjustment**"), then (w) such holder's Adjusted Tranche A Allocation shall be equal to zero, (x) Premier LP shall provide additional cash as necessary to pay all Adjusted Tranche A Allocations for such Period in full, (y) such holder's Tranche B allocation shall be reduced by the amount of the Excess Downward Adjustment and (z) such holder shall make a capital contribution to Premier LP of an amount equal to such Excess Downward Adjustment, and such holder hereby authorizes the General Partner to offset such required capital contribution against sharebacks of administrative fees otherwise due to such holder under Section 4.1 of the GPO Participation Agreement until paid in full.

**Distributions**

One hundred percent of each Limited Partner's Adjusted Tranche A Allocation for each Period shall be paid in cash to such Limited Partner. While it is generally anticipated that none of the Tranche B allocation for each Period will be distributed to the Limited Partners, if the General Partner, in its sole discretion, designates a portion of any distributions made to the holders of Class B Common Units in the aggregate under **Section 5.2.2** for such Period as Tranche B distributions, then such Tranche B distributions will be paid in cash to each Limited Partner in proportion to Common Units held (subject to any offset as described in the paragraph immediately above).

A distribution shall be deemed attributable to the most recently ended Fiscal Quarter to the extent of the After-Tax Net Profit allocated to the holders of Class B Common Units in the aggregate during such Fiscal Quarter, multiplied by the percentage by which the percentage used in determining the Tax Distribution for such Fiscal Quarter is less than 100%. If the distribution exceeds the amount set forth in the preceding sentence, the distribution shall be deemed to be attributable to the After-Tax Net Profit allocated to the holders of the Class B Common Units for the next preceding Fiscal Quarter, and to preceding Fiscal Quarter until the entire distribution is attributed.

**Conclusive Determination By the General Partner**

The General Partner shall make the determinations required by this **Exhibit 5** in its sole judgment, and all such determinations by the General Partner shall be conclusive and binding on the Limited Partners.

4

**EXHIBIT 13.4**

**FORM OF INDEMNIFICATION AGREEMENT**

This Indemnification Agreement (this "Agreement"), dated as of September  **[ ● ]** , 2013, is made by and between Premier, Inc., a Delaware corporation (the " Company "), and **[ ● ]** (the " Indemnitee ").

<u>RECITALS</u>

WHEREAS, the Company and the Indemnitee recognize the substantial increase in corporate litigation in general, subjecting directors, officers, employees and other agents to expensive litigation risks at the same time that the availability and coverage of liability insurance is limited;

WHEREAS, the Company desires to attract and retain talented and experienced individuals, such as the Indemnitee, to serve as directors, officers, employees and agents of the Company and its subsidiaries and wishes to indemnify its directors, officers, employees and other agents to the maximum extent permitted by law;

WHEREAS, Section 145 ("Section 145") of the General Corporation Law of the State of Delaware, the state in which the Company is organized, expressly provides that the indemnification provided by Section 145 is not exclusive and authorizes the Company to indemnify by agreement its directors, officers, employees, agents and persons who serve, at the request of the Company, as the directors, officers, employees or agents of other corporations or enterprises; and

WHEREAS, in order to induce the Indemnitee to serve or continue to serve as a director, officer, employee or agent of the Company and/or one or more subsidiaries of the Company, free from undue concern for claims for damages arising out of or related to such services to the Company and/or one or more subsidiaries of the Company, the Company has determined and agreed to enter into this Agreement with the Indemnitee.

<u>AGREEMENT</u>

NOW, THEREFORE, the Indemnitee and the Company hereby agree as follows:

1.      <u>Definitions</u> .    As used in this Agreement:

(a) " <u>Agent</u> " means any person who is or was a director, officer, employee or other agent of the Company or a subsidiary of the Company; or is or was serving at the request of, for the convenience of, or to represent the interests of the Company or a subsidiary of the Company as a director, officer, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust or other enterprise; or was a director, officer, employee or agent of a foreign or domestic corporation which was a predecessor corporation of the Company or a subsidiary of the Company, or was a

5

director, officer, employee or agent of another enterprise at the request of, for the convenience of, or to represent the interests of such predecessor corporation.

(b) " Board " means the Board of Directors of the Company.

(c) A " Change in Control " shall be deemed to have occurred if (i) any "person," as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), other than a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a corporation owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of stock of the Company, is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing 20% or more of the total voting power represented by the Company's then outstanding voting securities, (ii) during any period of two consecutive years, individuals who at the beginning of such period constituted the Board, together with any new directors whose election by the Board or nomination for election by the Company's stockholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination was previously so approved, cease for any reason to constitute a majority of the Board, (iii) the stockholders of the Company approve a merger or consolidation or a sale of all or substantially all of the Company's assets with or to another entity, other than a merger, consolidation or asset sale that would result in the holders of the Company's outstanding voting securities immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least a majority of the total voting power represented by the voting securities of the Company or such surviving or successor entity outstanding immediately thereafter, or (iv) the stockholders of the Company approve a plan of complete liquidation of the Company.

(d) " Expenses " shall include all out-of-pocket costs of any type or nature whatsoever (including, without limitation, all attorneys' fees and related disbursements), actually and reasonably incurred by the Indemnitee in connection with either the investigation, defense or appeal of a Proceeding or establishing or enforcing a right to indemnification under this Agreement, or Section 145 or otherwise; provided, however, that "Expenses" shall not include any judgments, fines, ERISA excise taxes or penalties, or amounts paid in settlement of a Proceeding.

(e) " Independent Counsel " means a law firm, or a partner (or, if applicable, member) of such a law firm, that is experienced in matters of corporation law and neither currently is, nor within the past five years has been, retained to represent: (i) the Company or the Indemnitee in any matter material to either such party or (ii) any other party to or witness in the proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or the Indemnitee in an action to determine the Indemnitee's rights under this Agreement.

6

(f) " <u>Proceeding</u> " means any threatened, pending or completed action, suit or other proceeding, whether civil, criminal, administrative, or investigative.

(g) " <u>Subsidiary</u> " means (i) any corporation of which more than 50% of the outstanding voting securities is owned directly or indirectly by the Company, by the Company and one or more other subsidiaries, or by one or more other subsidiaries and (ii) any limited liability company, partnership, or other entity of which the Company directly or indirectly has the power to direct or cause the direction of its management and policies, whether through ownership of voting securities; such entity's operating, partnership, or similar agreement; or otherwise.

2.    <u>Agreement to Serve</u> .  The Indemnitee agrees to serve and/or continue to serve as an Agent so long as the Indemnitee is or was duly appointed or elected and qualified in accordance with the applicable provisions of the Bylaws of the Company or any predecessor to or subsidiary of the Company, until such time as the Indemnitee tenders his or her resignation in writing; provided, however, that nothing contained in this Agreement is intended to create any right to continued employment by the Indemnitee.

3.    <u>Liability Insurance</u> .

(a)  <u>Maintenance of D&O Insurance</u> .  The Company hereby covenants and agrees that, so long as the Indemnitee shall continue to serve as an Agent and thereafter so long as the Indemnitee shall be subject to any possible Proceeding by reason of the fact that the Indemnitee was an Agent, the Company, subject to Section 3(c) of this Agreement, shall promptly obtain and maintain in full force and effect directors' and officers' liability insurance (" <u>D&O Insurance</u> ") in reasonable amounts from established and reputable insurers, as more fully described below.

(b)  <u>Rights and Benefits</u> .  In all policies of D&O Insurance, the Indemnitee shall qualify as an insured in such a manner as to provide the Indemnitee the same rights and benefits as are accorded to the most favorably insured (1) of the Company's independent directors (as defined by the insurer) if the Indemnitee is such an independent director; (2) of the Company's non-independent directors if the Indemnitee is not an independent director; (3) of the Company's officers if the Indemnitee is an officer of the Company; or (4) of the Company's key employees if the Indemnitee is a key employee and is not a director or officer.

(c)  <u>Limitation on Required Maintenance of D&O Insurance</u> .  Notwithstanding the foregoing, the Company shall have no obligation to obtain or maintain D&O Insurance if the Company determines in good faith that: such insurance is not reasonably available, the premium costs for such insurance are disproportionate to the amount of coverage provided, the coverage provided by such insurance is limited by exclusions so as to provide an insufficient benefit, the Indemnitee is covered by similar insurance maintained by a subsidiary of the Company, the Company is to be acquired and a tail policy of reasonable duration and terms is purchased for pre-closing

7

acts or omissions by the Indemnitee, or the Company is to be acquired and D&O Insurance will be maintained by the acquirer that covers pre-closing acts and omissions by the Indemnitee.

4.      Mandatory Indemnification . Subject to the terms of this Agreement:

(a)  Third Party Actions . If the Indemnitee is a person who was or is a party or is threatened to be made a party to any Proceeding (other than an action by or in the right of the Company) by reason of the fact that the Indemnitee is or was an Agent, or by reason of anything done or not done by the Indemnitee in any such capacity, the Company shall indemnify the Indemnitee against all Expenses and liabilities of any type whatsoever (including, but not limited to, judgments, fines, ERISA excise taxes and penalties, and amounts paid in settlement) actually and reasonably incurred by the Indemnitee in connection with the investigation, defense, settlement or appeal of such Proceeding, provided that the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or Proceeding, had no reasonable cause to believe his or her conduct was unlawful.

(b)  Derivative Actions . If the Indemnitee is a person who was or is a party or is threatened to be made a party to any Proceeding by or in right of the Company by reason of the fact that the Indemnitee is or was an Agent, or by reason of anything done or not done by the Indemnitee in any such capacity, the Company shall indemnify the Indemnitee against all Expenses actually and reasonably incurred by the Indemnitee in connection with the investigation, defense, settlement or appeal of such Proceeding, provided that the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company; except that no indemnification under this Section 4(b) shall be made in respect to any claim, issue or matter as to which the Indemnitee shall have been finally adjudged to be liable to the Company by a court of competent jurisdiction unless and only to the extent that the Delaware Court of Chancery or the court in which such Proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, the Indemnitee is fairly and reasonably entitled to indemnity for such amounts which the Delaware Court of Chancery or such other court shall deem proper.

(c)  Actions where Indemnitee is Deceased . If the Indemnitee is a person who was or is a party or is threatened to be made a party to any Proceeding by reason of the fact that the Indemnitee is or was an Agent, or by reason of anything done or not done by the Indemnitee in any such capacity, and if, prior to, during the pendency of or after completion of such Proceeding the Indemnitee is deceased, the Company shall indemnify the Indemnitee's heirs, executors and administrators against all Expenses and liabilities of any type whatsoever to the extent the Indemnitee would have been entitled to indemnification pursuant to this Agreement were the Indemnitee still alive.

(d)  Certain Terminations . The termination of any Proceeding or of any

8

claim, issue, or matter therein by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself create a presumption that the Indemnitee did not act in good faith and in a manner which the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or Proceeding, that the Indemnitee had reasonable cause to believe that the Indemnitee's conduct was unlawful.

(e)    Limitations . Notwithstanding the foregoing, the Company shall not be obligated to indemnify the Indemnitee for Expenses or liabilities of any type whatsoever for which payment is actually made to or on behalf of the Indemnitee under an insurance policy, or under a valid and enforceable indemnity clause, bylaw or agreement.

5.    Mandatory Indemnification for Expenses in a Proceeding in Which the Indemnitee Is Wholly or Partly Successful .

(a)    Successful Defense . Notwithstanding any other provisions of this Agreement, if the Indemnitee has been successful, on the merits or otherwise, in defense of any Proceeding (including, without limitation, an action by or in the right of the Company) to which the Indemnitee was a party by reason of the fact that the Indemnitee is or was an Agent at any time, the Company shall indemnify the Indemnitee against all Expenses actually and reasonably incurred by or on behalf of the Indemnitee in connection with the investigation, defense or appeal of such Proceeding.

(b)    Partially Successful Defense . Notwithstanding any other provisions of this Agreement, if the Indemnitee is a party to or a participant in any Proceeding (including, without limitation, an action by or in right of the Company) in which the Indemnitee was a party by reason of the fact that the Indemnitee is or was an Agent at any time and is successful, on the merits or otherwise, as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify the Indemnitee against all Expenses actually and reasonably incurred by or on behalf of the Indemnitee in connection with each successfully resolved claim, issue or matter.

(c)    Dismissal . For purposes of this section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

6.    Mandatory Advancement of Expenses . Subject to the terms of this Agreement and following notice pursuant to Section 7 (a) below, the Company shall advance all Expenses reasonably incurred by the Indemnitee in connection with the investigation, defense, settlement or appeal of any Proceeding to which the Indemnitee is a party or is threatened to be made a party by reason of the fact that the Indemnitee is or was an Agent (unless there has been a final determination that the Indemnitee is not entitled to indemnification for such Expenses) upon receipt of (i) an undertaking by

9

or on behalf of the Indemnitee to repay the amount advanced in the event that it shall ultimately be determined that the Indemnitee is not entitled to indemnification by the Company and (ii) satisfactory documentation supporting such Expenses. Such advances are intended to be an obligation of the Company to the Indemnitee hereunder and shall in no event be deemed to be a personal loan. The advances to be made hereunder shall be paid by the Company to the Indemnitee within twenty (20) business days following delivery of a written request therefor by the Indemnitee to the Company. In the event that the Company fails to pay Expenses incurred by the Indemnitee as required by this Section 6, the Indemnitee may seek mandatory injunctive relief from any court having jurisdiction to require the Company to pay Expenses as set forth in this Section 6. If the Indemnitee seeks mandatory injunctive relief pursuant to this Section 6, it shall not be a defense to enforcement of the Company's obligations set forth in this Section 6 that the Indemnitee has an adequate remedy at law for damages.

       7.      <u>Notice and Other Indemnification Procedures</u>.

       (a)   <u>Notice by Indemnitee</u>. Promptly after receipt by the Indemnitee of notice of the commencement of or the threat of commencement of any Proceeding, the Indemnitee shall, if the Indemnitee believes that indemnification with respect thereto may be sought from the Company under this Agreement, notify the Company in writing of the commencement or threat of commencement thereof; provided, however, that the failure of the Indemnitee to provide such notice will not relieve the Company of its liability hereunder if the Company receives notice of such Proceeding from any other source.

       (b)   <u>Insurance</u>. If the Company receives notice pursuant to Section 7(a) hereof of the commencement of a Proceeding that may be covered under D&O Insurance then in effect, the Company shall give prompt notice of the commencement of such Proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of such proceeding in accordance with the terms of such policies.

       (c)   <u>Defense</u>. In the event the Company shall be obligated to pay the Expenses of any Proceeding against the Indemnitee, the Company shall be entitled to assume the defense of such Proceeding, with counsel selected by the Company and approved by the Indemnitee (which approval shall not be unreasonably withheld), upon the delivery to the Indemnitee of written notice of its election so to do. After delivery of such notice, and the retention of such counsel by the Company, the Company will not be liable to the Indemnitee under this Agreement for any fees of counsel subsequently incurred by the Indemnitee with respect to the same Proceeding, provided that (i) the Indemnitee shall have the right to employ his or her own counsel in any such Proceeding at the Indemnitee's expense; and (ii) the Indemnitee shall have the right to employ his or her own counsel in any such Proceeding at the Company's expense if (A) the Company has authorized the employment of counsel by the Indemnitee at the expense of the Company, (B) the Indemnitee shall have reasonably concluded that

10

there may be a conflict of interest between the Company and the Indemnitee in the conduct of any such defense, (C) after a Change in Control not approved by a majority of the members of the Board who were directors immediately prior to such Change in Control, the employment of counsel by Indemnitee has been approved by Independent Counsel, or (D) the Company shall not, in fact, have employed counsel to assume the defense of such Proceeding.

        8.         <u>Right to Indemnification</u> .

        (a)   <u>Right to Indemnification</u> . In the event that Section 5(a) of this Agreement is inapplicable, the Company shall indemnify the Indemnitee pursuant to this Agreement unless, and except to the extent that, it shall have been determined by one of the methods listed in Section 8(b) that the Indemnitee has not met the applicable standard of conduct required to entitle the Indemnitee to such indemnification.

        (b)   <u>Determination of Right to Indemnification</u> . A determination of the Indemnitee's right to indemnification hereunder shall be made at the election of the Board by (i) a majority vote of directors who are not parties to the Proceeding for which indemnification is being sought, even though less than a quorum, (ii) by a committee consisting of directors who are not parties to the Proceeding for which indemnification is being sought, who, even though less than a quorum, have been designated by a majority vote of the disinterested directors, (iii) if there are no such disinterested directors or if the disinterested directors so direct, by an Independent Counsel in a written opinion to the Board, a copy of which shall be delivered to the Indemnitee, or (iv) by the stockholders of the Company; *provided, however* , that, following any Change in Control not approved by a majority of the members of the Board who were directors immediately prior to such Change in Control, such determination shall be made by an Independent Counsel as specified in clause (iii) above.

        (c)   <u>Submission for Decision</u> . As soon as practicable, and in no event later than 30 business days after the Indemnitee's written request for indemnification, the Board shall select the method for determining the Indemnitee's right to indemnification. The Indemnitee shall cooperate with the person or persons or entity making such determination with respect to the Indemnitee's right to indemnification, including providing to such person, persons or entity upon reasonable advance request any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to the Indemnitee and reasonably necessary to such determination. Any Independent Counsel, member of the Board or stockholder of the Company shall act reasonably and in good faith in making a determination regarding the Indemnitee's entitlement to indemnification under this Agreement.

        (d)   <u>Application to Court</u> . If (i) the claim for indemnification or advancement of Expenses is denied, in whole or in part, (ii) no disposition of such claim is made by the Company within ninety (90) business days after the request therefor, (iii) the advancement of Expenses is not timely made pursuant to Section 6 of this Agreement

11

or (iv) payment of indemnification is not made pursuant to Section 5 of this Agreement, the Indemnitee shall have the right to apply to the Delaware Court of Chancery, the court in which the Proceeding is or was pending or any other court of competent jurisdiction, for the purpose of enforcing the Indemnitee's right to indemnification (including the advancement of Expenses) pursuant to this Agreement.

(e)  Expenses Related to the Enforcement or Interpretation of this Agreement . The Company shall indemnify the Indemnitee against all reasonable Expenses incurred by the Indemnitee in connection with any hearing or proceeding under this Section 8 involving the Indemnitee and against all reasonable Expenses incurred by the Indemnitee in connection with any other proceeding between the Company and the Indemnitee involving the interpretation or enforcement of the rights of the Indemnitee under this Agreement, unless a court of competent jurisdiction finds that each of the claims and/or defenses of the Indemnitee in any such proceeding was frivolous or made in bad faith.

9.      Exceptions . Any other provision herein to the contrary notwithstanding, the Company shall not be obligated:

(a)  Claims Initiated by Indemnitee . To indemnify or advance Expenses to the Indemnitee with respect to Proceedings or claims initiated or brought voluntarily by the Indemnitee and not by way of defense, with a reasonable allocation where appropriate, unless (i) such indemnification is expressly required to be made by law, (ii) the Proceeding was authorized by the Board, (iii) such indemnification is provided by the Company, in its sole discretion, pursuant to the powers vested in the Company under the General Corporation Law of Delaware or (iv) the Proceeding is brought to establish or enforce a right to indemnification under this Agreement or any other statute or law or otherwise as required under Section 145 of the General Corporation Law of Delaware in advance of a final determination;

(b)  Lack of Good Faith . To indemnify the Indemnitee for any Expenses incurred by the Indemnitee with respect to any Proceeding instituted by the Indemnitee to enforce or interpret this Agreement, if a court of competent jurisdiction determines that each of the material assertions made by the Indemnitee in such Proceeding was not made in good faith or was frivolous;

(c)  Unauthorized Settlements . To indemnify the Indemnitee under this Agreement for any amounts paid in settlement of a Proceeding or claim unless the Company consents to such settlement, which consent shall not be unreasonably withheld;

(d)  Claims Under Section 16(b) . To indemnify the Indemnitee for Expenses and the payment of profits made from the purchase and sale (or sale and purchase) by the Indemnitee of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of state statutory law or common law;

12

(e) <u>Payments Contrary to Law</u> . To indemnify or advance Expenses to the Indemnitee for which payment is prohibited by applicable law; or

(f) <u>Claims under the 1933 Act</u> .  To indemnify Indemnitee or otherwise act in violation of any undertaking appearing in and required by the rules and regulations promulgated under the Securities Act of 1933, as amended (the "Act"), or in any registration statement filed with the SEC under the Act. Indemnitee acknowledges that paragraph (h) of Item 512 of Regulation S-K currently generally requires the Company to undertake in connection with any registration statement filed under the Act to submit the issue of the enforceability of Indemnitee's rights under this Agreement in connection with any liability under the Act on public policy grounds to a court of appropriate jurisdiction and to be governed by any final adjudication of such issue. Indemnitee specifically agrees that any such undertaking shall supersede the provisions of this Agreement and to be bound by any such undertaking

10.       <u>Non-Exclusivity</u> . The provisions for indemnification and advancement of Expenses set forth in this Agreement shall not be deemed exclusive of any other rights that the Indemnitee may have under any provision of law, the Company's Certificate of Incorporation or Bylaws, the vote of the Company's stockholders or disinterested directors, other agreements, or otherwise, both as to action in the Indemnitee's official capacity and as to action in another capacity while occupying the Indemnitee's position as an Agent.

11.       <u>Permitted Defenses</u> . It shall be a defense to any action for which a claim for indemnification is made under this Agreement (other than an action brought to enforce a claim for Expenses pursuant to Section 6 hereof, provided that the required undertaking has been tendered to the Company) that the Indemnitee is not entitled to indemnification because of the limitations set forth in Sections 4(e) and 9 hereof. Neither the failure of the Company (including its Board) or an Independent Counsel to have made a determination prior to the commencement of such enforcement action that indemnification of the Indemnitee is proper in the circumstances, nor an actual determination by the Company (including its Board) or an Independent Counsel that such indemnification is improper, shall be a defense to the action or create a presumption that the Indemnitee is not entitled to indemnification under this Agreement or otherwise.

12.       <u>Subrogation</u> . In the event the Company is obligated to make a payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery under an insurance policy or any other indemnity agreement covering the Indemnitee, who shall execute all documents required and take all action that may be necessary to secure such rights and to enable the Company effectively to bring suit to enforce such rights (provided that the Company pays the Indemnitee's costs and expenses of doing so), including without limitation by assigning all such rights to the extent of such indemnification or advancement of Expenses.

13

13.   Survival of Rights .

(a)   Survival . All agreements and obligations of the Company contained herein shall continue during the period Indemnitee is an Agent and shall continue thereafter so long as Indemnitee shall be subject to any possible claim or threatened, pending or completed Proceeding by reason of the fact that Indemnitee was serving in the capacity referred to herein. The Indemnitee's rights hereunder shall continue after the Indemnitee has ceased acting as an Agent and shall inure to the benefit of the heirs, executors and administrators of the Indemnitee.

(b)   Successor to the Company . The Company shall require any successor to the Company (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business or assets of the Company, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

14.   Interpretation of Agreement . It is understood that the parties hereto intend this Agreement to be interpreted and enforced so as to provide indemnification to the Indemnitee to the fullest extent permitted by law, including those circumstances in which indemnification would otherwise be discretionary.

15.   Severability . If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever, (i) the validity, legality and enforceability of the remaining provisions of the Agreement (including, without limitation, all portions of any paragraphs of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that are not themselves invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby, and (ii) to the fullest extent possible, the provisions of this Agreement (including, without limitation, all portions of any paragraph of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that are not themselves invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable and to give effect to Section 14 hereof.

16.   Modification and Waiver . No supplement, modification or amendment of this Agreement shall be binding unless it is in a writing signed by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be deemed to be or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall any such waiver constitute a continuing waiver.

17.   Notice . All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) upon delivery if delivered by hand to the party to whom such notice or other communication shall have been directed, (b) if mailed by certified or registered mail with postage prepaid, return receipt requested, on the third business day after the date on which it is so mailed, (c) one business day after the business day of deposit with a nationally recognized overnight delivery service, specifying next day delivery, with

14

written verification of receipt, or (d) on the same day as delivered by confirmed facsimile transmission if delivered during business hours or on the next successive business day if delivered by confirmed facsimile transmission after business hours. Addresses for notice to either party shall be as shown on the signature page of this Agreement, or to such other address as may have been furnished by either party in the manner set forth above.

18.     <u>Governing Law</u> . This Agreement shall be governed exclusively by and construed according to the laws of the State of Delaware as applied to contracts between Delaware residents entered into and to be performed entirely within Delaware. This Agreement is intended to be an agreement of the type contemplated by Section 145(f) of the General Corporation Law of Delaware.

19.     <u>Counterparts</u> . This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforcement is sought needs to be produced to evidence the existence of this Agreement.

20.     <u>Integration</u> .  This Agreement contains and constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto, including without limitation that certain Indemnification Agreement dated as of **[DATE]** by and between Premier Healthcare Solutions, Inc. and Indemnitee.

[Signature Page Follows.]

In witness whereof, the parties hereto have executed this Agreement as of the date first set forth above.

**COMPANY**                                                    **INDEMNITEE**

**Premier, Inc.**


By: _____        **[NAME]** _____
Name:    Susan DeVore
Title:     President and CEO

15

99

**FIRST AMENDMENT TO
AMENDED AND RESTATED
LIMITED PARTNERSHIP AGREEMENT OF
PREMIER HEALTHCARE ALLIANCE, L.P.**

**THIS FIRST AMENDMENT TO AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF PREMIER HEALTHCARE ALLIANCE, L.P.** (this "Amendment") is made and entered into as of January 27, 2014 (the "Effective Date") by Premier Services, LLC, the General Partner of Premier Healthcare Alliance, L.P. ("Premier LP"), pursuant to the authority granted to the General Partner under Section 15.1 of Premier LP's Amended and Restated Limited Partnership Agreement effective as of October 1, 2013 (the "LP Agreement"). All capitalized terms not otherwise defined herein will have the meaning given to such terms in the LP Agreement.

1.    **Amendment.** The definition of "Class B Unit Redemption Amount" set forth in Section 1.1 of the LP Agreement is hereby replaced in its entirety with the following:

"**Class B Unit Redemption Amount**" means the lower of (i) a Terminating Limited Partner's capital account balance immediately following the Reorganization (after giving effect to the Contribution and the transactions contemplated in the Unit Put/Call Agreement, but excluding any appreciation in consequence of the Reorganization) multiplied by a fraction,
the numerator of which is seven minus the number of full years following the commencement of such Partner's ownership of Class B Common Units and the denominator of which is seven or (ii) the Fair Market Value of such Unvested Units (using the principles set forth in the definition of "Deemed Per-Unit Value of the Class B Common Units") as of the Termination
Date, payable in accordance with **Section 3.3**.

2.    **Full Force and Effect of Agreement.** Except as hereby specifically amended, the LP agreement is hereby confirmed and ratified in all respects and shall remain in full force and effect according to its terms.

3.    **Copies to Limited Partners.** The General Partner will provide copies of this First Amendment to all Limited Partners.

**IN WITNESS WHEREOF,** this Amendment is hereby executed as of the Effective Date.

**PREMIER SERVICES, LLC**


By: /s/ Craig McKasson
Craig McKasson
Chief Financial Officer

**SECOND AMENDMENT TO**
**AMENDED AND RESTATED**
**LIMITED PARTNERSHIP AGREEMENT OF**
**PREMIER HEALTHCARE ALLIANCE, L.P.**

**THIS SECOND AMENDMENT TO AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT OF PREMIER HEALTHCARE ALLIANCE, L.P.** (this "Second Amendment") is made and entered into as of November 6, 2017 (the "Effective Date") by Premier Services, LLC, the General Partner of Premier Healthcare Alliance, L.P. ("Premier LP"), pursuant to the authority granted to the General Partner under Section 15.1 of Premier LP's Amended and Restated Limited Partnership Agreement effective as of October 1, 2013, as amended by that certain First Amendment to Amended and Restated Limited Partnership Agreement of Premier Healthcare Alliance, L.P. entered into as of January 27, 2014 (collectively, the "LP Agreement"). All capitalized terms not otherwise defined herein will have the meaning given to such terms in the LP Agreement.

1.    **Amendment.** The definition of "Class B Unit Redemption Amount" set forth in Section 1.1 of the LP Agreement is hereby deleted and replaced in its entirety with the following:

"**Class B Unit Redemption Amount**" means the lower of (i) a Terminating Limited Partner's capital account balance immediately following the Reorganization (after giving effect to the Contribution and the transactions contemplated in the Unit Put/Call Agreement, but excluding any appreciation in consequence of the Reorganization) multiplied by a fraction, the numerator of which is seven minus the number of full years following the last day of the calendar month in which Premier consummates the IPO and the denominator of which is seven or (ii) the Fair Market Value of such Unvested Units (using the principles set forth in the definition of "Deemed Per-Unit Value of the Class B Common Units") as of the Termination Date, payable in accordance with **Section 3.3**.

2.    **Full Force and Effect of Agreement.** Except as hereby specifically amended, the LP Agreement is hereby confirmed and ratified in all respects and shall remain in full force and effect according to its terms.

3.    **Copies to Limited Partners.** The General Partner will provide copies of this Second Amendment to all Limited Partners.

**IN WITNESS WHEREOF,** this Second Amendment is hereby executed as of the Effective Date.

**PREMIER SERVICES, LLC,** a Delaware limited liability company, as General Partner of Premier Healthcare Alliance, L.P.

By:    /s/ Craig McKasson
        Name:    Craig McKasson
        Title:    Chief Financial Officer

101

# EXHIBIT 3

**Exhibit 10.2**



FORM OF GPO PARTICIPATION AGREEMENT

Between

Premier Purchasing Partners, L.P.

and

_____

## GPO PARTICIPATION AGREEMENT

THIS GPO PARTICIPATION AGREEMENT (this " Agreement ") is made as of the Effective Date (as defined below) by and between Premier Purchasing Partners, L.P. (" Premier LP "), and _____ (" Member ") (each of Premier LP and Member may be referred to herein as a " Party " and collectively as the " Parties ").

### RECITALS

WHEREAS, Member is a limited partner in Premier LP and a stockholder in Premier, Inc. (collectively, the " Premier Group ") and participates in the group purchasing programs operated by the Premier Group and their Related Entities, pursuant to which Premier Members are entitled to purchase Products and Services under the terms of the Premier Program Contracts negotiated with Vendors (collectively, the " Premier Program ").

WHEREAS, following a reorganization of the Premier Group effective as of the closing (the " Effective Date ") of the initial public offering of Class A shares of the common stock of Premier, Inc., a newly formed Delaware corporation (" Premier Parent "), Premier LP will be renamed "Premier Healthcare Alliance, L.P." and will operate the Premier Program.

WHEREAS, all existing agreements between Member and any of the Premier Group entities, other than the Premier, Inc. Stockholders' Agreement (collectively, the " Existing Agreements "), will remain in full force and effect; provided, that to the extent that any provision of this Agreement conflicts with any provision of any Existing Agreement related to the duration of Member's and its Member Facilities' (as defined below) participation in the Premier Program, the terms of this Agreement shall be controlling and any conflicting provision of such Existing Agreement is hereby deemed to be amended to conform to the provisions of this Agreement without any further action by either Party.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Definitions .

As used herein, the following terms have the following meanings:

1.1      " Administrative Fees " means the fees paid by Vendors to Premier LP pursuant to the Medicare safe harbor regulations set forth in 42 CFR 1001.952(j), for administrative and support services provided by Premier LP pursuant to Premier Program Contracts.  These fees are generally expressed as a defined percentage of the purchases made by Premier Members under a given Premier Program Contract.  The term "Administrative Fees" shall also include

1

administrative fees paid to an applicable Member under group purchasing contracts between the Member and vendors that are remitted to Premier LP under the terms of any Existing Agreement.

1.2 " Change of Control " means the consummation of a transaction in which a majority of the equity or nonprofit corporate membership interests in, or all or substantially all of the assets of, Member are sold, transferred or assigned to an unrelated third party, or by which Member is merged into and with an unrelated third party and the equityholders or nonprofit corporate members of Member prior to the transaction hold less than a majority of the equity or nonprofit corporate membership interests in the surviving entity.

