

FILED & ENTERED

OCT 23 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re: Verity Health System of California, Inc., *et al.*,<br>            Debtors and Debtors in Possession. | Lead Case No.:          2:18-bk-20151-ER<br>Chapter:                     11 |

☒ Affects All Debtors

☐ Affects Verity Health System of California, Inc.
☐ Affects O'Connor Hospital
☐ Affects Saint Louise Regional Hospital
☐ Affects St. Francis Medical Center
☐ Affects St. Vincent Medical Center
☐ Affects Seton Medical Center
☐ Affects O'Connor Hospital Foundation
☐ Affects Saint Louise Regional Hospital Foundation
☐ Affects St. Francis Medical Center of Lynwood Medical Foundation
☐ Affects St. Vincent Foundation
☐ Affects St. Vincent Dialysis Center, Inc.
☐ Affects Seton Medical Center Foundation
☐ Affects Verity Business Services
☐ Affects Verity Medical Foundation
☐ Affects Verity Holdings, LLC
☐ Affects De Paul Ventures, LLC
☐ Affects De Paul Ventures - San Jose Dialysis, LLC

            Debtors and Debtors in Possession.,

Jointly Administered With:
Case No. 2:18-bk-20162-ER;
Case No. 2:18-bk-20163-ER;
Case No. 2:18-bk-20164-ER;
Case No. 2:18-bk-20165-ER;
Case No. 2:18-bk-20167-ER;
Case No. 2:18-bk-20168-ER;
Case No. 2:18-bk-20169-ER;
Case No. 2:18-bk-20171-ER;
Case No. 2:18-bk-20172-ER;
Case No. 2:18-bk-20173-ER;
Case No. 2:18-bk-20175-ER;
Case No. 2:18-bk-20176-ER;
Case No. 2:18-bk-20178-ER;
Case No. 2:18-bk-20179-ER;
Case No. 2:18-bk-20180-ER;
Case No. 2:18-bk-20181-ER;

Chapter 11 Cases.

**MEMORANDUM OF DECISION GRANTING DEBTORS' EMERGENCY MOTION TO ENFORCE THE SALE ORDER [DOC. NO. 3188]**

| | |
|---|---|
| Date: | October 15, 2019 |
| Time: | 10:00 a.m. |
| Location: | Ctrm. 1568<br>Roybal Federal Building<br>255 East Temple Street<br>Los Angeles, CA 90012 |

Before the Court is the Debtors' motion to sell four not-for-profit hospitals free and clear of regulatory conditions which the California Attorney General claims authority to impose under Cal. Corp. Code § 5914. For the reasons set forth below, the Court finds that § 363 of the Bankruptcy Code authorizes a sale free and clear of the conditions which the Attorney General contends he is authorized to impose.

## I. Facts

On August 31, 2018 (the "Petition Date"), Verity Health Systems of California ("VHS") and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered.

As of the Petition Date, the Debtors operated six acute care hospitals in the state of California. On December 27, 2018, the Court authorized the Debtors to sell two of their hospitals—O'Connor Hospital and Saint Louise Regional Hospital—to Santa Clara County (the "Santa Clara Sale").[1] The Santa Clara Sale closed on February 28, 2019.

On February 19, 2019, the Court entered an order establishing bidding procedures (the "Bidding Procedures Order") for the auction of the Debtors' four remaining hospitals—St. Francis Medical Center ("St. Francis"), St. Vincent Medical Center (including St. Vincent Dialysis Center) ("St. Vincent"), Seton Medical Center ("Seton"), and Seton Medical Center Coastside ("Seton Coastside") (collectively, the "Hospitals"). Under the Bidding Procedures Order, Strategic Global Management ("SGM") was designated as the stalking horse bidder. SGM's bid for all four of the Hospitals was $610 million.

The Hospitals were extensively marketed by the Debtors' investment banker, Cain Brothers, a division of KeyBank Capital Markets, Inc. ("Cain Brothers"). Cain Brothers notified ninety parties of the auction process. Sixteen of these parties requested continued access to a data room containing information about the Hospitals.

Notwithstanding Cain Brothers' thorough marketing efforts, the Debtors did not receive any qualified bids for all of the Hospitals. The Debtors received one bid to purchase only St. Vincent and one bid to purchase only St. Francis. After consulting with the Official Committee of Unsecured Creditors (the "Committee") and the largest secured creditors, the Debtors determined not to conduct an auction. On May 2, 2019, the Court entered an order finding that SGM was the winning bidder and approving the sale to SGM (the "SGM Sale").

In 2015, prior to the commencement of these cases, the Debtors' predecessor sought authorization from the California Attorney General (the "Attorney General"), pursuant to Cal. Corp. Code § 5914, to implement a *System Restructuring and Support Agreement* (the "Restructuring Agreement"). The Attorney General approved the Restructuring Agreement, subject to various conditions (the "2015 Conditions"). Among other things, the 2015 Conditions required capital expenditures to make the Hospitals seismically compliant, and required the Hospitals to maintain specified levels of emergency services, intensive care services, cardiac services, and various other services.

Cal. Corp. Code § 5914 requires a non-profit entity operating a health facility to obtain approval from the Attorney General when selling a material amount of its assets to a for-profit entity. Pursuant to Cal. Corp. Code § 5914, the Debtors submitted the SGM Sale to the Attorney General for review.

---

[1] For a description of the Santa Clara Sale, see *In re Verity Health Sys. of California, Inc.*, 598 B.R. 283 (Bankr. C.D. Cal. 2018) ("*Verity I*").

The Asset Purchase Agreement under which SGM agreed to purchase the Hospitals (the "APA") provided that SGM would close the sale so long as any conditions imposed by the Attorney General under the review process set forth in Cal. Corp. Code § 5914 were substantially consistent with conditions that SGM had agreed to accept (the "Approved Conditions").[2] In the event that the Attorney General sought to impose conditions materially different from the Approved Conditions (the "Additional Conditions"), the APA provided that the Debtors would have an opportunity to seek a determination from the Court that the Hospitals could be sold free and clear of the Additional Conditions under § 363(f) of the Bankruptcy Code. Under the APA, Additional Conditions imposing upon SGM costs of $5 million or more are conclusively deemed to be materially different from the Approved Conditions. Further, if the Debtors fail to obtain a final, non-appealable order authorizing the sale free and clear of the Additional Conditions, SGM is not obligated to close on the sale and is entitled to a refund of its good faith deposit.

On September 25, 2019, the Attorney General consented to the SGM Sale, subject to various conditions (the "2019 Conditions"). The 2019 Conditions are materially different from the Approved Conditions that SGM had agreed to accept. In particular, two of the 2019 Conditions impose an additional financial burden upon SGM of approximately $305 million. First, the 2019 Conditions require that SGM continue to operate St. Vincent as a licensed general acute care hospital through December 2024. SGM had agreed to maintain St. Vincent's general acute care license only through December 2020. SGM estimates that continuing to operate St. Vincent as a general acute care hospital for an additional four years would cost approximately $285 million. Second, the 2019 Conditions require St. Francis to provide annual charity care in an amount of $12,793,435 for six fiscal years. The required charity care amount is approximately $6.4 million more than the charity care that St. Francis provided in fiscal year 2019. The charity care requirement imposes an additional incremental cost of approximately $20 million.

SGM will not close the sale absent an order finding that the Hospitals can be sold free and clear of the Additional Conditions pursuant to § 363(f). If the SGM Sale does not close, the most likely outcome will be the closure of St. Vincent, Seton, and Seton Coastside. The Debtors would be required to close these three Hospitals to conserve resources to continue to operate St. Francis, the most solvent of the Hospitals, during the time it would take to obtain approval of a sale of St. Francis. The Debtors cannot continue to sustain operational losses of approximately $450,000 per day without the prospect of a prompt sale. There is no back-up bidder to purchase the Hospitals if the SGM Sale does not close.

The Debtors are facing very significant liquidity constraints. Recently, the California Department of Health Care Services (the "DHCS") began withholding certain Medi-Cal fee-for-service payments owed to the Debtors, for the purposing of recovering alleged Medi-Cal overpayments. As of the beginning of October 2019, DHCS had withheld approximately $4.5 million. The Debtors do not have the ability to borrow under any debtor-in-possession financing facility. At this time, the Debtors' cases are being financed by a consensual cash collateral stipulation executed between the Debtors and the principal secured creditors (the "Cash Collateral Stipulation"). Termination of the APA constitutes an event of default under the Cash Collateral Stipulation. It is unclear whether the Debtors would be able to obtain alternative financing. Further, the Debtors must begin the expensive process of closing the Hospitals while

---

[2] The Approved Conditions are set forth in Schedule 8.6 of the APA.

they still possess a significant cash buffer.[3] In short, the Debtors' prediction that failure of the SGM Sale would necessitate the closure of St. Vincent, Seton, and Seton Coastside is not a bluff.

