1  SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com

2  TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com

3  SAM J. ALBERTS (pro hac vice)
sam.alberts@dentons.com

4  DENTONS US LLP
601 South Figueroa Street, Suite 2500

5  Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

6  Attorneys for the Chapter 11 Debtors and
Debtors In Possession

7

8  **UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

9  In re

10  VERITY HEALTH SYSTEM OF
CALIFORNIA, INC., *et al.*,

11

12  Debtors and Debtors In
Possession.

13  ☒ Affects All Debtors

14  ☐ Affects Verity Health System of
California, Inc.

15  ☐ Affects O'Connor Hospital
☐ Affects Saint Louise Regional

16  Hospital
☐ Affects St. Francis Medical Center

17  ☐ Affects St. Vincent Medical Center
☐ Affects Seton Medical Center

18  ☐ Affects O'Connor Hospital
Foundation

19  ☐ Affects Saint Louise Regional
Hospital Foundation

20  ☐ Affects St. Francis Medical Center of
Lynwood Foundation

21  ☐ Affects St. Vincent Foundation
☐ Affects St. Vincent Dialysis Center,

22  Inc.
☐ Affects Seton Medical Center

23  Foundation
☐ Affects Verity Business Services

24  ☐ Affects Verity Medical Foundation
☐ Affects Verity Holdings, LLC

25  ☐ Affects De Paul Ventures, LLC
☐ Affects De Paul Ventures  - San Jose

26  Dialysis, LLC

27  Debtors and Debtors In
Possession.

28

Lead Case No. 2:18-bk-20151-ER

Jointly Administered With:
Case No. 2:18-bk-20162-ER
Case No. 2:18-bk-20163-ER
Case No. 2:18-bk-20164-ER
Case No. 2:18-bk-20165-ER
Case No. 2:18-bk-20167-ER
Case No. 2:18-bk-20168-ER
Case No. 2:18-bk-20169-ER
Case No. 2:18-bk-20171-ER
Case No. 2:18-bk-20172-ER
Case No. 2:18-bk-20173-ER
Case No. 2:18-bk-20175-ER
Case No. 2:18-bk-20176-ER
Case No. 2:18-bk-20178-ER
Case No. 2:18-bk-20179-ER
Case No. 2:18-bk-20180-ER
Case No. 2:18-bk-20181-ER

Hon. Judge Ernest M. Robles

**DEBTORS' OMNIBUS MOTION FOR APPROVAL OF 1) SETTLEMENT AGREEMENTS WITH LABOR UNIONS, 2) ASSUMPTION AND ASSIGNMENT OF MODIFIED COLLECTIVE BARGAINING AGREEMENTS TO SGM, 3) TERMINATION OF RETIREE HEALTHCARE BENEFITS AND 4) RELATED RELIEF**
**DECLARATION OF RICHARD G. ADCOCK IN SUPPORT THEREOF**

**Hearing:**
Date:    December 4, 2019
Time:    10:00 am
Location: Courtroom 1568
        255 E. Temple St., Los Angeles, CA

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**PLEASE TAKE NOTICE** that, at the above-referenced date, time and location, Verity Health System of California, Inc., a California nonprofit benefit corporation and a debtor herein, and the above-referenced affiliated debtors, the debtors and debtors in possession in the above-captioned chapter 11 bankruptcy cases (collectively, the "Debtors"), will move (the "Motion"), pursuant to §§ 105, 363, 365, and 1113 and 1114 of the Bankruptcy Code,[1] and Rules 6006, 9007, 9014 and 9019 for the entry of an order approving settlement agreements (collectively, the "Settlement Agreements") with those labor unions who are parties to the remaining prepetition collective bargaining agreements ("CBAs") that cover represented employees at the Debtors' remaining hospital facilities, which will be modified, assumed and assigned effective upon the Closing[2] of the Sale of such assets to Strategic Global Management (together, with is applicable affiliates, "SGM"), along with resolution of other issues, including the *nunc pro tunc* termination of retiree healthcare benefits utilized by approximately eleven (11) individuals, ten (10) of whom are represented by unions and one non-represented individual, and for related relief.   More specifically, the Debtors seek approval of the following:

- the "CNA Settlement Agreement" (attached hereto as **Exhibit 1**) between the Debtors and the California Nurses Association ("CNA"), which, in turn, seeks, *inter alia*, approval of the assumption and assignment to SGM effective upon Closing of a (i) modified CNA/VHS Master Agreement between CNA and Debtors St. Vincent Medical Center ("SVMC") and Seton Medical Center ("SMC"), effective December 22, 2016-December 21, 2020,[3] (ii) modified SVMC Local Contract 2016-2020 between CNA and SVMC , effective December 22, 2016 to December

---

[1]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All "Rule" references are to the Federal Rules of Bankruptcy Procedure. All "LBR" references are to the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California.

[2] All capitalized terms not defined herein have the meaning ascribed to them in the *Debtors' Emergency Motion for the Entry of an Order: (I) Enforcing the Order Authorizing the Sale to Strategic Global Management, Inc.; (II) Finding that the Sale is Free and Clear of Conditions Materially Different than those Approved by the Court; (III) Finding that the Attorney General Abused His Discretion in Imposing Conditions on that Sale and (IV) Granting Related Relief; Memorandum of Points and Authorities and Declaration in Support Thereof* [Docket No. 3188].

[3] The Modified CBAs (as defined in the Motion) are not attached to the Motion because they are SGM's confidential, proprietary information and trade secrets.  Upon request and execution of a confidentiality agreement, the Debtors will make the Modified CBAs available to proper requesting parties.

113293221\V-13

21, 2020, and (iii) modified SMC Local Contract 2016-2020 between CNA and SMC effective December 22, 2016-December 21, 2020;

- the "Local 20 Settlement Agreement" (attached hereto as **Exhibit 2**), between SMC and IFPTE AFL-CIO CLC, Local 20 ("Local 20"), which, in turn, seeks, *inter alia*, approval of the assumption and assignment to SGM effective upon Closing, of a modified Collective Bargaining Agreement between Local 20 and SMC, effective May 1, 2017-April 30, 2020;

- the "NUHW Settlement Agreement," (attached hereto as **Exhibit 3**), between SMC and the National Union of Healthcare Workers ("NUHW"), which, in turn, seeks, *inter* alia, approval of the assumption and assignment to NUHW effective upon Closing, of a modified Collective Bargaining Agreement between NUHW and SMC and SMC-Coastside, effective November 1, 2016-October 31, 2019;

- the "SEIU Settlement Agreement" (attached hereto as **Exhibit 4**), between the Debtors SVMC and St. Francis Medical Center ("SFMC") and the Service Employees International Union, United Healthcare Workers-West ("SEIU"), which, in turn, seeks, *inter alia*, the assumption and assignment to SEIU effective upon Closing of a modified Collective Bargaining Agreement between SEIU and SFMC and SVMC, effective May 1, 2017-April 30, 2020;

- the "UNAC Settlement Agreement" (attached hereto as **Exhibit 5**), between the SFMC and the United Nurses Associations of California/Union of Health Care Professionals ("UNAC," and referred to along with CNA Local 20, NUHW and SEIU as the "Unions"), which, in turn, seeks, *inter alia*, approval of the assumption and assignment to SGM effective upon Closing of a modified Labor Management Collective Bargaining Agreement effective from December 29, 2017 to December 29, 2021;

- under the CNA Settlement Agreement, the NUHW Settlement Agreement, and the Local 20 Settlement Agreement, and by request contained in the Motion, the termination *nunc pro tunc* to the date of the Settlement Agreements of all "retiree

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    benefits," as defined under § 1114, related to current and future retirees; and will

2    provide to the 11 current retirees who are receiving actual retiree health care

3    benefits (under the program that permits retirees who elect within a set period of

4    time, a supplement to continue Debtor-provided healthcare) a one-time payment in

5    the amount equal to the value of those payment supplements in the amount set forth

6    on the schedule attached hereto as **Exhibit 6**;[4] and

7    • discrete issues between the Debtors and the respective Unions.

8    **PLEASE TAKE FURTHER NOTICE** that this relief is required because: (a) the Debtors

9    are liquidating their assets in chapter 11 and, will, at the end of the process, no longer operate their

10   hospitals; (b) SGM has been approved as buyer of the Debtors' remaining hospitals [Docket No.

11   2306] and; (c) as of the Closing, the Debtors will no longer employ the employees currently

12   represented by the Unions at those hospitals.  After the Closing, the Debtors have no justifiable

13   reason to be bound by the terms of the CBAs or to incur further obligations under them, which,

14   unless modified or terminated, will add additional and undue financial burden on the estates and

15   otherwise harm the Debtors' reorganization.

16   **PLEASE TAKE FURTHER NOTICE** that this Motion is based on this Notice of Motion

17   and Motion, the attached *Declaration of Richard G. Adcock*, filed concurrently herewith, the

18   *Declaration of Richard G. Adcock in Support of Emergency First-Day Motions* [Docket No. 8], the

19   *Declaration of James M. Moloney In Support of The Debtors Memorandum. In Support of Entry of*

20   *an Order: (A) Authorizing The Sale Of Property Free And Clear Of All Claims, Liens and*

21   *Encumbrances; (B) Authorizing The Assumption and Assignment Of Designated Executory*

22   *Contracts And Unexpired Leases; and (C) Granting Related Relief,* [Docket No. 2220]; the

23   supporting statements, arguments and representations of counsel who will appear at the hearing on

24   the Motion, the record in this case, and any other evidence properly brought before the Court in all

25   other matters of which this Court may properly take judicial notice.

26

27

28   [4] Initials, rather than complete last names of the individuals have been provided for privacy purposes, with first names
identified so applicable retirees may identify themselves.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

**PLEASE TAKE FURTHER NOTICE** that this Motion will be heard on December 4, 2019, at 10:00 a.m., Pacific Time.

**PLEASE TAKE FURTHER NOTICE** that any party opposing or responding to the Motion must file and serve the response ("Response") on the moving party and the United States Trustee.  A Response must be a complete written statement of all reasons in opposition thereto or in support, declarations and copies of all evidence on which the responding party intends to rely, and any responding memorandum of points and authorities.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to LBR 9013-1(h), the failure to file and serve a timely objection to the Motion may be deemed by the Court to be consent to the relief requested herein.

Dated:  November 13, 2019

DENTONS US LLP
SAMUEL R. MAIZEL
TANIA M. MOYRON
SAM J. ALBERTS

By      */s/ Tania M. Moyron*
          *Tania M. Moyron*

Attorneys for the Chapter 11 Debtors and
Debtors In Possession

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 4 -

113293221\V-13

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 4

III.    STATEMENT OF FACTS ................................................................................. 4

    A.    General Background.................................................................................. 4

    B.    The CBAs And The Represented Employees ........................................... 4

    C.    The Retiree Benefits................................................................................. 6

    D.    The Unions' Proofs Of Claim .................................................................. 6

    E.    The Debtors' Pre-SGM Sale Efforts and Sale to SCC ............................. 7

    F.    The SGM Sale Process And SGM APA .................................................. 8

    G.    The Union § 1113 CBA Modification And § 1114 Retiree Healthcare
        Benefit Termination Process ................................................................... 11

    H.    The Settlement Agreements .................................................................... 13

    I.    Related Relief for the One Non-Union Current Retiree Who Receives
        Retiree Health Care Benefits.................................................................. 16

    J.    The Plan ................................................................................................. 16

IV.     ARGUMENT .................................................................................................. 16

    A.    The Settlement Agreement Should Be Approved Under §§ 365, 1113 And
        1114 ...................................................................................................... 16

        a.    §§ 1113 and 1114 Grant the Court with Authority to Approve the
            Settlement  Agreements And Related Relief ............................... 17

        b.    No Party other than the Debtors, the Unions or SGM has Standing
            to Object  to the CBA Modifications ......................................... 18

        c.    The Debtors have met the Test for Modification under §§ 1113 and
            1114...................................................................................... 19

        d.    The Amended Proposals were based on the Most Complete and
            Reliable Information Available.................................................. 20

        e.    The Amended Proposals are Necessary to Permit a Successful Plan
            Confirmation. .......................................................................... 20

        f.    The Modification and Settlement Agreement Treat all Creditors,
            the Debtors, and all of the Affected Parties Fairly and Equitably,
            and the Balance of the Equities Favors the Requested Relief.................. 22

        g.    The 1114 Agreements and Lump Sum Payments are Necessary,
            Fair and  Equitable. .................................................................. 24

        h.    The Settlement Agreements will Allow the Hospitals to Continue
            to Operate  and Employ Represented Employees ....................... 25

        i.    Section 365 Permits the Assumption and Assignment ............... 25

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

B.      The Debtors Have Satisfied § 363 and Rule 9019 ................................................. 27

a.      The Debtors have Satisfied Section 363(b) and 363(c) ........................... 27

b.      The Debtors have Satisfied Rule 9019 ..................................................... 28

V.      CONCLUSION ........................................................................................................... 32

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A & C Properties*,
784 F.2d 1377 (9th Cir. 1986)..................................................................28, 29, 30

*In re Adelphia Communications Corp.*,
327 B.R. 143 (Bankr. S.D.N.Y. 2005) ....................................................................31

*In re AEG Acquisition Corp.*,
127 B.R. 34 (Bankr. C.D. Cal. 1991) ......................................................................26

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.*,
197 F.3d 76 (3d Cir. 1999)......................................................................................25

*In re Am. Provision Co.*,
44 B.R. 907 (Bankr. D. Minn. 1984) .......................................................................19

*In re AMR Corp.*,
477 B.R. 384 (Bankr. S.D.N.Y. 2012) ....................................................................18

*In re AMR Corp.*,
523 B.R. 415 (S.D.N.Y. 2014).................................................................................23

*In re ANC Rental Corp., Inc.*,
277 B.R. 226 (Bankr. D. Del. 2002) ........................................................................26

*In re Blair*,
538 F.2d 849 (9th Cir. 1976)..............................................................................29, 31

*In re Bowman*,
194 B.R. 227 (Bankr. D. Ariz. 1995) ......................................................................26

*Matter of Carla Leather, Inc.*,
44 B.R. 457 (Bankr. S.D.N.Y. 1984) ......................................................................29

*In re Certified Air Techs., Inc.*,
300 B.R. 355 (Bankr. C.D. Cal. 2003).....................................................................17

*In re Chicago Const. Specialties, Inc.*,
510 B.R. 205 (Bankr. N.D. Ill. 2014).................................................................22, 23

*In re Fairmont Gen. Hosp., Inc.*,
510 B.R. 783 (Bankr. N.D. W.Va. 2014).................................................................28

*In re Family Snacks, Inc.*,
257 B.R. 884 (B.A.P. 8th Cir. 2001)........................................................................25

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

*In re Garfinckels, Inc.*,
    124 B.R. 3 (Bankr. D.D.C. 1991) ........................................................................................24

*In re Hertz*,
    536 B.R. 434 (Bankr. C.D. Cal. 2015) ...............................................................................26

*In re Karykeion, Inc.*,
    435 B.R. 663 (Bankr. C.D. Cal. 2010) ..................................................................20, 21, 25

*In re Lawrence & Erausquin, Inc.*,
    124 B.R. 37 (Bankr. N.D. Ohio 1990) ...............................................................................30

*In re Leslie Fay Companies, Inc.*,
    168 B.R. 294 (Bankr. S.D.N.Y. 1994) ...............................................................................27

*Massachusetts Air Conditioning & Heating Corp. v. McCoy*,
    196 B.R. 659 (D. Mass. 1996) ....................................................................................18, 25

*In re MF Glob. Inc.*,
    466 B.R. 244 (Bankr. S.D.N.Y. 2012) ...............................................................................31

*In re N. Am. Royalties, Inc.*,
    276 B.R. 860 (Bankr. E.D. Tenn. 2002) ............................................................................25

*In re Nat'l Forge Co.*,
    289 B.R. 803 (Bankr. W.D. Pa. 2003) ..................................................................22, 23, 24

*In re Nw. Airlines Corp.*,
    346 B.R. 307 (Bankr. S.D.N.Y. 2006) ........................................................................17, 27

*In re Nw. Airlines Corp.*,
    483 F.3d 160 (2d Cir. 2007) ...............................................................................................23

*In re Partsearch Techs., Inc.*,
    453 B.R. 84 (Bankr. S.D.N.Y. 2011) .................................................................................31

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968) ........................................................32

*In re Rufener Const., Inc.*,
    53 F.3d 1064 (9th Cir. 1995) ..............................................................................................30

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ...............................................................................28

*In re Tower Auto., Inc.*,
    342 B.R. 158 (Bankr. S.D.N.Y. 2006) ...............................................................................24

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) ..................................................................................29

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

*In re UAL Corp.*,
    408 F.3d 847 (7th Cir. 2005)................................................................................18

*In re UAL Corp.*,
    468 F.3d 456 (7th Cir. 2006)................................................................................19

*United Mine Workers of Am. 1974 Pension Plan & Tr. v. Walter Energy, Inc.*,
    579 B.R. 603 (N.D. Ala. 2016) ........................................................................3, 19

*United States v. Alaska Nat'l Bank (In re Walsh Constr., Inc.)*,
    669 F.2d 1325 (9th Cir. 1982).......................................................................29, 31

*In re W.T. Grant & Co.*,
    699 F.2d 599 (2nd Cir. 1983)..............................................................................29

*In re Walter Energy, Inc.*,
    542 B.R. 859 (Bankr. N.D. Ala. 2015) .....................................................22, 23, 24

*In re Walter Energy, Inc.*,
    911 F.3d 1121 (11th Cir. 2018)......................................................................17, 19

*In re Wilde Horse Enterprises, Inc.*,
    136 B.R. 830 (Bankr. C.D. Cal. 1991)..................................................................28

*In re Yellowstone Mountain Club, LLC*,
    460 B.R. 254 (Bankr. D. Mont. 2011) ..................................................................31

**Statutes**

11 U.S.C. § 365(b)(1)..................................................................................................26

11 U.S.C. § 1107...........................................................................................................4

11 U.S.C. § 1108...........................................................................................................4

11 U.S.C. § 1113(d)(1)................................................................................................19

11 U.S.C. § 1113(d)(2)................................................................................................18

11 U.S.C. § 1114.........................................................................................................25

11 U.S.C. § 1129(a)(13).........................................................................................24, 30

28 U.S.C. § 157.............................................................................................................4

28 U.S.C. § 1334...........................................................................................................4

28 U.S.C. § 1408...........................................................................................................4

28 U.S.C. § 1409...........................................................................................................4

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

**Rules**

FED. R. BANKR. P. 6006 ...............................................................................................1

FED. R. BANKR. P. 9007 ...............................................................................................1

FED. R. BANKR. P. 9014 ...............................................................................................1

FED. R. BANKR. P. 9019 ......................................................................................... *passim*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Verity Health System Of California, Inc. ("VHS"), and the above-referenced affiliated debtors and debtors in possession in the above captioned chapter 11 bankruptcy cases (collectively, the "Debtors") move, pursuant to §§ 105, 363, 365, and 1113 and 1114 of the Bankruptcy Code[1] and Rules 6006, 9007, 9014 and 9019, for the entry of an order (i) approving settlement agreements (collectively, the "Settlement Agreements") between the Debtors and those labor unions who are parties to prepetition collective bargaining agreements ("CBAs"), which will be modified, assumed and assigned effective upon the Closing[2] of the Sale to Strategic Global Management, Inc. ("SGM"), and (ii) approving related relief including the *nunc pro tunc* termination of retiree healthcare benefits utilized by for approximately eleven (11) individuals represented by certain of these unions and one non-union represented individual (collectively, the "Current Retirees" and each individually a "Current Retiree").

More specifically, the Debtors seek approval of the following agreements and related relief applicable to the CBAs that is conditioned upon the Closing of the Sale to SGM under that Asset Purchase Agreement [Docket No. 2305] dated January 8, 2019 (the "APA"):

•      the "CNA Settlement Agreement" (attached hereto as **Exhibit 1**) between SVMC/SMC and the California Nurses Association ("CNA"), which, in turn, seeks, inter alia, approval of the assumption and assignment to SGM effective upon Closing of the (i) modified CNAMaster Agreement between CNA and SVMC/SMC, effective December 22, 2016 to December 21, 2020 (the "CNA Master CBA,"),[3] (ii) modified SVMC Local Contract 2016-2020

---

[1]  Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. All "Rule" references are to the Federal Rules of Bankruptcy Procedure. All "LBR" references are to the Local Bankruptcy Rules for the United States Bankruptcy Court for the Central District of California.

[2] All capitalized terms not defined herein have the meaning ascribed to them in the *Debtors' Emergency Motion for the Entry of an Order: (I) Enforcing the Order Authorizing the Sale to Strategic Global Management, Inc.; (II) Finding that the Sale is Free and Clear of Conditions Materially Different than those Approved by the Court; (III) Finding that the Attorney General Abused His Discretion in Imposing Conditions on that Sale and (IV) Granting Related Relief; Memorandum of Points and Authorities and Declaration in Support Thereof* [Docket No. 3188] unless otherwise noted.

[3]  e Modified CBAs (as defined *infra*) are not attached to the Motion because they are SGM's confidential, proprietary information and trade secrets.  Upon request and execution of a confidentiality agreement, the Debtors will make the Modified CBAs available to proper requesting parties.

113293221\V-13

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

between CNA and St. Vincent Medical Center ("SVMC") effective December 22, 2016 to December 21, 2020 (the "CNA SVMC CBA"), and (iii) modified SMC Local Contract 2016-2020 between CNA and Seton Medical Center ("SMC") effective December 22, 2016-December 21, 2020 (the "CNA SMC CBA,"referred to along with the CNA Master CBA and the CNA SVMC CBA as the "CNA CBAs");

• the "Local 20 Settlement Agreement" (attached hereto as **Exhibit 2**), between SMC and IFPTE AFL-CIO CLC, Local 20 ("Local 20"), which, in turn, seeks, inter alia, approval of the assumption and assignment to SGM effective upon Closing, of a modified Collective Bargaining Agreement between Local 20 and SMC, effective May 1, 2017 to April 30, 2020 (the "Local 20 CBA");

• the "NUHW Settlement Agreement," (attached hereto as **Exhibit 3**), between SMC and the National Union of Healthcare Workers ("NUHW"), which, in turn, seeks, inter alia, approval of the assumption and assignment to NUHW effective upon Closing, of a modified Collective Bargaining Agreement between NUHW and SMC and SMC-Coastside ("SC"), effective November 1, 2016 to October 31, 2019 (the "NUHW CBA");

• the "SEIU Settlement Agreement" (attached hereto as **Exhibit 4**), between SVMC/SFMC and the Service Employees International Union, United Healthcare Workers-West ("SEIU"), which, in turn, seeks, inter alia, the assumption and assignment to SEIU effective upon Closing of a modified Collective Bargaining Agreement between SEIU and SFMC and SVMC, effective May 1, 2017 to April 30, 2020 (the "SEIU CBA");

• the "UNAC Settlement Agreement" (attached hereto as **Exhibit 5**), between SFMC and the United Nurses Associations of California/Union of Health Care Professionals ("UNAC," and referred to along with CNA Local 20, NUHW and SEIU as the "Unions"), which, in turn, seeks, inter alia, approval of the assumption and assignment to SGM effective upon Closing of a modified Labor Management Collective Bargaining Agreement effective from December 29, 2017 to December 29, 2021 (the "UNAC CBA");

• under the CNA Settlement Agreement, the NUHW Settlement Agreement, and the Local 20 Settlement Agreement, and by request contained in the Motion, the *termination nunc pro*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 2 -

1  *tunc* to the date of the Settlement Agreements of all "retiree benefits," as defined under § 1114

2  which, in this case includes the program that permits retirees who elect, within a set period of time,

3  a supplement to purchase Debtor-provided healthcare (the "Retiree Healthcare Program"); and will

4  provide to the 11 current retirees who are receiving benefits under the Retiree Healthcare Program

5  (the "Retiree Health Benefits") a one-time payment equal to the value of those payment

6  supplements in the amount set forth on the schedule attached hereto as **Exhibit 6**;[4] and

7  • discrete issues between the Debtors and the respective Unions.

8  The requested relief is required because (a) the Debtors are selling their assets in chapter

9  11, and will, at the end of the process, no longer operate hospitals, (b) after a thorough marketing

10  process (the "Marketing Process"), no bidder (other than SGM) emerged seeking to acquire the

11  cumulative assets of SMC, SC, SVMC, SFMC, and St. Vincent Dialysis Center (together, the

12  "Hospitals"), (c) as of the Closing, the Debtors will no longer employ the employees currently

13  represented by the Unions at the Hospitals (though SGM will provisionally employ qualified

14  employees as of the Closing Date according to § 5.3 of the APA), (d) the Debtors need to settle and

15  terminate their retiree benefit liability to confirm a plan, and (e) acting through the process codified

16  in §§ 1113 and 1114 and Rule 9019 and structured under §§ 4.7 and 5.11 of the APA, the parties

17  have entered into a reasonable compromise to preserve going-forward unionized jobs, compensate

18  employees and preserve and maximize estate assets.

19  Relief is justified under §§ 105, 363, 365, 1113 and 1114 and Rule 9019.  Without this

20  relief, the Debtors' employees, the SGM Sale, and the prospect of confirming a successful Plan of

21  Liquidation [Docket No. 2993] (the "Plan") will be imperiled.  Congress passed §§ 1113 and 1114

22  to allow for unions and debtors to expediently collectively bargain for modifications to a CBA, and

23  the Debtors and the Unions (in conjunction with SGM) have fulfilled this goal.

24  For these and other reasons addressed below, the Court should grant all of the relief

25  requested in the Motion.

26

27

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

28  [4] Initials, rather than complete last names of the individuals have been provided for privacy purposes, with first names identified so applicable retirees may identify themselves.

113293221\V-13

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## II.    JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of these cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    STATEMENT OF FACTS

### A.    General Background

1.    On August 31, 2018 ("Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Since the commencement of their cases, the Debtors have been operating their businesses as debtors in possession pursuant to §§ 1107 and 1108.

2.    Debtor VHS, a California nonprofit public benefit corporation, is the sole corporate member of Debtor California nonprofit public benefit corporations that operate four acute care hospitals, including SFMC, SMC and SVMC and other facilities in the state of California. *Declaration of Richard G. Adcock in Support of Emergency First-Day Motions* at 4, ¶ 11 (the "First-Day Declaration") [Docket No. 8].

3.    The Debtors incorporate the First-Day Declaration for further general background, including the description of the Hospitals' history and operations.  First Day Declaration at ¶¶ 11-55.

### B.    The CBAs And The Represented Employees

4.    The Local 20 CBA covers 31 active employees for SMC and one retired employee from O'Connor Regional Hospital ("OCH")[5] (with the employees as the "Local 20 Represented Employees").  The Local 20 Represented Employees are and were predominantly Clinical Laboratory Scientists who work primarily in the hospital laboratory.

5.    The CNA CBAs cover 792 active employees at SVMC and SMC and eight retired employees from SMC, OCH and SLRH (the "CNA Represented Employees").  The CNA Represented Employees are and were registered nurses.

