SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
SONIA MARTIN (State Bar No. 191148)
sonia.martin@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
NICHOLAS A. KOFFROTH (Bar No. 287854)
nick.koffroth@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

Counsel to Chapter 11 Debtors and
Debtors In Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>VERITY HEALTH SYSTEM OF CALIFORNIA, INC., *et al.*,<br><br>    Debtors and Debtors In Possession.<br><br>☒ Affects All Debtors<br>☐ Affects Verity Health System of California, Inc.<br>☐ Affects O'Connor Hospital<br>☐ Affects Saint Louise Regional Hospital<br>☐ Affects St. Francis Medical Center<br>☐ Affects St. Vincent Medical Center<br>☐ Affects Seton Medical Center<br>☐ Affects O'Connor Hospital Foundation<br>☐ Affects Saint Louise Regional Hospital Foundation<br>☐ Affects St. Francis Medical Center of Lynwood Foundation<br>☐ Affects St. Vincent Foundation<br>☐ Affects St. Vincent Dialysis Center, Inc.<br>☐ Affects Seton Medical Center Foundation<br>☐ Affects Verity Business Services<br>☐ Affects Verity Medical Foundation<br>☐ Affects Verity Holdings, LLC<br>☐ Affects De Paul Ventures, LLC<br>☐ Affects De Paul Ventures - San Jose Dialysis, LLC<br><br>    Debtors and Debtors In Possession. | Lead Case No. 2:18-bk-20151-ER<br><br>Jointly administered with:<br>Case No. 2:18-bk-20162-ER;<br>Case No. 2:18-bk-20163-ER;<br>Case No. 2:18-bk-20164-ER;<br>Case No. 2:18-bk-20165-ER;<br>Case No. 2:18-bk-20167-ER;<br>Case No. 2:18-bk-20168-ER;<br>Case No. 2:18-bk-20169-ER;<br>Case No. 2:18-bk-20171-ER;<br>Case No. 2:18-bk-20172-ER;<br>Case No. 2:18-bk-20173-ER;<br>Case No. 2:18-bk-20175-ER;<br>Case No. 2:18-bk-20176-ER;<br>Case No. 2:18-bk-20178-ER;<br>Case No. 2:18-bk-20179-ER;<br>Case No. 2:18-bk-20180-ER;<br>Case No. 2:18-bk-20181-ER;<br><br>Chapter 11 Cases<br><br>Hon. Ernest M. Robles<br><br>Adversary No. _____.<br><br>**COMPLAINT FOR BREACH OF CONTRACT, PROMISSORY FRAUD, AND TORTIOUS BREACH OF CONTRACT (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)** |

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113905121\V-6

VERITY HEALTH SYSTEM OF CALIFORNIA, INC., a California nonprofit public benefit corporation, ST. VINCENT MEDICAL CENTER, a California nonprofit public benefit corporation, ST. VINCENT DIALYSIS CENTER, INC., a California nonprofit public benefit corporation, and ST. FRANCIS MEDICAL CENTER, a California nonprofit public benefit corporation, SETON MEDICAL CENTER, a California nonprofit public benefit corporation, and VERITY HOLDINGS, LLC, a California limited liability company; and

        Plaintiffs,

v.

KALI P. CHAUDHURI, M.D., an individual, STRATEGIC GLOBAL MANAGEMENT, INC., a California corporation, KPC HEALTHCARE HOLDINGS, INC. a California Corporation KPC HEALTH PLAN HOLDINGS, INC. a California Corporation, KPC HEALTHCARE, INC. a Nevada Corporation, KPC GLOBAL MANAGEMENT, LLC, a California Limited Liability Company, and DOES 1 through 500,

        Defendants.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Plaintiffs Verity Health System of California, Inc. ("VHS"), St. Vincent Medical Center and its wholly-owned subsidiary ("collectively, St. Vincent"), St. Vincent Dialysis Center, Inc., St. Francis Medical Center ("St. Francis"), Seton Medical Center ("Seton," and together with St Francis and St. Vincent, the "Plaintiff Hospitals" or the "Hospitals"), and Verity Holdings, LLC ("Verity Holdings"), and the above-captioned debtors (collectively, the "Debtors" or "Plaintiffs"), for their Complaint against Kali P. Chaudhuri, M.D., Strategic Global Management, Inc., KPC Healthcare Holdings, Inc., KPC Health Plan Holdings, Inc., KPC Healthcare, Inc., and KPC Global Management, LLC (the foregoing also doing business as the KPC Group), and DOES 1 through 500 (collectively, "Defendants"), allege as follows:

113905121\V-6

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## PRELIMINARY STATEMENT

This case arises from breach of contract and intentional, misleading conduct by Defendants designed to wrongfully and fraudulently lock Plaintiffs into that certain asset purchase agreement (the "APA")[1] for the sale of four hospitals under the auspices of a Bankruptcy Court order, with which Defendants had no intention of complying.  The Debtors expended tremendous human resources, time and effort with respect to the sale, while incurring significant additional expense performing under the APA and diligently preparing for a closing of the sale for nearly a year.  During that time, the Plaintiffs suffered and were encouraged to sustain daily operating losses of $450,000.  Once all contingencies precedent to close under the APA were satisfied, waived or passed, Defendants repeatedly defaulted under the APA and refused to close the sale, levied factually meritless and legally irrelevant accusations against Plaintiffs, and sought to coerce Plaintiffs into a re-trade at a substantially lower purchase price.  Along the way, Defendants also violated the Bankruptcy Court's orders requiring them to close the sale and failed to even file a motion for stay of the orders before violating each of them.

Plaintiffs are informed and believe that Defendants had demanded conditions precedent to close the APA that Defendants had concluded imposed conditions that the Plaintiffs could never satisfy, irrespective of whether they were necessary.  In particular, it now appears that Defendants never anticipated that Plaintiffs would obtain agreement from the Attorney General of California not to impose conditions on the sale transaction that materially differed from the conditions SGM developed and agreed to in Section 8.6 and Schedule 8.6 of the APA.  Rather, Defendants believed they would never be obligated to pay the full purchase price (comprised of a cash payment $610 million, plus cure costs and assumption of liabilities) and instead concluded they would eventually be positioned to either walk away from the transaction or coerce the Plaintiffs into a re-trade at a significantly lower purchase price.  In the meantime, Plaintiffs were obligated to continue operating the Plaintiff Hospitals at significant losses and were precluded from attempting to sell the Plaintiff Hospitals to anyone other than SGM.

Defendants' conduct was calculated, intentional, fraudulent and callous, designed to take

---

[1] [Docket No. 1279 (Ex. A), as subsequently amended by Docket No. 2305-1, and attached hereto as Exhibit "A" and incorporated herein by this reference.]

113905121\V-6

1    advantage of the Plaintiffs' good faith desire to ensure that the hospitals were sold to a purchaser who

2    would keep them open, in order to continue providing critical access to health care in low income

3    communities and jobs to thousands of employees.  Defendants must be held accountable for the

4    substantial damage they have caused to the Plaintiffs, the Hospitals, and their estates.

5

6                                    **JURISDICTION AND VENUE**

7        1.      The Bankruptcy Court has jurisdiction over this adversary proceeding (the "<u>Action</u>"),

8    pursuant to 28 U.S.C. §§ 157 and 1334.

9        2.      The Action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O).

10       3.      The Action concerns an asset purchase agreement (defined as the APA below) executed

11   by SGM, which states, in relevant part, as follows:

12               12.3  <u>Governing Law; Venue</u>.  This Agreement shall be construed,
13           performed, and enforced in accordance with, and governed by, the laws
             of the State of California (without giving effect to the principles of
14           conflicts of laws thereof), except to the extent that the laws of such State
             are superseded by the Bankruptcy Code or other applicable federal law.
15           For so long as Sellers are subject to the jurisdiction of the Bankruptcy
             Court, the parties irrevocably elect, as the sole judicial forum for the
16           adjudication of any matters arising under or in connection with the
             Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy
17           Court.  The parties hereby consent to the jurisdiction of such court and
             waive their right to challenge any proceeding involving or relating to this
18           Agreement on the basis of lack of jurisdiction over the Person or forum
             non conveniens.

19       4.      Venue is proper pursuant to 28 U.S.C. § 1409 because the Action arises in, and is related

20   to, the above captioned bankruptcy cases (the "<u>Bankruptcy Cases</u>") pending in the United States

21   Bankruptcy Court of the Central District of California, Los Angeles Division (the "<u>Bankruptcy Court</u>").

22       5.      Plaintiffs consent to the entry of final orders or judgments by the Bankruptcy Court even

23   if it is determined that, absent consent of the parties, the Bankruptcy Court cannot enter final orders or

24   judgments in this proceeding.

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113905121\V-6

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**THE PARTIES**

Plaintiffs

6.      The Debtor and Plaintiff VHS is a California nonprofit public benefit corporation located at 601 S. Figueroa, Suite 4050, Los Angeles, California, and the sole corporate member of Plaintiff Hospitals.

7.      The Debtor and Plaintiff St. Vincent is a California nonprofit public benefit corporation located at 2131 West Third Street in Los Angeles, California, doing business in the County of Los Angeles, and providing hospital and ancillary medical services on an inpatient and outpatient basis, including dialysis services.

8.      The Debtor and Plaintiff St. Francis is a California nonprofit public benefit corporation located at 3630 East Imperial Highway in Lynwood, California, doing business in the County of Los Angeles providing hospital and ancillary medical services on an inpatient and outpatient basis.

9.      The Debtor and Plaintiff Seton is a California nonprofit public benefit corporation with two hospitals located at 1900 Sullivan Avenue in Daly City, California and at 600 Marine Boulevard, Moss Beach, California, each doing business in the County of San Mateo providing hospital and ancillary medical services on an inpatient and outpatient basis.

10.     The Debtor and Plaintiff Verity Holding is a California limited liability company, located at 1850 Sullivan Avenue in Daly City, California.  Verity Holdings was created in 2016 to hold and finance VHS' interests in medical office buildings whose tenants are primarily physicians, medical groups, healthcare providers, and certain of VHS' hospitals.

Defendants

11.     Defendants own and/or manage seven hospitals in Southern California, including Victor Valley Global Medical Center (Victorville, CA), Hemet Valley Medical Center (Hemet, CA), Menifee Valley Medical Center (Sun City, CA), Orange County Global Medical Center (Santa Ana, CA), South Coast Global Medical Center (Santa Ana, CA), Chapman Global Medical Center (Orange, CA), and Anaheim Global Medical Center (Anaheim, CA).

12.     Plaintiffs are informed and believe that Defendant Strategic Global Management, Inc. ("SGM") is a California corporation in which Chaudhuri is the majority (or sole) shareholder.  SGM is

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

the acquisition arm of the other Defendants for the SGM Sale (as defined below).  According to filings with the California Secretary of State, dated August 12, 2016 and July 2, 2019, Chaudhuri is also the Chief Executive Officer and sole Director of SGM.  William Thomas is listed in those same corporate filings as SGM's Secretary.  SGM's corporate headquarters is located at 9 KPC Parkway, Suite 301, in Corona, CA.

13.  Defendant Kali P. Chaudhuri, M.D. ("Chaudhuri") is an individual who is a resident of Hemet, California.  According to thekpcgroup.com:

> Dr. Kali Pradip Chaudhuri, the Chairman and Founder of the KPC Group of Companies, has reached an unprecedented level of success through extraordinary vision, acute entrepreneurial spirit and relentless hard work. The KPC Group is engaged in numerous businesses around the world serving diverse industries such as healthcare services and facilities, pharmaceutical and biotechnology, education, real estate, infrastructure development, agriculture, architecture and engineering, alternative energy, waste management, travel services and information technology.

> * * *

> Dr. Chaudhuri diversified his quest for progress in many business verticals while enhancing his footprint in the healthcare services and facilities industry.  During the last four months of 2010, Dr. Chaudhuri and his group acquired a $70 million note on four hospitals in California including Western Medical Center in Santa Ana, Western Medical Center in Anaheim, Chapman Medical Center and Coastal Communities Hospital in Orange County.  In addition, Dr. Chaudhuri successfully acquired two hospitals: Hemet Valley Medical Center and Menifee Valley Medical Center for $172 million.  His latest hospital acquisition includes Victor Valley Community Hospital in Victorville, California.

> A real estate entrepreneur with widely diversified property acquisitions worldwide, Dr. Chaudhuri has enhanced his footprint significantly over the last several years.  The KPC Group has been contracted to execute the prestigious "City of Corona Redevelopment" project – worth $ 1.8 billion over a period of several years.  The Group has acquired the multi-million dollar high profile 300,000 SF commercial complex in Corona, California and named it KPC Summit.  In addition, Dr. Chaudhuri and his group are currently engaged in the development and construction of more than 3.3 million sq. ft. of commercial real estate comprising of hotels, resorts, apartments, old age homes and educational institutions.

14.  Plaintiffs are informed and believe that Defendant KPC Healthcare Holdings, Inc. is a California corporation in which Chaudhuri is the majority (or sole) shareholder.  According to filings with the California Secretary of State, dated July 18, 2019, Chaudhuri is the Chief Executive Officer of KPC Healthcare Holdings.  William Thomas is listed in those same corporate filings as KPC Healthcare

Holdings' Secretary.  Kali Priyo Chaudhuri, Chaudhuri's son, is listed in those same corporate filings as KPC Healthcare Holdings' Chief Financial Officer.  KPC Healthcare Holdings' corporate headquarters is located at 9 KPC Parkway, Suite 301, in Corona, CA, on the same campus as its hospital, Orange County Global Medical Center.

15.    Plaintiffs are informed and believe that Defendant KPC Healthcare, Inc. is a Nevada corporation in which Chaudhuri is the majority (or sole) shareholder and which has qualified to do business in California and is doing business in California.  According to filings with the California Secretary of State, dated July 20, 2018, Peter Baronoff is the Chief Executive Officer of KPC Healthcare, Inc.  William Thomas is listed in those same corporate filings as KPC Healthcare, Inc.'s Secretary.  KPC Healthcare, Inc.'s corporate headquarters is located at 1301 North Tustin Avenue in Santa Ana, CA.

16.    Plaintiffs are informed and believe that Defendant KPC Health Plan Holdings, Inc. ("KPC Health Plan") is a California corporation in which Chaudhuri is the majority (or sole) shareholder.  According to filings with the California Secretary of State, dated August 17, 2018, Chaudhuri is also the Chief Executive Officer and sole Director of KPC Health.  William Thomas is listed in those same corporate filings as KPC Health Plan's Secretary.  Kali Priyo Chaudhuri is listed in those same corporate filings as KPC Health Plan's Chief Financial Officer.  KPC Health Plan's corporate headquarters is located at 9 KPC Parkway, Suite 301, in Corona, CA.

17.    Plaintiffs are informed and believe that Defendant KPC Global Management, LLC ("KPC Global") is a California limited liability company located at 890 West Stetson Avenue in Hemet, California.  According to filings with the California Secretary of State, dated July 20, 2018, Chaudhuri is the sole manager or member of KPC Global.  KPC Global, KPC Healthcare Holdings, Inc., KPC Healthcare, Inc., and KPC Health Plan are referred to herein, collectively, as "KPC."

Alter Ego Allegations

18.    At all relevant times, as alleged more fully herein, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 7 -

and/or in furtherance of the joint venture. Each of the Defendant's acts alleged herein was done with the permission and consent of each of the other Defendants.

19.     Plaintiffs are informed and believe that, at all times relevant hereto, Defendants Chaudhuri and KPC were the alter egos of Defendant SGM, and there exists, and at all times herein mentioned has existed, a unity of interest and ownership between Defendants such that any separateness between them has ceased to exist in that Defendants Chaudhuri and KPC completely controlled, dominated, managed, and operated SGM to suit their convenience. Defendants operated as a single enterprise and should be treated as such.

20.     Specifically, without limitation and discussed below, Plaintiffs are informed and believe that Defendants Chaudhuri and KPC: (1) controlled the business and affairs of SGM, including any and all of their affiliates; (2) disregarded legal formalities and failed to maintain arm's length relationships among the corporate entities; (3) inadequately capitalized SGM; (4) used the same office or business location and employed the same employees for the corporate entities; (5) held Chaudhuri himself out as personally liable for the debts of the corporate entities; (6) used the corporate entities as a mere shells, instrumentalities or conduits for Chaudhuri and/or his individual businesses; (7) manipulated the assets and liabilities between the corporate entities so as to concentrate the assets in one and the liabilities in another; (8) used corporate entities to conceal their ownership, management and financial interests and/or personal business activities; and/or (9) used the corporate entities to shield against personal obligations, and in particular the obligations as alleged in this Complaint.

21.     At all times relevant thereto, Defendant SGM was not only influenced and governed by Defendants Chaudhuri and KPC, but there was such a unity of interest and ownership that the individuality, or separateness, of SGM, Chaudhuri and KPC has ceased. Defendants acted inequitably, such that adherence to the fiction of the separate existence of these entities and failure to recognize Defendants as alter egos of one another would, under these particular circumstances, sanction a fraud or promote injustice. Defendants on their website and in their public statements characterize themselves as a single enterprise and call themselves "The KPC Group." The KPC Group may include other entities and persons.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113905121\V-6

22.     Plaintiffs are ignorant of the true names or capacities of the defendants sued under the fictitious names Does 1 through 500, inclusive. Plaintiffs will amend this Complaint to allege the true names and capacities of these Does when they have been ascertained. Plaintiffs are informed and believe that each of the defendants designated as a Doe is responsible in some manner for the events and happenings herein alleged.

### Agency; Aiding and Abetting; and Conspiracy

23.     At all times relevant to this Complaint, Defendants, and each of them, were acting as the agents, employees, and/or representatives of each other, and were acting within the course and scope of their agency and employment with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

24.     As members of the conspiracies alleged more fully below, each of the Defendants participated and acted with or in furtherance of said conspiracy, or aided or assisted in carrying out the purposes of the conspiracy, and have performed acts and made statements in furtherance of the conspiracy and other violations of California and other applicable law.

25.     Each Defendant acted both individually and in alignment with the other Defendants with full knowledge of their respective wrongful conduct. As such, Defendants conspired together, building upon each other's wrongdoing, in order to accomplish the acts set forth in this Complaint.

26.     Defendants are individually sued as principals, participants, aiders and abettors, and co-conspirators in the wrongful conduct complained of and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

## **FACTUAL BACKGROUND**

### A.     **The Hospitals**

27.     As of August 31, 2018 (the "Petition Date"), VHS and its affiliated entities (collectively, the "Verity Health System"), including St. Vincent, St. Francis, and Seton, operated as an integrated nonprofit health care system, with approximately 1,680 inpatient beds, six active emergency rooms, a

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113905121\V-6

1  trauma center, eleven medical office buildings, and a host of medical specialties, including tertiary and

2  quaternary care.

3      28.    Debtor VHS, a California nonprofit public benefit corporation, is the sole corporate

4  member of five Debtor California nonprofit public benefit corporations, including (i) two that operated

5  O'Connor Hospital and Saint Louise Regional Hospital before they were sold to the County of Santa

6  Clara, and (ii) three that operate the Plaintiff Hospitals.

7      29.    St. Francis owns real property commonly known as: (i) 3630 E. Imperial Highway

8  Lynwood, CA 90262, including the patient tower and all of the facilities thereon; (ii) 2700 E. Slauson

9  Ave, Huntington Park, CA 90255, and the Huntington Park Medical Office Building thereon; and

10  (iii) 5953 S. Atlantic Blvd., Maywood, CA 90270, and the Maywood Medical Office Building thereon.

11      30.    St. Francis: (i) operates a 384 licensed bed, general acute care hospital located at 3630

12  East Imperial Highway in Lynwood, California; (ii) has an emergency department with 46 licensed

13  emergency treatment stations and is designated a Level II Trauma Center; (iii) has nine surgical

14  operating rooms and three cardiac catheterization labs for inpatient and outpatient cardiac

15  catheterization services; (iv) offers a comprehensive range of services, including emergency and trauma

16  care, neonatal intensive, cardiovascular, oncology, pediatrics, behavioral health, and maternity and child

17  services; and (v) offers various outpatient services, including ambulatory surgical services, laboratory

18  services, imaging services, infusion therapy, nuclear medicine services, respiratory therapy, and

19  physical therapy.  Other outpatient services are provided at the following clinics: Orthopedics Clinic,

20  Wound Care Clinic, Industrial Clinic, Lynwood Clinic, Downey Clinic, and Huntington Park Clinic.

21  St. Francis is accredited by The Joint Commission.

22      31.    As of the Petition Date, St. Francis employed approximately 2,017 employees, of which

23  1,583 were full-time, 136 were part time, and 298 were per diem.  St. Francis was incorporated in 1983

24  and is governed by a Board of Trustees.

25      32.    St. Vincent owns real property commonly known as:  (i) 2131 W 3rd Street, Los Angeles,

26  CA 90057, including the hospital and all of the facilities located thereon; and (ii) vacant land in Salton

27  Sea, California.  St. Vincent was founded as the first hospital in Los Angeles in 1856.  In 1971, a new

28  facility was constructed at St. Vincent's current location at 2131 West Third Street, Los Angeles, CA

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

90057.  It has expanded to a 366 licensed bed, regional acute care, tertiary referral facility, specializing in cardiac care, cancer care, total joint and spine care, and multi-organ transplant services. St. Vincent serves both local residents and residents from Los Angeles, San Bernardino, Riverside, and Orange Counties.  As a provider of healthcare services for a high percentage of elderly patients, many of the St. Vincent Medical Center's services and programs are focused on the treatment of various chronic diseases.

33.     As of the Petition Date, St. Vincent employed approximately 1,099 employees, of which 897 were full-time, 42 were part time and 160 were per diem.

34.     Seton operates two distinct medical facilities: Seton Medical Center and Seton Medical Center Coastside.  The Seton Medical Center and Seton Medical Center Coastside locations share a consolidated license.  Seton Medical Center owns (i) real property commonly known as 1900 Sullivan Avenue, Daly City, CA 94015, and the hospital and the facilities thereon (the "Daly Property"), and (ii) an employee parking lot on the Daly Property.  Seton Medical Center was originally founded as Mary's Help Hospital by the Daughters of Charity of St. Vincent De Paul in 1893.  The original facility was destroyed in the San Francisco Earthquake of 1906, and by 1912, Mary's Help Hospital reopened a new facility in San Francisco.  In 1965, the hospital was moved to its current location at 1900 Sullivan Avenue in Daly City.  The hospital was renamed Seton Medical Center in 1983, is currently licensed for 357 beds and serves residents from San Francisco and San Mateo areas.  Seton has an emergency department with 18 licensed treatment stations.  It also has 13 surgical operating rooms and three cardiac catheterization labs. Of the hospital's 83 licensed skilled nursing beds, 39 are in suspense, and the remaining 44 beds are utilized as subacute care beds.  Additionally, the hospital has 24 licensed acute psychiatric beds which have been placed in suspense.  The hospital has a broad spectrum of medical services, including cancer, cardiac, emergency, surgical, rehabilitation, respiratory, orthopedic, and sub-acute care.  The hospital is accredited by The Joint Commission.

35.     Seton also operates a location doing business as Seton Medical Center Coastside ("Seton Coastside") located at 600 Marine Blvd, Moss Beach, CA 94038.  Seton Coastside is not a separate legal entity from Seton Medical Center.  Seton Coastside was founded as Moss Beach Rehabilitation Hospital in 1970.  In 1980, the City of Half Moon Bay acquired ownership of the hospital and signed

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    an agreement for Daughters of Charity to manage operations of the hospital and rename it St. Catherine's

2    Hospital.  In 1993, St. Catherine's Hospital became Seton Coastside when it became integrated with

3    Seton Medical Center.  Today, Seton Coastside is licensed for 116 skilled nursing beds and five general,

4    acute-care beds.  Seton Coastside also operates the only 24-hour "standby" Emergency Department

5    along the 55-mile stretch between Santa Cruz and Daly City.  Under a consolidated license, Seton

6    Medical Center and Seton Coastside share the same Board of Directors, executive leadership team,

7    charity care policies, and union collective bargaining agreements.

