

FILED & ENTERED

JAN 09 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA—LOS ANGELES DIVISION

| | |
|---|---|
| In re: Verity Health System of California, Inc., *et al.*,<br><br>Debtors and Debtors in Possession. | Lead Case No.:  2:18-bk-20151-ER<br>Chapter:  11 |

☒ Affects All Debtors

☐ Affects Verity Health System of California, Inc.
☐ Affects O'Connor Hospital
☐ Affects Saint Louise Regional Hospital
☐ Affects St. Francis Medical Center
☐ Affects St. Vincent Medical Center
☐ Affects Seton Medical Center
☐ Affects O'Connor Hospital Foundation
☐ Affects Saint Louise Regional Hospital Foundation
☐ Affects St. Francis Medical Center of Lynwood Medical Foundation
☐ Affects St. Vincent Foundation
☐ Affects St. Vincent Dialysis Center, Inc.
☐ Affects Seton Medical Center Foundation
☐ Affects Verity Business Services
☐ Affects Verity Medical Foundation
☐ Affects Verity Holdings, LLC
☐ Affects De Paul Ventures, LLC
☐ Affects De Paul Ventures - San Jose Dialysis, LLC

Debtors and Debtors in Possession.,

Jointly Administered With:
Case No. 2:18-bk-20162-ER;
Case No. 2:18-bk-20163-ER;
Case No. 2:18-bk-20164-ER;
Case No. 2:18-bk-20165-ER;
Case No. 2:18-bk-20167-ER;
Case No. 2:18-bk-20168-ER;
Case No. 2:18-bk-20169-ER;
Case No. 2:18-bk-20171-ER;
Case No. 2:18-bk-20172-ER;
Case No. 2:18-bk-20173-ER;
Case No. 2:18-bk-20175-ER;
Case No. 2:18-bk-20176-ER;
Case No. 2:18-bk-20178-ER;
Case No. 2:18-bk-20179-ER;
Case No. 2:18-bk-20180-ER;
Case No. 2:18-bk-20181-ER;

Chapter 11 Cases.

**MEMORANDUM OF DECISION GRANTING DEBTORS' EMERGENCY MOTION FOR AUTHORIZATION TO CLOSE ST. VINCENT MEDICAL CENTER**

**[RELATES TO DOC. NO. 3906]**

| | |
|---|---|
| Date: | January 8, 2020 |
| Time: | 10:00 a.m. |
| Location: | Ctrm. 1568<br>Roybal Federal Building<br>255 East Temple Street<br>Los Angeles, CA 90012 |

Before the Court is the Debtors' emergency motion (the "Motion") for authorization to implement a plan to close St. Vincent Medical Center and St. Vincent Dialysis Center, Inc. (collectively, "St. Vincent"). The Court conducted a hearing on the Motion at the above-captioned date and time. Because the Motion was heard on an emergency basis, the Court allowed parties who had not filed a written opposition to the Motion to present arguments at the hearing.[1] For the reasons set forth below, the Motion is GRANTED.

## I. Facts

On August 31, 2018 (the "Petition Date"), Verity Health System of California ("VHS") and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered.

As of the Petition Date, the Debtors operated six acute care hospitals in the state of California. On December 27, 2018, the Court authorized the Debtors to sell two of their hospitals—O'Connor Hospital and Saint Louise Regional Hospital—to Santa Clara County (the "Santa Clara Sale").[2] The Santa Clara Sale closed on February 28, 2019.

On February 19, 2019, the Court entered an order establishing bidding procedures (the "Bidding Procedures Order")[3] for the auction of the Debtors' four remaining hospitals—St. Francis Medical Center ("St. Francis"), St. Vincent Medical Center (including St. Vincent Dialysis Center) ("St. Vincent"), Seton Medical Center ("Seton"), and Seton Medical Center Coastside ("Seton Coastside") (collectively, the "Hospitals"). Under the Bidding Procedures Order, Strategic Global Management ("SGM") was designated as the stalking horse bidder.

