SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
NICHOLAS A. KOFFROTH (Bar No. 287854)
nick.koffroth@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

Attorneys for the Chapter 11 Debtors and
Debtors In Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION

In re

VERITY HEALTH SYSTEM OF CALIFORNIA, INC., *et al.*,

Debtors and Debtors In Possession.

☒ Affects All Debtors
☐ Affects Verity Health System of California, Inc.
☐ Affects O'Connor Hospital
☐ Affects Saint Louise Regional Hospital
☐ Affects St. Francis Medical Center
☒ Affects St. Vincent Medical Center
☒ Affects Seton Medical Center
☐ Affects O'Connor Hospital Foundation
☐ Affects Saint Louise Regional Hospital Foundation
☐ Affects St. Francis Medical Center of Lynwood Foundation
☐ Affects St. Vincent Foundation
☐ Affects St. Vincent Dialysis Center, Inc.
☐ Affects Seton Medical Center Foundation
☐ Affects Verity Business Services
☐ Affects Verity Medical Foundation
☐ Affects Verity Holdings, LLC
☐ Affects De Paul Ventures, LLC
☐ Affects De Paul Ventures - San Jose Dialysis, LLC

Debtors and Debtors In Possession.

Lead Case No. 2:18-bk-20151-ER

Jointly Administered With:
Case No. 2:18-bk-20162-ER
Case No. 2:18-bk-20163-ER
Case No. 2:18-bk-20164-ER
Case No. 2:18-bk-20165-ER
Case No. 2:18-bk-20167-ER
Case No. 2:18-bk-20168-ER
Case No. 2:18-bk-20169-ER
Case No. 2:18-bk-20171-ER
Case No. 2:18-bk-20172-ER
Case No. 2:18-bk-20173-ER
Case No. 2:18-bk-20175-ER
Case No. 2:18-bk-20176-ER
Case No. 2:18-bk-20178-ER
Case No. 2:18-bk-20179-ER
Case No. 2:18-bk-20180-ER
Case No. 2:18-bk-20181-ER

Chapter 11 Cases
Hon. Judge Ernest M. Robles

**DEBTORS' EMERGENCY MOTION TO APPROVE AGREEMENTS WITH THE STATE OF CALIFORNIA IN RESPONSE TO THE COVID-19 HEALTHCARE EMERGENCY TO (I) PROVIDE CERTAIN HEALTHCARE SERVICES AT SETON MEDICAL CENTER AND (II) LEASE ST. VINCENT MEDICAL CENTER; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF**

Hearing:
Date:    [TBD]
Time:    [TBD]
Place:   Courtroom: 1568
         255 East Temple Street
         Los Angeles, CA 90012

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**EMERGENCY MOTION**

Pursuant to §§ 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"),[1] Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1(b) and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "LBR"), Verity Health System of California, Inc. ("VHS") and the above-referenced affiliated debtors, the debtors and debtors in possession (collectively, the "Debtors" or the "Verity Health System") in the above-captioned chapter 11 bankruptcy cases (the "Cases"), hereby move, on an emergency basis (the "Motion"),[2] for the entry of an order (a form of which is attached hereto as **Exhibit "A"**) (the "Proposed Order"): (i) approving the Service Agreement by and between the State of California (the "State"), on the one hand, and VHS and Seton Medical Center ("Seton"), on the other hand, attached hereto as **Exhibit "B"** (the "Service Agreement"), concerning the delivery of healthcare services at the general acute care hospital operated by Seton and located at 1900 Sullivan Ave, Daly City, California (the "Hospital"); (ii) approving the Master Lease Agreement by and between the State, on the one hand, and VHS and St. Vincent Medical Center ("St. Vincent"), on the other hand, concerning real property located at 2131 West Third Street, Los Angeles, California 90057, attached hereto as **Exhibit "C"** (the "Lease" and, together with the Service Agreement, the "Agreements"); (iii) waiving any stay of the effectiveness of such order; and (iv) granting such other and further relief as is just and appropriate under the circumstances.

The Debtors operate a nonprofit regional healthcare system with a mission to provide effective and affordable healthcare services to their communities. The United States is currently facing the impact of the infectious disease Severe Acute Respiratory Syndrome Coronavirus 2, which is the cause of the ongoing 2019 coronavirus pandemic ("COVID-19"). The President of the United States has declared a national emergency because of COVID-19, and the California Governor issued a Proclamation of a State of Emergency on March 4, 2020, to allow for him to

---

[1] All references to "§" are to sections of the Bankruptcy Code.

US_Active\114447096\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

exercise extraordinary powers to address the COVID-19 pandemic.  In an attempt to address the consequences of COVID-19, representatives of the Governor have contacted the Debtors to partner with the State to ensure the availability of some of the Debtors' facilities to treat the expected thousands of COVID-19 patients.  The Debtors have concluded, in their business judgment, that entering into the Agreements is in the best interests of the Debtors, their estates, stakeholders, creditors, and the communities they serve, which include communities already affected by, or certain to be affected in the future by COVID-19.  The effectuation of the Agreements is consistent with the Debtors' charitable mission, particularly in light of the current public health crisis caused by the outbreak of COVID-19.  Furthermore, the Agreements will inject funds into the estates to cover certain operational and monthly losses.  The Debtors request that the relief sought be granted on an emergency basis to avoid immediate and irreparable harm given the exigencies presented to the communities served by the Debtors as a result of the COVID-19 healthcare emergency.

Finally, the Debtors' prepetition secured creditors and the Official Committee of Unsecured Creditors have been informed of the Motion and the relief sought herein and anticipate that they will support the Debtors' intention to enter into the Agreements.  Accordingly, the Debtors respectfully request that the Court grant the Motion for an emergency hearing because the proposed expedited hearing will not prejudice any parties and is in the best interests of the Debtors' estates, creditors and the communities facing an urgent public health emergency.

## I.

## BASIS FOR THE REQUESTED RELIEF

The Debtors seek approval of the Agreements as expeditiously as possible for the reasons set forth above.  The Motion is based upon §§ 105 and 363, Bankruptcy Rules 2002, 6004, 9007, and 9014, and LBRs 6004-1(b) and 9013-1, the attached Memorandum of Points and Authorities, the *Declaration of Richard Adcock in Support of Emergency First-Day Motions* [Docket No. 8]

---

*{continued from previous page}*

[2] **The Debtors will request that the Motion be heard on an emergency basis on March 20, 2020.**

US_Active\114447096\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

(the "First-Day Decl."), the Declaration of Richard G. Adcock (the "Adcock Decl.") filed concurrently herewith, the arguments and statements of counsel to be made at the hearing on the Motion, and any other admissible evidence properly brought before the Court.  The Debtors request that the Court take judicial notice of the record in the Debtors' Cases and any other judicially noticeable facts in support of the Motion, as appropriate, including all documents filed with the Court in these Cases.

## II.

## RESPONSES

Any party opposing or responding to the Motion may present such response (the "Response") at any time before or at the hearing on the Motion.  *See* LBR 9075-1(a)(8).  A Response must be a complete written or oral statement of all reasons in opposition to the Motion or in support, declarations and copies of all evidence on which the responding party intends to rely, and any responding memorandum of points and authorities.  Pursuant to LBR 9013-1(h), the failure to file and serve a timely objection to the Motion may be deemed by the Court to be consent to the relief requested herein.

## III.

## SERVICE OF MOTION

Counsel to the Debtors will serve this Motion, the attached Memorandum of Points and Authorities, the Adcock Declaration, the Exhibits attached hereto, and any notice required by the Court on: (i) the Official Committee of Unsecured Creditors; (ii) the Debtors' prepetition secured creditors; (iii) the State; the Office of the United States Trustee; and any other parties on the Limited Service List set forth in the *Order Granting Emergency Motion of Debtors for Order Limiting Scope of Notice* [Docket No. 132].  To the extent necessary, the Debtors request that the Court waive compliance with LBR 9075-1(a)(6) and approve service (in addition to the means of service set forth in such LBR) by overnight delivery.

# IV.

## <u>CONCLUSION</u>

For all the foregoing reasons and such additional reasons as may be advanced at or prior to the hearing regarding this Motion, the Debtors respectfully request that the Court hold a hearing on an emergency basis to consider the Debtors request for an order: (i) approving the Service Agreement; (ii) approving the Lease; (iii) waiving any stay of the effectiveness of such order; and (iv) granting such other and further relief as is just and appropriate under the circumstances.

Dated:  March 19, 2020

**DENTONS US LLP**
SAMUEL R. MAIZEL
TANIA M. MOYRON
NICHOLAS A. KOFFROTH

By____*/s/ Tania M. Moyron*_____

Attorneys for Verity Health System of California, Inc., *et al.*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114447096\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## MEMORANDUM OF POINTS AND AUTHORITIES

Verity Health System of California, Inc. ("VHS") and the above-referenced affiliated debtors, the debtors and debtors in possession (collectively, the "Debtors" or the "Verity Health System") in the above-captioned chapter 11 bankruptcy cases (the "Cases"), hereby move, on an emergency basis (the "Motion"), for the entry of an order (a form of which is attached hereto as **Exhibit "A"**) (the "Proposed Order"): (i) approving the Service Agreement by and between the State of California (the "State"), on the one hand, and VHS and Seton Medical Center ("Seton"), on the other hand, attached hereto as **Exhibit "B"** (the "Service Agreement"), concerning the delivery of healthcare services at the general acute care hospital operated by Seton and located at 1900 Sullivan Ave, Daly City, California ("Seton Hospital"); (ii) approving the Master Lease Agreement by and between the State, on the one hand, and VHS and St. Vincent Medical Center ("St. Vincent"), on the other hand, concerning real property located at 2131 West Third Street, Los Angeles, California 90057 (collectively, the "Property") attached hereto as **Exhibit "C"** (the "Lease" and, together with the Service Agreement, the "Agreements"); (iii) waiving any stay of the effectiveness of such order; and (iv) granting such other and further relief as is just and appropriate under the circumstances.  In support of the Motion, the Debtors rely on the *Declaration of Richard Adcock in Support of Emergency First-Day Motions* [Docket No. 8] (the "First-Day Decl."), the Declaration of Richard G. Adcock (the "Adcock Decl.") filed concurrently herewith, any other admissible evidence properly brought before the Court, and respectfully state as follows:

## I.

## INTRODUCTION

The Debtors operate a nonprofit regional healthcare system with a mission to provide effective and affordable healthcare services to their communities.  The United States is currently facing the impact of the infectious disease Severe Acute Respiratory Syndrome Coronavirus 2, which is the cause of the ongoing 2019 coronavirus pandemic ("COVID-19").  The President of the United States has declared a national emergency because of COVID-19, and the California Governor issued a Proclamation of a State of Emergency on March 4, 2020, to allow for him to

exercise extraordinary powers to address the COVID-19 pandemic. In an attempt to address the consequences of COVID-19, representatives of the Governor have contacted the Debtors to partner with the State to ensure the availability of some of the Debtors' facilities to treat the expected thousands of COVID-19 patients. To that end, the Debtors and the State have reached two agreements to assist the State's efforts to combat COVID-19. The first agreement (the Service Agreement) provides that there will be "Designated Space" at Seton Hospital to ensure the treatment of patients affected by the pandemic in exchange for a monthly payment of up to $5 million. The second agreement (the Lease) provides that the State will lease St. Vincent, as a closed facility, for a monthly payment of $2.6 million; the State may operate or engage a third party to operate a hospital at St. Vincent. The Agreements further the Debtors' mission to provide affordable and effective healthcare to their communities and to assist the State in its fight against the COVID-19 pandemic. Furthermore, the Agreements will inject funds into the estates to cover certain operational and monthly losses.

Based on the foregoing, the Debtors have determined that entry into the Agreements is in the best interests of the Debtors, their estates, stakeholders and creditors, and as such, respectfully request that this Court approve the Agreements.

## II.

## JURISDICTION AND STATUTORY PREDICATES

The Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The Debtors the relief requested in this Motion pursuant to §§ 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"),[3] Rules 2002, 6004, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1(b) and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "LBR").

---

[3] All references to "§" are to sections of the Bankruptcy Code.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114447096\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**III.**

**STATEMENT OF FACTS**

**A.    General Background**

1.    On August 31, 2018 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court").  Since the Petition Date, the Debtors have been operating their businesses as debtors in possession pursuant to §§ 1107 and 1108.  On September 14, 2018, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors [Docket No. 197].

2.    Debtor VHS, a California nonprofit public benefit corporation, is the sole corporate member of five Debtor California nonprofit public benefit corporations that operated O'Connor Hospital, Saint Louise Regional Hospital, and St. Vincent, and currently operates St. Francis Medical Center and Seton, including Seton Hospital.

3.    As of the Petition Date, the Verity Health System operated as a nonprofit healthcare system in the State of California, with approximately 1,680 inpatient beds, six active emergency rooms, a trauma center, eleven medical office buildings, and a host of medical specialties, including tertiary and quaternary care.  *See* First-Day Decl. at ¶ 12.  The Verity Health System was originally established by the Daughters of Charity of St. Vincent de Paul, Province of the West, to support the mission of the Catholic Church through a commitment to the sick and poor.  *Id.*

**B.    St. Vincent**

4.    Prior to its closing earlier this year, St. Vincent operated as a 366 licensed bed, regional acute care hospital.  *See id.*

5.    On January 6, 2020, the Debtors filed an emergency motion [Docket No. 3906] to close St. Vincent and St. Vincent Dialysis Center, Inc., in part, because of the hospital's ongoing economic losses and the Debtors' need to have sufficient cash on hand for the orderly closure of the hospital.  On January 9, 2020, the Court entered a memorandum of decision [Docket No. 3933] and order [Docket No. 3934] granting the closure motion and authorizing the Debtors to

US_Active\114447096\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  close the hospital pursuant to a closure plan (the "Closure Plan").  As set forth in the Debtors'

2  status reports, the Debtors have substantially completed the Closure Plan, including the discharge

3  or transfer of all patients.  *See* Docket Nos. 3982, 4053, 4126, 4219.

4  6.    The Debtors started marketing St. Vincent's real estate assets for a sale following

5  the closure of the hospital.  Total monthly costs are approximately $2.6 million, including

6  adequate protection payments and other restructuring fees.

7  **C.    Seton**

8  7.    Seton was originally founded as Mary's Help Hospital by the Daughters of Charity

9  of St. Vincent De Paul in 1893.  *See id.* at ¶ 39.  In 1965, Seton Hospital was moved to its current

10  location at 1900 Sullivan Avenue, Daly City, California.  *See id.*  Seton Hospital was renamed

11  Seton Medical Center in 1983, and serves residents from San Francisco and San Mateo areas.  *See*

12  *id.*

13  8.    In addition to Seton Hospital, Seton operates a second campus, the "Coastside

14  Campus," located at 600 Marine Boulevard, Moss Beach, California 94038.

15  9.    Seton Hospital and the Coastside Campus operate under one consolidated acute

16  care license, issued by the California Department of Public Health ("CDPH") with an effective

17  date of January 1, 2020.  They have a single Board of Directors, executive leadership team, human

18  resources and charity care policies, and union collective bargaining agreements.  *See id.* at ¶¶ 11,

19  39, 40.

20  10.    Seton Hospital is currently licensed for 357 beds, comprising 250 general acute

21  care beds, 83 skilled nursing beds, and 24 acute psychiatric beds.  *See* Adcock Decl. at ¶ 7.  Of the

22  250 general acute care beds, 18 are designated for perinatal services (in suspense),[4]  14 for

23  coronary care, 14 for intensive care, three for intensive care newborn nursery (in suspense), with

24  the remaining 201 beds unspecified general acute care beds.  *Id.*  Seton Hospital has an emergency

25

26  [4] The 2020 License fails to reflect that these perinatal beds are in suspense.  Seton believes this

27  was an inadvertent oversight.  By letter dated January 30, 2020, the Debtors have requested that
CDPH update its license to correct this and other errors, including errors related to three NICU

28  beds, two psychiatric beds and its Outpatient Joint Replacement Clinic.

US_Active\114447096\V-1

1   department with 11 rooms with 18 beds; and four surgical suites constituting an ambulatory

2   surgical center. *Id.* It also has 10 surgical operating rooms (eight of which are active), and three

3   cardiac catheterization labs (one of which is dedicated for endoscopic retrograde

4   cholangiopancreatography (ERCP)). *Id.* Additionally, Seton Hospital has 24 licensed acute

5   psychiatric beds, two of which have been placed in suspense. *Id.*

6         11.    On the Petition Date, Seton Hospital accounted for approximately 29% of the

7   operating losses of the Verity Health System, although Seton Hospital accounted for only

8   approximately 17% of the net patient revenue. *See* Adcock Decl. at ¶ 8. Since the Petition Date,

9   Seton Hospital's share of the system operating losses has remained consistent, requiring the

10  Debtors' estates to fund approximately $5 million of working capital per month, including

11  corporate overhead allocations. *Id.* The Debtors project similar continuing operating losses at

12  Seton Hospital. *Id.*

13        12.    Since the sale to Strategic Global Management, Inc. did not close, the Debtors have

14  been diligently analyzing options to keep Seton Hospital open as an operating hospital and are

15  currently in the process of negotiating a sale of Seton Hospital as an operating hospital.

16  **D.**    **The COVID-19 Pandemic**

17        13.    On March 4, 2020, the California Governor issued a Proclamation of a State of

18  Emergency (the "Proclamation") to allow for him to exercise extraordinary powers to deal with

19  the COVID-19 pandemic. *See* Proclamation attached hereto as **Exhibit "D."** On March 13, 2020,

20  the President of the United States declared a national emergency over the coronavirus pandemic.

21  *See*    www.cnbc.com/2020/03/13/trump-will-hold-a-press-conference-at-3-pm-et-to-discuss-

22  coronavirus-response.html (last visited on March 14, 2020). The Proclamation relies on the

23  California Emergency Services Act, generally, and California Government Code § 8625, in

24  particular. In the Proclamation, the Governor ordered, among other things, that State agencies

25  "shall enter into contracts to arrange for the procurement of materials, goods and services needed

26  to assist in preparing for, containing, responding to, mitigating the effects of, and recovering from

27  the spread of COVID-19." Among the powers conferred upon the Governor is the power to

28  commandeer property to address the public health crisis.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114447096\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

14.     Regarding the health crisis presented by COVID-19, the State is urgently working to develop  additional healthcare facility capacity and services in order that those residents of the State affected by COVID-19 may obtain medical care.  On March 12, 2020, the Debtors received a request from State representatives to partner together to ensure the availability of some of the Debtors' facilities to treat patients affected by the COVID-19 pandemic.  The Debtors, their advisors, and representatives of the State have worked tirelessly to ensure the availability of these facilities to meet this urgent need.

**E.      The Seton Hospital Services Agreement**

15.     The Debtors and the State have negotiated a Services Agreement with respect to the delivery of certain healthcare services at Seton Hospital, the principal terms of which provide:[5]

a.      for the rendering of patient medical services and dedication of inpatient bed space at Seton Hospital to address the COVID-19 pandemic;

b.      fixed compensation for (i) the first month of $5 million (paid three business days after entry of the Court's order), an amount that covers the Debtors' expected monthly operating losses for Seton, plus $2.7 million per month thereafter, plus an additional amount up to $2.3 million per month depending upon the average monthly  bed utilization by COVID-19 patients with (ii) the $2.7 million for the second month advanced early (i.e., only six business days after entry of the Proposed Order); provided, however, that to the extent any construction is required to upgrade Seton Hospital, cure any existing defects or bring Seton Hospital into compliance with applicable laws or otherwise for medical services use, the State may, but shall not be obligated to, perform such construction at State's sole cost and expense in accordance with other provisions in the Lease;

c.      the Debtors as operators to continue to invoice and collect from Medicare, MediCal, or other party payors for patient services in the ordinary course of business;

---

[5] This summary is not intended to, and does not modify, the specific terms of the Service Agreement.  In the event of a conflict between the summary provided in this Motion and the Services Agreement, the Services Agreement shall govern.  In the event of a conflict between the Services Agreement and the order approving the Motion, the order shall govern.

US_Active\114447096\V-1

d.      the Debtors to provide regular daily, monthly and/or as requested reporting to the State with respect to items such as a census of all patients in the Designated Space (as defined in the Services Agreement), as well as all other COVID-19 patients housed outside of the Designated Space (such census shall include the location and level of care of each patient in the Hospital, along with indication as to whether the patient has been officially diagnosed as being infected with COVID-19, or whether the patient is suspected of being infected with COVID-19), staffing levels at the Designated Space during the previous month, a statement of income and expenses as reflected in the Monthly Operating Report filed in the Bankruptcy Court, any changes to the original recommendation regarding the operations of the Designated Space;

e.      the Debtors to weekly consult with the State project representative;

f.      projections of changes in utilization and expected discharges from the Designated Space;

g.      upon expiration of the Services Agreement, and the satisfaction of Seton Hospital's obligations under section 5.6 arising in connection with the Services Agreement, including payment of all costs and obligations incurred in providing the services contemplated therein, the constraints under section 5.15 on the use of funds received as compensation, shall immediately terminate and be of no further force and effect; and

h.      the final version of the Proposed Order must be satisfactory to both parties.

**F.      The St. Vincent Property Lease**

16.      The Debtors and the State have negotiated a Lease, attached as **Exhibit "C"** with respect to the Property, the principal terms of which provide:[6]

a.      the State exclusive access for a period of six (6) months (the "Term"), subject to monthly extension for up to an additional six (6) months, as a commercial tenant under

---

[6] This summary is not intended to, and does not modify, the specific terms of the Lease. In the event of a conflict between the summary provided in the Motion and the Lease, the Lease shall govern. In the event of a conflict between the Lease and the order approving the Motion, the order shall govern.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114447096\V-1

1    a Bankruptcy Court approved net lease to the St. Vincent Medical Center  hospital premises

2    located at 2131 W. 3rd Street, Los Angeles, California, 90057 (the "<u>Hospital Premises</u>");

3          b.    a net base rent of $2.6 million per month payable to the Debtors, plus

4    additional rent payments with responsibility for all impositions, insurance premiums, utility

5    charges, maintenance, repair and replacement expenses, all expenses relating to compliance with

6    laws, and all other costs, fees, charges, expenses, reimbursements and obligations of  every kind

7    and nature whatsoever relating to the Hospital Premises, which may arise or become due during

8    the Term or by reason of events occurring during the Term shall be paid or discharged by State as

9    tenant;

10          c.    the State to use the Hospital Premises, without support or assistance from

11    the Debtors, for the operation of a general acute care hospital, including outpatient services,

12    ambulance services, and any other lawful health care purpose in response to the COVID-19

13    pandemic emergency (collectively, the "<u>Medical Business</u>"), provided the State returns the

14    Hospital Premises to the Debtors;

15          d.    the State with full responsibility to maintain the Hospital Premises and the

16    furniture, fixtures and equipment located therein in accordance with the terms of conditions of the

17    Lease during the Term and to return the Hospital Premises to the Debtors in their original

18    condition, free of medical waste, subject to any construction and repairs undertaken during the

19    term of the Lease;

20          e.    the Debtors may, upon approval by the Bankruptcy Court, transfer the

21    Debtors' fee simple interest in the Hospital Premises subject to Lease and without the consent of

22    the State as Tenant;

23          f.    the State shall pay daily liquidated damages under a specified formula for

24    any holdover period  after expiration of the Term; and

25          g.    the final version of the Proposed Order must be satisfactory to both parties.

26    **G.**    <u>**The Proposed Order**</u>

27        17.    A copy of the Proposed Order is attached hereto as Exhibit "A."  Among other

28    things, the Proposed Order provides:

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114447096\V-1

a.    the Motion is granted in all respects and all provisions thereof, and the terms of the Agreements are effective and binding whether or not specifically referenced herein;

b.    the Debtors are authorized and directed to perform all obligations provided hereunder and in the Agreements;

c.    the Court is exercising its jurisdiction over the Debtors' property, pursuant to § 105(a), § 363(b), § 363(f), to authorize the Debtors to enter into the Agreements as being a reasonable exercise of the Debtors' business judgment in response to the humanitarian and commercial exigencies affecting the Debtors' estates, the communities in which they operate or exist and the State;

d.    from and after the execution of the Agreements, the automatic stay under § 362(a), if and to the extent applicable, is hereby lifted with respect to the State's use and enjoyment of the Debtors' property and exercise of rights, subject to the Agreements;

e.    that the State's actions under the Executive Order N-25-20 and through the Agreements under the facts of these Cases to obtain control or use of the Debtors' property are exempt from the automatic stay as valid exercises of the State's police powers under § 362(b)(4) and otherwise not subject to the automatic stay under § 362(a);

f.    the Debtors will not seek a stay under § 105 to enjoin any of the rights, privileges or benefits of, or provided to the State under the Agreements;

g.    the Proposed Order, and the terms and conditions of the Agreements, are binding on the Debtors and their estates and shall be binding upon any trustee appointed under Chapter 11 or under Chapter 7 of the Bankruptcy Code, their estates and the Cases;

h.    neither the State nor any department or agency obtaining benefit from, or utilizing the Debtors' property, assume any obligation to any third party nor shall it be deemed to have any liability to any third party, including, without limitation, any of the Debtors' creditors, interest holders or parties in interest in the Debtors' Cases;

i.    Unless a court of competent jurisdiction has determined that the State is in material breach of this Agreements, the rights conveyed to the State under the Agreements and the Proposed Order are inviolable, and not subject to alteration, interference or divestiture by any

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

9

party, including, without limitation, any creditor, interest holder, or party in interest, in the Debtors' Cases, without regard to any liens, claims, encumbrances and/or interests those parties may assert, allege and/or possess, including, for the avoidance of doubt, any liens, claims, encumbrances and/or interests of the Prepetition Secured Creditors (as defined in the Cash Collateral Orders) under any Cash Collateral Order (as defined below);

j.    the Agreements and the Proposed Order shall each survive any dismissal of the Cases, except as to the extent that either of the Agreements already have been terminated in accordance with their terms prior any such dismissal;

k.    nothing in the Agreements or the Proposed Order shall be deemed to be a waiver of the State's police powers;

l.    the Debtors and the State may mutually agree to make non-material modifications to the Agreements from time to time without Court approval and to make material modifications pursuant to a stipulation and subsequent order thereon and may give notice of any material modifications by five (5) days' negative notice;

m.    except as may be expressly provided in the Proposed Order and in the Agreements, nothing in the Proposed Order modifies the rights of the Prepetition Secured Creditors, the Debtors or the Official Committee of Unsecured Creditors with respect to the allocation of value or any Challenge under the *Final Order (I) Authorizing Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V)  Modifying Automatic Stay, and (VI) Granting Related Relief* [Docket No. 409], the *Final Order (A) Authorizing Continued Use of Cash Collateral (B) Granting Adequate Protection, (C) Modifying Automatic Stay and (D) Granting Related Relief* [Docket No. 3022], the *Final Order Approving Stipulation to (A) Amend Cash Collateral Agreement and Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief Supplemental* [Docket No. 3883] and the *Final Order Approving Stipulation to (A) Amend the Second Amended Supplemental Cash Collateral Order, (B) Authorize*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief* [Docket No.4187] (collectively, the "Cash Collateral Orders").

n. Pursuant to the Services Agreement, the Operators shall deposit all *compensation* received from the State thereunder into a newly-created segregated account that, during the term of the Services Agreement and until all obligations of the Operators thereunder are satisfied, shall be free from all liens, claims, interests and third-party encumbrances, to be used solely for Seton and the services under the Service Agreement; provided that, pending establishment of such new segregated account, the Operators may use an existing segregated account that contains no other proceeds and, notwithstanding any prior orders of this Court, no replacement or other liens relat-ing to collateral of any pre- or post-petition lender or other person shall attach to the segregated account or any deposits therein, and any existing liens, claims, interests and third-party encum-brances associated with such existing segregated account shall be deemed terminated and of no force and effect.

o. Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective;

p. The Debtors, KCC, as claims and noticing agent, and the Clerk of this Court are authorized to take all steps necessary or appropriate to carry out this Order; and

q. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

## IV.

## ARGUMENT

A.  **This Court Has Authority Pursuant to §§ 363(b)(1) and 105(a) to Grant the Relief Requested.**

Ample authority exists for approval of the Agreements under §§ 363(b) and 105(a). Section 363(b)(1) provides, in relevant part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although § 363 does not set forth a standard for determining when it is appropriate for a Court to authorize the use of a debtor's assets, courts in the Ninth Circuit and others, in applying

US_Active\114447096\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

this section, have required that it be based upon the sound business judgment of the debtor. *See In re Lahijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005) ("Ordinarily, the position of the trustee is afforded deference, particularly where business judgment is entailed in the analysis or where there is no objection."); *In re Galleria USA, Inc.*, No. 8:09-BK-20651-TA, 2010 WL 4519724, at *2 (Bankr. C.D. Cal. Jan. 13, 2010) (finding sale of assets under § 363(b) was "a reasonable exercise of the Trustee's business judgment"). In *In re American Development Corp.*, when asked by debtor to "approve a transaction that is not covered by a specific provision in the Bankruptcy Code, that is not in the ordinary course of business, and that may have a significant impact on debtor's reorganization," the court considered, among other things, whether "the debtor satisfied the business judgment test by demonstrating good and sound business reasons for the proposed transaction." 95 B.R. 735, 739 (Bankr. C.D. Cal. 1989).

The business judgment standard requires that the bankruptcy court "presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the bankruptcy estate." *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d 665, 670 (9th Cir. 2007). As a result, the Debtors submit that the Court should approve the Debtors' entry into the Agreements "unless it finds that the debtor-in-possession's conclusion that rejection would be 'advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.'" *Id.* (quoting *Lubrizol Enters. v. Richmond Metal Finishers*, 726 F.2d 1043, 1047 (4th Cir. 1985)).

Furthermore, pursuant to § 105(a), "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Essentially, § 105(a) provides a statutory counterpart to the bankruptcy court's otherwise inherent and discretionary equitable powers. *See In re Sasson*, 424 F.3d 864, 874 (9th Cir. 2005); *In re Halvorson*, 581 B.R. 610, 636 n.91 (Bankr. C.D. Cal. 2018).

The Debtors' decision to enter into the Agreements is a reasonable exercise of the Debtors' business judgment as the Agreements further the Debtors' charitable mission to provide affordable and effective healthcare to members of their communities. Such care is needed now more than ever in light of the global healthcare crisis caused by the COVID-19 pandemic. Further, both Los

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Angeles and San Mateo County, the locations of St. Vincent and Seton Hospital, respectively, are likely to be hard-hit by the pandemic. On March 4, 2020, Los Angeles' Mayor Eric Garcetti declared a local emergency. San Mateo County is one of six Bay Area counties currently under a "shelter in place" order to flatten the curve of the pandemic's spread.

