SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
NICHOLAS A. KOFFROTH (Bar No. 287854)
nick.koffroth@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Tel: (213) 623-9300 / Fax: (213) 623-9924

Attorneys for the Chapter 11 Debtors and
Debtors In Possession

*DENTONS US LLP*
*601 SOUTH FIGUEROA STREET, SUITE 2500*
*LOS ANGELES, CALIFORNIA 90017-5704*
*(213) 623-9300*

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| | |
|---|---|
| In re | Lead Case No. 2:18-bk-20151-ER |
| VERITY HEALTH SYSTEM OF CALIFORNIA, INC., *et al.*, | Jointly Administered With: Case No. 2:18-bk-20162-ER Case No. 2:18-bk-20163-ER Case No. 2:18-bk-20164-ER Case No. 2:18-bk-20165-ER Case No. 2:18-bk-20167-ER Case No. 2:18-bk-20168-ER Case No. 2:18-bk-20169-ER Case No. 2:18-bk-20171-ER Case No. 2:18-bk-20172-ER Case No. 2:18-bk-20173-ER Case No. 2:18-bk-20175-ER Case No. 2:18-bk-20176-ER Case No. 2:18-bk-20178-ER Case No. 2:18-bk-20179-ER Case No. 2:18-bk-20180-ER Case No. 2:18-bk-20181-ER |
| Debtors and Debtors In Possession. | |

Debtors and Debtors In Possession.

☒ Affects All Debtors
☒ Affects Verity Health System of California, Inc.
☐ Affects O'Connor Hospital
☐ Affects Saint Louise Regional Hospital
☐ Affects St. Francis Medical Center
☐ Affects St. Vincent Medical Center
☒ Affects Seton Medical Center
☐ Affects O'Connor Hospital Foundation
☐ Affects Saint Louise Regional Hospital Foundation
☐ Affects St. Francis Medical Center of Lynwood Foundation
☐ Affects St. Vincent Foundation
☐ Affects St. Vincent Dialysis Center, Inc.
☐ Affects Seton Medical Center Foundation
☐ Affects Verity Business Services
☐ Affects Verity Medical Foundation
☒ Affects Verity Holdings, LLC
☐ Affects De Paul Ventures, LLC
☐ Affects De Paul Ventures - San Jose Dialysis, LLC

Chapter 11 Cases
Hon. Judge Ernest M. Robles

**DEBTORS' NOTICE OF MOTION AND MOTION TO APPROVE TERMS AND CONDITIONS OF A PRIVATE SALE OF CERTAIN OF THE DEBTORS' ASSETS RELATED TO SETON MEDICAL CENTER TO AHMC HEALTHCARE INC.; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF**

Hearing:
Date:    April 22, 2020
Time:    10:00 a.m.
Place:    Courtroom: 1568
              255 East Temple Street
              Los Angeles, CA 90012

US_Active\114400090\V-3

**PLEASE TAKE NOTICE** that, at the above-referenced date, time and location, Verity Health System of California, Inc. ("VHS") and the above-referenced affiliated debtors, the debtors and debtors in possession (collectively, the "Debtors" or the "Verity Health System") in the above-captioned chapter 11 bankruptcy cases (the "Cases"), will move (the "Motion") for the entry of an order: (i) approving a private sale (the "Sale") of certain assets (the "Purchased Assets") of Debtors Seton Medical Center ("Seton"),[1] Verity Holdings, LLC ("Holdings"), and VHS (together with Seton and Holdings, the "Sellers") to AHMC Healthcare Inc. ("AHMC" or the "Buyer"); (ii) approving the asset purchase agreement (the "APA") and ancillary documents attached to the Motion as Exhibit "A" by and between the Sellers and AHMC; (iii) approving procedures related to the assumption and assignment of the Assigned Contracts and Assigned Leases (as those terms are defined in the Motion, and, collectively, the "Assigned Executory Contracts"), together with the payment of Cure Costs (as such terms are defined in the Motion); (iv) waiving any stay of the effectiveness of such order; and (v) granting such other and further relief as is just and appropriate under the circumstances.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Notice and Motion, the attached Memorandum of Points and Authorities, *Declaration of Richard Adcock in Support of Emergency First-Day Motions* [Docket No. 8] (the "First-Day Decl."), the *Declaration of James M. Moloney in Support of the Debtors' Memorandum in Support of Entry of an Order: (A) Authorizing the Sale of Property Free and Clear of All Claims, Liens and Encumbrances; (B) Authorizing the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 2220] (the "Prior Moloney Decl."); the Declarations of Richard Adcock (the "Adcock Decl."), Peter C. Chadwick (the "Chadwick Decl."), and James M. Moloney (the "Moloney Decl.") filed concurrently herewith, any other admissible evidence properly brought before the Court.  In addition, the Debtors request that the

---

[1] The Purchased Assets related to Seton concern assets located at both (i) Seton Medical Center, located at 1800, 1850 and 1900 Sullivan Ave and 1500 Southgate Ave, Daly City, California (the "Hospital") and (ii) Seton Medical Center–Coastside, located at 600 Marine Blvd, Moss Beach, California (the "Coastside Campus" and, together with the Hospital, the "Seton Facilities").

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    Court take judicial notice of all documents filed with the Court in the Cases and the public

2    meetings of the County Board of Supervisors of the County of San Mateo.

3        **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

4    1(f), any party opposing or responding to the Motion must file a response (the "<u>Response</u>") with

5    the Bankruptcy Court and serve a copy of it upon the moving party and the United States Trustee

6    not later than 14 days before the date designated for the hearing.  A Response must be a complete

7    written statement of all reasons in opposition to the Motion or in support, declarations and copies

8    of all evidence on which the responding party intends to rely, and any responding memorandum of

9    points and authorities.

10        **PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-

11    1(h), the failure to file and serve a timely a Response to the Motion may be deemed by the Court

12    to be consent to the relief requested herein.

13    Dated:  March 29, 2020

14                                                              DENTONS US LLP
                                                              SAMUEL R. MAIZEL
15                                                            TANIA M. MOYRON
                                                              NICHOLAS A. KOFFROTH
16

17                                                            By    */s/ Tania M. Moyron*
                                                                    Tania M. Moyron
18
                                                              Attorneys for Verity Health Systems of
19                                                            California, Inc., et al.

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114400090\V-3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## TABLE OF CONTENTS

I.      Introduction ................................................................................................ 2

II.     Jurisdiction and Statutory Predicates ....................................................... 3

III.    Statement of Facts ...................................................................................... 3

        A.      General Background ........................................................................ 3

        B.      Marketing and Sale Efforts ............................................................ 7

                a.      Prepetition Sale Efforts ......................................................7

                b.      DIP Facility .........................................................................7

                c.      Postpetition Sale Efforts ....................................................8

                d.      The First Sale Process ........................................................8

                e.      Marketing Process 2020 ...................................................10

                f.      The AHMC APA ...............................................................10

                g.      The SGM and GMC Seton Offers ....................................13

IV.     Argument.................................................................................................. 16

        A.      This Court Has Authority Pursuant to §§ 363(b)(1) and 105(a) to Grant the
                Relief Requested. .......................................................................... 16

        B.      The Debtors Have Chosen The Highest and Best Offer For The Purchased
                Assets. ........................................................................................... 19

                a.      The Debtors Exercised Their Sound Business Judgment in
                        Selecting the AHMC Bid. .................................................19

                b.      Potential Bidders Do Not Have Standing to Challenge the Debtors'
                        Exercise of Business Judgment. .......................................21

        C.      The Court Can Approve the Sale Free and Clear of Liens, Claims,
                Encumbrances, and Interests Pursuant to § 363(f). ...................... 22

                a.      Sale Free And Clear of Liens, Claims, Interests, and Encumbrances ..........23

                b.      Sale Free and Clear of Attorney General Conditions...................................23

                c.      Transfer of the Seton Provider Agreements .................................................23

        D.      The Court Should Approve Procedures to Provide for Assumption and
                Assignment of the Sellers' Executory Contracts and Unexpired Leases. ............... 24

US_Active\114400090\V-3

E.    Waiver of the 14-Day Stay Provided under Bankruptcy Rule 6004(h) Is
Appropriate...................................................................................................... 25

V.    Conclusion.................................................................................................................. 26

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re 160 Royal Palm, LLC,*
600 B.R. 119 (Bankr. S.D. Fla. 2019) ...............................................................................20, 21

*In re Abbots Dairies of Pa., Inc.,*
788 F.2d 143 (3d Cir. 1986) ...........................................................................................17

*In re Anchorage Nautical Tours, Inc.,*
145 B.R. 637 (B.A.P. 9th Cir. 1992) ...............................................................................20

*In re Bakalis,*
220 B.R. 525 (Bankr. E.D.N.Y. 1998) .............................................................................19

*In re Del. & Hudson Ry. Co.,*
124 B.R. 169 (D. Del. 1991) ..............................................................................16, 17, 19

*In re Diplomat Constr., Inc.,*
481 B.R. 215 (Bankr. N.D. Ga. 2012) .............................................................................20

*In re Distrib. Energy Sys. Corp.,*
No. 08-11101 (KG), 2008 WL 8153631 (Bankr. D. Del. Aug. 20, 2008) ........................17

*In re Gulf States Steel, Inc. of Al.,*
285 B.R. 497 (N.D. Al. 2002) .........................................................................................20

*In re HST Gathering Co.,*
125 B.R. 466 (W.D. Tex. 1991) ......................................................................................21

*In re Integrated Res., Inc.,*
147 B.R. 650 (Bankr. S.D.N.Y. 1992) .............................................................................17

*Kabro Assocs. v. Colony Hill Assocs. (In re Colony Hill Assocs.),*
111 F.3d 269 (2d Cir. 1997) ...........................................................................................21

*Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.,*
141 F.3d 490 (3d Cir. 1998) ...........................................................................................16

*In re MF Global, Inc.,*
535 B.R. 596 (Bankr. S.D.N.Y. 2015) .......................................................................16, 17

*In re Nepsco, Inc.,*
36 B.R. 25 (Bankr. D. Me. 1983) ...................................................................................16

*In re Nuttery Farm, Inc.,*
467 F. App'x 711 (9th Cir. 2012) ....................................................................................19

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

iii

*In re Planned Sys.*,
  82 B.R. 919 (Bankr. S.D. Ohio 1988) ...................................................................16

*Stark v. Moran (In re Moran)*,
  566 F.3d 676 (6th Cir. 2009)..............................................................................22

*In re Trans World Airlines, Inc.*,
  No. 01-00056 (PJW), 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001) .................16

*In re United Healthcare Sys., Inc.*,
  200 F.3d 170 (3d Cir. 1998)...............................................................................20

*In re United Healthcare System, Inc.*,
  No. 97-1159, 1997 WL 176574 (D.N.J. Mar. 26, 1997)................................19, 20

**Statutes and Rules**

11 U.S.C. § 363(b) ...............................................................................................16

11 U.S.C. § 363(f) ..................................................................................11, 22, 23

28 U.S.C. § 157 ......................................................................................................3

28 U.S.C. § 1334 ....................................................................................................3

28 U.S.C. § 1408 ....................................................................................................3

28 U.S.C. § 1409 ....................................................................................................3

Cal. Corp. Code § 5914(a)(1) ...............................................................................15

California Code of Regulations, tit. 11, § 999.5 ....................................................23

Fed. R. Bankr. P. 6004(f)(1) .................................................................................16

Fed. R. Bankr. P. 6004(h) ..............................................................................25, 26

Local Bankruptcy Rule 6004-1(b)............................................................................3

Local Bankruptcy Rule 9013-1 ...............................................................................3

**Other Authorities**

10 Collier on Bankruptcy ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds. 16th
  ed. 2015)..................................................................................................25, 26

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

iv

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## MEMORANDUM OF POINTS AND AUTHORITIES

Verity Health System of California, Inc. ("VHS") and the above-referenced affiliated debtors, the debtors and debtors in possession (collectively, the "Debtors" or the "Verity Health System") in the above-captioned chapter 11 bankruptcy cases (the "Cases"), hereby move (the "Motion") for the entry of an order: (i) approving a private sale (the "Sale") of certain assets (the "Purchased Assets") of Debtors Seton Medical Center ("Seton"),[2] Verity Holdings, LLC ("Holdings"), and VHS (together with Seton and Holdings, the "Sellers") to AHMC Healthcare Inc. ("AHMC" or the "Buyer"); (ii) approving the asset purchase agreement (the "APA") and ancillary documents attached hereto as **Exhibit "A"** by and between the Sellers and AHMC; (iii) approving procedures related to the assumption and assignment of the Assigned Contracts and Assigned Leases (as those terms are defined in the Motion, and, collectively, the "Assigned Executory Contracts"), together with the payment of Cure Costs (as such terms are defined in the Motion); (iv) waiving any stay of the effectiveness of such order; and (v) granting such other and further relief as is just and appropriate under the circumstances.  In support of the Motion, the Debtors rely on the *Declaration of Richard Adcock in Support of Emergency First-Day Motions* [Docket No. 8] (the "First-Day Decl."), the *Declaration of James M. Moloney in Support of the Debtors' Memorandum in Support of Entry of an Order: (A) Authorizing the Sale of Property Free and Clear of All Claims, Liens and Encumbrances; (B) Authorizing the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 2220] (the "Prior Moloney Decl."); the Declarations of Richard Adcock (the "Adcock Decl."), Peter C. Chadwick (the "Chadwick Decl."), and James M. Moloney (the "Moloney Decl.") filed concurrently herewith, any other admissible evidence properly brought before the Court, and respectfully state as follows:

---

[2] The Purchased Assets related to Seton concern assets located at both (i) Seton Medical Center, located at 1800, 1850 and 1900 Sullivan Ave and 1500 Southgate Ave, Daly City, California (the "Hospital") and (ii) Seton Medical Center–Coastside, located at 600 Marine Blvd, Moss Beach, California (the "Coastside Campus" and, together with the Hospital, the "Seton Facilities").

US_Active\114400090\V-3

# I.

## INTRODUCTION[3]

The Debtors have successfully negotiated an APA with AHMC that will preserve the Seton Facilities—both the Hospital and the Coastside Campus—as operating hospitals. The APA is the product of exhaustive marketing efforts undertaken by the Debtors and their professionals after the prior sale of the Seton Facilities did not close. As a result of the Debtors' marketing efforts, the Debtors received one[4] qualified offer from AHMC, an experienced hospital operator in California that has had successes revitalizing distressed hospitals. The subsequent negotiations between the parties eventually resulted in the APA, which provides that AHMC will pay the Sellers $40 million, plus an amount equal to the cure costs for the Purchased Assets, while the Debtors' estates will retain certain accounts receivable generated prior to the closing of the Sale.

The continued operation of the Seton Facilities will serve the interests of the communities served by the Debtors, the Debtors' charitable mission, and the Debtors' estates, including of employees and trade vendors that will maintain an ongoing relationship with the Seton Facilities. Further, preservation of the Seton Facilities as operating hospitals will be critical to the State of California's (the "State") efforts to address the ongoing 2019 coronavirus ("COVID-19") pandemic and continue to provide other essential health care services to Seton's communities. Based on the foregoing, the Debtors have determined, in their business judgment, that the Sale to AHMC pursuant to the APA is in the best interests of the Debtors, their estates, creditors, stakeholders, and mission of service to the communities. As such, the Debtors respectfully request that this Court approve the Sale.

---

[3] Capitalized terms used and not defined in this Introduction have the definitions set forth elsewhere in this Motion.

[4] As set forth more fully in the Motion, the Debtors received unsolicited offers from Strategic Global Management, Inc. ("SGM") and its affiliate. The Debtors, in their business judgment, determined that any offer from SGM or its affiliates exposes their estates to significant and unacceptable risks. Further, as set forth herein, the terms of the offers yielded negative value to the Debtors' estates.

US_Active\114400090\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## II.

## JURISDICTION AND STATUTORY PREDICATES

The Bankruptcy Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The Debtors the relief requested in this Motion pursuant to §§ 105, 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"),[5] Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 6004-1(b) and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California (the "LBR").

## III.

## STATEMENT OF FACTS

### A.    General Background

1.    On August 31, 2018 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "Bankruptcy Court"). Since the commencement of their Cases, the Debtors have been operating their businesses as debtors in possession pursuant to §§ 1107 and 1108. On September 14, 2018, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors [Docket No. 197].

2.    Debtor VHS, a California nonprofit public benefit corporation, is the sole corporate member of five Debtor California nonprofit public benefit corporations that operated O'Connor Hospital, Saint Louise Regional Hospital, and St. Vincent Medical Center, and currently operates St. Francis Medical Center, the Coastside Campus and the Hospital (the subject of this Motion).

3.    As of the Petition Date, the Verity Health System operated as a nonprofit healthcare system in the State of California, with approximately 1,680 inpatient beds, six active emergency rooms, a trauma center, eleven medical office buildings, and a host of medical

US_Active\114400090\V-3

1 specialties, including tertiary and quaternary care.  *See* First-Day Decl. at ¶ 12.  The scope of the

2 services provided by the Verity Health System is exemplified by the fact that in 2017, the system

3 hospitals provided medical services to over 50,000 inpatients and approximately 480,000

4 outpatients.  *Id.*  The Verity Health System was originally established by the Daughters of Charity

5 of St. Vincent de Paul, Province of the West, to support the mission of the Catholic Church

6 through a commitment to the sick and poor.  *Id.*

7    4. Seton was originally founded as Mary's Help Hospital by the Daughters of Charity

8 of St. Vincent De Paul in 1893.  *See id.* at ¶ 39.  The original facility was destroyed in the San

9 Francisco Earthquake of 1906, and by 1912, Mary's Help Hospital reopened a new facility in San

10 Francisco.  Id.  In 1965, the Hospital was moved to its current location at 1900 Sullivan Avenue,

11 Daly City, California.  *Id.*  The Hospital was renamed Seton Medical Center in 1983, and serves

12 residents from San Francisco and San Mateo areas.  *Id.*  Seton owns the real property constituting

13 the Daly City Campus, including the Hospital, an employee parking lot, and other facilities

14 thereon.  *Id.* at ¶ 27.  Seton is exempt from federal income taxation as an organization described in

15 § 501(c)(3) of the Internal Revenue Code of 1986.  *Id.* at ¶ 21.

16    5. In addition to the Hospital, Seton operates a second campus, the Coastside Campus,

17 located at 600 Marine Boulevard, Moss Beach, California 94038.  The Coastside Campus was

18 founded as Moss Beach Rehabilitation Hospital in 1970.  *Id.* at ¶ 40.  In 1980, the City of Half

19 Moon Bay acquired ownership of the hospital and signed an agreement for Daughters of Charity

20 to manage operations of the hospital and rename it St. Catherine's Hospital.  *Id.*  In 1993, St.

21 Catherine's Hospital became Seton Medical Center Coastside as it became integrated with the

22 Hospital.  *Id.*

23    6. The Hospital and the Coastside Campus operate under one consolidated acute care

24 license, issued by the State of California Department of Public Health ("CDPH") with effective

25 date of January 1, 2020.  Seton has a single board of directors (the "Seton Board"), executive

26

27 *{continued from previous page}*

 5 All references to "§" are to sections of the Bankruptcy Code.

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114400090\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

leadership team, human resources and charity care policies, and union collective bargaining agreements. *Id.* at ¶¶ 11, 39, 40.

7.    The Hospital is currently licensed for 357 beds, comprising 250 general acute care beds, 83 skilled nursing beds, and 24 acute psychiatric beds (two of which have been placed in suspense). *See* Adcock Decl., at ¶ 6.  Of the 250 general acute care beds, 18 are designated for perinatal services (in suspense),[6] 14 for coronary care, 14 for intensive care, three for intensive care newborn nursery (in suspense), with the remaining 201 beds unspecified general acute care beds. *Id.* Seton has an emergency department with 11 rooms with 18 beds; and four surgical suites constituting an ambulatory surgical center. *Id.* It also has 10 surgical operating rooms (eight of which are active), and three cardiac catheterization labs (one of which is dedicated for endoscopic retrograde cholangiopancreatography (ERCP) used by specialist gastroenterologists). *Id.*

8.    As of the date of this Motion, the Hospital employs approximately 1172 employees, of which 411 are full time, 432 are part time, and 329 are per diem. *See* Adcock Decl., at ¶ 7.  The Hospital's employees are represented by four unions with the respective contractual obligations: (i) NUHW (Non-Nursing Service Employees); (ii) CNA (Nurses); (iii) Local 20 (Clinical Laboratory Scientists); and (iv) Local 39 (Stationary and Bio-medical Engineers).  *See* First-Day Decl., at ¶ 60.

9.    The Hospital is a jointly "obligated" party with its affiliates on approximately $461.4 million of outstanding secured debt consisting of: (a) $259.4 million outstanding tax exempt revenue bonds, Series 2005 A, G and H issued by the California Statewide Communities Development Authority (the "2005 Bonds"), which loaned the bond proceeds to certain Debtors to provide funds for capital improvements and to refinance certain tax exempt bonds previously issued in 2001 by the Daughters of Charity Health System; and (b) $202.0 million outstanding tax

---

[6] The 2020 License fails to reflect that these perinatal beds are in suspense.  Seton believes this was an inadvertent oversight.  By letter dated January 30, 2020, it has requested that CDPH update its license to correct this and other errors, including errors related to three NICU beds, two psychiatric beds and its Outpatient Joint Replacement Clinic.

exempt revenue notes, Series 2015 A, B, C, and D and Series 2017 issued by the California Public Finance Authority. *Id.* at ¶ 121.

10.    In May 2017, the California Statewide Communities Development Authority (the "CSCDA") issued $20 million of limited obligation tax exempt bonds, pursuant to the CaliforniaFIRST Clean Fund Program in five series, all with the same maturity date of September 2, 2047 (the "Clean Fund Bonds"), as the conduit issuer for the benefit and obligation of Seton. *Id.* at ¶ 124.    The purpose of the bond funding was to assist with clean energy and seismic construction efforts of Seton and are secured by Seton's voluntary agreement to special tax assessments by Daly City, California. *Id.*    No other Debtor is liable for repayment of the Clean Fund Bonds. *Id.*    Interest on the Clean Fund Bonds accrues at 6.4%. *Id.*    The special assessment runs for a period which is the shorter of 30 years or the early full defeasance of the Clean Fund Bonds. *Id.*

11.    In September 2017, the CSCDA issued an additional $20 million of limited obligation tax exempt bonds in a single series, also pursuant to the CaliforniaFIRST program, and also for the purpose of assisting with clean energy and seismic improvement construction at the Hospital ("NR2 Petros Bonds"). *Id.* at ¶ 125.    The NR2 Petros Bonds also mature on September 2, 2047 but carry an interest rate of 6.45%. *Id.*    The NR2 Petros Bonds also are secured by a special Daly City tax assessment on Seton property. *Id.*    No other Debtor is liable for repayment of the NR2 Petros Bonds. *Id.*    The special assessment runs for a period which is the shorter of 30 years or the early full defeasance of the NR2 Petros Bonds. *Id.*

12.    The Hospital has consistently lost money for many years due to, among other things, unfavorable payor contracts, rising costs of providing health care, high pension obligations and certain requirements imposed on the Hospital by the California Attorney General. *See id.* at ¶¶ 95, 99.

13.    On the Petition Date, the Hospital accounted for approximately 29% of the operating losses of the entire Verity Health System although the Hospital accounted for approximately only 17% of the net patient revenue. *See* Chadwick Decl., at ¶ 5.    Since the Petition Date, the Hospital's share of the system operating losses has required the Debtors' estates

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

6

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

to fund approximately $5 million of working capital per month, including corporate overhead allocations. *Id*. at ¶ 6. The Debtors project continuing operating losses at the Hospital. *Id*. Based on Seton's performance, the Debtors concluded that a sale to a buyer with experience revitalizing distressed hospitals offered the best alternative to maintain the Seton Facilities as operating hospitals.

**B.**    **Marketing and Sale Efforts**

    **a.**    **Prepetition Sale Efforts**

14.    Prior to the Petition Date, the Debtors engaged in substantial efforts to market and solicit interest in their assets, including the five hospitals and related assets (collectively, the "Assets"). *See* Prior Moloney Decl. at ¶ 4. In June 2018, Debtors engaged Cain Brothers, a division of KeyBanc Capital Markets ("Cain"), to assist in identifying potential buyers of some or all of the Assets and commenced discussions with those potential Buyers. *Id*. Cain prepared a Confidential Investment Memorandum and organized an online data site to share information with potential buyers and contacted strategic and financial buyers beginning in July 2018. *Id*. In this initial marketing process, Cain contacted more than 100 potential partners to evaluate their interest in exploring a transaction involving some or all of the Assets. *Id*. By August 2018, as a result of its ongoing and broad marketing process, Cain had received 11 "Indications of Interest" from potential buyers of some or all of the Assets. *Id*.

    **b.**    **DIP Facility**

15.    At the commencement of the Cases, the Debtors obtained court approval for a DIP financing facility with up to $185 million of availability from Ally Bank subject to a borrowing base (the "DIP Facility"). *See* Docket No. 409. The DIP Facility was secured by substantially all of the Debtors' assets and also provided for super priority administrative priority status for all obligations under the facility. *Id*. The DIP Facility enabled Debtors to operate the system hospitals while they continued their efforts to find a purchaser for their assets and to reach agreements with key constituents. On September 6, 2019, the Debtors received authority to pay off the DIP Facility and continue funding operations through the consensual use of cash collateral [Docket No. 3022].

### c.    Postpetition Sale Efforts

16.    Postpetition, Cain continued to work with potential buyers for some or all of the Assets. *See* Prior Moloney Decl., at ¶ 5. Based on these discussions, the Debtors determined that seeking a buyer for the Assets in Santa Clara and a separate buyer for the other Assets would most likely yield higher net proceeds for the Debtors' estates. *Id.* As a result, the sale of the Santa Clara Assets to Santa Clara County was approved by the Court on December 27, 2018 [Docket No. 1153].

17.    Thereafter, Cain focused on marketing the Debtors' remaining Assets, including the Hospital. *See* Prior Moloney Decl., at ¶ 6. As a part of this process, Cain contacted more 189 potential parties to evaluate potential stalking horse bidders for some or all of the Debtors' remaining Assets of which 92 had executed an NDA and 18 submitted written proposals. *Id.* Subsequent to receiving access to the virtual data room and being offered additional information via conference calls and site visits, many of the potential purchasers indicated that they were not interested in being the stalking horse bidder. *Id.* During November and December 2018, the Debtors and their advisors had substantial discussions with those potential buyers remaining, during which Prime Healthcare and SGM emerged as the leading potential candidates to be selected as the stalking horse bidder for the Debtors' remaining Assets. *Id.*

### d.    The First Sale Process

18.    After extensive negotiations with both parties and careful review of the proposed transactions by the Debtor and its advisors, the Debtors selected SGM as the stalking horse bidder (the "Stalking Horse Bidder") for the Debtors' remaining Assets. *Id*. at ¶ 7. On February 19, 2019, the Court held a hearing on the Sale and Bidding Procedures Motion and thereafter entered an order approving the Sale and Bidding Procedures Motion [Docket No. 1572] (the "Bidding Procedures Order"). SGM served as the Stalking Horse Bidder under the terms of the Bidding Procedures Order. The Bidding Procedures Order also approved that certain asset purchase agreement [Docket No. 2305-1] (the "SGM APA") as modified therein.

19.    Cain sent the approved bidding procedures to the 90 parties with whom the Debtor had previously executed NDAs and included the timetable for the sale of the Debtors' remaining

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Assets.  *See* Prior Moloney Decl., at ¶ 8.  Cain also requested that each party confirm that each party continued access to the data room and were interested in continuing to evaluate the purchase of some or all of the Debtors' remaining assets.  *Id.*  Nineteen of those parties confirmed that they were still evaluating the transaction and requested continued access to the data room.  *Id.*

20.    Cain facilitated due diligence by potential buyers, including arranging site visits, organizing calls with the Debtors' leadership team and facilitated follow-up from the Debtors and their advisors to address diligence requests.  *Id.* at ¶ 9.  Of these nineteen interested parties, certain parties evaluated acquiring all the Debtors' remaining Assets, others evaluated acquiring individual hospitals, and others were real estate companies that evaluated purchasing Seton to convert its campus to non-hospital uses.  *Id.*

21.    At the end of the marketing period, two parties submitted Qualified Bids (as defined in the Bidding Procedures Order), one for St. Vincent Medical Center and one for St. Francis Medical Center, one party submitted a non-Qualified Bid for St. Francis Medical Center and one party submitted a non-Qualified Bid for all of the assets.  *Id.* at ¶ 10.  No Qualified Full Bid (as defined in the Bidding Procedures Order) was received; neither was any Qualified Bid received for the Hospital.  *See* Docket No. 2053.

22.    Accordingly, under the terms of the SGM APA and the Bidding Procedures Order, no auction was held and the Debtors declared SGM as the "winning bidder" of the hospitals. Docket No. 2053, at 2.  On May 2, 2019, the Bankruptcy Court entered the *Order (A) Authorizing the Sale of Certain of the Debtors' Assets to Strategic Global Management, Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of an Unexpired Lease Related Thereto; and (C) Granting Related Relie*f [Docket No. 2306] (the "Sale Order"), approving the sale to SGM (the "SGM Sale").  Pursuant to the SGM APA, SGM agreed to continue to operate the Hospital as well as the Debtors' other three hospitals.

23.    SGM did not close the sale by December 27, 2019 and the Debtors then terminated the SGM APA.

US_Active\114400090\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

### e.    Marketing Process 2020

24.    Following the failure of the SGM Sale, Cain commenced a new marketing process to identify parties interested in acquiring the Seton Facilities.  *See* Moloney Decl., at ¶ 5.  Cain contacted select parties that had previously expressed interest in the Hospital and the Coastside Campus.  *Id*.  In addition, Cain updated the Seton Facilities Confidential Information Memorandum (CIM), which it posted to the data room on December 30, 2019.  *Id*.

25.    On January 10, 2020, two bidders submitted non-binding Indications of Interest ("IOI") to acquire the Seton Facilities as operating facilities.  *Id.* at ¶ 6.  One of the bidders submitted an IOI but, ultimately, the bidder decided not to move forward with its bid.  *Id.*

26.    The remaining bidder, AHMC, entered into substantive negotiations with the Debtors, which ultimately resulted in the APA.

### f.    The AHMC APA

27.    The AHMC APA contemplates the sale of the Purchased Assets to AHMC[7] on the following material terms:[8]

- AHMC will pay $40 million (the "Cash Consideration"), plus an amount equal to cure costs for the Purchased Assets, less amounts creditable to certain hired employees on account of paid time off. *See* Ex. A (APA § 1.1).

- AHMC will provide a good faith deposit of 20% of the Cash Consideration that, except for certain limited circumstances set forth in the APA, will be non-refundable.  *See id.* (APA § 1.2).

- AHMC will not assume any liabilities of the Sellers, and, instead, will perform and satisfy certain transferred obligations such as those under any Assigned Executory Contracts.  *See id.* (APA § 1.9).

- AHMC will designate the contracts and leases subject to assumption and assignment not later than 30 days prior to the closing date; however, AHMC will reserve the right to designate additional contracts or leases up to 14 days before

---

[7] AHMC may assign its rights and obligations under the APA to its designated affiliates or assignees as permitted by the APA.

[8] Any summary of the terms of the APA contained in this Motion is qualified in its entirety by reference to the provisions of the APA.  In the event of any inconsistencies between the provisions of the APA and any summaries set forth herein, the terms of the APA shall govern.

US_Active\114400090\V-3

closing and the Sellers reserve the absolute right to remove contracts and leases from such designation to preserve avoidance claims. *See id.* (APA § 1.11(a)).

- The Sellers will pay cure costs to counterparties of Assigned Executory Contracts from the purchase price. *See id.* (APA § 5.8).

- The Sellers will retain all accounts receivable generated or allocable to patient services prior to closing, excluding certain post-closing receipts of Measure B trauma funding, California QAF Program payments and disproportionate share funding. *See id.* (APA § 1.8(g)).

- The closing of the Sale will take place no later than five business days following the satisfaction or waiver of all conditions to closing set forth in the APA. *See id.* (APA § 1.3).

- Among the conditions to closing are: (i) entry of an order approving the Sale with a finding that AHMC is a good faith purchaser pursuant to § 363(m), *see id.* (APA § 8.1); (ii) approval of settlement agreements authorizing the transfer of Seton's Medi-Cal and Medicare provider agreements to AHMC, *see id.* (APA § 8.6); and (iii) (a) imposition of conditions by the Attorney General that are substantially consistent with the conditions set forth in Schedule 8.5 to the APA, or (b) entry of an order finding that any additional conditions are an "interest in property" for purposes of § 363(f) and that the Purchased Assets can be sold free and clear of any such additional conditions, *see id.* (APA § 8.5). With respect to the Attorney General closing condition, the condition is satisfied if the Debtors obtain an unstayed Court order authorizing the Sale free and clear of any additional conditions within 30 days from the Attorney General's imposition of such additional conditions. *See id.*

- The APA may be terminated by either party if, among other things, (a) a Sale Order is not entered by August 1, 2020, *see id.* (APA § 9.1(f)), or (b) if a closing has not occurred by September 1, 2020, *see id.* (APA § 9.1(g)).

- Upon the closing, and given certain regulatory approval processes applicable to the Sale, the Purchased Assets will be sold to AHMC and immediately leased back to the Sellers pursuant to an leaseback agreement with a concurrent management arrangement until such time as AHMC obtains an effective general acute care hospital license and hospital pharmacy permit. *See id.* (APA § 1.3, Exs. 1.3(a) & 1.3(b)).

28.    Importantly, AHMC is aware of the *Agreement with the State of California in Response to the COVID-19 Healthcare Emergency to Provide Certain Healthcare Services at Seton Medical Center* approved by this Court on March 20, 2020 [Docket No. 4315] (the "Services Agreement"). AHMC intends to cooperate with the State in order to achieve an

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114400090\V-3

1  assignment of the Services Agreement in accordance with Clause 1.1 of the Additional Provisions

2  Addendum contained in the Service Agreement..

3      29.    Additionally, the continued operation of the Seton Facilities will serve the interests

4  of the communities served by the Debtors, the Debtors' charitable mission, and the Debtors'

5  estates, including of employees and trade vendors that will maintain an ongoing relationship with

6  the Seton Facilities.   The Board of Supervisors for the County of San Mateo (the "<u>Board of

7  Supervisors</u>") held emergency meetings concerning the status of Seton on March 4, March 6, and

8  March 10.   Community members gave hours of comment in unequivocal support of efforts to

9  maintain the Seton Facilities as operating hospitals.[9]   As a result of the meetings, on March 10,

10 2020, the Board of Supervisors voted to provide $20 million in seismic assistance funding for a

11 purchaser of the Seton Facilities as operating hospitals.  *See* San Mateo Cty. Bd. of Supervisors,

12 *Special Meeting of the Board of Supervisors*, County of San Mateo (Mar. 10, 2020),

13 https://sanmateocounty.legistar.com/MeetingDetail.aspx?ID=769850&GUID=9918C61F-BD9A-

14 47FB-8DE4-FB1CC1803142&Options=&Search=.

15     30.    The Debtors have exchanged communications with the California Attorney General

16 (the "<u>Attorney General</u>") to request expedited review of the proposed AHMC Sale, including in

17 connection with the negotiation of the Services Agreement.   Although the Attorney General has

18 not offered any commitments, the Debtors will continue to urge the Attorney General to review

19 and approve the Sale expeditiously to limit delay, uncertainty and further cash losses associated

20 with that process.

21

22

23

24 [9] *See* San Mateo Cty. Bd. of Supervisors, *San Mateo County Meeting on Seton Medical Center*,
   YOUTUBE, (Mar. 4, 2020), https://www.youtube.com/watch?v=jkB4M_h1Mt8; San Mateo Cty.

25 Bd. of Supervisors, *San Mateo County Meeting on Seton Medical Center*, YOUTUBE (Mar. 6,
   2020), https://www.youtube.com/watch?v=ssxtyBZfyP0; San Mateo Cty. Bd. of Supervisors,

26 *Special Meeting of the Board of Supervisors*, COUNTY OF SAN MATEO (Mar. 10, 2020),
   https://sanmateocounty.legistar.com/MeetingDetail.aspx?ID=769850&GUID=

27 9918C61F-BD9A-47FB-8DE4-FB1CC1803142&Options=&Search=.

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114400090\V-3

g.    **The SGM and GMC Seton Offers**

31.    On February 13, 2020, SGM submitted an unsolicited "Offer to Purchase" (the "SGM Seton Offer").  The SGM Seton Offer proposed the acquisition of the Seton Facilities for "Sixty Million Dollars ($60,000,000.00) cash at Closing."  *See* Adcock Decl., Ex. 1.  The SGM Seton Offer was subject to certain closing conditions, including transfer of Seton's Medi-Cal and Medicare provider agreements free and clear of successor liability and California Attorney General approval, and provides for a seven-day due diligence period.  *See id.*

32.    On February 25, 2020, SGM submitted an unsolicited "Offer to Purchase" (the "SGM System Offer") the "four properties that are the subject of the Verity-SGM APA."  *See id.* The SGM System Offer requested that the Debtors "give our proposal serious consideration" and provide input on the Debtors' intention to, among other things, "[q]ualify SGM as a bidder for St. Francis."  *Id.*

33.    On March 6, 2020, an entity named "Global Medical Center San Mateo County, LLC, wholly owned by Dr. Kali P. Chaudhuri"[10] ("GMC") submitted an unsolicited "Offer to Purchase Seton Assets" (the "GMC Seton Offer").  *See id.*  The GMC Seton Offer proposes the acquisition of the Seton Facilities for "Fifty Million Dollars ($50,000,000.00) cash at Closing"— $10 million less than the $60 million SGM Seton Offer.  *See id.*  The GMC Seton Offer is subject to certain closing conditions, including transfer of Seton's Medi-Cal and Medicare provider agreements free and clear of successor liability and California Attorney General approval, and provides for a seven-day due diligence period.  *See id.*  The GMC Seton Offer purports to withdraw the SGM Seton Offer on behalf of SGM.  *See id.*

34.    SGM and GMC have repeatedly set forth their intention to bid on the Purchased Assets.  On March 16, 2020, SGM filed its *Strategic Global Management, Inc.'s Reply Brief Re: "Order Setting Briefing Schedule To Determine Whether Strategic Global Management Should Be Disqualified From Participating In The Auction"* [Docket No. 4278] wherein SGM argued that,

---

[10] In an irony not lost on the Debtors, KPC Global Medical Center San Mateo County, LLC was the Seton acquisition entity originally formed for the failed SGM Sale.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114400090\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   although the "sale of Seton [was] not presently before the court [sic]" it should be allowed to bid

2   on the Seton assets.  *Id.*, at 2, lines 20-24.  On March 25, 2020, GMC filed a *Notice of Intent to*

3   *Bid on Seton Assets and Request for Opportunity to Bid* [Docket No. 4347] (the "GMC Notice").

