

FILED & ENTERED

JUL 31 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA—LOS ANGELES DIVISION

| | |
|---|---|
| In re: Verity Health System of California, Inc., *et al.*,<br>　　　Debtors and Debtors in Possession.<br><br>☒ Affects All Debtors<br><br>☐ Affects Verity Health System of California, Inc.<br>☐ Affects O'Connor Hospital<br>☐ Affects Saint Louise Regional Hospital<br>☐ Affects St. Francis Medical Center<br>☐ Affects St. Vincent Medical Center<br>☐ Affects Seton Medical Center<br>☐ Affects O'Connor Hospital Foundation<br>☐ Affects Saint Louise Regional Hospital Foundation<br>☐ Affects St. Francis Medical Center of Lynwood Medical Foundation<br>☐ Affects St. Vincent Foundation<br>☐ Affects St. Vincent Dialysis Center, Inc.<br>☐ Affects Seton Medical Center Foundation<br>☐ Affects Verity Business Services<br>☐ Affects Verity Medical Foundation<br>☐ Affects Verity Holdings, LLC<br>☐ Affects De Paul Ventures, LLC<br>☐ Affects De Paul Ventures - San Jose Dialysis, LLC<br><br>　　　Debtors and Debtors in Possession., | Lead Case No.:　　2:18-bk-20151-ER<br>Chapter:　　　　　11<br><br>Jointly Administered With:<br>Case No. 2:18-bk-20162-ER;<br>Case No. 2:18-bk-20163-ER;<br>Case No. 2:18-bk-20164-ER;<br>Case No. 2:18-bk-20165-ER;<br>Case No. 2:18-bk-20167-ER;<br>Case No. 2:18-bk-20168-ER;<br>Case No. 2:18-bk-20169-ER;<br>Case No. 2:18-bk-20171-ER;<br>Case No. 2:18-bk-20172-ER;<br>Case No. 2:18-bk-20173-ER;<br>Case No. 2:18-bk-20175-ER;<br>Case No. 2:18-bk-20176-ER;<br>Case No. 2:18-bk-20178-ER;<br>Case No. 2:18-bk-20179-ER;<br>Case No. 2:18-bk-20180-ER;<br>Case No. 2:18-bk-20181-ER;<br><br>Chapter 11 Cases.<br><br>**MEMORANDUM OF DECISION GRANTING DEBTORS' OMNIBUS MOTION TO REJECT AND TERMINATE COLLECTIVE BARGAINING AGREEMENTS**<br><br>**[RELATES TO DOC. NO. 5115]**<br><br>Date:　　　July 29, 2020<br>Time:　　　10:00 a.m.<br>Location:　Ctrm. 1568<br>　　　　　　Roybal Federal Building<br>　　　　　　255 East Temple Street<br>　　　　　　Los Angeles, CA 90012 |

## I. Introduction

At the above-captioned date and time, the Court conducted a hearing on the Debtors' *Omnibus Motion Under Bankruptcy Code § 1113 to Reject and Terminate Remaining Collective Bargaining Agreements (With CNA, NUHW, Local 20 and Local 39) Prior to the Scheduled Closing of the Sale of Seton Medical Center and Seton Coastside to AHMC* [Doc. No. 5115] (the "Motion"). The Motion seeks the rejection, termination, and abrogation of collective bargaining agreements (the "CBAs") between certain of the Debtors and the California Nurses Association (the "CNA"), the National Union of Healthcare Worker ("NUHW"), IFPTE AFL-CIO CLC, Local 20 ("Local 20"), and IUOE Stationary Engineers, Local 39 ("Local 39").

Prior to the hearing, the Debtors filed executed settlement agreements (the "Settlement Agreements") between the relevant Debtors and CNA, NUHW, and Local 20 (the "Consenting Unions"), which provide for the consensual rejection, termination, and abrogation of the relevant CBAs. Doc. No. 5198. Per the Debtors' request, the Court finds it appropriate to grant the Motion as to the Consenting Unions, subject to the terms of the Settlement Agreements.