1.3 " Eligible Organization " means any entity that is not a healthcare provider but which is eligible for participation in the Premier Program.

1.4 " Force Majeure Event " means events outside of a Party's control, which shall include, but not be limited to, fire, flood, explosion, natural disaster, inability to obtain or shortage of materials, equipment or transportation, governmental orders (including restrictions, priorities or rationing), acts of God, accidents and strikes, lockouts or other labor trouble or shortage.

1.5 " Member Facilities " means the acute and non-acute health care providers and other Eligible Organizations that are Owned, Leased or Managed by, or Affiliated with, Member.  A list of the Member Facilities is attached as Exhibit A and shall be updated by the Parties as required.  Any Member Facility that ceases to be Owned, Leased or Managed by, or Affiliated with Member shall cease to be a "Member Facility" for purposes of this Agreement as of the effective date of the termination of such relationship (e.g., consummation of sale transaction, termination of sponsorship, etc.).

1.6 " Owned, Leased or Managed by, or Affiliated with " means (a) each acute and non-acute health care provider with respect to which Member directly or indirectly:  (i) holds (A) a majority of the equity interests or corporate membership interests in such provider or the power to appoint a majority of such provider's governing body or (B) a significant equity interest (which may be less than a majority of the total equity) sufficient to enable operational control and such provider is willing to designate Premier LP as its primary group purchasing organization; (ii) leases and operates such provider; or (iii) manages such provider in whole or in part (including, at a minimum, the supplies purchasing function); and (b) each acute and non-acute health care provider and other Eligible Organization which Member has sponsored for participation in the Premier Program, if such entity is not otherwise described in subsection (a).

1.7 " Premier Member " means any entity that participates in the Premier Program.

1.8 " Premier Policies " means the policies and procedures applicable to the Premier Program, as made available to Premier Members from time to time (including through Premier LP's web-site).

2

1.9    " <u>Premier Program</u> " means the group purchasing programs conducted by Premier LP and its Related Entities, pursuant to which Premier Members are entitled to purchase Products and Services under the terms of Premier Program Contracts negotiated with Vendors.

1.10    " <u>Premier Program Contracts</u> " means the purchasing agreements between Premier Vendors and Premier LP, for the purchase by Premier Members of Products and Services (including any enhancements of Premier Program Contracts negotiated by, or on behalf of, any Member Facility).

1.11    " <u>Products and Services</u> " means the products, supplies, equipment and services available to Premier Members through Premier Program Contracts.

1.12    " <u>Rebates</u> " means the payments, if any, made by Vendors to Premier LP for the benefit of Premier Members, related to the volume of particular Products and Services purchased by such Premier Members under the terms of Premier Program Contracts.

1.13    " <u>Related Entities</u> " means, with respect to either Premier LP or Member, any entity that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such entity, with the term "control" for purposes of this definition meaning the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract (written or oral) or otherwise; and the terms "controlling," "controlled by" and "under common control with" shall have meanings correlative to the foregoing.

1.14    " <u>Vendor</u> " means a supplier of Products and Services under a Premier Program Contract.

2.    <u>Premier LP Obligations</u> .

2.1    <u>Access to Premier Program</u> .  Subject to the terms and conditions of this Agreement, Premier LP will make the Premier Program available to each Member Facility that completes Premier LP's standard membership application (each, a " <u>Membership Application</u> ") and is approved for participation in such program in accordance with the Premier Policies.  No Member Facility that is currently participating in the Premier Program as of the Effective Date will be required to execute a new Membership Application.  Member understands that Vendors have discretion with regard to extending Premier Program Contracts to individual Premier Members and that Premier LP will not be in breach of this Agreement if a Vendor declines to extend its contract to Member or any Member Facility.

2.2    <u>Support Services Team</u> .  Premier LP will provide support to Member throughout the Term (as defined in Section 7 below), including through Premier LP's Core Field Service team, national analytics team, regional and national subject matter experts who assist with specific contract categories (e.g., cardiology, pharmacy, laboratory, nursing, construction, and foodservice) based on Member's needs, and the Premier Solutions Center.

3

2.3    Core Tools .  Member shall have access to all web-based tools that are provided to all Premier LP owners for no additional cost.  These tools include but are not limited to: (i) Supply Chain Advisor®, an online, automated, contract management system including catalog, electronic price activation, news/resources, and the ability to manage all contracts in one place, including regional/local agreements; (ii) SpendAdvisor® PharmacySpend™, which uses data from pharmacy wholesalers to support pharmacy spend analysis; and (iii) SpendAdvisor® PremierSpend™, which provides analysis of supplier-reported data for spend using Premier Program Contracts. It does not include SpendAdvisor® MySpend™, which is a fee-based tool that will continue to be provided under the terms of any Existing Agreement governing the use and cost of that tool.

2.4    Other Services .  Premier LP shall provide such other services and support to Member and Member Facilities as set forth under any Existing Agreements or any other contractual arrangements entered into between Premier LP and Member during the Term of this Agreement.

3.    Member Obligations .

Member shall, and shall cause each Member Facility to, (a) participate in the Premier Program throughout the Term of this Agreement in compliance with the Premier Policies; and (b) utilize Premier LP as its primary group purchasing organization (provided, that Member Facilities that are transitioning from a relationship with another group purchasing organization may continue to access specific agreements under such other group purchasing organization's programs during a reasonable transition phase, consistent with the Premier Policies and following formal notice to such other group purchasing organization of such Member Facility's withdrawal from such group purchasing organization's programs).  Member shall convert all new Member Facilities after the Effective Date to participation in the Premier Program as soon as practicable; provided, that such conversion shall in all cases be completed within (i) 12 months following the effective date upon which such Member Facility becomes Owned, Leased or Managed by, or Affiliated with, Member, in the absence of a contractual commitment barring conversion or (ii) three months following the expiration or other lapse of any such contractual bar to conversion.

4.    Financial Matters .

4.1    Administrative Fee Shareback .  To the extent permitted under then-applicable law, Premier LP shall pay to Member, within 60 days following the end of each calendar quarter, 30% of all Administrative Fees actually collected and allocated in Premier LP's contract management system based upon purchases made by Member Facilities through Premier Program Contracts, or otherwise remitted to Premier LP by Member under the terms of an Existing Agreement (if applicable), during such quarter.  The amounts paid to Member under this Section will be (a) considered "offeror rebates" as defined in the discount safe harbor under the federal

4

Medicare program, codified at 42 C.F.R. § 1001.952(h), and (b) calculated on a cash accounting basis, i.e., based on the allocation of Administrative Fees as a result of actual cash receipts during the preceding quarter.  In the event of termination of this Agreement by Member for breach under Section 7.4, for a period of twelve months following the effective date of such termination Premier LP will continue to pay offeror rebates as provided in this Section to Member based upon purchases made by Member Facilities through Premier Program Contracts prior to the effective date of such termination.

      4.2    <u>Vendor Rebates</u> .  Premier LP shall pay directly to applicable Member Facilities, in the manner provided in the Premier Program Contracts, all Rebates actually received by Premier LP from Vendors during the preceding quarter with respect to purchases by those Member Facilities under such Premier Program Contracts.

      4.3    <u>Misdirected Payments</u> .  Member shall, and shall cause each Member Facility to, remit to Premier LP on a quarterly basis, any payments of Administrative Fees directly from Vendors to Member or such Member Facility as a result of purchases by Member Facilities through Premier Program Contracts.

      4.4    <u>Safe Harbor Reports</u> .  Premier LP shall provide an annual report to each Member Facility (a) identifying (i) all Administrative Fees earned by Premier LP from each Vendor with respect to purchases by such Member Facility under Premier Program Contracts during the preceding twelve-month period, in accordance with the group purchasing organization safe harbor promulgated under the federal Medicare program (42 C.F.R. § 1001.952(j), as amended) and (ii) all offeror rebates paid by Premier LP to Member with respect to purchases by such Member Facility under Premier Program Contracts during the preceding twelve months, in accordance with the discount safe harbor promulgated under the federal Medicare program (42 C.F.R. § 1001.952(h), as amended); and (b) notifying each Member Facility of its obligation to:  (i) disclose the specified dollar value of discounts or reductions in price under any state or federal program which provides cost or charge-based reimbursement to such facility for items and services covered by any Premier Program Contract in accordance with applicable regulations, including, without limitation, by appropriately reflecting such amounts in the facility's cost reports; and (ii) provide information upon request in accordance with the provisions of 42 C.F.R. § 1001.952(h)(1), as such may be amended.  Member shall cause each Member Facility to comply with all requirements of the discount safe harbor set forth in 42 C.F.R. § 1001.952(h)(1), as such may be amended.  Member shall be responsible for providing safe harbor reports to Member Facilities, in accordance with the group purchasing organization safe harbor promulgated under the federal Medicare program (42 C.F.R. § 1001.952(j), as amended), with respect to any Administrative Fees collected by Member under its own group purchasing contracts with vendors.

5

5.    Representations and Warranties .

Each of Premier LP and Member, as applicable, represents and warrants the following to the other Party for its reliance thereon:

5.1    Valid Formation .  Each is an entity duly organized or formed, validly existing and in good standing under the laws of the state pursuant to which it is organized, and has all requisite legal power to enter into this Agreement and to perform its obligations hereunder.

5.2    Due Authority .  This Agreement has been duly executed and delivered by each and is the legal, valid, and binding obligation of each, fully enforceable against each in accordance with its terms.

5.3    No Consents .  No consent or approval of any court, governmental or administrative agency, individual or entity is required in connection with the execution of this Agreement by such Party or the consummation of the transactions contemplated hereby, except for such consents or approvals which have been duly obtained prior to the execution of this Agreement.

5.4    Due Enforceability .  The execution of this Agreement and the performance by such Party of its obligations hereunder does not violate, conflict with, or constitute a default under or breach of, any judgment, order, writ, injunction, decree, or organizational document of such Party, or violate any statute, law, order, regulation, agreement or instrument to which that Party is bound as of the Effective Date.

5.5    No Debarment .  Each Party, each Member Facility, and their respective directors, officers, and, to the best of such Party's knowledge, their respective employees: (i) are not currently excluded, debarred, or otherwise ineligible to participate in the Federal health care programs as defined in 42 U.S.C. § 1320a-7b(f) (the " Federal Healthcare Programs "); (ii) have not been convicted of a criminal offense related to the provision of healthcare items or services but have not yet been excluded, debarred, or otherwise declared ineligible to participate in the Federal Healthcare Programs; and (iii) are not under investigation or otherwise aware of any circumstances which may result in such Party or Member Facility being excluded from participation in the Federal Healthcare Programs. These representations and warranties shall be ongoing during the Term and a Party shall immediately notify the other Party of any change in the status of these representations and warranties.  Any breach of this provision shall be deemed to be a material breach under this Agreement giving the other Party the right to terminate for cause.

6.    Vendor Acts and Omissions .  Premier LP, its Related Entities and their respective directors, officers, employees and agents shall not be liable to Member, any Member Facility or to any other entity or person for the acts or omissions of Vendors; further, Premier LP, its Related Entities and their respective directors, officers, employees and agents shall not be liable to Member, Member Facilities or to any other entity or person for any breach of any expressed or

6

implied representation or warranty regarding any Products or Services that may be the subject of any purchasing agreement under or concerning the Premier Program or any other Premier LP program.

7.    Term; Termination .

7.1    Term .  The term of this Agreement shall commence as of the Effective Date and shall continue until the fifth anniversary of the Effective Date (the " Initial Term "); provided, that the Term shall be automatically extended for successive five-year periods (each, a " Renewal Term ", and, together with the Initial Term, the " Term ") unless either Party notifies the other, prior to the fourth anniversary of the then-current Term, that such Party desires to terminate this Agreement effective upon the expiration of the then-current Term.

7.2    Termination for Convenience .  This Agreement may be terminated by either Party for convenience upon 12 months' prior written notice, given at any time after the second anniversary of the commencement date of the then-current Term.

7.3    Termination Due to Change of Control .  This Agreement may be terminated by either Party at any time, upon 12 months' prior written notice, in the event of a Change of Control of Member.

7.4    Termination for Cause .  This Agreement may be terminated for cause, by either Party, upon written notice to the other Party (a " Breach Notice ") specifying with particularity the event of breach upon which such Breach Notice is based; provided, that in the event of a breach of Sections 3, 4.3, 5.5, 9.1, 10, 11.5, 11.16 or 11.17 with respect to a Member Facility, Premier LP may in its sole discretion elect to terminate only such Member Facility's participation in the Premier Program. The terminating Party shall have the right to terminate this Agreement immediately if the non-terminating Party shall fail within 30 days after the receipt of such Breach Notice to cure or correct the breach alleged in the notice; provided, that if the Parties agree that the breach alleged by the terminating Party in the Breach Notice is not capable of correction within such 30-day period, the terminating Party shall have the right to terminate this Agreement immediately if the non-terminating Party shall have failed to commence corrective action within such 30-day period and diligently pursue corrective measures to the satisfaction of the terminating Party (provided, that in no event shall the period to cure extend beyond 90 days without the prior approval of the terminating Party).  As used herein, the term "cause" shall mean: (a) a material breach by the other Party of the provisions of this Agreement; (b) the loss of the ability of either Party lawfully to perform its obligations hereunder; (c) the failure of the other Party to negotiate in good faith to amend this Agreement pursuant to Section 8 hereof; (d) the breach by the other Party of the representations and warranties set forth in Section 5 hereof (provided that no cure period shall apply in the event of a breach of Section 5.5 ); or (e) the filing by the other Party of a petition commencing a voluntary case under the Bankruptcy Code; an admission in writing by the other Party of its inability to pay its debts as they become due; the filing by the other Party of any petition or answer in any proceeding seeking for itself, or consenting to, or acquiescing in, any insolvency, receivership, liquidation, dissolution, or similar

7

relief under any present or future statute, law or regulation, or the filing by the other Party of an answer or other pleading admitting or failing to deny or contest the material allegations of the petition filed against it in any such proceeding; the seeking of or consenting to, or acquiescence by the other Party in, the appointment of any trustee, receiver, or liquidator of it, or any part of its property; and the commencement against the other Party of an involuntary case under the Bankruptcy Code, or a proceeding under any insolvency, receivership, liquidation, dissolution law or similar statute.

7.5    Effect of Termination .  Upon any termination or expiration of this Agreement, all rights and obligations of the Parties under this Agreement shall terminate (except for those rights and obligations accrued prior to the effective date of such termination or expiration and except as otherwise provided in Section 7.7 below); provided, that:  (a) at Member's request Premier LP will continue to permit Member Facilities to access Premier Program Contracts for a period not to exceed 90 days following the termination of this Agreement (other than termination by Premier LP for cause), to provide Member Facilities with a reasonable time to transition their arrangements for group purchasing services; and (b) in the event of termination of this Agreement by Premier LP for cause under Section 7.4, Premier LP shall retain, as liquidated damages and not as a penalty, all Administrative Fees collected after the date of the Breach Notice and shall have no obligation to share those Administrative Fees with Member under Section 4.1.

7.6    Limitation of Liability .  Except as is otherwise provided herein and except as may arise from a breach of Section 10 (" Confidentiality "), neither Party shall be liable to the other Party on any theory of liability.

7.7    Survival of Terms .  Section 4.3 (" Misdirected Payments "), Section 4.4 (" Safe Harbor Reports "), Section 5 (" Representations and Warranties "), Section 6 (" Vendor Acts or Omissions "), Section 7.5 (" Effect of Termination "), Section 7.6 (" Limitations of Liability "), Section 7.7 (" Survival of Terms "), Section 9 (" Books and Records "), Section 10 (" Confidentiality ") and Section 11 (" Miscellaneous "), and any terms in this Agreement which by their nature must survive after the Term to give their intended effect shall be deemed to survive termination or expiration of this Agreement.

8.    Changes in Law .

In the event that during the Term any federal, state or local law, rule or regulation is adopted, modified, or interpreted by a judicial body, in such a manner as to prohibit or materially change the terms of this Agreement, then the Parties to this Agreement shall negotiate in good faith to amend this Agreement in a manner consistent with such change and the intent of the Parties.

8

9.    Books and Records.

9.1    Audits.  Each of Premier LP and Member shall have the right from time to time during business hours and upon not less than thirty (30) days written notice to the other Party (and Member Facilities, if applicable) to examine, at the requesting Party's own cost, such of their respective books and records as necessary to audit and verify the accuracy of any amounts paid or received under this Agreement.  Member shall cause each Member Facility to make its books and records available for the purposes of such audits.  No Party may request an audit under this Section more frequently than once each calendar year.

9.2    Social Security Act Requirements.  In accordance with Medicare requirements under Section 952 of the Omnibus Reconciliation Act of 1980 (P.L. 96 499) and such final regulations relating thereto as may be promulgated by the Secretary of the U.S. Department of Health and Human Services (the "Secretary"), and to the extent that such requirements are applicable to this Agreement, both Parties shall, while this Agreement is effective and until the expiration of six (6) years after the furnishing of any services hereunder, make available, upon written request to the Secretary, or the Comptroller General of the United States (the "Comptroller General"), or to any of their duly authorized representatives, a copy of this Agreement and such books, documents and records as are necessary to certify the nature and extent of the costs incurred by the other Party with respect to the services furnished hereunder. If either Party carries out any of the duties hereunder through a subcontract with a value or cost of $10,000 or more over a twelve (12) month period, such subcontract shall contain a clause identical to the foregoing concerning the maintenance of records and their availability to the Secretary or the Comptroller General.

10.    Confidentiality.

10.1    Confidential Information.  During the Term and surviving its expiration or termination, except as otherwise provided in this Agreement, the Parties will regard and preserve as confidential and not disclose publicly or to any third party any information related to the business of the other Party without such Party's prior written consent.  Without limiting the foregoing, Member shall not, and shall cause each Member Facility not to, use or permit the use of pricing, terms and/or conditions of any Premier Program Contract in connection with any negotiations or dealings with third parties to create contracts which exclude Premier LP's involvement (in this regard, and without limiting the foregoing, Member shall not, and shall cause each Member Facility to not, leverage such information and will not permit its affiliates, agents or representatives, including without limitation any group purchasing organization other than Premier LP, to leverage such information in order to obtain better terms and/or pricing from third parties under contracts which exclude Premier LP's involvement).  Subject to the requirements of Section 10.3 below and any applicable law or regulation, the confidentiality obligations of this Section 10 do not apply to the use or disclosure of any of the following (the "Confidentiality Exceptions"): (a) information that is publicly known prior to the disclosure or becomes publicly known through no wrongful act of the receiving Party; (b) information that was in lawful possession of the receiving Party prior to the disclosure and was not received as a

9

112

result of any breach of confidentiality with respect to the disclosing Party; (c) information that was independently developed by the receiving Party outside the scope of this Agreement; (d) information which the receiving Party is required to disclose by law, court order or regulatory agency request; (e) information that is disclosed by the receiving Party without attributing the source; (f) information that must be disclosed for performance under this Agreement; or (g) information that must be disclosed in compliance with Premier Parent's obligations as a public company.  In the event of a request for disclosure falling under subsection (d) above, prompt notice of such request shall be provided to the other Party in order to provide an opportunity to oppose such request for disclosure.

10.2    Exceptions.  Each of the Parties shall have the right to use pricing information on Products and Services for its internal analyses and for creating pricing evaluations for disclosure to potential recruits pursuant to a confidentiality agreement.  Subject to the terms of the applicable Premier Program Contract, the Parties shall also have the right to disclose such information to third parties for performance of such analysis under a confidentiality agreement that prevents such information from being used for any other purpose.  The disclosing Party shall promptly notify the other Party if any such disclosure is made to any third party.  Member shall have the right to disclose the terms of this Agreement to Member Facilities and to health care providers that Member is seeking to recruit to join the Premier Program, provided such disclosure is made pursuant to the terms of a confidentiality agreement executed by the Member Facility or other receiving organization.

10.3    HIPAA Requirements.  The Parties acknowledge that many Member Facilities are "covered entities" as that term is defined at 45 C.F.R. § 160.103. To the extent applicable, the Parties agree to comply with the Administrative Simplification Provisions of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. § 1320d et seq. ("HIPAA") and any current and future regulations promulgated thereunder, including without limitation the federal privacy regulations contained in 45 C.F.R. Parts 160 and 164 (the "Federal Privacy Regulations"), the federal security standards contained in 45 C.F.R. Parts 160, 162 and 164 (the "Federal Security Regulations") and the federal standards for electronic transactions contained in 45 C.F.R. Parts 160 and 162 (the "Federal Electronic Transaction Regulations"), and the Health Information Technology for Economic and Clinical Health Act and its implementing regulations, all as amended from time to time and collectively referred to herein as the "HIPAA Requirements."  The Parties agree not to use or further disclose any Protected Health Information (as defined in the Federal Privacy Regulations) or EPHI (as defined in the Federal Security Regulations) other than as permitted by the HIPAA Requirements, the terms of this Agreement and terms of any Business Associate Agreement then in effect between the Parties.  The Parties will make their internal practices, books, and records relating to the use and disclosure of Protected Health Information available to the Secretary to the extent required for determining compliance with the HIPAA Requirements.

10.4    Remedies.  The Parties acknowledge and agree that (a) the restrictions contained in this Section 10 are reasonable and a necessary protection of the legitimate interest of the Parties, and that any violation of these restrictions would cause substantial and irreparable injury

10

113

to the Parties; and (b) the Parties would not have entered into this Agreement without receiving the additional consideration offered by the Parties binding themselves to these restrictions.  In the event of any violation of these restrictions, the non-breaching Party shall be entitled, in addition to any other remedy available, to preliminary and permanent injunctive relief, and all reasonable costs of enforcement hereunder, including, but not limited to, reasonable attorney's fees.

11.    Miscellaneous .

    11.1    Entire Agreement .  This Agreement, the Exhibits attached hereto, and the Membership Applications signed by Member and each Member Facility (which are incorporated herein by this reference) contain the entire agreement between Premier LP and Member relating to the subject matter of this Agreement and supersede all previous contracts and all prior representations or agreements between the Parties, whether written or oral, relating to the subject matter of this Agreement.  To the extent that any provision of this Agreement conflicts with any provision of any Existing Agreement related to the scope and duration of Member's and its Member Facilities' participation in the Premier Program, the terms of this Agreement shall be controlling and any conflicting provision of such Existing Agreement is hereby deemed to be amended to conform to the provisions of this Agreement without any further action by either Party.  For avoidance of doubt:  (a) all agreements between Member and any of the Premier Group entities other than the Premier, Inc. Stockholders Agreement (e.g., software agreements, consulting engagements, business associate agreements, etc.) shall remain in full force and effect; and (b) all provisions of agreements between Member and Premier LP (e.g., field service resource support, savings guarantees, business associate agreements, etc.) which do not address the duration of participation in the Premier Program shall remain in full force and effect.

    11.2    Severability .  If any part of this Agreement shall be determined to be invalid, illegal, or unenforceable by any valid Act of Congress or of any legislature or by any regulation duly promulgated by the United States or a state acting in accordance with the law, or declared null and void by any court of competent jurisdiction, then such part shall be reformed, if possible, to conform to the law, and, in any event, the remaining parts of this Agreement shall be fully effective and operative insofar as reasonably possible.

    11.3    Modification; Waiver .  No modification of or amendment to this Agreement shall be deemed effective unless in writing and signed by a duly authorized representative of each of the Parties.  Waiver of a breach of any provision(s) of this Agreement shall not be deemed a waiver of any other breach of the same or any different provision(s).

    11.4    Binding on Successors .  This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective legal representative(s), successor(s), and permitted assignee(s).

    11.5    Assignments .  Neither Party may assign, subcontract, delegate or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of

11

the other Party; provided, however, that Premier LP may assign this Agreement to a Related Entity without consent.  No assignment hereunder shall operate to release assigning Party of any of its obligations hereunder.

11.6    Governing Law .  This Agreement has been executed and delivered and shall be construed and enforced in accordance with the internal laws of the State of Delaware.

11.7    Notices .  Any notice required to be given pursuant to the terms and provisions hereof shall be in writing, postage prepaid, and shall be sent by first-class mail or certified mail, return receipt requested, to Premier LP or Member at the addresses below.  Either Party may change the address to which notices are to be sent by notice given in accordance with the provisions of this section.  Notices hereunder shall be deemed to have been given, and shall be effective, upon receipt by the other Party:

> If to Premier LP:
>
> Premier Healthcare Alliance, L.P.
> 13034 Ballantyne Corporate Place
> Charlotte, NC 28277
> Attention: General Counsel
>
> If to Member:
>
> At the last address of record for Member in Premier LP's records.

11.8    Force Majeure .  In the event that either Party is unable to perform any of its obligations under this Agreement or to enjoy any of its benefits because of a Force Majeure Event, the Party who has been so affected shall immediately give written notice to the other Party and shall do everything reasonably possible to resume performance.  Upon the other Party's receipt of such notice, all obligations under this Agreement shall be suspended immediately until termination of the Force Majeure Event.  If the period of nonperformance exceeds 90 days from the receipt of notice of the Force Majeure Event, the Party whose ability to perform has not been so affected may, by giving written notice to the other Party, terminate this Agreement.

11.9    Headings .  The article and section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11.10    Independent Contractors .  It is hereby understood and agreed that nothing contained in this Agreement is intended, or shall constitute or be construed, to be or to create or to establish a partnership, joint venture or lease between or among Member, Member Facilities, their respective Related Entities, or their respective successors or assignees, on the one hand, and Premier LP, its Related Entities, other Premier Members or their respective successors or assignees, on the other hand, or as constituting either Party as the general representative or

12

general agent of the other Party or its member hospitals or affiliates for any purpose whatsoever, except as expressly set forth herein.  In entering into this Agreement and in acting in compliance herewith, each Party shall at all times be deemed to be acting and performing as an independent contractor duly authorized to perform only as provided for in this Agreement.

11.11    <u>Retention of Documents</u>.  Premier LP and Member agree that each Party shall retain and make available upon written request to the other Party, for a period of four years after the furnishing of such services as described in this Agreement, copies of this Agreement and any books, documents, records, and other data that are necessary to certify the nature and extent of the cost thereof when requested by the Secretary or the Comptroller General, or any of their duly authorized representatives.

11.12    <u>Legal Action</u>.  If either Party commences legal action or arbitration against the other Party related to any claim or controversy for a matter arising out of this Agreement, the non-prevailing Party shall pay all costs and reasonable attorneys' fees incurred by the prevailing Party in connection with such action.

11.13    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original and all of which taken together shall constitute one and the same instrument.  Signatures of the Parties transmitted by email or facsimile shall be deemed to be their original signatures for all purposes.

11.14    <u>Expenses</u>.  Each Party to this Agreement shall bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the transactions contemplated hereby, including all fees and expenses of its representatives.

11.15    <u>Trademarks</u>.  Neither Premier LP nor Member shall use, and Member shall cause each Member Facility to not use, the other Party's name, trademarks, or service marks in advertising or promotional materials or otherwise without the other Party's prior written consent; provided, that Premier LP may identify Member as a participant in the Premier Program.  The Parties shall ensure that their respective Related Entities comply with this provision.

11.16    <u>Press Releases and Communication</u>.  No Party shall, and Member shall cause each Member Facility to not, issue or make any press release or public statement regarding this Agreement without the prior written consent of the other Party.

11.17    <u>Arbitration</u>.  Any controversy, claim or dispute arising out of, accruing, or relating to this Agreement shall be resolved exclusively by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association; provided, that nothing in this Section shall be deemed to prevent either Party from seeking injunctive or other equitable relief in a court of law.  Such arbitration shall be in lieu of litigation in any state or federal court.  The arbitration shall be heard before a panel of three neutral arbitrators who, to the extent not inconsistent with applicable law, will have no power or authority to award treble, punitive, exemplary, consequential, or other damages not measured by the prevailing party's actual

13

damages except as otherwise expressly provided for in this Agreement.  The proceeding will be held in Wilmington, Delaware and the costs of the arbitration, as well as reasonable attorneys' fee as determined by the arbitrators, will be awarded to the prevailing party.  The decision of the arbitrators shall be final and binding and the parties irrevocably submit to the jurisdiction of the United States District Court for the District of Delaware for enforcement of the arbitral award.  Notwithstanding the foregoing, in the event any dispute arises under this Agreement, prior to the initiation of any legal proceeding, the Parties shall first attempt to resolve such dispute through one or more meetings of the principals of each Party.

[Signatures on Next Page]

14

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Execution Date.

PREMIER PURCHASING PARTNERS, L.P.


By:    PREMIER PLANS, LLC, its general partner

By: _____

Name: _____

Title: _____


[MEMBER]

By: _____

Name: _____

Title: _____

[Signature page to GPO Participation Agreement]

118

EXHIBIT A

<u>LIST OF MEMBER FACILITIES</u>

A-1

# EXHIBIT 4

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 5

**Exhibit 10.2**

## EXCHANGE AGREEMENT

THIS EXCHANGE AGREEMENT (this " <u>Agreement</u> ") is made as of September 25, 2013 and will be effective immediately prior to the closing of the initial public offering of Premier, Inc., a newly formed Delaware corporation (" <u>Premier</u> ") (the " <u>Effective Date</u> "), and is made by and among Premier, Premier Purchasing Partners, L.P., a California limited partnership (together with its successors and assigns, " <u>Premier LP</u> "), and the Limited Partners (as such term is defined below) of Premier LP listed on **<u>Schedule I</u>** hereto from time to time party hereto.

WHEREAS, following the proposed reorganization (the " <u>Reorganization</u> ") of Premier LP and its affiliates, Premier intends to consummate an initial public offering (the " <u>IPO</u> ") of shares of its Class A common stock, par value $0.01 per share (the " <u>Class A Common Stock</u> ");

WHEREAS, in connection with the IPO, Premier will purchase Class A Common Units in Premier LP (the " <u>Class A Common Units</u> "), including both newly issued Class A Common Units from Premier LP and then-outstanding Class B Common Units in Premier LP (the " <u>Class B Common Units</u> " and, together with the Class A Common Units, the " <u>Units</u> ") (which, pursuant to Section 3.2(a) of the LP Agreement (as such term is defined below) will be converted into Class A Common Units when acquired by Premier) acquired from the Limited Partners and from Premier Healthcare Solutions, Inc., a Delaware corporation and a wholly owned subsidiary of Premier LP, and Premier Services, LLC, a Delaware limited liability company and a wholly owned subsidiary of Premier which will become the general partner of Premier LP following the Reorganization;

WHEREAS, Premier intends to have its ownership of Class A Common Units increased over time and agrees to permit the holders of Class B Common Units (the " <u>Limited Partners</u> ") and Class B Common Stock, par value $0.000001 per share, of Premier (the " <u>Class B Common Stock</u> "), subject to the exchange limitations set forth in the LP Agreement, to transfer their Class B Common Units to Premier at the times specified herein and concurrently surrender the corresponding shares of Class B Common Stock in exchange for the consideration specified herein; and

WHEREAS, the parties hereto desire that this Agreement govern the terms and conditions for the exchange of Class B Common Units for Class A Common Stock, cash or a combination of both, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements, covenants and provisions herein contained, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.1.**     **<u>Definitions</u>** .

The following terms shall, for purposes of this Agreement, have the following meanings:

" Business Day " means each day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by law to close.

" Code " means the U.S. Internal Revenue Code of 1986, as amended.