The Attorney General asserts that imposition of the 2019 Conditions will not result in the closure of St. Vincent, Seton, or Seton Coastside. The Attorney General points to a declaration from Kenneth Sim, M.D. (the "Sim Decl."), the Chairman of Allied Physicians of California, A Professional Medical Corporation ("Allied"). According to the Attorney General, the Sim Decl. shows that Allied is prepared to acquire Seton and Seton Coastside and operate both Hospitals in accordance with the 2019 Conditions.

Contrary to the Attorney General's characterization, the Sim Decl. provides no certainty that a sale of Seton and Seton Coastside will occur. The Sim Decl. states only that "Allied remains interested in purchasing Seton …." Sim Decl. at ¶ 5. The Court further notes that Allied did not timely submit a qualified bid for Seton. At this late stage in the proceedings, Allied's vague statement that it is "interested" in purchasing Seton and Seton Coastside does nothing to dissuade the Court from its conclusion that absent consummation of the SGM Sale, Seton and Seton Coastside will most likely close.

The Attorney General also points to a bid for the Hospitals submitted by Prime Healthcare ("Prime"). The Attorney General overlooks the Prime did not submit a qualified bid. Among other things, Prime failed to submit the mandatory good faith deposit. In fact, Prime itself recognized that its "bid will not be formally considered at auction" and was submitted only "for reference."[4] Further, Prime stated that it did not want to serve as a back-up bidder.[5] In short, Prime's offer to purchase the Hospitals is just as illusory as Allied's.

Finally, the Attorney General points to an offer by AHMC Healthcare, Inc. ("AHMC Healthcare") to purchase St. Francis. The Attorney General is correct that AHMC submitted a qualified bid to purchase St. Francis. However, even assuming that AHMC would follow through on its prior bid to purchase St. Francis, that still would not prevent the closure of St. Vincent, Seton, and Seton Coastside. As discussed above, the Debtors lack sufficient cash to continue operating all four Hospitals during the time it would take for a sale of St. Francis to close. The Debtors would be required to close St. Vincent, Seton, and Seton Coastside to conserve the cash necessary to operate St. Francis during the sale process.

It is against this backdrop that the Debtors move for authorization to sell the Hospitals free and clear of the Additional Conditions, pursuant to § 363(f). The Debtors argue that the Additional Conditions constitute an "interest in property" within the meaning of § 363(f), and that a sale free and clear of the 2019 Conditions may be authorized under § 363(f)(1), (4), or (5), for the following reasons:

- Pursuant to § 363(f)(1), the Hospitals may be sold under applicable nonbankruptcy law, because under California law, the purchaser of assets does not assume successor liability.
- Pursuant to § 363(f)(4), the validity of the Additional Conditions is subject to a *bona fide* dispute, because the Attorney General abused his discretion in imposing the Additional Conditions.

---

[3] For a description of the difficulties associated with closing a much smaller hospital, see *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 567 B.R. 820, 829 (Bankr. C.D. Cal. 2017), *appeal dismissed,* No. 2:16-BK-17463-ER, 2018 WL 1229989 (C.D. Cal. Jan. 19, 2018).

[4] April 3, 2019 E-mail from Prime to the Debtors [Doc. No. 3333, Ex. 6].

[5] *Id.*

- Pursuant to § 363(f)(5), the Attorney General could be compelled to accept a money satisfaction of certain of the Additional Conditions, such as the condition that SGM provide specified levels of charitable care.

The Debtors assert that imposition of the Additional Conditions violates § 525, which prohibits government entities from discriminating against debtors who have failed to pay dischargeable debts when issuing licenses. According to the Debtors, the Additional Conditions constitute an attempt by the Attorney General to collect a dischargeable debt. The Debtors' theory is that Attorney General's refusal to approve the SGM Sale absent imposition of the Additional Conditions amounts to the discriminatory denial of licensure in contravention of § 525.

Finally, the Debtors request that the Court issue a writ of mandate compelling the Attorney General to approve the SGM Sale without imposition of the Additional Conditions, pursuant to Cal. Civ. Proc. Code § 1085 or § 1094.5. The Debtors assert that a writ of mandate is justified because the Attorney General abused his discretion by imposing the Additional Conditions.

The Committee supports the Motion. The Committee argues that prompt closing of the SGM Sale is the best means of insuring a distribution to unsecured creditors.

The Attorney General opposes the Motion. He disputes the Debtors' contention that the Hospitals may be sold under applicable nonbankruptcy law, or that a bona fide dispute exists as to the Attorney General's authority to impose the Additional Conditions. The Attorney General denies that he abused his discretion in imposing the Additional Conditions. He notes that he considered an extensive record in arriving at the Additional Conditions, and states that the Debtors' dislike of the Additional Conditions does not mean that imposing the conditions was an abuse of discretion.

Service Employees International Union, United Healthcare Workers-West ("SEIU-UHW"), which represents approximately 1,303 employees at St. Vincent and St. Francis, opposes the Motion. SEIU-UHW contends that the Additional Conditions are economically feasible for SGM.

The United Nurses Association of California/Union of Health Care Professional ("UNAC"), which represents approximately 900 registered nurses at St. Francis, urges SGM, the Attorney General, and the Debtors to explore prospects for a consensual resolution with respect to the Additional Conditions.

## II. Discussion

Section 363(d)(1) authorizes non-profit entities, such as the Debtors, to sell estate assets only if the sale is "in accordance with nonbankruptcy law applicable to the transfer of property by" a non-profit entity. Section 541(f) similarly provides that property held by debtors that are § 501(c)(3) corporations under the Internal Revenue Code may be transferred, but "only under the same conditions as would apply if the debtor had not filed a case under this title." Section 363(b) authorizes the Debtors to sell estate property out of the ordinary course of business, subject to court approval. The Debtors must articulate a business justification for the sale. *In re Walter*, 83 B.R. 14, 19–20 (9th Cir. BAP 1988). Whether the articulated business justification is sufficient "depends on the case," in view of "all salient factors pertaining to the proceeding." *Id.* at 19–20. Section 363(f) provides that a sale of estate property may be "free and clear of any interest in such property of an entity other than the estate," provided that certain conditions are satisfied.

## A. The Additional Conditions are an "Interest in Property" Within the Meaning of § 363(f)

As this Court has previously explained:

> The Bankruptcy Code does not define the phrase "interest in ... property" for purposes of § 363(f). The Third Circuit has held that the phrase "interest in ... property" is "intended to refer to obligations that are connected to, or arise from, the property being sold." *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 259 (3d Cir. 2000). That conclusion is echoed by *Collier on Bankruptcy*, which observes a trend in caselaw "in favor of a broader definition [of the phrase] that encompasses other obligations that may flow from ownership of the property." 3 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 363.06[1] (16th ed. 2017).
>
> Courts have held that interests in property include monetary obligations arising from the ownership of property, even when those obligations are imposed by statute. For example, in *Mass. Dep't of Unemployment Assistance v. OPK Biotech, LLC (In re PBBPC, Inc.)*, 484 B.R. 860 (1st Cir. BAP 2013), the court held that taxes assessed by Massachusetts under its unemployment insurance statutes constituted an "interest in ... property." The taxes were computed based on the Debtor's "experience rating," which was determined by the number of employees it had terminated in the past. *Id.* at 862. Because the Debtor had terminated most of its employees prior to selling its assets, its experiencing rating, and corresponding unemployment insurance tax liabilities, were very high. *Id.* The *PBBPC* court held that the experience rating was an interest in property that could be cut off under § 363(f). *Id.* at 869–70. Similarly, in *United Mine Workers of Am. Combined Benefit Fund v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 581, the court held that monetary obligations imposed by the Coal Industry Retiree Health Benefit Act of 1992 constituted an "interest in ... property" within the meaning of § 363(f).

*In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 567 B.R. 820, 825–26 (Bankr. C.D. Cal. 2017), *appeal dismissed*, No. 2:16-BK-17463-ER, 2018 WL 1229989 (C.D. Cal. Jan. 19, 2018) ("*Gardens I*").