---

[5]  Although the assets of OCH have been sold to Santa Clara County under a prior Bankruptcy Case sale, Current Retirees who were employed at OCH while it was operating continue to receive Retiree Health Benefits.

6.     The UNAC CBA covers 817 active employees for SMC (the "UNAC Represented Employees").  The UNAC Represented Employees are and were registered nurses.

7.     The SEIU CBA covers active 1,331 active employees for SVMC and SFMC (the "SEIU Represented Employees").  The SEIU Represented Employees are and were comprised of service workers including but not limited to environmental services aides, certified nurse assistants, unit coordinators, and technical workers, including but not limited to radiological technician and pharmacy technicians.

8.     The NUHW CBA covers active 731 active employees and 1 retired employee for SMC and Seton Medical Center Coastside (the "NUHW Represented Employees") (together, with the Local 20 Represented Employees, the CNA Represented Employees, the UNAC Represented Employees, the SEIU Represented Employees, the "Represented Employees."  The NUHW Represented Employees are and were comprised of technicians, such as radiological technician, pharmacy technicians, and service workers such as, environmental service aides, dietary aides, cooks, clinical staff such licensed vocational nurse, certified nursing aides and administrative workers such unit secretaries and clerks.

9.     On the Petition Date, the Debtors filed their *Emergency Motion Of Debtors For Entry Of Order: (I) Authorizing The Debtors To (A) Pay Prepetition Employee Wages And Salaries, And (B) Pay And Honor Employee Benefits And Other Workforce Obligations; And (II) Authorizing And Directing The Applicable Bank To Pay All Checks And Electronic Payment Requests Made By The Debtors Relating To The Foregoing; Memorandum Of Points And Authorities In Support Thereof* [Docket No. 26] (the "Wage Motion") seeking an order to pay priority employee claims and to pay employees in the ordinary course of business for post-petition work.

10.    On October 22, 2018, the Court granted the Wage Motion in its *Final Order Granting the [Debtors'] Emergency Motion of Debtors for Entry of Order: (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages and Salaries, and (B) Pay and Honor Employee Benefits and Other Workforce Obligations; and (II) Authorizing and Directing the Applicable Bank to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing* [Docket No. 612], concurrently issued the *Memorandum of Decision (1) Overruling Objections to*

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES , CALIFORNIA 90017-5704
(213) 623-9300

- 5 -

1  *the (A) Prepetition Wages Motion and (B) Financing Motions and (2) Denying Motion for*

2  *Reconsideration of the Final Financing Order* [Docket No. 614 ] (together, the "Wage Order"),

3  and ordered the payment of priority and administrative wage and benefit claims, including for

4  Represented Employees.  The Court "denied without prejudice" union claimants' ability to request,

5  by motion, that (contested as to classification) underfunded pre-petition pension liabilities be paid

6  as administrative claims by the Debtors.  *Id.*

7         11.    In connection with the previous sale of assets to Santa Clara County, the Debtors

8  obtained final orders [Docket Nos. 1575, 1576, 1577 and 1578] (the "SCC Rejection Orders")

9  modifying and rejecting (the "SCC Rejection") CBAs with Local 20, CNA, and SEIU covering

10  OCH and St. Louise Regional Hospital ("SLRH") upon the closing of sale of these assets to Santa

11  Clara County ("SCC," and the "SCC Sale," respectively); *see also* Docket No. 1541 (tentative

12  decision/memorandum for SCC Rejection Orders) (the "Prior 1113 Decision").[6]

13  **C.**    **The Retiree Benefits**

14         12.    There are 11 Current Retirees, 10 represented by Unions and one Current Retiree

15  who is not represented and who are receiving Retiree Healthcare Benefits under the Retiree

16  Healthcare Program.   *See* Exhibit 6.

17  **D.**    **The Unions' Proofs Of Claim**

18         13.    CNA has filed eleven proofs of claim in these cases: (claim nos. 6233, 6247, 6249,

19  6250, 6251, 6336, 6340, 6342, 6350, 6359 and 7847) against the Debtors (the "CNA Claim").  The

20  CNA Claim seeks pre-petition pension contributions, severance payments, grievances and rejection

21  damages.

22         14.    Local 20 has filed a proof of claim in these cases (claim no. 5169) (the "Local 20

23  Claim") against VHS.  The Local 20 Claim seeks paid time off ("PTO"), extended sick leave,

24

---

25  [6] The SCC Rejection Orders approved the SCC Rejection through the two mechanisms: (i) a contested full rejection
and termination of collective bargaining agreement terms with CNA and SEIU for their collective bargaining

26  agreements covering OCH and SLRH [Docket Nos. 1577; 1578] and approval of two stipulations between the Debtors
and Local 20 and the Debtors and the California Licensed Vocational Nurses Association ("CLVNA") [Docket Nos.

27  1575; 15776] entered into under § 1113(2) (the "SCC Stipulations").  In the SCC Stipulations, the parties agreed to the
rejection of the collective bargaining agreements with OCH and SLRH, reserved rights regarding the filing of claims
and objections to same, agreed that allowed Paid Time Off ("PTO") would be treated as administrative expenses or

28  unsecured claims depending on its accrual date, and agreed that employees not re-hired by SCC would be entitled to
severance.

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES , CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

severance payments, and retiree benefits.

15.    NUHW has not filed any proof of claim in these cases.

16.    SEIU has filed fourteen proofs of claims in these cases: (claim nos. 4718, 4719, 4722, 4723, 4725, 4726, 5117, 5137, 5140, 5150, 5160, 5158, 6186, 6221) against the Debtors (the "SEIU Claim").    The SEIU Claim seeks, *et. al.*, pre-petition pension contributions, severance payments, grievances and rejection damages.

17.    UNAC has filed fourteen proofs of claims in these cases (claim nos. 5911, 5912, 5913, 5917, 5918, 5920, 5925, 5927, 5928, 5931, 5932, 5933, 5934 and 5936) against the Debtors (together, the "UNAC Claim") (together the CNA Claim,  Local 20 Claim, and the SEIU Claim are referred to as the "Proofs of Claims").    The UNAC Claim seeks, et. al., pre-petition pension contributions, severance payments, grievances and rejection damages.

**E.    The Debtors' Pre-SGM Sale Efforts and Sale to SCC**

18.    Prior to the Petition Date, the Debtors engaged in substantial efforts to market and sell their assets.  In June 2018, the Debtor engaged Cain Brothers, a division of KeyBanc Capital Markets ("Cain"), to identify potential buyers of the hospitals and related assets and commenced discussions with those potential buyers.   First-Day Declaration, at 34, ¶ 128.

19.    Cain prepared a Confidential Investment Memorandum and organized an online data site to share information with potential buyers and contacted over 110 strategic and financial buyers beginning in July 2018 to solicit their interest in exploring a transaction regarding the Debtors and has advanced significantly towards achieving sales.  First-Day Declaration, at 34-35 ¶ 129; Moloney Declaration at ¶ 4.

20.    By August 2018, as a result of its ongoing and broad marketing process, Cain had received 11 Indications of Interest ("IOI"), and continued to develop potential sales.  First-Day Declaration, at 35, ¶ 130; Moloney Declaration at ¶ 5.

21.    From the Petition Date, the Debtors' objective has been to sell substantially all of its assets as going concerns to maximize recovery to creditors while maintaining healthcare in their communities.  First-Day Declaration at 25, ¶ 96

22.    On December 27, 2018, the Court entered the *Order (A) Authorizing the Sale of*

113293221\V-13

*Certain of the Debtors' Assets to Santa Clara County Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of an Unexpired Lease Related Thereto; and (C) Granting Related Relief* [Docket No. 1153], approving a sale of OCH, SLRH through the SCC Sale.

23.     The SCC Sale closed on February 28, 2019.  After payment of certain cure costs, closing costs and other items, the net remaining proceeds were approximately $184.38 million, which are held in four sale proceeds account.  An additional $23.35 million is held in escrow (the "Post-Closing Escrow") by First American Title Insurance Company, the escrow agent.  The Post-Closing Escrow was established pursuant to the terms of the SCC APA, as security for the Debtors' post-closing obligations and expires in February 2020.

**F.      The SGM Sale Process And SGM APA**

24.     On January 17, 2019, the Debtors filed a motion [Docket No. 1279][7] seeking entry of an order (the "Bidding Procedures Motion"): (a) establishing SGM as the stalking horse bidder for the Purchased Assets (as defined in the APA), including SFMC, SVMC and SMC; (b) approving the form of the APA with SGM as a stalking horse bidder for this transaction; (c) setting bid procedures to establish guidelines for parties interesting in making an overbid; (d) setting an auction to be held if necessary; and (e) setting a hearing for the Court to approve the winning bidder.

25.     The APA was the result of extensive negotiations between the Debtors and SGM. Moloney Declaration at ¶ 7.  SGM submitted a stalking-horse bid for $610 million ($420 million allocated to St. Francis Medical Center, $120 million allocated to St. Vincent Medical Center and $70 million allocated to Seton Medical Center and Seton Coastside combined), plus payments of cure costs, as set forth therein.  *See generally*, APA.

26.     The Debtors sought approval of the APA because, among other things, (i) SGM's bid represented fair market value, and (ii) SGM would maintain the healthcare characteristics of

---

[7] *Motion For The Entry of (I) An Order (1) Approving Form of Asset Purchase Agreement For Stalking Horse Bidder and For Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice To Be Provided To Interested Parties; (4) Scheduling A Court Hearing To Consider Approval of The Sale To The Highest Bidder; and (5) Approving Procedures Related To The Assumption of Certain Executory Contracts and Unexpired Leases; and (II) An Order (A) Authorizing The Sale of Property Free and Clear of All Claims, Liens and Encumbrances; Memorandum of Points and Authorities In Support Thereof.*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 8 -

the Debtors' Hospitals and continue patient care for the communities served by the Hospitals. First-Day Declaration at 25, ¶ 97 ("The goals of the Debtors' restructuring are to maintain the Debtors' business operations; preserve the going-concern value of the Debtors' businesses, its stakeholders, and parties in interest; and, most importantly, to protect the health and wellbeing of the patients who are treated at the Hospitals and the jobs of the Debtors' approximately 7,000 employees.").

27.    On February 19, 2019, the Court granted the Bidding Procedures Motion (the "Bidding Procedures Order") [Docket No. 1572].

28.    Under the APA, SGM agreed to the following terms with respect to hiring employees:

> (a)    Purchaser agrees to make offers of employment, effective as of the Effective Time, to substantially all persons (whether such persons are full time employees, part-time employees, on short-term or long-term disability or on leave of absence, military leave or workers compensation leave) (the "**Hospital Employees**") who, immediately prior to the Effective Time are: (i) employees of any Seller; (ii) employees of any affiliate of any Seller which employs individuals at the Hospital and are listed on **Schedule 5.3**; or (iii) employed by an affiliate of any Seller and are listed on **Schedule 5.3**. For the avoidance of doubt, the Hospital Employees shall not include any employees of Verity or any other affiliate of Seller unless such individual is listed on **Schedule 5.3**. Any of the Hospital Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "**Hired Employees**." All employees who are Hired Employees shall cease to be employees of the applicable Seller or its affiliates as of the Effective Time.

> (b)    Purchaser shall give all Hired Employees full credit for paid time off pay to such employees as of the Closing Date by crediting such employees the time off reflected in the employment records of the applicable Seller and/or any of its affiliates immediately prior to the Effective Time, subject to compliance with applicable law and regulation, including consent of such employees if required.

APA at § 5.3(a) & (b) (with § 5.3 of the APA as the "Hiring Clause"). The Hiring Clause is subject in all respects to any other terms and conditions of the APA.

29.    The APA also provided that SGM and the Debtors would work with the Unions to effectuate a transfer of CBAs with modifications sought by SGM:

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 9 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

4.7    <u>Contract With Unions</u>.    Representatives of Sellers who are parties to collective bargaining agreements and Purchaser shall meet and confer from time to time as reasonable requested by either party to discuss strategic business options and alternative approaches in negotiating each collective bargaining agreement.    The applicable Sellers and Purchaser shall each participate in all union negotiations related to any specific collective bargaining agreement.    Promptly following the Signing Date, applicable Sellers shall use commercially reasonable efforts to initiate discussions with Purchaser and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union. The applicable Sellers will not unreasonable withhold, condition or delay approval or implementation of any successfully renegotiated collective bargaining agreement.    The parties recognize that an applicable Seller's failure to secure a modification to any collective bargaining agreement, or to conclude a successor collective bargaining agreement shall not be a breach of Sellers' obligation under this Agreement, provided that if the unions refuse to negotiate, or otherwise are not timely, reasonable or realistic in renegotiating, the collective bargaining agreements during the period between the Signing Date and the Closing Date, Sellers and Purchaser will jointly consider, and negotiate mutually in good faith, alternative approaches that may be available and/or necessary to reduce Sellers' labor cost structure, including, but not limited to, seeking to reject the collective bargaining agreement(s).

5.11    <u>Contract with Unions</u>.    Representatives of Sellers who are parties to collective bargaining agreements and Purchaser shall meet and confer from time to time as reasonably requested by either party to discuss strategic business options and alternative approaches in negotiating each collective bargaining agreement.    The applicable Sellers and Purchaser shall each participate in all union negotiations related to any specific collective bargaining agreement.    Promptly following the Signing Date, applicable Sellers shall use commercially reasonable efforts to initiate discussions with Purchaser and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union. The applicable Sellers will not unreasonably withhold, condition or delay approval or implementation of any successfully renegotiated collective bargaining agreement to be assumed by Purchaser.    The parties recognize that an applicable Seller's failure to secure a modification to any collective bargaining agreement, obligation under this Agreement.    In addition, Sellers may, in their direction, seek to reject any or all of the collective bargaining agreement(s).

APA at §§ 4.7 and 5.11 (together, the "<u>APA CBA Provisions</u>").

30.    Pursuant to the requirement of the Bidding Procedures Order, the Debtors continued

1  to market the Hospitals and related assets through Cain.  Cain vigilantly monitored interest and

2  continued to communicate with parties that had expressed interest and that Cain had identified as

3  potential bidders, either as partial or aggregate bidders.  Moloney Declaration at 1-3.  However, no

4  Potential Bidder expressed interest in assuming in whole or in part, the CBAs.  Moloney

5  Declaration at ¶ 13.  As a result, no auction was conducted, and SGM was accepted as the winning

6  bidder.  Docket No. 2035.

7      31.    On May 2, 2019 the Bankruptcy Court entered an order approving the Sale to SGM.

8  Docket No. 2306.

9  **G.    The Union § 1113 CBA Modification And § 1114 Retiree Healthcare Benefit
   Termination Process**

10     32.    After approval of the SGM Sale, the Debtors, SGM and Unions negotiated the

11 ultimate terms of the Settlement Agreements (the "Negotiations") through a series of meetings and

12 exchanges with the Unions (the "Meetings").  The process began on February 1, 2019, when the

13 Debtors delivered to each of the Unions a proposal under § 1113 and, as applicable, § 1114

14 (collectively, the "First Proposals").[8]  The First Proposals noted that SGM was amenable to

15 assuming existing CBAs, provided they were modified to comport with similar collective

16 bargaining arrangements that covered other facilities owned and operated by SGM.  The First

17 Proposals further represented that the Debtors "stood ready" to discuss with the Unions any

18 counter-proposal and that the Debtors were "open to receive and consider all comments, concerns

19 and any counterproposals from [the Unions]" and told the Unions that "if you desire any specific,

20 relevant information, do not hesitate to ask for it."  None of the Unions submitted counter-proposals

21 to the Debtors.  Declaration of Richard G. Adcock ("Adcock Declaration") at ¶ 9.

22     33.    After conducting discussions with SGM as to what it wished to modify with respect

23 to the CBAs, the Debtors and SGM then began to directly engage each of the Unions and provide

24 each Union with amended proposals, including proposed modified CBAs in redline form

25 (collectively, the "Amended Proposals").  *Id.*  Specifically,

26     a.    On or about July 11, 2019, and July 15, 2019, the Debtors and SGM met with CNA

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

28 ───────────────
[8] The Debtors will make the written copies of the First Proposals, as well as the Amended Proposals (as defined, *infra*)
to any proper requesting party.

- 11 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1     and presented the applicable Amended Proposal, which included proposed redline

2     changes to the CNA CBAs. *Id.* at ¶ 9(a).

3   b.   On or about July 19, 2019, the Debtors and SGM met with Local 20 and presented

4     the applicable Amended Proposal, which included proposed redline changes to the

5     Local 20 CBA. *Id.* at ¶ 9(b).

6   c.   On or about July 25, 2019, the Debtors and SGM met with SEIU and presented the

7     applicable Amended Proposal, which included a proposed redline to the SEIU CBA.

8     *Id.* at ¶ 9(c).

9   d.   On or about July 25, 2019, the Debtors and SGM met with UNAC and presented the

10     applicable Amended Proposal, which included a proposed redline to the UNAC

11     CBA. *Id.* at ¶ 9(d).

12   e.   On or about July 25, 2019, the Debtors' counsel met with NUHW and presented the

13     applicable Amended Proposal, which included a proposed redline to NUHW CBA.

14     *Id.* at ¶ 9(e).

15   34.   Thereafter, the Debtors continued to travel to and attend Meetings with the Unions

16 regarding the Amended Proposals and going-forward CBA terms with SGM, including:

17   f.   with respect to UNAC, on August 2, 23, and 29, 2019, *Id.* at ¶ 10(a);

18   g.   with respect to CNA, on August 7, 8, 20, 21, 2019, and September 5, 2019, *Id.* at ¶

19     10(b);

20   h.   with respect to SEIU, on July 30, 2019, August 13, 2019, August 30, 2019 and

21     September 9, 2019, *Id.* at ¶ 10(c);

22   i.   with respect to NUHW, on August 14 and 24, 2019 and September 10 and 15, 2019

23     *Id.* at ¶ 10(d); and

24   j.   with respect to Local 20, on August 15, 2019. *Id.* at ¶ 10(e).

25   35.   The in-person Meetings were also supplemented by substantial negotiations over

26 phone and by email, which culminated in the Debtors and the Unions executing the Settlement

27 Agreements attached hereto. *Id.* at ¶ 11.

28

- 12 -

**H.    The Settlement Agreements**

36.    Each Settlement Agreement incorporates modified versions of the applicable Unions' CBA or CBAs (the "<u>Modified CBAs</u>," or, individually each a "<u>Modified CBA</u>") which are to be modified under § 1113 and, as applicable § 1114 (the "<u>Modification</u>").  Through the Motion, the Debtors agree to assume and assign the CBA or CBAs (as modified under the Modified CBAs) to SGM (the "<u>Assumption and Assignment</u>"), which the Unions agree to not oppose (which process is defined in the Settlement Agreements and herein as the "<u>Agreed Outcome</u>").[9]    The parties reached the Settlement Agreement so that the SGM Sale is economically viable for SGM and the Debtors, while also providing just treatment for the Debtors' employees, including the Represented Employees.  *See* Adcock Declaration at ¶ 12.

37.    As a part of the Agreed Outcome, the Unions preserve their rights and remedies against SGM in connection with post-Closing operations, with SGM solely responsible for all post-closing obligations under the Modified CBAs.[10]

38.    Likewise, under the Settlement Agreements, the Debtors: (a) will not have any liability or obligation to perform under the CBAs or Modified CBAs with respect to post-Closing activity; (b) shall in no way be liable for or otherwise responsible for any "cure" obligations independent of any Union claims that may be expressly preserved under the Settlement Agreements; and (c) shall in no way be liable for or otherwise responsible for any nonperformance or violation by SGM or any of its affiliates arising at any time.[11]

39.    The Settlement Agreements provide the following treatment of Unions claims:

a.    an allowed claim for PTO for each employee who is not offered a job with SGM's applicable acquiring and operating entity (the "<u>Operator</u>"), will be granted, under the "accrual method" (meaning the amount earned (in this case as to PTO) and yet unpaid or used: 1) on or after August 31, 2018, will be granted administrative status; 2) between March 4, 2018 to August 30, 2018, will be granted priority claim status

---

[9] Settlement Agreements at § 3.  The Settlement Agreements are substantially similar.  For avoidance of doubt, the Settlement Agreement used for "Settlement Agreements at [##]" cites herein is the CNA Settlement Agreement.  When there is such a citation, all Settlement Agreements will contain such a term.
[10] Settlement Agreements at §§ 3; 4.
[11] Settlement Agreements at § 6.

113293221\V-13

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee) with any excess granted general unsecured claim status and; 3) prior to March 4, 2018, will be given general unsecured claim status.)  The administrative and priority claim portions will be paid with the employee' last paycheck (upon the Closing);[12]

b.    an allowed claim for severance for each employee who is not offered a job by the Operator no later than the Closing, will be calculated under the "accrual method." The administrative and priority claim portions will be paid within 30 business days of the Effective Date,[13] provided further, that payment of severance to an employee is contingent on that employee executing a written general release;[14]

c.    any allowed unpaid claim for reimbursement of educational expenses of employee represented by the Unions will be calculated under the "accrual method."  The administrative and priority claim portions will be paid within 30 business days of the Effective Date;[15]

d.    any grievance claim of an employee not settled as of the Effective Date will be treated in accordance with the treatment of claims and administrative expenses under the terms of the Plan.  The parties agree to work with the Operator in the event that the remedy is or includes reinstatement of the employee post-Closing (the Unions' claims and rights expressly preserved in the Settlement Agreement relating to the CBAs are the "Preserved Claims");[16] and

e.    other than the Preserved Claims, all other prepetition claims, priority claims and administrative expense claims are deemed waived, including without limitation, any claims for unpaid pension; provided, however, the Unions may assert any wage or defined contribution claim that may arise and is unpaid as of the Effective Date.[17]

---

[12] Settlement Agreements at § 7(a).
[13] Defined in the Plan as" a day, as determined by the Debtors, that is a Business Day as soon as reasonably practicable after all conditions to the Effective Date specified in Section 12.2 hereof have been satisfied or waived."
[14] Settlement Agreements at §§ 7(b).
[15] Settlement Agreements at § 7(d).
[16] Settlement Agreements at § 7(c).
[17] Settlement Agreements at § 7(f).

- 14 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

40.    The Settlement Agreements are conditioned upon the Closing, with a purchase price that is not materially less than APA's purchase price.[18]

41.    The Unions agreed to withdraw any outstanding applicable information requests.[19]

42.    In the applicable Settlement Agreements, the parties have also agreed under § 1114 with respect to the Retiree Health Benefits, that:

a.    Subject to this subparagraph (c), the Unions agreed that the CBAs are to be deemed automatically modified to immediately terminate and discontinue the Retiree Health Benefit under § 1114;[20]

b.    The Unions agreed to further support the termination and discontinuation of the Retiree Health Benefit with respect to all current and former employees, including any relief sought under or in accordance with § 1114;[21] and

c.    The Debtors agreed to seek approval of a one-time payment to each Retiree equal to the present value of each Retiree's Health Benefit, (the "Lump Sum Payment") (sub-paragraphs a-c are the "1114 Agreements.").[22]

43.    The Unions agreed not to oppose the "to not oppose the prompt Closing of the [SGM] Sale"[23] and to support "any Plan of the Debtors that does not contradict the material terms of this Agreement."[24]

44.    The CNA and SEIU Settlement Agreements include provisions allowing their employees who were not hired by SCC to obtain severance, giving them the same treatment that the Local 20 and CLVNA employees received in the SCC Stipulations.[25]

45.    CNA and SEIU also agreed to affirmatively support the SGM Sale in writing to the AG, and did so by writing letters in support of the SGM Sale in the context of the AG's pending review of the SGM Sale under California law.[26]

---

[18] Settlement Agreements at § 12.
[19] Settlement Agreements at § 14.
[20] Settlement Agreement at § 8(a).
[21] Settlement Agreement at § 8(b).
[22] Settlement Agreement at § 8(c).
[23] Settlement Agreements at § 15.
[24] Settlement Agreements at § 11.
[25] Settlement Agreements at § 7(b).
[26] Settlement Agreements at § 15.

113293221\V-13

**I.    Related Relief for the One Non-Union Current Retiree Who Receives Retiree Health Care Benefits**

46.    The Debtors will also pay the only Current Retiree not represented by one of the Unions the value of their retiree benefits in cash under the same methodology provided to the Union-represented Current Retirees.  The amount to be paid is reflected on Exhibit 6.  Adcock Declaration at ¶ 13.

**J.    The Plan**

47.    On September 3, 2019, the Debtors filed their Plan and their related disclosure statement.  *See Debtors' Chapter 11 Plan of Liquidation* [Docket No. 2993]; *Disclosure Statement Describing Debtors' Chapter 11 Plan of Liquidation* [Docket No. 2994] (the "Disclosure Statement").  The Plan states that "Prior to the Effective Date [of the Plan (the "Effective Date,")] the Debtors expect to receive approval for either the consensual or, pursuant to § 1113, the nonconsensual modification, assignment and/or termination of collective bargaining agreements." Plan at ¶ 15.2.

48.    On September 11, 2019, the Court entered an order extending the exclusive period that the Debtors can file and solicit votes on a plan to October 25, 2019 and solicit acceptances to December 24, 2019.  Docket No. 3039.  On October 25, 2019, the Debtors filed a motion [Docket No. 3417] seeking to extend these deadlines, respectively, to December 31, 2019 and February 29, 2020.

**IV.    ARGUMENT**

**A.    The Settlement Agreement Should Be Approved Under §§ 365, 1113 And 1114**

In *PTC Alliance Corp., et. al.*, Case No. 09-13395-CSS ("*PTC*") (Bankr. D. Del.), the Bankruptcy Court for the District of Delaware approved a transaction between the debtor, a union and a buyer for the modification and assumption of a CBA ***solely under the auspices of §§ 365 (for the assumption and the assignment), 1114 (to resolve retiree benefits) and 1113 (for the remaining relief)***.  The debtor modified collective bargaining agreements as requested by a buyer and agreed to by the union, and then assumed and assigned the collective bargaining agreements upon the closing of a previously approved sale. The modifications included a new wage scale, new

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   bonus structure, the termination of the pension plan, and with a one-time lump sum payment made

2   to a 401(k) plan.  *PTC,* Docket No. 869 (order attached as **Exhibit 7-A**, with a sample approved

3   modification agreement, *PTC,* Docket No. 847-1 attached as **Exhibit 7-B**).  The modification was

4   achieved through written memorandums of understanding that the previous clauses of the CBAs

5   would continue to be binding on the purchaser, except as modified in the memorandum.  *Id.* (the

6   union, buyer and debtor "hereby agree to a new [collective bargaining agreement] which … shall

7   become effective conditioned upon and on the date of the closing of the sale [and] will be identical

8   to the current labor agreement … except for appropriate changes in dates and the changes set forth

9   below [then listing modifications]").

10       Following the example of the successfully approved *PTC* transaction, the Debtors request

11  that this Court implement the Settlement Agreements under §§ 365, 1113 and 1114, effective upon

12  the Closing.