8        36.    As of the Petition Date, Seton Medical Center and Seton Coastside employed

9    approximately 1,340 employees, of which 516 were full-time, 551 were part time and 273 were per

10   diem.

11       37.    The Plaintiff Hospitals have been operating and serving their communities for many

12   decades.  Since 1995, the Plaintiff Hospitals have incurred substantial operating losses.  Efforts were

13   made over many years to find a solution which would resolve the operating losses, either through a sale

14   of some or all of the Plaintiff Hospitals, or a merger with a more financially sound partner.  Despite

15   continuous efforts to improve operations, operating losses continued to plague the health system due to,

16   among other things, mounting labor costs, low reimbursement rates and the ever-changing healthcare

17   landscape.

18       **B.    The Bankruptcy Cases**

19       38.    On the Petition Date, the Debtors and certain related entities filed a voluntary petition

20   for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[2]  The

21   Bankruptcy Cases are jointly administered under Lead Case No.  2:18-bk-20151-ER [Docket No. 17].

22       39.    In connection with the Bankruptcy Cases, the Debtors initiated a process to sell

23   substantially all of their assets.  To that end, the Debtors' investment banker, Cain Brothers, a division

24   of KeyBanc Capital Markets ("Cain"), prepared a Confidential Investment Memorandum (the "CIM")

25   and organized an online data site to share information with potential buyers, and contacted over 110

26

27   _____

     [2] All references to "§" or "section" herein are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq*., as

28   amended.

113905121\V-6

strategic and financial buyers beginning in July 2018 to solicit their interest in exploring a transaction regarding the Debtors.

40.    By August 2018, as a result of its ongoing and broad marketing process, Cain had received 11 Indications of Interest ("IOI").  Postpetition Cain continued to market the assets.  Each potential buyer was given access to the data room and conducted its due diligence.  Upon request, the Debtors provided each interested party with tours of the facilities and the opportunity to discuss operations with senior leadership.  The Debtors, in consultation with Cain and its other advisors, selected SGM to be the stalking-horse bidder based on its offer to acquire the Purchased Assets for a purchase price (the "Purchase Price") that consisted of a cash payment in the amount $610,000,000, plus assumption of certain liabilities, and payment of cure costs associated with any assumed leases, contracts and assumption of other obligations.  *See* APA, Section 1.1.  The Debtors selected SGM in reliance on Defendants' representations and inducements.

41.    The SGM offer, dated August 13, 2018, was issued on letterhead that included the KPC logo.  The offer letter stated in relevant part as follows:

> Strategic Global Management, Inc. ("SGM" or "Strategic") is a venture company used to acquire assets and businesses, through companies which are affiliated or associated (through common ownership and otherwise) with SGM, but which are not subsidiaries of SGM.  SGM and its associated and affiliated companies (collectively, the "SGM Companies") currently own, operate and/or manage several healthcare companies, including seven hospitals in Riverside, San Bernardino and Orange County, California.  The SGM Companies also own and operate various ancillary providers, including without limitation, skilled nursing facilities, recovery centers, rehabilitation centers, diagnostic companies, surgery centers, urgent care and home health providers and others.  In addition, SGM is affiliated with three medical groups and one IPA providing care to over 85,000 commercial equivalent members in Southern California.  The SGM Companies also operate a medical college, nursing college and nutritional college and related operations in India.
>
> Consistent with the manner in which the SGM has structured other acquisitions and consistent with lender requirements for special purpose borrowing entities, SGM would cause this proposed acquisition to be accomplished through one or more special purpose acquisition entities, which would be fully and adequately funded.
>
> Hospitals affiliated with SGM ("SGM Hospitals") include the following:
>
> Victor Valley Global Medical Center ("VVGMC") is a safety net provider located in Victorville.  It is one of the largest providers of Medi-Cal

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Managed Care through an Inland Empire Health Plan ("IEHP") contract in the High Desert. It was acquired from a non-profit out of bankruptcy in 2012. It has faithfully satisfied all of the Attorney General's five-year conditions for approval of the transaction.

Physicians for Healthy Hospitals ("PHH") acquired Hemet Valley Medical Center and Menifee Valley Medical Center, as well as a skilled nursing facility, Hemet Valley Recovery Center, and a nationally respected inpatient and outpatient chemical dependency center, Hemet Valley Recovery Center and Sage Retreat, from Valley Health System, a district hospital system, out of bankruptcy in 2010.

KPC Healthcare, Inc. ("KPC Health") owns and, through subsidiaries, operates Anaheim Global Medical Center ("Anaheim"), Chapman Global Medical Center ("Chapman"), Orange County Global Medical Center ("OC") and South Coast Global Medical Center "South Coast"), which are all safety net providers. Orange County Global Medical Center is a key Level II Trauma center located in central Orange County. All four facilities have contracts for Medi-Cal Managed Care through a Cal-OPTIMA contract. Pursuant to contracts with the County of Orange, Anaheim is the primary provider of behavioral health services and correctional health services for the County.

We are proud of the SGM Hospitals' accomplishments under SGM's stewardship. Some of the key accomplishments are as follows:

- All SGM Hospitals service large economically depressed populations with significant medical needs.

- All SGM hospitals were in danger of closing if SGM did not assume ownership.

- When VVGMC was acquired out of bankruptcy in 2012, many of its services were closed or suspended. In the first year of SGM operations, the laboratory that was closed by CLIA was reopened for all services, including microbiology and is fully accredited. The diagnostic cardiac catheterization lab was taken out of suspension and new modifications are being done to bring it up to standards for interventional work. The NICU and GI laboratory were taken out of suspension and reopened.

- VVGMC received full Joint Commission accreditation for the first time in 2014. It currently also maintains accreditation through the Health Facilities Accreditation Program. It is the only facility in the High Desert that is dual accredited.

- VVGMC financial performance has improved from a pre-acquisition monthly loss of $500,000 to positive EBITDA within six months.

- VVGMC is the largest Medi-Cal provider in the High Desert area and the largest provider for IEHP.

- The PHH facilities, which pre-acquisition had annual losses in excess of $6,000,000, have generated positive EBITDA since their acquisition.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- KPC Health has been sold to an Employee Stock Ownership Plan ("ESOP") and now operates for the benefit of its employees but remains managed by SGM affiliates under a long-term agreement. The KPC Health facilities have been consistently profitable under SGM management.

42.    On December 3, 2018, Mr. Thomas provided to James Moloney of Cain a letter regarding the asserted availability of certain liquidity (the "Letter") from Chaudhuri. ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████

43.    On December 14, 2018, a meeting was held between numerous representatives of "KPC Group," including, but not limited to, Chaudhuri and Peter Baronoff, Verity's CEO Richard Adcock, and the Debtors' investment bankers, James Moloney and Carsten Beith of Cain, to discuss St. Francis, St. Vincent, Seton, Seton Coastside, and Defendants' proposal to acquire them.

44.    The Debtors, in consultation with Cain and its other advisors, selected SGM to serve as the stalking-horse bidder based on its offer to acquire the Hospitals at the Purchase Price. On January 8, 2019, SGM executed the APA to acquire the Plaintiff Hospitals and related assets for the Purchase Price.

45.    If Defendants had indicated that they were not serious about closing, or would not be able to close the Sale transaction in accordance with the APA at the Purchase Price, then Plaintiffs would have pursued other options for the sale and disposition of these assets and reduced ongoing operational losses.

46.    The APA is incorporated herein by reference. The APA provided, in relevant part, as follows:

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1.12   <u>Disclaimer of Warranties; Release</u>.  (b) Purchaser further acknowledges that the representations and warranties of Sellers contained in ARTICLE 2 of this Agreement are the sole and exclusive representations and warranties made by Sellers to Purchaser (including with respect to the Hospitals, the Assets and the Assumed Obligations) and shall expire, and be of no further force or effect after January 8, 2019 (the period from the Signing Date until January 8, 2019, the "Final Diligence Period") [.]

\*      \*      \*

3.6    <u>Representations of Sellers</u>. Purchaser acknowledges that it is purchasing the Assets on an "AS IS, WHERE IS" basis (as more particularly described in Section 1.12), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of any Seller other than as <u>expressly</u> set forth in this Agreement. Purchaser further acknowledges that no Seller is making any representations or warranties herein relating to the Assets or the operation of the Hospital on and after the Effective Time.

\*      \*      \*

3.8.   <u>No Knowledge of a Seller's Breach</u>.  Neither Purchaser nor any of its affiliates has knowledge of any breach of any representation or warranty by any Seller or of any other condition or circumstance that would give Purchaser a right to terminate this Agreement pursuant to Section 9.1(c). If information comes to Purchaser's attention on or before the Closing Date (whether through a Seller or otherwise and whether before or after the Signing Date) which indicates that Sellers have breached any of its representations and warranties under this Agreement, then the effect shall be as if the representations and warranties had been modified in this Agreement in accordance with the actual state of facts existing prior to the Effective Time such that there will be no breach under Sellers' representations and warranties in relation to such information; provided, however, that Purchaser must immediately notify Sellers if any such breach comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Sellers shall constitute a waiver by Purchaser of Sellers' breach, if any, of any representation or warranty. If any such information comes to Purchaser's attention on or before the Closing Date (whether through a Seller or otherwise, including through updated schedules, and whether before or after the Signing Date) that would give Purchaser a right to terminate this Agreement pursuant to Section 9.1(c), Purchaser must immediately notify Sellers if any such information comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Sellers shall constitute a waiver of such right in relation to the relevant breach.

\*      \*      \*

3.9    <u>Ability to Perform</u>. Purchaser has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

113905121\V-6

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

\*      \*      \*

3.11.   <u>Investigation</u>.  Purchaser has been afforded reasonable access to, and has been provided adequate time to review, the books, records, information, operations, facilities and personnel of each Seller and the Hospital for purposes of conducting a due diligence investigation of each Seller and the Hospital. Purchaser has conducted a reasonable due diligence investigation of each Seller and the Hospital and has received satisfactory answers to all inquiries it has made respecting each Seller and the Hospital and has received all information it considers necessary to make an informed business evaluation of each Seller and the Hospital. In connection with its due diligence investigation of each Seller and the Hospital, Purchaser has not relied upon any books, records, information, operations, facilities and personnel provided by any Seller, including in making its determination to enter into this Agreement and/or consummate the transactions contemplated hereby.

\*      \*      \*

12.14  <u>Entire Agreement</u>. This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "Superseded Agreements"), which Superseded Agreements shall be of no further force or effect; provided, that notwithstanding the foregoing, the letter Confidentiality Agreement dated July 12, 2018 between Purchaser and Cain Brothers, a division of KeyBanc Capital Markets Inc., on behalf of Sellers and their related entities shall not be a Superseded Agreement and shall continue in full force in effect in accordance with its terms schedules, and the documents referred to in this Agreement contain the entire understanding.

**C.**     **The SGM Sale**

47.     On January 17, 2019, the Debtors filed the Debtors' *Motion for the Entry of (I) an Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and For Prospective Overbidders to Use, (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections, (3) Approving Form of Notice to be Provided to Interested Parties, (4) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest Bidder and (5) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and (II) an Order (A) Authorizing the Sale of Property Free and Clear of All Claims, Liens and Encumbrances* (the "<u>Sale and Bidding Procedures Motion</u>") [Docket No. 1279].

113905121\V-6

48.     On February 6, 2019, the Bankruptcy Court held a hearing on the approval of the APA.

During that hearing, Gary Klausner, counsel for SGM, stated on the record to the Bankruptcy Court:

> [L]et me tell you a little bit about Strategic Global, which is an affiliate of a larger organization called The KPC Group.
>
> Starting in 2007 I was representing an entity called Valley Health System, which was a healthcare district, in a Chapter 9 case that was in Riverside County in front of Judge Peter Carroll. During the course of that case, the board of trustees decided that the best course of action to take was for the district to sell the three hospitals it was then operating.
>
> So, we went through a sale process, and an entity that's affiliated with KPC called PHH, was Physicians for Healthy Hospitals, was the successful bidder. We had a contested confirmation hearing where there was a competing bidder who was arguing against our plan and against the sale. Ultimately, Judge Carroll approved our Chapter 9 plan of adjustment and he approved the sale.
>
> PHH, the affiliate of the KPC Group, then went ahead and closed the sale, and has continued to operate those facilities and has turned them around successfully.
>
> I also had occasion to work with the KPC people in connection with the Victor Valley Chapter 11 case, in which Mr. Maizel was debtor's counsel. I represented the KPC Group that was a purchaser. And in that case, there was another purchaser there. The sale went up for approval to the Attorney General. The Attorney General turned them down. We were then the backup bidder. We stepped forward.
>
> My client went ahead and closed that transaction. By the way, the Valley Health transaction was in excess of $100,000,000. I don't remember the exact number of Victor Valley. But in that case, your Honor, our client did close that transaction. Our client was approved by the Attorney General. Our client successfully met all of the conditions that the Attorney General had set forth.
>
> Our client also was involved in the purchase of two troubled Orange County hospitals, which it not only turned around, but in 2015, again, the affiliate of KPC Group, sold those hospitals to four employee stock ownership plans, ESOP's. And I believe it was the first acute care hospital system in the United States to be wholly owned by the employees. And KPC continues to operate those facilities.
>
> The point of all this being, that our client is very familiar with not only the ownership and management of hospitals in Southern California, but has a very good track record with the Attorney General's office.

[Transcript of February 6, 2019 Hearing at 13:2-14:22.]

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113905121\V-6

49.     During the hearing on February 6, 2019, Mr. Klausner made clear that the purpose of the evaluation period (the "Evaluation Period") under the APA was to prevent SGM from being required to close the sale if there was a risk that the Supplemental Sale Order could be overturned on appeal.  SGM further admitted that it would be required to close the sale if the Supplemental Sale Order became final and nonappealable.  Specifically, Mr. Klausner stated:  "If the Debtor can get us a final, non-appealable order, meaning that if there's an appeal, it gets resolved in the Debtor's favor or maybe gets dismissed, at that point we will be obligated to close the transaction, as long as all the other conditions to closing have been satisfied."  [Transcript of February 6, 2019 Hearing at 20:7–21:6.]

50.     On February 19, 2019, the Bankruptcy Court held a hearing on the Sale and Bidding Procedures Motion and certain changes to the APA were set forth on the record.  Thereafter, the Bankruptcy Court entered an order approving the Sale and Bidding Procedures Motion (the "Bidding Procedures Order") [Docket No. 1572].  Among other things, the Bankruptcy Court approved the APA, as amended, and SGM as the stalking-horse bidder, as set forth in the Bidding Procedures Order.

51.     On March 11, 2019, Mr. Thomas sent an email to the Debtors' investment banker, James Moloney of Cain, requesting permission to populate "KPC's dataroom with Verity's confidential information" in order to provide "KPC's potential financing partners" with access to such information.

52.     After the marketing process with respect to the Plaintiff Hospitals, there were two "Qualified Bidders" (as defined in the Bidding Procedures Order, Docket No. 1572) for partial bids for different Hospitals (one for St. Vincent and one for St. Francis) and no Qualified Full Bid.  After consultation with the Consultation Parties (as defined in the Bidding Procedures Order), the Debtors determined to not conduct either a Partial Bid or Full Bid auction, as set forth in the *Notice That No Auction Shall Be Held Re Debtors' Motion and Motion for the Entry of (I) An Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and for Prospective Overbidders; (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections; (3) Approving Form of Notice to Be Provided to Interested Parties; (4) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest Bidder; and (5) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and (II) an Order (A) Authorizing the Sale of Property Free and Clear of All Claims, Liens and Encumbrances* [Docket No. 2053] filed

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 19 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

by the Debtors on April 4, 2019.  Accordingly, under the terms of the APA and the Bidding Procedures Order, no auction was held and the Debtors declared SGM the "winning bidder" of the Plaintiff Hospitals.

53.    On May 2, 2019, after briefing and a hearing, the Bankruptcy Court entered the *Order (A) Authorizing The Sale Of Certain Of The Debtors' Assets To Strategic Global Management, Inc. Free And Clear Of Liens, Claims, Encumbrances, And Other Interests; (B) Approving The Assumption And Assignment Of An Unexpired Lease Related Thereto; And (C) Granting Related Relief* [Docket No. 2306] (the "Sale Order"), approving the sale to SGM pursuant to the APA (the "SGM Sale").

54.    The Sale Order is incorporated herein by reference, and provides, in relevant part:

> In accordance with the APA, concurrently with the Closing, SGM shall pay that portion of the Purchase Price due at Closing, by wire transfer of immediately available funds, to Debtors' Escrow Deposit Accounts (defined below), subject to the adjustments set forth in the APA.  Any direct expenses of the Sale shall be disclosed by Debtors to the DIP Agent, the Prepetition Secured Creditors, and the Committee in advance of the Closing.

[*Id.* at 15:10-14.]

55.    On May 17, 2019, Chaudhuri filed an Early Termination Notice with the Federal Trade Commission regarding the SGM Sale.  The filing lists the "Acquiring Party" as "Kali P. Chaudhuri, trustee," and the "Acquired Party" as "Verity Health System of California, Inc."

56.    Defendants thereafter described the SGM Sale on their websites as an acquisition by KPC and Chaudhuri.  For example, kpcgroup.com describes the transaction as follows:

> KPC Health, a Santa Ana, California-based healthcare company, announced Wednesday that **a federal bankruptcy judge approved the $610 million purchase** of four hospitals owned by financially-troubled Verity Health System.

> KPC Health will take ownership of St. Francis Medical Center, St. Vincent Medical Center, Seton Medical Center, and Seton Coastside in Moss Beach.  The company also acquired St. Vincent Dialysis Center as part of the deal. [. . .]

> "Today marks an important milestone for KPC Health's bid to acquire four Verity Health hospitals," Dr. Kali P. Chaudhuri, chairman of KPC Health, said in a statement.  "We look forward to working with Verity Health on a successful acquisition and welcoming these important community hospitals into our integrated healthcare system."

- 20 -

113905121\V-6

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

The acquisition of four Verity Health hospitals adds to KPC Health's seven acute care hospitals in southern California as well as seven long-term acute care hospitals and two skilled nursing facilities in multiple states.[3]

57.    Likewise, kpchealth.com states the following regarding the Sale:

KPC Group founder Kali Chaudhuri is attempting to do what a private capital firm, a nonprofit charity, and Los Angeles' wealthiest person couldn't—turn around a struggling regional hospital system.

The Business Journal reported last month that Chaudhuri's KPC planned to pay $610 million to acquire assets of bankrupt Verity Holdings LLC, a Redwood City-based firm that owned four hospitals—including Lynwood's St. Francis Medical Center, a 384-bed trauma center in L.A. County—and a nursing facility.

Chaudhuri's plan to revitalize those facilities may be to give the unionized workers a chance to own part of the hospital, something he's done with other hospitals he turned around in Orange County.

"I came to America with $8 in my pocket," Chaudhuri told the Business Journal.   "The reason I work hard in America is because I own my own business, and our employees will work hard because they are owners."

The ownership plan for Verity won't immediately be available, as KPC will initially focus on restructuring.[4]

58.    Plaintiffs are informed and believe that SGM had concluded that the APA imposed conditions that the Plaintiffs could never satisfy (i.e., conditions to closing).  In particular, it now appears that SGM never anticipated the Debtors would obtain agreement from the Attorney General not to impose conditions on the sale transaction that materially differed from the conditions SGM developed and set forth in Section 8.6 and Schedule 8.6 of the APA.  Accordingly, it now appears that SGM believed that it would never be obligated to pay the full Purchase Price under the APA, and instead believed that it would eventually be positioned to either walk away from the transaction or coerce the Debtors to submit to a significantly lower purchase price.  In the meantime, Plaintiffs were obligated to continue operating the Plaintiff Hospitals at a daily estimated loss of $450,000 and were precluded from attempting to sell the Plaintiff Hospitals to anyone other than SGM.   Particularly egregious is

---

[3] http://thekpcgroup.com/2019/04/20/kpc-wins-bid-for-verity-hospitals/
[4] http://kpchealth.com/kpc-chaudhuri-aims-for-kaiser-like-integration/

113905121\V-6

1   Defendants' seeming belief that Plaintiffs would be forced to accept a lower purchase price because of

2   Plaintiff's averred dedication to ensuring all Plaintiff Hospitals remained open and operating.

3       **D.    Plaintiffs Devote Substantial Time and Resources In Reliance On The Sale.**

4       59.    Plaintiffs expended tremendous time, expenses and resources to prepare for and close

5   the SGM Sale in reliance on the APA and the Sale Order.  Those efforts included but are by no means

6   limited to the efforts described below.

7       60.    Transfer of Operations.  The transfer of operations for the Hospitals and related

8   regulatory approval presents an enormous undertaking, and consumed thousands of hours on the part of

9   Plaintiffs and their advisors.  By way of example: (i) Plaintiffs sent "WARN notices" to approximately

10  4,900 employees, pursuant to the federal Worker Adjustment and Retraining Notification Act of 1988,

11  at three different times, as KPC continued to postpone the "closing date"; (ii) thousands of

12  counterparties to executory contracts and unexpired leases, including physicians, relied on the Sale

13  Order and continued to provide services in reliance on the finality of that Sale Order; (iii) Plaintiffs

14  spent months facilitating an efficient close of the sale, with approximately 20 different workstreams,

15  meeting at least weekly with employees of KPC to ensure a smooth transition of operations and

16  continued care of patients; (iv) government agency personnel, including the California Department of

17  Public Health and the Board of Pharmacy, diligently undertook to process SGM's change of ownership

18  applications for licenses and permits in reliance on the finality of the Sale Order; (v) the Attorney

19  General's office conducted a lengthy review process, including review of the Application (as defined

20  below) and multiple hearings; (vi) Plaintiffs and each of their six unions spent months successfully

21  negotiating and finalizing modified collective bargaining agreements; (vii) the medical groups affiliated

22  with Plaintiffs sent termination notices to their remaining physicians; (viii) Plaintiffs coordinated

23  changes in insurance coverages and insurance policies to ensure seamless coverage for employees and

24  patients; and (ix) Plaintiffs created plans to shut off certain services after the close of the SGM Sale.

25      61.    Chapter 11 Plan.  On September 3, 2019, the Debtors filed the Debtors' Chapter 11 Plan

26  of Liquidation (Dated September 3, 2019 [Docket No. 2993] (the "Plan")) and their related disclosure

27  statement [Docket No. 2994] (the "Disclosure Statement").  As more fully described in the Disclosure

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 22 -

113905121\V-6

1    Statement, the Debtors' Plan provided for, among other things, deemed substantive consolidation and

2    the distribution of proceeds from certain sale transactions, including the SGM Sale.

3         62.    <u>Cash Collateral Agreement.</u>    On September 6, 2019, the Court granted the Debtors'

4    motion to use cash collateral [Docket No. 2962, 2968] and entered *the Final Order (A) Authorizing*

5    *Continued Use of Cash Collateral, (B) Granting Adequate Protection, (C) Modifying Automatic Stay,*

6    *and (D) Granting Related Relief* [Docket No. 3022] (the "<u>Supplemental Cash Collateral Order</u>").  The

7    Supplemental Cash Collateral Order authorized the Debtors' consensual use of cash collateral pursuant

8    to an agreement with certain of its secured lenders (the "<u>Cash Collateral Agreement</u>").  Pursuant to the

9    Cash Collateral Agreement, the Debtors were obligated to meet certain milestones, including

10    confirmation of the Debtors' plan by December 15, 2019 an effective date on or before December 31,

11    2019.