---

[1] In addition to the oral presentations made at the hearing, the Court considered the following papers in adjudicating the Motion:

1) Debtors' Emergency Motion for Authorization to Close St. Vincent Medical Center (the "Motion") [Doc. No. 3906];
   a) Order Setting Hearing on Debtors' Emergency Motion for Authorization to Close St. Vincent Medical Center [Doc. No. 3907];
   b) Notice of Hearing on Debtors' Emergency Motion for Authorization to Close St. Vincent Medical Center [Doc. No. 3909];
   c) Declaration of Service by Kurtzman Carson Consultants, LLC Regarding Docket Numbers 3906, 3907 and 3909 [Doc. No. 3913];
2) Opposition by California Nurses Association to Debtors' Emergency Motion for Authorization to Close St. Vincent Medical Center [Doc. No. 3914];
3) Opposition to Emergency Motion Filed by Marc Girsky, M.D., Chief of Staff of St. Vincent Medical Center [Doc. No. 3916]; and
4) Opposition to Emergency Motion Filed by Samuel K. Lee [Doc. No. 3926].

[2] For a description of the Santa Clara Sale, see *In re Verity Health Sys. of California, Inc.*, 598 B.R. 283 (Bankr. C.D. Cal. 2018) ("*Verity I*").

[3] *See* Order (1) Approving Form of Asset Purchase Agreement for Stalking Horse Bidder and for Prospective Overbidders, (2) Approving Auction Sale Format, Bidding Procedures and Stalking Horse Bid Protections, (3) Approving Form of Notice To Be Provided to Interested Parties, (4) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest Bidder and (5) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and (II) An Order (A) Authorizing the Sale of Property Free and Clear of All Claims, Liens and Encumbrances [Doc. No. 1572].

SGM's bid for all four of the Hospitals was $610 million. The Bidding Procedures Order approved an Asset Purchase Agreement (the "APA") between the Debtors and SGM.

The Hospitals were extensively marketed by the Debtors' investment banker, Cain Brothers, a division of KeyBank Capital Markets, Inc. ("Cain Brothers"). Cain Brothers notified ninety parties of the auction process. Sixteen of these parties requested continued access to a data room containing information about the Hospitals.

Notwithstanding Cain Brothers' thorough marketing efforts, the Debtors did not receive any qualified bids for all of the Hospitals. The Debtors received one bid to purchase only St. Vincent and one bid to purchase only St. Francis. After consulting with the Official Committee of Unsecured Creditors (the "Committee") and the largest secured creditors, the Debtors determined not to conduct an auction. On May 2, 2019, the Court entered an order finding that SGM was the winning bidder and approving the sale to SGM (the "SGM Sale").[4]

On November 27, 2019, the Court entered a memorandum of decision and accompanying order finding that as of November 19, 2019, all conditions precedent under the APA to SGM's obligation to close the SGM Sale had been satisfied.[5] The Court found that pursuant to § 1.3 of the APA, SGM was obligated to close the SGM Sale by no later than December 5, 2019. *Id.* SGM did not close the sale by December 5, 2019.[6] On December 27, 2019, the Debtors sent SGM a notice terminating the APA and asserting that SGM had materially breached the APA.[7]

The Debtors seek authorization to implement a plan to close St. Vincent (the "Closure Plan"). The Debtors assert that there is no buyer interested in purchasing St. Vincent as a going-concern; that the operating losses generated by St. Vincent threaten the viability of the entire Verity Health System; and that if the Debtors do not immediately begin implementing the Closure Plan, they will lack sufficient funds to conduct an orderly closure.

The timeline contemplated by the Closure Plan is as follows (all dates are calculated with reference to entry of an order granting the Motion):

- Order + 1 day: Notify Emergency Medical Services and place St. Vincent on diversion protocol for all patients. Begin process of transferring patients, along with their medical information, to a hospital of their choice.
- Order + 3 days: Complete closure of emergency department.
- Order + 5 days: Cease scheduling all elective procedures.
- Order + 7 days: Conclude and cease all elective surgeries and other procedures.
- Order + 21 days: Complete closure of the dialysis department.
- Order + 30 days: Complete closure of the transplant department.

---

[4] *See* Order (A) Authorizing the Sale of Certain of the Debtors' Assets to Strategic Global Management, Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of Unexpired Leases Related Thereto; and (C) Granting Related Relief [Doc. No. 2306].

[5] *See* Memorandum of Decision Finding that SGM is Obligated to Close the SGM Sale By No Later than December 5, 2019 [Doc. No. 3723] and Order (1) Finding that SGM is Obligated to Close the SGM Sale By No Later than December 5, 2019 and (2) Setting Continued Hearing on Debtors' Motion for Approval of Disclosure Statement [Doc. No. 3274].

[6] *Id.*

[7] *See* Notice Re Termination of Asset Purchase Agreement with Strategic Global Management, Inc. [Doc. No. 3899].