Court approval of the Services Agreement will authorize delivery to the State healthcare services including, but not limited to, medical, dietary, pharmacy, radiology, surgical, anesthesia, and clinical laboratory services at Seton Hospital, while providing for continuing revenue from all treated patients in accordance with Medicare, Medi-Cal and other third-party payor agreements to the extent appropriately covered patients are treated at Seton Hospital. Further, the Lease will allow the Debtors to lease the Property at St. Vincent to the State, such that the State may utilize the Property to effect the continued delivery of health to the benefit of the communities served by the Debtors. Additionally, the payments the State will pay the Debtors, pursuant to the terms of the Services Agreement and Lease, will inject funds into the estates to cover operations and monthly losses at Seton Hospital and subsidize costs at St. Vincent. The foregoing is critically important given the recent challenges to the sufficiency of the operating budget and the Debtors' ability to protect the estates. Further, the State is aware that the Debtors have implemented a sale process for both Seton Hospital and St. Vincent, and the Agreements do not negate the Debtors' rights to sell either facility. The Seton Agreement provides that Seton Medical Center may be sold, subject to the assignment of the Agreement to the buyer with the written consent of the State. *See* Seton Services Agreement, Exhibit B ¶ 1.1. The Lease provides that St. Vincent may sell the Property subject to the Lease. *See* Lease ¶ 15.1 & ¶ 24.4.

The benefits to the estates must also be judged based upon the current public health crisis. Governor Newsom has issued Executive Order N-25-20, under which the Governor asserts the power to take and use private property as needed to address the epidemic. The State further asserts that such action is exempt from the automatic stay under the police power exception provided in § 362(b)(4).[7] *See In re Dunbar*, 235 B.R. 465, 471 (B.A.P. 9th Cir. 1999), *aff'd*, 245

---

[7] Section 362(b)(4) provides in pertinent part: (b) The filing of a petition under section 301, 302, or 303 of this title […] does not operate as a stay — (4) under paragraph (1), (2), (3), or (6) of
*{footnote continued}*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

F.3d 1058 (9th Cir. 2001).  The exercise of the State's police powers includes actions to protect the public health through the seizure of or exercise of control over property of the estate.  *See Maricopa Cty. v. PMI-DVW Real Estate Holdings, LLP (In re PMI-DVW Real Estate Holdings, LLP),* 240 B.R. 24, 31-32 (Bankr. D. Ariz. 1999) ("The Court recognizes that traditionally in situations where there is an imminent health, welfare, or safety issue, that the government has a special interest in protecting its citizens and that the government may use its special police and regulatory power to afford such protection to its citizens.   The exception allowed by § 362(b)(4) allows a governmental unit to pursue actions to protect public health and safety. . . . ");  *Javens v. City of Hazel Park (In re Javens)*, 107 F.3d 359, 370 (6th Cir. 1997) (ruling that the municipalities' actions in demolishing buildings that posed a fire hazard were exempted from the automatic stay pursuant to § 362(b)(4));  *Manuel v. City of Jacksonville (In re Blunt),* 210 B.R. 626 (Bankr. M.D. Fla. 1997) (same).  "[T]he standard for a regulatory taking is whether the taking substantially advances a legitimate state interest."  *Maricopa Cty*, 240 B.R. at 31-32 (citing *Chevron U.S.A., Inc. v. Cayetano,* 57 F. Supp. 2d 1003, 1008 (D. Haw. 1998).  The State believes that this standard is clearly satisfied in these Cases.  Given that the Debtors and the State have reached a consensual agreement, however, the Court need not decide these issues.

Based on all of the foregoing, the Debtors respectfully request that the Court grant the Motion and authorize the Debtors to enter into the Agreements.

## B.    Waiver of the 14-Day Stay Provided under Bankruptcy Rule 6004(h) Is Appropriate.

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court order, unless the Court orders otherwise.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* 10 Collier on Bankruptcy ¶ 6004.11 at 6004-26 (Alan N. Resnick & Henry J. Sommer eds. 16th

---

*{continued from previous page}*
subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit [...] to enforce such governmental unit's [...] police and regulatory power.

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

ed. 2015).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes relating thereto are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen day period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." *Id.* at 6004-22.

For the reasons discussed above, the Debtors believe that it is critically important that the Debtors have the ability to enter into the Agreements without delay in light of, among other things, the exigencies of the COVID-19 public health emergency the Agreements are intended to address and the Debtors' well-documented financial condition.  Based on the foregoing, the Debtors respectfully requests that the Court waive the 14-day stay period set forth in Bankruptcy Rule 6004(h) to permit the Debtor to proceed immediately enter into the Agreements upon entry of an order granting this Motion.

**V.**

**<u>CONCLUSION</u>**

For all the foregoing reasons and such additional reasons as may be advanced at or prior to the hearing regarding this Motion, the Debtors request entry of an order: (i) approving the Service Agreement by and between the State, on the one hand, and VHS and Seton, on the other hand; (ii) approving the Lease by and between the State, on the one hand, and VHS and St. Vincent, on the other hand, concerning the Property; (iii) waiving any stay of the effectiveness of such order; and (iv) granting such other and further relief as is just and appropriate under the circumstances.

Dated:  March 19, 2020

**DENTONS US LLP**
SAMUEL R. MAIZEL
TANIA M. MOYRON
NICHOLAS A. KOFFROTH


By___*/s/ Tania M. Moyron*_____

Attorneys for Verity Health System of California, Inc., *et al.*

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114447096\V-1

1  **DECLARATION OF RICHARD G. ADCOCK**

2       I, Richard G. Adcock, hereby state and declare as follows:

3       I submit this declaration (the "Declaration")[1] in support of the *Debtors' Emergency Motion*

4  *to Approve Agreements with the State of California in response to the COVID-19 Healthcare*

5  *Emergency to (I) Provide Certain Healthcare Services at Seton Medical Center and (II) Lease St.*

6  *Vincent Medical Center* (the "Motion"), which seeks entry of an order (a form of which is attached

7  hereto as **Exhibit "A"**): (i) approving the Service Agreement by and between the State of

8  California (the "State"), on the one hand, and Verity Health System of California, Inc. ("VHS")

9  and Seton Medical Center ("Seton"), on the other hand, attached to the Motion as **Exhibit "B"**

10  (the "Service Agreement"), concerning the delivery of healthcare services at the general acute care

11  hospital operated by Seton and located at 1900 Sullivan Ave, Daly City, California (the "Seton

12  Hospital"); (ii) approving the Master Lease Agreement by and between the State, on the one hand,

13  and VHS and St. Vincent Medical Center ("St. Vincent"), on the other hand, concerning real

14  property located at 2131 West Third Street, Los Angeles, California 90057 (collectively, the

15  "Property") attached to the Motion as **Exhibit "C"** (the "Lease" and, together with the Service

16  Agreement, the "Agreements"); (iii) waiving any stay of the effectiveness of such order; and (iv)

17  granting such other and further relief as is just and appropriate under the circumstances.

18  **General Background**

19       1.      I am the Chief Executive Officer ("CEO") of VHS.  I became VHS' CEO effective

20  January 2018.  Prior thereto, I served as VHS' Chief Operating Officer ("COO") beginning in

21  August 2017.  In my roles as COO and CEO at VHS, I have become intimately familiar with all

22  aspects of the Debtors as well as those affiliated entities that are not in bankruptcy.

23       2.      I have been serving as the CEO of Seton since August 2019.  In this capacity, I

24  have gained valuable insight into the operations of all the VHS hospitals as well as the patients

25  and residents who are treated there.

26

27  ───────────────

28  [1] Unless otherwise defined, capitalized terms herein shall have the same meaning as in the Motion.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

3.    I have worked for more than 25 years in the healthcare arena, with 15 years in not for profit operations.  During this period, I have accumulated extensive senior level experience in the areas of not-for-profit healthcare, especially in healthcare delivery, hospital acute care services, health plan management, product management, acquisitions, integrations, population health management, budgeting, disease management and medical devices.  I also have meaningful experience in other related areas, including human resources and personnel management.

4.    My background and familiarity with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 bankruptcy cases are set forth more fully in my *Declaration filed in Support of Emergency First-Day Motions* filed on the Petition Date, and are incorporated by reference into this Declaration.

**St. Vincent Medical Center**

5.    Prior to its closing earlier this year, St. Vincent operated as a 366 licensed bed, regional acute care hospital, that served both local residents and residents from Los Angeles, San Bernardino, Riverside, and Orange Counties.  As a provider of healthcare services for a high percentage of elderly patients, many of the hospital's services and programs were focused on the treatment of various chronic diseases.

6.    On January 6, 2020, the Debtors filed an emergency motion to close St. Vincent and St. Vincent Dialysis Center, Inc., in part, because of the hospital's ongoing economic losses and the Debtors' need to have sufficient cash on hand for the orderly closure of the hospital.  On January 9, 2020, the Court entered a memorandum of decision and order granting the closure motion and authorizing the Debtors to close the hospital pursuant to a closure plan (the "Closure Plan").  As set forth in the Debtors' status reports, the Debtors have substantially completed the Closure Plan, including the discharge or transfer of all patients.

7.    The Debtors started marketing St. Vincent's real estate assets for a sale following the closure of the hospital. Total monthly costs are approximately $2.6 million, including adequate protection payments and other restructuring fees.

US_Active\114447096\V-1

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**Seton Medical Center**

8. Seton Hospital is regional acute care hospital currently licensed for 357 beds, comprising 250 general acute care beds, 83 skilled nursing beds, and 24 acute psychiatric beds. Of the 250 general acute care beds, 18 are designated for perinatal services (in suspense), 14 for coronary care, 14 for intensive care, three for intensive care newborn nursery (in suspense), with the remaining 201 beds unspecified general acute care beds. Seton Hospital has an emergency department with 11 rooms with 18 beds; and four surgical suites constituting an ambulatory surgical center. It also has 10 surgical operating rooms (eight of which are active), and three cardiac catheterization labs (one of which is dedicated for endoscopic retrograde cholangiopancreatography (ERCP)).

9. In addition to Seton Hospital, Seton operates a second campus, the "Coastside Campus," located at 600 Marine Boulevard, Moss Beach, California 94038.

10. As of the date hereof, Seton Hospital employs approximately 1172 employees, of which 411 are full time, 432 are part time, and 329 are per diem.

11. Seton Hospital and the Coastside Campus operate under one consolidated acute care license, issued by the California Department of Public Health with an effective date of January 1, 2020. They have a single Board of Directors, executive leadership team, human resources and charity care policies, and union collective bargaining agreements.

12. On the Petition Date, Seton Hospital accounted for approximately 29% of the operating losses of the Verity Health System, although Seton Hospital accounted for only approximately 17% of the net patient revenue. Since the Petition Date, Seton Hospital's share of the system operating losses has remained consistent, requiring the Debtors' estates to fund approximately $5 million of working capital per month, including corporate overhead allocations. Id. The Debtors project similar continuing operating losses at Seton Hospital. Id.

13. Since the sale to Strategic Global Management, Inc. did not close, the Debtors have been diligently analyzing options to keep Seton Hospital open as an operating hospital and are currently in the process of negotiating a sale of Seton Hospital as an operating hospital.

US_Active\114447096\V-1

**The COVID-19 Pandemic**

14.    The United States is currently facing the impact of the infectious disease Severe Acute Respiratory Syndrome Coronavirus 2, which is the cause of the ongoing 2019 coronavirus pandemic ("COVID-19").

15.    On March 4, 2020, the California Governor issued a Proclamation of a State of Emergency (the "Proclamation") to allow for him to exercise extraordinary powers to deal with the COVID-19 pandemic.  *See* Proclamation attached hereto as **Exhibit "D."**  The Proclamation relies on the California Emergency Services Act, generally, and California Government Code § 8625, in particular.  In the Proclamation, the Governor ordered, among other things, that State agencies "shall enter into contracts to arrange for the procurement of materials, goods and services needed to assist in preparing for, containing, responding to, mitigating the effects of, and recovering from the spread of COVID-19."

16.    On March 12, 2020, the California Governor issued an Executive Order further enhancing the State's ability to respond to the COVID19 pandemic.  This Executive Order "readies the state to commandeer property for temporary residences and medical facilities for quarantining, isolating or treating individuals."  *See* Executive Order attached hereto as **Exhibit "E.**"  Under the Executive Order, the Governor asserts the power to commandeer private property to address the public health crisis.

17.    On March 13, 2020, the President of the United States declared a national emergency over the coronavirus pandemic.  *See* www.cnbc.com/2020/03/13/trump-will-hold-a-press-conference-at-3-pm-et-to-discuss-coronavirus-response.html (last visited on March 14, 2020).

18.    Regarding the health crisis presented by COVID-19, the State is in dire need of additional healthcare facilities and services in order that those residents of the State affected by COVID-19 may obtain medical care.

**Seton Hospital Services Agreement and St. Vincent Lease**

19.    On March 13, 2020, the Debtors were contacted by State representatives regarding the Governor identifying Seton Hospital and St. Vincent as high priority facilities to treat patients

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114447096\V-1

affected by the COVID-19 pandemic.  The State requested that the Debtors partner with the State to ensure the availability of space at Seton Hospital and St. Vincent.

20.     The Debtors, their advisors, and representatives of the State have worked tirelessly to reach an agreement on the terms of the Seton Hospital Services Agreement and the St. Vincent Lease.  The terms of the Seton Hospital Services Agreement and the St. Vincent Lease are set forth in the Motion and in Exhibit "B" and Exhibit "C" attached to the Motion, respectively.

21.     After careful review of the circumstances and the Agreements, the Debtors have concluded, in their business judgment, that entering into the Agreements is in the best interests of the Debtors, their estates, stakeholders, creditors, and the communities they serve, which include communities already affected by, or certain to be affected in the future by COVID-19.   The effectuation of the Agreements is consistent with the Debtors' charitable mission, particularly in light of the current public health crisis caused by the outbreak of COVID-19.  Further, both Los Angeles and San Mateo County, the locations of St. Vincent and Seton Hospital, respectively, are likely to be especially hard-hit by the pandemic.  On March 4, 2020, Los Angeles' Mayor Eric Garcetti declared a local emergency.  San Mateo County is one of  six Bay Area counties currently under a "shelter in place" order to flatten the curve of the pandemic's spread.  Additionally, the Agreements will inject funds into the estates to cover certain operational and monthly losses.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 19th day of March, 2020, at Santa Monica, California.

_____
RICHARD G. ADCOCK

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# EXHIBIT A

# Proposed Order

SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
NICHOLAS A. KOFFROTH (Bar No. 287854)
nick.koffroth@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

Attorneys for the Chapter 11 Debtors and
Debtors In Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| In re | Lead Case No. 2:18-bk-20151-ER |
| VERITY HEALTH SYSTEM OF CALIFORNIA, INC., *et al.*, | Jointly Administered with: Case No. 2:18-bk-20162-ER Case No. 2:18-bk-20163-ER Case No. 2:18-bk-20164-ER Case No. 2:18-bk-20165-ER Case No. 2:18-bk-20167-ER Case No. 2:18-bk-20168-ER Case No. 2:18-bk-20169-ER Case No. 2:18-bk-20171-ER Case No. 2:18-bk-20172-ER Case No. 2:18-bk-20173-ER Case No. 2:18-bk-20175-ER Case No. 2:18-bk-20176-ER Case No. 2:18-bk-20178-ER Case No. 2:18-bk-20179-ER Case No. 2:18-bk-20180-ER Case No. 2:18-bk-20181-ER |
| Debtors and Debtors In Possession. | |

☒ Affects All Debtors

☐ Affects Verity Health System of California, Inc.
☐ Affects O'Connor Hospital
☐ Affects Saint Louise Regional Hospital
☐ Affects St. Francis Medical Center
☐ Affects St. Vincent Medical Center
☐ Affects Seton Medical Center
☐ Affects O'Connor Hospital Foundation
☐ Affects Saint Louise Regional Hospital Foundation
☐ Affects St. Francis Medical Center of Lynwood Foundation
☐ Affects St. Vincent Foundation
☐ Affects St. Vincent Dialysis Center, Inc.
☐ Affects Seton Medical Center Foundation
☐ Affects Verity Business Services
☐ Affects Verity Medical Foundation
☐ Affects Verity Holdings, LLC
☐ Affects De Paul Ventures, LLC
☐ Affects De Paul Ventures - San Jose Dialysis, LLC

Debtors and Debtors In Possession.

Chapter 11 Cases
Honorable Ernest M. Robles

**ORDER GRANTING DEBTORS' EMERGENCY MOTION TO APPROVE AGREEMENTS WITH THE STATE OF CALIFORNIA IN RESPONSE TO THE COVID-19 HEALTHCARE EMERGENCY TO (I) PROVIDE CERTAIN HEALTHCARE SERVICES AT SETON MEDICAL CENTER AND (II) LEASE ST. VINCENT MEDICAL CENTER**

**[RELATES TO DOCKET NO. _____]**

HEARING:
Date:    March __, 2020
Time:    10:00 a.m.
Place:   Courtroom 1568, 255 East Temple Street
         Los Angeles, California 90012-3300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 1 -

The Court, having read and considered the *Debtors' Emergency Motion To Approve Agreements With The State Of California In Response To The COVID-19 Healthcare Emergency To (I) Provide Certain Healthcare Services At Seton Medical Center And (II) Lease St. Vincent Medical Center* (the "Motion")[1], filed by Verity Health System Of California, Inc. and the above-referenced affiliated debtors and debtors in possession in the above captioned chapter 11 bankruptcy cases (collectively, the "Debtors"), and the papers in support thereof, and no objection or response having been filed or any such objection or response having been overruled or resolved as announced at the hearing on the Motion; it further appearing that proper notice of the Motion had been provided; and for the reasons set forth in the Court's tentative ruling on the Motion [Docket No. ###] (the "Ruling"), which the Court adopts as its final Ruling and which is incorporated herein by reference; and good and sufficient cause having been shown,

**IT IS HEREBY ORDERED**:

1.     The Motion is granted in all respects and all provisions thereof, and the terms of the Agreements are effective and binding whether or not specifically referenced herein;

2.     The Debtors are authorized and directed to perform all obligations provided hereunder and in the Agreements;

3.     The Court is exercising its jurisdiction over the Debtors' property pursuant to §§ 105(a), § 363(b) and § 363(f) of the Bankruptcy Code to authorize the Debtors to enter into the Agreements as being a reasonable exercise of the Debtors' business judgment in response to the humanitarian and commercial exigencies affecting the Debtors' estates, the communities in which they operate or exist, and the State;

4.     From and after the execution of the Agreements, the automatic stay under § 362(a) of the Bankruptcy Code, if an to the extent applicable, is hereby lifted with respect to the State's use and enjoyment of the Debtors' property and exercise of rights, subject to the Agreements;

---

[1]     Capitalized terms used but not otherwise defined in this Order shall have the meaning for such term set forth in the Motion or the Agreements, as applicable.

- 2 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

5.      The State's actions under the Executive Order N-25-20 and through the Agreements under the facts of these Cases to obtain control or use of the Debtors' property are exempt from the automatic stay as valid exercises of the State's police powers under § 362(b)(4) of the Bankruptcy Code and otherwise not subject to the automatic stay under § 362(a) of the Bankruptcy Code;

6.      The Debtors will not seek a stay under § 105 of the Bankruptcy Code to enjoin any of the rights, privileges or benefits of, or provided to the State under the Agreements;

7.      This Order, and the terms and conditions of the Agreements, are binding on the Debtors and their estates and shall be binding upon any trustee appointed under  Chapter 11 or under Chapter 7 of the Bankruptcy Code, their estates and the Cases;

8.      Neither the State nor any department or agency obtaining benefit from, or utilizing the Debtors' property, assume any obligation to any third party nor shall it be deemed to have any liability to any third party, including, without limitation, any of the Debtors' creditors, interest holders or parties in interest in the Debtors' Cases;

9.      Unless a court of competent jurisdiction has determined that the State is in material breach of the Agreements, all rights conveyed to the State under the Agreements and this Order are inviolable, and not subject to alteration, interference or divestiture by any party, including, without limitation, any creditor, interest holder, or other party in interest, in the Debtors' Cases, without regard to any liens, claims, encumbrances and/or interests those parties may assert, allege and/or possess, including, for avoidance of doubt, any liens, claims, encumbrances and/or interests of the Prepetition Secured Creditors (as defined in the *Final Order (A) Authorizing the Debtors to Use Cash Collateral and (B) Granting Adequate Protection to Prepetition Secured Creditors (C) Modifying Automatic Stay and (D) Granting Related Relief* [Docket No. 3022]) the Cash Collateral Orders (defined below);

10.     The Agreements and this Order shall each survive any dismissal of the Cases, except as to the extent that either of the Agreements already have been terminated in accordance with their terms prior any such dismissal;

11.     Nothing in the Agreements or this Order shall be deemed to be a waiver of the State's police powers;

- 3 -

114466118\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

12.     The Debtors and the State may mutually agree to make non-material modifications to the Agreements from time to time without Court approval and to make material modifications pursuant to a stipulation and subsequent order thereon and may give notice of any material modifications by five (5) days' negative notice;

13.     Except as may be expressly provided in this Order or the Agreements, nothing in this Order modifies the rights of the Prepetition Secured Creditors, the Debtors or the Official Committee of Unsecured Creditors with respect to the allocation of value or the any Challenge under the *Final Order (I) Authorizing Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [Docket No. 409], the *Final Order (A) Authorizing Continued Use of Cash Collateral (B) Granting Adequate Protection, (C) Modifying Automatic Stay and (D) Granting Related Relief* [Docket No. 3022], the *Final Order Approving Stipulation to (A) Amend Cash Collateral Agreement and Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief Supplemental* [Docket No. 3883], the *Final Order Approving Stipulation to (A) Amend the First Amended Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief* [Docket No. 4028], and the *Final Order Approving Stipulation to (A) Amend the Second Amended Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief* [Docket No.4187] (collectively, the "Cash Collateral Orders");

14.     Pursuant to the Services Agreement, the Operators shall deposit all compensation received from the State thereunder into a newly-created segregated account that, during the term of the Services Agreement and until all obligations of the Operators thereunder are satisfied, shall be free from all liens, claims, interests and third-party encumbrances, to be used solely for Seton and the services under the Service Agreement; provided that, pending establishment of such new segregated account, the Operators may use an existing segregated account that contains no other

- 4 -

114466118\V-3

proceeds and, notwithstanding any prior orders of this Court, no replacement or other liens relating to collateral of any pre- or post-petition lender or other person shall attach to the segregated account or any deposits therein, and any existing liens, claims, interests and third-party encumbrances associated with such existing segregated account shall be deemed terminated and of no force and effect.

15. Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective;

16. The Debtors, KCC, as claims and noticing agent, and the Clerk of this Court are authorized to take all steps necessary or appropriate to carry out this Order; and

17. This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**IT IS SO ORDERED.**

# # #

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

114466118\V-3

# EXHIBIT B

# Service Agreement

## SERVICES AGREEMENT

This SERVICES AGREEMENT (the "Agreement") is to provide for the delivery of health care services, including, but not limited to, Medical, Nursing, Dietary, Pharmacy, Radiology, Surgical, Anesthesia, and Clinical Laboratory Services, unless otherwise waived by the licensing authority. This Agreement is entered into, subject to approval by the Bankruptcy Court, by and between the California Department of Public Health (the "State"), on the one hand, and on the other hand, Verity Healthcare System of California, Inc., a California nonprofit public benefit corporation ("Verity") and Seton Medical Center, a California nonprofit public benefit corporation ("Seton" and together with Verity, collectively, the "Operators" or "Debtors" or "contractor").

## RECITALS

A.     WHEREAS, the State determined that grounds exist to contract with an operator to preserve and increase critical medical services, pursuant to the Governor's Emergency Declaration, Executive Order (EO) N-25-20 dated March 12, 2020 (the "Executive Order").

B.     WHEREAS, all agencies of the state government shall perform any and all activities consistent with the direction of the State, pursuant to paragraph 1 of the Executive Order.

C.     WHEREAS, Seton engages in the business of the operation of a general acute care hospital, with the hospital campus known as Seton Medical Center, located at 1900 Sullivan Avenue, Daly City, CA 94015 (the "Hospital"), including, but not limited to, the hospital pharmacy, laboratory, and emergency department.

D.     WHEREAS, the State selected Seton Medical Center as a location for enhanced availability of hospital beds and space (sometime hereinafter referred to as the "Designated Space," and as described in paragraph 2.2 of this Agreement), to be used by the State or its designated agencies for inpatient medical services associated with the COVID-19 pandemic. The State selected Operators to operate and maintain the Designated Space to provide health care services (further described below) for patients admitted to the Designated Space, as well as to provide health care services to other COVID-19 patients admitted to the Hospital if the Designated Space reaches capacity and the Operators elect to house and care for those COVID-19 patients outside of the Designated Space (collectively, the "Emergency Facility Services," as described in paragraphs 4.1-4.3 of this Agreement) within Seton Medical Center. (For purposes of this Agreement, the "Project" shall mean the provision of Emergency Facility Services at the Designated Space upon the terms and subject to the conditions in this Agreement.)

E.     WHEREAS, the Operators are operating their businesses as debtors in possession, pursuant to §§ 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), under Lead Case No. 2:18-bk-20151-ER (the "Bankruptcy Cases"), pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

F.      WHEREAS, as of March 25, 2020, the Operators will operate the Hospital, including the Designated Space, pursuant to the terms of this Agreement and applicable State and Federal law, on behalf of the State.

G.      WHEREAS, the State requires that there will be no disruption of medical services at the Designated Space, and

H.      WHEREAS, Verity is likely to file a motion to obtain authority to sell Seton Medical Center, to a qualified hospital operator, pursuant to § 363 of the Bankruptcy Code, and such sale will likely be subject to review (the "Review") by the California Attorney General, pursuant to California Corporations Code § 5914, which may take from 90 days to 135 days (the "Review Period"); and, if the Review is not conducted on an expedited basis, Seton Medical Center will face significant liquidity constraints.

I.      WHEREAS, the parties wish to document their Agreement with respect to the provision of such services between the Operators and the State.

NOW, THEREFORE, in consideration of the facts referenced above and the covenants contained herein, it is hereby agreed as follows:

**1.      Term.**

1.1      This Agreement shall be effective, and the term of the Agreement shall begin, upon entry of an order of the Bankruptcy Court (the "Agreement Date") and continue throughout the term set forth in Exhibit B, Section 4.2.

**2.      Service Location and Description of the Designated Space.**

2.1      The services shall be performed at the location listed below, within the Designated Space, at:

Seton Medical Center's hospital campus located at, 1900 Sullivan Avenue, Daly City, California 94015.

2.2      The Designated Space shall consist of the following areas of the Hospital:

On or around March 25, 2020, the Hospital's ground-floor ICU (14 beds), the Hospital's first-floor Transitional Care Unit (14 beds), the Hospital's fifth-floor Telemetry Med/Surg area (46 beds), and the Hospital's seventh-floor Acute Med/Surg area (46 beds).

In addition, on or around April 1, 2020, the Designated Space shall be expanded to also include the Hospital's tenth-floor Acute Med/Surg area (33 beds).

In addition, on or around April 22, 2020, the Designated Space shall be expanded to also include the Hospital's eighth-floor area (formerly Gero Psych) (to be repurposed as 24 Acute Med/Surg beds; upon execution of this Agreement, the California Department of Public Health approves of repurposing of these beds to Acute Med/Surg for the duration of the time this Agreement is in

effect, or the duration of the time the Governor's Emergency Declaration
(described in the Executive Order) remains in effect, whichever is longer).

**3.    Project Representatives.**

3.1    The project representatives during the term of this agreement will be:

| The State | Contractor |
|---|---|
| Attention: Cassie Dunham<br>California Dept. of Public Health<br>Licensing and Certification Program<br>P.O. 997377, MS 3001<br>Sacramento, CA 95899-7377 | Attention: Richard Adcock<br>Verity Health System of California, Inc.<br>601 S. Figueroa St.<br>Suite 4050<br>Los Angeles, CA 90017 |
| Telephone: (916) 324-1261<br>Email: cassie.dunham@cdph.ca.gov | Telephone: (605) 940-6685<br>Email: richadcock@verity.org |

3.2    Direct all inquiries to and notices to:

| The State | Contractor |
|---|---|
| Attention: Cassie Dunham<br>California Dept. of Public Health<br>Licensing and Certification Program<br>P.O. 997377, MS 3001<br>Sacramento, CA 95899-7377 | Attention: Tania Moyron<br>Dentons US LLP<br>601 S. Figueroa St.<br>Ste. 2500<br>Los Angeles, CA 90017-5704 |
| Telephone: (916) 324-1261<br>Email: cassie.dunham@cdph.ca.gov | Telephone: (213) 243-6101<br>Fax: (213) 623-9924<br>Email: tania.moyron@dentons.com |

3.3    Either party may make changes to the contact information in Sections 3.1 or 3.2 above by giving written notice to the other party. Said changes shall not require an amendment to this Agreement.

**4.    Emergency Facility Services - Service Overview.**

4.1    The Designated Space shall be used by Operators to provide health care services, including inpatient medical services, to patients diagnosed with COVID-19, patients suspected of having COVID-19, or patients being tested or monitored for COVID-19.  Operators

agree to make available in the Designated Space the following minimum number of inpatient beds ("Minimum Beds"):

> 4.1.1    On or around March 25, 2020, 120 total inpatient beds (which shall consist of 14 ground-floor ICU beds, 14 first-floor Transitional Care Unit beds, 46 fifth-floor Telemetry Med/Surg beds, and 46 seventh-floor Acute Med/Surg beds) (collectively, the "Initial Phase Beds").  The Operators shall make at least 40 of these beds, consisting of 14 ICU beds and 26 Acute Med/Surg beds, available by March 25, 2020, with the rest becoming available within one (1) week of that date.

> 4.1.2    On or around April 1, 2020, 153 total inpatient beds (consisting of the Initial Phase Beds, plus 33 tenth-floor Acute Med/Surg Beds) (collectively, the "Second Phase Beds").

> 4.1.3    On or around April 22, 2020, 177 total inpatient beds (consisting of the Second Phase Beds and 24 eight-floor Med/Surg beds) (collectively, the "Third Phase Beds").

4.2    Operators agree to provide its patients in the Designated Space with health care services including but not limited to Medical, Nursing, Dietary, Pharmacy, Radiology, Surgical, Anesthesia, and Clinical Laboratory Services, consistent with the scope of services it currently provides, and the licenses it currently holds, unless otherwise waived by the licensing authority. If Operators elect to admit and provide health care services to other COVID-19 patients outside of the Designated Space (for example, because the Designated Space has reached capacity), Operators agree to provide those additional COVID-19 patients with health care services including, but not limited to Medical, Nursing, Dietary, Pharmacy, Radiology, Surgical, Anesthesia, and Clinical Laboratory Services, consistent with the scope of services it currently provides, and the licenses it currently holds.

4.3    The Operators shall take all necessary action to maintain operations of the Designated Space. The Operators shall oversee all activities necessary to maintain operations, programs, and activities that are necessary for participation in the Medicare and Medi-Cal programs, and Operators shall provide safe and adequate care for patients in the Designated Space, in accordance with Health and Safety Code, Chapter 2 and 2.4, and Title 22 California Code of Regulations, Chapters 1 and 3 of Division 5. If the Operators elect to admit and provide health care services to other COVID-19 patients outside of the Designated Space (for example, because the Designated Space has reached capacity), the Operators shall provide safe and adequate care for those additional COVID-19 patients, in accordance with Health and Safety Code, Chapter 2 and 2.4, and Title 22 California Code of Regulations, Chapters 1 and 3 of Division 5.