4   GMC did not set the GMC Notice for hearing or make any affirmative request for relief.  *See*

5   GMC Notice at 2 (recognizing that "the issue of how or when a Seton sale will be conducted is not

6   currently before the Court").   Nevertheless, GMC restated its intention to bid on the Seton

7   Facilities and suggested that it would challenge any sale process in which it is precluded from

8   bidding. *See id.*

9        35.    The Debtors determined that the GMC Seton Offer (or any other bid from SGM, its

10  insiders, or affiliates) is subject to significant and unacceptable risks given the Debtors' history

11  and course of dealing with SGM and related parties over the period of nearly one year in

12  connection with the SGM Sale.  *See* Adcock Decl. at ¶ 11; *see also* Docket No. 3784 (authorizing

13  the Debtors to undertake an alternative disposition of the Seton Facilities following the SGM

14  Sale).  The Debtors also considered this issue in connection with SGM's request for access to the

15  virtual data room related to St. Francis Medical Center, which the Debtors declined to permit.  *See*

16  Adcock Decl. at ¶ 12 (declining request and explaining that "[a]fter my course of dealing with

17  KPC, it is clear to me that entering into a new process with KPC would be an irresponsible

18  decision and proposes, among other things, significant risks and harm to these estates").   In

19  addition, the Debtors are in litigation with SGM concerning its conduct related to the SGM Sale

20  (the "Adversary Proceeding").  *See* Adv. Case No. 2:20-ap-01001-ER, Adv. Docket No. 1.  In a

21  short timeframe, SGM has filed four appeals of orders entered in these Cases, a motion to

22  withdraw the reference of the Adversary Proceeding to the District Court, and a motion to stay the

23  Adversary Proceeding.  *See* Docket Nos. 3726, 3727, 3746; Adv. Docket No. 50.

24       36.    Additionally, the "offers" reflect that even now SGM (and its affiliate, GMC) is not

25  prepared to close a transaction.  The offers each contain a 7 day due diligence period (after more

26  than a year of allegedly conducting due diligence on the Purchased Assets) and multiple

27  conditions to closing.  *See id.* at. Ex. 1.  The proposed conditions include undefined "customary

28  closing conditions," which would likely result in extensive negotiations.  *See id.*  Negotiations

1  with SGM and its principals in connection with the SGM Sale were difficult and time consuming.

2  *See id.* at ¶ 16.  Additionally, GMC proposes to use the same form of agreement that gave rise to

3  the morass of business disputes and appeals regarding Attorney General conditions, material

4  adverse changes and closing requirements.  *See id.* at Ex. 1 ("The previous purchase agreement

5  between Verity and SGM dated January 8, 2019, shall serve as a model for a Definitive

6  Agreement, appropriately tailored to refer only to the Seton Assets.").

7        37.  GMC suggests that it could close a transaction more quickly than alternative

8  bidders because, among other things, "the Attorney General's conditions to the approval of the

9  sale to SGM, Buyer's affiliate, pertaining to Seton, are acceptable to Buyer."  *See id.* at Ex. 1.

10  However, GMC fails to point out that those approvals were only in connection with the SGM Sale.

11  *See* Docket No. 3611 (approving sale free and clear of certain additional conditions "[s]olely and

12  exclusively for purposes of the [SGM] APA").  The Debtors only obtained those approvals only

13  after a hard-fought legal battle that compelled the Attorney General to stipulate to entry of an

14  order agreeing to the conditions insisted upon by SGM, only to see SGM appeal that order.

15  Moreover, SGM is well aware that because this transaction is materially different from the

16  transaction previously approved by the Attorney General, a new review is required by California

17  statute.  *See* Cal. Corp. Code § 5914(a)(1) (requiring notice and review "prior to entering into

18  any agreement or transaction" covered by the statute).

19        38.  Based on the foregoing, when the Debtors valued the SGM Seton Offer and the

20  GMC Seton Offer, the Debtors determined that they yielded negative value given the risk that

21  SGM, or its affiliate GMC, will not close (again), the operating losses that would be incurred

22  during the regulatory review and approval of the sale, and the risk of a tax remediation issue

23  arising from the assumption of liabilities.  *See* Chadwick Decl. at ¶ 6.

24

25

26

27

28

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

15

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**IV.**

**ARGUMENT**

**A.    This Court Has Authority Pursuant to §§ 363(b)(1) and 105(a) to Grant the Relief Requested.**

"The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363.  Although sales may be conducted through an auction, that is not required.  Rather, "[a]ll sales not in the ordinary course of business may be *by private sale* or by public auction."  FED. R. BANKR. P. 6004(f)(1) (emphasis added); *see also Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 498 (3d Cir. 1998); *In re Trans World Airlines, Inc.*, No. 01-00056 (PJW), 2001 WL 1820326, at *4   (Bankr. D. Del. Apr. 2, 2001) ("[I]t is worth noting that a § 363(b) sale transaction does not require an auction procedure.    The auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").  As set forth in *In re Nepsco, Inc.*, 36 B.R. 25, 26-27 (Bankr. D. Me. 1983):

> [C]urrent Bankruptcy Rule [6004(f)(1)] provides that *all* sales not in the ordinary course of business may be private or by public auction. If the sale is private, all creditors receive notice of the terms and conditions of the sale and the time fixed for filing objections. [] If no objections are filed, the trustee may proceed with the sale without either a hearing or a court order. []  Clearly, the thrust of this statutory scheme is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, *i.e.*, the creditors of the estate.   This scheme also promotes Congress' intent of keeping bankruptcy judges out of the administrative aspect of bankruptcy cases . . . .

As a general proposition, "[t]he proper standard for determining in the first instance if a proposed sale should be ordered is whether such sale is in the best interest of the estate."  *In re Planned Sys.*, 82 B.R. 919, 923 n.2 (Bankr. S.D. Ohio 1988).

In reviewing the proposed sale, the Court should apply a "business judgment" standard whereby the Debtors are required to show "there is a sound business purpose for conducting the sale prior to confirmation of a plan."  *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 175-76 (D. Del. 1991); *see, also, In re MF Global, Inc.*, 535 B.R. 596, 605 (Bankr. S.D.N.Y. 2015) ("A trustee generally satisfies the business judgment standard if he 'acted on an informed basis, in good faith

and in the honest belief that the action taken was in the best interests of the company.'") (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)); *In re Abbots Dairies of Pa., Inc.*, 788 F.2d 143 (3d Cir. 1986).

Under the "sound business purpose" test, the Bankruptcy Court for the District of Delaware has looked at the following factors: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value." *Del. & Hudson Ry. Co.*, 124 B.R. at 176. "Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith." *Id.*

The bankruptcy court in *In re Del. & Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991), addressed whether a proposed sale of the assets of a railroad was in the sound business judgment of the debtor. The court also noted the following factors weighing in favor of finding that the assets had been sold for a fair and reasonable purchase price: "the extensive solicitation of bids by the Trustee; the negotiations with several prospective purchasers; and the Trustee's testimony that the [buyer's] offer was the best offer for [the debtor's] assets." *Id.* at 179; *see, also, In re Distrib. Energy Sys. Corp.*, No. 08-11101 (KG), 2008 WL 8153631, at *1 (Bankr. D. Del. Aug. 20, 2008) (finding without elaboration that a private sale of debtors' assets was "in the best interests of the Debtors, their estates and creditors and all other parties in interest").

In *In re MF Global, Inc.*, 535 B.R. 596 (Bankr. S.D.N.Y. 2015), the bankruptcy court approved a private sale of assets under the business judgment standard where only a single purchaser expressed interest in purchasing the assets and it was familiar with the rights which it would be assigned. *Id.* at 606. The trustee also demonstrated, among other things, that the interested parties received adequate and reasonable notice and both parties to the sale proceeded in good faith. Consequently, the court found that the trustee and debtor had presented

17

"uncontroverted evidence" that the private sale "reflects the appropriate exercise of their sound business judgment" where the agreement was negotiated extensively, no party objected to the proposed sale, and there was no dispute about the adequacy of the consideration.

Under the foregoing factors, the Debtors have satisfied the "sound business judgment" standard in determining that the AHMC APA is in the best interests of the Debtors, their estates, and stakeholders:

- The Debtors will receive $40 million, plus an amount equal to cure costs, that will offer substantial recovery to the Debtors' estates and preserve ongoing employee and trade vendor relationships at the Seton Facilities.

- The Debtors will retain all accounts receivable generated or allocable to patient services prior to closing, excluding certain post-closing receipts of Measure B trauma funding, California QAF Program payments and disproportionate share funding.

- Nineteen months have elapsed since the Debtors filed the Cases, during which the Debtors have engaged in two thorough marketing efforts for the Seton Facilities.

- The Debtors anticipate that the Committee, the Debtors' Prepetition Secured Creditors, the State, and the Board of Supervisors support a sale of the Seton Facilities as operating hospitals.

- The sale of the Seton Facilities will serve the Debtors' charitable mission by transferring the Seton Facilities to a proven operator of hospitals with a positive record of rehabilitating hospitals.

- AHMC is committed to addressing the COVID-19 health care emergency by continuing to partner with the State after a close of the Sale.

- The "all cash" structure of the transaction minimizes the risk of remediation claims arising from the Debtors' potential failure to defease the tax exempt financing supporting the Seton Medical Center improvements.

- AHMC has shown the financial ability to close this transaction.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

18

1  Accordingly, the proposed Sale is in the best interests of the Debtors, their estates, and

2  stakeholders.

3      The Purchased Assets will be sold for a "fair and reasonable purchase price."  The Debtors

4  engaged in two thorough marketing processes for the Purchased Assets—one that resulted in the

5  SGM APA and the most recent efforts resulting in the AHMC APA.  SGM did not close the SGM

6  Sale, and, in connection with the instant Sale process, AHMC was the only bidder (other than

7  SGM and GMC) that submitted a bid for the Purchased Assets as operating hospitals.  *See Del. &*

8  *Hudson Ry. Co.*, 124 B.R. at 179 (holding a sale is for a "fair and reasonable purchase price" if the

9  evidence demonstrates "the extensive solicitation of bids by the Trustee; the negotiations with

10  several prospective purchasers; and . . . testimony that the . . . offer was the best offer for [the]

11  assets").  In light of the thorough review of offers and alternatives, the Debtors, in consultation

12  with the Committee and the Prepetition Secured Creditors, have concluded that the AHMC Sale

13  will maximize value for the Debtors' estates.

14  **B.**    **The Debtors Have Chosen The Highest and Best Offer For The Purchased Assets.**

15      **a.**    **The Debtors Exercised Their Sound Business Judgment in Selecting the**

16          **AHMC Bid.**

17      The Seton Board's, the VHS board of directors' (the "VHS Board" and, together with the

18  Seton Board, the "Boards"), and the Debtors' "management of the procedural details surrounding

19  bidding and sale are 'ultimately a matter of discretion that depends upon the dynamics of the

20  particular situation.'"  *In re Nuttery Farm, Inc.*, 467 F. App'x 711, 712 (9th Cir. 2012).  Therefore,

21  the Debtors are "entitled to exercise their 'business judgment' in deciding which bid to accept, and

22  this business judgment is entitled to 'great judicial deference.'"  *In re Bakalis*, 220 B.R. 525, 532

23  (Bankr. E.D.N.Y. 1998).  Based on the facts discussed above, the Debtors and the Boards

24  determined that the SGM Seton Offer and GMC Seton Offer were not better bids than the AHMC

25  bid because, among other things, SGM (and its affiliate, GMC) were unlikely to close the

26  transaction, and, therefore, unlikely to continue Seton's long history of providing care to the

27  community and fulfilling the Debtors' charitable mission.  *See* Adcock Decl. ¶ 15; *see also In re*

28  *United Healthcare System, Inc.*, 1997 WL 176574, at *5 (D.N.J. Mar. 26, 1997) ("The officers and

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

19

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1   directors of a nonprofit organization are charged with the fiduciary obligation to act in furtherance

2   of the organization's charitable mission.").[11]

3        Even if SGM or GMC superficially offered greater monetary value, courts have noted that

4   "while a debtor has a duty to 'maximize the return to a bankruptcy estate,' which 'often does

5   require [the] recommendation of the highest monetary bid, overemphasis of this usual outcome

6   overlooks a fundamental truism, *i.e.*, a 'highest' bid is not always the 'highest and best' bid.  The

7   inclusion of 'best' in that conjunction is not mere surplusage." *In re 160 Royal Palm, LLC*, 600

8   B.R. 119, 129 (Bankr. S.D. Fla. 2019) (citing *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y.

9   1998)); *In re Diplomat Constr., Inc.,* 481 B.R. at 218–19 ("The highest bid does not always equate

10  to the best bid for the estate."); *In re Gulf States Steel, Inc. of Al.*, 285 B.R. 497, 516 (N.D. Al.

11  2002) ("[C]ourts have authorized the acceptance of the lower of competing bids because the lower

12  bid provides greater benefit to the estate than the higher bid.").  In this circumstance, the Boards

13  may, for example, refuse to consider bids from bidders because they may consider, among other

14  factors, their duty to maximize value to the creditors, "considerations such as finality, stability,

15  and expeditious resolution of the bankruptcy proceeding." *In re 160 Royal Palm, LLC*, 600 B.R.

16  119, 130 (Bankr. S.D. Fla. 2019).

17       The Boards may consider "concerns about the uncertainty of the offer" in deciding whether

18  to accept a bid. *Id.*, at 129.  In *Royal Palm*, for example, the court accepted the debtor's business

19  _____

20  [11] Courts interpreting the duties of a director for a for-profit corporation have held that the duties
     before and after insolvency are essentially the same: to attempt to preserve and grow corporate

21  value (before bankruptcy for equity, in bankruptcy for creditors).  *In re Anchorage Nautical
     Tours, Inc.,* 145 B.R. 637 (B.A.P. 9th Cir. 1992) (citing *In re Crouse Group, Inc.*, 75 B.R. 553,

22  557-58 (Bankr. E.D. Pa. 1987); *In re Clu Dev. & Mgmt.*, 27 B.R. 610, 612 (B.A.P. 9th Cir. 1982));

23  *see also In re United Healthcare Sys., Inc.,* 200 F.3d 170, n.9 (3d Cir. 1998) ("United Healthcare,
     as a debtor-in-possession, is a fiduciary for its estate and for its creditors.").  In the context of a

24  non-profit, therefore, the duties of a director before and after insolvency should also include the
     duty to further the charitable mission of the corporation (called the Duty of Obedience).

25  Insolvency does not eliminate that duty for directors of a nonprofit.  *In re United Healthcare Sys.,
     Inc.,* 1997 WL 176574, at *5 ("[c]ourt must not only weigh the financial aspects of the transaction

26  but also look to the countervailing consideration of a public health emergency.").  While it is true
     that commencing a bankruptcy case creates a fiduciary duty to creditors, the Boards must therefore

27  balance the duty to creditors with the duty to the charitable mission.

28

US_Active\114400090\V-3

1  judgment in not accepting a higher offer in part because the higher offer was made by a party with

2  which the debtor had previously "sought a settlement and sale . . . in the past, which fell through,

3  because [the prospective buyer] defaulted." *Id.* Further, in *Royal Palm* the debtor considered "the

4  fear of additional litigation" as a valid concern allowing the debtor to take a lower offer, saying

5  that "the avoidance of litigation is a legitimate business objective." *Id*. at 130. All of these factors

6  are present here and were part of the analysis done by the Boards in arriving at their business

7  judgment to select the AHMC offer.

8       Additionally, as the Court is aware, the Debtors incur substantial monthly losses from

9  operations at the Seton Facilities. *See* Chadwick Decl. at ¶ 5. Although the payments under the

10  Services Agreement will reduce losses in the short term, the Debtors are cognizant that any delay

11  in the closing risk that the estates will continue to incur substantial losses. *See id*. The foregoing,

12  is an important consideration in weighting the economic value of any bid by SGM or GMC.

13  SGM's pattern and practice of delay in the prior SGM Sale raise serious and substantive concerns

14  that a delayed closing under the SGM Seton Offer or GMC Seton Offer would cause the estates to

15  incur additional losses.

16       **b.     Potential Bidders Do Not Have Standing to Challenge the Debtors' Exercise of**

17       **Business Judgment.**

18       SGM and GMC do not have standing to challenge the Debtors' conclusion that the AHMC

19  offer is the highest and best or the Debtors' determinations of the risks associated with the SGM

20  Seton Offer or GMC Seton Offer. "[T]he statutes governing the sale of assets of bankruptcy

21  estates are intended to protect the creditors of such estates and not prospective purchasers." *In re*

22  *HST Gathering Co.*, 125 B.R. 466, 468 (W.D. Tex. 1991). A potential bidder, such as SGM and

23  GMC, "is not within the 'zone of interests intended to be protected' under the bankruptcy statutes

24  and regulations." *Id.* Thus, SGM and GMC lack standing to contest any decision precluding

25  SGM or GMC from the bidding process or sale process because they are "not a person whose

26  interest was intended to be protected by the bankruptcy statutes or regulations." *Id.*; *see also*

27  *Kabro Assocs. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 273 (2d Cir.

28  1997) ("[A]n unsuccessful bidder—whose only pecuniary loss is the speculative profit it might

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

21

1    have made had it succeeded in purchasing property at an auction—usually lacks standing to

2    challenge a bankruptcy court's approval of a sale transaction."); *Stark v. Moran (In re Moran)*,

3    566 F.3d 676, 682 (6th Cir. 2009) ("A frustrated bidder lacks bankruptcy appellate standing when

4    he merely alleges that he would have profited from his desired purchase, and does not allege, for

5    instance, that fraud or impropriety prevented the estate from accepting his higher bid such that

6    creditors would not receive as great a recovery as they would have had the estate accepted the

7    higher bid."). Accordingly, the Court should overrule any objection from SGM or GMC—

8    including the GMC Notice—on the grounds that SGM or GMC are entitled to participate in the

9    Sale process or contest the Debtors' risk assessment associated with the SGM Seton Bid or GMC

10   Seton Bid.

11   **C.    The Court Can Approve the Sale Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to § 363(f).**

12

13        Section 363(f) states:

14            The Trustee may sell property under subsection (b) … of this
             section free and clear of any interest in such property of an entity
15           other than the estate, only if -

16        (1)    applicable nonbankruptcy law permits sale of such property
                 free and clear of such interest;
17

18        (2)    such entity consents;

19        (3)    such interest is a lien and the price at which such property is
                 to be sold is greater than the aggregate value of all liens on
20               such property;

21        (4)    such interest is in a bona fide dispute; or

22        (5)    such entity could be compelled, in a legal or equitable
                 proceeding, to accept a money satisfaction of such interest.

23   In accordance with § 363(f), the transfer of the Purchased Assets to AHMC will be a legal, valid,

24   enforceable and effective transfer of the Purchased Assets, and will vest AHMC with all right,

25   title, and interest in the Purchased Assets free and clear of all liens, claims, encumbrances and

26   interests.

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114400090\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

### a.    Sale Free And Clear of Liens, Claims, Interests, and Encumbrances

The Debtors will sell the Purchased Assets to AHMC free and clear of any and all liens, claims, interests and encumbrances, including claims of secured creditors (which includes the claims of the Prepetition Secured Creditors), but on the condition such any such lien, claim, interest or encumbrance, will attach to the proceeds of the Sale in the same validity, priority, and amount that the lien, claim, interest or encumbrance held in the Purchased Assets, and subject to the secured creditors' rights with respect to allocation of such proceeds.

### b.    Sale Free and Clear of Attorney General Conditions

The Court can approve the Sale free and clear of any conditions imposed by the Attorney General that are inconsistent (the "Additional Conditions") with the conditions to which AHMC agreed in the APA.  As AHMC is a for-profit entity, the Sale will be subject to the Attorney General's review pursuant to California Corporations Code, §§ 5914 *et seq.*, and the California Code of Regulations, title 11, § 999.5.  AHMC has agreed to accept the majority of the conditions the Attorney General sought to impose on the transfer of the Seton Facilities in connection with the SGM Sale.  *See* APA § 8.5, Sched. 8.5.  However, AHMC has required, as a condition to closing the Sale, that the Attorney General not impose Additional Conditions or, alternatively, that the Debtors obtain an order confirming that the Sale is free and clear of any Additional Conditions.  *See* APA § 8.5.  Therefore, in the event the Attorney General seeks to impose Additional Conditions, the Debtors reserve their rights to seek enforcement of an order approving the Sale and finding that the Sale is free and clear of such Additional Conditions pursuant to § 363(f) and the limitations of the Attorney General's authority to impose such Additional Conditions under applicable California law.

### c.    Transfer of the Seton Provider Agreements

AHMC's obligation to close the Sale is further conditioned on the Debtors obtaining settlements concerning the transfer of the Seton Medicare and Medi-Cal provider agreements (collectively, the "Provider Agreements") with the Centers for Medicare and Medicaid Services ("CMS") and the California Department of Health Care Services ("DHCS").  *See* APA § 8.6.  Given the expedited nature of the relief requested herein, the Debtors have yet to engage in these

US_Active\114400090\V-3

settlement discussions, which they anticipate will begin in earnest upon the filing of this Motion. Although the Debtors anticipate these negotiations will be fruitful, the Debtors reserve their rights to seek an order authorizing the Debtors to transfer the Provider Agreements to AHMC free and clear of any interests asserted by CMS or DHCS consistent with the requirements of the APA.

**D.**     **The Court Should Approve Procedures to Provide for Assumption and Assignment of the Sellers' Executory Contracts and Unexpired Leases.**

As part of the Sale, the Debtors also seek to assume and assign certain of their executory contracts (the "Assigned Contracts") and unexpired leases (the "Assigned Leases") pursuant to § 365.  Given the expedited nature of the relief sought by this Motion, the Debtors request that the Court approve the Sale and the APA subject to the following procedures to provide sufficient notice to counterparties to the Assigned Executory Contracts.

The Assigned Executory Contracts will be those contracts and leases that the Debtors believe may be assumed and assigned as part of the orderly transfer of the Purchased Assets; provided, that AHMC may choose to exclude (or to add) contracts or leases to the list of Assigned Executory Contracts, subject to notice to the counterparties to any Assigned Executory Contracts which are added.

The Debtors will file with the Court and serve a cure notice, substantially in the form attached hereto as **Exhibit "B"** (the "Cure Notice"), (along with a copy of this Motion) upon each counterparty to the Assigned Executory Contracts.  The Cure Notice will state the date by which any objection (an "Assumption Objection") to the assumption and assignment of Assigned Executory Contracts (including the Cure Amount (defined below)) must be filed and served and the date, time and place of a hearing on such Assumption Objections (the "Assumption Objection Hearing").  The Cure Notice also will identify the amounts, if any, that the Debtors believe are owed to each counterparty to an Assigned Executory Contract in order to cure any defaults that exist under such contract (the "Cure Amounts").  The Debtors respectfully request that the Court set (i) **April 29, 2020,** as the deadline for the Debtors to file and serve the Cure Notice, (ii) **May 6, 2020, at 5:00 p.m. (Pacific Time)**, as the deadline for counterparties to file and serve Assumption

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Objections, and (iii) **May 20, 2020, at 10:00 a.m. (Pacific Time)** as the Assumption Objection Hearing.

If a contract or lease is assumed and assigned pursuant to Court Order, then unless the Assigned Executory Contract counterparty properly files and serves an Assumption Objection, the Assigned Executory Contract counterparty will receive at the time of the Closing of the Sale (or as soon as reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any. If an objection is filed by a counterparty to an Assigned Executory Contract, the Debtors propose that such objection must set forth a specific default in the executory contract or unexpired lease, claim a specific monetary amount that differs from the amount, if any, specified by the Debtors in the Cure Notice, and set forth any reason why the counterparty believes the executory contract or unexpired lease cannot be assumed and assigned to AHMC.

The inclusion of a contract, lease, or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such contract, lease, or other agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights with respect thereto shall be reserved.  The Debtors reserve the right to remove any Assigned Executory Agreements from those listed on the Cure Notice at any time prior to the closing of the Sale.

Except to the extent otherwise provided in the APA, the Debtors and the Debtors' estates shall be relieved of all liability accruing or arising after the assumption and assignment of the Assigned Executory Contracts pursuant to § 365(k).

**E.**    **Waiver of the 14-Day Stay Provided under Bankruptcy Rule 6004(h) Is Appropriate.**

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court order, unless the Court orders otherwise.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  *See* 10 COLLIER ON BANKRUPTCY ¶ 6004.11 at 6004-26 (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2015).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes relating thereto are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen day

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

25

1    period, the leading treatise on bankruptcy suggests that the stay period should be eliminated to

2    allow a sale or other transaction to close immediately "where there has been no objection to the

3    procedure." *Id.* at 6004-22.

4        For the reasons discussed above, the Debtors believe that it is critically important that the

5    Debtors consummate the Sale without delay in light of, among other things, their well-documented

6    financial condition and the continuing need for access to high quality health care at the Seton

7    Facilities, particularly during the COVID-19 public health emergency.  Based on the foregoing,

8    the Debtors respectfully requests that the Court waive the 14-day stay period set forth in

9    Bankruptcy Rule 6004(h) to permit the Sellers and AHMC to enter into the APA and begin the

10   process of closing the Sale immediately upon entry of an order granting this Motion.

**V.**

**CONCLUSION**

13       For all the foregoing reasons and such additional reasons as may be advanced at or prior to

14   the hearing regarding this Motion, the Debtors request entry of an order: (i) approving the Sale of

15   the Purchased Assets of the Sellers to AHMC; (ii) approving the APA and ancillary documents by

16   and between the Sellers and AHMC; (iii) approving procedures related to the assumption and

17   assignment of Assigned Executory Contracts; (iv) waiving any stay of the effectiveness of such

18   order; and (v) granting such other and further relief as is just and appropriate under the

19   circumstances.

20   Dated:  March 29, 2020                    **DENTONS US LLP**
                                               SAMUEL R. MAIZEL
21                                             TANIA M. MOYRON
                                               NICHOLAS A. KOFFROTH
22

23                                             By     */s/ Tania M. Moyron*

24                                             Attorneys for Verity Health System of
                                               California, Inc., *et al.*
25

26

27

28

US_Active\114400090\V-3

1

**DECLARATION OF RICHARD G. ADCOCK**

2

I, Richard G. Adcock, hereby state and declare as follows:

3

1.    I submit this declaration (the "Declaration") in support of the *Debtors' Notice of*

4

*Motion and Motion to Approve Terms and Conditions of a Private Sale of Certain of the Debtors'*

5

*Assets Related to Seton Medical Center to AHMC Healthcare Inc.* (the "Motion"),[12] which seeks

6

entry of an order authorizing the Debtors to: (i) approving a private sale (the "Sale") of certain

7

assets (the "Purchased Assets") of Debtors Seton Medical Center ("Seton"),[13] Verity Holdings,

8

LLC ("Holdings"), and VHS (together with Seton and Holdings, the "Sellers") to AHMC

9

Healthcare Inc. ("AHMC" or the "Buyer"); (ii) approving the asset purchase agreement (the

10

"APA") and ancillary documents attached to the Motion as Exhibit "A" by and between the

11

Sellers and AHMC; (iii) approving procedures related to the assumption and assignment of the

12

Assigned Contracts and Assigned Leases (as those terms are defined in the Motion, and,

13

collectively, the "Assigned Executory Contracts"), together with the payment of Cure Costs (as

14

such terms are defined in the Motion); (iv) waiving any stay of the effectiveness of such order; and

15

(v) granting such other and further relief as is just and appropriate under the circumstances.

16

2.    I am the Chief Executive Officer ("CEO") of Verity Health System of California,

17

Inc. ("VHS"). I became VHS' CEO effective January 2018. Prior thereto, I served as VHS' Chief

18

Operating Officer ("COO") beginning in August 2017. In my roles as COO and CEO at VHS, I

19

have become intimately familiar with all aspects of the Debtors as well as those affiliated entities

20

that are not in bankruptcy.

21

22

23

24

[12] Unless otherwise defined, capitalized terms used herein shall have the same meaning as in the Motion.

25

26

[13] The Purchased Assets related to Seton concern assets located at both (i) Seton Medical Center, located at 1800, 1850 and 1900 Sullivan Ave and 1500 Southgate Ave, Daly City, California (the "Hospital") and (ii) Seton Medical Center–Coastside, located at 600 Marine Blvd, Moss Beach, California (the "Coastside Campus" and, together with the Hospital, the "Seton Facilities").

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114400090\V-3

3.     I have been serving as the CEO of Seton since August 2019.  In this capacity, I have gained valuable insight into the Hospital's operations as well as the patients and residents who are treated there.

4.     I have worked for more than 25 years in the healthcare arena, with 15 years in not for profit operations.  During this period, I have accumulated extensive senior level experience in the areas of not-for-profit healthcare, especially in healthcare delivery, hospital acute care services, health plan management, product management, acquisitions, integrations, population health management, budgeting, disease management and medical devices.  I also have meaningful experience in other related areas, including human resources and personnel management.

5.     My background and familiarity with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading to the commencement of these chapter 11 bankruptcy cases are set forth more fully in my *Declaration filed in Support of Emergency First-Day Motions* [Docket No. 8] filed on the Petition Date, and are incorporated by reference into this Declaration.

A.     **The Hospital**

6.     The Hospital is currently licensed for 357 beds, comprising 250 general acute care beds, 83 skilled nursing beds, and 24 acute psychiatric beds (two of which have been placed in suspense).  Of the 250 general acute care beds, 18 are designated for perinatal services (in suspense), 14 for coronary care, 14 for intensive care, three for intensive care newborn nursery (in suspense), with the remaining 201 beds unspecified general acute care beds.[14]  Seton has an emergency department with 11 rooms with 18 beds; and four surgical suites constituting an ambulatory surgical center.  It also has 10 surgical operating rooms (eight of which are active), and three cardiac catheterization labs (one of which is dedicated for endoscopic retrograde cholangiopancreatography (ERCP) used by specialist gastroenterologists).

---

[14] The 2020 License fails to reflect that these perinatal beds are in suspense.  Seton believes this was an inadvertent oversight.  By letter dated January 30, 2020, it has requested that CDPH update its license to correct this and other errors, including errors related to three NICU beds, two psychiatric beds and its Outpatient Joint Replacement Clinic.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114400090\V-3

7.    As of the date of the Motion, the Hospital employs approximately 1172 employees, of which 411 are full time, 432 are part time, and 329 are per diem.

**B.    Indications of Interest and Offers for the Seton Facilities as Operating Hospitals**

8.    The Boards and the Debtors concluded, in their business judgment, that the sale of the Seton Facilities as operating hospitals is in the best interests of the Debtors, their estates, creditors, stakeholders, and mission of service to the communities.

9.    As set forth in the declaration of Peter Chadwick, the Hospital has been operating at significant financial losses.

**C.    Selection of AHMC**

10.    AHMC, entered into substantive negotiations with the Debtors, which ultimately resulted in the APA.  A true and correct copy of the APA is attached to the Motion as Exhibit "A." The Debtors and their Boards determined in their business judgment that a sale of the Seton Facilities to AHMC is in the best interests of the Debtors, their estates, creditors, stakeholders, and mission of service to their communities based on, among other things, the following:

- The Debtors will receive $40 million, plus an amount equal to cure costs, that will offer substantial recovery to the Debtors' estates and preserve ongoing employee and trade vendor relationships at the Seton Facilities.

- The Debtors will retain all accounts receivable generated or allocable to patient services prior to closing, excluding certain post-closing receipts of Measure B trauma funding, California QAF Program payments and disproportionate share funding.

- Nineteen months have elapsed since the Debtors filed the Cases, during which the Debtors have engaged in two thorough marketing efforts for the Seton Facilities.

- The sale of the Seton Facilities will serve the Debtors' charitable mission by transferring the Seton Facilities to a proven operator of hospitals with a positive record of rehabilitating hospitals.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

US_Active\114400090\V-3

- AHMC is committed to addressing the COVID-19 health care emergency by continuing to partner with the State after a close of the Sale.

- The "all cash" structure of the transaction minimizes the risk of remediation claims arising from the Debtors' potential failure to defease the tax exempt financing supporting the Seton Medical Center improvements.

- AHMC has shown the financial ability to close this transaction.

**D.    The SGM and GMC Offers**

11.    On February 13, 2020, SGM submitted an unsolicited "Offer to Purchase" (the "SGM Seton Offer").  On February 25, 2020, SGM submitted an unsolicited "Offer to Purchase" (the "SGM System Offer") the "four properties that are the subject of the Verity-SGM APA."  On March 6, 2020, an entity named "Global Medical Center San Mateo County, LLC, wholly owned by Dr. Kali P. Chaudhuri" ("GMC") submitted an unsolicited "Offer to Purchase Seton Assets" (the "GMC Seton Offer").  True and correct copies of the SGM Seton Offer, SGM Systems Offer, and GMC Seton Offer are attached hereto as **Exhibit "1."**

12.    The Debtors determined that the GMC Seton Offer (or any other bid from SGM, its insiders, or affiliates) is subject to significant and unacceptable risks given the Debtors' history and course of dealing with SGM over the period of nearly one year in connection with the SGM Sale.  The Debtors also considered this issue in connection with SGM's request for access to the virtual data room related to St. Francis Medical Center.  On February 28, 2020, I emailed Peter Baronoff, the CEO of SGM, and informed Mr. Baronoff of the Debtors decision not to permit SGM or its affiliates access to the virtual data room based on SGM's prior conduct.  Specifically, I informed Mr. Baronoff that "I do not find KPC to be a trustworthy, believable or a capable or reliable business partner," and that, "[a]fter my course of dealing with KPC, it is clear to me that entering into a new process with KPC would be an irresponsible decision and proposes, among other things, significant risks and harm to these estates."  The Debtors are in litigation with SGM concerning its conduct related to the SGM Sale.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

13.     Additionally, the "offers" reflect that SGM (and its affiliate, GMC) is not prepared to close a transaction.  The offers each contain a 7 day due diligence period (after more than a year of allegedly conducting due diligence on the Purchased Assets) and multiple conditions to closing.  The proposed conditions include undefined "customary closing conditions," which would likely result in extensive negotiations.  Negotiations with SGM and its principals in connection with the SGM Sale were difficult and time consuming.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Executed this 29th day of March, 2020, at Los Angeles, California.

_____
RICHARD G. ADCOCK

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

31

US_Active\114400090\V-3

## **Exhibit 1**

**SGM Seton Offer**
**SGM System Offer**
**GMC Seton Offer**



**STRATEGIC GLOBAL MANAGEMENT, INC.**
9 KPC Parkway, Suite 301, Corona, California  92879
Telephone: (951) 987-8100  Facsimile: (951) 782-8850

Kali P. Chaudhuri, M.D.
F.A.C.S., F.I.C.S., F.A.A.O.S.
Chairman and
Chief Executive Officer

William E. Thomas
Executive Vice President
and General Counsel
Bthomas@globalmso.com

**Via Email to:  Samuel.maizel@dentons.com**

February 13, 2020

Samuel R. Maizel
Dentons US LLP
601 S. Figueroa Street
Suite 2500
Los Angeles, CA  90017-5704

**Re: Offer to Purchase**

Dear Sam:

Strategic Global Management, Inc. ("Buyer") offers to purchase the assets of Seton Medical Center and Seton Coastside and keep them open as viable medical centers on the following terms:

1. <u>Assets to be Purchased</u>.  All assets of the hospital known as Seton Medical Center located at 1900 Sullivan Avenue, Daly City, CA  including the hospital pharmacy, laboratory, emergency department as well as the medical office buildings and clinics owned or operated by Seton Medical Center and the hospital known as Seton Medical Center Coastside located at 600 Marine Blvd., Moss Beach, CA  including the hospital pharmacy, laboratory and emergency department as well as the medical office building and clinics owned or operated by Seton Coastside.  Collectively, the assets of the two hospitals are referred to as the "Seton Assets".

2. <u>Purchase Price</u>.  Sixty Million Dollars ($60,000,000.00) cash at Closing.

3. <u>Assumed Liabilities</u>.  Buyer will assume (1) accrued vacation and PTO with respect to Hired Employees; (2) all liabilities of Seton as Obligated Party under the PACE Program; and (3) Cure Costs associated with Assumed Leases and/or Assumed Contracts designated by Buyer.

4. <u>Free and Clear Title</u>.  Except as set forth above, Buyer shall receive free and clear title to all real and personal property, accounts receivable, and other assets related to the Seton Assets, except for cash on hand at Closing and other excluded assets to be mutually agreed between the Parties.

5. <u>QAF Adjustment</u>.  Any net QAF received by Seller in 2020 relating to the Seton Assets through Closing shall either constitute a downward adjustment to purchase price or shall be paid over in cash at Closing at Buyer's election.

6. <u>Conditions</u>.  The Closing is subject to:

    (a) Approval of the Bankruptcy Court;

    (b) Approval of the Attorney General to the extent required;

    (c) Transfer of the Medi-Cal and Medicare provider agreements pursuant to settlement agreements executed by DCHS and CMS such that Buyer is not exposed to successor liability or recoupment at no cost to Buyer; and

    (d) Such other customary closing conditions as agreed to in the definitive asset purchase agreement.