In view of the Settlement Agreements, only the CBA between Debtors Seton Medical Center and Seton Medical Center Coastside (collectively, "Seton"), on the one hand, and Local 39, on the other hand (the "Local 39 CBA") remains at issue. Local 39 did not file an opposition to the Motion. For the reasons set forth below, the Motion is **GRANTED** as to the Local 39 CBA.

## II. Findings of Fact and Conclusions of Law
### A. Background

On August 31, 2018 (the "Petition Date"), Verity Health System of California, Inc. ("VHS") and certain of its subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors' cases are being jointly administered.

On April 22, 2020, the Court entered an order authorizing the Debtors to sell assets related to Seton to AHMC Healthcare, Inc ("AHMC"). Doc. No. 4511 (the "Seton Sale Order"). Pursuant to the Asset Purchase Agreement (the "APA") approved by the Seton Sale Order, the Debtors were required to use commercially reasonable efforts to facilitate the renegotiation of collective bargaining agreements currently in effect for Seton.

The Local 39 CBA covers approximately 24 stationary engineers employed at Seton. On July 7, 2020, the Debtors sent Local 39 a proposal providing for the rejection, termination, and abrogation of the Local 39 CBA. Doc. No. 5115 at 199–205[1] (the "Proposal"). Under the Proposal, the Debtors agreed to provide the following in exchange for consensual rejection and termination of the Local 39 CBA:

1) Each Local 39–represented employee not hired by AHMC shall receive a claim for unused paid-time off ("PTO") calculated under the "accrual method," as follows:
   a) PTO accruing on or after the Petition Date shall be granted administrative expense status;
   b) PTO accruing between March 4, 2018 and the Petition Date shall be granted priority claim status under § 507(a)(4) up to any remaining balance (up to a maximum of $12,850 per employee); and
   c) PTO accruing prior to March 4, 2018, shall be granted general unsecured claim status.

---

[1] Page citations are to the docket pagination which appears at the top of each page, not to the document's internal pagination.

2) The Local 39 Pension Funds[2] shall receive an allowed general unsecured claim of $3 million to cover any withdrawal liability or pension-related claims.
3) In the event that AHMC and Local 39 do not enter into a new CBA (the "New CBA") prior to the closing of the Seton Sale, each Local 39–represented Seton employee, with ninety or more days of employment, shall receive the value of existing healthcare benefits for a period of no more than three months, provided that these payments will be reduced in the event that a New CBA that maintains the Local 39 Health and Welfare Trust Fund medical benefits is entered into at any time in the three-month post-closing period, with such reduction to be based upon a *pro rata* daily calculation.

### B. The Motion is Granted as to the Local 39 CBA

Section 1113 provides:

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, … may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)
  (1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

    (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employee benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

    (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

  (2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

  (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

---

[2] Local 39 and the Local 39 Pension Funds are different legal entities.

      (2) the authorized representative of the employees has refused to accept such proposal without good cause; and

      (3) the balance of the equities clearly favors rejection of such agreement.

"Bankruptcy cases generally approach this complicated statute by breaking the statute into a nine part test" first set forth in *In re Am. Provision Co.*, 44 B.R. 907, 909 (Bankr. D. Minn. 1984). *See In re Karykeion, Inc.*, 435 B.R. 663, 677 (Bankr. C.D. Cal. 2010); *see also In re Family Snacks, Inc.*, 257 B.R. 884, 892 (B.A.P. 8th Cir. 2001) ("Virtually every court that is faced with the issue of whether a Chapter 11 debtor may reject its collective bargaining agreement utilizes a nine-part test that was first set down by the bankruptcy court in *In re American Provision Co.*"). The *American Provision* factors are as follows:

1) The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.
2) The proposal must be based on the most complete and reliable information available at the time of the proposal.
3) The proposed modifications must be necessary to permit the reorganization of the debtor.
4) The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.
5) The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.
6) Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.
7) At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.
8) The Union must have refused to accept the proposal without good cause.
9) The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*American Provision*, 44 B.R. at 909.