" Deemed Per-Unit Value of the Class B Common Units " means the deemed value of each Class B Common Unit based on the market value (the " Fair Market Value ") of one share of Class A Common Stock determined as follows:

(a)       If Class A Common Stock is then traded on a national securities exchange, then such Fair Market Value shall be the average of the closing prices of a share of such Class A Common Stock on such exchange over the 20 trading days ending three days prior to the Exchange Notice Date (as such term is defined below) (the " Determination Date ");

(b)       If Class A Common Stock is then traded on the over-the-counter system, then such Fair Market Value shall be the average of the closing bid and ask prices of a share of such Class A Common Stock over the 20 trading days prior to the Determination Date; and

(c)       If there is then no public market for Class A Common Stock, then such Fair Market Value shall be the highest price per share which could be obtained from a willing buyer (not a current employee or director) for a share of Class A Common Stock sold from authorized but unissued shares, as determined in good faith by Premier;

provided , however , that if Premier LP shall be party to a merger or other consolidation in which Premier LP is not the surviving party, the Fair Market Value of each Class B Common Unit shall be deemed to be the value received by the holders of the Class B Common Units for each such Class B Common Unit pursuant to such merger or other consolidation.

If closing prices or closing bid and ask prices are no longer reported by a securities exchange or other trading system, the closing price or closing bid and ask price shall be that which is reported by such securities exchange or other trading system at 4:00 p.m. New York City time on the applicable trading day.

" Exchanging Limited Partners " means Limited Partners which deliver an Exchange Notice pursuant to the terms of Section 2.2 of this Agreement.

" First Quarterly Exchange Date " means the date that is the one-year anniversary of the last day of the calendar month in which Premier consummates the IPO.

" Group " has the meaning set forth in Section 13(d)(3) and Rule 13d-5 of the Exchange Act.

" LP Agreement " means the Amended and Restated Limited Partnership Agreement, to be entered into among Premier LP, Premier Services, LLC, as general partner, and each of the Limited Partners party thereto, as amended from time to time.

" Person " means any individual, corporation, limited liability company, partnership, trust, joint stock company, business trust, unincorporated association, joint venture, governmental

2

authority or other entity or organization of any nature whatsoever or any Group of two or more of the foregoing.

"Pro Rata Share" means (a) for the purpose of Section 2.2, for any Limited Partner, the percentage equal to (x) the number of Class B Common Units beneficially owned by such Limited Partner *divided by* (y) the total number of Class B Common Units outstanding less the number of Class B Common Units subject to an Exchange Notice or otherwise subject to Exchange on the Quarterly Exchange Date pursuant to the Agreement and (b) for the purpose of Section 2.2(b), for any Participating Limited Partner, the percentage equal to (x) the number of Class B Common Units beneficially owned by such Participating Limited Partner *divided by* (y) the total number of Class B Common Units beneficially owned by all of the Participating Limited Partners.

"Quarterly Exchange Date" means the First Quarterly Exchange Date and the last day of each sequential three-month period thereafter.

"Registration Rights Agreement" means the Registration Rights Agreement of even date herewith between Premier and the Limited Partners from time to time party thereto.

"ROFR Unit Price" means the Deemed Per-Unit Value of the Class B Common Units *plus* the TRA Payments Present Value for such Class B Common Units.

"Tax Receivable Agreement" means the Tax Receivable Agreement dated of even date herewith, among Premier and the Limited Partners from time to time party thereto.

"Transfer Agent" means such bank, trust company or other Person as shall be appointed from time to time by Premier to act as registrar and transfer agent for the Class A Common Stock.

"TRA Payments Present Value" means, for each Class B Common Unit, the amount the holder of such Class B Common Unit would receive with respect to such Class B Common Unit under Section 4.3 of the Tax Receivable Agreement, determined as if the date of the Exchange Notice were the Early Termination Date (as defined in the Tax Receivable Agreement).

## ARTICLE II
## EXCHANGE OF PREMIER LP UNITS

**Section 2.1.**    **Exchange of Premier LP Units**.

(a)    Beginning with the First Quarterly Exchange Date, subject to the exchange limitations set forth in the LP Agreement, including, without limitation, vesting of the Limited Partner's right to exchange Class B Common Units, each Limited Partner shall be entitled (or in the case of a Terminating Limited Partner, as defined in the LP Agreement, shall be required) to exchange (any such exchange, an "Exchange") Class B Common Units held by such Limited Partner on any Quarterly Exchange Date for (at the option of Premier) any of (i) the delivery by Premier of a number of shares of Class A Common Stock equal to the number of Class B Common Units offered by such Limited Partner (with such one-to-one exchange ratio subject to adjustment pursuant to Section 2.4 below), (ii) cash in an amount equal to the Fair

3

Market Value of the Class A Common Stock such Limited Partner would receive pursuant to (i) above or (iii) a combination of Class A Common Stock (on a one-for-one basis) and the balance in cash (at Fair Market Value).

(b)        On each Quarterly Exchange Date (and in accordance with the terms of this Agreement) (i) in conjunction with an exchange of Class B Common Units, an Exchanging Limited Partner shall deliver or cause to be delivered to Premier, an equal number of Class B Common Units and shares of Class B Common Stock, (ii) such Limited Partner shall be treated for all purposes as having become the record holder of the issued Class A Common Stock, if any, and (iii) such Limited Partner's right to receive cash, if any, shall vest with the Limited Partner.

Section 2.2.        **Exchange Procedures and Right of First Refusal .**

(a)        A Limited Partner may exercise the right to exchange Class B Common Units as set forth in Section 2.1 above by providing to Premier a written notice of Exchange, substantially in the form of Exhibit A hereto (the " Exchange Notice "), at least 30 Business Days prior to the Quarterly Exchange Date (or 55 Business Days prior to a Quarterly Exchange Date in conjunction with a Company-Directed Offering (as such term is defined in the Registration Rights Agreement)) (such date that is 30 Business Days prior to the Quarterly Exchange Date (or 55 Business Days prior to a Quarterly Exchange Date in conjunction with a Company-Directed Offering) is referred to as the " Exchange Notice Date ") with respect to which such Limited Partner intends to Exchange or within such shorter period of time as may be agreed by Premier and the Exchanging Limited Partner (so long as other Limited Partners are not prejudiced thereby).  The Exchange Notice shall be duly executed by the Exchanging Limited Partner and delivered in accordance with Section 3.2 of this Agreement.  At least 25 Business Days (or 50 Business Days in conjunction with a Company-Directed Offering) prior to such Quarterly Exchange Date, Premier shall give written notice (the " Limited Partners' Notice ") to all Limited Partners (" Eligible Limited Partners ") that have not provided an Exchange Notice to Premier or otherwise requested an Exchange with respect to such Quarterly Exchange Date (only such Limited Partners shall have the right of first refusal as set forth herein), setting forth the number of Class B Common Units subject to an Exchange Notice and the ROFR Unit Prices at which such Eligible Limited Partners may purchase such Class B Common Units.  Each Eligible Limited Partner shall then have the right, exercisable upon written notice to Premier at least 20 Business Days (or 45 Business Days in conjunction with a Company-Directed Offering) prior to the Quarterly Exchange Date, to purchase such Eligible Limited Partner's Pro Rata Share of the Class B Common Units subject to the Exchange Notice at the ROFR Unit Prices set forth in the Limited Partners' Notice.  Class B Common Units purchased by a Limited Partner pursuant to the right of first refusal set forth in this Section 2.2 will not be eligible for Exchange until the first Quarterly Exchange Date following such purchase.

(b)        In the event that not all of the Eligible Limited Partners elect to purchase their full Pro Rata Shares of the Class B Common Units available pursuant to their rights under Section 2.2(a) above within the time period set forth therein, then Premier shall promptly give written notice (the " Undersubscription Notice ") at least 15 Business Days (or 35 Business Days in conjunction with a Company-Directed Offering) prior to the Quarterly Exchange Date to each of the Limited Partners that have elected to purchase all of their Pro Rata Shares in accordance with this section (the " Participating Limited Partners "), which Undersubscription Notice shall set

4

forth the Class B Common Units not purchased by the other Limited Partners (the " Unsubscribed Units ") and shall offer such Participating Limited Partners the right to acquire such Unsubscribed Units. Each Participating Limited Partner shall notify Premier at least 5 Business Days (or 30 Business Days in conjunction with a Company-Directed Offering) prior to the Quarterly Exchange Date if it elects to purchase Unsubscribed Units at the same ROFR Unit Prices set forth in the Limited Partners' Notice and indicating the maximum number of Unsubscribed Units that such Participating Limited Partner will purchase in the event that any other Participating Limited Partner elects not to purchase its Pro Rata Share of the Unsubscribed Units.  Each Participating Limited Partner shall be entitled to purchase at least such Participating Limited Partner's Pro Rata Share of Unsubscribed Units and, thereafter, any remaining Unsubscribed Units available to be purchased shall be allocated equitably among the Participating Limited Partners that elected to purchase Unsubscribed Units beyond their full Pro Rata Share, as determined by Premier in its reasonable discretion.

(c)        The parties acknowledge and agree that Premier may exercise reasonable discretion with respect to the allocation of Class B Common Units subject to an Exchange Notice among the Participating Limited Partners in general and, in particular, when accommodating Retraction Notices (as such term is defined below) or allocating Class B Common Units with varying ROFR Unit Prices, provided however , that Premier will use reasonable efforts to allocate Class B Common Units of each ROFR Unit Price to Participating Limited Partners.

(d)        Each Limited Partner beneficially owning the Class B Common Units that are subject to sale pursuant to Section 2.2(a) and Section 2.2(b) (a " Sale ") and the Participating Limited Partners shall execute and deliver to Premier LP, no later than the applicable Quarterly Exchange Date (or 20 Business Days prior to the applicable Quarterly Exchange Date in conjunction with a Company-Directed Offering), a written unit purchase agreement with respect to the Class B Common Units subject to a Sale, in a form reasonably acceptable to Premier LP.  Thereafter, upon delivery by the Participating Limited Partners of the aggregate ROFR Unit Price (payable in cash or immediately available funds to an account designated by the selling Limited Partner) for the Class B Common Units being purchased thereby, Premier LP shall evidence the Sale of such Class B Common Units on the books and records of Premier LP pursuant to the LP Agreement, including updating Exhibit 3.1 thereto with the number of Class B Common Units purchased and the purchase price therefor.

(e)        If the Limited Partners do not elect to purchase all of the Class B Common Units that are the subject of a Limited Partners' Notice (such unpurchased Class B Common Units referred to as " Unpurchased Units "), then Premier shall give written notice to Premier LP, which shall have the right but not the obligation to purchase all or a portion of the Unpurchased Units at the same ROFR Unit Prices as set forth in the Limited Partners' Notice.  Premier LP's purchase right shall be exercised by written notice signed by an officer of Premier LP and delivered to Premier at least 3 Business Days (or 25 Business Days in conjunction with a Company-Directed Offering) prior to the Quarterly Exchange Date.

(f)        Upon delivery to each Limited Partner beneficially owning the Class B Common Units that are subject to redemption pursuant to Section 2.2(e) (a " Redemption ") of a written unit purchase agreement with respect to the Class B Common Units subject to Redemption, in a form reasonably acceptable to Premier LP, and delivery by Premier LP of the

5

aggregate ROFR Unit Price for the respective Class B Common Units being redeemed thereby (in each case, promptly, but no later than the applicable Quarterly Exchange Date), Premier LP shall evidence the Redemption of such Class B Common Units on the books and records of Premier LP pursuant to the LP Agreement, including updating Exhibit 3.1 thereto.  The Unpurchased Units so redeemed shall thereupon be cancelled and cease to be issued and outstanding.

(g)      If the Limited Partners and Premier LP do not elect to purchase any or all of the Class B Common Units that are the subject of an Exchange Notice pursuant to this Section 2.2, then Premier shall notify the Exchanging Limited Partner (the " Option Notice ") at least 3 Business Days (or 25 Business Days in conjunction with a Company-Directed Offering) prior to the Quarterly Exchange Date that the requested Exchange of Class B Common Units (less any Class B Common Units purchased or redeemed pursuant to Sections 2.2(a)-(f) above) is to be consummated and Premier's intended settlement method; provided , however , that, if Premier does not timely deliver an Option Notice, Premier shall be deemed to have elected to pay the consideration in the Exchange entirely in Class A Common Stock.  The Exchanging Limited Partner (other than a Terminating Limited Partner or a Limited Partner contractually obligated pursuant to Section 2.2(d) to sell Class B Common Units in conjunction with a Sale) may retract its Exchange Notice by giving written notice (the " Retraction Notice ") to Premier at least one Business Day (or 21 Business Days in conjunction with a Company-Directed Offering) prior to the Quarterly Exchange Date.  The timely delivery of a Retraction Notice shall terminate all of the rights and obligations of the Exchanging Limited Partners and Premier under this Agreement arising from the Exchange Notice and the Class B Common Units subject to such retracted Exchange shall remain beneficially owned by such Limited Partner and subject to the terms and conditions of this Agreement.

(h)      Each Exchanging Limited Partner beneficially owning the Class B Common Units that are subject to Exchange pursuant to Section 2.1(a) shall, if requested by Premier, execute and deliver to Premier, on or before the Quarterly Exchange Date, a written assignment with respect to the Class B Common Units subject to an Exchange, in a form reasonably acceptable to Premier.

(i)      To complete an Exchange, Premier shall, promptly after a Limited Partner's delivery of Class B Common Units to Premier, deliver or cause to be delivered, as applicable (a) to the Exchanging Limited Partner, or to the office of the Transfer Agent, the number of shares of Class A Common Stock issuable upon such Exchange, issued in the name of the Exchanging Limited Partner and (b) to the Exchanging Limited Partner the cash due pursuant to this Agreement.

(j)      Each certificate of Class A Common Stock issued pursuant to this Agreement shall be imprinted with a legend in substantially the following form:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED."

6

(f)        The parties hereto acknowledge and agree that Premier's determination hereunder of the settlement method (stock, cash or a combination thereof) for the Exchange shall be made by the Audit Committee of Premier.

Section 2.3.        **Surrender of Class B Common Stock Upon Exchange or Redemption** .  In addition to the Class B Common Units exchanged or redeemed pursuant to this Agreement, an Exchanging Limited Partner or Limited Partner with Class B Common Units that are subject to a Redemption shall surrender or cause to be surrendered to Premier, for no additional consideration, a number of shares of Class B Common Stock equal to the number of Class B Common Units transferred by the Exchanging Limited Partner or subject to the Redemption on such Quarterly Exchange Date, subject to adjustment consistent with Section 2.4.  Class B Common Stock surrendered to Premier pursuant to an Exchange or Redemption shall be cancelled and cease to be issued and outstanding.

Section 2.4.        **Adjustments** .    The exchange ratios set forth in Sections 2.1(a) and (b) shall be adjusted to reflect: (a) any subdivision (by any unit split, unit distribution, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse unit split, reclassification, reorganization, recapitalization or otherwise) of the Units that is not accompanied by an identical subdivision or combination of the Class A Common Stock; or (b) any subdivision (by any stock split, stock dividend or distribution, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse stock split, reclassification, reorganization, recapitalization or otherwise) of the Class A Common Stock that is not accompanied by an identical subdivision or combination of the Units. If there is any reclassification, reorganization, recapitalization or other similar transaction in which the Class A Common Stock is converted or changed into another security or securities or other property, then upon any subsequent Exchange, an Exchanging Limited Partner shall be entitled to receive the amount of such security or securities or other property that such Exchanging Limited Partner would have received if such Exchange had occurred immediately prior to the effective date of such reclassification, reorganization, recapitalization or other similar transaction, taking into account any adjustment as a result of any subdivision (by any split, distribution, reclassification, reorganization, recapitalization or otherwise) or combination (by reverse split, reclassification, recapitalization or otherwise) of such security or securities or other property that occurs after the effective time of such reclassification, reorganization, recapitalization or other similar transaction. All references to "Units" in this Agreement shall be deemed to include any security, securities or other property of Premier LP which may be issued in respect of, in exchange for or in substitution of Units by reason of any split, distribution, reclassification, reorganization, recapitalization or otherwise.

Section 2.5.        **Class A Common Stock to be Issued** .   When and if the Class A Common Stock is registered under the Securities Act of 1933, as amended, Premier shall use its reasonable efforts to list the Class A Common Stock required to be delivered upon Exchange prior to such delivery on each national securities exchange or inter-dealer quotation system on which the outstanding Class A Common Stock may be listed or traded at the time of such delivery. Nothing contained herein shall be construed to preclude Premier from satisfying its obligations in respect of the Exchange of the Class B Common Units by delivery of Class A Common Stock which is held in the treasury of Premier.

7

**Section 2.6.** **Tax Matters** .   The delivery of Class A Common Stock upon Exchange of Class B Common Units shall be made without charge to the Exchanging Limited Partner for any stamp or other similar tax in respect of such issuance.  The parties shall report each Exchange consummated pursuant to this Agreement as a transfer of an interest in Premier LP eligible to give rise to a basis adjustment under sections 732, 734(b) and 1012 of the Code (in situations where, as a result of one or more Exchanges, Premier LP becomes an entity that is disregarded as separate from its owner for tax purposes) or under sections 734(b), 743(b) and 754 of the Code (in situations where, following the Exchange Premier LP remains in existence as an entity for United States federal income tax purposes), and no party shall take a contrary position on any tax return.

**Section 2.7.** **Consideration for Exchange** .   The parties hereto acknowledge and agree that the consideration paid by Premier to the Limited Partners pursuant to the Tax Receivable Agreement shall serve as a portion of the consideration for the Exchanges contemplated hereunder.

**Section 2.8.** **Limited Partner Representations** .   Each Limited Partner that is issued Class A Common Stock pursuant to this Agreement hereby severally represents and warrants, as of each Quarterly Exchange Date upon which such Limited Partner is issued Class A Common Stock, that (a) if it is not a natural person, that it is duly incorporated or formed and, to the extent such concept exists in its jurisdiction of organization, is in good standing under the laws of such jurisdiction, (b) it has all requisite legal capacity and authority to enter into and perform this Agreement and to consummate the transactions contemplated hereby, (c) this Agreement constitutes a legal, valid and binding obligation of such Limited Partner enforceable against it in accordance with its terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally, (d) it is acquiring the Class A Common Stock issued in accordance with this Agreement for its own account with the present intention of holding such Class A Common Stock for purposes of investment, and that it has no intention of selling Class A Common Stock in a public distribution in violation of any federal or state securities laws, (e) it is a sophisticated party for purposes of applicable federal and state securities laws and regulations, (f) such Limited Partner has knowledge and experience in financial and business matters such that such Limited Partner is capable of evaluating the merits and risks of an investment in Premier, (g) it is able to bear the economic risks of an investment in the Class A Common Stock and could afford a complete loss of such investment, (h) the execution, delivery and performance of this Agreement by such Limited Partner does not and will not conflict with, violate or cause a breach (or an event which with notice or lapse of time or both would become a breach) of any agreement, contract or instrument to which such Limited Partner is subject, give to others any rights of termination, amendment, acceleration or cancellation of any agreement, contract or instrument to which such Limited Partner is subject or result in a violation of any law, rule, regulation, order, judgment or decree to which such Limited Partner is subject and (i) the Class B Common Units surrendered in connection with an Exchange are owned by such Limited Partner free and clear of all liens and encumbrances.

8

## ARTICLE III
## GENERAL PROVISIONS

**Section 3.1.**    __Amendment__ .   The provisions of this Agreement may be amended only by the written consent of each of the parties hereto; provided , however , that each Limited Partner hereby constitutes and appoints Premier, irrevocably as its true and lawful agent and attorney-in-fact, in its name, place and stead to execute and deliver amendments to this Agreement as reasonably required from time to time and consistent with the intent of this Agreement as determined in the good faith reasonable judgment of Premier.

**Section 3.2.**    __Notice__ .   Any written notice required or permitted to be delivered pursuant to this Agreement shall be in writing and shall be deemed delivered (a) upon delivery if delivered in person, (b) upon transmission if sent by facsimile, with receipt confirmed by the recipient thereof, (c) one Business Day after deposit with a nationally recognized overnight courier service; provided , that confirmation of such overnight delivery is received by the sender thereof or (d) upon transmission if sent by e-mail, with receipt confirmed by the recipient thereof. Notices to Premier, Premier LP or any Limited Partner shall be delivered to the respective addresses as set forth below:

| | |
|---|---|
| If to Premier, to: | Premier, Inc.<br>13034 Ballantyne Corporate Place<br>Charlotte, NC 28277<br>Attention: Chief Financial Officer and General Counsel<br>Facsimile: (704) 816-6307<br>Email: craig_mckasson@premierinc.com<br>and Jeffrey_Lemkin2@premierinc.com, respectively |
| If to Premier LP, to: | Premier Healthcare Alliance, L.P.<br>c/o Premier, Inc.<br>13034 Ballantyne Corporate Place<br>Charlotte, NC 28277<br>Attention: Chief Financial Officer and General Counsel<br>Facsimile: (704) 816-6307<br>Email: craig_mckasson@premierinc.com<br>and Jeffrey_Lemkin2@premierinc.com, respectively |
| If to any Limited Partner: | The address thereof set forth on the books and records of Premier LP. |

Any party hereto may change its address for notices by giving written notice of such party's new address to the other parties hereto in accordance with this Section 3.2.

**Section 3.3.**    __Further Action__ .   The parties shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**Section 3.4.**    __Binding Effect__ .   This Agreement shall be binding upon and inure to the benefit of all of the parties and, to the extent permitted by this Agreement, their successors, executors, administrators, heirs, legal representatives and assigns. Other than as expressly provided herein, nothing in this Agreement will be construed to give any person other than the

9

parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement shall apply to the Units held by the Limited Partners and their permitted transferees (under the LP Agreement) as of the date hereof, as well as any Units hereafter acquired by a Limited Partner and such Limited Partner's permitted transferees (under the LP Agreement).

Section 3.5.    **Severability** .  If any term or other provision of this Agreement is held to be invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions is not affected in any manner materially adverse to any party. Upon a determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

Section 3.6.    **Integration** .  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

Section 3.7.    **Waiver** .  No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach of any other covenant, duty, agreement or condition.

Section 3.8.    **Counterparts** .  This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts for purposes of this Section 3.8.

Section 3.9.    **Applicable Law** .  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware.

Section 3.10.    **Additional Parties** .  Additional persons who acquire Class B Common Units may become parties to this Agreement by executing a joinder hereto substantially in the form attached hereto as **Exhibit B** .  By virtue of the execution of a joinder to this Agreement, such person shall be deemed a Limited Partner as defined herein and thereupon **Schedule I** attached hereto shall be automatically amended without further action on the part of any of the parties hereto to reflect that such party is to be considered a Limited Partner as defined herein.

Section 3.11.    **Void Date** .  If the Effective Date does not occur prior to March 31, 2014, this Agreement shall be null and void and of no further effect.

[ *Signature Page Follows* ]

10

131

IN WITNESS WHEREOF, the undersigned have executed this Exchange Agreement as of the date set forth above.

**PREMIER, INC.**

By:  /s/Craig McKasson
      Name: Craig McKasson
      Title: Chief Financial Officer

**PREMIER PURCHASING PARTNERS, L.P.**

By:     Premier Plans, LLC, its general partner

By:  /s/Craig McKasson
      Name: Craig McKasson
      Title: Chief Financial Officer

**LIMITED PARTNERS**

**EACH OF THE LIMITED PARTNERS LISTED ON
SCHEDULE I ATTACHED HERETO**

By:  Premier Plans, LLC, as attorney-in-fact pursuant to the Special
Power of Attorney executed by each of the Limited Partners

By:  /s/Craig McKasson
      Name: Craig McKasson
      Title: Chief Financial Officer

EXHIBIT A

NOTICE OF EXCHANGE

_____, 20___

Premier, Inc.
13034 Ballantyne Corporate Place
Charlotte, North Carolina 28277
Attention: Chief Financial Officer and General Counsel
Facsimile: (704) 816-6307 and (    )    -    , respectively
Email: craig_mckasson@premierinc.com and
        Jeffrey_Lemkin2@premierinc.com, respectively

    Reference is hereby made to the Exchange Agreement (the " Exchange Agreement "), among Premier, Inc. (" Premier "), Premier Purchasing Partners, L.P. ("Premier LP") and the Limited Partners (as defined in the Exchange Agreement), as amended from time to time. Capitalized terms used but not defined herein shall have the meanings given to them in the Exchange Agreement.

    _____ (the " Exchanging Limited Partner ") desires to Exchange the number of Class B Common Units set forth below.

    Number of Class B Common Units to be Exchanged:

    _____ Class B Common Units (" Exchange Units ")

    The Exchanging Limited Partner hereby (i) affirms and gives the representations set forth in Section 2.8 of the Exchange Agreement, (ii) gives notice of its desire to Exchange the above-specified number of Exchange Units for Class A Common Stock, cash or a combination of both as set forth in the Exchange Agreement and (iii) irrevocably constitutes and appoints any officer of Premier as its attorney, with full power of substitution, to exchange such Exchange Units on the books of Premier LP for Class A Common Stock on the books of Premier, with full power of substitution in the premises.

    IN WITNESS WHEREOF, the undersigned, by authority duly given, has executed this Notice of Exchange as of the date first set forth above.

[LIMITED PARTNER]

By: _____
    Name: _____
    Title: _____

133

EXHIBIT B

JOINDER TO EXCHANGE AGREEMENT

Pursuant to Section 3.10 of the Exchange Agreement (the " Exchange Agreement ") among Premier, Inc., a Delaware corporation (" Premier "), Premier Purchasing Partners, L.P., a California limited partnership (" Premier LP "), the entities listed on Schedule I thereto as amended from time to time (the " Limited Partners "), certain individuals or entities who acquire Class B Common Units (the " Class B Common Units ") of Premier LP may execute this joinder to the Exchange Agreement.  The undersigned is, on the date hereof, acquiring Class B Common Units, and hereby agrees to be a party to and be bound as a "Limited Partner" as defined in the Exchange Agreement and hereby authorizes this joinder to the Exchange Agreement as of the date hereof.

Dated: _____

                                        AGREED AND ACCEPTED:

                                        [                              ]

                                        By: _____
                                        Name:
                                        Title:

# EXHIBIT 6

**Exhibit 10.3**

**TAX RECEIVABLE AGREEMENT**

**among**

**PREMIER, INC.**

**AND**

**THE LIMITED PARTNERS OF**

**PREMIER HEALTHCARE ALLIANCE, L.P.**

## TAX RECEIVABLE AGREEMENT

This TAX RECEIVABLE AGREEMENT (the " Agreement ") is made as of September 25, 2013 and is effective immediately prior to the closing of the initial public offering of Premier, Inc., a Delaware corporation (" Premier ") (the " Effective Date "), and is made by and among Premier and each of the undersigned parties hereto identified as Limited Partners (as such term is defined below), and each of the successors and assigns thereto.

## RECITALS

WHEREAS, in conjunction with the proposed reorganization of Premier Purchasing Partners, L.P., a California limited partnership (together with its successors and assigns, " Premier LP ") and its affiliates and the initial public offering of Class A shares (the " Class A Shares ") of the common stock of Premier, Premier LP will adopt an Amended and Restated Limited Partnership Agreement, in the form approved by its general partner and a majority of its Limited Partners (the " LP Agreement "), pursuant to which Premier LP will (a) change its name to "Premier Healthcare Alliance, L.P." and (b) issue Class A Common Units to its general partner and Class B Common Units (the " Class B Common Units ") to its Limited Partners, collectively representing a 100% interest in Premier LP; and

WHEREAS, Premier LP is treated as a partnership for United States federal income tax purposes;

WHEREAS, Premier and the Limited Partners entered into a certain Unit Purchase Agreement dated as of the date hereof (the " Purchase Agreement ") and a certain Exchange Agreement as of the date hereof (the " Exchange Agreement ");

WHEREAS, pursuant to the Purchase Agreement and the LP Agreement, certain Class B Common Units held by a Limited Partner will be sold to Premier in exchange for cash and the right to certain payments under this Agreement (the " Original Sale " and the date of such sale, the " Original Sale Date ");

WHEREAS, pursuant to the Exchange Agreement and the LP Agreement, certain Class B Common Units held by a Limited Partner may be exchanged with Premier over time for Class A Shares, cash or a combination of Class A Shares and cash, and, in each case, the right to certain payments under this Agreement (an " Exchange ");

WHEREAS, contemporaneous with the Original Sale, Premier will purchase additional newly issued Class A Common Units directly from Premier LP;

WHEREAS, immediately following the Original Sale, Premier will contribute the Class B Common Units acquired in the Original Sale and the Class A Common Units purchased from Premier LP to Premier Services, LLC, a Delaware limited liability company that will be formed concurrently with Premier, will be wholly owned by Premier, and will be the general partner of Premier LP (" Premier GP "), and the Class B Common Units held by Premier GP will be automatically converted to Class A Common Units;

1

WHEREAS, on and after the Original Sale Date, Premier LP and each of its direct and indirect subsidiaries which are treated as a partnership for United States federal income tax purposes (together with Premier LP and any direct or indirect subsidiary (owned through a chain of pass-through entities) of Premier LP that is treated as a disregarded entity for United States federal income tax purposes, the " Premier LP Group ") will have in effect an election under Section 754 of the United States Internal Revenue Code of 1986, as amended (the " Code "), for the Taxable Year in which the Original Sale occurs and for each Taxable Year in which an Exchange occurs, which election is intended to result in an adjustment to the tax basis of the assets owned by Premier LP Group (solely with respect to Premier) at the time of an Exchange (such time, the " Exchange Date ");

WHEREAS, the income, gain, loss, expense and other Tax (as such term is defined below) items of Premier may be affected by (i) the Basis Adjustments (as such term is defined below) and (ii) the Imputed Interest (as such term is defined below);

WHEREAS, the parties to this Agreement desire to make certain arrangements with respect to the effect of the Basis Adjustments and Imputed Interest on the liability for Taxes of Premier;

NOW, THEREFORE, in consideration of the foregoing and the respective covenants and agreements set forth herein, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.1        Definitions . As used in this Agreement, the terms set forth in this Article 1 shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined).

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such first Person.

"Agreed Rate" means LIBOR plus 100 basis points.

"Agreement" is defined in the Recitals.

"Amended Schedule" is defined in Section 2.4(b).

"Basis Adjustment" means the adjustment to the tax basis of a Reference Asset under sections 732, 734(b) and 1012 of the Code (in situations where, as a result of one or more Exchanges, Premier LP becomes an entity that is disregarded as separate from its owner for tax purposes); or under sections 734(b), 743(b) and 754 of the Code (in situations where, following the Original Sale or an Exchange, as applicable, Premier LP remains in existence as an entity for United States federal income tax purposes) and, in each case, comparable sections of foreign, state and local income and franchise tax laws, as a result of the Original Sale, any Exchange and

2

138

payments under this Agreement. For the avoidance of doubt, the amount of any Basis Adjustment resulting from the Original Sale or an Exchange of one or more Class B Common Units shall be determined without regard to any Pre-Original Sale Transfer or Pre-Exchange Transfer, as applicable, of such Class B Common Units and as if any such Pre-Original Sale Transfer or Pre-Exchange Transfer, as applicable, had not occurred.

"Beneficial Owner" of a security means a Person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares:  (i) voting power, which includes the power to vote, or to direct the voting of, such security and/or (ii) investment power, which includes the power to dispose of, or to direct the disposition of, such security. The terms "Beneficially Own" and "Beneficial Ownership" shall have correlative meanings.

"Board" means the Board of Directors of Premier.

"Business Day" means each day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by law to close.

"Change of Control" means the occurrence of any of the following events:

(i)        any Person or any group of Persons acting together which would constitute a "group" for purposes of Section 13 (d) of the Securities and Exchange Act of 1934, or any successor provisions thereto, excluding a group of Persons which includes all Limited Partners or an Affiliate, is or becomes the Beneficial Owner, directly or indirectly, of securities of Premier representing more than 50% of the combined voting power of Premier's then outstanding voting securities;

(ii)        the following individuals cease for any reason to constitute a majority of the number of directors of Premier then serving: individuals who, on the IPO Date, constitute the Board and any new director whose appointment or election by the Board or nomination for election by Premier's shareholders was approved or recommended by a vote of more than 50% of the directors then still in office who either were directors on the IPO Date or whose appointment, election or nomination for election was previously so approved or recommended by the directors referred to in this clause (ii);

(iii)        there is consummated a merger or consolidation of Premier with any other corporation or other entity, and, immediately after the consummation of such merger or consolidation, either (x) the Board immediately prior to the merger or consolidation does not constitute at least a majority of the board of directors of the company surviving the merger or, if the surviving company is a Subsidiary, the ultimate parent thereof, or (y) the voting securities of Premier immediately prior to such merger or consolidation do not continue to represent or are not converted into more than 50% of the combined voting power of then outstanding voting securities of the Person resulting from such merger or consolidation or, if the surviving company is a Subsidiary, the ultimate parent thereof; or

(iv)        the shareholders of Premier approve a plan of complete liquidation or dissolution of Premier or there is consummated an agreement or series of related agreements for the sale or other disposition, directly or indirectly, by Premier of all or substantially all of Premier's assets, other than such sale or other disposition by Premier

3

of all or substantially all of Premier's assets to an entity, at least 50% of the combined voting power of the voting securities of which are owned by shareholders of Premier in substantially the same proportions as their ownership of Premier immediately prior to such sale.