The Additional Conditions are an "interest in property" within the meaning of § 363(f). First, the Additional Conditions are monetary obligations arising from the ownership of property. Similar to the "experience rating" at issue in *PBBPC, Inc.*, the Additional Conditions were calculated based upon the Hospitals' prior operating history. Among other things, the Additional Conditions require that SGM cause the Hospitals to provide specified levels of healthcare services. The required service levels have been set based upon the Hospitals' historical operations. For example, the Additional Conditions require that St. Francis "maintain and provide 24-hour emergency and trauma medical services at no less than current licensure and designation with the same types and/or levels of services ...."[6] St. Francis is required to maintain cardiac services, critical care services, neonatal intensive services, women's health services, cancer services, pediatric services, orthopedic and rehabilitation services, wound care services, behavioral health services, and perinatal services, all at "current licensures, types, and/or levels

---

[6] St. Francis Conditions at § IV [Doc. No. 3188, Ex. B].

of services."[7] St. Vincent, Seton, and Seton Coastside are also required to maintain various healthcare services at current levels.[8]

Second, the Attorney General's statutory authority to impose the Additional Conditions arises from the Debtors' operation of the Hospitals as non-profit entities. Had the Debtors not operated the Hospitals in this manner, there could be no contention that the SGM Sale is subject to the Attorney General's review pursuant to Cal. Corp. Code § 5914. In this sense as well, the Additional Conditions "arise from the property being sold," *In re Trans World Airlines, Inc.*, 322 F.3d 283, 290 (3d Cir. 2003), and therefore qualify as an "interest in … property" within the meaning of § 363(f).

Third, the Attorney General is barred by the law of the case doctrine from asserting that the Additional Conditions are not an "interest in … property." "Under the 'law of the case' doctrine, a court is ordinarily precluded from reexamining an issue previously decided by the same court, or a higher court, in the same case." *Richardson v. United States*, 841 F.2d 993, 996 (9th Cir.), *amended,* 860 F.2d 357 (9th Cir. 1988). "For the doctrine to apply, the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.'" *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000).

In connection with the Santa Clara Sale, the Court addressed the exact issue presented here— whether conditions that the Attorney General sought to impose upon the sale constituted an "interest in … property" for purposes of § 363(f).[9] The Attorney General litigated the issue, and the Court overruled the Attorney General's arguments.[10] The Attorney General voluntarily dismissed his appeal of the order finding that the conditions he sought to impose were an "interest in … property." The law of the case doctrine bars relitigation of the issue.

The doctrine of issue preclusion is a further bar to any attempt by the Attorney General to contest the Additional Conditions' status as an "interest in … property." As explained by the Supreme Court, issue preclusion forecloses "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S. Ct. 2161, 2171, 171 L. Ed. 2d 155 (2008) (internal citations omitted). The doctrine protects "against 'the expense and vexation attending multiple lawsuits, conserve[s] judicial resources, and foster[s] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Id.* Issue preclusion applies if "(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1041 (9th Cir. 2017).

---

[7] *Id.* at § VI.

[8] *See* St. Vincent Conditions at § VI (setting forth a list of healthcare services that St. Vincent must maintain at current levels); *see also* Seton and Seton Coastside Conditions at § VI (same).

[9] *See Verity I*, 598 B.R. at 293 ("The Conditions [imposed by the Attorney General] are an 'interest in property' within the meaning of § 363(f). The Conditions provide that any owner of the Hospitals must furnish specified levels of emergency services, intensive care services, cardiac services, and various other services. The required service levels were derived based upon the historical experience of the prior operator. As such, the Conditions are monetary obligations arising from the ownership of property.").

[10] *See generally Verity I.*

The Attorney General has litigated the issue presented here, both in connection with the Santa Clara Sale and in connection with a sale in *Gardens I* (the "Gardens Sale"). Just as he did in the Santa Clara Sale, the Attorney General claimed in the Gardens Sale the regulatory authority to impose conditions. The Court found that the Attorney General's claim to regulatory authority was an "interest in … property" for purposes of § 363(f). *Gardens I*, 567 B.R. at 826. The Attorney General is precluded from relitigating the issue of whether his claimed authority to impose conditions on the SGM Sale is an "interest in … property."

**B. The Debtors May Sell the Hospitals Free and Clear of the Additional Conditions Pursuant to § 363(f)(1)**

Sale of the Hospitals may be free and clear of the Additional Conditions only upon satisfaction of one or more of the five disjunctive sub-factors set forth in § 363(f). Under § 363(f)(1), a sale free and clear may be approved if permitted by applicable nonbankruptcy law.

Applicable nonbankruptcy law permits a sale free and clear for two reasons. First, the Attorney General's attempt to impose the Additional Conditions upon SGM is equivalent to an attempt to impose successor liability upon SGM. California law does not authorize the imposition of successor liability upon SGM. Second, even if the Attorney General were authorized to impose successor liability under California law, the Attorney General abused his discretion in imposing the Additional Conditions, meaning that the Additional Conditions must be set aside.

1. California Law Does Not Authorize the Attorney General to Impose Successor Liability Upon SGM

*i. The Additional Conditions Qualify as Successor Liability*

The Attorney General's attempt to impose the Additional Conditions upon SGM qualifies as an attempt to impose successor liability upon SGM. The reason is that the Additional Conditions impose upon SGM many of the same obligations imposed upon the Debtors by the 2015 Conditions. By attempting to enforce the Additional Conditions, the Attorney General is attempting to enforce the obligations imposed by the 2015 Conditions against SGM.

It is true that the 2015 Conditions are not identical to the Additional Conditions. Some medical services required under the 2015 Conditions are no longer required under the Additional Conditions. And unlike the 2015 Conditions, the Additional Conditions do not impose obligations to fund pension plans. But for the most part the Additional Conditions reinstate obligations imposed by the 2015 Conditions. For example, both the 2015 Conditions and the Additional Conditions require that St. Francis maintain cardiac services, including designation as a STEMI Receiving Center; critical care services, including a minimum of 36 intensive care unit beds; neonatal intensive care services, including a minimum of 29 neonatal intensive care beds; women's health services, including women's imaging services; cancer services, including radiation oncology; orthopedic and rehabilitation services; and wound care services. The Additional Conditions do not reinstate St. Francis' obligation to maintain advanced certification as a Primary Stroke Center, and the Additional Conditions reduce St. Francis' pediatric services obligation from 14 beds to 5 beds.

The 2015 Conditions required St. Francis to maintain the specified healthcare services for ten years from the date of the closing of the Restructuring Agreement. The Additional Conditions

require that the specified services be maintained for ten years from the date of the closing of the APA. That is, the Additional Conditions extend the term of the 2015 Conditions by approximately six years.

Considered within the overall scope of the obligations imposed, the differences between the 2015 Conditions and the Additional Conditions are comparatively inconsequential. The Attorney General relies upon these minor differences in support of his argument that the Additional Conditions do not impose successor liability. Such reliance is misplaced. The Additional Conditions still qualify as successor liability even though they are not exactly identical to the 2015 Conditions. Nor does the extension in the term of the reinstituted obligations remove the Additional Conditions from the category of successor liability.

The Attorney General argues that the Additional Conditions do not impose successor liability because they are SGM's own obligations, going forward from the date of the sale. According to the Attorney General, the Additional Conditions are based upon healthcare impact reports prepared for each Hospital. The Attorney General asserts that it is not surprising that the Additional Conditions resemble the 2015 Conditions, which are only four years old and relate to the same Hospitals and communities. Citing *In re General Motors Corp.*, 407 B.R. 463, 508 (Bankr. S.D.N.Y. 2009), the Attorney General analogizes the Additional Conditions to the environmental remediation liabilities that would remain the obligation of a purchaser of contaminated real estate.

These arguments are not persuasive. In *General Motors*, the environmental remediation obligations were not successor liability because any entity purchasing contaminated property would have an obligation to comply with environmental law:

> Under section 363(f), there could be no successor liability imposed on the purchaser for the [seller's] … monetary obligations related to cleanup costs, or any other obligations that were obligations of the seller. But the purchaser would have to comply with its environmental responsibilities starting with the day it got the property, and if that property required remediation as of that time, any such remediation would be the buyer's responsibility …. Those same principles will be applied here. Any Old GM properties to be transferred will be transferred free and clear of successor liability, but New GM will be liable from the day it gets any such properties for its environmental responsibilities going forward.

*In re Gen. Motors Corp.*, 407 B.R. 463, 508 (Bankr. S.D.N.Y. 2009).

There is a key difference between the contaminated property at issue in *General Motors* and the Hospitals at issue here. Any entity that purchased the contaminated property at issue in *General Motors* would have been required to comply with environmental regulations going forward. A purchaser's duty to comply with environmental regulations would not vary based upon the identity of the purchaser or the identity of the seller. Here, by contrast, whether a purchaser is obligated to comply with Attorney General conditions can vary, depending upon either the identity of the purchaser or the identity of the seller. There is no general obligation imposed upon an entity that purchases a hospital in the State of California to operate that hospital in accordance with conditions asserted by the Attorney General. The Attorney General's regulatory authority applies only to non-profit hospitals, and only to certain types of sale transactions. Had the Hospitals been sold to a public entity, such as the County of Los Angeles, the Attorney General could not have reviewed the sale. *See Verity I*, 598 B.R. at 294  (holding

that Cal. Corp. Code § 5914 did not apply where non-profit hospitals were sold to a public entity). Had the Hospitals been operated by a for-profit entity, the Attorney General could not have reviewed the sale. *See* Cal. Corp. Code § 5914(a) (requiring only nonprofit corporations to submit the sale of assets to Attorney General review).