13       a.    <u>§§ 1113 and 1114 Grant the Court with Authority to Approve the Settlement Agreements And Related Relief</u>

14

15       The Debtors move to implement the Modification and applicable portions of the Settlement

16  Agreements under §§ 1113 and § 1114, because, as courts recognize, these statutes (interpreted

17  interchangeably due to their overlapping language and standards) [27] allow mutually agreed

18  modification of CBAs, and "consistent with [the statutes] the parties [the debtor and a union] should

19  have every opportunity to come to an agreement themselves." *In re Nw. Airlines Corp.*, 346 B.R.

20  307, 315 (Bankr. S.D.N.Y. 2006) (authorizing debtor to institute new terms and conditions of

21  employment as in proposal union had previously agreed to unless debtor and union agreed to

22  alternative deal within two weeks).  As explained by another Bankruptcy Court in this District, §

23  1113 (and § 1114) codified an "expedited form of collective bargaining" to allow unions and

24  debtors to enter into settlements in distressed situations with a primary goal to "to protect the

25  existence of collective bargaining agreements in chapter 11 cases."  *In re Certified Air Techs., Inc.*,

26  300 B.R. 355, 361 (Bankr. C.D. Cal. 2003) (citations omitted).  Here, the parties have engaged in

27

28  [27] *In re Walter Energy, Inc.*, 911 F.3d 1121, 1129 n. 8, 39 (11th Cir. 2018), ("As we mentioned above Congress modeled § 1114 on § 1113, see supra note 8, so cases interpreting § 1113 are relevant to our understanding of § 1114.").

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 17 -

the vigorous, expedited collective bargaining that §§ 1113 and 1114 was designed to engender and have arrived at the equitable and necessary Modified CBAs and the Settlement Agreements.

**b.** **No Party other than the Debtors, the Unions or SGM has Standing to Object to the CBA Modifications**

Sections 1113(d)(1) and 1114(k)(1) proscribe that only "interested parties" may participate and appear at a hearing on a motion under the statutes. *In re UAL Corp.*, 408 F.3d 847, 849 (7th Cir. 2005). Precedent holds that this group is limited to the unions, the debtor(s) and guarantors. The §§ 1113/1114 process is not an open inquiry for third parties to pick at a transaction, because the statutes are "designed to provide additional procedural requirements for the ***rejection or modification*** of collective bargaining agreements [and] supersedes and supplements the provisions in § 365." *Massachusetts Air Conditioning & Heating Corp. v. McCoy*, 196 B.R. 659, 663 (D. Mass. 1996). Congress placed special consideration on protecting collective bargaining and gave debtors and unions the exclusive power to come to a consensual agreement to be approved on a highly expedited basis, without third-party procedural interference. *Cf.* 11 U.S.C. § 1113(d)(2) (court must rule 30 days after hearing or relief is deemed granted); § 1114(k)(2) (court must rule 90 days after hearing or relief is deemed granted).

For instance, in the leading Seventh Circuit *In re UAL* decision, third parties sought to participate in § 1113 litigation because of their "concern that [the debtor] and the union may reach a compromise" that would adversely affect them. 408 F.3d at 849. The Seventh Circuit denied their participation:

> The term "interested party" in Section 1113 "is most naturally read to mean 'party to the collective bargaining agreement' or a guarantor of that contract... the union acts as the employees' representative; without the limitation, ***every retiree would receive separate notice and an opportunity to be heard; tax collectors, unsecured creditors that might gain if the debtor altered its obligations to labor—the list would go on and on***" … It is not hard to see the reasoning for such a rule in the Section 1113 context … a court [should not] hand …groups a potential veto over the ability for a debtor to enter into a new collective bargaining agreement.

*In re AMR Corp.*, 477 B.R. 384, 452 (Bankr. S.D.N.Y. 2012) (emphasis added) (following and explaining *In re UAL Corp.*, 408 F.3d at 849). As further explained by the Seventh Circuit in a

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

1    follow-up decision, "[p]arties to a contract are always free to modify their contract without

2    considering the views of third parties, and [the debtor] and [the union] were the only parties to the

3    collective bargaining agreement … [and, as] only "interested parties" may participate in a [§ 1113]

4    hearing on the debtor's proposal [under] 11 U.S.C. § 1113(d)(1), **_[this] means only the parties to_**

5    **_the agreement or a guarantor of it_**." *In re UAL Corp.*, 468 F.3d 456, 459 (7th Cir. 2006)"

6    (emphasis added).

7         Here, the Debtors and the Unions are in agreement as to the Modification and the Settlement

8    Agreements, and no other party has standing to object.[28]    The Court should approve the

9    Modification because the Unions and the Debtors have fulfilled the policy goal of §§ 1113 and

10   1114 of expediently entering into the new Modified CBAs during a bankruptcy.

11        **c.    <u>The Debtors have met the Test for Modification under §§ 1113 and 1114</u>**

12        The Prior 1113 Decision described the test for modification or rejection of a CBA, as

13   originally articulated in *In re Am. Provision Co.*, 44 B.R. 907, 910 (Bankr. D. Minn. 1984), for

14   rejection of a CBA (the "<u>1113/1114 Test</u>").  This test applies to both §§ 1113 and 1114, because

15   "the statutory requirements for modification of retiree benefits are...substantially the same as the

16   requirements for rejection of collective bargaining agreements, [and] courts routinely analyze

17   motions for relief under Sections 1113 and 1114 simultaneously." *United Mine Workers of Am.*

18   *1974 Pension Plan & Tr. v. Walter Energy, Inc.*, 579 B.R. 603, 608 (N.D. Ala. 2016), aff'd sub

19   nom. *In re Walter Energy, Inc.*, 911 F.3d 1121 (11th Cir. 2018) (citations omitted).

20        This 1113/1114 Test contains the following factors: (1) the debtors make a proposal; (2) the

21   proposal is based on the most complete and reliable information available at the time of the

22   proposal; (3) the proposed modifications or rejection are necessary to permit reorganization of the

23   debtor; (4) the modifications assure that all creditors, the debtors, and all other affected parties are

24   treated fairly and equitably; (5) the debtors provide the union relevant information as is necessary

25   to evaluate the proposal; (6) the debtors meet at reasonable times with the union between the time

26   of the proposal and the time of the hearing; (7) the debtors negotiate with the union in good faith at

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

---

[28] SGM, as assignee, would have standing as a de facto guarantor, but SGM has agreed to the relevant relief.

1    these meetings; (8) the union has refused to accept such proposal without good cause; and (9) the

2    balance of equities clearly favors the relief.

3    Here, the Unions have agreed in the Settlement Agreements that the Debtors have met

4    factors (1), (5) & (6) and (7),[29] which are procedural factors that apply to meetings, discussions and

5    the adequacy of information sharing between a debtor and a union.  Factor (8) is rendered moot

6    because the Unions have not "refused" the Amended Proposals, they have accepted them.

7    The Debtors will therefore analyze the remaining four substantive factors: (2) (proposal

8    made on good information); (3) (proposal necessary for cases); (4) (parties treated fairly); and (9)

9    (balance of equities favor relief) which concern the substantive effects of the Modification.

10    **d.    The Amended Proposals were based on the Most Complete and Reliable
        Information Available**

11    To satisfy this factor, "the debtor is simply required to gather the most complete information

12    available at the time and to base its proposal on the information it considers reliable."  *In re*

13    *Karykeion, Inc.*, 435 B.R. 663, 678 (Bankr. C.D. Cal. 2010).  Here, the Debtors—unable to operate

14    the Hospitals without bankruptcy protection—made Amended Proposals (and Unions accepted

15    them) because the Marketing Process demonstrated that SGM is the only willing system buyer (and

16    offered the highest and best bid).  SGM will not assume the CBAs without the Modification is

17    because the CBAs are not currently economically viable for the Hospitals.  Prior 1113 Decision at

18    26 ("The unfortunate but undeniable reality is that the legacy cost structure imposed by the CBAs

19    is simply too great to permit the Hospitals to continue to sustainably operate.").

20    The Proposals were based on current, complete and reliable information because the

21    Proposals were made shortly after SGM became the stalking horse bidder and then amended after

22    the Negotiations produced a result that treats labor and the claim fairly and allow the Hospitals to

23    become economically sustainable in the long-term instead of "kicking the can" for CBA issues.

24

25    **e.    The Amended Proposals are Necessary to Permit a Successful Plan
        Confirmation.**

26

27    _____

28    [29] All the Settlement Agreements contain provisions acknowledging that (i) the Debtors made a proposal (at 3), (ii) the
    Unions do not have any outstanding informational requests (at ¶ 14), (iii) the Debtors met with the Unions to negotiate
    and reached the Settlement Agreements (at 2-3) and (iv) the Debtors negotiated in good faith (at 2).

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

This Court has found that, "within the context of this [Verity] case, the term 'necessary to permit the reorganization of the debtor' is best interpreted to mean 'necessary to permit the Debtors to confirm a liquidating plan.'" Prior 1113 Decision at 23. The Court explained:

> This interpretation aligns most closely with the manner in which the Debtors are prosecuting this case. ***From the outset, the Debtors have stated their intent to sell the six hospitals that they operate as going concerns, and use the proceeds from the sales to fund a plan of liquidation***. This process is well underway. The Court has already approved the sale of two of the Debtors' hospitals to Santa Clara, and recently approved bidding procedures pertaining to the auction of the remaining four hospitals.

*Id.* (emphasis added). The Court then adopted the testimony of the Debtors' CEO that explicitly stated the closing of successful and timely sales of the Hospitals were necessary for the confirmation of a liquidating plan:

> Selling the hospitals on a going concern basis is necessary to maximize proceeds to the estate. The Debtors' operational difficulties and mounting losses require that the hospitals be sold quickly. In [the First-Day Declaration], the Debtors' CEO Richard Adcock testified that the hospital system was losing $175 million annually on a cash flow basis …

*Id.* at 24 (citing First Day Declaration at ¶ 95) ("[T]he Debtors have commenced these chapter 11 cases to protect the original legacy of the Daughters of Charity to the maximum extent possible by retiring debt incurred over the past 18 years and freeing the hospital facilities and work force to continue to operate as hospitals under new ownership and leadership without the accumulated crisis of the past. ***To do that requires the bankruptcy court supervised sale of some or all of the hospitals and related facilities***.") (emphasis added)). The Court correctly found that, without the orderly and "quick" sales of the hospitals, there would be no efficient and fair way for a distribution to the various creditors in this case—lenders, vendors, employees etc. *Id*.

Here, the Negotiations, Meetings and the §§ 1113 and 1114 process produced a consensual, productive result—the Debtors, the Unions and SGM negotiated a structure for the CBAs to remain, but modified them to reflect economic reality, and agreed to similar terms this Court previously approved in the SCC Stipulation regarding the Unions' claim treatment. As the parties recognized, with no bidder willing to assume the CBAs in full as-is, and with SGM only willing to accept

- 21 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  assignment of the Modified CBAs, the Settlement Agreements' terms are necessary. *In re Walter*

2  *Energy, Inc.*, 542 B.R. 859, 893-94 (Bankr. N.D. Ala. 2015)[30] ("if the sale(s) consummate and the

3  [businesses] are sold as a going-concern, Debtors' employees have the best chance of future

4  employment"); *In re Nat'l Forge Co.*, 289 B.R. at 810–11.

5       Relief is also necessary to limit the Debtors' potential liability and expenses.  As the Court

6  found in the SCC Rejection, unchecked, the CBAs in this case would expose the Debtors to

7  "substantial" administrative claims from unions for an enterprise that the Debtors would neither be

8  operating nor wish to be operating, with the total of these administrative claims in excess of the

9  estimated funds available to pay *all* administrative claims.  *Id.* at 24-25 (citing *Declaration of David*

10  *Galfus* [Docket 1507]);[31] *see also In re Chicago Const. Specialties, Inc.*, 510 B.R. 205, 217-18

11  (Bankr. N.D. Ill. 2014*)*.   Waiting to reject as a part of a confirmed plan, when such plan

12  confirmation process may be protracted and the intermediate period results in accrual of

13  administrative obligations, would not be in the best interest of the Debtors' estate as a whole.")

14  (citations omitted).   This Court summarized the immediate "necessity" best in its Prior 1113

15  Decision (at 26):

16          Here, the Debtors are in the process of selling the Hospitals … and
17          will no longer operate the Hospitals once the sale has closed. As was
           the case in *Chicago Const.*, it makes little sense to require the Debtors
18          to remain bound by CBAs that pertain to assets which they will no
           longer operate.

19     **f.**    **The Modification and Settlement Agreement Treat all Creditors, the Debtors,**
20              **and all of the Affected Parties Fairly and Equitably, and the Balance of the**
                **Equities Favors the Requested Relief.**

21  This Court, in finding that the SCC Rejection treated parties fairly, found:

22          In sum, prior to seeking bankruptcy relief, the Debtors diligently
            attempted to put their operations on a sound financial footing. **The**
23          **unfortunate but undeniable reality is that the legacy cost**
            **structure imposed by the CBAs is simply too great to permit the**
24          **Hospitals to continue to sustainably operate**. This reality was
            confirmed by the recent sales process … Many parties have been
25          required to make sacrifices to permit continued operations of the

26

---

27  [30] (aff'd sub nom. *United Mine Workers of Am. Combined Benefit Fund v. Walter Energy, Inc.*, 551 B.R. 631 (N.D. Ala. 2016) and aff'd sub nom. *United Mine Workers of Am. 1974 Pension Plan & Tr. v. Walter Energy, Inc.*, 579 B.R.
28  603 (N.D. Ala. 2016)).

[31] The Debtors incorporate this Declaration by reference herein.

Hospitals. Under these circumstances, the proposed rejection and/or modification of the CBAs is fair and equitable.

Prior 1113 Decision at 26-27 (emphasis added).  The Court also cited precedent that, in a sale context, this factor does not require that unions are paid in full or that all employees are re-hired or re-represented, and instead the inquiry is whether the debtor is placing a disproportionate burden on non-represented employees.  *Id.* (citing *Walter Energy*, 542 B.R. at 892); *see also In re Nat'l Forge Co.*, 289 B.R. at 811.

The Settlement Agreements place no disproportionate burden on the Represented Employees or anyone else.  Like the previously approved SCC Stipulation, the Settlement Agreements, in consideration for the Unions' cooperation and waivers, allow the Preserved Claims but disallow other claims that otherwise have no basis, especially if the CBAs had been rejected. *In re Nw. Airlines Corp.*, 483 F.3d 160, 169–72 (2d Cir. 2007) (emphasis added) (citing *In re Blue Diamond Coal Co.*, 147 B.R. 720, 732-34 (Bankr. E.D Tenn. 1992), aff'd 160 B.R. 574, 576–77 (E.D.Tenn.1993) (denying rejection damages after a § 1113 rejection) ("The only conclusion this court can reach is that *a claim for damages alleged to have resulted from the rejection of a collective bargaining agreement under § 1113 cannot be premised on § 365(g) nor can the claim be asserted pursuant to § 502(g)* … inasmuch as the Union is not a 'creditor' nor does it hold a claim otherwise allowable under § 502, it is not entitled to assert a claim for damages alleged to have resulted from the rejection of the [CBA].") (emphasis added));  *In re AMR Corp.*, 523 B.R. 415, 422–23 (S.D.N.Y. 2014), aff'd, 622 Fed. Appx. 64 (2d Cir. 2015).  Further, the Debtors' proposal to eliminate other general and rejection damages also was fair and equitable as it was consistent with the Bankruptcy Code for a rejected CBA.  *See In re Chicago Constr. Specialties, Inc.*, 510 B.R. at 222 ("[T]he Debtor's proposal to reject the CBA simply treats CBA claims [as they would be liquidated and disposed of under the Bankruptcy Code].").[32]  The Settlement Agreements also provide waivers of any and all "cure claims" that might otherwise said to exist based upon a technical assumption of the CBAs.

---

[32] The Debtors take no position on the ultimate recovery or rights of the Unions or the Represented Employees to these claims.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 23 -

Further, the APA includes the Provisional Hiring Clause for SGM to provisionally employ substantially all qualifying Represented Employees (who will then be covered under the Modified CBAs). *In re Nat'l Forge Co.*, 289 B.R. 803 at 808–09 ("where, as here, the evidence establishes that it is likely that some of the employees 'may be employed by the successful buyer' this supports a finding of fair treatment to employees"); *see also In re Walter Energy, Inc.*, 542 B.R. at 867 ("The record . . . indicate[s] the proposed going concern sale is the best chance for selling the [businesses] and to provide potential future employment for the Debtors' represented employees.").[33]

### g. The 1114 Agreements and Lump Sum Payments are Necessary, Fair and Equitable.

Further, the 1114 Agreements and the Lump Sum Payment are fair and equitable because they provide the Retirees the present value of their health benefits. By paying cash in full, the Debtors do not prejudice the Retirees and act in accord with Congress' intent in protecting vulnerable retirees by giving them enhanced rights above unsecured creditors, such as requiring that a debtor either resolve the retirees' liability under § 1114 or continue to pay retiree benefits after confirmation of a plan, *see* § 1129(a)(13)) and encouraging reorganizations by allowing debtors to formulate plans and unburden themselves of long-term financial obligations. *In re Tower Auto., Inc.*, 342 B.R. 158, 162 (Bankr. S.D.N.Y. 2006) ("the statute requires the parties to attempt to come to an agreement on terms. General unsecured creditors have no such specific protection in Chapter 11, either with respect to the process of bargaining or the substantive provisions of a plan [and] unless the Court approves a modification in accordance with § 1114 standards and procedures, a plan must provide for the continuation of retiree benefits for the duration of the period the debtor has obligated itself to provide such benefits" at an unmodified level … the Court has no reason not to endorse a settlement that satisfies the Debtors' principal goal, saving cash, while affording significant protection for the rights that Congress required be preserved for the retirees.") (citations omitted); *see also In re Garfinckels, Inc.*, 124 B.R. 3, 4–5 (Bankr. D.D.C. 1991) ("There is nothing in § 1114 that would prohibit modification, pursuant to an agreement being reached

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

---

[33] Further, the Debtors intend to honor the CBAs, in full, up to and until the Closing for post-petition liabilities accrued until the Settlement Agreement becomes effective, under the Wage Order.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1     under § 1114(e)(1)(B) or a motion being granted under § 1114(g), from applying to those benefits

2     that have arisen before the agreement is reached or the motion has been granted.").[34]

3        **h.    The Settlement Agreements will Allow the Hospitals to Continue to Operate
              and Employ Represented Employees**

4        The Settlement Agreements are necessary to keep the Hospitals operating into the future

5     with Represented Employees.  The results of the Marketing Process, with no third parties willing

6     to assume the CBAs "as is," and the Debtors' inability to operate the Hospitals outside of these

7     Cases, are not within the Debtors' (or the Unions') control.  Neither a debtor, nor a union, may

8     "base its rejection of its only suitor['s] [conditions] on a speculative white knight with greater

9     riches."  *In re Karykeion, Inc.*, 435 B.R. at 678.  Here, SGM has made the best offer for the Hospitals

10    that will allow the Hospitals to remain open to continue their mission of providing high-quality

11    patient care, offer payment to creditors, and offer provisional the continued unionization and

12    employment of the bulk of the Represented Employees.  The SGM Sale is the best possible option

13    for the Represented Employees, the Hospitals, and the communities they serve—and the Sale

14    hinges on the § 1113 and § 1114 relief the Debtors seek herein.

15       **i.    Section 365 Permits the Assumption and Assignment**

16       As approved in *PTC*, immediately after the agreed Modification (complete with the

17    abrogation of existing liabilities under the CBAs (except for the Preserved Claims)) occurs, the

18    Debtors move for the Assumption and the Assignment of the Modified CBAs to SGM under § 365.

19       Section 365 applies to the Assumption and Assignment because "given the ambiguity in §

20    1113, § 365(b) … governs the procedure for assumption [and assignment] of a CBA [and] in

21    comparable settings, the courts have so held."  *In re Family Snacks, Inc.*, 257 B.R. 884, 900 (B.A.P.

22    8th Cir. 2001) (following *Massachusetts Air Conditioning & Heating Corp.*, 196 B.R. at 663; *Am.*

23    *Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 82 (3d Cir. 1999) (citing *Wien*

24    *Air Alaska, Inc. v. Bachner*, 865 F.2d 1106, 1111 n. 5 (9th Cir. 1989)).  Also, the Debtors have

25

26    ---

[34] Section 1114's provision that a committee of retirees may sometimes be appointed (§ 1114(d)) is obviated because
eleven out of twelve of the Retirees are represented by unions who have agreed to be their authorized representative,
27    leaving an effective "committee of one," of the remaining retiree who is being paid in full and in cash.  *See* 11 U.S.C.
§ 1114(b)(1), (c) (labor union acts as authorized representative of retirees unless affirmatively opting out); *see also  In*
28    *re N. Am. Royalties, Inc.*, 276 B.R. 860, 862 (Bankr. E.D. Tenn. 2002) (the union may remain the authorized
representative even if it represents current employees and retirees).

- 25 -

1   previously assumed and assigned contracts that have been modified.  *See Order Granting Motion*

2   *to Approve Compromise under Rule 9019* [Docket No. 2461, May 29, 2019] (approving

3   modification of agreements with Premier, Inc. and assumption and assignment therein).

4       "The propriety of a decision to assume or reject an unexpired [contract] (*i.e.*, whether the

5   motion to assume/reject should be approved by the court) normally is determined under the

6   deferential 'business judgment' test."  *In re Hertz*, 536 B.R. 434, 442 (Bankr. C.D. Cal. 2015)

7   (citing *In re Pomona Valley Med. Grp. Inc.*, 476 F.3d 665, 670 (9th Cir.2007)).  "The court must

8   presume that the debtor [is acting] 'prudently, on an informed basis, in good faith, and in the honest

9   belief that the action taken was in the best interests of the bankruptcy estate.'  The court should

10  approve the debtor's decision unless it is 'manifestly unreasonable that it could not be based on

11  sound business judgment, but only on bad faith, or whim or caprice.'  The primary question to

12  guide the court in deciding whether a debtor has properly exercised its business judgment is

13  'whether rejection would benefit the general unsecured creditors.'"  *Id.* (citations omitted).

14      Here, the Debtors move for the Assumption and the Assignment (and the Settlement

15  Agreements as a whole) in good faith for the benefit of unsecured creditors (as discussed in detail,

16  *supra*).  Without the Assumption and Assignment, the Sale would be imperiled or delayed, the

17  Debtors would risk losing the benefit of having $610 million in hand, and, instead, would be

18  hampered with unwanted CBAs and illiquid assets.

19      **i.     The Unions' Consent is Dispositive**

20      The Unions have agreed that the Debtors have met § 365(b)(1)'s requirements that a debtor

21  "cure any existing defaults under such agreements … and provide adequate assurance of future

22  performance under the contract or lease" under 11 U.S.C. § 365(b)(1) through the total

23  consideration of the Settlement Agreements. *In re Bowman*, 194 B.R. 227, 230 (Bankr. D. Ariz.

24  1995); *In re AEG Acquisition Corp*., 127 B.R. 34, 44 (Bankr. C.D. Cal. 1991), *aff'd*, 161 B.R. 50

25  (B.A.P. 9th Cir. 1993).  This obviates the need for any further analysis.  As the only parties with

26  standing in this inquiry, the Unions' consent is dispositive.  *In re ANC Rental Corp., Inc.*, 277 B.R.

27  226, 231 (Bankr. D. Del. 2002) (third party did not have standing in § 365 inquiry) ("Section 365

28  is designed to protect the rights of parties with whom debtors have contractual relationships.").

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

### ii.    The Debtors have Met § 365(b)(1)'s Requirements

The Debtors have cured priority and post-petition obligations by their Wage Order payments.  Regarding any alleged pre-petition arrears, the Modification, to the extent it does not "cure amounts" through the Unions' agreement, rejects and replaces the Debtors CBAs with the Modified CBAs and therefore abrogates any pre-petition "rejection" damages.  *Nw. Airlines Corp.*, 483 F.3d at 169–72 (2d Cir. 2007).  So, any and all cure issues are satisfied, either through the consideration given through the Settlement Agreement or the legal power of § 1113.

Regarding the second prong of § 365—adequate assurance of future performance—SGM meets this requirement of providing an adequate assurance of future performance under the Modified CBAs because it is a large, sophisticated healthcare company, with a $610 million cash investment, an obligation to provisionally hire all the Represented Employees, who dedicated months to re-negotiating the Modified CBAs, and who was approved by this Court as an able-steward and of the Hospitals going-forward.

### B.    The Debtors Have Satisfied § 363 and Rule 9019

Though the Debtors urge the Court to apply § 1113 and § 1114 as umbrella statutes for their entire deal with the Unions (as Congress intended), § 363(b), § 363(c) and Rule 9019 also support the requested relief.  *See In re Leslie Fay Companies, Inc.*, 168 B.R. 294, 301 (Bankr. S.D.N.Y. 1994) (finding that Rule 9019 would apply to a debtor's decision to enter into new post-petition CBA where transaction settled all liability by and between union and debtor).   Therefore, the Debtors move for approval of the Settlement Agreement under § 363(b), 363(c) and Rule 9019 as well as under §§ 1113, 1114 and 365.  This analysis is made simpler because the requirements for approval under § 363 and Rule 9019 are highly complementary with the above-discussed 1113/1114 Test.

### a.    The Debtors have Satisfied Section 363(b) and 363(c)

Under § 363(b), the Court considers (i) whether the transaction is "is in the best interest of the estates and is "fair and reasonable" (*cf.* 1113/1114 Test factors (3) (necessary for reorganization) and (9) (balance of equities in favor)) and (ii) whether it has been given "adequate marketing," and "that it has been negotiated and proposed in good faith, and  that the [counter-

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 27 -

1  party] is proceeding in good faith" in an "arms-length" transaction." *In re Wilde Horse Enterprises,*

2  *Inc.*, 136 B.R. 830, 841–42 (Bankr. C.D. Cal. 1991) (collecting cases).    Regarding the latter

3  requirement, the above-discussed evidence establishes that the parties proceeded in good-faith and

4  certainly remained arms-length in the Negotiations.

5       Likewise, the Court should apply § 363(c) to the underlying terms of the Modified CBAs

6  by and between the Debtors and the Unions, and defer to the Debtors' business judgment.    Courts

7  have determined that large corporate debtors, including hospital debtors, commonly enter into

8  collective bargaining agreements and are entitled to business judgment deference as to their terms.

9  *See In re Fairmont Gen. Hosp., Inc.*, 510 B.R. 783, 787–88 (Bankr. N.D. W.Va. 2014).

10      As to the balance of the analysis under § 363(b) and (c), the Debtors incorporate their above

11  1113/1114 Test analysis (and, to the extent necessary, their § 365 analysis) that they proceeded in

12  good faith and have negotiated a fair, equitable and necessary set of transactions in the Settlement

13  Agreements for moving under § 363(b) for the Settlement Agreements.

14      **b.    <u>The Debtors have Satisfied Rule 9019</u>**

15      Under Rule 9019(a), "compromises are favored because they minimize costly litigation and

16  further parties' interests in expediting the administration of the bankruptcy estate" and the Court

17  only needs to find that the settlement was negotiated in good faith and is reasonable, fair, and

18  equitable by utilizing the following factors:

19          • the complexity of the litigation involved, and the expense, inconvenience, and delay

20            necessarily attending it and the probability of success in the litigation;

21          • the difficulties, if any, to be encountered in the matter of collection;

22          • the paramount interest of the creditors and a proper deference to their reasonable

23            views in the premises.