12         63.    <u>Attorney General Approval.</u>    One of the conditions to closing under the APA was (i) the

13    approval by the Attorney General Of California (the "<u>Attorney General</u>"), pursuant to California

14    Corporations Code § 5914 and title 11 of the California Code of Regulations, § 999.5, and (ii) that the

15    Attorney General did not impose any conditions that were "materially different" that those set forth in

16    Schedule 8.6 to the APA.  Under Section 8.6 of the APA, the APA also provided that SGM "shall

17    reasonably cooperate in any efforts to render the Supplemental Sale Order a final, non-appealable

18    order."

19         64.    Plaintiffs undertook tremendous efforts to secure Attorney General approval in order to

20    satisfy Section 8.6 of the APA.  Among other efforts, (i) Plaintiffs were required to pay approximately

21    $500,000 for an expert retained by the Attorney General, (ii) Plaintiffs incurred significant costs,

22    including attorneys' fees, preparing and submitting an application (which, including exhibits, totaled

23    more than 5,826 pages) (the "<u>Application</u>") to the Attorney General for approval of the SGM Sale, (iii)

24    Plaintiffs participated in public meetings related to same, and negotiated intensely with the Attorney

25    General through multiple meetings, emails and documents, and (iv) Plaintiffs filed pleadings in the

26    Bankruptcy Court wherein they prevailed.

27         65.    By the Application, dated May 7, 2019, Plaintiffs provided notice to, and requested

28    written consent from, the Attorney General for the proposed SGM Sale, pursuant to California

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    Corporations Code § 5914 and title 11 of the California Code of Regulations, § 999.5.  On May 13,

2    2019, Plaintiffs supplemented their Application to the Attorney General.

3        66.    During the week of August 26, 2019, Deputy Attorney General Scott Chan held public

4    hearings at each of the Hospitals to solicit comments regarding the SGM Sale.  At those public meetings,

5    Peter Baronoff, as CEO and a representative of Defendants, made public statements to the effect that

6    SGM is the acquisition arm of KPC, but that KPC and SGM are one and the same business entity led

7    by Chaudhuri.

8        67.    Specifically, at the August 26, 2019 Attorney General Public Meeting regarding St.

9    Francis, Mr. Baronoff stated:

> SGM is pleased to be here this morning.  For those of you that don't
> know, Strategic Global Management is the acquisition entity that is part
> of the KPC group.  For those of you who do not know KPC, KPC is an
> integrated healthcare system.  Our system consists of seven hospitals:
> Two in Riverside County, located in Hemet and Menifee; one in San
> Bernardino County, Victor Valley Global Medical Center; and four in
> Orange County, Orange County Global Medical Center, Chapman Global
> Medical Center, Anaheim Global Medical Center and South Coast Global
> Medical Center.
>
> *        *        *
>
> KPC has been extremely diligent in our pursuit of these, and this is not
> our first time showing interest for the Verity assets.  We come to the table
> with vast experience in operating safety net hospitals, very similar to
> many of those facilities which are now part of the Verity system.
>
> *        *        *
>
> We believe there is a great fit with Verity.  Saint Francis is a Level 2
> trauma center and our Orange County Global is a Level 2 trauma center.
> The management team has done what it could in bankruptcy, but it is time
> for the Verity system to move on.  We, at KPC, have had a great
> relationship with labor, with physicians, with payers and IPAs.  We work
> closely with these groups to make our hospitals successful.  We certainly
> get to know our communities and community leadership, and we certainly
> want to get to know those here as well.
>
> *        *        *
>
> KPC is here today because we want to move forward.  We want to move
> forward with 8.6.  It's essential that the Attorney General's Office works
> with us so that the folks in this room never have to be back here today.

[August 26, 2019 Transcript, at 12:2-14:21.]

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

68.    Likewise, at the August 27, 2019 Attorney General Public Meeting regarding St. Vincent, Mr. Baronoff stated in part:

> I'm the CEO of KPC Healthcare.  SGM, our acquisition entity, will be a part of KPC.  For a few moments, let me tell you a little bit about KPC.  KPC is an integrated healthcare system.  We operate seven acute care hospitals:  Two in Riverside County, located in Hemet and Menifee; one in San Bernardino County, Victor Valley Global Medical Center; and four in Orange County, Orange County Global Medical Center, South Coast Global Medical Center, Chapman Global Medical Center and Anaheim Global Medical Center.
>
> *       *       *
>
> In the ancillary side […] we also own and operate seven long-term acute care hospitals.  These hospitals are located in Baton Rouge, Louisiana; in Vicksburg, Mississippi; in Wichita Falls, Texas; Dallas, Texas; Kansas City; and Salt Lake City, Utah; and Mesa Arizona.
>
> *       *       *
>
> Where others fail, we find a way to succeed. And it's through a partnership between the employees and the physicians along with ourselves in management understanding the community's needs that we're able to move forward.
>
> With this turnaround experience, we've seen failing hospitals and we see what happens if they do fail. We've seen hospitals close -- hospital closures -- never under our watch, but we've watched our competitors close hospitals. We find a way to implement strategy to turn these troubled hospitals around; hospitals just like this that have gone through severe financial difficulty.
>
> *       *       *
>
> Today, we see opportunities with the Verity system where many others have not. We see that it's a great fit for our system with our locations in Orange County, Riverside County and San Bernardino County.
>
> *       *       *
>
> In working forward towards the future of these hospitals, we have to be able to implement a strategy and a plan that will get us to the next level and ensure that the people behind me have stable viable futures with hospitals and communities they love. That's what keep [KPC] is all about. We've done it at seven.  We plan to do it at these four and we look forward to the opportunity, and we hope the Attorney General takes a good hard look at 8.6 and agrees that it's the only way to go.

[August 27, 2019 Transcript, at 13:1-16:3.]

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 25 -

113905121\V-6

69.    Further, at the August 29, 2019 Attorney General Public Meeting concerning Seton Medical Center, Mr. Baronoff stated:

> I'm the CEO and managing director of the KPC Healthcare Group.  Some of you today are hearing our name as SGM, but make no mistake, we are KPC.  That is our acquisition vehicle.  Before I make my remarks about Seton, I'd like to say a couple of words about who KPC is.
>
> *        *        *
>
> Well, KPC has a track record of turning around troubled hospitals.  Our integrated health system, which consists of seven hospitals in Southern California, including a trauma hospital, including physician groups in the areas of emergency medicine, anesthesia, radiology, hospitalists, medical specialty groups in a variety of areas, and ancillaries in skilled nursing, skilled nursing facilities, three of them, long-term acute care hospitals. Seven located in Louisiana, Mississippi, Texas, Arizona, Utah and Kansas.
>
> We understand that to move forward in this business one has to roll up their sleeves and know what they are getting into. We have the turnaround experience to do just that.
>
> In one example in Victor Valley, in San Bernardino County we had attorney general conditions and we complied with all.
>
> In Riverside County, we saw hospitals survive through Chapter 9 bankruptcies. We work closely with laborers, physicians, payors, IPAs, and we are a community partner in all cases.
>
> We plan to do the same thing here. But people ask me why are you jumping into this. Why are you jumping into an environment with $70 million of losses.  There is a reason. We believe that Seton Medical Center's best days are in front of it. We understand there are seismic issues; we understood there are IT issues; we understand there are payor-related issues; we understand there are management-related issues; we understand there are clinical-documentation issues; we understand that there is case mix index issues. We understand all that.
>
> *        *        *
>
> Now, how do you get started here and how do you take on this huge task. Well, we started the process by meeting with management. We followed that process by meeting with physicians, reviewing numerous areas, engaging with employees, bringing teams of people here, from capital sponsors onwards.
>
> *        *        *
>
> But rest assured, a turnaround of $70 million, for a variety of reasons, is no easy task to tackle.  San Mateo County, the City of Daly City needs the Seton Medical Center. Those developers who only had an eye on the 20 acres of real estate didn't understand the community passion. Well,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113905121\V-6

1    this buyer does.  And rest assured, when KPC gets involved, me, as the
2    leader will make sure the voices are heard.

3    [August 29, 2019 Transcript, at 12:9-16:3.]

4        70.    On September 25, 2019, the Attorney General consented to the SGM Sale, subject to

5    2019 conditions that included additional conditions that were materially different than those SGM

6    contractually agreed to in Schedule 8.6 (the "2019 Conditions").  Accordingly, Plaintiffs filed a motion

7    which sought the entry of an order enforcing the Sale Order, finding that the SGM Sale was free and

8    clear of the 2019 Conditions, and limiting the SGM Sale to only those conditions that SGM developed

9    and then contractually agreed to in Schedule 8.6 of the APA (the "Enforcement Motion").  [Docket No.

10   3188.]

11       71.    On October 23, 2019, the Bankruptcy Court issued a *Memorandum of Decision Granting*

12   *the Debtors' Emergency Motion to Enforce the Sale Order [Doc. No. 3188]*.  [Docket No. 3446.]  In

13   the memorandum, the Bankruptcy Court ruled for the Plaintiffs on all issues, holding, among other

14   things, that the Attorney General's conditions that were materially different than the conditions in

15   Schedule 8.6 were not enforceable under the Bankruptcy Code and state law.

16       72.    Following negotiations, Plaintiffs and the Attorney General reached a *Stipulation*

17   *Resolving "Debtors Emergency Motion for the Entry of an Order: (I) Enforcing the Sale Order*

18   *Authorizing the Sale to Strategic Global Management, Inc.; (II) Finding That the Sale Is Free and Clear*

19   *of Conditions Materially Different Than Those Approved by the Court; (III) Finding That the Attorney*

20   *General Abused His Discretion in Imposing Conditions on That Sale; and (IV) Granting Related Relief"*

21   *[Docket No. 3188]* [Docket No. 3572]  and lodged a related order [Docket No. 3574].  SGM objected

22   to the proposed order.  [Docket No. 3582.]

23       73.    The Bankruptcy Court held a hearing on SGM's objection to the proposed order.  At the

24   hearing, the SEIU United Healthcare Workers-West withdrew its limited objection [Docket No. 3324]

25   to the Enforcement Motion.  Although the California Nurses Association only filed a responsive

26   statement [Docket No. 3325], it withdrew the same to the extent it would be considered an objection.

27       74.    On November 14, 2019, the Bankruptcy Court issued an *Order Granting "Debtors*

28   *Emergency Motion for the Entry of an Order: (I) Enforcing the Sale Order Authorizing the Sale to*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 27 -

*Strategic Global Management, Inc.; (II) Finding That the Sale Is Free and Clear of Conditions Materially Different Than Those Approved by the Court; (III) Finding That the Attorney General Abused His Discretion in Imposing Conditions on That Sale; and (IV) Granting Related Relief" [Doc. 3188]* (the "<u>Enforcement Order</u>").  [Docket No. 3611.]

75.    The Enforcement Order provided, in relevant part, that "the Additional Conditions (as defined in Section 8.6 of that certain asset purchase agreement [Docket No. 2305-1] (the "<u>APA</u>")) are an "interest in property" for purposes of 11 U.S.C. § 363(f). The Assets (as defined in the APA) are being sold free and clear of the Additional Conditions without the imposition of any other conditions which would adversely affect the Purchaser (as defined in the APA)."  [Docket No. 3611.]  The findings in the Enforcement Order mirrored the findings required under the APA.

76.    After the entry of the Enforcement Order, SGM's conduct increasingly contravened its obligations under the APA, as set forth below.  It now appears that SGM did not anticipate such a favorable order would be entered, but instead anticipated that a supplemental sale order would trigger the Evaluation Period under Section 8.6 of the APA, which would give SGM the option to withdraw from the transaction and/or coerce the Plaintiffs to agree to a substantially reduced purchase price.

77.    <u>Transfer Of Medicare and Medi-Cal Agreements.</u>  The APA also required that Plaintiffs secure the transfer of Medicare and Medi-Cal Provider Agreements to SGM.  To that end, on November 19, 2019, Plaintiffs obtained a settlement with the Centers for Medicare and Medicaid Services, an agency of the United States Department of Health & Human Services, providing for the transfer of their Medicare Provider Agreements to SGM without successor liability, thereby satisfying their remaining obligations under Article 8.7 of the APA.  [Docket No. 3680.]  With respect to California Department of Health Care Services ("<u>DHCS</u>"), Plaintiffs secured an Order [Docket No. 3372] from the Bankruptcy Court authorizing the transfer free and clear of any interests asserted by DHCS, in addition to the Sale Order which terminated any creditor's recoupment rights [Docket No. 2306].  Those Orders afforded equal or greater protection to SGM than any settlement could have, thereby satisfying Section 8.7.  SGM disagreed that the DHCS Order and the Sale Order satisfied Section 8.7.  Consequently, although not necessary but given SGM's position, on November 22, 2019, Plaintiffs reached a settlement agreement with DHCS, which the Bankruptcy Court approved.  [Docket Nos. 3786 & 3787.]

113905121\V-6

### E. **Defendants Fail To Work With Alacrity Towards A Close**

78.     Despite the Plaintiffs' good faith efforts to work towards a prompt close of the SGM Sale, and the APA's requirement that "[t]ime is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement" (APA §12.17), Defendants dragged their feet and frustrated Plaintiffs' efforts.  Defendants failed to ensure that financing, resources, management and personnel were in place for Defendants to assume operations of these four hospitals in 2019.  Defendants did so knowing that Plaintiffs were continuing to operate at a loss of approximately $450,000 per day, which imposed significant costs upon the estates and upon creditors.  Defendants continuously failed to disclose to Plaintiffs that they did not have funding in place to close the Sale pursuant to the APA.

79.     Defendants failed to timely engage with Plaintiffs' primary revenue providers—health plans and physician groups—to provide assurances that their business relationships with the Hospitals would continue after the close date.  Defendants failed to actively engage with them for nearly five months until it was too late.  In the interim, as a result of the uncertainty caused by Defendants' failure to communicate with those groups, many of them started moving patients to other facilities, which resulted in a negative revenue impact.

80.     For example, beginning in May 2019, Debtors' co-counsel, Mr. Henry Kevane at Pachulski Stang Ziehl & Jones, sent a series of emails to Defendants' counsel, Gary Klausner, regarding Plaintiffs' proposed approach to the risk pool agreements that would result in assignment and closure of open issues.  The majority of Mr. Klausner's responses repeated that he would check with his client, and provided no further response.  Defendants' non-responsiveness on this point in turn required Plaintiffs to stipulate to multiple continuances of objections related to cure issues (*see, e.g.,* Docket Nos. 2169, 2464, 2669, 2820, 2960, 3114, 3331, 3450, 3458, 3556), and to explain to concerned and frustrated parties why Defendants did not engage in a meaningful dialogue.  In addition to Mr. Kevane's correspondence, there were numerous telephone calls and substantial efforts by Plaintiffs and their financial advisors at Berkeley Research Group to move these issues forward on a weekly basis.

81.     Defendants' delays on other fronts were also detrimental to operations.  For example, Defendants (i) failed to onboard a sufficient management team to run the Plaintiff Hospitals (in part

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 29 -

113905121\V-6

because it has failed to make financially viable offers to potential candidates), and engaged in eleventh hour efforts to hire away key members of Plaintiffs' management team, (ii) delayed developing a hiring protocol that was compliant with the collective bargaining agreements in place, and instead asked the Debtors to create one despite that being the buyer's obligation, (iii) failed to effectuate a hiring process to promptly identify the employees it wishes to hire and extend offers to them, which resulted in employee anxiety and turnover at all levels of the organization, and (iv) delayed decisions on assumption or rejection on thousands of contracts, which created uncertainty for thousands of counterparties to leases and contracts. As a result of these and other failures by Defendants, Plaintiffs were required to devote even more of their own time and resources to efforts to make up for Defendants' shortcomings and ensure the continued operation for the benefit of Defendants.

82.    Further, after the Debtors repeatedly requested Defendants provide evidence of financing, on October 3, 2019, Defendants provided to Plaintiffs a non-binding discussion draft term sheet ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

**F.    The Court Orders SGM To Close By No Later Than December 5, 2019**

83.    APA Section 1.3 obligated SGM to close the sale "promptly but no later than ten (10) business days following the satisfaction" of all conditions precedent. On November 18, 2019, the

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113905121\V-6

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Bankruptcy Court entered an order (the "Section 8.6 Order") [Docket No. 3633] and related memorandum [Docket No. 3632] finding that: "The Debtors have complied with their obligation under the APA to obtain a final, nonappealable Supplemental Sale Order. Consequently, SGM is now obligated to promptly close the SGM Sale, provided that all other conditions to closing have been satisfied."

84.     On November 19, 2019, the Debtors obtained a settlement with the Centers for Medicare and Medicaid Services providing for the transfer of their Medicare Provider Agreements to SGM, thereby satisfying their remaining obligations under Article 8.7 of the APA. [Docket No. 3680.] SGM approved the terms of the Medicare settlement. With respect to DHCS, the Debtors had previously obtained an order [Docket No. 3372] from the Bankruptcy Court authorizing the transfer free and clear of any interests asserted by DHCS on October 11, 2019, in addition to the Sale Order which terminated any creditor's recoupment rights [Docket No. 2306]. Those Orders afforded equal or greater protection to SGM than any settlement could have, thereby satisfying Section 8.7. In addition, on November 22, 2019, the Debtors reached a settlement with DHCS to the same effect. SGM approved the terms of the DHCS settlement.

85.     The conditions to close under the APA had been satisfied on November 19, 2019, and the transaction should have promptly closed by December 5, 2019. Accordingly, on November 20, 2019, the Debtors sent a letter to SGM, stating (i) the conditions to close under the APA had been satisfied on November 19, 2019, and that (ii) the transaction should promptly close by December 5, 2019. *See* Status Report at 1. The letter requested "immediate written assurances that SGM intend[ed] to proceed with the transaction and abide by its obligations under the APA not later than close of business on Friday, November 22, 2019." *Id.*

G.     **Defendants Finally Reveal Their Lack Of Financing, And Engage In Bad Faith Attempts To Force A Re-Trade**

86.     On or about November 18, 2019, SGM's CEO, Peter Baronoff, telephoned Carsten Beith, at the Debtors' investment banker Cain, and stated that SGM could not obtain sufficient financing for the transaction, contrary to Section 3.9 of the APA. [Docket No. 3644.] That telephone call immediately resulted in the Debtors' request for an order [entered at Docket No. 3646] continuing the

113905121\V-6

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   hearing on the Debtors' motion [Docket No. 2995] for approval of its disclosure statement [Docket No.

2   2994].

3       87.     Recognizing that the existence of financing is not a condition to close, SGM resorted to

4   making unfounded and self-serving assertions that the Debtors breached the APA and embarked on

5   impermissible manipulations to substantially reduce the purchase price without regard to: (i) the

6   language in the APA; (ii) the indisputable fact that SGM's diligence period had expired in January 2019;

7   (iii) SGM's prior representations; and (iv) the fact that all conditions of the Debtors to close had been

8   satisfied.  SGM even sought meetings with the Debtors' constituents in an effort to purportedly obtain

9   concessions that would substantially reduce SGM's financial obligations, despite the Debtors' request

10  that it not do so.

11      88.     On November 22, 2019, SGM sent the Debtors letters from Gary Klausner, Esq. of

12  Levene, Neale, Bender, Yoo & Brill L.L.P. and Robert W. Lundy, Jr. of Hooper, Lundy & Bookman,

13  P.C. (with enclosures), setting forth the issues that SGM had asserted amounted to a "Material Adverse

14  Effect" under the APA [Docket No. 3705] (the "November 22, 2019 Letters").[5]  The issues SGM raised

15  at the eleventh hour were not "new"—they were all known or discoverable during the diligence period

16  that had expired at least nine months earlier.  And none of the issues raised changed the inescapable

17  conclusion that the SGM Sale was required to close by December 5, 2019, because the Debtors and

18  SGM negotiated the sale as an "AS IS, WHERE IS" sale under the express terms of the APA.  SGM's

19  untimely, baseless and immaterial complaints were nothing more than a transparent attempt to delay the

20  closing and manufacture a basis to coerce the Plaintiffs into submitting to a substantially reduced

21  purchase price.

22      89.     On November 26, 2019, the Bankruptcy Court held a Status Conference.  In advance of

23  the Status Conference, SGM filed a Reservation of Rights, alleging (among other things) that "there are

24  no genuine disputes of material fact as to the [sic] whether there have been Material Adverse Effects

25  under the terms of the APA."  [Docket No. 3701.]  In addition, the Debtors submitted to the Bankruptcy

26

27  _____
   [5] The November 22, 2019 Letters were filed under seal pursuant to an order of the Bankruptcy Court
   [Docket No. 3699], and should be maintained as confidential because they contain false and disparaging

28  statements about the Plaintiff Hospitals.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    Court SGM's November 22, 2019 Letters under seal.  [Docket Nos. 3697 & 3705.]  At the status

2    conference, the Court rejected SGM's arguments, stating (among other things) that "[a]s far as the Court

3    is concerned" SGM is the "proud owner" of the Debtors' assets as set forth in the APA, and that SGM

4    "has an obligation to close" the transaction pursuant to the APA.  [Nov. 26, 2019 Hr'g Tr. at 12:22-24,

5    14:10-11.]  The Bankruptcy Court further stated:

6            After reviewing the statement of [S]trategic, I don't want to cast any
             negative aspersions at all. But I want to make clear that I believe that it is
7            operating very closely within the satellite of bad faith. I think it has an
             obligation to close. I think it wants to negotiate a better deal. I think it
8            believes that it will be unpalatable for the Court and for others here to see
             patients, young, old, infirmed, being wheeled or carted out of the
9            hospitals. That's a cynical view and I don't adhere to it.

10                                              ***

11           All right. I'll do the following. First, I won't take the bait either. What I
             stated was not really founded on any letters, actually. It was founded just
12           on the representations that were made in the statement. I think it was a
             reservation of rights as far as the purchaser was concerned, which I found
13           wholly inapposite to my understanding of the APA. It appears to the
             Court that perhaps the purchaser felt that the asset purchase agreement
14           wasn't actually an asset purchase agreement. It was a contract to
             contemplate the purchase of an asset after the Attorney General removed
15           his conditions. And so once the Attorney General did that, then it become
             -- became the proverbial dog that caught the car. They didn't know what
16           to do.

17           So I think that's the situation we have. With all due respect to counsel, I
             respect them, but I think the position of his client doesn't hold water. And
18           again, that's not based upon any letters. That's just my review of the asset
             purchase agreement and the clear terms of that or where the terms have
19           not been clear they have been made clear by the Court. As I've indicated,
             I've given a definition of "material adverse effect."

20
     [*Id.* at 14:7-16, 20:1-22.]
21

22           90.    On November 27, 2019, the Bankruptcy Court issued an order finding that, "[p]ursuant

23    to § 1.3 of the APA, SGM is obligated to close the SGM Sale by no later than December 5, 2019"

24    ("<u>Closing Order</u>").  [Docket No. 3724.]  The Memorandum Decision supporting the Closing Order

25    concluded, among other things, that (i) "Adjudication of SGM's Obligations Under the APA Does Not

26    Require an Adversary Proceeding," (ii) "Adjudication of SGM's Obligations Under the APA Is Not

27    Premature," (iii) "SGM Is Not Entitled to Appeal the Bankruptcy Court's Determination Regarding a

28    Material Adverse Effect," (iv) "No Material Adverse Effect Has Occurred," (v) "All Conditions

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    Precedent to Closing Have Been Satisfied."    [Docket No. 3723.]    The Bankruptcy Court further

2    concluded that:

3              SGM's contention that it is not obligated to close is a cynical attempt to
         extract a better purchase price.  A key component of SGM's negotiation
4         strategy is its attempt to delay as long as possible the adjudication of its
         obligations under the APA.  The Court will not facilitate SGM's dubious
5         tactics.