- Order + 30 days: Complete closure and cease clinical operations.

**<u>Summary of the California Nurses Association's Opposition to the Motion</u>**

The California Nurses Association (the "CNA"), which represents registered nurses employed at St. Vincent, opposes the Motion. The CNA makes the following arguments and representations in support of its opposition:

The Debtors have not demonstrated that they have provided the notice of the contemplated closure that is required under California law. Specifically, the contemplated closure violates the following provisions of the Cal. Health & Safety Code:

- Cal. Health & Safety Code § 1255.1(a) requires that any hospital providing emergency medical services give 90 days' advance notice of the elimination of such services to "the state department, the local government entity in charge of the provision of health services, and all health care service plans or other entities under contract with the hospital to provide services to enrollees of the plan or other entity."
- Cal. Health & Safety Code § 1225.1(b) requires a hospital to provide 90 days' advance notice of the closure "in a manner that is likely to reach a significant number of residents of the community" serviced by the hospital.
- Cal. Health & Safety Code § 1255.25(a)(1) requires that not less than 30 days prior to the closure, the hospital (1) post notice of the closure "at the entrance to all affected facilities" and (2) provide notice of the closure to the department and the board of supervisors of the county in which the hospital is located.
- Cal. Health & Safety Code § 1255.25(b)(2) requires that not less than 30 days prior to closure, the hospital provide notice to Medicare and Medi-Cal beneficiaries, including information on the nearest available facilities providing similar healthcare services.

The notification requirements serve a vital role in helping underserved communities prepare for the devastating loss of essential healthcare services. As set forth in a January 7, 2020 letter from California State Senator Maria Elena Durazo and California State Assembly Member Wendy Carrillo, who represent constituents in the district in which St. Vincent is located, closure of the hospital will be "devastating" for the district, and the public notice requirement "is crucial because it gives [the public] time to figure out where patients should be going to receive care in the area" and "ensure[s] workers are not left unemployed …."

In *Norris Square Civic Ass'n v. St. Mary Hosp. (In re St. Mary Hosp.*), the Bankruptcy Court enjoined a hospital from closing because it had failed to comply with applicable notice requirements imposed by state law. 86 B.R. 393, 400 (Bankr. E.D. Pa. 1988). The Motion should be denied based on the Debtors' failure to comply with the notice requirements imposed by California law.

The timeframe proposed by the Debtors for closing the emergency department creates an unreasonable risk to public safety. The Debtors plan to close the emergency department within three days after entry of an order granting the Motion. Even if ambulances are placed on diversion status, many residents of the community will still drive to the emergency department to receive care. Based on the most recent filing with the California Office of Statewide Health Planning and Development, the emergency department receives approximately 83 visits per day.

## II. Discussion

### A. CNA's Opposition to the Motion is Overruled

CNA asserts that the Closure Plan cannot be approved because the Debtors have failed to provide notification of the closure in accordance with the provisions of the Cal. Health & Safety Code. CNA's argument incorrectly assumes that the Cal. Health & Safety Code's notice provisions are controlling within the bankruptcy context.

Title 28 U.S.C. § 959(b) requires the Debtors to "manage and operate the property" in their possession "according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." However, § 959(b) applies only to property used in connection with an operating business; it does not apply to property where business operations have ceased and the assets are being liquidated. In *In re Gardens Reg'l Hosp. & Med. Ctr., Inc.*, this Court held that § 959(b) did not apply to the sale of a closed hospital. 567 B.R. 820, 829 (Bankr. C.D. Cal. 2017). *See also S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 334 (7th Cir. 2010) ("Modern courts have ... concluded that § 959(b) does not apply to liquidations"); *Alabama Surface Min. Comm'n v. N.P. Min. Co. (In re N.P. Min. Co., Inc.)*, 963 F.2d 1449, 1460 (11th Cir. 1992) ("A number of courts have held that section 959(b) does not apply when a business's operations have ceased and its assets are being liquidated"); *Saravia v. 1736 18th St., N.W., Ltd. P'ship*, 844 F.2d 823, 827 (D.C. Cir. 1988) (viewing § 959(b) "as applying only to operating businesses, not ones that were in the process of being liquidated").

Upon initiation of the Closure Plan, St. Vincent will enter the process of liquidation and will no longer be an operating business. Therefore, § 959(b) does not require the Debtors to comply with the notice deadlines of the Cal. Health & Safety Code when implementing the Closure Plan.