## 5.    Services to be Performed by Operators.

Initial Assessment.

5.1    Upon execution of the Agreement, the Operators shall complete a thorough operational outline of the Operators' capacity at the Designated Space to operate and provide Emergency Facility Services in compliance with State and Federal law, including an analysis of the Designated Space's organizational, staffing and supply chain needs for the Project. The

Operators shall report those findings to the State project representative within (3) three business days of the Agreement Date.

5.2     Within seven (7) calendar days of the Agreement Date, the Operators shall memorialize the report in writing to the State project representative on the Hospital's ability to maximize operations at the Designated Space.

5.3     Within thirty (30) calendar days of the Agreement Date, the Operators shall provide a written report to the State project representative describing the operational status and capacity of the Designated Space. The report shall be updated and submitted to the State project representative on a monthly basis for the duration of the Agreement.

5.4     The operational outline provided to the State project representative shall include:

5.4.1   A list of tasks needed to operationalize or maximize operations at the Designated Space, including any additional staffing challenges and needs;

5.4.2   Estimated completion dates for each task listed;

5.4.3   The person(s) responsible for each task; and

5.4.4   A column to insert the date each task was actually completed.

5.5     The State project representative shall review and approve or revise the operational outline within three (3) calendar days of the date the operational outline is submitted.

**Operators' Responsibilities:**

The Operators shall have the following duties and responsibilities with respect to the Project:

5.6     The Operators shall operate the Designated Space in accordance with the exempt organization requirements and applicable State and Federal law in a manner consistent with current operations after scaling up Operators' staffing and resource levels, as reasonably available, to provide Emergency Facility Services for the Minimum Beds in the Designated Space. Unless otherwise waived by applicable authority, operating the Designated Space includes:

5.6.1   Arranging for and providing sufficient physician medical staff (such as hospitalists, intensivists, anesthesiologists, radiologists, and surgeons), non-physician clinical staff (such as advanced practice nurses, registered nurses, licensed vocational nurses, technicians, and nursing assistants), and non-clinical staff necessary to provide safe and effective health care services to the patients in the Designated Space, including as needed to render the requisite level of care of the designated unit or floor (i.e., ICU, Transitional Care Unit, Telemetry Med/Surg, or Acute Med/Surg) for the Minimum Beds.

5.6.1.1 If the Operators elect to admit and provide health care services to other COVID-19 patients outside of the Designated Space (for example, because the Designated Space has reached capacity),

the Operators shall arrange for and provide sufficient physician medical staff (such as hospitalists, intensivists, anesthesiologists, radiologists, and surgeons), non-physician clinical staff (such as advanced practice nurses, registered nurses, licensed vocational nurses, technicians, and nursing assistants), and non-clinical staff necessary to provide safe and effective health care services to those additional COVID-19 patients, including as needed to render the requisite level of care of the designated unit or floor (i.e., ICU, Transitional Care Unit, Telemetry Med/Surg, or Acute Med/Surg).

5.6.2   Obligating that Project funds all usual and customary operating expenses of the Designated Space, including accounts payable, employee payroll, taxes, insurance premiums, and all other administrative expense payments due from the Designated Space.

5.6.3   Ensuring the Designated Space and all fixtures, furnishings, equipment and other property located therein is maintained in good repair, consistent with past practice.

5.6.4   Maintaining all licenses, certifications, permits, consents, and approvals required for the operation of the Designated Space.

5.6.5   Hiring, terminating, or reassigning staff as necessary and managing employee grievances and employment issues.

5.6.6   Arranging for the issuance of staff paychecks and withholding from such paychecks the appropriate amounts for income tax, social security, and unemployment insurance.

5.6.7   Providing staff benefits, including holidays, sick leave, and other benefits in accordance with the Labor Code, the Bankruptcy Code and any collective bargaining agreements and maintaining worker's compensation insurance, as required by law.

5.6.8   Providing for the bookkeeping, accounting, and administrative functions reasonably necessary for the efficient and proper support of operation of the Designated Space, including but not limited to:

5.6.8.1 Preparing and maintaining business records, financial reports, and other reports.

5.6.8.2 Establishing and administering accounting procedures and controls.

5.6.8.3 Processing and payment of accounts payable.

5.6.8.4 Billing, processing, and collection of accounts receivable,

including the billing and completion of any reports and forms that may be required by insurance companies, governmental agencies, or other third-party payors.

5.6.8.5  Providing and processing of all staff recordkeeping, payroll accounting, and administrative expense benefits for all staff working at the Designated Space.

5.6.9    Arranging for the maintenance, repair, trash removal, and janitorial services which may be necessary to maintain the Designated Space and equipment in a clean and safe condition, in compliance with applicable law.

5.6.10  Arranging for continued payment of the utilities reasonably required for operation of the Designated Space, including telephone, electricity, gas, water, and refuse disposal.

5.6.11  Arranging for the provision and replenishment of all supplies and inventory used in the Designated Space as necessary.

5.6.12  Altering Designated Space's procedures, if necessary.

5.6.13  Preparing and filing with the appropriate Medicare and Medi-Cal agencies any partial, interim, or final cost reports with respect to the operation of the Designated Space which are required to be file by law.

5.6.14  Any other actions necessary to correct deficiencies identified in the Designated Space's operation.

5.6.15  The Hospital or Designated Space shall only close during the term of this Agreement if agreed to in writing by the State. If the Hospital should unexpectedly close, the Operator will oversee the transfer of patients, if applicable, upon the expiration or earlier termination of this Agreement.

5.7    The Operators shall ensure the health and safety of the Designated Facility's patients. If the Operators elect to admit and provide health care services to other COVID-19 patients outside of the Designated Space (for example, because the Designated Space has reached capacity), the Operators shall ensure the health and safety of those additional COVID-19 patients.

5.8    The Operators shall use all funds received from the State pursuant to this Agreement, and all buildings, fixtures, and furnishings constituting the Seton Medical Center, and any consumable goods for the provision of care and services for patients receiving services in the Designated Space; subject to the foregoing restriction, the requirements of any orders of the Bankruptcy Court relating to the use of the cash collateral and cash management shall remain in place.

5.9    The Operators shall maintain Medicare and Medi-Cal provider numbers, submitter ID, National Provider Number, and any other identifying numbers which the Operators may use to bill for services provided to patients at the Hospital.

5.10    The Operators shall not, during the period of this Agreement, without prior written approval from the State, dispose of any assets on or in the Designated Space, except for ordinary course consumables such as spoiled, used, or contaminated supplies; provided, however, that this provision is (i) not intended to hinder or delay the Operators' ongoing efforts to sell Seton Medical Center and its assets in a manner that preserves all of the State's rights hereunder, and (ii) that the State shall reasonably cooperate with Operators with respect to an assignment or separate agreement with a third-party purchaser, as set forth in Exhibit B, section 1.1.  Further, the State will support the Operators' request that the California Attorney General complete the Review Period in an expedited manner.

5.11    The Operators must produce documentation that all staff required by law or by the needs of the Designated Space are in place as reasonably available in the market.

5.12    The Operators must produce proof of: (i) all insurance necessary and appropriate for the operation and maintenance of the Designated Space; (ii) appropriate bonding; and (iii) a business line of credit.

5.13    The Operators shall adopt and implement COVID-19 protocols for the Hospital consistent with those recommended by the Federal Centers for Disease Control, the Joint Commission, and the State's respective health agencies.  This shall include COVID-19 training, as well as procedures for infection control, protection of staff, and proper intake of suspected COVID-19 patients.

5.14    The Operators may contract for services, equipment, and supplies as necessary for the operation of the Designated Space.

5.14.1  The Operators shall maintain a copy of each contract entered into in support of this Agreement and shall, upon request by any state or federal agency, make copies available for approval, inspection, or audit. The Operators shall retain all records for at least three (3) years and make all records available for audit and inspection by state or federal agencies. In the event that the Operators are authorized to exercise rights under § 351 of the Bankruptcy Code, the State may arrange for the preservation of records at its expense.

5.14.2  The Operators accept sole responsibility for the payment of contractors used during the Agreement period and are responsible for all performance requirements of the contractor. Subject to the requirements of the Bankruptcy Code and any Bankruptcy Court orders affecting the receipt or use of assets subject to liens of pre-petition creditors of the Operator, including orders permitting the use of cash collateral, the Operators shall honor all leases, mortgages, and secured transactions involving the building in which the Designated Space is located and all goods and fixtures in the building of which the Operators have taken possession.

**Segregation of Funds**.

5.15    The Operators shall deposit all compensation received from the State pursuant to this Agreement into a newly-created segregated account that, during the term of this Agreement and until all obligations of the Operators thereunder are satisfied, shall be free from all liens, claims, interests and third-party encumbrances, to be used solely for Seton and the services

under this Agreement; provided that pending establishment of such new segregated account, the Operators may use an existing segregated account that contains no other proceeds and, notwithstanding any prior orders of the Bankruptcy Court, no replacement or other liens relating to collateral of any pre- or post-petition lender or other person shall attach to the segregated account or any deposits therein and any existing liens, claims, interests and third-party encumbrances associated with such existing segregated account shall be deemed terminated and of no force of effect. Notwithstanding any prior order of the Bankruptcy Court relating to the operator's cash management system and use of cash collateral, during the term of this Agreement, the Operators shall not:

5.15.1  Co-mingle the funds received as compensation under this Agreement with any other funds of the Operators or any affiliates of the operators.

5.15.2  Loan or advance any funds received as Compensation under this Agreement to any affiliate.

5.15.3  Utilize funds received as Compensation under this Agreement to contract with any entity in which the Operator has an ownership interest, in which the Operators serve as an officer or director, or in which an immediate family member has an ownership interest or serves as an officer or director.

5.15.4  Utilize funds received as Compensation under this Agreement to make any capital investments in the facility without the prior written approval of the CDPH project representative.

5.15.5  Upon expiration of this Agreement, and the satisfaction of Operators' obligations under section 5.6 arising in connection with the Agreement, including payment of all costs and obligations incurred in providing the services contemplated by this Agreement, the constraints under this section, 5.15, on Operator's use of funds received as Compensation, shall immediately terminate and be of no further force and effect.

<u>Reporting on Facility Status.</u>

5.16    If the State determines that it is necessary, for public health purposes, to receive daily census reports from the Operators, then the Operators shall provide to the State a daily census of all patients in the Designated Space, as well as all other COVID-19 patients housed outside of the Designated Space. Such census shall include the location and level of care of each patient in the Hospital, along with indication as to whether the patient has been officially diagnosed as being infected with COVID-19, or whether the patient is suspected of being infected with COVID-19.

5.17    The Operators shall, within 30 calendar days of the signing of this Agreement and then every subsequent month by the 25th of the month, report to the State in writing the following:

5.17.1  Patient census at the Designated Space during the previous month;

5.17.2 Patient census for COVID-19 patients housed outside the Designated Space;

5.17.3 Staffing levels at the Designated Space during the previous month;

5.17.4 A statement of income and expenses as reflected in the Monthly Operating Report filed in the Bankruptcy Court (the "MOR");

5.17.5 Any changes to the original recommendation regarding the operations of the Designated Space; and

5.18    The Operators shall consult weekly with the State project representative.

5.19    As requested by the State, the Operators shall also provide projections of changes in utilization and expected discharges from the Designated Space.

Confidentiality and Records.

5.20    The Operators shall maintain the confidentiality of all patient information received in accordance with applicable State and Federal law, including the Health Insurance Portability and Accountability Act (HIPAA) and the Health Information Technology for Economic and Clinical Health Act (HITECH), and, except as permitted by such laws, the Operators shall not discuss, transmit, or narrate in any manner any patient information of a personal, medical, or other nature except as a necessary part of providing services to the patient or otherwise fulfilling its obligations under this Agreement or under law.

5.21    At all times during the term of this Agreement, and in accordance with all applicable State and Federal Law, the Operators shall allow the State and its representatives to inspect (upon reasonable prior notice and during normal business hours) and to make copies of, all books and records and supporting material relating to the operation of the Designated Space. These records include, but are not limited to, records relating to all bank deposits and disbursements and cash receipts.

5.22    The Operators agree to retain such books, records, and other materials comprising records of the Designated Space's operations, including, but not limited to, patient records, to the extent required by law or in accordance with any applicable Bankruptcy Court order. If the Operators wish to dispose of or destroy such books and records prior to any legally mandated retention period, the Operators must first notify the State project representative and provide the State an opportunity to make alternative arrangements to maintain or preserve the records.

Hospital or Designated Space Closure.

5.23    The Hospital or Designated Space shall only close during the term of this Agreement if agreed to in writing by the State. In the unexpected event of a Designated Space or Hospital closure, and subject to Bankruptcy law, the Operators shall:

5.23.1 Ensure compliance with applicable requirements of the California Health and Safety Code, unless otherwise waived or in accordance with any applicable Bankruptcy Court order.

5.23.2  Ensure that all prescription medications are returned to the pharmacy and that all medical devices and supplies are returned to any lessor.

5.23.3 Obtain written approval from the CDPH project representative prior to removing any material property from the Hospital.

## 6.    Fiscal Requirements and Accounting.

6.1    Throughout the entire period of this Agreement, the Operators shall submit to the State project representative MORs. Operators agree to also provide financial and operational information reasonably requested by the State.

6.2    Without limiting Operators' rights under Bankruptcy law, including § 351 of the Bankruptcy Code, the Operators agree to maintain for three (3) years after termination of this Agreement, all books, records, documents, and other evidence, including those related to accounting procedures and practices, sufficient to properly reflect all direct and indirect costs of the Project, claimed pursuant to this Agreement. These records are to be maintained for review and audit purposes. In the event that the Operators are authorized to exercise rights under § 351, the State may arrange for the preservation or records at its expense.

## 7.    Access to the Designated Space and State's Option to Control Admissions into the Designated Space.

7.1    The Operators shall allow the State and its representatives to enter the Designated Space, or any other location in the Hospital where COVID-19 patients are housed or being treated, at any time for the purpose of monitoring patient safety, subject to reasonable restrictions for overriding health and safety of the patients and applicable laws.

## 8.    The State's Responsibilities.

8.1    The State agrees to provide the following services:

8.1.1    Review and provide feedback on all reports within ten (10) business days of receipt unless indicated otherwise.

8.1.2    Promptly review and respond to any requests by Operators for program flexibility or waivers.

8.1.3    Support Operators in discussions with the Office of Statewide Health Planning and Development ("OSHPD") to permit the continued use of the Hospital as an acute care hospital site, without initiation or further seismic upgrades or corresponding penalties, on an emergency basis, during the term of this Agreement, and continuing for six months after this Agreement expires or is earlier terminated. This section shall apply to Operators or any successor Operators of the Hospital. Operators shall immediately submit a request under California Health and Safety Code § 130062(d) and (f) to the Office of Statewide Health Planning and Development ("OSHPD").  OSHPD shall promptly process such request.

8.1.4   Support Operators' request that the California Attorney General complete the Review Period in an expedited manner.

**EXHIBIT A**
**Budget and Payment**

1.      **Operators' Right to Separately Seek Reimbursement From Health Insurance or Health Plan Payors.**

      1.1      Except for the Compensation set forth in Paragraph 2.1 of this Exhibit A to the Agreement, the State will not reimburse the Operators any costs incurred in providing services under this Agreement.  The Operators shall instead submit bills to and collect from the applicable health insurance or health plan payor (such as Medicare, Medi-Cal, private health insurance companies, or employer-sponsored health plans) reimbursement for items and services provided by Operators to patients, including those patients receiving Emergency Facility Services under this Agreement. Any revenue received by Seton Medical Center as a result of these efforts shall be the sole property of the Operators.

      1.2      The State shall not be responsible for the cost or reimbursement of any items and services provided by Operators to uninsured patients.  Nor shall the State be responsible for the costs or reimbursement of any patient care that is otherwise not covered by a health insurance or health plan payor.

      1.3      Payment will be made in accordance with, and within the time specified in, Government Code Chapter 4.5, commencing with section 927 (the "California Prompt Payment Law"), except as otherwise set forth in this Agreement.

2.      **Compensation & Invoicing.**

      2.1      Compensation for Operators' services under this Agreement shall be:

      2.1.1      Five Million dollars ($5,000,000.00) for the first month of this agreement. The State shall pay this amount within three business days of entry of an order by the Bankruptcy Court approving this Agreement.

      2.1.2      For the second month, and all subsequent one-month periods under this Agreement, compensation shall be $2,700,000 (the "Base Payment"), plus ($38,333.33 x the average patient bed census for COVID-19 patients for the month *that exceeds 177 beds*) (the "Census Payment"), up to a maximum monthly amount of Five Million dollars ($5,000,000.00) per month. The Census Payment shall be made five (5) days after delivery of the monthly report referred to in 2.1.4.

            2.1.2.1      For example, if the average daily patient bed census for COVID-19 patients for the third month of the Agreement was 177 occupied beds, the Compensation for that month would be $2,700,000.

            2.1.2.2      As another example, if the average daily patient bed census for COVID-19 patients for the third month of the Agreement was 200 occupied beds, the Base Payment plus Census Payment for that month would be $2,700,000 + ($38,333.33 x 23 beds), which equals $3,581,666.67 total Compensation for the third month.

2.1.2.3   If the average daily patient bed census for COVID-19 patients is at or exceeds 237 occupied beds in a given month during the pendency of this Agreement, the Base Payment plus Census Payment shall not exceed the total maximum monthly Compensation of $5,000,000.

2.1.3.4   The State shall advance the second month's Base Payment amount of $2,700,000 to the Operators within six business days of entry of an order by the Bankruptcy Court approving this Agreement.

2.1.4    This is the only compensation owed to Operators by the State under this Agreement. The State is not responsible for any other costs or expenses incurred by Operators in operating the Hospital or the Designated Space.

2.1.5    On or before the 65th day after execution of this Agreement, or as soon thereafter as practicable, Operator shall provide a Census Payment reconciliation report to CDPH reconciling the Census Payment for the second month. Thereafter, Operator shall provide a Census Payment reconciliation report to CDPH five (5) business days after the end of the month.

2.2      Operators shall invoice the State not fewer than five business days in advance of payment due.

2.3      Each invoice shall contain the following:

Agreement # XX-XXXXX

Attention:

California Department of Public Health

Center for Health Care Quality, Licensing and Certification Program

MS 3001

PO Box 997377

Sacramento, CA 95899-7377

2.4      Nothing in this Agreement shall preclude or interfere with Operators' invoicing or collecting from Medicare, MediCal, or other government and private third party payors for patient services in the ordinary course of the operation of the Seton Medical Center.

**3.      State Budget Contingency Clause.**

3.1      It is mutually agreed that if the Budget Act of 2019-2020, and/or the Budget Act of 2020-2021, does not appropriate sufficient funds for the programs related to this agreement, and the Governor expressly determines in writing not to exercise his discretion to reallocate funds otherwise appropriated to other programs, then, upon such determination, this Agreement shall be of no further force, as of the next occurring December 31st (the "Budgetary Expiration

Date"). From and after the Budgetary Expiration Date, the State shall have no liability to pay any Compensation, under this Agreement, to Operators, or to furnish any other monetary considerations under this Agreement, and Operators shall not be obligated to perform any provisions of this Agreement, except for payments for periods occurring prior to the Budgetary Expiration Date.

**4. Federal Emergency Management Agency ("FEMA") Requirements.**

*Operators are referred to as "contractor" in this section*

4.1    This Agreement is subject to the requirements set forth in 2 C.F.R. § 200.326 and 2 C.F.R. Part 200, Appendix II and are hereby incorporated by reference.

4.2    The State reserves the right to terminate this agreement upon 30 days written notice.

4.3    Clean Air Act

4.3.1 The contractor agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq.

4.3.2 The contractor agrees to report each violation to the (name of applicant entering into the contract) and understands and agrees that the (name of the applicant entering into the contract) will, in turn, report each violation as required to assure notification to the Federal Emergency Management Agency, and the appropriate Environmental Protection Agency Regional Office.

4.3.3 The contractor agrees to include these requirements in each subcontract exceeding $150,000 financed in whole or in part with Federal assistance provided by FEMA.

4.4    Federal Water Pollution Control Act

4.4.1 The contractor agrees to comply with all applicable standards, orders, or regulations issued pursuant to the Federal Water Pollution Control Act, as amended, 33 U.S.C. 1251 et seq.

4.4.2 The contractor agrees to report each violation to the (name of the applicant entering into the contract) and understands and agrees that the (name of the applicant entering into the contract) will, in turn, report each violation as required to assure notification to the Federal Emergency Management Agency, and the appropriate Environmental Protection Agency Regional Office.

4.4.3 The contractor agrees to include these requirements in each subcontract exceeding $150,000 financed in whole or in part with Federal assistance provided by FEMA.

4.5    Debarment and Suspension

4.5.1    This contract is a covered transaction for purposes of 2 C.F.R. pt. 180 and 2 C.F.R. pt. 3000. As such, the contractor is required to verify that none of the contractor's principals (defined at 2 C.F.R. § 180.995) or its affiliates (defined at 2 C.F.R. § 180.905) are excluded (defined at 2 C.F.R. § 180.940) or disqualified (defined at 2 C.F.R. § 180.935).

4.5.2    The contractor must comply with 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C, and must include a requirement to comply with these regulations in any lower tier covered transaction it enters into.

4.5.3    This certification is a material representation of fact relied upon by (insert name of recipient/subrecipient/applicant). If it is later determined that the contractor did not comply with 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C, in addition to remedies available to (insert name of recipient/subrecipient/applicant), the Federal Government may pursue available remedies, including but not limited to suspension and/or debarment.

4.5.4    The bidder or proposer agrees to comply with the requirements of 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C while this offer is valid and throughout the period of any contract that may arise from this offer. The bidder or proposer further agrees to include a provision requiring such compliance in its lower tier covered transactions.

4.6    Byrd Anti-Lobbying Amendment, 31 U.S.C. § 1352 (as amended); Contractors who apply or bid for an award of $100,000 or more shall file the required certification. Each tier certifies to the tier above that it will not and has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, officer or employee of Congress, or an employee of a Member of Congress in connection with obtaining any Federal contract, grant, or any other award covered by 31 U.S.C. § 1352. Each tier shall also disclose any lobbying with non-Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier to tier up to the recipient who in turn will forward the certification(s) to the awarding agency.

4.6.1    APPENDIX A, 44 C.F.R. PART 18 – CERTIFICATION REGARDING LOBBYING

Certification for Contracts, Grants, Loans, and Cooperative Agreements

The undersigned certifies, to the best of his or her knowledge and belief, that:

1. No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2. If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any

agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3. The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

The Contractor certifies or affirms the truthfulness and accuracy of each statement of its certification and disclosure, if any. In addition, the Contractor understands and agrees that the provisions of 31 U.S.C. Chap. 38, Administrative Remedies for False Claims and Statements, apply to this certification and disclosure, if any.

_____
Signature of Contractor's Authorized Official

_____
Name and Title of Contractor's Authorized Official

_____
Date

**EXHIBIT B**
**Additional Provisions**

**1.     Assignment.**

1.1     This Agreement may not be assigned, absent the State's written consent via an amendment to this Agreement, which shall not be unreasonably withheld. In evaluating whether assignment is reasonable, the proposed assignee shall be required to provide adequate assurance to the State of its ability to perform all of Operator's remaining obligations under this Agreement (a "Qualified Buyer").  In the event the Seton Medical Center is sold during the term of this Agreement and pursuant to a sale authorized by the Bankruptcy Court, the Qualified Buyer shall be obligated to perform all obligations under this Agreement without interruption of patient care. In the event of a sale of the Hospital described in this Paragraph, the State may condition its consent upon an agreed change in Compensation under the Agreement upon the effective date of buyer's operations under new licenses.

1.2     Unless subcontracts were used in the operation of the Facility prior to the date of the Agreement, no subcontracts may be used in performance of the Operator's duties without prior written approval from the State project representative unless otherwise provided for in Section 5.13. The Operators shall disclose the existence of any subcontracts currently in effect prior to seeking Bankruptcy Court approval for this Agreement. Except as provided above, Operators must request approval for a subcontract of this Agreement at least five (5) days before the effective date of the subcontract.

**2.     Dispute Resolution Process.**

2.1     Any dispute concerning a question of fact arising under the terms of this contract that is not disposed of within ten (10) calendar days by the Operators and the State employees normally responsible for the administration of this contract shall be brought to the attention of the designated representative for the Operators and the Secretary of State (or designated representative) for joint resolution, and, if no joint resolution is reached, such dispute shall be resolved exclusively before the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"). If the Bankruptcy Court does not have jurisdiction, or elects not to exercise jurisdiction, such dispute shall be resolved by another court in the State of California. The Parties hereby expressly waive any rights to a jury trial.

2.2     The State hereby waives sovereign immunity with respect to any dispute relating to this Agreement.

**3.     No Indemnification by the State.**

3.1     The State shall not indemnify, defend, protect, or hold harmless the Operators from losses, attorneys' fees, fines, judgments, or other liability for any action taken as Operators.

**4.     Conditions of Termination/Cancellation.**

4.1     The State reserves the right to terminate this Agreement for material breach by Operators upon thirty (30) days written notice.

4.2     This Agreement shall terminate at 12:01 am on the 181st day after entry of an order by the Bankruptcy Court approving this Agreement, unless extended by the express mutual agreement of the Operators and the State.

4.3     Upon mutual agreement between the State and the Operators, this agreement shall be terminated at any time.

4.4     During the Term of this Agreement, the Hospital shall not be closed without the written consent of the State. If the State agrees in writing that the Hospital may close, upon such closure, when all patients have been relocated and the Hospital has ceased operation this Agreement shall be terminated.

**5.     Miscellaneous Provisions.**

5.1     This Agreement may be modified or amended in writing only, signed by the parties in interest at the time of the modification. No waiver of any term, provision, or condition of this Agreement in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision, or condition of this Agreement. No failure to act shall be construed as a waiver of any term, provision, condition, or right granted hereunder.

5.2     This Agreement is executed and intended to be performed in the State of California, its interpretation and performance, the relationship between the parties, and any disputes arising from or relating to any of the foregoing, shall be governed, construed, interpreted, and regulated under the Laws of the State, without regard to principles of conflict of laws; provided however, that the State shall waive and hereby expressly waives any rights to assert sovereign immunity with respect to matters arising under or related to the parties performance under this Agreement.

5.3     This Agreement does not terminate any recorded mortgages, deeds of trust, or other validly recorded liens affecting the Premises and any liens affecting the premises arising from entry of orders by the Bankruptcy Court, whether or not recorded.

5.4     This Agreement shall not become effective until entry of an order of the Bankruptcy Court, which includes the terms listed in 5.5, and which has not been stayed regardless of whether such order is otherwise subject to an appeal. The Debtors shall seek waiver of the 14-day stay concerning the order approving this Agreement, pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

5.5     This Agreement shall not become effective until entry of an order of the Bankruptcy Court that includes the following terms:

The final version of the Proposed Order must be satisfactory to both parties.

The Court is exercising its jurisdiction over the Debtors' property pursuant to § 105(a),

§ 363(b), and § 363(f) of the Bankruptcy Code to authorize the Debtors to enter into the Agreements as being a reasonable exercise of the Debtors' business judgment in response to the humanitarian and commercial exigencies affecting the Debtors' estates, the communities in which they operate or exist and the State;

From and after the execution of the Agreements, the automatic stay under § 362(a) of the Bankruptcy Code, if and to the extent applicable, is hereby lifted with respect to the State's use and enjoyment of the Debtors' property, and exercise of rights subject to the Agreements;

That the State's actions under the Executive Order N-25-20 and through the Agreements under the facts of these Cases to obtain control or use of the Debtors' property are exempt from the automatic stay as valid exercises of the State's police powers under § 362(b)(4) of the Bankruptcy Code and otherwise not subject to the automatic stay under § 362(a) of the Bankruptcy Code;

Debtors will not seek a stay under § 105 of the Bankruptcy Code to enjoin any of the rights, privileges or benefits of, or provided to the State under the Agreements;

The Proposed Order, and the terms and conditions of the Agreements, are binding on the Debtors and their estates and shall be binding upon any trustee appointed under Chapter 11 or under Chapter 7 of the Bankruptcy Code, their estates and the Cases;

Neither the State nor any department or agency obtaining benefit from, or utilizing the Debtors' property, assume any obligation to any third party nor shall they be deemed to have any liability to any third party, including, without limitation, any of the Debtors' creditors, interest holders or parties in interest in the Debtors' Cases;

Unless a court of competent jurisdiction has determined that the State is in material breach of this Agreement, the rights conveyed to the State under the Agreements and the Proposed Order are inviolable, and not subject to alteration, interference or divestiture by any party, including, without limitation, any creditor, interest holder, or party in interest, in the Debtors' Cases, without regard to any liens, claims, encumbrances and/or interests those parties may assert, allege and/or possess, including, for the avoidance of doubt, any liens, claims, encumbrances and/or interests of the Prepetition Secured Creditors (as defined in the Cash Collateral Orders) under the Cash Collateral Orders (defined below);

The Agreements and the Proposed Order shall each survive any dismissal of the Cases, except as to the extent that either of the Agreements already have been terminated in accordance with their terms prior any such dismissal;

Nothing in the Agreements or the Proposed Order shall be deemed to be a waiver of the State's police powers;

The Debtors and the State may mutually agree to make non-material modifications to the Agreements from time to time without Court approval and to make material modifications pursuant to a stipulation and subsequent order thereon and may give notice of any material modifications by five (5) days' negative notice;

Except as may be expressly provided in the Proposed Order or the Agreements, nothing in the Proposed Order modifies the rights of the Prepetition Secured Creditors, the Debtors or the Official Committee of Unsecured Creditors with respect to the allocation of value or the any Challenge under the *Final Order (I) Authorizing Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [Docket No. 409], the *Final Order (A) Authorizing Continued Use of Cash Collateral (B) Granting Adequate Protection, (C) Modifying Automatic Stay and (D) Granting Related Relief* [Docket No. 3022], the *Final Order Approving Stipulation to (A) Amend Cash Collateral Agreement and Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief Supplemental* [Docket No. 3883], the *Final Order Approving Stipulation to (A) Amend the First Amended Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief* [Docket No. 4028], and the *Final Order Approving Stipulation to (A) Amend the Second Amended Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief* [Docket No.4187] (collectively, the "<u>Cash Collateral Orders</u>").