7. <u>Definitive Agreement</u>.  The previous asset purchase agreement dated January 8, 2019, shall serve as a model for the definitive agreement in this transaction appropriately tailored to refer only to the Seton Assets.

8. <u>Target Closing Date</u>.  March 31, 2020

9. <u>Confirmatory Due Diligence Period</u>.  Seven (7) days.

There are obvious benefits to accepting SGM's proposal including (1) SGM already has secured Attorney General approval of the previous transaction and the conditions pertaining to Seton are acceptable; (2) all labor unions associated with Seton have accepted modified collective bargaining agreements with SGM as Buyer; (3) the management teams of Verity and SGM have spent months integrating workstreams to make transition as seamless as possible; and (4) vendors, payors, providers and other counterparties have worked closely with SGM to pave the way for a successful transition.  This high degree of approvals and synergies cannot be duplicated by any other potential buyer.

We have provided proof of funds in the past, but if you wish us to refresh our bank letter, we would do so.

We are anxious to move expeditiously to a closing.  Our proposed calendar would be as follows:

A. <u>Verity Response to SGM Offer</u>.  On or before February 20.

B. <u>Definitive Agreement</u>.  On or before February 28.  Prior to that time, Verity would meet with SGM representatives to discuss and resolve all issues and allow access to financial and operational information regarding the Seton Assets.

C.  <u>Bankruptcy Court Approval</u>.   Between March 9 and March 15.

D.  <u>Attorney General.</u>   The parties jointly approach the Attorney General to confirm conditions of approval.

E.  <u>Target Closing</u>.   On or before March 31.

Please let us know if Verity is willing to proceed along these lines.

This is a non-binding term sheet.  The parties will be legally bound upon execution of a definitive agreement regarding these matters.

Sincerely,

William E. Thomas
Executive Vice President and General Counsel



**STRATEGIC GLOBAL MANAGEMENT, INC.**

9 KPC Parkway, Suite 301, Corona, California 92879
Telephone: (951) 987-8100  Facsimile: (951) 782-8850

Kali P. Chaudhuri, M.D.
F.A.C.S., F.I.C.S., F.A.A.O.S.
Chairman and
Chief Executive Officer

William E. Thomas
Executive Vice President
and General Counsel
Bthomas@globalmso.com

**Via Email to:  Samuel.maizel@dentons.com**

February 25, 2020

Samuel R. Maizel
Dentons US LLP
601 S. Figueroa Street
Suite 2500
Los Angeles, CA  90017-5704

**Re: Offer to Purchase**

Dear Sam:

It is unfortunate that the transaction that each side worked so hard on for over a year has fallen apart and resulted in litigation which, absent a settlement, will likely be expensive and protracted.  Nevertheless, SGM continues to desire to acquire the four properties that are the subject of the Verity-SGM APA ("Old APA") (recognizing that SVMC has now closed) and SGM continues to believe that a sale of all four properties and related assets to SGM will provide the Verity bankruptcy estate, and its multiple constituencies, with the best available outcome.

We understand that Verity is currently evaluating SGM's proposal for the acquisition of Seton and Seton Coastside, and we appreciate having had the opportunity last Saturday to confirm that SGM has the financial resources to close that sale promptly and SGM's proposal for Seton is independent of the pending litigation.

In addition to and as an alternative to the "Seton only" proposal, which remains in effect, SGM is making the following proposal to complete the original transaction with mutually acceptable modifications and to resolve all of the pending litigation.

SGM proposes the following:

1. <u>Assets to be Purchased</u>.  All assets set forth in the Old APA ("Assets").

2. <u>Purchase Price</u>.  Four Hundred Fifty Million Dollars ($450,000,000.00).

3. <u>Assumed Liabilities</u>. Similar to the Old APA, SGM will assume (1) accrued vacation and PTO with respect to Hired Employees; (2) all liabilities of Seton as Obligated Party under the PACE Program; and (3) Cure Costs associated with Assumed Leases and/or Assumed Contracts designated by SGM.

4. <u>Free and Clear Title</u>. Except as set forth above, SGM shall receive free and clear title to all real and personal property, accounts receivable, and other assets related to the purchased Assets, except for cash on hand at Closing and other excluded assets to be mutually agreed between the Parties.

5. <u>QAF Adjustment</u>. Any net QAF received by Verity in 2020 through Closing shall either constitute a downward adjustment to purchase price or shall be paid over in cash at Closing at SGM's election.

6. <u>Conditions</u>. The Closing is subject to:

   (a) Approval of the Bankruptcy Court;
   (b) Approval of the Attorney General consistent with Bankruptcy Court's order of November 14, 2019;
   (c) Settlement with Medi-Cal and Medicare such that SGM is not exposed to successor liability at no cost to SGM consistent with Section 8.7 of Old APA;
   (d) Due diligence period of 30days commencing on the signing of a new purchase contract;
   (e) Mutual release of claims effective at Closing; and
   (f) Such other customary closing conditions as agreed to in the definitive asset purchase agreement.

7. <u>Definitive Agreement</u>. The Old APA, shall serve as a model for the definitive agreement in this transaction to facilitate final approvals from regulatory bodies and others.

8. <u>Proof of Finance</u>. Our financing sources are prepared to meet with you face to face as soon as possible to provide confirmation and commitment in writing.

9. <u>Target Closing Date</u>. April 15, 2020

As we've indicated before, our months of hard work in cooperation with the Verity team have resulted in synergies that cannot be duplicated by any other potential buyer.

If Verity is not prepared to consider our proposal for all the assets at this time, SGM is requesting that Verity not object to SGM's participation as a bidder for St. Francis Medical Center subject, of course, to SGM's satisfaction of the qualifying conditions contained in Verity's proposed sale procedures including execution of a new NDA and obtaining access to the dataroom and key Verity personnel.

We trust Verity will give our proposal serious consideration.  In all events, SGM continues to invest a huge amount of money in this transactional process.  Please let us know by February 28th how Verity wishes to proceed:

1. Consummate a full and complete sale of all assets and settlement of the litigation.
2. Consummate a purchase agreement for Seton only.
3. Qualify SGM as a bidder for St. Francis.

We are available to further discuss at your convenience.

This is a non-binding offer.  The parties will be legally bound upon execution of a definitive agreement regarding these matters.  This is not a confidential letter and you are welcome to share it with all of Verity's creditor representatives and constituencies.

Sincerely,

William E. Thomas
Executive Vice President and General Counsel



LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
LAW OFFICES

March 6, 2020

Via Email to:  Samuel.maizel@dentons.com

Samuel R. Maizel
Dentons US LLP
601 S. Figueroa Street
Suite 2500
Los Angeles, CA  90017-5704

Re:     Offer to Purchase Seton Assets

Dear Sam:

We have been authorized by Global Medical Center San Mateo County, LLC
("GMC" or "Buyer"),  wholly owned by Dr. Kali P. Chaudhuri, M.D., to make this offer,
on its behalf, to purchase the assets of Seton Medical Center and Seton Coastside
(sometimes, collectively, "Seton" or "Seller").

We understand that Verity is currently deciding whether to close Seton and sell
the real estate, or to sell to a purchaser who will continue to operate and maintain Seton
as viable medical centers.  This will confirm that Buyer will maintain Seton as operating
medical centers.  The benefits to the community, healthcare professionals, and employees
(union and non-union) are obvious.

Dr. Chaudhuri  shall guaranty the Buyer's obligations to close the transaction
subject to this offer.

1.      Assets to be Purchased.  The hospital known as Seton Medical Center
located at 1900 Sullivan Avenue, Daly City, CA  including the hospital pharmacy,
laboratory, emergency department as well as the medical office buildings and clinics
owned or operated by Seton Medical Center and the hospital known as Seton Medical
Center Coastside located at 600 Marine Blvd., Moss Beach, CA, including the hospital
pharmacy, laboratory and emergency department, as well all real estate assets including
the medical office building and clinics owned or operated by Seton Coastside.
Collectively, the assets of the two hospitals are referred to as the "Seton Assets".
Excluded from the purchased assets are (1) Seton's accounts receivable, and (2) QAF
payments received by Seton prior to closing.

2.      Purchase Price.  Fifty Million Dollars ($50,000,000.00) cash at Closing.

LNBY&B

Samuel R. Maizel
March 6, 2020
Page 2

3.      Assumed Liabilities.  Buyer will assume (1) accrued vacation and PTO with respect to Hired Employees; (2) all liabilities of Seton as Obligated Party under the PACE Program; and (3) Cure Costs associated with Assumed Leases and/or Assumed Contracts designated by Buyer.  Buyer will also assume all post-closing obligations under existing collective bargaining agreements as modified by stipulations previously reached between Verity and the unions during the Chapter 11 case.

4.      Free and Clear Title.  Except as set forth above, Buyer shall receive free and clear title to all real and personal property and other assets related to the Seton Assets, except for cash on hand at Closing and other excluded assets as described above and to be mutually agreed between the Parties.

5.      Conditions.  The Closing is subject to:

(a)      Approval of the Bankruptcy Court;

(b)      Approval of the California Attorney General;

(c)      Transfer of Medi-Cal and Medicare provider agreements to Buyer such that Buyer is not exposed to successor liability, at no cost to Buyer;

(d)      Such other customary closing conditions as agreed to in the definitive asset purchase agreement ("Definitive Agreement");

6.      Due diligence shall be completed within 7 days of Buyer being provided access to Seton data room and physical assets.

7.      Definitive Agreement.  The previous asset purchase agreement between Verity and SGM dated January 8, 2019, shall serve as a model for the Definitive Agreement, appropriately tailored to refer only to the Seton Assets.  Buyer will be prepared to execute a Definitive Agreement within seven (7) business days of Seller's acceptance of this offer.  Alternatively, if Verity has a form of APA for the Seton assets, that form will be used, subject to agreed modifications.

For the avoidance of doubt, there is no financing contingency and no other contingencies or conditions to closing other than as set forth herein.

8.      The offer made by Strategic Global Management, Inc. ("SGM") on February 13, 2020 is hereby withdrawn.

9.      Target Closing Date.  45 days from Bankruptcy Court approval

L N B Y & B

Samuel R. Maizel
March 6, 2020
Page 3

10.    <u>Good Faith Deposit and Cash Advance Payment to Cover Operating Losses.</u>  Upon execution of the Definitive Agreement and completion of Due Diligence as described above, Buyer shall provide to Seller (1) a good faith deposit of $5 Million, (which Seller shall place in an account separate from all other debtor-in-possession accounts ) and (2) $9 Million (the "Cash Advance") which Seller may use, solely to cover any operating losses of Seton (not including administrative expenses and professional fees of the Verity Chapter 11 estate) between the execution of a Definitive Agreement and the Closing, up to a maximum of 45 days. The Cash Advance shall be applied as a credit against the purchase price, provided, however, if the Buyer fails to close as required by the Definitive Agreement, Buyer shall forfeit any right to the return of the Good Faith Deposit and the Cash Advance.

There are obvious benefits to accepting Buyer's proposal including: (1) the Attorney General's conditions to his approval of the sale to SGM, Buyer's affiliate, pertaining to Seton, are acceptable to Buyer; (2) all labor unions associated with Seton have accepted modified collective bargaining agreements that are acceptable to Buyer; (3) the management teams of Verity and Buyer's affiliate, SGM, have spent months integrating workstreams to make transition as seamless as possible; and (4) vendors, payors, providers and other counterparties have worked closely with Buyer's affiliate, SGM, to pave the way for a successful transition.  This high degree of approvals and synergies cannot be duplicated by any other potential buyer.

Dr. Chaudhuri has provided proof of funds in the past, but if you wish him to refresh his bank letter, he would do so.

We are anxious to move expeditiously to a closing.  Would you please respond on or before March 9, 2019 at 5:00 P.M.

Finally, this will confirm that the transaction described herein shall have no impact whatsoever of the pending litigation between Verity and SGM, and other defendants; and all parties to that litigation shall reserve all rights, claims, counter-claims and defenses.

Please let us know if Verity is willing to proceed along these lines, and if you have any questions, please let me know as soon as possible.

Sincerely,

Gary E. Klausner

L N B Y & B

Samuel R. Maizel
March 6, 2020
Page 4


cc:    Mark Shinderman, Esq.
       Peter Benvenutti, Esq.
       Tobias Keller, Esq.
       John D. Nibbelin, Esq.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## DECLARATION OF PETER C. CHADWICK

I, Peter C. Chadwick, hereby state and declare as follows:

1.    I submit this declaration (the "Declaration") in support of the *Debtors' Notice of Motion and Motion to Approve Terms and Conditions of a Private Sale of Certain of the Debtors' Assets Related to Seton Medical Center to AHMC Healthcare Inc.* (the "Motion"),[15] which seeks entry of an order authorizing the Debtors to: (i) approving a private sale (the "Sale") of certain assets (the "Purchased Assets") of Debtors Seton Medical Center ("Seton"),[16] Verity Holdings, LLC ("Holdings"), and VHS (together with Seton and Holdings, the "Sellers") to AHMC Healthcare Inc. ("AHMC" or the "Buyer"); (ii) approving the asset purchase agreement (the "APA") and ancillary documents attached to the Motion as Exhibit "A" by and between the Sellers and AHMC; (iii) approving procedures related to the assumption and assignment of the Assigned Contracts and Assigned Leases (as those terms are defined in the Motion, and, collectively, the "Assigned Executory Contracts"), together with the payment of Cure Costs (as such terms are defined in the Motion); (iv) waiving any stay of the effectiveness of such order; and (v) granting such other and further relief as is just and appropriate under the circumstances.

2.    I am a Managing Director of Berkeley Research Group, LLC ("BRG") and am duly authorized to make this declaration on behalf of BRG.  Except as otherwise noted, the facts set forth herein are personally known to me and, if called as a witness, I could and would testify thereto.[17]  In July 2018, BRG began its engagement serving as the financial advisor to the Debtors, which has continued since the Petition Date.  In this capacity, I have become intimately familiar

---

[15] Unless otherwise defined, capitalized terms used herein shall have the same meaning as in the Motion.

[16] The Purchased Assets related to Seton concern assets located at both (i) Seton Medical Center, located at 1800, 1850 and 1900 Sullivan Ave and 1500 Southgate Ave, Daly City, California (the "Hospital") and (ii) Seton Medical Center–Coastside, located at 600 Marine Blvd, Moss Beach, California (the "Coastside Campus" and, together with the Hospital, the "Seton Facilities").

[17] Certain of the disclosures herein relate to matters within the personal knowledge of other professionals at BRG and are based on information provided to me by such other BRG professionals.

US_Active\114400090\V-3

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  with the Debtors' operations, business, books, records, financial affairs, material agreements, and

2  sale processes, and, as a result, have become uniquely situated to assist the Debtors.

3    3.    As a result, pursuant to the Debtors' request, and as authorized by the Bankruptcy

4  Court, I have agreed to serve in the role of Chief Financial Officer to the Debtors in these chapter

5  11 cases.    I have significant operating experience, including improving underperforming

6  businesses and advising debtors and creditors in complex financial matters.  I have served as chief

7  executive officer, chief operating officer, chief financial officer, and advisor to companies in a

8  variety of industries.  My healthcare experience includes acting as the advisor or an officer to

9  healthcare providers, including leading hospital systems and long-term care providers through

10  operational turnarounds and financial restructurings.  As an officer or advisor, I prepared and

11  implemented post-acquisition integration plans, viability plans, asset dissolution strategies, and

12  liquidity enhancement plans.  My experience spans the spectrum from the largest U.S. companies

13  to middle market proprietary companies.

14    4.    For all of the reasons set forth in the Motion and the supporting declarations, the

15  Debtors have determined in their business judgment that it is in the best interest of the Debtors and

16  their estates, creditors, stakeholders, and mission to serve their communities to consummate the

17  Sale pursuant to the terms of the AHMC APA.

18    5.    On the Petition Date, the Hospital accounted for approximately 29% of the

19  operating losses of the entire Verity Health System although the Hospital accounted for

20  approximately only 17% of the net patient revenue.  Since the Petition Date, the Hospital's share

21  of the system operating losses has required the Debtors' estates to fund approximately $5 million

22  of working capital per month, including corporate overhead allocations.  The Debtors project

23  continuing operating losses at the Hospital.  The reported financial statements of Seton reflect that,

24  in fiscal year 2019 (ended June 30, 2019), Seton lost approximately $62 million which was a

25  192% and 215% increase over the fiscal years 2018 and 2017, respectively.

26    6.    When the Debtors valued the SGM Seton Offer and the GMC Seton Offer, the

27  Debtors determined that they yielded negative value given the risk that SGM, or its affiliate GMC,

28  will not close, the foregoing operating losses that would be incurred during the regulatory review

1    and approval of the sale, and the risk of a tax remediation issue arising from the assumption of

2    liabilities.

3         I declare under penalty of perjury that, to the best of my knowledge and after reasonable

4    inquiry, the foregoing is true and correct.

5         Executed this 29th day of March, 2020, at Los Angeles, California.

6

7    _____

8                    PETER C. CHADWICK

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

34

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

# DECLARATION OF JAMES M. MOLONEY

I, James M. Moloney, hereby state and declare as follows:

1.    I submit this declaration (the "Declaration") in support of the *Debtors' Notice of Motion and Motion to Approve Terms and Conditions of a Private Sale of Certain of the Debtors' Assets Related to Seton Medical Center to AHMC Healthcare Inc.* (the "Motion"),[18] which seeks entry of an order authorizing the Debtors to: (i) approving a private sale (the "Sale") of certain assets (the "Purchased Assets") of Debtors Seton Medical Center ("Seton"),[19] Verity Holdings, LLC ("Holdings"), and VHS (together with Seton and Holdings, the "Sellers") to AHMC Healthcare Inc. ("AHMC" or the "Buyer"); (ii) approving the asset purchase agreement (the "APA") and ancillary documents attached to the Motion as Exhibit "A" by and between the Sellers and AHMC; (iii) approving procedures related to the assumption and assignment of the Assigned Contracts and Assigned Leases (as those terms are defined in the Motion, and, collectively, the "Assigned Executory Contracts"), together with the payment of Cure Costs (as such terms are defined in the Motion); (iv) waiving any stay of the effectiveness of such order; and (v) granting such other and further relief as is just and appropriate under the circumstances.

2.    I am a managing director of Cain Brothers ("Cain"), which is a division of KeyBanc Capital Markets Inc., a wholly-owned broker/dealer subsidiary of KeyCorp and an affiliate of KeyBank National Association.  I am located in Cain's San Francisco office which is located at One California Street, Suite 2400, San Francisco, California.  Mr. Carsten Beith and I are the co-heads of Cain's Health Systems Mergers & Acquisition group.  I am over the age of 18 and competent to testify as to the facts set forth herein and will do so if called upon.

3.    As set forth in Cain's previous declarations, beginning in June 2018, Cain began working with the Debtors to collect and review financial, operational and other information about

---

[18] Unless otherwise defined, capitalized terms used herein shall have the same meaning as in the Motion.

[19] The Purchased Assets related to Seton concern assets located at both (i) Seton Medical Center, located at 1800, 1850 and 1900 Sullivan Ave and 1500 Southgate Ave, Daly City, California (the "Hospital") and (ii) Seton Medical Center–Coastside, located at 600 Marine Blvd, Moss Beach, California (the "Coastside Campus" and, together with the Hospital, the "Seton Facilities").

the historic, current and project future operations and financial performance of each of the Debtors. Cain also began searching for a buyer or buyers for the Debtors' assets and created a potential list of buyers for the Verity Heath System as a whole or in parts. Mr. Moloney and I led the marketing and sale efforts on behalf of Verity and advised Verity in connection with Verity's selection of Strategic Global Management, Inc. ("SGM") as the Stalking Horse Buyer for the Debtors' hospitals and related assets (the "SGM Sale").

4.      The previous marketing and sale process conducted in 2019 yielded no qualified bid for the Hospital as a stand-alone hospital. The Debtors proceeded toward closing of the SGM Sale.

5.      Following the failure of the SGM Sale, Cain commenced a new marketing process to identify parties interested in acquiring the Hospital and Coastside. Cain contacted select parties that had previously expressed interest in the Hospital and Coastside. In addition, Cain updated the Seton Facilities Confidential Information Memorandum (CIM), which it posted to the data room on December 30, 2019.

6.      On January 10, 2020, two bidders submitted non-binding Indications of Interest ("IOI") to acquire the Hospital/Coastside as operating facilities. One of the bidders submitted an IOI but, ultimately, the bidder decided not move forward with its bid. The Debtors entered into entered into substantive negotiations with the remaining bidder, AHMC Healthcare Inc., which ultimately resulted in the APA attached to the Motion as Exhibit "A." The AHMC APA provides that AHMC will pay $40 million, plus an amount equal to cure costs for the Seton Facilities, and the Debtors will retain certain accounts receivable generated or allocable to patient services prior to closing.

7.      The Debtors also received unsolicited bids for Seton from SGM and an affiliated entity, Global Medical Center San Mateo County, LLC.

/ / /

/ / /

/ / /

/ / /

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    I declare under penalty of perjury that, to the best of my knowledge and after reasonable

2    inquiry, the foregoing is true and correct.

3    Executed this 29th day of March, 2020, at San Francisco, California.

4

5    _____

6    JAMES M. MOLONEY

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

37

## Exhibit A

**APA and Ancillary Documents**

**ASSET PURCHASE AGREEMENT**

**By and Among**

**Verity Health System of California, Inc., Verity Holdings, LLC,**

**Seton Medical Center**

**and**

**AHMC Healthcare Inc.**

**Dated March 30, 2020**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 SALE AND TRANSFER OF ASSETS; CONSIDERATION; CLOSING ............. 2

    1.1       Purchase Price ............................................................................................. 2
    1.2       Deposit ........................................................................................................ 2
    1.3       Closing Date ................................................................................................ 2
    1.4       Items to be Delivered by Sellers at Closing ............................................. 3
    1.5       Items to be Delivered by Purchaser at Closing ......................................... 4
    1.6       Prorations and Utilities .............................................................................. 5
    1.7       Transfer of Assets of Sellers ...................................................................... 6
    1.8       Excluded Assets ......................................................................................... 9
    1.9       Transferred Obligations ............................................................................ 13
    1.10     Excluded Liabilities ................................................................................. 14
    1.11     Designation of Assigned Contracts and Assigned Leases ...................... 14
    1.12     Disclaimer of Warranties; Release .......................................................... 15

ARTICLE 2 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 16

    2.1       Authorization ............................................................................................ 16
    2.2       Binding Agreement ................................................................................... 16
    2.3       Organization and Good Standing; No Violation ...................................... 16
    2.4       Contracts .................................................................................................. 16
    2.5       Brokers and Finders ................................................................................. 17
    2.6       Seller Knowledge ..................................................................................... 17
    2.7       Non-Contravention ................................................................................... 17
    2.8       Compliance with Legal Requirements ..................................................... 17
    2.9       Required Consents .................................................................................... 17
    2.10     Environmental Matters ............................................................................. 17
    2.11     Title .......................................................................................................... 18
    2.12     Certain Other Representations with Respect to the Hospital .................. 18
    2.13     Financial Statements ................................................................................ 18
    2.14     Legal Proceedings .................................................................................... 19
    2.15     Employee Benefits ................................................................................... 19
    2.16     Personnel .................................................................................................. 19
    2.17     Insurance .................................................................................................. 20
    2.18     Payer Contracts ........................................................................................ 20
    2.19     Excluded Individuals ............................................................................... 20
    2.20     Third Party Payor Cost Reports. .............................................................. 20
    2.21     Recoupment Claims. ................................................................................ 20
    2.22     Bankruptcy Proceedings Compliance. ..................................................... 20

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF PURCHASER ...................... 21

    3.1       Authorization ............................................................................................ 21
    3.2       Binding Agreement ................................................................................... 21
    3.3       Organization and Good Standing .............................................................. 21
    3.4       No Violation .............................................................................................. 21

US_Active\114503813\V-2

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 3.5 | Brokers and Finders | 21 |
| 3.6 | Representations of Sellers | 21 |
| 3.7 | Legal Proceedings | 22 |
| 3.8 | No Knowledge of a Seller's Breach | 22 |
| 3.9 | Ability to Perform | 22 |
| 3.10 | Purchaser Knowledge | 22 |
| 3.11 | Investigation | 23 |

**ARTICLE 4 COVENANTS OF SELLERS** ........ 23

| | | |
|---|---|---|
| 4.1 | Access and Information; Inspections | 23 |
| 4.2 | Cooperation | 23 |
| 4.3 | Other Bidders | 24 |
| 4.4 | Sellers' Efforts to Close | 24 |
| 4.5 | Termination Cost Reports | 24 |
| 4.6 | Conduct of the Business | 25 |
| 4.7 | Contract With Unions | 26 |
| 4.8 | Indemnity Escrow Agreement | 26 |
| 4.9 | Transferred Private Payor Agreements | 26 |
| 4.10 | Insurance Coverage | 27 |

**ARTICLE 5 COVENANTS OF PURCHASER** ........ 27

| | | |
|---|---|---|
| 5.1 | Purchaser's Efforts to Close | 27 |
| 5.2 | Required Governmental Approvals | 27 |
| 5.3 | Certain Employee Matters | 28 |
| 5.4 | Excluded Assets | 29 |
| 5.5 | Waiver of Bulk Sales Law Compliance | 29 |
| 5.6 | Attorney General | 29 |
| 5.7 | Conduct Pending Closing | 29 |
| 5.8 | Cure Costs | 29 |
| 5.9 | Operating Covenant | 29 |
| 5.10 | Contract with Unions | 29 |
| 5.11 | Cooperation | 30 |

**ARTICLE 6 SELLERS' BANKRUPTCY AND BANKRUPTCY COURT APPROVAL** ........ 30

| | | |
|---|---|---|
| 6.1 | Bankruptcy Court Approval | 30 |
| 6.2 | Appeal of Sale Order | 31 |

**ARTICLE 7 CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS** ........ 31

| | | |
|---|---|---|
| 7.1 | Signing and Delivery of Instruments | 31 |
| 7.2 | No Restraints | 31 |
| 7.3 | Performance of Covenants | 31 |
| 7.4 | Governmental Authorizations | 31 |
| 7.5 | Attorney General Provisions | 32 |
| 7.6 | Bankruptcy Court Approval | 32 |

-ii-

# TABLE OF CONTENTS

(continued)

Page

ARTICLE 8 CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER ............... 32

| | | |
|---|---|---|
| 8.1 | Bankruptcy Court Approval | 32 |
| 8.2 | Signing and Delivery of Instruments | 32 |
| 8.3 | Performance of Covenants | 32 |
| 8.4 | No Restraints | 32 |
| 8.5 | Attorney General Provisions | 33 |
| 8.6 | Medicare and Medi-Cal Provider Agreements | 33 |
| 8.7 | Title Policies. | 33 |
| 8.8 | Phase I Environmental Survey. | 33 |
| 8.9 | Insurance. | 33 |

ARTICLE 9 TERMINATION ............... 34

| | | |
|---|---|---|
| 9.1 | Termination | 34 |
| 9.2 | Termination Consequences | 35 |

ARTICLE 10 POST-CLOSING MATTERS ............... 35

| | | |
|---|---|---|
| 10.1 | Excluded Assets | 35 |
| 10.2 | Preservation and Access to Records After the Closing | 35 |
| 10.3 | Closing of Financials | 38 |
| 10.4 | Medical Staff | 38 |
| 10.5 | Shared Intangible Assets | 38 |

ARTICLE 11 DEFAULT, TAXES AND COST REPORTS ............... 38

| | | |
|---|---|---|
| 11.1 | Purchaser Default | 38 |
| 11.2 | Seller Default | 39 |
| 11.3 | Tax Matters; Allocation of Purchase Price | 39 |
| 11.4 | Cost Report Matters | 39 |

ARTICLE 12 MISCELLANEOUS PROVISIONS ............... 40

| | | |
|---|---|---|
| 12.1 | Further Assurances and Cooperation | 40 |
| 12.2 | Successors and Assigns | 40 |
| 12.3 | Governing Law; Venue | 40 |
| 12.4 | Amendments | 40 |
| 12.5 | Exhibits, Schedules and Disclosure Schedule | 40 |
| 12.6 | Notices | 41 |
| 12.7 | Headings | 41 |
| 12.8 | Publicity | 42 |
| 12.9 | Fair Meaning | 42 |
| 12.10 | Gender and Number; Construction; Affiliates | 42 |
| 12.11 | Third Party Beneficiary | 42 |
| 12.12 | Expenses and Attorneys' Fees | 42 |
| 12.13 | Counterparts | 42 |
| 12.14 | Entire Agreement | 43 |

US_Active\114503813\V-2

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| 12.15 | No Waiver | 43 |
| 12.16 | Severability | 43 |
| 12.17 | Time is of the Essence | 43 |

US_Active\114503813\V-2

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "**Agreement**") is made and entered into as of the 30th day of March, 2020 (the "**Signing Date**") by and among Verity Health System of California, Inc., a California nonprofit public benefit corporation ("**Verity**"), Verity Holdings, LLC, a California limited liability company ("**Verity Holdings**"), and Seton Medical Center, a California nonprofit public benefit corporation ("**Seton**" or "**Hospital Seller**") (Verity, Verity Holdings, and Seton are each referred to herein individually as a "**Seller**" and collectively as the "**Sellers**"), and AHMC Healthcare Inc., a California corporation, or its designated affiliates or assignees ("**Purchaser**").

# R E C I T A L S :

A.      Seton engages in the business of the operation of two general acute care hospitals under a single license, consisting of: (i) the hospital known as Seton Medical Center, located at 1900 Sullivan Avenue, Daly City, CA 94015, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by Sellers (collectively, the "**Seton Hospital Facilities**") and (ii) the hospital known as Seton Medical Center Coastside, located at 600 Marine Blvd, Moss Beach, CA 94038, including the hospital pharmacy, laboratory and emergency department as well as through the medical office buildings and clinics owned or operated by Sellers (collectively, the "**Seton Coastside Hospital Facilities**", and together with the Seton Hospital Facilities, the "**Hospital**" or the "**Seton Medical Center Facilities**"; the business of the operation of the Seton Medical Center Facilities and related assets is referred to herein as the "**Business**").

B.      Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser, the Seton Medical Center Facilities' assets described in Section 1.7 below (the "**Assets**") owned by Sellers, for the consideration and upon the terms and conditions contained in this Agreement.

C.      Sellers filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Bankruptcy Court**"), lead Case No. 2:18-bk-201510ER, jointly administered or to be jointly administered with their affiliates (the "**Bankruptcy Cases**").

D.      The parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Assets approved by the Bankruptcy Court pursuant to Sections 105, 363 and 365 of Title 11 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual promises and covenants contained in this Agreement, and for their mutual reliance and incorporating into this Agreement the above recitals, the parties hereto agree as follows:

1

# ARTICLE 1

## SALE AND TRANSFER OF ASSETS;
## CONSIDERATION; CLOSING

1.1     Purchase Price.

(a)     Subject to the terms and conditions of this Agreement, the purchase price ("**Purchase Price**") shall consist of the following:

(i)     Cash payment to Sellers (the "**Cash Consideration**") of Forty Million Dollars ($40,000,000.00); and

(ii)     An amount equal to the Cure Costs (defined below) associated with outstanding liabilities of Sellers under any Assigned Leases and/or Assigned Contracts (the "**Cure Pool**").

(b)     Purchaser (i) is acquiring the Assets; (ii) is not assuming any liabilities of Sellers; and (iii) is agreeing to be responsible for the Transferred Obligations (as defined below).

(c)     At the Closing, Purchaser shall pay to Sellers, by wire transfer of immediately available funds to the accounts specified by Sellers to Purchaser in writing, an aggregate amount equal to the Cash Consideration, plus the Cure Pool, minus the Deposit (defined below) and the amount of PTO to be credited to Hired Employees pursuant to Section 5.3(b).

1.2     Deposit.  Purchaser, by wire transfer to an account designated by Sellers shall make a good faith deposit in an amount equal to twenty percent (20%) of the Cash Consideration within two (2) business days after the Signing Date (the "**Deposit**").  The Deposit shall be non-refundable in all events, except as provided in Section 6.1(b) or Section 6.2, or in the event Purchaser has terminated this Agreement pursuant to Section 9.1 (other than Section 9.1(b)) or as set forth in Section 9.2, in which case Sellers shall immediately return the Deposit to Purchaser with all interest earned thereon.  Upon Closing, the Deposit will be credited against the Purchase Price. Pending the Closing, or until this Agreement is terminated, the Deposit shall be deposited in an interest bearing account, with interest credited to Purchaser, at a federally-insured financial institution mutually acceptable to Purchaser and Sellers.

1.3     Closing Date.  The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place at 10:00 a.m. local time at the offices of Dentons US LLP, 601 South Figueroa St., Suite 2500, Los Angeles, CA 90017-5704 (the day on which Closing actually occurs, the "**Closing Date**") promptly but no later than five (5) business days following the satisfaction or waiver of the conditions set forth in ARTICLE 7 and ARTICLE 8, other than those conditions that by their nature are to be satisfied at Closing but subject to fulfillment or waiver of those conditions.  The Closing shall be deemed to occur and to be effective as of 11:59 p.m. Pacific time on the Closing Date (the "**Effective Time**").  Purchaser and Sellers agree that

2

because the change of ownership and regulatory approval process may take an extended period of time, at the Effective Time, the Assets (less any Assets constituting drugs or pharmacy assets) will be sold to Purchaser and immediately leased back to Sellers (substantially in the form of the Leaseback Agreement attached hereto as **Exhibit 1.3(a)**, the "**Leaseback Agreement**"), with a concurrent management arrangement (substantially in the form of the Interim Management Agreement attached hereto as **Exhibit 1.3(b)**, the "**IMA**"). On the effective date that Purchaser obtains a general acute care hospital license from the California Department of Public Health ("**CDPH**") and a hospital pharmacy permit from the California State Board of Pharmacy ("**BOP**") (i) the Leaseback Agreement and IMA will terminate and (ii) the drugs and pharmacy assets will be transferred to Purchaser (without payment of any additional Purchase Price) (the "**Licensure Date**"). For the avoidance of any doubt, the Licensure Date shall be the date the Purchaser's hospital license and pharmacy permit are effective, even if they are not actually issued until some time later. The Licensure Date may be determined based on oral assurances and/or temporary permits issued by CDPH and the BOP.

      1.4   <u>Items to be Delivered by Sellers at Closing</u>. At or before the Closing, Sellers shall deliver, or cause to be delivered, to Purchaser the following:

      1.4.1   a Bill of Sale substantially in the form of **Exhibit 1.4.1** attached hereto (the "**Bill of Sale**"), duly executed by each Seller, with respect to the Assets;

      1.4.2   Real Estate Assignment Agreements (the "**Real Estate Assignments**") in the form of **Exhibit 1.4.2** attached hereto with respect to (i) the Leased Real Property, and (ii) the Tenant Leases, each duly executed by each Seller;

      1.4.3   Quitclaim Deeds in the form of **Exhibit 1.4.3** attached hereto with respect to the real property listed in **Schedule 1.4.3**, together with all plant, buildings, structures, installments, improvements, fixtures, betterments, additions and constructions in progress situated thereon (collectively, the "**Owned Real Property**") as well as with respect to the Purchased Verity Holdings Assets (as defined below) duly executed by each Seller, as appropriate;

      1.4.4   an Assigned Contract Transfer Agreement (the "**Transfer Agreement**") in the form of **Exhibit 1.4.4** attached hereto with respect to the Transferred Obligations duly executed by each Seller;

      1.4.5   favorable original certificates of good standing, of each Seller, issued by the State of California, dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

      1.4.6   a duly executed certificate of an officer of each Seller certifying to Purchaser: (i) the incumbency of the officers of such Seller on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement, and (ii) the due adoption and text of the resolutions or consents of the Board of Directors of such Seller authorizing: (I) the transfer of the Assets and transfer of the Transferred Obligations by such Seller to Purchaser, and (II) the due execution, delivery and performance of this Agreement and all additional documents

3

contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.4.7    a certified copy of the Sale Order (as defined below);

1.4.8    a Transition Services Agreement (the "**Transition Services Agreement**") in form and substance satisfactory to Sellers and Purchaser, in their reasonable discretion, granting to Sellers use of certain assets, systems and personnel identified in such agreement solely in connection with Sellers' wind-down of the Business, the completion of the Bankruptcy Cases and the dissolution of Sellers (and following completion of such wind-down, Bankruptcy Cases and dissolution of Sellers, such Transition Services Agreement shall automatically terminate);

1.4.9    the Indemnity Escrow Agreement (as defined in Section 4.8);

1.4.10    evidence of payment of all Cure Costs;

1.4.11    Evidence of insurance coverage for Sellers as described in Section 4.10; and

1.4.12    any such other instruments, certificates, consents or other documents which Purchaser and Sellers mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

1.5    Items to be Delivered by Purchaser at Closing.  At or before the Closing, Purchaser shall deliver or cause to be delivered to Sellers the following:

1.5.1    payment of the Cash Consideration, plus the Cure Pool, minus the Deposit (defined below) and the amount of PTO to be credited to Hired Employees pursuant to Section 5.3(b), subject to credits or plus payment to Sellers of all amounts as provided under Section 1.6;

1.5.2    a duly executed certificate of the Secretary of Purchaser certifying to Sellers: (a) the incumbency of the officers of Purchaser on the Signing Date and on the Closing Date and bearing the authentic signatures of all such officers who shall execute this Agreement and any additional documents contemplated by this Agreement, and (b) the due adoption and text of the resolutions of the Board of Directors of Purchaser authorizing the execution, delivery and performance of this Agreement and all additional documents contemplated by this Agreement, and that such resolutions have not been amended or rescinded and remain in full force and effect on the Closing Date;

1.5.3    favorable original certificate of good standing, of Purchaser, issued by the California Secretary of State dated no earlier than a date which is fifteen (15) calendar days prior to the Closing Date;

1.5.4    the Bill of Sale, duly executed by Purchaser;

1.5.5    the Real Estate Assignment(s), duly executed by Purchaser;

1.5.6    the Transfer Agreement, duly executed by Purchaser;

4

      1.5.7    the Indemnity Escrow Agreement;

      1.5.8    the Transition Services Agreement; and

      1.5.9    any such other instruments, certificates, consents or other documents which Purchaser and Sellers mutually deem reasonably necessary to carry out the transactions contemplated by this Agreement and to comply with the terms hereof.