    Courts apply the *American Provision* factors even where a debtor is liquidating its assets and does not intend to continue in business after emerging from bankruptcy. Courts reason that "reorganization," as used in § 1113(b)(1)(A), is "generally understood to include all types of debt adjustment, including a sale of assets, piecemeal or on a going concern basis, under § 363 followed by a plan of reorganization which distributes the proceeds of the sale to creditors in accordance with the Bankruptcy Code's priority scheme." *Family Snacks*, 257 B.R. at 895. Some courts have held that where, as here, the Debtors are liquidating their assets, the phrase "necessary to permit the reorganization of the debtor" means "necessary to achieve a sale under § 363 of the Bankruptcy Code." *Alpha Nat. Res., Inc.*, 552 B.R. 314, 333 (Bankr. E.D. Va. 2016); *see also Walter Energy*, 542 B.R. at 890 (requiring that the debtor's proposal "be necessary to permit … those modifications necessary to consummate a going-concern sale"); *In re Karykeion, Inc.*, 435 B.R. 663, 679 (Bankr. C.D. Cal. 2010) (finding that the debtor had proven that rejection was necessary when the closing of a § 363 sale was contingent on rejection of a collective bargaining agreement). Others courts have concluded that in a liquidating case,

the phrase "necessary to permit reorganization of the debtor" means "necessary to accommodate confirmation of a Chapter 11 plan." *Family Snacks*, 257 B.R. at 895.

*i. Factors 2 and 5—Complete Information*

Factor 2 requires that the Debtors' proposal be based on the most complete and reliable information available at the time the proposal is made. Factor 5 requires that the Debtors provide Local 39 with "such relevant information as is necessary to evaluate the proposal." For both factors, a debtor "must gather the 'most complete information at the time and ... base its proposal on the information it considers reliable,' excluding 'hopeful wishes, mere possibilities and speculation.' 'The breadth and depth of the requisite information will vary with the circumstances, including the size and complicacy of the debtor's business and work force; the complexity of the wage and benefit structure under the collective bargaining agreement; and the extent and severity of modifications the debtor is proposing.'" *In re Walter Energy, Inc.*, 542 B.R. 859, 886 (Bankr. N.D. Ala. 2015), *aff'd sub nom. United Mine Workers of Am. 1974 Pension Plan & Tr. v. Walter Energy, Inc.*, 579 B.R. 603 (N.D. Ala. 2016), *aff'd sub nom. In re Walter Energy, Inc.*, 911 F.3d 1121 (11th Cir. 2018) (internal citations omitted).

The Proposal itself contains information necessary for Local 39 to conduct an evaluation. Specifically, the Proposal explains that the Debtors are in the process of selling Seton to AHMC; that AHMC is not willing to acquire Seton subject to the Local 39 CBA; that the Debtors have agreed to facilitate discussions between Local 39 and AHMC with respect to the negotiation of the New CBA, which would replace the Local 39 CBA; and that upon the closing of the Seton Sale, the Debtors will no longer operate Seton and thus will have no need for the Local 39 CBA.

On July 16, 2020, the Debtors facilitated a bargaining session between Local 39 and AHMC with respect to the negotiation of the New CBA. During the session, the Debtors provided Local 39 with AHMC's proposed New CBA, which consisted of AHMC's redline of the operative Local 39 CBA. The Debtors' chief labor negotiator, An Ruda, explained the basic terms and provisions of AHMC's proposed New CBA, including the differences from the operative Local 39 CBA. After the bargaining session concluded, the Debtors provided Local 39 with information regarding AHMC's 401-k plan, a copy of AHMC's Fair Treatment Process Protocol (the "FTP Protocol"),[3] and a copy of AHMC's Fair Treatment Process Arbitration Agreement. A further bargaining session involving the Debtors, Local 39, and AHMC was conducted on June 25, 2020.

The Debtors have provided Local 39 with all the information necessary for Local 39 to understand the Proposal, and the Proposal was based upon the most complete and reliable information available at the time it was made. The Debtors have satisfied Factors 2 and 5.

*ii. Factor 4—Fair and Equitable Treatment*

Factor 4 requires that the proposed modifications to the collective bargaining agreement treat all creditors, the Debtors, and all affected parties fairly and equitably. As explained by the court in *Walter Energy*:

---

[3] The FTP Protocol sets forth a multi-step process for AHMC's resolution of employment-related disputes. The FTP Protocol reflects that after all administrative procedures are exhausted, the employee has the right to appeal AHMC's decision to an arbitrator.