Notwithstanding the foregoing, except with respect to clause (ii) and clause (iii)(x) above, a "Change of Control" shall not be deemed to have occurred by virtue of the consummation of any transaction or series of integrated transactions immediately following which the record holders of the shares of Premier immediately prior to such transaction or series of transactions continue to have substantially the same proportionate ownership in, and own substantially all of the shares of, an entity which owns all or substantially all of the assets of Premier immediately following such transaction or series of transactions.

"Change of Control Termination Date" means the date of a Change of Control Termination Notice for purposes of determining the Change of Control Termination Payment.

"Change of Control Termination Effective Date" is defined in Section 4.2.

"Change of Control Termination Notice" is defined in Section 4.2.

"Change of Control Termination Payment" is defined in Section 4.3(b).

"Change of Control Termination Schedule" is defined in Section 4.2.

"Class A Shares" is defined in the Recitals.

"Class B Common Units" is defined in the Recitals.

"Code" is defined in the Recitals.

"Common Units" means Class A Common Units and Class B Common Units issued by Premier LP.

"Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Covered Taxable Year" means any Taxable Year of Premier ending before or including the Unilateral Termination Date.

"Cumulative Net Realized Tax Benefit" for a Taxable Year means, with respect to each Limited Partner, the cumulative amount of Realized Tax Benefits for all Taxable Years of Premier, up to and including such Taxable Year, net of the cumulative amount of Realized Tax Detriments for the same period. The Realized Tax Benefit and Realized Tax Detriment with respect to each Limited Partner for each Taxable Year shall be determined based on the most recent Tax Benefit Schedule or Amended Schedule, if any, in existence at the time of such determination, or, if applicable, the Early Termination Schedule, Change of Control Termination Schedule, or amendments thereto.

4

"Default Rate" means LIBOR plus 100 basis points.

"Determination" shall have the meaning ascribed to such term in section 1313(a) of the Code or similar provision of foreign, state and local tax law, as applicable, or any other event (including the execution of IRS Form 870-AD) that finally and conclusively establishes the amount of any liability for Tax.

"Dispute" has the meaning set forth in Section 7.8(a).

"Early Termination Date" means the date of an Early Termination Notice for purposes of determining the Early Termination Payment.

"Early Termination Effective Date" is defined in Section 4.2.

"Early Termination Notice" is defined in Section 4.2.

"Early Termination Payment" is defined in Section 4.3(b).

"Early Termination Rate" means the long-term Applicable Federal Rate published by the Internal Revenue Service in accordance with section 1274(d) of the Code.

"Early Termination Schedule" is defined in Section 4.2.

"Exchange" is defined in the Recitals.

"Exchange Agreement" is defined in the Recitals.

"Exchange Basis Schedule" is defined in Section 2.2(b).

"Exchange Date" means the date of any Exchange.

"Expert" is defined in Section 7.9.

"Hypothetical Tax Liability" means, with respect to a Limited Partner and a Taxable Year, the liability for Taxes of (i) Premier and (ii) without duplication, Premier LP, but only with respect to Taxes imposed on Premier LP and allocable, based on Common Units held, to Premier, or to the other members of the consolidated group of which Premier is the parent, for the Taxable Year, in each case using the same methods, elections, conventions and similar practices used on the relevant Premier Return, but (x) excluding any aggregate increase or decrease in Tax liability for the Taxable Year attributable to Basis Adjustments resulting from Original Sales and Exchanges by the Limited Partner and any payments under this Agreement to the Limited Partner and (y) excluding any deductions attributable to Imputed Interest with respect to payment obligations under this Agreement to the Limited Partner for the Taxable Year. For the avoidance of doubt, Hypothetical Tax Liability shall be determined without taking into account the carryover or carryback of any Tax item (or portions thereof) that is attributable to the Basis Adjustment or Imputed Interest.

5

"Imputed Interest" shall mean any interest imputed under section 1272, 1274 or 483 or any other provision of the Code and any similar provision of foreign, state, and local tax law, as applicable, with respect to Premier's payment obligations under this Agreement.

"Independent Director" means any member of the Board who is not affiliated with any of the Limited Partners or any of the other principal shareholders of Premier and is neither a current officer nor a former officer of Premier or any of its Subsidiaries.

"Interest Amount" is defined in Section 3.1(b).

"IPO" means the initial public offering of Class A Shares by Premier.

"IPO Date" means the closing date of the IPO.

"IRS" means the United States Internal Revenue Service.

"LIBOR" means during any period, an interest rate per annum equal to the one-year LIBOR reported, on the date two days prior to the first day of such period, on the Telerate Page 3750 (or if such screen shall cease to be publicly available, as reported on Reuters Screen page "LIBOR01" or by any other publicly available source of such market rate) for London interbank offered rates for United States dollar deposits for such period.

"Limited Partners" means each holder of Class B Common Units of Premier LP party hereto as of the date hereof and each other Person that is issued Class B Common Units from time to time and executes a Joinder Agreement in the form attached hereto as Exhibit A, other than Premier and Premier LP and their successors and assigns.

"LP Agreement" is defined in the Recitals.

"Market Value" shall mean the closing price of the Class A Shares on the applicable Original Sale Date or Exchange Date, or deemed Exchange Date, determined as follows:

(a)      If Class A Shares are traded on a national securities exchange, then such Market Value shall be the average of the closing prices of a Class A Share on such exchange over the 20 trading days ending three days prior to the applicable Original Sale Date or Exchange Date, or deemed Exchange Date (the "**Determination Date**");

(b)      If Class A Shares are traded on the over-the-counter system, then such Market Value shall be the average of the closing bid and ask prices of a Class A Share over the 20 trading days prior to the Determination Date; and

(c)      If there is then no public market for the Class A Shares, then such Market Value shall be the highest price per share which could be obtained from a willing buyer (not a current employee or director) for a Class A Share sold from authorized but unissued shares, as determined in good faith by Premier.

If closing prices or closing bid and ask prices are no longer reported by a securities exchange or other trading system, the closing price or closing bid and ask price shall be that which is reported

6

by such securities exchange or other trading system at 4:00 p.m. New York City time on the applicable trading day.

"Material Objection Notice" has the meaning set forth in Section 4.2.

"Net Tax Benefit" is defined in Section 3.1(b).

"Non-Stepped Up Tax Basis" means, with respect to any Reference Asset at any time, the tax basis that such asset would have had at such time if no Basis Adjustments had been made.

"Objection Notice" has the meaning set forth in Section 2.4(a).

"Original Sale" is defined in the Recitals.

"Original Sale Basis Schedule" is defined in Section 2.2(a).

"Original Sale Date" is defined in the Recitals.

"Payment Date" means any date on which a payment is required to be made pursuant to this Agreement.

"Person" means any individual, corporation, limited liability company, partnership, trust, joint stock company, business trust, unincorporated association, joint venture, governmental authority or other entity or organization of any nature whatsoever or any group of two or more of the foregoing which are Related Entities.

"Pre-Exchange Transfer" means any transfer (including upon the death of a Limited Partner) or distribution in respect of one or more Class B Common Units (i) that occurs prior to an Exchange of such Class B Common Units, and (ii) to which section 743(b) or 734(b) of the Code applies.

"Pre-Original Sale Transfer" means any transfer (including upon the death of a Limited Partner) or distribution in respect of one or more Class B Common Units (i) that occurs prior to Class B Common Units sold in the Original Sale, and (ii) to which section 743(b) or 734(b) of the Code applies.

"Premier" is defined in the Recitals.

"Premier LP" is defined in the Recitals.

"Premier LP Group" is defined in the Recitals.

"Premier Return" means the United States federal, and/or foreign, and/or state and/or local Tax Return, as applicable, of Premier filed with respect to Taxes of any Taxable Year.

"Purchase Agreement" is defined in the Recitals.

7

"Qualified Tax Advisor" means Ernst & Young LLP, or any other law or accounting firm that is nationally recognized as being expert in Tax matters and that is reasonably acceptable to Premier.

"Realized Tax Benefit" means, for a Limited Partner in a Taxable Year, the excess, if any, of (a) the Hypothetical Tax Liability with respect to the Limited Partner in the Taxable Year over (b) the "actual" liability for Taxes of (i) Premier and (ii) without duplication, Premier LP, but only with respect to Taxes imposed on Premier LP that are allocable, based on Common Units held, to Premier or to the other members of the consolidated group of which Premier is the parent for such Taxable Year, such "actual" liability to be computed with the adjustments described in this Agreement (including, for the avoidance of doubt, the application of the Valuation Assumptions when provided for in this Agreement). If all or a portion of the "actual" liability for such Taxes for the Taxable Year arises as a result of an audit by a Taxing Authority of any Taxable Year, any such liability arising as a result of an audit shall not be included in determining the Realized Tax Benefit unless and until there has been a Determination.

"Realized Tax Detriment" means, for a Limited Partner in a Taxable Year, the excess, if any, of (a) the "actual" liability for Taxes of (i) Premier and (ii) without duplication, Premier LP, but only with respect to Taxes imposed on Premier LP that are allocable, based on Common Units, held to Premier or to the other members of the consolidated group of which Premier is the parent for such Taxable Year, over (b) the Hypothetical Tax Liability with respect to the Limited Partner in the Taxable Year, such "actual" liability to be computed with the adjustments described in this Agreement (including, for the avoidance of doubt, the application of the Valuation Assumptions when provided for in this Agreement). If all or a portion of the "actual" liability for such Taxes for the Taxable Year arises as a result of an audit by a Taxing Authority of any Taxable Year, any such liability arising as a result of an audit shall not be included in determining the Realized Tax Detriment unless and until there has been a Determination.

"Reconciliation Dispute" has the meaning set forth in Section 7.9.

"Reconciliation Procedures" has the meaning set forth in Section 2.4(a).

"Reference Asset" means an asset that is held by any member of Premier LP Group, at the time of the Original Sale or an Exchange, as applicable. A Reference Asset also includes any asset that is "substituted basis property" under section 7701(a)(42) of the Code with respect to a Reference Asset.

"Related Entity" when used with respect to another Person means any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, such other Person. In addition, Related Entities of a Limited Partner shall be deemed to include all of its directors, managers, officers and employees in their capacities as such.

"Schedule" means any of the following: (a) an Original Sale Basis Schedule, (b) an Exchange Basis Schedule, (c) a Tax Benefit Schedule, (d) the Early Termination Schedule, or (e) the Change of Control Termination Schedule.

"Senior Obligations" is defined in Section 5.1.

8

"Subsidiaries" means, with respect to any Person, as of any date of determination, any other Person as to which such Person owns, directly or indirectly, or otherwise controls more than 50% of the voting power or other similar interests or the sole general partner interest or managing member or similar interest of such Person.

"Tax Benefit Payment" is defined in Section 3.1(b).

"Tax Benefit Schedule" is defined in Section 2.3(a).

"Tax Return" means any return, declaration, report or similar statement required to be filed with respect to Taxes (including any attached schedules), including, without limitation, any information return, claim for refund, amended return and declaration of estimated Tax.

"Taxable Year" means a taxable year of Premier as defined in Section 441(b) of the Code or comparable section of foreign, state or local tax law, as applicable (and, therefore, for the avoidance of doubt, may include a period of less than 12 months for which a Tax Return is made), ending on or after the IPO Date or on or after the Original Sale Date, whichever occurs earlier.

"Taxes" means any and all United States federal, foreign, state and local taxes, assessments or similar charges that are based on or measured with respect to net income or profits, franchise taxes of such governmental entities, and any interest related to such Tax (but excluding, for the avoidance of doubt, any Interest Amount).

"Taxing Authority" shall mean any domestic, federal, national, foreign, state, county or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising any taxing authority or any other authority exercising Tax regulatory authority.

"Treasury Regulations" means the final, temporary and proposed regulations under the Code promulgated from time to time (including corresponding provisions and succeeding provisions) as in effect for the relevant taxable period.

"Unilateral Termination Date" is defined in Section 4.4.

"Unilateral Termination Notice" is defined in Section 4.4.

"Valuation Assumptions" shall mean, as of an Early Termination Date or Change of Control Termination Date, the assumptions that:

(a)    in each Taxable Year ending on or after such Early Termination Date, Premier will have taxable income sufficient to fully utilize the deductions arising from the Basis Adjustments and the Imputed Interest during such Taxable Year (including, for the avoidance of doubt, Basis Adjustments and Imputed Interest that would result from future Tax Benefit Payments that would be paid in accordance with the Valuation Assumptions) in which such deductions would become available;

9

(b)        the United States federal income tax rates, and any foreign, state and local income tax rates that will be in effect for each such Taxable Year will be those specified for each such Taxable Year by the Code and other law as in effect on such date;

(c)        all taxable income of Premier will be subject to the maximum applicable Tax rates throughout the relevant period;

(d)        any loss carryovers generated by any Basis Adjustment or Imputed Interest and available as of the date of the Early Termination Schedule will be utilized by Premier on a pro rata basis from the date of the such schedule through the scheduled expiration date of such loss carryovers;

(e)        any non-amortizable assets will be disposed of on the fifteenth anniversary of the applicable Basis Adjustment; provided, that in the event of a Change of Control, such non-amortizable assets shall be deemed disposed of at the time of sale of the relevant asset (if earlier than such fifteenth anniversary); and

(f)        if, as of such date, there are Class B Common Units that were not sold in the Original Sale and have not been Exchanged, then each such Unit shall be deemed to be Exchanged for the Market Value of the Class A Shares and the amount of cash that would be transferred to the applicable Limited Partner under this Agreement if the Exchange occurred on the Early Termination Date. For the avoidance of doubt, the term "Exchange" as used herein shall include any Exchange deemed to have occurred under this subsection.

## ARTICLE 2

## DETERMINATION OF CERTAIN REALIZED TAX BENEFITS

Section 2.1        Basis Adjustment . The parties hereto acknowledge that an Original Sale or an Exchange constitutes a transfer of an interest in Premier LP giving rise to a Basis Adjustment. For the avoidance of doubt, payments made under this Agreement shall not be treated as resulting in a Basis Adjustment to the extent such payments are treated as Imputed Interest.

Section 2.2        Basis Schedule .

(a)        Within forty-five (45) calendar days after the filing of the United States federal income tax return of Premier for the Taxable Year in which the Original Sale has been effected, Premier shall deliver to Premier LP a schedule (the " Original Sale Basis Schedule ") that shows, in reasonable detail necessary to perform the calculations required by this Agreement, including with respect to the Limited Partners, for purposes of Taxes, (i) the Non-Stepped Up Tax Basis of the Reference Assets as of the Original Sale Date, (ii) the Basis Adjustment with respect to the Reference Assets as a result of the Original Sale, calculated in the aggregate, (iii) the period (or periods) over which the Reference Assets are amortizable and/or depreciable and (iv) the period (or periods) over which each Basis Adjustment is amortizable and/or depreciable. The Original Basis Schedule will become final as provided in Section 2.4(a)

10

and may be amended as provided in Section 2.4(b) (subject to the procedures set forth in Section 2.4(b)).

(b)    Within forty-five (45) calendar days after the filing of the United States federal income tax return of Premier for each Taxable Year in which any Exchange has been effected, Premier shall deliver to each Limited Partner a schedule (the " Exchange Basis Schedule ") that shows, in reasonable detail necessary to perform the calculations required by this Agreement, including with respect to each such Limited Partner, for purposes of Taxes, (i) the Non-Stepped Up Tax Basis of the Reference Assets as of each Exchange Date, (ii) the Basis Adjustment with respect to the Reference Assets as a result of any Exchanges effected in such Taxable Year, calculated in the aggregate, (iii) the period (or periods) over which the Reference Assets are amortizable and/or depreciable and (iv) the period (or periods) over which each Basis Adjustment is amortizable and/or depreciable. The Exchange Basis Schedule will become final as provided in Section 2.4(a) and may be amended as provided in Section 2.4(b) (subject to the procedures set forth in Section 2.4(b)).

Section 2.3    Tax Benefit Schedule .

(a)    Tax Benefit Schedule .  Within forty-five (45) calendar days after the filing of the United States federal income tax return of Premier for any Taxable Year in which there is a Realized Tax Benefit or Realized Tax Detriment, Premier shall provide to each Limited Partner a schedule showing, in reasonable detail and, at the request of the Limited Partner, with respect to each separate Exchange (and Original Sale, as applicable), the calculation of the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year (each a " Tax Benefit Schedule "). The Tax Benefit Schedule will become final as provided in Section 2.4(a) and may be amended as provided in Section 2.4 (b) (subject to the procedures set forth in Section 2.4(b)).

(b)    Applicable Principles .  Subject to Sections 3.3 and 3.4, the Realized Tax Benefit or Realized Tax Detriment for each Taxable Year is intended to measure the decrease or increase in the actual liability for Taxes of Premier for such Taxable Year attributable to the Basis Adjustments and Imputed Interest, determined using a "with and without" methodology. For the avoidance of doubt, the actual liability for Taxes will take into account the deduction of the portion of each Tax Benefit Payment that must be accounted for as interest under the Code based upon the characterization of Tax Benefit Payments as additional consideration payable by Premier for the Class B Common Units acquired in the Original Sale or an Exchange. Carryovers or carrybacks of any Tax item attributable to the Basis Adjustment and Imputed Interest shall be considered to be subject to the rules of the Code and the Treasury Regulations or the appropriate provisions of foreign, state and local income and franchise tax law, as applicable, governing the use, limitation and expiration of carryovers or carrybacks of the relevant type. If a carryover or carryback of any Tax item includes a portion that is attributable to the Basis Adjustment or Imputed Interest and another portion that is not, such portions shall be considered to be used in accordance with the "with and without" methodology. The parties agree that (i) all Tax Benefit Payments (other than amounts accounted for as interest under the Code) will (A) be treated as subsequent upward purchase price adjustments that give rise to further Basis Adjustments to Reference Assets for Premier and (B) have the effect of creating additional Basis Adjustments to Reference Assets for Premier in the year of payment, and (ii) as a result, such additional Basis

11

Adjustments will be incorporated into the current year calculation and into future year calculations, as appropriate.

Section 2.4        Procedures, Amendments .

(a)        Procedure . Every time Premier delivers to a Limited Partner an applicable Schedule under this Agreement, including any Amended Schedule delivered pursuant to Section 2.4(b), but excluding any Early Termination Schedule, Change of Control Termination Schedule, amended Early Termination Schedule, or amended Change of Control Termination Schedule, Premier shall also (i) deliver to the Limited Partner schedules and work papers, as determined by Premier or reasonably requested by such Limited Partner, providing reasonable detail regarding the preparation of the Schedule and (ii) allow such the Limited Partner reasonable access at no cost to the appropriate representatives at Premier, as determined by Premier or requested by the Limited Partner in connection with a review of such Schedule. An applicable Schedule or amendment thereto shall become final and binding on Premier and a Limited Partner thirty (30) calendar days from the first date on which the Limited Partner received the applicable Schedule or amendment thereto unless the Limited Partner (i) within 30 calendar days after receiving an applicable Schedule or amendment thereto, provides Premier with notice of a material objection to such Schedule (" Objection Notice ") made in good faith or (ii) provides a written waiver of such right of any Objection Notice within the period described in clause (i) above, in which case such Schedule or amendment thereto becomes binding on the date the waiver is received by Premier. If the parties, for any reason, are unable to successfully resolve the issues raised in the Objection Notice within 30 calendar days after receipt by Premier of an Objection Notice, Premier and the Limited Partner shall employ the reconciliation procedures as described in Section 7.9 (the " Reconciliation Procedures ").

(b)        Amended Schedule . The applicable Schedule for any Taxable Year may be amended from time to time by Premier (i) in connection with a Determination affecting such Schedule, (ii) to correct inaccuracies in the Schedule identified as a result of the receipt of additional factual information relating to any Taxable Year after the date the Schedule was provided to the Limited Partner (iii) to comply with the Expert's determination under the Reconciliation Procedures, (iv) to reflect a change in the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year attributable to a carryback or carryforward of a loss or other Tax item to such Taxable Year, (v) to reflect a change in the Realized Tax Benefit or Realized Tax Detriment for such Taxable Year attributable to an amended Tax Return filed for such Taxable Year, or (vi) to adjust the Original Basis Schedule or an Exchange Basis Schedule to take into account payments made pursuant to this Agreement (any such Schedule, an " Amended Schedule ").

# ARTICLE 3

## TAX BENEFIT PAYMENTS

Section 3.1        Payments .

(a)        Payments . Within five (5) Business Days after a Tax Benefit Schedule delivered to a Limited Partner becomes final in accordance with Section 2.4(a), Premier shall pay

12

to such Limited Partner for the applicable Taxable Year the Tax Benefit Payment with respect to such Limited Partner for such Taxable Year, as determined pursuant to Section 3.1(b). Each such Tax Benefit Payment shall be made by wire transfer of immediately available funds to the bank account previously designated by the Limited Partner to Premier or as otherwise agreed by Premier and the Limited Partner. For the avoidance of doubt, no Tax Benefit Payment shall be made in respect of estimated tax payments, including, without limitation, federal estimated income tax payments.

(b)       A " Tax Benefit Payment " for a Taxable Year means, with respect to each Limited Partner, an amount, not less than zero, equal to the sum of the Limited Partner's Net Tax Benefit and the Interest Amount. For the avoidance of doubt, for Tax purposes, the Interest Amount shall not be treated as interest but instead shall be treated as additional consideration for the acquisition of Class B Common Units in Exchanges, unless otherwise required by law. Subject to Sections 3.3 and 3.4, the " Net Tax Benefit " with respect to each Limited Partner for a Taxable Year shall be an amount equal to the excess, if any, of 85% of the Cumulative Net Realized Tax Benefit with respect to such Limited Partner for such Taxable Year over the total amount of payments previously made to such Limited Partner under this Section 3.1 (excluding payments attributable to Interest Amounts). The " Interest Amount " with respect to each Limited Partner for a Taxable Year shall equal the interest on the Net Tax Benefit with respect to such Limited Partner for such Taxable Year calculated at the Agreed Rate from the due date (without extensions) for filing Premier Return with respect to Taxes for such Taxable Year until the Payment Date. For the avoidance of doubt, no Limited Partner shall have any obligation to make any payment to Premier, or to reimburse Premier for amounts previously paid, pursuant to this Agreement, except as provided in Section 7.9.

(c)       Notwithstanding anything else in this Agreement to the contrary, Premier's obligation to make payments to a Limited Partner under this Agreement shall cease immediately if, pursuant to the LP Agreement, such Limited Partner ceases to be a limited partner in Premier LP.

Section 3.2       No Duplicative Payments . It is intended that the provisions will not result in duplicative payment of any amount (including interest) required under this Agreement. It is also intended that the provisions provide that Tax Benefit Payments are paid to the Limited Partners pursuant to this Agreement. The provisions shall be construed in the appropriate manner to ensure such intentions are realized.

Section 3.3       Pro Rata Payments . Notwithstanding anything in Section 3.1 to the contrary, and subject to Section 3.4 hereof, to the extent that the aggregate tax benefit of Premier's deduction with respect to the Basis Adjustments or Imputed Interest under this Agreement is limited in a particular Taxable Year because Premier does not have sufficient taxable income or to the extent that Premier lacks sufficient funds to satisfy its obligations to make all Tax Benefit Payments due with respect to a particular Taxable Year, the limitation on the tax benefit for Premier, or the payments under this Agreement that may be made, as the case may be, shall be taken into account or made for each Person entitled to receive a payment pursuant to Section 3.1 on a pro rata basis by comparing the amount of such Person's share of the tax benefits or amounts payable (as the case may be) with respect to the applicable Taxable Year

13

to the aggregate amount of the tax benefits or amounts payable to all Person's entitled to receive a payment pursuant to Section 3.1 with respect to the applicable Taxable Year.

Section 3.4    Coordination . If for any reason Premier does not fully satisfy its obligations to make all payments due under this Agreement in respect of a particular Taxable Year, then no payments shall be made under this Agreement in respect of any Taxable Year until all payments in respect of prior Taxable Years have been made in full, including any additional amounts due under Section 5.2.

# ARTICLE 4

# TERMINATION

Section 4.1    Termination and Breach of Agreement .

(a)    With the written approval of a majority of the Independent Directors, Premier may terminate this Agreement with respect to all amounts payable to the Limited Partners at any time by paying to them the Early Termination Payment; provided, however, that this Agreement only terminates under this Section 4.1(a) upon the receipt of the Early Termination Payments by the Limited Partners, and provided, further, that Premier may withdraw any notice to execute its termination rights under this Section 4.1(a) prior to the time at which any Early Termination Payment has been paid. Upon payment of the Early Termination Payments by Premier, Premier shall not have any further payment obligations under this Agreement, other than for any (i) Tax Benefit Payments agreed to by Premier and the Limited Partners as due and payable but unpaid as of the Early Termination Notice and (ii) Tax Benefit Payments due for the Taxable Year ending with or including the date of the Early Termination Notice (except to the extent that the amount described in clause (ii) is included in Early Termination Payments). If an Exchange occurs after Premier makes such payments to the Limited Partners, Premier shall have no obligations under this Agreement with respect to such Exchange.

(b)    Upon the occurrence of a Change of Control, Premier shall be obligated to terminate this Agreement effective as of the Change of Control Termination Date by paying to the Limited Partners the Change of Control Termination Payment, substituting Change of Control Termination Date for Early Termination Date each time Early Termination Date appears in the definition of Valuation Assumptions and substituting Change of Control Termination Schedule for Early Termination Schedule each time Early Termination Schedule appears in the definition of Valuation Assumptions, and following the procedures set forth in Sections 4.2 and 4.3, as applicable to a Change of Control; provided, however, that this Agreement shall terminate under this Section 4.1(b) only upon the receipt of the Change of Control Termination Payments by the Limited Partners. Upon payment of the Change of Control Termination Payments by Premier, Premier shall have no further payment obligations under this Agreement, other than for any (i) Tax Benefit Payments agreed to by Premier and the Limited Partners as due and payable but unpaid as of the Change of Control Termination Notice and (ii) Tax Benefit Payments due for the Taxable Year ending with or including the date of the Change of Control Termination

14

Notice (except to the extent that the amount described in clause (ii) is included in Change of Control Termination Payments). If an Exchange occurs by a Limited Partner after Premier makes such payments to the Limited Partners, Premier shall have no obligations under this Agreement with respect to such Exchange.

(c)    In the event that Premier breaches any of its material obligations under this Agreement, whether as a result of failure to make any payment when due, failure to honor any other material obligation required hereunder or by operation of law as a result of the rejection in a case commenced under the Bankruptcy Code or otherwise, then all obligations hereunder shall be accelerated and such obligations shall be calculated as if an Early Termination Notice had been delivered on the date of such breach and shall include, but not be limited to, (i) Early Termination Payments calculated as if an Early Termination Notice had been delivered on the date of a breach, (ii) any Tax Benefit Payments agreed to by Premier and the Limited Partners as due and payable but unpaid as of the date of a breach, and (iii) any Tax Benefit Payments due for the Taxable Year ending with or including the date of a breach. Notwithstanding the foregoing, in the event that Premier breaches this Agreement, the Limited Partners shall each separately be entitled to elect to receive the amounts set forth in clauses (i), (ii) and (iii) above or to seek specific performance of the terms hereof. The parties agree that the failure to make any payment due pursuant to this Agreement within three months after the date such payment is due shall be deemed to be a breach of a material obligation under this Agreement for all purposes, and that it will not be considered to be a breach of a material obligation under this Agreement to make a payment due pursuant to this Agreement within three months after the date such payment is due.

(d)    Premier may satisfy its obligation under this Agreement to pay amounts to a Limited Partner attributable to the Original Sale or a particular Exchange at any time 15 or more years after the year of the Original Sale or such Exchange, by making a final payment to such Limited Partner in an amount computed in the same manner as an Early Termination Payment would be computed if the Original Sale or such Exchange were the only event giving rise to payments under this Agreement.

Section 4.2    Termination Notice . If Premier chooses to exercise its right of early termination under Section 4.1 above, or within 30 days of a Change of Control, Premier shall deliver to each of the Limited Partners notice of such intention to exercise such right or of such occurrence (" Early Termination Notice " or " Change of Control Termination Notice ", as applicable) and a schedule (the " Early Termination Schedule " or " Change of Control Termination Schedule ", as applicable) specifying Premier's intention to exercise such right or of such occurrence and showing in reasonable detail the calculation of the Early Termination Payments or the Change of Control Termination Payments, as applicable, for the Limited Partners. Premier shall, along with such notice and schedule, (i) deliver to the Limited Partners schedules and work papers, as determined by Premier or requested by a Limited Partner providing reasonable detail regarding the preparation of the Schedule and (ii) allow the Limited Partners reasonable access at no cost to the appropriate representatives at Premier, as determined by Premier or requested by a Limited Partner, in connection with a review of such schedule. The Early Termination Schedule or Change of Control Termination Schedule, as applicable, shall

15

become final and binding on Premier and a Limited Partner 30 calendar days from the first date on which such Limited Partner received such schedule or amendment thereto unless such Limited Partner (i) within 30 calendar days after receiving such schedule, provides Premier with notice of a material objection to such schedule made in good faith (" Material Objection Notice ") or (ii) provides a written waiver of such right of a Material Objection Notice within the period described in clause (i) above, in which case such schedule becomes binding on the date the waiver is received by Premier (the " Early Termination Effective Date " or " Change of Control Termination Effective Date "). If the parties, for any reason, are unable to successfully resolve the issues raised in such notice within 30 calendar days after receipt by Premier of the Material Objection Notice, Premier and such Limited Partner shall employ the Reconciliation Procedures.

Section 4.3        Payment upon Termination .

(a)        Within three (3) Business Days after the Early Termination Effective Date Premier shall pay to each Limited Partner an amount equal to the Early Termination Payment with respect to the Limited Partner. Within three (3) Business Days after the Change of Control Termination Effective Date, Premier shall pay to each Limited Partner an amount equal to the Change of Control Termination Payment with respect to the Limited Partner. Such payments shall be made by wire transfer of immediately available funds to a bank account or accounts designated by each of the Limited Partners or as otherwise agreed by Premier and each of the Limited Partners.

(b)        " Early Termination Payment " for a Limited Partner shall equal the present value, discounted at the Early Termination Rate as of the Early Termination Effective Date, of all Tax Benefit Payments that would be required to be paid by Premier to the Limited Partner hereunder beginning from the Early Termination Date and assuming that the Valuation Assumptions are applied. " Change of Control Termination Payment " for a Limited Partner shall equal the present value, discounted at the Early Termination Rate as of the Change of Control Termination Effective Date, of all Tax Benefit Payments that would be required to be paid by Premier to the Limited Partner hereunder beginning as of the Change of Control Termination Date and assuming that the Valuation Assumptions are applied, as amended by Section 4.1(b).

Section 4.4        Unilateral Termination . At any time, by providing notice (the " Unilateral Termination Notice ") to Premier, a Limited Partner may elect to terminate this Agreement with respect to such Limited Partner effective as of the date designated by the Limited Partner in such notice (the " Unilateral Termination Date "). Upon receipt of the Unilateral Termination Notice, Premier shall have no further payment obligations under this Agreement with respect to such Limited Partner other than for a (a) Tax Benefit Payment agreed to by Premier through a majority of its Independent Directors and the Limited Partner as due and payable but unpaid as of the Unilateral Termination Date and (b) Tax Benefit Payment due for the Covered Taxable Year ending with or including the Unilateral Termination Date (except to the extent that the amount described in clause (b) is attributable to Class B Common Units exchanged after the Unilateral Termination Date).