Because the obligation to comply with the Additional Conditions is contingent upon the identity of the purchaser and the identity of the seller, the conditions cannot fairly be characterized as the purchaser's obligation to comply with applicable law on a going-forward basis. The Attorney General can claim authority to impose the Additional Conditions upon purchaser SGM only because the Debtors operated the Hospitals as non-profit entities. Since the Attorney General's alleged authority to impose the Additional Conditions derives from the manner in which the sellers operated the Hospitals, the Additional Conditions are appropriately characterized as successor liability.

*ii. Successor Liability Cannot Be Imposed Under California Law*

Under California law, the general rule is "that where a corporation purchases, or otherwise acquires by transfer, the assets of another corporation, the acquiring corporation does not assume the selling corporation's debts and liabilities." *Fisher v. Allis-Chalmers Corp. Prod. Liab. Tr.*, 95 Cal. App. 4th 1182, 1188, 116 Cal. Rptr. 2d 310, 315 (2002). The general rule does not apply if "(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability for the seller's debts." *Id.*

None of the exceptions to the general rule are present here. First, SGM has not agreed to assume the Additional Conditions, either expressly or by implication. Second, the SGM Sale is not a consolidation or merger of the Debtors and SGM. A sale transaction is a consolidation or merger of two corporations "where one corporation takes all of another's assets without providing any consideration that could be made available to meet claims of the other's creditors or where the consideration consists wholly of shares of the purchaser's stock which are promptly distributed to the seller's shareholders in conjunction with the seller's liquidation." *Ray v. Alad Corp.*, 19 Cal. 3d 22, 28, 560 P.2d 3 (1977) (internal citations omitted). Neither factor applies. SGM is paying for the Hospitals in cash (not stock),[11] and that cash will be distributed to the Debtors' creditors through a plan of liquidation. Third, SGM is not a mere continuation of the Debtors. A purchaser is a mere continuation of a seller if there is inadequate consideration for the purchaser or if one or more persons are officers, directors, or stockholders or both corporations. *Id.* Consideration for the SGM Sale is adequate and no officers or directors of the Debtors are officers or directors of SGM.[12] Fourth, the Debtors are not selling the Hospitals for the purpose of escaping liabilities for their debts. In fact, the opposite is true—the objective of the SGM Sale is to generate proceeds to pay the Debtors' debts, to the extent possible. In sum, successor liability cannot be imposed on SGM under California common law.

Successor liability cannot be imposed under Cal. Corp. Code §§ 5914–5919. Cal. Corp. Code § 5914 authorizes the Attorney General to review transactions in which a non-profit healthcare

---

[11] *See* APA at § 1.1(a)(i) [Doc. No. 2305, Part 1].

[12] As nonprofit public benefit corporations, the Debtors do not have stockholders.

facility seeks to transfer a material amount of its assets to a for-profit entity, and provides in relevant part:

> Any nonprofit corporation that is defined in Section 5046 and operates or controls a health facility, as defined in Section 1250 of the Health and Safety Code, or operates or controls a facility that provides similar health care, regardless of whether it is currently operating or providing health care services or has a suspended license, shall be required to provide written notice to, and to obtain the written consent of, the Attorney General prior to entering into any agreement or transaction to do either of the following:
>> (A) Sell, transfer, lease, exchange, option, convey, or otherwise dispose of, its assets to a for-profit corporation or entity or to a mutual benefit corporation or entity when a material amount of the assets of the nonprofit corporation are involved in the agreement or transaction.

Cal. Corp. Code § 5914(a)(1) (West).

The "Attorney General shall have discretion to consent to, give conditional consent to, or not consent to" the transaction. Cal. Corp. Code § 5917.

Nothing within the statute authorizes the Attorney General to impose successor liability upon SGM, the for-profit entity that purchased the healthcare assets from the non-profit Debtors. Under the statute, the Attorney General is authorized to review transactions entered into by a "nonprofit corporation that … operates or controls a health facility," Cal. Corp. Code § 5914(a)(1), and to "consent to, give conditional consent to, or not consent to" any such transactions, Cal. Corp. Code § 5917. These provisions do not grant the Attorney General authority to impose going-forward obligations on the assets that are the subject of the transaction. That is, the statute does not provide that the healthcare assets themselves are subject to regulation by the Attorney General. Rather, it is the non-profit status of the entity operating the healthcare assets that triggers the Attorney General's regulatory authority. Upon transfer of the healthcare assets from the non-profit entity to the for-profit entity, the Attorney General's regulatory authority over the assets terminates.

The issue of the Attorney General's authority to impose successor liability arose in the case of *La Paloma Generating Co.*, No. 16-12700, 2017 WL 5197116 (Bankr. D. Del. Nov. 9, 2017). In *La Paloma*, the debtor operated a power plant subject to a cap-and-trade emissions regulation. The regulation required "Covered Entities"—defined as entities engaging in operations that generated emissions—to surrender "Compliance Instruments" equal to the amount of emissions generated at specified times. At issue was whether a power plant could be sold "free and clear of, and without the purchaser assuming, any obligation to surrender compliance instruments under the California Cap-and-Trade Program for emissions generated by the Debtors and/or their facility during the period before the transfer of the assets." *Id.* at *2. The court found that "[u]nder the Regulation, only entities—and not assets—are Covered Entities" subject to the obligation to surrender Compliance Instruments. *Id.* at *5. As a result, the court found, the debtors could sell the power plant free and clear of the surrender obligations, pursuant to § 363(f)(1). *Id.* at *8. The court reasoned that the regulation did not impose successor liability on the purchaser, because it imposed liability only on "Covered Entities," and the purchaser would not become a Covered Entity until after it acquired the power plant. *Id.* at *7–*8. The regulation, the court held, was limited to Covered Entities, and could not be used to "impugn liability on the purchaser of … the Covered Entity's assets." *Id.* at *8.

With respect to the imposition of successor liability, the statute at issue here operates in the same manner as the regulation examined in *La Paloma*. Similar to the regulation in *La Paloma*, Cal. Corp. Code § 5914–5919 permits the imposition of liability upon the Hospitals only because they are operated by a non-profit corporation. That is, independent of the fact that they are operated by a non-profit entity, nothing within Cal. Corp. Code § 5914–5919 authorizes the Attorney General to impose liabilities upon the Hospitals. Further, the Attorney General's regulatory authority under the statute does not extend to for-profit entities. As was the case in *La Paloma*, Cal. Corp. Code §5914–5919 does not authorized the Attorney General to impose liability upon the for-profit purchaser of the Hospitals.

The Attorney General argues that the statute's implementing regulations authorize the imposition of successor liability. Specifically, the Attorney General points to Cal. Code Regs. Tit. 11, § 999.5, which provides in relevant part:

> It is the policy of the Attorney General, in consenting to an agreement or transaction involving a general acute care hospital, to require for a period of at least five years the continuation at the hospital of existing levels of essential healthcare services, including but not limited to emergency room services. The Attorney General shall retain complete discretion to determine whether this policy shall be applied in any specific transaction under review.

Cal. Code Regs. tit. 11, § 999.5.

Significantly, the statute's implementing regulations do not differentiate between Cal. Corp. Code §§ 5914–5919, which codifies the Attorney General's authority to review transfers between a non-profit and a for-profit entity, and Cal. Corp. Code §§ 5920–5925, which codifies the Attorney General's authority to review transfers between a non-profit entity and a different non-profit entity. Where assets are transferred between two different non-profit entities, the structure of the statute clearly provides the Attorney General the authority to impose successor liability.

The Court construes Cal. Code Regs. Tit. 11, § 999.5 as implementing Cal. Corp. Code §§ 5920–5925, not as implementing Cal. Corp. Code §§ 5914–5919. Cal. Corp. Code §§ 5920–5925 does authorize the imposition of successor liability, whereas Cal. Corp. Code §§ 5914–5919 does not. This construction is appropriate because it harmonizes the language of the regulation with the language of the statute, while still giving full effect to every part of the regulation. *See Butts v. Bd. of Trustees of California State Univ.*, 225 Cal. App. 4th 825, 835, 170 Cal. Rptr. 3d 604, 612 (2014) ("The rules of statutory construction also govern our interpretation of regulations promulgated by administrative agencies. We give the regulatory language its plain, commonsense meaning. If possible, we must accord meaning to every word and phrase in the regulation, and we must read regulations as a whole so that all of the parts are given effect.").