24  *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986); *In re Sabine Oil & Gas Corp.*, 555

25  B.R. 180, 256 (Bankr. S.D.N.Y. 2016).

26      As to the "paramount interest of the creditors" factor, the Debtors incorporate their above

27  analysis that the Settlement Agreements are in the best and paramount interests of the creditors

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

1   (under the 1113/1114 Test, that the transaction is "necessary," is in the "best interest" of the estate

2   is "fair" to all parties and that the balance of equities favor it).

3       Further, the "difficulty of collection factor" is not relevant here, as the Debtors are the ones

4   settling claims from the Unions and are not receiving cash consideration.  However, the Debtors

5   note that, without the Settlement Agreements, it would be much more difficult to "collect" the

6   hundreds of millions of dollars of consideration from the Sale.  This leaves the first listed *A&C*

7   factor: "The complexity of the litigation involved, and the expense, inconvenience, and delay

8   necessarily attending it and the probability of success in the litigation," for consideration for Rule

9   9019 approval.

10       "The purpose of a compromise agreement [under Rule 9019] is to allow the [debtor in

11   possession] and the creditors to avoid the expenses and burdens associated with litigating sharply

12   contested … claims." *In re A & C Properties*, 784 F.2d 1377, 1380-81.  Accordingly, in approving

13   a settlement agreement, the Court need not conduct an exhaustive investigation of the claims sought

14   to be compromised.  *See United States v. Alaska Nat'l Bank (In re Walsh Constr., Inc.)*, 669 F.2d

15   1325, 1328 (9th Cir. 1982).  A court should not substitute its own judgment for the judgment of the

16   debtor in possession. *Matter of Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984).  A

17   court, in reviewing a proposed settlement, is not to decide the numerous questions of law and fact

18   but rather to canvass the issues to determine whether the settlement falls below the lowest point in

19   the range of reasonableness.  *In re Tribune Co.*, 464 B.R. 126, 158 (Bankr. D. Del. 2011) ("the

20   settlement need only be above the "lowest point in the range of reasonableness");  *In re W.T. Grant*

21   *& Co.*, 699 F.2d 599, 608 (2nd Cir. 1983);  The court should not conduct a "mini-trial" on the

22   merits of the issues.  *In re Walsh Const., Inc.*, 669 F.2d at 1328; *In re Blair*, 538 F.2d 849 (9th Cir.

23   1976).

24       The Settlement Agreements primarily dispose of two major pieces of litigation with five

25   separate Unions: (1) §§ 1113/1114 litigation over modification or rejection of the CBA and Retiree

26   Benefits and (2) litigation over the validity and amounts of the Unions' claims.

27       As to the contesting unions in the SCC Sale, the SCC Rejection was an arduous, months-

28   long undertaking involving novel § 1113 questions.  Sections 1113 and 1114 are highly complex,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 29 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

factually intensive statute, made particularly difficult to analyze in a liquidation context.  *See In re*

*Rufener Const., Inc.*, 53 F.3d 1064, 1067 (9th Cir. 1995) ("the procedural requirements imposed by

§ 1113 appear ill-suited to a liquidation proceeding").  The Debtors would be required to meet nine-

factors, marshal substantial evidence and rebut and reply to the Unions' legal arguments under an

expedited, contested setting.  Further, if contested, a pivotal part of the Settlement Agreements —

the permanent modification of the CBAs through § 1113—does not appear to have been addressed

by a published Ninth Circuit case when a union has not consented.  The Settlement Agreements

avoid the potential labor unrest and disruption to the Debtors during the sensitive pre-Closing

period that might be occasioned by a forced contract abrogation, and the obvious loss of value

arising therefrom.  The Settlement Agreements not only fulfill the express Congressional goals of

compromise and "expedited collective bargaining," they also resolve any uncertainty of potentially

"sharply contested" §§ 1113 and 1114 process over the CBAs.  *In re A & C Properties*, 784 F.2d

at 1380-81.

Further, the Settlement Agreements streamline and settle key aspects of the Unions claims

and Proofs of Claims and the Debtors liability for severance for re-hired employees and PTO.  It

allows the Unions the benefit of continuing to assert claims for pending grievances and arbitration,

but also allows the Debtors and successors to contest these claims—allowing truly aggrieved

employees their "day in court" while allowing unmerited grievances to be ultimately dismissed

without interfering with the confirmation of the Plan.  They also preclude any general "cure" or

rejection claims or other claims that the Unions could assert from the Sale and resolve retiree

benefits before the Plan process.  *See* 11 U.S.C. § 1129(a)(13) (not allowing plan to dispose of

retiree benefits unless it pays them in full).

Given the complexity of this potential litigation, interposed with the fact that the Debtors

are in the largest healthcare case currently in the country, attorneys' fees and costs (which would

most likely run well into the six figures for each side) and attorneys and professionals investment

in time and attention (and away from Plan and SGM Sale issues) to bring this matter to full fruition

would be high compared to the total gain and exposure. *In re Lawrence & Erausquin, Inc.*, 124

B.R. 37, 39 (Bankr. N.D. Ohio 1990) (approving Rule 9019 settlement where "[i]f all the issues

which have been raised in this case were to be litigated by the Trustee, the litigation would be time consuming, burdensome, somewhat risky, and would quite possibly cost the estate more than it would generate for the payment of unsecured creditors."); *In re Partsearch Techs., Inc.*, 453 B.R. 84, 105 (Bankr. S.D.N.Y. 2011) (approving Rule 9019 agreement where "the risks of litigation here appear to be significant because of the substantial time and expense required to conduct a trial."). The Debtors have now filed their Disclosure Statement and Plan and wish to focus on making the Effective Date effective instead of protracted labor litigation that can be avoided through a fair compromise.

The Modified CBAs, the Proposal and all aspects of the Settlement Agreement result from the arm's length, protracted, and hard fought negotiations.  The Debtors mediated the negotiations between SGM and the Unions and arrived at the Modification for the Debtors to pass on their Hospitals to SGM with an increased market competitiveness, while maintaining the loyalty and morale of their employees and further settled liability and obtained other benefits for the Debtors (such as CNA and SEIU writing to the AG to support the SGM Sale).  The parties are entitled to deference in their decisions.  *In re Walsh Const., Inc.*, 669 F.2d at 1328; *In re Blair*, 538 F.2d 849; *see also In re Yellowstone Mountain Club, LLC*, 460 B.R. 254, 265 (Bankr. D. Mont. 2011) (*citing A& C Properties*, 784 F.2d 1381) ("rather than an exhaustive investigation or a mini-trial on the merits, this court need only find that the settlement was negotiated in good faith and is reasonable, fair and equitable");  *In re Adelphia Communications Corp.*, 327 B.R. 143, 163 (Bankr. S.D.N.Y. 2005), adhered to on reconsideration, 327 B.R. 175 (Bankr. S.D.N.Y. 2005) (approving settlement of claims where debtor was to pay $715 million even where court found there "there [was] quite a high probability that [the debtor] would ultimately prevail on at least some of its claims," because "that litigation" had already "been hotly contested [through] numerous legal and factual defenses" by the counterparty against the debtors' claims and where debtors were not likely to "win quickly," given the "complexities of [the] situation," and concluding that "even a successful outcome in such litigation likely would take substantial time [and the] the [s]ettlement [a]greements eliminate these risks.");  *In re MF Glob. Inc.*, 466 B.R. 244, 251 (Bankr. S.D.N.Y. 2012) (approving under Rule 9019 where "the [s]ettlement [a]greement will resolve all claims between the Parties related to the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 31 -

1 Property and will save the costs of further litigation [and was the] result of arms-length negotiations

2 and good-faith dealings among the Parties.").

3   The Settlement Agreements represent the type of rational, negotiated solutions that Rule

4 9019 encourages, and the Court should approve it. *See generally Protective Comm. for Indep.*

5 *Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 434, 88 S. Ct. 1157, 1168, 20

6 L. Ed. 2d 1 (1968) ("Litigation and delay are always the alternative to settlement, and whether that

7 alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable

8 outcome of litigation.").

9

**V.** **CONCLUSION**

10   Based upon the foregoing, the Debtors respectfully request that the Court enter an order

11 granting the relief requested herein (i) granting and approving the Settlement Agreements as

12 attached as **Exhibits 1-5** so that, effective upon the Closing, (a) the Modification occurs, with (b)

13 the Modified CBAs then assumed and assigned through the Assumption and Assignment to SGM

14 (c) the other terms of the Settlement Agreement are given effect and (ii) for such other and further

15 relief as the Court may deem proper.

16 Dated:  November 13, 2019     DENTONS US LLP

17             SAMUEL R. MAIZEL
              TANIA M. MOYRON

18             SAM J. ALBERTS

19             By  */s/ Tania M. Moyron*
                 *Tania M. Moyron*

20

21             Attorneys for the Chapter 11 Debtors and
              Debtors In Possession

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 32 -

113293221\V-13

## DECLARATION OF RICHARD G. ADCOCK

I, Richard G. Adcock, declare that if called on as a witness, I would and could testify of my own personal knowledge as follows:

1.    I am the Chief Executive Officer ("CEO") of Verity Health System of California, Inc. ("VHS"). I became VHS' CEO effective January 2018. Prior thereto, I served as VHS' Chief Operating Officer ("COO") beginning in August 2017. In my roles as COO and CEO at VHS, I have become intimately familiar with all aspects of VHS and its above-captioned affiliates who have also filed for bankruptcy protection (collectively the "Debtors," and each a "Debtor") as well as those affiliated entities that are not in bankruptcy. I submit this Declaration in support of the *Debtors' Omnibus Motion for Approval of 1) Settlement Agreements with Labor Unions, 2) Assumption and Assignment of Modified Collective Bargaining Agreements, 3) Termination of Retiree Healthcare Benefits and 4) Related Relief* (the "Motion").[35]

2.    Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors or the Debtors' legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the healthcare industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.    True and correct copies of the following documents are attached to the Motion as follows:

- the "CNA Settlement Agreement" (attached hereto as **Exhibit 1**) between the Debtors and the California Nurses Association ("CNA"), which, in turn, seeks, *inter alia*, approval of the assumption and assignment to SGM effective upon Closing of a (i) modified CNA/VHS Master Agreement between CNA and Debtors St. Vincent Medical Center ("SVMC") and Seton Medical Center ("SMC"), effective December 22, 2016-December 21, 2020,[36] (ii) modified SVMC Local Contract

---

[35] Unless otherwise defined herein, all capitalized terms have the definitions set forth in the Motion.

[36] Modified CBAs (as defined in the Motion) are not attached to the Motion because they are SGM's confidential, proprietary information and trade secrets. Upon request and execution of a confidentiality agreement, the Debtors will make the Modified CBAs available to proper requesting parties.

113293221\V-13

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

2016-2020 between CNA and SVMC , effective December 22, 2016 to December 21, 2020, and (iii) modified SMC Local Contract 2016-2020 between CNA and SMC effective December 22, 2016-December 21, 2020;

- the "Local 20 Settlement Agreement" (attached hereto as **Exhibit 2**), between SMC and IFPTE AFL-CIO CLC, Local 20 ("Local 20"), which, in turn, seeks, *inter alia*, approval of the assumption and assignment to SGM effective upon Closing, of a modified Collective Bargaining Agreement between Local 20 and SMC, effective May 1, 2017-April 30, 2020;

- the "NUHW Settlement Agreement," (attached hereto as **Exhibit 3**), between SMC and the National Union of Healthcare Workers ("NUHW"), which, in turn, seeks, *inter* alia, approval of the assumption and assignment to NUHW effective upon Closing, of a modified Collective Bargaining Agreement between NUHW and SMC and SMC-Coastside, effective November 1, 2016-October 31, 2019;

- the "SEIU Settlement Agreement" (attached hereto as **Exhibit 4**), between the Debtors SVMC and St. Francis Medical Center ("SFMC") and the Service Employees International Union, United Healthcare Workers-West ("SEIU"), which, in turn, seeks, *inter alia*, the assumption and assignment to SEIU effective upon Closing of a modified Collective Bargaining Agreement between SEIU and SFMC and SVMC, effective May 1, 2017-April 30, 2020;

- the "UNAC Settlement Agreement" (attached hereto as **Exhibit 5**), between SFMC and the United Nurses Associations of California/Union of Health Care Professionals ("UNAC," and referred to along with CNA Local 20, NUHW and SEIU as the "Unions"), which, in turn, seeks, *inter alia*, approval of the assumption and assignment to SGM effective upon Closing of a modified Labor Management Collective Bargaining Agreement effective from December 29, 2017 to December 29, 2021;

- the schedule regarding the 11 current retirees who are receiving actual retiree health care benefits (under the program that permits retirees who elect within a set period

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 34 -

of time, a supplement to continue Debtor-provided healthcare) and the one-time payment in the amount equal to the value of those payment, which is attached as **Exhibit 6**.[37]

### a. The CBAs And The Represented Employees

4.    The Local 20 CBA covers 31 active employees for SMC and one retired employee from O'Connor Regional Hospital ("OCH")[38] (with the employees as the "Local 20 Represented Employees").    The Local 20 Represented Employees are and were predominantly Clinical Laboratory Scientists who work primarily in the hospital laboratory.

5.    The CNA CBAs cover 792 active employees at SVMC and SMC and eight retired employees from SMC, OCH and SLRH (the "CNA Represented Employees").    The CNA Represented Employees are and were registered nurses.

6.    The UNAC CBA covers 817 active employees for SMC (the "UNAC Represented Employees").    The UNAC Represented Employees are and were registered nurses.

7.    The SEIU CBA covers active 1,331 active employees for SVMC and SFMC (the "SEIU Represented Employees").    The SEIU Represented Employees are and were comprised of service workers including but not limited to environmental services aides, certified nurse assistants, unit coordinators, and technical workers, including but not limited to radiological technician and pharmacy technicians.

8.    The NUHW CBA covers active 731 active employees and 1 retired employee for SMC and Seton Medical Center Coastside (the "NUHW Represented Employees") (together, with the Local 20 Represented Employees, the CNA Represented Employees, the UNAC Represented Employees, the SEIU Represented Employees, the "Represented Employees."    The NUHW Represented Employees are and were comprised of technicians, such as radiological technician, pharmacy technicians, and service workers such as, environmental service aides, dietary aides, cooks, clinical staff such licensed vocational nurse, certified nursing aides and administrative

---

[37] Initials, rather than complete last names of the individuals have been provided for privacy purposes, with first names identified so applicable retirees may identify themselves.

[38] Although the assets of OCH have been sold to Santa Clara County under a prior Bankruptcy Case sale, Current Retirees who were employed at OCH while it was operating continue to receive Retiree Health Benefits.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 35 -

1  workers such unit secretaries and clerks.

2  **b. The Union § 1113 CBA Modification And § 1114 Retiree Healthcare Benefit Termination Process**

3  9.    After approval of the SGM Sale, but pending completion of AG Review, the

4  Debtors, SGM and Unions negotiated the ultimate terms of the Settlement Agreements (the

5  "Negotiations") through a series of meetings and exchanges with the Unions (the "Meetings").  The

6  process began on February 1, 2019, when the Debtors delivered to each of the Unions a proposal

7  under § 1113 and, as applicable, § 1114 (collectively, the "First Proposals").[39]   The First Proposals

8  noted that SGM was amenable to assuming existing CBAs, provided they were modified to comport

9  with similar collective bargaining arrangements that covered other facilities owned and operated

10  by SGM.  The First Proposals further represented that the Debtors "stood ready" to discuss with

11  the Unions any counter-proposal and that the Debtors were "open to receive and consider all

12  comments, concerns and any counterproposals from [the Unions]" and told the Unions that "if you

13  desire any specific, relevant information, do not hesitate to ask for it."   None of the Unions

14  submitted counter-proposals to the Debtors.  After conducting discussions with SGM as to what it

15  wished to modify with respect to the CBAs, the Debtors and SGM then began to directly engage

16  each of the Unions and provide each Union with amended proposals, including proposed modified

17  CBAs in redline form (collectively, the "Amended Proposals").  Specifically,

18  a.    On or about July 11, 2019 and July 15, 2019, the Debtors and SGM met with CNA
19      and presented the applicable Amended Proposal, which included proposed redline
20      changes to the CNA CBAs.

21  b.    On or about July 19, 2019, the Debtors and SGM met with Local 20 and presented
22      the applicable Amended Proposal, which included proposed redline changes to the
23      Local 20 CBA.

24  c.    On or about July 25, 2019, the Debtors and SGM met with SEIU and presented the
25      applicable Amended Proposal, which included a proposed redline to the SEIU CBA.

26  d.    On or about July 25, 2019, the Debtors and SGM met with UNAC and presented the

27

28  [39] The Debtors will make the written copies of the First Proposals, as well as the Amended Proposals (as defined, *infra*) to any proper requesting party.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113293221\V-13

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

applicable Amended Proposal, which included a proposed redline to the UNAC CBA.

e.   On or about July 25, 2019, the Debtors' counsel met with NUHW and presented the applicable Amended Proposal, which included a proposed redline to NUHW CBA. *Id.* at

10.   Thereafter, the Debtors continued to travel to and attend Meetings with the Unions regarding the Amended Proposals and going-forward CBA terms with SGM, including:

f.   with respect to UNAC, on August 2, 23, and 29, 2019;

g.   with respect to CNA, on August 7, 8, 20, 21, 2019, and September 5, 2019;

h.   with respect to SEIU, on July 30, 2019, August 13, 2019, August 30, 2019 and September 9, 2019;

i.   with respect to NUHW, on August 14 and 24, 2019 and September 10 and 15, 2019; and

j.   with respect to Local 20, on August 15, 2019.

11.   The in-person Meetings were also supplemented by substantial negotiations over phone and by email, which culminated in the Debtors and the Unions executing the Settlement Agreements attached hereto.

**C.   The Settlement Agreements**

12.   Each Settlement Agreement incorporates modified versions of the applicable Unions' CBA or CBAs (the "Modified CBAs") which are to be modified under § 1113 and, as applicable § 1114 (the "Modification"). Through the Motion, the Debtors agree to assume and assign the CBA or CBAs (as modified under the Modified CBAs) to SGM (the "Assumption and Assignment"), which the Unions agree to not oppose (which process is defined in the Settlement Agreements and herein as the "Agreed Outcome").[40]   The parties reached the Settlement Agreement so that the SGM Sale is economically viable for SGM and the Debtors, while also providing just treatment for the Debtors' employees, including the Represented Employees.

---

[40] Settlement Agreements at § 3. The Settlement Agreements are substantially similar. For avoidance of doubt, the Settlement Agreement used for "Settlement Agreements at [##]" cites herein is the CNA Settlement Agreement. When there is such a citation, all Settlement Agreements will contain such a term.

113293221\V-13

**D.    Related Relief for the One Non-Union Current Retiree Who Receives Retiree Health
Care Benefits**

13.    The Debtors will also pay the only Current Retiree not represented by one of the
Unions the value of their retiree benefits in cash under the same methodology provided to the
Union-represented Current Retirees.  The amount to be paid is reflected on Exhibit 6.

14.    The Debtors have determined in their business judgment that the relief sought in the
Motion is in the best interests of the Estates.  To the extent that the Motion settles matters that the
Debtors could litigate, the Debtors believe that settlement under the terms sought in the Motion is
in the best interest of their estates in lieu of the expensive, unproductive and uncertain litigation
that would ensue without relief.  The Debtors have now filed their Disclosure Statement and Plan
and wish to focus on making the Effective Date effective instead of protracted labor litigation that
can be avoided through a fair compromise

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.

Executed this 13 day of November, 2019, at Los Angeles, California.


By:  [TO BE SUBMITTED]
RICHARD G. ADCOCK

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 38 -

113293221\V-13

# EXHIBIT 1

## Settlement Agreement

On this 19th day of September, 2019 (the "Settlement Date"), and subject to approval by order of the Bankruptcy Court (as defined below), Verity Health Care System of California, Inc., Seton Medical Center (including the campus known as Seton Medical Center-Coastside), St. Vincent Medical Center, St. Francis Medical Center and their affiliates in chapter 11 bankruptcy (collectively the "Debtors," and individually a "Debtor"), on the one hand, and the California Nurses Association ("CNA") (collectively, the "Parties"), on the other, and subject to the terms, conditions and approvals set forth herein, agree to the following (the "Agreement"):

### Recitals

WHEREAS, on August 31, 2018 (the "Petition Date"), each of the Debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), and since that date, all Debtors have been operating as debtors in possession;

WHEREAS, CNA and St. Vincent Medical Center are parties to a certain SVMC Local Contract 2016-2020 effective December 22, 2016-December 21, 2020 (the "SVMC CBA"), CNA and Seton Medical Center are parties a certain SMC Local Contract 2016-2020 effective December 22, 2016-December 21, 2020 (the "SMC CBA") and CNA and St. Vincent Medical Center, Seton Medical Center and other Debtors are parties to a certain CNA/VHS Master Agreement effective December 22, 2016 −December 21, 2020 (the "Master CBA," and referred to with the SVMC CBA and SMC CBA as the "CBAs" and each individually a "CBA");

WHEREAS, the Debtors previously obtained a final order rejecting their collective bargaining agreements with CNA covering O'Connor Hospital and St. Louise Regional Hospital (the "SCC Rejection") upon closing of the sale [Docket No. 1153] of these assets to Santa Clara County (the "SCC Closing") and also modifying the Master CBA in the *Order Granting Debtors' Motion Under Section 1113 Of The Bankruptcy Code To (A) Reject And Terminate The Terms Of California Nurses Association's Collective Bargaining Agreements With Saint Louise Regional Hospital And O'Connor Hospital And (B) To Modify Related Provisions In A Certain Master Agreement Upon The Closing Of The Sale Of Hospitals To Santa Clara County* [Docket No. 1578] (the "SCC CBA Order").

WHEREAS, on January 17, 2019, the Debtors filed a *Notice Of Motion For The Entry of (I) An Order (1) Approving Form of Asset Purchase Agreement For Stalking Horse Bidder and For Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice To Be Provided To Interested Parties; (4) Scheduling A Court Hearing To Consider Approval of The Sale To The Highest Bidder; and (5) Approving Procedures Related To The*

1

*Assumption of Certain Executory Contracts and Unexpired Leases; and (II) An Order (A) Authorizing The Sale of Property Free and Clear of All Claims, Liens and Encumbrances; Memorandum of Points and Authorities In Support Thereof* [Docket No. 1279] (the "Remaining Hospitals Sale Motion"), which sought, among other things, to sell the assets of St. Francis Medical Center, a California nonprofit public benefit corporation ("SFMC"), St. Vincent Medical Center, a California nonprofit public benefit corporation ("SVMC"), St. Vincent Dialysis Center, a California nonprofit public benefit corporation, ("SVDC"), Seton Medical Center, a California nonprofit public benefit corporation, including Seton Coastside ("SMC," and referred to collectively with SFMC, SVMC and SVDC as the "Remaining Hospitals") under a Stalking Horse Asset Purchase Agreement (the "APA") between Verity Health Care System of California, Inc., a California nonprofit public benefit corporation ("Verity"), Verity Holdings, LLC, a California limited liability company, SFMC, SVMC, SVDC, and SMC (collectively, the "Sellers") and Strategic Global Management, Inc., a California Corporation ("SGM");

WHEREAS, on May 2, 2019, the Bankruptcy Court entered the *Order (A) Authorizing the Sale of Certain of the Debtors' Assets to Strategic Global Management, Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of an Unexpired Lease Related Thereto; and (C) Granting Related Relief* [Docket No. 2306];

WHEREAS, under the terms of the APA, SGM agreed to participate in union negotiations related to any specific collective bargaining agreement;

WHEREAS, the Debtors have agreed to use commercially reasonable efforts to initiate discussions with SGM and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union. *See* APA § 5.11;

WHEREAS, SGM and the Debtors seek to effectuate the sale (the "Sale") Closing (used herein as that term is defined in the APA) after the review of the transaction by the Attorney General of California (the "California AG"), by October 14, 2019, or as soon thereafter as possible, consistent with the terms and conditions of the APA;

WHEREAS, upon the Closing, the Debtors will no longer operate or employ anyone at the Remaining Hospitals;

WHEREAS, CNA has filed a proof of claim (collectively, along with any and all amendments, the ("POC") in the Bankruptcy Cases against the Debtors, which has been designated as claim number #5169;

WHEREAS, the Debtors have, in good faith, sought to facilitate the modifications to the CBAs desired by SGM and to otherwise consensually resolve issues and claims of CNA;

2

WHEREAS, on February 1, 2019, the Debtors sent to CNA a proposal under §§ 1113/1114 to modify the CBAs and to resolve other issues;

WHEREAS, on or about July 25, 2019, the Debtors presented CNA with an amended §§ 1113/1114 proposal and, along with SGM, began the process of negotiating changes to terms of the CBAs acceptable to SGM and CNA; and

WHEREAS, beginning on July 25, 2019 and through the Settlement Date, the Debtors, SGM, and CNA have met and negotiated on several occasions about modifying the CBAs and the Debtors and CNA have otherwise exchanged proposals to resolve the other issues between the Parties.

NOW THEREFORE, the Parties agree as follows:

<u>Terms</u>

1.    Effective and conditioned upon the Closing, the CBAs shall be modified in the form attached hereto as **Exhibit 1** (the "<u>Modified CBAs</u>") under §§ 1113/1114 of the Bankruptcy Code (the "<u>Modification</u>").

2.    Effective and conditioned upon the Closing, the Debtors will assume and assign the CBAs (as modified under the Modified CBAs) to SGM (the "<u>Assumption and Assignment</u>").

3.    CNA agrees to (a) accept i) the Modification, ii) the Assumption and Assignment and iii) the terms of the foregoing (collectively, the "<u>Agreed Outcome</u>") (b) support, as lawful and as commercially reasonable, motions or plans filed by the Debtors in the Bankruptcy Cases, seeking approval of the Agreed Outcome; provided, however, that nothing in this Agreement is intended to affect A) CNA rights and remedies against SGM in connection with x) post-Closing operations at SMC and SVMC, including, but not limited to, interaction with the California AG, and y) adequate assurance of future performance by SGM; and B) the Parties' rights to seek enforcement of the terms of this Agreement from the Bankruptcy Court.

4.    Upon Closing, SGM will become solely responsible for performance of all post-Closing obligations arising under the Modified CBAs.

5.    Upon Closing, the CBAs (as modified under the Modified CBAs) will be deemed to be automatically assigned to SGM in full.

6.    The Debtors: (a) will not have any liability or obligation to perform under the CBAs or Modified CBAs with respect to post-Closing activity; (b) shall in no way be liable

3

for or otherwise responsible for any "cure" obligations independent of any CNA claims that may be expressly preserved under this Agreement; and (c) and shall in no way be liable for or otherwise for any nonperformance or violation by SGM or any of its affiliates arising at any time.