6                                    *          *          *

7              By presenting non-meritorious arguments as to why it is not obligated to
         close, SGM is holding the estates, creditors, and patients of the Hospitals
8         hostage in an attempt to extort a better purchase price.  SGM's cynical
         tactics are especially offensive given the significant harm that closure of
9         the Hospitals would impose upon patients.  For example, two of the
         Hospitals that would likely close upon failure of the SGM Sale contain
10        large populations of long-term patients suffering from severe illnesses, all
         of whom would have to be relocated to other facilities.

11

12    [*Id.*, pp. 6-7.]

13        91.    On November 27, 2019, the Debtors sent correspondence to SGM, reiterating their

14    demand that it close the transaction by December 5, 2019 and restating the Debtors' commitment to

15    cooperating with SGM towards a prompt and smooth closing.  Despite the Debtors' repeated requests

16    that SGM provide assurances of its ability to finance the SGM Sale transaction in accordance with the

17    APA and the Purchase Price therein, SGM refused to respond.

18        92.    On November 29, 2019, the Debtors then sent a further letter to SGM, reiterating their

19    demand that it timely close the transaction in accordance with the APA no later than December 5, 2019.

20        93.    On November 29, 2019, SGM filed two notices of appeal [Docket Nos. 3726 & 3727]

21    related to (i) the order granting the Enforcement Motion [Docket No. 3611], and (ii) the order finding

22    that SGM is obligated to promptly close the transaction under Section 8.6 of the APA provided all other

23    conditions to closing are satisfied [Docket No. 3633].  The appeals were frivolous and designed solely

24    to delay and frustrate these proceedings and the closing of the SGM Sale.

25        94.    Beginning Monday, December 2, 2019, SGM representatives failed to participate in at

26    least five pre-scheduled operations closing calls, stating that they were doing so on the advice of SGM's

27    counsel, Gary Klausner.

28

113905121\V-6

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

95.     On December 3, 2019, the Debtors emailed SGM, expressing continued concern for SGM's delay and the impact on the Hospitals, including that many employees no longer have confidence that SGM will purchase the hospitals given that they are still waiting for formal offers, that the Hospitals continue to flex staff and registry to manage patient care, and that vendors and the Hospitals' risk pool participants/IPAs have expressed concern that SGM does not intend to close the transaction.  The Debtors again demanded that SGM affirm whether it had financial ability to proceed with the transaction in accordance with the APA, and whether it intended to close the transaction.  In response, SGM announced that it would not close the Sale by December 5, and that it had filed a notice of appeal [Docket No. 3746] of the Bankruptcy Court's Closing Order.

96.     On December 4 and 5, 2019, the Debtors sent additional demands to SGM for information and assurances bearing on whether it had the financial ability to perform in accordance with the APA and whether it intended to do so.  SGM did not provide the requested information to Debtors.

97.     On December 5, 2019, the Debtors were prepared to close the Sale, pursuant to the APA and in accordance with the Bankruptcy Court's Sale Order and Closing Order.  SGM failed to do so.  Accordingly, the Debtors sent a notice of default to SGM, dated December 5, 2019.

98.     On December 17, 2019, the Debtors sent a notice to SGM citing various notices of breaches, and stating that the APA would terminate effective December 27, 2019.

99.     SGM did not formally offer or request a different closing date with respect to closing the SGM Sale at the Purchase Price.

## COUNT I:  BREACH OF CONTRACT

### (All Plaintiffs Against All Defendants)

Plaintiffs restate and reallege all paragraphs as if fully set forth herein.

100.     As described above, Defendants have materially and continually breached the APA by (among other things):  (a) failing to consummate and close the Sale transaction in accordance with the APA; (b) failing to have funds available to close the Sale at the price set forth in the APA; (c) representing in Section 3.9 of the APA and elsewhere that they had the ability to obtain "funds in cash in amounts equal to the purchase price;" (d) attempting to coerce Plaintiffs to agree to a substantially reduced purchase price, (e) failing to cooperate with Plaintiffs and move with alacrity

- 35 -

towards closing the SGM Sale; (f) making unfounded and untimely assertions of alleged Material Adverse Effects; (g) asserting entitlement to an "Evaluation Period" when no such period existed after the entry of the Enforcement Order, the Section 8.6 Order and the Closing Order; (h) appealing the Enforcement Order to avoid its' obligation to close and despite the APA's requirement that Defendants cooperate to render it a final, nonappealable order; and (i) filing meritless and frivolous Notices of Appeal.

101.    As a direct and proximate result of the aforementioned breaches, each Plaintiff has been damaged, the exact amount to be proven.  As a result of Defendants' breaches, and as part of their damages, Plaintiffs are also entitled to the recovery of attorneys' fees associated with this dispute pursuant to Section 12.12 of the APA.

### COUNT II:  PROMISSORY FRAUD

### (All Plaintiffs Against All Defendants)

Plaintiffs restate and reallege all paragraphs as if fully set forth herein.

102.    As described more fully above, Defendants promised to perform in accordance with the terms of the APA.  Plaintiffs are informed and believe that, at the time those promises were made, Defendants had no intention of performing in accordance with the APA, including (without limitation) by paying the $610 million purchase price.  Defendants concealed their true intention not to fund the $610 million purchase price under the APA, and instead to hold the estates, creditors, and patients of the Plaintiff Hospitals hostage in an attempt to extort a lower purchase price.

103.    Defendants intended to induce Plaintiffs to detrimentally rely on their promise to perform in accordance with the APA by (among other things) having Plaintiff select SGM as the successful bidder, enter into the APA, and devote almost a year to performing under the APA.

104.    Plaintiffs justifiably relied upon the misrepresentation of Defendants, and each of them, and as a proximate result suffered, and will continue to suffer damages in an amount to be proved at the time of trial.

105.    Plaintiffs are informed and believe and thereon allege that these acts were willful, despicable, oppressive and/or fraudulent as contemplated by California Civil Code § 3294, and that all were done with the knowledge, approval and ratification of Defendants, and each of them, by or through

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113905121\V-6

their managerial agents.  In order to deter such conduct by Defendants, and each of them, in the future, and to prevent repetition of such conduct as a practice, Plaintiffs pray for exemplary and punitive damages.

## COUNT III:  TORTIOUS BREACH OF CONTRACT (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

### (All Plaintiffs Against All Defendants)

Plaintiffs restate and reallege all paragraphs as if fully set forth herein.

106.    The APA contains an implied covenant of good faith and fair dealing, whereby Defendants agreed to act in good faith and deal fairly with Plaintiffs, and to refrain from taking any action which would interfere with Plaintiffs' rights under the APA.

107.    Defendants, and each of them, tortiously breached the APA and the implied covenant of good faith and fair dealing owed to Plaintiffs by (among other things) intentionally, fraudulently, unreasonably, oppressively, and without proper cause: (a) entering the APA with no intention to perform their obligations thereunder; (b) failing to consummate and close the Sale transaction in accordance with the APA; (c) failing to have funds available to close the Sale at the Purchase Price set forth in the APA; (d) attempting to coerce Plaintiffs to engage in a re-trade; (e) failing to cooperate with Plaintiffs and move with alacrity towards closing the SGM Sale; (f) making unfounded and untimely assertions of alleged Material Adverse Effects; (g) asserting entitlement to an "Evaluation Period" following entry of the Enforcement Order, Section 8.6 Order and Closing Order; (h) filing meritless and frivolous Notices of Appeal; and (i) failing to respond to Plaintiffs inquiries regarding SGM's intent and financial ability to perform the APA.

108.    Defendants intended and/or knew that their conduct described herein would cause severe harm in the form of, *inter alia*, substantial consequential damages to Plaintiffs.  As a direct and proximate result of Defendants' tortious breach of the APA and breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in an amount to be proved.

109.    As a further direct and proximate result of Defendants' tortious breach of the APA and the implied covenant of good faith and fair dealing, Plaintiffs have been compelled to incur operational

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 37 -

expenses, attorney's fees and other expenses to pursue their right to benefits due under the APA, causing Plaintiffs to suffer further loss in an amount to be proved.

110.    Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, intentionally engaged in a course of conduct which was intended or expected to injure Plaintiffs, in conscious disregard of Plaintiffs' right under the APA, as alleged in this Complaint.  Plaintiffs are informed and believe and thereon allege that these acts were willful, despicable, oppressive and/or fraudulent as contemplated by California Civil Code § 3294, and that all were done with the knowledge, approval and ratification of Defendants, and each of them, by or through their managerial agents.  In order to deter such conduct by Defendants, and each of them, in the future, and to prevent repetition of such conduct as a practice, Plaintiffs pray for exemplary and punitive damages.

WHEREFORE, Plaintiffs pray for judgment as hereinafter set forth.

## **PRAYER**

Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.    For special and consequential damages in an amount to be proved at trial;

2.    For attorney's fees;

3.    For punitive damages in an amount to punish or make an example of Defendants' conduct;

4.    For prejudgment and post-judgment interest allowed by law;

5.    For costs of suit incurred herein; and

6.    For such other and further relief as the Bankruptcy Court deems just and proper.

Dated: January 3, 2020                          Respectfully submitted,


DENTONS US LLP
SAMUEL R. MAIZEL
SONIA R. MARTIN
TANIA M. MOYRON



By:  */s/ Samuel R. Maizel*
_____
Counsel to Plaintiffs and Chapter 11
Debtors and Debtors In Possession

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

113905121\V-6

# EXHIBIT A

# EXHIBIT A

FINAL VERSION

**ASSET PURCHASE AGREEMENT**

**By and Among**

**Verity Health System of California, Inc., Verity Holdings, LLC,**

**St. Francis Medical Center, St. Vincent Medical Center, St. Vincent Dialysis Center, Inc.,
Seton Medical Center**

**and**

**Strategic Global Management, Inc.**

**Dated January 8, 2019**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING..............2

   1.1    Purchase Price.................................................................................2
   1.2    Deposit...........................................................................................3
   1.3    Closing Date ...................................................................................4
   1.4    Items to be Delivered by Sellers at Closing...................................4
   1.5    Items to be Delivered by Purchaser at Closing..............................5
   1.6    Prorations and Utilities ..................................................................6
   1.7    Transfer of Assets of Sellers.........................................................7
   1.8    Excluded Assets ...........................................................................10
   1.9    Assumed Obligations...................................................................13
   1.10   Excluded Liabilities.....................................................................14
   1.11   Designation of Assumed Contracts and Assumed Leases...............14
   1.12   Disclaimer of Warranties; Release ..............................................15

ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF SELLERS ..............16

   2.1    Authorization ...............................................................................16
   2.2    Binding Agreement.......................................................................16
   2.3    Organization and Good Standing; No Violation ............................16
   2.4    Contracts .....................................................................................16
   2.5    Brokers and Finders.....................................................................17
   2.6    Seller Knowledge.........................................................................17
   2.7    Non-Contravention .......................................................................17
   2.8    Compliance with Legal Requirements..........................................17
   2.9    Required Consents .......................................................................17
   2.10   Environmental Matters .................................................................17
   2.11   Title.............................................................................................18
   2.12   Certain Other Representations with Respect to the Hospitals.........18
   2.13   Financial Statements ...................................................................18
   2.14   Legal Proceedings.......................................................................19
   2.15   Employee Benefits ......................................................................19
   2.16   Personnel.....................................................................................19
   2.17   Insurance.....................................................................................19
   2.18   Accounts Receivable ...................................................................20
   2.19   Payer Contracts ...........................................................................20
   2.20   Excluded Individuals ...................................................................20

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF PURCHASER..................20

   3.1    Authorization ...............................................................................20
   3.2    Binding Agreement.......................................................................20
   3.3    Organization and Good Standing...................................................20
   3.4    No Violation .................................................................................21
   3.5    Brokers and Finders.....................................................................21
   3.6    Representations of Sellers.............................................................21

-i-

# TABLE OF CONTENTS
## (continued)

Page

3.7    Legal Proceedings...................................................................21
3.8    No Knowledge of a Seller's Breach ...............................21
3.9    Ability to Perform...................................................................22
3.10   Purchaser Knowledge ........................................................22
3.11   Investigation...........................................................................22

ARTICLE 4 COVENANTS OF SELLERS ..........................................22

4.1    Access and Information; Inspections ............................22
4.2    Cooperation.............................................................................23
4.3    Other Bidders........................................................................23
4.4    Sellers' Efforts to Close ......................................................24
4.5    Termination Cost Reports ................................................24
4.6    Conduct of the Business ...................................................24
4.7    Contract With Unions .......................................................25

ARTICLE 5 COVENANTS OF PURCHASER......................................25

5.1    Purchaser's Efforts to Close ............................................26
5.2    Required Governmental Approvals ...............................26
5.3    Certain Employee Matters ...............................................27
5.4    Excluded Assets....................................................................27
5.5    Waiver of Bulk Sales Law Compliance........................28
5.6    Attorney General .................................................................28
5.7    Conduct Pending Closing ................................................28
5.8    Cure Costs..............................................................................28
5.9    Operating Covenant ..........................................................28
5.10   HSR Filing.............................................................................28
5.11   Contract with Unions .......................................................29

ARTICLE 6 SELLERS' BANKRUPTCY AND BANKRUPTCY COURT APPROVAL.........29

6.1    Bankruptcy Court Approval; Overbid Protection and Break-Up Fee ...............29
6.2    Appeal of Sale Order ........................................................30

ARTICLE 7 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS.....................31

7.1    Signing and Delivery of Instruments...........................31
7.2    No Restraints .......................................................................31
7.3    Performance of Covenants...............................................31
7.4    Governmental Authorizations.......................................31
7.5    Attorney General Provisions ..........................................31
7.6    Bankruptcy Court Approval ...........................................31
7.7    HSR Act..................................................................................31
7.8    CSCDA Acknowledgement ..............................................32

ARTICLE 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER ...............32

8.1    Governmental Authorizations........................................32

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 8.2 | Bankruptcy Court Approval | 32 |
| 8.3 | Signing and Delivery of Instruments | 32 |
| 8.4 | Performance of Covenants | 32 |
| 8.5 | No Restraints | 32 |
| 8.6 | Attorney General Provisions | 32 |
| 8.7 | Medicare and Medi-Cal Provider Agreements | 34 |
| 8.8 | HSR Act | 34 |

ARTICLE 9 TERMINATION .................................................................................34

| | | |
|---|---|---|
| 9.1 | Termination | 34 |
| 9.2 | Termination Consequences | 35 |

ARTICLE 10 POST-CLOSING MATTERS ...........................................................36

| | | |
|---|---|---|
| 10.1 | Excluded Assets | 36 |
| 10.2 | Preservation and Access to Records After the Closing | 36 |
| 10.3 | Closing of Financials | 38 |
| 10.4 | Medical Staff | 39 |
| 10.5 | Shared Intangible Assets | 39 |

ARTICLE 11 DEFAULT, TAXES AND COST REPORTS .....................................39

| | | |
|---|---|---|
| 11.1 | Purchaser Default | 39 |
| 11.2 | Seller Default | 39 |
| 11.3 | Tax Matters; Allocation of Purchase Price | 39 |
| 11.4 | Cost Report Matters | 40 |

ARTICLE 12 MISCELLANEOUS PROVISIONS ...................................................40

| | | |
|---|---|---|
| 12.1 | Further Assurances and Cooperation | 40 |
| 12.2 | Successors and Assigns | 40 |
| 12.3 | Governing Law; Venue | 41 |
| 12.4 | Amendments | 41 |
| 12.5 | Exhibits, Schedules and Disclosure Schedule | 41 |
| 12.6 | Notices | 41 |
| 12.7 | Headings | 42 |
| 12.8 | Publicity | 42 |
| 12.9 | Fair Meaning | 43 |
| 12.10 | Gender and Number; Construction; Affiliates | 43 |
| 12.11 | Third Party Beneficiary | 43 |
| 12.12 | Expenses and Attorneys' Fees | 43 |
| 12.13 | Counterparts | 43 |
| 12.14 | Entire Agreement | 43 |
| 12.15 | No Waiver | 44 |
| 12.16 | Severability | 44 |
| 12.17 | Time is of the Essence | 44 |

109394840\V-21

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is made and entered into as of the 8th day of January, 2019 (the "**Signing Date**") by and among Verity Health System of California, Inc., a California nonprofit public benefit corporation ("**Verity**"), Verity Holdings, LLC, a California limited liability company ("**Verity Holdings**"), St. Francis Medical Center, a California nonprofit public benefit corporation ("**St. Francis**"), St. Vincent Medical Center, a California nonprofit public benefit corporation ("**St. Vincent**"), St. Vincent Dialysis Center, Inc., a California nonprofit public benefit corporation ("**St. Vincent Dialysis**"), and Seton Medical Center, a California nonprofit public benefit corporation ("**Seton**" and together with St. Francis Medical Center, St. Vincent Medical Center and St. Vincent Dialysis, collectively, the "**Hospital Sellers**") (Verity, Verity Holdings, St. Francis, St. Vincent, St. Vincent Dialysis and Seton are each referred to herein individually as a "**Seller**" and collectively as the "**Sellers**"), and Strategic Global Management, Inc., a California corporation ("**Purchaser**").

## R E C I T A L S:

A.    St. Francis engages in the business of the operation of the hospital known as St. Francis Medical Center, located at 3630 E. Imperial Highway, Lynwood, CA 90262, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by St. Francis (collectively, the "**St. Francis Hospital**").

B.    St. Vincent engages in the business of the operation of the hospital known as St. Vincent Medical Center, located at 2131 W 3rd Street, Los Angeles, CA 90057, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by St. Vincent (collectively, the "**St. Vincent Hospital**").

C.    Seton engages in the business of the operation of two general acute care hospitals under a single license, consisting of: (i) the hospital known as Seton Medical Center, located at 1900 Sullivan Avenue, Daly City, CA 94015, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by Seton (collectively, the "**Seton Hospital**") and (ii) the hospital known as Seton Medical Center Coastside, located at 600 Marine Blvd, Moss Beach, CA 94038, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by Seton (collectively, the "**Seton Coastside Hospital**" and together with the St. Francis Medical Center Hospital, the St. Vincent Medical Center Hospital and the Seton Hospital, the "**Hospitals**"; the business of the operation of the Hospitals is referred to herein as the "**Businesses**").

D.    Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser, the assets described in <u>Section 1.7</u> below (the "**Assets**") owned by Sellers and used with respect to the Businesses, for the consideration and upon the terms and conditions contained in this Agreement.

1

E.      Sellers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**"), lead Case No. 2:18-bk-201510ER, jointly administered or to be jointly administered with their affiliates (the "**Bankruptcy Cases**").

F.      The parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets approved by the Bankruptcy Court pursuant to Section 363 of Title 11 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

## ARTICLE 1

## SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING

1.1    Purchase Price.

(a)      Subject to the terms and conditions of this Agreement, the purchase price ("**Purchase Price**") shall consist of the following:

(i)      Cash payment to Sellers (the "**Cash Consideration**") of Six Hundred Ten Million Dollars ($610,000,000.00), which shall be allocated Four Hundred Twenty Million Dollars ($420,000,000) to St. Francis Medical Center, One Hundred Twenty Million Dollars ($120,000,000) to St. Vincent Medical Center, and Seventy Million Dollars ($70,000,000) to Seton for Seton Hospital and Seton Coastside Hospital, provided, that if the CA AG's approval does not include a requirement that Seton Hospital remain open as an acute care hospital or that Seton Coastside Hospital remain open as a skilled nursing facility, then an amount to be determined by Purchaser, in its sole discretion, of such Cash Consideration shall be re-allocated from St. Francis to Seton;

(ii)      Assumption of Sellers' accrued vacation and other paid time off as of the Closing, to be provided only with respect to Hired Employees (as defined in Section 5.3(a)) in the form of credited vacation and PTO, subject to compliance with applicable law and regulation, including consent of such employees if required;

(iii)      Assumption of all liabilities of Seton as Obligated Party and Property Owner under the (i) Agreement to Pay Assessment and Finance Improvements dated May 17, 2017 with California Statewide Communities Development Authority ("**CSCDA**") and (ii) Agreement to Pay Assessment and Finance Improvements dated May 18, 2017 with CSCDA (collectively

2

the "**Special Assessments**") each associated with of the Property Assessed Clean Energy ("**PACE**") (seismic and clean energy) loans (collectively the "**PACE Obligations**"); and

(iv)    Payment of Cure Costs (defined below) associated with any Assumed Leases and/ or Assumed Contracts and assumption of the other Assumed Obligations (as defined below).

(b)    Purchaser (i) is acquiring the Assets and (ii) is only assuming (x) the PACE Obligations and (y) the Assumed Obligations (as defined below).

(c)    At the Closing, Purchaser shall pay to Sellers, by wire transfer of immediately available funds to the accounts specified by Sellers to Purchaser in writing, an aggregate amount equal to the Cash Consideration, minus the Net QAF Reduction Amount (defined below), if any, plus the Net QAF Increase Amount (defined below), if any, plus any amounts (x) held by the PACE Trustee as an interest or fee reserve on account the PACE Obligations on the Closing Date and (y) remitted to CSCDA by Seton pursuant to the Special Assessments from and after the date of execution of this Agreement by Buyer up to and including the Closing Date, minus the Deposit (defined below).

(d)    For purposes of this Agreement, the "**QAF Program**" means the California Department of Health Care Services Hospital Quality Assurance Fee Programs IV ("**QAF IV**") and V ("**QAF V**"). During the period prior to Closing, Sellers shall pay any fees owing under QAF IV and QAF V, and Sellers shall be entitled to retain all payments received under QAF IV and QAF V. At Closing, Sellers shall credit to the Cash Consideration the amount by which payments received under QAF IV and QAF V between the Signing Date and Closing exceed the sum of (i) fees paid under QAF IV and QAF V during such period plus (ii) the amount of fees which are unpaid and owing as of the Closing in respect of invoices received by Sellers prior to Closing under QAF IV and QAF V (the "**Net QAF Reduction Amount**"), as provided above in Section 1.1(c). At Closing, Purchaser shall pay Sellers (as an increase to the Cash Consideration) the amount by which the sum of (i) fees paid under QAF IV and QAF V between the Signing Date and Closing plus (ii) the amount of fees which are unpaid and owing as of Closing in respect of invoices received by Sellers prior to Closing under QAF IV and QAF V exceeds payments received under QAF IV and QAF V during such period (the "**Net QAF Increase Amount**"), as provided above in Section 1.1(c).

(e)    Purchaser shall, prior to Closing, be permitted to communicate with holders of secured debt of the Sellers regarding the possible assumption by Purchaser of all or a portion of such debt at the Closing. If Purchaser agrees to assume any such debt at the Closing, Purchaser and Sellers shall  negotiate an appropriate credit to the Purchase Price for such assumption of debt.

1.2    Deposit. Purchaser, by wire transfer to an account designated by Sellers has made a good faith deposit in the amount of Thirty Million Dollars ($30,000,000) on the date hereof (the "**Deposit**"). The Deposit shall be non-refundable in all events, except as provided in Section 6.1(b) or Section 6.2, or in the event Purchaser has terminated this Agreement pursuant to Section 9.1 (other than Section 9.1(b)) or as set forth in Section 9.2, in which case Seller shall immediately return the Deposit to Purchaser with all interest earned thereon. Upon Closing, the Deposit will

be credited against the Purchase Price. Pending the Closing, or until this Agreement is terminated, the Deposit shall be deposited in an interest bearing account, with interest credited to Purchaser, at a federally-insured financial institution mutually acceptable to Purchaser and Sellers. In addition, on the Signing Date, Purchaser shall deliver to Sellers executed letters from its financing sources, in form and substance satisfactory to Sellers in their discretion.