This case provides a compelling illustration of why the Bankruptcy Court's authority to supervise the use of estate property under § 363(b) must trump the Cal. Health & Safety Code. The Debtors worked to close the SGM Sale, which would have allowed St. Vincent to continue operating, until December 27, 2019. Compliance with the Cal. Health & Safety Code's notice requirements would have required the Debtors to provide notice that St. Vincent would be closing at a time when the Debtors reasonably expected that the SGM Sale would close. The provision of such notice would have interfered with St. Vincent's operations, disrupting the Debtors' efforts to close the SGM Sale. Premature publication of notice of closure would have harmed employee retention and morale, confused patients, and caused vendors to cease furnishing critical supplies. These serious harms would have undercut the central objective of the § 363 sale process—providing the Debtors the opportunity to realize the optimal value of their assets. *Simantob v. Claims Prosecutor, LLC (In re Lahijani)*, 325 B.R. 282, 288–89 (9th Cir. BAP 2005).

CNA's opposition suffers from an additional defect. As a party in interest, CNA "may appear and be heard on any issue" in these cases. § 1109(b). However, the Court must still assess whether CNA has standing to assert that the Closure Plan violates the Cal. Health & Safety Code. The Court finds that it does not.

The provisions of the Cal. Health & Safety Code cited by CNA are enforced by the California Department of Public Health (the "CDPH"). CDPH did not file a written opposition to the Motion.[8] CNA's opposition essentially seeks to enforce various provisions of the Cal. Health

---

[8] At the hearing, Deputy Attorney General Kenneth K. Wang, who represents the California Department of Health Care Services, alleged that the Motion had not been properly served upon

& Safety Code against the Debtors on CDPH's behalf. That is not appropriate, because the Health & Safety Code does not create a private right of action. The California Supreme Court has explained that a private right of action exists under the following circumstances:

> A violation of a state statute does not necessarily give rise to a private cause of action. Instead, whether a party has a right to sue depends on whether the Legislature has "manifested an intent to create such a private cause of action" under the statute….
>
> A statute may contain " 'clear, understandable, unmistakable terms,' " which strongly and directly indicate that the Legislature intended to create a private cause of action. For instance, the statute may expressly state that a person has or is liable for a cause of action for a particular violation. (See, e.g., Civ.Code, § 51.9 ["A person is liable in a cause of action for sexual harassment" when a plaintiff proves certain elements]; Health & Saf.Code, § 1285, subd. (c) ["Any person who is detained in a health facility solely for the nonpayment of a bill has a cause of action against the health facility for the detention"].) Or, more commonly, a statute may refer to a remedy or means of enforcing its substantive provisions, i.e., by way of an action.

*Lu v. Hawaiian Gardens Casino, Inc.*, 50 Cal. 4th 592, 597, 236 P.3d 346, 348 (2010) (internal citations omitted).

None of the sections cited by CNA contains language expressly creating a private right of action. Further, there is no indication that the legislature intended for private entities to have the ability to enforce those provisions against hospitals. *See Lu*, 50 Cal. 45th at 600 (providing that if a statute does not expressly create a private right of action, there must be a "clear indication" that the legislature intended to do so). To the contrary, the structure of the statute indicates that the legislature delegated enforcement responsibilities solely to the CDPH. The provisions cited by CNA are contained within the chapter of the statute pertaining to licensure. That chapter also contains provisions setting forth the circumstances under which a health facility's license may be revoked, including the manner in which the CDPH must conduct hearings on license revocation. *See* Cal. Health & Safety Code § 1294 (the "state department may suspend or revoke any license

---

the CDPH. The Court finds that the CDPH received sufficient notice of the Motion. On January 6, 2020, the Motion was served upon Deputy Attorney General David K. Eldan, Deputy Attorney General Kenneth K. Wang, and Deputy Attorney General Scott Chan, via e-mail. Doc. No. 3913, Ex. B. On January 6, 2020, the Debtors provided telephonic notice of the hearing to Attorney General Xavier Becerra and Deputy Attorney General Kenneth K. Wang. *Id.* at Ex. A. On January 6, 2020, the Debtors served the Motion, via overnight mail, upon Attorney General Xavier Becerra, Deputy Attorney General Kenneth K. Wang, Deputy Attorney General David Eldan, the Office of the Attorney General located in Los Angeles, and the Consumer Law Section of the Office of the Attorney General. *Id.* at Ex. D. On January 7, 2020, at 5:48 p.m. (Pacific Time), the Debtors served the Motion electronically upon the CDPH, at seven different e-mail addresses. Doc. No. 3924. On that same date, the Debtors provided telephonic notice of the Motion and the hearing date to counsel to the CDPH. *Id.* CDPH had sufficient notice of the Motion to have a team of representatives onsite at St. Vincent preparing for the contemplated closure at the same time that the hearing was being conducted, as represented by Debtors' counsel at the hearing.

or special permit issued under the provisions of this chapter upon any of the following grounds ….”); *id.* at § 100171 (containing procedures for hearings on licensure).