# EXHIBIT C

# Lease

# LEASE

*BETWEEN*

**ST. VINCENT MEDICAL CENTER**
**and**
**VERITY HEALTH SYSTEM OF CALIFORNIA, INC,**
**as Landlord**

*AND*

**THE STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH,**
**as Tenant**

# TABLE OF CONTENTS

Page

1.   Definitions ......................................................................................................... 2

2.   Term ................................................................................................................. 12

3.   Rent ................................................................................................................. 13

     3.1    Base Rent ........................................................................................... 13
     3.2    Additional Rent .................................................................................. 13
     3.3    Payment .............................................................................................. 13
     3.4    Offsets ................................................................................................ 13
     3.5    Delinquent Payments ......................................................................... 13

4.   Real Estate Taxes; Other Payments ............................................................... 14

     4.1    Real Estate Taxes .............................................................................. 14
     4.2    Utilities .............................................................................................. 14

5.   Use .................................................................................................................. 14

     5.1    Permitted Use ..................................................................................... 14
     5.2    Exclusive Control .............................................................................. 14

6.   Compliance. .................................................................................................... 14

     6.1    Generally ............................................................................................ 14
     6.2    HIPAA ................................................................................................ 14
     6.3    Copies of Notices .............................................................................. 15

7.   Maintenance and Construction ....................................................................... 15

     7.1    Obligation to Maintain ...................................................................... 15
     7.2    Construction and FF&E During Term. .............................................. 16
     7.3    Plans and Specifications .................................................................... 18
     7.4    Applications and Approvals ............................................................... 19
     7.5    Landlord Nonopposition .................................................................... 19
     7.6    Tenant EMR and Business Systems ................................................... 19

8.   Prohibited Liens ............................................................................................. 19

     8.1    Tenant's Covenant ............................................................................. 19
     8.2    Protection of Landlord ....................................................................... 19

9.   Hazardous Substances .................................................................................... 20

     9.1    Restrictions ........................................................................................ 20

9.2     Compliance; Clean-Up..........................................................................20
9.3     Medical Waste ......................................................................................20

10.     Indemnification; Liability of Landlord ...........................................................21

10.1    Obligations ............................................................................................21
10.2    Liability of Landlord ............................................................................21
10.3    Indemnification Procedures ..................................................................21

11.     Right of Contest ..............................................................................................22

11.1    Tenant's Right; Contest Conditions......................................................22
11.2    Landlord Obligations and Protections ..................................................23
11.3    Miscellaneous ......................................................................................23

12.     Insurance ........................................................................................................23

12.1    Tenant Insurance Coverages ................................................................23
12.2    Tenant Insurance Requirements............................................................24
12.3    Self-Insure............................................................................................25
12.4    Waiver of Certain Claims ....................................................................26
12.5    Landlord Insurance ..............................................................................26
12.6    No Representation ................................................................................27

13.     Losses and Loss Proceeds ..............................................................................27

13.1    Prompt Notice ......................................................................................27
13.2    Casualty................................................................................................27
13.3    Substantial Condemnation ....................................................................27
13.4    Insubstantial Condemnation..................................................................28
13.5    Temporary Condemnation ....................................................................28
13.6    Use of Loss Proceeds ..........................................................................28
13.7    Continuation of Lease ..........................................................................28

14.     Representations and Warranties......................................................................29

14.1    Landlord's Representations and Warranties .........................................29
14.2    Tenant's Representations and Warranties.............................................30

15.     Landlord's Transfers ......................................................................................30

15.1    Landlord's Right to Convey..................................................................30
15.2    Release of Landlord ............................................................................30

16.     Tenant's Transfers ..........................................................................................30

16.1    Tenant's Right......................................................................................30
16.2    Bond Financing......................................................................................31

16.3    Contracts for the Management and Operation of the Premises ............................31

17.    Equipment Liens .........................................................................................................31

17.1    Tenant's Rights .......................................................................................................31

18.    Quiet Enjoyment; Access and Inspection; Certain Agreements .........................32

18.1    Quiet Enjoyment .....................................................................................................32
18.2    Access and Inspection..............................................................................................32
18.3    Reserved and Off-Premises Rights .........................................................................32

19.    Events of Default; Remedies .....................................................................................33

19.1    Definition of "Event of Default."...........................................................................33
19.2    Remedies..................................................................................................................33
19.3    Cure Rights ..............................................................................................................35
19.4    No Waiver ................................................................................................................35
19.5    Holding Over ...........................................................................................................35
19.6    Waivers ....................................................................................................................35
19.7    Accord and Satisfaction; Partial Payments .............................................................35

20.    End of Term ................................................................................................................36

20.1    Surrender .................................................................................................................36
20.2    Abandonment ...........................................................................................................36

21.    Notices .........................................................................................................................36

22.    No Broker .....................................................................................................................37

23.    Nonrecourse ................................................................................................................37

24.    Additional Deliveries; Third Parties ........................................................................37

24.1    Estoppel Certificates ...............................................................................................37
24.2    Further Assurances...................................................................................................37
24.3    Modification.............................................................................................................37
24.4    Successors and Assigns............................................................................................37
24.5    Memorandum of Lease .............................................................................................37

25.    Miscellaneous ..............................................................................................................38

25.1    Costs and Expenses; Legal Costs............................................................................38
25.2    No Consequential Damages .....................................................................................38
25.3    No Merger ................................................................................................................38
25.4    No Waiver by Silence ..............................................................................................38
25.5    Performance Under Protest ......................................................................................38

25.6   Survival ...................................................................................................39
25.7   Unavoidable Delay .................................................................................39
25.8   Landlord is not Employer ......................................................................39
25.9   Federal Emergency Management Agency ("FEMA") Requirements ..................39

26.    Interpretation, Execution, and Application of Lease .........................................40

26.1   Captions .................................................................................................40
26.2   Counterparts ...........................................................................................41
26.3   Delivery of Drafts ..................................................................................41
26.4   Entire Agreement ...................................................................................41
26.5   Governing Law ......................................................................................41
26.6   Partial Invalidity .....................................................................................41
26.7   Principles of Interpretation .....................................................................41
26.8   Reasonableness .......................................................................................41
26.9   Books and Records .................................................................................42
26.10  Net Lease ...............................................................................................42

## LEASE

This **LEASE** (the "Lease") is made and entered into as of _____, 2020 (the "Execution Date"), between **ST. VINCENT MEDICAL CENTER,** a California nonprofit corporation ("SVMC"), and **VERITY HEALTH SYSTEM OF CALIFORNIA, INC.,** a California nonprofit corporation ("VHS" and referred to collectively with SVMC as "Landlord"), and **THE STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH** ("Tenant").

## *W I T N E S S E T H :*

**WHEREAS**, VHS and SVMC, along with certain other Affiliates (collectively, the "Debtors") are debtors and debtors in possession under Chapter 11 of Title 11 of the United States Code, §§ 101-1532 (the "Bankruptcy Code")[1] under the lead case of *In re Verity Health System of California, Inc.*, Case No. 2:18-bk-20151-ER (the "Bankruptcy Case") that is pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court").

**WHEREAS**, SVMC is the owner of a general acute care hospital located at 2131 W. 3rd Street, Los Angeles, California, 90057, known as St. Vincent Medical Center (the "Hospital");

**WHEREAS**, pursuant to an order of the Bankruptcy Court entered on or about January 9, 2020 [Bankruptcy Case Docket No. 3934], Landlord was authorized to close the Hospital and otherwise terminate operations and, in fact, the Hospital is not operating;

**WHEREAS**, at the Execution Date, SVMC owns the following real property that constitutes the Hospital (collectively, the "Premises"): (a) the land described and depicted in **Exhibit A** (the "Land"); (b) all buildings, structures, and other improvements and appurtenances located on the Land or otherwise constituting part of the Premises (the "Improvements"); (c) all right, title, and interest of SVMC, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line of such street or highway; (d) the appurtenances and all the estate and rights of SVMC in and to the Land; (e) any strips or gores adjoining the Land; and (f) all Building Equipment attached or appurtenant to any of the foregoing;

**WHEREAS**, in connection with the Premises, SVMC owns or leases certain FF&E (the "Existing FF&E");

**WHEREAS**, subject to Bankruptcy Court Approval, Landlord desires to lease the Premises and the Existing FF&E to Tenant, and Tenant desires to lease the Premises and the Existing FF&E from Landlord so that Tenant may utilize the Premises for delivery of health care services in response to the COVID-19 pandemic emergency; and

**WHEREAS**, the parties desire to enter into this Lease to set forth their rights and obligations to each other relating to the Premises and the Existing FF&E.

---

[1] All references to "§" herein are to sections of the Bankruptcy Code unless otherwise noted.

**NOW, THEREFORE**, for good and valuable consideration, Landlord leases and demises the Premises and the Existing FF&E to Tenant, and Tenant takes and leases the Premises and the Existing FF&E from Landlord for the Term, upon the terms and conditions of this Lease.

1.    _Definitions_.  In addition to the above-defined terms, the following definitions apply in this Lease:

"Additional Rent" means all sums that this Lease requires Tenant to pay Landlord, whether or not expressly called Additional Rent, except Base Rent.

"Affiliate" of any specified Person means any other Person Controlling or Controlled by or under common Control with such specified Person. "Affiliated" shall have the correlative meaning.

"Application" means any agreement, application, certificate, document, or submission (or amendment of any of the foregoing): (a) necessary or appropriate for any Construction this Lease allows, including any application for any building permit, certificate of occupancy, utility service or hookup, easement, covenant, condition, restriction, subdivision plat, or such other instrument as Tenant may from time to time reasonably request for such Construction; (b) if and to the extent (if any) this Lease permits, to allow Tenant to change the use or zoning of the Premises; (c) to enable Tenant from time to time to seek any Approval or to use and operate the Premises in accordance with this Lease; or (d) otherwise reasonably necessary and appropriate to permit Tenant to realize the benefits of the Premises under this Lease.

"Approvals" means any and all licenses, permits (including building, demolition, alteration, use, and special permits), approvals, consents, certificates (including certificate(s) of occupancy), rulings, variances, authorizations, or amendments to any of the foregoing as shall be necessary or appropriate under any Law for the commencement, performance, or completion of any Construction, or the zoning, rezoning (to the extent this Lease allows), use, occupancy, maintenance, or operation of the Premises.

"Bankruptcy Court Approval" means approval as evidenced by entry of an order of the Bankruptcy Court, which includes the terms listed below, and which has not been stayed regardless of whether such order is otherwise subject to an appeal. Debtors shall seek waiver of the 14-day stay concerning the order approving this Lease, pursuant to Rule 6004(h) of the FRBP. This Lease shall not become effective until entry of an order of the Bankruptcy Court that includes the following terms, and the final version of which must be satisfactory to both parties:

The Bankruptcy Court is exercising its jurisdiction over the Debtors' property pursuant to § 105(a), § 363(b) and § 363(f) to authorize Landlord to enter into this Lease as being a reasonable exercise of the Debtors' business judgment in response to the humanitarian and commercial exigencies affecting the Debtors' estates, the communities in which they operate or exist and the State;

From and after the execution of this Lease, the automatic stay under § 362(a) if and to the extent applicable, is hereby lifted with respect to Tenant's use and enjoyment of Landlord's property and exercise of rights subject to this Lease;

That Tenant's actions under the Executive Order N-25-20 and through this Lease under the facts of the Bankruptcy Case to obtain control or use of Landlord's property are exempt from the automatic stay as valid exercises of Tenant's police power under § 362(b)(4) and otherwise not subject to the automatic stay under § 362(a);

Debtors will not seek a stay under § 105 to enjoin any of the rights, privileges or benefits of, or provided to Tenant under this Lease;

The order, and the terms and conditions of this Lease, are binding on the Landlord and its estates and shall be binding upon any trustee appointed under Chapter 11 or under Chapter 7 of the Bankruptcy Code, their estates and the Bankruptcy Case;

Neither Tenant nor any department or agency obtaining benefit from, or utilizing Landlord's property, assume any obligation to any third party nor shall they be deemed to have any liability to any third party, including, without limitation, any of the Debtors' creditors, interest holders or parties in interest in the Debtors' Bankruptcy Case;

Unless a court of competent jurisdiction has determined that Tenant is in material breach of this Lease, the rights conveyed to Tenant under this Lease and the order are inviolable, and not subject to alteration, interference or divestiture by any party, including, without limitation, any creditor, interest holder, or party in interest, in the Debtors' Bankruptcy Case, without regard to any liens, claims, encumbrances and/or interests those parties may assert, allege and/or possess, including, for the avoidance of doubt, any liens, claims, encumbrances and/or interests of the Prepetition Secured Creditors (as defined in the Cash Collateral Orders) under the Cash Collateral Orders (defined below);

This Lease and the order shall each survive any dismissal of the Bankruptcy Case, except as to the extent that this Lease already has been terminated in accordance with their terms prior any such dismissal;

Nothing in this Lease or the order shall be deemed to be a waiver of Tenant's police powers;

Landlord and Tenant may mutually agree to make non-material modifications to this Lease from time to time without Bankruptcy Court approval and to make material modifications pursuant to a stipulation and subsequent order thereon and may give notice of any material modifications by five (5) days' negative notice; and

Except as may be expressly provided in the order or this Lease, nothing in the order modifies the rights of the Prepetition Secured Creditors, the Debtors or the Official Committee of Unsecured Creditors with respect to the allocation of value or any challenge under the *Final Order (I) Authorizing Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief [Docket*

*No. 409], the Final Order (A) Authorizing Continued Use of Cash Collateral (B) Granting Adequate Protection, (C) Modifying Automatic Stay and (D) Granting Related Relief [Docket No. 3022], the Final Order Approving Stipulation to (A) Amend Cash Collateral Agreement and Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief Supplemental [Docket No. 3883], the Final Order Approving Stipulation to (A) Amend the First Amended Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief [Docket No. 4028], and the Final Order Approving Stipulation to (A) Amend the Second Amended Supplemental Cash Collateral Order, (B) Authorize Continued Use of Cash Collateral, (C) Grant Adequate Protection, (D) Modify Automatic Stay, and (E) Grant Related Relief* [Docket No.4187] (collectively, the "Cash Collateral Orders").

"Building" means all occupiable Improvements located or to be located on the Premises from time to time.

"Building Equipment" means all fixtures incorporated in the Premises and used, useful, or necessary to operate the Building as such (including boilers; compactors; compressors; conduits; wiring, ducts; elevators; escalators; IT systems; life safety systems; heating, ventilating and air conditioning systems; power plants and electrical systems; and pipes and plumbing systems) as opposed to operating any particular business in the Building.

"Business Day" means any weekday on which State-chartered banks are open to conduct regular banking business with bank personnel.

"Casualty" means any damage or destruction of any kind or nature, ordinary or extraordinary, foreseen or unforeseen, affecting any or all Improvements, whether or not insured or insurable.

"Casualty Termination" means a termination of this Lease because of a Substantial Casualty, when and as this Lease expressly allows such a termination.

"Commencement Date" means the earlier of (a) the date Tenant commences operation of the Premises, conditioned upon the Bankruptcy Court Approval, or (b) three (3) Business Days after Bankruptcy Court Approval.

"Condemnation" means: (a) any temporary or permanent taking of (or of the right to use or occupy) any Premises by condemnation, eminent domain, or any similar proceeding; or (b) any action by any Government not resulting in an actual transfer of an interest in (or of the right to use or occupy) any Premises but creating a right to compensation, such as a change in grade of any street upon which the Premises abut.

"Condemnation Award" means any award(s) paid or payable (whether or not in a separate award) to either party after the Commencement Date because of or as compensation for any Condemnation, including: (1) any award made for any Improvements that are the subject of the Condemnation; (2) the full amount paid or payable by the condemning authority for the estate that is the subject of the Condemnation, as determined in Condemnation; (3) any interest on such

award; and (4) any other sums payable on account of such Condemnation, including for any prepayment premium under any mortgage.

"Condemnation Effective Date" means, for any Condemnation, the first date when the condemning authority has acquired title to or possession of any Premises subject to the Condemnation.

"Construction" means any alteration, construction, demolition, development, expansion, reconstruction, redevelopment, repair, Restoration, or other work affecting any Improvements, including new construction.

"Control" means the possession, directly or indirectly, of either: (a) at least 51% direct or indirect ownership of the Equity Interests of a Person; or (b) the power to direct or cause the direction of the management and policies of such Person, whether by ownership of Equity Interests, by contract, or otherwise.

"County" means the county where the Premises are located.

"Default" means an uncured default or breach under this Lease. A Default may consist of a Monetary Default or a Nonmonetary Default.

"Default Interest" means interest at an annual rate equal to the lesser of: (a) the Prime Rate plus two percent (2%) per annum; or (b) the Usury Limit.

"Environmental Law" means any Law about the following at, in, under, above, or upon the Premises: (a) air, environmental, ground water, or soil conditions; or (b) clean-up, control, disposal, generation, storage, release, transportation, or use of, or liability or standards of conduct concerning, Hazardous Substances.

"Equipment Lien" means any security interest, financing lease, personal property lien, conditional sales agreement, chattel mortgage, security agreement, title retention arrangement or any similar arrangement (including any related financing statement) for Tenant's acquisition or leasing of any Financed FF&E used in the Premises that is leased, purchased under conditional sale or installment sale arrangements, encumbered by a security interest, or used under a license, provided that each Equipment Lien encumbers or otherwise relates only to the Financed FF&E for which such secured party provides bona fide purchase-money financing or a bona fide equipment lease, after the Commencement Date.

"Equity Interest" means all or any part of any direct or indirect equity or ownership interest(s) (whether stock, partnership interest, beneficial interest in a trust, membership interest, or other interest of an ownership or equity nature) in any entity at any tier of ownership that directly or indirectly owns or holds any ownership or equity interest in a Person.

"Estoppel Certificate" means a statement setting forth, as of the date of such statement, (a) the documents comprising this Lease, (b) whether or not any Defaults exist under this Lease, (c) the Base Rent and (d) whether any Base Rent has been prepaid for more than one (1) month in advance.

"Expiration Date" means the date when this Lease terminates or expires in accordance with its terms or otherwise, whether on the Scheduled Expiration Date, by Landlord's exercise of remedies for an Event of Default, by Tenant's exercise of its termination right or otherwise.

"Fee Estate" means SVMC's fee estate in the Premises, including SVMC's reversionary interest in the Premises after the Expiration Date.

"FF&E" means all movable furniture, furnishings, equipment, and personal property (excluding Building Equipment) that may be removed without material damage to the Premises and without adversely affecting: (a) the structural integrity of the Premises; (b) any electrical, plumbing, mechanical, or other system in the Premises; (c) the present or future operation of any such system; or (d) the present or future provision of any utility service to the Premises. FF&E includes items such as hospital equipment, furniture, movable equipment, telephone, telecommunications and facsimile transmission equipment, point of sale equipment, televisions, radios, network racks, and computer systems and peripherals.

"Financed FF&E" means any FF&E subject to an Equipment Lien in favor of a lessor or lender that: (a) is not an Affiliate of Tenant, and (b) actually provides bona fide financing or a bona fide equipment lease after the Commencement Date for Tenant's acquisition or use of such FF&E.

"FRBP" means the Federal Rules of Bankruptcy Procedure.

"Government" means each and every governmental agency, authority, bureau, department, quasi-governmental body, or other entity or instrumentality having or claiming jurisdiction over the Premises (or any activity this Lease allows), including the United States federal government, the State and County governments and their subdivisions and municipalities, and all other applicable governmental agencies, authorities, and subdivisions thereof. "Government" shall also include any planning commission, board of standards and appeals, department of buildings, city council, zoning board of appeals, or planning board or commission having or claiming jurisdiction over the Premises or any activities on or at the Premises.

"Hazardous Substances" includes flammable substances, explosives, radioactive materials, asbestos, asbestos-containing materials, polychlorinated biphenyls, chemicals known to cause cancer or reproductive toxicity, pollutants, contaminants, hazardous wastes, medical wastes, toxic substances or related materials, explosives, petroleum and petroleum products, and any "hazardous" or "toxic" material, substance or waste that is defined by those or similar terms or is regulated as such under any Law, including any material, substance or waste that is: (i) defined as a "hazardous substance" under Section 311 of the Water Pollution Control Act (33 U.S.C. § 1317), as amended; (ii) defined as a "hazardous waste" under Section 1004 of The Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901, et seq., as amended; (iii) defined as a "hazardous substance" or "hazardous waste" under Section 101 of The Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Reauthorization Act of 1986, 42 U.S.C. § 9601 et seq. or any so-called "superfund" or "superlien" law, including the judicial interpretations thereof; (iv) defined as a "pollutant" or "contaminant" under 42 U.S.C.A. § 9601(33); (v) defined as "hazardous waste" under 40 C.F.R. Part 260; (vi) defined as

a "hazardous chemical" under 29 C.F.R. Part 1910; or (vii) subject to any other Law regulating, relating to or imposing obligations, liability or standards of conduct concerning protection of human health, plant life, animal life, natural resources, property or the enjoyment of life or property free from the presence in the environment of any solid, liquid, gas, odor or any form of energy from whatever source.

"Hazardous Substances Discharge" means any deposit, discharge, generation, emission, release, or spill of Hazardous Substances that occurs at or from the Premises, or into the Land, or that arises at any time from the use, occupancy, or operation of the Premises or any activities conducted therein or any adjacent or nearby real property, or resulting from seepage, leakage, or other transmission of Hazardous Substances from other real property to the Land, whether or not caused by a party to this Lease and whether occurring before or after the Commencement Date.

"Improvements" has the meaning set forth in the recitals of this Lease.

"Indemnify" means, where this Lease states that any Indemnitor shall "Indemnify" any Indemnitee from, against, or for a particular matter (the "Indemnified Risk"), that the Indemnitor shall indemnify the Indemnitee and defend and hold the Indemnitee harmless from and against any and all loss, cost, claims, liability, penalties, judgments, damages, and other injury, detriment, or expense (including Legal Costs, interest and penalties) that the Indemnitee suffers or incurs: (a) from, as a result of, or on account of the Indemnified Risk; or (b) in enforcing the Indemnitor's indemnity. Indemnitor's counsel shall be subject to Indemnitee's approval, not to be unreasonably withheld.

"Indemnitee" means any party entitled to be Indemnified under this Lease and its agents, directors, employees, Equity Interest holders, mortgagees, and officers.

"Indemnitor" means a party that agrees to Indemnify any other Person.

"Insubstantial Condemnation" means any Condemnation except a Substantial Condemnation or a Temporary Condemnation.

"Land" has the meaning set forth in the recitals of this Lease.

"Landlord" means the Landlord named in the opening paragraph of this Lease and its permitted successors and assigns (in all cases in compliance with this Lease).

"Laws" means all laws, including all laws arising in, under or in connection with the Bankruptcy Code, the FRBP, the LBR, ordinances, requirements, orders, proclamations, directives, rules, and regulations of any Government affecting the Premises, this Lease, or any Construction in any way, including any use, maintenance, taxation, operation, or occupancy of, or environmental conditions affecting, the Premises, or relating to any Real Estate Taxes, or otherwise relating to this Lease or any party's rights and remedies under this Lease, or any Transfer of any of the foregoing, whether in force at the Commencement Date or passed, enacted, or imposed at some later time, subject in all cases, however, to any applicable waiver, variance, or exemption.

"LBR" mean the Local Bankruptcy Rules for the Bankruptcy Court.

"Leasehold Estate" means Tenant's leasehold estate, and all of Tenant's rights, privileges, and Preemptive Rights, under this Lease, upon and subject to all the terms and conditions of this Lease, and any direct or indirect interest in such leasehold estate.

"Legal Costs" of any Person means all reasonable costs and expenses such Person incurs in any legal proceeding (or other matter for which such Person is entitled to be reimbursed for its Legal Costs), including reasonable attorneys' fees, court costs, and expenses, including those arising in the Bankruptcy Case.

"Loss" means any Casualty or Condemnation.

"Loss Proceeds" means Condemnation Award(s) and/or Property Insurance Proceeds.

"Market Value" of the Fee Estate or the Leasehold Estate means, as of any date of determination, the present fair market value of such estate (including the fair market value of the rights of the holder of such estate in and to any Improvements) as of such date, considered: (a) as if no Loss had occurred; (b) without adjusting for any expectation of any Loss; (c) as if the Leasehold Estate had not been terminated; (d) taking into account the benefits and burdens of this Lease, the remaining Term, all Permitted Encumbrances, and all other matters affecting such estate and its valuation; and (e) discounting to present value all the obligations and benefits associated with such estate (including, in the case of the Fee Estate, the Rent and Landlord's reversion). The Market Value shall be determined as if the Term: (1) were to continue until the Scheduled Expiration Date and (2) included, prospectively, all renewal Terms except any renewal Term for which Tenant Notifies Landlord that Tenant would not have exercised the renewal option in due course. Market Value shall be determined independently of, and without regard to, any valuation established in a Condemnation.

"Medical Waste" means, without limitation, all medical and/or biohazard wastes regulated by federal, state or local Laws or authorities which includes any gaseous, liquid and solid waste which is generated in the diagnosis, treatment or immunization of a human being or animal or in any research relating to that diagnosis, treatment or immunization, or in the production or testing of biologicals, which includes but is not limited to: cultures and stocks of infectious agents and associated biologicals, including cultures from medical and pathological laboratories, cultures and stocks of infectious agents from research and industrial laboratories, wastes from the production of biologicals, discarded live and attenuated vaccines, and culture dishes and devices used to transfer, inoculate, and mix cultures; pathological wastes, including tissues, organs, and body parts that removed during surgery or autopsy; waste human blood and products of blood, including serum, plasma, and other blood components; sharps that have been used in patient care or in medical, research, or industrial laboratories, including hypodermic needles, syringes, pasteur pipettes, broken glass, and scalpel blades; contaminated animal carcasses, body parts, and bedding of animals that were exposed to infectious agents during research, production of biologicals, or testing of pharmaceuticals; wastes from surgery or autopsy that were in contact with infectious agents, including soiled dressings, sponges, drapes, lavage tubes, drainage sets, underpads, and surgical gloves; laboratory wastes from medical, pathological, pharmaceutical, or other research,

commercial, or industrial laboratories that were in contact with infectious agents, including slides and cover slips, disposable gloves, laboratory coats, and aprons; dialysis wastes that were in contact with the blood of patients undergoing hemodialysis, including contaminated disposable equipment and supplies such as tubing, filters, disposable sheets, towels, gloves, aprons, and laboratory coats; discarded medical equipment and parts that were in contact with infectious agents; biological waste and discarded materials contaminated with blood, excretion, exudates or secretions from human beings or animals who are isolated to protect others from communicable diseases; or such other waste material that results from the administration of medical care to a patient by a health care provider and represents a threat to human health or the environment.

"Memorandum of Lease" means a memorandum of this Lease, in recordable form, setting forth the following provisions of this Lease: (a) all information any Law requires; and (b such other provisions, except the amount or means of determining Rent, as either party reasonably desires.

"Modification" means any abandonment, amendment, cancellation, discharge, extension, modification, rejection, renewal, replacement, restatement, substitution, supplement, surrender, termination, or waiver of a specified agreement or document, or of any of its terms or provisions, or the acceptance of any cancellation, rejection, surrender, or termination of such agreement, document, or terms.

"Modify" means agree to, cause, make, or permit any Modification.

"Monetary Default" means a party's failure to pay money (including Real Estate Taxes and insurance premiums) when and as this Lease requires.

"Nonmonetary Default" means a party's material: (a) failure to comply with any affirmative or negative covenant or obligation in this Lease, except a Monetary Default; or (b) breach of any representation or warranty (as of the date made or deemed made).

"Notice" means any consent, demand, designation, election, notice, or request relating to this Lease, including any Notice of Default. Notices shall be delivered, and shall become effective, only in accordance with the "Notices" section of this Lease.

"Notice of Default" means any Notice claiming or giving Notice of a Default or alleged Default.

"Notify" means give a Notice.

"People" means with respect to a party, its agents, employees, contractors, officers, directors, consultants, representatives, and designees.

"Person" means any association, corporation, Government, individual, joint venture, joint-stock company, limited liability company, partnership, trust, unincorporated organization, or other entity of any kind. (This does not limit any Transfer restriction).

"Preemptive Right" means any expansion, extension, purchase, or renewal option; right of first refusal or first offer; or other preemptive right this Lease gives Tenant.

"Premises" has the meaning set forth in the recitals of this Lease.

"Prime Rate" means the prime rate or equivalent "base" or "reference" rate for corporate loans that is from time to time: (a) published in the Wall Street Journal; or (b) if such rate is no longer so published or announced, then a reasonably equivalent rate published by an authoritative third party that Landlord and Tenant jointly designate. Notwithstanding anything to the contrary in this paragraph, the Prime Rate shall never exceed the Usury Limit.

"Prohibited Lien" means any mechanic's, vendor's, laborer's, or material supplier's statutory lien or other similar lien arising from work, labor, services, equipment, or materials supplied, or claimed to have been supplied, to Tenant (or anyone claiming through Tenant), which lien attaches (or may attach upon termination of this Lease) to the Fee Estate. An Equipment Lien is not a Prohibited Lien.

"Property Insurance" means insurance providing coverage for the Premises, the Building, and Building Equipment, against loss, damage, or destruction by fire and other hazards (except earthquake or war risk) from time to time during the Term.

"Property Insurance Proceeds" means net proceeds (after reasonable costs of adjustment and collection, including Legal Costs) of Property Insurance, when and as received by Landlord or Tenant, excluding proceeds of Tenant's business interruption insurance in excess of Rent.

"Real Estate Taxes" means all general and special real estate taxes, together with all assessments, water rates and charges, sewer rates and charges, including any sum or sums payable for present or future sewer or water capacity, charges for public utilities, street lighting, excise levies, licenses, permits, inspection fees, other governmental charges, and all other charges or burdens of whatsoever kind and nature (including costs, fees, and expenses of complying with any restrictive covenants or similar agreements to which the Premises are subject) incurred in the use, occupancy, ownership, operation, leasing or possession of the Premises, without particularizing by any known name or by whatever name hereafter called, and whether any of the foregoing be general or special, ordinary or extraordinary, foreseen or unforeseen.

"Release" means any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching, or migration into or through the environment.

"Rent" means Base Rent, and Additional Rent.

"Restoration" means, after a Loss, the alteration, clearing, rebuilding, reconstruction, repair, replacement, restoration, and safeguarding of the damaged or remaining Improvements, substantially consistent with their condition before the Loss, subject to such Construction as Tenant shall perform in conformity with this Lease, subject to any changes in Law that would limit the foregoing.

"Restoration Funds" means any Loss Proceeds (and deposits by Tenant) to be applied to Restoration.

"Restore" means accomplish a Restoration.

"Scheduled Expiration Date" means 11:59 p.m. on either (x) if the Commencement Date is not the first day of a calendar month, the last day of the sixth (6th) full calendar month following the calendar month in which the Commencement Date occurs, or (y) if the Commencement Date is the first day of a calendar month, the last day of the fifth (5th) full calendar month following the calendar month in which the Commencement Date occurs. The Scheduled Expiration Date may be extended in one (1) month increments, and up to six (6) months total, by not less than thirty (30) days prior notice to the Landlord.

"State" means the state of California.

"Structure" of the Premises means only the concrete floors, footings, foundation, load-bearing walls, roof, roof support system, and structural steel or other structural support system of the Premises.