      1.6    <u>Prorations and Utilities</u>. All items of income and expense listed below with respect to the Assets shall be prorated in accordance with the principles and the rules for the specific items set forth hereafter:

      1.6.1    All transfer, conveyance, sales, use, stamp, similar state and local taxes arising from the sale of the Assets hereunder shall be the responsibility of, and allocated to, Purchaser.

      1.6.2    Other than the Utility Deposits (defined below), which are governed by <u>Section 1.8(j)</u>, and other than with respect to Cure Costs payable by Purchaser, the following costs and expenses shall be prorated based upon the payment period (*i.e.*, calendar or other tax fiscal year) to which the same are attributable: all real estate and personal property lease payments, real estate and personal property taxes, real estate assessments, and power and utility charges (collectively, the "**Prorated Charges**") on the Assets. Each Seller shall pay its respective portion at or prior to the Closing (or Purchaser shall receive credit for) of any unpaid Prorated Charges attributable to periods or portions thereof occurring prior to the Effective Time, and Purchaser shall be responsible for as a Transferred Obligation or, to the extent previously paid by any Seller, pay to such Seller at the Closing all Prorated Charges attributable to periods or portions thereof occurring from and after the Effective Time. In the event that as of the Closing Date the actual tax bills for the tax year or years in question are not available and the amount of taxes to be prorated as aforesaid cannot be ascertained, then rates, millages and assessed valuation of the previous year, with known changes, shall be used. The parties agree that if the real estate and personal property tax prorations are made based upon the taxes for the preceding tax period, the prorations shall be re-prorated after the Closing. As to power and utility charges, "final readings" as of the Closing Date shall be ordered from the utilities; the cost of obtaining such "final readings," if any, shall be paid by Purchaser.

      1.6.3    Sellers shall be entitled to all rents and other payments under Tenant Leases accruing for the period prior to the Effective Time ("**Pre Effective Time Lease Amounts**"), and Purchaser shall be entitled to all rents and other payments under Tenant Leases accruing for the period after the Effective Time ("**Post Effective Time Lease Amounts**" and together with the Pre Effective Time Lease Amounts, the "**Lease Amounts**"). All Lease Amounts that are collected prior to the Closing shall be prorated as of the Closing in accordance with the immediately preceding sentence. All Lease Amounts that are accrued but uncollected as of the Closing (including, without limitation, rents and other payments accrued prior to the Closing but payable in arrears after the Closing) (collectively, the "**Unpaid Amounts**") shall belong to Sellers, and Purchaser shall, upon receipt of said rents and other payments, receive the same in trust for Sellers and shall promptly remit any of such amounts to the applicable Seller within ten (10) days after

5

Purchaser's receipt of same. For the avoidance of doubt, all rental payments received after Closing shall be first applied to any amounts owed to the Sellers under this <u>Section 1.6.3</u>.

1.6.4    If Purchaser requests that Sellers transfer electronic medical records in a specific electronic format, then Purchaser shall reimburse, on the Closing Date, all amounts paid or to be paid by Sellers to transfer electronic medical records to Purchaser in such electronic format.

1.6.5    All prorations and payments to be made under the foregoing provisions shall be agreed upon by Purchaser and Sellers prior to the Closing and shall be binding upon the parties; provided, however, with respect to the Unpaid Amounts, in the event any proration, apportionment or computation shall prove to be incorrect for any reason, then either the applicable Seller or Purchaser shall be entitled to an adjustment to correct the same, provided that said party makes written demand on the party from whom it is entitled to such adjustment within thirty (30) calendar days after the erroneous payment or computation was made, or such later time as may be required, in the exercise of due diligence, to obtain the necessary information for proration. This <u>Section 1.6</u> shall survive Closing.

1.7    <u>Transfer of Assets of Sellers</u>. On the Closing Date and subject to the terms and conditions of this Agreement, each Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all liens, claims, interests and encumbrances other than the Permitted Exceptions (defined below), and Purchaser shall acquire, all of each Seller's right, title and interest in and to only the following assets and properties, as such assets shall exist on the Closing Date, in each case (notwithstanding anything else in this Agreement) solely to the extent used primarily in the conduct of the Business and to the extent not included among the Excluded Assets, such transfer being deemed to be effective at the Effective Time:

(a)    all of the tangible personal property owned by Hospital Seller, or to the extent assignable or transferable by Hospital Seller, leased, subleased or licensed by Hospital Seller, and used by Hospital Seller in the operation of the Hospital, including equipment, furniture, fixtures, machinery, vehicles, office furnishings and leasehold improvements (the "**Personal Property**");

(b)    on and after the Closing Date, all of Hospital Seller's rights, to the extent assignable or transferable, to and all of Hospital Seller's obligations due from and after the Closing Date under, all Medicare and Medi-Cal provider agreements, permits, approvals, certificates of exemption, franchises, accreditations and registrations and other governmental licenses, permits or approvals issued to Hospital Seller for use in the operation of the Hospital (the "**Licenses**"), including, without limitation, the Licenses and Medicare/Medi-Cal Provider Agreements set forth on **Schedule 1.7(b)**, except to the extent Purchaser elects, in its discretion, not to take assignment of any such Licenses;

(c)    all of Sellers' interest in and to the Owned Real Property and all of Sellers' interest, to the extent assignable or transferable, in and to all of the following (the "**Assigned Leases**"): (i) personal property leases with respect to the operation of the Hospital (including leases for assets described in <u>Section 1.7(i)</u>), (ii) the real property leases for all real property leased by Hospital Seller and set forth on **Schedule 1.7(c)(ii)** (the "**Leased Real Property**"),

6

and (iii) the real property leased or subleased by Hospital Seller to a third party and set forth on **Schedule 1.7(c)(iii)** (the "**Tenant Leases**");

      (d)    other than those contracts specified in 1.7(x), all of Hospital Seller's interest, to the extent assignable or transferable, in and to all contracts and agreements (including, but not limited to, purchase orders and the State Services Agreement) with respect to the operation of the Hospital that have been designated by Purchaser as a contract to be assumed and assigned pursuant to <u>Section 1.11</u> (the "**Assigned Contracts**");

      (e)    <u>[Reserved]</u>;

      (f)    to the extent assignable or transferable, all inventories of supplies, drugs, food, janitorial and office supplies and other disposables and consumables (i) located at the Hospital, or (ii) used in the operation of the Hospital (the "**Inventory**") except as set forth in <u>Section 1.8(f)</u>;

      (g)    other than Utility Deposits, all prepaid rentals, deposits, prepayments (excluding prepaid insurance and Base Payments (as defined in State Services Agreement) recieved prior to the Effective Time and prepaid taxes) and similar amounts relating to the Assigned Contracts and/or the Assigned Leases, which were made with respect to the operation of the Hospital (the "**Prepaids**");

      (h)    to the extent assignable or transferrable, all of the following that are not proprietary to Sellers and/or owned by or proprietary to Sellers' affiliates:  operating manuals, files and computer software with respect to the operation of the Hospital, including, without limitation, all patient records, medical records, employee records, billing records, financial records, equipment records, construction plans and specifications, and medical and administrative libraries; *provided, however*, that any electronic medical records may be transferred in paper or "pdf" if Sellers' EMR system and Purchaser's EMR system are not interoperable;

      (i)    to the extent assignable or transferrable (and if leased, to the extent the associated lease is transferrable), including any assignment which is made effective pursuant to the Sale Order where the consent of a third party is required pursuant to the terms of an applicable agreement but not obtained, all systems, servers, computers, hardware, firmware, middleware, telecom equipment, networks, data communications lines, routers, hubs, switches and all other information technology equipment, and all associated documentation owned, leased or licensed by Hospital Seller and used by Hospital Seller with respect to the operations of the Hospital;

      (j)    all Measure B trauma funding received by Hospital Seller after the Closing Date, regardless of the state fiscal year for which the funding is made in reference to and regardless of the state fiscal year for which the data was derived to calculate eligibility for such funding;

      (k)    all funds received by Hospital Seller after the Closing Date under the QAF Program and any subsequent QAF Program payment (e.g., QAF VI and QAF VII), regardless of the state fiscal year for which the funding is made in reference to and regardless of the state fiscal

7

year for which the data was derived to calculate eligibility for such funding; for purposes of this Agreement, the "**QAF Program**" means the California Department of Health Care Services Hospital Quality Assurance Fee Programs V ("**QAF V**"), and VI ("**QAF VI**").  To the extent Hospital Seller has paid QAF fees for QAF funds that are not received until after the Closing Date, Purchaser will reimburse the Hospital Seller for any such fees that have been paid;

(l)    all disproportionate share funds received by Hospital Seller after the Closing Date, regardless of the state fiscal year for which the funding is made in reference to and regardless of the state fiscal year for which the data was derived to calculate eligibility for such funding;

(m)    other than the Excluded Settlements and Actions, all regulatory settlements, rebates, adjustments, refunds or group appeals, including without limitation pursuant to all cost reports filed by Sellers for payment or reimbursement from government payment programs and other payors with respect to periods after the Signing Date;

(n)    other than the Excluded Settlements and Actions, all casualty and property insurance proceeds arising in respect of losses occurring after the Closing Date in connection with the ownership or operation of, or damage or destruction to, the Assets;

(o)    all transferable unclaimed property of any Person in Sellers' possession as of the Closing Date that relate to the Hospital, including, without limitation, property which is subject to applicable escheat laws;

(p)    to the extent assignable or transferable by Sellers without out-of-pocket expense to Sellers, all warranties (including warranties of any manufacturer or vendor) on or in connection with the Assets (including the Personal Property) in favor of the Hospital or Sellers;

(q)    the right to use the names "Seton Medical Center" and "Seton Medical Center Coastside", including any trademarks, service marks, trademark and service mark registrations and registration applications, trade names, trade name registrations, logos, domain names, trade dress, copyrights, copyright registrations, website content, know-how, trade secrets and the corporate or company names of Hospital Seller and the name of the Hospital, together with all rights to sue and recover damages for infringement, dilution, misappropriation or other violation or conflict associated with any of the foregoing; at the Closing, Purchaser will execute and deliver to Sellers the Transition Services Agreement granting to Sellers an unlimited, royalty free, irrevocable license to use any and all of the foregoing solely in connection with the wind-down of the Business, the completion of the Bankruptcy Cases and the dissolution of Sellers (and following completion of such wind-down, Bankruptcy Cases and dissolution of Sellers, such license shall automatically terminate);

(r)    all goodwill of the Hospital evidenced by or associated with any of the Assets;

(s)    to the extent transferable or assignable, Hospital Seller's right or interest in the telephone and facsimile numbers and uniform resource locaters used with respect to the operation of the Hospital;

8

(t)    all of Hospital Sellers' interest in and to, from and after the Licensure Date, to Hospital Seller's Medicare and Medi-Cal provider agreements and lockbox account(s) identified on **Schedule 1.7(t)**, with the submission and payment of claims to be made in accordance with the provisions of Section 3.4 of the IMA;

(u)    with respect to Verity Holdings, the real property assets represented by the assessor's parcel numbers (APN's) listed in **Schedule 1.7(u)** hereof, together with all plant, buildings, structures, installments, improvements, fixtures, betterments, additions and constructions in progress situated thereon (the "**Purchased Verity Holdings Assets**");

(v)    except for the Excluded Assets, to the extent assignable or transferable, and subject to the Permitted Exceptions, any other assets owned by Hospital Seller (which are not otherwise specifically described above in this Section 1.7) that are used in the operation of the Hospital;

(w)    all claims, counterclaims and causes of action of each Seller, Seller affiliate or such Seller's or Seller affiliate's bankruptcy estate (including parties acting for and on behalf of such Seller's bankruptcy estate, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Cases), arising under or with respect to claims and causes of action against Purchaser or any Purchaser affiliate or that relate to the Assets or the Transferred Obligations but excluding any claims or causes of action: (i) relating to the Excluded Assets; (ii) arising under Chapter 5 of the Bankruptcy Code; or (iii) as set forth on **Schedule 1.7(w)**; and

(x)    subject to Section 4.9 and the provisions of **Exhibit 4.9**, all of Sellers' interest in, and all of Sellers' obligations due under, from and after the Licensure Date, to the extent assignable or transferable, in and to any of the Hospital's services, participation or provider agreements with private health plans, insurers or other third party payors (collectively, the "**Private Payor Agreements**") that have been designated by Purchaser as an Assigned Contract pursuant to Section 1.11 (to the extent so designated, the "**Transferred Private Payor Agreements**"), *provided that*, (i) the submission and payment of claims shall be in accordance with the provisions of Section 3.4 of the IMA, and (ii) Private Payor Agreements shall not include any "risk-sharing" agreements with independent physician associations;

As used herein, the term "**Permitted Exceptions**" means: (i) the Transferred Obligations; (ii) liens for taxes not yet due and payable; (iii) easements, rights of way, zoning ordinances and other similar encumbrances affecting real property; (iv) other imperfections of title or encumbrances, if any, which are not monetary in nature and that are not, individually or in the aggregate, material to the business of the Hospital; (v) any agreements made with any governmental authority in order to obtain any consent or approval, including, without limitation, in connection with the Medicare and Medi-Cal provider agreements; and (vi) other imperfections of title or encumbrances that are expressly identified on **Schedule 1.7** hereof.

1.8    Excluded Assets. Notwithstanding anything to the contrary in Section 1.7, each Seller shall retain all interests, rights and other assets owned directly or indirectly by it (or any of such Seller's affiliates) which are not among the Assets, including, without limitation, the following interests, rights and other assets of such Seller (collectively, the "**Excluded Assets**"):

9

(a)    cash, cash equivalents and short-term investments;

(b)    all Seller Plans (defined below) and the assets of all Seller Plans and any asset that would revert to the employer upon the termination of any Seller Plan, including, without limitation, any assets representing a surplus or overfunding of any Seller Plan;

(c)    all contracts that are not Assigned Contracts and all Private Payor Agreements that are not Transferred Private Payor Agreements;

(d)    all leases that are not Assigned Leases;

(e)    the portions of Inventory, Prepaids, and other assets disposed of, expended or canceled, as the case may be, by such Seller after the Signing Date and prior to the Effective Time in the ordinary course of business;

(f)    assets owned and provided by vendors of services or goods to the Hospital;

(g)    Except for as stated in Section 1.7(j), Section 1.7(k), and Section 1.7(l), all accounts and interest thereupon, notes and interest thereupon and other receivables of Sellers, including, without limitation, accounts, notes or other amounts receivable, and all rights, interests and proceeds, and claims, counterclaims and causes of action, related thereto, including all accounts and other receivables, and Seller Cost Report settlements related thereto, in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital, billed and unbilled, recorded and unrecorded, for services, goods, products and supplies provided by Sellers prior to the Effective Time whether payable by Medicare, Medicaid, or any other payor (including an insurance company), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source (collectively, "**Accounts Receivable**"); all documents, records, correspondence, work papers and other documents primarily relating to the Accounts Receivable; and all rights, claims and causes of action of Sellers to the extent related to and/or to the extent arising out of the Accounts Receivable;

(h)    all of such Seller's organizational or corporate record books, minute books, tax returns, tax records and reports, data, files and documents, including electronic data related thereto;

(i)    except as set forth in Section 1.7(w) and 1.8(g), all claims, counterclaims and causes of action of such Seller or such Seller's bankruptcy estate (including parties acting for or on behalf of such Seller's bankruptcy estate, including, but not limited to, the official committee of unsecured creditors appointed in the Bankruptcy Cases), including, without limitation, rights of recovery or set-off of every kind and character against third parties, causes of action arising out of any claims and causes of action under chapter 5 of the Bankruptcy Code and any related claims, counterclaims and causes of action under applicable non-bankruptcy law, and any rights to challenge liens asserted against property of such Seller's bankruptcy estate,

10

including, but not limited to, liens attaching to the Purchase Price paid to such Seller, and the proceeds from any of the foregoing;

(j)    other than insurance proceeds described in Section 1.7(n), all insurance policies and contracts and coverages obtained by such Seller or listing such Seller as insured party, a beneficiary or loss payee, including prepaid insurance premiums, and all rights to insurance proceeds under any of the foregoing, and all subrogation proceeds related to any insurance benefits arising from or relating to Assets prior to the Closing Date;

(k)    all deposits made with any entity that provides utilities to the Hospital (the "**Utility Deposits**");

(l)    all rents, deposits, prepayments, and similar amounts relating to any contract or lease that is not an Assigned Contract or Assigned Lease;

(m)    all non-transferrable unclaimed property of any third party as of the Effective Time, including, without limitation, property which is subject to applicable escheat laws;

(n)    all other bank accounts of such Sellers not listed on **Schedule 1.7(t)**;

(o)    all writings and other items that are protected from discovery by the attorney-client privilege, the attorney work product doctrine or any other cognizable privilege or protection;

(p)    the rights of such Seller to receive mail and other communications with respect to Excluded Assets or Excluded Liabilities;

(q)    all director and officer insurance;

(r)    all tax refunds and tax assets of such Seller;

(s)    all documents, records, operating manuals and film pertaining to the Hospital that the parties agree that such Seller is required by law to retain;

(t)    all patient records and medical records which are not required by law to be maintained by such Seller as of the Effective Time;

(u)    all documents, records, correspondence, work papers and other patient records that may not be transferred under applicable law, and any other documents, records, or correspondence (including with respect to any employees) that may not be transferred under applicable law;

(v)    any rights or documents relating to any Excluded Liability or other Excluded Asset;

(w)    any rights or remedies provided to such Seller under this Agreement and each other document executed in connection with the Closing;

11

(x)    any: (i) personnel files for employees of such Seller who are not hired by Purchaser; (ii) other books and records that such Seller is required by Law to retain; provided, however, that except as prohibited by Law and subject to Article 5, Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the business of the Hospital as conducted before the Closing or that relate to any of the Assets; (iii) documents which such Seller is not permitted to transfer pursuant to any contractual obligation owed to any third party; (iv) documents primarily related to any Excluded Assets; and (v) documents necessary to prepare tax returns (Purchaser shall be entitled to a copy of such documents).  With respect to documents necessary to prepare cost reports, Purchaser shall receive the original document and such Seller shall be entitled to retain a copy of such documents for any period ending on or prior to the Closing Date;

(y)    all deposits or other prepaid charges and expenses paid in connection with or relating to any other Excluded Assets;

(z)    all pre-Closing settlements or settlements pursuant to adversary proceedings in the Bankruptcy Cases, including, without limitation, any proceedings identified in <u>Section 1.8(i)</u> (together with the items identified in <u>Section 1.8(i)</u>, the "**Excluded Settlements and Actions**");

(aa)    for the avoidance of doubt, all QAF IV and QAF V payments actually received prior to the Closing Date;

(bb)    all assets of Verity Holdings other than the Purchased Verity Holdings Assets and all assets of any of the tenants located in the leased premises of the purchased Verity Holdings properties;

(cc)    any rights or remedies, including deposits, against any individual or entity arising pursuant to (including in connection with Sellers' termination of) or relating to that certain Asset Purchase Agreement dated January 8, 2019 between, *inter alia*, Sellers and Strategic Global Management, Inc.;

(dd)    any and all rights and entitlements of Sellers in respect of that certain Settlement Agreement, executed as of April 29, 2019, by and between, on the one hand, Premier, Inc., Premier Services, LLC ("**Premier GP**"), Premier Healthcare Alliance, L.P. ("**Premier LP**"), Premier Healthcare Solutions, Inc. ("**PHSI**") and each of Premier, Inc.'s other subsidiaries (collectively and including Premier GP, Premier LP and PHSI, "**Premier**"), and on the other hand, Verity Health System of California, Inc., formerly known as Daughters of Charity Health System ("**VHS**"), as approved by the Bankruptcy Court by order entered on May 29, 2019 [Docket No. 2461], including but not limited to the right to convert and exchange partnership interests arising under that certain Amended and Restated Limited Partnership Agreement, effective as of October 1, 2013, as amended, by and among Premier LP, Premier GP and the limited partners of Premier LP party thereto (including VHS);

(ee)    any and all rights and entitlements of Sellers in respect of the compensations under that certain Services Agreement by and between the California Department of Public Health (the "State"), on the one hand, and on the other hand, Verity Healthcare System

12

of California, Inc., ("Verity") and Seton Medical Center, a California nonprofit public benefit corporation as approved by the Bankruptcy Court on March 20, 2020 [Docket No. 4315] (the "State Services Agreement"), as it may be amended,  received or due  on account of  services provided prior to Effective Time;

(ff)    any COVID-19 grants or related governmental awards or supplemental payments received,  allocable to, or on account of the delivery of individual patient care services performed prior to the Effective Time. (All other COVID-19 grants or related government awards shall be the property of Purchaser.); and

(gg)    any assets identified in **Schedule 1.8(gg)**.

1.9    Transferred Obligations.  Purchaser is not assuming any liabilities of Sellers. Instead, on and after the Closing Date, Purchaser shall be responsible for and agrees to discharge, perform and satisfy fully, on and after the Effective Time, the following liabilities and obligations and only the following liabilities and obligations (collectively, the "**Transferred Obligations**"):

(a)    the Assigned Contracts and all obligations under the Assigned Contracts but solely to the extent related to periods after the Effective Time;

(b)    the Assigned Leases and all obligations under the Assigned Leases but solely to the extent related to periods after the Effective Time;

(c)    all liabilities and obligations arising out of or relating to any act, omission, event or occurrence connected with the use, ownership or operation by Purchaser of the Hospital or any of the Assets on or after the Effective Time;

(d)    accrued payroll and related expenses with respect to Hired Employees arising on or following the Effective Time;

(e)    all liabilities and obligations related to the Hired Employees arising on or following the Effective Time;

(f)    all unpaid real and personal property taxes, if any, that are attributable to the Assets after the Effective Time, subject to the prorations provided in Section 1.6;

(g)    all liabilities and obligations relating to utilities being furnished to the Assets, subject to the prorations provided in Section 1.6;

(h)    any documentary, sales and transfer tax liabilities incurred as a result of the consummation of the transaction contemplated by this Agreement;

(i)    all liabilities or obligations provided for in Section 5.3;

(j)    on and after the Closing Date, any obligations Purchaser may desire or need to undertake in order to have the Certifications/Licenses/Permits identified on **Schedule 1.7(b)** reissued to Purchaser, as well as any obligations associated with Hospital Seller's Medicare and Medi-Cal provider agreements, but subject to the satisfaction of the condition

13

precedent set forth in <u>Section 8.6</u>, and any Medi-Cal liabilities or obligations needed to support ongoing Hospital Quality Assurance Fee Program payments; and

(k)    any other obligations and liabilities identified in **Schedule 1.9(k)**.

1.10    <u>Excluded Liabilities</u>.  Purchaser shall have those duties, obligations and liabilities set forth in this Agreement, the IMA, the Leaseback Agreement, the Transition Services Agreement, the Bill of Sale, the Transfer Agreement and the Real Estate Assignment(s) and shall be responsible for the Transferred Obligations.  However, Purchaser shall not assume or become responsible for any liabilities of any Seller (the "**Excluded Liabilities**"), and each Seller shall remain fully and solely responsible for all of such Seller's debts, liabilities, contract obligations, expenses, obligations and claims of any nature whatsoever related to the Assets or the Hospital other than the Transferred Obligations.

1.11    <u>Designation of Assigned Contracts and Assigned Leases</u>.

(a)    Except as provided in <u>Section 1.11(b)</u>, all contracts and leases will be subject to evaluation by Purchaser for assumption or rejection (collectively "**Evaluated Contracts**").  Not later than thirty (30) days prior to Closing (i) Purchaser shall notify each Seller in writing of which Evaluated Contracts are to be assumed by such Seller and assigned to Purchaser, and (ii) Purchaser shall notify each Seller in writing signed and dated by Purchaser of which Evaluated Contracts are to be rejected by such Seller (collectively, the "**Rejected Contracts**"); <u>provided</u>, that Purchaser shall have the right to designate additional Evaluated Contracts for assumption up to  fourteen (14) days prior to Closing and Sellers shall have the absolute right to remove any Evaluated Contract from the list of Assigned Contracts in order to preserve avoidance claims.  Each Seller shall file such motions in the Bankruptcy Court and take such other actions as are reasonably necessary to ensure that final and non-appealable orders are entered: (x) assuming and assigning the respective Assigned Contracts or Assigned Leases applicable to such Seller to Purchaser, and (y) rejecting the Rejected Contracts.  With respect to each Assigned Lease, the applicable Seller shall execute and deliver to Purchaser an Assignment of Lease.  Notwithstanding anything to the contrary set forth in this Agreement, the Rejected Contracts shall constitute part of the Excluded Assets pursuant to, and as defined in, this Agreement.

(b)    At Closing and pursuant to an order of the Bankruptcy Court and any applicable authority, including, but not limited to, section 365 of the Bankruptcy Code, each Seller will assume and immediately assign to Purchaser the leases of such Seller for Leased Real Property and the Tenant Leases.

(c)    Notwithstanding the foregoing, except for those contracts set forth in **Schedule 1.11(c)** and subject to Section 4.9 (the "**Required Assigned Contracts**"), Purchaser's obligation to consummate the transactions contemplated by this Agreement are not contingent upon the assumption, assignment or rejection of any contract or lease, or on the amount of any payment or other performance needed to cure any default thereunder.

14

1.12    Disclaimer of Warranties; Release.

(a)    THE ASSETS TRANSFERRED TO PURCHASER WILL BE SOLD BY SELLERS AND PURCHASED BY PURCHASER IN THEIR PHYSICAL CONDITION AT THE EFFECTIVE TIME, "AS IS, WHERE IS AND WITH ALL FAULTS AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, USAGE, WORKMANSHIP, QUALITY, PHYSICAL CONDITION, OR VALUE, AND ANY AND ALL SUCH OTHER REPRESENTATIONS AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, AND WITH RESPECT TO THE LEASED REAL PROPERTY WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, INCLUDING, WITHOUT LIMITATION, THE LAND, THE BUILDINGS AND THE IMPROVEMENTS.  ALL OF THE PROPERTIES, ASSETS, RIGHTS, LICENSES, PERMITS, PRIVILEGES, LIABILITIES, AND OBLIGATIONS OF SELLERS INCLUDED IN THE ASSETS AND THE TRANSFERRED OBLIGATIONS ARE BEING ACQUIRED "AS IS, WHERE IS" ON THE CLOSING DATE AND IN THEIR PRESENT CONDITION, WITH ALL FAULTS.  ALL OF THE TANGIBLE ASSETS SHALL BE FURTHER SUBJECT TO NORMAL WEAR AND TEAR AND NORMAL AND CUSTOMARY USE OF THE INVENTORY AND SUPPLIES IN THE ORDINARY COURSE OF BUSINESS UP TO THE EFFECTIVE TIME.

(b)    Purchaser acknowledges that Purchaser has examined, reviewed and inspected all matters which in Purchaser's judgment bear upon the Assets, the Sellers, the Hospital, the business of the Hospital and their value and suitability for Purchaser's purposes and is relying solely on Purchaser's own examination, review and inspection of the Assets and Transferred Obligations.  Purchaser releases each Seller and its affiliates from all responsibility and liability regarding the condition, valuation, salability or utility of the business of the Hospital or the Assets, or their suitability for any purpose whatsoever.  Purchaser further acknowledges that the representations and warranties of Sellers contained in ARTICLE 2 of this Agreement are the sole and exclusive representations and warranties made by Sellers to Purchaser (including with respect to the Hospital, the Assets and the Transferred Obligations) and shall expire, and be of no further force or effect after the date which is twelve (12) months from the Closing Date, except that the Sale Order Date Representations shall expire, and be of no further force or effect upon the Sale Order Date, and in each case Sellers shall not have any liability in respect of any breach thereof following such expiration.

US_Active\114503813\V-2

# ARTICLE 2

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller hereby represents, warrants and covenants to Purchaser, severally (and not jointly) with respect to such Seller that the following matters are true and correct as of the Signing Date, except as would not have a material adverse effect upon the Assets, taken as a whole (a "**Material Adverse Effect**") and except as disclosed in the disclosure schedule, as may be amended pursuant to the terms of this Agreement (the "**Disclosure Schedule**"), provided that the representations and warranties set forth in <u>Sections 2.1</u> (Authorization), <u>2.2</u> (Binding Agreement), <u>2.3</u> (Organization and Good Standing; No Violation), <u>2.8</u> (Compliance with Legal Requirements), <u>2.9</u> (Required Consents), <u>2.11</u> (Title), <u>2.14</u> (Legal Proceedings), and <u>2.22</u> (Bankruptcy Proceedings) (the "**Sale Order Date Representations**") shall also be made as of immediately prior to the entry of the Sale Order (the "**Sale Order Date**"):

2.1    <u>Authorization</u>.  Such Seller has all necessary corporate power and authority to enter into this Agreement and, subject to Bankruptcy Court approval, to carry out the transactions contemplated hereby.

2.2    <u>Binding Agreement</u>.  This Agreement has been duly and validly executed and delivered by such Seller and, assuming due and valid execution by Purchaser, this Agreement constitutes a valid and binding obligation of such Seller enforceable in accordance with its terms subject to (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect, and (b) limitations on the enforcement of equitable remedies.  Except for such corporate actions which have been taken on or before the date hereof, no other corporate action on the part of Sellers is necessary to authorize the execution, delivery and performance of this Agreement and the transactions contemplated hereby and thereby.

2.3    <u>Organization and Good Standing; No Violation</u>.

(a)    Such Seller is an entity duly organized, validly existing and in good standing under the laws of the State of California.  Such Seller has all necessary power and authority to own, operate and lease its properties and to carry on its businesses as now conducted.

(b)    Neither the execution and delivery by such Seller of this Agreement nor the consummation of the transactions contemplated hereby by such Seller nor compliance with any of the material provisions hereof by such Seller, will violate, conflict with or result in a breach of any material provision of such Seller's articles of incorporation or bylaws or any other organizational documents of such Seller.

2.4    <u>Contracts</u>.  Except as set forth in **Schedule 2.4**, upon entry of the Sale Order and Purchaser's payment of the Cure Costs, to Seller's knowledge, Seller is not in material breach or default of the Assigned Contracts or Assigned Leases except to the extent of defaults that will be cured in connection with assumption pursuant to Section 365 of the Bankruptcy Code, and no act or omission by the appropriate Seller has accrued or failed to occur which, with the giving of notice, the lapse of time or both would constitute a default under the Assigned Contracts or

16

Assigned Leases except to the extent of defaults that will be cured in connection with assumption pursuant to Section 365 of the Bankruptcy Code.  No provision of this Section 2.4 shall apply to any failure to obtain consents to the assignment of the Assigned Contracts and Assigned Leases from third parties to the Assigned Contracts and Assigned Leases for which consent is required to assign the Assigned Contracts and Assigned Leases to Purchaser (the "**Contract and Lease Consents**").

2.5     Brokers and Finders.  Except as set forth on **Schedule 2.5**, neither such Seller nor any affiliate thereof, nor any officer or director thereof, have engaged or incurred any liability to any finder, broker or agent in connection with the transactions contemplated hereunder.

2.6     Seller Knowledge.  References in this Agreement to "Sellers' knowledge" or "the knowledge of Sellers" means the actual knowledge of the Chief Executive Officer or Chief Financial Officer of the applicable Seller, without independent research.  No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other Person or for any other reason.

2.7     Non-Contravention.   Neither the execution and delivery by Sellers of this Agreement and each Ancillary Agreement nor performance of any of the material provisions hereof by Sellers, will violate, conflict with or result in a breach of any material provisions of the articles of incorporation or bylaws of Sellers.

2.8     Compliance with Legal Requirements. Except as set forth in **Schedule 2.8,** to the knowledge of Sellers: each Seller, with respect to the operation of the Hospital, is in material compliance with all applicable laws, statutes, ordinances, orders, rules, regulations, policies, guidelines, licenses, certificates, judgments or decrees of all judicial or governmental authorities (federal, state, local, foreign or otherwise) (collectively, "**Legal Requirements**").  Except as set forth in **Schedule 2.8**, to the knowledge of Sellers, none of the Sellers, with respect to the operation of the Hospital, has been charged in writing with or been given written notice of or is under investigation with respect to, any material violation of, or any obligation to take material remedial action under, any applicable Legal Requirements.

2.9     Required Consents. Except as set forth in **Schedule 2.9**, and other than in connection with any Licenses, any provider agreements (including any such agreements with a governmental authority) and the CA AG (defined below), Sellers are not a party to or bound by, nor are any of the Assets subject to, any mortgage, or any material lien, deed of trust, material lease, or material contract or any material order, judgment or decree which, after giving effect to the Sale Order: (a) will require the consent of any third party to the execution of this Agreement, or (b) will require the consent of any third party to consummate the transactions contemplated by this Agreement.

2.10    Environmental Matters.

(a)     Sellers have provided Purchaser with the Phase I Environmental Site Assessments set forth in said **Schedule 2.10(a)**.

(b)     Except as disclosed in **Schedule 2.10(b)**, to the knowledge of Sellers, the

17

operations of the Hospital are not in material violation of any applicable limitations, restrictions, conditions, standards, prohibitions, requirements and obligations of Environmental Laws and related orders of any court or any other governmental authority.

(c)     For the purposes of this Section, the term "**Environmental Laws**" shall mean all state, federal or local laws, ordinances, codes or regulations relating to Hazardous Substances or to the protection of the environment, including, without limitation, laws and regulations relating to the storage, treatment and disposal of medical and biological waste. For purposes of this Agreement, the term "**Hazardous Substances**" shall mean (i) any hazardous or toxic waste, substance, or material defined as such in (or for the purposes of) any Environmental Laws, (ii) asbestos-containing material, (iii) medical and biological waste, (iv) polychlorinated biphenyls, (v) petroleum products, including gasoline, fuel oil, crude oil and other various constituents of such products, and (vi) any other chemicals, materials or substances, exposure to which is prohibited, limited or regulated by any Environmental Laws.

2.11    Title.  Within five (5) days after the Signing Date, Sellers shall have delivered at their own expense: (i) for all the Real Property preliminary title reports issued by Chicago Title (the "**Title Commitments**"), (ii) for all of the Real Property all underlying title documents listed on the Title Commitments (the "**Underlying Title Documents**"), and (iii) for the Hospital an as-built ALTA Survey (the "**Survey**", and collectively with the Title Commitment and the Underlying Title Documents, the "**Title Documents**").

2.12    Certain Other Representations with Respect to the Hospital.

(a)     Except as set forth in **Schedule 2.12**, all Licenses which are material and necessary to the operation of the Hospital by Sellers are valid and in good standing and Sellers are in compliance with the terms and conditions of all such Licenses in all material respects. Except as set forth in **Schedule 2.12**, as of the Closing Date Sellers will have any and all material Licenses required under Legal Requirements to conduct the Hospital as presently conducted by Sellers. To the knowledge of Sellers, no loss or expiration of any License is pending or threatened.

(b)     Hospital Seller is certified for participation in the Medicare, Medi-Cal and TRICARE programs and any other federal or state health care reimbursement programs in which it participates, and has current and valid provider agreements with each such program.

(c)     Sellers have not been excluded from Medicare, Medi-Cal or any federal or state health care reimbursement program, and, to the knowledge of Sellers, there is no pending or threatened exclusion action by a governmental authority against Sellers.

2.13    Financial Statements.

(a)     **Schedule 2.13(a)** hereto contains the following financial statements (the "Historical Financial Statements"): (i) the Sellers audited financial statement with consolidating statement of operations and  consolidating balance sheets of Sellers for the years ended 2016 and 2017; (ii) the unaudited consolidating statement of operations and consolidating  balance sheet of Sellers as of June 30, 2018; (iii) the Sellers' unaudited monthly operating report and four month

18

consolidating statement of operations and consolidating balance sheet for the period ending December 31, 2018 [ECF Docket No.1453];  (iv) the Sellers' unaudited monthly operating report and sixteen (16) month consolidating statement of operations and consolidating balance sheet for the period ending of December 31, 2019 [ECF Docket No.4038] ; and (v) the Sellers' unaudited monthly operating report and seventeen (17) month consolidating statement of operations and consolidating balance sheet for the period ending January 31, 2020 [ECF Docket No. 4198].  .

(b)    The monthly operating statements and monthly consolidating balance sheets contained in the Historical Financial Statements were prepared under the Guidelines of the Office of the United States Trustee for Region 16 and to Seller's knowledge present fairly the results of the operations of the Sellers as of and for the periods covered therein. Except as set forth on **Schedule 2.13(b)**, the Sellers' balance sheets contained in the Historical Financial Statements: (i) are true, complete and correct in all material respects; and (ii) to the extent audited by an independent certified public accounting firm, to Sellers' knowledge, have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods covered, except as disclosed therein.

2.14    Legal Proceedings. Except as set forth on **Schedule 2.14**, and except for any and all cases and/or pleadings filed or to be filed in the Bankruptcy Court, which shall be available through          Sellers'          claims          and          noticing          agent's          website          at http://www.kcclcc.com/VERITYHEALTH/, to the knowledge of Sellers, there are no material claims, proceedings or investigations pending or threatened with respect to the ownership of the Assets or the operation of the Hospital by Sellers before any governmental authority. Except as set forth on **Schedule 2.14**, and other than any action or proceeding brought in the Bankruptcy Court, to the knowledge of Sellers, Sellers are not subject to any government order with respect to the ownership or operation by Sellers of the Hospital or the other Assets or the other Assets and are in substantial compliance with respect to each such government order.

2.15    Employee Benefits. **Schedule 2.15** contains a list of: (i) each pension, profit sharing, bonus, deferred compensation, or other retirement plan or arrangement of Sellers with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee pension benefit plan" as defined in Section 3(2) of ERISA, (ii) each medical, health, disability, insurance or other plan or arrangement of Sellers with respect to the operation of the Hospital, whether oral or written, which constitutes an "employee welfare benefit plan" as defined in Section 3(1) of ERISA, and (iii) each other employee benefit or perquisite provided by Sellers with respect to the operation of the Hospital, in which any employee of Sellers participates in his/her capacity as such (collectively, the "**Seller Plans**").