> This requirement "spread[s] the burden of saving the company to every constituency while ensuring that all sacrifice to a similar degree." "Courts take a flexible approach in considering what constitutes fair and equitable treatment due to the difficulty in comparing the differing sacrifices of the parties in interest." A debtor can meet the requirement "by showing that its proposal treats the union fairly when compared with the burden imposed on other parties by the debtor's additional cost-cutting measures and the Chapter 11 process generally."

*Walter Energy*, 542 B.R. at 892.

In applying this factor, it is important to emphasize how the Debtors arrived at this point. In early 2014, facing serious operating losses, the Debtors began evaluating strategic alternatives. First Day Decl. of Richard G. Adcock [Doc. No. 8] at ¶ 87. To continue operations until a contemplated sale or recapitalization could close, the Debtors borrowed $125 million in 2014. *Id.* In 2015, the Debtors entered into a recapitalization transaction with BlueMountain Capital Management LLC ("BlueMountain"). BlueMountain injected $100 million of capital and arranged for an additional $160 million of loans. *Id.* at ¶¶ 88–89. Despite BlueMountain's infusion of cash, the health system did not prosper. *Id.* at ¶ 93.

In July 2017, NantWorks, LLC loaned another $148 million to the Debtors. *Id.* at ¶ 94. Notwithstanding these additional capital infusions and the retention of various consultants and experts to improve operations, losses of approximately $175 million annually continued to mount. *Id.* at ¶ 95. In sum, prior to seeking bankruptcy relief, the Debtors diligently attempted to put their operations on a sound financial footing, but were unable to do so, in part because of the legacy cost structure imposed by the various collective bargaining agreements.

Seton has been extensively marketed, but neither AHMC nor any other buyer is willing to acquire the hospital subject to the Local 39 CBA. In June 2018, prior to the Petition Date, the Debtors engaged Cain Brothers, a division of KeyBanc Capital Markets ("Cain") to market all of the Debtors' hospitals, including Seton. Declaration of James M. Moloney [Doc. No. 2220] at ¶ 4. Beginning in July 2018, Cain prepared a Confidential Investment Memorandum (the "CIM"), created an online data room to share information with potential buyers, and contacted over 110 strategic and financial buyers. *Id.*

Subsequent to the Petition Date, Cain continued to market Seton. *Id.* at ¶ 5. Cain contacted more than 189 potential parties to evaluate potential stalking horse bidders. *Id.* at ¶ 6. Of these parties, 92 executed non-disclosure agreements ("NDAs") and eighteen submitted written proposals. *Id.* On May 2, 2019, the Court approved the sale of Seton (along with two of the Debtors' other hospitals) to Strategic Global Management, Inc. ("SGM," and the sale to SGM, the "SGM Sale"). The SGM Sale failed to close.

After the failure of the SGM Sale, Cain commenced a new marketing process. Declaration of James M. Moloney [Doc. No. 4360] at ¶ 5. Cain contacted select parties that had previously expressed interest in Seton. *Id.* On January 10, 2020, two bidders submitted non-binding Indications of Interest. *Id.* at ¶ 6. One of the bidders elected not to move forward with its bid, leaving AHMC as the only viable bidder for Seton. *Id.*

Seton cannot continue to operate unless it is purchased by a solvent third-party such as AHMC, and AHMC is not willing to acquire Seton subject to the Local 39 CBA. Further, under the APA, AHMC is required to provisionally hire "substantially all" of Seton's current employees. Under these circumstances, the rejection, termination, and abrogation of the Local 39 CBA is fair and equitable, and does not place a disproportionate burden upon employees

represented by Local 39. The Court notes that sacrifices imposed by these bankruptcies have been widespread. For example, current projections indicate that unsecured creditors will receive a distribution of only 0.5% on account of their claims. The Debtors have satisfied Factor 4.

*iii. Factor 3—Necessity of Rejection*

Factor 3 requires that the proposed modifications must be necessary to permit the reorganization of the debtor. In the context of this case, the term "necessary to permit the reorganization of the debtor" is best interpreted to mean "necessary to permit the Debtors to confirm a liquidating plan." This interpretation aligns most closely with the manner in which the Debtors are prosecuting this case. From the outset, the Debtors have stated their intent to sell their hospitals and use the proceeds from the sales to fund a plan of liquidation. This process is well underway. The sales of O'Connor Hospital, St. Louise Regional Medical Center, and St. Vincent Medical Center have all closed.