16

## ARTICLE 5

## SUBORDINATION AND LATE PAYMENTS

Section 5.1     Subordination . Notwithstanding any other provision to the contrary, any payment required to be made by Premier under this Agreement shall rank subordinate and junior in right of payment to any principal, interest or other amounts due and payable in respect of any obligations in respect of indebtedness for borrowed money of Premier and its Subsidiaries (" Senior Obligations ") and shall rank pari passu with all current or future unsecured obligations of Premier that are not Senior Obligations.

Section 5.2     Late Payments by Premier . The amount of all or any portion of any payment not made by Premier when due under the terms of this Agreement shall be payable together with any interest thereon, computed at the Default Rate and commencing from the date on which such payment was due.

## ARTICLE 6

## NO DISPUTES; CONSISTENCY; COOPERATION

Section 6.1     Election to be Filed . As the sole member of the general partner of Premier LP, Premier shall cause Premier LP and each Premier LP Group member that is treated as a partnership for United States federal income tax purposes to file an election under Section 754 of the Code commencing with its Taxable Year in which the Original Sale occurs, unless such entity already has a Section 754 election in effect, and shall not cause any such entity to revoke such election until this Agreement is no longer in effect for any Limited Partner. If Premier LP acquires an interest in an entity that is treated as a partnership for United States federal income tax purposes, Premier shall use its best efforts to cause such entity to file an election under Section 754 of the Code effective for each such entity's Taxable Year in which such acquisition occurs, unless such entity already has an election under Section 754 of the Code in effect, and shall not cause such entity to revoke such election until this Agreement is no longer in effect.

Section 6.2     Participation in Premier's and Premier LP's Tax Matters . Except as otherwise provided herein, Premier shall have full responsibility for, and sole discretion over, all Tax matters concerning Premier and Premier LP, including without limitation the preparation, filing or amending of any Tax Return and defending, contesting or settling any issue pertaining to Taxes. Notwithstanding the foregoing, Premier shall notify each applicable Limited Partner, and keep each applicable Limited Partner reasonably informed with respect to, the portion of any material audit of Premier or Premier LP by a Taxing Authority the outcome of which is reasonably expected to affect the rights and obligations of such Limited Partner(s) under this Agreement, and shall provide to such Limited Partner(s) reasonable opportunity to provide information and other input to Premier, Premier LP and their respective advisors concerning the conduct of any such portion of such audit; provided, however, that Premier and Premier LP shall not be required to take any action that is inconsistent with any provision of the LP Agreement.

Section 6.3     Consistency . Premier and the Limited Partners agree to report and cause to be reported for all purposes, including federal, foreign, state and local Tax purposes and financial reporting purposes, all Tax-related items (including, without limitation, the Basis Adjustments and each Tax Benefit Payment) in a manner consistent with that specified by Premier in any

17

Schedule required to be provided by or on behalf of Premier under this Agreement unless otherwise required by law.

Section 6.4     Cooperation . Each applicable Limited Partner shall (a) furnish to Premier in a timely manner such information, documents and other materials as Premier may reasonably request for purposes of making any determination or computation necessary or appropriate under this Agreement, preparing any Tax Return or contesting or defending any audit, examination or controversy with any Taxing Authority, (b) make itself available to Premier and its representatives to provide explanations of documents and materials and such other information as Premier or its representatives may reasonably request in connection with any of the matters described in clause (a) above, and (c) reasonably cooperate in connection with any such matter, and Premier shall reimburse any such Limited Partner for any reasonable third-party costs and expenses incurred pursuant to this Section.

**ARTICLE 7**

**MISCELLANEOUS**

Section 7.1     Notices . All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be deemed duly given and received (a) on the date of delivery if delivered personally or (b) on the first Business Day following the date of dispatch if delivered by a recognized next-day courier service. All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice:

If to Premier, to:    Premier, Inc.
           13034 Ballantyne Corporate Place
           Charlotte, NC 28277
           Attention: Chief Financial Officer and General Counsel
           Facsimile: (704) 816-6307
           Email: craig_mckasson@premierinc.com
           and Jeffrey_Lemkin2@premierinc.com, respectively

If to any Limited Partner:  The address set forth on the books and records of Premier LP

Any party may change its address or fax number by giving the other parties written notice of its new address or fax number in the manner set forth above.

Section 7.2     Counterparts . This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart. Delivery

18

of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart.

Section 7.3 <u>Entire Agreement; No Third Party Beneficiaries</u> . This Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their respective successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason.

Section 7.4 <u>Governing Law</u> . This Agreement shall be governed by, and construed in accordance with, the law of the State of Delaware, without regard to the conflicts of laws principles thereof that would mandate the application of the laws of another jurisdiction.

Section 7.5 <u>Severability</u> . If any term or other provision is invalid, illegal or incapable of being enforced by any law or public policy, all other terms and provisions shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 7.6 <u>Successors; Assignment; Amendments; Waivers</u> .

(a) A Limited Partner may not assign any of its rights under this Agreement to any Person; provided, however, that in connection with a sale by the Limited Partner of Class B Common Units to another Limited Partner, such selling Limited Partner shall have the option to assign its rights under this Agreement with respect to the Class B Common Units sold to such acquiring Limited Partner, so long as such acquiring Limited Partner has executed and delivered, or in connection with such sale executes and delivers, a joinder to this Agreement, in form and substance reasonably satisfactory to Premier, agreeing to become a successor for all purposes, except as otherwise provided in such joinder.

(b) No provision may be amended unless such amendment is approved in writing by Premier and the Limited Partners; provided, that, the definition of Change of Control cannot be amended without the written approval of a majority of the Independent Directors. No provision may be waived unless such waiver is in writing and signed by the party against whom the waiver is to be effective.

(c) All of the terms and provisions shall be binding upon, shall inure to the benefit of and shall be enforceable by the parties hereto and their respective successors, assigns, heirs, executors, administrators and legal representatives. Premier shall require and cause any direct or indirect successor (whether by purchase, merger, consolidation or otherwise) to all or

19

substantially all of the business or assets of Premier, by written agreement, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that Premier would be required to perform if no such succession had taken place.

Section 7.7    <u>Titles and Subtitles</u> . The titles of the sections and subsections are for convenience of reference only and are not to be considered in construing this Agreement.

Section 7.8    <u>Resolution of Disputes</u> .

(a)    Any and all disputes which cannot be settled amicably, including any ancillary claims of any party, arising out of, relating to or in connection with the validity, negotiation, execution, interpretation, performance or non-performance (including the validity, scope and enforceability of this arbitration provision) (each a " <u>Dispute</u> ") shall be finally settled by arbitration conducted by a single arbitrator in Delaware in accordance with then-existing Rules of Arbitration of the American Arbitration Association. If the parties to the Dispute fail to agree on the selection of an arbitrator within ten (10) days of the receipt of the request for arbitration, the American Arbitration Association shall make the appointment. The arbitrator shall be a lawyer admitted to the practice of law in the State of Delaware and shall conduct the proceedings in the English language. Performance under this Agreement shall continue if reasonably possible during any arbitration proceedings.

(b)    Notwithstanding the provisions of paragraph (a), Premier may bring an action or special proceeding in any court of competent jurisdiction for the purpose of compelling a party to arbitrate, seeking temporary or preliminary relief in aid of an arbitration hereunder, and/or enforcing an arbitration award and, for the purposes of this paragraph (b), the Limited Partners (i) expressly consent to the application of paragraph (c) of this Section 7.8 to any such action or proceeding, (ii) agree that proof shall not be required that monetary damages for breach of the provisions would be difficult to calculate and that remedies at law would be inadequate, and (iii) irrevocably appoint Premier as agent of the Limited Partners for service of process in connection with any such action or proceeding and agree that service of process upon such agent, who shall promptly advise the Limited Partners of any such service of process, shall be deemed in every respect effective service of process upon the Limited Partners in any such action or proceeding.

(c)    (i) EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF COURTS LOCATED IN WILMINGTON, DELAWARE FOR THE PURPOSE OF ANY JUDICIAL PROCEEDING BROUGHT IN ACCORDANCE WITH THE PROVISIONS OF THIS SECTION 7.8, OR ANY JUDICIAL PROCEEDING ANCILLARY TO AN ARBITRATION OR CONTEMPLATED ARBITRATION ARISING OUT OF OR RELATING TO OR CONCERNING THIS AGREEMENT. Such ancillary judicial proceedings include any suit, action or proceeding to compel arbitration, to obtain temporary or preliminary judicial relief in aid of arbitration, or to confirm an arbitration award. The parties acknowledge that the forums designated by this paragraph (c) have a reasonable relation to this Agreement, and to the parties' relationship with one another; and

(ii) The parties hereby waive, to the fullest extent permitted by applicable law, any objection which they now or hereafter may have to personal jurisdiction or to the laying

20

of venue of any such ancillary suit, action or proceeding brought in any court referred to in the preceding paragraph of this Section 7.8 and such parties agree not to plead or claim the same.

Section 7.9    Reconciliation . In the event that Premier and a Limited Partner are unable to resolve a disagreement with respect to the matters governed by Sections 2.4 and 4.2 within the relevant period designated in this Agreement (" Reconciliation Dispute "), the Reconciliation Dispute shall be submitted for determination to a nationally recognized expert (the " Expert ") in the particular area of disagreement mutually acceptable to both parties. The Expert shall be a partner or principal in a nationally recognized accounting or law firm, and unless Premier and either the Limited Partner agree otherwise, the Expert shall not, and the firm that employs the Expert shall not, have any material relationship with Premier or either the Limited Partner or other actual or potential conflict of interest. If the parties are unable to agree on an Expert within fifteen (15) days of receipt by the respondent(s) of written notice of a Reconciliation Dispute, the Expert shall be appointed by the Qualified Tax Advisor. The Expert shall resolve any matter relating to the Original Basis Schedule, or an amendment thereto, an Exchange Basis Schedule, or an amendment thereto, the Early Termination Schedule, or an amendment thereto, or the Change of Control Termination Schedule, or an amendment thereto, within 30 calendar days and shall resolve any matter relating to a Tax Benefit Schedule or an amendment thereto within 15 calendar days or as soon thereafter as is reasonably practicable, in each case after the matter has been submitted to the Expert for resolution. Notwithstanding the preceding sentence, if the matter is not resolved before any payment that is the subject of a disagreement would be due (in the absence of such disagreement) or any Tax Return reflecting the subject of a disagreement is due, the undisputed amount shall be paid on the date prescribed by this Agreement and such Tax Return may be filed as prepared by Premier, subject to adjustment or amendment upon resolution. The costs and expenses relating to the engagement of such Expert or amending any Tax Return shall be borne by Premier except as provided in the next sentence. Premier and the Limited Partner shall bear their own costs and expenses of such proceeding, unless (a) the Expert adopts Premier LP's or the Limited Partner's position, or concludes that 75% or more of the aggregate amount of any payments at issue should be made to the Limited Partner, in which case Premier shall reimburse the Limited Partner for any reasonable out-of-pocket costs and expenses in such proceeding, or (b) the Expert adopts Premier's position, or concludes that less than 25% of the aggregate amount of any payments at issue should be made to the Limited Partner, in which case the Limited Partner shall reimburse Premier for any reasonable out-of-pocket costs and expenses in such proceeding. Any dispute as to whether a dispute is a Reconciliation Dispute within the meaning of this Section 7.9 shall be decided by the Expert. The Expert shall finally determine any Reconciliation Dispute and the determinations of the Expert pursuant to this Section 7.9 shall be binding on Premier and the Limited Partner which is a party to such Dispute and may be entered and enforced in any court having jurisdiction.

Section 7.10    Withholding . Premier shall be entitled to deduct and withhold from any payment payable pursuant to this Agreement such amounts as Premier is required to deduct and withhold with respect to the making of such payment under the Code or any provision of state, local or foreign Tax law. To the extent that amounts are so withheld and paid over to the appropriate Taxing Authority by Premier, such withheld amounts shall be treated for all purposes as having been paid to either the applicable Limited Partner.

21

Section 7.11    <u>Admission of Premier into a Consolidated Group; Transfers of Corporate Assets</u> .

(a)    If Premier is or becomes a member of an affiliated or consolidated group of corporations that files a consolidated income tax return pursuant to Sections 1501 et seq. of the Code or any corresponding provisions of state or local law, then: (i) the provisions of this Agreement shall be applied with respect to the group as a whole; and (ii) Tax Benefit Payments, Early Termination Payments, Change of Control Termination Payments, and other applicable items hereunder shall be computed with reference to the consolidated taxable income of the group as a whole.

(b)    If any entity that is obligated to make a Tax Benefit Payment, Early Termination Payment, or Change of Control Termination Payment hereunder transfers one or more assets to a corporation (or a Person classified as a corporation for United States federal income tax purposes) with which such entity does not file a consolidated tax return pursuant to Section 1501 of the Code, such entity, for purposes of calculating the amount of any Tax Benefit Payment, Early Termination Payment, or Change of Control Termination Payment due hereunder, shall be treated as having disposed of such asset in a fully taxable transaction on the date of such transfer. The consideration deemed to be received by such entity shall be equal to the fair market value of the transferred asset. For purposes of this Section 7.11, a transfer of a partnership or limited liability company interest shall be treated as a transfer of the transferring partner's or member's share of each of the assets and liabilities of that partnership or limited liability company.

Section 7.12    <u>Confidentiality</u> . Premier LP, the Limited Partners and each of their assignees acknowledge and agree that the information of Premier is confidential and, except in the course of performing any duties as necessary for Premier and its Affiliates, as required by law or legal process or to enforce the terms, such person shall keep and retain in the strictest confidence and not disclose to any Person any confidential matters, acquired pursuant to this Agreement, of Premier and its Affiliates and successors, concerning Premier LP and its Affiliates and successors or the Limited Partners, learned by the Limited Partners heretofore or hereafter. This Section 7.12 shall not apply to (a) any information that has been made publicly available by Premier or any of its Affiliates, becomes public knowledge (except as a result of an act of Premier LP or a Limited Partner in violation ) or is generally known to the business community and (b) the disclosure of information to the extent necessary for the Limited Partners to prepare and file their Tax Returns, to respond to any inquiries regarding the same from any Taxing Authority or to prosecute or defend any action, proceeding or audit by any taxing authority with respect to such returns. Notwithstanding anything to the contrary herein, the Limited Partners and each of their assignees (and with respect to each, their respective employee, representative or other agents or their assignees, as applicable) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of Premier, Premier LP, the Limited Partners and their Affiliates, and any of their transactions, and all materials of any kind (including opinions or other tax analyses) that are provided to the Limited Partners relating to such tax treatment and tax structure.

If a Limited Partner or its assignee commits a breach, or threatens to commit a breach, of any of the provisions of this Section 7.12, Premier shall have the right and remedy to have the

22

provisions of this Section 7.12 specifically enforced by injunctive relief or otherwise by any court of competent jurisdiction without the need to post any bond or other security, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Premier or any of its Subsidiaries and the accounts and funds managed by Premier and that money damages alone shall not provide an adequate remedy to such Persons. Such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available at law or in equity.

Section 7.13    <u>Void Date</u>. If the Effective Date does not occur prior to March 31, 2014, this Agreement shall be null and void and of no further effect.

23

159

IN WITNESS WHEREOF, Premier and the Limited Partners have duly executed this Agreement as of the date first written above.

Premier, Inc.

By:   /s/Craig McKasson
Name: Craig McKasson
Title: Chief Financial Officer

**[Signature Page to Tax Receivable Agreement]**

IN WITNESS WHEREOF, Premier and the Limited Partners have duly executed this Agreement as of the date first written above.

**EACH OF THE LIMITED PARTNERS LISTED ON
SCHEDULE I ATTACHED HERETO**

By:  Premier Plans, LLC, as attorney-in-fact pursuant to the Special
Power of Attorney executed by each of the Limited Partners

By:   /s/Craig McKasson
Name: Craig McKasson
Title: Chief Financial Officer

**[Signature Page to Tax Receivable Agreement]**

Exhibit A

Form of Joinder Agreement

[                              ] does hereby agree to the terms and conditions of the Tax Receivable Agreement, dated as of [          ], 2013, a copy of which is attached hereto, and shall be and hereby is a Limited Partner, as defined in such Agreement, and is bound by its terms and conditions.

Effective [                ].

Premier, Inc.

By: _____
Name: Craig McKasson
Title: Chief Financial Officer

Limited Partner

By: _____

# EXHIBIT 7

**Exhibit 10.4**

**<u>REGISTRATION RIGHTS AGREEMENT</u>**

THIS REGISTRATION RIGHTS AGREEMENT (this " <u>Agreement</u> ") made as of September 25, 2013 and to be effective immediately prior to the closing of the initial public offering of Premier, Inc., a newly formed Delaware corporation (" <u>Premier</u> ") (the " <u>Effective Date</u> "), is made by and among Premier and the Limited Partners (as such term is defined below) listed on **<u>Schedule I</u>** hereto from time to time party hereto.

WHEREAS, following a proposed reorganization of Premier Purchasing Partners, L.P., a California limited partnership (together with its successors and assigns, " <u>Premier LP</u> ") and its Related Entities and an initial public offering of Class A Common Stock (as such term is hereinafter defined) of Premier, Premier LP will adopt an Amended and Restated Limited Partnership Agreement pursuant to which Premier LP will (a) change its name to "Premier Healthcare Alliance, L.P." and (b) issue Class A Common Units to its general partner and Class B Common Units (as such term is defined below) to its limited partners (the " <u>Limited Partners</u> "), collectively representing a 100% interest in Premier LP and concurrently therewith the Limited Partners will purchase for nominal consideration Class B Common Stock (as such term is defined below) in amounts corresponding to the number of Class B Common Units held by each Limited Partner;

WHEREAS, the Limited Partners are concurrently herewith entering into an Exchange Agreement (as such term is defined below) providing for the exchange, from time to time, subject to certain restrictions and requirements, of Class B Common Units (and surrender of the corresponding shares of Class B Common Stock) for, at the option of Premier (i) shares of Class A Common Stock, (ii) cash in an amount equal to the fair market value of the Class A Common Stock a Limited Partner would have received for such exchange or (iii) a combination of Class A Common Stock and cash; and

WHEREAS, Premier has agreed to provide certain registration rights under the Securities Act (as such term is defined below) with respect to shares of Class A Common Stock received pursuant to the Exchange Agreement or otherwise held by the Limited Partners.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements, covenants and provisions herein contained, the parties hereto agree as follows:

1. <u>Defined Terms; Interpretation</u> .

(a) <u>Defined Terms</u> . The following terms shall, for purposes of this Agreement, have the following meanings:

" <u>Adverse Effect</u> " has the meaning set forth in Section 2(b)(vi) of this Agreement.

" <u>Agreement</u> " has the meaning set forth in the Introduction of this Agreement.

" <u>Applicable Quarterly Exchange Date</u> " has the meaning set forth in Section 2(b)(ii).

" Board " means the Board of Directors of Premier.

" Business Day " means each day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York are authorized or required by law to close.

" CEO " means the Chief Executive Officer of Premier.

" Class A Common Stock " shall mean the shares of Class A common stock, par value $0.01 per share, of Premier and any securities into which such shares may hereinafter be reclassified.

" Class B Common Stock " shall mean the shares of Class B common stock, par value $0.000001 per share, of Premier and any securities into which such shares may hereinafter be reclassified.

" Class B Common Units " shall mean the Class B Common Units of Premier LP, and any securities into which such shares may hereinafter be reclassified.

" Company-Directed Offering " has the meaning set forth in Section 2(b)(i) of this Agreement.

" Company-Directed Offering Notice " has the meaning set forth in Section 2(b)(ii) of this Agreement.

" control " means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract (written or oral) or otherwise; and the terms "controlling," "controlled by" and "under common control with" shall have meanings correlative to the foregoing.

" Demand Party " has the meaning set forth in Section 2(b)(ii) of this Agreement.

" Director " means a member of the Board.

" Effective Date " has the meaning set forth in the Introduction.

" Exchange Act " means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

" Exchange Agreement " means the Exchange Agreement of even date herewith among Premier, Premier LP and the Limited Partners pursuant to which each Limited Partner has the right, under certain circumstances, to exchange its Class B Common Units and surrender its corresponding shares of Class B Common Stock for shares of Class A Common Stock, cash or a combination thereof.

" Exchange Notice Date " has the meaning set forth in the Exchange Agreement.

2

" Exchange Year " means any of the First Exchange Year and each sequential 12-month period thereafter until the end of the Seventh Exchange Year.

" FINRA " means the Financial Industry Regulatory Authority, Inc.

" First Exchange Year " means the 12-month period beginning on the First Quarterly Exchange Date.

" First Quarterly Exchange Date " means the date that is the one-year anniversary of the last day of the calendar month in which Premier consummates the IPO.

" Fourth Exchange Year " means the fourth Exchange Year.

" Governmental Authority " means any nation or government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

" Group " has the meaning set forth in Section 13(d)(3) and Rule 13d-5 of the Exchange Act.

" IPO " means an initial primary sale by Premier of shares of Class A Common Stock to the public in an offering pursuant to an effective registration statement (other than a registration statement on Form S-4 or S-8 or any similar or successor form) filed under the Securities Act, after which such shares of Class A Common Stock are listed on one or more nationally recognized exchanges or quoted on one or more automated quotation systems, including the NYSE or NASDAQ.

" Limited Partners " has the meaning set forth in the Recitals.

" Lock-up Period " has the meaning set forth in Section 2(j)(i) of this Agreement.

" Losses " has the meaning set forth in Section 2(h)(i) of this Agreement.

" LP Agreement " means the Amended and Restated Limited Partnership Agreement, to be entered into among Premier LP, Premier Services, LLC, as general partner, and each of the Limited Partners party thereto, as amended from time to time.

" NASDAQ " has the meaning set forth in Section 2(d)(vii) of this Agreement.

" Notice and Questionnaire " means a written notice, substantially in the form attached as **Exhibit B** (which may be amended by Premier to include all information required by law), delivered by a Limited Partner to Premier (i) notifying Premier of such Limited Partner's desire to include Registrable Securities held thereby in a Shelf Registration Statement and (ii) containing all information about such Limited Partner to be included in such Shelf Registration Statement in accordance with applicable law, including Item 507 of Regulation S-K promulgated under the Securities Act.

3

" <u>NYSE</u> " has the meaning set forth in Section 2(d)(vii) of this Agreement.

" <u>Officer</u> " means a person designated as an officer of Premier by the Board or the CEO.

" <u>Participation Notice</u> " has the meaning set forth in Section 2(b)(ii) of this Agreement.

" <u>Person</u> " means any individual, corporation, limited liability company, partnership, trust, joint stock company, business trust, unincorporated association, joint venture, Governmental Authority or other entity or organization of any nature whatsoever or any Group of two or more of the foregoing.

" <u>Premier</u> " has the meaning set forth in the Introduction of this Agreement.

" <u>Premier LP</u> " has the meaning set forth in the Recitals.

" <u>Quarterly Exchange Date</u> " has the meaning given that term in the Exchange Agreement.

" <u>Registrable Securities</u> " mean the Shares. As to any particular Registrable Securities, such Shares shall cease to be Registrable Securities when (i) a registration statement with respect to the sale of such Shares shall have become effective under the Securities Act and such Shares shall have been disposed of in accordance with such registration statement, (ii) such Shares may be sold without restrictions (including volume and manner of sale restrictions) pursuant to Rule 144, (iii) such Shares are transferred and the subsequent disposition of such Shares do not require registration under the Securities Act or (iv) such Shares shall have ceased to be outstanding.

" <u>Registration Expenses</u> " means any and all reasonable expenses of Premier and Premier LP incident to performance of or compliance with Sections 2(a), 2(b), 2(c) and 2(d), including (i) all SEC and stock exchange or automated quotation system or FINRA registration, filing and listing fees incurred by Premier and Premier LP, (ii) all fees and expenses of complying with state securities or blue sky laws (including fees and disbursements of counsel for the underwriters in connection with blue sky qualifications of the Registrable Securities), (iii) all printing, word processing, duplication, messenger and delivery expenses incurred by Premier and Premier LP, (iv) all fees and expenses incurred by Premier and Premier LP in connection with the listing of the Registrable Securities on any stock exchange or automated quotation system pursuant to this Agreement, (v) the fees and disbursements of counsel for Premier, (vi) the reasonable fees and disbursements of Premier's independent public accountants, including the expenses of any "cold comfort" letters required by or incident to the transactions contemplated by this Agreement and (vii) all reasonable expenses incurred in connection with any road shows.

" <u>Registration Indemnified Parties</u> " has the meaning set forth in Section 2(h)(i) of this Agreement.

" <u>Related Entity</u> " means, with respect to any Person (i) any other Person that, directly or indirectly, controls or is controlled by or is under common control with such Person, (ii) any other Person that owns, beneficially, directly or indirectly, 10% or more of the outstanding

4

capital stock, shares or equity interests of such Person or (iii) any officer, director, employee, shareholder, partner, member, manager or trustee of such Person or any Person controlling, controlled by or under common control with such Person (excluding trustees and persons serving in similar capacities who are not otherwise a Related Entity of such Person).

" Rule 144 " means Rule 144 (or any successor provision), as the same may be amended from time to time, under the Securities Act.

" SEC " means the U.S. Securities and Exchange Commission or any other federal agency then administering the Securities Act or the Exchange Act and other federal securities law.

" Second Exchange Year " means the second Exchange Year.

" Securities Act " means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder, as the same may be amended from time to time.

" Seventh Exchange Year " means the seventh Exchange Year.

" Shares " means the shares of Class A Common Stock issued to any Limited Partner pursuant to the exercise by such Limited Partner of its exchange rights under the Exchange Agreement, including any shares of Class A Common Stock issued in connection with a stock split, distribution, reclassification, recapitalization or otherwise in respect of such shares and other shares of Class A Common Stock otherwise held by Limited Partners from time to time.

" Shelf Registration Statement " has the meaning set forth in Section 2(a)(i) of this Agreement.

" Third Exchange Year " means the third Exchange Year.

" Third Party Holder " has the meaning set forth in Section 2(c)(i) of this Agreement.

" Transfer " (including the term " Transferred ") means, directly or indirectly, to sell, transfer, give, exchange (including exchange under the Exchange Agreement), assign, pledge, encumber, hypothecate or otherwise dispose of, either voluntarily or involuntarily (including upon the foreclosure under any pledge or hypothecation permitted below that results in a change in title), any equity interests in Premier or any interest in any equity interests in Premier beneficially owned by a Person; provided , however , that a bona fide pledge of equity interests by any Limited Partner or its Related Entities shall not be deemed to be a Transfer hereunder.

(b)  Other Definitional Provisions; Interpretation .

(i) The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole, including the Exhibits and Schedules attached hereto, and not to any particular provision of this Agreement. Articles, section and subsection references are to this Agreement unless otherwise specified.

5

(ii) The words "include" and "including" and words of similar import when used in this Agreement shall be deemed to be followed by the words "without limitation".

(iii) The titles and headings in this Agreement are included for convenience of reference only and will not limit or otherwise affect the meaning or interpretation of this Agreement.

(iv) The meanings given to capitalized terms defined herein will be equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(v) If any notice or action hereunder is due on a day which is not a Business Day, then such notice or action shall be due on the next succeeding Business Day.

2.  Registration Rights and Procedures .

(a)  Resale Shelf Registration Statement .

(i)  Right to Use a Shelf Registration Statement for Resales .  Premier shall use all reasonable efforts to cause to become effective a "shelf" registration statement (the " Shelf Registration Statement ") as soon as practicable after the one-year anniversary of the closing of the IPO on an appropriate form to allow Limited Partners, subject to applicable Lock-up Periods pursuant to Section 2(j) and the restrictions set forth in Section 3.4 of the LP Agreement, to sell on a continuous basis pursuant to Rule 415 under the Securities Act any Registrable Securities that the Limited Partners hold.

(ii)  Participation in Shelf Registration Statement .  Each Limited Partner that has delivered a duly completed and executed Notice and Questionnaire to Premier on or prior to the date 10 Business Days prior to the effectiveness of the Shelf Registration Statement shall be named as a selling securityholder at the time of such effectiveness in the Shelf Registration Statement and the related prospectus in such a manner as to permit such Limited Partner to deliver such prospectus to purchasers of Registrable Securities in accordance with applicable law. Subject to the terms and conditions hereof, after effectiveness of the Shelf Registration Statement, Premier shall file a supplement to such prospectus or amendment to the Shelf Registration Statement not less frequently than once a quarter as necessary to name as selling securityholders therein any Limited Partners that provide to Premier a duly completed and executed Notice and Questionnaire (and include all required information related thereto) and shall use reasonable efforts to cause any post-effective amendment to such Shelf Registration Statement filed for such purpose to be declared effective by the SEC as promptly as reasonably practicable after the filing thereof.

(iii)  Effective Period of Shelf Registrations .  Premier shall use reasonable efforts to keep a Shelf Registration Statement effective at all times (but subject to shelf registration limitations under Rule 415 of the Securities Act) from the first anniversary of the completion of the IPO until the end of the Seventh Exchange Year.

6

169

(iv)  Expenses .  Premier will pay all Registration Expenses in connection with registrations pursuant to this Section 2(a), which Registration Expenses shall in no event be deemed to include brokerage commissions or transfer taxes, or, if applicable, underwriting commissions and discounts.

(b)  Company Initiated Annual Underwritten Offering .

(i)  Company-Directed Offering .  Subject to the terms and conditions of this Agreement, and subject to applicable vesting restrictions set forth in the LP Agreement applicable to Limited Partners, Premier will use all reasonable efforts to conduct a Premier-directed underwritten public offering (a " Company-Directed Offering ") for secondary resales under the Securities Act of Registrable Securities by the Limited Partners and, at Premier's option, primary sales of newly issued or treasury shares of Class A Common Stock, in each of the First Exchange Year, the Second Exchange Year and the Third Exchange Year. Premier may, in its sole discretion, effect a Company-Directed Offering in the remaining Exchange Years.  All Company-Directed Offerings shall be conducted in accordance with the procedures set forth in this Section 2(b).

(ii)  Company-Directed Offering Process .  Premier shall deliver a notice (the " Company-Directed Offering Notice ") to all Limited Partners 65 Business Days prior to the first Quarterly Exchange Date of each Exchange Year in which Premier will conduct a Company-Directed Offering (the " Applicable Quarterly Exchange Date ").  The Company-Directed Offering Notice shall state that Premier will effect a Company-Directed Offering and include the material terms of such Company-Directed Offering then known but such terms of Company-Directed Offering, including price, shall be at the sole discretion of Premier and the lead and managing underwriters of such Company-Directed Offering.  To participate in such Company-Directed Offering, addressees of a Company-Directed Offering Notice shall deliver to Premier a notice of intent to participate (a " Participation Notice ") in the Company-Directed Offering no later than 20 Business Days prior to such Applicable Quarterly Exchange Date (each such addressee a " Demand Party ").  Each Participation Notice shall specify the number of Registrable Securities proposed to be sold.  Premier shall use reasonable efforts to complete such Company-Directed Offering no later than 20 Business Days after the Applicable Quarterly Exchange Date.  Notwithstanding the terms and procedures of the Company-Directed Offering set forth in this Section 2(b), Premier reserves the right to modify the terms and procedures of a Company-Directed Offering in a manner providing a reasonable registration process for Premier consistent with the intent of this Agreement and not materially adverse to the Limited Partners as reasonably determined in good faith by the Board.