Because the Attorney General's authority to review the sale arises under Cal. Corp. Code §§ 5914–5919, the Attorney General cannot rely upon Cal. Code Regs. tit. 11, § 999.5, which implements Cal. Corp. Code §§ 5920–5925, as the basis for imposing successor liability upon SGM.

## 2. Even if California Law Allowed the Attorney General to Impose Successor Liability Upon SGM, the Attorney General Abused his Discretion in Imposing the Additional Conditions

As set forth below, the Court finds that the Attorney General's decision to impose the Additional Conditions is subject to judicial review by administrative mandate under California law. This Court is empowered to conduct such judicial review pursuant to § 1221(e) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), which provides:

> Nothing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property.

Pub. L. No. 109-8, § 1221(e) (2005).[13] *See also In re HHH Choices Health Plan, LLC*, 554 B.R. 697, 700 (Bankr. S.D.N.Y. 2016) (construing New York state law to determine the appropriate disposition of a non-profit debtor's assets).

Upon review of the Attorney General's decision, the Court finds that the imposition of the Additional Conditions constituted an abuse of discretion, for the reasons explained below. Therefore, the Additional Conditions must be set aside, which means that the Debtors are authorized to sell the Hospitals free and clear of the Additional Conditions under applicable nonbankruptcy law.

*i. The Attorney General's Imposition of the Additional Conditions is Subject to Judicial Review by Administrative Mandate*

Cal. Civ. Proc. Code § 1094.5 provides for judicial review by administrative mandate of decisions made by agencies or officers of the State of California. A writ of mandate may be issued if the agency or officer making the decision engaged in a "prejudicial abuse of discretion." Cal. Civ. Proc. Code § 1094.5(b). An "abuse of discretion is established if … the order or decision is not supported by the findings, or the findings are not supported by the evidence." *Id.*

The Attorney General contends that administrative mandamus review is not available because the Additional Conditions were not issued subsequent to "a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal." Cal. Civ. Proc. Code § 1094.5(a). The Attorney General acknowledges that he conducted "public meetings … to hear comments from interested parties" as required by Cal. Corp. Code § 5922. However, the Attorney General asserts that such public meetings were not "hearings" within the meaning of Cal. Civ. Proc. Code § 1094.5(a), because public comments were not presented under oath and no effort was made to determine the accuracy of the information offered by members of the public. The Attorney General's position is that the Debtors are entitled only to traditional mandamus review under Cal. Civ. Proc. Code § 1085.

"Quasi-legislative acts are ordinarily reviewed by traditional mandate, and quasi-judicial acts are reviewed by administrative mandate. 'Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts.'" *Friends of the Old Trees v. Dep't of Forestry & Fire Prot.*, 52 Cal. App. 4th 1383, 1389, 61 Cal. Rptr. 2d 297, 303 (1997) (internal citation omitted).

---

[13] This provision of BAPCPA does not appear in the Bankruptcy Code itself.

The Court is not persuaded by the Attorney General's contention that administrative mandamus review is unavailable to the Debtors. In reviewing the SGM Sale, the Attorney General hired JD Healthcare, Inc. to prepare expert reports containing information on how the SGM Sale would affect the availability of healthcare services in the regions served by the Hospitals. The JD Healthcare expert reports contained recommendations regarding the conditions that the Attorney General should impose on the SGM Sale. Upon receiving the expert reports, the Attorney General asked the Debtors to respond to the conditions recommended by JD Healthcare. The Attorney General conducted public meetings, all of which were transcribed, at which members of the public commented on the SGM Sale. "[P]urely documentary proceedings can satisfy the hearing requirement of Code of Civil Procedure § 1094.5, so long as the agency is required by law to accept and consider evidence from interested parties before making its decision." *Friends of the Old Trees*, 52 Cal. App. 4th at 1391–92. A "trial-type hearing" is not necessary. *Id.* at 1392.

The Attorney General's review involved "the actual application of … a rule to a specific set of existing facts." *Friends*, 52 Cal. App. 4th at 1389. The Attorney General received evidence from JD Healthcare, heard comments from members of the public, and elected to impose the Additional Conditions after considering all the evidence collected during the review process. The Attorney General's review of the SGM Sale was a quasi-judicial act subject to review by administrative mandate.

The Attorney General next asserts that administrative mandamus review is unavailable because the Debtors have failed to produce the complete administrative record supporting the Attorney General's decision. This contention is without merit. For purposes of administrative mandamus review, a partial record is sufficient if it "accurately represent[s] the administrative proceedings, provide[s] the reviewing court with an understanding of what occurred below, and enable[s] that court to undertake an independent judicial review of the administrative decision." *Elizabeth D. v. Zolin*, 21 Cal. App. 4th 347, 349, 25 Cal. Rptr. 2d 852 (1993). The record before the Court consists of the expert reports prepared by JD Healthcare, partial transcripts of public meetings conducted by the Attorney General, and various letters submitted by stakeholders. The record on file provides the Court with an understanding of reasons for the Attorney General's decision.

There are two tests for judicial review by administrative mandate. "The 'independent judgment' rule applies when the decision of an administrative agency will substantially affect a fundamental vested right." *Mann v. Dep't of Motor Vehicles*, 76 Cal. App. 4th 312, 320, 90 Cal. Rptr. 2d 277, 283 (1999). Under the "independent judgment" rule, the Court must "begin its review with a presumption of the correctness of administrative findings, and then, after affording the respect due to these findings, exercise independent judgment in making its own findings." *Fukuda v. City of Angels*, 20 Cal. 4th 805, 819, 977 P.2d 693, 701 (1999). "[T]he presumption provides the trial court with a starting point for review but it is only a presumption, and may be overcome. Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the agency's findings." *Id.*

"The 'substantial evidence' rule applies when the administrative decision neither involves nor substantially affects a vested right. The trial court must then review the entire administrative record to determine whether the findings are supported by substantial evidence and whether the agency committed any errors of law …." *Mann*, 76 Cal. App. 4th 312, 320, 90 Cal. Rptr. 2d 277, 283 (1999).

To determine whether an administrative decision affects a fundamental vested right, the Court examines "whether the affected right is deemed to be of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power." *Interstate Brands v. Unemployment Ins. Appeals Bd.*, 26 Cal. 3d 770, 779, 608 P.2d 707, 713 (1980) (emphasis in original). An administrative decision that would have the effect of shutting down a business affects a fundamental vested right. *See, e.g.*, *The Termo Co. v. Luther*, 169 Cal. App. 4th 394, 407–08, 86 Cal. Rptr. 3d 687, 697 (2008) ("The implementation of the Order and Decision would have the effect not only of shutting down a business that has been in existence for 20 years or more, but also of terminating the right to produce oil—an extraordinarily valuable resource, especially in the current economic era…. Certainly, a fundamental vested right is at issue."); *Goat Hill Tavern v. City of Costa Mesa*, 6 Cal. App. 4th 1519, 1529, 8 Cal. Rptr. 2d 385, 391 (1992) (holding that "the right to continue operating an established business in which [the owner] has made a substantial investment" is a fundamental vested right).

Imposition of the Additional Conditions will precipitate the collapse of the SGM Sale and require the Debtors to close three of the four Hospitals. The Debtors' rights to preserve the Hospitals' operations, by means of a sale to SGM, is a fundamental vested right that is abrogated by the Attorney General's attempt to impose the Additional Conditions. Consequently, the Court reviews the Attorney General's decision under the independent judgment test.

*ii. In Imposing the Additional Conditions, the Attorney General Abused His Discretion*

Under certain circumstances, the sale of a not-for-profit healthcare facility is subject to review by the Attorney General. Cal. Corp. Code § 5914. The Legislature enacted Cal. Corp. Code § 5914 to ensure that the public was not deprived of the benefits of charitable health facilities as a result of the transfer of those facilities' assets to for-profit entities. In enacting § 5914, the Legislature found:

> Charitable, nonprofit health facilities have a substantial and beneficial effect on the provision of health care to the people of California, providing as part of their charitable mission uncompensated care to uninsured low-income families and under-compensated care to the poor, elderly, and disabled.
>
> Transfers of the assets of nonprofit, charitable health facilities to the for-profit sector, such as by sale, joint venture, or other sharing of assets, directly affect the charitable use of those assets and may affect the availability of community health care services….
>
> It is in the best interests of the public to ensure that the public interest is fully protected whenever the assets of a charitable nonprofit health facility are transferred out of the charitable trust and to a for-profit or mutual benefit entity.