7.    In further resolution, the following claims shall be allowed and receive the following treatment:

a.    PTO:  each employee who is not offered a job with SGM, including Global Medical Center of Downtown Los Angeles, LLC ("GMCDLA") or Global Medical Center of San Mateo County, LLC ("GMCSMC"), will be allowed in the Bankruptcy Cases a claim for unused and unpaid PTO calculated under the "accrual method;" meaning PTO earned and yet unpaid or used 1) on or after the Petition Date, will be granted administrative status, 2) between March 4, 2018 to the Petition Date, will be granted priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee) with any excess granted general unsecured claim status and; 3) prior to March 4, 2018 ,will be given general unsecured claim status.  The administrative and priority claim portions of an allowed PTO claim will be paid with the employee' last paycheck (upon the Closing);

b.    Severance:

i)    each employee who is not offered employment by SGM, including GMCDLA or GMCSMC, no later than the date of Closing, will be allowed a claim for severance calculated under the "accrual method"—meaning severance earned but not yet paid will be calculated on per diem basis from the date of the employee's retention by a Debtor to the earlier of the date of their termination or the Closing—and treated as follows: 1) amounts earned on and after Petition Date through the date of termination or the Closing (whichever is earlier) will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will receive priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of the Effective Date of a confirmed Bankruptcy Plan (as defined in such plan or confirmation order, and referred to herein as the "Bankruptcy Plan Effective Date"), provided, further, that payment of severance to an employee is contingent on that employee executing a written general release in a form acceptable to CNA and the Debtors;

4

ii)  notwithstanding anything to the contrary contained in or caused by the SCC CBA Order, each employee who was not offered employment by SCC by the SCC Closing, will be allowed a claim for severance calculated under the "accrual method"—meaning severance earned but not yet paid will be calculated on per diem basis from the date of the employee's retention by a Debtor to the earlier of the date of their termination or the SCC Closing—and treated as follows: 1) amounts earned on and after Petition Date through the date of termination or the SCC Closing (whichever is earlier) will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will receive priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of the Bankruptcy Plan Effective Date, provided, further, that payment of severance to an employee is contingent on that employee executing a written general release in a form acceptable to CNA and the Debtors;

c.      Grievance Claims:

i)      Any grievance claim of an employee being represented by CNA that is not settled as of the Bankruptcy Plan Effective Date will be treated in accordance with the Plan or otherwise in accordance with bankruptcy law. The parties agree to work with SGM in the event that the remedy is or includes reinstatement of the employee after the Closing;

ii)      Kris Suzuki, who is a member of CNA, settled a termination-based grievance claim in June 2018 with one or more of the Debtors in the amount of $70,000, and received $25,000 of that amount prepetition, will receive an allowed priority claim under §507(a)(4) in the amount of $12,850 and a general unsecured claim in the amount of $27,150; and

The claims in i) and ii) will be treated in the same manner as severance claims in paragraph 7(b) above.

d.      Educational Claims.  Any allowed unpaid claim for reimbursement of educational expenses of employee represented by CNA will be calculated under the "accrual method," meaning that such claim will be calculated on *per diem* basis from the date of retention to the earlier of the date of termination or the date of Closing and treated as follows: 1) amounts earned on or after the Petition Date through the date of termination or the Closing (whichever is earlier) earned will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will

5

be granted priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of Bankruptcy Plan Effective Date; and

f.   All other prepetition claims, prepetition priority claims and administrative expenses and claims arising from the Petition Date to the Settlement Date not enumerated in subparagraphs a) through d) above are deemed waived; *provided further*, 1) CNA does not waive the right to assert any unpaid administrative expenses that arise from the Settlement Date to the Closing and the Debtors maintain the right to oppose such administrative expenses; 2) the Debtors maintain the right to seek estimation from the Bankruptcy Court of any claims and administrative expenses for voting or distribution purposes and CNA maintains the right to oppose such estimation; and 3) the Parties agree that the Bankruptcy Court retains jurisdiction to determine the allowance, priority and treatment of all claims and administrative expenses.

8.   With respect to Retiree Health Benefits:

a.   Subject to subparagraph (c), CNA agrees that the CBAs shall be deemed automatically modified to immediately terminate and discontinue the Retiree Health Benefit under § 1114;

b.   CNA  agrees to further support the termination and discontinuation of the Retiree Health Benefit with respect to all current and former employees, including any relief sought under or in accordance with § 1114; and

c.   The Debtors will seek approval of a one-time payment to each Retiree equal to the present value of each Retiree's Retiree Health Benefit, in the amount set forth on **Exhibit 2**.

9.   As between CNA and the Debtors, to the extent there is any conflict between this Agreement and the CBAs or the Modified CBAs, this Agreement shall control.

10.  Any dispute concerning the terms and interpretation of this Agreement shall be resolved by the Bankruptcy Court.

11.  CNA agrees to support any Plan of the Debtors that does not contradict the material terms of this Agreement.

US_Active\113177985\V-5

12. Terms of this Agreement shall be null and void in the event that 1) the Sale does not close, or 2) the Sale closes for a purchase price that is materially less than the contracted amount in the APA.

13. The Parties reserve all rights and defenses provided to them under the Bankruptcy Code except as otherwise stated herein.

14. CNA hereby withdraws any outstanding information requests that relate to this Agreement or the §§ 1113/1114 process.

15. CNA agrees to support the prompt Closing of the Sale, including sending to California AG as copy of the letter attached hereto as **Exhibit 3**.

16. The effectiveness of this Agreement is subject to the approval of the Bankruptcy Court. Approval of this Agreement will be sought by motion of the Debtors and affirmatively supported by CNA.

17. The terms of this Agreement supersede any prior agreement(s) between the Parties.

18. Any modification of this Agreement must be in writing and approved by both Parties.

19. By executing below, each Party represents that it has the requisite authority to enter into an implement all terms of this Agreement.

CNA

By:

The Debtors

By:

7

# EXHIBIT 2

**Settlement Agreement**

On this 19 day of September, 2019 (the "Settlement Date"), and subject to approval by order of the Bankruptcy Court (as defined below), Verity Health Care System of California, Inc., Seton Medical Center (including the campus known as Seton Medical Center-Coastside), St. Vincent Medical Center, St. Francis Medical Center and their affiliates in chapter 11 bankruptcy (collectively the "Debtors," and individually a "Debtor"), on the one hand, and IFPTE AFL-CIO CLC, Local 20 ("Local 20") (collectively, the "Parties"), on the other, and subject to the terms, conditions and approvals set forth herein, agree to the following (the "Agreement"):

Recitals

WHEREAS, Local 20 and Seton Medical Center are parties to a certain *Collective Bargaining Agreement*, effective May 1, 2017 - April 30, 2020 (the "CBA");

WHEREAS, on August 31, 2018 (the "Petition Date"), each of the Debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), and since that date, all Debtors have operating as debtors in possession;

WHEREAS, on January 17, 2019, the Debtors filed a *Notice Of Motion For The Entry of (I) An Order (1) Approving Form of Asset Purchase Agreement For Stalking Horse Bidder and For Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice To Be Provided To Interested Parties; (4) Scheduling A Court Hearing To Consider Approval of The Sale To The Highest Bidder; and (5) Approving Procedures Related To The Assumption of Certain Executory Contracts and Unexpired Leases; and (II) An Order (A) Authorizing The Sale of Property Free and Clear of All Claims, Liens and Encumbrances; Memorandum of Points and Authorities In Support Thereof* [Docket No. 1279] (the "Remaining Hospitals Sale Motion"), which sought, among other things, to sell the assets of St. Francis Medical Center, a California nonprofit public benefit corporation ("SFMC"), St. Vincent Medical Center, a California nonprofit public benefit corporation ("SVMC"), St. Vincent Dialysis Center, a California nonprofit public benefit corporation, ("SVDC"), Seton Medical Center, a California nonprofit public benefit corporation, including Seton Coastside ("SMC," and referred to collectively with SFMC, SVMC and SVDC as the "Remaining Hospitals") under a Stalking Horse Asset Purchase Agreement (the "APA") between Verity Health Care System of California, Inc., a California nonprofit public benefit corporation ("Verity"), Verity Holdings, LLC, a California limited liability company, SFMC, SVMC, SVDC, and SMC (collectively, the "Sellers") and Strategic Global Management, Inc., a California Corporation ("SGM");

1

WHEREAS, on May 2, 2019, the Bankruptcy Court entered the *Order (A) Authorizing the Sale of Certain of the Debtors' Assets to Strategic Global Management, Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of an Unexpired Lease Related Thereto; and (C) Granting Related Relief* [Docket No. 2306];

WHEREAS, under the terms of the APA, SGM agreed to participate in union negotiations related to any specific collective bargaining agreement;

WHEREAS, the Debtors have agreed to use commercially reasonable efforts to initiate discussions with SGM and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union. *See* APA § 5.11;

WHEREAS, SGM and the Debtors seek to effectuate the sale (the "Sale") Closing (used herein as that term is defined in the APA) after the review of the transaction by the Attorney General of California (the "California AG"), by October 14, 2019, or as soon thereafter as possible, consistent with the terms and conditions of the APA;

WHEREAS, upon the Closing, the Debtors will no longer operate or employ anyone at the Remaining Hospitals;

WHEREAS, Local 20 has filed a proof of claim (collectively, along with any and all amendments, the ("POC") in the Bankruptcy Cases, which has been designated as claim number #5169;

WHEREAS, the Debtors have, in good faith, sought to facilitate the modifications to the CBA desired by SGM and to otherwise consensually resolve issues and claims of Local 20;

WHEREAS, on February 1, 2019, the Debtors sent to Local 20 a proposal under §§ 1113/1114 to modify the CBA and to resolve` other issues;

WHEREAS, on or about July 25, 2019, the Debtors presented Local 20 with an amended §§ 1113/1114 proposal and, along with SGM, began the process of negotiating changes to terms of the CBA acceptable to SGM and Local 20;

WHEREAS, beginning on July 25, 2019 and through the Settlement Date, the Debtors, SGM, and Local 20 have met and negotiated on several occasions about modifying the CBA and the Debtors and Local 20 have otherwise exchanged proposals to resolve the other issues between the Parties; and

2

WHEREAS, Debtors and Local 20 have tentatively agreed upon a Modified CBA subject to ratification by the bargaining unit.

NOW THEREFORE, the Parties agree as follows:

Terms

1.    Effective and conditioned upon the Closing, and ratification, the CBA shall be modified in the form attached hereto as **Exhibit 1** (the "Modified CBA") under §§ 1113/1114 of the Bankruptcy Code (the "Modification").

2.    Effective and conditioned upon the Closing, the Debtors will assume and assign the CBA (as modified under the Modified CBA) to SGM (the "Assumption and Assignment").

3.    Local 20 agrees to (a) accept i) the Modification, ii)  the Assumption and Assignment and   iii) the terms of the foregoing (collectively, the "Agreed Outcome") (b) not to oppose, as lawful and as commercially reasonable, motions or plans filed by the Debtors in the Bankruptcy Cases, seeking approval of the Agreed Outcome; provided, however, that nothing in this Agreement is intended to affect A) Local 20 rights and remedies against SGM in connection with x) post-Closing operations at SMC, including, but not limited to, interaction with the California AG, and y) adequate assurance of future performance by SGM; and B) the Parties' rights to seek enforcement of the terms of this Agreement from the Bankruptcy Court.

4.    Upon Closing, SGM will become solely responsible for performance of all post-Closing obligations arising under the Modified CBA.

5.    Upon Closing, the CBA (as modified under the Modified CBA) will be deemed to be automatically assigned to SGM in full.

6.    The Debtors: (a) will not have any liability or obligation to perform under the CBA or Modified CBA with respect to post-Closing activity; (b) shall in no way be liable for or otherwise responsible for any "cure" obligations independent of any Local 20 claims that may be expressly preserved under this Agreement; and (c) and shall in no way be liable for or otherwise for any nonperformance or violation by SGM or any of its affiliates arising at any time.

7.    In further resolution, the following claims shall be allowed and receive the following treatment:

   a.    PTO: Each employee who is not offered a job with SGM, including KPC Global Medical Center of San Mateo County, LLC ("GMCSMC"), will be

3

allowed in the Bankruptcy Cases a claim for unused and unpaid PTO calculated under the "accrual method;" meaning PTO earned and yet unpaid or used 1) on or after the Petition Date, will be granted administrative status, 2) between March 4, 2018 to the Petition Date, will be granted priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee) with any excess granted general unsecured claim status and; 3) prior to March 4, 2018 ,will be given general unsecured claim status. The administrative and priority claim portions of an allowed PTO claim will be paid with the employee' last paycheck (upon the Closing);

b.  Severance: Each employee who is not offered employment with SGM, including GMCSMC no later than the date of Closing, will be allowed a claim for severance calculated under the "accrual method"—meaning severance earned but not yet paid will be calculated on per diem basis from the date of the employee's retention by a Debtor to the earlier of the date of their termination or the Closing—and treated as follows: 1) amounts earned on and after Petition Date through the date of termination or the Closing (whichever is earlier) will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will receive priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of the Effective Date of a confirmed Bankruptcy Plan (as defined in such plan or confirmation order, and referred to herein as the "Bankruptcy Plan Effective Date"), provided, further, that payment of severance to an employee is contingent on that employee executing a written general release in a form acceptable to Local 20 and the Debtors;

c.  Grievance Claims: Any grievance claim of an employee being represented by Local 20 that is not settled as of the Bankruptcy Plan Effective Date will be treated in accordance with the Plan or otherwise in accordance with bankruptcy law. The parties agree to work with GMCSMC in the event that the remedy is or includes reinstatement of the employee after the Closing;

d.  Educational Claims. Any allowed unpaid claim for reimbursement of educational expenses of employee represented by Local 20 will be calculated under the "accrual method," meaning that such claim will be calculated on *per diem* basis from the date of retention to the earlier of the date of termination or the date of Closing and treated as follows: 1) amounts earned on or after the Petition Date through the date of termination or the Closing (whichever is earlier) earned will receive administrative status; 2) amounts

4

earned after March 4, 2018 and through the day prior to the Petition Date will be granted priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of Bankruptcy Plan Effective Date; and

e.     All other prepetition claims, prepetition priority claims and administrative expenses and claims arising from the Petition Date to the Settlement Date not enumerated in subparagraphs a) through d) above are deemed waived; *provided further*, 1) Local 20 does not waive the right to assert any unpaid administrative expenses that arise from the Settlement Date to the Closing and the Debtors maintain the right to oppose such administrative expenses; 2) the Debtors maintain the right to seek estimation from the Bankruptcy Court of any claims and administrative expenses for voting or distribution purposes and Local 20 maintains the right to oppose such estimation; and 3) the Parties agree that the Bankruptcy Court retains jurisdiction to determine the allowance, priority and treatment of all claims and administrative expenses.

8.     With respect to Retiree Health Benefits:

a.     Subject to subparagraph (c), Local 20 agrees that the CBA shall be deemed automatically modified to immediately terminate and discontinue the Retiree Health Benefit under § 1114;

b.     Local 20 agrees to further support the termination and discontinuation of the Retiree Health Benefit with respect to all current and former employees, including any relief sought under or in accordance with § 1114; and

c.     The Debtors will seek approval of a one-time payment to each Retiree equal to the present value of each Retiree's Retiree Health Benefit, in the amount set forth on Exhibit 2.

9.     As between Local 20 and the Debtors, to the extent there is any conflict between this Agreement and the CBA or the Modified CBA, this Agreement shall control. However, the Modified CBA is subject to ratification vote by the bargaining unit which shall be held on or before the end of September 2019.

10.    Any dispute concerning the terms and interpretation of this Agreement shall be resolved by the Bankruptcy Court.

5

11.     Local 20 agrees to not oppose any Plan of the Debtors that does not contradict the material terms of this Agreement.

12.     Terms of this Agreement shall be null and void in the event that 1) the Sale does not close, or 2) the Sale closes for a purchase price that is materially less than the contracted amount in the APA.

13.     The Parties reserve all rights and defenses provided to them under the Bankruptcy Code except as otherwise stated herein.

14.     Local 20 hereby withdraws any outstanding information requests that relate to this Agreement or the §§ 1113/1114 process.

15.     Local 20 agrees to not oppose the prompt Closing of the Sale.

16.     The effectiveness of this Agreement is subject to the approval of the Bankruptcy Court. Approval of this Agreement will be sought by motion of the Debtors and affirmatively supported by Local 20.

17.     The terms of this Agreement supersede any prior agreement(s) between the Parties.

18.     Any modification of this Agreement must be in writing and approved by both Parties.

19.     By executing below, each Party represents that it has the requisite authority to enter into an implement all terms of this Agreement.

Local 20

By: _____

The Debtors

By: _____

6

**EXHIBIT 3**

## Settlement Agreement

On this 16th day of September, 2019 (the "Settlement Date"), and subject to approval by order of the Bankruptcy Court (as defined below), Verity Health Care System of California, Inc., Seton Medical Center (including the campus known as Seton Medical Center-Coastside), St. Vincent Medical Center, St. Francis Medical Center and their affiliates in chapter 11 bankruptcy (collectively the "Debtors," and individually a "Debtor"), on the one hand, and the National Union of Healthcare Workers ("NUHW") (collectively, the "Parties"), on the other, and subject to the terms, conditions and approvals set forth herein, agree to the following (the "Agreement"):

### Recitals

WHEREAS, NUHW and Seton Medical Center and Seton Medical Center-Coastside are parties to a certain Collective Bargaining Agreement, effective November 1, 2016 to October 31, 2019 (the "CBA");

WHEREAS, on August 31, 2018 (the "Petition Date"), each of the Debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), and since that date, all Debtors have been operating as debtors in possession;

WHEREAS, on January 17, 2019, the Debtors filed a *Notice Of Motion For The Entry of (I) An Order (1) Approving Form of Asset Purchase Agreement For Stalking Horse Bidder and For Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice To Be Provided To Interested Parties; (4) Scheduling A Court Hearing To Consider Approval of The Sale To The Highest Bidder; and (5) Approving Procedures Related To The Assumption of Certain Executory Contracts and Unexpired Leases; and (II) An Order (A) Authorizing The Sale of Property Free and Clear of All Claims, Liens and Encumbrances; Memorandum of Points and Authorities In Support Thereof* [Docket No. 1279] (the "Remaining Hospitals Sale Motion"), which sought, among other things, to sell the assets of St. Francis Medical Center, a California nonprofit public benefit corporation ("SFMC"), St. Vincent Medical Center, a California nonprofit public benefit corporation ("SVMC"), St. Vincent Dialysis Center, a California nonprofit public benefit corporation, ("SVDC"), Seton Medical Center, a California nonprofit public benefit corporation, including Seton Coastside ("SMC," and referred to collectively with SFMC, SVMC and SVDC as the "Remaining Hospitals") under a Stalking Horse Asset Purchase Agreement (the "APA") between Verity Health Care System of California, Inc., a California nonprofit public benefit corporation ("Verity"), Verity Holdings, LLC, a California limited liability company, SFMC, SVMC, SVDC, and SMC (collectively, the "Sellers") and Strategic Global Management, Inc., a California Corporation ("SGM");

1

WHEREAS, on May 2, 2019, the Bankruptcy Court entered the *Order (A) Authorizing the Sale of Certain of the Debtors' Assets to Strategic Global Management, Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of an Unexpired Lease Related Thereto; and (C) Granting Related Relief* [Docket No. 2306];

WHEREAS, under the terms of the APA, SGM agreed to participate in union negotiations related to any specific collective bargaining agreement;

WHEREAS, the Debtors have agreed to use commercially reasonable efforts to initiate discussions with SGM and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union. *See* APA § 5.11;

WHEREAS, SGM and the Debtors seek to effectuate the sale (the "Sale") Closing (used herein as that term is defined in the APA) after the review of the transaction by the Attorney General of California (the "California AG"), by October 14, 2019, or as soon thereafter as possible, consistent with the terms and conditions of the APA;

WHEREAS, upon the Closing, the Debtors will no longer operate or employ anyone at the Remaining Hospitals;

WHEREAS, NUHW has filed no proofs of claim in the Bankruptcy Cases;

WHEREAS, the Debtors have, in good faith, sought to facilitate the modifications to the CBA desired by SGM and to otherwise consensually resolve issues and claims of NUHW;

WHEREAS, on February 1, 2019, the Debtors sent to NUHW a proposal under §§ 1113/1114 to modify the CBA and to resolve other issues;

WHEREAS, on or about July 25, 2019, the Debtors presented NUHW with an amended §§ 1113/1114 proposal and, along with SGM, began the process of negotiating changes to terms of the CBA acceptable to SGM and NUHW; and

WHEREAS, beginning on July 25, 2019 and through the Settlement Date, the Debtors, SGM, and NUHW have met and negotiated on several occasions about modifying the CBA and the Debtors and NUHW have otherwise exchanged proposals to resolve the other issues between the Parties.

NOW THEREFORE, the Parties agree as follows:

2

## Terms

1.  Effective and conditioned upon the Closing, the CBA shall be modified in the form attached hereto as **Exhibit 1** (the "Modified CBA") under §§ 1113/1114 of the Bankruptcy Code (the "Modification").

2.  Effective and conditioned upon the Closing, the Debtors will assume and assign the CBA (as modified under the Modified CBA) to SGM (the "Assumption and Assignment").

3.  NUHW agrees to (a) accept i) the Modification, ii) the Assumption and Assignment and iii) the terms of the foregoing (collectively, the "Agreed Outcome") (b) not to oppose, as lawful and as commercially reasonable, motions or plans filed by the Debtors in the Bankruptcy Cases, seeking approval of the Agreed Outcome; provided, however, that nothing in this Agreement is intended to affect A) NUHW rights and remedies against SGM in connection with x) post-Closing operations at SMC, including, but not limited to, interaction with the California AG, and y) adequate assurance of future performance by SGM; and B) the Parties' rights to seek enforcement of the terms of this Agreement from the Bankruptcy Court.

4.  Upon Closing, SGM will become solely responsible for performance of all post-Closing obligations arising under the Modified CBA.

5.  Upon Closing, the CBA (as modified under the Modified CBA) will be deemed to be automatically assigned to SGM in full.

6.  The Debtors: (a) will not have any liability or obligation to perform under the CBA or Modified CBA with respect to post-Closing activity; (b) shall in no way be liable for or otherwise responsible for any "cure" obligations independent of any NUHW claims that may be expressly preserved under this Agreement; and (c) and shall in no way be liable for or otherwise for any nonperformance or violation by SGM or any of its affiliates arising at any time.

7.  In further resolution, the following claims shall be allowed and receive the following treatment:

    a.  PTO: each employee who is not offered a job with SGM, including KPC Global Medical Center of San Mateo County, LLC ("GMCSMC"), will be allowed in the Bankruptcy Cases a claim for unused and unpaid PTO calculated under the "accrual method;" meaning PTO earned and yet unpaid or used 1) on or after the Petition Date, will be granted administrative status, 2) between March 4, 2018 to the Petition Date, will be granted priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of

3

$12,850 per employee) with any excess granted general unsecured claim status and; 3) prior to March 4, 2018, will be given general unsecured claim status. The administrative and priority claim portions of an allowed PTO claim will be paid with the employee' last paycheck (upon the Closing);

b.    Severance: each employee who is not offered employment by KPC, including GMCSMC no later than the date of Closing, will be allowed a claim for severance calculated under the "accrual method"—meaning severance earned but not yet paid will be calculated on per diem basis from the date of the employee's retention by a Debtor to the earlier of the date of their termination or the Closing—and treated as follows: 1) amounts earned on and after Petition Date through the date of termination or the Closing (whichever is earlier) will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will receive priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of the Effective Date of a confirmed Bankruptcy Plan (as defined in such plan or confirmation order, and referred to herein as the "Bankruptcy Plan Effective Date"), provided, further, that payment of severance to an employee is contingent on that employee executing a written general release in a form acceptable to NUHW and the Debtors;

c.    Grievance Claims: Any grievance claim of an employee being represented by NUHW that is not settled as of the Bankruptcy Plan Effective Date will be treated in accordance with the Plan or otherwise in accordance with bankruptcy law. The parties agree to work with GMCSMC in the event that the remedy is or includes reinstatement of the employee after the Closing;

d.    Educational Claims.  Any allowed unpaid claim for reimbursement of educational expenses of employee represented by NUHW will be calculated under the "accrual method," meaning that such claim will be calculated on *per diem* basis from the date of retention to the earlier of the date of termination or the date of Closing and treated as follows: 1) amounts earned on or after the Petition Date through the date of termination or the Closing (whichever is earlier) earned will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will be granted priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess

4

granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of Bankruptcy Plan Effective Date; and

e.  All other prepetition claims, prepetition priority claims and administrative expenses and claims arising from the Petition Date to the Settlement Date not enumerated in subparagraphs a) through d) above are deemed waived; *provided further*, 1) NUHW does not waive the right to assert any unpaid administrative expenses that arise from the Settlement Date to the Closing and the Debtors maintain the right to oppose such administrative expenses; 2) the Debtors maintain the right to seek estimation from the Bankruptcy Court of any claims and administrative expenses for voting or distribution purposes and NUHW maintains the right to oppose such estimation; and 3) the Parties agree that the Bankruptcy Court retains jurisdiction to determine the allowance, priority and treatment of all claims and administrative expenses.

8.  With respect to Retiree Health Benefits:

a.  Subject to subparagraph (c), NUHW agrees that the CBA shall be deemed automatically modified to immediately terminate and discontinue the Retiree Health Benefit under § 1114;

b.  NUHW agrees to further support the termination and discontinuation of the Retiree Health Benefit with respect to all current and former employees, including any relief sought under or in accordance with § 1114; and

c.  The Debtors will seek approval of a one-time payment to each Retiree equal to the present value of each Retiree's Retiree Health Benefit, in the amount set forth on Exhibit 2.

9.  As between NUHW and the Debtors, to the extent there is any conflict between this Agreement and the CBA or the Modified CBA, this Agreement shall control.

10.  Any dispute concerning the terms and interpretation of this Agreement shall be resolved by the Bankruptcy Court.

11.  NUHW agrees to not oppose any Plan of the Debtors that does not contradict the material terms of this Agreement.

US_Active\113178089\V-1
113178089\V-3

12.   Terms of this Agreement shall be null and void in the event that 1) the Sale does not close, or 2) the Sale closes for a purchase price that is materially less than the contracted amount in the APA.

13.   The Parties reserve all rights and defenses provided to them under the Bankruptcy Code except as otherwise stated herein.

14.   NUHW hereby withdraws any outstanding information requests that relate to this Agreement or the §§ 1113/1114 process.

15.   NUHW agrees to not oppose the prompt Closing of the Sale.

16.   The effectiveness of this Agreement is subject to the approval of the Bankruptcy Court. Approval of this Agreement will be sought by motion of the Debtors and affirmatively supported by NUHW.

17.   The terms of this Agreement supersede any prior agreement(s) between the Parties.

18.   Any modification of this Agreement must be in writing and approved by both Parties.

19.   By executing below, each Party represents that it has the requisite authority to enter into an implement all terms of this Agreement.