1.3    Closing Date.    The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at 10:00 a.m. local time at the offices of Dentons US LLP, 601 South Figueroa St., Suite 2500, Los Angeles, CA 90017-5704 (the day on which Closing actually occurs, the "**Closing Date**") promptly but no later than ten (10) business days following the satisfaction or waiver of the conditions set forth in ARTICLE 7 and ARTICLE 8, other than those conditions that by their nature are to be satisfied at Closing but subject to fulfillment or waiver of those conditions. The Closing shall be deemed to occur and to be effective as of 11:59 p.m. Pacific time on the Closing Date (the "**Effective Time**").

1.4    Items to be Delivered by Sellers at Closing. At or before the Closing, Sellers shall deliver, or cause to be delivered, to Purchaser the following:

1.4.1    a Bill of Sale substantially in the form of **Exhibit 1.4.1** attached hereto (the "**Bill of Sale**"), duly executed by each Seller, with respect to the Assets;

1.4.2    Real Estate Assignment and Assumption Agreements (the "**Real Estate Assignments**") in the form of **Exhibit 1.4.2** attached hereto with respect to (i) the Leased Real Property, and (ii) the Tenant Leases, each duly executed by each Seller;

1.4.3    a Quitclaim Deed (the "**Deed**") in the form of **Exhibit 1.4.2** attached hereto with respect to the real property listed in Schedule 1.4.3, together with all plant, buildings, structures, installments, improvements, fixtures, betterments, additions and constructions in progress situated thereon (collectively, the "**Owned Real Property**") duly executed by each Seller;

1.4.4    an Assumption Agreement (the "**Assumption Agreement**") in the form of **Exhibit 1.4.2** attached hereto with respect to the Assumed Obligations duly executed by each Seller;

1.4.5    favorable original certificates of good standing, of each Seller, issued by the State of California, dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

1.4.6    a duly executed certificate of an officer of each Seller certifying to Purchaser (i) the incumbency of the officers of such Seller on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (ii) the due adoption and text of the resolutions or consents of the Board of Directors of such Seller authorizing (I) the transfer of the Assets and transfer of the Assumed Obligations by such Seller to Purchaser and (II) the due execution, delivery and performance of this Agreement and all additional documents contemplated

4

by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

      1.4.7   a certified copy of the Sale Order (as defined below);

      1.4.8   a Transition Services Agreement (the "**Transition Services Agreement**") in form and substance satisfactory to Sellers and Purchaser, in their reasonable discretion, granting to Sellers use of certain assets, systems and personnel identified in such agreement solely in connection with Sellers' wind-down of the Businesses, the completion of the Bankruptcy Cases and the dissolution of Sellers (and following completion of such wind-down, Bankruptcy Cases and dissolution of Sellers, such Transition Services Agreement shall automatically terminate);

      1.4.9   acknowledgements by CSCDA and the PACE Trustee that Purchaser is the Successor Property Owner and Obligated Party under the PACE  Obligations and releases of the Sellers from any and all claims arising or accruing prior to the Closing Date, and

      1.4.10   any such other instruments, certificates, consents or other documents which Purchaser and Sellers mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

    1.5   <u>Items to be Delivered by Purchaser at Closing</u>.  At or before the Closing, Purchaser shall deliver or cause to be delivered to Sellers the following:

      1.5.1   payment of the Cash Consideration subject to credits or plus payment to Sellers of all amounts as provided under <u>Section 1.6</u>;

      1.5.2   evidence of payment of all Cure Costs required hereunder to be paid by Purchaser;

      1.5.3   a duly executed certificate of the Secretary of Purchaser certifying to Sellers (a) the incumbency of the officers of Purchaser on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement and (b) the due adoption and text of the resolutions of the Board of Directors of Purchaser authorizing the execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

      1.5.4   favorable original certificate of good standing, of Purchaser, issued by the California Secretary of State dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

      1.5.5   the Bill of Sale, duly executed by Purchaser;

      1.5.6   the Real Estate Assignment(s), duly executed by Purchaser;

      1.5.7   the Assumption Agreement, duly executed by Purchaser;

1.5.8    the License Agreement referenced in Section 1.7(q);

1.5.9    the Transition Services Agreement; and

1.5.10    any such other instruments, certificates, consents or other documents which Purchaser and Sellers mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.6    Prorations and Utilities.  All items of income and expense listed below with respect to the Assets shall be prorated in accordance with the principles and the rules for the specific items set forth hereafter:

1.6.1    All transfer, conveyance, sales, use, stamp, similar state and local taxes arising from the sale of the Assets hereunder shall be the responsibility of, and allocated to, Purchaser.

1.6.2    Other than the Utility Deposits (defined below), which are governed by Section 1.8(j), and other than with respect to Cure Costs payable by Purchaser, the following costs and expenses shall be prorated based upon the payment period (*i.e.*, calendar or other tax fiscal year) to which the same are attributable: all real estate and personal property lease payments, real estate and personal property taxes, real estate assessments, other than the PACE Special Assessments and other similar charges against real estate, and power and utility charges (collectively, the "**Prorated Charges**") on the Assets.  Each Seller shall pay its respective portion at or prior to the Closing (or Purchaser shall receive credit for) of any unpaid Prorated Charges attributable to periods or portions thereof occurring prior to the Effective Time, and Purchaser shall assume as an Assumed Liability or, to the extent previously paid by any Seller, pay to such Seller at the Closing all Prorated Charges attributable to periods or portions thereof occurring from and after the Effective Time.  In the event that as of the Closing Date the actual tax bills for the tax year or years in question are not available and the amount of taxes to be prorated as aforesaid cannot be ascertained, then rates, millages and assessed valuation of the previous year, with known changes, shall be used.  The parties agree that if the real estate and personal property tax prorations are made based upon the taxes for the preceding tax period, the prorations shall be re-prorated after the Closing.  As to power and utility charges, "final readings" as of the Closing Date shall be ordered from the utilities; the cost of obtaining such "final readings," if any, shall be paid by Purchaser.

1.6.3    Sellers shall be entitled to all rents and other payments under Tenant Leases accruing for the period prior to the Effective Time ("**Pre Effective Time Lease Amounts**"), and Purchaser shall be entitled to all rents and other payments under tenant leases accruing for the period after the Effective Time ("**Post Effective Time Lease Amounts**" and together with the Pre Effective Time Lease Amounts, the "**Lease Amounts**").  All Lease Amounts that are collected prior to the Closing shall be prorated as of the Closing in accordance with the immediately preceding sentence.  All Lease Amounts that are accrued but uncollected as of the Closing (including, without limitation, rents and other payments accrued prior to the Closing but payable in arrears after the Closing) (collectively, the "**Unpaid Amounts**") shall belong to Sellers, and Purchaser shall, upon receipt of said rents and other payments, receive the same in trust for Sellers and shall promptly remit any of such amounts to the applicable Seller within ten (10) days after

6

Purchaser's receipt of same. For the avoidance of doubt, all rental payments received after Closing shall be first applied to any amounts owed to the Sellers under this Section 1.6.3.

1.6.4    All prorations and payments to be made under the foregoing provisions shall be agreed upon by Purchaser and Sellers prior to the Closing and shall be binding upon the parties; provided, however, with respect to the Unpaid Amounts, in the event any proration, apportionment or computation shall prove to be incorrect for any reason, then either the applicable Seller or Purchaser shall be entitled to an adjustment to correct the same, provided that said party makes written demand on the party from whom it is entitled to such adjustment within thirty (30) calendar days after the erroneous payment or computation was made, or such later time as may be required, in the exercise of due diligence, to obtain the necessary information for proration. This Section 1.6 shall survive Closing.

1.7    <u>Transfer of Assets of Sellers</u>. On the Closing Date and subject to the terms and conditions of this Agreement, each Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all liens, claims, interests and encumbrances other than the Permitted Exceptions (defined below), and Purchaser shall acquire, all of each Seller's right, title and interest in and to only the following assets and properties, as such assets shall exist on the Closing Date, in each case (notwithstanding anything else in this Agreement) solely to the extent used primarily in the conduct of the Businesses and to the extent not included among the Excluded Assets, such transfer being deemed to be effective at the Effective Time:

(a)    all of the tangible personal property owned by such Hospital Seller, or to the extent assignable or transferable by each Hospital Seller, leased, subleased or licensed by such Hospital Seller, and used by such Seller in the operation of the Hospital of such Hospital Seller, including equipment, furniture, fixtures, machinery, vehicles, office furnishings and leasehold improvements (the "**Personal Property**");

(b)    all of such Hospital Seller's rights, to the extent assignable or transferable, to all Medicare and Medi-Cal provider agreements, permits, approvals, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to such Seller for use in the operation of the Hospital of such Hospital Seller (the "**Licenses**"), including, without limitation, the Licenses and Medicare/Medi-Cal Provider Agreements set forth on **Schedule 1.7(b)**, except to the extent Purchaser elects, in its discretion, not to take assignment of any such Licenses;

(c)    all of such Hospital Seller's interest in and to the Owned Real Property and all of such Hospital Seller's interest, to the extent assignable or transferable, in and to all of the following (the "**Assumed Leases**"): (i) personal property leases with respect to the operation of the Hospital of such Hospital Seller (including leases for assets described in Section 1.7(i), (ii) the real property leases for all real property leased by such Hospital Seller and set forth on **Schedule 1.7(c)(ii)** (the "**Leased Real Property**"), and (iii) the real property leased or subleased by such Seller to a third party and set forth on **Schedule 1.7(c)(iii)** (the "**Tenant Leases**");

(d)    all of such Hospital Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders) with respect

7

to the operation of the Hospital of such Hospital Seller that have been designated by Purchaser as a contract to be assumed pursuant to Section 1.11 (the "**Assumed Contracts**");

(e)    other than the Excluded Settlements and Actions (defined below), all claims, rights, interests and proceeds (whether received in cash or by credit to amounts otherwise due to a third party) with respect to amounts overpaid by such Seller to any third party health plans with respect to periods prior to the Effective Time (e.g. such overpaid amounts may be determined by billing audits undertaken by such Seller or such Seller's consultants), except with respect to any causes of action or proceeds thereof arising under Chapter 5 of the Bankruptcy Code other than with respect to Assumed Contracts and Assumed Leases and other items described in Section 1.8(h);

(f)    to the extent assignable or transferable, all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (i) located at the Hospital of such Seller or (ii) used in the operation of the Hospital of such Seller (the "**Inventory**") except as set forth in Section 1.8(e);

(g)    other than Utility Deposits, all prepaid rentals, deposits, prepayments (excluding prepaid insurance and prepaid taxes) and similar amounts relating to the Assumed Contracts and/or the Assumed Leases, which were made with respect to the operation of the Hospital of such Hospital Seller (the "**Prepaids**");

(h)    to the extent assignable or transferable, all of the following that are not proprietary to such Seller and/or owned by or proprietary to such Hospital Seller's affiliates: operating manuals, files and computer software with respect to the operation of the Hospital of such Hospital Seller, including, without limitation, all patient records, medical records, employee records, financial records, equipment records, construction plans and specifications, and medical and administrative libraries; *provided*, *however*, that any patient records and medical records which are not required by law to be maintained by such Hospital Seller as of the Effective Time shall be an Excluded Asset;

(i)    to the extent assignable or transferable (and if leased, to the extent the associated lease is transferrable), including any assignment which is made effective pursuant to the Sale Order where the consent of a third party is required pursuant to the terms of an applicable agreement but not obtained, all systems, servers, computers, hardware, firmware, middleware, telecom equipment, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation owned, leased or licensed by Sellers and used by Sellers with respect to the operations of the Hospitals;

(j)    all Measure B trauma funding received after the Signing Date to be paid related to service periods ending on or after the Signing Date (pro rated between Purchaser and Sellers for any such payments covering service periods which include days both before and after the Signing Date based upon the number of days in the relevant payment period before the Signing Date (for the account of Sellers) and after the Signing Date (for the account of Purchaser));

(k)    Except for as stated in Section 1.7(j), all accounts and interest thereupon, notes and interest thereupon and other receivables of such Seller, including, without limitation,

8

accounts, notes or other amounts receivable, disproportionate share payments and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, and Seller Cost Report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital of such Seller, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by such Seller prior to the Effective Time whether payable by Medicare, Medicaid, or any other payor (including an insurance company), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source (collectively, "**Accounts Receivable**");

(l)     all rights, claims and causes of action of such Seller to the extent related to and/or to the extent arising out of the Accounts Receivable acquired by Purchaser at the Closing;

(m)     other than the Excluded Settlements and Actions, all regulatory settlements, rebates, adjustments, refunds or group appeals, including without limitation pursuant to all cost reports filed by Sellers for payment or reimbursement from government payment programs and other payors with respect to periods after the Signing Date;

(n)     other than the Excluded Settlements and Actions, all casualty insurance proceeds arising in respect of casualty losses occurring after the Signing Date in connection with the ownership or operation of the Assets;

(o)     other than the Excluded Settlements and Actions, all surpluses arising out of any risk pools, shared savings program or accountable care organization arrangement to which any Seller is party on the Closing Date, in each case to the extent Purchaser assumes the underlying contract relating to such risk pools, shared savings program or accountable care organization arrangement;

(p)     all transferable unclaimed property of any Person in Sellers' possession as of the Closing Date, including, without limitation, property which is subject to applicable escheat laws;

(q)     to the extent assignable or transferable by Sellers without out-of-pocket expense to Sellers, all warranties (including warranties of any manufacturer or vendor) on or in connection with the Assets (including the Personal Property) in favor of the Hospitals or Sellers;

(r)     the right to use the names "St. Francis Medical Center", "St. Vincent Medical Center", "Seton Medical Center" and "Seton Medical Center Coastside", including any trademarks, service marks, trademark and service mark registrations and registration applications, trade names, trade name registrations, logos, domain names, trade dress, copyrights, copyright registrations, website content, know- how, trade secrets and the corporate or company names of Sellers and the names of the Hospitals, together with all rights to sue and recover damages for infringement, dilution, misappropriation or other violation or conflict associated with any of the foregoing; at the Closing, Purchaser will execute and deliver to Sellers the Transition Services Agreement granting to Sellers an unlimited, royalty free, irrevocable license to use any and all of the foregoing solely in connection with the wind-down of the Businesses, the completion of the

9

Bankruptcy Cases and the dissolution of Sellers (and following completion of such wind-down, Bankruptcy Cases and dissolution of Sellers, such license shall automatically terminate);

(s)    all goodwill of the Hospital of such Hospital Seller evidenced by or associated with any of the Assets;

(t)    to the extent transferable or assignable, such Hospital Seller's right or interest in the telephone and facsimile numbers and uniform resource locaters used with respect to the operation of the Hospital of such Hospital Seller;

(u)    each such Hospital Seller's Medicare and Medi-Cal provider agreements and lockbox account(s) identified on **Schedule 1.7(u)**;

(v)    all documents, records, correspondence, work papers and other documents, other than patient records, primarily relating to the Accounts Receivable;

(w)    with respect to Verity Holdings, the assets represented by the assessor's parcel numbers (APN's) listed in **Schedule 1.7(w)** hereof (the "**Purchased Verity Holdings Assets**");

(x)    except for the Excluded Assets, to the extent assignable or transferable, and subject to the Permitted Exceptions, any other assets owned by such Hospital Seller (which are not otherwise specifically described above in this Section 1.7) that are used in the operation of the Hospital of such Hospital Seller;

(y)    all of Seton's interest in and to the PACE Obligations; and

(z)    all QAF V and subsequent QAF program payments received after the Closing (e.g., QAF VI and QAF VII).

As used herein, the term "**Permitted Exceptions**" means (i) the Assumed Obligations; (ii) the PACE Obligations; (iii) liens for taxes not yet due and payable (iv) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property; (v) other imperfections of title or encumbrances, if any, which are not monetary in nature and that are not, individually or in the aggregate, material to the business of the Hospital; (vi) any agreements made with any governmental authority in order to obtain any consent or approval, including, without limitation, in connection with the Medicare and Medi-Cal provider agreements; and (vii) other imperfections of title or encumbrances that are expressly identified on **Schedule 1.7** hereof.

1.8    Excluded Assets. Notwithstanding anything to the contrary in Section 1.7, each Seller shall retain all interests, rights and other assets owned directly or indirectly by it (or any of such Seller's affiliates) which are not among the Assets, including, without limitation, the following interests, rights and other assets of such Seller (collectively, the "**Excluded Assets**"):

(a)    cash, cash equivalents and short-term investments;

(b)    all Seller Plans (defined below) and the assets of all Seller Plans and any asset that would revert to the employer upon the termination of any Seller Plan, including, without limitation, any assets representing a surplus or overfunding of any Seller Plan;

(c)    all contracts that are not Assumed Contracts;

(d)    all leases that are not Assumed Leases;

(e)    the portions of Inventory, Prepaids, and other assets disposed of, expended or canceled, as the case may be, by such Seller after the Signing Date and prior to the Effective Time in the ordinary course of business;

(f)    assets owned and provided by vendors of services or goods to the Hospital of such Hospital Seller;

(g)    all of such Seller's organizational or corporate record books, minute books, tax returns, tax records and reports, data, files and documents, including electronic data related thereto;

(h)    all claims, counterclaims and causes of action of such Seller or such Seller's bankruptcy estate (including parties acting for or on behalf of such Seller's bankruptcy estate, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Cases), including, without limitation, rights of recovery or set-off of every kind and character against third parties, causes of action arising out of any claims and causes of action under chapter 5 of the Bankruptcy Code and any related claims, counterclaims and causes of action under applicable non-bankruptcy law, and any rights to challenge liens asserted against property of such Seller's bankruptcy estate, including, but not limited to, liens attaching to the Purchase Price paid to such Seller, and the proceeds from any of the foregoing;

(i)    other than casualty insurance proceeds described in Section 1.7(m), all insurance policies and contracts and coverages obtained by such Seller or listing such Seller as insured party, a beneficiary or loss payee, including prepaid insurance premiums, and all rights to insurance proceeds under any of the foregoing, and all subrogation proceeds related to any insurance benefits arising from or relating to Assets prior to the Closing Date;

(j)    all deposits made with any entity that provides utilities to the Hospital (the "**Utility Deposits**");

(k)    all rents, deposits, prepayments, and similar amounts relating to any contract or lease that is not an Assumed Contract or Assumed Lease;

(l)    all non-transferrable unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat laws;

(m)    all other bank accounts of such Sellers not listed on **Schedule 1.7(u)**;

11

(n)     all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection;

(o)     the rights of such Seller to receive mail and other communications with respect to Excluded Assets or Excluded Liabilities;

(p)     all director and officer insurance;

(q)     all tax refunds of such Seller;

(r)     all documents, records, operating manuals and film pertaining to the Hospital that the parties agree that such Seller is required by law to retain;

(s)     all patient records and medical records which are not required by law to be maintained by such Seller as of the Effective Time;

(t)     all documents, records, correspondence, work papers and other patient records that may not be transferred under applicable law, and any other documents, records, or correspondence (including with respect to any employees) that may not be transferred under applicable law;

(u)     any rights or documents relating to any Excluded Liability or other Excluded Asset;

(v)     any rights or remedies provided to such Seller under this Agreement and each other document executed in connection with the Closing;

(w)     any (i) personnel files for employees of such Seller who are not hired by Purchaser; (ii) other books and records that such Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the business of the Hospital as conducted before the Closing or that relate to any of the Assets; (iii) documents which such Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents). With respect to documents necessary to prepare cost reports, Purchaser shall receive the original document and such Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(x)     all deposits or other prepaid charges and expenses paid in connection with or relating to any other Excluded Assets;

(y)     all rights, claims and causes of action of such Seller to the extent related to and/or to the extent arising out of the receivables identified in **Schedule 1.8(y)** and rights to settlements and retroactive adjustments, if any, whether arising under a Seller Cost Report or otherwise, for any reporting periods ending on or prior to the Effective Time, whether open or closed, arising from or against the United States government under the terms of the Medicare

program or TRICARE (formerly the Civilian Health and Medical Program of the Uniformed Services);

(z)    all pre-Closing settlements or settlements pursuant to adversary proceedings in the Bankruptcy Cases, including, without limitation, any proceedings identified in Section 1.8(h) or 1.8(y) (together with the items identified in Section 1.8(h) and 1.8(y), the "**Excluded Settlements and Actions**");

(aa)    for the avoidance of doubt, all QAF IV and QAF V payments actually received prior to the Signing Date;

(bb)    all assets of Verity Holdings other than the Purchased Verity Holdings Assets and all assets of any of the tenants located in the leased premises of the purchased Verity Holdings properties; and

(cc)    any assets identified in **Schedule 1.8(cc)**.

1.9    Assumed Obligations. On the Closing Date, each Seller shall assign, and Purchaser shall assume and agrees to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations of such Seller and only the following liabilities and obligations (collectively, the "**Assumed Obligations**"):

(a)    the Assumed Contracts and all liabilities of such Seller under the Assumed Contracts, including related Cure Costs;

(b)    the Assumed Leases and all liabilities of such Seller under the Assumed Leases, including related Cure Costs;

(c)    all liabilities and obligations arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Purchaser of the Hospital or any of the Assets on or after the Effective Time;

(d)    all accrued vacation and other paid time off, to the extent assumed under Section 1.1(a)(ii);

(e)    all liabilities and obligations of such Seller related to the Hired Employees arising on or following the Effective Time;

(f)    all unpaid real and personal property taxes, if any, that are attributable to the Assets after the Effective Time, subject to the prorations provided in Section 1.6;

(g)    all liabilities and obligations relating to utilities being furnished to the Assets, subject to the prorations provided in Section 1.6;

(h)    any documentary, sales and transfer tax liabilities of such Seller incurred as a result of the consummation of the transaction contemplated by this Agreement;

(i)    all liabilities or obligations provided for in Section 5.3;

13

(j)     any obligations or liabilities Purchaser may desire or need to assume in order to have the Certifications/Licenses/Permits identified on Schedule 1.7(b) reissued to Purchaser, as well as any liabilities or obligations associated with Sellers' Medicare and Medi-Cal provider agreements, but only to the extent assumed by Purchaser, and any Medi-Cal liabilities or obligations needed to support ongoing Hospital Quality Assurance Fee Program payments; and

(k)     any other obligations and liabilities identified in **Schedule 1.9(k)**.

1.10    Excluded Liabilities.  Purchaser shall not assume or become responsible for any duties, obligations or liabilities of any Seller that are not assumed by Purchaser pursuant to the terms of this Agreement, the Bill of Sale, the Assumption Agreement or the Real Estate Assignment(s) (the "**Excluded Liabilities**"), and each Seller shall remain fully and solely responsible for all of such Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Assets or the Hospital unless assumed by Purchaser under this Agreement, in the Bill of Sale, the Assumption Agreement or in the Real Estate Assignment(s).