In addition, at least one court has held that a provision contained within Division 2 of the Health & Safety Code (the same division containing the provisions cited by CNA) does not create a private right of action. *See John Muir Health v. Glob. Excel Mgmt.*, No. C-14-04226 DMR, 2014 WL 6657656, at *4 (N.D. Cal. Nov. 21, 2014) (dismissing a claim brought under Cal. Health & Safety Code § 13714(b) because the provision did not create a standalone private right of action).

**B. The Debtors Are Authorized to Implement the Closure Plan to Effect an Orderly Closure of St. Vincent**

Section 363(b) authorizes a debtor to use property of the estate outside the ordinary course of business upon court approval. The debtor must articulate a “business justification” to use property outside the ordinary course of business. *In re Walter*, 83 B.R. 14, 19–20 (B.A.P. 9th Cir. 1988). Whether the articulated business justification is sufficient “depends on the case,” in view of “all salient factors pertaining to the proceeding.” *Id.* at 19–20.

The Debtors’ decision to close St. Vincent constitutes a “use” of estate property within the meaning of § 363(b). The Debtors have articulated a sufficient business justification for closing St. Vincent. The following facts have been established by the declarations submitted in support of the Motion:

- No buyer has presented a realistic bid to purchase St. Vincent as a stand-alone hospital. Moloney Decl. at ¶ 4. Although James M. Moloney, the Debtors’ investment banker, had a telephone conversation with a potential bidder on January 6, 2020, that bidder had conducted limited due diligence and did not have experience with the regulatory approval process required to purchase a hospital. *Id.* Further, the bidder’s intended use for St. Vincent was as a real-estate investment if the bidder’s hospital operating partner could not develop a viable plan to profitably operate St. Vincent. *Id.*
- St. Vincent is generating substantial operating losses. As of the Petition Date, St. Vincent accounted for approximately 23% of the patient volume of the entire Verity Health System, but was responsible for 60% of the operating losses. Chadwick Decl. at ¶ 6. If the Debtors do not implement the Closure Plan rapidly, they will lack sufficient funds to conduct an orderly closure of St. Vincent. Adcock Decl. at ¶ 7.
- The Debtors lack sufficient funds to continue to subsidize St. Vincent’s operating losses. Absent the closure of St. Vincent, the Debtors will be unable to continue operating their other hospitals. Chadwick Decl. at ¶ 9.

Since it is not feasible for the Debtors to continue St. Vincent’s operations, implementation of the Closure Plan is necessary to sustain public health and welfare. Public safety would be jeopardized if the Debtors allowed St. Vincent to remain open while lacking sufficient funds to support its operations. In this respect, the Court notes that the Debtors do not have the ability to borrow under any debtor-in-possession financing facility. The Debtors’ cases are being financed by a consensual cash collateral stipulation executed between the Debtors and the principal secured creditors (the “Cash Collateral Stipulation”). Under the Cash Collateral Stipulation, the Debtors’ ability to use cash collateral terminates on January 31, 2020.

CNA asserts that the Debtors are entitled to damages from SGM for its failure to perform under the APA, and that St. Vincent's operations could be funded from these breach damages. CNA overlooks the fact that the Court has not made a finding as to whether SGM has breached the APA. The issue of SGM's alleged breach is subject to ongoing litigation, which will not be resolved in the near term. Sustaining St. Vincent's operations requires immediately available liquidity, which the Debtors lack. The speculative possibility of a future cash infusion based upon SGM's alleged breach is not a solution to St. Vincent's current funding crisis.  Nor is pursuing a sale, another alternative suggested by CNA.  There are no firm expressions of interest. Even if a buyer was identified, the sale process and review by the Attorney General's office would take months to conclude.