"Sublease" means, for the Premises, any: (a) sublease; (b) agreement or arrangement (including a concession, license, management, operation, services or occupancy agreement) allowing any Person to occupy, operate use or possess; (c) sub-sublease or any further level of subletting; or (d) Modification or assignment of "a" through "c." (Any reference to Subleases does not diminish, impair, limit, or waive any limit on Subleases.)

"Substantial Casualty" means a Casualty that: (a) renders 10% or more of the Premises used for a general acute care hospital facility not capable of being used or occupied; (b) requires Restoration whose cost Landlord reasonably estimates in writing would exceed One Million Dollars ($1,000,000); or (c) pursuant to Law, prevents the Premises from being restored to the same bulk, and for the same use(s), as before the Casualty.

"Substantial Condemnation" means any Condemnation that (a) takes the entire Premises; or (b) in Tenant's reasonable determination renders the remaining Premises Uneconomic.

"Subtenant" means any Person entitled to occupy, use, or possess any Premises under a Sublease.

"Temporary Condemnation" means a Condemnation of the temporary right to use or occupy all or part of the Premises.

"Transfer" of any property means any of the following, whether by operation of law or otherwise, whether voluntary or involuntary, and whether direct or indirect: (a) any Sublease, assignment, conveyance, grant, hypothecation, mortgage, pledge, sale, or other transfer, whether direct or indirect, of all or any part of such property, or of any legal, beneficial, or equitable interest or estate in such property or any part of it (including the grant of any easement, lien, or other encumbrance); (b) any conversion, exchange, issuance, modification, reallocation, sale, or other transfer of any direct or indirect Equity Interest(s) in the owner of such property by the holder of such Equity Interest(s); (c) any transaction described in "b" affecting any Equity Interest(s) or any other interest in such property or in any such owner (or in any other direct or indirect owner at any higher tier of ownership) through any manner or means whatsoever; or (d) any transaction

that is in substance equivalent to any of the foregoing. A "Transfer" shall not, however, include any of the foregoing (provided that the other party to this Lease has received Notice thereof) transactions affecting Equity Interests: (a) that constitutes a mere change in form of ownership with no material change in beneficial ownership and is a tax-free transaction under federal income tax law and the State real estate transfer tax; (b) to member(s) of the immediate family(ies) of the transferor(s) or trusts for their benefit; or (c) to any Person that, as of the Commencement Date, holds an Equity Interest in the entity whose Equity Interest is being transferred.

"Unavoidable Delay" means delay in performing any obligation under this Lease (except payment of money) arising from or on account of any cause whatsoever beyond the obligor's reasonable control, despite such obligor's reasonable diligent efforts, including industry-wide strikes, labor troubles or other union activities (but only to the extent such actions affect similar premises at that time and do not result from an act or omission of the obligor), the obligor's inability to obtain required labor or materials after commercially reasonable efforts to do so, litigation (unless caused by the obligor), Loss, accidents, Laws, governmental preemption, war, or riots. Unavoidable Delay shall exclude delay caused by epidemics, pandemics (including COVID-19) or the obligor's financial condition, illiquidity, or insolvency, or the Bankruptcy Case of the Landlord filed prior to execution of this Lease; provided that the Commencement Date under this Lease requires prior Bankruptcy Court Approval of this Lease. Any obligor claiming Unavoidable Delay shall Notify the obligee: (a) within 30 days after such obligor knows of any such Unavoidable Delay; and (b) within 10 days after such Unavoidable Delay ceases to exist. To be effective, any such Notice must describe the Unavoidable Delay in reasonable detail. Where this Lease states that performance of any obligation is subject to Unavoidable Delay(s) or words of similar import, such Unavoidable Delay(s) shall extend the time for such performance only by the number of days by which such Unavoidable Delay(s) actually delayed such performance.

"Uneconomic" means that the Premises or any substantial part of the Premises: (1) is materially diminished in value or utility; (2) cannot be used for its previously intended purpose; (3) is subject to material impairment of access to, parking facilities benefiting, or any material service(s) necessary or appropriate for economic operation; (4) requires Restoration whose cost Tenant reasonably estimates in writing would exceed the then-current aggregate Market Value of the Premises; (5) does not comply with any operating requirements under any hospital license held by Tenant; (6) cannot reasonably be operated as a general acute care hospital, whether in a manner substantially consistent with past practice or on a scale that is smaller but nevertheless profitable (after taking into account the payment of all expenses, including Rent as adjusted after any Condemnation) and reasonably feasible; or (7) cannot be developed or operated in a commercially reasonable manner.

"Usury Limit" means the highest rate of interest, if any, that Law allows under the circumstances.

"Waiver of Subrogation" means a provision in, or endorsement to, any Property Insurance policy, by which the carrier agrees to waive rights of recovery by way of subrogation against either party to this Lease for any loss such policy covers.

2.    _Term_. The term of this Lease (the "Term") shall: (a) commence on the Commencement Date; and (b) continue until the Scheduled Expiration Date, unless terminated

sooner.  The Commencement Date shall be memorialized in a notice of commencement to Tenant following Bankruptcy Court Approval.  For the avoidance of doubt, the Term shall not commence and no obligation hereunder (including the payment of Rent) shall be effective unless and until Bankruptcy Court Approval has occurred, except that the parties shall use best commercially reasonable efforts to promptly secure Bankruptcy Court Approval.

    3.    *Rent*.

3.1 *Base Rent*.  For the Term, Tenant shall pay a monthly rent in the amount of Two Million Six Hundred Thousand and No/100 Dollars ($2,600,000.00), without deduction, set off, prior notice or demand from Landlord (the "Base Rent").  Base Rent will be payable on the last day of each month until the Expiration Date, with the first (1st) calendar month  pro-rated based on the number of days remaining in the current calendar month in which the Commencement Date occurs.

3.2 *Additional Rent*.  The Base Rent shall be absolutely net to Landlord so that this Lease shall yield, net to Landlord, the Base Rent specified in Section 3.1 during the Term and that all impositions, insurance premiums, utility charges, maintenance, repair and replacement expenses, all expenses relating to compliance with Laws, and all other costs, fees, charges, expenses, reimbursements and obligations of every kind and nature whatsoever relating to the Premises, which accrue during the Term or by reason of events occurring during the Term shall be paid or discharged by Tenant.  In the event Tenant fails to pay or discharge any imposition, insurance premium, utility charge, maintenance repair or replacement expense which it is obligated to pay or discharge, Landlord may, but shall not be obligated to pay the same, and in that event Tenant shall immediately reimburse Landlord therefor and pay the same as Additional Rent, and Tenant hereby agrees to Indemnify Landlord from and against such impositions, insurance premiums, utility charges, maintenance, repair and replacement expenses, all expenses relating to compliance with Laws, and all other costs, fees, charges, expenses, reimbursements and obligations referred to above.

3.3 *Payment*.  During the Term, Tenant shall pay Rent by good and sufficient check payable to Landlord by wire transfer, pursuant to such instructions set forth on **Exhibit B**, or as Landlord shall designate from time to time.

3.4 *Offsets*.  Except as expressly provided in this Lease, Tenant shall pay all Rent without offset, defense, claim, counterclaim, reduction, or deduction of any kind whatsoever.

3.5 *Delinquent Payments*.  The performance and observance by Tenant of all the terms, covenants, conditions and agreements to be performed or observed by Tenant hereunder shall be performed and observed by Tenant at Tenant's sole cost and expense.  Any installment of Rent or any other charges payable by Tenant under the provisions hereof which shall not be paid when due or within ten days thereafter shall bear Default Interest from the date when the same is due hereunder until the same shall be paid.  In addition, any installment of Rent or any other charges payable by Tenant under the provisions hereof which shall not be paid when due and which remain unpaid ten days thereafter shall be subject to a late payment fee of five percent (5%) of the

unpaid amount.  California Government Code, Section 927, et seq., shall control in the event of any conflict with this Section 3.5.

4.    *Real Estate Taxes; Other Payments*.

4.1 *Real Estate Taxes*.  Tenant shall pay all Real Estate Taxes associated with the Premises.

4.2 *Utilities*.  Tenant shall arrange and pay for all fuel, gas, light, power, water, sewage, garbage disposal, telephone, and other utility charges, and the expenses of maintenance, use, and service in connection with the foregoing, for the Premises during the Term. Except as set forth in Section 18.3, Landlord shall have absolutely no liability or responsibility for the foregoing, provided that Landlord performs its obligations regarding any related Application.

5.    *Use*.

5.1 *Permitted Use.*  Tenant shall use the Premises for the operation of a general acute care hospital, including outpatient services, ambulance services, and any other lawful health care purpose in response to the COVID-19 pandemic emergency (collectively, the "Medical Business").  Landlord expressly disclaims and makes no representations and warranties concerning the suitability of the Premises for the Medical Business, including, but not limited to, any Approvals required in connection therewith.  Tenant's obligations under this Section 5 will not survive termination of this Lease.

5.2 *Exclusive Control*.  Tenant shall have exclusive control, possession, occupancy, use, and management of the Premises.  Tenant shall have full and complete charge, authority and control of the administration, management and operation of the Medical Business at the Premises. Tenant shall have the right and authority to determine all business, technical and professional policies relating to the operation of the Medical Business, with no restrictions, qualifications or supervision by Landlord.  Tenant shall determine the financial policy of the Medical Business and shall have complete power to fix, control and regulate the charges and collections made for services therein.  Accordingly, Tenant shall be responsible for all operational and medical services provided at the Premises and the security of all persons and property at the Premises in compliance with applicable Laws, and Tenant acknowledges and agrees that Landlord is providing no services whatsoever and shall not responsible or otherwise liable for the same.

6.    *Compliance.*

6.1 *Generally*.  Tenant shall during the Term, at Tenant's expense, in all material respects, subject to Tenant's right of Contest: (a) comply with all Laws (including, without limitation, life-safety or seismic compliance), and (b) procure and comply with all Approvals required by Law (including, without limitation, all hospital/medical operational licenses or payor certifications).

6.2 *HIPAA*.  Tenant agrees to comply with all requirements and obligations which may be imposed on Tenant by or under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), at 45 C.F. R. 18 §164.501, as amended, and all other applicable healthcare and privacy laws, regulations, ordinances, statutes, and rules to which Tenant may be subject. For

purposes of this Section of this Lease, "protected health information", or "PHI", shall have the meaning defined by the Standards for Privacy of Individually Identifiable Health Information, 45 C.F.R. Part 160 and Subparts A and E of Part 164 (the "Privacy Standards"), as promulgated by the Department of Health and Human Services ("HHS") pursuant to the Administrative Simplification provisions of HIPAA. Tenant agrees to reasonably safeguard PHI from any intentional or unintentional disclosure in violation of the Privacy Standards by implementing appropriate administrative, technical and physical safeguards to protect the privacy of PHI. Tenant further agrees to implement appropriate administrative, technical and physical safeguards to limit incidental disclosures of PHI, including disclosures to Landlord and its People. The parties agree that neither the Landlord nor its People shall need access to, nor shall they use or disclose, any PHI of Tenant. However, in the event PHI is disclosed by Tenant to Landlord or its People, regardless as to whether the disclosure is inadvertent or otherwise, Landlord agrees to take reasonable steps to maintain, and to require its People to maintain, the privacy and confidentiality of such PHI. Landlord hereby agrees that, notwithstanding the rights granted to Landlord pursuant under this Lease, except when accompanied by an authorized representative of Tenant or except in the case of an emergency, neither Landlord nor its People shall be permitted to enter those areas of the Premises where such entry is prohibited by applicable state or federal health care privacy laws. The parties agree that the foregoing does not create, and is not intended to create, a "business associate" relationship between the parties as that term is defined by the Privacy Standards. Notwithstanding anything in this Section 6.2 to the contrary, this provision does not limit the rights of Landlord or any other Debtor under bankruptcy law, including § 351.

6.3 *Copies of Notices*.  Landlord shall promptly give Tenant a copy of any notice of any kind regarding the Premises, and any notice of nonrenewal or threatened nonrenewal of any Approval that Landlord receives from any Government, utility company, insurance carrier, or insurance rating bureau.

7.    *Maintenance and Construction*.

7.1 *Obligation to Maintain*.

7.1.1.  *Tenant's Obligations*.  Tenant, at its sole cost and expense, throughout the Term, shall take good care of the Premises and Existing FF&E (including any Construction hereafter made to the Premises), and shall keep the same in good order, condition and repair, and shall make and perform all routine maintenance thereof and all necessary repairs thereto, interior and exterior, structural and nonstructural, ordinary and extraordinary, foreseen and unforeseen, of every nature, kind and description.  Such obligation shall include, but not be limited to, the repair and maintenance of all driveways, pathways, roadways, sidewalks, curbs, spur tracks, parking areas, loading areas, landscaped areas, entrances and passageways in good order and repair, and Tenant shall promptly remove all accumulated snow, ice and debris from any and all driveways, pathways, roadways, sidewalks, curbs, parking areas, loading areas, entrances and passageways, and keep all portions of the Premises, including areas appurtenant thereto, in a clean and orderly condition free of snow, ice, dirt, rubbish, debris and unlawful obstructions. Further, Tenant shall keep the Premises safe for human occupancy and use.  To the extent any Construction is required to upgrade the Premises, cure any existing defects or bring the Premises into compliance with applicable Laws or otherwise for the Medical Business use, Tenant may, but shall not be obligated to, perform such Construction at Tenant's sole cost and expense in accordance with

Section 7.2; provided, however, Tenant's inability to use the Premises due to its non-compliance with applicable Laws or otherwise for the Medical Business use shall be at Tenant's sole risk and shall not relieve Tenant from its other obligations hereunder, including, but not limited to the obligation to pay Rent.  Tenant shall be responsible for all repairs to the Premises and Existing FF&E which are made necessary by any misuse or neglect by: (i) Tenant or any of its People; or (ii) any visitors, patrons, guests, or invitees of Tenant while in or upon the Premises.  All repairs made by Tenant shall be at least equal in quality and cost to the original work and shall be made by Tenant in accordance with all Laws. The necessity for or adequacy of maintenance and repairs shall be measured by the standards applicable at the time which are appropriate for improvements of similar construction and class, provided that Tenant shall in any event make all repairs necessary to avoid any structural damage or other damage or injury to the Premises and Existing FF&E. When used in this Section 7.1, "repairs" shall include all necessary replacements, renewals, alterations, additions and betterments.

7.1.2.  *Waste*. Tenant shall not do or suffer any waste or damage, disfigurement or injury to the Premises, or any Improvements hereafter erected thereon, or to the Existing FF&E therein, or permit or suffer any overloading of the floors or other use of the Premises that would place an undue stress on the same or any portion thereof beyond that for which the same was designed.

7.1.3.  *Landlord's Obligations*. Notwithstanding anything herein to the contrary, Landlord shall have no obligation to, during the Term, (i) keep and maintain the Premises and the Existing FF&E in good order, condition, and repair, and Landlord shall not be required to furnish any services or facilities in, about or to the Premises or any Improvements hereafter erected thereon, or (ii) upgrade the Premises, cure any existing defects or bring the Premises into compliance with applicable Laws (including, without limitation, life-safety or seismic compliance) or otherwise for the Medical Business use.  Tenant hereby assumes all risk associated with the condition, operation, repair, replacement, maintenance and management of the Premises and all Improvements hereafter erected thereon, and Tenant hereby waives any rights created by any Law to make repairs to the Premises or Improvements hereafter erected thereon at Landlord's expense.

7.1.4.  *Landlord's Right to Effect Repairs*. If Tenant should fail to perform any of its obligations under this Section 7.1, then Landlord may, if it so elects, in addition to any other remedies provided herein, effect such repairs and maintenance.  Any sums expended by Landlord in effecting such repairs and maintenance shall be due and payable, on demand, together with Default Interest from the date of each such expenditure by Landlord to the date of repayment by Tenant.

7.2 *Construction and FF&E During Term.*

7.2.1.  Tenant may cause any Construction to the Premises, and acquire FF&E for the Premises, provided that they are consistent with  the Medical Business and further provided that Tenant shall obtain the prior written consent of Landlord (not to be unreasonably withheld, conditioned or delayed) for such Construction and FF&E that would cause structural injury to the Improvements or have a material adverse impact on the value or usefulness of the Premises.

Notwithstanding the above, it shall be unreasonable for Landlord to withhold, condition or delay consent to Construction or FF&E that are legally required in connection with the operation of the Hospital or to otherwise comply with Tenant's obligations under this Lease; provided the same are removed from the Premises upon the Expiration Date as provided herein . As a condition to granting approval for any Construction and FF&E, Landlord may require Tenant to agree that Landlord, by written notice to Tenant, given at or prior to the time of granting such approval, may require Tenant to remove any Construction or FF&E installed by Tenant in the Premises at Tenant's sole cost and expense, and repair and restore any damage caused by the installation and removal of such Construction and FF&E. All Construction and FF&E installed by Tenant which did not require Landlord's prior approval shall be removed by Tenant as provided for in this Section 7.2.1, unless Tenant has obtained a written waiver of such condition from Landlord.

All Construction (other than Tenant's movable trade fixtures and FF&E) made or installed by Tenant shall immediately, upon completion or installation thereof, become the property of Landlord without payment therefor by Landlord, and shall be surrendered to Landlord on the Expiration Date. Movable trade fixtures that are acquired by Tenant during the Term shall be the property of and owned by Tenant throughout the Term, and shall in no event be deemed Building Equipment, even if affixed to the Premises; provided the same are removed from the Premises upon the Expiration Date as provided herein. Landlord hereby expressly waives and releases any and all contractual liens and security interests or constitutional and/or statutory liens and security interests arising by operation of law or under the applicable lease to which Landlord might now or hereafter be entitled on any of Tenant's FF&E, including, without limitation, Tenant's trade fixtures.

7.2.2. Construction to the Premises shall be done in a good and workmanlike manner using suitable materials equivalent in quality to those used in the construction of the existing improvements to the Premises. If such Construction is structural in nature, require a building or construction permit and the contractual cost of such Construction exceeds five hundred thousand dollars ($500,000) (a "Material Construction"), such Material Construction shall be done under the supervision of a licensed contractor or structural engineer. Promptly following completion of any Material Construction, Tenant shall deliver to Landlord a reproducible copy of the drawings of such Material Construction as built. If this Lease terminates before completion of any Material Construction by Tenant, upon Landlord's request Tenant shall assign its right under any construction, design or material supply contract required for completion of the Material Construction to Landlord or its designee.

7.2.3. Tenant shall promptly pay all charges and costs incurred in connection with any Construction to the Premises performed by or at the request of Tenant, as and when required by the terms of any agreements with contractors, designers, or suppliers to which Tenant is a party; provided, however, that Tenant may contest any such charges and costs in good faith as Tenant reasonably considers necessary. At least ten (10) Business Days before beginning construction of any Material Construction to the Premises, Tenant shall give Landlord written notice of the expected commencement date of that Construction to permit Landlord to post and record a notice of non-responsibility.

7.2.4. On completion of any specific Construction to the Premises, Tenant shall (i) cause a timely notice of completion to be recorded in the office of the recorder of Los

Angeles County, in accordance with California Code Sections 8182, 8184, 9204, and 9208 or any successor statute; and (ii) deliver to Landlord evidence of full payment and executed unconditional final waivers of all liens for labor, services, or materials, all in recordable form.

7.2.5.   Except as expressly approved by Landlord in writing, Tenant shall not be the cause or object of any liens or allow such liens to exist, attach to, be placed on, or encumber Tenant's interest in the Premises, by operation of law or otherwise. Tenant shall not suffer or permit any lien of mechanics, material suppliers, or others to be placed against the Premises with respect to work or services performed for Tenant or materials furnished to Tenant or the Premises at the request of Tenant. Landlord has the right at all times to post and keep posted on the Premises (in such areas reasonably acceptable to Tenant) any notice that it considers necessary for protection from such liens.  If any such lien attaches or Tenant receives notice of any such lien, Tenant shall promptly provide Landlord with a copy of same and shall cause the lien to be released and removed of record within thirty (30) days after Tenant's receipt of written notice of such lien or bonded over as provided in subsection 7.2.6 below. Despite any other provision of this Lease, if the lien is not released and removed within such period or otherwise bonded over as provided in subsection 7.2.6 below, Landlord may, at Tenant's expense, upon at least ten (10) Business Days prior written notice to Tenant of its intention to do so, thereafter take all action reasonably necessary to release and remove the lien, without any duty to investigate the validity of it, unless Tenant has commenced legal action to contest, dispute, or defend the claims of the lienholders and the validity of the liens and continues to diligently prosecute such action to a successful judgment releasing the lienholder's lien against the Premises.

7.2.6.   Notwithstanding subsection 7.2.5 above, Tenant may in good faith and at Tenant's own expense contest the amount and/or validity, in whole or in part of any such lien, provided Tenant has furnished a bond meeting the requirements of California Civil Code Section 8424 (or any successor statute hereafter enacted).    If Tenant: (i) is in default of its foregoing obligation to bond such lien, or (ii) a final judgment has been rendered against Tenant by a court of competent jurisdiction on account of such mechanic's, materialman's, contractor's or subcontractor's lien claim and Tenant fails to stay the execution of the judgment by lawful means or to pay the judgment; then Landlord shall have the right, but not the duty, to pay or otherwise discharge, stay, or prevent the execution of any such judgment or lien or both, at Tenant's expense; provided, however, that with respect to subsection (i), Landlord shall have first provided at least seven (7) Business Days prior written notice to Tenant of Landlord's intention to do so.

7.2.7.   Landlord agrees to reasonably assist Tenant in the procurement of any licenses, permits, "sign-offs," Approvals or certificates that may be required by any governmental or quasi-governmental agency or authority with respect to Tenant's Construction in and to the Premises permitted under this Lease, or with respect to the obtaining of any services, utilities or facilities from the public utility corporation(s) supplying the same to the Premises, and Landlord agrees to execute any documents that are required by any such governmental or quasi-governmental agency or authority in connection therewith.

7.3 *Plans and Specifications*.    To the extent that Tenant obtains plans and specifications or surveys (including working plans and specifications and "as-built" plans and specifications and surveys) for any Construction, Tenant shall promptly upon Landlord's request

give Landlord a copy, subject to the terms of any agreement between Tenant and the applicable architect, engineer, or surveyor.

7.4 *Applications and Approvals*.  Tenant shall apply to each applicable Government for such Approvals as any Construction undertaken by Tenant shall require.  Upon Tenant's request, Landlord shall, without cost to Landlord, promptly join in and execute any Application as Tenant reasonably requests, and otherwise reasonably cooperate with Tenant in obtaining Approvals, provided that such Application is in customary form and imposes no material obligations (beyond obligations ministerial in nature or merely requiring compliance with Law) upon Landlord. Landlord grants to Tenant a power of attorney, coupled with an interest, and therefore irrevocable, to sign on Landlord's behalf any Application that this Lease requires Landlord to sign. Promptly upon Tenant's request and without charge, Landlord shall furnish all information in its possession that Tenant reasonably requests for any Application.  Landlord assumes no liability by cooperating with any Construction undertaken by Landlord.

7.5 *Landlord Nonopposition*.  Landlord shall not appear in opposition to any Application brought, sought, or defended by Tenant before any Government arising out of any Application consistent with this Lease.

7.6 *Tenant EMR and Business Systems*.  Tenant may implement an electronic medical record ("<u>EMR</u>") system of its choice and other standard business technology solutions for use in operations at the Premises at such time as Tenant decides.

8.    <u>*Prohibited Liens*</u>.

8.1 *Tenant's Covenant*.  If a Prohibited Lien is filed then Tenant shall, within 30 days after receiving Notice from Landlord of such filing (but in any case within 15 days after receipt of Notice from Landlord of commencement of foreclosure proceedings), commence appropriate action to cause such Prohibited Lien to be paid, discharged, bonded, or cleared from title. Tenant shall thereafter prosecute such action with reasonable diligence and continuity. If Landlord receives notice of any such filing, then Landlord shall promptly Notify Tenant.  Nothing in this Lease shall be construed to: (a) limit Tenant's right of Contest; or (b) obligate Tenant regarding any lien that results from any act or omission by Landlord, or that arises in or relates to any period prior to the Term. If any Subtenant causes a Prohibited Lien, then Tenant's obligations under this paragraph shall be suspended so long as both: (a) Tenant is with reasonable diligence endeavoring to cause the Subtenant to remove the Prohibited Lien; and (b) the holder of the Prohibited Lien has not commenced foreclosure proceedings.

8.2 *Protection of Landlord*.  NOTICE IS HEREBY GIVEN THAT LANDLORD SHALL NOT BE LIABLE FOR ANY LABOR OR MATERIALS FURNISHED OR TO BE FURNISHED TO TENANT UPON CREDIT, AND THAT NO MECHANIC'S OR OTHER LIEN FOR ANY SUCH LABOR OR MATERIALS SHALL ATTACH TO OR AFFECT THE FEE ESTATE. NOTHING IN THIS LEASE SHALL BE DEEMED OR CONSTRUED IN ANY WAY TO CONSTITUTE LANDLORD'S CONSENT OR REQUEST, EXPRESS OR IMPLIED, BY INFERENCE OR OTHERWISE, TO ANY CONTRACTOR, SUBCONTRACTOR, LABORER, EQUIPMENT OR MATERIAL SUPPLIER FOR THE PERFORMANCE OF ANY LABOR OR THE FURNISHING OF ANY MATERIALS OR EQUIPMENT FOR ANY

CONSTRUCTION, NOR AS GIVING TENANT ANY RIGHT, POWER OR AUTHORITY TO CONTRACT FOR, OR PERMIT THE RENDERING OF, ANY SERVICES, OR THE FURNISHING OF ANY MATERIALS THAT WOULD GIVE RISE TO THE FILING OF ANY LIENS AGAINST THE FEE ESTATE.   TENANT SHALL INDEMNIFY LANDLORD AGAINST ANY CONSTRUCTION UNDERTAKEN BY TENANT OR ANYONE CLAIMING THROUGH TENANT, AND AGAINST ALL PROHIBITED LIENS.

9.    *Hazardous Substances*.

9.1 *Restrictions*.  Tenant shall not cause on, under or at the Premises during the Term: (a) any material violation of any Environmental Law; or (b) the use, generation, release, manufacture, refining, production, processing, storage, or disposal of any Hazardous Substance, or transportation to or from the Premises of any Hazardous Substance, unless in compliance with all applicable Environmental Laws.

9.2 *Compliance; Clean-Up*.  Tenant shall, at Tenant's expense: (a) comply with Environmental Law in connection with its operations and, to the extent Environmental Law requires, clean up any Hazardous Substance Discharge on, at, or under the Premises caused or exacerbated by Tenant or any of Tenant's People; (b) make all submissions to, deliver all information required by, and otherwise fully comply with all requirements of any Government under Environmental Laws in connection with its operations; (c) if any Government requires any clean-up plan or clean-up because of a Hazardous Substances Discharge caused or exacerbated by Tenant or any of Tenant's People, prepare and submit the required plans and all related bonds and other financial assurances; (d) promptly and diligently carry out all such clean-up plans; and (e) Indemnify Landlord against any Hazardous Substances Discharge to the extent caused or exacerbated by Tenant or any of Tenant's People or violation of Environmental Law caused by Tenant or any of Tenant's People. Landlord shall, at Landlord's expense: (v) comply with Environmental Law and, to the extent Environmental Law requires, clean up any Hazardous Substance Discharge on, at, or under the Premises caused or exacerbated by Landlord or any of Landlord's People or predating the Commencement Date; (w) make all submissions to, deliver all information required by, and otherwise fully comply with all requirements of any Government under Environmental Laws; (x) if any Government requires any clean-up plan or clean-up because of a Hazardous Substances Discharge caused or exacerbated by Landlord or any of Landlord's People or predating the Commencement Date, prepare and submit the required plans and all related bonds and other financial assurances; (y) promptly and diligently carry out all such clean-up plans; and (z) Indemnify Tenant against any Hazardous Substances Discharge caused or exacerbated by Landlord or any of Landlord's People or predating the Commencement Date or violation of Environmental Law caused by Landlord or any of Landlord's People or predating the Commencement Date, in either case, whether known or unknown. Any party's obligations under this paragraph shall not limit such party's rights against third parties. .

9.3 *Medical Waste*.  Notwithstanding anything to the contrary contained in this Lease, Tenant is responsible, at Tenant's sole cost and expense, for proper handling and disposal of all infectious waste (including, without limitation, Medical Waste) generated in the Premises during the Term. Landlord is not responsible for any handling of contaminated objects, materials or substances. Tenant acknowledges that the Laws governing proper waste management may be amended from time to time by city, state, county or federal government agencies. Each and every

waste management company chosen by Tenant to handle Tenant's waste removal may change its policies and practices governing the disposal of waste from time to time; provided, however, that such policies and practices will at all times comport with current Laws governing proper waste management. Tenant will provide Landlord with a copy of any waste disposal agreement, if any, entered into between Tenant and such waste management company for the removal of waste from the Premises at any time during the Term. Notwithstanding any changes in the Laws governing the manner of handling or other manner affecting waste management, Tenant agrees to fully cooperate and abide by the foregoing as the same may be amended or changed from time to time. Failure to abide by the aforementioned Laws governing proper waste management constitutes an Nonmonetary Default under the terms of this Lease. Notwithstanding anything to the contrary contained herein, Tenant agrees to retain all Medical Waste in the Premises or, at Landlord's election, in an area within the Building designated by Landlord, at all times until such Medical Waste is removed therefrom by Tenant's waste management company. Tenant shall be solely responsible for all claims, costs and liabilities, including Legal Costs, arising out of or in connection with such Medical Waste and the work and materials necessary to return the Premises to its condition existing prior to Tenant's placement of the Medical Waste on the Premises. Landlord may, at its sole option, engage a waste management company to remove such Medical Waste from the Premises and the Buildings, and such costs shall be payable as Additional Rent.

10.     *Indemnification; Liability of Landlord*.

10.1    *Obligations*.  Landlord and Tenant shall each Indemnify the Indemnitees of the other, to the extent caused by any: (a) breach or default by the Indemnitor under this Lease; (b) breach of any representation or warranty made by Indemnitor in this Lease; or (c) any wrongful act, wrongful omission, or negligence of the Indemnitor (and anyone claiming by or through Indemnitor) or its People.  In addition, Tenant shall Indemnify Landlord Indemnitees against the following during the Term: ; (w) any Contest Tenant initiates; (x) any Application made at Tenant's request; (y) any Construction undertaken by Tenant and any agreements that Tenant (or anyone claiming through Tenant) makes for any such Construction; and (z) any accident, injury or damage whatsoever caused to any Person or property (of Tenant or any other Person) in or on the Premises or upon or under the sidewalks adjoining the Premises. Notwithstanding anything to the contrary in this Lease, no Indemnitor shall be required to Indemnify any Indemnitee regarding the Indemnitee's willful misconduct or negligence. This paragraph does not apply to Environmental Law and Hazardous Substances Discharges, which are covered elsewhere.