2.16    Personnel. **Schedule 2.16** sets forth a complete list (as of the date set forth therein) of names, positions and current annual salaries or wage rates and any scheduled bonus of all employees of Seton immediately prior to the Signing Date, whether such employees are full time employees, part-time employees, on short-term or long-term disability or on leave of absence pursuant to Seton's policies, the Family and Medical Leave Act of 1993 or other similar Legal Requirements (the "**Hospital Employees**") and indicating whether the Hospital Employee is full-time or part-time.  Sellers shall have the right to update to **Schedule 2.16** to reflect changes in employment status or new hires and terminations occurring after the Signing Date by providing a

19

revised schedule to Purchaser no later than five (5) business days before the date scheduled for the Closing.

2.17    Insurance.  **Schedule 2.17** contains a list of all material insurance maintained by Sellers with respect to the Assets and the Business, as of the Signing Date.

2.18    Payer Contracts. To the knowledge of Sellers, and subject to Section 365 of the Bankruptcy Code, **Schedule 2.18** sets forth a complete list of all written contracts with private third party payers including insurance companies and HMOs ("**Payer Contracts**"). Sellers have provided Purchaser with a true and correct copy of all material Payer Contracts, whether or not entered into in the ordinary course of business, or otherwise required to be disclosed on **Schedule 2.18**, in each case together with all amendments thereto.

2.19    Excluded Individuals.  Except as set forth on **Schedule 2.19**, to the knowledge of Sellers: neither Sellers, the Hospital nor any director, officer or employee of Sellers or the Hospital: (a) was, is or is proposed to be, suspended, excluded from participation in, or sanctioned under, any federal or state health care program (including, without limitation, Medicare and Medicaid) (an "**Excluded Individual**"); (b) has been convicted of any criminal offense related to the delivery of any medical or health care services or supplies, or related to the neglect or abuse of patients; (c) has failed to maintain its current License to provide the services required to be provided by it to or on behalf of Sellers and the Hospital; or (d) is unable to obtain or maintain liability insurance consistent with commercially reasonable industry practices.

2.20    Third Party Payor Cost Reports.  To Sellers' knowledge, Sellers have duly filed all required cost reports for the fiscal years set forth on **Schedule 2.20**, and copies of all such cost reports filed by or on behalf of Sellers have been provided to Purchaser.  To Sellers' knowledge, all such cost reports accurately reflect in all material respects the information required to be included thereon and such cost reports do not claim, and Sellers have not, to their knowledge received, reimbursement in any amount in excess of the amounts provided by law or any applicable agreement.  To Sellers' knowledge, there are no facts or circumstances that would give rise to any disallowance under such cost reports.

2.21    Recoupment Claims.  To Sellers' knowledge, except as set forth on **Schedule 2.21**, and except for routine claim adjustments, denials, adjudications and reconciliations arising in the ordinary course, there are no outstanding Seton Overpayment (as such term is defined in **Exhibit 4.9**) claims pending or threatened against Seton.  For the avoidance of doubt, responsibility for Seton Overpayments shall be addressed in accordance with Section 4.9 and **Exhibit 4.9** of this Agreement.

2.22    Bankruptcy Proceedings Compliance.    Sellers have duly complied with all Bankruptcy Court orders, directives, and requirements applicable with respect to giving appropriate notice, to creditors and parties in interest, of Sellers' request to authorize entry into this Agreement and to complete the transactions contemplated hereby, which notices shall be subject to Purchaser's prior written approval, which approval shall not be unreasonably withheld.

20

# ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

As an inducement to Sellers to enter into this Agreement and to consummate the transactions contemplated by this Agreement, Purchaser hereby represents, warrants and covenants to Sellers as to the following matters as of the Signing Date and, except as otherwise provided herein, shall be deemed to remake all of the following representations, warranties and covenants as of the Closing Date:

3.1 <u>Authorization</u>. Purchaser has full power and authority to enter into this Agreement and has full power and authority to perform its obligations hereunder and to carry out the transactions contemplated hereby. No additional internal consents are required in order for Purchaser to perform its obligations and agreements hereunder.

3.2 <u>Binding Agreement</u>. This Agreement has been duly and validly executed and delivered by Purchaser and, assuming due and valid execution by Sellers, subject to entry of the Sale Order, this Agreement constitutes a valid and binding obligation of Purchaser enforceable in accordance with its terms subject to: (a) applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect, and (b) limitations on the enforcement of equitable remedies.

3.3 <u>Organization and Good Standing</u>. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of California, is or will be duly authorized to transact business in the State of California, and has full power and authority to own, operate and lease its properties and to carry on its business as now conducted.

3.4 <u>No Violation</u>. Except as set forth in **Schedule 3.4**, neither the execution and delivery by Purchaser of this Agreement nor the consummation of the transactions contemplated hereby nor compliance with any of the material provisions hereof by Purchaser will: (a) violate, conflict with or result in a breach of any material provision of the Articles of Incorporation, Bylaws or other organizational documents of Purchaser or any contract, lease or other instrument by which Purchaser is bound; (b) require any approval or consent of, or filing with, any governmental agency or authority, (c) violate any law, rule, regulation, or ordinance to which Purchaser is or may be subject, (d) violate any judgment, order or decree of any court or other governmental agency or authority to which Purchaser is subject.

3.5 <u>Brokers and Finders</u>. Neither Purchaser nor any affiliate thereof nor any officer or director thereof has engaged any finder or broker in connection with the transactions contemplated hereunder.

3.6 <u>Representations of Sellers</u>. Purchaser acknowledges that it is purchasing the Assets on an "AS IS, WHERE IS" basis (as more particularly described in <u>Section 1.12</u>), and that Purchaser is not relying on any covenant, representation or warranty (expressed or implied, oral or otherwise) made on behalf of any Seller other than as expressly set forth in this Agreement. Purchaser further acknowledges that no Seller is making any representations or warranties herein relating to the Assets or the operation of the Hospital on and after the Effective Time.

21

3.7    <u>Legal Proceedings</u>.  Except as described on **<u>Schedule 3.7</u>**, there are no claims, proceedings or investigations pending or, to the best knowledge of Purchaser, threatened relating to or affecting Purchaser or any affiliate of Purchaser before any court or governmental body (whether judicial, executive or administrative) in which an adverse determination would materially adversely affect the properties, business condition (financial or otherwise) of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.  Neither Purchaser nor any affiliate of Purchaser is subject to any judgment, order, decree or other governmental restriction specifically (as distinct from generically) applicable to Purchaser or any affiliate of Purchaser which materially adversely affects the condition (financial or otherwise), operations or business of Purchaser or any affiliate of Purchaser or which would adversely affect Purchaser's ability to consummate the transactions contemplated hereby.

3.8    <u>No Knowledge of a Seller's Breach</u>.  Neither Purchaser nor any of its affiliates has knowledge of any breach of any covenant, representation or warranty by any Seller or of any other condition or circumstance that would give Purchaser a right to terminate this Agreement pursuant to <u>Section 9.1(c)</u>.  If information comes to Purchaser's attention on or before the Closing Date (whether through a Seller or otherwise and whether before or after the Signing Date) which indicates that Sellers have breached any of their covenants, representations or warranties under this Agreement, then the effect shall be as if the covenants, representations and warranties had been modified in this Agreement in accordance with the actual state of facts existing prior to the Effective Time such that there will be no breach under Sellers' covenants, representations and warranties in relation to such information; *provided*, *however*, that Purchaser must immediately notify Sellers if any such breach comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Sellers shall constitute a waiver by Purchaser of Sellers' breach, if any, of any covenant, representation or warranty.  If any such information comes to Purchaser's attention on or before the Closing Date (whether through a Seller or otherwise, including through updated schedules, and whether before or after the Signing Date) that would give Purchaser a right to terminate this Agreement pursuant to <u>Section 9.1(c)</u>, Purchaser must immediately notify Sellers if any such information comes to its attention on or before the Closing Date, and Purchaser's failure to so notify Sellers shall constitute a waiver of such right in relation to the relevant breach.

3.9    <u>Ability to Perform</u>.  Purchaser will have at the Closing immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement. In furtherance of the foregoing, Purchaser has provided Seller with evidence of such available funds in deposit accounts with recognized banking institutions and shall maintain such deposit accounts with a balance of not less than Forty Million Dollars ($40,000,000) at all times until the Closing.

3.10    <u>Purchaser Knowledge</u>.  References in this Agreement to "Purchaser's knowledge" or "the knowledge of Purchaser" means the actual knowledge of the Chief Executive Officer, Chief Financial Officer or Chief Operating Officer of Purchaser, without independent research. No constructive or imputed knowledge shall be attributed to any such individual by virtue of any position held, relationship to any other person or for any other reason.

US_Active\114503813\V-2

3.11    Investigation.  Purchaser has been afforded reasonable access to, and has been provided adequate time to review, the books, records, information, operations, facilities and personnel of each Seller and the Hospital for purposes of conducting a due diligence investigation of each Seller and the Hospital.  Purchaser has conducted a reasonable due diligence investigation of each Seller and the Hospital and has received satisfactory answers to all inquiries it has made respecting each Seller and the Hospital and has received all information it considers necessary to make an informed business evaluation of each Seller and the Hospital.  In connection with its due diligence investigation of each Seller and the Hospital, Purchaser has not relied upon any books, records, information, operations, facilities and personnel provided by any Seller, including in making its determination to enter into this Agreement and/or consummate the transactions contemplated hereby.  Purchaser has completed all of its due diligence of Sellers and the Hospital and this Agreement is not subject to any further due diligence of Sellers and the Hospital by Purchaser.

## ARTICLE 4

## COVENANTS OF SELLERS

4.1    Access and Information; Inspections.

4.1.1    From the Signing Date through the Effective Time: (a) each Seller shall afford to the officers and agents of Purchaser (which shall include accountants, attorneys, bankers and other consultants and authorized agents of Purchaser) reasonable access during normal business hours at Sellers' corporate headquarters in Los Angeles, California to, and the right to inspect, the books, accounts, records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital and the plant and property of the Hospital at the Hospital, and (b) each Seller shall furnish Purchaser with such additional financial and operating data and other information in such Seller's possession as to businesses and properties of the Hospital as Purchaser or its representatives may from time to time reasonably request; *provided*, *however*, that Sellers are not obligated to disclose information which is proprietary to Sellers and would not be essential to the ongoing operation of the Hospital by Purchaser; *provided*, *further*, that all disclosures of information shall be consistent with the confidentiality agreements and any other non-disclosure agreements entered into (or to be entered into) among Purchaser, its representatives and Seller(s).  Purchaser's right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of any Seller or the Hospital.

4.1.2    Notwithstanding anything contained herein, no Seller shall be required to provide Purchaser or its representatives or agents access to or disclose information where such access or disclosure would violate the rights of its patients, jeopardize the attorney-client or similar privilege with respect to such information or contravene any law, judgment, fiduciary duty or contract entered into prior to or on the date of this Agreement with respect to such information.

4.2    Cooperation.

4.2.1    Each Seller shall reasonably cooperate with Purchaser and its authorized representatives and attorneys: (a) in Purchaser's efforts to obtain all consents, approvals, authorizations, clearances and licenses required to carry out the transactions contemplated by this

23

Agreement (including, without limitation, those of governmental and regulatory authorities) or which Purchaser reasonably deems necessary or appropriate, (b) in the preparation of any document or other material which may be required by any governmental agency as a predicate to or result of the transactions contemplated in this Agreement, and (c) in Purchaser's efforts to effectuate the assignment of Assigned Contracts to Purchaser as of the Closing Date.  Except as may be otherwise requested by a Seller in order to comply with applicable law or regulatory guidance, notwithstanding anything contained herein, other than Bankruptcy Court orders and authorizations, it shall be Purchaser's sole responsibility (including payment of any fees, expenses, filings costs or other amounts) to obtain the Contract and Lease Consents, as well as all governmental consents, approvals, assignments, authorizations, clearances and licenses required to: (x) carry out the transactions contemplated by this Agreement, including but not limited to medical licenses, and/or (y) transfer any of the Assets, including any Licenses.  To the extent Purchaser needs certain information and data which is in the possession of a Seller in order for Purchaser to complete Purchaser's license and permit approval applications, Purchaser shall receive, upon request, reasonable assistance from such Seller in connection with the provision of such information.

4.2.2    Notwithstanding any provision to the contrary contained in this Agreement (including Section 8.6), no Seller shall be obligated to obtain the approval or consent to the assignment, to Purchaser, of any Assigned Contracts or Assigned Leases, from any party to any of the Assigned Contracts or Assigned Leases even if any such contract or lease states that it is not assignable without such party's consent.

4.2.3    From the Signing Date until the Closing, the parties agree that Sellers may update the Disclosure Schedule as necessary upon written notice to, and with the prior written consent of (which consent shall not be unreasonably withheld), Purchaser, and the applicable representation and warranty shall thereafter be deemed amended for all purposes by such updated Disclosure Schedule.  Notwithstanding the foregoing, should any exhibit or schedule not be completed and attached hereto as of the Signing Date, Sellers and Purchaser shall promptly negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Sellers and Purchaser in their reasonable discretion prior to being attached hereto.

4.3    Other Bidders.  Purchaser expressly acknowledges and agrees that each Seller has an obligation to seek out and determine the best and highest offer reasonably available for such Seller's assets in accordance with the Bankruptcy Code, and nothing herein shall amend, modify, alter, diminish or affect such obligation.

4.4    Sellers' Efforts to Close.  Each Seller shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Purchaser's obligations under this Agreement to the extent that such Seller's action or inaction can control or materially influence the satisfaction of such conditions; *provided, however*, that such Seller shall not be required to pay or commit to pay any amount to (or incur any obligation in favor of) any person (other than filing or application fees).

4.5    Termination Cost Reports.  Hospital Seller shall file all Medicare, Medi-Cal and any other termination cost reports required to be filed as a result of the consummation of: (a) the transfer of the Assets of Hospital Seller to Purchaser, and (b) the transactions contemplated by this

Agreement with respect to Hospital Seller, provided that Purchaser shall fund reasonable costs and expenses of preparation, filing and audit of such reports. Purchaser shall permit each Seller access to all Hospital books and records to prepare such reports and shall assist such Seller in the process of preparing, filing, and reviewing the termination cost reports. All such termination cost reports shall be filed by Hospital Seller in a manner that is consistent with current laws, rules and regulations. Hospital Seller shall be responsible for filing governmental cost reports for the period of January 1, 2020 through the Licensure Date. Purchaser shall be responsible for its own cost report filings relating to the Hospital beginning on the day immediately following the Licensure Date.

4.6    <u>Conduct of the Business</u>. From the Signing Date until the Closing, or the earlier termination of this Agreement, without the prior written consent of Purchaser, Sellers shall, with respect to the ownership of the Assets and the operation of the Hospital, use commercially reasonable efforts to (except as otherwise noted):

(a)    without regard to any Material Adverse Effect, carry on Sellers' ownership of the Assets and the operation of the Hospital consistent with past practice, but subject to the Bankruptcy Cases and Sellers' obligations and actions in connection therewith;

(b)    without regard to any Material Adverse Effect, maintain in effect the insurance and equipment replacement coverage with respect to the Assets;

(c)    without regard to any Material Adverse Effect, if and as permitted by the Bankruptcy Court, pay any bonuses payable under the Key Employee Retention Plan and Key Employee Incentive Plan of Sellers;

(d)    without regard to any Material Adverse Effect, maintain the Assets in materially the same condition as at present, ordinary wear and tear excepted;

(e)    without regard to any Material Adverse Effect, perform its obligations under all contracts with respect to the Assets in compliance with the Bankruptcy Code;

(f)    following entry of the Sale Order, permit and allow reasonable access by Purchaser and its representatives (which shall include the right to send written materials, all of which shall be subject to Sellers' reasonable approval prior to delivery) to make offers of post-Closing employment to any of Sellers' personnel (including access by Purchaser and its representatives for the purpose of conducting open enrollment sessions for Purchaser's employee benefit plans and programs) and to establish relationships with physicians, medical staff and others having business relations with Sellers;

(g)    with respect to material deficiencies, if any, cited by any governmental authority (other than the Attorney General of the State of California and other than with respect to seismic requirements) or accreditation body in the most recent surveys conducted by each, cure or develop and timely implement a plan of correction (without regard to Material Adverse Effect) that is reasonably acceptable to such governmental authority or such accreditation body;

25

(h)    timely file or cause to be filed all material reports, notices and tax returns required to be filed and pay all required taxes as they come due, unless such failure would not have a Material Adverse Effect;

(i)    in accordance with the Sellers' budget under their debtor in possession financing, timely pay any fees that are or become due and payable under QAF IV, QAF V, and QAF VI;

(j)    without regard to any Material Adverse Effect, comply in all material respects with all Legal Requirements (including Environmental Laws) applicable to the conduct and operation of the Hospital; and

(k)    without regard to any Material Adverse Effect, maintain all material approvals, permits and environmental permits relating to the Hospital and the Assets.

4.7    <u>Contract With Unions</u>.  Representatives of Sellers who are parties to collective bargaining agreements and Purchaser shall meet and confer from time to time as reasonably requested by either party to discuss strategic business options and alternative approaches in negotiating each collective bargaining agreement.  The applicable Sellers and Purchaser shall each participate in all union negotiations related to any specific collective bargaining agreement. Promptly following the Signing Date, applicable Sellers shall use commercially reasonable efforts to initiate discussions with Purchaser and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union.  The applicable Sellers will not unreasonably withhold, condition or delay approval or implementation of any successfully renegotiated collective bargaining agreement. The parties recognize that an applicable Seller's failure to secure a modification to any collective bargaining agreement, or to conclude a successor collective bargaining agreement shall not be a breach of Sellers' obligation under this Agreement, provided that if the unions refuse to negotiate, or otherwise are not timely, reasonable or realistic in renegotiating, the collective bargaining agreements during the period between the Signing Date and the Closing Date, Sellers and Purchaser will jointly consider, and negotiate mutually in good faith, alternative approaches that may be available and/or necessary to reduce Sellers' labor cost structure, including, but not limited to, seeking to reject the collective bargaining agreement(s).

4.8    <u>Indemnity Escrow Agreement</u>.  Purchaser and Sellers will enter into a mutually acceptable form of indemnity escrow agreement (the "**Indemnity Escrow Agreement**") providing for an indemnity escrow fund in an amount equal to ten percent (10%) of the Cash Consideration (the "**Indemnity Escrow Fund**") pursuant to which Sellers shall indemnify, defend and hold harmless Purchaser from and against any losses incurred or suffered by Purchaser, directly or indirectly, as a result of or arising from:  (a) any breach of any Sale Order Date Representation; (b) nonfulfillment of any covenant, agreement or other obligation of Sellers set forth in this Agreement or in any other related agreement or instrument; or (c) the Excluded Liabilities.  Such Indemnity Escrow Agreement shall have a term of twelve (12) months following the Closing Date (the "Escrow Period"), with the remaining balance of escrow funds to be released to Sellers at the end of such Escrow Period, subject to retention of funds for any pending indemnity claims.

4.9    <u>Transferred Private Payor Agreements</u>.  As more particularly set forth in **Exhibit 4.9**, the parties intend that all rights and obligations under the Transferred Private Payor

26

Agreements for dates of service prior to the Closing Date shall be Sellers' responsibility and all rights and obligations under the Transferred Private Payor Agreements for dates of service after the Closing Date shall be Purchaser's responsibility.

4.10    Insurance Coverage.    Sellers, at their sole cost and expense, shall renew for the policy period 3/31/20-3/31/21 and maintain professional and general liability insurance coverage for the Seller Hospital through Verity's captive insurance company on the same terms as provided in Policy No. DOC PLGL-26000-019 in effect for the period 3/31/19-3/31/20, which terms include an automatic Extended Reporting Period of thirty (30) days, and Sellers, at their sole cost and expense, shall, together with and for the same periods as the foregoing insurance coverage, maintain excess and umbrella coverage for professional and general liability coverage in an amount of at least $15 million per claim and annual aggregate limits.

## ARTICLE 5

## COVENANTS OF PURCHASER

5.1    Purchaser's Efforts to Close.    Purchaser shall use its reasonable commercial efforts to satisfy all of the conditions precedent set forth in ARTICLE 7 and ARTICLE 8 to its or Sellers' obligations under this Agreement to the extent that Purchaser's action or inaction can control or materially influence the satisfaction of such conditions.  Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement, Purchaser shall be permitted to communicate and meet with: (a) counter-parties to the agreements and contracts of the Hospital, including those included in Transferred Obligations, regarding the terms and conditions under which they may be assumed and assigned to Purchaser, and (b) applicable governmental and regulatory authorities regarding prospective compliance with regulatory requirements and related issues; so long as, in the case of each of (a) and (b): (i) such communications and meetings do not interfere with the operation of the Business or the conduct of the Bankruptcy Cases, and (ii) any communications or meetings with any governmental authority are approved in advance by Sellers as to timing and content (and Sellers are copied on such communications and afforded the opportunity to participate in such meetings).

5.2    Required Governmental Approvals.    Purchaser, at its sole cost and expense: (a) shall use its best efforts to secure, as promptly as practicable before the Closing Date, all consents, approvals (or exemptions therefrom), authorizations, clearances and licenses required to be obtained from governmental and regulatory authorities in order to carry out the transactions contemplated by this Agreement and to cause all of its covenants and agreements to be performed, satisfied and fulfilled (and provide Sellers copies of all materials relating to such consents, approvals, authorizations, clearances and licenses upon submission and all materials received from third parties in connection with such consents, approvals, authorizations, clearances and licenses upon receipt), and (b) will provide such other information and communications to governmental and regulatory authorities as any Seller or such authorities may reasonably request.  Purchaser will provide Sellers periodic and timely updates regarding all such consents, approvals, authorizations, clearances and licenses.  Purchaser is responsible for all filings with and requests to governmental authorities necessary to enable Purchaser to operate the Hospital at and after the Closing Date, subject to the IMA.  Purchaser shall, promptly, but no later than thirty (30) business days after the entry of the Sale Order or sooner if required by applicable governmental or regulatory authorities,

27

file all applications, licensing packages and other similar documents with all applicable governmental and regulatory authorities which are a prerequisite to obtaining the material licenses, permits, authorizations and provider numbers necessary for operation of the Hospital. Purchaser shall be entitled, but not obligated, to obtain the Contract and Lease Consents. Purchaser shall be entitled, but not obligated, to solicit and obtain estoppel certificates from any third party to any Leased Real Property. Purchaser's failure to obtaining any or all of the Contract and Lease Consents or estoppel certificates as of the Closing Date shall not be a condition precedent to either party's obligation to close the transactions contemplated by this Agreement. Notwithstanding the foregoing, for the avoidance of doubt, it is acknowledged that the California Attorney General (the "**CA AG**") approval process of the proposed transaction in accordance with Section 5914 of the California Corporations Code shall be governed exclusively by <u>Section 5.6</u> and <u>Section 8.5</u> of this Agreement.

  5.3 <u>Certain Employee Matters</u>.

   (a) Purchaser agrees to make offers of employment, effective as of the Effective Time, to substantially all persons (whether such persons are full time employees, part-time employees, on short-term or long-term disability or on leave of absence, military leave or workers compensation leave); provided, that such employees satisfy Purchaser's screening and required employment background checks and meet the customary and reasonable conditions and qualifications for their respective positions (the "**Hospital Employees**") who, immediately prior to the Effective Time are: (i) employees of Hospital Seller; (ii) employees of any affiliate of any Seller which employs individuals at the Hospital and are listed on **<u>Schedule 5.3</u>**; or (iii) employed by an affiliate of any Seller and are listed on **<u>Schedule 5.3</u>**. For the avoidance of doubt, the Hospital Employees shall not include any employees of Verity or any other affiliate of Seller unless such individual is listed on **<u>Schedule 5.3</u>**. Any of the Hospital Employees who accept an offer of employment with Purchaser as of or after the Effective Time shall be referred to in this Agreement as the "**Hired Employees**." All employees who are Hired Employees shall cease to be employees of the applicable Seller or its affiliates as of the Effective Time.

   (b) Purchaser shall give all Hired Employees full credit for paid time off ("**PTO**") accruing but unused under applicable Seller's PTO policy as of the Closing Date, with the amount of such PTO to be credited against the Purchase Price at the Closing;

   (c) After the Closing Date, Purchaser's human resources department will give reasonable assistance to Hospital Seller and its affiliates with respect to such Seller's and such Seller's affiliates' post-Closing administration of such Seller's and such Seller's affiliates' pre-Closing employee benefit plans for the Hospital Employees. Within five (5) business days after the Closing Date, Purchaser shall provide to Hospital Seller a list of all the Hospital Employees who were offered employment by Purchaser but refused such employment along with a list of all Hired Employees (which such list Purchaser shall periodically update).

   (d) With respect to any collective bargaining agreements or labor contract with respect to any employees, Purchaser shall comply with the applicable laws and bankruptcy court orders relating to collective bargaining agreements or labor contracts. Nothing herein shall obligate Purchaser to accept Hospital Seller's collective bargaining agreements or labor contracts.

28

(e)    The provisions of this Section 5.3 are solely for the benefit of the parties to this Agreement, and no employee or former employee or any other individual associated therewith or any employee benefit plan or trustee thereof shall be regarded for any purpose as a third party beneficiary of this Agreement, and nothing herein shall be construed as an amendment to any employee benefit plan for any purpose.

5.4    Excluded Assets.  As soon as practicable after the Closing Date, Purchaser shall deliver to each Seller or such Seller's designee any Excluded Assets of such Seller found at the Hospital on and after the Effective Time, without imposing any charge on any Seller for Purchaser's storage or holding of same on and after the Effective Time.

5.5    Waiver of Bulk Sales Law Compliance.  Purchaser hereby waives compliance by Sellers with the requirements, if any, of Article 6 of the Uniform Commercial Code as in force in any state in which the Assets are located and all other laws applicable to bulk sales and transfers.

5.6    Attorney General.  Promptly after entry of the Sale Order, but in any event within two (2) business days thereafter, Purchaser and Sellers shall notify the CA AG of the proposed transaction in accordance with Section 5914 of the California Corporations Code.  Purchaser and Sellers shall use commercially reasonable efforts to file any other such filings and notices as soon as reasonably practicable, shall provide such other information as the CA AG shall request, and shall generally use their commercially reasonable efforts to obtain the CA AG's approval of the transaction.  Purchaser shall provide such information and communications to the CA AG as Sellers may reasonably request and shall otherwise cooperate with Sellers in obtaining the Attorney General's approval of the transaction.

5.7    Conduct Pending Closing.  Prior to consummation of the transactions contemplated hereby or the termination or expiration of this Agreement pursuant to its terms, unless Sellers shall otherwise consent in writing, Purchaser shall not take any action or fail or omit to take any action which would cause any of Purchaser's representations and warranties set forth in ARTICLE 3 to be inaccurate or untrue as of the Closing.

5.8    Cure Costs.  On or about the Closing Date, Sellers (from the proceeds of the Purchase Price) shall pay an amount equal to the Cure Costs to each counterparty to an Assigned Contract and Assigned Lease so that each such Assigned Contract and Assigned Lease may be assumed by the applicable Seller and assigned to Purchaser in accordance with the provisions of section 365 of the Bankruptcy Code.  For purposes of this Agreement, "**Cure Costs**", means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of the Assigned Contracts and Assigned Leases to Purchaser as provided herein.

5.9    Operating Covenant.  Purchaser shall act in good faith and use Purchaser's commercially reasonable efforts to serve the medical needs of the Hospital's service area.

5.10    Contract with Unions.  Representatives of Sellers who are parties to collective bargaining agreements and Purchaser shall meet and confer from time to time as reasonably requested by either party to discuss strategic business options and alternative approaches in negotiating each collective bargaining agreement.  The applicable Sellers and Purchaser shall each

29

participate in all union negotiations related to any specific collective bargaining agreement. Promptly following the Signing Date, applicable Sellers shall use commercially reasonable efforts to initiate discussions with Purchaser and conduct discussions to renegotiate each collective bargaining agreement currently in effect with each applicable union.  The applicable Sellers will not unreasonably withhold, condition or delay approval or implementation of any successfully renegotiated collective bargaining agreement to be assigned to Purchaser. The parties recognize that an applicable Seller's failure to secure a modification to any collective bargaining agreement, or to conclude a successor collective bargaining agreement shall not be a breach of Sellers' obligation under this Agreement.  In addition, Sellers may, in their discretion, seek to reject any or all of the collective bargaining agreement(s).

5.11    Cooperation.  From the Signing Date until the Closing, the parties agree that Sellers may update the Disclosure Schedule as necessary upon written notice to, and with the prior written consent of (which consent shall not be unreasonably withheld), Purchaser, and the applicable representation and warranty shall thereafter be deemed amended for all purposes by such updated Disclosure Schedule.  Notwithstanding the foregoing, should any exhibit or schedule not be completed and attached hereto as of the Signing Date, Sellers and Purchaser shall promptly negotiate in good faith any such exhibit or schedule, which exhibit or schedule must be acceptable to each of Sellers and Purchaser in their reasonable discretion prior to being attached hereto.

## ARTICLE 6

## SELLERS' BANKRUPTCY AND BANKRUPTCY COURT APPROVAL

6.1    Bankruptcy Court Approval.

(a)    Sellers and Purchaser acknowledge that this Agreement and the sale of the Assets and the assumption and assignment of the Assigned Contracts and Assigned Leases are subject to Bankruptcy Court approval pursuant to sections 105(a), 363(b), 363(m), 363(f), and 365 of the Bankruptcy Code, and that this Agreement is subject to termination in its entirety in the event the Bankruptcy Court approves a better and higher offer for the Assets in accordance with the Bankruptcy Code and subject to the terms stated herein.

(b)    Each Seller shall at the Sale Hearing exercise reasonable efforts to obtain a "Sale Order", in a form acceptable to Purchaser in its reasonable discretion, approving this Agreement, subject to such Seller's obligations in respect of any better and higher offer for such Seller's assets in accordance with the Bankruptcy Code.  For purposes of this Agreement, the term "**Sale Order**" shall mean an order of the Bankruptcy Court authorizing the sale of the Assets (including the assumption and assignment of the Assigned Contracts and Assigned Leases) to Purchaser consistent with this Agreement and in a form satisfactory to Purchaser in its reasonable discretion pursuant to sections 105(a), 363(b), 363(m), 363(f), and 365 of the Bankruptcy Code, which is not stayed.

(c)    Each Seller must obtain Bankruptcy Court approval of the sale contemplated herein with a determination that Purchaser is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code and to file such declarations and other evidence as may be required to support a finding of good faith.

(d)     Each Seller shall seek an order from the Bankruptcy Court retaining jurisdiction over all matters relating to claims against such Seller as debtor and the Sale Order solely in the Bankruptcy Court.

6.2     Appeal of Sale Order.  In the event an appeal is taken or a stay pending appeal is requested from any sale order issued by the Bankruptcy Court, Sellers shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay.  Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.  In the event of an appeal of a sale order, Sellers shall be primarily responsible for drafting pleadings and attending hearings as necessary to defend against the appeal; provided, however, Purchaser, at its option, shall have the right to participate as a party in interest in such appeal. In the event a stay is issued by any appellate court, including the United States District Court, Bankruptcy Appellate Panel, and Circuit Court of Appeal, which prevents the sale from closing, as scheduled, Purchaser shall have the right to terminate this Agreement if such stay is not vacated on or before 45 days from the date the stay is issued, and Purchaser shall be entitled to the prompt return of the Deposit and any interest earned thereon.  Notwithstanding the foregoing, for the avoidance of doubt, it is acknowledged that the provisions of Section 8.5 shall govern with respect to any Bankruptcy Court order relating to the CA AG approval process.

## ARTICLE 7

## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

Sellers' obligation to sell the Assets and to close the transactions as contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Sellers in whole or in part at or prior to the Closing:

7.1     Signing and Delivery of Instruments.  Purchaser shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to the provisions of this Agreement.

7.2     No Restraints.    No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction or any other governmental body and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.

7.3     Performance of Covenants.  Purchaser shall have in all respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by it on or prior to the Closing Date.

7.4     Governmental Authorizations.  Purchaser shall have obtained all material licenses, permits and authorizations from governmental agencies or governmental bodies that are necessary

31

or required for completion of the transactions contemplated by this Agreement, including reasonable assurances that any material licenses, permits and authorizations not actually issued as of the Closing will be issued following Closing (which may include oral assurances from appropriate governmental agencies or bodies).

      7.5    <u>Attorney General Provisions</u>.  The conditions to Purchaser's obligations to close set forth in <u>Section 8.5</u> shall have been satisfied.

      7.6    <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Sale Order.

# ARTICLE 8

## CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

      Purchaser's obligation to purchase the Assets and to close the transactions contemplated by this Agreement shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date unless specifically waived in writing by Purchaser in whole or in part at or prior to the Closing.

      8.1    <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered the Sale Order and made a finding that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  For the avoidance of doubt, it is acknowledged that <u>Section 8.5</u> shall govern with respect to any Bankruptcy Court order relating to the CA AG approval process.

      8.2    <u>Signing and Delivery of Instruments</u>.  Sellers shall have executed and delivered all documents, instruments and certificates required to be executed and delivered pursuant to all of the provisions of this Agreement.

      8.3    <u>Performance of Covenants</u>.  Sellers shall have in all material respects performed or complied with each and all of the obligations, covenants, agreements and conditions required to be performed or complied with by Sellers on or prior to the Closing Date, except where the failure to so perform or comply would not have a Material Adverse Effect; *provided*, *however*, this condition will be deemed to be satisfied unless Sellers were given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within fifteen (15) business days after receipt of such notice.

      8.4    <u>No Restraints</u>.  No temporary restraining order, preliminary or permanent injunction or other order preventing the consummation of the transactions contemplated in this Agreement shall have been issued by any court of competent jurisdiction and shall remain in effect on the Closing Date, and further, no governmental entity shall have commenced any action or suit before any court of competent jurisdiction or other governmental authority that seeks to restrain or prohibit the consummation of the transactions contemplated hereby.  For the avoidance of doubt, it is acknowledged that <u>Section 8.5</u> shall govern with respect to any Bankruptcy Court order relating to the CA AG approval process.

US_Active\114503813\V-2

8.5    <u>Attorney General Provisions</u>.    Purchaser recognizes that the transactions contemplated by this Agreement may be subject to review and approval of the CA AG.  Purchaser agrees to close the transactions contemplated by this Agreement so long as any conditions imposed by the CA AG are substantially consistent with the conditions set forth in **Schedule 8.5**.  In the event the CA AG imposes conditions on the transactions contemplated by this Agreement which are not as set forth on **Schedule 8.5** (the **"Additional Conditions"**), Sellers must file a motion with the Bankruptcy Court seeking the entry of an order finding that the Additional Conditions are an "interest in property" for purposes of 11 U.S.C. § 363(f), and that the Assets can be sold free and clear of the Additional Conditions.  If Sellers do not obtain such an order, from the Bankruptcy Court or another court, within thirty (30) days of the CA AG's imposition of conditions inconsistent with the conditions set forth in **Schedule 8.5**, Purchaser shall have the right, in Purchaser's sole and absolute discretion, to terminate this Agreement and receive the return of its Deposit.  If Sellers obtain such an order, from the Bankruptcy Court or another court, within the aforesaid thirty (30) period, then, so long as such order is not stayed, the condition precedent of obtaining the CA AG's approval shall be deemed satisfied.

8.6    <u>Medicare and Medi-Cal Provider Agreements</u>.  Hospital Seller shall enter into a settlement agreement with the Centers for Medicare and Medicaid Services (**"CMS"**) which has the effect of allowing Hospital Seller to transfer its Medicare provider agreements in accordance with the IMA and Leaseback Agreement and shall enter into a settlement agreement with the California Department of Health Care Services (**"DHCS"**) which has the effect of allowing Hospital Seller to transfer its Medi-Cal provider agreements in accordance with the IMA and Leaseback Agreement, which such settlement agreements shall result in: (i) resolution of all outstanding financial defaults under Hospital Seller's Medicare and Medi-Cal provider agreements, and (ii) full satisfaction, discharge, and release of any claims under the Medicare or Medi-Cal provider agreements, whether known or unknown, that CMS or DHCS, as applicable, has against Hospital Seller or Purchaser for monetary liability arising under the Medicare or Medi-Cal provider agreements before the Effective Time; provided, however, that Purchaser acknowledges that it will succeed to the quality history associated with the relevant Medicare or Medi-Cal provider agreements assigned and shall be treated, for purposed of survey and certification issues as if it is Hospital Seller and no change of ownership occurred.

8.7    <u>Title Policies</u>.  Purchaser shall have received commitments for issuance as of the Closing Date one or more ALTA title insurance policies for the Owned Real Property which are substantially similar to those commitments referenced in **Schedule 8.7**, with such modifications as are specifically referenced in **Schedule 8.7**.

8.8    <u>Phase I Environmental Survey</u>.    Purchaser shall have received a Phase I environmental survey covering the Owned Real Property which is substantially similar to the Phase I environmental survey referenced in **Schedule 8.8**, and if recommended in such Phase I, a Phase II environmental survey as so recommended.

8.9    <u>Insurance</u>.  Sellers shall have obtained the insurance coverage to be maintained by Sellers as provided for in Section 4.10.