Two lines of authority exist as to the meaning of the word "necessary." In *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America,* 791 F.2d 1074 (3d Cir.1986), the Third Circuit defined "necessary" as synonymous with "essential." The Second Circuit has defined "necessary" more broadly. In *Truck Drivers Local 807 v. Carey Transportation, Inc.,* 816 F.2d 82 (2d Cir.1987), the court held that "the necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully." The parties have not cited, and the Court has been unable to locate, any binding Ninth Circuit authority as to the scope of the word "necessary."

The Court finds the Second Circuit's approach to be better reasoned. As explained in *Carey Transportation*, the Third Circuit's strict definition conflicts with other provisions of the statute:

> Because the statute requires the debtor to negotiate in good faith over the proposed modifications, an employer who initially proposed truly minimal changes would have no room for good faith negotiating, while one who agreed to any substantive changes would be unable to prove that its initial proposals were minimal. Thus, requiring the debtor to propose bare-minimum modifications at the outset would make it virtually impossible for the debtor to meet its other statutory obligations.

*Carey Transportation*, 816 F.2d at 89.

Further, the "legislative history strongly suggests that 'necessary' should not be equated with 'essential' or bare minimum." *Id.* A prior version of § 1113 would have permitted rejection only if the debtor's proposal contained "such 'minimal modifications in the contract that would permit the reorganization, taking into account the best estimate of the sacrifices expected to be made by all classes of creditors and other affected parties.'" *Wheeling-Pittsburgh Steel Corp.*, 791 F.2d at 1083 (quoting 130 Cong. Rec. S6181-82 (daily ed. May 22, 1984)). Congress rejected this language in favor of broader language permitting rejection if "necessary to permit the reorganization of the debtor …." *Id.*

The prompt closing of the Seton Sale is necessary to the Debtors' ability to confirm a liquidating plan. The failure of the SGM Sale has made confirmation of a liquidating plan more challenging by requiring the Debtors to remain in bankruptcy for far longer than had been anticipated. The Debtors' cash on hand is limited, making a prompt closing critical. Rejection of

the Local 39 CBA is a prerequisite to the closing of the Seton Sale because AHMC is not willing to acquire Seton subject to the Local 39 CBA.

In addition, absent rejection, the estates would be exposed to substantial administrative claims in favor of Local 39, which would imperil the Debtors' ability to confirm a Plan. Other courts have looked with disfavor upon unions who seek to maintain collective bargaining agreements for the sole purpose of obtaining an administrative claim. The facts of *In re Chicago Const. Specialties, Inc.*, 510 B.R. 205 (Bankr. N.D. Ill. 2014) are similar to this case. In *Chicago Const.*, the debtor moved to reject a collective bargaining agreement because it was no longer operating. Overruling the unions' objections to rejection, the court held:

> As noted above, the only purpose of leaving the CBA in place would be to afford the [unions] the opportunity for an augmented administrative claim rather than a general unsecured claim. Naturally, a creditor would prefer to maximize its distribution from the bankruptcy estate. Nonetheless, section 1113 may not be used to elevate a union's position at the cost of any distribution to any other creditor. Such would be contrary to the purpose of section 1113 and the Bankruptcy Code as a whole.

*Chicago Const. Specialties*, 510 B.R. at 221.

Here, the Debtors will no longer operate Seton once the sale has closed. As was the case in *Chicago Const.*, it makes little sense to require the Debtors to remain bound by a collective bargaining agreement pertaining to an asset which they will no longer operate.

The Debtors have satisfied Factor 3.

### iv. Factor 1—Written Proposal

Factor 1 requires that the Debtors make a written proposal to Local 39. By sending the Proposal to Local 39 on July 7, 2020, the Debtors have satisfied Factor 1.

### v. Factor 6—Meetings at Reasonable Times

Factor 6 requires that the Debtors meet at reasonable times with Local 39 between the time the proposal is made and the hearing on the rejection or modification of the collective bargaining agreement.