(iii)  Offering Minimum for Company-Directed Offering .  In no event shall Premier be required to effect a registration pursuant to this Section 2(b) unless, on the date that is 15 Business Days prior to the Applicable Quarterly Exchange Date related to such Company-Directed Offering, the aggregate number of Registrable Securities proposed to be sold constitutes or represents the equivalent of (on a one-for-one basis) at least 3.5% of the aggregate number of Class A Common Units and Class B Common Units outstanding (taking into account the effect of any unit splits or similar distributions in respect of the Class A Common Units or Class B

7

Common Units); provided , that, notwithstanding the foregoing, Premier may still elect to effect such a Company-Directed Offering even if not required to do so.

(iv)    Expenses .  Premier will pay all Registration Expenses in connection with registrations pursuant to this Section 2(b), which shall in no event be deemed to include underwriting commissions or discounts, brokerage commissions or transfer taxes.

(v)    Effective Registration Statement .  Other than with respect to a shelf registration, a registration requested pursuant to this Section 2(b) will not be deemed to have been effected:

(1) unless a registration statement with respect thereto has become effective and remained effective in compliance with the provisions of the Securities Act until the earlier of (x) such time as all of such Registrable Securities have been disposed of in accordance with the intended methods of disposition thereof set forth in such registration statement or (y) 60 days after the effective date of such registration statement (or if such registration statement is not effective for any period within such 60 days, such 60-day period shall be extended by the number of days during which such registration statement is not effective); provided , however , that if the failure of any such registration statement to become or remain effective in compliance with this Section 2(b)(v)(1) is due solely to acts or omissions of a Demand Party, such registration requested pursuant to this Section 2(b) will be deemed to have been effected; or

(2) if, after it has become effective, the registration statement with respect thereto is subject to any stop order, injunction or other order or requirement of the SEC or other Governmental Authority prohibiting the sale of securities pursuant to such registration statement, other than by reason of an act or omission on the part of a Demand Party.

(vi)    Underwriters; Priority in Company-Directed Offerings .  In conjunction with Company-Directed Offerings, the underwriter or underwriters shall be selected by Premier in its reasonable discretion.  Other than in connection with a Company-Directed Offering, Premier shall have no obligation to cooperate with an underwritten offering of Class A Common Stock or other securities of Premier. If the lead or managing underwriters in a Company-Directed Offering advise Premier in writing that, in such underwriters' opinion, the number of securities to be included in such Company-Directed Offering would be likely to have an adverse effect on the price, timing or distribution of the securities to be offered in such Company-Directed Offering (an " Adverse Effect "), then Premier shall include in such Company-Directed Offering all securities that the lead or managing underwriters believe can be sold in such offering without having an Adverse Effect allocated first to Registrable Securities which the Limited Partners have requested to be included and second to shares of Class A Common Stock to be issued and sold by Premier in such offering and shares of Class A Common Stock which any other holders of Class A Common Stock have requested to be included.  If such lead or managing underwriters advise Premier that only a portion of the Registrable Securities or shares of Class A Common Stock requested to be included by the Limited Partners may be included in such registration without such Adverse Effect, Premier shall include such Registrable Securities and shares of Class A Common Stock from the Limited Partners on a pro rata basis based on the

8

relative number of Registrable Securities requested by such holder to be so included in such Company-Directed Offering.

      (vii) <u>Postponement of Company-Directed Offerings</u> . If Limited Partners proposing to sell 50 percent or more of the shares of Class A Common Stock to be registered in a Company-Directed Offering deliver notice to Premier three Business Days prior to the Applicable Quarterly Exchange Date in conjunction with a Company-Directed Offering requesting delay of such Company-Directed Offering due to unfavorable market conditions, then Premier shall not be required to comply with its obligations under this Section 2(b) and such Company-Directed Offering shall be postponed until the next Quarterly Exchange Date and such postponed Company-Directed Offering shall then be conducted in a manner consistent with the process set forth in Section 2(b)(i) and Section 2(b)(ii). The right to postpone a Company-Directed Offering pursuant to this Section 2(b)(vii) may only be exercised once in any Exchange Year.

      (viii) <u>Additional Rights</u> . Premier shall not grant to any other holders of shares of Class A Common Stock (or securities that are convertible, exchangeable or exercisable into shares of Class A Common Stock) any rights to request Premier to effect the registration under the Securities Act of any such shares on terms more favorable to such holders than the terms set forth in this Agreement and Premier shall not grant any such rights unless the holders of such shares agree to be subject to the lock-up agreement set forth in Section 2(j)(i).

    (c) <u>Incidental Registrations</u> .

      (i) <u>Right to Piggyback</u> . If Premier or any other Person that has demand registration rights (a " <u>Third Party Holder</u> ") proposes to register shares of Class A Common Stock under the Securities Act (other than a registration on Form S-4 or S-8, or any successor or other forms promulgated for similar purposes), Premier will, at each such time, give prompt written notice to the Limited Partners of its intention to so register such shares of Class A Common Stock and of the Limited Partners' rights under this Agreement. Upon the written request of any Limited Partner made within 15 Business Days after the receipt of any such notice (which request shall specify the Registrable Securities intended to be disposed of by such Limited Partner), subject to applicable vesting restrictions set forth in the LP Agreement, Premier will use its reasonable efforts to effect the registration under the Securities Act of all Registrable Securities which Premier has been so requested to register by the Limited Partners; <u>provided</u> , <u>however</u> , that (A) if, at any time after giving written notice of its intention to register any securities and prior to the effective date of the registration statement filed in connection with such registration, Premier or such Third Party Holder shall determine for any reason not to proceed with the proposed registration of the securities to be sold thereby, Premier may, at its election, give written notice of such determination to each Limited Partner and thereupon shall be relieved of its obligation to register any Registrable Securities in connection with such terminated registration and (B) if such registration involves an underwritten offering, all Limited Partners requesting to be included in the registration of Premier or such Third Party Holder shall enter into an agreement with the underwriters to sell their Registrable Securities to the underwriters selected by Premier or such Third Party Holder on substantially the same terms and conditions as apply to Premier or such Third Party Holder, with such differences, including with

9

respect to indemnification as may be customary or appropriate in combined primary and secondary offerings.  The registrations provided for in this Section 2(c) are in addition to, and not in lieu of, registrations made in accordance with Section 2(a) and 2(b).

       (ii)  <u>Expenses</u> .  Premier will pay all Registration Expenses in connection with each registration of Registrable Securities requested pursuant to this Section 2(c), which in no event shall be deemed to include underwriting discounts or commissions, brokerage commissions or transfer taxes.

       (iii)  <u>Priority in Incidental Registrations</u> .  If a registration pursuant to this Section 2(c) involves an underwritten offering and the lead or managing underwriters advise Premier in writing that, in the opinion of such underwriters, the number of Registrable Securities and other shares of Class A Common Stock requested to be included in such registration would be likely to have an Adverse Effect on such offering, then Premier shall include in such registration: (a) first, the securities which Premier or the Third Party Holder proposes to sell and (b) second, the number of Registrable Securities which the Limited Partners have requested to be included in such registration and the number of shares of Class A Common Stock which any other holders of Class A Common Stock have requested to be included in the registration.  If such lead or managing underwriters advise Premier that only a portion of such Registrable Securities or shares of Class A Common Stock referenced in clause (b) may be included in such registration without such Adverse Effect, Premier shall include such Registrable Securities and shares of Class A Common Stock in such clause (b) on a pro rata basis based on the relative number of Registrable Securities or shares of Class A Common Stock then held by each such holder who has requested that securities owned by them be so included in a registration.

     (d)  <u>Registration Procedures</u> .  If and whenever Premier is required to cause the registration of any Registrable Securities under the Securities Act as provided in this Agreement, Premier will, within the applicable time frames set forth herein or otherwise as expeditiously as reasonably practicable:

       (i)  with respect to any registration under Section 2(b), prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its reasonable efforts to cause such registration statement to become effective within 60 days of the initial filing and remain effective for the periods specified in this Section 2; <u>provided</u> , <u>however</u> , that before filing a registration statement or related prospectus or amendments or supplements thereto, Premier will use reasonable efforts to furnish to the holders of Registrable Securities included in such registration statement, the counsel for the holders of the Registrable Securities being registered and the lead or managing underwriters, if any, copies of all such documents proposed to be filed.  The holders holding Registrable Securities shall have the right to request that Premier modify any information contained in such registration statement or related prospectus or amendments or supplements thereto pertaining to such holder and Premier shall use its reasonable efforts to comply with such request; <u>provided</u> , <u>however</u> , that Premier shall not have any obligation to so modify any information if Premier reasonably expects that so doing would cause such registration statement or related prospectus or amendments or supplements thereto, to contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

10

(ii) prepare and file with the SEC such amendments and supplements to any registration statement with respect to Registrable Securities and the related prospectus as Premier may determine to be necessary to keep such registration statement effective in accordance with Section 2(a) and 2(b) and to comply with the provisions of the Securities Act and the Exchange Act; provided , however , that before filing any such amendments or supplements in accordance with Section 2(d)(i) or this Section 2(d)(ii), Premier will use reasonable efforts to furnish to the holders of Registrable Securities included in such registration statement, the counsel for the holders of the Registrable Securities being registered and the lead or managing underwriters copies of all such documents proposed to be filed.  The holders holding Registrable Securities shall have the right to request that Premier modify any information contained in such amendments and supplements pertaining to such holder and Premier shall use its reasonable efforts to comply with such request; provided , however , that Premier shall not have any obligation to so modify any information if Premier reasonably expects that so doing would cause such registration statement or related prospectus or amendments or supplements thereto, to contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading;

(iii) furnish to each holder of Registrable Securities being registered such number of copies of the prospectus included in such registration statement (including each preliminary prospectus), in conformity with the requirements of the Securities Act, as such seller may reasonably request in order to facilitate the disposition of the Registrable Securities by such holder;

(iv) use its reasonable efforts to register or qualify such Registrable Securities covered by such registration statement in such jurisdictions as each holder of Registrable Securities being so registered shall reasonably request, and do any and all other acts and things which may be reasonably necessary or advisable to enable such holder to consummate the disposition in such jurisdictions of the Registrable Securities owned by such holder, except that Premier shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction where, but for the requirements of this Section 2(d)(iv), it would not be obligated to be so qualified, to subject itself to taxation in any such jurisdiction or to consent to general service of process in any such jurisdiction;

(v) notify each holder of any such Registrable Securities covered by a registration statement, at any time when a prospectus relating thereto is required to be delivered under the Securities Act, of Premier's becoming aware that the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing, and at the request of any such holder, prepare and furnish to such holder a reasonable number of copies of an amended or supplemental prospectus as may be necessary so that, as thereafter delivered to the holders of such Registrable Securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

11

(vi) otherwise use its reasonable efforts to comply with all applicable rules and regulations of the SEC and make available to its security holders, as soon as reasonably practicable (but not more than 18 months) after the effective date of the registration statement, an earnings statement which shall satisfy the provisions of Section 11(a) of the Securities Act;

(vii) use its reasonable efforts to cause all Registrable Securities covered by such registration statement to be (a) listed on each stock exchange or automated quotation system, if any, on which securities issued by Premier of the same class are then listed or, if no such securities issued by Premier are then so listed, on the New York Stock Exchange (the " NYSE "), Nasdaq Stock Market of the Nasdaq National Market (" NASDAQ ") or another nationally recognized stock exchange, if the securities qualify to be so listed or (b) on a nationally recognized automated quotation system, if the securities qualify to be so quoted;

(viii) enter into such customary agreements (including an underwriting agreement in customary form), which shall include customary indemnification provisions in favor of underwriters and other Persons in addition to or in substitution for the provisions of Section 2(h) hereof, and take such other customary actions as sellers of a majority of shares of such Registrable Securities or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities;

(ix) use reasonable efforts to obtain a "cold comfort" letter or letters from Premier's independent public accountants in customary form and covering matters of the type customarily covered by "cold comfort" letters as the holders of a majority of shares of such Registrable Securities shall reasonably request;

(x) make available for inspection by any holder of such Registrable Securities covered by such registration statement, by any underwriter participating in any disposition to be effected pursuant to such registration statement and by any attorney, accountant or other agent retained by any such holder or any such underwriter, any pertinent financial and other records, pertinent corporate documents and properties of Premier as reasonably requested by any such seller, underwriter, attorney, accountant or agent in connection with customary due diligence performed for a public offering of such Registrable Securities;

(xi) promptly notify counsel for the holders of Registrable Securities included in such registration statement and the lead or managing underwriters (a) when the registration statement, or any post-effective amendment to the registration statement, shall have become effective, or any supplement to the prospectus or any amendment to the prospectus shall have been filed, (b) of the receipt of any comments from the SEC relating to such registration statement, (c) of any request of the SEC to amend the registration statement or amend or supplement the prospectus and (d) of the issuance by the SEC of any stop order suspending the effectiveness of the registration statement or of any order preventing or suspending the use of any prospectus, or of the suspension of the qualification of the registration statement for offering or sale in any jurisdiction, or of the institution or threatening of any proceedings for any of such purposes;

12

175

(xii) cooperate with the holders of Registrable Securities covered by the registration statement and the lead or managing underwriters if any, to facilitate the timely preparation and delivery of any certificates representing securities to be sold under the registration statement, and enable such securities to be in such denominations and registered in such names as the lead or managing underwriters or agent, if any, or such holders may request;

(xiii) use its reasonable efforts to obtain for delivery to the holders of Registrable Securities being registered and to the underwriter an opinion or opinions from counsel for Premier in customary form and in form, substance and scope reasonably satisfactory to such holders, underwriters or agents and their counsel; and

(xiv) cooperate with each holder of Registrable Securities being registered and each underwriter participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the NYSE, NASDAQ or any other stock exchange or automated quotation system and FINRA.

(e) Information Supplied .  Premier may require each holder of Registrable Securities being registered to furnish Premier with such information regarding such holder and pertinent to the disclosure requirements relating to the registration and the distribution of such securities as Premier may from time to time reasonably request in writing.  Premier shall not be required to include in any registration statement any Registrable Securities of any holder which does not provide such information.

(f) Restrictions on Disposition .  Each Limited Partner agrees that, upon receipt of any notice from Premier of the happening of any event of the kind described in Section 2(d)(v), such Limited Partner will forthwith discontinue disposition of Registrable Securities pursuant to the registration statement covering such Registrable Securities until such Limited Partner's receipt of any copies of the supplemented or amended prospectus contemplated by Section 2(d)(v), and, if so directed by Premier, such Limited Partner will deliver to Premier (at Premier's expense) all copies, other than permanent file copies then in such Limited Partner's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice.

(g) Premier Transaction Delay Right .

(i) If, in conjunction with any registered offering of Registrable Securities under this Agreement, Premier shall furnish the holders with a certificate signed by an Officer of Premier (the " Transaction Delay Notice ") stating that Premier has pending or in process a material transaction or a material development which Premier has a bona fide business purpose in keeping confidential and that the filing of a registration statement or continued sales under a Shelf Registration Statement would require disclosure (or premature disclosure) of such material transaction or material development, then Premier (A) in the case of a Company-Directed Offering, shall not be required to comply with its obligations under Section 2(b) and such Company-Directed Offering shall be postponed until the next Quarterly Exchange Date and such postponed Company-Directed Offering shall be conducted in a manner consistent with the process set forth in Section 2(b)(i) and Section 2(b)(ii) and (B) in the case of Shelf Registration

13

Statement, shall include in the Transaction Delay Notice that sales under such Shelf Registration Statement are suspended for a period of up to 90 days following the Transaction Delay Notice.

(ii)    Notwithstanding the foregoing provisions of Section 2(g)(i), the right to postpone a Company-Directed Offering pursuant to this Section may only be exercised once in any Exchange Year and, in the case of a Shelf Registration Statement, Premier shall be entitled to serve only one Transaction Delay Notice within any period of 365 consecutive days.

(h)    Indemnification .

(i) In the event of any registration of any securities of Premier under the Securities Act pursuant to this Section 2, Premier shall indemnify and hold harmless the holder of any Registrable Securities covered by such registration statement, its directors, officers and employees, each Person who participates as an underwriter in the offering or sale of such securities and each other Person, if any, who controls such holder or any such underwriter within the meaning of the Securities Act (collectively, the " Registration Indemnified Parties "), against any and all losses, claims, damages or liabilities, joint or several, actions or proceedings (whether commenced or threatened) in respect thereof and expenses (including reasonable attorney's fees and reasonable expenses of investigation) to which such Registration Indemnified Party may become subject under the Securities Act (" Losses "), state law or otherwise, insofar as such Losses arise out of, relate to or are based upon (a) any untrue statement or alleged untrue statement of any material fact contained in any registration statement under which such securities were registered under the Securities Act, any preliminary or final prospectus contained therein, or any amendment or supplement thereto, or (b) any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a prospectus, in light of the circumstances under which they were made) not misleading; provided , that Premier shall not be liable to any Registration Indemnified Party in any such case to the extent, but only to the extent, that any such Losses or expenses arise out of, relate to or are based upon any untrue statement or alleged untrue statement or omission or alleged omission made in such registration statement or amendment or supplement thereto or in any such preliminary or final prospectus in reliance upon and in conformity with written information furnished to Premier by or on behalf of such Registration Indemnified Party specifically for use in the preparation thereof; and, provided , further , that Premier will not be liable in any such case to the extent, but only to the extent, that the foregoing indemnity with respect to any untrue statement contained in or omitted from a registration statement or the prospectus shall not inure to the benefit of any party (or any Person controlling such party) who is obligated to deliver a prospectus in transactions in a security as to which a registration statement has been filed pursuant to the Securities Act and from whom the Person asserting any such Losses purchased any of the Registrable Securities to the extent that it is finally judicially determined that Losses resulted from the fact that such party sold Registrable Securities to a Person to whom there was not sent or given, at or prior to the written confirmation of such sale, a copy of the registration statement or the prospectus, as amended or supplemented, and (x) Premier shall have previously and timely furnished sufficient copies of the registration statement or prospectus, as so amended or supplemented if required under the Securities Act, to such party in accordance with this Agreement and (y) the registration statement or prospectus, as so amended or supplemented, would have corrected such untrue statement or omission of a material fact. Such indemnity shall

14

remain in full force and effect regardless of any investigation made by or on behalf of any Registration Indemnified Party and shall survive the Transfer of securities by any holder.

(ii) Premier may require, as a condition to participating in the sale of any Registrable Securities in any registration statement filed in accordance with Sections 2(a) or 2(b) herein, that it shall have received an undertaking reasonably satisfactory to it from the selling holder of such Registrable Securities and any underwriter to indemnify and hold harmless (in the same manner and to the same extent as set forth in Section 2(h)(i)) Premier and all other selling holders or any underwriter, as the case may be, with respect to any untrue statement or alleged untrue statement in or omission or alleged omission from such registration statement, any preliminary or final prospectus contained therein, or any amendment or supplement thereto, if such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to Premier by or on behalf of such selling holder or such underwriter specifically for inclusion in such registration statement, preliminary or final prospectus or amendment or supplement.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of Premier, any of the selling holders or any underwriter and shall survive the Transfer of securities by any holder.

(iii) Promptly after receipt by a Registration Indemnified Party hereunder of written notice of the commencement of any action or proceeding with respect to which a claim for indemnification may be made pursuant to this Section 2(h), such Registration Indemnified Party will, if a claim in respect thereof is to be made against Premier, give written notice to Premier of the commencement of such action or proceeding; provided , however , that the failure of the Registration Indemnified Party to give notice as provided herein shall not relieve Premier of its obligations under this Section 2(h), except to the extent that Premier is materially prejudiced by such failure to give notice.  In case any such action or proceeding is brought against a Registration Indemnified Party, unless in such Registration Indemnified Party's reasonable judgment (after consultation with legal counsel) a bona fide conflict of interest between such Registration Indemnified Party and Premier may exist in respect of such action or proceeding, Premier will be entitled to participate in and to assume the defense thereof (at its expense) with counsel reasonably satisfactory to such Registration Indemnified Party, and after notice from Premier to such Registration Indemnified Party of its election so to assume the defense thereof, Premier will not be liable to such Registration Indemnified Party for any legal or other expenses subsequently incurred by the Registration Indemnified Party in connection with the defense thereof other than reasonable costs of investigation; provided , however , in the event Premier declines or fails to assume the defense of the action or proceeding or to employ counsel reasonably satisfactory to the Registration Indemnified Party or if a court of competent jurisdiction determines that Premier is not vigorously defending such action or proceeding, or if there is a bona fide conflict of interest between Premier and the Registration Indemnified Party, then such Registration Indemnified Party may employ counsel to represent or defend it in any such action or proceeding and Premier shall pay the reasonable fees and disbursements of such counsel or other representative as incurred; provided , further , however , that Premier shall not be required to pay the fees and disbursements of more than one counsel for all Registration Indemnified Parties in any jurisdiction in any single action or proceeding.  Premier will not settle any such action or proceeding or consent to the entry of any judgment without the prior written consent of the Registration Indemnified Party, unless such settlement or judgment (a) includes as

15

an unconditional term thereof the giving by the claimant or plaintiff of a release to such Registration Indemnified Party from all liability in respect of such action or proceeding and (b) does not involve the imposition of equitable remedies.  No Registration Indemnified Party will settle any such action or proceeding or consent to the entry of any judgment without the prior written consent of Premier (such consent not to be unreasonably withheld).

(iv) (1) If the indemnification provided for in this Section 2(h) is unavailable to Premier or to a Registration Indemnified Party hereunder in respect of any Losses or expenses referred to herein, then Premier and the Registration Indemnified Parties, in lieu of such indemnification, shall contribute to the amount paid or payable by Premier or such Registration Indemnified Party as a result of such Losses or expenses in such proportion as is appropriate to reflect the relative fault of Premier and Registration Indemnified Party in connection with the actions or proceedings which resulted in such Losses or expenses, as well as any other relevant equitable considerations.  The relative fault of Premier and Registration Indemnified Party shall be determined by reference to, among other things, whether any action or proceeding in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made by, or relates to information supplied by, Premier or Registration Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action or proceeding.  The amount paid or payable by a party under this Section 2(h) (iv) as a result of the Losses and expenses referred to above shall be deemed to include any legal or other fees or expenses reasonably incurred by such party in connection with any action or proceeding.

(2) The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 2(h) (iv) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in Section 2(h)(iv)(1).  No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of similar fraudulent misrepresentation.

(v) The obligations of the parties under this Section 2(h) shall be in addition to any liability which any party may otherwise have to any other party and shall survive until the expiration of the applicable statutes of limitations (including any waivers or extensions thereof) with respect to any such registrations made hereunder.

(i) Required Reports .  Premier covenants that it will timely file the reports required to be filed by it under the Securities Act and the Exchange Act, and it will take such further action as any Limited Partner may reasonably request, all to the extent required from time to time to enable such Limited Partner to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144.

(j) Lock-Up Agreements .

(i) If any registration under this Agreement shall be in connection with an underwritten public offering (including each Company-Directed Offering), each holder of Registrable Securities and each holder of Class B Common Units agrees that (A) during a period

16

of 60 days beginning on the date of effectiveness of the registration statement or (B) in the case of a Company Directed Offering, from the Exchange Notice Date until the earlier of (I) the delivery of notice by Premier announcing the abandonment of the Company-Directed Offering (whether due to failure to obtain sufficient participation pursuant to Section 2(b)(iii), postponement by Limited Partners under Section 2(b)(vii) or a Transaction Delay Notice pursuant to Section 2(g)) or (II) 60 days after completion of the Company-Directed Offering (each of (A) and (B), the " Lock-up Period "), such holder will not (other than as part of such underwritten public offering), (w) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant for the sale of, or otherwise dispose of or transfer any shares of Class A Common Stock or any securities convertible into or exchangeable or exercisable for shares of Class A Common Stock, whether now owned or hereafter acquired by such holder or with respect to which the holder has or hereafter acquires the power of disposition, or file, or cause to be filed, any registration statement under the Securities Act, with respect to any of the foregoing (collectively, the " Lock-Up Securities ") or (x) enter into any swap or any other agreement or any transaction that transfers, in whole or in part, directly or indirectly, the economic consequence of ownership of the Lock-Up Securities, whether any such swap or transaction is to be settled by delivery of Class A Common Stock or other securities, in cash or otherwise.  If (y) Premier issues an earnings release or discloses other material information or a material event relating to Premier occurs during the last 17 days of the Lock-up Period or (z) prior to the expiration of the Lock-up Period, Premier announces that it will release earnings results during the 16-day period beginning upon the expiration of such period, then to the extent necessary for a lead, managing or co-managing underwriter of a registered offering required hereunder to comply with FINRA Rule 2711(f)(4), the Lock-up Period will be extended until 18 days after the earnings release or disclosure of other material information or the occurrence of the material event, as the case may be.  Premier shall use reasonable efforts to obtain the agreement of the Directors and Officers and all holders of more than 1% of the then-outstanding shares of Class A Common Stock to adhere to the Lock-up Period specified in this Subsection 2(j)(i).

(ii) If any registration under this Agreement shall be in connection with an underwritten public offering (including each Company-Directed Offering), Premier agrees (A) during the period of 60 days beginning on the date of effectiveness of the registration statement for such offering, not to (x) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant for the sale of, or otherwise dispose of or transfer any Lock-up Securities or file, or cause to be filed, any registration statement under the Securities Act, with respect to any Lock-up Securities, or (y) enter into any swap or any other agreement or any transaction that transfers, in whole or in part, directly or indirectly, the economic consequence of ownership of the Lock-Up Securities, whether any such swap or transaction is to be settled by delivery of Class A Common Stock or other securities, in cash or otherwise, except as part of such registration or in connection with any employee benefit or similar plan, any dividend reinvestment plan, or a business acquisition or combination and (B) to use reasonable efforts to cause each Director, Officer and holder of greater than 1% (on a fully-diluted basis) of the then-outstanding shares of Class A Common Stock, or any securities convertible into or exchangeable or exercisable for such Class A Common Stock, which are or may be purchased from Premier at any time after the date of this

17

Agreement (other than in a registered offering) to agree to the same restraints during the Lock-up Period (except as part of such underwritten offering, if otherwise permitted).

(k) <u>Mergers, Recapitalizations, Exchanges or Other Transactions Affecting Registrable Securities</u>. The provisions of this Agreement shall apply to the full extent set forth herein with respect to the Registrable Securities, to any and all securities or units of Premier LP or Premier or any successor or assign of any such Person (whether by merger, amalgamation, consolidation, sale of assets or otherwise) that may be issued in respect of, in exchange for, or in substitution of such Registrable Securities, by reason of any dividend, split, issuance, reverse split, combination, recapitalization, reclassification, merger, amalgamation, consolidation or otherwise.

(l) <u>Termination of Rights</u>. Except for indemnification rights provided in Section 2(h), the rights granted to a Limited Partner in this Agreement shall terminate and forthwith become null and void in full on the earliest date that such Limited Partner no longer beneficially owns any Registrable Securities.

3. <u>Miscellaneous</u>.

(a) <u>Agreement to Cooperate; Further Assurances</u>. In case at any time any further action is necessary or desirable to carry out the purposes of this Agreement, the proper officers and directors and each Limited Partner and their respective Related Entities shall execute such further documents and shall take such further action as shall be reasonably necessary to carry out the purposes of this Agreement, in each case to the extent not inconsistent with applicable law.

(b) <u>Amendments</u>. Except as otherwise expressly provided in this Agreement, amendments to this Agreement shall require approval of Premier and Limited Partners holding a majority of the outstanding Class B Common Units; <u>provided</u>, <u>however</u>, that each Limited Partner hereby constitutes and appoints Premier, irrevocably as its true and lawful agent and attorney-in-fact, in its name, place and stead to execute and deliver amendments to this Agreement as reasonably required from time to time and consistent with the intent of this Agreement as determined in the good faith reasonable judgment of Premier.

(c) <u>Injunctive Relief</u>. Premier and each Limited Partner acknowledge and agree that a violation of any of the terms of this Agreement may cause the other Limited Partners and Premier, as the case may be, irreparable injury for which an adequate remedy at law is not available. Accordingly, it is agreed that each of the Limited Partners and Premier will be entitled to seek an injunction, restraining order or other equitable relief to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction, in addition to any other remedy to which they may be entitled at law or, equity. Nothing stated herein shall limit any other remedies provided under this Agreement or available to the parties at law or in equity.

(d) <u>Assignment; Successors</u>. This Agreement shall be binding upon and inure to the benefit of the respective legatees, legal representatives, successors and assigns of the Limited Partners; provided, however, that a Limited Partner may not assign this Agreement or any of his

18

rights or obligations hereunder, and any purported assignment in breach hereof by a Limited Partner shall be void; and provided further that no assignment of this Agreement by Premier or to a successor of Premier (by operation of law or otherwise) shall be valid unless such assignment is made to a Person which succeeds to the business of such Person substantially as an entirety.

(e)  Successors and Assigns; Certain Transferees Bound Hereby .  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by each of Premier and its successors and assigns, and by the Limited Partners and their respective successors and assigns so long as they hold shares of Class A Common Stock or Class B Common Units.

(f)  Notices .  Any written notice required or permitted to be delivered pursuant to this Agreement shall be in writing and shall be deemed delivered (i) upon delivery if delivered in person, (ii) upon transmission if sent by facsimile, with receipt confirmed by the recipient thereof, (iii) one Business Day after deposit with a nationally recognized overnight courier service; provided , that confirmation of such overnight delivery is received by the sender thereof or (iv) upon transmission if sent by e-mail, with receipt confirmed by the recipient thereof.  Notices to Premier or any Limited Partner shall be delivered to their respective addresses as set forth in the Exchange Agreement.  Any party hereto may change its address for notices by giving written notice of such party's new address to the other parties hereto in accordance with the Exchange Agreement.

(g)  Integration .  This Agreement contains the exclusive, entire and final understanding of the parties with respect to the subject matter hereof.  There are no agreements, representations, warranties, covenants or undertakings with respect to the subject matter hereof other than those expressly set forth herein.  Except as expressly set forth herein, this Agreement supersedes all other prior agreements, discussions, negotiations, communications and understandings between the parties with respect to such subject matter hereof.  No party has relied on any statement, representation, warranty, or promise not expressly contained in this Agreement in connection with this transaction.

(h)  Severability .  If one or more of the provisions, paragraphs, words, clauses, phrases or sentences contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, then such provision, paragraph, word, clause, phrase or sentence shall be deemed restated to reflect the original intention of the parties as nearly as possible in accordance with applicable law and the remainder of this Agreement. The legality and enforceability of any such provision, paragraph, word, clause, phrase or sentence in every other respect and of the remaining provisions, paragraphs, words, clauses, phrases or sentences hereof will not be in any way impaired, it being intended that all obligations, rights, powers and privileges of Premier and the Limited Partners will be enforceable to the fullest extent permitted by law.  Upon such determination of invalidity, illegality or unenforceability, Premier and the Limited Partners shall negotiate in good faith to amend this Agreement to effect the original intent of the Limited Partners.

(i)  Counterparts .  This Agreement may be executed in one or more counterparts and by different parties on separate counterparts, each of which will be deemed an original, but

19

all of which will constitute one and the same instrument.  The parties agree that this Agreement shall be legally binding upon the electronic transmission, including by facsimile or email, by each party of a signed signature page hereof to the other party.

(j)  <u>Governing Law; Submission to Jurisdiction</u> .

(i) This Agreement is to be construed in accordance with and governed by the internal laws of the State of Delaware without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the internal laws of the State of Delaware to the rights and duties of the parties.

(ii) Each party hereto agrees that any legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement shall be brought or otherwise commenced exclusively in any state or federal court located in Delaware.

(k)  <u>Additional Parties</u> .  Additional Persons who acquire Class B Common Units may become parties to this Agreement by executing a joinder hereto substantially in the form attached hereto as **Exhibit A** .  By virtue of the execution of a joinder to this Agreement, such Person shall be deemed a Limited Partner hereunder and thereupon **Schedule I** attached hereto shall be automatically amended without further action on the part of any of the parties hereto to reflect that such party is to be considered a Limited Partner hereunder.

(l)  <u>Void Date</u> .  If the Effective Date does not occur prior to March 31, 2014, this Agreement shall be null and void and of no further effect.