1996 Cal. Legis. Serv. Ch. 1105 (A.B. 3101) (West).

The Attorney General has "discretion to consent to, give conditional consent to, or not consent to" the sale of a healthcare facility. Cal. Corp. Code § 5917. In exercising that discretion, the Attorney General "shall consider any factors that the Attorney General deems relevant," including but not limited to whether any of the following apply:

a) The terms and conditions of the agreement or transaction are fair and reasonable to the nonprofit corporation.
b) The agreement or transaction will result in inurement to any private person or entity.

c) Any agreement or transaction that is subject to this article is at fair market value. In this regard, "fair market value" means the most likely price that the assets being sold would bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and in their own best interest, and a reasonable time being allowed for exposure in the open market.

d) The market value has been manipulated by the actions of the parties in a manner that causes the value of the assets to decrease.

e) The proposed use of the proceeds from the agreement or transaction is consistent with the charitable trust on which the assets are held by the health facility or by the affiliated nonprofit health system.

f) The agreement or transaction involves or constitutes any breach of trust.

g) The Attorney General has been provided, pursuant to Section 5250, with sufficient information and data by the nonprofit corporation to evaluate adequately the agreement or transaction or the effects thereof on the public.

h) The agreement or transaction may create a significant effect on the availability or accessibility of health care services to the affected community.

i) The proposed agreement or transaction is in the public interest.

j) The agreement or transaction may create a significant effect on the availability and accessibility of cultural interests provided by the facility in the affected community.

Cal. Corp. Code § 5917 (West).

Nothing in the record indicates that SGM's bid was other than for fair market value (factor (c)). The Hospitals were thoroughly marketed by Cain Brothers. SGM was the only bidder interested in purchasing the Hospitals. The Court must presume that a bid submitted after extensive marketing reflects the Hospital's fair market value. *See Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457, 119 S. Ct. 1411, 1423, 143 L. Ed. 2d 607 (1999) (stating that "the best way to determine value is exposure to a market").

There is no indication that SGM, or any other party, took any actions to decrease the value of the Hospitals (factor (d)). In view of the extensive marketing, the terms of the sale are fair and reasonable to the Debtors (factor (a)). There is no evidence that any of the parties involved in the SGM sale have engaged in any conduct that would amount to a breach of trust (factor (f)), or that the SGM Sale will inure to the benefit of any private person or entity (factor (b)). Nor has there been any suggestion that the Debtors failed to provide the Attorney General with sufficient information to evaluate the SGM Sale (factor (g)). Factor (e) does not apply, because the proceeds of the SGM Sale are fully encumbered by the claims of creditors, leaving no remaining equity that could be devoted to charitable purposes.

The remaining factors are (1) the effect of the SGM Sale on the accessibility of healthcare services (factor (h)) and cultural interests (factor (j)) in the affected communities and (2) whether the SGM Sale is in the public interest (factor (i)). Applying the independent judgment standard of review, the Court finds that in electing to impose the Additional Conditions, the Attorney General abused his discretion with respect to these factors.

By letter dated August 23, 2019 (the "August Letter"), the Debtors advised the Attorney General that if the Additional Conditions were imposed, SGM would not complete the sale and the most likely outcome would be the closure of St. Vincent, Seton, and Seton Coastside. The August Letter advised the Attorney General that SGM had submitted the only offer for the Hospitals, and that the "Debtors cannot sustain incurring ongoing operational losses to maintain

the going-concern value of St. Vincent and Seton without the realistic prospect of a purchaser."[14] The Debtors stated that upon the failure of the SGM Sale, they would be required to begin the process of closing St. Vincent, Seton, and Seton Coastside "almost immediately."[15]

Having overseen the Debtors' bankruptcy cases since their inception, the Court has become intimately familiar with the Debtors' operational and cash flow situation. As discussed above, the Debtors' statements regarding the necessity of closing certain of the Hospitals upon the failure of the SGM Sale are not an idle threat.

Imposition of the Additional Conditions will dramatically reduce the availability of healthcare services by causing the closure of three of the four Hospitals. In addition to the loss of healthcare services, closure of the Hospitals will destroy approximately 2900 jobs. Closure of the Hospitals will require the relocation of many patients suffering from critical conditions. None of this is in the public interest.[16]

The Court understands that the Additional Conditions were imposed with the laudable objective of increasing the amount of healthcare services provided by the Hospitals. The Court can only assume that the Attorney General does not believe the representation that imposition of the Additional Conditions will result in a collapse of the SGM Sale. Unfortunately, the dire economic circumstances in which the Debtors now find themselves leaves the Court with no doubt that if the SGM Sale is not completed, three of the Hospitals will almost certainly close.

Because the Additional Conditions will reduce health care services by resulting in the closure of three of the Hospitals, imposition of the Additional Conditions was an abuse of the Attorney General's discretion.

Outside of bankruptcy, the finding that the Attorney General abused his discretion would result in the entry of a judgment commanding the issuance of a peremptory writ of mandate, followed by the issuance of the writ. The writ would command the Attorney General to set aside the 2019 Conditions, and would further command the Attorney General to exercise his discretion with respect to the review of the SGM Sale in a lawful manner. *See, e.g.*, *California Hosp. Assn. v. Maxwell-Jolly*, 188 Cal. App. 4th 559, 570, 115 Cal. Rptr. 3d 572, 581 (2010), *as modified on denial of reh'g* (Sept. 16, 2010).

BAPCPA § 1221(e) compels a different result inside bankruptcy. Section 1221(e) provides that the Court is not required "to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property." In *In re HHH Choices Health Plan*, the Bankruptcy Court relied upon BAPCPA § 1221(e) to conclude that it had the authority to interpret a New York law governing the transfer of the assets of a non-profit entity. The court observed that "[i]n the case of an insolvent not-for-profit corporation, section 511 of the New York Not-For-Profit Corporation Law ordinarily, would require the approval of the New York State Supreme Court for a transfer of assets." *HHH Choices Health Plan*, 554 B.R. at 700. The court rejected arguments advanced by certain of the parties "that the

---

[14] August Letter at 14.

[15] *Id.*

[16] SEIU-UHW contends that it is economically feasible for SGM to operate the Hospitals while complying with the Additional Conditions. The record does not support SEIU-UHW's contention. SGM was the only bidder willing to purchase the Hospitals and has stated unequivocally that it will not complete its purchase if the Additional Conditions are imposed. These facts show that the Additional Conditions render operation of the Hospitals economically infeasible.

ordinary state court procedures must still be followed" with respect to the transfer of the assets. *Id.* Instead, the court held that substantive state law requirements remained applicable, but that it was the Bankruptcy Court that had authority to apply those requirements. *Id.*

Pursuant to BAPCPA § 1221(e), and consistent with the ruling in *HHH Choices Health Plan*, the Court is not required to issue a judgment and writ commanding the Attorney General to set aside the 2019 Conditions, and is not required to remand these proceedings to allow the Attorney General to conduct a further review of the SGM Sale in light of the Court's finding that the Attorney General abused his discretion. Instead, the Court is empowered to apply Cal. Corp. Code § 5914, and to determine the conditions under which the Debtors may sell the Hospitals to SGM.

Under the circumstances presented here, the only way that closure of three of the four Hospitals can be avoided is if a sale not subject to the Additional Conditions is approved. A decision by the Attorney General to not consent to the sale, or a decision to consent to the sale subject to conditions other than the Approved Conditions, would constitute an abuse of discretion. That is because SGM, the only entity willing to purchase and continue to operate the Hospitals, will do so only if it is permitted to operate the Hospitals in a manner consistent with the Approved Conditions.

In reaching this conclusion, the Court is not limiting or controlling the discretion vested in the Attorney General, in contravention of Cal. Code Civ. Proc. § 1094.5(f). The Hospitals have been financially distressed for years. A $100 million capital infusion made in connection with the 2015 Restructuring Agreement failed to stabilize the Hospitals' operations. A further capital infusion of $148 million in 2017 failed to restore the Hospitals to financial health. This demonstrates that it was not possible to successfully operate the Hospitals subject to the 2015 Conditions. It should come as no surprise that no buyer exists that is willing to purchase and operate the Hospitals if operations are constrained by Additional Conditions that are substantially similar to the 2015 Conditions. The Attorney General's continued attempts to impose conditions rendering sustainable operation of the Hospitals impossible amounts to an abuse of discretion.

The Attorney General contends that SGM, by refusing to purchase and operate the Hospitals subject to conditions other than the Approved Conditions, is attempting to divest the Attorney General of his regulatory authority by forcing him to accede to a transaction on SGM's terms. This argument ignores the financial and operational realities facing the Hospitals. SGM's refusal to accept the Additional Conditions is not an attempt to blackmail the Attorney General into approving the sale. Such refusal is instead dictated by economic reality.