NUHW

By: _____ 9/12/19


The Debtors

By: _____


6

# EXHIBIT 4

## Settlement Agreement

On this 17th day of September, 2019 (the "Settlement Date"), and subject to approval by order of the Bankruptcy Court (as defined below), Verity Health Care System of California, Inc., Seton Medical Center (including the campus known as Seton Medical Center-Coastside), St. Vincent Medical Center, St. Francis Medical Center and their affiliates in chapter 11 bankruptcy (collectively the "Debtors," and individually a "Debtor"), on the one hand, and the Service Employees International Union - United Healthcare Workers West ("SEIU-UHW") (collectively, the "Parties"), on the other, and subject to the terms, conditions and approvals set forth herein, agree to the following (the "Agreement"):

Recitals

WHEREAS, on August 31, 2018 (the "Petition Date"), each of the Debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), and since that date, all Debtors have been operating as debtors in possession;

WHEREAS, the Debtors previously obtained a final order modifying the CBA to reject the terms of the CBA covering O'Connor Hospital and St. Louise Regional Hospital upon closing of the sale [Docket No. 1153] of these assets to Santa Clara County (the "SCC Closing") in the SCC CBA Order;

WHEREAS, SEIU-UHW and St. Francis Medical Center and St. Vincent Medical Center currently are parties to a Collective Bargaining Agreement effective November 1, 2018 - October 31, 2021 (the "CBA"), which was modified by the *Order Granting Debtors' Motion Under § 1113 Of The Bankruptcy Code To Modify, Reject And Terminate The Terms Of Service Employee International Union-United Healthcare Workers-West's Collective Bargaining Agreements With Certain Debtors Upon The Closing Of The Sale Of Hospitals To Santa Clara County* [Docket No. 1577] that, *inter alia,* removed O'Connor Hospital and Saint Louise Regional Hospital as parties thereto (the "SCC CBA Order");

WHEREAS, on January 17, 2019, the Debtors filed a *Notice Of Motion For The Entry of (I) An Order (1) Approving Form of Asset Purchase Agreement For Stalking Horse Bidder and For Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice To Be Provided To Interested Parties; (4) Scheduling A Court Hearing To Consider Approval of The Sale To The Highest Bidder; and (5) Approving Procedures Related To The Assumption of Certain Executory Contracts and Unexpired Leases; and (II) An Order (A) Authorizing The Sale of Property Free and Clear of All Claims, Liens and Encumbrances; Memorandum of Points and Authorities In Support Thereof* [Docket No.

1

1279] (the "Remaining Hospitals Sale Motion"), which sought, among other things, to sell the assets of St. Francis Medical Center, a California nonprofit public benefit corporation ("SFMC"), St. Vincent Medical Center, a California nonprofit public benefit corporation ("SVMC"), St. Vincent Dialysis Center, a California nonprofit public benefit corporation, ("SVDC"), Seton Medical Center, a California nonprofit public benefit corporation, including Seton Coastside ("SMC," and referred to collectively with SFMC, SVMC and SVDC as the "Remaining Hospitals") under a Stalking Horse Asset Purchase Agreement (the "APA") between Verity Health Care System of California, Inc., a California nonprofit public benefit corporation ("Verity"), Verity Holdings, LLC, a California limited liability company, SFMC, SVMC, SVDC, and SMC (collectively, the "Sellers") and Strategic Global Management, Inc., a California Corporation ("SGM");

WHEREAS, on May 2, 2019, the Bankruptcy Court entered the *Order (A) Authorizing the Sale of Certain of the Debtors' Assets to Strategic Global Management, Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of an Unexpired Lease Related Thereto; and (C) Granting Related Relief* [Docket No. 2306];

WHEREAS, under the terms of the APA, SGM agreed to participate in union negotiations related to any specific collective bargaining agreement;

WHEREAS, the Debtors have agreed to use commercially reasonable efforts to initiate discussions with SGM and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union. *See* APA § 5.11;

WHEREAS, SGM and the Debtors seek to effectuate the sale (the "Sale") Closing (used herein as that term is defined in the APA) after the review of the transaction by the Attorney General of California (the "California AG"), by October 14, 2019, or as soon thereafter as possible, consistent with the terms and conditions of the APA;

WHEREAS, upon the Closing, the Debtors will no longer operate or employ anyone at the Remaining Hospitals;

WHEREAS, SEIU-UHW has filed proofs of claim (collectively, along with any and all amendments, the "POCs") in the Bankruptcy Cases against the Debtors, which have been designated with the following claims numbers: #4725, #5160, #6186 and #6221 (Verity Medical Foundation), #4723 and #5117 (Verity Health System of California, Inc.), #4722 and #5140 (St. Vincent Medical Center), #4719 and #5137 (St. Louise Regional Hospital), #4726 and #5150 (St. Francis Medical Center), #5158 and #4718 (O'Connor Hospital);

2

WHEREAS, the Debtors have, in good faith, sought to facilitate the modifications to the CBA desired by SGM and to otherwise consensually resolve issues and claims of SEIU-UHW;

WHEREAS, on February 1, 2019, the Debtors sent to SEIU-UHW a proposal under § 1113 to modify the CBA and to resolve other issues;

WHEREAS, on or about July 25, 2019, the Debtors presented SEIU-UHW with an amended § 1113 proposal and, along with SGM, began the process of negotiating changes to terms of the CBA acceptable to SGM and SEIU-UHW; and

WHEREAS, beginning on July 25, 2019 and through the Settlement Date, the Debtors, SGM, and SEIU-UHW have met and negotiated on several occasions about modifying the CBA and the Debtors and SEIU-UHW have otherwise exchanged proposals to resolve the other issues between the Parties.

NOW THEREFORE, the Parties agree as follows:

Terms

1.  Effective and conditioned upon the Closing, the CBA shall be modified in the form attached hereto as **Exhibit 1** (the "Modified CBA") under § 1113 of the Bankruptcy Code (the "Modification").

2.  Effective and conditioned upon the Closing, the Debtors will assume and assign the CBA (as modified under the Modified CBA) to SGM (the "Assumption and Assignment").

3.  SEIU-UHW agrees to (a) accept i) the Modification, ii) the Assumption and Assignment and iii) the terms of the foregoing (collectively, the "Agreed Outcome") (b) support, as lawful and as commercially reasonable, motions or plans filed by the Debtors in the Bankruptcy Cases, seeking approval of the Agreed Outcome; provided, however, that nothing in this Agreement is intended to affect A) SEIU-UHW rights and remedies against SGM in connection with x) post-Closing operations at SFMC and SVMC, including, but not limited to, interaction with the California AG, and y) adequate assurance of future performance by SGM; and B) the Parties' rights to seek enforcement of the terms of this Agreement from the Bankruptcy Court.

4.  Upon Closing, SGM will become solely responsible for performance of all post-Closing obligations arising under the Modified CBA.

3

5.    Upon Closing, the CBA (as modified under the Modified CBA) will be deemed to be automatically assigned to SGM in full.

6.    The Debtors: (a) will not have any liability or obligation to perform under the CBA or Modified CBA with respect to post-Closing activity; (b) shall in no way be liable for or otherwise responsible for any "cure" obligations independent of any SEIU-UHW claims that may be expressly preserved under this Agreement; and (c) and shall in no way be liable for or otherwise for any nonperformance or violation by SGM or any of its affiliates arising at any time.

7.    In further resolution, the following claims shall be allowed and receive the following treatment:

    a.    PTO:  each employee who is not offered a job with SGM, including Global Medical Center of Downtown Los Angeles, LLC ("GMCDLA") or Global Medical Center of South Los Angeles County, LLC ("GMCSLA"), will be allowed in the Bankruptcy Cases a claim for unused and unpaid PTO calculated under the "accrual method;" meaning PTO earned and yet unpaid or used 1) on or after the Petition Date, will be granted administrative status, 2) between March 4, 2018 to the Petition Date, will be granted priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee) with any excess granted general unsecured claim status and; 3) prior to March 4, 2018 ,will be given general unsecured claim status.  PTO replacement for cancelled hours, required as part of the Full-Guarantee Article 11, shall go back into the PTO bank as of the date used to replace cancellation.  The administrative and priority claim portions of an allowed PTO claim will be paid with the employee' last paycheck (upon the Closing);

    b.    Severance:

        i)   each employee who is not offered employment by SGM, including GMCDLA or GMCSLA, no later than the date of Closing, will be allowed a claim for severance calculated under the "accrual method"—meaning severance earned but not yet paid will be calculated on per diem basis from the date of the employee's retention by a Debtor to the earlier of the date of their termination or the Closing—and treated as follows: 1) amounts earned on and after Petition Date through the date of termination or the Closing (whichever is earlier) will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will receive priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted

4

general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of the Effective Date of a confirmed Bankruptcy Plan (as defined in such plan or confirmation order, and referred to herein as the "Bankruptcy Plan Effective Date"), provided, further, that payment of severance to an employee is contingent on that employee executing a written general release in a form acceptable to SEIU-UHW and the Debtors;

ii)  notwithstanding anything to the contrary contained in or caused by the SCC CBA Order, each employee who was not offered employment by SCC by the SCC Closing, will be allowed a claim for severance calculated under the "accrual method"—meaning severance earned but not yet paid will be calculated on per diem basis from the date of the employee's retention by a Debtor to the earlier of the date of their termination or the SCC Closing— and treated as follows: 1) amounts earned on and after Petition Date through the date of termination or the SCC Closing (whichever is earlier) will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will receive priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of the Bankruptcy Plan Effective Date, provided, further, that payment of severance to an employee is contingent on that employee executing a written general release in a form acceptable to SEIU-UHW and the Debtors;

c.    Grievance Claims:  Any grievance claim of an employee or group of employees being represented by SEIU-UHW that is not settled as of the Bankruptcy Plan Effective Date will be treated in accordance with the Plan or otherwise in accordance with bankruptcy law;

d.    Dmitry Zudzianau is owed a total of $27,156.99 for previously-issued and uncashed checks for work performed during the period of March 4, 2018 to the Petition Date.  Any amount remaining under the §507(a)(4) claim priority cap of $12,850 for Dmitry Zudzianau will be granted priority claim status with the balance granted general unsecured claim status.  These claims will be treated in the same manner as severance claims in paragraph 7(b) above; and

5

e.    All other prepetition claims, prepetition priority claims and administrative expenses and claims arising from the Petition Date to the Settlement Date not enumerated in subparagraphs a) through d) above are deemed waived; *provided further*, 1) SEIU-UHW does not waive the right to assert any unpaid administrative expenses that arise from the Settlement Date to the Closing and the Debtors maintain the right to oppose such administrative expenses; 2) the Debtors maintain the right to seek estimation from the Bankruptcy Court of any claims and administrative expenses for voting or distribution purposes and SEIU-UHW maintains the right to oppose such estimation; and 3) the Parties agree that the Bankruptcy Court retains jurisdiction to determine the allowance, priority and treatment of all claims and administrative expenses.

8.    As between SEIU-UHW and the Debtors, to the extent there is any conflict between this Agreement and the CBA or the Modified CBA, this Agreement shall control.

9.    Any dispute concerning the terms and interpretation of this Agreement shall be resolved by the Bankruptcy Court.

10.   SEIU-UHW agrees to support any provision of the Plan of the Debtors that deals with the material terms of this Agreement and does not contradict this Agreement.

11.   Terms of this Agreement shall be null and void in the event that 1) the Sale does not close, or 2) the Sale closes for a purchase price that is materially less than the contracted amount in the APA.

12.   The Parties reserve all rights and defenses provided to them under the Bankruptcy Code except as otherwise stated herein.

13.   SEIU-UHW hereby withdraws any outstanding information requests that relate to this Agreement or the § 1113 process.

14.   SEIU-UHW agrees to support the prompt Closing of the Sale, including sending to the California AG a copy of the attached hereto as **Exhibit 2**.

15.   The effectiveness of this Agreement is subject to the approval of the Bankruptcy Court. Approval of this Agreement will be sought by motion of the Debtors and affirmatively supported by SEIU-UHW.

16.   The terms of this Agreement supersede any prior agreement(s) between the Parties.

6

17.  Any modification of this Agreement must be in writing and approved by both Parties.

18.  By executing below, each Party represents that it has the requisite authority to enter into an implement all terms of this Agreement.

SEIU-UHW

By: _____
Emily P. Rich

The Debtors

By: _____

US_Active\113178844\V-6
113178844\V-6
145535\1046447

# EXHIBIT 5

DocuSign Envelope ID: 16F8A14B-8E61-494F-AF9D-3C3B1BD5A07B

## Settlement Agreement

On this 19th day of September, 2019 (the "Settlement Date"), and subject to approval by order of the Bankruptcy Court (as defined below), Verity Health Care System of California, Inc., Seton Medical Center (including the campus known as Seton Medical Center-Coastside), St. Vincent Medical Center, St. Francis Medical Center and their affiliates in chapter 11 bankruptcy (collectively the "Debtors," and individually a "Debtor"), on the one hand, and St. Francis Registered Nurses Association, United Nurses Associations of California/Union of Health Care Professionals, NUHHCE AFSCME AFL-CIO (collectively "UNAC"), (collectively, the "Parties"), on the other, and subject to the terms, conditions and approvals set forth herein, agree to the following (the "Agreement"):

## Recitals

WHEREAS, UNAC and one or more of the Debtors are parties to a certain *Labor Management Collective Bargaining Agreement* effective from December 29, 2017 to December 29, 2021 (the "CBA");

WHEREAS, on August 31, 2018 (the "Petition Date"), each of the Debtors filed a petition for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), and since that date, all Debtors have been operating as debtors in possession;

WHEREAS, on January 17, 2019, the Debtors filed a *Notice Of Motion For The Entry of (I) An Order (1) Approving Form of Asset Purchase Agreement For Stalking Horse Bidder and For Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice To Be Provided To Interested Parties; (4) Scheduling A Court Hearing To Consider Approval of The Sale To The Highest Bidder; and (5) Approving Procedures Related To The Assumption of Certain Executory Contracts and Unexpired Leases; and (II) An Order (A) Authorizing The Sale of Property Free and Clear of All Claims, Liens and Encumbrances; Memorandum of Points and Authorities In Support Thereof* [Docket No. 1279] (the "Remaining Hospitals Sale Motion"), which sought, among other things, to sell the assets of St. Francis Medical Center, a California nonprofit public benefit corporation ("SFMC"), St. Vincent Medical Center, a California nonprofit public benefit corporation ("SVMC"), St. Vincent Dialysis Center, a California nonprofit public benefit corporation, ("SVDC"), Seton Medical Center, a California nonprofit public benefit corporation, including Seton Coastside ("SMC," and referred to collectively with SFMC, SVMC and SVDC as the "Remaining Hospitals") under a Stalking Horse Asset Purchase Agreement (the "APA") between Verity Health Care System of California, Inc., a California nonprofit public benefit corporation ("Verity"), Verity Holdings, LLC, a California limited liability company, SFMC, SVMC, SVDC, and SMC (collectively, the "Sellers") and Strategic Global Management, Inc., a California Corporation (along with all affiliates, "SGM");

1

DocuSign Envelope ID: 16F8A14B-8E61-494F-AF9D-3C3B1BD5A07B

WHEREAS, on May 2, 2019, the Bankruptcy Court entered the *Order (A) Authorizing the Sale of Certain of the Debtors' Assets to Strategic Global Management, Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of an Unexpired Lease Related Thereto; and (C) Granting Related Relief* [Docket No. 2306];

WHEREAS, under the terms of the APA, SGM agreed to participate in union negotiations related to any specific collective bargaining agreement;

WHEREAS, the Debtors have agreed to use commercially reasonable efforts to initiate discussions with SGM and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union. *See* APA § 5.11;

WHEREAS, SGM and the Debtors seek to effectuate the sale (the "Sale") Closing (used herein as that term is defined in the APA) after the review of the transaction by the Attorney General of California (the "California AG"), by October 14, 2019, or as soon thereafter as possible, consistent with the terms and conditions of the APA;

WHEREAS, upon the Closing, the Debtors will no longer operate or employ anyone at the Remaining Hospitals;

WHEREAS, UNAC has filed proofs of claim (collectively, along with any and all amendments, the "POCs") in the Bankruptcy Cases against the Debtors, which have been designated with the following claims numbers: #5911 (Verity Business Services), #5912 (Verity Medical Foundation), #5913 (Verity Health System of California, Inc.), #5915 (St. Vincent Foundation), #5917 (De Paul Ventures, LLC), #5918 (O'Connor Hospital), #5920 (Verity Holdings, LLC), #5925 (O'Connor Hospital Foundation), #5926 (Seton Medical Center Foundation), #5927 (Saint Louise Regional Hospital Foundation), #5928 (St. Francis Medical Center), #5931 (St. Francis Medical Center of Lynwood Foundation), #5932 (De Paul Ventures - San Jose Dialysis, LLC), #5933 (St. Vincent Medical Center), #5934 (Seton Medical Center), and #5936 (St. Louise Regional Hospital);

WHEREAS, the Debtors have, in good faith, sought to facilitate the modifications to the CBA desired by SGM and to otherwise consensually resolve issues and claims of UNAC;

WHEREAS, on February 1, 2019, the Debtors sent to UNAC a document that the Debtors aver constitutes a proposal under §1113 to modify the CBA and to resolves other issues; UNAC, however, disputes the proposal constitutes a proper § 1113 proposal;

WHEREAS, on or about July 25, 2019, the Debtors presented UNAC with a § 1113 proposal which the Debtors aver constituted an amendment to the §1113 proposal it delivered on February 1, 2019 and UNAC avers constitutes the first § 1113 proposal and,

DocuSign Envelope ID: 16F8A14B-8E61-494F-AF9D-3C3B1BD5A07B

along with SGM, began the process of negotiating changes to terms of the CBA acceptable to SGM and UNAC; and

WHEREAS, beginning on July 25, 2019 and through the Settlement Date, the Debtors, SGM, and UNAC have met and negotiated on several occasions about modifying the CBA and the Debtors and UNAC have otherwise exchanged proposals to resolve the other issues between the Parties.

NOW THEREFORE, the Parties agree as follows:

<u>Terms</u>

1.  Effective and conditioned upon the Closing, the CBA shall be modified in the form attached hereto as **Exhibit 1** (the "Modified CBA") under § 1113 of the Bankruptcy Code (the "Modification").

2.  Effective and conditioned upon the Closing, the Debtors will assume and assign the CBA (as modified under the Modified CBA) to SGM (the "Assumption and Assignment").

3.  UNAC agrees to (a) accept i) the Modification, ii) the Assumption and Assignment and iii) the terms of the foregoing (collectively, the "Agreed Outcome"); (b) not to oppose, as commercially reasonable, motions or plans filed by the Debtors in the Bankruptcy Cases, seeking approval of the Agreed Outcome; provided, however, that nothing in this Agreement is intended to affect A) UNAC rights and remedies against SGM in connection with x) post-Closing operations at SFMC, including, but not limited to, interaction with the California AG, and y) adequate assurance of future performance by SGM; and B) the Parties' rights to seek enforcement of the terms of this Agreement from the Bankruptcy Court.

4.  Upon Closing, SGM will become solely responsible for performance of all post-Closing obligations arising under the Modified CBA.

5.  Upon Closing, the CBA (as modified under the Modified CBA) will be deemed to be automatically assigned to SGM in full.

6.  The Debtors: (a) will not have any liability or obligation to perform under the CBA or Modified CBA with respect to post-Closing activity; (b) shall in no way be liable for or otherwise responsible for any "cure" obligations independent of any UNAC claims that may be expressly preserved under this Agreement; and (c) and shall in no way be liable for or otherwise for any nonperformance or violation by SGM or any of its affiliates arising at any time.

DocuSign Envelope ID: 16F8A14B-8E61-494F-AF9D-3C3B1BD5A07B

7.    In further resolution, the following claims shall be allowed and receive the following treatment:

a.  PTO:  each employee who is not offered a job with KPC Global Medical Center of South Los Angeles, LLC ("GMCSLA") will be allowed in the Bankruptcy Cases a claim for unused and unpaid PTO calculated under the "accrual method;" meaning PTO earned and yet unpaid or used 1) on or after the Petition Date, will be granted administrative status, 2) between March 4, 2018 to the Petition Date, will be granted priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee) with any excess granted general unsecured claim status and; 3) prior to March 4, 2018 ,will be given general unsecured claim status.  The administrative and priority claim portions of an allowed PTO claim will be paid with the employee' last paycheck (upon the Closing);

b.  Severance: each employee who is not offered employment by GMCSLA no later than the date of Closing, will be allowed a claim for severance calculated under the "accrual method"—meaning severance earned but not yet paid will be calculated on per diem basis from the date of the employee's retention by a Debtor to the earlier of the date of their termination or the Closing—and treated as follows: 1) amounts earned on and after Petition Date through the date of termination or the Closing (whichever is earlier) will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will receive priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of the Effective Date of a confirmed Bankruptcy Plan (as defined in such plan or confirmation order, and referred to herein as the "Bankruptcy Plan Effective Date"), provided, further, that payment of severance to an employee is contingent on that employee executing a written general release in a form acceptable to UNAC and the Debtors;

c. Grievance Claims:  Any grievance claim of an employee being represented by UNAC that is not settled as of the Bankruptcy Plan Effective Date will be treated in accordance with the Plan or otherwise in accordance with bankruptcy law.  The parties agree to work with GMCSLA in the event that the remedy is or includes reinstatement of the employee after the Closing;

d.    Educational Claims.    Any allowed unpaid claim for reimbursement of educational expenses of employee represented by UNAC will be calculated under the "accrual method," meaning that such claim will be calculated on *per diem* basis from the date of retention to the earlier of the date of termination or the date of Closing and treated as follows: 1) amounts earned on or after the Petition Date

DocuSign Envelope ID: 16F8A14B-8E61-494F-AF9D-3C3B1BD5A07B

through the date of termination or the Closing (whichever is earlier) earned will receive administrative status; 2) amounts earned after March 4, 2018 and through the day prior to the Petition Date will be granted priority claim status up to any remaining balance under § 507(a)(4) (up to a maximum of $12,850 per employee), with any excess granted general unsecured claim status; and 3) amounts earned prior to March 4, 2018 will receive general unsecured claim status. The administrative and priority claim portions will be paid within 30 business days of Bankruptcy Plan Effective Date; and

e. All other prepetition claims, prepetition priority claims and administrative expenses and claims arising from the Petition Date to the Settlement Date not enumerated in subparagraphs a) through d) above are deemed waived; *provided further*, 1) UNAC does not waive the right to assert any unpaid administrative expenses that arise from the Settlement Date to the Closing and the Debtors maintain the right to oppose such administrative expenses; 2) the Debtors maintain the right to seek estimation from the Bankruptcy Court of any claims and administrative expenses for voting or distribution purposes and UNAC maintains the right to oppose such estimation; and 3) the Parties agree that the Bankruptcy Court retains jurisdiction to determine the allowance, priority and treatment of all claims and administrative expenses (post-arbitral or otherwise); and 4) with respect to wages, health care flexible spending accounts, mileage or other non-pension, non-severance and non-educational claims, the Debtors will, prior to the Closing, represent and warrant that all such claims will receive treatment in the same manner as for Severance pursuant to Section 7(b), *supra*. For the avoidance of doubt, the Debtors' heath care plans and programs related to UNAC-represented employees will be terminated effective upon the Closing.

8.   As between UNAC and the Debtors, to the extent there is any conflict between this Agreement and the CBA or the Modified CBA, this Agreement shall control.

9.   Any dispute concerning the terms and interpretation of this Agreement shall be resolved by the Bankruptcy Court.

10.   UNAC agrees to not oppose any Plan of the Debtors that does not contradict the material terms of this Agreement.

11.   Terms of this Agreement shall be null and void in the event that 1) the Sale does not close, or 2) the Sale closes for a purchase price that is materially less than the contracted amount in the APA.

12.   The Parties reserve all rights and defenses provided to them under the Bankruptcy Code except as otherwise stated herein.

DocuSign Envelope ID: 16F8A14B-8E61-494F-AF9D-3C3B1BD5A07B

13.  UNAC hereby withdraws any outstanding information requests that relate to this Agreement or the § 1113 process.

14.  UNAC agrees to not oppose the prompt Closing of the Sale.

15.  The effectiveness of this Agreement is subject to the approval of the Bankruptcy Court. Approval of this Agreement will be sought by motion of the Debtors and affirmatively supported by UNAC.

16.  The terms of this Agreement supersede any prior agreement(s) between the Parties.

17.  Any modification of this Agreement must be in writing and approved by both Parties.

18.  By executing below, each Party represents that it has the requisite authority to enter into an implement all terms of this Agreement.