1.11    Designation of Assumed Contracts and Assumed Leases.

(a)     Except as provided in Section 1.11(b), all contracts and leases will be subject to evaluation by Purchaser for assumption or rejection (collectively "**Evaluated Contracts**").  Not later than seven (7) days prior to the date of the auction for the Assets (i) Purchaser shall notify each Seller in writing of which Evaluated Contracts are to be assumed by such Seller and assigned to Purchaser and (ii) Purchaser shall notify each Seller in writing signed and dated by Purchaser of which Evaluated Contracts are to be rejected by such Seller (collectively, the "**Rejected Contracts**"); provided, that Purchaser shall have the right to designate additional Evaluated Contracts for assumption up to thirty (30) days prior to Closing. Each Seller shall file such motions in the Bankruptcy Court and take such other actions as are reasonably necessary to ensure that final and non-appealable orders are entered (x) assuming and assigning the respective Assumed Contracts or Assumed Leases applicable to such Seller to Purchaser and (y) rejecting the Rejected Contracts.  With respect to each Assumed Lease, the applicable Seller shall execute and deliver to Purchaser an Assignment and Assumption of Lease.  Notwithstanding anything to the contrary set forth in this Agreement, the Rejected Contracts shall constitute part of the Excluded Assets pursuant to, and as defined in, this Agreement.

(b)     At Closing and pursuant to an order of the Bankruptcy Court, each Seller will assume and immediately assign to Purchaser the leases of such Seller for Leased Real Property and the Tenant Leases.

(c)     Notwithstanding the foregoing, Purchaser's obligation to consummate the transactions contemplated by this Agreement are not contingent upon the assumption, assignment or rejection of any contract or lease, or on the amount of any payment or other performance needed to cure any default thereunder.

14

1.12    Disclaimer of Warranties; Release.

(a)    THE ASSETS TRANSFERRED TO PURCHASER WILL BE SOLD BY SELLERS AND PURCHASED BY PURCHASER IN THEIR PHYSICAL CONDITION AT THE EFFECTIVE TIME, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND WITH RESPECT TO THE LEASED REAL PROPERTY WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, INCLUDING, WITHOUT LIMITATION, THE LAND, THE BUILDINGS AND THE IMPROVEMENTS.  ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLERS INCLUDED IN THE ASSETS AND THE ASSUMED OBLIGATIONS ARE BEING ACQUIRED OR ASSUMED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS.  ALL OF THE TANGIBLE ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE EFFECTIVE TIME.

(b)    Purchaser acknowledges that Purchaser will be examining, reviewing and inspecting all matters which in Purchaser's judgment bear upon the Assets, the Sellers, the Hospitals, the business of the Hospitals and their value and suitability for Purchaser's purposes and is relying solely on Purchaser's own examination, review and inspection of the Assets and Assumed Obligations.  Purchaser releases each Seller and its affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the business of the Hospitals or the Assets, or their suitability for any purpose whatsoever.  Purchaser further acknowledges that the representations and warranties of Sellers contained in ARTICLE 2 of this Agreement are the sole and exclusive representations and warranties made by Sellers to Purchaser (including with respect to the Hospitals, the Assets and the Assumed Obligations) and shall expire, and be of no further force or effect after January 8, 2019 (the period from the Signing Date until January 8, 2019, the "**Final Diligence Period**"), except that the Sale Order Date Representations shall expire, and be of no further force or effect upon the Sale Order Date, and in each case Sellers shall not have any liability in respect of any breach thereof following such expiration.

15

# ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby represents, warrants and covenants to Purchaser, severally (and not jointly) with respect to such Seller that the following matters are true and correct as of the Signing Date and as of the last day of the Final Diligence Period, except as would not have a material adverse effect upon the Hospitals, taken as a whole (a "**Material Adverse Effect**") and except as disclosed in the disclosure schedule, as may be amended pursuant to the terms of this Agreement (the "**Disclosure Schedule**"), provided that the representations and warranties set forth in Sections 2.1 (Authorization), 2.2 (Binding Agreement), 2.3 (Organization and Good Standing; No Violation), 2.8 (Compliance with Legal Requirements), 2.9 (Required Consents), 2.11 (Title) and 2.14 (Legal Proceedings) (the "**Sale Order Date Representations**") shall also be made as of immediately prior to the entry of the Sale Order (the "**Sale Order Date**"):

2.1    Authorization.  Such Seller has all necessary corporate power and authority to enter into this Agreement and, subject to Bankruptcy Court approval, to carry out the transactions contemplated hereby.

2.2    Binding Agreement.  This Agreement has been duly and validly executed and delivered by such Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of such Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.  Except for such corporate actions which have been taken on or before the date hereof, no other corporate action on the part of Sellers is necessary to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby and thereby.

2.3    Organization and Good Standing; No Violation.

(a)    Such Seller is an entity duly organized, validly existing and in good standing under the laws of the State of California.  Such Seller has all necessary power and authority to own, operate and lease its properties and to carry on its businesses as now conducted.

(b)    Neither the execution and delivery by such Seller of this Agreement nor the consummation of the transactions contemplated hereby by such Seller nor compliance with any of the material provisions hereof by such Seller, will violate, conflict with or result in a breach of any material provision of such Seller's articles of incorporation or bylaws or any other organizational documents of such Seller.

2.4    Contracts.  Except as set forth in Schedule 2.4, upon entry of the Sale Order and Purchaser's payment of the Cure Costs, to Seller's knowledge, Seller is not in material breach or default of the Assumed Contracts or Assumed Leases.  No provision of this Section 2.4 shall apply to any failure to obtain consents to the assignment of the Assumed Contracts and Assumed Leases from third parties to the Assumed Contracts and Assumed Leases for which consent is required to

16

assign the Assumed Contracts and Assumed Leases to Purchaser (the "**Contract and Lease Consents**").

    2.5   <u>Brokers and Finders</u>.  Except as set forth on <u>Schedule 2.5</u>, neither such Seller nor any affiliate thereof, nor any officer or director thereof, have engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder.

    2.6   <u>Seller Knowledge</u>.  References in this Agreement to "Sellers' knowledge or "the knowledge of Sellers" means the actual knowledge of the Chief Executive Officer or Chief Financial Officer of the applicable Seller, without independent research.  No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

    2.7   <u>Non-Contravention</u>.   Neither the execution and delivery by Sellers of this Agreement and each Ancillary Agreement nor performance of any of the material provisions hereof by Sellers, will violate, conflict with or result in a breach of any material provisions of the articles of incorporation or bylaws of Sellers.

    2.8   <u>Compliance with Legal Requirements</u>. Except as set forth in <u>Schedule 2.8</u>, to the knowledge of Sellers: each Seller, with respect to the operation of the Hospitals, is in material compliance with all applicable laws, statutes, ordinances, orders, rules, regulations, policies, guidelines, licenses, certificates, judgments or decrees of all judicial or governmental authorities (federal, state, local, foreign or otherwise) (collectively, "**Legal Requirements**").  Except as set forth in <u>Schedule 2.8</u>, to the knowledge of Sellers, none of the Sellers, with respect to the operation of the Hospitals, has been charged in writing with or been given written notice of or is under investigation with respect to, any material violation of, or any obligation to take material remedial action under, any applicable Legal Requirements.

    2.9   <u>Required Consents</u>. Except as set forth in <u>Schedule 2.9</u>, and other than in connection with any Licenses, any provider agreements (including any such agreements with a governmental authority) and the CA AG (defined below), Sellers are not a party to or bound by, nor are any of the Assets subject to, any mortgage, or any material lien, deed of trust, material lease, or material contract or any material order, judgment or decree which, after giving effect to the Sale Order (a) will require the consent of any third party to the execution of this Agreement or (b) will require the consent of any third party to consummate the transactions contemplated by this Agreement.

    2.10   <u>Environmental Matters</u>.

        (a)    Sellers have provided Purchasers with the Phase I Environmental Site Assessments set forth in said <u>Schedule 2.10(a)</u>.

        (b)    Except as disclosed in <u>Schedule 2.10(b)</u>, to the knowledge of Sellers, the operations of the Hospitals are not in material violation of any applicable limitations, restrictions, conditions, standards, prohibitions, requirements and obligations of Environmental Laws and related orders of any court or any other governmental authority.

(c)    For the purposes of this Section, the term "**Environmental Laws**" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the storage, treatment and disposal of medical and biological waste. For purposes of this Agreement, the term "**Hazardous Substances**" shall mean (i) any hazardous or toxic waste, substance, or material defined as such in (or for the purposes of) any Environmental Laws, (ii) asbestos-containing material, (iii) medical and biological waste, (iv) polychlorinated biphenyls, (v) petroleum products, including gasoline, fuel oil, crude oil and other various constituents of such products, and (vi) any other chemicals, materials or substances, exposure to which is prohibited, limited or regulated by any Environmental Laws.

2.11    Title. Prior to December 21, 2018, Sellers have delivered at their own expense (i) for all the Real Property preliminary title reports issued by First American Title Insurance Company (the "**Title Commitments**"), (ii) for all of the Real Property all underlying title documents listed on the Title Commitments (the "**Underlying Title Documents**"), and (iii) for all of the Hospitals an as-built ALTA Surveys (the "**Surveys**", and collectively with the Title Commitment and the Underlying Title Documents, the "**Title Documents**").

2.12    Certain Other Representations with Respect to the Hospitals.

(a)    Except as set forth in Schedule 2.12, all Licenses which are material and necessary to the operation of the Hospitals or the Hospitals by Sellers are valid and in good standing and Sellers are in compliance with the terms and conditions of all such Licenses in all material respects, in each case except where the failure to be valid and in good standing or in compliance would not have a material adverse effect on the Assets or the Hospitals. Except as set forth in Schedule 2.12, as of the Closing Date Sellers will have any and all material Licenses required under Legal Requirements to conduct the Hospitals as presently conducted by Sellers, except where the failure to have any such License would not have a material adverse effect on the Assets or the Hospitals. To the knowledge of Sellers, no loss or expiration of any License is pending or threatened.

(b)    Sellers are certified for participation in the Medicare, Medi-Cal and TRICARE programs and any other federal or state health care reimbursement programs in which they participate, and have current and valid provider agreements with each such program, except where the failure to be so certified or have such provider agreements would not have a material adverse effect.

(c)    Sellers have not been excluded from Medicare, Medi-Cal or any federal or state health care reimbursement program, and, to the knowledge of Sellers, there is no pending or threatened exclusion action by a governmental authority against Sellers.

2.13    Financial Statements.

(a)    Schedule 2.13(a) hereto contains the following financial statements (the "Historical Financial Statements"): (i) the unaudited balance sheets of the Sellers as of June 30,

18

2018; (ii) unaudited income statements of the Sellers for the twelve-month periods ended June 30, 2018; (iii) the audited consolidated income statements of Sellers for the years ended 2016 and 2017; and (iv) the unaudited consolidated balance sheet of Sellers as of June 30, 2018.

(b) the income statements contained in the Historical Financial Statements present, fairly in all material respects the results of the operations of the Sellers as of and for the periods covered therein and, except as set forth on Schedule 2.13(b), the balance sheets contained in the Historical Financial Statements (i) are true, complete and correct in all material respects; (ii) present, fairly in all material respects the financial condition of the Sellers as of the dates indicated thereon; and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods covered, except as disclosed therein.

2.14   Legal Proceedings. Except as set forth on Schedule 2.14, and except for any and all cases and/or pleadings filed or to be filed in the Bankruptcy Court, which shall be available through Sellers' claims and noticing agent's website at http://www.kcclcc.com/VERITYHEALTH/, to the knowledge of Sellers, there are no material claims, proceedings or investigations pending or threatened with respect to the ownership of the Assets or the operation of the Hospitals or the Hospitals by Sellers before any governmental authority. Except as set forth on Schedule 2.14, and other than any action or proceeding brought in the Bankruptcy Court, to the knowledge of Sellers, Sellers are not subject to any government order with respect to the ownership or operation by Sellers of the Hospitals or the other Assets or the Hospitals and are in substantial compliance with respect to each such government order.

2.15   Employee Benefits. Schedule 2.15(a) contains a list of (i) each pension, profit sharing, bonus, deferred compensation, or other retirement plan or arrangement of Seller with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee pension benefit plan" as defined in Section 3(2) of ERISA, (ii) each medical, health, disability, insurance or other plan or arrangement of Seller with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee welfare benefit plan" as defined in Section 3(1) of ERISA, and (iii) each other employee benefit or perquisite provided by Seller with respect to the operation of the Hospital, in which any employee of Seller participates in his capacity as such (collectively, the "**Seller Plans**").

2.16   Personnel. Schedule 2.16 sets forth a complete list (as of the date set forth therein) of names, positions and current annual salaries or wage rates and scheduled bonus, and the accrued paid time off pay of all employees of Sellers (including employees of the Hospitals and employees of Verity and Verity Holdings) immediately prior to December 21, 2018, whether such employees are full time employees, part-time employees, on short-term or long-term disability or on leave of absence pursuant to Sellers's policies, the Family and Medical Leave Act of 1993 or other similar Legal Requirements (the "**Hospital Employees**") and indicating whether the Hospital Employee is full- time or part-time.  Sellers shall have the right to update to Schedule 2.16(a) to reflect changes in employment status or new hires and terminations occurring after December 21, 2018 by providing a revised schedule to Purchase no later than five (5) Business Days before the date scheduled for the Closing.Insurance.  Schedule 2.17 contains a list of all material insurance maintained by Sellers with respect to the Assets and the Businesses, as of the Signing Date.

2.18    Accounts Receivable. To the knowledge of Sellers, all Accounts Receivable included in the Assets at Closing result from the bona fide provision of products or services in the ordinary course of business. All Sellers Accounts Receivable are currently deposited, either electronically or manually, into the bank accounts listed on Schedule 4.25(b).

2.19    Payer Contracts. To the knowledge of Sellers, and subject to Section 365 of the Bankruptcy Code, Schedule 2.19 sets forth a complete list of all written contracts with private third party payers including insurance companies and HMOs (“**Payer Contracts**”). Sellers have provided Purchasers with a true and correct copy of all material Payer Contracts, whether or not entered into in the ordinary course of business, or otherwise required to be disclosed on Schedule 2.20, in each case together with all amendments thereto.

2.20    Excluded Individuals. Except as set forth on Schedule 2.20, to the knowledge of Sellers: neither Sellers, Hospitals nor any director, officer or employee of Sellers or Hospitals (a) was, is or is proposed to be, suspended, excluded from participation in, or sanctioned under, any federal or state health care program (including, without limitation, Medicare and Medicaid) (an “**Excluded Individual**”); (b) has been convicted of any criminal offense related to the delivery of any medical or health care services or supplies, or related to the neglect or abuse of patients; (c) has failed to maintain its current License to provide the services required to be provided by it to or on behalf of Sellers and Hospitals; or (d) is unable to obtain or maintain liability insurance consistent with commercially reasonable industry practices.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Sellers as to the following matters as of the Signing Date and, except as otherwise provided herein, shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date:

3.1    Authorization. Purchaser has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby. No additional internal consents are required in order for Purchaser to perform its obligations and agreements hereunder.

3.2    Binding Agreement. This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Sellers, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors’ rights generally from time to time in effect and (b) limitations on the enforcement of equitable remedies.

3.3    Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of California, is or will be duly

authorized to transact business in the State of California, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

3.4    <u>No Violation</u>.  Except as set forth in **Schedule 3.4**, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Purchaser is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

3.5    <u>Brokers and Finders</u>.  Neither Purchaser nor any affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

3.6    <u>Representations of Sellers</u>.  Purchaser acknowledges that it is purchasing the Assets on an "AS IS, WHERE IS" basis (as more particularly described in <u>Section 1.12</u>), and that Purchaser is not relying on any representation or warranty (expressed or implied, oral or otherwise) made on behalf of any Seller other than as expressly set forth in this Agreement.  Purchaser further acknowledges that no Seller is making any representations or warranties herein relating to the Assets or the operation of the Hospital on and after the Effective Time.

3.7    <u>Legal Proceedings</u>.  Except as described on **Schedule 3.7**, there are no claims, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened relating to or affecting Purchaser or any affiliate of Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, business condition (financial or otherwise) of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.  Neither Purchaser nor any affiliate of Purchaser is subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any affiliate of Purchaser which materially adversely affects the condition (financial or otherwise), operations or business of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

3.8    <u>No Knowledge of a Seller's Breach</u>.  Neither Purchaser nor any of its affiliates has knowledge of any breach of any representation or warranty by any Seller or of any other condition or circumstance that would give Purchaser a right to terminate this Agreement pursuant to <u>Section 9.1(c)</u>.  If information comes to Purchaser's attention on or before the Closing Date (whether through a Seller or otherwise and whether before or after the Signing Date) which indicates that Sellers have breached any of its representations and warranties under this Agreement, then the effect shall be as if the representations and warranties had been modified in this Agreement in accordance with the actual state of facts existing prior to the Effective Time such that there will be no breach under Sellers' representations and warranties in relation to such information; *provided, however*, that Purchaser must immediately notify Sellers if any such breach comes to its attention

21

on or before the Closing Date, and Purchaser's failure to so notify Sellers shall constitute a waiver by Purchaser of Sellers' breach, if any, of any representation or warranty. If any such information comes to Purchaser's attention on or before the Closing Date (whether through a Seller or otherwise, including through updated schedules, and whether before or after the Signing Date) that would give Purchaser a right to terminate this Agreement pursuant to Section 9.1(c), Purchaser must immediately notify Sellers if any such information comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Sellers shall constitute a waiver of such right in relation to the relevant breach.

3.9    Ability to Perform.    Purchaser has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

3.10    Purchaser Knowledge.    References in this Agreement to "Purchaser's knowledge" or "the knowledge of Purchaser" means the actual knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Operating Officer of Purchaser, without independent research. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

3.11    Investigation.    Purchaser has been afforded reasonable access to, and has been provided adequate time to review, the books, records, information, operations, facilities and personnel of each Seller and the Hospital for purposes of conducting a due diligence investigation of each Seller and the Hospital. Purchaser has conducted a reasonable due diligence investigation of each Seller and the Hospital and has received satisfactory answers to all inquiries it has made respecting each Seller and the Hospital and has received all information it considers necessary to make an informed business evaluation of each Seller and the Hospital. In connection with its due diligence investigation of each Seller and the Hospital, Purchaser has not relied upon any books, records, information, operations, facilities and personnel provided by any Seller, including in making its determination to enter into this Agreement and/or consummate the transactions contemplated hereby.

## ARTICLE 4

## COVENANTS OF SELLERS

4.1    Access and Information; Inspections.

4.1.1    From the Signing Date through the Effective Time, (a) each Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonable access during normal business hours at Seller's corporate headquarters in El Segundo, California to, and the right to inspect, the books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital of such Seller and the plant and property of the Hospital of such Seller at the Hospital of such Seller and (b) each Seller shall furnish Purchaser with such additional financial and operating data and other information in such Seller's possession

22

as to businesses and properties of the Hospital of such Seller as Purchaser or its representatives may from time to time reasonably request; *provided, however*, that such Seller is not obligated to disclose information which is proprietary to such Seller and would not be essential to the ongoing operation of the Hospital of such Seller by Purchaser; *provided, further*, that all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and such Seller. Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of any Seller or the Hospital.

4.1.2    Notwithstanding anything contained herein, no Seller shall be required to provide Purchaser or its representatives or agents access to or disclose information where such access or disclosure would violate the rights of its patients, jeopardize the attorney-client or similar privilege with respect to such information or contravene any law, judgment, fiduciary duty or contract entered into prior to or on the date of this Agreement with respect to such information.

4.2    <u>Cooperation</u>.

4.2.1    Each Seller shall reasonably cooperate with Purchaser and its authorized representatives and attorneys:  (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Purchaser's efforts to effectuate the assignment of Assumed Contracts to Purchaser as of the Closing Date.  Except as may be otherwise requested by a Seller in order to comply with applicable law or regulatory guidance, notwithstanding anything contained herein, other than Bankruptcy Court orders and authorizations, it shall be Purchaser's sole responsibility (including payment of any fees, expenses, filings costs or other amounts) to obtain the Contract and Lease Consents, as well as all governmental consents, approvals, assignments, authorizations, clearances and licenses required to (x) carry out the transactions contemplated by this Agreement, including but not limited to medical licenses and/or (y) transfer any of the Assets, including any Licenses.  To the extent Purchaser needs certain information and data which is in the possession of a Seller in order for Purchaser to complete Purchaser's license and permit approval applications, Purchaser shall receive, upon request, reasonable assistance from such Seller in connection with the provision of such information.

4.2.2    Notwithstanding any provision to the contrary contained in this Agreement (including Section 8.7), no Seller shall be obligated to obtain the approval or consent to the assignment, to Purchaser, of any Assumed Contracts or Assumed Leases, from any party to any of the Assumed Contracts or Assumed Leases even if any such contract or lease states that it is not assignable without such party's consent.

4.3    <u>Other Bidders</u>.  Purchaser expressly acknowledges and agrees that each Seller has an obligation to seek out and determine the best and highest offer reasonably available for such

Seller's assets in accordance with the Bankruptcy Code, and nothing herein shall amend, modify, alter, diminish or affect such obligation.

4.4    Sellers' Efforts to Close. Each Seller shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Purchaser's obligations under this Agreement to the extent that such Seller's action or inaction can control or materially influence the satisfaction of such conditions; provided, however, that such Seller shall not be required to pay or commit to pay any amount to (or incur any obligation in favor of) any person (other than filing or application fees).

4.5    Termination Cost Reports. Each Seller shall file all Medicare, Medi-Cal and any other termination cost reports required to be filed as a result of the consummation of (a) the transfer of the Assets of such Seller to Purchaser and (b) the transactions contemplated by this Agreement with respect to such Seller, provided that Purchaser shall fund reasonable costs and expenses of preparation, filing and audit of such reports. Purchaser shall permit each Seller access to all Hospital books and records to prepare such reports and shall assist such Seller in the process of preparing, filing, and reviewing the termination cost reports. All such termination cost reports shall be filed by the applicable Seller in a manner that is consistent with current laws, rules and regulations. Each Seller shall be responsible for filing governmental cost reports for the period of January 1, 2019 through the Closing Date. Purchaser shall be responsible for its own cost report filings relating to the Hospitals beginning on the day immediately following the Effective Time.

4.6    Conduct of the Business. From the Signing Date until the Closing, or the earlier termination of this Agreement, without the prior written consent of Purchaser, Sellers shall, with respect to the ownership of the Assets and the operation of the Hospitals, use commercially reasonable efforts to, in each case except as would not have a Material Adverse Effect (except as otherwise noted):

(a)    without regard to Material Adverse Effect, carry on Sellers' ownership of the Assets and the operation of the Hospitals consistent with past practice, but subject to the Bankruptcy Cases and Sellers' obligations and actions in connection therewith;

(b)    maintain in effect the insurance and equipment replacement coverage with respect to the Assets;

(c)    if and as permitted by the Bankruptcy Court, pay any bonuses payable under the Key Employee Retention Plan and Key Employee Incentive Plan of Sellers;

(d)    maintain the Assets in materially the same condition as at present, ordinary wear and tear excepted;

(e)    perform its obligations under all contracts with respect to the Assets in compliance with the Bankruptcy Code;

(f)    following entry of the Sale Order, permit and allow reasonable access by Purchaser and its representatives (which shall include the right to send written materials, all of which shall be subject to Sellers' reasonable approval prior to delivery) to make offers of post-

Closing employment to any of Sellers' personnel (including access by Purchasers and their representatives for the purpose of conducting open enrollment sessions for Purchasers' employee benefit plans and programs) and to establish relationships with physicians, medical staff and others having business relations with Sellers;

(g)    with respect to material deficiencies, if any, cited by any governmental authority (other than the Attorney General of the State of California and other than with respect to Seismic requirements) or accreditation body in the most recent surveys conducted by each, cure or develop and timely implement a plan of correction that is acceptable to such governmental authority or such accreditation body;

(h)    timely file or cause to be filed all material reports, notices and tax returns required to be filed and pay all required taxes as they come due;

(i)    without regard to Material Adverse Effect, beginning on February 21, 2019 and in accordance with the Sellers' budget under their debtor in possession financing, timely pay any fees that are or become due and payable under QAF IV and QAF V;

(j)    comply in all material respects with all Legal Requirements (including Environmental Laws) applicable to the conduct and operation of the Hospitals; and

(k)    without regard to Material Adverse Effect, maintain all material approvals, permits and environmental permits relating to the Hospitals and the Assets.