The Closure Plan preserves patient safety. Acute care patients will be transferred to Good Samaritan Hospital, which is located approximately one mile from St. Vincent. Adcock Decl. at ¶ 8. St. Joseph Hospital has agreed to assume care of the kidney transplant patients who are part of the St. Vincent Transplant Program, subject to approval of the United Network for Organ Sharing. *Id.*

### 1. The Timeline Set Forth in the Closure Plan is Approved, Except that the Deadline for Physicians to Vacate St. Vincent's Medical Office Facilities is Extended by 30 Days

At the hearing, multiple parties testified regarding the impact of the Closure Plan upon physicians, employees, patients, and other stakeholders. Having considered the evidence before it, the Court approves the deadlines set forth in the Closure Plan, with the exception of the deadline for physicians to vacate St. Vincent's medical office facilities, which is extended by 30 days to April 30, 2020.

The Court places substantial weight upon the testimony of Dr. Jacob Nathan Rubin, the Court-appointed Patient Care Ombudsman. Dr. Rubin testified as follows:

- To protect patient safety, St. Vincent must be closed as quickly as possible following the announcement of the hospital's closure. Once closure is announced, key members of St. Vincent's medical staff will immediately leave to seek employment elsewhere. Replacing experienced staff with temporary workers is not feasible because the temporary workers will be unfamiliar with St. Vincent's systems, procedures, and electronic medical records. There will not be a sufficient number of experienced staff remaining to adequately train the large influx of temporary workers. The result of the rapid departure of experienced staff will be a marked decline in the quality of patient care, seriously jeopardizing patient safety.
- The transfer of existing patients to other hospitals will not impair patient safety. Patients are routinely transferred from one hospital to another, and the hospital resources within St. Vincent's immediate vicinity are more than sufficient to accommodate St. Vincent's patients.

Alice Kirchner, director of Dialysis Services at St. Vincent, asserted that the Closure Plan did not provide sufficient notice to enable the smooth relocation of patients. Ms. Kirchner stated that the Closure Plan's deadlines were creating stress and trauma for affected patients, staff, and physicians. Ms. Kirchner requested that the Dialysis Unit be provided a minimum of 30 days to relocate patients before being shut down.

In view of Dr. Rubin's testimony, the Court does not find it appropriate to extend the
deadlines set forth in the Closure Plan. In fact, Dr. Rubin testified that if the deadlines were to be
modified, they should be shortened, not extended. The Court understands the difficulties that the
Closure Plan's deadlines place upon stakeholders. However, the Court's first priority must be
protecting patient safety, and that requires a rapid closure.

St. Vincent leases office space to physicians who provide outpatient services. Dr. Marc
Girsky, St. Vincent's Chief of Staff, stated that the March 31, 2020 deadline for physicians to
vacate the office space would not provide physicians adequate time to relocate their practices.
Dr. Girsky requested that physicians be provided at least six months to relocate. Dr. Samuel Lee,
St. Vincent's former Chief of Staff, and Ryan Yant, counsel for St. Vincent Independent
Physicians Association, made statements in support of Dr. Girsky's request. The Court also
received a letter signed by numerous physicians who lease office space at St. Vincent requesting
that the deadline to relocate by extended to June 30, 2020.[9]

In response to the physicians' requests, the Debtors proposed extending the relocation
deadline by 30 days, to **April 30, 2020**. The Court finds the compromise proposed by the
Debtors to be appropriate. The April 30 deadline provides physicians approximately four months
to relocate.

## III. Conclusion

The Court is fully cognizant of the hardship that closure of St. Vincent will have upon
employees and members of the surrounding community. The absence of any serious purchaser
willing to acquire St. Vincent as a going-concern has placed all constituencies in this case in a
difficult position. However, forcing the Debtors to keep St. Vincent open when there is
insufficient money to operate it would only make the situation far worse for St. Vincent and for
the patients of the Debtor's other hositals.

The Motion is **GRANTED** to the extent set forth herein. Notwithstanding Bankruptcy Rule
6004(h), the order granting the Motion shall take effect immediately upon entry. By no later than
**January 23, 2020**, the Debtors shall submit a Status Report regarding implementation of the
Closure Plan. Subsequent Status Reports shall be submitted every fourteen days until the Closure
Plan has been fully implemented.[10] The Court will enter an order consistent with this
Memorandum of Decision.

###

Date: January 9, 2020

Ernest M. Robles
United States Bankruptcy Judge

---

[9] Doc. No. 3926.

[10] No hearings will be conducted in connection with the Status Report unless otherwise ordered
by the Court.