10.2    *Liability of Landlord*.  Notwithstanding anything herein to the contrary, during the Term: (a) Tenant is and shall be in exclusive control and possession of the Premises; and (b) Landlord shall not be liable for any injury or damage to any property (of Tenant or any other Person) or to any person occurring on or about the Premises, except to the extent caused by Landlord's willful misconduct or gross negligence.

10.3    *Indemnification Procedures*.  Wherever this Lease requires any Indemnitor to Indemnify any Indemnitee:

10.3.1. *Prompt Notice*.  Indemnitee shall promptly Notify Indemnitor of any claim.  If Indemnitee fails to give prompt Notice, then to the extent, and only to the extent, such

failure materially prejudices Indemnitor, Indemnitor shall be relieved of its indemnity obligations for such claim.

10.3.2. *Selection of Counsel*.  Indemnitor shall select counsel reasonably acceptable to Indemnitee. Counsel to Indemnitor's insurance carrier shall be deemed satisfactory. Even though Indemnitor shall defend the action, Indemnitee may, at its option and its own expense, engage separate counsel to advise it regarding the claim and its defense. Such counsel may attend all proceedings and meetings. Indemnitor's counsel shall actively consult with Indemnitee's counsel. Indemnitor and its counsel shall, however, fully control the defense.

10.3.3. *Cooperation*.    Indemnitee shall reasonably cooperate with Indemnitor's defense, provided Indemnitor reimburses Indemnitee's actual reasonable out of pocket expenses (including Legal Costs) in providing such cooperation.

10.3.4. *Settlement*.  Indemnitor may, with Indemnitee's consent, not to be unreasonably withheld, settle the claim. Indemnitee's consent shall not be required for any settlement by which: (w) Indemnitor procures (by payment, settlement, or otherwise) a release of Indemnitee by which Indemnitee need not make any payment to the claimant; (x) neither Indemnitee nor Indemnitor on behalf of Indemnitee admits liability; (y) the continued effectiveness of this Lease is not jeopardized in any way; and (z) Indemnitee's interest in the Premises is not jeopardized in any way.

10.3.5. *Insurance Proceeds*.  Indemnitor's obligations shall be reduced by net insurance proceeds Indemnitee actually receives for the matter giving rise to indemnification.

11.    <u>*Right of Contest*</u>.

11.1    *Tenant's Right; Contest Conditions*.    Notwithstanding anything to the contrary in this Lease, Tenant shall have the exclusive right to contest, at its sole cost, by appropriate legal proceedings diligently conducted in good faith, the amount or validity of any Prohibited Lien; the validity of any Law or its Application to the Premises; the terms or conditions of, or requirements for, any Approval; or the validity or merit of any claim against which this Lease requires Tenant to Indemnify Landlord (any of the foregoing, a "<u>Contest</u>"). Tenant may defer payment or performance of the contested obligation pending outcome of the Contest, provided that Tenant causes the following conditions (collectively, the "<u>Contest Conditions</u>") to remain satisfied:

11.1.1. *No Criminal Act*.  Such deferral or noncompliance shall not constitute a criminal act by Landlord or subject Landlord to a material risk of any fine or penalty.

11.1.2. *No Liability*.  Such deferral or noncompliance creates no material risk of a lien, charge, or other liability of any kind against the Fee Estate,.

11.1.3. *No Forfeiture.*  Such deferral or noncompliance will not place the Fee Estate in material danger of being forfeited or lost.

11.1.4. *No Cost to Landlord.*  Such Contest shall be without cost, liability, or expense to Landlord.

11.1.5. *Diligence*.  Tenant shall prosecute such Contest with reasonable diligence and in good faith.

11.1.6. *Payment*.  If required for such Contest, Tenant shall have paid the contested Real Estate Taxes or other matter.

11.1.7. *Named Parties.*  If Landlord has been named as a party in any action, then Tenant shall cause Landlord to be removed as such party and Tenant substituted in Landlord's place, if permissible under the circumstances.

11.2   *Landlord Obligations and Protections*.  Landlord need not join in any Contest unless (a) Tenant has complied with the Contest Conditions; and (b) such Contest must be initiated or prosecuted in SVMC's name.  In such case, Landlord shall cooperate, as Tenant reasonably requests, to permit the Contest to be prosecuted in SVMC's name. Landlord shall give Tenant any documents, deliveries, and information in Landlord's control and reasonably necessary for Tenant to prosecute its Contest. Landlord shall otherwise assist Tenant in such Contest as Tenant reasonably requires. Tenant shall pay all reasonable costs and expenses, including Legal Costs, of any Contest.

11.3   *Miscellaneous*.  Upon final determination of Tenant's Contest of a Law, Tenant shall comply with such final determination. So long as the Contest Conditions remain satisfied, Landlord shall enter no objection to any Contest.

12.   *Insurance*.

12.1   *Tenant Insurance Coverages*.  Tenant shall, at its sole expense, maintain the following insurance coverage:

12.1.1. *Casualty*.  Property Insurance against loss, damage or destruction to the Premises caused by any peril covered by "Causes of Loss – Special Form" policy of insurance, including, without limitation, coverage by endorsement for flood insurance (if the Premises is in a Special Flood Hazard Area), earthquake insurance, boiler and pressure vessel (including, but not limited to, pressure pipes, steam pipes and condensation return pipes) insurance and other risks which at the time are included under "extended coverage" endorsements, at least as broad as ISO form CP 1030 (or its current equivalent), without any exclusions other than standard printed exclusions and without exclusion for wind, terrorism, sprinkler leakage, sewer backup or other water-related damage.  The policy or policies for such insurance shall provide for loss payable to Landlord with deductibles of not more than $25,000 per occurrence and with all co-insurance provisions waived.  The amount of the insurance required by this Subsection 12.1.1 shall be in an amount not less than the actual replacement cost of the Improvements (replacement cost new, including coverage for the cost of debris removal and ordinance or law coverage).

12.1.2. *Personal Property*.  Property Insurance against loss, damage or destruction to all FF&E at the Premises caused by any peril covered by "Causes of Loss – Special Form" policy of insurance (or its current equivalent).  The policy or policies for such insurance shall provide for loss payable to Landlord with deductibles of not more than $25,000 per occurrence and with all co-insurance provisions waived.  The amount of the insurance required by

this Section 12.1.2 shall be in an amount not less than the actual replacement cost of all FF&E at the Premises.

12.1.3. *Liability*.    Commercial general liability insurance and medical/hospital professional liability insurance for its employees (on an occurrence basis) providing coverage at least as broad as ISO form CG 00 01 12 07 (or its current equivalent), against claims for bodily injury, death, medical expenses and property damage occurring on, in or about the Premises in the minimum amounts of $5,000,000 per occurrence and $10,000,000 in the aggregate, or in such greater amounts as are then customary for property similar in use to the Premises, with deletions of contractual liability exclusions with respect to personal injury and with defense to be provided as an additional benefit and not within the limits of liability and with deductibles of not more than $25,000 per occurrence.  In addition, if Tenant's medical/hospital professional liability insurance is written on a claims made basis, Tenant agrees to purchase an unlimited extended reporting period endorsement or "tail" coverage.  In addition, Tenant shall maintain excess liability or umbrella liability (in follow form) insurance with a limit of not less than $20,000,000 per occurrence, which shall provide excess coverage over all limits and coverages noted elsewhere herein.

12.1.4. *Worker's Compensation*.  Worker's compensation insurance in amounts necessary to comply with applicable Law, covering all persons employed by Tenant in connection with any work done on or about the Premises for which claims for death, disease or bodily injury may be asserted against Landlord, Tenant or the Premises or, in lieu of such worker's compensation insurance, a program of self-insurance or a non-subscriber system complying with all applicable Law.

12.1.5. *Builder's Risk*.  During any period in which Material Construction at the Premises is being undertaken, builder's risk insurance covering the total completed value including any "soft costs" with respect to the Improvements being altered or repaired (on a completed value, non reporting basis), replacement cost of work performed and equipment, supplies and materials furnished in connection with such construction or repair of Improvements or FF&E, together with such "soft cost" endorsements and such other endorsements as Landlord may reasonably require and contractors' general liability, worker's compensation and automobile liability insurance with respect to the Improvements being constructed, altered or repaired.

12.1.6. *Automobile*.  Automobile liability insurance with limits of not less than $2,000,000 per occurrence covering all owned and hired/non-owned vehicles.

12.1.7. *Other*.  Such other insurance (or other terms with respect to any insurance required pursuant to this Section 12.1, including without limitation, amounts of coverage, deductibles, and form of mortgagee clause) as Landlord may reasonably require, which at the time is usual and commonly obtained in connection with properties similar in type of building size, use and location of the Premises.

12.2    *Tenant Insurance Requirements*.  Tenant agrees that all insurance that Tenant is required to carry pursuant to Section 12.1 will be written by companies authorized to do business in the State and carrying a claims paying ability of at least A:XII by A.M. Best or A by Standard and Poor's, as applicable.  The insurance required hereunder (excluding worker's

compensation) will name Landlord as an additional insured as its interests may appear. Tenant agrees that the casualty and builder's risk insurance required hereunder shall bear a loss payee endorsement in favor of Landlord, and any loss under any such policy will be payable to Landlord, to be held and applied by Landlord toward restoration pursuant to provisions and procedures of this Lease. Every policy referred to in Section 12.1 will provide that any loss otherwise payable thereunder will be payable notwithstanding: (i) any act or omission of Landlord or Tenant which might, absent such provision, result in a forfeiture of all or a part of such insurance payment; (ii) the occupation or use of the Premises for purposes more hazardous than those permitted by the provisions of such policy; or (iii) any change in title to or ownership of the Premises. All coverages described in Section 12.1 shall provide Landlord, by applicable endorsement, with thirty (30) days' notice of cancellation, non-renewal and change of material terms. If any insurance required to be maintained by Tenant under this Lease will expire, be withdrawn, become void or voidable, for any reason, including a breach of any condition thereof by Tenant or the failure or impairment of the capital of any insurer, or if for any other reason whatsoever said insurance becomes reasonably unsatisfactory to Landlord, Tenant shall immediately obtain new or additional insurance reasonably satisfactory to Landlord. All insurance required to be maintained by Tenant under this Lease shall be primary to, and non-contributing with respect to, any insurance maintained by Landlord. Tenant shall pay as they become due all premiums and costs, including losses falling within deductibles, for the insurance required by Section 12.1, shall renew or replace each policy and deliver to Landlord evidence of the payment of the full premium therefor or installment then due at least thirty (30) days prior to the expiration date of such policy. Prior to the Commencement Date, and upon each renewal or replacement of such insurance, Tenant shall deliver to Landlord certificates of insurance in the most currently published form of ACORD 28 (Evidence of Property Insurance) and ACORD 25 (Certificate of Liability Insurance) evidencing all insurance coverages required to be maintained by Tenant hereunder, together with an endorsement(s) adding Landlord as additional insured and loss payee, as appropriate, as its interests may appear, and such certificates shall confirm that Tenant has obtained all insurance required hereunder. Upon request by Landlord, Tenant shall promptly forward to Landlord copies of all original policies and endorsements. The minimum policy limits for all policies required to be maintained by Tenant hereunder will not in any way affect or limit Tenant's obligations to Indemnify set forth in this Lease and will not limit the liability of Tenant for its acts or omissions as provided in this Lease. The per occurrence and annual aggregate limits for all insurance required to be maintained by the Tenant hereunder may be increased by Landlord from time to time to reflect current market conditions (not more frequently than once every five years).

12.3    *Self-Insure*. Notwithstanding the foregoing, with respect to any insurance coverages to be provided by Tenant hereunder, Tenant may, so long as Tenant remains the originally named Tenant hereunder, determine to self-insure or purchase insurance policies required hereunder with such deductibles as is customary for the risks involved.

In accordance with Government Code section 11007.4, the State of California has elected to be self-insured for liability exposures. Under this form of insurance, the State and its employees acting in the course and scope of their employment are insured for tort liability arising out of official State business. All claims against the State of California based on tort liability should be presented as a government claim to the Government Claims Program, P.O. Box 989052 MS 414, West Sacramento, CA 95798-9052. (Gov. Code section 900, et. seq.) Internet link:

https://www.dgs.ca.gov/ORIM/Services/Page-Content/Office-of-Risk-and-Insurance-Management-Services-List-Folder/File-a-Government-Claim

The State of California has also elected to be insured for its motor vehicle liability exposures through the State Motor Vehicle Liability Self-Insurance Program (VELSIP). This program provides liability coverage arising out of the operations of motor vehicles used by state employees for official state business (California Vehicle Code Sections 17000 and 17001). Motor vehicle liability claims against the State of California should be presented to the Office of Risk and Insurance Management, P.O. Box 989052 MS-403, West Sacramento, CA 95798-9052, (800) 900-3634, claims@dgs.ca.gov. If your motor vehicle liability claim is not resolved within six months from the date of loss, California law requires you to file a formal claim with the Government Claims Program, P.O. Box 989052 MS 414, West Sacramento, CA 95798-9052. (Gov. Code section 900, et. seq.)  Internet link:

https://www.dgs.ca.gov/ORIM/Services/Page-Content/Office-of-Risk-and-Insurance-Management-Services-List-Folder/File-a-Government-Claim

The State of California has a Master Agreement with the State Compensation Insurance Fund regarding workers' compensation benefits for all state employees, as required by the Labor Code.

This Section 12.3 shall not apply to a Sublease or other permitted Transfer of this Lease.

12.4    *Waiver of Certain Claims*.  To the extent that Landlord or Tenant purchases any policy of Property Insurance, the party purchasing such insurance (the "Insurance Purchaser") shall cause the insurance carrier to agree to a Waiver of Subrogation, if not already in the policy. If any insurance policy cannot be obtained with a Waiver of Subrogation, or a Waiver of Subrogation is obtainable only by paying an additional premium, then the Insurance Purchaser shall so Notify the other party. The other party shall then have ten (10) Business Days after receipt of such Notice either to (a) direct the Insurance Purchaser to place such insurance with a company reasonably satisfactory to the other party and willing to issue the insurance with a Waiver of Subrogation at no greater or additional cost, or (b) agree to pay the additional premium if such a policy can be obtained only at additional cost. To the extent that the parties actually obtain insurance with a Waiver of Subrogation, the parties release each other, and their respective People, from any claims for damage to any person or the Premises that are caused by or result from risks insured against under such insurance policies.

12.5    *Landlord Insurance*.  Landlord may, at its sole expense, maintain comprehensive general liability coverage for its own protection, and other insurance policies or programs of self-insurance it deems appropriate to cover the liability of Landlord.  In addition, if Landlord's medical/hospital professional liability insurance is written on a claims made basis, Landlord agrees to purchase an unlimited extended reporting period endorsement or "tail" coverage.  Landlord agrees to provide Tenant with evidence of such coverage.  Any policies, including any policy now or after the Commencement Date, carried by Landlord, will serve as excess coverage.  If Tenant shall do anything in or about the Premises which increase insurance rates of Landlord's insurance, if any, without imposing any obligation on Landlord to do so, on

the Leased Premises over customary rates for the uses permitted under this Lease, Tenant shall pay for any such increase

12.6    *No Representation*.  Neither party makes any representation that the limits, scope, or forms of insurance coverage this Lease requires are adequate or sufficient.

13.    *Losses and Loss Proceeds*.

13.1    *Prompt Notice*.  If either party becomes aware of any Casualty or actual, contemplated, or threatened Condemnation, then such party shall promptly so Notify the other party.

13.2    *Casualty*.  If any Casualty occurs that is not a Substantial Casualty, then Tenant shall, except as otherwise provided in this paragraph, Restore with reasonable promptness. If the Casualty is a Substantial Casualty, then Tenant may, by Notice to Landlord given within two (2) months after the Casualty elect a Casualty Termination effective thirty (30) days after such Notice. Upon any Casualty Termination, Tenant shall assign and transfer to Landlord all of Tenant's rights to Property Insurance Proceeds Tenant received, or is entitled to receive, because of the Casualty. If, however, pursuant to Law, the Premises cannot be Restored to the same bulk, and for the same use(s), as before the Casualty, then upon any resulting Casualty Termination, Tenant shall be entitled to receive and retain (as a first priority claim to the Property Insurance Proceeds) a portion of the Property Insurance Proceeds equal to the Market Value of the Leasehold Estate. Unless Tenant has validly elected a Casualty Termination: (a) this Lease shall not terminate; and (b) Tenant shall be solely responsible for negotiating and adjusting any Property Insurance Proceeds (or, if Landlord is the insuring party, then Landlord shall allow Tenant to participate in the negotiation and adjustment of any Property Insurance Proceeds).

13.3    *Substantial Condemnation*.  If a Substantial Condemnation occurs during the Term, then as of the Condemnation Effective Date the Expiration Date shall occur and the parties shall apportion Rent. Landlord shall not settle or compromise any Condemnation Award without consent by Tenant.  Landlord and Tenant shall allocate the Condemnation Award as follows and in the following order of priority, without duplication, until exhausted:

13.3.1. *Costs and Expenses*.  To reimburse Landlord and Tenant for their respective actual costs and expenses, including Legal Costs, incurred in the Substantial Condemnation and determining and collecting the Condemnation Award.

13.3.2. *Landlord's Claim*.  Landlord shall receive such portion of the Condemnation Award as shall equal the Market Value of the Fee Estate at the Condemnation Effective Date.

13.3.3. *Tenant's Claim*.  Tenant shall receive such portion of the Condemnation Award as shall equal the Market Value of the Leasehold Estate, if any, at the Condemnation Effective Date.

13.3.4. *Residual Claim*.  Landlord shall receive the entire remaining Condemnation Award.

13.4    *Insubstantial Condemnation*.    If an Insubstantial Condemnation occurs during the Term then any Condemnation Award(s) shall be paid to Tenant and applied first toward Restoration, in the same manner as Restoration after Casualty, provided that if the Condemnation Award is inadequate to complete the Restoration, Tenant shall contribute the deficiency and Tenant shall Restore in compliance with this Lease. After Tenant has completed and fully paid for Restoration, any remaining Condemnation Award shall be distributed to Landlord and Tenant as if it arose from a Substantial Condemnation that affected only the part of the Premises taken, with an equitable allocation of all elements taken into account in determining such distribution. After the Condemnation Effective Date, all Base Rent shall decrease by a fraction whose numerator is the amount of the Condemnation Award paid to Landlord and whose denominator is the Market Value of the Fee Estate immediately before the Condemnation Effective Date.

13.5    *Temporary Condemnation*.    If a Temporary Condemnation occurs during the Term and relates to a period longer than ninety (90) days, then Tenant may terminate this Lease effective as of the Condemnation Effective Date. In that event, and to the extent that the period of such Temporary Condemnation otherwise includes any period outside the Term, the Condemnation Award from such Temporary Condemnation shall belong to Landlord. If the Temporary Condemnation relates to a period of ninety (90) days or less, or if Tenant does not terminate this Lease because of the Temporary Condemnation, then Tenant shall receive the Condemnation Award (to the extent attributable to periods within the Term) and this Lease shall not be affected in any way. Landlord shall have no right to participate in any Temporary Condemnation proceedings unless either (a) Tenant elects to terminate this Lease because of the Temporary Condemnation; or (b) Tenant may not legally participate in such proceedings. In the latter case, Landlord shall participate in such proceedings in accordance with Tenant's instructions, all at Tenant's reasonable expense and using counsel selected, instructed, and paid by Tenant.

13.6    *Use of Loss Proceeds*.    Landlord assigns to Tenant the right to receive all Loss Proceeds if the event giving rise to such Loss Proceeds has not resulted in the termination of this Lease. If Landlord receives any Loss Proceeds under such circumstances, Landlord shall promptly remit them to Tenant. Until Tenant has completed and paid for Restoration, Tenant shall hold all Loss Proceeds to be used first to Restore and for no other purpose. When Tenant has completed and paid for Restoration, Tenant may retain any remaining Loss Proceeds. Notwithstanding anything in this Lease to the contrary, if Restoration Funds are insufficient to Restore, then Tenant may terminate this Lease on thirty (30) days' Notice to Landlord and shall deliver all of the Loss Proceeds received by Tenant (or the right to receive same if not yet received by Tenant) to Landlord.

13.7    *Continuation of Lease*.    Except as this Lease expressly provides, this Lease shall not terminate, be forfeited, or be affected in any other manner, and Tenant waives any right to quit or surrender the Premises or any part of the Premises, because of any Loss or any resulting untenantability. Unless and until this Lease has been validly terminated, Tenant's obligations under this Lease, including the obligation to pay Rent, shall continue unabated, subject to the Nonrecourse Clause.

14. *Representations and Warranties*.

14.1 *Landlord's Representations and Warranties*.  Landlord represents and warrants to Tenant that the following facts and conditions exist and are true as of the Commencement Date:

14.1.1. *Due Authorization and Execution*.  Upon entry of the order by the Bankruptcy Court authorizing the Landlord to enter into the Lease approving the terms of the Lease, Landlord has full right, title, authority, and capacity to execute and perform this Lease, the Memorandum of Lease and any other agreements and documents to which Landlord is a party and referred to or required by this Lease, (collectively, the "Lease-Related Documents"); the execution and delivery of the Lease-Related Documents have been duly authorized by all requisite actions of Landlord; the Lease-Related Documents constitute valid, binding, and enforceable obligations of Landlord; and neither the execution of the Lease-Related Documents nor the consummation of the transactions they contemplate violates any agreement (including Landlord's governing documents), contract, or other restriction to which Landlord is a party or is bound. The representations and warranties in this paragraph shall continue to apply in full force and effect throughout the Term as if made continuously during the Term.

14.1.2. *Real Property*. Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty with respect to the Premises, any Approvals required in connection therewith, or with respect to the suitability or fitness of either for the conduct of the Medical Business or for any other purpose and Tenant accepts the Premises in an "as is" condition.  Tenant further acknowledges that Tenant (i) has been afforded the opportunity to inspect the Premises, (ii) is aware of the age and condition of the Premises and the fact that it is not currently operational, (iii) and has not relied on any representation or warranty of Landlord or any agent of Landlord with respect thereto, and (iv) is responsible, at its sole cost and expense, for any Construction at the Premises required for the conduct of the Medical Business, in accordance with Section 7.2.

14.1.3. *No Litigation*.  Landlord has not been served with any summons, complaint or written notice to arbitrate, and, to Landlord's knowledge, there is no existing, pending or threatened litigation, suit, action, investigation or proceeding before any court or administrative agency affecting Landlord, any constituent entity or individual of Landlord, or the Premises that would, if adversely determined, materially adversely affect Landlord, the Premises, this Lease, or the Leasehold Estate, except as set forth in **Schedule 14.3**.

14.1.4. *No Pending Condemnation*.  To Landlord's knowledge, there is no existing. pending or threatened Condemnation affecting any portion of the Premises or any pending public improvements in, about, outside or appurtenant to the Premises that will materially adversely affect the use and operation of the Premises for the Medical Business, the value of the Premises, or access to the Premises or that will create additional cost to any owner or Tenant of the Premises by means of special assessments or otherwise.

14.1.5. *Equipment Liens*.  To Landlord's knowledge, the Premises are free and clear of any rights or claims of a type that, if Tenant entered into or granted them after the Commencement Date, would constitute Equipment Liens.

14.1.6. *FIRPTA.*  Landlord is not a "foreign person" within the meaning of Section 1445(f)(3) of the United States Internal Revenue Code of 1986.

14.1.7. *Premises Status.*  To Landlord's knowledge, the Premises are subject only to the Permitted Real Property Encumbrances listed on **Schedule 14.8** (the "Permitted Encumbrances"); and except as disclosed on **Schedule 14.8**, there are no purchase contracts, options, rights of first refusal, rights of first offer or first negotiation, restrictive covenants or other agreements of any kind, oral or written, formal or informal, choate or inchoate, recorded or unrecorded, whereby any person or entity will have acquired or will have any basis to assert any right, title or interest in the Premises.

14.2    *Tenant's Representations and Warranties.*  Tenant represents and warrants to Landlord that the following facts and conditions exist and are true as of the Commencement Date:

14.2.1. *Due Authorization and Execution.*  Tenant has full right, title, authority, and capacity to execute and perform the Lease-Related Documents; the execution and delivery of the Lease-Related Documents have been duly authorized by all requisite actions of Tenant (including, but not limited to, necessary budgeted or emergency appropriations for the payment of the Rent required by applicable Law); the Lease-Related Documents constitute valid, binding, and enforceable obligations of Tenant; and neither the execution of the Lease-Related Documents nor the consummation of the transactions they contemplate violates any agreement (including Tenant's governing documents), contract, or other restriction to which Landlord is a party or is bound. The representations and warranties in this paragraph shall continue to apply in full force and effect throughout the Term as if made continuously during the Term.

15.    *Landlord's Transfers.*

15.1    *Landlord's Right to Convey.*  Landlord may Transfer the Fee Estate from time to time, subject to this Lease.

15.2    *Release of Landlord.*  Upon any Transfer of the entire Fee Estate, the grantor (together with VHS to the extent the grantor is SVMC) shall be automatically freed and relieved from all liability (excluding liability previously accrued) for performance of any covenants or obligations to be performed by Landlord after the Transfer, provided that such successor Landlord assumes Landlord's future obligations under this Lease, subject to the Nonrecourse Clause. This Lease shall bind Landlord only while Landlord (together with VHS to the extent the owner thereof is SVMC) owns the Fee Estate, except as to any liabilities and obligations accrued before the date of Transfer of the Fee Estate.

16.    *Tenant's Transfers.*

16.1    *Tenant's Right.*  Tenant may Transfer this Lease or the Leasehold Estate to an Affiliate of Tenant without Landlord's consent (but with prior written Notice) and otherwise with Landlord's prior written consent, not to be unreasonably withheld, delayed or conditioned; provided that: (i) any transferee of Tenant shall assume all obligations and liabilities of Tenant under this Lease, and a copy of any instrument effectuating such assumption and the Transfer shall be provided to Landlord, which instrument shall be in form and content acceptable to Landlord;

(ii) Tenant shall pay all transfer and other taxes payable on account of any Transfer by Tenant, together with any and all costs of Landlord, including reasonable attorney's fees paid or payable to outside counsel, occasioned by such Transfer; (iii) Tenant shall promptly Notify Landlord of any Transfer; (iv) at the time of any Transfer, and at the time when Tenant requests Landlord's written consent thereto, this Lease must be in full force and effect, without any Default or Event of Default on the part of Tenant; (v) such Transfer shall be subject to all the provisions, terms, covenants and conditions of this Lease, and Tenant-transferor and the transferee or transferees shall continue to be and remain liable under this Lease, as it may be amended from time to time without notice to any transferor of Tenant's interest; (vi) in the case of a Sublease permitted hereunder, such Sublease shall contain provisions to the effect that (a) such Sublease is only for actual use and occupancy by the Subtenant, (b) such Sublease is subject and subordinate to all of the terms, covenants and conditions of this Lease and to all of the rights of Landlord thereunder, and (c) in the event this Lease shall terminate before the expiration of such Sublease, the Subtenant thereunder will, at Landlord's option, attorn to Landlord and waive any rights the Subtenant may have to terminate the Sublease or to surrender possession thereunder, as a result of the termination of this Lease; (vii) such Transfer does not violate the restrictions set forth in Sections 16.2 and 16.3 below; and (viii) such Transfer is subject to any applicable order of the Bankruptcy Court.

16.2    *Bond Financing*.  Landlord confirms that all or portions of the Premises have been financed with the proceeds of tax exempt bonds ("TE Bonds") which are currently outstanding. In order not to adversely affect the tax exempt status of the TE Bonds, Tenant acknowledges and agrees that it will not Transfer all or any portion of the Premises or enter into a management agreement with any Person that is not either a governmental entity or a 501(c)(3) organization without the written consent of Landlord.  Such consent shall not be unreasonably withheld, provided Tenant   provides Landlord with reasonable advance notice of the material terms of any such proposed arrangement or agreement with a provider or service provider including the compensation structure, term and scope thereof  and cooperates with Landlord in order for Landlord to confirm that such arrangement will not adversely impact the tax exempt status of its TE Bonds.

16.3    *Contracts for the Management and Operation of the Premises*.  In the event Landlord reasonably withholds consent for any proposed contract entered into by Tenant with a third party service provider ("Service Provider") for the operation, management or use of the Premises for purposes consistent with Medical Business, and Tenant determines to lawfully exercise powers of condemnation, or eminent domain or compulsory use with respect to the Premises in order to facilitate the Service Provider's use of the Premises in accordance with Tenant's objectives (a "Compulsory Use"), Tenant must give Landlord written notice  of Tenant's exercise of such condemnation authority.  Compulsory Use and shall exercise such condemnation and use Compulsory Use in a manner otherwise consistent with the terms and conditions of this Lease.

17.    *Equipment Liens*.

17.1    *Tenant's Rights*.  After the Commencement Date, Tenant intends, from time to time, to acquire or lease FF&E.  If at any time or from time to time Tenant desires to enter into or grant any Equipment Lien that otherwise complies with this Lease, then upon Tenant's request Landlord shall enter into such customary documentation regarding the Financed FF&E as Tenant

reasonably requests, providing for matters such as: (a) waiver of any right to take possession of such Financed FF&E upon an Event of Default; (b) waiver of any other right, title, or interest in the Financed FF&E; and (c) agreements to enable the holder of such Equipment Lien to repossess such Financed FF&E if such holder exercises remedies under its Equipment Lien. Tenant shall not enter into any Equipment Lien that causes any Prohibited Lien.

18. *Quiet Enjoyment; Access and Inspection; Certain Agreements*.

18.1    *Quiet Enjoyment*.  So long as this Lease has not been terminated, Landlord covenants that Tenant shall and may peaceably and quietly have, hold, and enjoy the Premises and the Existing FF&E for the Term, subject to the terms of this Lease, without molestation, hindrance, or disturbance by or from Landlord or by anyone claiming by or through Landlord or having title to the Premises or the Existing FF&E paramount to Landlord, and free of any encumbrance created or suffered by Landlord, except Permitted Encumbrances.

18.2    *Access and Inspection*.  Notwithstanding anything to the contrary in this Lease, Landlord and its People shall have the right to enter the Premises upon reasonable Notice during regular business hours, solely to: (a) ascertain whether Tenant is complying with this Lease; (b) cure Tenant's Defaults; (c) inspect the Premises and any Construction; (d) perform such tests, borings, and other analyses as Landlord determines may be necessary or appropriate relating to (non)compliance with any Law or possible Hazardous Substances Discharge; (e) show the Premises to a prospective transferee, tenant or mortgagee; (f) to fulfill any legal obligation Landlord may retain, as a healthcare district, with respect to the Premises under the California Health & Safety Code, or (g) as reasonably required pursuant to Section 18.3. In entering the Premises, Landlord and its designees shall not unreasonably interfere with operations on the Premises and shall comply with Tenant's reasonable instructions and all applicable Laws. Landlord shall Indemnify Tenant against any claims arising from Landlord's entry upon the Premises.