US_Active\114503813\V-2

# ARTICLE 9

## TERMINATION

9.1    <u>Termination</u>.  This Agreement may be terminated at any time prior to Closing:

(a)    by the mutual written consent of the parties;

(b)    by Sellers if a material breach of this Agreement has been committed by Purchaser and such breach has not been: (i) waived in writing by Sellers, or (ii) cured by Purchaser to the reasonable satisfaction of Sellers within fifteen (15) business days after service by Sellers upon Purchaser of a written notice which describes the nature of such breach;

(c)    by Purchaser if a material breach of this Agreement has been committed by Sellers and such breach has not been: (i) waived in writing by Purchaser, or (ii) cured by Sellers to the reasonable satisfaction of Purchaser within fifteen (15) business days after service by Purchaser upon Sellers of a written notice which describes the nature of such breach;

(d)    by Purchaser if satisfaction of any of the conditions in <u>ARTICLE 8</u> has not occurred by September 1, 2020, or becomes impossible, and Purchaser has not waived such condition in writing (provided that the failure to satisfy any of the applicable condition or conditions in <u>Sections 8.1 through 8.4</u> inclusive has occurred by reason other than: (i) through the failure of Purchaser to comply with its obligations under this Agreement, or (ii) Sellers' failure to provide their closing deliveries on the Closing Date as a result of Purchaser not being ready, willing and able to close the transaction on the Closing Date).

(e)    by Sellers if satisfaction of any of the conditions in <u>ARTICLE 7</u> has not occurred by September 1, 2020, or becomes impossible, and Sellers have not waived such condition in writing (provided that the failure to satisfy the applicable condition or conditions has occurred by reason other than: (i) through the failure of Sellers to comply with their obligations under this Agreement, or (ii) Purchaser's failure to provide its closing deliveries on the Closing Date as a result of Sellers not being ready, willing and able to close the transaction on the Closing Date);

(f)    by either Purchaser or Sellers if the Bankruptcy Court enters an order dismissing the Bankruptcy Cases or fails to issue a Sales Order (as defined in <u>Section 6.1(b)</u>) approving this Agreement on or before August 1, 2020;

(g)    by either Purchaser or Sellers if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before September 1, 2020; or

(h)    by Purchaser if a force majeure event (such as acts of God, storms, floods, landslides, earthquakes, lightning, riots, fires, pandemics (excluding any arising from the SARS-CoV-2 virus or mutations therefrom or in connection with the disease COVID-19), sabotage, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities, other national or international calamity, one or more acts of

34

terrorism, or failure of energy sources) shall have occurred between the Signing Date and Closing Date, which event is reasonably likely to result in a Material Adverse Effect.

9.2    <u>Termination Consequences</u>.    If this Agreement is terminated pursuant to <u>Sections 6.2</u> or <u>9.1</u>: (a) all further obligations of the parties under this Agreement shall terminate, provided that the provisions of <u>ARTICLE 12</u>, shall survive; and (b) each party shall pay only its own costs and expenses incurred by it in connection with this Agreement; provided, in the case of any termination based on <u>Sections 9.1(b)</u> or <u>(c)</u> the consequences of such termination shall be determined in accordance with <u>ARTICLE 11</u> hereof.  In addition, if this Agreement is terminated pursuant to <u>Sections</u> <u>6.2</u> or <u>9.1</u> (other than <u>Section 9.1(b)</u>), Seller shall immediately return the Deposit to Purchaser with all interest earned thereon.    Each party acknowledges that the agreements contained in this <u>Section 9.2</u> are an integral part of the transactions contemplated by this Agreement, that without these agreements such party would not have entered into this Agreement.

## ARTICLE 10

## POST-CLOSING MATTERS

10.1    <u>Excluded Assets</u>.

Subject to <u>Section 10.2</u> hereof, any Excluded Asset (or proceeds thereof): (a) pursuant to the terms of this Agreement, (b) as otherwise determined by the parties' mutual written agreement, or (c) absent such agreement, as determined by adjudication by the Bankruptcy Court, which comes into the possession, custody or control of Purchaser (or its respective successors-in-interest, assigns or affiliates) shall, within five (5) business days following receipt, and at no cost to Sellers, be transferred, assigned or conveyed by Purchaser (and its respective successors-in-interest, assigns and affiliates) to the applicable Seller.  Purchaser (and its respective successors-in-interest, assigns and affiliates) shall have neither the right to offset amounts payable to any Seller under this <u>Section 10.1</u> against, nor the right to contest its obligation to transfer, assign and convey to any Seller because of, outstanding claims, liabilities or obligations asserted by Purchaser against any Seller.  If Purchaser does not remit any monies included in the Excluded Assets (or proceeds thereof) to the applicable Seller in accordance with the first sentence of this <u>Section 10.1</u>, such withheld funds shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to Seller (the "**Excluded Asset Due Date**") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Excluded Asset Due Date until payment of the Excluded Assets and all interest thereon is made to the applicable Seller.

10.2    <u>Preservation and Access to Records After the Closing</u>.

(a)    From the Licensure Date until seven (7) years after the Licensure Date or such longer period as required by law (the "**Document Retention Period**"), Purchaser shall keep and preserve all medical records (including, without limitation, electronic medical records), patient records, medical staff records and other books and records which are among the Assets as of the Effective Time, but excluding any records which are among the Excluded Assets. Purchaser will afford to the representatives of Sellers, any of their affiliates, the Official

35

Committee of the Unsecured Creditors of the Sellers, Sellers' estate representative or any liquidating trustee of the Sellers' bankruptcy estate ("**Seller Parties**"), including their counsel and accountants, full and complete access to, and copies (including, without limitation, color laser copies) of, such records with respect to time periods prior to the Licensure Date (including, without limitation, access to records of patients treated at the Hospital prior to the Licensure Date) during normal business hours after the Licensure Date, to the extent reasonably needed by any Seller Party for any lawful purpose.  Purchaser acknowledges that, as a result of entering into this Agreement and operating the Hospital, it will gain access to patient records and other information which are subject to rules and regulations concerning confidentiality.  Purchaser shall abide by any such rules and regulations relating to the confidential information it acquires.  Purchaser shall maintain the patient and medical staff records at the Hospital in accordance with applicable law and the requirements of relevant insurance carriers.  After the expiration of the Document Retention Period, if Purchaser intends to destroy or otherwise dispose of any of the documents described in this Section 10.2(a), Purchaser shall provide written notice to Sellers of Purchaser's intention no later than forty-five (45) calendar days prior to the date of such intended destruction or disposal.  Any of the Seller Parties shall have the right, at its sole cost, to take possession of such documents during such forty-five (45) calendar day period.  If any of the Seller Parties does not take possession of such documents during such forty-five (45) calendar day period, Purchaser shall be free to destroy or otherwise dispose of such documentation upon the expiration of such forty-five (45) calendar day period.

(b)      Provided that Purchaser shall not incur any out of pocket costs, Purchaser shall give full cooperation to the Seller Parties and their insurance carriers in connection with the administration of Sellers' estate, including, without limitation, in connection with all claims, actions, causes of action or audits relating to the Excluded Assets, Excluded Liabilities or pre-Closing operation of the Sellers or the Hospital that any Seller Party may elect to pursue, dispute or defend, in respect of events occurring prior to the Closing Date with respect to the operation of the Hospital, subject to the terms of the IMA.  Such cooperation shall include, without limitation, making the Hired Employees available for interviews, depositions, hearings and trials and other assistance in connection with the administration of Sellers' estate and such cooperation shall also include making all of its employees available to assist in the securing and giving of evidence and in obtaining the presence and cooperation of witnesses (all of which shall be done without payment of any fees or expenses to Purchaser or to such employees); provided that Purchaser shall not be required to incur any out of pocket costs in association therewith.  In addition, Sellers and their affiliates shall be entitled to remove from the Hospital originals of any such records, but only for purposes of pending litigation involving the persons to whom such records refer, as certified in writing prior to removal by counsel retained by Sellers or any of their affiliates in connection with such litigation.  Any records so removed from the Hospital shall be promptly returned to Purchaser following Sellers' or their applicable affiliate's use of such records.

(c)      In connection with: (i) the transition of the Hospital pursuant to the transaction contemplated by this Agreement, (ii) Sellers' rights to the Excluded Assets, (iii) any claim, audit, or proceeding, including, without limitation, any tax claim, audit, or proceeding and (iv) the Sellers' obligations under the Excluded Liabilities, Purchaser shall after the Effective Time give Sellers access during normal business hours to Purchaser's books, personnel, accounts

36

and records and all other relevant documents and information with respect to the assets, liabilities and business of the Hospital as representatives of Sellers and their affiliates may from time to time reasonably request, all in such manner as not to unreasonably interfere with the operations of the Hospital.

(d)     Purchaser and its representatives shall be given access by Sellers during normal business hours to the extent reasonably needed by Purchaser for business purposes to all documents, records, correspondence, work papers and other documents retained by Sellers pertaining to any of the Assets prior to the Effective Time (excluding confidential employee information, privileged materials and patient records), all in such manner as to not interfere unreasonably with Sellers.  Such documents and other materials shall be, at Sellers' option, either: (i) copied by Sellers for Purchaser at Purchaser's expense, or (ii) removed by Purchaser from the premises, copied by Purchaser and promptly returned to Sellers.

(e)     Purchaser shall comply with, and be solely responsible for, all obligations under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Parts 160 and 164) promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996 with respect to the operation of the Hospital on and after the Closing Date.

(f)     Purchaser shall cooperate with Sellers, on a timely basis and as reasonably requested by Sellers, in connection with the provision of all data of the Hospital and other information required by Sellers for reporting to HFAP for the remainder of the quarterly period in which the Closing has occurred.

(g)     To the maximum extent permitted by law, if any Person requests or demands, by subpoena or otherwise, any documents relating to the Excluded Liabilities or Excluded Assets, including without limitation, documents relating to the operations of any of the Hospital or any of the Hospital's committees prior to the Closing Date, subject to the IMA, prior to any disclosure of such documents, Purchaser shall notify Sellers and shall provide Sellers with the opportunity to object to, and otherwise coordinate with respect to, such request or demand.

(h)     <u>Provision of Benefits of Certain Contracts</u>.  Notwithstanding anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contract or Assigned Lease, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would constitute a breach thereof or in any way negatively affect the rights of Sellers or Purchaser, as the assignee of such Assigned Contract or Assigned Lease, as the case may be, thereunder.  If, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, such consent or approval is required but not obtained, Sellers will cooperate with Purchaser in any reasonable arrangement designed to both: (a) provide Purchaser with the benefits of or under any such Assigned Contract or Assigned Lease, and (b) cause Purchaser to bear all costs and obligations of or under any such Assigned Contract or Assigned Lease. Further, notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Account Receivable the assignment of which is either prohibited by law or by the terms of any contract with a payor without the consent of such payor.  Any payments received by Sellers after the Closing Date from patients, payors, clients, customers, or others who are the obligors on Accounts Receivables transferred to Purchaser as a

37

part of the Assets on the Closing Date shall be paid over to Purchaser within ten (10) business days after receipt by Seller.

    10.3   Closing of Financials.  Provided that Purchaser shall not incur any out of pocket costs, Purchaser shall cause the individual acting as the chief financial officer of the Hospital after the Effective Time (the "**Post-Effective Time CFO**") to cooperate with Sellers' representatives in order to complete the standardized closing of Sellers' financial records through the Licensure Date including, without limitation, the closing of general ledger account reconciliations (collectively, the "**Closing of Financials**").  Purchaser shall cause the Post-Effective Time CFO to use his or her good faith efforts to cooperate with Sellers' representatives in order to complete the Closing of Financials by no later than the date which is thirty (30) calendar days after the Licensure Date. The Post-Effective Time CFO and other appropriate personnel shall be reasonably available to Sellers for a period of no less than one hundred eighty (180) calendar days after the Licensure Date to assist Sellers in the completion of Sellers' post-Closing audit, such assistance not to interfere unreasonably with such Post-Effective Time CFO's other duties.

    10.4   Medical Staff.  To ensure continuity of care in the community, Purchaser agrees that the Hospital's medical staff members in good standing as of the Closing Date shall maintain medical staff privileges at the Hospital as of the Closing Date.  On and after the Closing Date, the medical staff will be subject to the Hospital's Medical Staff Bylaws then currently in effect, provided that such Bylaws are in compliance with all applicable laws and regulations and contain customary obligations.

    10.5   Shared Intangible Assets.  In the event and to the extent that certain intangible Assets transferred by Sellers have been used to operate businesses of Verity or Verity Holdings or their affiliates ("**Shared Intangible Assets**") and such Shared Intangible Assets continue to be used by Verity or Verity Holdings or their affiliates to operate such businesses after Closing, Verity and Verity Holdings retain the rights to continue to use such Assets notwithstanding their sale to Purchaser.  Purchaser shall reasonably cooperate with Verity and Verity Holdings and their affiliates to give effect to such rights and shall provide Verity and Verity Holdings and their affiliates such documentation, records and information and reasonable access to such systems as necessary for Verity and Verity Holdings and their affiliates to continue to operate such businesses; all in such manner as not to reasonably interfere with the operations of the Hospitals; *provided, however*, Purchaser shall not be required to incur any out-of-pocket costs in association therewith unless reimbursed by Verity and Verity Holdings and their affiliates.

# ARTICLE 11

# DEFAULT, TAXES AND COST REPORTS

    11.1   Purchaser Default.  If Purchaser or any of its assignees commits any material default under this Agreement, Sellers shall have the right to sue Purchaser and any assignees for damages; provided, however that the amount of such damages shall never exceed Ten Million Dollars ($10,000,000).  For the avoidance of doubt, Sellers shall have no right to sue for specific performance under this Agreement.

11.2    <u>Seller Default</u>.  If Sellers commit any material default under this Agreement, Purchaser shall have the right to demand and receive a refund of the Deposit (if such material default occurs prior to Closing and Purchaser terminates this Agreement pursuant to Section 9.1(c)), and Purchaser shall have the right (i) to sue for damages; provided, however, that the amount of such damages shall never exceed Ten Million Dollars ($10,000,000), or (ii) to sue for specific performance under this Agreement; provided, however, that in seeking specific performance Purchaser shall request only that all parties perform their respective obligations essentially as are set forth in this Agreement, including without limitation recognizing Purchaser's obligation for the Cash Consideration as set forth in <u>Section 1.1(a)(i)</u>, without any diminution in such amount other than for such amounts as may be credited against such Cash Consideration as provided for in this Agreement.

11.3    <u>Tax Matters; Allocation of Purchase Price</u>.

(a)    After the Closing Date, the parties shall cooperate fully with each other and shall make available to each other, as reasonably requested, all information, records or documents relating to tax liabilities or potential tax liabilities attributable to Sellers with respect to the operation of the Hospital for all periods prior to the Licensure Date and shall preserve all such information, records and documents at least until the expiration of any applicable statute of limitations or extensions thereof.  The parties shall also make available to each other to the extent reasonably required, and at the reasonable cost of the requesting party (for out-of-pocket costs and expenses only), personnel responsible for preparing or maintaining information, records and documents in connection with tax matters and as Sellers reasonably may request in connection with the completion of any post-Closing audits of the Hospital.

(b)    Solely for purposes of tax reporting, **Schedule 11.3** sets forth the allocation of the Purchase Price (including any liabilities that are considered to be an increase to the Purchase Price for United States federal income Tax purposes) among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "**Allocation Schedule**").  The Allocation Schedule shall be final and binding upon Sellers and Purchaser with respect to matters relating to required tax reporting by each such party.  The parties shall refrain from taking any position that is inconsistent with the Allocation Schedule with respect to tax reporting.

11.4    <u>Cost Report Matters</u>.

(a)    Consistent with <u>Section 4.5</u>, Sellers shall, at Purchaser's expense, prepare and timely file all cost reports relating to the periods ending prior to the Licensure Date or required as a result of the consummation of the transactions described in this Agreement, including, without limitation, those relating to Medicare, Medicaid, and other third party payors which settle on a cost report basis (the "**Seller Cost Reports**").

(b)    Upon reasonable notice and during normal business office hours, Purchaser will cooperate reasonably with Sellers in regard to Sellers' preparation and filing of the Seller Cost Reports.  Such cooperation shall include, at no cost to Sellers, obtaining access to files at the Hospital and Purchaser's provision to Sellers of data and statistics, and the coordination with Sellers pursuant to reasonable notice of Medicare and Medicaid exit

39

conferences or meetings.  Sellers shall have no obligations after the Licensure Date with respect to Seller Cost Reports except for preparation and filing thereof.

## ARTICLE 12

## MISCELLANEOUS PROVISIONS

12.1    Further Assurances and Cooperation.  Sellers shall execute, acknowledge and deliver to Purchaser any and all other assignments, consents, approvals, conveyances, assurances, documents and instruments reasonably requested by Purchaser at any time and shall take any and all other actions reasonably requested by Purchaser at any time for the purpose of more effectively assigning, transferring, granting, conveying and confirming to Purchaser, the Assets.  After consummation of the transaction contemplated in this Agreement, the parties agree to cooperate with each other and take such further actions as may be necessary or appropriate to effectuate, carry out and comply with all of the terms of this Agreement, the documents referred to in this Agreement and the transactions contemplated hereby.

12.2    Successors and Assigns.  All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; *provided, however,* that no party hereto may assign any of its rights or delegate any of its duties under this Agreement without the prior written consent of the other parties which consent shall not be unreasonably withheld or delayed, except that Purchaser may, without the prior written consent of Sellers, assign all or any portion of its rights under this Agreement to one or more of its affiliates prior to the Closing Date (for the avoidance of doubt, such assignment shall not relieve Purchaser of any of its obligations under this Agreement).

12.3    Governing Law; Venue.  This Agreement shall be construed, performed, and enforced in accordance with, and governed by, the laws of the State of California (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  The parties hereby consent to the jurisdiction of such court and waive their right to challenge any proceeding involving or relating to this Agreement on the basis of lack of jurisdiction over the Person or forum non conveniens.

12.4    Amendments.  This Agreement may not be amended other than by written instrument signed by the parties hereto.

12.5    Exhibits, Schedules and Disclosure Schedule.  The Disclosure Schedule and all exhibits and schedules referred to in this Agreement shall be attached hereto and are incorporated by reference herein.  Any matter disclosed in this Agreement or in the Disclosure Schedule with reference to any Section of this Agreement shall be deemed a disclosure in respect of all sections to which such disclosure may apply. The headings, if any, of the individual sections of the Disclosure Schedule are provided for convenience only and are not intended to affect the construction or interpretation of this Agreement. The Disclosure Schedule is arranged in sections and paragraphs corresponding to the numbered and lettered sections and paragraphs of Article III

40

merely for convenience, and the disclosure of an item in one section of the Disclosure Schedule as an exception to a particular representation or warranty shall be deemed adequately disclosed as an exception with respect to all other representations or warranties to the extent that the relevance of such item to such representations or warranties is reasonably apparent on the face of such disclosure, notwithstanding the presence or absence of an appropriate section of the Disclosure Schedule with respect to such other representations or warranties or an appropriate cross reference thereto.

12.6    Notices.  Any notice, demand or communication required, permitted, or desired to be given hereunder shall be deemed effectively given when personally delivered, when received by telegraphic or other electronic means (including facsimile) or overnight courier, or five (5) calendar days after being deposited in the United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, addressed as follows:

|  |  |
|---|---|
| If to Sellers: | Verity Health System of California, Inc.<br>601 South Figueroa St., Suite 4050<br>Los Angeles, CA 90017-5704<br>Attention: Rich Adcock, CEO |
| With copies to:<br>(which copies shall<br>not constitute notice) | Dentons US LLP<br>601 South Figueroa St., Suite 2500<br>Los Angeles, CA 90017-5704<br>Attention:  Samuel R. Maizel, Esq.<br>Telephone: 213-892-2910<br>Facsimile: 213-623-9924 |
| If to Purchaser: | AHMC Healthcare Inc.<br>55 S. Raymond Ave., Suite 105<br>Alhambra, CA 91801<br>Attention:  Jonathan Wu<br>Facsimile: 626-289-8952 |
| With copies to:<br>(which copies shall<br>not constitute notice) | AHMC Healthcare Inc., Legal Department<br>500 E. Main St., 5th Floor<br>Alhambra, CA 91801<br>Attention: Maan-Huei Hung, Esq.<br>Facsimile: 626-248-3303 |

or at such other address as one party may designate by notice hereunder to the other parties.

12.7    Headings.  The section and other headings contained in this Agreement and in the Disclosure Schedule, exhibits and schedules to this Agreement are included for the purpose of convenient reference only and shall not restrict, amplify, modify or otherwise affect in any way the meaning or interpretation of this Agreement or the Disclosure Schedule, exhibits and schedules hereto.

41

12.8    Publicity.  Prior to the Closing Date, Sellers and Purchaser shall consult with each other as to the form and substance of any press release or other public disclosure materially related to this Agreement or any other transaction contemplated hereby and each shall have the right to review and comment on the other's press releases prior to issuance; *provided*, *however*, that nothing in this Section 12.8 shall be deemed to prohibit either Sellers or Purchaser from making any disclosure that its counsel deems necessary or advisable in order to satisfy either party's disclosure obligations imposed by law subject to reasonable prior notice to the other party thereof.

12.9    Fair Meaning.  This Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

12.10    Gender and Number; Construction; Affiliates.  All references to the neuter gender shall include the feminine or masculine gender and vice versa, where applicable, and all references to the singular shall include the plural and vice versa, where applicable.  Unless otherwise expressly provided, the word "including" followed by a listing does not limit the preceding words or terms and shall mean "including, without limitation."  Any reference in this Agreement to an "affiliate" shall mean any Person directly or indirectly controlling, controlled by or under common control with a second Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.  A "Person" shall mean any natural person, partnership, corporation, limited liability company, association, trust or other legal entity.

12.11    Third Party Beneficiary.  None of the provisions contained in this Agreement are intended by the parties, nor shall they be deemed, to confer any benefit on any person not a party to this Agreement, except for the parties' successors and permitted assigns, and except for any liquidating trustee or plan administrator for Sellers' estate.

12.12    Expenses and Attorneys' Fees.  Except as otherwise provided in this Agreement, each party shall bear and pay its own costs and expenses relating to the preparation of this Agreement and to the transactions contemplated by, or the performance of or compliance with any condition or covenant set forth in, this Agreement, including without limitation, the disbursements and fees of their respective attorneys, accountants, advisors, agents and other representatives, incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby are consummated.  The parties expressly agree that all sales, transfer, documentary transfer and similar taxes, fees, surcharges and the like in connection with the sale of the Assets shall be borne by Purchaser.  If any action is brought by any party to enforce any provision of this Agreement, the prevailing party shall be entitled to recover its court costs and reasonable attorneys' fees.

12.13    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto.  The parties agree that facsimile copies of signatures shall be deemed originals for all purposes hereof and that a party may produce such copies, without the need to produce original signatures, to prove the existence of this Agreement in any proceeding brought hereunder.

12.14  <u>Entire Agreement</u>.  This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the parties on the subject matter hereof (the "**Superseded Agreements**"), which Superseded Agreements shall be of no further force or effect; provided, that notwithstanding the foregoing, the letter Confidentiality Agreement dated December 27, 2019, between Purchaser and Cain Brothers, a division of KeyBanc Capital Markets Inc., on behalf of Sellers and their related entities shall not be a Superseded Agreement and shall continue in full force in effect in accordance with its terms.

12.15  <u>No Waiver</u>.  Any term, covenant or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof but only by a written notice signed by the party expressly waiving such term or condition.  The subsequent acceptance of performance hereunder by a party shall not be deemed to be a waiver of any preceding breach by any other party of any term, covenant or condition of this Agreement, other than the failure of such other party to perform the particular duties so accepted, regardless of the accepting party's knowledge of such preceding breach at the time of acceptance of such performance.  The waiver of any term, covenant or condition shall not be construed as a waiver of any other term, covenant or condition of this Agreement.

12.16  <u>Severability</u>.  If any term, provision, condition or covenant of this Agreement or the application thereof to any party or circumstance shall be held to be invalid or unenforceable to any extent in any jurisdiction, then the remainder of this Agreement and the application of such term, provision, condition or covenant in any other jurisdiction or to persons or circumstances other than those as to whom or which it is held to be invalid or unenforceable, shall not be affected thereby, and each term, provision, condition and covenant of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

12.17  <u>Time is of the Essence</u>.  Time is of the essence for all dates and time periods set forth in this Agreement and each performance called for in this Agreement.

*[Signature Page Follows]*

43

IN WITNESS WHEREOF, this Agreement has been entered into as of the day and year first above written.

**PURCHASER:**

**AHMC HEALTHCARE INC.,**
a California corporation

Signature By: _____
Print Name: ___Jonathan Wu_____
Title: _____President/CEO_____
Date: _____March 30, 2020_____

**SELLERS:**

**SETON MEDICAL CENTER,**
a California nonprofit public benefit corporation

Signature By: _____
Print Name: _____
Title: _____
Date: _____

**VERITY HOLDINGS, LLC,**
a California limited liability company

Signature By: _____
Print Name: _____
Title: _____
Date: _____

44

**VERITY HEALTH SYSTEM OF CALIFORNIA, INC.,**
a California nonprofit public benefit corporation

Signature By:_____
Print Name:_____
Title:_____
Date:_____

45

**ADDITIONAL EXHIBITS AND SCHEDULES OMITTED**

The schedules and the exhibits to the Asset Purchase Agreement are omitted and will be filed subsequently, except for Exhibit 4.9 to the Asset Purchase Agreement, the Interim Management Agreement and the Sale Leaseback Agreement, which are attached hereto.

**Exhibit 4.9**
**Transferred Private Payor Agreements**

**1.**    Definitions:

"**Payor**" means the non-debtor counter-party to a Private Payor Agreement.

"**Purchaser Contracted Payment**" means the contractual reimbursement due from a Payor (i) to Sellers under a Private Payor Agreement for covered services rendered by Hospital under such agreement with a date of service after the Effective Time and prior to the Licensure Date, and (ii) to Purchaser under a Transferred Private Payor Agreement for covered services rendered by Hospital under such agreement with a date of service after the Licensure Date.

"**Purchaser Overpayment**" means an overpayment made by a Payor on account of a Purchaser Contracted Payment.

"**Purchaser Receivables**" means accounts (as that term is defined in the Uniform Commercial Code) earned by Purchaser (a) under any Private Payor Agreement pursuant to the IMA for covered services rendered between the period from the Effective Time through the Licensure Date, and (b) under any Transferred Private Payor Agreement for covered services rendered after the Licensure Date.

"**Seton Contracted Payment**" means the contractual reimbursement due from a Payor to Sellers under a Private Payor Agreement for covered services rendered by Hospital under such agreement with a date of service on or prior to the Effective Time.

"**Seton Overpayment**" means an overpayment made by a Payor on account of a Seton Contracted Payment.

"**Seton Receivables**" means Accounts Receivable earned under any Private Payor Agreement prior to the Effective Time.

"**True-up**" shall refer to the following reconciliation procedure:  On the last business day of each calendar quarter (or partial calendar quarter) commencing on the Licensure Date through December 31, 2021, (a) Sellers shall identify and report to Purchaser the amount and other applicable details of any Purchaser Overpayment that has been remitted to Sellers during the reporting period, and (b) Purchaser shall identify and report to Sellers the amount and other applicable details of any Seton Overpayment that has been remitted to Purchaser during the reporting period.  For each reporting period, the foregoing amounts shall be offset and any net balance shall be paid by Sellers or Purchaser, as applicable, to the other party not later than five business days following the date of delivery of each quarterly report.  Sellers and Purchaser shall resolve any discrepancies in their respective reports under Section 12.1 of this Agreement.

**2.**    Seller Responsibility.  Sellers shall be responsible, vis-à-vis the Payors, for any Seton Overpayment that is remitted either to Sellers or to Purchaser.  Purchaser agrees, however, that any Seton Overpayment that is remitted to Purchaser shall be subject to True-Up.  Sellers agree to indemnify and hold harmless Purchaser for any Seton Overpayment that is deducted from, or recouped against, any Purchaser Receivables, and in furtherance thereof Sellers agree that,

1

US_Active\114503813\V-2

pursuant to the terms of the Indemnity Escrow Agreement to be entered into between the parties, Purchaser shall be authorized to withdraw from the Indemnity Escrow Fund, upon Purchaser's written instruction to the escrow agent and with written notice to Sellers, any Seton Overpayment that is deducted from, or recouped against, any Purchaser Receivables.  Notwithstanding the foregoing, in the event that Sellers dispute any such Seton Overpayment claim and prevail in such claim, to the extent that Purchaser is later credited for any such Payor deduction or recoupment against any Purchaser Receivables for which Purchaser had withdrawn funds from the Indemnity Escrow Fund as provided for herein, then Purchaser shall remit funds equal to such credit to Sellers within five (5) business days after Purchaser receives such credit.

**3.**     _Purchaser Responsibility_.  Purchaser shall be responsible, vis-à-vis the Payors, for any Purchaser Overpayment that is remitted either to Purchaser or to Sellers.  Sellers agree, however, that any Purchaser Overpayment that is remitted to Sellers shall be subject to True-Up.  Purchaser agrees to indemnify and hold harmless Sellers for any Purchaser Overpayment that is deducted from, or recouped against, any Seton Receivables.

**4.**     _Payor Disputes_.  Nothing in this Agreement shall affect the applicable party's right to dispute or appeal the validity of any alleged Seton Overpayment or alleged Purchaser Overpayment.

**5.**     _Adequate Assurance_.   The Seller and Purchaser agree to cooperate to confirm the provisions of this **Exhibit 4.9** with any Payor under a Transferred Private Payor Agreement in order to provide adequate assurances of cure and compensation to such Payor pursuant to Sections 365(b) and (f) of the Bankruptcy Code.  Sellers and Purchaser acknowledge and agree that (a) the Sale Order shall authorize a Payor to continue to exercise its defenses to reimbursement for covered services based on an overpayment, and (b) overpayments do not constitute Cure Costs under this Agreement.  If a Payor does not agree to the provisions of this Exhibit at least thirty (30) days prior to the Closing Date, such Private Payor Agreement shall be removed from **Schedule 1.11(c)** and shall be an Excluded Asset.

**6.**     _Payor Release_.   Following the Licensure Date, pursuant to Section 365(k) of the Bankruptcy Code, Sellers shall be relieved and released by a Payor from any obligation to any Payor on account of any overpayment or otherwise under any Transferred Private Payor Agreement.

US_Active\114503813\V-2

## <u>INTERIM MANAGEMENT AGREEMENT</u>

This Interim Management Agreement (the "**Agreement**") is made and entered into as of March 30, 2020 (the "**Signing Date**"), by and among Seton Medical Center, a California nonprofit public benefit corporation (the "**Corporation**") on the one hand, and AHMC Healthcare Inc., a California corporation ("**Parent Company**"), and a legal entity to be formed and controlled by Parent Company ("**Hospital Newco**" or the "**Manager**," and collectively with the Corporation and Parent Company, the "**parties**") on the other hand.

## RECITALS

A.      On August 31, 2018, the Corporation and certain of its affiliates each filed a voluntary petition for relief (collectively, the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United State Code (the "**Bankruptcy Code**").

B.      The Bankruptcy Cases are jointly administered under Lead Case No. 18-20151 and are currently pending in the United States Bankruptcy Court for the Central District of California Los Angeles Division (the "**Bankruptcy Court**").

C.      Parent Company, as purchaser, and the Corporation and certain of its affiliates (collectively, the "**Sellers**" as defined in the APA), as seller, entered into that certain Asset Purchase Agreement, dated of even date herewith (the "**APA**"), which provides for the sale of certain assets of the Sellers (collectively, the "**Assets**").  All terms not otherwise defined herein shall have the meaning ascribed to them in the APA.

D.      The Corporation operates a two-campus general acute care hospital, consisting of: (i) the hospital campus known as Seton Medical Center, located at 1900 Sullivan Avenue, Daly City, CA 94015, including the related hospital pharmacy, laboratory and emergency department; and (ii) the hospital campus known as Seton Medical Center Coastside, located at 600 Marine Blvd., Moss Beach, CA 94038, including the related hospital pharmacy, laboratory and emergency department (collectively, the "**Hospital**"), and such other locations where the Hospital's licensed services are provided (collectively, the "**Hospital Premises**")

E.      Pursuant to the APA, Parent Company agreed to purchase the Assets, which include certain assets of the Corporation (the "**Corporation's Assets**").

F.      Parent Company designated Hospital Newco as the owner of certain of the Corporation's Assets and as the future operator of the Hospital.

G.      Parent Company and the Manager have requested this Agreement to afford the Manager additional time to obtain its general acute care hospital license from the California Department of Public Health ("**CDPH**"), and its hospital pharmacy permit(s) from the California Board of Pharmacy (together, the "**New Licenses**," and the date on which the New Licenses are issued is the "**Licensure Date**").

H.      Pursuant to the APA, that portion of the Assets constituting drugs, dangerous devices, pharmacy systems, or other pharmacy assets (the "**Pharmacy Assets**") shall transfer to Hospital Newco as of the Licensure Date.

**I.**    The Corporation shall maintain a possessory interest in the Hospital and the Hospital Premises, and Parent Company, or its designated nominee, and Hospital Newco on the one hand as lessor, and the Corporation, on the other hand as lessee, are entering into that certain Sale Leaseback Agreement of even date herewith, pursuant to which certain of the Corporation's Assets will be leased back to the Corporation (the "**Leaseback Agreement**").

**J.**    Until Hospital Newco obtains the New Licenses, the Manager desires to assume the management of the Hospital, including its pharmacy, on behalf of the Corporation, and the Corporation desires to avail itself of such management services, upon the terms and conditions set forth in this Agreement.

**K.**    The California Department of Public Health (the "**State**"), on the one hand, and on the other hand, Verity Healthcare System of California, Inc., ("**Verity**") and Seton Medical Center, entered into that certain Services Agreement, as approved by the Bankruptcy Court on March 20, 2020 [Docket No. 4315] (the "**State Services Agreement**"),

### TERMS OF AGREEMENT

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**1.**    **Term**.

**1.1**    The term of this Agreement (the "**Management Period**") shall commence as of the Effective Time (as defined in the APA) and shall continue until the Licensure Date.  The parties acknowledge that, during the Management Period, the Corporation shall remain the licensee of the Hospital, and in that capacity, and during such period, shall retain statutory and regulatory authority and responsibility for the Hospital and for oversight of the Manager.

**2.**    **Acknowledgements and Covenants**.

**2.1**    As of the Effective Time, Parent Company or its designated nominee shall have acquired all of the Corporation's Assets (other than the Pharmacy Assets) as set forth in the APA, with those assets necessary for the operation of the Hospital leased back to the Corporation pursuant to the terms of the Leaseback Agreement during the term of this Agreement.

**2.2**    Pursuant to Section 1.3 of the APA, contemporaneously with the date the New Licenses are issued and the termination of the Leaseback Agreement, ownership of the Pharmacy Assets shall be transferred to Hospital Newco.  Parent Company and the Manager acknowledge that this Agreement and the foregoing subsequent transfer of the Pharmacy Assets are made at the request of Parent Company and the Manager, to provide more time for the Manager to obtain its New Licenses.  As such, Parent Company acknowledges, covenants, and agrees that the total Purchase Price (as defined in the APA) shall be paid to the Sellers under the APA as if the Pharmacy Assets were transferred as of the Effective Time.

**2.3**    As of the Effective Time, the Corporation shall have ended the employment or engagement of all employees and contractors and, to the extent they received offers of employment

2

or engagement from the Manager (or its affiliates) and accepted such offers, shall have been transferred to the Manager (or its affiliate) as employees or contractors of the Manager (collectively, the "**Hired Employees**").

2.4    During the Management Period, the Corporation will (a) assign an individual to oversee the operation of the Hospital, subject to the terms of this Agreement, and serve as the president of the Corporation, as required by the Centers for Medicare & Medicaid Services, CDPH, and applicable California laws and regulations (the "**Responsible Officer**"), and (b) maintain proper oversight by a board of directors.

3.    **Appointment of Manager**.

3.1    During the Management Period, the Corporation hereby appoints the Manager as the sole and exclusive provider of the Services (defined below) and hereby grants to the Manager the exclusive right to manage the Hospital under the Corporation's Licenses (as defined in the APA) as a general acute care hospital, including without limitation, the right to undertake those certain management responsibilities and permitted activities described in <u>Section 4</u> below.  The Manager hereby accepts such appointment for all purposes with respect to the Corporation's rights, duties, and responsibilities under the Licenses for the Hospital, to the fullest extent permitted by law, and agrees, to the fullest extent permitted by law, to provide management services to the Hospital on behalf of the Corporation (the "**Services**").

3.2    The Services hereunder shall include management and operation of the Hospital's pharmacy on behalf of the Hospital, even though the Pharmacy Assets will not be transferred to Hospital Newco pursuant to the APA until the Licensure Date.

3.3    Upon the Licensure Date, the Services provided to the Hospital under the Corporation's Licenses shall terminate and, thereafter, Hospital Newco will be operating the Hospital as the licensee holding its own New Licenses.

3.4    During the Management Period, the Manager shall submit claims for services rendered by the Hospital to various governmental and non-governmental entities, patients, and other third parties pursuant to the Corporation's provider agreements, payor contracts, and NPI numbers as set forth in <u>Schedule 3.4</u>, attached hereto (collectively, the "**Corporation's Billing Credentials**").  Because all billing and collecting shall be under the Corporation's Billing Credentials, payments shall be made in the Corporation's name and deposited in the Corporation's bank accounts.  Parent Company and the Manager shall indemnify and hold Corporation harmless for any and all costs or liabilities incurred by Corporation as a result of Manager's use of Corporation's Billing Credentials or any breach of the terms and conditions of Corporation's Billing Credentials during the Management Period.  Manager shall be responsible for any overpayments that arise for services rendered during the Management Period. The parties acknowledge and agree that during the Management Period, the Corporation's bank accounts and lockboxes shall remain under the Corporation's name; provided except as to the Corporation's "AP" or other accounts at Bank of America segregated for use under the State Services Agreement, as of the Effective Time, the Corporation will provide transfers of the Manager Compensation one (1) business day after receipt.  In addition, as of the Effective Time, Manager will be provided electronic read-only access to the Corporation's lockboxes and collection deposit accounts to

3

review all Hospital Revenue.  On and after the day that is thirty-one (31) days after the Effective Time, Corporation will provide automatic daily sweeps of all Hospital Revenue in its lockboxes and collection deposit accounts to Manager; Manager will then electronically transfer to Corporation all funds that are not the Manager Compensation one (1) business day after receipt. As soon as practicable, Manager shall have sole signing authority, provided Manager shall demonstrate that such authority shall be acceptable to the Medicare and Medi-Cal programs and the relevant depository institution without cost to Corporation.  The Parties shall cooperate to ensure that any and all payments or revenues arising from or relating to any Excluded Asset, including without limitation Accounts Receivable and Census Payments under the State Services Agreement for services rendered by the Corporation at the Hospital prior to the Effective Time, shall be properly paid to the Corporation, with any and all payments or revenues constituting Management Compensation under this Agreement or purchased Assets under the APA properly paid to the Manager.  Each Party shall have the right to audit by an independent and competent auditor, at the requesting Party's sole expense, the bank records and remittance advices of the other Party.  Thereafter, upon the findings of the auditor that there has either been an overpayment or underpayment of funds due, the Party owing funds shall, within five (5) business days, make payment of such funds to the Party to whom they are owed.  Manager shall, as soon as practical, set up its own bank accounts and direct payors to make deposits to such accounts immediately following the Licensure Date.