The Debtors and AHMC met with Local 39 and engaged in bargaining on June 16 and 25, 2020. The Debtors have satisfied Factor 6.

### vi. Factor 7—Good Faith Negotiations

Factor 7 requires that the Debtors meet and confer with Local 39 in good faith. Where, as here, the Debtors are selling the assets to which the collective bargaining agreement pertains, the Debtors demonstrate good faith by facilitating negotiations with respect to a new collective bargaining between the union and the purchaser. *See In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 336 (Bankr. E.D. Va. 2016) ("The Debtors recognized that they could not force the Stalking Horse Bidder to assume the collective bargaining agreements. The Debtors, therefore, facilitated negotiations between the [union] and the [purchaser of the assets] directly. These negotiations potentially proved fruitful…. The Court finds the Debtors have acted in good faith throughout the negotiations.").

The Debtors' chief labor negotiator, An Ruda, facilitated and attended two days' of bargaining sessions with respect to the negotiation of the New CBA between Local 39 and AHMC. The Debtors have satisfied Factor 7.

### vii. Factor 8—Refusal to Accept Proposal Without Good Cause

Under Factor 8, Local 39 must have refused to accept the proposal without good cause. "Once a union rejects an offer from a debtor, it is incumbent on the union to produce evidence that it had good cause to reject the proposal." *In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 336 (Bankr. E.D. Va. 2016); *see also In re Patriot Coal Corp.*, 493 B.R. 65, 135 (Bankr. E.D. Mo. 2013) ("The union has the burden of proof that it had good cause to reject the debtor's proposal.").

By failing to submit an explanation for its refusal to accept the Proposal, Local 39 has not satisfied its burden of proof with respect to Factor 8. Local 39 knows that AHMC is the only buyer willing to acquire Seton and that AHMC is unwilling to acquire Seton subject to the Local 39 CBA. Under these circumstances, there are only two plausible reasons why Local 39 could refuse to accept the Proposal. First, Local 39's refusal could be an attempt to put additional pressure upon AHMC with respect to the negotiation of the New CBA. Second, Local 39's refusal could be an attempt to elevate its claim against the estates to administrative status. Neither reason constitutes good cause for rejecting the Proposal.

With respect to the first possible reason, the Debtors lack the ability to compel AHMC, the only viable purchaser interested in acquiring Seton, to assume the Local 39 CBA. A "[u]nion's insistence that the Debtor provide something which was not within its control indicates that the [u]nion's refusal to accept Debtor's proposal was without good cause." *In re Nat'l Forge Co.*, 289 B.R. 803, 812 (Bankr. W.D. Pa. 2003). With respect to the second possible reason, a union's desire to elevate its claim to administrative status is not good cause for refusing a proposal. As held by the court in *Chicago Const.*, "section 1113 may not be used to elevate a union's position …." *Chicago Const.*, 510 B.R. at 221.

Factor 8 is satisfied.

### viii. Factor 9—Balance of the Equities

Factor 9 requires that the balance of the equities must clearly favor rejection of the collective bargaining agreement.

The Debtors have satisfied Factor 9. As discussed, rejection of the Local 39 CBA is a pre-requisite to the closing of the Seton Sale, which in turn is necessary to enable the Debtors to confirm a Plan. AHMC's acquisition of Seton allows the hospital to continue to operate and will allow substantially all of the employees represented by Local 39 to keep their jobs. At this late stage, the Debtors "cannot base [their] rejection of [their] only suitor [to purchase a going-concern business] on a speculative white knight with greater riches." *In re Karykeion, Inc.*, 435 B.R. 663, 678 (Bankr. C.D. Cal. 2010). AHMC has made the best offer that will allow Seton to continue to exist as a hospital.

## III. Conclusion

Based upon the foregoing, the Motion is **GRANTED** as to the Consenting Unions, subject to the terms of the Settlement Agreements. The Motion is **GRANTED** as to the Local 39 CBA. Within seven days, the Debtors shall submit orders consistent with this Memorandum of Decision.

###

Date: July 31, 2020

Ernest M. Robles
United States Bankruptcy Judge