[ *Signature Page Follows* ]

20

IN WITNESS WHEREOF, the undersigned have executed this Registration Rights Agreement as of the date set forth above.

**PREMIER, INC.**

By:  /s/Craig McKasson
_____
    Name:   Craig McKasson
    Title:    Chief Financial Officer

**EACH OF THE LIMITED PARTNERS LISTED ON
SCHEDULE I ATTACHED HERETO**

By:  Premier Plans, LLC, as attorney-in-fact pursuant to the Special
Power of Attorney executed by each of the Limited Partners

By:  /s/Craig McKasson
_____
    Name:   Craig McKasson
    Title:    Chief Financial Officer

21

EXHIBIT A

JOINDER TO REGISTRATION RIGHTS AGREEMENT

Pursuant to Section 3(k) of the Registration Rights Agreement (the " Registration Rights Agreement ") among Premier, Inc., a Delaware corporation (" Premier ") and the entities listed on Schedule I thereto as amended from time to time (the " Limited Partners "), certain individuals or entities who acquire shares of Class B Common Units (the " Class B Common Units ") of Premier may execute this joinder to the Registration Rights Agreement.  The undersigned is, on the date hereof, acquiring Class B Common Units, and hereby agrees to be a party to and be bound as an "Limited Partner" under the Registration Rights Agreement and hereby authorizes this joinder to the Registration Rights Agreement as of the date hereof.

Dated:  _____

AGREED AND ACCEPTED:

[                              ]

By:  _____
Name:
Title:

185

EXHIBIT B

PREMIER, INC.
FORM OF NOTICE AND QUESTIONNAIRE

The undersigned beneficial holder of shares of Class A Common Stock and/or Class B Common Units understands that Premier has filed or intends to file with the SEC one or more registration statements for the registration and resale of the Registrable Securities in accordance with the terms of the Registration Rights Agreement (the " Registration Rights Agreement "), among Premier and the Limited Partners party thereto.  A copy of the Registration Rights Agreement is available from Premier upon request at the address set forth below. All capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Registration Rights Agreement.

Each beneficial owner of Registrable Securities is entitled to the benefits of the Registration Rights Agreement. In order to sell or otherwise dispose of any Registrable Securities pursuant to the Shelf Registration Statement, a beneficial owner of Registrable Securities generally will be required to be named as a selling security holder in the related prospectus, deliver a prospectus to purchasers of Registrable Securities and be bound by those provisions of the Registration Rights Agreement applicable to such beneficial owner (including certain indemnification provisions as described below). **To be included in the Shelf Registration Statement, this Notice and Questionnaire must be completed, executed and delivered to Premier at the address set forth herein on or prior to the tenth business day before the effectiveness of the Shelf Registration Statement.** We will give notice of the filing and effectiveness of the initial Shelf Registration Statement by issuing a press release and by mailing a notice to the holders at their addresses set forth in the register of the registrar.

Beneficial owners that do not complete this Notice and Questionnaire and deliver it to Premier as provided below will not be named as selling security holders in the prospectus and therefore will not be permitted to sell any Registrable Securities pursuant to the Shelf Registration Statement. Beneficial owners are encouraged to complete and deliver this Notice and Questionnaire prior to the effectiveness of the initial Shelf Registration Statement so that such beneficial owners may be named as selling security holders in the related prospectus at the time of effectiveness. Upon receipt of a completed Notice and Questionnaire from a beneficial owner following the effectiveness of the initial Shelf Registration Statement, in accordance with the Registration Rights Agreement, Premier will file such amendments to the initial Shelf Registration Statement or additional shelf registration statements or supplements to the related prospectus as are necessary to permit such holder to deliver such prospectus to purchasers of Registrable Securities.

Certain legal consequences arise from being named as selling security holders in the Shelf Registration Statement and the related prospectus. Accordingly, holders and beneficial owners of Registrable Securities are advised to consult their own securities law counsel regarding the consequences of being named or not being named as a selling security holder in the Shelf Registration Statement and the related prospectus.

## NOTICE

The undersigned beneficial owner (the " <u>Selling Security Holder</u> ") of Registrable Securities hereby elects to include in the prospectus forming a part of the Shelf Registration Statement the Registrable Securities beneficially owned by it and listed below in Item 3 (unless otherwise specified under Item 3). The undersigned, by signing and returning this Notice and Questionnaire, understands that it will be bound by the terms and conditions of this Notice and Questionnaire and the Registration Rights Agreement.

Pursuant to the Registration Rights Agreement, the undersigned has agreed to indemnify and hold harmless Premier and its directors, officers and each person, if any, who controls Premier within the meaning of either Section 15 of the Securities Act or Section 20 of the Exchange Act, from and against certain losses arising in connection with statements concerning the undersigned made in the Shelf Registration Statement or the related prospectus in reliance upon the information provided in this Notice and Questionnaire.

The undersigned hereby provides the following information to Premier and represents and warrants to Premier that such information is accurate and complete:

## QUESTIONNAIRE

1.    (a)      **Full Legal Name of Selling Security Holder:**


      (b)      **Full Legal Name of registered holder (if not the same as (a) above) through which Registrable Securities listed in Item (3) below are held:**


      (c)      **Full Legal Name of DTC Participant (if applicable and if not the same as (b) above) through which Registrable Securities listed in Item (3) below are held:**


      (d)      **List below the individual or individuals who exercise voting and/or dispositive powers with respect to the Registrable Securities listed in Item (3) below:**

B-2

**2.        Address for Notices to Selling Security Holder:**

**Street Address:**

**Telephone:**

**Fax:**

**E-mail address:**

**Contact Person:**

**3.        Beneficial Ownership of Registrable Securities:**

**Type of Registrable Securities beneficially owned, and number of shares of Class A Common Stock and/or Class B Common Units, as the case may be, beneficially owned:**

**4.        Beneficial Ownership of Securities of Premier Owned by the Selling Security Holder:**

**Except as set forth below in this Item (4), the undersigned is not the beneficial or registered owner of any securities of Premier, other than the Registrable Securities listed above in Item (3).**

**Type and amount of other securities beneficially owned by the Selling Security Holder:**

**5.        Relationship with Premier**

**Except as set forth below, neither the undersigned nor any of its affiliates, officers, directors or principal equity holders (5% or more) has held any position or office or has had any other material relationship with Premier (or its predecessors or affiliates) during the past three years.**

**State any exceptions here:**

B-3

**6.      Plan of Distribution**

**Except as set forth below, the undersigned (including its donees or pledgees) intends to distribute the Registrable Securities listed above in Item (3) pursuant to the Shelf Registration Statement only as follows and will not be offering any of such Registrable Securities pursuant to an agreement, arrangement or understanding entered into with a broker or dealer <u>prior to the effective date</u> of the Shelf Registration Statement. Such Registrable Securities may be sold from time to time directly by the undersigned or, alternatively, through underwriters or broker-dealers or agents. If the Registrable Securities are sold through underwriters or broker-dealers, the Selling Security Holder will be responsible for underwriting discounts or commissions or agent's commissions. Such Registrable Securities may be sold in one or more transactions at fixed prices, at prevailing market prices at the time of sale, at varying prices determined at the time of sale, or at negotiated prices. Such sales may be effected in transactions (which may involve crosses or block transactions)**

- **on any national securities exchange or quotation service on which the Registrable Securities may be listed or quoted at the time of sale;**

- **in the over-the-counter market;**

- **in transactions otherwise than on such exchanges or services or in the over-the-counter market; or**

- **through the writing of options.**

**In connection with sales of the Registrable Securities or otherwise, the undersigned may enter into hedging transactions with broker-dealers, which may in turn engage in short sales of the Registrable Securities and deliver Registrable Securities to close out such short positions, or loan or pledge Registrable Securities to broker-dealers that in turn may sell such securities.**

**State any exceptions here:**

**Note:   In no event may such method(s) of distribution take the form of an underwritten offering of the Registrable Securities without the prior written agreement of Premier.**

B-4

## ACKNOWLEDGEMENTS

The undersigned acknowledges that it understands its obligation to comply with the provisions of the Securities Exchange Act of 1934, as amended, and the rules thereunder relating to stock manipulation, particularly Regulation M thereunder (or any successor rules or regulations), in connection with any offering of Registrable Securities pursuant to the Registration Rights Agreement. The undersigned agrees that neither it nor any person acting on its behalf will engage in any transaction in violation of such provisions.

The Selling Security Holder hereby acknowledges its obligations under the Registration Rights Agreement to indemnify and hold harmless certain persons set forth therein. Pursuant to the Registration Rights Agreement, Premier has agreed under certain circumstances to indemnify the Selling Security Holders against certain liabilities.

In accordance with the undersigned's obligation under the Registration Rights Agreement to provide such information as may be required by law for inclusion in the Shelf Registration Statement, the undersigned agrees to promptly notify Premier of any inaccuracies or changes in the information provided herein that may occur subsequent to the date hereof at any time while the Shelf Registration Statement remains effective. All notices hereunder and pursuant to the Registration Rights Agreement shall be made in writing at the address set forth below.

In the event that the undersigned transfers all or any portion of the Registrable Securities listed in Item 3 above after the date on which such information is provided to Premier, the undersigned agrees to notify the transferee(s) at the time of transfer of its rights and obligations under this Notice and Questionnaire and the Registration Rights Agreement.

By signing this Notice and Questionnaire, the undersigned consents to the disclosure of the information contained herein in its answers to Items (1) through (6) above and the inclusion of such information in the Shelf Registration Statement and the related prospectus. The undersigned understands that such information will be relied upon by Premier in connection with the preparation or amendment of the Shelf Registration Statement and the related prospectus.

Once this Notice and Questionnaire is executed by the Selling Security Holder and received by Premier, the terms of this Notice and Questionnaire and the representations and warranties contained herein shall be binding on, shall insure to the benefit of and shall be enforceable by the respective successors, heirs, personal representatives and assigns of Premier and the Selling Security Holder with respect to the Registrable Securities beneficially owned by such Selling Security Holder and listed in Item 3 above.

This Notice and Questionnaire shall be governed by, and construed in accordance with, the laws of the State of Delaware.

IN WITNESS WHEREOF, the undersigned, by authority duly given, has caused this Notice and Questionnaire to be executed and delivered either in person or by its duly authorized agent.

Beneficial Owner

By _____

Name:

Title:

Dated: _____

**Please return the completed and executed Notice and Questionnaire to:**

**Premier, Inc.**
**13034 Ballantyne Corporate Place**
**Charlotte, North Carolina 28277**
**Attention:  Chief Financial Officer and General Counsel**
**Tel: (704) 357-0022**
**Fax: (704) 816-6307**

# EXHIBIT 8

**Exhibit 9.1**

**VOTING TRUST AGREEMENT**

**RELATING TO SHARES OF CLASS B COMMON STOCK OF PREMIER, INC.**

THIS VOTING TRUST AGREEMENT (this " Agreement "), dated October 1, 2013, is effective immediately prior to the closing of the initial public offering of a newly formed Delaware corporation named "Premier, Inc." (" Premier ") (the " Effective Date "), and is made by and among Premier, Premier Purchasing Partners, L.P., a California limited partnership (" Premier LP "), the stockholders listed on **Schedule I** hereto (the " Stockholders ") from time to time party hereto and Wells Fargo Delaware Trust Company, N.A., as trustee (together with its successors in such capacity, the " Trustee ").

**WITNESSETH:**

WHEREAS, in conjunction with the proposed reorganization of Premier LP and its affiliates (the " Reorganization ") and initial public offering (" IPO ") of shares of Class A Common Stock of Premier, Premier LP will adopt an Amended and Restated Limited Partnership Agreement pursuant to which Premier LP will (a) change its name to "Premier Healthcare Alliance, L.P." and (b) issue Class A Common Units to its general partner and Class B Common Units to its limited partners, collectively representing a 100% interest in Premier LP;

WHEREAS, in conjunction with the Reorganization, the Stockholders (which are also holders of Class B Common Units of Premier LP) will purchase for nominal consideration shares of Class B Common Stock (together with any securities into which such shares may hereinafter be reclassified, the " Shares ") of Premier;

WHEREAS, the parties hereto desire to record their arrangements with respect to the Shares; and

WHEREAS, the Trustee has consented to act under this Agreement for the purposes herein provided.

NOW, THEREFORE, in consideration of these premises, the mutual covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

ARTICLE 1
**DEFINITIONS**

Section 1.1      Certain Definitions .  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1 :

" Board " means the Board of Directors of Premier.

" Business Day " means each day that is not a Saturday, Sunday or other day on which banking institutions in New York City, New York and Wilmington, Delaware are authorized or required by law to close.

"<u>Class A Common Stock</u>" shall mean the shares of Class A common stock, par value $0.01 per share, of Premier and any securities into which such shares may hereinafter be reclassified.

"<u>Class B Common Stock</u>" shall mean the shares of Class B common stock, par value $0.000001 per share, of Premier and any securities into which such shares may hereinafter be reclassified.

"<u>Custodian</u>" means the Trustee acting in its capacity as custodian of the Voting Trust Certificates as provided in <u>Section 2.1(c)</u> hereof.

"<u>Effective Date</u>" means October 1, 2013, which is the date of the closing of the IPO.

"<u>Exchange Agreement</u>" means the Exchange Agreement effective as of the Effective Date among Premier, Premier LP and the holders of Class B Common Units of Premier LP and the Shares, pursuant to which each such holder has the right to exchange its Class B Common Units (and surrender its corresponding shares of Class B Common Stock) for shares of Class A Common Stock, cash or a combination thereof under certain circumstances.

"<u>Independent Director</u>" means any director who (i) satisfies the definition of an "independent director" set forth in the applicable rules of the NASDAQ Stock Market ("<u>NASDAQ</u>"), as such rules may be amended from time to time (the "<u>NASDAQ Stock Market Rules</u>") and (ii) meets the requirements set forth in the NASDAQ Stock Market Rules for membership on the Audit Committee of the Board; <u>provided</u>, <u>however</u>, that if the Class A Common Stock is traded on a stock exchange other than the NASDAQ, then, with respect to clauses (i) and (ii) of this definition, such term shall mean any director who satisfies the definition of "independent director" and who meets the requirements for audit committee membership according to the rules of such other stock exchange.

"<u>IPO</u>" has the meaning set forth in the Recitals.

"<u>Nominating and Corporate Governance Committee</u>" means the Nominating and Corporate Governance Committee of the Board or any committee of the Board authorized to perform the function of nominating directors for the Board.

"<u>Transfer</u>," "<u>Transferred</u>" or "<u>Transferring</u>" means to sell, transfer, give, exchange (including exchanges under the Exchange Agreement), assign, pledge, encumber, hypothecate or otherwise dispose of, directly or indirectly, either voluntarily or involuntarily, any of the rights granted to a holder of Shares.

Section 1.2        <u>Other Definitional Provisions</u>

(i)        The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole, including the Exhibits and Schedules attached hereto, and not to any particular provision of this Agreement. Article, section and subsection references are to this Agreement unless otherwise specified.

(ii)       The words "include" and "including" and words of similar import when used in this Agreement shall be deemed to be followed by the words "without limitation."

(iii)      The titles and headings in this Agreement are included for convenience of reference only and will not limit or otherwise affect the meaning or interpretation of this Agreement.

(iv)      The meanings given to capitalized terms defined herein will be equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(v)       If any notice or action hereunder is due on a day which is not a Business Day, then such notice or action shall be due on the next succeeding Business Day.

ARTICLE 2
**OWNERSHIP AND VOTING OF SHARES**

Section 2.1       (a)       <u>Transfer of Shares to Trustee</u> .  Each Stockholder hereby agrees to Transfer to the Trustee on the Effective Date (i) all Shares listed opposite such Stockholder's name on **Schedule I** hereto and (ii) any Shares hereinafter acquired by any Stockholder. Stockholders shall concurrently therewith deposit such Shares with the Trustee and receive from the Trustee in exchange therefor one or more voting trust certificates, substantially in the form of **Exhibit A** hereto, evidencing the Shares deposited with the Trustee (the " <u>Voting Trust Certificates</u> "), to be held subject to all terms of this Agreement.  The Trustee shall cause such Shares so deposited to be registered in the name of the Trustee, with a notation to the effect that such certificates have been issued pursuant to this Agreement, and Premier shall Transfer the Shares on its books and records to the name of the Trustee, with a similar notation in the stock ledger as to the effect of this Agreement. Notwithstanding the foregoing, Stockholders that are to receive Shares immediately prior to the closing of the initial public offering of Premier hereby consent and agree to the issuance of such Shares directly in the name of the Trustee and the Trustee shall concurrently issue one or more Voting Trust Certificates evidencing such Shares deposited with the Trustee to such Stockholders.  Each Stockholder shall (i) within 90 days following the consummation of the IPO or (ii) following the IPO, at or prior to the time of the issuance of its Voting Trust Certificate, and thereafter as required, deliver an incumbency certificate substantially in the form of **Exhibit B** attached hereto (" <u>Incumbency Certificate</u> ") to the Trustee as provided in <u>Section 3.5(m)</u> hereof.

(b)       Annexed to each Voting Trust Certificate and made a part hereof is a schedule (the "Issuance and Cancellation Schedule") on which shall be shown the number of Shares deposited from time to time with the Trustee by or on behalf of the Stockholder in whose name the Voting Trust Certificate is issued and such other information provided for on such Issuance and Cancellation Schedule.  Each Stockholder hereby appoints the Trustee as its agent to make an appropriate notation on the Issuance and Cancellation Schedule (or on a continuation of such Issuance and Cancellation Schedule) evidencing the date and the number of Shares

deposited, received, transferred or exchanged by or on behalf of such Stockholder or such other information provided for on the Issuance and Cancellation Schedule.

(c)      The Trustee shall act as custodian (the " Custodian ") hereunder in respect of each Voting Trust Certificate issued by the Trustee under Sections 2.1(a) , 2.5 , 2.6 and 2.7 , and it is agreed that the Custodian shall retain possession of each original Voting Trust Certificate on behalf of each Stockholder entitled to receive such certificate issued, notwithstanding anything to the contrary provided in this Agreement.  The Custodian shall, upon written request of a Stockholder, promptly provide to such Stockholder a copy of the Voting Trust Certificate issued in such Stockholder's name and held by the Custodian. The Custodian shall not have any duty or obligation to notify or act on behalf of any Stockholder.  The Trustee shall treat the registered holder of each Voting Trust Certificate held by the Custodian at any time as the owner thereof for all purposes hereunder.

Section 2.2      Legal Title; Voting .

(a)      While this Agreement is in effect, the Trustee shall have the legal title to the Shares deposited hereunder.

(b)      At least 10 Business Days (or such lesser period as may be required or appropriate under the circumstances) prior to any meeting of the stockholders of Premier, however called, or at any adjournment or postponement thereof (a " Stockholders Meeting "), or in any other circumstances upon which a vote, consent or other approval (including by written consent) is sought by or from the stockholders of Premier, the Trustee shall provide notice in accordance with Section 5.1 to all Stockholders of the matters to be voted on, consented to or approved by, such Stockholders.  The notice shall specify the date by which voting consent or approval directions must be received by the Trustee in accordance with Section 5.1 in order to be counted which date shall be at least two Business Days prior to the date of the Stockholders Meeting.

(c)      In all circumstances wherein Premier provides notice to the stockholders of Premier in connection with a special or annual Stockholders' Meeting or other matter in respect of which Premier seeks a vote, consent or approval of the stockholders, Premier agrees to provide timely notice (together with any and all materials and/or access to any and all materials provided by Premier to its stockholders in connection therewith) to the Stockholders on behalf of the Trustee as provided in Section 2.2(b) , and the Trustee will be deemed to have fulfilled its duty to give such notice in all such cases upon the Trustee providing a current copy of **Schedule I** to Premier following written notice given by Premier to the Trustee of such meeting, vote, consent or approval and as its written request.

(d)      Regardless of how many Stockholders' voting, consent or approval directions are actually received by the Trustee, the Trustee shall cause all Shares deposited hereunder to be counted as present for the purposes of establishing a quorum at the Stockholders Meeting.

(e)      The Trustee shall cause all Shares deposited hereunder to be voted, consented to or approved as a block on each matter to come before the Stockholders Meeting or

under any such other circumstances upon which a vote, consent or other approval (including by written consent) is sought by or from the stockholders of Premier in the manner directed by the holders of a majority (or, in the case of voting for the election of directors, based on a plurality) of the Shares represented by the Voting Trust Certificates as to which directions have been actually and timely received by the Trustee.  If the Trustee receives directions from the holders of an equal number of Shares represented by the Voting Trust Certificates which directions result in a tie vote, then the Trustee shall vote, approve or consent in a manner that resolves such tie based upon written direction from Premier.

(f)        For all purposes relating to the particular Stockholders Meeting or other vote, consent or approval sought, the date on which the Trustee first provides **Schedule I** to Premier under Section 2.2(c), or otherwise first provides notice under Section 2.2(b), shall constitute the record date for those Stockholders appearing on **Schedule I** who shall be entitled to give direction to the Trustee in respect of such matters notwithstanding any transfer that may be initiated or completed after such date.

Section 2.3        Covenants with Respect to Director Voting.

(a)        During the term of this Agreement, subject to the provisions of Section 2.3(b), each of the Stockholders will use its reasonable efforts to (i) cause the appointment or nomination of directors as necessary to ensure that the number of directors constituting the full Board, as fixed by the Board from time to time, are serving on the Board, (ii) to the extent of such Stockholder's voting rights under Section 2.2(b), cause the appointment or nomination of at least three Independent Directors including one who meets the requirements of an "audit committee financial expert" within the meaning of Item 407 of Regulation S-K under the Securities Exchange Act of 1934, as amended (the " Exchange Act ") and (iii) cause Premier to be in compliance with all corporate governance and all other rules of the NASDAQ (or, if the Class A Common Stock is traded on a stock exchange other than the NASDAQ, the rules of such exchange).  The Trustee shall have no responsibility for compliance with the requirements of this Section 2.3(a) or to monitor or enforce in any manner such compliance by any other party to this Agreement.

(b)        Notwithstanding anything to the contrary provided elsewhere in this Agreement, in the event that Premier ceases to qualify as a "controlled company" within the meaning of the rules of the NASDAQ, as amended (or, if the Class A Common Stock is traded on a stock exchange other than the NASDAQ, the comparable rules of such other exchange) (" Controlled Company "), then within 12 months following the date that Premier ceases to so qualify, each of the Stockholders shall use its reasonable efforts to ensure that Independent Directors selected by the Nominating and Corporate Governance Committee shall thereafter constitute at least a majority of the full Board. Premier shall take such other steps as reasonably necessary to comply on a timely basis with the requirements of the NASDAQ Stock Market Rules, as amended (or, if the Class A Common Stock is traded on a stock exchange other than the NASDAQ, the comparable rules of such other exchange), including the corporate governance requirements set forth therein, at such time as Premier ceases to qualify as a Controlled Company.  The Trustee shall have no responsibility for compliance with the requirements of this Section 2.3(b) or to monitor or enforce in any manner such compliance by any other party to this Agreement.

Section 2.4     <u>Stockholders Retain No Legal Title to Shares</u>.  During the term of this Agreement, the Stockholders shall not have legal title to any part of the Shares deposited hereunder and, except pursuant to <u>Sections 2.6</u>, <u>2.7</u> and <u>2.8</u>, shall not be entitled to Transfer any interest in such Shares or the Voting Trust Certificates.  It is intended by Premier, Premier LP and the Stockholders that no creditor of any Stockholder shall be able to obtain legal title to or exercise legal or equitable remedies with respect to the Shares deposited hereunder or the Voting Trust Certificates.

Section 2.5     <u>Dividends</u>.  Stock splits, dividends or other distributions paid in Shares received by the Trustee shall be retained by the Trustee and held by the Trustee pursuant to the terms of this Agreement.  Upon receipt of such Shares, the Trustee shall promptly issue and deliver Voting Trust Certificates, substantially in the form of **Exhibit A** hereto, to the Stockholders, or make appropriate notation on such Stockholders' Voting Trust Certificates, representing a number of Shares equal to the number of Shares to which each Stockholder would otherwise be entitled.

Section 2.6     <u>Transfer of Shares</u>.  Notwithstanding anything to the contrary set forth in this Agreement, if a Stockholder validly elects to Transfer Class B Common Units of Premier LP in accordance with the terms of the Amended and Restated Limited Partnership Agreement of Premier LP, the respective Stockholder shall provide written notice to the Trustee within five days of the Transfer directing the Trustee to update the Trustee's books and records to update the names of the holders of record of the Voting Trust Certificates to those of the transferee(s) of the corresponding Shares and, upon (i) delivery by the transferring Stockholder of a completed and executed assignment (substantially in the form of the "Form of Assignment" on the reverse of Exhibit A hereto) and written instruction to the Custodian to surrender such holders' Voting Trust Certificates, (ii) execution and delivery by the transferee(s) of a joinder pursuant to <u>Section 5.10</u> and (iii) delivery of a transfer certificate substantially in the form of **Exhibit C** hereto (a " <u>Transferee Certificate</u> "), issue a new Voting Trust Certificate or Certificates in the name of such transferee(s) or, if any such transferee is a Stockholder of other Shares at such time, make appropriate notation on such Stockholder's Voting Trust Certificate, and thereupon **Schedule I** attached hereto shall be automatically amended without further action on the part of any of the parties hereto to reflect such Transfer.

Section 2.7     <u>Exchange of Shares</u>.  Notwithstanding anything to the contrary set forth in this Agreement, if any Class B Common Units of Premier LP are to be Transferred pursuant to the right of first refusal under <u>Section 2.2</u> of the Exchange Agreement, the transferring Stockholder must provide written notice to the Trustee within five days of the Transfer directing the Trustee to update the Trustee's books and records to update the names of the holders of record of the Voting Trust Certificates to those of the transferee(s) of the corresponding Shares and, upon delivery by the transferring Stockholder of a written instruction to the Custodian to surrender the transferring Stockholder's Voting Trust Certificates (for cancellation of all or such specified number of shares by appropriate notation thereon), issue new Voting Trust Certificates in the name of such transferee(s) or, if any such transferee is a Stockholder of other Shares at such time, make appropriate notation on such Stockholder's Voting Trust Certificate or, if any such transferee is a Stockholder of other Shares at such time, make appropriate notation on such Stockholder's Voting Trust Certificate, and thereupon **Schedule I** attached hereto shall be

automatically amended without further action on the part of any of the parties hereto to reflect such Transfer.

Section 2.8    Acquisition of Shares by Premier .  In the event that Premier presents evidence satisfactory to the Trustee and the Custodian that it has acquired the beneficial ownership of any Shares represented by a Voting Trust Certificate pursuant to (i) a repurchase under Section 3.3 of the Amended and Restated Limited Partnership Agreement of Premier LP, or (ii) the surrender of Shares pursuant to Section 2.3 of the Exchange Agreement upon an exchange under that agreement, the Trustee shall immediately refrain from exercising any voting rights with respect to such Shares, the Trustee shall make appropriate notation on the Schedule to the related Voting Trust Certificate and the Trustee shall take all steps as reasonably requested in writing by Premier to transfer legal title to such Shares to Premier (including the execution by the Trustee of any transfer documents provided to it in appropriate form), and Premier shall thereafter cancel such Shares.

Section 2.9    Lost/Damaged Certificate .  If any mutilated Voting Trust Certificate is surrendered to the Trustee, or the Trustee receives evidence to its reasonable satisfaction that any Voting Trust Certificate has been destroyed, lost or stolen, and upon proof of ownership satisfactory to the Trustee together with such security or indemnity, in the case of a destroyed, lost or stolen Voting Trust Certificate, as may be requested by the Trustee to ensure that the Trustee is held harmless for any liability therefor, the Trustee shall execute and deliver a new Voting Trust Certificate representing the same number of Shares as the Voting Trust Certificate so mutilated, destroyed, lost or stolen, with such notations, if any, as the Trustee shall determine.

Section 2.10    Trustee Filing of Exchange Act Reports .

(a)    Each of the Stockholders hereby agrees that the statements on Schedule 13G with respect to the Shares deposited hereunder, and any amendments thereto (including any filings on Schedule 13D with respect to such Shares), shall be filed by the Trustee on behalf of each of the Stockholders pursuant to and in accordance with the provisions of Rule 13d-1(k) under the Exchange Act.  Pursuant to Rule 13d-1(k)(1), each of the Stockholders hereby agrees that only one statement concerning the information required by Schedule 13G (or Schedule13D) need be filed with respect to the ownership by each of the Stockholders of the Shares deposited hereunder.

(b)    Each of the Stockholders hereby agrees that Securities and Exchange Commission statements of beneficial ownership of securities of such Stockholder on Schedule 13G (or Schedule 13D) as required under Section 13 of the Exchange Act and Forms 3, 4 and 5 as required under Section 16(a) of the Exchange Act, and any amendments thereto, shall be filed by the Trustee on behalf of each of the Stockholders as evidenced by execution of the Power of Attorney attached as **Exhibit D** hereto, until such time as such Stockholder withdraws such authorization in writing.  The Trustee shall have no responsibility to determine or monitor whether any filing under Section 2.10(a) or this Section 2.10(b) is required, accurate in content, appropriate in form or timely, and any filing thereunder by the Trustee shall be made upon the further written direction of the Stockholder on whose behalf the statement or amendment is to be filed, in such form as may be provided to the Trustee with only the Trustee's signature, if required, needed to complete the statement or amendment for filing.

(c)        Each Stockholder agrees that it will indemnify and hold harmless the Trustee, its directors, officers, employees and agents from and against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expense whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened; or any claims whatsoever) arising out of or based upon the action or failure to act of the Trustee under Section 2.10(a)  or Section 2.10(b) , including the contents of any such filing, except to the extent such loss, liability, claim, damage or expense is caused by or results from the Trustee's gross negligence or willful misconduct (as determined by a final and unappealable order of a court of competent jurisdiction).  Each Stockholder's obligation hereunder shall survive the termination of the voting trust created herein or the resignation or removal of the Trustee.

ARTICLE 3
**TRUSTEE**

Section 3.1        Successor Trustee .  Upon the liquidation, dissolution, winding-up, suspension, incapacity, resignation or removal (in accordance with Section 3.2 ) of the initial Trustee, the holders of Voting Trust Certificates representing more than 50 percent of the then outstanding Shares then deposited hereunder shall appoint a successor Trustee.  In the event a successor Trustee shall not have been appointed within 30 days of such removal, the Trustee may petition a court of competent jurisdiction to appoint such a successor.

Section 3.2        Removal/Resignation of Trustee .

(a)        A Trustee may be removed by Stockholders holding Voting Trust Certificates representing more than 50 percent of the then outstanding Shares then deposited hereunder:

(1)        if it is determined by a court of competent jurisdiction that either: (i) the Trustee has willfully and materially violated the terms of the trust created herein, or (ii) the Trustee has been guilty of malfeasance, misfeasance or dereliction of duty hereunder;

(2)        if the Trustee shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall have consented to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall have made a general assignment for the benefit of creditors, or shall have failed generally to pay its debts as they become due, or shall have taken any corporate action to authorize any of the foregoing; or

(3)        if an involuntary case or other proceeding shall have been commenced against the Trustee seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect, or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall have

remained undismissed and unstayed for a period of 60 days; or an order for relief shall have been entered against the Trustee under the federal bankruptcy laws as now or hereafter in effect.

(b)    If Stockholders holding Voting Trust Certificates representing more than 50 percent of the then outstanding Shares then deposited hereunder determine that a basis exists for removal of the Trustee under Section 3.2(a) above, they shall deliver written notice of such determination to the Trustee stating the basis for such removal.

(c)    The Trustee may resign its position as such upon 30 days' written notice to Premier, Premier LP and the Stockholders provided, that, if a successor Trustee, appointed as provided for in Section 3.1 above, has agreed to serve as Trustee effective upon the effectiveness of the resignation of the Trustee then acting the Trustee may resign upon 10 days' written notice to Premier.

Section 3.3    Trustee Qualification . The Trustee represents that it is a federal or state-chartered bank or trust company having, or having a parent that has, combined capital and surplus and retained earnings in excess of $200,000,000.