*iii. Even if the Attorney General's Decision is Subject to Traditional Mandamus Review Under Cal. Civ. Proc. Code § 1085, Imposition of the Additional Conditions Was an Abuse of Discretion*

Even if the Attorney General's review of the sale transaction is a quasi-legislative decision, subject to traditional mandamus review under Cal. Civ. Proc. Code § 1085, the decision to impose the Additional Conditions was an abuse of discretion.

Under Cal. Civ. Proc. Code § 1085, a traditional mandate "may issue to correct the exercise of discretionary legislative power, *but only* if the action taken is so palpably unreasonable and arbitrary as to show an abuse of discretion as a matter of law." *Carrancho v. California Air Res. Bd.*, 111 Cal. App. 4th 1255, 1265, 4 Cal. Rptr. 3d 536, 545 (2003) (emphasis in original). In reviewing quasi-legislative decisions, the "authority of the court is limited to determining

whether the decision of the agency was arbitrary, capricious, entirely lacking in evidentiary support, or unlawfully or procedurally unfair." *Fullerton Joint Union High Sch. Dist. v. State Bd. of Educ.*, 32 Cal. 3d 779, 786, 654 P.2d 168, 172 (1982). The Court must ensure that the agency or officer making the decision "has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute." *W. States Petroleum Assn. v. Superior Court*, 9 Cal. 4th 559, 577, 888 P.2d 1268, 1277 (1995). Traditional mandamus review of a quasi-legislative decision is therefore more deferential than administrative mandamus review of a quasi-judicial decision under the independent judgment standard.

Even applying this more deferential standard of review, the Court finds that the decision to impose the Additional Conditions was an abuse of discretion, and that a proper exercise of discretion required the Attorney General to consent to the sale subject only to the Approved Conditions. Preservation of access to healthcare is one of the factors the Attorney General must consider in reviewing the transaction. *See* Cal. Corp. Code § 5917(h) (requiring the Attorney General to consider whether the "agreement or transaction may create a significant effect on the availability or accessibility of health care services to the affected community"). At the hearing, the Attorney General stated that he imposed the Additional Conditions in furtherance of § 5917(h)'s objective of preserving healthcare access.[17] The effect of the Additional Conditions will be the closure of three of the four Hospitals, which will significantly reduce access to healthcare. There is no "rational connection" between the purpose of the Additional Conditions (preserving healthcare access) and the actual results of the conditions (a severe reduction in healthcare access). *See W. States Petroleum Ass'n*, 888 P.2d at 1277. With respect to three of the four Hospitals, the Attorney General's decision will destroy the very charitable assets that he is charged with protecting.

In sum, regardless of whether the Debtors are entitled to review of the Attorney General's decision under traditional mandamus or administrative mandamus, the Attorney General's decision to impose the Additional Conditions was an abuse of discretion. In the unique circumstances of this case, the Attorney General was required to consent to the SGM Sale without imposing the Additional Conditions. As a result, sale of the Hospitals to SGM free and clear of the Additional Conditions is authorized under applicable nonbankruptcy law. The Court approves the SGM Sale, free and clear of the Additional Conditions, pursuant to § 363(f)(1).

## C. The Debtors May Sell the Hospitals Free and Clear of the Additional Conditions Pursuant to § 363(f)(4)

Under § 363(f)(4), the Hospitals may be sold free and clear of the Additional Conditions provided the Additional Conditions are "in bona fide dispute …" A bona fide dispute exists if "there is an objective basis for either a factual or legal dispute as to the validity" of the interest at

---

[17] Specifically, counsel for the Attorney General explained that in imposing the conditions, the Attorney General "is weighing the impact on the affected community, and making a determination as to what would be the best outcome for this community in order to ensure that it is not being adversely impacted, and not inappropriately losing access to these nonprofit hospitals …." Hearing Transcript [Doc. No. 3416] at 24. Counsel further stated that the Attorney General's "obligation is … to do what's needed to preserve access to healthcare, in particular for disadvantaged populations, which is clearly what we're dealing with here." *Id.* at 12.

issue. *In re Octagon Roofing*, 123 B.R. 583, 590 (Bankr. N.D. Ill. 1991). The court "court need not determine the probable outcome of the dispute, but merely whether one exists." *Id.*

The Debtors dispute the Attorney General's authority to impose the Additional Conditions, on the grounds that the (1) Additional Conditions attempt to impose successor liability in a manner not authorized under California law and that (2) the Attorney General abused his discretion in issuing the Additional Conditions. As discussed above, the Debtors have shown that the Attorney General cannot impose the Additional Conditions for both of these reasons. The Debtors have easily satisfied §363(f)(4), which does not require the Debtors to show that they will prevail upon the dispute—only that a dispute exists.

A bona fide dispute exists for yet another reason. The Debtors have shown that by imposing the Additional Conditions, the Attorney General violated § 525.

Section 525 provides in relevant part:

> [A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title … or another person with whom such … debtor has been associated, solely because such … debtor is or has been a debtor under this title … or has not paid a debt that is dischargeable in the case under this title ….

In *In re Aurora Gas, LLC*, the court held that the State of Alaska violated § 525 by refusing to approve the debtor's sale of oil and gas leases unless the purchaser posted a bond of $6 million to pay for the cost of plugging abandoned wells that the purchaser was not acquiring. *In re Aurora Gas, LLC*, No. A16-00130-GS, 2017 WL 4325560 (Bankr. D. Alaska Sept. 26, 2017). The court held that by conditioning approval of the sale upon the posting of a bond, the State was attempting to collect upon the debtor's obligation to pay for the costs of plugging the abandoned wells. Imposition of such a condition, the court found, constituted impermissible discrimination against the debtor and its affiliate, the purchaser of the gas leases, in violation of § 525.

The facts of this case are strikingly similar. Here, the Attorney General has conditioned approval of the SGM Sale upon SGM assuming the obligation to operate the Hospitals in accordance with conditions similar to the 2015 Conditions that are an obligation of the Debtors. As discussed, the Additional Conditions require that SGM maintain and operate the Hospitals at current licensure and service levels. The Additional Conditions amount to an attempt by the Attorney General to enforce the obligations imposed by the 2015 Conditions. The 2015 Conditions are liabilities that are dischargeable in bankruptcy. By conditioning the transfer of the Hospitals upon the assumption of the Additional Conditions, which impose obligations equal to or in excess of the 2015 Conditions, the Attorney General is impermissibly discriminating against the Debtors in violation of § 525.

The fact that the Additional Conditions can be characterized as a regulatory obligation does not change the analysis. Regulatory obligations such as the Additional Conditions qualify as a "debt" under the Bankruptcy Code's broad definition of the term:

> Under the Bankruptcy Code, "debt" means "liability on a claim," 11 U.S.C. § 101(12), and "claim," in turn, includes any "right to payment," § 101(5)(A). We have said that "[c]laim" has "the broadest available definition," *Johnson v. Home State Bank,* 501 U.S.

78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), and have held that the "plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation, regardless of the objectives the State seeks to serve in imposing the obligation," *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 559, 110 S.Ct. 2126 (1990). See also *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985). In short, a debt is a debt, even when the obligation to pay it is also a regulatory condition.

*F.C.C. v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 302–03, 123 S. Ct. 832, 839, 154 L. Ed. 2d 863 (2003).

## D. The Debtors May Sell the Hospitals Free and Clear of Certain of the Additional Conditions Pursuant to § 363(f)(5)

Under § 363(f)(5), property may be sold free and clear of an interest, if the entity holding the interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

An interest "that can be reduced to a specific monetary value" falls within the scope of § 363(f)(5). *In re Trans World Airlines, Inc.*, 322 F.3d 283, 291 (3d Cir. 2003); *see also In re Vista Marketing Grp. Ltd.*, 557 B.R. 630, 635 (Bankr. N.D. Ill. 2016) ("[O]ne would be hard-pressed to present a clearer example of a situation where the interest-holder could be compelled to accept a money satisfaction of its interest under subsection (f)(5) than the calculable monetary obligation asserted by the District in its surcharge bill and disconnection notice.").

Among the Additional Conditions are requirements that each of the Hospitals provide specified levels of charity care and community benefit services. The Additional Conditions allow any shortfalls in charity care or community benefit services to be satisfied through deficiency payments to tax-exempt entities within the Hospitals' service area. The charity care and community benefit obligations can easily be reduced to a specific monetary value. The Debtors may sell the Hospitals free and clear of these obligations pursuant to § 363(f)(5).

## E. Section 363(d)(1) Does Not Bar the Sale

As noted, § 363(d)(1) provides that non-profit entities, such as the Debtors, may sell estate assets only if the sale is "in accordance with nonbankruptcy law applicable to the transfer of property by" a non-profit entity.