For UNAC

Dated: _9/19/19_                                    By: _Joseph Guzynski_
                                                          Joseph Guzynski
                                                          UNAC/UHCP Executive Director

Dated: _9/19/2019_                                  By: _Ana Bergeron_
                                                          Ana Bergeron
                                                          SFRNA President

Dated: _9/19/19_                                    By: _Jessica Ludd_
                                                          Jessica Ludd
                                                          UNAC/UHCP General Counsel

Dated: _9/19/2019_                                  By: _Sandra Marques_
                                                          Sandra Marques
                                                          UNAC/UHCP Staff Representative

DocuSign Envelope ID: 16F8A14B-8E61-494F-AF9D-3C3B1BD5A07B

For the Debtors

By: _____

# EXHIBIT 6

| | Qualified Bridge Retiree Information | | | | | | | | Premium Data[1,2] | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2019 | | | | 2020 | | | 2021 | | | 2022 | | | 2023 | | | 2024 | | | | Projected Cost | | |
| Union / NR | QBR Full Name | Date of Retirement | Date of Birth | Plan Description | Date of Age 65 | Assignment End Date[3] | Total | QBR | Verity | % | Total | QBR | VHS | Total | QBR | VHS | Total | QBR | VHS | Total | QBR | VHS | Total | QBR | VHS | Months to Assignment End[4] | Total | QBR | VHS |
| O'Connor Hospital CNA | Lisa B. | 8/20/2018 | 6/5/1956 | Medical EPO North | 6/5/2021 | 5/31/2021 | $805.78 | $201.44 | $604.34 | 25% | $805.78 | $201.44 | $604.34 | | | | | | | | | | | | | 23 | $18,532.94 | $4,633.12 | $13,899.82 |
| O'Connor Hospital CNA | Kathryn B. | 2/5/2017 | 1/25/1959 | Medical EPO North | 1/25/2024 | 1/31/2024 | $805.78 | $201.44 | $604.34 | 25% | $805.78 | $201.44 | $604.34 | $805.78 | $201.44 | $604.34 | $805.78 | $201.44 | $604.34 | $805.78 | $201.44 | $604.34 | $805.78 | $201.44 | $604.34 | 55 | $44,317.90 | $11,079.20 | $33,238.70 |
| O'Connor Hospital CNA | Olga H. | 6/13/2017 | 5/23/1956 | Medical EPO North | 5/23/2021 | 5/31/2021 | $805.78 | $201.44 | $604.34 | 25% | $805.78 | $201.44 | $604.34 | $805.78 | $201.44 | $604.34 | | | | | | | | | | 23 | $18,532.94 | $4,633.12 | $13,899.82 |
| O'Connor Hospital CNA | Kathleen R. | 9/21/2018 | 3/24/1956 | Medical EPO North | 3/24/2021 | 3/31/2021 | $805.78 | $201.44 | $604.34 | 25% | $805.78 | $201.44 | $604.34 | $805.78 | $201.44 | $604.34 | | | | | | | | | | 21 | $16,921.38 | $4,230.24 | $12,691.14 |
| O'Connor Hospital CNA | Judith T. | 6/4/2018 | 9/10/1955 | Medical EPO North | 9/10/2020 | 9/1/2020 | $805.78 | $402.89 | $402.89 | 50% | $805.78 | $402.89 | $402.89 | | | | | | | | | | | | | 15 | $12,086.70 | $6,043.35 | $6,043.35 |
| O'Connor Hospital Non-Rep | Sue M. | 8/2/2018 | 4/2/1955 | MEDICAL PPO North | 4/2/2020 | 3/31/2020 | $855.74 | $213.93 | $641.81 | 25% | $855.74 | $213.93 | $641.81 | | | | | | | | | | | | | 9 | $7,701.66 | $1,925.37 | $5,776.29 |
| O'Connor Hospital Local 20 Thrpy+ | Thu N. | 1/8/2017 | 11/22/1955 | Medical EPO North | 11/22/2020 | 11/30/2020 | $805.78 | $201.44 | $604.34 | 25% | $805.78 | $201.44 | $604.34 | | | | | | | | | | | | | 17 | $13,698.26 | $3,424.48 | $10,273.78 |
| Seton Medical Center CNA | Yolanda M. | 5/1/2018 | 8/5/1957 | MEDICAL BSPPO | 8/5/2022 | 7/31/2022 | $1,215.14 | $303.78 | $911.36 | 25% | $1,215.14 | $303.78 | $911.36 | $1,215.14 | $303.78 | $911.36 | $1,215.14 | $303.78 | $911.36 | | | | | | | 37 | $44,960.18 | $11,239.86 | $33,720.32 |
| St. Louise Regional Hospital CNA | Diane T. | 5/1/2018 | 2/18/1957 | Medical EPO North | 2/18/2022 | 2/28/2022 | $805.78 | $201.44 | $604.34 | 25% | $805.78 | $201.44 | $604.34 | $805.78 | $201.44 | $604.34 | $805.78 | $201.44 | $604.34 | | | | | | | 32 | $25,784.96 | $6,446.08 | $19,338.88 |
| Seton Medical Center CNA | Joanne W. | 2/1/2019 | 4/8/1956 | Medical EPO North | 4/8/2021 | 4/1/2021 | $805.78 | $201.44 | $604.34 | 25% | $805.78 | $201.44 | $604.34 | $805.78 | $201.44 | $604.34 | | | | | | | | | | 22 | $17,727.16 | $4,431.68 | $13,295.48 |
| Seton Medical Center NUHW | Mary G. | 12/31/2018 | 4/5/1955 | Medical EPO North | 4/5/2020 | 3/31/2020 | $805.78 | $201.44 | $604.34 | 25% | $805.78 | $201.44 | $604.34 | | | | | | | | | | | | | 9 | $7,252.02 | $1,812.96 | $5,439.06 |

[1] This is not COBRA

[2] Rates are based on COBRA equivalent rates for QBR Only coverage

[3] Assignment end date is to age 65

[4] Months to end date calculated from 7/1/2019

| | Total | QBR | VHS |
|---|---|---|---|
| Total Cost | $227,516 | $59,899 | $167,617 |
| Total PEPM | $865.08 | $227.75 | $637.33 |

**EXHIBIT 7-A**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 09-13395 (CSS) |
| PTC ALLIANCE CORP., *et al.*,[1] | ) | Jointly Administered |
| | ) | |
| _____ Debtors. | ) | Re: Docket No. 847 |

## ORDER PURSUANT TO 11 U.S.C. §§ 365, 1113, AND 1114 AUTHORIZING THE (I) MODIFICATION, ASSUMPTION AND ASSIGNMENT OF COLLECTIVE BARGAINING AGREEMENTS AT ALLIANCE, OHIO AND DARLINGTON, PENNSYLVANIA AND (II) TERMINATION OF CLOSING AGREEMENTS AT MONACA, PENNSYLVANIA AND CHICAGO HEIGHTS, ILLINOIS

Upon consideration of the Motion of the Debtors, PTC Alliance Corp., *et al.*,

pursuant to 11 U.S.C. §§ 365, 1113, and 1114 for an Order Authorizing the (I) Modification,

Assumption and Assignment of Collective Bargaining Agreements at Alliance, Ohio and

Darlington, Pennsylvania and (II) Termination of Closing Agreements at Monaca, Pennsylvania

and Chicago Heights, Illinois (the "Motion"),[2] and it appearing that: (i) appropriate notice of the

Motion has been given; (ii) the Court has jurisdiction to consider the relief requested pursuant to

28 U.S.C. §§ 157 and 1334; and (iii) it appearing that the relief requested in the Motion is in the

best interests of the Debtors, their estates, and creditors, and after due deliberation and good and

sufficient cause appearing, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

---

[1]    The Debtors in these cases, along with the last four digits of their federal tax identification numbers are: PTC Alliance Corp. (2395), with a principal executive office located at 6051 Wallace Road Ext., Suite 200, Wexford, PA 15090; Alliance Tubular Products Co. (7185), with a principal executive office located at 640 Keystone Street, Alliance, OH 44601; PACD Acquisition LLC (3405), with a principal executive office located at 4400 West 3rd, Beaver Falls, PA 15010; Enduro Industries, Inc. (4669), with a principal executive office located at 2001 Orchard Avenue, Hannibal, MO 64031; PTC Tubular Products LLC (9342), with a principal executive office located at 23041 E. 800 North Road, Fairbury, IL 61739-8824; Mid-West Mfg. Co. (0660), with a principal executive office located at 475 East 16th Street, Chicago Heights, IL 60411; and PT/VW Corporation (9385), with a principal executive office located at 6051 Wallace Road Ext., Suite 200, Wexford, PA 15090.

[2]    Capitalized terms used but not defined herein shall have the same meanings given to them in the Motion.

1.     The Motion be, and hereby is, GRANTED.

2.     Any objections to the Motion, including any relief requested therein, are hereby denied and overruled with prejudice.

3.     Pursuant to 11 U.S.C §§ 1113 and 1114, the Debtors are hereby authorized to modify the terms of the Alliance Agreement in accordance with the Alliance MOA effective as of the closing of the Proposed Sale.

4.     Pursuant to 11 U.S.C. § 365, the Debtors are hereby authorized to assume and to assign the Alliance Agreement as modified by, and in accordance with, the Alliance MOA to Acquisition Co., effective as of the closing of the Proposed Sale.

5.     Pursuant to 11 U.S.C §§ 1113 and 1114, the Debtors are hereby authorized to modify the terms of the Darlington Agreement in accordance with the Darlington MOAs effective as of the closing of the Proposed Sale.

6.     Pursuant to 11 U.S.C. § 365, the Debtors are hereby authorized to assume and to assign the Darlington Agreement as modified by, and in accordance with, the Darlington MOAs to Acquisition Co., effective as of the closing of the Proposed Sale.

7.     Pursuant to 11 U.S.C. §§ 1113 and 1114, the Debtors are hereby authorized to terminate the Mid-West Closing Agreement in accordance with the Mid-West MOA effective as of the closing of the Proposed Sale.

8.     Pursuant to 11 U.S.C. §§ 1113 and 1114, the Debtors are hereby authorized to terminate the Monaca Closing Agreement in accordance with the Monaca MOA effective as of the closing of the Proposed Sale.

9.     The Monaca Closing Agreement and the Mid-West Closing Agreement are not being assumed by the Debtors or assigned to Acquisition Co. as part of the Proposed

US_ACTIVE-104289110.4

Sale. Accordingly, Acquisition Co. will have no liability or obligation under either of such

Closing Agreements, including without limitation any obligations or liabilities relating to

pensions or retiree health benefits; provided, however, nothing herein shall release the Company

of (i) its obligations to provide continuing benefit insurance coverage to retirees and their

dependents, in accordance with the MOAs and Closing MOAs, until the VEBA becomes

operational but in no event will coverage extend beyond December 31, 2010, and (ii) its

obligations to make contributions to the VEBA as set forth in the MOAs and Closing MOAs.

10. The Debtors' 1113/1114 Motions, filed at Docket Nos. 693 and 733, shall

be, and hereby are, withdrawn.

11. The Debtors are hereby authorized and empowered to take such steps as

may be necessary to implement and effect the terms and requirements of this Order.

Dated: _____8/11/10_____

_____
CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

- 3 -

US_ACTIVE-104289110.4

# EXHIBIT 7-B

# EXHIBIT A

*July 17, 2010 Company-USW & USW Local 3059-01*
*Memorandum of Understanding ("MOA")*

**Between**
**ALLIANCE TUBULAR PRODUCTS CO.**
**(Alliance, OH Plant)**
**And**
**UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY,**
**ALLIED, INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-**
**CIO, CLC On Behalf of Its Local 3059-01**

Alliance Tubular Products, Co. ("Company") and the United Steel, Paper and Forestry,

Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union,

AFL-CIO CLC, on behalf of itself and its Local Union No. 3059-01 (collectively called "Union"

or "USW"), hereby agree to a new four (4) year Company-Union labor agreement which shall

expire at 12:01 am on July 28, 2014, with the new labor agreement to become effective

conditioned upon and on the date of the closing of the sale referred to in Paragraph 16 below.

This new labor agreement will be identical to the current labor agreement, dated and effective

November 28, 2007, except for appropriate changes in dates and the changes set forth below:

    1.    **SECTION I -- Paragraph 3.** Amend existing language as follows to replace "the chauffeur" with "janitors" as a bargaining unit exclusion, but permit the three displaced janitors six months to successfully bid into other jobs and shifts, take a modified bump, or be placed in the labor gang after the time frame listed above has expired, whichever is applicable, and consistent with the November 28, 2007 labor agreement, and they will receive the greater of the hourly rates of those jobs.

        3.    The term "employee" as used in this Agreement will include all production and maintenance employees employed at the Company's Alliance, Ohio Plant, excluding clerical employees, timekeepers, guards, janitors, and nurses, and all supervisory employees at or above the rank of foreman.

    2.    **SECTION IV – Wages – and Appendix A.** Amend existing Section IV base tables and Appendix A tables to reduce, across-the-board, all current and new employee straight time hourly wages by five percent (5%). In addition to any scheduled wage increases, the Company will restore those wage cuts, as rounded off to the nearest whole cent, as follows, during the new labor agreement:

| **Effective Date** | **Percent Restored** |
|---|---|
| 1st Anniversary of<br>Effective Date of this MOA | Two Point Five Percent (2.5%) |

1

|  |  |
|---|---|
| 2nd Anniversary of<br>Effective Date of this MOA | Two Point Five Percent (2.5%) |

**3.** **SECTION XIII -- Vacations – Paragraph 1.**  Amend existing language as follows to require an employee to work at least one (1) day in a calendar year to be eligible for vacation in that year, to lower the percentage of pay periods for eligibility from fifty percent (50%) to thirty percent (30%), and to permit an employee who fails to receive earnings in thirty percent (30%) of the pay periods to receive up to one (1) week of vacation if such employee would otherwise be entitled to that amount by seniority:

    1.    *Eligibility.*  To be eligible for a vacation in any calendar year during the term of this Agreement, the employee must:

    a.    Have one (1) year or more of continuous service;

    b.    Work in that calendar year;

    c.    Have received earnings in at least thirty percent (30%) of the pay periods in the preceding calendar year; except that, in the case of an employee who completes one (1) year of continuous service in the current calendar year, s/he will have received earnings in at least thirty percent (30%) of the pay periods during the twelve (12) months following the date of his or her original employment; and, further, except that an employee who received earnings in less than thirty percent (30%) of the pay periods during such twelve (12) month period will receive one (1) week of vacation so long as s/he is entitled to at least one (1) week according to his or her Plant seniority record, and provided, in determining vacation eligibility under this paragraph an employee who incurred a compensable disability in the preceding calendar year and did not receive earnings in one or more pay periods in that year because of such disability, will have the number of such pay periods included with the number of pay periods in which s/he received earnings for the year in which such disability occurred.  The continuous service record of each employee will be governed by his or her Plant seniority record; and

    d.    Once an employee has become eligible for vacation benefits, the employee will not subsequently lose the right to vacation pay by reason of the employee's death, resignation, discharge, break in service, or termination of this Agreement.

**4.** **SECTION XIV – Seniority – New Paragraph 6.**  Add the following language as new Paragraph 6 to increase Company flexibility to make needed temporary transfers and renumber the remaining paragraphs of this Section, including renumbering any internal references within those renumbered paragraphs for accuracy:

6.     The Union recognizes the Company's need to maintain uninterrupted production, therefore, in the event of an emergency or unforeseen daily absence, the Company will attempt to fill the vacancy through APPENDIX B, TEMPORARY ASSIGNMENT language first contained in the November 28, 2007 labor agreement. If, after exhausting the language listed above, the vacancy cannot be filled, the Company may fill the vacancy by using the most junior qualified employee from that shift.

**5.     SECTION XXIII – Severance Allowance – Side Letter Agreement.** Retain existing Section XXIII, Severance Allowance. The Company and Union will execute a side letter which provides that there will be no claim for severance pay in connection with a transaction in which the Company satisfies its obligations under Appendix P, Successorship.

**6.     SECTION XXVII – Complete Agreement – New Section XXVII.** Add the following language as new Section XXVII – Complete Agreement and renumber remaining sections:

1.     This Agreement shall be considered a new labor agreement between the Company and the Union with respect to the wages, hours, and working conditions of all employees.

2.     No modification of this Agreement will be effective unless signed by authorized officials of the Company and Union.

**7.     SECTION XXVI – Termination Date.** Replace "October 2, 2011" with the new expiration date of "July 28, 2014."

**8.     Insurance and Pension Benefits Appendix-- New Appendix AA – Welfare Benefits Plans.** Pre-October 1, 2007 employees will, so long as they remain in the insurance plan in effect on January 1, 2010, pay monthly the following amounts:

| Single: | $120 |
|---|---|
| Employee +1: | $130 |
| Employee +2 | $140 |
| Employee +3 | $150 |

In addition, based upon proof of alternative coverage, any such employee may opt out of this existing Company-provided plan, and any employee who does will receive, in exchange, ten percent (10%) of the then prevailing individual coverage COBRA group insurance rate from the Company.

**9.     Insurance and Benefit Appendix – Pensions & 401(k) Plan – New Appendix BB –401(k) Plans.** Replace the "Pensions" and "Voluntary 401(k) plan" portions of the unlettered appendix to the existing Alliance labor agreement with the attached new Appendix BB containing 401(k) plans for existing employees and future hires, with the understanding and agreement that the Union will not oppose the termination of the existing pension plan, and,

3

further, that the specified 401(k) plans will be the sole and exclusive retirement plans provided by the Company to employees after the new labor agreement becomes effective.

10. **Appendices S & X -- TUBE Share Program & New Incentive Program Add-On to Appendix S or X.** Continue existing Appendices S and X, the existing TUBE Share Program following the assumption of the labor agreement described in Paragraph 16 until changed by Company-Union agreement on a replacement plan or an arbitrator's decision on a replacement plan, as stated below. During the first three (3) months following the assumption of the labor agreement described in Paragraph 16, the Company and Union will meet and attempt to reach agreement on a replacement incentive program designed to award incentive earnings equivalent to an average hourly target rate of two dollars ($2.00) for achieving reasonably based group profitability, productivity, quality, quantity, tonnage, and other reasonable business milestones, to be distributed among actively employed employees in proportion to the hours each employee worked during the incentive time period. During this same three (3) month period, because of the possibility that the parties may fail to reach agreement on a replacement incentive program and the need for an expedited arbitration award to confirm the new program, the Company and Union will select an impartial arbitrator with an industrial engineering background and/or demonstrated experience in plant manufacturing incentive bonus plans and arrange an arbitration hearing for a date as close as practicable to the end of the initial three (3) month period.

Any agreed replacement program will become effective at or before the end of the initial three (3) month period, as the parties agree. If no agreement is reached by the end of those three (3) months, however, the alternate Company and Union versions of the new program will be grieved and appealed immediately to arbitration, as provided elsewhere in this Agreement. Within one (1) week following the arbitration hearing, and no later than two (2) months after the close of the initial three (3) month period, unless otherwise agreed, the previously selected Arbitrator will decide whether the Company or Union plan is the more reasonable, realistic program, on the basis of all relevant facts, by choosing only between the final versions of the two complete programs offered to each other by the Company and Union at or prior to the end of the initial three (3) month period. The Arbitrator's decision will be a simple award, with no written decision, that simply selects one plan over the other, without any modification of the plan selected.

This language will be added to existing Appendix S or X.

11. **APPENDIX P – Memorandum of Understanding Regarding Successorship – New Appendix P.** Replace existing Appendix P with the attached new Appendix P.

12. **New Appendix CC – Patient Protection and Affordable Care Act.** Add the attached new Appendix CC to the new labor agreement.

13. **New Appendix DD.** Add the attached appendix as new Appendix DD to the new labor agreement. In exchange for the payment specified in new Appendix DD, the Company will have no further obligation to provide any existing or future retirees with Company-provided

4

retiree medical or other insurance coverage (also called "OPEB," short for Other Post-Employment Benefits).

     **14.**    <u>**Investment Commitment – New Appendix EE.**</u>  Add the attached new Appendix EE to the new labor agreement.

     **15.**    <u>**Transferred Employees – Exhibit 1.**</u>  The Company will take the actions specified in the attached Exhibit 1, conditioned upon the sale and on the effective date of the sale referred to in Paragraph 16 below.

     **16.**    <u>**Labor Agreement Assumption.**</u>  This MOA will become effective on the closing of the sale by the Company of its assets to BD PTC Acquisitions, Inc. ("Buyer"), which is an entity created by Black Diamond Capital Management LLC for the purpose of acquiring the Company's assets. The Union, on its own behalf and on behalf of its members, agrees to the assignment by the Company and the assumption of the new labor agreement by the Buyer on the effective date of the acquisition of the Alliance plant assets, with the Buyer to be fully responsible for all obligations arising under the new labor agreement after that date, and with the Company to be fully responsible for any such obligations arising on or prior to that date.

     **17.**    <u>**Bankruptcy Court Approval**</u>.  The Company has filed a petition pursuant to Chapter 11 of the United States Bankruptcy Code in the U.S. Bankruptcy Court in Wilmington, Delaware at Case No. 09-13395 (CSS). Following ratification of this MOA, as stated below, the Company shall promptly file a motion with the Bankruptcy Court in this matter to approve this MOA and shall furnish the Union with a draft of such motion prior to filing. Further, upon entry of an order approving the MOA, the Company will withdraw, with prejudice, its motion filed under Sections 1113 and 1114 of the Bankruptcy Code, 11 U.S.C. 1113, 1114 with respect to the Alliance employees and retirees and Mid-West retirees.

     **18.**    <u>**Grievance Settlements.**</u>  Subject to Bankruptcy Court approval of this MOA as addressed in Paragraph 17, with regard to the Drummond and vacation eligibility grievances, the Company will take all necessary steps to make the payments specified here. In the Drummond case, the Company will pay its portion of the Arbitrator's fee/expense statement and the Arbitrator-directed payment to Mr. Drummond. In the vacation eligibility grievances, the settlements will be on a non-precedent setting basis, and payment of denied 2009 and 2010 vacation pay will be made directly to the surviving spouse of the employee who died during 2009 and to employees who failed to receive 2009 and/ or 2010 vacation.

     **19.**    <u>**Closing Bonuses.**</u>  Provided that this MOA, in its entirety, is ratified by the Local 3059-01 membership on or before July ___, 2010, and it otherwise becomes effective as stated here, a lump sum bonus of two thousand dollars ($2000.00), less authorized or legally required deductions, will be paid on the payday following the closing of the transaction described in Paragraph 16, and a second lump sum bonus of one thousand dollars ($1000.00), less authorized or legally required deductions, will be paid on the payday following the first year anniversary of such closing, to every employee accruing seniority as of the closing date for the first bonus and the first year anniversary for the second bonus.

20.    **Printing.** The Company will print, as soon as practicable after the Effective Date of this MOA, pocket-sized copies of an amended and restated collective bargaining agreement reflecting the terms and conditions set forth in this MOA.

21.    **Other Proposals.** Except for matters agreed upon in this MOA, the Company and Union have withdrawn all other bargaining proposals.

This MOA has been tentatively agreed between the Company and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("International Union"), and its affiliated Local 3059-01, by and through the International and the USW Local 3059-01 bargaining committee officials whose signatures appear below. The International Union and the USW Local 3059-01 bargaining committee have agreed to unanimously recommend ratification of this MOA to the membership of USW Local 3059-01 in connection with the transaction described in paragraph 16 of this MOA. As addressed above, this MOA is subject to and will become effective only after (x) ratification by the Local 3059-01 membership, (y) the closing of the transaction described in Paragraph 16, and (z) entry of an order of the Bankruptcy Court approving this MOA.

UNITED STEEL, PAPER AND FORESTRY,      ALLIANCE TUBULAR PRODUCTS, CO.
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION,
AFL-CIO, CLC

By _____      By _____

_____      _____

_____      _____

6

BARGAINING COMMITTEE OF LOCAL
UNION NO. 3059-01 OF THE UNITED
STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION

By_____

_____

By_____

_____

## APPENDIX P

## MEMORANDUM OF UNDERSTANDING
### REGARDING SUCCESSORSHIP

1.      In the case of a sale of the stock of PTC Alliance Corp., PTC Alliance Corp. will ensure that any such buyer is made aware of the contractual obligations of its subsidiary. Alliance Tubular Products Company ("Alliance Tubular"), to continue to honor the labor agreement between Alliance Tubular and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied, Industrial and Service Workers International Union, and its affiliated Local 3059-01 ("Union"), for the remaining lifetime of the Agreement.

2.      In the case of an asset sale, the Company agrees that it will not sell, convey, assign or otherwise transfer, using any form of transaction, any Plant or significant part thereof covered by this Agreement (any of the foregoing, a Sale) to any other party (Buyer), unless the following conditions have been satisfied prior to the closing date of the Sale:

      a.  the Buyer shall have entered into an agreement with the Union recognizing it as the bargaining representative for the Employees working at the plant(s) to be sold; and the Buyer shall have entered into an agreement with the Union establishing the terms and conditions of employment to be effective as of the closing date of the Sale; or

      b.  the Buyer shall have assumed the Agreement.

3.      This Section shall not apply to any transactions solely between the Company and any of its affiliates, or to a public offering of registered securities.

## APPENDIX AA

## WELFARE BENEFITS PLANS

A. *In General*

1.     Effective upon signing this Agreement and for the duration of this Agreement, the parties agree on the following Welfare Benefit Plans for the employees under this Agreement. These Welfare Benefit Plans include group health, dental, vision and life insurance coverage as summarized below. The Company will determine the insurance carrier, if any, for the benefits shown below and any carrier changed by the Company will continue to provide these benefits during this Agreement. To the extent an inconsistency arises between language in this Appendix and the underlying insurance contract with regard to claim notification and/or processing procedures only, however, the terms of the applicable insurance contract will prevail.

2.     The Company will maintain three Welfare Benefit Plans. All employees shall be entitled to a single monthly credit of $62.50. Employee contributions for these plans will remain unchanged for the duration of this Agreement.

3.     Pre-October 1, 2007 hires shall be eligible to participate in the Welfare Benefit Plan in effect at the Alliance facility as of January 1, 2010. So long as an employee remains in this plan, the employee shall pay the following amounts monthly:

| | |
|---|---|
| Single: | $120 |
| Employee +1: | $130 |
| Employee +2: | $140 |
| Employee +3: | $150 |

4. The Company shall maintain a 90/10 and an 80/20 plan for all Post-October 1, 2007 hires and for those Pre-October 1, 2007 hires who elect to participate in such plan. The election by a Pre-October 1, 2007 hire to participate in the 90/10 plan or 80/20 plan can be made on any enrollment date, however, once such an election is made, that election shall be binding for the duration of this Agreement and the employee may not move back to the plan in existence on January 1, 2010.

5.     Except as otherwise required by laws such as the Family and Medical Leave Act of 1993 ("FMLA"), the Company's obligation to pay for the insurance coverage outlined below for employees whose active employment ceases temporarily or permanently (except for a quit, retirement, death, or discharge for cause) will terminate as follows:

9

| YEARS OF SERVICE | INSURANCE END DATE |
|---|---|
| Less than 2 years | End of calendar month in which employment ends |
| 2 but less than 10 years | End of sixth (6th) calendar month after employment ends |
| 10 or more years | End of twelfth (12th) calendar month after employment ends |

In the event of a quit, retirement, death, or discharge for cause, the Company's obligation will cease as of the end of the calendar month in which employment terminates, irrespective of the employee's years of service.

To the extent required by law, however, after the Company's insurance payment obligation terminates, an employee will have the opportunity to continue group insurance coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ('COBRA") by prepaying the portion of the monthly premiums established by the Company consistent with COBRA.

6.      During the term of this Agreement, federal and/or state laws may be passed to require the Company to provide certain medical or other related benefits for its employees, benefits that may duplicate or overlap similar benefits to be provided by this Agreement. If this happens, and to the extent these laws do not permit the Company to credit cost and benefits under this Agreement against those required by law, upon providing the Union with documentation of such additional costs to the Union's satisfaction, the Company may reduce the duplicated benefits to be provided by this Agreement without violating this Agreement to avoid any actual, practical, or otherwise unreasonable duplication of cost or benefits.

B.      *Benefits*

1.      Sickness & Accident Benefit.

The Sickness & Accident Weekly Benefit under the Program of Insurance Benefits (PIB) will be $350 per week for disabilities.

2.      Life Insurance Benefit.

The Life Insurance provisions will be as follows:

Life insurance coverage for active employees will be $30,000.

10

3. Medical Plans.

     (a) **Eligibility**. After working 720 hours, any employee will be eligible to participate in the health, dental and vision plans in effect and summarized at the end of this Appendix during this Collective Bargaining Agreement. The employee will have a choice of either Option I or Option II in connection with health and dental benefits.

     (b) **Company Contribution**. Any employee who elects to participate in the medical plans will receive a Company contribution of $62.50 per month towards the cost of their medical benefits.

(4)      **Summary of Medical, Dental, and Vision Plans for 90/10 and 80/20 Plans.**

(i)      Summary of PPO Benefits – Option I

With your PPO, or Preferred Provider Organization, if you receive services from a provider who is in the PPO network, you'll receive the highest level of benefits. If you receive services from a provider who is not in the PPO network, you'll receive the lower level of benefits. In either case, you coordinate your own care. There is no requirement to select a Primary Care Physician (PCP) to coordinate your care. Below are specific benefit levels that apply during your benefit period.