4.7    <u>Contract With Unions</u>.  Representatives of Sellers who are parties to collective bargaining agreements and Purchaser shall meet and confer from time to time as reasonably requested by either party to discuss strategic business options and alternative approaches in negotiating each collective bargaining agreement. The applicable Sellers and Purchaser shall each participate in all union negotiations related to any specific collective bargaining agreement. Promptly following the Signing Date, applicable Sellers shall use commercially reasonable efforts to initiate discussions with Purchaser and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union. The applicable Sellers will not unreasonably withhold, condition or delay approval or implementation of any successfully renegotiated collective bargaining agreement. The parties recognize that an applicable Seller's failure to secure a modification to any collective bargaining agreement, or to conclude a successor collective bargaining agreement shall not be a breach of Sellers' obligation under this Agreement, provided that if the unions refuse to negotiate, or otherwise are not timely, reasonable or realistic in renegotiating, the collective bargaining agreements during the period between the Signing Date and the Closing Date, Sellers and Purchaser will jointly consider, and negotiate mutually in good faith, alternative approaches that may be available and/or necessary to reduce Sellers' labor cost structure, including, but not limited to, seeking to reject the collective bargaining agreement(s).

## ARTICLE 5

## COVENANTS OF PURCHASER

25

5.1    <u>Purchaser's Efforts to Close</u>.  Purchaser shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in <u>ARTICLE 7</u> and <u>ARTICLE 8</u> to its or Sellers' obligations under this Agreement to the extent that Purchaser's action or inaction can control or materially influence the satisfaction of such conditions.  Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement, Purchaser shall be permitted to communicate and meet with (a) counter-parties to the agreements and contracts of the Hospitals, included those included in Assumed Obligations, regarding the terms and conditions under which they may be assumed and assigned to Purchaser, and (b) applicable governmental and regulatory authorities regarding prospective compliance with regulatory requirements and related issues; so long as, in the case of each of (a) and (b) (i) such communications and meetings do not interfere with the operation of the Businesses or the conduct of the Bankruptcy Cases and (ii) any communications or meetings with any governmental authority are approved in advance by Sellers as to timing and content (and Sellers are copied on such communications and afforded the opportunity to participate in such meetings).

5.2    <u>Required Governmental Approvals</u>.

(a)    Purchaser, at its sole cost and expense (a) shall use its best efforts to secure, as promptly as practicable before the Closing Date, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled (and provide Sellers copies of all materials relating to such consents, approvals, authorizations, clearances and licenses upon submission and all materials received from third parties in connection with such consents, approvals, authorizations, clearances and licenses upon receipt), and (b) will provide such other information and communications to governmental and regulatory authorities as any Seller or such authorities may reasonably request.  Purchaser will provide Sellers periodic and timely updates regarding all such consents, approvals, authorizations, clearances and licenses.  Purchaser is responsible for all filings with and requests to governmental authorities necessary to enable Purchaser to operate the Hospital at and after the Effective Time.  Purchaser shall, promptly, but no later than thirty (30) business days after the entry of the Sale Order or sooner if required by applicable governmental or regulatory authorities, file all applications, licensing packages and other similar documents with all applicable governmental and regulatory authorities which are a prerequisite to obtaining the material licenses, permits, authorizations and provider numbers described in <u>Section 8.1</u>.  Purchaser shall be entitled, but not obligated, to obtain the Contract and Lease Consents.  Purchaser shall be entitled, but not obligated, to solicit and obtain estoppel certificates from any third party to any Leased Real Property.  Purchaser's failure to obtaining any or all of the Contract and Lease Consents or estoppel certificates as of the Closing Date shall not be a condition precedent to either party's obligation to close the transactions contemplated by this Agreement.

(b)    Purchaser and Sellers agree that because the change of ownership and regulatory approval process in connection with the transactions contemplated by this Agreement may take an extended period of time, Purchaser and Sellers agree to an initial closing effective upon the approval of the court and upon the approval of the transaction by the CA AG (as defined below) in accordance with Sections 7.5 and 8.6, at which time the Assets (less the portion of the Assets constituting drugs or other pharmacy assets) will be sold to Purchaser and immediately leased back

26

to Sellers, with a concurrent management agreement entered into at that time upon terms mutually agreeable to the parties in their reasonable business judgment. The Sale Leaseback Agreement and Interim Management Agreement will terminate at the Closing when the Purchaser is issued the Licenses necessary to operate the Hospitals directly (namely, the Hospital Licenses and pharmacy permits).

5.3    Certain Employee Matters.

(a)    Purchaser agrees to make offers of employment, effective as of the Effective Time, to substantially all persons (whether such persons are full time employees, part-time employees, on short-term or long-term disability or on leave of absence, military leave or workers compensation leave) (the "**Hospital Employees**") who, immediately prior to the Effective Time are: (i) employees of any Seller; (ii) employees of any affiliate of any Seller which employs individuals at the Hospital and are listed on **Schedule 5.3**; or (iii) employed by an affiliate of any Seller and are listed on **Schedule 5.3**. For the avoidance of doubt, the Hospital Employees shall not include any employees of Verity or any other affiliate of Seller unless such individual is listed on **Schedule 5.3**. Any of the Hospital Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "**Hired Employees**." All employees who are Hired Employees shall cease to be employees of the applicable Seller or its affiliates as of the Effective Time.

(b)    Purchaser shall give all Hired Employees full credit for paid time off pay to such employees as of the Closing Date by crediting such employees the time off reflected in the employment records of the applicable Seller and/or any of its affiliates immediately prior to the Effective Time, subject to compliance with applicable law and regulation, including consent of such employees if required.

(c)    After the Closing Date, Purchaser's human resources department will give reasonable assistance to each Seller and its affiliates with respect to such Seller's and such Seller's affiliates' post-Closing administration of such Seller's and such Seller's affiliates' pre-Closing employee benefit plans for the Hospital Employees. Within five (5) days after the Closing Date, Purchaser shall provide to each Seller a list of all the Hospital Employees who were offered employment by Purchaser but refused such employment along with a list of all Hired Employees (which such list Purchaser shall periodically update).

(d)    With respect to any collective bargaining agreements or labor contract with respect to any employees, Purchaser shall comply with the applicable laws and bankruptcy court orders relating to collective bargaining agreements or labor contracts.

(e)    The provisions of this Section 5.3 are solely for the benefit of the parties to this Agreement, and no employee or former employee or any other individual associated therewith or any employee benefit plan or trustee thereof shall be regarded for any purpose as a third party beneficiary of this Agreement, and nothing herein shall be construed as an amendment to any employee benefit plan for any purpose.

5.4    Excluded Assets. As soon as practicable after the Closing Date, Purchaser shall deliver to each Seller or such Seller's designee any Excluded Assets of such Seller found at the

Hospital on and after the Effective Time, without imposing any charge on any Seller for Purchaser's storage or holding of same on and after the Effective Time.

5.5     Waiver of Bulk Sales Law Compliance.  Purchaser hereby waives compliance by Sellers with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Assets are located and all other laws applicable to bulk sales and transfers.

5.6     Attorney General.  Promptly after entry of the Sale Order, but in any event within ten (10) calendar days, Purchaser shall, at its sole cost and expense, make any notices or other filings with the Attorney General of the State of California (the "**CA AG**").  Each Seller shall reasonably cooperate with Purchaser in such notices or other filings.

5.7     Conduct Pending Closing.  Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement pursuant to its terms, unless Sellers shall otherwise consent in writing, Purchaser shall not take any action or fail or omit to take any action which would cause any of Purchaser's representations and warranties set forth in ARTICLE 4 to be inaccurate or untrue as of the Closing.

5.8     Cure Costs.  Purchaser, upon assumption, shall pay the Cure Costs for each Assumed Contract and Assumed Lease so that each such Assumed Contract and Assumed Lease may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code.  For purposes of this Agreement, "**Cure Costs**", means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of the Assumed Contracts and Assumed Leases to Purchaser as provided herein.

5.9     Operating Covenant.  Purchaser shall act in good faith and use Purchaser's commercially reasonable efforts to serve the medical needs of each Hospital's service area.

5.10    HSR Filing.  Purchaser and each Seller will as promptly as practicable, and in any event no later than five business days after the date of the Sale Order, file with the Federal Trade Commission and the Department of Justice the notification and report forms required for the transactions contemplated hereby and any supplemental information that may be reasonably requested in connection therewith pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "**HSR Act**"), which notification and report forms and supplemental information will comply in all material respects with the requirements of the HSR Act.  Purchaser shall pay all filing fees required with respect to the notification, report and other requirements of the HSR Act.  Each of Purchaser and Sellers shall furnish to the other such information and assistance as the other shall reasonably requires in connection with the preparation and submission to, or agency proceedings by, any governmental authority under the HSR Act, and each of Purchaser and Sellers shall keep the other promptly apprised of any communications with, and inquires or requests for information from, such governmental authorities.  Purchaser shall take such action (including divestitures or hold separate arrangements) as may be required by any governmental authority in order to resolve with the minimum practicable delay any objections such governmental authorities may have to the transactions contemplated by this Agreement under the HSR Act.

28

5.11    <u>Contract with Unions</u>.    Representatives of Sellers who are parties to collective bargaining agreements and Purchaser shall meet and confer from time to time as reasonably requested by either party to discuss strategic business options and alternative approaches in negotiating each collective bargaining agreement.  The applicable Sellers and Purchaser shall each participate in all union negotiations related to any specific collective bargaining agreement.  Promptly following the Signing Date, applicable Sellers shall use commercially reasonable efforts to initiate discussions with Purchaser and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union.  The applicable Sellers will not unreasonably withhold, condition or delay approval or implementation of any successfully renegotiated collective bargaining agreement to be assumed by Purchaser. The parties recognize that an applicable Seller's failure to secure a modification to any collective bargaining agreement, or to conclude a successor collective bargaining agreement shall not be a breach of Sellers' obligation under this Agreement.  In addition, Sellers may, in their discretion, seek to reject any or all of the collective bargaining agreement(s).

## ARTICLE 6

## SELLERS' BANKRUPTCY AND BANKRUPTCY COURT APPROVAL

6.1    <u>Bankruptcy Court Approval; Overbid Protection and Break-Up Fee</u>.

(a)    Sellers and Purchaser acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases are subject to Bankruptcy Court approval, and that this Agreement is subject to termination in its entirety in the event any Seller receives a better and higher offer for the Assets in accordance with the Bankruptcy Code and subject to the terms stated herein.

(b)    Promptly following the execution of this Agreement by all parties, the Seller shall file a motion with the Bankruptcy Court (the "**Sales Procedures Motion**"), the content of which shall be subject to the reasonable approval by Purchaser, for entry of an order approving bid procedures and overbid protections containing substantially the following terms and conditions:

(1) the Seller shall not accept any offer to sell the Assets subject to this Agreement ("**Overbid**") to another purchaser ("**Overbidder**") unless that offer exceeds the Purchase Price by an amount sufficient to pay the Break-Up Fee and such offer includes the purchase of substantially all Assets subject of this Agreement;

(2) in the event that an overbidder (and not the Purchaser) is the successful bidder for the purchase of the Assets (the "**Alternate Transaction**") and the Alternative Transaction is approved by the Bankruptcy Court, (a) the Deposit, and any interest earned thereon, shall be returned to Purchaser immediately upon the entry of such sale order, and (b) Purchaser shall be paid a break-up fee of three and one-half percent (3.25%) of the Cash Consideration ($19,825,000.00) plus reimbursement of reasonably documented reasonable costs and expenses incurred by Purchaser related to its due diligence, and pursuing, negotiating, and documenting the transactions contemplated by this Agreement in an amount not to exceed $2,000,000.00 ( (the "**Break-Up Fee**"); provided, however, that in the event that

29

the Purchaser is successful as to some but not all of the Assets, the Break-Up Fee shall be reduced pro rata to the percentage of Assets not actually purchased by the Purchaser, based on the allocation of the Purchase Price as described in Section 1.1(a)(i), as compared to the Assets which were the subject of this Agreement; in the event that Purchaser terminates this Agreement in accordance with Section 8.6 hereof, expenses of Purchaser incurred in satisfaction of Section 8.6 shall be reimbursed up to $500,000; and

(3) The Break-Up Fee shall be deemed to be an allowed expense of the kind specified in Section 503(b) of the Bankruptcy Code to be paid solely from the proceeds of the Alternate Transaction, pursuant to the Sale Order. The Break-Up Fee shall not be paid if the Alternate Transaction was pursued due to a material breach by the Purchaser or the Purchaser's failure or refusal to consummate the transaction after the satisfaction or waiver of all closing conditions.

The Sales Procedures Motion will contain bid procedures as set forth in the bid procedures attached hereto as **Schedule 6.1(b)(3)**.

If Sellers fails to obtain Bankruptcy Court approval for the Sales Procedures Motion by no later than four weeks after the end of the Final Diligence Period, Purchaser shall have the right to terminate this Agreement, without recourse or liability, and Seller shall immediately thereafter return to Purchaser the Deposit and any interest earned thereon.

(c)    Each Seller shall at the Sale Hearing exercise reasonable efforts to obtain a "Sale Order" approving this Agreement, subject to its obligations in respect of any better and higher offer for such Seller's assets in accordance with the Bankruptcy Code. For purposes of this Agreement, the term "**Sale Order**" shall mean an order of the Bankruptcy Court authorizing the sale of the Assets (including the assumption and assignment of the Assumed Contracts and Assumed Leases) to Purchaser consistent with this Agreement and in a form reasonably satisfactory to Purchaser.

(d)    Each Seller agrees to proceed in good faith to obtain Bankruptcy Court approval of the sale contemplated herein with a determination that Purchaser is a good faith purchaser pursuant to Bankruptcy Code section 363(m) and to file such declarations and other evidence as may be required to support a finding of good faith.

(e)    Each Seller shall seek an order from the Bankruptcy Court retaining jurisdiction over all matters relating to claims against such Seller as debtor solely in the Bankruptcy Court.

6.2    Appeal of Sale Order. In the event an appeal is taken or a stay pending appeal is requested from the Sale Order, Sellers shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay. Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders. In the event of an appeal of the Sale Order, Sellers shall be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal; provided, however, Purchaser, at its option, shall have the right to

participate as a party in interest in such appeal. In the event a stay is issued by any appellate court, including the United States District Court, which prevents the sale from closing, as scheduled, Purchaser shall have the right to terminate this Agreement if such stay is not vacated on or before 45 days from the date of the stay is issued, and Purchaser shall be entitled to the prompt return of the Deposit and any interest earned thereon.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

Sellers' obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Sellers in whole or in part at or prior to the Closing:

7.1     Signing and Delivery of Instruments.  Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement.

7.2     No Restraints.     No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

7.3     Performance of Covenants.  Purchaser shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

7.4     Governmental Authorizations. Purchaser shall have obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits and authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies).

7.5     Attorney General Provisions.  The conditions to Purchaser's obligations to close set forth in Section 8.6 shall have been satisfied.

7.6     Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order.

7.7     HSR Act.  The applicable waiting period under the HSR Act shall have expired or been earlier terminated.

7.8    CSCDA Acknowledgement.  The CSCDA and PACE Trustee shall have executed acknowledgements in form and substance acceptable to Sellers that Purchaser is the Successor Property Owner and Obligated Party under the PACE Obligations, and releases of the Sellers from any and all claims arising or accruing prior to the Closing Date.

## ARTICLE 8

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

8.1    Governmental Authorizations.  Except as otherwise set forth in this Agreement, Purchaser and Sellers shall have obtained licenses, permits and authorizations from governmental agencies or governmental bodies that are required for the purchase, sale and operation of the Hospitals, including without limitation approval of the CA AG (subject to Section 8.6), except in such case where failure to obtain such license, permit or authorizations from a governmental agency or governmental body does not have a Material Adverse Effect.

8.2    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered the Sale Order and made a finding that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

8.3    Signing and Delivery of Instruments.  Sellers shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement.

8.4    Performance of Covenants.  Sellers shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Sellers on or prior to the Closing Date; *provided, however*, this condition will be deemed to be satisfied unless (a) Sellers were given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within fifteen (15) business days after receipt of such notice and (b) the respects in which such obligations, covenants, agreements and conditions have not been performed have had or would have a Material Adverse Effect.

8.5    No Restraints.  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

8.6    Attorney General Provisions.  Purchaser recognizes that the transactions contemplated by this Agreement may be subject to review and approval of the CA AG. Purchaser

agrees to close the transactions contemplated by this Agreement so long as any conditions imposed by the CA AG are substantially consistent with the conditions set forth, as Purchaser Approved Conditions, in Schedule 8.6. In the event the CA AG imposes conditions on the transactions contemplated by this Agreement, or on Purchaser in connection therewith, which are materially different than the Purchaser Approved Conditions set forth on Schedule 8.6 (the "Additional Conditions"), Sellers shall have the opportunity to file a motion with the Bankruptcy Court seeking the entry of an order ("Supplemental Sale Order") finding that the Additional Conditions are an "interest in property" for purposes of 11 U.S.C. § 363(f), and that the Assets can be sold free and clear of the Additional Conditions without the imposition of any other conditions, which would adversely affect the Purchaser. For purposes of this Section 8.6, Additional Conditions which individually or collectively impose a direct or indirect cost to Purchaser of $5 million, or more, shall be conclusively deemed to be "materially different." If Sellers determine not to seek such Supplemental Sale Order, or fail to obtain such Supplemental Sale Order within 60 days of the Attorney General's imposition of Additional Conditions, Purchaser shall be entitled to terminate this Agreement and receive the return of its Good Faith Deposit. If Sellers timely obtain such Supplemental Sale Order from the Bankruptcy Court or another court, Purchaser shall have a period of 21 business days from the entry of such order (the "Evaluation Period") to determine, in the exercise of the Purchaser's reasonable business judgment and in consultation with Purchaser's financing sources, whether to proceed to consummate the transactions contemplated by this Agreement; provided, however, (i) Purchaser shall not terminate or provide notice of termination of the Stalking Horse APA based on the Seller's failure to satisfy the condition set forth under this Section 8.6 until the expiration of the Evaluation Period as may be extended herein, and (ii) the Evaluation Period may be extended by the Debtors, in consultation with the Consultation Parties, by up to 90 days for any appeal properly perfected with respect to the Supplemental Sale Order (the "Extended Evaluation Periods"). For the avoidance of doubt, if the Debtors or any of the Consultation Parties dispute the reasonableness of the exercise of the Purchaser's business judgment, such dispute shall be determined by the Bankruptcy Court only in the context of an adversary proceeding. If, at the conclusion of the Extended Evaluation Periods, such Supplemental Sale Order has not become a final, non-appealable order and Purchaser determines not to proceed, Purchaser shall have the right within ten (10) business days after the conclusion of the Extended Evaluation Periods to terminate this Agreement and receive the return of its Good Faith Deposit. Sellers shall provide Purchaser with prompt written notice of the conclusion of the Extended Evaluation Periods and whether the Supplemental Sale Order has become a final, non-appealable order. For purposes of this Section 8.6, "a final, non-appealable order" shall include a Supplemental Sale Order (i) which has been affirmed or the appeal of which has been dismissed by any appellate court and for which the relevant appeal period has expired (other than any right of appeal to the U.S. Supreme Court), or (ii) which has been withdrawn by the appellant. If the Supplemental Sale Order becomes a final, non-appealable order prior to the expiration of the Evaluation Period or, if applicable, the Extended Evaluation Periods, Purchaser shall consummate the Sale provided that all other conditions to closing have been satisfied. During any Evaluation Period or Extended Evaluation Periods, Purchaser shall reasonably cooperate in any efforts to render the Supplemental Sale Order a final, non-appealable order, including timely taking reasonable steps in preparation for closing of the transactions described in this Agreement; provided, however, Purchaser shall not be obligated to expend more than $500,000. For the avoidance of doubt, neither this provision, nor any of the rights granted to the Purchaser herein,

33

shall constitute a waiver of any party in interest's right to argue that any appeal from the Sale Order should be dismissed on statutory, Constitutional or equitable mootness grounds.

8.7    Medicare and Medi-Cal Provider Agreements. Sellers shall transfer their Medicare provider agreements pursuant to a settlement agreement with the Centers for Medicare and Medicaid Services (**"CMS"**) and shall transfer their Medi-Cal provider agreements pursuant to a settlement agreement with the California Department of Health Care Services (**"DHCS"**), which such settlement agreements shall result in: (i) resolution of all outstanding financial defaults under any of Sellers' Medicare and Medi-Cal provider agreements and (ii) full satisfaction, discharge, and release of any claims under the Medicare or Medi-Cal provider agreements, whether known or unknown, that CMS or DHCS, as applicable, has against the Seller or Purchaser for monetary liability arising under the Medicare or Medi-Cal provider agreements before the Effective Time; provided, however, that Purchaser acknowledges that it will succeed to the quality history associated with the relevant Medicare or Medi-Cal provider agreements assigned and shall be treated, for purposed of survey and certification issues as if it is the relevant Seller and no change of ownership occurred.

8.8    HSR Act. The applicable waiting period under the HSR Act shall have expired or been earlier terminated.

## ARTICLE 9

## TERMINATION

9.1    Termination. This Agreement may be terminated at any time prior to Closing:

(a)    by the mutual written consent of the parties;

(b)    by Sellers if a material breach of this Agreement has been committed by Purchaser and such breach has not been (i) waived in writing by Sellers or (ii) cured by Purchaser to the reasonable satisfaction of Sellers within fifteen (15) business days after service by Sellers upon Purchaser of a written notice which describes the nature of such breach;

(c)    by Purchaser if, in its sole and absolute discretion, it is not satisfied with either (i) the results of its due diligence examination of the Hospitals, or (ii) the contents of any schedule or exhibit that was not completed and attached to this Agreement, but which has been provided to Purchaser after the Signing Date, and Purchaser has notified Seller of its election to terminate the Agreement under this Section 9.1(c) on or prior to January 8, 2019, which notice may be given by facsimile or email correspondence; provided, that for the avoidance of doubt, following expiration of the Final Diligence Period, notwithstanding anything else in this Agreement, Purchaser shall not be entitled to terminate this Agreement (or not Close) as a result of the breach of any representation or warranty made by Sellers (or any of them) other than the breach of a Sale Order Date Representation, but in each case solely to the extent such breach of a Sale Order Date Representation would result in a Material Adverse Effect; provided, further, that any dispute between Purchaser and Sellers as to whether a Material Adverse Effect has occurred for any purpose under this Agreement shall be exclusively settled by a determination made by the Bankruptcy Court;

34

(d)    by Purchaser if a material breach of this Agreement has been committed by Sellers and such breach has not been (i) waived in writing by Purchaser or (ii) cured by Sellers to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser upon Sellers of a written notice which describes the nature of such breach;

(e)    by Purchaser if satisfaction of any of the conditions in ARTICLE 8 has not occurred by December 31, 2019 or becomes impossible, and Purchaser has not waived such condition in writing (provided that the failure to satisfy any of the applicable condition or conditions in Sections 8.1 through 8.5 inclusive has occurred by reason other than (i) through the failure of Purchaser to comply with its obligations under this Agreement or (ii) Sellers' failure to provide their closing deliveries on the Closing Date as a result of Purchaser not being ready, willing and able to close the transaction on the Closing Date); provided that upon the imposition of Additional Conditions by the CA AG, Section 8.6 must be satisfied or waived by Purchaser by no later than sixty (60) days thereafter.