18.3    *Reserved and Off-Premises Rights*.  The parties acknowledge that the Premises is a part of a larger contiguous medical campus, including medical/professional office buildings (the "Adjacent Property"), owned by Landlord's Affiliate and co-Debtor in the Bankruptcy Case, Verity Holdings, LLC ("VH"), and that certain Building Equipment or other facilities (collectively, the "Shared Facilities") may be shared by the Premises and Adjacent Property or located on the Premises or the Adjacent Property, but exclusively serving the other. During the Term, Landlord hereby reserves unto itself and shall cause VH to grant unto Tenant a reciprocal license in, under, upon, over and through the applicable portions of the Premises and Adjacent Property (the "License Area"), which are reasonably necessary for using, operating, maintaining, repairing, replacing and enjoying any rights or performing any other obligations under this Lease with respect to any such Shared Facilities, subject to the following conditions: (a) neither party shall cause any damage to the improvements or Shared Facilities located in the License Area, and to the extent a party causes such damage, such party shall promptly restore such improvements and Shared Facilities to their original condition and compensate the other party for any irreparable damage, (b) neither party shall overload or use any Shared Facilities beyond its intended capacity, (c) each party's use of the License Area and Shared Facilities shall comply with all applicable Laws, (d) each party's use of the License Area and Shared Facilities shall be coordinated with the other party to minimize interference to operations at the Premises and

Adjacent Property, as applicable, and (e) to the extent any Shared Facilities results in the sharing of any utilities described in Section 4.2, which are not separately metered to the Premises and Adjacent Property, the cost of such utilities shall be reasonably allocated among the parties based on approximate use thereof.

19.    *Events of Default; Remedies*.

19.1    *Definition of "Event of Default."*    An "Event of Default" means the occurrence of any one or more of the following:

19.1.1. *Monetary Default*.  If a Monetary Default occurs and continues for ten (10) Business Days after Notice from the non-defaulting party, specifying in reasonable detail the amount of money not paid and the nature and calculation of each such payment.

19.1.2. *Prohibited Liens*.  If a party fails to comply with any obligation regarding Prohibited Liens and does not remedy such failure within 15 days after Notice from the non-obligated party.

19.1.3. *Nonmonetary Default*.  If any other Nonmonetary Default occurs and the defaulting party does not cure it within 45 days after Notice from the non-defaulting party describing it in reasonable detail, or, in the case of a Nonmonetary Default that cannot with due diligence be cured within 45 days from such Notice, if defaulting party does not (x) within 45 days from Landlord's Notice advise the non-defaulting party of the defaulting party's intention to take all reasonable steps to cure such Nonmonetary Default; (y) duly commence such cure within such period, and then diligently prosecute such cure to completion; and (z) complete such cure within a reasonable time under the circumstances (not necessarily limited to 45 days).

19.2    *Remedies*.  If an Event of Default occurs and so long as such Event of Default is continuing without cure or waiver, then the non-defaulting party shall, at its option, have any or all of the following remedies, all cumulative (so exercise of one remedy shall not preclude exercise of another remedy), in addition to such other remedies as may be available at law or in equity or under any other terms of this Lease. The non-defaulting party's remedies include:

19.2.1. *Tenant Specific Remedies*.  Tenant will have the following specific remedies for Landlord Events of Default in addition to all other remedies available to Tenant as set forth in this Lease:

19.2.1.1.    *Tenant's Termination Right*.  Tenant shall have the right, at Tenant's sole election, to terminate this Lease upon failure to cure a default within fifteen (15) days or Landlord fails to perform a material obligation under the Lease.

19.2.2. *Landlord Specific Remedies*.  Landlord will have the following specific remedies for Tenant Events of Default in addition to all other remedies set forth in this Lease.

19.2.2.1.    *Continuation of Lease*.  Landlord may continue this Lease in full force and effect and the Lease will continue in effect as long as Landlord does not terminate Tenant's right to possession, and Landlord shall have the right to collect Rent when due.

During an Event of Default, Landlord can enter the Premises and relet them, or any part of them, to third parties for Tenant's account.  Tenant shall be liable immediately to Landlord for all costs Landlord incurs in reletting the Premises, including, without limitation, brokers' commissions, expenses of remodeling the Premises required by the reletting, and like costs.  Reletting can be for a period shorter or longer than the remaining term of this Lease.  Tenant shall pay to Landlord the Rent due under this Lease on the dates the Rent is due, less the rent Landlord receives from any reletting.  No act by Landlord allowed by this paragraph shall terminate this Lease unless Landlord Notifies Tenant that Landlord elects to terminate this Lease.

If Landlord elects to relet the Premises as provided in this paragraph, rent that Landlord receives from reletting shall be applied to the payment of:

First, any indebtedness from Tenant to Landlord other than Base Rent due from Tenant;

Second, all costs, including for maintenance, incurred by Landlord in reletting;

Third, Base Rent due and unpaid under this Lease.  After deducting the payments referred to in this paragraph, any sum remaining from the rent Landlord receives from reletting shall be held by Landlord and applied in payment of future Rent as Rent becomes due under this Lease.  In no event shall Tenant be entitled to any excess rent received by Landlord.  If, on the date Rent is due under this Lease, the rent received from the reletting is less than the Rent due on that date, Tenant shall pay to Landlord, in addition to the remaining Rent due, all costs, including for maintenance, Landlord incurred in reletting that remain after applying the rent received from the reletting as provided in this paragraph.

19.2.2.2.    *Termination of Lease*.    Landlord can terminate Tenant's right to possession of the Premises and the Existing FF&E.  No act by Landlord other than giving Notice to Tenant shall terminate this Lease.  Acts of maintenance, efforts to relet the Premises, or the appointment of a receiver on Landlord's initiative to protect Landlord's interest under this Lease shall not constitute a termination of Tenant's right to possession.  On termination, Landlord has the right to recover from Tenant:

(i)    The worth, at the time of the award, of the unpaid Rent that had been earned at the time of termination of this Lease;

(ii)    The worth, at the time of the award, of the amount by which the unpaid Rent that would have been earned after the date of termination of this Lease until the time of award exceeds the amount of the loss of Rent that Tenant proves could have been reasonably avoided;

(iii)    The worth, at the time of the award, of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of the loss of Rent that Tenant proves could have been reasonably avoided

19.3    *Cure Rights*.  If a party at any time fails to make any payment or take any action this Lease requires and such failure has ripened into an Event of Default, then the non-defaulting party, after ten (10) Business Days' Notice to the defaulting party, or in an emergency with such Notice (if any) as is reasonably practicable under the circumstances, and without waiving or releasing the defaulting party from any obligation or Default and without waiving the non-defaulting party's right to take such action as this Lease may permit as a result of such Default, may (but need not) make such payment or take such action. The defaulting party shall reimburse the defaulting in an amount equal to (a) all reasonable sums paid, and reasonable costs and expenses (including Legal Costs) incurred, by the non-defaulting party in exercising its cure rights under this paragraph; and (b) Default Interest on "a."

19.4    *No Waiver*.  No failure by the non-defaulting party to insist upon strict performance of any covenant, agreement, term, or condition of this Lease or to exercise any right or remedy upon a Default. Landlord's acceptance of full or partial Rent during continuance of any such Default, shall waive any such Default or such covenant, agreement, term, or condition. No covenant, agreement, term, or condition of this Lease to be performed or complied with, and no Default, shall be Modified except by a written instrument executed by the non-defaulting party. No waiver of any Default shall affect or alter this Lease. Each and every covenant, agreement, term and condition of this Lease shall continue in full force and effect with respect to any other then existing or subsequent Default of such covenant, agreement, term or condition of this Lease.

19.5    *Holding Over*.  If for any reason or no reason Tenant remains in the Premises after the Expiration Date without the consent of Landlord, then Landlord will suffer injury that is substantial, difficult, or impossible to measure accurately. Therefore, if Tenant remains in the Premises after the Expiration Date without the consent of Landlord, for any reason or no reason, then in addition to any other rights or remedies of Landlord, Tenant shall pay to Landlord, as liquidated damages and not as a penalty, for each month (prorated daily for partial months) during which Tenant holds over after the Expiration Date, a sum equal to: 102% (for the first month or partial month of holding over and each subsequent month or partial month of holding over) times the monthly Rent, including Additional Rent, payable under this Lease during the year preceding the Expiration Date.

19.6    *Waivers*.   TENANT WAIVES ANY RIGHT OF REDEMPTION PROVIDED FOR BY LAW. TENANT WAIVES ANY RIGHT TO INTERPOSE ANY COUNTERCLAIM IN ANY ACTION BY LANDLORD TO ENFORCE THIS LEASE OR LANDLORD'S RIGHTS AND REMEDIES UNDER THIS LEASE.

19.7    *Accord and Satisfaction; Partial Payments*.  No payment by either party of a lesser amount than the amount owed under this Lease shall be deemed to be other than a part payment on account. No endorsement or statement on any check or letter accompanying any check or payment of Rent shall be deemed an accord or satisfaction. Landlord may accept any such check or payment without prejudice to Landlord's right to recover the balance of such Rent or pursue any other remedy.

20.    *End of Term*.

20.1    *Surrender*  Upon the Expiration Date: (a) Tenant shall, at Tenant's sole cost and expense, deliver to Landlord possession of the Premises and the Existing FF&E, in the same condition as the same were in upon delivery of possession thereof at the Commencement Date and as otherwise required by this Lease, including, but not limited to the satisfaction of all maintenance obligations set forth in Section 7.1, environmental clean-up obligations set forth in Section 9, and decontamination of the Premises from the presence of any communicable diseases associated with the Medical Business, subject to any Loss that this Lease does not require Tenant to Restore and reasonable wear and tear; (b) Tenant shall, at Tenant's sole cost and expense, surrender any right, title, or interest in and to the Premises and the then Existing FF&E and deliver such evidence and confirmation thereof as Landlord reasonably requires; (c) Tenant shall, at Tenant's sole cost and expense, deliver the Premises and the then Existing FF&E free and clear of all liens except (1) Permitted Encumbrances and (2) liens that Landlord or any of its agents caused; (d) the parties shall adjust for Real Estate Taxes and all other expenses and income of the Premises and any prepaid Rent and shall make such payments as shall be appropriate on account of such adjustment in the same manner as for a sale of the Premises (but any sums otherwise payable to Tenant shall first be applied to cure any Default); (e) the parties shall terminate the Memorandum of Lease; (f) Tenant shall assign to Landlord, and Landlord shall reimburse Tenant for, all utility and other service provider deposits for the Premises paid by Tenant; and (g) Tenant shall, at Tenant's sole cost and expense, remove any and all Construction made to and FF&E placed in the Premises by Tenant, which is required to be removed in accordance with Section 7.2.1, and repair and restore any damage caused by the installation and removal of such Construction and FF&E.

20.2    *Abandonment*  All property of Tenant not removed within thirty (30) days after the Expiration Date shall be deemed abandoned.  Tenant hereby appoints Landlord its agent to remove all property of Tenant from the Premises upon termination of this Lease and to cause its transportation and storage for Tenant's benefit, all at the sole cost and risk of Tenant and Landlord shall not be liable for damage, theft, misappropriation or loss thereof and Landlord shall not be liable in any manner in respect thereto. Tenant shall pay all costs and expenses of such removal, transportation and storage.  Tenant shall reimburse Landlord upon demand for any expenses incurred by Landlord with respect to removal or storage of abandoned property and with respect to restoring said Premises to good order, condition and repair.

21.    *Notices*.

All Notices shall be in writing and shall be addressed to Landlord and/or Tenant (and their designated copy recipients), as applicable, as set forth in **Exhibit B**. Notices (including any required copies as set forth in **Exhibit B**) shall be delivered by Federal Express or other overnight (one-night) courier service, or by personal delivery, to the addresses set forth in **Exhibit B**, in which case they shall be deemed delivered on the date of delivery (or when delivery has been attempted twice, as evidenced by the written report of the courier service) to such address(es). Either party may change its address by giving Notice in compliance with this Lease. Notice of such a change shall be effective only upon receipt. Any party giving a Notice may request the recipient to acknowledge receipt of such Notice. The recipient shall promptly comply with any such request, but failure to do so shall not limit the effectiveness of any Notice. Any attorney may give any Notice on behalf of its client.  No Notice shall be effective unless and until a copy of such

Notice has been delivered to the intended recipient's mortgagee(s) of which the sender shall have received Notice.

22.   *No Broker*.

Each party: (a) represents and warrants that it did not engage or deal with any broker or finder in connection with this Lease and no Person is entitled to any commission or finder's fee on account of any agreements or arrangements made by such party; and (b) shall Indemnify the other party against any breach of such representation.

23.   *Nonrecourse*.

No shareholder, officer, member, manager, director, agent, or employee of Landlord or Tenant shall have any liability under this Lease. (This Lease sometimes refers to this paragraph as the "Nonrecourse Clause").

24.   *Additional Deliveries; Third Parties*.

24.1   *Estoppel Certificates*.   Up to twice a year, each party to this Lease (a "Requesting Party") may require the other party (a "Certifying Party") to execute, acknowledge, and deliver to the Requesting Party (or directly to a designated third party) up to four original counterparts of an Estoppel Certificate. The Certifying Party shall sign, acknowledge, and return such Estoppel Certificate within fifteen (15) days after request, even if the Requesting Party is in Default. Any Estoppel Certificate shall bind the Certifying Party.

24.2   *Further Assurances*.   Each party shall execute and deliver such further documents, and perform such further acts, as may be reasonably necessary to achieve the parties' intent in entering into this Lease.   Upon request from Tenant, Landlord shall promptly, under documentation reasonably satisfactory to the requesting party: (a) acknowledge any Subtenant's non-disturbance and recognition rights (provided such Subtenant joins in such agreement); and (b) certify (subject to any then exception reasonably specified) that this Lease is in full force and effect, that no Lease impairment has occurred, that to Landlord's knowledge no Default exists, the date through which Rent has been paid, and other similar matters as reasonably requested.

24.3   *Modification*.   Any Modification of this Lease must be in writing signed by the party to be bound.

24.4   *Successors and Assigns*.   This Lease shall bind and benefit Landlord and Tenant and their successors and assigns, but this shall not limit or supersede any Transfer restrictions. Nothing in this Lease confers on any Person (except Landlord and Tenant) any right to insist upon, or to enforce against Landlord or Tenant, the performance or observance by either party of its obligations under this Lease.

24.5   *Memorandum of Lease*.   Concurrently with the execution of this Lease, the parties shall promptly execute, acknowledge, and deliver duplicate originals of a Memorandum of Lease. Either party may record such Memorandum of Lease. Any taxes imposed upon such recording shall be paid by the party that caused such recordation to occur. If the parties amend this Lease, then the parties shall have the same rights and obligations regarding a memorandum of such

amendment as they do for the Memorandum of Lease. Tenant may at any time by Notice to Landlord elect to require the Memorandum of Lease to be terminated, in which case: (a) the parties shall terminate the Memorandum of Lease; and (b) the parties acknowledge that Tenant shall rely on notice by possession rather than constructive notice by recordation of the Memorandum of Lease. It is further acknowledged by Tenant and Landlord, that such Memorandum of Lease and the rights reflected therein are subordinate to any recorded mortgages, deeds of trust or other validly recorded liens affecting the Premises and any liens affecting the premises arising from entry of orders by the Bankruptcy Court, whether or not recorded.

25.   *Miscellaneous*.

25.1   *Costs and Expenses; Legal Costs*.  In the event of any litigation or dispute between the parties, or claim made by either party against the other, arising from this Lease or the landlord-tenant relationship under this Lease, or Landlord's enforcement of this Lease upon a Default, or to enforce or interpret this Lease or seek declaratory or injunctive relief in connection with this Lease, or to exercise any right or remedy under or arising from this Lease, or to regain or attempt to regain possession of the Premises or terminate this Lease, in the Bankruptcy Case or in any subsequent bankruptcy or insolvency proceeding affecting the other party to this Lease, the prevailing party shall be entitled to reimbursement of its Legal Costs with Default Interest and all other reasonable costs and expenses incurred in enforcing this Lease or curing the other party's default.

25.2   *No Consequential Damages*.  Whenever either party may seek or claim damages against the other party (whether by reason of a breach of this Lease by such party, in enforcement of any indemnity obligation, for misrepresentation or breach of warranty, or otherwise), neither Landlord nor Tenant shall seek, nor shall there be awarded or granted by any court, arbitrator, or other adjudicator, any speculative, consequential, collateral, special, punitive, or indirect damages, whether such breach shall be willful, knowing, intentional, deliberate, or otherwise. The parties intend that any damages awarded to either party shall be limited to actual, direct damages sustained by the aggrieved party. Neither party shall be liable for any loss of profits suffered or claimed to have been suffered by the other.

25.3   *No Merger*.  If the Leasehold Estate and the Fee Estate are ever commonly held, they shall remain separate and distinct estates (and not merge).

25.4   *No Waiver by Silence*.  Failure of either party to complain of any act or omission on the part of the other party shall not be deemed a waiver by the noncomplaining party of any of its rights under this Lease. No waiver by either party at any time, express or implied, of any breach of this Lease shall waive such breach or any other breach.

25.5   *Performance Under Protest*.  If a dispute arises regarding performance of any obligation under this Lease, the party against which such obligation is asserted shall have the right to perform it under protest, which shall not be regarded as voluntary performance. A party that has performed under protest may institute appropriate proceedings to recover any amount paid or the reasonable cost of otherwise complying with any such obligation, with interest at the Prime Rate.

25.6    *Survival*.  All rights and obligations that by their nature are to be performed after any termination of this Lease shall survive any such termination.

25.7    *Unavoidable Delay*.  Each party's obligation to perform or observe any nonmonetary obligation under this Lease shall be suspended during such time as such performance or observance is prevented or delayed by Unavoidable Delay.

25.8    *Landlord is not Employer*.  Landlord nor any other Debtor constitutes an employer under Laws concerning the operations and activities conducted by Tenant, Subtenant or any party contracted to do business by Tenant or Subtenant.

25.9    *Federal Emergency Management Agency ("FEMA") Requirements*.  To the extent Tenant applies for and receives Federal assistance provided by FEMA for its obligations under this Lease, this Lease is subject to the requirements set forth in 2 C.F.R. § 200.326 and 2 C.F.R. Part 200, Appendix II and are hereby incorporated by reference, as follows:

25.9.1. *Clean Air Act*.  Landlord agrees to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act, as amended, 42 U.S.C. § 7401 et seq.  Landlord agrees to report each violation to the Tenant and understands and agrees that the Tenant will, in turn, report each violation as required to assure notification to the Federal Emergency Management Agency, and the appropriate Environmental Protection Agency Regional Office.  Landlord agrees to include these requirements in each subcontract exceeding $150,000 financed in whole or in part with federal assistance provided by FEMA.

25.9.2. *Federal Water Pollution Control Act*.  Landlord agrees to comply with all applicable standards, orders, or regulations issued pursuant to the Federal Water Pollution Control Act, as amended, 33 U.S.C. 1251 et seq. Landlord agrees to report each violation to the Tenant and understands and agrees that the Tenant will, in turn, report each violation as required to assure notification to the Federal Emergency Management Agency, and the appropriate Environmental Protection Agency Regional Office. Landlord agrees to include these requirements in each subcontract exceeding $150,000 financed in whole or in part with Federal assistance provided by FEMA.

25.9.3. *Debarment and Suspension*.  This Lease is a covered transaction for purposes of 2 C.F.R. pt. 180 and 2 C.F.R. pt. 3000. As such, Landlord is required to verify that none of the Landlord's principals (defined at 2 C.F.R. § 180.995) or its Affiliates (defined at 2 C.F.R. § 180.905) are excluded (defined at 2 C.F.R. § 180.940) or disqualified (defined at 2 C.F.R. § 180.935).  Landlord must comply with 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C, and must include a requirement to comply with these regulations in any lower tier covered transaction it enters into.  This certification is a material representation of fact relied upon by Tenant. If it is later determined that Landlord did not comply with 2 C.F.R. pt. 180, subpart C and 2 C.F.R. pt. 3000, subpart C, in addition to remedies available to Tenant, the Federal Government may pursue available remedies, including but not limited to suspension and/or debarment.

25.9.4. *Byrd Anti-Lobbying Amendment, 31 U.S.C. § 1352 (as amended)*. Contractors who apply or bid for an award of $100,000 or more shall file the required certification. Each tier certifies to the tier above that it will not and has not used Federal appropriated funds to

pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, officer or employee of Congress, or an employee of a Member of Congress in connection with obtaining any Federal contract, grant, or any other award covered by 31 U.S.C. § 1352. Each tier shall also disclose any lobbying with non-Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier to tier up to the recipient who in turn will forward the certification(s) to the awarding agency.

APPENDIX A, 44 C.F.R. PART 18 – CERTIFICATION REGARDING LOBBYING

Certification for Contracts, Grants, Loans, and Cooperative Agreements

The Landlord certifies, to the best of its knowledge and belief, that:

1. No Federal appropriated funds have been paid or will be paid, by or on behalf of Landlord, to any person for influencing or attempting to influence an officer or employee of an agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any Federal contract, grant, loan, or cooperative agreement.

2. If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Lease, Landlord shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3. Landlord shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants, and contracts under grants, loans, and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

Landlord certifies or affirms the truthfulness and accuracy of each statement of its certification and disclosure, if any. In addition, Landlord understands and agrees that the provisions of 31 U.S.C. Chap. 38, Administrative Remedies for False Claims and Statements, apply to this certification and disclosure, if any.

26.    *Interpretation, Execution, and Application of Lease*.

26.1    *Captions*.   The captions of this Lease are for convenience and reference only. They in no way affect this Lease.

26.2    *Counterparts*. This Lease may be executed in counterparts.

26.3    *Delivery of Drafts*.  Neither party shall be bound by this Lease unless and until such party shall have executed and delivered at least one counterpart of this Lease. The submission of draft(s) or comment(s) on drafts shall bind neither party in any way. Such draft(s) and comment(s) shall not be considered in interpreting this Lease.

26.4    *Entire Agreement*.    The Lease-Related Documents contain all terms, covenants, and conditions about the Premises. The parties have no other understandings or agreements, oral or written, about the Premises or Tenant's use or occupancy of, or any interest of Tenant in, the Premises.

26.5    *Governing Law*.    This Lease, its interpretation and performance, the relationship between the parties, and any disputes arising from or relating to any of the foregoing, shall be governed, construed, interpreted, and regulated, to the extent not preempted by bankruptcy law, under the Laws of the State, without regard to principles of conflict of laws; provided however, that Tenant shall waive and hereby expressly waives any rights to assert sovereign immunity with respect to matters arising under or related to the parties performance under the Lease.

26.6    *Partial Invalidity*.  If any term or provision of this Lease or its application to any party or circumstance shall to any extent be invalid or unenforceable, then the remainder of this Lease, or the application of such term or provision to Persons or circumstances except those as to which it is invalid or unenforceable, shall not be affected by such invalidity. All remaining provisions of this Lease shall be valid and be enforced to the fullest extent Law allows.

26.7    *Principles of Interpretation*.   No inference in favor of or against any party shall be drawn from the fact that such party has drafted any part of this Lease. The parties have both participated substantially in its negotiation, drafting, and revision, with advice from counsel and other advisers. A term defined in the singular may be used in the plural, and vice versa, all in accordance with ordinary principles of English grammar, which also govern all other language in this Lease. The words "include" and "including" shall be construed to be followed by the words: "without limitation." Each of these terms shall be interpreted as if followed by the words "(or any part of it)" except where the context clearly requires otherwise: Building Equipment; FF&E; Fee Estate; Land; Leasehold Estate; Premises; Structure; and any other similar collective noun. Every reference to any document, including this Lease, refers to such document as Modified from time to time (except, at Landlord's option, any Modification that violates this Lease), and includes all exhibits, schedules, and riders to such document. The word "or" includes the word "and." Any reference to "good order, condition, or repair" of any item identified in this Lease shall refer to a state akin to which such item existed on the earlier of (a) the Commencement Date or (b) the commencement of any period of early access pursuant to Section 2.

26.8    *Reasonableness*.    Wherever this Lease states that a party shall not unreasonably withhold approval: (a) such approval shall not be unreasonably delayed or conditioned; (b) no withholding of approval shall be deemed reasonable unless withheld by Notice specifying reasonable grounds, in reasonable detail, for such withholding, and indicating specific reasonable changes in the proposal under consideration that would make it acceptable; (c) if a party

grants its consent (or fails to object) to any matter, this shall not waive its rights to require such consent for any further or similar matter; and (d) any dispute on the withholding or delay of consent shall be determined by arbitration. Any consent or approval which is not stated to be able to be withheld or granted in a party's sole and absolute discretion shall be subject to the reasonableness standard described above.

26.9    *Books and Records*. To the extent that the services provided under this Agreement are deemed by the Secretary of HHS, the U.S. Comptroller General, or the Secretary's or Comptroller's delegate, to be subject to the provisions of Section 952 of Public Law 96-499, the parties, until the expiration of four (4) years subsequent to the furnishing of services under this Agreement, shall make available, upon written request of the Secretary, the Comptroller, or any of their duly authorized representatives this Lease, and the books, documents, and records of the parties that are necessary to certify the nature and extent of the charges to Tenant's patients; provided that this provision does not limit the rights of Landlord or any other Debtor under bankruptcy law, including § 351.

If any party carries out any of its duties under this Lease through a subcontract, with a value of $10,000 or more over a twelve (12)-month period, with a related organization (as that term is defined with regard to a provider in 42 C.F.R. 413.17(1)), such subcontract shall contain a clause to the effect that until the expiration of four (4) years after the furnishing of such services pursuant to such subcontract, the related organization upon written request shall make available, to the Secretary, the Comptroller, or any of their duly authorized representatives the subcontract, and books, documents, and records of such organization that are necessary to verify the nature and extent of such costs.

If any party is requested to disclose any books, documents, or records relevant to this Agreement for the purpose of an audit or investigation related directly to the provision of services under this Agreement (e.g. a governmental investigation of billing practices or services provided to hospital patients), such party shall Notify the other party of the nature and scope of such request and shall make available to the other party, upon written request, all such books, documents, or records.

26.10    *Net Lease*. Landlord and Tenant do each state and represent that it is the intention of each of them that this Lease be interpreted and construed as an absolute net lease and all Rent shall be paid by Tenant to Landlord without abatement, deduction, diminution, deferment, suspension, reduction or setoff, and the obligations of Tenant shall not be affected by reason of damage to or destruction of the Premises from whatever cause (except as provided for in Section 13.2 hereof); nor shall the obligations of Tenant be affected by reason of any condemnation, eminent domain or like proceedings (except as provided in Section 13.3 hereof); nor shall the obligations of Tenant be affected by reason of any other cause whether similar or dissimilar to the foregoing or by any laws or customs to the contrary. It is the further express intent of Landlord and Tenant that (a) the obligations of Landlord and Tenant hereunder shall be separate and independent covenants and agreements and that the Rent, and all other charges and sums payable by Tenant hereunder, shall commence at the times provided herein and shall continue to be payable in all events unless the obligations to pay the same shall be terminated pursuant to an express provision in this Lease; (b) all costs or expenses of whatsoever character or kind, general or special, ordinary or extraordinary, foreseen or unforeseen, and of every kind and nature whatsoever that

may be necessary or required in and about the Premises, or any portion thereof, and Tenant's possession or authorized use thereof during the term of this Lease, shall be paid by Tenant and all provisions of this Lease are to be interpreted and construed in light of the intention expressed in this Section 26.10; (c) the Base Rent specified in Section 3.1 shall be absolutely net to Landlord so that this Lease shall yield net to Landlord the Base Rent specified in Section 3.1 during the Term; (d) all Real Estate Taxes, insurance premiums, utility expense, repair and maintenance expense, and all other costs, fees, interest, charges, expenses, reimbursements and obligations of every kind and nature whatsoever relating to the Premises, or any portion thereof, which accrue during the Term, shall be paid or discharged by Tenant as Additional Rent; and (e) Tenant hereby agrees to Indemnify Landlord from and against such costs, fees, charges, expenses, reimbursements and obligations, and any interest thereon.

*[Signatures on Next Page.]*

**IN WITNESS WHEREOF**, Landlord and Tenant have executed this Lease on the Commencement Date.

**LANDLORD**

ST. VINCENT MEDICAL CENTER,
a California nonprofit corporation

By: _____

Its _____

VERITY HEALTH SYSTEM OF CALIFORNIA, INC.,
a California nonprofit corporation

By: _____

Its _____

**TENANT**

THE STATE OF CALIFORNIA,
DEPARTMENT OF PUBLIC HEALTH

By: _____

Its _____

*Attachments:*

**Exhibit A** = Land Legal Description
**Exhibit B** = Notice Addresses (Including Required Copy Recipients) and Wire Instructions for Rent Payments

Schedule 14.3 = Material Litigation/Proceedings
Schedule 14.8 = Permitted Real Property Encumbrances

**EXHIBIT A**

**LAND LEGAL DESCRIPTION**

Real property in the City of Los Angeles, County of Los Angeles, State of California, described as follows:

PARCEL A OF PARCEL MAP L.A. NO, 3304, IN THE CITY OF LOS ANGELES, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP FILED IN BOOK 80, PAGES 90 AND 91, OF PARCEL MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN: 5154-018-018



# EXHIBIT B

## NOTICE ADDRESSEES (INCLUDING REQUIRED COPY RECIPIENTS)

| Party: | Notice Address: | With a Copy to: |
|---|---|---|
| Landlord | Dentons US LLP<br>601 S. Figueroa Street, Suite 4050<br>Los Angeles, CA 90017<br>Attention: Tania Moyron | |
| Tenant | California Department of Public Health<br>PO Box 997377, MS 3001<br>Sacramento, CA 95899-7377 | Department of General Services, Real Estate Services Division, Lease Management<br>707 Third Street, Suite 5-305<br>West Sacramento, CA 95605<br><br>and<br><br>Office of Statewide Health Planning and Development Legal Office, 2020 W El Camino, 12th Floor, Sacramento, CA 95833 |

## WIRE INSTRUCTIONS FOR RENT PAYMENTS

**St. Vincent Medical Center**

| | |
|---|---|
| Bank:    Bank of America, N.A. | |
| Account Name: St. Vincent Medical Center – AP Account | ACH/EFT ABA #: 121000358<br>DOM Wire #026009593 |
| | Bank of America, N.A. |
| Account Number: 001499086426 | 2000 Clayton Road, 5th Floor |
| Attn: Ty Conner (650) 822-4030 | Concord, CA 94520 |
| | |

## SCHEDULE 14.3

## MATERIAL LITIGATION/PROCEEDINGS

*In re Verity Health System of California, Inc.*, Case No. 2:18-bk-20151-ER, in the United States Bankruptcy Court for the Central District of California - Los Angeles Division

[To be supplemented]

**SCHEDULE 14.8**

**PERMITTED REAL PROPERTY ENCUMBRANCES**

1.      Matters contained in that certain document

Entitled: Revocable Permit Agreement Between St. Vincent's Hospital, a
California corporation and City of Los Angeles
Dated: June 8, 1951
Executed by: City of Los Angeles, a municipal corporation and St. Vincent's
Hospital, a California corporation
Recording Date: April 22, 1955
Recording No: 3705 of Official Records
Reference is hereby made to said document for full particulars.