     **3.5**     To the extent the Corporation's lenders continue to have liens, security interests, charges, mortgages, or any other encumbrances whatsoever (collectively, "**Encumbrances**") on the Corporation's bank accounts or lockboxes as of the Effective Time, the Corporation, Parent Company, and the Manager shall work cooperatively to facilitate termination and release of such Encumbrances.

     **3.6**     The Corporation shall retain and, upon the Licensure Date, the Manager shall assume, any contracts necessary for the Corporation to continue to be the holder of the Licenses and to bill for Hospital services during the Management Period, in accordance with the APA including all compliance obligations thereunder.  Such contracts shall be as set forth in Schedule 3.6, attached hereto (the "**Retained Contracts**").  Parent Company hereby designates each Retained Contract as an Assigned Contract under Section 1.11 of the APA.

**4.**     **Management Responsibility**.

     **4.1**     During the Management Period, the Manager shall, subject to all applicable legal and regulatory requirements and pursuant to the terms of this Agreement, only as and to the extent required by applicable legal and regulatory requirements and pursuant to the terms of this Agreement, the Corporation's ultimate oversight and control, have responsibility for the management of the Hospital, and agrees to assume and discharge all responsibilities, duties, liabilities, payments, and obligations in connection with properly maintaining the Hospital in full compliance with all regulations and standards required of a general acute care hospital facility so licensed.  In furtherance thereof, the Services shall include, but not be limited to, the following duties, which duties shall be performed at the Manager's sole cost and expense:

     (a)     Managing the operations of the Hospital as a general acute care hospital in compliance with all applicable laws, regulations, provider agreements, payor contracts, CDPH

4

requirements for maintenance of the Licenses in good standing, Conditions of Participation and Payment with respect to governmental programs, and the requirements for maintenance of the Hospital's accreditations;

(b)    Employing and managing the Hired Employees and any other non-clinical and clinical personnel (i) necessary for the operation of the Hospital as a general acute care hospital, or (ii) required by law and so as to meet the applicable regulatory requirements, pursuant to all applicable labor laws and regulations, and consistent with orders of the Bankruptcy Court;

(c)    Ensuring that the Corporation is able to pay itself out of the Hospital Revenues for the costs and expenses set forth in Section 4.5(b);

(d)    Maintaining and repairing, as needed, the Hospital Premises so as to ensure material compliance with all applicable local, state, and federal law;

(e)    Providing security services reasonably necessary to prevent unlawful entry or damage to the Hospital Premises;

(f)    Affording the Responsible Officer or his or her designee access, during normal business hours, to the Hospital Premises, the books and records at the Hospital Premises or in Manager's possession, the Hired Employees and any other personnel of Manager or otherwise who are providing services associated with the operation of the Hospital, and such other access and assistance as reasonably requested by the Responsible Officer;

(g)    Upon at least one (1) business day's prior written notice to the Manager, if applicable, providing access, during normal business hours, to the Hospital Premises to lessors of equipment at the Hospital Premises, if any, who have been authorized by order of the Bankruptcy Court to remove their equipment from the Hospital Premises, provided that the Manager shall have full power and authority to require that the removal of such equipment by such lessors does not damage the Hospital Premises;

(h)    Providing access, upon at least one (1) business day's prior written notice, during normal business hours and without causing any disruption to or undue burden upon the ordinary operation of the Hospital business or the incurrence of any out-of-pocket expense by Manager, to the Hospital, the Hospital Premises, the Hospital's books and records, electronic health records, financial information systems, operating systems, laboratory systems, the Hired Employees and any other personnel of Manager or otherwise who are providing services associated with the operation of the Hospital, to the Corporation, the Corporation's directors, officers and representatives, and the Corporation's successors in interest, including, but not limited to, any plan administrator, liquidating trustee or similar representatives appointed or approved by the Bankruptcy Court for the purpose of winding down the Corporation's affairs, pursuing litigation and adversary proceedings, and to effectuate a plan of liquidation, as approved by the Bankruptcy Court (the "**Plan**");

(i)    Maintaining all licenses, permits, consents, approvals, accreditations, and certifications currently held by the Corporation that are necessary in connection with the operation of the Hospital and the Hospital Premises in good standing, in active status, and in

5

compliance with all applicable local, state, and federal laws, including the timely payment by Manager of all applicable fees to support or renew these approvals;

(j)    Maintaining and obtaining all insurance coverages, from and after the Effective Time, for the Hospital that a prudent hospital operator or owner would maintain, including directors and officers insurance for Manager with no less coverage than was maintained for the Corporation's directors and officers just prior to the Effective Time;

(k)    Maintaining and obtaining those insurance coverages required under the Leaseback Agreement, for its own account, with the Corporation included as a named insured, and paying all amounts required under the Leaseback Agreement in a timely manner, including rent, utilities, taxes, and insurance premiums;

(l)    Opening and forwarding all mail relating to the financial or business affairs of the Corporation to the notice address below;

(m)    Periodically reporting to the Corporation (or its designee), either in person or telephonically, the condition of the Hospital and the Hospital Premises;

(n)    Coordinating with the governing board and the organized medical staff (each, as established by the Corporation and the Sellers) on the appropriateness and quality of medical care and all medical staff issues requiring governing board oversight;

(o)    Paying all costs and expenses in connection with and incidental to ownership of the Corporation Assets and management and operation of the Hospital hereunder, including but not limited to, all the Hospital operating costs, employee-related costs, and taxes, whether or not identified, described, or referenced in this Agreement;

(p)    Cooperating with the Corporation in facilitating termination and release of any Encumbrances on the Corporation's bank accounts and lockboxes;

(q)    Performing such other duties and activities as are reasonably necessary for the Manager to fulfill its responsibilities under this Agreement and the APA; and

(r)    Providing access, upon at least one (1) business day's prior written notice, without causing any disruption to or undue burden upon the ordinary operation of the Hospital business or the incurrence of any out-of-pocket expense by Manager, to the Hospital, the Hospital Premises, the Hospital's electronic health records, the Hired Employees and any other personnel of Manager or otherwise any individual who is providing services associated with the Hospital's delivery of health care services to patients, to the Patient Care Ombudsman appointed in the Bankruptcy Cases under Section 333 of the Bankruptcy Code (the "PCO") [*see* Docket No. 430].

4.2    **Permitted Manager Activities**.  During the Management Period, the Manager may do any of the following, subject to the requirements of applicable local, state, and federal law, which activities may be performed by the Manager at the Manager's sole cost and expense:

(a)    Make alterations, improvements, and repairs to the interior or exterior of the Hospital Premises, including structural alterations, improvements, and repairs;

6

(b)    Remove and dispose of furniture, fixtures, equipment (other than equipment owned by equipment lessors), and supplies at the Hospital Premises;

(c)    Move into and install furniture, fixtures, equipment, and supplies at the Hospital Premises;

(d)    Prepare the Hospital for a name change, except that no such name change may take effect, and no signage reflecting such change shall be installed, during the Management Period; and

(e)    Perform, or permit to be performed, any other activities at the Hospital Premises that are not inconsistent with operating the Hospital under the Licenses, and receiving and retaining for the Manager's own account all revenues and proceeds of any such activities, to the extent they comprise the Manager Compensation.

**4.3    Prohibited Manager Activities.**

(a)    Notwithstanding anything to the contrary in this Agreement, the Manager shall have no authority to take and shall not take any action with respect to any Excluded Assets or Excluded Liabilities (as such terms are defined in the APA) of the Corporation.

(b)    The Manager's authority to manage and operate the Hospital is limited to those actions that Manager is expressly required or permitted to do hereunder.

(c)    The Manager shall not (i) take any action that interferes with the Corporation's transfer of funds to pay itself out of the Hospital Revenues as set forth in Sections 4.5(b); or (ii) remove, withdraw, or authorize removal or withdrawal of funds from the Corporation's bank accounts or lockboxes to the extent that the Corporation would be unable to fully pay itself for the costs and expenses set forth in Section 4.5(b).

**4.4    APA Provisions; Transition Services Agreement.**

(a)    Nothing herein shall modify the prorations of expenses and utilities set forth in the APA, including specifically as set forth in Section 1.6 of the APA.

(b)    None of the information accessed, learned or obtained by Parent Company or the Manager or any of their affiliates in the course of performing their duties hereunder may serve as the basis for payment of less than the full Purchase Price or to otherwise assert a claim against the Sellers.

(c)    Nothing herein shall modify the transfer of the Assets from the Sellers to Parent Company as contemplated in the APA, including specifically as set forth in Section 1.7 of the APA.

(d)    Nothing herein shall modify the APA in respect of the exclusion from purchase by Parent Company of the Excluded Assets, including specifically as set forth in Section 1.8 of the APA.

7

(e)    Pursuant to Section 1.4.8 and Section 1.5.8 of the APA, the Sellers and Parent Company will be entering into a Transition Services Agreement to facilitate the winding down of the Sellers' businesses, the completion of the Bankruptcy Cases, and the dissolution of the Sellers.  The parties hereto shall cooperate with each other to enable the Corporation and Parent Company to carry out their obligations under, and give effect to the terms of, the Transition Services Agreement.

### 4.5    Manager Compensation; Distribution of Revenue.

(a)    As used in this Agreement, the term "**Hospital Revenues**" shall mean all revenues and reimbursement received by the Corporation after the Effective Time, including, but not limited to, cash, accounts, notes, or other accounts receivable, disproportionate share payments, quality assurance fee payments, Seller Cost Report (as defined in the APA) settlements, and capitation premiums, whether payable by Medicare, Medi-Cal or any other commercial or governmental payor, or any health maintenance organization or any other managed care program or any private pay patients, and State Services Agreement revenues and reimbursement, but only to the extent they are not Excluded Assets (as defined in the APA).

(b)    As full and complete payment for the Manager's Services, the Manager shall be entitled to receive an amount equal to the Hospital Revenues less the following amounts that will be retained by the Corporation (the "**Manager Compensation**"):

(i)    All costs and expenses incurred by the Corporation for the Corporation's purchase of drugs and dangerous devices that the Manager determines are necessary for the operation of the Hospital;

(ii)    All costs and expenses associated with the Corporation maintaining its Licenses and maintaining the Retained Contracts, if any are directly incurred by the Corporation,; and

(iii)    All revenue associated with Census Payments for services provided by Corporation under the State Services Agreement prior to the Effective Time.

(c)    Except for and with respect to Hospital Revenues, under no circumstance may the Manager seek payment for the Manager's Services from the liquidating trustee, the Corporation, any of the Corporation's officers, directors, agents, contractors, personnel, affiliates or subsidiaries, Verity Health System of California, Inc. ("**VHS**"), or any of VHS' officers, directors, agents, contractors, personnel, affiliates or subsidiaries.

(d)    The Corporation shall issue invoices to the Manager on a weekly basis for the items described in Section 4.5(b) (i), (ii) and (iii), with reasonable supporting detail therefor. The Manager shall pay such invoices within five (5) business days of receipt of such invoices.  If the Manager does not remit payment in respect of such invoices in accordance with the immediately preceding sentence, the unpaid amount of such invoices shall bear interest at the Prime Rate in effect on the calendar day upon which such payment was required to be made to the Corporation (the "**Invoice Payment Due Date**") plus five percent (5%) (or the maximum rate allowed by law, whichever is less), such interest accruing on each calendar day after the Invoice

8

Payment Due Date until payment of such invoices and all interest thereon is made to the Corporation.

(e)    The Parties acknowledge and agree that if the State consents in writing to assignment of the State Services Agreement to Manager at the Closing, then all payments under the State Services Agreement for services rendered during the Management Period at the Hospital after the Effective Time, shall be retained by Manager as part of the Manager Compensation.

### 4.6    Liabilities and Losses.

(a)    Parent Company shall be responsible for all the Hospital liabilities and losses incurred or accrued during the Management Period.

(b)    Nothing hereunder shall, or is intended to, modify or supersede Parent Company's responsibility for the Transferred Obligations (as defined in the APA) or the Corporation's responsibility for the Excluded Liabilities (as defined in the APA).

(c)    Specifically with respect to quality assurance fee ("**QAF**") liabilities owed by the Corporation, Parent Company shall pay all QAF fees that become due and owing during the Management Period that relate to QAF payments constituting Assets transferred to Hospital Newco under the APA, even though such fees may have been calculated based on data prior to the Effective Time.

### 4.7    The Corporation's Ultimate Control.  Notwithstanding anything to the contrary in this Section 4 or in this Agreement more generally, the Corporation, as holder of the Licenses, shall remain ultimately responsible for the operation of the Hospital, and, during the Management Period, in consultation with the Manager, may take any action (with Manager's cooperation as may be reasonably requested and at Parent Company's or the Manager's sole cost and expense) necessary to ensure the Corporation's compliance with applicable laws and regulations.

## 5.    Continued Responsibility of the Corporation.

**5.1**    During the Management Period, the Corporation shall maintain (at its sole cost and expense, except as otherwise contemplated in this Agreement), and shall not take or voluntarily permit any actions which may adversely affect, the Corporation's corporate existence and its full rights as the licensee under the Licenses.  In addition, during the Management Period, the Corporation and its officers shall reasonably cooperate with the Manager (at Parent Company's or the Manager's sole cost and expense) in the Manager's provision of the Services.

**5.2**    Notwithstanding the statutory and regulatory authority and responsibility of the Corporation for the continued management of the Hospital during the Management Period, the parties recognize and acknowledge that under this Agreement, the Manager shall, subject to the ultimate oversight by the Corporation as and to the extent legally required, be responsible for the day-to-day operation and maintenance of the Hospital as a general acute care hospital.  In the event that any violation or alleged violation of or non-compliance with any statute or regulation applicable to the operation or maintenance of the Hospital as a general acute care hospital certified by the Medicare and Medi-Cal programs occurs during the Management Period, then without regard to legal or statutory fault on the part of the Manager or of the Corporation, the Manager

9

shall immediately notify the Corporation of such violation or alleged violation or non-compliance and take reasonable efforts to address and resolve the alleged violation or non-compliance, and avoid, mitigate or minimize any related adverse consequences. In addition to the indemnification in Section 3.4, Parent Company and the Manager shall be responsible for the costs of any penalty, fine or remediation identified during the Management Period arising from or relating to the Manager's operation of the Hospital during the Management Period, including, without limitation, the cost of engaging third party consultants or experts to help address or resolve the violation, alleged violation or non-compliance, and shall indemnify and hold the Corporation harmless for the same in accordance with Section 9.2. The Corporation retains the right to join the Manager in contesting said violations upon providing the Manager with notice of its intent to do so.

      **5.3**    The Corporation shall be responsible for purchasing drugs and dangerous devices that the Manager determines are necessary for the operation of the Hospital at the Manager's sole cost and expense, as set forth in Section 4.5(b)(i).

      **5.4**    The Corporation agrees to execute and deliver to the Manager such documents as the Manager may reasonably request to maintain the hospital license active and in good standing with CDPH and the other Licenses necessary or appropriate to maintain the Hospital as a general acute care hospital and to facilitate the Manager's obtaining of the New Licenses.

**6.**    **The Parties' Cooperation with Regulatory Agencies**. The Manager shall use its best efforts to obtain the New Licenses as expeditiously as possible. The Manager and Corporation shall agree to the target Licensure Date identified in the change of ownership applications. The Manager shall provide updates to the Corporation as reasonably requested by the Corporation, on the status of the Manager's efforts to obtain the New Licenses. The Corporation shall, at Parent Company's or the Manager's cost, reasonably cooperate with the Manager's efforts to obtain the New Licenses, and may communicate and coordinate with licensing agencies as necessary in connection with obtaining the New Licenses. Notwithstanding the foregoing, obtaining all governmental consents, approvals, assignments, authorizations, and clearances necessary to obtain the New Licenses shall be solely Parent Company's and the Manager's (and not the Corporation's) responsibility, including payment of any fees, expenses, filing costs or other amounts related thereto.

**7.**    **Risk of Loss**.

      **7.1**    The Corporation assumes no risks or liability for damage to or injury occurring to the Hospital Premises, Assets or the Hospital during the term of this Agreement by any means whatsoever, including fire, storm, earthquake, vandalism, strike, cyberattack, accident or any other casualty (collectively, "**Casualty**"), and Parent Company shall have all right, title, and interest in and to the proceeds of any insurance it obtained and paid for covering such Casualty.

      **7.2**    If, during the term of this Agreement, action is initiated to take the Hospital Premises or any portion thereof by eminent domain proceedings or by deed in lieu thereof (collectively, "**Condemnation**"), Parent Company, and not the Corporation, shall have all right, title, and interest in and to the award from the Condemnation.

**7.3**    In the event of a Casualty or Condemnation, neither Parent Company nor the Corporation may terminate this Agreement.

**8.**    **Exculpation; Indemnification**.

**8.1**    The Corporation and the Corporation's affiliates, members, officers, directors, employees, attorneys, accountants, consultants, agents, representatives, successors and assigns, including the liquidating trustee and responsible officer (collectively the "**Corporation Indemnified Parties**") shall have no liability in contract, tort or otherwise unless and until a Chosen Court finds in a final, non-appealable judgment that any Damages result solely from a Corporation Indemnified party's gross negligence or willful misconduct.

**8.2**    In addition to any other indemnification provided for in the Agreement, Parent Company and the Manager shall promptly and fully keep and hold the Corporation Indemnified Parties forever harmless from, and shall indemnify and defend the Corporation Indemnified Parties from and against, without regard to materiality, any and all obligations, judgments, fines, civil money penalties, sanctions, awards, liabilities, losses, penalties, claims, costs, demands, damages, expenses, liens, and encumbrances, including investigation costs, time spent in depositions and reasonable attorneys' fees and expenses (collectively, "**Damages**"), whether civil or criminal, direct, indirect or consequential and no matter how arising, in any way related to, connected with, arising or resulting from, or under this Agreement, the APA, the Hired Employees (as defined in the APA), the Manager's performance of the Services, or the operation or management of the Hospital or the Corporation's Assets by the Manager after the Effective Time. Notwithstanding the foregoing, the parties understand that except as otherwise specifically provided for in the APA: (i) Parent Company and the Manager are not, by virtue of this Agreement or any term or provision herein, assuming any claim, liability, expense, debt or other obligation of the Corporation or Sellers that both relates to the operation of the Hospital or the Hospital Premises prior to the Effective Time and constitutes an Excluded Liability under the APA; and (ii) neither the Corporation, Manager or Parent Company are, by virtue of this Agreement or any term or provision herein, relieved or excused from any duties or obligations under the APA.

**9.**    **HIPAA Compliance**.  The Manager agrees to take such steps as are necessary to ensure compliance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), the California Confidentiality of Medical Information Act, and other applicable federal and state privacy laws and regulations (collectively, the "**Privacy Laws**") with respect to the Hospital and its operations, and the Corporation agrees not to take or voluntarily permit any actions which violate Privacy Laws with respect to the Hospital or its operations.  Toward this end, Parent Company, the Manager, and the Corporation agree to execute and deliver that certain Business Associate Agreement, attached hereto as Exhibit A and incorporated by reference herein, upon execution of this Agreement.

**10.**    **Further Assurances**.  Each of the parties hereto agree to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by any other party hereto to perfect or evidence their rights hereunder.

11

**11.    Relationship of Parties**.  In performing their duties and permitted activities under this Agreement, Parent Company, the Manager, and the Corporation shall, at all times be acting and performing as independent contractors.  Parent Company, the Manager, and the Corporation are not partners or joint venturers with each other and nothing herein shall be construed as making them partners or joint venturers or imposing upon any of them any liability as partners or joint venturers.

**12.    Notices and Demands**.  All notices and demands, requests, consents, approvals, and other similar communications under this Agreement shall be in writing and shall be sent by personal delivery or by either (a) United States certified or registered mail, return receipt requested, postage prepaid, or (b) Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery, addressed as follows:

| | |
|---|---|
| If to the Corporation: | Seton Medical Center<br>c/o Verity Health System of California, Inc.<br>601 South Figueroa Street, Suite 4050<br>Los Angeles, CA 90017-5704<br>Attention:  Chief Executive Officer |
| With copies to:<br>(which copy shall not constitute notice) | Tania Moyron, Esq.<br>Dentons US LLP<br>601 South Figueroa St., Suite 2500<br>Los Angeles, CA 90017-5704<br><br>and<br><br>Hope Levy-Biehl, Esq.<br>Davis Wright Tremaine LLP<br>865 S Figueroa St,<br>Los Angeles, CA 90017 |
| If to Parent Company and/or<br>the Manager: | AHMC Healthcare Inc.<br>55 S. Raymond Ave., Suite 105<br>Alhambra, CA 91801<br>Attention: Jonathan Wu<br>Facsimile: 626-289-8952 |
| With copies to:<br>(which copies shall not constitute notice) | AHMC Healthcare Inc., Legal Department<br>500 E. Main St., 5th Floor<br>Alhambra, CA 91801<br>Attention: Maan-Huei Hung, Esq.<br>Facsimile: 626-248-3303 |

12

Any notice so given by mail shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be, whether accepted or refused. Any such notice not so given shall be deemed given upon receipt of the same by the party to whom the same is to be given. Any party hereto may designate a different address for itself by notice to the other party in accordance with this Section 13.

13.    **Expenses**. Except for Parent Company's and the Manager's obligations to be responsible for certain costs, fees, and expenses as set forth elsewhere in this Agreement, each party to this Agreement shall pay its own expenses in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby, including the fees of any attorneys, accountants, financial advisors, investment bankers or other professionals engaged by such party.

14.    **Entire Agreement**. This Agreement, the Leaseback Agreement, and those provisions of the APA expressly identified in this Agreement, contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements, arrangements, and understandings relating to the subject matter hereof and thereof. There are no written or oral agreements, understandings, representations, or warranties among the parties other than those set forth in this Agreement, the Leaseback Agreement, and those provisions of the APA expressly identified in this Agreement. Nothing in this Agreement modifies or shall be construed as modifying any orders entered by the Bankruptcy Court.

15.    **Amendment**. This Agreement may not be modified, amended, altered or supplemented except by a written agreement executed by all the parties hereto.

16.    **Waiver**. Waiver by any party of any breach or failure to comply with any provision of this Agreement by any other party shall not be construed as or constitute, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any other provision of this Agreement. No waiver of any such breach or failure or of any term or condition of this Agreement shall be effective unless in a written notice signed by the waiving party and delivered, in the manner required for notices generally, to each affected party.

17.    **Severability**. In case any provision of this Agreement shall be found by a court of competent jurisdiction to be invalid, illegal or unenforceable, such provision shall be construed and enforced as if it had been narrowly drawn so as not to be invalid, illegal or unenforceable, and the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

18.    **Successors and Assigns**. This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective permitted successors and assigns. The Corporation shall not be permitted to assign its rights or its obligations under this Agreement without the prior consent of Parent Company and the Manager. The parties further acknowledge and agree that the Manager may subcontract for any of the goods or services required to be provided by the Manager pursuant to this Agreement, and the Manager may assign any of its rights hereunder and/or delegate any of its obligations hereunder, so long as in each case the Manager remains responsible for such subcontracted goods or services and for any of such Manager obligations hereunder.

US_Active\114507302\V-2

19. **Attorneys' Fees**.  In the event of any litigation or arbitration between the parties hereto arising out of this Agreement, the prevailing party therein shall be allowed to recover from the other party all court costs and reasonable attorneys' fees which shall be fixed by the court or arbitrator.

20. **Headings**.  The descriptive headings of sections and subsections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

21. **Governing Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to its conflicts of laws principles or decisions.

22. **Jurisdiction**.  The parties agree that the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction over any action or proceeding with respect to any claim arising out of or related to this Agreement, and any of the documents or transactions contained in or contemplated by this Agreement; provided, however, that the parties agree that the United States District Court for the Central District of California (together with the Bankruptcy Court, the "**Chosen Courts**") shall have exclusive jurisdiction over such claim if (i) the Bankruptcy Cases are closed and if the Bankruptcy Cases are not reopened to adjudicate such claim after request by the party bringing such claim or (ii) the Bankruptcy Court determines that it does not have jurisdiction over such claim.  Solely in connection with claims arising under this Agreement, or any of the documents or transactions contemplated hereby, the parties (a) irrevocably submit to the exclusive jurisdiction of the Chosen Courts, (b) waive any objection to laying venue in any such action or proceeding in the Chosen Courts, (c) waive any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto, and (d) agree that service of process upon such party in any such action or proceeding shall be effective if notice is given in accordance with Section 13 hereof.

23. **Commencement**.  The parties acknowledge that commencement of the Manager's Services under this Agreement is subject to and contingent upon the occurrence of the Closing (as defined in the APA).  The Management Period shall not commence, and the parties' obligations during the Management Period shall not commence, unless and until the Closing has occurred.

24. **Cooperation on Regulatory Compliance Matters**.  Parent Company and the Manager understand and acknowledge that the Corporation intends to comply with applicable federal and state laws, regulations, and guidance.  In the event the terms of this Agreement need to be amended or supplemented based on guidance from or at the request or direction of a regulator made during the term of this Agreement, Parent Company and the Manager shall cooperate with such amendment and/or supplement to ensure the Corporation's ability to comply with such guidance, request or directive.

25. **Counterparts**.  This Agreement may be executed by one or more of the parties hereto on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  It may be delivered by facsimile or electronic transmission, including by e-mail as a PDF, and facsimile or PDF copies of executed signature pages, which shall be binding as originals.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties agree to the foregoing terms of agreement through the execution below by their respective, duly authorized representatives as of the Signing Date.

**MANAGER/HOSPITAL NEWCO:**

A LEGAL ENTITY TO BE FORMED AND CONTROLLED BY AHMC HEALTHCARE INC.

BY: AHMC HEALTHCARE INC.

By: _____
Name: ____Jonathan Wu____
Title: ____President/CEO____

**CORPORATION:**

SETON MEDICAL CENTER, a California non-profit public benefit corporation

By: _____
Name: _____
Title: _____

**PARENT COMPANY:**

AHMC HEALTHCARE INC.

By: _____
Name: ____Jonathan Wu____
Title: ____President/CEO____

16

## Exhibit A To IMA

## BUSINESS ASSOCIATE AGREEMENT

The Business Associate Agreement ("BA Agreement") is entered into as of and is in effect as of the first day of the Management Period ("Effective Date") by and between Seton Medical Center ("Covered Entity" or "CE") and AHMC Healthcare, Inc. ("Business Associate" or "BA").

## RECITALS

A.   CE provides certain Protected Health Information (as defined below and referred to herein as "PHI") to BA in the course of BA providing services under that certain Interim Management Agreement entered into by CE and BA as of March 30, 2020 (the "IMA") and effective during the Management Period (as defined in the IMA).

B.   In order to protect the privacy of the PHI and to comply with HIPAA, the HIPAA Regulations, and the California Confidentiality Laws (each as defined below), CE and BA desire to enter into this BA Agreement setting forth the terms and conditions of the use and disclosure of such PHI.

In consideration of the mutual promises set forth below, the parties agree as follows:

## ARTICLE I:  DEFINITIONS

1.1   **General Rule**. Capitalized terms not otherwise defined in this BA Agreement shall have the same meaning as those terms have in the HIPAA Regulations.

1.2   **HIPAA** means the Health Insurance Portability & Accountability Act of 1996, P.L. 104-191, as amended by the HITECH Act.

1.3   **HIPAA Regulations** means the regulations promulgated under HIPAA by the U.S. Department of Health and Human Services, including, but not limited to, the Privacy Rule, the Security Rule, and the Breach Notification Rule, as currently in effect and as modified from time to time.

1.4   **HITECH Act** means Subtitle D of the Health Information Technology for Economic and Clinical Health Act ("HITECH"), which is Title XIII of the American Recovery and Reinvestment Act of 2009, P.L. 111-5.

1.5   **Privacy Rule** means the Standards for Privacy of Individually Identifiable Health Information, codified at 45 CFR Parts 160 and 164, Subparts A and E, as currently in effect and as modified from time to time.

1.6   **Protected Health Information or "PHI"** shall have the meaning given to the term "Protected Health Information" under the Privacy Rule.

1.7 **Breach Notification Rule** means the Standards for Notification in the Case of Breach of Unsecured Protected Health Information, codified at 45 CFR Parts 160 and 164, Subparts A and D, as currently in effect and as modified from time to time.

1.8 **Security Rule** means the Security Standards for the Protection of Electronic Protected Health Information, codified at 45 CFR Parts 160 and 164, Subparts A and C, as currently in effect and as modified from time to time.

1.9 **California Confidentiality Laws** means the laws of the State of California governing the confidentiality of PHI, including, but not limited to, the California Confidentiality of Medical Information Act (Cal. Civil Code §56 *et seq.*), the patient access law (Cal. Health & Safety Code §123100 et seq.), the HIV test result confidentiality law (Cal. Health & Safety Code §120975 et seq.), the Lanterman-Petris-Short Act (Cal. Wel. & Inst. Code §5328 et seq.), the medical identity theft law (Cal. Civil Code §1798.82), and the improper access notification law (Cal. Health & Safety Code §1280.15).

## ARTICLE II:  OBLIGATIONS OF BA

2.1 **General Requirements**. Except as otherwise limited in this BA Agreement, BA may use or disclose PHI to perform functions, activities, or services for, or on behalf of, CE pursuant to one or more services agreements between CE and BA (the "Services Agreements"), as listed on Exhibit A to this BA Agreement, provided that such Use or Disclosure would not violate HIPAA, the HIPAA Regulations, or the California Confidentiality Laws if done by CE.  BA and its agents and subcontractors shall only request, use, and disclose the minimum amount of PHI necessary to accomplish the purpose of the permitted Use or Disclosure. BA agrees to comply with all applicable provisions in HIPAA, the HIPAA Regulations, and the California Confidentiality Laws.

2.2 **Uses or Disclosures Permitted by Privacy Rule**. As permitted by the Privacy Rule, BA may use or disclose PHI: (a) as is necessary for the proper management and administration of BA's organization, or (b) to carry out the legal responsibilities of BA; provided, however, that any permitted Disclosure to a third party must be either Required By Law or subject to reasonable assurances obtained by BA from the third party that the PHI will be held confidentially, and securely, and used or disclosed only as Required By Law or for the purposes for which it was disclosed to such third party, and that any breaches of confidentiality of the PHI which become known to such third party will be immediately reported to BA.  BA shall obtain the prior permission of CE before making any such disclosure that is not Required by Law.  BA shall notify CE in a timely manner prior to making any Disclosure that is Required By Law, in order to afford CE the opportunity to respond to the request for such a Disclosure.

2.3 **Data Aggregation**. BA may provide Data Aggregation services relating to the Health Care Operations of CE.

2.4 **Disclosures to Agents and Subcontractors**. BA shall ensure that any agent or subcontractor to whom it provides PHI agrees in writing to the same restrictions, conditions, and requirements that apply to BA with respect to such PHI and as set forth

US_Active\114453229\V-1

herein regarding the Use and Disclosure and security of PHI, including, but not limited to, implementation of administration, physical and technical safeguards, notice of prohibited Use or Disclosure, mitigation of harmful effects, responses to requests for access and amendment, and a term permitting immediate termination of the agent's or subcontractor's agreement with BA for improper Use or Disclosure of PHI. BA shall terminate its agreement with any agent or subcontractor to whom it provides PHI if such agent or subcontractor fails to abide by any material term of such agreement.

2.5 **Safeguards**. BA shall implement and use appropriate safeguards as necessary to prevent the Use or Disclosure of PHI in any manner that is not permitted by this BA Agreement, including but not limited to, safeguards designed to limit incidental Uses or Disclosures made pursuant to an otherwise permitted or required Use or Disclosure.

2.6 **Security Rule Safeguards**. To the extent that BA creates, receives, maintains, or transmits electronic PHI, BA shall comply with the Security Rule and implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any electronic PHI that may be transmitted in conformity with the requirements of the Security Rule and prevent the Use or Disclosure of electronic PHI in any manner that is not permitted by this BA Agreement.

2.7 **Direct Access to CE's Electronic Systems**. If BA or its employees/agents are granted direct access to CE's electronic systems, BA will ensure that each of its employees and agents has access to only what is required for each employee/agent to perform the specific duties assigned by BA to that individual employee/agent pursuant to the Services Agreement with CE. Further, BA will provide immediate notice when its employees/agents are terminated or change roles or otherwise no longer have a need for access, BA will routinely monitor the list of employees/agents with access, BA will educate its employees/agents that sharing of login information among its employees/agents is prohibited, and BA will provide CE with a list of its employees/agents with access to CE's electronic systems upon request by CE.

2.8 **Minimum Necessary Use and Disclosure**. In conducting functions and/or activities under this BA Agreement or any other agreement between the parties hereto that involve the use and/or disclosure of PHI, BA shall make reasonable efforts to limit the use and/or disclosure of PHI to the minimum amount of information necessary as determined by CE to accomplish the intended purpose of the use or disclosure.

2.9 **Reporting**. BA agrees to provide written notice to CE of any Use or Disclosure of PHI that is in violation of this BA Agreement, the Privacy Rule, the California Confidentiality Laws, or other applicable federal or state law, within five (5) calendar days of becoming aware of such Use or Disclosure. BA shall also notify CE in writing within five (5) calendar days of receipt of any complaint that BA receives concerning the handling of PHI or compliance with this BA Agreement. BA further agrees to provide written notice to CE of any Security Incident within five (5) calendar days of BA's discovery of such Security Incident.

US_Active\114453229\V-1

Notwithstanding the foregoing, BA shall immediately, and in no case longer than forty-eight (48) hours after, upon discovery of a Breach under HIPAA or breach under applicable state law, report to CE such Breach/breach, consistent with HIPAA, the HIPAA Regulations, and the California Confidentiality Laws.  BA must also, without unreasonable delay, identify each individual whose unsecured PHI has been, or is reasonably believed to have been, accessed, acquired or disclosed as a result of the Breach/breach, and provide such information to CE as needed in order to meet the data breach notification requirements under the Breach Notification Rule and the California Confidentiality Laws, and in any event within five (5) calendar days after the discovery of the Breach/breach.  The Breach shall be considered "discovered" when the BA knew or reasonably should have known when the Breach occurred.

BA agrees to fully cooperate, coordinate with and assist CE in gathering the information necessary to notify the affected individuals.  BA agrees to cooperate with CE to ensure that all such Breach/breach notices are sent without unreasonable delay, and in no case more than five (5) business days from the discovery of the Breach/breach, as required under the applicable California Confidentiality Laws.  BA agrees that it shall be solely responsible for all costs and expenses incurred by both CE and BA as a result of the Breach/breach, including costs associated with mitigation, preparation and delivery of the notices.

2.10    **Mitigation**. BA shall mitigate promptly, to the extent practicable, any harmful effect that is known to BA of a Use or Disclosure of PHI by BA in violation of this BA Agreement, the Privacy Rule, or other applicable federal or state law.

2.11    **Requests for Restrictions**.  BA agrees to comply with requests for restrictions on Use or Disclosure of PHI that CE has agreed to or is required to abide by under 45 C.F.R. §164.522, to the extent that such restriction may affect BA's use or disclosure of such PHI.

2.12    **Access and Amendment**. To enable CE to fulfill its obligations under the Privacy Rule, BA shall make PHI in Designated Record Sets that are maintained by BA or its agents or subcontractors available to CE for inspection, copying or amendment within ten (10) calendar days of a request by CE. If an Individual requests inspection, copying or amendment of PHI directly from BA or its agents or subcontractors, BA shall notify CE in writing within five (5) business days of receipt of the request, and shall defer to, and comply with, CE's direction in a timely manner regarding the response to the Individual regarding the request for inspection, copying or amendment.

2.13    **Accounting**. BA shall implement a process for recording certain Disclosures of PHI by BA ("Accounting Information") in order to enable CE to comply timely with its obligations under the Privacy Rule including, but not limited to, 45 CFR Section 164.528. At a minimum, this Accounting Information shall include for each such Disclosure recordation of (a) the name and date of birth of the Individual whose PHI was the subject of the Disclosure; (b) the date of Disclosure; (c) the name and address of the recipient of the PHI; (d) a brief description of the PHI disclosed; and (e) a brief statement of the purpose for the Disclosure that reasonably informs the Individual of the basis for the

Disclosure. Within ten (10) calendar days of notice from CE of a request for an accounting of Disclosures of PHI, BA shall make available to CE this Accounting Information. In addition, for any month in which BA makes a Disclosure of PHI, BA shall provide Accounting Information during the subsequent month pertaining to CE, in a format and medium specified by CE. If an Individual requests an accounting directly from BA or its agents or subcontractors, BA must notify CE in writing within five (5) business days of the request, and shall defer to, and comply in a timely manner with, CE's direction regarding the response to the Individual regarding the request for an accounting.

2.14    **Government Officials**. BA shall make its internal practices, books and records relating to the Use and Disclosure of PHI available to the Secretary of the U.S. Department of Health and Human Services ("Secretary") for purposes of determining CE's compliance with the Privacy Rule.  BA shall notify CE regarding any PHI that BA provides to the Secretary concurrently with providing such PHI to the Secretary, and upon CE's request, shall provide CE with a duplicate copy of such PHI.