Section 3.4    Compensation; Expenses .  Reasonable expenses lawfully incurred in the administration of the Trustee's duties hereunder shall be reimbursed to it by Premier LP.  During the period of its services hereunder, the Trustee shall receive fees from Premier LP as set forth in a separate agreement.  The provisions of such an agreement and this Section 3.4 shall survive the termination of this Agreement or the resignation or removal of the Trustee.

Section 3.5    Indemnity; Respecting the Trustee .

(a)    Premier LP agrees that it will indemnify and hold harmless the Trustee, its directors, officers, employees and agents from and against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expense whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened; or any claims whatsoever) (the " Indemnified Claims ") arising out of or based upon this Agreement or the actions or failures to act of the Trustee (including in the capacity as Custodian) hereunder or thereunder, except to the extent such loss, liability, claim, damage or expense is caused by or results from the Trustee's gross negligence or willful misconduct (as determined by a final and unappealable order of a court of competent jurisdiction).  Premier LP's obligation hereunder shall survive the termination of the voting trust created herein or the resignation or removal of the Trustee.

(b)    The Trustee shall be entitled to the prompt reimbursement for its out-of-pocket expenses (including reasonable attorneys' fees and expenses) incurred in investigating, preparing or defending against any litigation, commenced or threatened, arising out of or based upon this Agreement, or the actions or failures to act of the Trustee hereunder or thereunder, without regard to the outcome of such litigation; provided , however , that the Trustee shall be obligated to return any such reimbursement if it is subsequently determined by a final and unappealable order of a court of competent jurisdiction that the Trustee was grossly negligent or engaged in willful misconduct in the matter in question.

(c)      If an Indemnified Claim under this <u>Section 3.5</u> is not paid in full within 30 days after a written Indemnified Claim has been submitted by the Trustee, the Trustee may at any time thereafter bring suit to recover the unpaid amount of the Indemnified Claim and, if successful in whole or in part, the Trustee shall be entitled to be paid also the expense of prosecuting such claims.

(d)      The Trustee is authorized and empowered to construe this Agreement and its construction of the same, made in good faith, shall be final, conclusive, and binding upon all Stockholders and all other parties interested.  The Trustee may, in its discretion, consult with counsel to be selected and employed by it, and the reasonable fees and expenses of such counsel shall be an expense for which the Trustee is entitled to be reimbursed hereunder.

(e)      In acting in such capacity hereunder, the Custodian shall be entitled to all of the rights, protections and benefits, including, but not limited to, the indemnities afforded to the Trustee under the terms of this Agreement.

(f)      The Trustee hereby accepts the trust created hereby and agrees to carry out the terms and provisions hereof, but assumes no responsibility for the management of Premier or for any action taken by Premier, by any person elected as a director of Premier or by Premier pursuant to any vote cast or consent given by the Trustee. The Trustee, whether or not acting upon the advice of counsel, shall incur no liability because of any error of law or fact, mistake of judgment or any matter or thing done or omitted under this Agreement, except its own malfeasance. Anything done or suffered in good faith by the Trustee in accordance with the advice of counsel chosen as indicated above shall be conclusive in favor of the Trustee against the Stockholders and any other interested party.  To the fullest extent permitted by law, the parties hereto hereby waive any and all fiduciary duties of the Trustee that, absent such waiver, may be implied by law or equity. The Trustee shall not be required to give a bond or other security for the faithful performance of its duties as such.

(g)      The Trustee shall not be liable in any event for acts or defaults of any other trustee or trustees (under this or any other voting trust of Premier's securities) or for acts or defaults of any employee, agent, proxy or attorney-in-fact of any other trustee or trustees. The Trustee shall be protected and free from liability in acting upon any notice, request, consent, certificate, declaration, guarantee, affidavit or other paper or document or signature reasonably believed by it to be genuine and to have been signed by the proper party or parties or by the party or parties purporting to have signed the same.

(h)      No provision of this Agreement shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(i)      Anything in this Agreement to the contrary notwithstanding, in no event shall the Trustee be liable under or in connection with this Agreement for indirect, special, incidental, punitive or consequential losses or damages of any kind whatsoever, including, but

not limited to, lost profits, whether or not foreseeable, even if the Trustee, has been advised of the possibility thereof and regardless of the form of action in which such damages are sought.

(j)      The Trustee shall not incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of Trustee, including, but not limited to, any act or provision of any present or future law or regulation or governmental authority, any act of God or war or terrorism, accidents, labor disputes, loss or malfunction of utilities or computer software or hardware, or the unavailability of any communication facility.

(k)      The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any terms of or restrictions on transfer provided or imposed under any agreement referred to in Sections 2.6 , 2.7 or 2.8 or under applicable law with respect to any transfer of any Shares deposited hereunder or Voting Trust Certificates.

(l)      If at any time the Trustee is served with any judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process which in any way affects the Shares deposited hereunder or the Voting Trust Certificates, the Trustee is authorized to comply therewith in any manner as it or its legal counsel of its own choosing deems appropriate; and if the Trustee complies with any such judicial or administrative order, judgment, decree, writ or other form of judicial or administrative process, the Trustee shall not be liable to any of the parties hereto or to any other person or entity even though such order, judgment, decree, writ or process may be subsequently modified or vacated or otherwise determined to have been without legal force or effect.

(m)      The Trustee shall be entitled to receive updated Incumbency Certificates from time to time furnished to the Trustee by Premier and each Stockholder, and the Trustee is authorized to follow and rely upon all written directions given by those persons named in such certificates if the Trustee believes such directions to be genuine and to have been signed, sent or presented by the proper party or parties. The Trustee shall not incur any liability to anyone resulting from actions taken by the Trustee in reliance in good faith on such directions. Premier and each Stockholder agrees promptly to update each certificate delivered to the Trustee as may be required. The Trustee shall not incur any liability in executing directions of any person named in an Incumbency Certificate delivered hereunder prior to receipt by it of a more current certificate.

(n)      Notwithstanding anything contained herein to the contrary, the Trustee shall not be responsible for ascertaining whether any transfer complies with the provisions of or exemptions from applicable federal or state laws (including securities laws, the Employee Retirement Income Security Act of 1974 or the Internal Revenue Code), or the provisions of this Agreement; provided, however, that if a certificate is specifically required to be delivered to the Trustee by an initial Stockholder or a transferee, the Trustee shall be under a duty to examine the same only to determine whether it conforms on its face to the requirements of this Agreement as set forth in the relevant Exhibit and shall as soon as reasonably practicable notify the party delivering the same if such certificate does not so conform.

ARTICLE 4
**TERM; EFFECT OF TERMINATION**

Section 4.1 <u>Term</u> . The term of this Agreement and the voting trust created hereby shall commence on the Effective Date and shall extend, unless earlier amended or terminated by the parties hereto, until the earlier to occur of: (i) with respect to all Stockholders, the date on which the Stockholders cease to beneficially own Voting Trust Certificates corresponding to Shares deposited hereunder representing in the aggregate at least 20 percent of the common stock of Premier and (ii) with respect to a Stockholder, the date on which such Stockholder ceases to own any Voting Trust Certificates corresponding to Shares deposited hereunder. If the Effective Date does not occur prior to March 31, 2014, this Agreement shall be null and void and of no further effect. Premier shall promptly provide notice to the Trustee, Premier LP and the Stockholders upon the occurrence of the event described in (x) clause (i) of this <u>Section 4.1</u> or (y) the immediately preceding sentence.

Section 4.2 <u>Effect of Termination</u> . Upon the termination of this Agreement, the Trustee shall request that Premier issue certificates representing the Shares deposited hereunder in the names of the holders of record of the Voting Trust Certificates and shall deliver such certificates to the Stockholders in the amounts of their respective beneficial interests as set forth on the books and records of the Trustee, upon cancellation by the Trustee of the Voting Trust Certificates therefor. If the Trustee for any reason shall be unable to complete such deliveries within 30 days after the termination of this Agreement, the Trustee may then deposit with Premier such certificates (to the extent actually received), along with written authority to Premier to deliver such certificates upon cancellation of the Voting Trust Certificates and the Custodian shall simultaneously deposit the Voting Trust Certificates with Premier for such purpose, and upon such deposit, all further liability of the Trustee for the delivery of such certificates shall cease, and the Trustee shall not be required to take any further action hereunder.

ARTICLE 5
**MISCELLANEOUS**

Section 5.1 <u>Notice</u> . Any written notice required or permitted to be delivered pursuant to this Agreement shall be in writing and shall be deemed delivered (a) upon delivery if delivered in person, (b) upon transmission if sent by facsimile, (c) one Business Day after deposit with a nationally recognized overnight courier service; or (d) upon transmission if sent by e-mail (with all such documents so transmitted in .PDF format or another graphic format). Notices to Premier, Premier LP, the Trustee or any Stockholder shall be delivered to the respective addresses as set forth below:

Stockholders:          At the address appearing on **Schedule I** hereto.

Premier:               Premier, Inc.
                       13034 Ballantyne Corporate Place
                       Charlotte, NC 28277
                       Attention: Chief Financial Officer and General Counsel
                       Facsimile: (704) 816-6307
                       Email: craig_mckasson@premierinc.com and

Jeffrey_Lemkin2@premierinc.com, respectively

| | |
|---|---|
| Premier LP: | Premier Healthcare Alliance, L.P.<br>c/o Premier, Inc.<br>13034 Ballantyne Corporate Place<br>Charlotte, NC 28277<br>Attention: Chief Financial Officer and General Counsel<br>Facsimile: (704) 816-6307<br>Email: craig_mckasson@premierinc.com and<br>Jeffrey_Lemkin2@premierinc.com, respectively |
| Trustee/Custodian: | Wells Fargo Delaware Trust Company, N.A.<br>919 N. Market Street, Suite 1600<br>Wilmington, DE 19801<br>Attention: Corporate Trust Administration<br>Email: Sandra.Battaglia@Wellsfargo.com<br>Facsimile: (302) 575-2006 |

Any party hereto may change its address for notices by giving written notice of such party's new address to the other parties hereto in accordance with this <u>Section 5.1</u>.

All distributions of securities, or other property hereunder by the Trustee to the holders of the Voting Trust Certificates may be made, in the discretion of the Trustee, by mail, email or courier in the same manner as herein above provided for the giving of notices to the holders of the Voting Trust Certificates. All notices, reports, statements and other communications directed to the Trustee from Premier shall be forwarded promptly by Premier (in accordance with a **<u>Schedule I</u>** provided by the Trustee) to each Stockholder.

Section 5.2    <u>Inspection</u>.  Premier shall keep on record at its registered office in Delaware a copy of this Agreement, and shall make such copy available for inspection during normal business hours to the Stockholders and to any other stockholder of Premier.

Section 5.3    <u>Amendment</u>.  This Agreement may not be amended without the written consent of the Trustee and the Stockholders holding Voting Trust Certificates representing more than 50 percent of the then outstanding Shares then deposited hereunder, and if so amended, this Agreement (as so amended) shall bind all of the parties hereto and all of the Stockholders; <u>provided</u>, <u>however</u>, that any amendment or modification to this Agreement which would have a materially adverse and discriminatory effect on any Stockholder, shall not be effective without the affirmative vote or consent of such Stockholder; <u>provided</u>, <u>further</u>, <u>however</u>, that each Stockholder acknowledges and agrees that this Agreement may require amendment upon designation of the initial Trustee and designation of any successor Trustee pursuant to <u>Section 3.1</u> in order to ensure that the provisions of this Agreement are consistent with customary terms reasonably required by such Trustee and, therefore, each Stockholder hereby constitutes and appoints Premier, irrevocably as its true and lawful agent and attorney-in-fact, in its name, place and stead to execute and deliver on such Stockholder's behalf amendments to this Agreement consistent with customary terms as reasonably required by the then-serving Trustee (as

determined in the good faith reasonable judgment of Premier) in conjunction with such Trustee's execution of this Agreement.

Section 5.4    Benefits and Assignment .  Nothing in this Agreement, expressed or implied, shall give or be construed to give any persons, other than the parties hereto and their successors and assigns, any legal claim under any covenant, condition or provision hereof, all the covenants, conditions and provisions contained in this Agreement being for the sole benefit of the parties hereto and their successors and assigns. No party may assign any of its rights or obligations under this Agreement without the written consent of all the other parties, which consent may be withheld in the sole discretion of the party whose consent is sought.

Section 5.5    Entire Agreement .  This Agreement embodies the entire agreement and understanding of the parties relating to the subject matter hereof and there are no covenants, promises, agreements, conditions or understandings, oral or written, except as herein set forth.

Section 5.6    Severability .  In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 5.7    Governing Law .  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware (including, without limitation, Section 218 of the General Corporation Law of the State of Delaware) without giving effect to the principles of conflicts of law thereof.  Each party hereto hereby (i) waives any and all rights to trial by jury in any legal proceeding arising out of or relating to this Agreement and (ii) consents to the jurisdiction of any state or federal court situated in Wilmington, Delaware in connection with any dispute arising hereunder.

Section 5.8    Binding Effect .  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns, legal representatives and heirs.

Section 5.9    Section Headings .  Captions in this Agreement are for convenience only and shall not be considered a part of or effect the construction or interpretation of any provision of this Agreement.

Section 5.10    Additional Parties .  Additional persons or entities who acquire Shares deposited hereunder may become parties to this Agreement by executing a joinder hereto substantially in the form attached hereto as **Exhibit E** .  By virtue of the execution of a joinder to this Agreement and the transfer of Shares to such person in accordance with Sections 2.6 or 2.7 , such person shall be deemed a Stockholder hereunder and thereupon **Schedule I** attached hereto shall be automatically amended without further action on the part of any of the parties hereto to reflect that such party is to be considered an Stockholder hereunder.

Section 5.11    Delaware Voting Trust .  The parties to this Agreement intend to create a voting trust within the meaning of Section 218(a) of the General Corporation Law of the State of Delaware, and as such Premier shall promptly file a copy of this Agreement in the registered office of Premier located in the State of Delaware, including all counterparts as executed, all supplements and amendments thereto and shall hold the Agreement, as executed, supplemented

and amended, open for inspection by the Stockholders and other stockholders of Premier upon request daily during business hours.

   Section 5.12       Counterparts . This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[ Signature Page Follows ]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the dates set forth below.

**PREMIER, INC.:**

Dated: September 25, 2013         By: /s/Craig McKasson
                                              Name: Craig McKasson
                                              Title: Chief Financial Officer

**PREMIER PURCHASING PARTNERS, L.P.:**

By:      Premier Plans, LLC, its general partner

Dated: September 25, 2013         By: /s/Craig McKasson
                                              Name: Craig McKasson
                                              Title: Chief Financial Officer

**WELLS FARGO DELAWARE TRUST
COMPANY, N.A., as Trustee:**

Dated: October 1, 2013         By: /s/ Rosemary Kennard
                                              Name: Rosemary Kennard
                                              Title: Vice President

**EACH OF THE STOCKHOLDERS LISTED ON
SCHEDULE I ATTACHED HERETO:**

By:      Premier Plans, LLC, as attorney-in-fact pursuant to the Special
Power of Attorney executed by each of the Stockholders

Dated: September 25, 2013         By: /s/Craig McKasson
                                              Name: Craig McKasson
                                              Title: Chief Financial Officer

EXHIBIT A

**THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE OR ANY OTHER APPLICABLE SECURITIES LAWS.  NEITHER THIS CERTIFICATE NOR THE BENEFICIAL INTEREST IN THE COMMON STOCK TO WHICH THIS CERTIFICATE RELATES MAY BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD, ASSIGNED OR OTHERWISE TRANSFERRED AT ANY TIME EXCEPT IN COMPLIANCE WITH SUCH SECURITIES ACT, ANY APPLICABLE SECURITIES LAWS OF ANY STATE AND ANY OTHER APPLICABLE SECURITIES LAWS.**

**THE TRANSFER OF THIS VOTING TRUST CERTIFICATE IS SUBJECT TO TERMS AND CONDITIONS SET FORTH IN THE VOTING TRUST AGREEMENT EFFECTIVE AS OF OCTOBER 1, 2013, A COPY OF WHICH HAS BEEN FILED IN THE REGISTERED OFFICE IN THE STATE OF DELAWARE OF PREMIER, INC., A DELAWARE CORPORATION.  SUCH COPY IS OPEN TO INSPECTION DAILY DURING BUSINESS HOURS BY ANY STOCKHOLDER OF THE CORPORATION OR ANY BENEFICIARY OF THE VOTING TRUST CREATED PURSUANT TO SUCH VOTING TRUST AGREEMENT.**

**PREMIER, INC.**

**Voting Trust Certificate**

No.                                       Class B Common Stock

This certifies that                        (" Stockholder ") has deposited                        shares of Class B Common Stock, par value $0.000001 per share, of Premier, Inc., a Delaware corporation (" Premier ") with the undersigned Trustee (the "Trustee"), under the Voting Trust Agreement, dated and effective as of October 1, 2013, as may be amended from time to time (the " Voting Trust Agreement "), among Premier, Premier Healthcare Alliance, L.P., a California limited partnership (as successor to Premier Purchasing Partners, LP.), the Trustee and the Stockholders named therein, a copy of which Voting Trust Agreement has been delivered to the above-named Stockholder and filed in the registered office of Premier in the State of Delaware. The Stockholder, or its registered assigns, will be entitled to the delivery of that number of shares on the termination of the Voting Trust Agreement, in accordance with its provisions, except no delivery shall be made without the surrender hereof. Prior to the delivery of such shares upon such termination, the undersigned Trustee shall possess and be entitled to exercise, in the manner and to the extent provided in the Voting Trust Agreement, all of the rights of every kind of the holder of this certificate with respect to the shares so deposited.

Subject to the terms of the Voting Trust Certificate, this Voting Trust Certificate is transferable on the books maintained by the Trustee at the principal corporate trust office of the Trustee by the Stockholder, in person or by duly authorized attorney, and upon surrender hereof; and until

so transferred the Trustee may treat the Stockholder as the absolute owner hereof for all purposes.

The Stockholder has been issued this Certificate as evidence of an investment and without a view towards distribution.  This Certificate, including the interest represented hereby, is transferable only on the books and records of the Trustee upon presentation and surrender hereof in accordance with the terms of the Voting Trust Agreement.

The Stockholder, by the acceptance of this Voting Trust Certificate, agrees to be bound by all of the provisions of the Voting Trust Agreement as fully as if its terms were set forth in this Voting Trust Certificate.

Annexed hereto and made a part hereof is a schedule (the "Issuance and Cancellation Schedule") on which shall be shown the number of Shares deposited from time to time with the Trustee by or on behalf of the Stockholder in whose name this Voting Trust Certificate is issued and such other information provided for on such Issuance and Cancellation Schedule.  Each holder appoints the Trustee as its agent to make an appropriate notation on the Issuance and Cancellation Schedule (or on a continuation of such Issuance and Cancellation Schedule) evidencing the date and the number of Shares deposited, received, transferred or exchanged by or on behalf of the Stockholder or such other information provided for on the Issuance and Cancellation Schedule.

     IN WITNESS WHEREOF, the Trustee has caused this Certificate to be signed as of this day of           , 20  .

     WELLS FARGO DELAWARE TRUST
     COMPANY, N.A., not in its individual capacity, but solely as Trustee

     By: _____
     Name:
     Title:

210

Issuance and Cancellation Schedule

| Date: | Activity: | Shares Added/Withdrawn: | Share Total: | Notation Made By: |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

**[REVERSE SIDE OF VOTING TRUST CERTIFICATE]**

**[FORM OF ASSIGNMENT]**

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

(PLEASE INSERT SOCIAL SECURITY OR TAXPAYER
IDENTIFICATION NUMBER OF ASSIGNEE)

_____

_____

_____
(Please Print or Typewrite Name and Address of Assignee)

_____
the within Certificate, and all rights thereunder, and hereby does irrevocably constitute and appoint

_____
Attorney to transfer the within Certificate on the books kept for registration thereof, with full power of substitution in the premises.

Date: _____

_____
                                          Signature Guaranteed*:

_____

     *Signature must be guaranteed by an "eligible guarantor institution" that is a bank, stockbroker, savings and loan association or credit union, meeting the requirements of the Security registrar, which requirements include membership or participation in the Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Security registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

212

**EXHIBIT B**

**INCUMBENCY CERTIFICATE**

The undersigned, _____, being the _____ of _____ (the " <u>Company</u> ") does hereby certify that the individuals listed below are qualified and acting officers of the Company as set forth in the right column opposite their respective names and the signatures appearing in the extreme right column opposite the name of each such officer is a true specimen of the genuine signature of such officer and such individuals have the authority to execute documents to be delivered to, or upon the request of, Wells Fargo Delaware Trust Company, N.A., as Trustee under the Voting Trust Agreement, dated and effective as of October 1, 2013, as may be amended from time to time, among Premier, Inc., a Delaware corporation, Premier Healthcare Alliance, L.P., a California limited partnership (as successor to Premier Purchasing Partners, LP.), the Trustee and the Stockholders named therein.

| Name | Title | Signature |
|------|-------|-----------|
|      |       |           |

IN WITNESS WHEREOF, the undersigned has duly executed and delivered this Certificate as of the _____ day of _____, 20___ .

By: _____
Name:
Title:

213

**EXHIBIT C**

**TRANSFER CERTIFICATE**

     This Certificate is made in connection with the acquisition by the undersigned from _____ , the beneficial owner (the " <u>Beneficiary</u> ") of _____ shares of Class B common stock, par value $0.000001 per share (the " <u>Shares</u> "), of Premier, Inc., a Delaware corporation (the " <u>Corporation</u> "), that are subject to the Voting Trust Agreement, dated and effective as of _____, 2013, as amended from time to time, among Premier, Inc., a Delaware corporation, Premier Healthcare Alliance, L.P., a California limited partnership (as successor to Premier Purchasing Partners, LP.), Wells Fargo Delaware Trust Company, N.A., as Trustee, the Beneficiary and other Stockholders of the Corporation from time to time party thereto (the " <u>Voting Trust Agreement</u> ").

     The undersigned hereby certifies that: (a) the undersigned has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of investments in the Shares subject to the terms of Voting Trust Agreement, (b) the undersigned has had the opportunity to ask questions of and receive answers concerning the purchase of the Shares and the terms of Voting Trust Agreement and all matters relating thereto or any additional information deemed necessary to its decision to acquire the Shares subject to the terms of Voting Trust Agreement, and (c) the undersigned has complied with all conditions on its part for transfer set forth in the Voting Trust Agreement and all applicable laws.

     The undersigned acknowledges that no subsequent transfer of the Share (or any interest therein) is permitted unless such transfer is made in accordance with all of the applicable terms of the Voting Trust Agreement.

     The undersigned further acknowledges that the Trustee and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements.

     DATED this _____ day of _____ , 20 ___ .

                        TRANSFEREE:

                        [                    ]

                        By: _____
                              Name:
                              Title:

**EXHIBIT D**

**POWER OF ATTORNEY**

The undersigned (the " Stockholder ") constitutes and appoints Wells Fargo Delaware Trust Company, N.A., as the Stockholder's true and lawful attorney-in-fact and agent, with full power of substitution and resubstitution, for the Stockholder and in the Stockholder's name, place and stead, to sign any and all Securities and Exchange Commission statements of beneficial ownership of securities of the Stockholder on Schedule 13D or Schedule 13G as required under Section 13 and Forms 3, 4 and 5 as required under Section 16(a) of the Securities Exchange Act of 1934, as amended (the " Exchange Act "), and any amendments thereto, and to file the same with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, the Stockholder and any stock exchange on which the Stockholder's stock is listed, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each act and thing requisite and necessary to be done under said Section 13 and Section 16(a) of the Exchange Act, as fully and to all intents and purposes as the Stockholder might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent may lawfully do or cause to be done by virtue hereof.

A copy of this power of attorney shall be filed with the Securities and Exchange Commission.  The authorization set forth above shall continue in full force and effect until the Stockholder revokes such authorization by written instructions to the attorney-in-fact.

The authority granted hereby shall in no event be deemed to impose or create any duty on behalf of the attorneys-in-fact with respect to the Stockholder's obligations to file Schedule 13Ds or Schedule 13Gs and Forms 3, 4 and 5 with the Securities and Exchange Commission.

Dated:                       , 20

[                              ]

By:  _____

Name:

Title:

215

**EXHIBIT E**

**JOINER
TO VOTING TRUST AGREEMENT**

Pursuant to Section 5.10 of the Voting Trust Agreement effective as of October 1, 2013 (the " Voting Trust Agreement ") among Premier, Inc., a Delaware corporation (" Premier "), Premier Healthcare Alliance, L.P., a California limited partnership (as successor to Premier Purchasing Partners, LP.), the entities listed on Schedule I thereto as amended from time to time (the " Stockholders ") and Wells Fargo Delaware Trust Company, N.A., as trustee (together with its successors in such capacity, the " Trustee "), certain individuals or entities who acquire shares of Class B common stock, par value $0.000001 per share (the " Shares ") of Premier may execute this joinder to the Voting Trust Agreement.

1.    Agreement to be bound by the Voting Trust Agreement .  The undersigned is, on the date hereof, acquiring Shares, and hereby agrees to be a party to and be bound as a "Stockholder" under the Voting Trust Agreement, and hereby authorizes this joinder to the Voting Trust Agreement as of the date hereof.

2.    Notice and Stock Information .  The address, email and facsimile details for the undersigned for the purpose of Section 5.1 of the Voting Trust Agreement are as follows:

[address]
[address]
Attention:
Facsimile:
Email:

The number of Shares of Class B Common Stock deposited with the Trustee:

3.    Incumbency Certificate and Power of Attorney .  An incumbency certificate, in the form of Exhibit B to the Voting Trust Agreement, and a power of attorney, in the form of Exhibit D to the Voting Trust Agreement, are each attached hereto, completed and executed by or on behalf of the undersigned.

Dated: _____

AGREED AND ACCEPTED:

[                                    ]

By: _____
Name:
Title:

# EXHIBIT 9

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 10

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 11

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 12

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 13

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 14

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 15

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 16

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 17

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 18

# DOCUMENT TO BE FILED UNDER SEAL

# EXHIBIT 19

# DOCUMENT TO BE FILED UNDER SEAL

**DECLARATION OF DAVID E. GALFUS**

I, David E. Galfus, declare, that if called as a witness, I would and could competently testify thereto, of my own personal knowledge, as follows:

1.  I am a Managing Director of Berkeley Research Group, LLC ("BRG") and am duly authorized to make this declaration (the "Declaration") on behalf of BRG. I obtained a BBA in Public Accounting from Pace University and I am a Certified Public Accountant. Before joining BRG, I was an Executive Director at Capstone Advisory Group, LLC and worked at the Policano & Manzo legacy of FTI Consulting.

2.  Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents or information provided to me by employees of BRG and the Debtors. In preparing this Declaration, I have relied on my experience as described above. I am also assisted by others at BRG who work at my direction in the preparation of the analysis and other information included herein. In addition, I reviewed the Debtors' schedules and legal papers. In preparing this Declaration, I worked with persons at the Debtors' facilities with factual knowledge of information upon which I have relied and have reviewed the supporting declaration filed herewith by Anita Chou. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.  This Declaration is in support of the *Debtors' Notice And Motion For Approval of Compromise With Premier, Inc. Pursuant to Federal Rule of Bankruptcy Procedure 9019 and Bankruptcy Code § 365* ("Motion") and for all other purposes permitted by law. All capitalized terms not otherwise defined herein shall have the same meaning as in the Motion.

4.  Members of the BRG team and I were parties to conversations and email communications between the Debtors and Premier Parties (as defined in the Settlement Agreement) during which the parties discussed Premier's agreements. Premier insisted on a complete cure of prepetition amounts due to it as part of those discussions. From the outset of those conversations there was a disagreement as to the amounts due to Premier. With the assistance of personnel from BRG, the Debtors filed schedules listing a disputed $2.6 million due

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1  to the Premier Parties. At all times during our vendor relationship conversations and thereafter,

2  Premier Parties have insisted the prepetition amount due to them exceeded $3.1 million.

3      5.      While the Parties' dispute over Premier's prepetition claim precluded the Debtors'

4  ability to come to an agreement on assumption of the Premier Agreements, the Debtors and BRG

5  concluded that terminating the Premier Agreements would be burdensome given the Debtors'

6  resources and the nature of these cases..

7      6.      As part of the negotiations with the Premier Parties the Debtors also conducted an

8  analysis of the prepetition transaction history between the parties to assess Premier's potential

9  liability for avoidance actions arising under Chapter 5 of the Bankruptcy Code.  As a result, BRG

10  determined that the Premier Parties distributions from prepetition and postpetition amounts to

11  VHS due under the GPO Agreement.

12      7.      In addition, during those discussions, Premier also made it clear that it would not

13  consent to the exchange of the vested Units held by Verity Health System of California pursuant

14  to the LP Agreement; without the prior assumption of the LP Agreement. Assumption of the LP

15  Agreement also necessitated assumption of the GPO Participation Agreement and Subscription

16  Agreements.

17      8.      BRG has reviewed the Premier Class A Common share price trading history and

18  has determined that the publicly reported prices of the Shares has fallen steadily since December

19  of 2018.  On or about December 30, 2018, the closing price of Tradable Stock was approximately

20  forty dollars ($40) per share.  Since December 30, 2018, it has never exceeded that price  As of

21  April 26 2019 the Premier common stock price was approximately $33 per share, which, if

22  constant, would yield approximately $2.45 million of additional capital in connection with an

23  April 2019 exchange.  At a share price of $33 per share (the share price at or around April 26,

24  2019), assuming all of the Debtors Class B Units became Tradeable Stock, the aggregate

25  realizable value of the Tradable Stock is estimated to be over $7.35 million.  While the Debtors

26  are required to cure the defaults under the Premier Agreements, the Debtors are doing so through

27  the liquidation of the Tradable Stock they will receive in the April 2019 Exchange, plus they will

28

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

1    receive the Disputed Distributions with a combined net positive benefit after paying the First

2    Premier Payment in excess $1.2 million to the Debtors' estates.

3    9.    I have reviewed the economic terms of the Settlement Agreement. In my

4    experience as a financial adviser and bankruptcy professional, I have concluded that the settlement

5    is a reasonable one from the perspective of the Debtors Chapter 11 estates and is in the best

6    interests of the estates. First, it resolves complex financial entitlement and setoff issues without the

7    cost of litigation between experienced counsel on both sides.  Second, at today's prices, the deal

8    provides for the expected recovery of $7.4 million from the share exchange of all Class B Units

9    into Tradeable Stock.  Third, it provides for the certainty of current and future exchanges of Class

10    B units into Class A common shares of Premier, without fear of termination due to the sale of the

11    Hospitals, the expected discontinued use of the GPO and/or Subscription Agreement prior to

12    October 2020 or the assignment of the Debtors' rights to a post plan confirmation liquidating trust

13    or comparable vehicle.  Fourth, it permits the Debtors continued access to the services, licenses

14    and goods provided by the Premier Parties utilized by the Hospitals prior to the sale and the

15    Debtors post sale pursuant to existing or to be negotiated transition services or post-sale operating

16    agreements.   Fifth, the Settlement Agreement lowers the monthly price of the Subscription

17    Services Agreement to $112,000 from approximately $117,456.  Sixth, it provides for the recovery

18    of the Disputed Distributions (as defined in the Motion) in the amount of $609,146.  Seventh and

19    most importantly, it lowers the maximum cure cost for prepetition amounts due and owing from

20    an asserted  number substantially in excess of  $3.1 million to $2.0 million, ties the payment of

21    such moneys to the Debtors' recoveries from the exchange of Units for Tradeable Stock and

22    eliminates a material unsecured claim.

23    I declare under penalty of perjury and of the laws in the United States of America, the

24    foregoing is true and correct.

25

26

27

28

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000

Executed this 29th day of April, 2019, at Saddle Brook, New Jersey.



DAVID E. GALFUS

110788160\V-17

DENTONS US LLP
300 SOUTH GRAND AVENUE, 14TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3124
(213) 688-1000