For the reasons discussed in Section II.B., above, the Debtors are authorized to sell the Hospitals, free and clear of the Additional Conditions, under applicable nonbankruptcy law.

Even if the Debtors were not authorized to sell the Hospitals free and clear under applicable nonbankruptcy law, § 363(d)(1) does not limit the Debtors' ability to sell the Hospitals free and clear of the Additional Conditions under § 363(f)(4) or (5).[18] Basic principles of statutory construction dictate this result. "Statutory construction … is a holistic endeavor." *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S. Ct. 626, 630, 98 L. Ed. 2d 740 (1988). The Court must look "to the provisions of the whole law, and to its object and policy." *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 94–

---

[18] Under § 363(f)(4), the Debtors are authorized to sell the Hospitals free and clear of all of the Additional Conditions. *See* Section II.C., above. Under § 363(f)(5), the Debtors are authorized to sell the Hospitals free and clear of the charity care and community benefit obligations. *See* Section II.D., above.

95, 114 S. Ct. 517, 523, 126 L. Ed. 2d 524 (1993). Absent a "clear intention otherwise," specific
provisions addressing an issue apply instead of more generalized provisions covering the
same issue. *Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S. Ct. 2474, 2483, 41 L. Ed. 2d 290 (1974).
This rule applies "regardless of the priority of enactment" of the provisions. *Id.*

Section 363(f) sets forth specific circumstances under which assets may be sold free and
clear. Section 363(f) is not limited by a non-profit debtor's general obligation under § 363(d)(1)
to comply with nonbankruptcy law. The general requirement set forth in § 363(d)(1) makes no
reference to § 363(f), which more specifically delineates the circumstances in which assets may
be sold free and clear. Without a "clear intention otherwise," *Morton*, 417 U.S. at 550–51, the
general requirement of § 363(d)(1) does not repeal the specifics of free and clear sales under
§ 363(f), even though § 363(d)(1) was enacted subsequent to § 363(f).

## F. Section 541(f) Does Not Bar the Sale

Section 541(f) provides:

> Notwithstanding any other provision of this title, property that is held by a debtor that is a
> corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and
> exempt from tax under section 501(a) of such Code may be transferred to an entity that is
> not such a corporation, but only under the same conditions as would apply if the debtor
> had not filed a case under this title.

The Attorney General asserts that § 541(f)'s initial clause, "[n]otwithstanding any other
provision of this title," is broad enough to trump § 363(f). According to the Attorney General,
§ 541(f) requires that the SGM Sale comply with applicable California law. As a result, the
Attorney General argues, the SGM Sale can occur only if SGM agrees to accept all of the 2019
Conditions, including the Additional Conditions.

The language of § 541(f) is similar, but not identical to, the language of § 363(d)(1). Section
363(d)(1) requires that non-profit entities transfer property "in accordance with nonbankruptcy
law applicable to the transfer of property by" the non-profit entity; § 541(f) requires that such
transfers occur "only under the same conditions as would apply if the debtor had not filed a case
under this title."

"[W]here Congress includes particular language in one section of a statute but omits it in
another section of the same Act, it is generally presumed that Congress acts intentionally and
purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23,
104 S. Ct. 296, 300, 78 L. Ed. 2d 17 (1983). Therefore, the Court cannot assume that § 541(f)
has the same meaning as § 363(f). That is, § 541(f) cannot mean that the Debtors are required to
transfer property "in accordance with nonbankruptcy law applicable to the transfer of [such]
property," since that is the language used in § 363(d)(1).

There is no legislative history to guide the Court in construing the phrase "under the same
conditions" in § 541(f). Nor has the Court been able to locate any cases interpreting this section.
In the absence of legislative history, phrases are construed in accordance with their "ordinary or
natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 114 S. Ct. 996, 1001, 127 L. Ed. 2d 308
(1994). According to *Roget's 21st Century Thesaurus* (3d ed. 2013), a synonymous phrase for
"under the same conditions" is "in these circumstances."

Here, the Debtors have complied with § 541(f)'s mandate. That is, "[n]otwithstanding any
other provisions" of the Bankruptcy Code, they have sought to transfer the Hospitals in the same

manner as the transfer would have occurred under applicable nonbankruptcy law. The Debtors submitted the transfer to the review of the Attorney General, paid for the expert healthcare impact statements required under the statute, and waited for 135 days for the Attorney General to review the transaction. The transfer has been subject to the same conditions that would have applied had the Debtors not sought bankruptcy protection.

Even if the Attorney General were correct that § 541(f) had the same meaning as § 363(d)(1), the Debtors would still be able to sell the Hospitals free and clear of the Additional Conditions, pursuant to § 363(f)(1), (4), and (5). Contrary to the Attorney General's contention, the "notwithstanding" clause does not mean that § 541(f) trumps § 363(f). The Ninth Circuit has held:

> In examining specific statutes, we have not, however, always accorded universal effect to the "notwithstanding" language, standing alone. *See Or. Natural Res. Council v. Thomas,* 92 F.3d 792, 796 (9th Cir.1996) ("We have repeatedly held that the phrase 'notwithstanding any other law' is not always construed literally." (citing *E.P. Paup Co. v. Dir., Office of Workers Comp. Programs,* 999 F.2d 1341, 1348 (9th Cir.1993); *Kee Leasing Co. v. McGahan (In re The Glacier Bay* ), 944 F.2d 577, 582 (9th Cir.1991); *Golden Nugget, Inc. v. Am. Stock Exch., Inc.,* 828 F.2d 586, 588–89 (9th Cir.1987) (per curium))). Instead, we have determined the reach of each such "notwithstanding" clause by taking into account the whole of the statutory context in which it appears.

*United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007).

Relying upon the "common-sense principle of statutory construction that sections of a statute generally should be read to give effect, if possible, to every clause," the Ninth Circuit has held that a "notwithstanding" provision should not be given its broadest possible interpretation if doing so would render other statutory provisions ineffectual. *Oregon Nat. Res. Council v. Thomas*, 92 F.3d 792, 797 (9th Cir. 1996).

According the "notwithstanding" clause the broad construction advocated by the Attorney General would render § 363(f) of the Bankruptcy Code ineffectual with respect to non-profit debtors. Section 541(f) was added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 1221(e) ("BAPCPA"). BAPCPA made no changes to § 363(f). The Court cannot find that Congress intended § 541(f) to trump § 363(f) with respect to non-profit debtors.

## G. The Court Certifies a Direct Appeal of its Decision to the Ninth Circuit Court of Appeals

Title 28 U.S.C. § 158(d)(2) provides that the Bankruptcy Court, acting on its motion, may certify a direct appeal of an order to the Court of Appeals if the order "involves a matter of public importance" or if an immediate appeal of the order will "materially advance the progress of the case or proceeding."

Certification is warranted here. The interplay between the sale provisions of the Bankruptcy Code and the authority of the Attorney General to regulate the sale of assets subject to a charitable trust is a matter of public importance. The issue has previously arisen in *Gardens I* and *Verity I*, and will continue to arise in future cases.

A direct appeal will materially advance the progress of the case. Closing of the SGM Sale is the lynchpin of the Debtors' plan of reorganization. However, under the APA, SGM is not

obligated to close the sale unless the Debtors obtain a final, non-appealable order authorizing a sale free and clear. The Debtors are facing severe liquidity constraints and cannot afford to continue to operate the Hospitals for much longer. A direct appeal will facilitate resolution of this case by providing certainty regarding the permissibility of a sale free and clear far sooner than would otherwise be possible. If the Court's order is upheld, SGM can proceed to close the sale. If not, the Debtors can commence shutting down St. Vincent, Seton, and Seton Coastside.

## III. Conclusion

Based upon the foregoing, the Court finds that the Debtors may sell the Hospitals to SGM, free and clear of the Additional Conditions. The sale may proceed under applicable nonbankruptcy law pursuant to § 363(f)(1) because (1) the Additional Conditions qualify as successor liability that may not be imposed against SGM under California law and because (2) the Attorney General abused his discretion in attempting to impose the Additional Conditions, which therefore must be set aside. A bona dispute as to the Attorney General's authority to impose the Additional Conditions exists under § 363(f)(4), because the Debtors (1) have shown that the Additional Conditions are not authorized under California law and that (2) the attempted imposition of the Additional Conditions violates § 525. Pursuant to §363(f)(5), the sale is free and clear of the charity care and community benefit obligations, which can be reduced to a monetary valuation.

The Court will prepare and enter an order certifying this matter for a direct appeal to the Ninth Circuit. The Debtors shall submit an order granting the Motion within seven days of the issuance of this Memorandum of Decision.

###

Date: October 23, 2019

Ernest M. Robles
United States Bankruptcy Judge