**PTC Alliance**                                                    **Option I**

| Benefit | Network | Out-of-Network |
|---|---|---|
| Benefit Period | Calendar Year | |
| Deductible (per benefit period)<br>Individual<br>Family | $200<br>$600 | $600<br>$1,800 |
| **Plan Payment Level** -- Based on the provider's reasonable charge (PRC) | 90% until out-of-pocket maximum is met; then 100% | 70% until out-of-pocket maximum is met; then 100% |
| **Out of Pocket Maximums**<br>Individual<br>Family | $600<br>$1,800 | $1,800<br>$3,600 |
| **Lifetime Maximum** (per person) | $1,000,000 | |
| **Primary Care Physician Office Visits** | 100% after $20 copayment | 70% after deductible |
| **Specialist Office Visits** | 100% after $25 copayment | 70% after deductible |
| **Preventive Care**<br>*Adult*<br>Routine physical exams | 100% after $20 copayment | Not Covered |
| Adult Immunizations | 90% | 70% after deductible |
| Routine gynecological exams | 100% after $20 copayment | 70% after deductible |

11

| Benefit | Network | Out-of-Network |
|---|---|---|
| Annual Pap Test | 90% | 70% after deductible |
| Annual Mammogram | 90% | 70% after deductible |
| *Pediatric* Routine physical exams | 100% after $20 copayment | 70% after deductible |
| Pediatric Immunizations | 90% | Not Covered |
| **Emergency Room Service** | 90% after $50 copayment (waived if admitted) (copayment of $30 for Instacare or other ER alternative instead of ER) ||
| **Spinal Manipulations** | 90% | 70% after deductible |
| | Limit: 13 visits/benefit period ||
| **Physical Medicine** | 90% | 70% after deductible |
| **Speech Therapy** | 90% | 70% after deductible |
| **Occupational Therapy** | 90% | 70% after deductible |
| **Allergy Extracts and Injections** | 90% | 70% after deductible |
| **Ambulance** | 90% deductible does not apply ||
| **Assisted Fertilization Procedures** | Not Covered ||
| **Dental Services Related to Accidental Injury** | 90% | 70% after deductible |
| **Diabetes Treatment** | 90% | 70% after deductible |
| **Diagnostic Services** (including routine) *Advanced Imaging* (MRI, CAT Scan PET Scan, etc.) | 90% | 70% after deductible |
| *Basic Diagnostic Services* (standard imaging, diagnostic medical, lab/pathology, allergy testing) | 90% | 70% after deductible |
| **Durable Medical Equipment, Orthotics and Prosthetics** | 90% | 70% after deductible |
| **Enteral Formulae** | 90% | 70% after deductible |
| **Home Infusion Therapy** | 90% | 70% after deductible |
| **Home Health Care** | 90% | 70% after deductible |
| | Limit 100 visits/benefit period ||
| **Hospice** | 90% | 70% after deductible |
| **Hospital Services** Inpatient | 90% | $250 inpatient copayment then 70% after deductible |
| Outpatient | 90% | 70% after deductible |
| **Infertility Counseling, Testing and Treatment** (for medical conditions only) | 90% | 70% after deductible |

12

| Benefit | Network | Out-of-Network |
|---|---|---|
| **Maternity Services** | | |
| Inpatient | 90% | 70% after deductible |
| Initial Visit | 100% after $20 Copayment | 70% after deductible |
| Delivery | 90% | 70% after deductible |
| **Medical Expenses** | 90% | 70% after deductible |
| **Surgical Expenses** | | |
| Facility | 90% | 70% after deductible |
| Professional | 90% | 70% after deductible |
| **Mental Health** | | $250 inpatient copayment then |
| Inpatient | 90% | 70% after deductible |
| | Limit: 30 days/benefits period: 90 days/lifetime | |
| Outpatient | 100% after $20 copayment | 70% after deductible |
| | Limit: 60 visits/benefit period | |
| **Private Duty Nursing** (excludes inpatient) | 90% | 70% after deductible |
| **Respiratory Therapy** | 90% | 70% after deductible |
| **Skilled Nursing Facility Care** | 90% | 70% after deductible |
| | Limit 100 days/benefit period | |
| **Substance Abuse** | | |
| Impatient Detoxification | 90% | 70% after deductible |
| | Limit: 7 days/admission: 1 admission/lifetime | |
| Inpatient Rehabilitation | 90% | $250 inpatient copayment then 70% after deductible |
| | Limit: 30 days/benefit period Lifetime limit $10,000 - 1 time admission/lifetime | |
| Outpatient | 100% after $20 copayment | 70% after deductible |
| | Limit: 60 visits/benefit period | |
| **Therapy Services** (Cardiac Rehab, Infusion Therapy and Dialysis) | 90% | 70% after deductible |
| **Transplant Services** | 90% | 70% after deductible |
| **Precertification Requirements** | Performed by Member Penalty for Failure to Per-Certify: $300 per confinement | |
| **Premier Prescription Drug Program** | **Retail Drugs** $10 generic copayment $20 brand formulary copayment $40 copayment brand non-formulary copayment $100 specialty copayment **Mandatory Generic** **30-day Supply** **Maintenance Drugs through Mail Order** $20 generic copayment $40 brand formulary copayment $80 copayment brand non-formulary copayment | |

13

| Benefit | Network | Out-of-Network |
|---|---|---|
|  | $200 specialty copayment **Mandatory Generic** **90-day Supply** ||

(ii)  *Summary of PPO Benefits* -- Option II

With your PPO, or Preferred Provider Organization, if you receive services from a provider who is in the PPO network, you'll receive the highest level of benefits.  If you receive services from a provider who is not in the PPO network, you'll receive the lower level of benefits.  In either case, you coordinate your own care.  There is no requirement to select a Primary Care Physician (PCP) to coordinate your care.  Below are specific benefit levels that apply during your benefit period.

**PTC Alliance**

**Option II**

| Benefit | Network | Out-of-Network |
|---|---|---|
| Benefit Period | Calendar Year ||
| Deductible (per benefit period) Individual Family | $300 $900 | $900 $2,700 |
| **Plan Payment Level -- Based** on the provider's reasonable charge (PRC) | 80% until out-of-pocket maximum is met; then 100% | 60% until out-of-pocket maximum is met; then 100% |
| **Out of Pocket Maximums** Individual Family | $900 $2,700 | $2,700 $5,400 |
| **Lifetime Maximum** (per person) | $1,000,000 ||
| **Primary Care Physician Office Visits** | 100% after $20 copayment | 60% after deductible |
| **Specialist Office Visits** | 100% after $25 copayment | 60% after deductible |
| **Preventive Care** *Adult* Routine physical exams | 100% after $20 copayment | Not Covered |
| Adult Immunizations | 80% | 60% after deductible |
| Routine gynecological exams | 100% after $20 copayment | 60% after deductible |
| Annual Pap Test | 80% | 60% after deductible |
| Annual Mammogram | 80% | 60% after deductible |
| *Pediatric* Routine physical exams | 100% after $20 copayment | 60% after deductible |
| Pediatric Immunizations | 80% | Not Covered |
| **Emergency Room Service** | 80% after $50 copayment (waived if admitted) (copayment of ||

14

| Benefit | Network | Out-of-Network |
|---|---|---|
| | $30 for Instacare or other ER alternative instead of ER) | |
| Spinal Manipulations | 80% | 60% after deductible |
| | Limit: 13 visits/benefit period | |
| Physical Medicine | 80% | 60% after deductible |
| Speech Therapy | 80% | 60% after deductible |
| Occupational Therapy | 80% | 60% after deductible |
| Allergy Extracts and Injections | 80% | 60% after deductible |
| Ambulance | 80% deductible does not apply | |
| Assisted Fertilization Procedures | Not Covered | |
| Dental Services Related to Accidental Injury | 80% | 60% after deductible |
| Diabetes Treatment | 80% | 60% after deductible |
| Diagnostic Services (including routine) *Advanced Imaging* (MRI, CAT Scan PET Scan, etc.) | 80% | 60% after deductible |
| *Basic Diagnostic Services* (standard imaging, diagnostic medical, lab/pathology, allergy testing) | 80% | 60% after deductible |
| Durable Medical Equipment, Orthotics and Prosthetics | 80% | 60% after deductible |
| Enteral Formulae | 80% | 60% after deductible |
| Home Infusion Therapy | 80% | 60% after deductible |
| Home Health Care | 80% | 60% after deductible |
| | Limit 100 visits/benefit period | |
| Hospice | 80% | 60% after deductible |
| Hospital Services Inpatient | 80% | $250 inpatient copayment then 60% after deductible |
| Outpatient | 80% | 60% after deductible |
| Infertility Counseling, Testing and Treatment (for medical conditions only) | 80% | 60% after deductible |
| Maternity Services Inpatient | 80% | 60% after deductible |
| Initial Visit | 100% after $20 Copayment | 60% after deductible |
| Delivery | 80% | 60% after deductible |
| Medical Expenses | 80% | 60% after deductible |
| Surgical Expenses Facility | 80% | 60% after deductible |

15

| Benefit | Network | Out-of-Network |
|---|---|---|
| Professional | 80% | 60% after deductible |
| **Mental Health** | | $250 inpatient copayment then |
| Inpatient | 80% | 60% after deductible |
| | Limit: 30 days/benefits period: 90 days/lifetime | |
| Outpatient | 100% after $20 copayment | 60% after deductible |
| | Limit: 60 visits/benefit period | |
| **Private Duty Nursing** (excludes inpatient) | 80% | 60% after deductible |
| **Respiratory Therapy** | 80% | 60% after deductible |
| **Skilled Nursing Facility Care** | 80% | 60% after deductible |
| | Limit 100 days/benefit period | |
| **Substance Abuse** | | |
| Impatient Detoxification | 80% | 60% after deductible |
| | Limit: 7 days/admission: 1 admission/lifetime | |
| Inpatient Rehabilitation | 80% | $250 inpatient copayment then 60% after deductible |
| | Limit: 30 days/benefit period | |
| | Lifetime limit $10,000 - 1 time admission/lifetime | |
| Outpatient | 100% after $20 copayment | 60% after deductible |
| | Limit: 60 visits/benefit period | |
| **Therapy Services** (Cardiac Rehab, Infusion Therapy and Dialysis) | 80% | 60% after deductible |
| **Transplant Services** | 80% | 60% after deductible |
| **Precertification Requirements** | Performed by Member Penalty for Failure to Per-Certify: $300 per confinement | |
| **Premier Prescription Drug Program** | **Retail Drugs** $10 generic copayment $20 brand formulary copayment $40 copayment brand non-formulary copayment $100 specialty copayment **Mandatory Generic** **30-day Supply** **Maintenance Drugs through Mail Order** $20 generic copayment $40 brand formulary copayment $80 copayment brand non-formulary copayment $200 specialty copayment **Mandatory Generic** **90-day Supply** | |

16

(iii).  **Dental Plan
Comparison Chart**

| Benefits currently available through Guardian Life Dental | Option 1 | | Option 2 | |
|---|---|---|---|---|
| | Preferred Provider | Non-preferred Provider | Preferred Provider | Non-preferred Provider |
| **Annual Deductible** | | | | |
| **Individual** | $50 | $75 | $50 | $75 |
| **Family Maximum** | $150 | $225 | $150 | $225 |
| | | | | |
| Calendar Year Maximum | $1,000 | | $1,200 | |
| | | | | |
| Preventative/Diagnostic Services | 100%-no deductible | 100%-no deductible | 100%-no deductible | 100%-no deductible |
| Cleanings (limit 2 per year) | | | | |
| Fluoride Treatment (1 per year under age 19) | | | | |
| Oral Exams (limit 2 per year) | | | | |
| Full mouth x-rays (one set in 60 months) | | | | |
| Bitewing x-rays (adults-1/year; children 2/year) | | | | |
| | | | | |
| **Minor Restorative Services** | 90%-no deductible | 90%-no deductible | 1st year-70% after deductible | 1st year-70% after deductible |
| | | | 2nd year-80% after deductible | 2nd year-80% after deductible |
| Fillings, Extractions, Palliative Treatment | | | | |
| Sealants (under the age of 14) | | | | |
| Denture Repair (once in 38 months) | | | | |
| Pariodontics Scaling (4 treatments/period) | | | | |
| Space Maintainers (covered to age 19) | | | | |
| | | | | |
| **Major Services** | Not Covered | | 1st year-50% after deductible | 1st year-50% after deductible |
| Pariodontics, Endodontics, Bridges | | | 2nd year-60% after | 2nd year-60% after |

17

| | | | deductible | deductible |
|---|---|---|---|---|
| Crowns, Inlays/Veneers, Onlays | | | | |
| Oral Surgery, Anesthesia | | | | |
| Replacement of Crowns, Inlays, Onlays (once every 5 years) | | | | |
| Root Canal (one per tooth) | | | | |
| Denture adjustment (min 8 months after installation) | | | | |
| Denture reline & rebase (once every 36 months) | | | | |
| | | | | |
| **ORTHODONTIA** | Not Covered | | 50% - no deductible | 50% - no deductible |
| Limited to children under 19 | | | | |
| Lifetime Maximum | | | $1,500 | |
| | | | | |

## (iv)    Vision Benefits
**Benefits currently available through Vision Benefits of America (VBA)**

| Exams | 12 months | |
|---|---|---|
| Lenses | 12 months | |
| Frames | 24 months | |
| Benefits | **In Network** | **Out of Network** |
| **Exams** | | |
| | | |
| **Eye Exams** | 100% after %5 co-pay | $35 |
| | | |
| **Lenses** | | |
| Single | 100% after %5 co-pay | $30 |
| | | |
| Bifocal | 100% after %5 co-pay | $40 |
| | | |
| Trifocal | 100% after %5 co-pay | $60 |
| | | |
| Lenticular | 100% after %5 co-pay | $80 |
| | | |
| **Frames** | 100% within the program's $40 wholesale allowance | $40 |
| | (approximately $80 - $120 retail) | |
| | | |
| | | |

18

| Contact Lenses | | |
|---|---|---|
| In Lieu of Glasses | $100 | $100 |
| Medically Required | UCR** | $250 |
| | | |
| ** Usual, Customary and Reasonable | | |
| ***Cost of the Exam is included in the Contact Lense Allowance | | |
| | | |

You can call VBA at 1-800-432-4966 to initiate your vision benefits

**(v)      Costs of Medical, Dental and Vision Benefits**

| **Medical** | **90-10 Option** | **80-20 Option** |
|---|---|---|
| Employee | $50 | $25 |
| Employee + 1 | $100 | $50 |
| Employee + 2 or more | $140 | $70 |

| **Dental** | **Option 1** | **Option 2** |
|---|---|---|
| Employee | $12.10 | $22.84 |
| Employee + 1 | $23.45 | $44.51 |
| Employee + 2 or more | $44.79 | $81.25 |

| **Vision** | | |
|---|---|---|
| Employee | $4.70 | |
| Employee + 1 | $8.35 | |
| Employee + 2 or more | $11.35 | |

\* \* \* \* \*

19

## APPENDIX BB

## 401(k) PLANS

### I. 401(k) Plan for Employees Hired Prior to October 1, 2007

A.    For employees hired prior to October 1, 2007, instead of a pension plan, the Company will continue its 401(k) Plan with the following elements:

- Payroll deduction

- Multiple investment options

- A contribution level up to the maximum allowed by federal law

- All contributions will be pre-tax

- Quarterly statements showing account levels

- Provisions to allow investment among the funds in 1% increments

- Provisions for changing investment directions, i.e., moving money from one fund to another or changing the direction of future investments

B.    For such employees, the Company will contribute $1.30 per hour for each hour worked during this Agreement. For purposes of this Appendix, "hours worked" shall mean hours worked (including straight time and overtime hours); vacation and holiday hours at the rate of eight (8) hours for each holiday or day of vacation; hours on Union business; and hours, at the rate of eight (8) hours for each day while receiving workers' compensation or sickness & accident benefits based on the number of days absent from work while receiving such benefits.

### II. 401(k) Plan for Employees hired on or after October 1, 2007

A.    _Overview_. The Company will make a 401(k) payroll deduction Savings Plan available to all actively employed bargaining unit employees. This will be the sole retirement plan of the Company. The Company does not sponsor a pension plan. The full Plan is contained in the Summary Plan Description Booklet dated January 1, 2007. Plan design, eligibility requirements, form design, vesting provisions, content, investment and all other provisions will be established at the discretion of the Company and be subject to change by the Company. The Plan design established by the Company will continue to contain the following major provisions:

- Payroll deduction

- Multiple investment options

- A contribution level up to the maximum allowed by federal law

- All contributions will be pre-tax

20

- Quarterly statements showing account levels

- Provisions to allow investment among the funds in 1% increments

- Provisions for changing investment directions, i.e., moving money from one fund to another or changing the direction of future investments

The Company will provide instruction to those employees interested in participating in the 401(k) Savings Plan.

B.    *Plan Details*.

(1)    After thirty (30) calendar days of uninterrupted employment, employees will be eligible to participate in the 401(k) Plan, as may be amended by the Company from time to time.

(2)    If such employees make elective deferrals of 2% or more to the 401(k) Plan, they will be eligible to receive a matching contribution equal to 25% of the first 6% of their elective deferral amount ("Employer Matching Contributions").

(3)    Employer Matching Contributions will be subject to a six-year graded vesting schedule. Your service with Alliance Tubular Products, LLC prior to the Effective Date of this Agreement will not be taken into account for purposes of determining your eligibility for, or the amount of, any contribution under the Plan. However, such prior service will be taken into account for the limited purpose of determining the extent to which you are vested in any Employer Matching Contributions made in regard to elective contributions that you make after the Effective Date of this Agreement. Investment options offered under the 401(k) Plan will be determined from time to time by the Plan Administrator.

### III. Company Lump Sum Contributions into 401(k) Plans under I & II

Within sixty (60) days after the closing described in Paragraph 16, the Company will make the contributions specified below into the 401(k) account for each employee accruing seniority under the Agreement as of its effective date. The contributions will be paid in an amount which is the product of fifty dollars ($50.00) multiplied by the sum of (x) each year of an employee's age and (y) his or her completed years of Company service as of June 30, 2010, with service dating from the later of either his or her hire date with the Company or the date of most recent rehire. For purposes of clarity, the lump sum contribution schedule follows:

| Age + Service | Lump Sum Payment | Age + Service | Lump Sum Payment | Age + Service | Lump Sum Payment | Age + Service | Lump Sum Payment |
|---|---|---|---|---|---|---|---|
| 22 | $1,100 | 43 | $2,150 | 64 | $3,200 | 85 | $4,250 |
| 23 | $1,150 | 44 | $2,200 | 65 | $3,250 | 86 | $4,300 |
| 24 | $1,200 | 45 | $2,250 | 66 | $3,300 | 87 | $4,350 |
| 25 | $1,250 | 46 | $2,300 | 67 | $3,350 | 88 | $4,400 |
| 26 | $1,300 | 47 | $2,350 | 68 | $3,400 | 89 | $4,450 |
| 27 | $1,350 | 48 | $2,400 | 69 | $3,450 | 90 | $4,500 |
| 28 | $1,400 | 49 | $2,450 | 70 | $3,500 | 91 | $4,550 |
| 29 | $1,450 | 50 | $2,500 | 71 | $3,550 | 92 | $4,600 |
| 30 | $1,500 | 51 | $2,550 | 72 | $3,600 | 93 | $4,650 |
| 31 | $1,550 | 52 | $2,600 | 73 | $3,650 | 94 | $4,700 |
| 32 | $1,600 | 53 | $2,650 | 74 | $3,700 | 95 | $4,750 |
| 33 | $1,650 | 54 | $2,700 | 75 | $3,750 | 96 | $4,800 |
| 34 | $1,700 | 55 | $2,750 | 76 | $3,800 | 97 | $4,850 |
| 35 | $1,750 | 56 | $2,800 | 77 | $3,850 | 98 | $4,900 |
| 36 | $1,800 | 57 | $2,850 | 78 | $3,900 | 99 | $4,950 |
| 37 | $1,850 | 58 | $2,900 | 79 | $3,950 | 100 | $5,000 |
| 38 | $1,900 | 59 | $2,950 | 80 | $4,000 | 101 | $5,050 |
| 39 | $1,950 | 60 | $3,000 | 81 | $4,050 | 102 | $5,100 |
| 40 | $2,000 | 61 | $3,050 | 82 | $4,100 | 103 | $5,150 |
| 41 | $2,050 | 62 | $3,100 | 83 | $4,150 | 104 | $5,200 |
| 42 | $2,100 | 63 | $3,150 | 84 | $4,200 | 105 | $5,250 |

| Examples | |
|---|---|
| Age 35, Service 12 | $2,350 |
| Age 47, Service 19 | $3,300 |
| Age 54, Service 15 | $3,400 |
| Age 60, Service 30 | $4,500 |
| Age 25, Service 4 | $1,450 |

In addition to the above-specified lump sum contributions, and within the same time frame as these lump sum contributions, the Company will make a one-time only payment of one million three hundred and seventy-five thousand dollars ($1,375,000.00), to be allocated on the basis of service as of June 30, 2010 (as reflected above). At the employee's election, an employee's allocation may be contributed into the employees' individual 401(k) accounts or paid directly to them in cash (less any authorized or legally required deductions) in a manner to be determined prior to the effective date of this MOA. Each individual employee's 401(k) account will belong solely and exclusively to him or her and the Company shall have no current or future claim to any monies contributed to an employee's account.

The amount of any and all contributions set forth in this Agreement shall be immediately vested in the employee's account notwithstanding any provisions of the 401(k) plan to the contrary.

22

## APPENDIX CC

## PATIENT PROTECTION AND AFFORDABLE CARE ACT

To the extent and in the event that the federal Patient Protection and Affordable Care Act ("PPACA") provides the Company with choices or other options in administering the PPACA-- including plan design changes that might offset cost increases to the Company and/or resulting from any modifications to the plan required by PPACA- the Company will negotiate in good faith over any such choices or options prior to their implementation.

If, after bargaining, the Company and Union fail to reach agreement and the Company unilaterally implements changes to its plan, the USW retains the right to grieve and immediately appeal to arbitration the reasonableness of the Company's plan changes.

## APPENDIX DD

At Company expense-including the fees and expenses of the legal and other professionals retained in connection with the establishment of the VEBA (Voluntary Employee Beneficiary Association)-- and subject to the approvals and recommendations of its accountants, the Company will establish a jointly administered, tax-qualified VEBA and will provide a total of $6,000,000 in three (3) lump sums ($3,000,000 on the establishment of the VEBA, $1,500,000 on the first anniversary of the closing described in Paragraph 16, and $1,500,000 on its second anniversary) for OPEB (Other Post-Employment Benefits) for existing and future retirees and their eligible dependants at Alliance and Darlington, including individuals covered by the Monaca and Mid -West closing agreements.  Deducted from the initial $3,000,000 payment will be the Company's cost of providing continuing benefit insurance coverage to retirees and their dependents until the VEBA becomes operational but in no event will such coverage extend beyond December 31, 2010.  The VEBA itself will be responsible for all expenses and all its administrative and other costs when and after it becomes operational.

The Union concurs that the Company will have no obligation to pay any amounts toward OPEB or into the VEBA beyond what is specified herein.

The obligations addressed above will become due upon the effective date of each of the Darlington and Alliance Memoranda of Agreement ("MOAs"), but shall be paid upon the establishment of the VEBA.  Upon ratification of the MOAs, sub-accounts will be established within the VEBA such that 67.9% of the assets shall be allocated to the Darlington, Monaca and Mid-West existing and future retirees and dependents and 32.1% of the assets shall be allocated to the Alliance existing and future retirees and dependents.  All contributions to the VEBA and expenses and administrative costs of the VEBA shall be apportioned between the sub-accounts to reflect this allocation.

In the event that either the Darlington or Alliance bargaining unit fails to ratify the respective MOA, the parties shall agree, based upon reasonable actuarial standards, as to the allocation of contributions to the existing and future retirees and dependents of the ratifying bargaining unit and the retirees and dependents of Monaca and Mid-West.  In the event that the parties are unable to agree to such allocation, the matter shall be submitted to binding arbitration on an expedited basis.

Any Alliance employee who retires sixty (60) or more days after the effective date of this MOA shall not participate in the VEBA.  An Alliance employee who retires within sixty (60) days of the effective date of this MOA may elect his share of the lump sum distribution of the $1,375,000.00 under Appendix BB or to participate in the VEBA and the amount he would otherwise have received will be contributed to the Alliance sub-account of the VEBA.

The Company, at its option, can appoint, as its trustee(s), non-employees as trustees and/or one or more corporate trustees such as a bank.

24

## APPENDIX EE

## INVESTMENT COMMITMENT

1.      During this Agreement, the Company agrees to maintain the competitive status of the Alliance facility, taking into consideration factors affecting the Company and its facility, provided, however, that final decisions on such expenditures will be made in the sole discretion of the Board of Directors.

2.      The Union agrees to contribute to the competitiveness of the facilities and work with the Company to maintain the competitive nature of the facilities.

## Exhibit 1 – Employee Transition Matters

1.  Each current Alliance Tubular Products Co. (called "PTC" for ease of reference) bargaining unit employee accruing continuous service under a collective bargaining agreement as of the Closing Date will thereupon become an employee of Buyer as defined in Paragraph 16 ("Transferred Employee") regardless of whether s/he is actively at work or absent from work whether due to layoff, disability or any other inactive status recognized under the collective bargaining agreements with PTC, although those absent from work will continue in their respective status under the Buyer/USW CBA until their circumstances change.

2.  With respect to any employee of PTC who was discharged prior to the Closing Date and who is actively pursuing a grievance concerning such discharge, Buyer shall, at its option, either (a) employ the dischargee as a Transferred Employee, placing him or her in accordance with the CBA, and taking no further action concerning such discharge; or (b) succeed to the position of PTC concerning such discharge, it being understood that such discharge shall be taken up and resolved pursuant to the grievance and arbitration procedure set forth in the Buyer/USW CBA. Buyer shall advise the USW within 15-days of the Closing Date as to which of the two options it will elect.

3.  Buyer shall conduct no pre-hire or other drug testing of Transferred Employees in connection with its acquisition of the assets of PTC.

4.  For all purposes under the Buyer/USW CBA, each Transferred Employee will be credited as of the Effective Date with all basic labor agreement service s/he accrued at PTC and its predecessors.

5.  Buyer shall assume all liabilities for 2010 vacation, as well as for vacation accrued for 2011. Each vacation day taken by a Transferred Employee prior to the Closing Date shall be counted as a vacation day under the Buyer/USW CBA.

6.  Each Transferred Employee absent from work due to disability who is receiving sickness and accident (or similar) benefits will be entitled to receive sickness and accident (or similar) benefits from Buyer for any remaining period of entitlement at the benefit level under the Buyer/USW CBA.

7.  Buyer shall assume liabilities for Transferred Employees absent from work as of the Closing Date due to disability who are receiving workers compensation benefits. Upon qualifying under the criteria of the Buyer/USW CBA for return to active employment, the Transferred Employees covered by this paragraph shall be placed in active employment or otherwise in accordance with their seniority.

8.  A Transferred Employee on layoff as of the Closing Date shall be subject to recall in accordance with their seniority and applicable provisions of the Buyer/USW CBA.

26

9.    Each Transferred Employee absent from work as of the Closing Date due to Family and Medical Leave, Union leave, military leave, or other form of leave of a type recognized by the Buyer/USW CBA will be entitled to the same treatment from Buyer for the balance of such leave and upon its expiration as provided for under the Buyer/USW CBA.