(f)    by Sellers if satisfaction of any of the conditions in ARTICLE 7 has not occurred by December 31, 2019 or becomes impossible, and Sellers have not waived such condition in writing (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than (i) through the failure of Sellers to comply with their obligations under this Agreement or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date as a result of Sellers not being ready, willing and able to close the transaction on the Closing Date);

(g)    by either Purchaser or Sellers if the Bankruptcy Court enters an order dismissing the Bankruptcy Cases or fails to approve the Sales Procedures Motion by the date specified in Section 6.1(b);

(h)    by Sellers if, in connection with the Bankruptcy Cases, any Seller accepts an Alternate Transaction and pays the Break-Up Fee;

(i)    by either Purchaser or Sellers if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before December 31, 2019; or

(j)    by Purchaser if a force majeure event (such as acts of God, storms, floods, landslides, earthquakes, lightning, riots, fires, pandemics, sabotage, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities, other national or international calamity, one or more acts of terrorism, or failure of energy sources) shall have occurred between the Signing Date and Closing Date, which event is reasonably likely to have a Material Adverse Effect.

9.2    Termination Consequences.    If this Agreement is terminated pursuant to Sections 6.1(b), 6.2 or 9.1: (a) all further obligations of the parties under this Agreement shall terminate (other than Purchaser's right to receive the Break-Up Fee if applicable), provided that the provisions of ARTICLE 12, shall survive; and (b) each party shall pay only its own costs and expenses incurred by it in connection with this Agreement; provided, in the case of any termination based on Sections 9.1(b) or (d) the consequences of such termination shall be determined in

accordance with ARTICLE 11 hereof.  In addition, if this Agreement is terminated pursuant to Sections 6.1(b), 6.2 or 9.1 (other than Section 9.1(b)), Seller shall immediately return the Deposit to Purchaser with all interest earned thereon.  Each Party acknowledges that the agreements contained in this Section 9.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

## ARTICLE 10

## POST-CLOSING MATTERS

10.1    Excluded Assets.

Subject to Section 10.2 hereof, any Excluded Asset (or proceeds thereof) (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement or (c) absent such agreement, as determined by adjudication by the Bankruptcy Court, which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall, within five (5) business days following receipt, be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to the applicable Seller.  Purchaser (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to any Seller under this Section 10.1 against, nor the right to contest its obligation to transfer, assign and convey to any Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against any Seller.  If Purchaser does not remit any monies included in the Excluded Assets (or proceeds thereof) to the applicable Seller in accordance with the first sentence of this Section 10.1, such withheld funds shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "**Excluded Asset Due Date**") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to the applicable Seller.

10.2    Preservation and Access to Records After the Closing.

(a)    From the Closing Date until seven (7) years after the Closing Date or such longer period as required by law (the "**Document Retention Period**"), Purchaser shall keep and preserve all medical records (including, without limitation, electronic medical records), patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets.  Purchaser will afford to the representatives of Sellers, any of their affiliates, the Official Committee of the Unsecured Creditors of the Sellers, Sellers' estate representative or any liquidating trustee of the Sellers' bankruptcy estate ("**Seller Parties**"), including their counsel and accountants, full and complete access to, and copies (including, without limitation, color laser copies) of, such records with respect to time periods prior to the Effective Time (including, without limitation, access to records of patients treated at the Hospital prior to the Effective Time) during normal business hours after the Effective Time, to the extent reasonably needed by any Seller Party for any lawful purpose.  Purchaser acknowledges that, as a result of entering into this Agreement and operating the Hospital, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality.  Purchaser shall abide by any such rules and regulations

36

relating to the confidential information it acquires.  Purchaser shall maintain the patient and medical staff records at the Hospital in accordance with applicable law and the requirements of relevant insurance carriers.  After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents described in this <u>Section 10.2(a)</u>, Purchaser shall provide written notice to Sellers of Purchaser's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal.  Any of the Seller Parties shall have the right, at its sole cost, to take possession of such documents during such forty-five (45) calendar day period.  If any of the Seller Parties does not take possession of such documents during such forty-five (45) calendar day period, Purchaser shall be free to destroy or otherwise dispose of such documentation upon the expiration of such forty-five (45) calendar day period.

(b)    Provided that Purchaser shall not incur any out of pocket costs, Purchaser shall give full cooperation to the Seller Parties and their insurance carriers in connection with the administration of Sellers' estate, including, without limitation, in connection with all claims, actions, causes of action or audits relating to the Excluded Assets, Excluded Liabilities or pre-Closing operation of the Sellers or the Hospital that any Seller Party may elect to pursue, dispute or defend, in respect of events occurring prior to the Effective Time with respect to the operation of the Hospital.  Such cooperation shall include, without limitation, making the Hired Employees available for interviews, depositions, hearings and trials and other assistance in connection with the administration of Sellers' estate and such cooperation shall also include making all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done without payment of any fees or expenses to Purchaser or to such employees); provided that Purchaser shall not be required to incur any out of pocket costs in association therewith.  In addition, Sellers and their affiliates shall be entitled to remove from the Hospital originals of any such records, but only for purposes of pending litigation involving the persons to whom such records refer, as certified in writing prior to removal by counsel retained by Sellers or any of their affiliates in connection with such litigation.  Any records so removed from the Hospital shall be promptly returned to Purchaser following Sellers' or their applicable affiliate's use of such records.

(c)    In connection with (i) the transition of the Hospital pursuant to the transaction contemplated by this Agreement, (ii) Sellers' rights to the Excluded Assets, (iii) any claim, audit, or proceeding, including, without limitation, any tax claim, audit, or proceeding and (iv) the Sellers' obligations under the Excluded Liabilities, Purchaser shall after the Effective Time give Sellers access during normal business hours to Purchaser's books, personnel, accounts and records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital as representatives of Sellers and their affiliates may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of the Hospital.

(d)    Purchaser and its representatives shall be given access by Sellers during normal business hours to the extent reasonably needed by Purchaser for business purposes to all documents, records, correspondence, work papers and other documents retained by Sellers pertaining to any of the Assets prior to the Effective Time (excluding confidential employee information, privileged materials and patient records), all in such manner as to not interfere unreasonably with Sellers.  Such documents and other materials shall be, at Sellers' option, either

(i) copied by Sellers for Purchaser at Purchaser's expense, or (ii) removed by Purchaser from the premises, copied by Purchaser and promptly returned to Sellers.

(e)    Purchaser shall comply with, and be solely responsible for, all obligations under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164) promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 with respect to the operation of the Hospital on and after the Effective Time.

(f)    Purchaser shall cooperate with Sellers, on a timely basis and as reasonably requested by Sellers, in connection with the provision of all data of the Hospital and other information required by Sellers for reporting to HFAP for the remainder of the quarterly period in which the Closing has occurred.

(g)    To the maximum extent permitted by law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including without limitation, documents relating to the operations of any of the Hospital or any of the Hospital's committees prior to the Effective Time, prior to any disclosure of such documents, Purchaser shall notify Sellers and shall provide Sellers with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

(h)    Provision of Benefits of Certain Contracts.  Notwithstanding anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract or Assumed Lease, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would constitute a breach thereof or in any way negatively affect the rights of Sellers or Purchaser, as the assignee of such Assumed Contract or Assumed Lease, as the case may be, thereunder.  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, Sellers will cooperate with Purchaser in any reasonable arrangement designed to both (a) provide Purchaser with the benefits of or under any such Assumed Contract or Assumed Lease, and (b) cause Purchaser to bear all costs and obligations of or under any such Assumed Contract or Assumed Lease.  Further, notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Account Receivable the assignment of which is either prohibited by law or by the terms of any contract with a payor without the consent of such payor.  Any payments received by Sellers after the Closing Date from patients, payors, clients, customers, or others who are the obligors on Accounts Receivables transferred to Purchaser as a part of the Assets on the Closing Date shall be paid over to Purchaser within ten (10) business days after receipt by Seller.

10.3    Closing of Financials.  Provided that Purchaser shall not incur any out of pocket costs, Purchaser shall cause the individual acting as the chief financial officer of the Hospital after the Effective Time (the "**Post-Effective Time CFO**") to cooperate with Sellers' representatives in order to complete the standardized closing of Sellers' financial records through the Closing Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "**Closing of Financials**").  Purchaser shall cause the Post-Effective Time CFO to use his or her good faith efforts to cooperate with Sellers' representatives in order to complete the Closing of Financials by no later than the date which is thirty (30) calendar days after the Closing Date. The Post-Effective Time CFO and other appropriate personnel shall be reasonably available to

38

Sellers for a period of no less than one hundred eighty (180) calendar days after the Closing Date to assist Sellers in the completion of Sellers' post-Closing audit, such assistance not to interfere unreasonably with such Post-Effective Time CFO's other duties.

10.4    Medical Staff.  To ensure continuity of care in the community, Purchaser agrees that the Hospital's medical staff members in good standing as of the Effective Time shall maintain medical staff privileges at the Hospital as of the Effective Time.  On and after the Effective Time, the medical staff will be subject to the Hospital's Medical Staff Bylaws then currently in effect, provided that such Bylaws are in compliance with all applicable laws and regulations and contain customary obligations.

10.5    Shared Intangible Assets.  In the event and to the extent that certain intangible Assets transferred by Sellers have been used to operate businesses of Verity or Verity Holdings or their affiliates which are not being sold to Purchaser ("**Shared Intangible Assets**") and such Shared Intangible Assets continue to be used by Verity or Verity Holdings or their affiliates to operate such businesses after Closing, Verity and Verity Holdings retain the rights to continue to use such Assets notwithstanding their sale to Purchaser.  Purchaser shall reasonably cooperate with Verity and Verity Holdings and their affiliates to give effect to such rights and shall provide Verity and Verity Holdings and their affiliates such documentation, records and information and reasonable access to such systems as necessary for Verity and Verity Holdings and their affiliates to continue to operate such businesses; all in such manner as not to reasonably interfere with the operations of the Hospitals; provided, however, Purchaser shall not be required to incur any out-of-pocket costs in association therewith unless reimbursed by Verity and Verity Holdings and their affiliates.

## ARTICLE 11

## DEFAULT, TAXES AND COST REPORTS

11.1    Purchaser Default.  If Purchaser commits any material default under this Agreement, Sellers shall have the right to sue for damages; provided, however that the amount of such damages shall never exceed $60,000,000.00.  For the avoidance of doubt, Sellers shall have no right to sue for specific performance under this Agreement.

11.2    Seller Default.  If Sellers commit any material default under this Agreement, Purchaser shall have the right to demand and receive a refund of the Deposit, and Purchaser may, in addition thereto, pursue any rights or remedies that Purchaser may have under applicable law, including the right to sue for damages or specific performance.

11.3    Tax Matters; Allocation of Purchase Price.

(a)    After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax liabilities or potential tax liabilities attributable to Sellers with respect to the operation of the Hospital for all periods prior to the Effective Time and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof.  The parties shall also make available to each other to the extent

reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters and as Sellers reasonably may request in connection with the completion of any post-Closing audits of the Hospital.

(b)    The Purchase Price (including any liabilities that are considered to be an increase to the Purchase Price for United States federal income Tax purposes) shall be allocated among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder as set forth in **Schedule 11.3(b)** (such schedule the "**Allocation Schedule**"). The Allocation Schedule shall be for Sellers' and Purchaser's tax purposes only, and shall not limit the Sellers' creditors in any way.

11.4    Cost Report Matters.

(a)    Consistent with Section 4.5, Sellers shall, at Purchaser's expense, prepare and timely file all cost reports relating to the periods ending prior to the Effective Time or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medicaid, and other third party payors which settle on a cost report basis (the "**Seller Cost Reports**").

(b)    Upon reasonable notice and during normal business office hours, Purchaser will cooperate reasonably with Sellers in regard to Sellers' preparation and filing of the Seller Cost Reports. Such cooperation shall include, at no cost to Sellers, obtaining access to files at the Hospital and Purchaser's provision to Sellers of data and statistics, and the coordination with Sellers pursuant to reasonable notice of Medicare and Medicaid exit conferences or meetings. Sellers shall have no obligations after the Effective Time with respect to Seller Cost Reports except for preparation and filing thereof.

## ARTICLE 12

## MISCELLANEOUS PROVISIONS

12.1    Further Assurances and Cooperation.    Sellers shall execute, acknowledge and deliver to Purchaser any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by Purchaser at any time and shall take any and all other actions reasonably requested by Purchaser at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Purchaser, the Assets. After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

12.2    Successors and Assigns.    All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; *provided, however,* that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties which consent shall not be unreasonably withheld or delayed, except that Purchaser

may, without the prior written consent of Sellers, assign all or any portion of its rights under this Agreement to one or more of its affiliates prior to the Closing Date.

12.3    Governing Law; Venue.    This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of California (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens.

12.4    Amendments.    This Agreement may not be amended other than by written instrument signed by the parties hereto.

12.5    Exhibits, Schedules and Disclosure Schedule.    The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein.  From the Signing Date until the Closing, the parties agree that Sellers may update the Disclosure Schedule as necessary upon written notice to Purchaser, and the applicable representation and warranty shall thereafter be deemed amended for all purposes by such updated Disclosure Schedule.  Notwithstanding the foregoing, but subject to Section 9.2(c), should any exhibit or schedule not be completed and attached hereto as of the Signing Date, Sellers and Purchaser shall promptly negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Sellers and Purchaser in their reasonable discretion prior to being attached hereto.  Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply. The headings, if any, of the individual sections of the Disclosure Schedule are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement.  The Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article III merely for convenience, and the disclosure of an item in one section of the Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such disclosure, notwithstanding the presence or absence of an appropriate section of the Disclosure Schedule with respect to such other representations or warranties or an appropriate cross reference thereto.

12.6    Notices.    Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

If to Sellers:    Verity Health System of California, Inc.
2040 East Mariposa St.

41

El Segundo, CA 90245
Attention: Rich Adcock, CEO
Telephone: 424-367-0630

With copies to:          Dentons US LLP
(which copies shall      601 South Figueroa St., Suite 2500
not constitute notice)   Los Angeles, CA 90017-5704
                         Attention: Samuel R. Maizel, Esq.
                         Telephone: 213-892-2910
                         Facsimile: 213-623-9924

If to Purchaser:         Strategic Global Management, Inc.
                         9 KPC Parkway, Suite 301
                         Corona, CA 92879
                         Attention: William E. Thomas
                         Facsimile: 951-782-8850

With copies to:          Levene, Neale, Bender, Yoo & Brill L.L.P.
(which copies shall      10250 Constellation Blvd., Suite 1700
not constitute notice)   Los Angeles, CA  90067
                         Attention: Gary E. Klausner, Esq.
                         Facsimile: 310-229-1244

                         and
                          Loeb & Loeb LLP
                         10100 Santa Monica Blvd., Suite 2200
                         Los Angeles, California 90067
                         Attention: Allen Z. Sussman, Esq.
                         Facsimile: 310-919-3934

or at such other address as one party may designate by notice hereunder to the other parties.

12.7    Headings. The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

12.8    Publicity. Prior to the Closing Date, Sellers and Purchaser shall consult with each other as to the form and substance of any press release or other public disclosure materially related to this Agreement or any other transaction contemplated hereby and each shall have the right to review and comment on the other's press releases prior to issuance; *provided*, *however*, that nothing in this Section 12.8 shall be deemed to prohibit either Sellers or Purchaser from making

any disclosure that its counsel deems necessary or advisable in order to satisfy either party's disclosure obligations imposed by law subject to reasonable prior notice to the other party thereof.

12.9    Fair Meaning. This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

12.10    Gender and Number; Construction; Affiliates. All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable. Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation." Any reference in this Agreement to an "affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with a second Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise. A "Person" shall mean any natural person, partnership, corporation, limited liability company, association, trust or other legal entity.

12.11    Third Party Beneficiary. None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement, except for the parties' successors and permitted assigns, and except for any liquidating trustee or plan administrator for Sellers' estate.

12.12    Expenses and Attorneys' Fees. Except as otherwise provided in this Agreement, each party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby are consummated. The parties expressly agree that all sales, transfer, documentary transfer and similar taxes, fees, surcharges and the like in connection with the sale of the Assets shall be borne by Purchaser. If any action is brought by any party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover its court costs and reasonable attorneys' fees.

12.13    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto. The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

12.14    Entire Agreement. This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "**Superseded Agreements**"), which

43

Superseded Agreements shall be of no further force or effect; provided, that notwithstanding the foregoing, the letter Confidentiality Agreement dated July 12, 2018 between Purchaser and Cain Brothers, a division of KeyBanc Capital Markets Inc., on behalf of Sellers and their related entities shall not be a Superseded Agreement and shall continue in full force in effect in accordance with its terms.

12.15   No Waiver.  Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition.  The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance.  The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

12.16   Severability.  If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12.17   Time is of the Essence.  Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

*[Signature Page Follows]*

44

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

**STRATEGIC GLOBAL MANAGEMENT, INC.,**
a California corporation

Signature By: _____
Print Name: KALI P. CHAUDHURI
Title: CHAIRMAN / CEO
Date: MAY 3, 2019

**SELLERS:**

**ST. FRANCIS MEDICAL CENTER,**
a California nonprofit public benefit corporation

Signature By: _____
Print Name: _____
Title: _____
Date: _____

**ST. VINCENT MEDICAL CENTER,**
a  California  nonprofit  public  benefit corporation

Signature By: _____
Print Name: _____
Title: _____
Date: _____

45

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

**STRATEGIC GLOBAL MANAGEMENT, INC.,**
a California corporation

Signature By:_____
Print Name:_____
Title:_____
Date:_____

**SELLERS:**

**ST. FRANCIS MEDICAL CENTER,**
a California nonprofit public benefit corporation

Signature By:_____
Print Name: Rich Adcock
Title: CEO VHS
Date: 5-3-19

**ST. VINCENT MEDICAL CENTER,**
a California nonprofit public benefit corporation

Signature By:_____
Print Name: Rich Adcock
Title: CEO VHS
Date: 5-3-19

46

**ST. VINCENT DIALYSIS CENTER, INC.**
a California nonprofit public benefit corporation

Signature By: _____
Print Name: __Rich Adcock__
Title: __CEO VHS__
Date: __5-3-19__


**SETON MEDICAL CENTER,**
a California nonprofit public benefit corporation

Signature By: _____
Print Name: __Rich Adcock__
Title: __CEO VHS__
Date: __5-3-19__


**VERITY HOLDINGS, LLC,**
a California limited liability company

Signature By: _____
Print Name: __Rich Adcock__
Title: __CEO VHS__
Date: __5-3-19__


**VERITY HEALTH SYSTEM OF CALIFORNIA, INC.,**
a California nonprofit public benefit corporation

Signature By:_____

Print Name:_____

Title:_____

Date:_____

**B1040 (FORM 1040) (12/15)**

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>VERITY HEALTH SYSTEM OF CALIFORNIA, INC., a California nonprofit public benefit corporation; ST. VINCENT MEDICAL CENTER, a California nonprofit public benefit corporation and ST FRANCIS MEDICAL CENTER, a California nonprofit public benefit corporation, SETON MEDICAL CENTER, a California nonprofit public benefit corporation; VERITY HOLDINGS, LLC, a California limited liability company | DEFENDANTS<br>KALI P. CHAUDHURI, M.D., an individual, STRATEGIC GLOBAL MANAGEMENT, INC., a California corporation, KPC HEALTHCARE HOLDINGS, INC., a California Corporation, KPC HEALTH PLAN HOLDINGS, INC., a California Corporation, KPC HEALTHCARE, INC., a Nevada Corporation, KPC GLOBAL MANAGEMENT, LLC, a California Limited Liability Company, and DOES 1 through 500 |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Samuel R. Maizel (SBN 189301)<br>samuel.maizel@dentons.com<br>Sonia Martin (SBN 191148)<br>sonia.martin@dentons.com<br>Tania M. Moyron (SBN 235736)<br>tania.moyron@dentons.com<br>Nicholas A. Koffroth (SBN 287854)<br>nick.koffroth@dentons.com<br>Dentons US LLP<br>601 South Figueroa Street, Suite 2500<br>Los Angeles, CA 90017-5704<br>T: (213) 623-9300 F: (213) 623-9924 | ATTORNEYS (If Known)<br>Gary E. Klausner (SBN 69055)<br>gek@lnbyb.com<br>Levene, Neale, Bender, Yoo & Brill<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, CA 90067<br>T: (310) 229-1234 F: (310) 229-1244 |

| PARTY (Check One Box Only)<br>☒ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☐ Debtor   ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor   ☒ Other<br>☐ Trustee |
|---|---|

| CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)<br>Breach of Contract, Promissory Fraud, and Tortious Breach of Contract (Breach of Implied Covenant of Good Faith and Fair Dealing) |
|---|

| NATURE OF SUIT |
|---|
| (Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.) |


American LegalNet, Inc.
www.FormsWorkFlow.com

**B1040 (FORM 1040) (12/15)**

| | |
|---|---|
| **FRBP 70 01( 1) – Recovery of Money/Property**<br>☐ 11-Recovery of money/propert y - §542 turnover of property<br>☐ 12-Recovery of money/property - §547 preference<br>☐ 13-Recovery of money/property - §548 fraudulent transfer<br>☐ 14-Recovery of money/property - other | **FRBP 70 01(6) – Dischargeability (continued)**<br>☐ 61 -Dischargeability- §523(a)(5 ), domestic support<br>☐ 68-Dischargeability - §523(a)(6), willful and malicious injury<br>☐ 63-Dischargeability - §523(a)(8), student loan<br>☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation<br>    (other than domestic support) |
| **FRBP 70 01 (2) – Validity, Priority or Extent of Lien**<br>☐ 21-Validity, priority or extent of lien or other interest in property | ☐ 6 5 -Dischargeability - other |
| **FRBP 7001( 3) – Approval of Sale of Property**<br>☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | **FRBP 70 01(7) – Injunctive Relief**<br>☐ 71 -Injunctive relief- imposition of stay<br>☐ 72-Injunctive relief - other |
| **FRBP 7001(4 ) – Objection/ Revocation of Discharge**<br>☐ 41-Objection/re vocation of discharge - §727(c),(d),(e) | **FRBP 70 01(8) Subordination of Claim or Interest**<br>☐ 81 -Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51-Revocation of confirmation | **FRBP 70 01(9) Declaratory Judgment**<br>☐ 91 -Declaratory judgment |
| **FRBP 7001(6) – Dischargeability**<br>☐ 6 6 -Dischargeability - §523(a)(1),(14),(14A) priority tax claims<br>☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,<br>    actual fraud<br>☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | **FRBP 70 01(10) Deter mi nation of Remove d Act ion**<br>☐ 01 -Determination of removed claim or cause<br>**Other**<br>☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.*<br>☒ 02-Other (e.g. other actions that would have been brought in state court<br>    if unrelated to bankruptcy case) |
| **(continued next column)** | |

| | |
|---|---|
| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
| ☐ Check if a jury trial is demanded in complaint | ☐ Demand $ |

Other Relief Sought
Demand:  Damages to be Proved at Trial


American LegalNet, Inc.
www.FormsWorkFlow.com

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>VERITY HEALTH SYSTEM OF CALIFORNIA, INC., et al. | BANKRUPTCY CASE NO.<br>2:18-bk-20151-ER | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>Los Angeles | NAME OF JUDGE<br>Hon. Ernest M. Robles |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF<br>None | DEFENDANT<br>None | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br>/s/Samuel Maizel | | |
| DATE<br>January 3, 2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Samuel Maizel | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.


American LegalNet, Inc.
www.FormsWorkFlow.com