2.      An easement for the purpose shown below and rights incidental thereto as set forth
in a document.

Purpose: Poles, wires and cables
Recording Date: December 7, 1961
Recording No: 3549 in Book D-1443 Page 281 of Official Records
Affects: That portion of said land as described in the document attached hereto.

3.      Easement(s) for the purpose(s) shown below and rights incidental thereto as set
forth in a document:

In favor of: Southern California Gas Company, a corporation
Purpose: Pipe lines
Recording Date: December 21, 1967
Recording No: 3348 in Book D-3865 Page 569 of Official Records
Affects: a portion of said land

4.      Matters contained in that certain document

Entitled: Waiver of Damages, Indemnification Agreement, and Right of Ingress and
Egress, to Run With the Land
Dated: July 25, 1969
Recording Date: November 3, 1969
Recording No: 1901 of Official Records
Reference is hereby made to said document for full particulars.

5.      Matters contained in that certain document

Entitled: Waiver of Damages, Indemnification Agreement, and Right of Ingress and
Egress, Covenant to Run With the Land
Dated: July 6, 1971

Recording Date: September 20, 1971
Recording No: 1753 of Official Records
Reference is hereby made to said document for full particulars.

6.  Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

> In favor of: Pacific Telephone and Telegraph Company, a corporation
> Purpose: Public utilities
> Recording Date: April 13, 1973
> Recording No: 3366 of Official Records
> Affects: a portion of said land

7.  Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

> In favor of: Pacific Telephone and Telegraph Company, a corporation
> Purpose: Public utilities
> Recording Date: April 13, 1973
> Recording No: 3367 of Official Records
> Affects: a portion of said land

8.  Easement(s) for the purpose(s) shown below and rights incidental thereto as set forth in a document:

> In favor of: Pacific Telephone and Telegraph Company, a corporation
> Purpose: Public utilities
> Recording Date: April 13, 1973
> Recording No: 3369 of Official Records
> Affects: a portion of said land

9.  Matters contained in that certain document

> Entitled: Waiver of Damages, Indemnification Agreement, and Right of Ingress and Egress, Covenant to Run With the Land
> Dated: June 21, 1974
> Recording Date: June 28, 1974
> Recording No: 5223 of Official Records
> Reference is hereby made to said document for full particulars.

10. Matters contained in that certain document

> Entitled: Waiver of Damages, Indemnification Agreement, and Right of Ingress and Egress, Covenant to Run With the Land
> Dated: September 25, 1974
> Recording Date: September 26, 1974
> Recording No: 2349 of Official Records

Reference is hereby made to said document for full particulars.

11.    Matters contained in that certain document

Entitled:  Covenant  and  Agreement  to  Prohibit  Residential  Development  in
Commercial Zones
Executed by: St. Vincent's Hospital and City of Los Angeles
Recording Date: October 16, 1974
Recording No: 2350 of Official Records
Reference is hereby made to said document for full particulars.

12.    A Covenant and Agreement wherein the owners of said land covenant and agree
that said land shall be held as one parcel and no portion shall be sold separately, which covenant
is expressed to run with the land and be binding upon future owners.

Dated: August 5, 1975
Executed by: St. Vincent Medical Center, a non profit California corporation
In Favor of: City of Los Angeles
Recording Date: August 11, 1975
Recording No: 3708 of Official Records

13.    Matters contained in that certain document

Entitled: Waiver of Damages, Indemnification Agreement, and Right of Ingress and
Egress, Covenant to Run With the Land
Dated: August 22, 1975
Recording Date: August 22, 1975
Recording No: 4972 of Official Records
Reference is hereby made to said document for full particulars.

14.    An  instrument  entitled  "Covenant  and  Agreement  Regarding  Maintenance  of
Building"

Executed by: St. Vincent Medical Center
In favor of: City of Los Angeles
Recording Date: August 22, 1975
Recording No: 4973 of Official Records
Reference is hereby made to said document for full particulars.
This covenant and agreement provides that it shall be binding upon any future
owners, encumbrancers, their successors or assigns, and shall continue in effect
until the advisory agency approves termination.

15.    An instrument entitled Waiver of Damages, Indemnification Agreement, and Right
of Ingress and Egress, Covenant to Run With the Land

Dated: August 29, 1975
Recording Date: September 3, 1975

Recording No: 2253 of Official Records
Reference is hereby made to said document for full particulars.
This covenant and agreement provides that it shall be binding upon any future owners, encumbrancers, their successors or assigns, and shall continue in effect until the advisory agency approves termination.

16.    Matters contained in that certain document

Entitled: Covenant and Agreement Regarding Maintenance of Building
Executed by: St. Vincent Professional Office Building, Inc.
In Favor of: City of Los Angeles
Recording Date: April 14, 1976
Recording No: 3716 of Official Records
Reference is hereby made to said document for full particulars.

17.    An instrument entitled Covenant and Agreement Regarding Maintenance of Building

Executed by: St. Vincent Medical Center, Inc.
In favor of: City of Los Angeles
Recording Date: March 23, 1977
Recording No: 77-293448 of Official Records
Reference is hereby made to said document for full particulars.
This covenant and agreement provides that it shall be binding upon any future owners, encumbrancers, their successors or assigns, and shall continue in effect until the advisory agency approves termination.

18.    An instrument entitled "Covenant and Agreement Regarding Maintenance of Building"

Executed by: St. Vincent Medical Center, Inc.
In favor of: City of Los Angeles
Recording Date: March 23, 1977
Recording No: 77-293449 of Official Records
Reference is hereby made to said document for full particulars.
This covenant and agreement provides that it shall be binding upon any future owners, encumbrancers, their successors or assigns, and shall continue in effect until the advisory agency approves termination.

19.    An instrument entitled Covenant and Agreement

Executed by: St. Vincent Medical Center Incorporated
In favor of: City of Los Angeles
Recording Date: June 27, 1977
Recording No: 77-682810 of Official Records
Reference is hereby made to said document for full particulars.

This covenant and agreement provides that it shall be binding upon any future owners, encumbrancers, their successors or assigns, and shall continue in effect until the advisory agency approves termination.

20.    An instrument entitled Covenant and Agreement

Executed by: St. Vincent Medical Center Incorporated
In favor of: City of Los Angeles
Recording Date: June 27, 1977
Recording No: 77-682811 of Official Records
Reference is hereby made to said document for full particulars.
This covenant and agreement provides that it shall be binding upon any future owners, encumbrancers, their successors or assigns, and shall continue in effect until the advisory agency approves termination.

21.    An instrument entitled Covenant and Agreement Regarding Maintenance of Building

Executed by: Saint Vincent Professional Office Building Inc.
In favor of: City of Los Angeles
Recording Date: November 30, 1977
Recording No: 77-1320918 of Official Records
Reference is hereby made to said document for full particulars.
This covenant and agreement provides that it shall be binding upon any future owners, encumbrancers, their successors or assigns, and shall continue in effect until the advisory agency approves termination.

22.    An instrument entitled Covenant and Agreement Regarding Maintenance of Off-Street Parking Space

Executed by: Daughters of Charity of St. Vincent De Paul
In favor of: City of Los Angeles
Recording Date: May 3, 1984
Recording No: 84-532407 of Official Records
Reference is hereby made to said document for full particulars.
This covenant and agreement provides that it shall be binding upon any future owners, encumbrancers, their successors or assigns, and shall continue in effect until the advisory agency approves termination.

23.    An instrument entitled Affidavit Regarding Maintenance of Guard House

Executed by: St. Vincent Medical Center
In favor of: City of Los Angeles
Recording Date: May 21, 1992
Recording No: 92-923131 of Official Records
Reference is hereby made to said document for full particulars.

This covenant and agreement provides that it shall be binding upon any future owners, encumbrancers, their successors or assigns, and shall continue in effect until the advisory agency approves termination.

24.    An instrument entitled Covenant and Agreement Regarding Maintenance of Off-Street Parking Space

> Executed by: St. Vincent Medical Center
> In favor of: City of Los Angeles
> Recording Date: October 19, 1993
> Recording No: 93-2031944 of Official Records
> Reference is hereby made to said document for full particulars.
> This covenant and agreement provides that it shall be binding upon any future owners, encumbrancers, their successors or assigns, and shall continue in effect until the advisory agency approves termination.

25.    An option to purchase said Land with certain terms, covenants, conditions and provisions as set forth therein.

> Optionor:: Catholic Healthcare West Southern California, a California nonprofit public benefit corporation, dba St. Vincent Medical Center
> Optionee: Hotel Dieu, a California nonprofit public benefit corporation
> Recording Date: March 8, 2000
> Recording No: 00-0352122 of Official Records

26.    A deed of trust which purports to secure performance of an agreement referred to therein, and any other obligations secured thereby

> Dated: December 31, 2001
> Trustor/Grantor: St. Vincent Medical Center, a California non-profit religious corporation
> Trustee: Chicago Title Company, a California corporation
> Beneficiary: U.S. Bank Trust National Association, as Master Trustee, under the Master Indenture
> Recording Date: December 31, 2001
> Recording No: 01-2516064 of Official Records

27.    Matters contained in that certain document

> Entitled: Partial Reconveyance
> Recording Date: August 30, 2016
> Recording No: 2016-1033768, of Official Records
> Reference is hereby made to said document for full particulars.

28.    The Land described herein is included within a project area of the Redevelopment Agency shown below, and that proceedings for the redevelopment of said project have been

instituted under the Redevelopment Law (such redevelopment to proceed only after the adoption of the Redevelopment Plan) as disclosed by a document.

> Redevelopment Agency: Westlake Recovery Redevelopment Project Area
> Recording Date: November 30, 2007
> Recording No: 2007-2636448, of Official Records

29.    Matters contained in that certain document

> Entitled: Master Covenant and Agreement Regarding On-Site Stormwater Treatment Devices Maintenance
> Dated: March 5, 2013
> Recording Date: March 26, 2013
> Recording No: 20130448492 of Official Records
> Reference is hereby made to said document for full particulars.

30.    A claim of mechanic's lien or materialman's lien

> Claimant: Ham's Electric, Inc.
> Amount: $6,166.00
> Recording Date: September 4, 2018
> Recording No: 2018-893516, of Official Records
> Any other claims for mechanics' or materialman's liens that may be recorded, by reason of a recent work of improvement that is disclosed by the lien shown in the last above numbered item.

31.    A claim of mechanic's lien or materialman's lien

> Claimant: Belfor USA Group, Inc.
> Amount: $250,733.03
> Recording Date: September 18, 2018
> Recording No: 2018-957816, of Official Records
> Any other claims for mechanics' or materialman's liens that may be recorded, by reason of a recent work of improvement that is disclosed by the lien shown in the last above numbered item.

32.    A claim of mechanic's lien or materialman's lien

> Claimant: Royal West Development, Inc.
> Amount: $367,297.00
> Recording Date: September 20, 2018
> Recording No: 2018-967571, of Official Records
> Any other claims for mechanics' or materialman's liens that may be recorded, by reason of a recent work of improvement that is disclosed by the lien shown in the last above numbered item.

33.    A claim of mechanic's lien or materialman's lien

Claimant: MGH Painting, Inc.
Amount: $225,000.00
Recording Date: September 24, 2018
Recording No: 2018-975456, of Official Records
Any other claims for mechanics' or materialman's hens that may be recorded, by reason of a recent work of improvement that is disclosed by the lien shown in the last above numbered item.

34.    A claim of mechanic's lien or materialman's lien

Claimant: PDQ Enterprises, Inc. dba PDQ Rent
Amount: $65,348.53
Recording Date: October 15, 2018
Recording No: 2018-1016827, of Official Records
Any other claims for mechanics' or materialman's hens that may be recorded, by reason of a recent work of improvement that is disclosed by the lien shown in the last above numbered item.

35.    A claim of mechanic's lien or materialman's lien

Claimant: Royal West Development, Inc.
Amount: $69,081.00
Recording Date: October 9, 2018
Recording No: 2018-1027091, of Official Records
Any other claims for mechanics' or materialman's liens that may be recorded, by reason of a recent work of improvement that is disclosed by the lien shown in the last above numbered item.

36.    A claim of mechanic's lien or materialman's lien

Claimant: John Dwyer Construction, Inc.
Amount: $7,032.00
Recording Date: October 22, 2018
Recording No: 2018-1072954, of Official Records
Any other claims for mechanics' or materialman's hens that may be recorded, by reason of a recent work of improvement that is disclosed by the hen shown in the last above numbered item.

37.    A deed of trust to secure an indebtedness in the amount shown below,

Amount: $185,000,000.00
Dated: March 22, 2019
Trustor/Grantor St. Vincent Medical Center, a California nonprofit religious corporation
Trustee: First American Title Insurance Company, a Nebraska corporation
Beneficiary: Ally Bank, a Utah state chartered bank
Recording Date: March 22, 2019

Recording No: 2019-258817, of Official Records

38.    A lien for unsecured property taxes filed by the tax collector of the county shown, for the amount set forth, and any other amounts due.

County: Los Angeles
Fiscal Year: 2006 - 2007
Taxpayer: St Vincent's Medical Center
County Identification Number: 06/40719957
Amount: $80.77
Recording Date: November 17, 2006
Recording No: 06-02559784 of Official Records

39.    A lien for unsecured property taxes filed by the tax collector of the county shown, for the amount set forth, and any other amounts due.

County: Los Angeles
Fiscal Year: 2012 - 2013
Taxpayer: Saint Vincent Medical Center Lessee
County Identification Number: 12/49126069
Amount: $301.40
Recording Date: December 14, 2012
Recording No: 20121933101 of Official Records

# EXHIBIT D

# Proclamation

# EXECUTIVE DEPARTMENT
# STATE OF CALIFORNIA

### PROCLAMATION OF A STATE OF EMERGENCY

**WHEREAS** in December 2019, an outbreak of respiratory illness due to a novel coronavirus (a disease now known as COVID-19), was first identified in Wuhan City, Hubei Province, China, and has spread outside of China, impacting more than 75 countries, including the United States; and

**WHEREAS** the State of California has been working in close collaboration with the national Centers for Disease Control and Prevention (CDC), with the United States Health and Human Services Agency, and with local health departments since December 2019 to monitor and plan for the potential spread of COVID-19 to the United States; and

**WHEREAS** on January 23, 2020, the CDC activated its Emergency Response System to provide ongoing support for the response to COVID-19 across the country; and

**WHEREAS** on January 24, 2020, the California Department of Public Health activated its Medical and Health Coordination Center and on March 2, 2020, the Office of Emergency Services activated the State Operations Center to support and guide state and local actions to preserve public health; and

**WHEREAS** the California Department of Public Health has been in regular communication with hospitals, clinics and other health providers and has provided guidance to health facilities and providers regarding COVID-19; and

**WHEREAS** as of March 4, 2020, across the globe, there are more than 94,000 confirmed cases of COVID-19, tragically resulting in more than 3,000 deaths worldwide; and

**WHEREAS** as of March 4, 2020, there are 129 confirmed cases of COVID-19 in the United States, including 53 in California, and more than 9,400 Californians across 49 counties are in home monitoring based on possible travel-based exposure to the virus, and officials expect the number of cases in California, the United States, and worldwide to increase; and

**WHEREAS** for more than a decade California has had a robust pandemic influenza plan, supported local governments in the development of local plans, and required that state and local plans be regularly updated and exercised; and

**WHEREAS** California has a strong federal, state and local public health and health care delivery system that has effectively responded to prior events including the H1N1 influenza virus in 2009, and most recently Ebola; and

**WHEREAS** experts anticipate that while a high percentage of individuals affected by COVID-19 will experience mild flu-like symptoms, some will have more serious symptoms and require hospitalization, particularly individuals who are elderly or already have underlying chronic health conditions; and

**WHEREAS** it is imperative to prepare for and respond to suspected or confirmed COVID-19 cases in California, to implement measures to mitigate the spread of COVID-19, and to prepare to respond to an increasing number of individuals requiring medical care and hospitalization; and

**WHEREAS** if COVID-19 spreads in California at a rate comparable to the rate of spread in other countries, the number of persons requiring medical care may exceed locally available resources, and controlling outbreaks minimizes the risk to the public, maintains the health and safety of the people of California, and limits the spread of infection in our communities and within the healthcare delivery system; and

**WHEREAS** personal protective equipment (PPE) is not necessary for use by the general population but appropriate PPE is one of the most effective ways to preserve and protect California's healthcare workforce at this critical time and to prevent the spread of COVID-19 broadly; and

**WHEREAS** state and local health departments must use all available preventative measures to combat the spread of COVID-19, which will require access to services, personnel, equipment, facilities, and other resources, potentially including resources beyond those currently available, to prepare for and respond to any potential cases and the spread of the virus; and

**WHEREAS** I find that conditions of Government Code section 8558(b), relating to the declaration of a State of Emergency, have been met; and

**WHEREAS** I find that the conditions caused by COVID-19 are likely to require the combined forces of a mutual aid region or regions to appropriately respond; and

**WHEREAS** under the provisions of Government Code section 8625(c), I find that local authority is inadequate to cope with the threat posed by COVID-19; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes, including the California Emergency Services Act, and in particular, Government Code section 8625, **HEREBY PROCLAIM A STATE OF EMERGENCY** to exist in California.

**IT IS HEREBY ORDERED THAT:**

1. In preparing for and responding to COVID-19, all agencies of the state government use and employ state personnel, equipment, and facilities or perform any and all activities consistent with the direction of the Office of Emergency Services and the State Emergency Plan, as well as the California Department of Public Health and the Emergency Medical Services Authority. Also, all residents are to heed the advice of emergency officials with regard to this emergency in order to protect their safety.

2. As necessary to assist local governments and for the protection of public health, state agencies shall enter into contracts to arrange for the procurement of materials, goods, and services needed to assist in preparing for, containing, responding to, mitigating the effects of, and recovering from the spread of COVID-19. Applicable provisions of the Government Code and the Public Contract Code, including but not limited to travel, advertising, and competitive bidding requirements, are suspended to the extent necessary to address the effects of COVID-19.

3. Any out-of-state personnel, including, but not limited to, medical personnel, entering California to assist in preparing for, responding to, mitigating the effects of, and recovering from COVID-19 shall be permitted to provide services in the same manner as prescribed in Government Code section 179.5, with respect to licensing and certification. Permission for any such individual rendering service is subject to the approval of the Director of the Emergency Medical Services Authority for medical personnel and the Director of the Office of Emergency Services for non-medical personnel and shall be in effect for a period of time not to exceed the duration of this emergency.

4. The time limitation set forth in Penal Code section 396, subdivision (b), prohibiting price gouging in time of emergency is hereby waived as it relates to emergency supplies and medical supplies. These price gouging protections shall be in effect through September 4, 2020.

5. Any state-owned properties that the Office of Emergency Services determines are suitable for use to assist in preparing for, responding to, mitigating the effects of, or recovering from COVID-19 shall be made available to the Office of Emergency Services for this purpose, notwithstanding any state or local law that would restrict, delay, or otherwise inhibit such use.

6. Any fairgrounds that the Office of Emergency Services determines are suitable to assist in preparing for, responding to, mitigating the effects of, or recovering from COVID-19 shall be made available to the Office of Emergency Services pursuant to the Emergency Services Act, Government Code section 8589. The Office of Emergency Services shall notify the fairgrounds of the intended use and can immediately use the fairgrounds without the fairground board of directors' approval, and

notwithstanding any state or local law that would restrict, delay, or otherwise inhibit such use.

7. The 30-day time period in Health and Safety Code section 101080, within which a local governing authority must renew a local health emergency, is hereby waived for the duration of this statewide emergency. Any such local health emergency will remain in effect until each local governing authority terminates its respective local health emergency.

8. The 60-day time period in Government Code section 8630, within which local government authorities must renew a local emergency, is hereby waived for the duration of this statewide emergency. Any local emergency proclaimed will remain in effect until each local governing authority terminates its respective local emergency.

9. The Office of Emergency Services shall provide assistance to local governments that have demonstrated extraordinary or disproportionate impacts from COVID-19, if appropriate and necessary, under the authority of the California Disaster Assistance Act, Government Code section 8680 et seq., and California Code of Regulations, Title 19, section 2900 et seq.

10. To ensure hospitals and other health facilities are able to adequately treat patients legally isolated as a result of COVID-19, the Director of the California Department of Public Health may waive any of the licensing requirements of Chapter 2 of Division 2 of the Health and Safety Code and accompanying regulations with respect to any hospital or health facility identified in Health and Safety Code section 1250. Any waiver shall include alternative measures that, under the circumstances, will allow the facilities to treat legally isolated patients while protecting public health and safety. Any facilities being granted a waiver shall be established and operated in accordance with the facility's required disaster and mass casualty plan. Any waivers granted pursuant to this paragraph shall be posted on the Department's website.

11. To support consistent practices across California, state departments, in coordination with the Office of Emergency Services, shall provide updated and specific guidance relating to preventing and mitigating COVID-19 to schools, employers, employees, first responders and community care facilities by no later than March 10, 2020.

12. To promptly respond for the protection of public health, state entities are, notwithstanding any other state or local law, authorized to share relevant medical information, limited to the patient's underlying health conditions, age, current condition, date of exposure, and possible contact tracing, as necessary to address the effect of the COVID-19 outbreak with state, local, federal, and nongovernmental partners, with such information to be used for the limited purposes of monitoring, investigation and control, and treatment and coordination of care. The

notification requirement of Civil Code section 1798.24, subdivision (i), is suspended.

13. Notwithstanding Health and Safety Code sections 1797.52 and 1797.218, during the course of this emergency, any EMT-P licensees shall have the authority to transport patients to medical facilities other than acute care hospitals when approved by the California EMS Authority. In order to carry out this order, to the extent that the provisions of Health and Safety Code sections 1797.52 and 1797.218 may prohibit EMT-P licensees from transporting patients to facilities other than acute care hospitals, those statutes are hereby suspended until the termination of this State of Emergency.

14. The Department of Social Services may, to the extent the Department deems necessary to respond to the threat of COVID-19, waive any provisions of the Health and Safety Code or Welfare and Institutions Code, and accompanying regulations, interim licensing standards, or other written policies or procedures with respect to the use, licensing, or approval of facilities or homes within the Department's jurisdiction set forth in the California Community Care Facilities Act (Health and Safety Code section 1500 et seq.), the California Child Day Care Facilities Act (Health and Safety Code section 1596.70 et seq.), and the California Residential Care Facilities for the Elderly Act (Health and Safety Code section 1569 et seq.). Any waivers granted pursuant to this paragraph shall be posted on the Department's website.

**I FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this proclamation.

**IN WITNESS WHEREOF I** have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 4th day of March 2020.

GAVIN NEWSOM
Governor of California

**ATTEST:**

ALEX PADILLA
Secretary of State

# EXHIBIT E

# Executive Order

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA

### EXECUTIVE ORDER N-25-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** despite sustained efforts, the virus remains a threat, and further efforts to control the spread of the virus to reduce and minimize the risk of infection are needed; and

**WHEREAS** state and local public health officials may, as they deem necessary in the interest of public health, issue guidance limiting or recommending limitations upon attendance at public assemblies, conferences, or other mass events, which could cause the cancellation of such gatherings through no fault or responsibility of the parties involved, thereby constituting a force majeure; and

**WHEREAS** the Department of Public Health is maintaining up-to-date guidance relating to COVID-19, available to the public at http://cdph.ca.gov/covid19; and

**WHEREAS** the State of California and local governments, in collaboration with the Federal government, continue sustained efforts to minimize the spread and mitigate the effects of COVID-19; and

**WHEREAS** there is a need to secure numerous facilities to accommodate quarantine, isolation, or medical treatment of individuals testing positive for or exposed to COVID-19; and

**WHEREAS**, many individuals who have developmental disabilities and receive services through regional centers funded by the Department of Developmental Services also have chronic medical conditions that make them more susceptible to serious symptoms of COVID-19, and it is critical that they continue to receive their services while also protecting their own health and the general public health; and

**WHEREAS** individuals exposed to COVID-19 may be temporarily unable to report to work due to illness caused by COVID-19 or quarantines related to COVID-19 and individuals directly affected by COVID-19 may experience potential loss of income, health care and medical coverage, and ability to pay for housing and basic needs, thereby placing increased demands on already strained regional and local health and safety resources such as shelters and food banks; and

**WHEREAS** in the interest of public health and safety, it is necessary to exercise my authority under the Emergency Services Act, specifically Government Code section 8572, to ensure adequate facilities exist to address the impacts of COVID-19; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8571 and 8572, do hereby issue the following order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1.  All residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19.

2.  For the period that began January 24, 2020 through the duration of this emergency, the Employment Development Department shall have the discretion to waive the one-week waiting period in Unemployment Insurance Code section 2627(b)(1) for disability insurance applicants who are unemployed and disabled as a result of the COVID-19, and who are otherwise eligible for disability insurance benefits.

3.  For the period that began January 24, 2020 through the duration of this emergency, the Employment Development Department shall have the discretion to waive the one-week waiting period in Unemployment Insurance Code section 1253(d) for unemployment insurance applicants who are unemployed as a result of the COVID-19, and who are otherwise eligible for unemployment insurance benefits.

4.  Notwithstanding Health and Safety Code section 1797.172(b), during the course of this emergency, the Director of the Emergency Medical Services Authority shall have the authority to implement additions to local optional scopes of practice without first consulting with a committee of local EMS medical directors named by the EMS Medical Directors Association of California.

5.  In order to quickly provide relief from interest and penalties, the provisions of the Revenue and Taxation Code that apply to the taxes and fees administered by the Department of Tax and Fee Administration, requiring the filing of a statement under penalty of perjury setting forth the facts for a claim for relief, are suspended for a period of 60 days after the date of this Order for any individuals or businesses who are unable to file a timely tax return or make a timely payment as a result of complying with a state or local public health official's imposition or recommendation of social distancing measures related to COVID-19.

6.  The Franchise Tax Board, the Board of Equalization, the Department of Tax and Fee Administration, and the Office of Tax Appeals shall use their administrative powers where appropriate to provide those individuals and businesses impacted by complying with a state or local public health official's imposition or recommendation of social

distancing measures related to COVID-19 with the extensions for filing, payment, audits, billing, notices, assessments, claims for refund, and relief from subsequent penalties and interest.

7. The Governor's Office of Emergency Services shall ensure adequate state staffing during this emergency. Consistent with applicable federal law, work hour limitations for retired annuitants, permanent and intermittent personnel, and state management and senior supervisors, are suspended. Furthermore, reinstatement and work hour limitations in Government Code sections 21220, 21224(a), and 7522.56(b), (d), (f), and (g), and the time limitations in Government Code section 19888.1 and California Code of Regulations, title 2, sections 300-303 are suspended. The Director of the California Department of Human Resources must be notified of any individual employed pursuant to these waivers.

8. The California Health and Human Services Agency and the Office of Emergency Services shall identify, and shall otherwise be prepared to make available—including through the execution of any necessary contracts or other agreements and, if necessary, through the exercise of the State's power to commandeer property – hotels and other places of temporary residence, medical facilities, and other facilities that are suitable for use as places of temporary residence or medical facilities as necessary for quarantining, isolating, or treating individuals who test positive for COVID-19 or who have had a high-risk exposure and are thought to be in the incubation period.

9. The certification and licensure requirements of California Code of Regulations, Title 17,  section 1079 and Business and Professions Code section 1206.5 are suspended as to all persons who meet the requirements under the Clinical Laboratory Improvement Amendments of section 353 of the Public Health Service Act for high complexity testing and who are performing analysis of samples to test for SARS-CoV-2, the virus that causes COVID-19, in any certified public health laboratory or licensed clinical laboratory.

10. To ensure that individuals with developmental disabilities continue to receive the services and supports mandated by their individual program plans threatened by disruptions caused by COVID-19, the Director of the Department of Developmental Services may issue directives waiving any provision or requirement of the Lanterman Developmental Disabilities Services Act, the California Early Intervention Services Act, and the accompanying regulations of Title 17, Division 2 of the California Code of Regulations.  A directive may delegate to the regional centers any authority granted to the Department by law where the Director believes such delegation is necessary to ensure services to individuals with developmental disabilities.  The Director shall describe the need justifying the waiver granted in each directive and articulate how the waiver is necessary to protect the public health or safety from the threat of COVID-19 or necessary to ensure that services to individuals with developmental disabilities are not disrupted.  Any waiver granted by a directive shall expire 30 days from the date of its issuance.  The Director may grant one or more 30-day extensions if the waiver continues to be necessary

to protect health or safety or to ensure delivery of services. The Director shall rescind a waiver once it is no longer necessary to protect public health or safety or ensure delivery of services. Any waivers and extensions granted pursuant to this paragraph shall be posted on the Department's website.

11. Notwithstanding any other provision of state or local law, including the Bagley-Keene Act or the Brown Act, a local legislative body or state body is authorized to hold public meetings via teleconferencing and to make public meetings accessible telephonically or otherwise electronically to all members of the public seeking to attend and to address the local legislative body or state body, during the period in which state or local public officials impose or recommend measures to promote social distancing, including but not limited to limitations on public events. All requirements in both the Bagley-Keene Act and the Brown Act expressly or impliedly requiring the physical presence of members, the clerk or other personnel of the body, or of the public as a condition of participation in or quorum for a public meeting are hereby waived.

In particular, any otherwise-applicable requirements that

(i)     state and local bodies notice each teleconference location from which a member will be participating in a public meeting;

(ii)    each teleconference location be accessible to the public;

(iii)   members of the public may address the body at each teleconference conference location;

(iv)   state and local bodies post agendas at all teleconference locations;

(v)    at least one member of the state body be physically present at the location specified in the notice of the meeting; and

(vi)   during teleconference meetings, a least a quorum of the members of the local body participate from locations within the boundaries of the territory over which the local body exercises jurisdiction

are hereby suspended, on the conditions that:

(i)     each state or local body must give advance notice of each public meeting, according to the timeframe otherwise prescribed by the Bagley-Keene Act or the Brown Act, and using the means otherwise prescribed by the Bagley-Keene Act or the Brown Act, as applicable; and

(ii)    consistent with the notice requirement in paragraph (i), each state or local body must notice at least one publicly accessible location from which members of the public shall have the right to observe and offer public comment at the public meeting, consistent with the public's rights of access and public comment otherwise provided for by the Bagley-Keene Act and the Brown Act, as applicable (including, but not limited to, the requirement that such rights of access and public comment be made available in a manner consistent with the Americans with Disabilities Act).

In addition to the mandatory conditions set forth above, all state and local bodies are urged to use sound discretion and to make reasonable efforts to adhere as closely as reasonably possible to the provisions of the Bagley-Keene Act and the Brown Act, and other applicable local laws regulating the conduct of public meetings, in order to maximize transparency and provide the public access to their meetings.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 12th day of March 2020.

_____
GAVIN NEWSOM
Governor of California

ATTEST:

_____
ALEX PADILLA
Secretary of State