2.15    **Insurance and Indemnity**. BA shall maintain or cause to be maintained sufficient insurance coverage as shall be necessary to insure BA and its agents or subcontractors against any claim or claims for damages arising under this BA Agreement. Such insurance coverage shall apply to all sites of BA and to all services provided by BA or its agents or subcontractors under this BA Agreement.

BA shall indemnify, hold harmless and defend CE and its affiliated entities from and against any and all claims, losses, liabilities, costs and other expenses (including reasonable attorneys' fees and costs, and administrative penalties and fines) incurred as a result of, or arising directly or indirectly out of or in connection with any act or omission of BA, its agents or subcontractors, under this BA Agreement including, but not limited to, negligent or intentional acts or omissions. The indemnification obligation of BA shall survive termination of this BA Agreement.

2.16    **Prohibition on Sale of PHI**.  BA agrees to comply with the prohibition of sale of PHI without authorization unless an exception under 45 C.F.R. § 164.508 applies.

2.17    **Compliance with CE's Obligations**.  To the extent that BA carries out CE's obligations under HIPAA, the HIPAA Regulations, or the California Confidentiality Laws, BA shall comply with all of the requirements of HIPAA, the HIPAA Regulations, and the California Confidentiality Laws, in the performance of such obligations.

## ARTICLE III:  OBLIGATIONS OF CE

3.1    **Notice of Privacy Practices**. CE shall notify BA of limitation(s) in its notice of privacy practices, in accordance with 45 CFR Section 164.520, to the extent such limitation affects BA's permitted Uses or Disclosures.

3.2    **Individual Permission**. CE shall notify BA of changes in, or revocation of, permission by an Individual to use or disclose PHI, to the extent such changes affect BA's permitted Uses or Disclosures.

3.3   **Restrictions**. CE shall notify BA of restriction(s) in the Use or Disclosure of PHI that CE has agreed to, in accordance with 45 CFR Section 164.522, to the extent such restriction affects BA's permitted Uses or Disclosures.

3.4   **Prohibited Requests**. CE shall not request BA to use or disclose PHI in any manner that would not be permissible under HIPAA, the HIPAA Regulations, or the California Confidentiality Laws, if done by CE.

## ARTICLE IV: TERM AND TERMINATION

4.1   **Term**. This BA Agreement shall be effective as of the Effective Date, and shall continue in effect with respect to each Services Agreement until: (i) this BA Agreement is terminated in accordance with the provisions of Section 4.2 or (ii) the relevant Services Agreement (in its entirety) is terminated; provided, however, that in the event that CE has entered into more than one Services Agreements with BA and one or more, or a portion of one or more, but not all, of such Services Agreements are terminated, this BA Agreement shall terminate only with respect to the Services Agreement(s) (or portions thereof) that have been terminated. Under such circumstances, this BA Agreement shall continue in effect with respect to all Services Agreements (or portions thereof) between CE and BA which have not been terminated.

4.2   **Termination for Cause**. In the event of either party's material breach of this BA Agreement, the non-breaching party may terminate this BA Agreement upon ten (10) calendar days prior written notice to the breaching party in the event the breaching party does not cure such breach to the reasonable satisfaction of the non-breaching party within such ten (10) calendar day period.  In the event that cure of a breach under this Section 4.2 is not reasonably possible, the non-breaching party may immediately terminate this BA Agreement; or if neither termination nor cure is feasible, the non-breaching party may, subject to all applicable legal privileges, report the violation to the Secretary of the Department of Health and Human Services.  Either party may terminate this BA Agreement immediately if (a) the other party is named as a defendant in a criminal proceeding for a violation of HIPAA, HIPAA Regulations, or the California Confidentiality Laws, or (b) if a finding or stipulation that the other party has violated any standard or requirement of HIPAA, the HIPAA Regulations, the California Confidentiality Laws, or any other security or privacy law is made in any administrative or civil proceeding in which that party has been joined.

4.3   **Effects of Termination**. Upon termination of the business relationship between the parties and/or the BA Agreement for any reason, BA shall, at CE's direction, return or destroy all PHI that BA or its agents or subcontractors still maintain in any form, and shall retain no copies of such PHI.  Upon CE's request, BA shall certify in writing that such return or destruction has occurred. If BA determines that return or destruction is not feasible, BA shall explain to CE in writing why conditions make the return or destruction of such PHI not feasible. If CE agrees that the return or destruction of PHI is not feasible, BA shall retain the PHI, subject to all of the protections of this BA Agreement, and shall make no further Use or Disclosure of the PHI, except as for those purposes that make the return or destruction of the PHI not feasible. In any event, upon termination of the

- 6 -

business relationship between the parties and/or the BA Agreement, BA shall retain for no less than six (6) years the Accounting Information compiled by BA pursuant to section 2.13 of this BA Agreement, and shall make such Accounting Information available to CE within five (5) business days of a request.

4.4 **Survival**. The obligations of BA under this Article IV shall survive the termination of the business relationship between the parties and/or the BA Agreement.

## ARTICLE V: MISCELLANEOUS

5.1 **Assistance**. In the event of an administrative or judicial action commenced against CE where BA may be at fault, in whole or in part, as the result of its performance under this BA Agreement, BA agrees to defend or to cooperate with CE in the defense against such action.

5.2 **Subcontracts and Assignment**. BA shall not subcontract its obligations, assign its rights, or delegate its duties under this BA Agreement without the express written consent of CE.

5.3 **Amendment**. If any modification to this BA Agreement is required for conformity with federal or state law or if CE reasonably concludes that an amendment to this BA Agreement is required because of a change in federal or state law, or by reason of CE's status as a business associate of another covered entity, CE shall notify BA of such proposed modification(s) ("Required Modifications"). Such Required Modifications shall be deemed accepted by BA and this BA Agreement so amended, if BA does not, within thirty (30) calendar days following the date of the notice, deliver to CE its written rejection of such Required Modifications. If BA submits a written rejection of the Required Modification, CE may terminate its business relationship with BA upon thirty (30) calendar days written notice, or such longer period as may be required by law. Other modifications to this BA Agreement may be made on mutual agreement of the parties.

5.4 **Business Relationship**. Except as specifically required to implement the purposes of this BA Agreement, and except to the extent inconsistent with this BA Agreement, all terms of the business relationship between the parties shall remain in full force and effect. In the event of a conflict between the terms of the business relationship between the parties and this BA Agreement, this BA Agreement shall control.

5.5 **Ambiguity**. Any ambiguity in this BA Agreement relating to the Use and Disclosure of PHI shall be resolved in favor of a meaning that furthers the obligations to protect the privacy and security of the PHI, whether electronic or other medium, in accordance with the Privacy Rule.

5.6 **Primacy**. To the extent that any provisions of this BA Agreement conflict with the provisions of any other agreement or understanding between the parties, this BA Agreement shall control with respect to the subject matter of this BA Agreement.

5.7 **Third Party Beneficiaries**. Except as expressly provided for in this BA Agreement or the Privacy Rule, there are no third party beneficiaries to this BA Agreement.

- 7 -

5.8  **Independent Contractors**. No provision of this BA Agreement is intended to create, nor shall be deemed or construed to create, any employment, agency or joint venture relationship between CE and BA other than that of independent entities contracting with each other hereunder solely for the purpose of effectuating the provisions of this BA Agreement.  None of the parties nor any of their respective representatives shall be construed to be the agent, employer, or representative of the other.  The parties have reviewed the factors to determine whether an agency relationship exists under the federal common law of agency and it is not the intention of either CE or BA that BA constitute an "agent" under such common law.

5.9  **Counterparts; Facsimiles**. This BA Agreement and any exhibits hereto may be executed in one or more counterparts; each counterpart shall be deemed an original.  Facsimile copies hereof shall be deemed to be originals.

5.10  **Notices**. All notices required or permitted to be given under this BA Agreement shall be in writing and shall be sufficient in all respects if delivered personally, by nationally recognized overnight delivery service, or by registered or certified mail, postage prepaid, addressed as set forth in the notice provisions under the IMA.  Notice shall be deemed to have been given upon transmittal thereof as to those personally delivered, upon the first day after mailing as to those sent by nationally recognized overnight delivery service, and upon the third day after mailing as to those sent by United States Mail. The above addresses may be changed by giving notice in the manner provided for above.

IN WITNESS WHEREOF, the parties hereto have duly executed this BA Agreement to be effective as of the Effective Date.

**CE**                                              **BA**
Seton Medical Center                                AHMC Healthcare, Inc.

By:_____          By:_____
Name: _____          Name: _____
Title: _____          Title: _____

US_Active\114453229\V-1

**Schedule 3.4 to IMA**

**Corporation's Billing Credentials**

| Provider Number Listing | |
|---|---|
| **Medicare** | |
| 05-0289 | Seton Medical Center |
| ZZZ26237Z | Seton Medical Center (Part B) |
| 55-5235 | Seton Medical Center-SNF (hospital based) |
| 05-S289 | Seton Medical Center - Psych |
| 05-7249 | West Bay-HHA (closed Dec 2008 but number is technically still active) |
| **Medi-Cal** | |
| ZZR 00289G | Acute Inpatient Non-Contract |
| HSC 00289G | Acute Inpatient Contract |
| LTC 55235G | SNF Inpatient LTC |
| LTC 70037G | MAC Inpatient (LTC Subacute) |
| | Gero-Psych |
| HSP 40289G | Coastside - Outpatient |
| HHA 70027F | Home Health Agency (no longer used) |

| Lockbox Accounts | | | |
|---|---|---|---|
| **Account Name** | **Legal Entity** | **Bank** | **Account #** |
| Seton Medical Center (SMC) - Lockbox | Seton Medical Center | Bank of America | XXXXXX2902 |
| Seton Medical Center Coastside (SMCC) - Lockbox | Seton Medical Center | Bank of America | XXXXXX2907 |

## __Schedule 3.6 to IMA__

## **Retained Contracts**

To be completed by the parties, in accordance with both the IMA and that certain Asset Purchase Agreement, dated as of March 30, 2020 by and between CE and BA and certain other entities (the "APA").

## SALE LEASEBACK AGREEMENT

This Sale Leaseback Agreement (the "**Leaseback Agreement**") is made and entered into as of March 30, 2020 (the "**Signing Date**"), by and among Seton Medical Center, a California nonprofit public benefit corporation (the "**Corporation**") on the one hand, and AHMC Healthcare Inc., a California corporation ("**Parent Company**") and a legal entity to be formed and controlled by Parent Company ("**Hospital Newco**," and collectively with Parent Company, the "**Parent Company Parties**") on the other hand. The Corporation, Parent Company, and Hospital Newco may be referred to herein individually as a "**Party**," and collectively as the "**parties**."

## RECITALS

**A.**     On August 31, 2018, the Corporation and certain of its affiliates each filed a voluntary petition for relief (collectively, the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United State Code (the "**Bankruptcy Code**").

**B.**     The Bankruptcy Cases are jointly administered under Lead Case No. 18-20151 and are currently pending in the Bankruptcy Court for the Central District of California in Los Angeles (the "**Bankruptcy Court**").

**C.**     Parent Company, on the one hand, and the Corporation, Verity Health System of California, Inc., a California nonprofit public benefit corporation ("**Verity**"), and Verity Holdings, LLC, a California limited liability company ("**Verity Holdings**", and together with Verity and the Corporation, "**Sellers**"), on the other, have entered into that certain Asset Purchase Agreement, dated of even date herewith (the "**APA**"), which provides for the sale of the assets of the Corporation and related assets (collectively, the "**Assets**").

**D.**     The Corporation operates two general acute care hospitals under a single license, consisting of: (i) the hospital known as Seton Medical Center, located at 1900 Sullivan Avenue, Daly City, CA 94015, including the related hospital pharmacy, laboratory and emergency department and (ii) the hospital known as Seton Medical Center Coastside, located at 600 Marine Blvd, Moss Beach, CA 94038, including the related hospital pharmacy, laboratory and emergency department (collectively, the "**Hospital**"), and such other locations where the Hospital's services are provided (collectively, the "**Hospital Premises**").

**E.**     Parent Company designated its affiliate, Hospital Newco, as the owner of the Corporation's Assets purchased by Parent Company under the APA (the "**Designation**"), and its affiliate _____ (the "**Manager**") as the operator of the Hospital.

**F.**     Pursuant to Section 1.3 of the APA, the Corporation, Parent Company, and the Manager, are entering into that certain Interim Management Agreement ("**IMA**") of even date herewith, and commencing at the Effective Time (as defined in the APA), to enable the Manager to manage the day-to-day operations of the Hospital following the Closing (as defined in the APA) until the Manager is issued the Licenses (as defined in the APA) necessary to operate the Hospital (for the avoidance of doubt, that date will occur when the Manager is issued both a license to operate the Hospital as an acute care hospital by the California Department of Public Health, and a permit to operate a hospital-based pharmacy by the California Board of Pharmacy (collectively, the "**New Licenses**")).

**G.** Pursuant to the APA, at the Effective Time, Parent Company will purchase the Hospital Assets, except for the Excluded Assets (as set forth in the APA). Also pursuant to the APA, that portion of the Assets constituting drugs, dangerous devices, pharmacy systems, or other pharmacy assets (the "**Pharmacy Assets**") shall transfer to Parent Company (or its affiliate) as of the Licensure Date (as defined in the APA).

**H.** Immediately following the Closing, and until the Manager obtains the New Licenses, the Parent Company Parties desire to lease back or license to the Corporation all of the then-acquired Hospital Assets used in the operation of the Hospital, and the Corporation desires to so lease or license such Hospital Assets from the Parent Company Parties on the terms and conditions set forth herein. The Hospital Assets shall exclude the Pharmacy Assets, which the Corporation shall own until the New Licenses are issued.

## AGREEMENT

NOW, THEREFORE, in consideration of the covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

**1.** <u>Definitions</u>. Any capitalized term appearing herein that is not defined shall have the same definition ascribed to it under the IMA or the APA (as designated when such term first appears herein).

**2.** <u>Description of The Leased or Licensed Assets</u>.

**2.1** <u>Leased or Licensed Assets</u>. The Parent Company Parties hereby lease or license to the Corporation, and the Corporation leases or licenses from the Parent Company Parties, all of the Assets used in the operation of the Hospital, except for the Pharmacy Assets, which the Corporation shall continue to own until the Licensure Date (as defined in the APA) (collectively, the "**Leased or Licensed Assets**"). Specifically, the Leased or Licensed Assets shall include: (a) the Hospital Premises (which shall be leased); (b) tangible personal property, including, but not limited to, fixtures, furnishings, hard copy medical and financial records and equipment (including, but not limited to, hardware to operate and run the electronic health record systems, hospital operating systems, laboratory information systems, and financial reporting systems) (which shall be leased); and (c) intangible intellectual property saved or embodied in the electronic health record systems, hospital operating systems, laboratory information systems, and financial reporting systems (which shall be licensed for use by the Corporation).

**2.2** <u>Management of Pharmacy and Use of Pharmacy Assets</u>.

(a) The Corporation shall at all times during the term of this Leaseback Agreement be the owner of the Pharmacy Assets. The parties acknowledge, however, that under the IMA, the Manager will be managing the Corporation's pharmacy during the Management Period (as defined in the IMA), and the Corporation therefore grants the Manager (i) access to and authority to use the drugs, dangerous drug delivery devices, or other tangible pharmacy assets, and (ii) a license to use the intangible intellectual property saved or embodied in the pharmacy systems, in each case to the extent necessary for the Manager to fulfill its obligations under the IMA.

2

(b)    Pursuant to the IMA, the Corporation shall be responsible for purchasing drugs and dangerous devices identified by the Manager as necessary for the operations of the Hospital, and the Manager shall reimburse the Corporation for all costs and expenses incurred for such purchases.

**3.**    Term; Termination.  This Leaseback Agreement shall have a term coextensive with the Management Period (as defined in the IMA) and shall automatically terminate upon the termination of the IMA.

**4.**    Payments by the Parent Company Parties.

**4.1**  Utilities.  The Parent Company Parties shall pay all utilities and services supplied to the Hospital during the term hereof, including but not limited to water, gas, air conditioning, heat, light, power, telephone service, and waste removal services.

**4.2**  Taxes.  The Parent Company Parties shall pay all taxes, assessments, and levies of any kind or nature whatsoever, including real property taxes, personal property taxes, income taxes, employment taxes, and sales or use taxes, that are taxed, assessed, levied, invoiced or imposed upon or against the Leased or Licensed Assets, the Hospital, and/or the Hospital Premises, after the Effective Time.

**4.3**  Insurance.  The Parent Company Parties shall pay for all insurance coverages, including premiums, deductibles, stop-loss, and any other insurance covering the Leased or Licensed Assets, the Pharmacy Assets, the Hospital, and the Hospital Premises during the term hereof.  The Parent Company Parties covenant and agree that the Leased or Licensed Assets, the Pharmacy Assets, the Hospital, and the Hospital Premises are covered as of the date hereof and will be covered at all times by general liability, fire, theft, business interruption, cyber, professional liability, directors and officers insurance, employment practices liability, terrorism, workers' compensation & employers' liability, directors and officers, fiduciary, crime, punitive damages excess liability, physical damage, property liability, automobile, storage tank, helipad and non-owned aviation, sexual misconduct and molestation, medical provider professional liability, and provider capitation stop loss (managed care excess loss) insurance.  All such insurance shall name the Parent Company Parties and the Corporation as insureds as their respective interests may appear.

**4.4**  Repairs and Maintenance: Alterations.  The Parent Company Parties shall pay all costs of repairing (including replacement of) and maintaining the Leased or Licensed Assets and Hospital and every part thereof in good and sanitary order, condition and repair during the term hereof, reasonable wear and tear excepted, including, without limitation, all costs of all repairs, replacements and maintenance required by any applicable governmental law, statute, ordinance, rule or regulation, including the California Office of Statewide Health Planning and Development (OSHPD).  The Corporation shall not make any alterations or changes to the Leased or Licensed Assets, the Hospital or the Hospital Premises without prior written approval of the Parent Company Parties, which may be given or withheld in the Parent Company Parties' sole discretion.

3

**4.5**  Payment.  Nothing in this Section 4 shall in any way limit, reduce, or otherwise affect Parent Company's payment obligations under the IMA or the APA.

**5.**  Use.  The Leased or Licensed Assets shall be used for the operation of the Hospital, subject to the terms of the APA and the IMA.

**6.**  Risk of Loss.

**6.1**  The Corporation assumes no risks or liability for damage to or injury occurring to the Leased or Licensed Assets or Hospital during the term of this Leaseback Agreement by any means whatsoever, including fire, storm, earthquake, vandalism, strike, accident or any other casualty (collectively, "**Casualty**"), and the Parent Company Parties shall have all right, title, and interest in and to the proceeds of any insurance it obtained and paid for covering such Casualty.

**6.2**  If, during the term of this Leaseback Agreement, action is initiated to take the Hospital Premises or any portion thereof by eminent domain proceedings or by deed in lieu thereof (collectively, "**Condemnation**"), the Parent Company Parties, and not the Corporation, shall have all right, title, and interest in and to the award from the Condemnation.

**6.3**  In the event of a Casualty or Condemnation, neither the Parent Company Parties nor the Corporation may terminate this Leaseback Agreement.

**7.**  Continued Access.  Following termination of this Leaseback Agreement, and until the entry of final decrees closing the Bankruptcy Cases, the Patient Care Ombudsman, appointed by the United States Trustee pursuant to Bankruptcy Code § 333 and approved by the Bankruptcy Court [see Docket No. 430], shall have continuing access to the Leased or Licensed Assets and related personnel during normal business hours and upon at least one (1) business day's prior written notice to the Parent Company Parties, for the purpose of winding down the Corporation's affairs, in connection with any litigation or adversary proceedings, and to effectuate the chapter 11 plan as approved by the Bankruptcy Court.

**8.**  Miscellaneous.

**8.1**  Further Assurances.  Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Leaseback Agreement and the transactions referred to herein or contemplated hereby or reasonably requested by the other Party to perfect or evidence their rights hereunder.

**8.2**  Notices and Demands.   All notices and demands, requests, consents, approvals, and other similar communications under this Leaseback Agreement shall be in writing and shall be sent by personal delivery or by either (a) United States certified or registered mail, return receipt requested, postage prepaid, or (b) Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery, addressed as follows:

4

If to the Corporation:    Seton Medical Center

          c/o Verity Health System of California, Inc.

          601 South Figueroa Street, Suite 4050

          Los Angeles, CA 90017-5704

          Attention:  Chief Executive Officer


With copies to:     Tania Moyron, Esq.
          Dentons US LLP
(which  copy  shall  not
constitute notice)    601 South Figueroa St., Suite 2500

          Los Angeles, CA 90017-5704


          and


          Hope Levy-Biehl, Esq.
          Davis Wright Tremaine LLP
          865 S Figueroa St,
          Los Angeles, CA 90017


If to the Parent Company AHMC Healthcare Inc.
Parties:        55 S. Raymond Ave., Suite 105
          Alhambra, CA 91801
          Attention: Jonathan Wu
          Facsimile: 626-289-8952


With copies to:     AHMC Healthcare Inc., Legal Department
          500 E. Main St., 5th Floor
(which  copies  shall  not
constitute notice)    Alhambra, CA 91801
          Attention: Maan-Huei Hung, Esq.
          Facsimile: 626-248-3303

5

Any notice so given by mail shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be, whether accepted or refused. Any such notice not so given shall be deemed given upon receipt of the same by the Party to whom the same is to be given. Any Party hereto may designate a different address for itself by notice to the other parties in accordance with this <u>Section 8.2</u>.

       **8.3** <u>Payment of Expenses</u>. Except for the Parent Company Parties' obligation to be responsible for certain costs, fees, and expenses as set forth elsewhere in this Leaseback Agreement, each Party hereto shall bear its own legal, accounting, and other expenses incurred in connection with the preparation and negotiation of this Leaseback Agreement and the consummation of the transactions contemplated hereby, whether or not the transaction is consummated.

       **8.4** <u>Rent</u>. The Corporation has prepaid the sum of One Thousand Dollars ($1,000.00), the receipt of which is hereby acknowledged by the Parent Company Parties, and the Corporation shall not be required to pay the Parent Company Parties any additional rent under this Leaseback Agreement.

       **8.5** <u>Entire Agreement; Amendment; Waiver</u>. This Leaseback Agreement, the IMA, and those provisions of the APA expressly identified in this Leaseback Agreement contain the entire agreement among the parties with respect to the subject matter hereof and supersede all prior agreements, arrangements, and understandings relating to the subject matter hereof and thereof. There are no written or oral agreements, understandings, representations, or warranties among the parties other than those set forth in this Leaseback Agreement, the IMA, and those provisions of the APA expressly identified in this Leaseback Agreement. Nothing in this Leaseback Agreement modifies or shall be construed as modifying any orders entered by the Bankruptcy Court. This Leaseback Agreement may not be modified or amended except in writing signed by the parties hereto. No waiver of any term, provision or condition of this Leaseback Agreement in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Leaseback Agreement. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder.

       **8.6** <u>Assignment</u>. Neither this Leaseback Agreement nor the rights, duties or obligations arising hereunder shall be assignable or delegable by the Corporation or the Parent Company Parties without the prior written consent of the other parties, which may be granted, denied or conditioned in such Party's absolute discretion except that the Parent Company Parties may assign this Leaseback Agreement in connection with any permitted assignment under the IMA. Subject to the foregoing, this Leaseback Agreement shall be binding upon, and inure to the benefit of, the respective successors and assigns of the parties hereto.

       **8.7** <u>Joint Venture; No Third Party Beneficiaries</u>. Nothing contained herein shall be construed as forming a joint venture or partnership among the parties hereto with respect to the subject matter hereof. The parties hereto do not intend that any third party shall have any rights under this Leaseback Agreement.

6

**8.8** <u>Captions</u>.  The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

**8.9** <u>Governing Law</u>.  This Leaseback Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to its conflicts of laws principles or decisions.

**8.10** <u>Jurisdiction</u>.  The parties agree that the Bankruptcy Court shall have exclusive personal and subject matter jurisdiction over any action or proceeding with respect to any claim arising out of or related to this Leaseback Agreement, and any of the documents or transactions contained in or contemplated by this Leaseback Agreement; *provided, however*, that the parties agree that the United States District Court for the Central District of California (together with the Bankruptcy Court, the "**Chosen Courts**") shall have exclusive jurisdiction over such claim if (i) the Bankruptcy Cases are closed and if the Bankruptcy Cases are not reopened to adjudicate such claim after request by the Party bringing such claim or (ii) the Bankruptcy Court determines that it does not have jurisdiction over such claim.  Solely in connection with claims arising under this Leaseback Agreement, or any of the documents or transactions contemplated hereby, the parties (a) irrevocably submit to the exclusive jurisdiction of the Chosen Courts, (b) waive any objection to laying venue in any such action or proceeding in the Chosen Courts, (c) waive any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto, and (d) agree that service of process upon such Party in any such action or proceeding shall be effective if notice is given in accordance with <u>Section 8.2</u> hereof

**8.11** <u>Conditions to Effectiveness</u>.  The parties acknowledge that this Leaseback Agreement is subject to and contingent upon the occurrence of the Closing under the APA.  This Leaseback Agreement shall not be effective, nor shall any Party have any obligations hereunder, unless and until the Closing under the APA has occurred.

**8.12** <u>Cooperation on Regulatory Compliance Matters</u>.  The Parent Company Parties understand and acknowledges that the Corporation intends to comply with applicable federal and state laws, regulations, and guidance, as well as the requirements or recommendations of any accrediting agencies.  In the event the terms of this Leaseback Agreement need to be amended or supplemented based on guidance from or at the request or direction of a regulator made during the term of this Leaseback Agreement, the Parent Company Parties shall cooperate with such amendment and/or supplement to ensure the Corporation's ability to comply with such guidance, request, recommendation or directive.

**8.13** <u>Transition Services Agreement</u>.  Pursuant to Section 1.4.8 and Section 1.5.8 of the APA, the Sellers and Parent Company will enter into a Transition Services Agreement to facilitate the winding down of the Sellers' businesses, the completion of the Bankruptcy Cases, and the dissolution of the Sellers.  The parties hereto shall cooperate with each other to enable the Corporation and the Parent Company Parties to carry out their obligations under, and give effect to the terms of, the Transition Services Agreement.

**8.14** <u>Fair Meaning</u>. This Leaseback Agreement shall be construed according to its fair meaning and as if prepared by all parties hereto.

US_Active\114507703\V-1

**8.15** <u>Counterparts</u>.  This Leaseback Agreement may be executed by one or more of the parties hereto on any number of separate counterparts (including by telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  This Leaseback Agreement may be delivered by facsimile or electronic transmission, including by e-mail as a PDF, and facsimile or PDF copies of executed signature pages, which shall be binding as originals.

*[Signature Page Follows.]*

8

IN WITNESS WHEREOF, the parties agree to the foregoing terms of agreement through the execution below by their respective, duly authorized representatives as of the Signing Date.

**Parent Company Parties:**                    **Corporation:**

AHMC HEALTHCARE INC.                          SETON MEDICAL CENTER,

                                              a California non-profit public benefit
                                              corporation

By: _____

Name:    Jonathan Wu                          By: _____

Title:    President/CEO                       Name: _____

                                              Title: _____

US_Active\114507703\V-1

**<u>Exhibit B</u>**

**Proposed Form of Cure Notice**

1   SAMUEL R. MAIZEL (Bar No. 189301)
    samuel.maizel@dentons.com
2   TANIA M. MOYRON (Bar No. 235736)
    tania.moyron@dentons.com
3   NICHOLAS A. KOFFROTH (Bar No. 287854)
    nicholas.koffroth@dentons.com
4   DENTONS US LLP
    601 South Figueroa Street, Suite 2500
5   Los Angeles, California 90017-5704
    Tel: (213) 623-9300 / Fax: (213) 623-9924
6
    Proposed Attorneys for the Chapter 11 Debtors and
7   Debtors In Possession

8               UNITED STATES BANKRUPTCY COURT
        CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION
9

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

10  In re                                   Lead Case No. 2:18-bk-20151-ER
                                            Jointly Administered With:
11  VERITY HEALTH SYSTEM OF                 Case No. 2:18-bk-20162-ER
    CALIFORNIA, INC., *et al.*,             Case No. 2:18-bk-20163-ER
12                                          Case No. 2:18-bk-20164-ER
        Debtors and Debtors In Possession.  Case No. 2:18-bk-20165-ER
13                                          Case No. 2:18-bk-20167-ER
    ☒ Affects All Debtors                   Case No. 2:18-bk-20168-ER
14                                          Case No. 2:18-bk-20169-ER
    ☒ Affects Verity Health System of      Case No. 2:18-bk-20171-ER
15    California, Inc.                       Case No. 2:18-bk-20172-ER
    ☐ Affects O'Connor Hospital             Case No. 2:18-bk-20173-ER
16  ☐ Affects Saint Louise Regional Hospital Case No. 2:18-bk-20175-ER
    ☐ Affects St. Francis Medical Center    Case No. 2:18-bk-20176-ER
17  ☐ Affects St. Vincent Medical Center    Case No. 2:18-bk-20178-ER
    ☒ Affects Seton Medical Center          Case No. 2:18-bk-20179-ER
18  ☐ Affects O'Connor Hospital Foundation  Case No. 2:18-bk-20180-ER
    ☐ Affects Saint Louise Regional Hospital Case No. 2:18-bk-20181-ER
19    Foundation
    ☐ Affects St. Francis Medical Center of Hon. Judge Ernest M. Robles
20    Lynwood Foundation
    ☐ Affects St. Vincent Foundation        **NOTICE TO COUNTERPARTIES TO**
21  ☐ Affects St. Vincent Dialysis Center, Inc. **EXECUTORY CONTRACTS AND UNEXPIRED**
    ☐ Affects Seton Medical Center Foundation **LEASES OF THE DEBTORS THAT MAY BE**
22  ☐ Affects Verity Business Services      **ASSUMED AND ASSIGNED**
    ☐ Affects Verity Medical Foundation
23  ☒ Affects Verity Holdings, LLC          **[RELATES TO DOCKET NOS. ____]**
    ☐ Affects De Paul Ventures, LLC
24  ☐ Affects De Paul Ventures - San Jose   **Hearing:**
      Dialysis, LLC                         **Date:**  _____, 2020
25                                          **Time:  10:00 am**
        Debtors and Debtors In Possession.  **Place:  Courtroom 1568**
26                                                    **255 E. Temple St.,**
                                                      **Los Angeles, CA**
27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

## NOTICE TO COUNTERPARTIES TO EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES OF THE DEBTORS
## THAT MAY BE ASSUMED AND ASSIGNED

**PLEASE TAKE NOTICE** that, on March ___, 2020, the above-captioned debtors and debtors in possession (the "<u>Debtors</u>"), filed the *Debtors' Notice of Motion and Motion to Approve Terms and Conditions of a Private Sale of Certain of the Debtors' Assets Related to Seton Medical Center to AHMC Healthcare, Inc.* [Docket No. _____] (the "<u>Motion</u>").[1]

**PLEASE TAKE FURTHER NOTICE** that, on _____, 2020, the Court entered an Order [Docket No. _____] (the "<u>Order</u>") approving, among other things, the sale (the "<u>Sale</u>") pursuant to that certain asset purchase agreement (the "<u>APA</u>") as set forth more fully in the Motion, which Order governs (i) the sale of certain assets (the "<u>Purchased Assets</u>") of Verity Health System of California, Inc. ("<u>VHS</u>"), Verity Holdings, LLC ("<u>Holdings</u>"), and Seton Medical Center ("<u>Seton</u>" and, together with VHS and Holdings, the "<u>Sellers</u>"), and (ii) procedures for the assumption and assignment of certain of the Sellers' executory contracts and unexpired leases.

**PLEASE TAKE FURTHER NOTICE** that the Motion also seeks Court approval of the Sale of the Purchased Assets to AHMC Healthcare, Inc. ("<u>AHMC</u>"), free and clear of all liens, claims, interests and encumbrances pursuant to § 363 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* including the assumption by the Debtors and assignment to AHMC of certain executory contracts and unexpired leases pursuant to § 365 of the Bankruptcy Code (the "<u>Assumed Executory Contracts</u>"), with such liens, claims, interests and encumbrances to attach to the proceeds of the Sale with the same priority, validity and enforceability as they had prior to such Sale.

**PLEASE TAKE FURTHER NOTICE** that the Court held a hearing (the "<u>Sale Hearing</u>") on _____, 2020, at 10:00 a.m. (Pacific Time), approving the Sale. The Court set a further hearing to be held on _____, **2020, at 10:00 a.m. (prevailing Pacific Time)**, before the United States Bankruptcy Court for the Central District of California, 255 E. Temple St., Los Angeles, California 90012, Courtroom 1568 concerning any objections to the assumption and assignment of the Assumed Executory Contracts (the "<u>Assumption Objection Hearing</u>"). The Assumption Objection Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Assumption Objection Hearing.

**PLEASE TAKE FURTHER NOTICE** that, consistent with the Order, the Debtors may seek to assume an executory contract or unexpired lease to which <u>you may be a party</u>. The Assumed Executory Contract(s) are described on <u>Exhibit A</u> attached to this Notice. The amount shown on <u>Exhibit A</u> hereto as the "Cure Amount" is the amount, if any, which the Debtors assert is owed to cure any defaults existing under the respective Assumed Executory Contract.

**PLEASE TAKE FURTHER NOTICE** that, if you (i) disagree with the Cure Amount shown for the Assumed Executory Contract(s) on <u>Exhibit A</u> to which you are a party, and/or (ii) object to the assumption and assignment of the Assumed Executory Contract with respect to

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

AHMC's ability to provide adequate assurance of future performance under the Assumed Executory Contract, then you must file in writing with the United States Bankruptcy Court for the Central District of California, 255 E. Temple St., Los Angeles, California 90012, an objection on or before **5:00 p.m. (prevailing Pacific Time) _____, 2020**.  Any objection must set forth the specific default or defaults alleged and set forth any cure amount as alleged by you.  If a contract or lease is assumed and assigned pursuant to a Court order approving same, then unless you properly file and serve an objection to the Cure Amount contained in this Notice, you will receive at the time of the closing of the sale (or as soon as reasonably practicable thereafter), the Cure Amount set forth herein, if any.  Any counterparty to an Assumed Executory Contract that fails to timely file and serve an objection to the Cure Amounts shall be forever barred from asserting that a Cure Amount is owed in an amount in excess of the amount, if any, set forth in the attached <u>Exhibit A</u>.

**PLEASE TAKE FURTHER NOTICE** that any objection you may file must be served so as to be received by the following parties by the applicable objection deadline date and time: (i) counsel to the Debtors:  Dentons US LLP, 601 S. Figueroa Street, Suite 2500, Los Angeles, CA 90017 (Attn: Tania M. Moyron (tania.moyron@dentons.com)); (ii) the Debtors' Investment Banker: Cain Brothers, a division of KeyBanc Capital Markets, 1 California Street, Suite 2400, San Francisco, CA 94111 (Attn: James Moloney (jmoloney@cainbrothers.com)); (iii) counsel to the Official Committee: Milbank, Tweed, Hadley & McCloy LLP, 2029 Century Park East, 33rd Floor, Los Angeles, CA 90067 (Attn: Gregory A. Bray (gbray@milbank.com)); (iv) counsel to the Master Trustee and Series 2005 Bond Trustee: Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, MA 02111 (Attn: Daniel S. Bleck and Paul Ricotta (dsbleck@mintz.com, pricotta@mintz.com)); (v) counsel to the Series 2015 Notes Trustee: McDermott Will & Emergy LLP, 444 West Lake Street, Suite 4000, Chicago, IL 60606 (Attn: Nathan F. Coco and Megan Preusker (ncoco@mwe.com; mpreusker@mwe.com)); (vi) counsel to the Series 2017 Notes Trustee: Maslon, LLP, 3300 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN 55402 (Attn: Clark Whitmore (clark.whitmore@maslon.com)); and (vii) counsel to the MOB Lenders: Jones Day, 250 Vesey Street, New York, NY 10281 (Attn: Bruce Bennett, Benjamin Rosenblum, and Peter Saba (bbennett@jonesday.com, brosenblum@jonesday.com, psaba@jonesday.com).

**PLEASE TAKE FURTHER NOTICE** that AHMC shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under 11 U.S.C. §§ 365(b) and (f) in connection with the proposed assignment of any Assumed Executory Contract.  The Court shall make its determinations concerning adequate assurance of future performance under the Assumed Executory Contracts pursuant to 11 U.S.C. §§ 365(b) and (f) at the Assumption Objection Hearing.

**PLEASE TAKE FURTHER NOTICE** that except to the extent otherwise provided in the AHMC APA, the Debtors and the Debtors' estates shall be relieved of all liability accruing or arising after the assumption and assignment of the Assumed Executory Contracts pursuant to 11 U.S.C. § 365(k).

**PLEASE TAKE FURTHER NOTICE** that Assumption Objections may be resolved by the Court at the Assumption Objection Hearing, or at a separate hearing either before or after the Assumption Objection Hearing.

US_Active\114444975\V-1

**PLEASE TAKE FURTHER NOTICE** that nothing contained herein shall obligate the Debtors to assume any Assumed Executory Contracts or to pay any Cure Amount.

**PLEASE TAKE FURTHER NOTICE** THAT IF YOU DO NOT TIMELY FILE AND SERVE AN OBJECTION AS STATED ABOVE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITH NO FURTHER NOTICE.

**PLEASE TAKE FURTHER NOTICE** THAT ANY COUNTERPARTY TO ANY ASSUMED EXECUTORY CONTRACT WHO DOES NOT FILE A TIMELY OBJECTION TO THE CURE AMOUNT FOR SUCH ASSUMED EXECUTORY CONTRACT IS DEEMED TO HAVE CONSENTED TO SUCH CURE AMOUNT.

Dated: _____, 2020

DENTONS US LLP
SAMUEL R. MAIZEL
TANIA M. MOYRON


By _____*[DRAFT]*_____
       Tania M. Moyron

Attorneys for the Chapter 11 Debtors and Debtors In Possession

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- 3 -

**<u>Exhibit A</u>**

**(Assumed Executory Contracts)**