

**FILED & ENTERED**

**SEP 14 2021**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA—LOS ANGELES DIVISION

| | |
|---|---|
| In re: Verity Health System of California, Inc., *et al.*,<br><br>   Debtors and Debtors in Possession.<br><br>☒ Affects All Debtors<br><br>☐ Affects Verity Health System of California, Inc.<br>☐ Affects O'Connor Hospital<br>☐ Affects Saint Louise Regional Hospital<br>☐ Affects St. Francis Medical Center<br>☐ Affects St. Vincent Medical Center<br>☐ Affects Seton Medical Center<br>☐ Affects O'Connor Hospital Foundation<br>☐ Affects Saint Louise Regional Hospital Foundation<br>☐ Affects St. Francis Medical Center of Lynwood Medical Foundation<br>☐ Affects St. Vincent Foundation<br>☐ Affects St. Vincent Dialysis Center, Inc.<br>☐ Affects Seton Medical Center Foundation<br>☐ Affects Verity Business Services<br>☐ Affects Verity Medical Foundation<br>☐ Affects Verity Holdings, LLC<br>☐ Affects De Paul Ventures, LLC<br>☐ Affects De Paul Ventures - San Jose Dialysis, LLC<br><br>   Debtors and Debtors in Possession. | Lead Case No.: 2:18-bk-20151-ER<br>Chapter: 11<br><br>Jointly Administered With:<br>Case No. 2:18-bk-20162-ER;<br>Case No. 2:18-bk-20163-ER;<br>Case No. 2:18-bk-20164-ER;<br>Case No. 2:18-bk-20165-ER;<br>Case No. 2:18-bk-20167-ER;<br>Case No. 2:18-bk-20168-ER;<br>Case No. 2:18-bk-20169-ER;<br>Case No. 2:18-bk-20171-ER;<br>Case No. 2:18-bk-20172-ER;<br>Case No. 2:18-bk-20173-ER;<br>Case No. 2:18-bk-20175-ER;<br>Case No. 2:18-bk-20176-ER;<br>Case No. 2:18-bk-20178-ER;<br>Case No. 2:18-bk-20179-ER;<br>Case No. 2:18-bk-20180-ER;<br>Case No. 2:18-bk-20181-ER;<br><br>Chapter 11 Cases.<br><br>**AMENDED MEMORANDUM OF DECISION ON MOTIONS FILED BY THE RETIREMENT PLAN FOR HOSPITAL EMPLOYEES**<br><br>**[RELATES TO DOC. NOS. 6543 AND 6553]**<br><br>Date:  August 4, 2021<br>Time:  10:00 a.m.<br>Location: Ctrm. 1568<br>    Roybal Federal Building<br>    255 East Temple Street<br>    Los Angeles, CA 90012 |

At the above-captioned date and time, the Court conducted hearings on two motions filed by the Retirement Plan for Hospital Employees (the "RPHE"): (1) the *Motion to Enforce Plan and Confirmation Order and to Alter or Amend Distribution Order* (the "Plan Enforcement Motion")[1] and (2) the *Motion to Allow Administrative Expense Claim of Retirement Plan for Hospital Employees* (the "Administrative Claim Motion").[2]

On August 18, 2021, the Court issued an *Interlocutory Memorandum of Decision on Motions Filed by the Retirement Plan for Hospital Employees* (the "Interlocutory Memorandum").[3] The Interlocutory Memorandum directed RPHE and Howard Grobstein, the Liquidating Trustee (the "Liquidating Trustee") of the VHS Liquidating Trust (the "Liquidating Trust"), to meet and confer with regard to what dollar amount of the underfunding component of RPHE's administrative claim was allocable to members of the California Nurses Association (the "CNA") versus plan participants whose benefits have been frozen, and to submit to the Court a stipulated figure or stipulated figures. The Interlocutory Memorandum explained that the Court would issue an Amended Memorandum of Decision (an "Amended Memorandum") after the amount of underfunding liability allocable to CNA members had been established.

On September 10, 2021, RPHE and the Liquidating Trustee (collectively, the "Parties") submitted a stipulation setting forth the amount of underfunding liability allocable to CNA members (the "Stipulation").[4] In the Stipulation, the Parties also agreed upon updated figures regarding certain other aspects of RPHE's administrative claim.

This document constitutes the Amended Memorandum contemplated by the Interlocutory Memorandum. Except for (a) the adoption of the Parties' stipulated figure regarding the underfunding liability allocable to CNA members, (b) the incorporation of the other updated figures set forth in the Stipulation, and (c) the updated procedural history set forth in this introductory section, this Amended Memorandum maintains verbatim the language of the Interlocutory Memorandum.

For the reasons set forth below, the Court (1) finds that the underfunding component of the RPHE's claim is not allowable as an administrative expense and (2) denies the relief requested in the Plan Enforcement Motion.[5]

---

[1] Doc. No. 6553.
[2] Doc. No. 6543.
[3] Doc. No. 6620.
[4] Doc. No. 6655.
[5] The Court considered the following pleadings in adjudicating this matter:
  1) Memorandum of Decision Granting Motion to Authorize Liquidating Trustee to Undertake Final Distribution Program for Administrative Claimants [Doc. No. 6515] (the "Memorandum");
  2) Order Granting Motion to Authorize Liquidating Trustee to Undertake Final Distribution Program for Administrative Claimants [Doc. No. 6523] (the "Distribution Order");
  3) Retirement Plan for Hospital Employees' Notice of Motion and Motion to Enforce Plan and Confirmation Order and to Alter or Amend Distribution Order [Docket No. 6523] (FRBP 9023) [Doc. No. 6553];
     a) Order Setting Hearing on Retirement Plan for Hospital Employees' Motion to Enforce Plan and Confirmation Order and to Alter or Amend Distribution Order [Doc. No. 6561];

## I. Facts and Summary of Pleadings
### A. Background

On August 31, 2018 (the "Petition Date"), Verity Health System of California, Inc. ("VHS") and certain affiliated entities (collectively, the "Debtors") each filed voluntary Chapter 11 petitions. The Debtors' cases are being jointly administered.

On August 14, 2020, the Court entered an order confirming the *Modified Second Amended Joint Chapter 11 Plan (Dated July 2, 2020) of the Debtors, the Committee, and the Prepetition Secured Creditors* [Doc. No. 5468, Ex. A] (the "Plan"). *See* Doc. No. 5504 (the "Confirmation Order"). Howard Grobstein has been appointed as the Liquidating Trustee responsible for administering the Plan.

The Plan established an Administrative Claims Reserve, consisting of "Cash to be set aside by the Debtors on the Effective Date in an aggregate amount sufficient to fund a reserve for the payment of all unpaid Allowed Administrative Claims that will be paid after the Effective Date and all Administrative Claims that are not yet Allowed as of the Effective Date." Plan at § 1.15. The Confirmation Order fixed the amount of the Administrative Claims Reserve at $52,749,427, and found that a reserve in this amount would be "sufficient to satisfy any unpaid Administrative

---

4) Opposition to Retirement Plan for Hospital Employees' Motion to Enforce Plan and Confirmation Order and to Alter or Amend Distribution Order [filed by the Liquidating Trustee] [Doc. No. 6587];
5) Reply Memorandum in Support of Retirement Plan for Hospital Employees' Motion to Enforce Plan and Confirmation Order and to Alter or Amend Distribution Order [Doc. No. 6589];
6) Motion to Allow Administrative Expense Claim of Retirement Plan for Hospital Employees [Doc. No. 6543];
    a) Application for Allowance of Administrative Claim [filed by RPHE] [Doc. No. 3296];
    b) Supplemental Application for Allowance of Administrative Claim [filed by RPHE] [Doc. No. 5252];
7) Order Continuing Hearing on <u>Motion to Allow Administrative Expense Claim of Retirement Plan for Hospital Employees</u> from July 14, 2021 at 10:00 a.m. to August 4, 2021 at 10:00 a.m. [Doc. No. 6560];
8) Omnibus Response to Administrative Claim Motions [filed by the Liquidating Trustee] [Doc. No. 6555];
9) Reply Memorandum in Support of Motion to Allow Administrative Expense Claim of Retirement Plan for Hospital Employees [Doc. No. 6559];
10) Order Approving Liquidating Trustee and Retirement Plan for Hospital Employees' Stipulation to Continue Deadline Set Forth in Interlocutory Memorandum of Decision [Doc. No. 6631];
    a) Liquidating Trustee and Retirement Plan for Hospital Employees' Stipulation to Continue Deadline Set Forth in Interlocutory Memorandum of Decision [Doc. No. 6630]; and
11) Liquidating Trustee and Retirement Plan for Hospital Employees' Stipulation Regarding Administrative Expense Claim Amounts [Doc. No. 6655].

Claims that are Allowed as of the Effective Date and any unpaid Administrative Claims that may become Allowed after the Effective Date."[6]

On May 11, 2021, the Liquidating Trustee filed a *Motion to Authorize Liquidating Trustee to Undertake Final Distribution Program for Administrative Claims* [Doc. No. 6475] (the "Distribution Motion"). The Distribution Motion was necessary because the amount of Allowed Administrative Claims arising in the ordinary course of business proved to be significantly higher than had been estimated at the time the Plan was confirmed. As a result, the Administrative Claims Reserve lacked sufficient funds to pay all Allowed Administrative Claims in full.

On June 7, 2021, the Court issued a Memorandum of Decision finding that it was appropriate for the Liquidating Trustee to implement the Final Distribution Program contemplated by the Distribution Motion. *See* Doc. No. 6515 (the "Distribution Memorandum"). An order on the Distribution Memorandum was entered on June 15, 2021. *See* Doc. No. 6523 (the "Distribution Order"). Under the Final Distribution Program, the Liquidating Trustee will pay administrative creditors an interim payment of approximately 15% of the value of their claims, followed by a final payment which will be made after the final amount of Allowed Administrative Claims has been determined.

**B. The Administrative Claim Asserted by the Retirement Plan for Hospital Employees**

The Retirement Plan for Hospital Employees (the "RPHE") is a multiemployer defined benefit pension plan qualified under § 401(a) of the Internal Revenue Code that is subject to the requirements of the Employee Retirement Income Security Act of 1974 ("ERISA"). Certain of the Debtors were participants in the RPHE.

Defined benefit pension plans such as the RPHE are employer-funded retirement plans created for the benefit of both active and inactive participating employees. Under a defined benefit pension plan, a pension fund is obligated to pay a specified benefit to employees covered by the plan upon their retirement and in accordance with the terms of the plan document. Thus, as employees earn their retirement benefits over time, the pension fund is accumulating fixed liabilities that will become due as employees retire and begin collecting their pensions. All defined benefit plans are funded through contributions made by employers that have employees participating in the plan.

Defined benefit pension plans apply the employers' contributions to satisfy three separate categories of costs. First, the contributions are used to pay for the expenses of administering the plan, including, for example, investment advisor and legal fees. Second, the contributions are used to pay for the value of the new benefits that accrue for participants each year. Although there can be some variation in how the value of those benefits is determined, actuaries refer to that value as the "normal cost" of the plan. If, after satisfying both administrative costs and the normal cost, there are any funds remaining from the contribution made by employers, those funds are used to satisfy underfunding or to create or increase a surplus.

Therefore, at any given point in time, a defined benefit pension plan uses contributions made by an employer to satisfy one of three categories of costs: costs of administering the fund, the "normal cost," and the costs of underfunding. The percentage of contributions allocated to each category of costs varies by plan and depends on a variety of factors, including a plan's funding levels.

---

[6] Confirmation Order at ¶ 24.

There is no dispute that the normal and administrative costs of the RPHE are entitled to administrative expense priority. Normal and administrative costs total $2,193,132.00. At issue is whether the underfunding cost—which totals $23,557,593.00—should also be accorded administrative expense status. RPHE contends that the underfunding cost should be allowed as an administrative claim; the Liquidating Trustee disputes this contention.

On February 28, 2011, the RPHE was amended to freeze all future benefit accruals for certain non-collectively bargained VHS employees. Under this amendment, the frozen employees were entitled to retain the benefits they had previously earned but did not earn any new benefits for future work. On January 1, 2013, the RPHE was frozen as to members of the Service Employees International Union (the "SEIU"). The only group of employees to whom these freezes did not apply were CNA members employed at O'Connor Hospital, Saint Louise Regional Medical Center, or Seton Medical Center. The RPHE's $23,557,593.00 underfunding liability includes unfunded liabilities relating to the frozen members as well as unfunded liabilities relating to CNA members. As set forth in the Stipulation, the underfunding liability allocable to CNA members that is attributable to the period from the Petition Date through the Effective Date of the Plan is $3,308,867.00.[7]

Under the terms of the *RPHE Trust Agreement* and the *Plan Document and Summary Plan Description* applicable to VHS and its affiliates, it was the practice of RPHE to issue an annual invoice to VHS requiring payments of the previous year's accrued contributions in three installments, due on February 15, May 15, and August 15 of the following calendar year.

During 2019, VHS made three installment payments in the total amount of $1,714,719 to RPHE, which payments covered the previous year's liabilities for the RPHE's normal and administrative expenses. VHS made further installment payments of $862,909 each on February 15, 2020 and May 15, 2020, but did not make the final installment payment of $862,910 which came due on August 2020. VHS failed to make the August 2020 installment payment even though a declaration filed in support of confirmation of the Plan by Peter C. Chadwick, the Debtors' Chief Financial Officer, represented that such payment would be made:

> [T]he Debtors have quantified an appropriate resolution of issues with [the RPHE], pursuant to which an administrative claim liability to RPHE for annual contributions will be funded in the ordinary course prior to the Effective Date with respect to 2019 accrued contributions payable in 2020. The contribution will cover active employees whose benefits were not previously frozen and is included in the results of operation[s] and the available Effective Date Cash.

Chadwick Decl. [Doc. No. 5385] at ¶ 35.

At no point has VHS made any payments on account of the RPHE's underfunding costs.

//
//
//
//
//

---

[7] Stipulation at ¶ B.

**C. Summary of Papers Filed in Connection with the RPHE's (1) Motion for Allowance of its Administrative Claim and (2) Motion (A) For Reconsideration of the Distribution Order and (B) To Enforce the Confirmation Order**

*1. RPHE's Motion for Allowance of the Underfunding Cost Component of its Administrative Claim*

RPHE asserts that the underfunding costs of its claim should be entitled to administrative priority. In support of its position, RPHE relies upon *Columbia Packing Co. v. Pension Ben. Guaranty Corp.*, 81 B.R. 205 (D. Mass. 1988), which held that a pension plan's past service liability (a cost category similar to underfunding liability) was allowable as an administrative expense. RPHE asserts that *Columbia Packing* should be accorded significant weight because it relied upon *Wyle v. Pacific Maritime Ass'n (In re Pacific Far East Lines)*, 713 F.2d 476 (9th Cir. 1983), a Ninth Circuit case.

The Liquidating Trustee opposes according administrative priority to the underfunding component of RPHE's claim. The Liquidating Trustee contends that *In re Pacific Far East Lines* is not applicable because it did not address the issue of underfunding costs, and asserts that *Columbia Packing* represents the minority rule. The Liquidating Trustee relies upon *Pension Ben. Guaranty Corp. v. Sunarhauserman, Inc.*, 126 F.3d 811 (6th Cir. 1997), in which the Sixth Circuit held that pension plan underfunding liabilities were not allowable as an administrative expense.

*2. RPHE's Motion (A) For Reconsideration of the Distribution Order and (B) To Enforce the Confirmation Order*

RPHE filed a combined motion which seeks both (a) reconsideration of the Distribution Order and (b) an order enforcing the Confirmation Order. Relying upon Post-Confirmation Status Reports filed by the Liquidating Trustee on December 21, 2020 [Doc. No. 6348] (the "December Status Report") and April 13, 2021 [Doc. No. 6454] (the "April Status Report"), RPHE contends that the Liquidating Trustee and/or the Debtors made between $8,723,974 and $16,138,075 in payments to administrative creditors prior to the Effective Date of the Plan. RPHE asserts that the Liquidating Trustee subsequently categorized these pre-Effective Date payments as constituting part of the Administrative Claims Reserve. This categorization, RPHE maintains, contravenes the plain language of the Plan, which defines the Administrative Claims Reserve as "Cash to be set aside by the Debtors on the Effective Date in an aggregate amount sufficient to fund a reserve for the payment of all *unpaid* Allowed Administrative Claims that will be paid *after* the Effective Date and all Administrative Claims that are not yet Allowed as of the Effective Date."[8] RPHE further asserts that the Liquidating Trustee improperly allocated to the Administrative Claims Reserve payments that were made *on* the Effective Date, when only payments made *after* the Effective Date should have been allocated to the reserve. According to RPHE, because the Liquidating Trustee allocated to the Administrative Claims Reserve $21,871,168 in payments made to administrative creditors either (a) prior to the Effective Date or (b) on the Effective Date, when only payments made *after* the Effective Date should have been allocated to the reserve, the Administrative Claims Reserve was underfunded by $21,871,168.

RPHE further contends that the Liquidating Trustee mismanaged the Administrative Claims Reserve by continuing to make full payments to administrative creditors subsequent to the

---

[8] Plan at § 1.15 (emphasis added).

December Status Report, after it had become apparent that there would be a substantial shortfall in the reserve. According to RPHE:

> To the extent that the Distribution Motion was an appropriate mechanism to deal with a manifest shortfall in the Administrative Claims Reserve, it is incomprehensible that furnished with the same information and projections in December, the Liquidating Trustee waited until the proposed distribution dropped from approximately 47 cents on the dollar to 21 cents, if that. It is one thing to massively underestimate potential claims on the Effective Date, but quite another to deplete reserves in the face of known facts, as the Liquidating Trustee apparently did between the December Status Report and the April Status Report.

Doc. No. 6553 at 8–9.

Based upon the alleged mismanagement and underfunding of the Administrative Claims Reserve, RPHE requests an order:

1) Requiring VHS, the Post-Effective Date Debtors, and/or the Liquidating Trustee to fully fund the Administrative Claims Reserve by restoring to such reserve all funds earmarked for the Administrative Claims Reserve that were paid on or prior to the Effective Date of the Plan;
2) Requiring VHS, the Post-Effective Date Debtors, and/or the Liquidating Trustee to provide a detailed and complete accounting of payments made on or prior to the Effective Date that reduced or had the effect of reducing the Administrative Claims Reserve, and payments made after December 21, 2021, the date of the December Status Report;
3) Freezing all funds currently held by the Liquidating Trustee until the Motion has been decided and a detailed and complete accounting of payments made by the Liquidating Trust has been provided to the Court and made a part of the record in these cases;
4) Requiring payment in full of the $862,910 August 2020 installment payment of RPHE's administrative claim which the Debtors had promised to pay in the Confirmation Brief; and
5) To the extent inconsistent with the foregoing, altering or amending the Distribution Order pursuant to Bankruptcy Rule 9023 and Civil Rule 59(e).

The Liquidating Trustee opposes the Motion. According to the Liquidating Trustee, the Motion is nothing more than a reiteration of arguments previously made by RPHE that the Court has already considered and rejected.

The Liquidating Trustee does not respond to RPHE's contention that the Liquidating Trustee wrongfully allocated approximately $21 million in pre-Effective Date and Effective Date payments to the Administrative Claims Reserve. However, the Liquidating Trustee does assert that the precise date upon which the payments were made would have made no "practical difference," because the "Administrative Claims Reserve would still have become inadequate as administrative claims came in over the next several months in amounts that were higher than anticipated."[9]

---

[9] Doc. No. 6587 at 5.

With respect to RPHE's demand that it be paid in full the August 2020 installment payment of $862,910, the Liquidating Trustee does not dispute the allowability of this portion of RPHE's administrative claim, but asserts that payment of the claim in full, as opposed to payment of the claim pursuant to the Final Distribution Program, would violate the Distribution Order.

In reply to the Liquidating Trustee's opposition, RPHE makes the following arguments:

1) The Debtor's Confirmation Brief stated that the portion of RPHE's administrative claim consisting of the $862,910 August 2020 installment payment was to have been paid prior to the Effective Date from Effective Date Cash. The Liquidating Trustee has offered no explanation as to why this payment was not made prior to the Effective Date. The Liquidating Trustee's argument that payment of the installment would violate the Distribution Order is unavailing, because the Distribution Order applies only to the Administrative Claims Reserve, not to Effective Date Cash. Since it appears that the $862,910 was diverted from Effective Date Cash to the Liquidating Trust, the funds must be returned to make the payment as provided in the Confirmation Brief.
2) The Liquidating Trustee has failed to respond to RPHE's arguments regarding the diversion of approximately $21 million from funds earmarked for the Administrative Claims Reserve.
3) The Liquidating Trust has been mismanaged since the Liquidating Trustee knew at the time of the December Status Report that the Administrative Claims Reserve was underfunded, yet continued to pay administrative claims in full until sometime prior to the April Status Report. The Liquidating Trustee must be ordered to provide an appropriate accounting regarding payments made from the Administrative Claims Reserve so that this issue can be squarely and publicly addressed.

## II. Findings of Fact and Conclusions of Law
### A. RPHE is Not Entitled to An Administrative Claim on Account of the Pension Plan's Underfunding Liabilities

Section 503(b) provides for the allowance of administrative expenses, including "the actual, necessary costs and expenses of preserving the estate." "Administrative status is allowed when a claim (1) is incurred postpetition, (2) directly and substantially benefits the estate, and (3) is an actual and necessary expense." *Gull Indus., Inc. v. Mitchell (In re Hanna)*, 168 B.R. 386, 388 (B.A.P. 9th Cir. 1994). "The burden of proving an administrative expense claim is on the claimant," and administrative claims are "construed narrowly" in order "to keep administrative costs to the estate at a minimum." *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995). A claimant "must prove by a preponderance of the evidence entitlement to the administrative expense." *Hanna*, 168 B.R. at 388.

There is no dispute that the normal and administrative costs of the RPHE, in the amount of $2,193,132.00,[10] are allowable as an administrative claim. At issue is whether the RPHE's

---

[10] RPHE initially asserted that the normal and administrative component of its claim totalled $2,417,890.00. In the Stipulation, RPHE and the Liquidating Trustee have agreed that the normal and administrative component of the claim totals $2,193,132.00. *See* Stipulation at ¶ A.

underfunding liabilities—in the amount of $23,557,593.00[11]—should also be accorded administrative expense status.

The parties have not cited, and the Court has been unable to locate, any cases within the Ninth Circuit that are directly on point. RPHE places substantial weight upon *Pacific Far East*, a 1983 Ninth Circuit case which found that payments to an employee benefit plan were entitled to administrative priority. In *Pacific Far East*, the benefit plan payment came due after the filing of the petition, but the amount of the payment was measured based on work performed prior to the petition date. The court held that the "hours of pre-filing labor were not consideration for the payments to the plan," but instead "were merely the units of measure for the post-filing payments, which were necessary for continued performance by both the employee and the employer under the collective bargaining agreement." *Pacific Far East*, 713 F.2d at 479.

The issue addressed in *Pacific Far East* differs fundamentally from the issue presented here. *Pacific Far East* involved only normal payments to the benefit plan—that is, payments for new benefits accruing to participants under the plan. Nothing in *Pacific Far East* addressed the administrative status of a benefit plan's underfunding liabilities.

In *Columbia Packing Co. v. Pension Ben. Guaranty Corp.*, 81 B.R. 205 (D. Mass. 1988), the court extended *Pacific Far East*'s reasoning to hold that underfunding liabilities were entitled to administrative priority. Relying upon *Pacific Far East*'s conclusion that "the hours of pre-filing labor were not the consideration for the contributions, but were merely units of measure for the post-filing contributions," *Columbia Packing* found that although the underfunding liability "was calculated by reference to services performed before the priority period," that liability was "more properly viewed as an actuarial unit of measure for determining the employer's current periodic contribution than as compensation for work performed before the inception of the plan." *Columbia Packing*, 81 B.R. at 208–9.

RPHE argues that the Court should follow *Columbia Packing* and extend the reasoning of *Pacific Far East* to hold that underfunding liabilities are entitled to administrative status. The Court declines to adopt this approach. While the reasoning of *Pacific Far East* can plausibly be extended to apply to underfunding liabilities, such an extension of the case is by no means required. Here, multiple considerations counsel against extending *Pacific Far East*.

On the facts of this case, the Court does not find it proper to follow *Columbia Packing* by construing the underfunding liability as "an actuarial unit of measure for determining [the Debtors'] current periodic contribution [rather] than as compensation" for pre-petition work. *Columbia Packing*, 81 B.R. at 208–9. RPHE acknowledges that the underfunding liability "includes an allocation of liability for 'frozen' participants (*i.e.*, individuals who have vested in the Plan and upon retirement will receive retirement benefits from RPHE for credit previously earned)," and that these frozen participants "include members of the Service Employees International Union Local 250 … whose participation in the Plan was frozen as of January 1, 2013, and certain non-collectively bargained VHS employees whose participation in the plan was frozen effective as of February 28, 2011."[12] Unlike the situation in *Columbia Packing*, the Debtors were not required to make normal-cost post-petition pension payments with respect to the RPHE's frozen participants as consideration for those participant's post-petition labor.

---

[11] RPHE initially asserted that the underfunding component of its claim totalled $23,558,142.00. In the Stipulation, RPHE and the Liquidating Trustee have agreed that the underfunding component of the claim totals $23,557,593.00.

[12] Doc. No. 3296 at 3.

Because the Debtors were not obligated to make normal-cost pension contributions to secure the post-petition labor of frozen participants, it follows that the underfunding costs with respect to those same participants cannot be fairly construed as an "actual [and] necessary" cost of preserving the estate, § 503(b).

Only a subset of RPHE participants—members of the CNA—were entitled to earn new benefits under the RPHE in exchange for post-petition labor. The Liquidating Trustee and RPHE have stipulated that of the total underfunding liability of $23,557,593.00, the amount of $3,308,867.00 is allocable to CNA members.[13] It is admittedly a closer question whether underfunding liability allocable to CNA members should be entitled to administrative status. The Debtors were required to make normal-cost post-petition plan payments to secure the CNA member's post-petition labor, and therefore it could be argued that the underfunding costs allocable to the CNA members also constituted consideration for that post-petition labor.

In the Court's view, the underfunding costs allocable to CNA members are more appropriately construed as consideration for pre-petition labor, not consideration for post-petition labor. According to the RPHE's actuary Thomas Supple, the underfunding liability results from "multiple causes, including … fluctuations in the value of investments, and changes in participant attributes, such as life expectancy, date of retirement and other factors."[14] Supple does not specify the precise causes of the $3,308,867.00 in underfunding liability allocable to the CNA members. Regardless of the exact reasons for the underfunding liability, the situation can be described in simple terms: Prior to the Petition Date, the Debtors did not make sufficient contributions to the RPHE to pay the benefits promised to CNA members in exchange for their prepetition labor. Because predicting the present value of a pension fund's assets is extraordinarily difficult and involves the consideration of multiple factors, such as future investment returns, the retirement date of plan participants, and the life expectancy of plan participants, the insufficiency of the Debtors' contributions did not become apparent until after the Petition Date. Subsequent to the Petition Date, the accounting reviews required by ERISA and other applicable law revealed the fact that the Debtors' pre-petition pension payments had been inadequate, giving rise to the substantial underfunding liability.

The underfunding liability is therefore better seen as accruing prior to the Petition Date, at the time the Debtors failed to make sufficient contributions to the RPHE, rather than as accruing subsequent to the Petition Date, at the time when it became apparent that the Debtors' prior contributions had been inadequate. As such, the underfunding costs constitute a prepetition claim, not a cost of administration.

The majority of courts that have dealt with the issue have adopted this perspective. Particularly persuasive is the Sixth Circuit's analysis in *Pension Ben. Guaranty Corp. v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, which is worth quoting at length:

> It is well established that the Bankruptcy Code, not ERISA, determines the priority of claims against a bankrupt estate…. Thus, regardless of the substantive law on which the claim is based, the proper standard for determining that claim's administrative priority looks to when the acts giving rise to a liability took place, not when they accrued. *Jartran,* for example, a leading decision from the Seventh Circuit, involved a claim by an advertising agency and a company that arranged for a debtor's ads to appear

---

[13] Doc. No. 6655 at ¶ B.
[14] Supple Decl. [Doc. No. 3296] at ¶ 6.

> in telephone directories. Applying the two-part benefit to the estate test, the court held that the claim, for the amount owing for ads published post-petition, was not entitled to administrative priority because the debtor committed to placing the ads *before* filing for bankruptcy. *Jartran,* 732 F.2d 584. The *Jartran* court based this finding on its conclusion that the creditors' claim arose pre-petition because "the agreement among the parties was entered into, and the ads were placed without possibility of revocation, before the petition was filed." *Id.* at 587. That the ads were published post-petition, and that the actual payment was made post-petition, was irrelevant to determining when the claim arose for purposes of § 503(b)(1)(A) priority. Instead, the court focused on when the commitment to place and pay for the ads occurred. In so doing, the *Jartran* court emphasized that the purpose of § 503 is to grant priority only to the claims of those entities who are induced to do business with the debtor *post-petition.* Such claims receive priority because they enable the estate to continue for the benefit of existing creditors. *Id.* at 587, 588.
>
> Similarly, in *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976), the First Circuit denied administrative expense priority for former employees' severance pay claims on the ground that such claims were based entirely upon services employees performed prior to bankruptcy filing. *Id.* at 955. In so holding, the court made clear that "[i]t is only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the debtor—give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration." *Id.* For purposes of administrative priority, the court therefore held that the employees' claims arose pre-petition, even though they were due and payable post-petition. As the court explained, "It is established that a debt is not entitled to priority as a cost and expense of administration simply because the claimant's right to payment arises after the debtor-in-possession has taken some action." *Id.* at 955.
>
> Applying the principles set forth in *Jartran* and *Mammoth Mart* to the facts of the present case, it is clear that the non-normal [underfunding] cost component of Pension Benefit's claim, because it relates to the Debtors' actions prior to filing for bankruptcy, arose pre-petition, and therefore is not entitled to administrative priority under § 503(b)(1)(A).

*In re Sunarhauserman*, 126 F.3d 811, 818–19 (6th Cir. 1997).

As noted, *Sunarhauserman*'s approach has been adopted by other courts. In *Pension Ben. Guaranty Corp. v. Skeen (In re Bayly Corp.)*, the Tenth Circuit held that "PBGC's claim for unfunded benefit liabilities predicated on pre-petition employment represents a pre-petition contingent claim not entitled to administrative expense priority." 163 F.3d 1205, 1211 (10th Cir. 1998).

The issue addressed in *Sunarhauserman* also arises in the context of a claim for "withdrawal liability," a claim that is similar—though not identical—to the underfunding liability at issue here. "[W]ithdrawal liability represents an employer's obligation to pay its 'proportionate share of the plan's unfunded vested benefits' at the time of withdrawal" from a pension plan. *United Mine Workers of Am. v. Lexington Coal Co. (In re HNRC Dissolution Co.)*, 396 B.R. 461, 471 (B.A.P. 6th Cir. 2008). Similar to underfunding liability, withdrawal liability often—though not always—arises where an employer's contributions to a pension plan prove inadequate to pay the benefits promised. Therefore, the cases holding that withdrawal liability attributable to prepetition labor is not allowable as an administrative expense bolster the Court's conclusion that

underfunding liability is not entitled to administrative expense status. Cases declining to accord administrative expense status to withdrawal liability attributable to prepetition labor include *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 99 (2d Cir. 1986), *In re Pulaski Highway Exp., Inc.*, 57 B.R. 502 (Bankr. M.D. Tenn. 1986), *LTV Corp. v. Pension Ben. Guaranty Corp. (In re Chateaugay Corp.)*, 130 B.R. 690 (S.D.N.Y. 1991), *United Mine Workers of Am. 1974 Plan and Trust v. Lexington Coal Co. (In re HNRC Dissolution Co.)*, 396 B.R. 461 (B.A.P. 6th Cir. 2008).

Based upon the foregoing, the Court finds that the underfunding component of the RPHE's claim is not entitled to administrative priority.

## B. RPHE's Motion (A) For Reconsideration of the Distribution Order and (B) To Enforce the Confirmation Order is Denied

To a significant extent, RPHE's motion for reconsideration of the Distribution Order and to enforce the Confirmation Order is predicated upon its allegation that the Liquidating Trustee improperly allocated to the Administrative Claims Reserve approximately $21 million in payments that were made either on the Effective Date or prior to the Effective Date. RPHE's allegations are based upon the December Status Report and April Status Report. The Liquidating Trustee has not responded to these allegations.

"[T]he provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner of the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan." § 1141(a).

Courts have analogized a confirmed plan to a contract between the debtor and its creditors. *See, e.g., In re Campesinos Unidos, Inc.,* 219 B.R. 886, 888 (Bankr. S.D. Cal. 1998) ("The reward of confirmation of a Chapter 11 plan is that generally the debtor's pre-confirmation obligations are discharged…. In place of the old obligations is the reorganized debtor's new contract with its creditors. That contract is the plan, and generally provides within its four corners, like many contracts, the creditors' rights and procedures for enforcing its terms."); *Nat'l City Bank v. Troutman Enterprises, Inc. (In re Troutman Enterprises, Inc.)*, 253 B.R. 8, 11 (B.A.P. 6th Cir. 2000) ("The plan is essentially a new and binding contract between the Reorganized Debtor and the Petitioning Creditors."); *In re Chatham Parkway Self Storage, LLC*, 507 B.R. 13, 18 (Bankr. S.D. Ga. 2014) ("A confirmed plan of reorganization operates as a contract between a reorganized debtor and its creditors."); *In re Nylon Net Co.*, 225 B.R. 404, 406 (Bankr. W.D. Tenn. 1998) ("The chapter 11 plan becomes a binding contract between the debtor and its creditors, and governs their rights and obligations.").

When the confirmed Plan is viewed as a contract, RPHE's motion essentially amounts to a request that the Court impose a remedy for an alleged contractual breach by the Liquidating Trustee and/or the Debtors. The alleged breach is that the Liquidating Trustee and/or the Debtors[15] paid $21,871,168 to administrative creditors either (a) on the Effective Date or (b) at some time during the three-week period between August 12, 2020 (the Confirmation Date) and

---

[15] Pursuant to § 6.5 of the Plan, the Liquidating Trustee was appointed and began performing his obligations under the Liquidating Trust Agreement as of the Effective Date of the Plan. Therefore, to the extent that payments were made to creditors between the Confirmation Date and the Effective Date, such payments would have been made by the Debtors.

September 4, 2020 (the Effective Date), instead of waiting until *after* the Effective Date to make the payments. RPHE contends that the approximately $21 million in Effective Date and pre-Effective Date payments should not have been allocated to the Administrative Claims Reserve, and that as a result the reserve was underfunded by approximately $21 million. As a remedy for this alleged breach of making payments approximately three weeks early, RPHE seeks an order requiring the Liquidating Trustee to return an amount equal to the Effective Date and pre-Effective Date payments to the Administrative Claims Reserve.

The April Status Report shows that the Liquidating Trustee and/or the Debtors did pay administrative claimants $21,871,168 either on the Effective Date or during the approximately three-week period between the Confirmation Date and the Effective Date, as opposed to waiting until *after* the Effective Date to make the payments. The Liquidating Trustee allocated these Effective Date and pre-Effective Date payments to the Administrative Claims Reserve.

To insure a clear record, the Court explains the relationship between the figures set forth in the Confirmation Order and the April Status Report with respect to the payments allocated to the Administrative Claims Reserve. The Confirmation Order fixed the amount of the Administrative Claims Reserve at $52,749,427.[16] The Confirmation Order also required the Debtors to hold the $30 million SGM Deposit in reserve pursuant to a stipulation with SGM.[17] Finally, the Debtors also determined that it was necessary to increase the Administrative Claims Reserve by $2,799,840 to fund settlements with certain administrative creditors who had objected to the Plan.[18] Therefore, the total amount required to be held in reserve on account of the Administrative Claims Reserve and the SGM Deposit was $85,549,267 (consisting of the initial Administrative Claims Reserve of $52,749,427, plus the $2,799,840 augmentation to the Administration Claims Reserve to settle objections to the Plan, plus the $30,000,000 SGM Deposit).

The April Status Report describes the allocation of these funds:

> On the Effective Date, the Debtors transferred $63,678,100 to the Liquidating Trust to create the reserves required by the Confirmation Order. Prior to the transfer of the foregoing funds to the Liquidating Trust on the Effective Date, (i) $8,723,794 of claims were paid, (ii) there were additional reserves of $2,799,840 in the Administrative Claims Reserve based on resolution of Plan objections, and (iii) $13,147,374 was paid on the Effective Date to various administrative claimants.

April Status Report at 5.

Parsing these figures shows that the Liquidating Trustee allocated to the Administrative Claims Reserve $21,871,168 in Effective Date and pre-Effective Date payments (consisting of $8,723,794 in pre-Effective Date payments and $13,147,374 in Effective Date payments). This is shown by the fact that adding the $21,871,168 in Effective Date and pre-Effective Date payments to the $63,678,100 that the Debtors "transferred … to the Liquidating Trust to create

---

[16] Confirmation Order at ¶ 24.
[17] *Id.*
[18] April Status Report at 5.

the reserves required by the Confirmation Order" yields a figure of $85,549,268, which is equal to the amount of the Administrative Claims Reserve plus the SGM Deposit.[19]

RPHE is correct that the Liquidating Trustee's allocation of the Effective Date and pre-Effective Date payments to the Administrative Claims Reserve deviates from the requirements of the Plan, which provides that the Administrative Claims Reserve is to consist of "Cash to be set aside by the Debtors on the Effective Date in an aggregate amount sufficient to fund a reserve for the payment of all *unpaid* Allowed Administrative Claims that will be paid *after* the Effective Date and all Administrative Claims that are not yet Allowed as of the Effective Date."[20] However, the decision to make $8,723,794 in payments during the three weeks prior to the Effective Date and $13,147,374 in payments on the Effective Date, as opposed to waiting until after the Effective Date to make the payments, amounts to nothing more than a non-material breach of the Plan. Such a non-material breach of contract cannot support the draconian remedy that RPHE requests—that is, that the Liquidating Trustee return $21,871,168 of non-existent funds to the Administrative Claims Reserve. Had the Liquidating Trustee delayed by approximately three weeks and not made the payments until after the Effective Date, the Administrative Claims Reserve would face the same shortfall in funds that gave rise to RPHE's Motion, and administrative creditors would be no better off.

RPHE contends that the allocation of the Effective Date and pre-Effective Date payments to the Administrative Claims Reserve means that the Administrative Claims Reserve was underfunded by the amount of those payments. RPHE mischaracterizes the situation. To say that the Administrative Claims Reserve was underfunded implies that funds that should have been earmarked for administrative creditors were diverted to a different party. That is not what happened here. As discussed above, the only deviation from the Plan was that certain administrative creditors were paid anywhere between one day and three weeks early. Had the deviation at issue not occurred, the only practical difference would have been that certain creditors would not have been paid as quickly. There would have been no change in the total amount paid to administrative claimants. Contrary to RPHE's contention, the Liquidating Trustee's allocation of the Effective Date and pre-Effective Date payments to the Administrative Claims Reserve does not mean that the reserve was underfunded.

Setting aside the fact that the Liquidating Trustee's non-material breach of the Plan cannot support the extreme remedy advocated by RPHE, there is an additional fatal defect to RPHE's Motion. RPHE has failed to identify a source of funds that could be restored to the Administrative Claims Reserve. The Court has already explained in the Memorandum why it is not appropriate to subject administrative creditors who have already been paid to disgorgement. Under the provisions of the Plan, 95% of all funds collected by the Liquidating Trustee must be distributed to the 2005 Bondholders, whose claims have priority to the claims of administrative creditors such as RPHE. The vast majority of the Debtors' assets were distributed in accordance with the Plan on the Effective Date. The Post-Effective Date Debtors and the Liquidating Trustee

---

[19] The sum of the Administrative Claims Reserve and the SGM Deposit is $85,549,267, or $1 less than the $85,549,268 figure resulting from adding the Effective Date and pre-Effective Date payments to the $63,678,100 transferred to the Liquidating Trustee on the Effective Date. The reason for this $1 difference is not clear from the record, but in any event the discrepancy is immaterial.

[20] Plan at § 1.15 (emphasis added).

could not augment the Administrative Claims Reserve by the amount demanded by RPHE even if the Court ordered them to do so.

RPHE argues that the Administrative Claims Reserve can be replenished using approximately $24 million in funds that the Liquidating Trustee is entitled to receive from a settlement with Strategic Global Management, Inc. (the "SGM Settlement Funds").[21] The SGM Settlement Funds are derived from a $30 million deposit made by SGM (the "SGM Deposit") in connection with an offer to purchase certain of the Debtors' hospitals that was never consummated.

Under the Plan, the SGM Settlement funds are not available to administrative creditors. The Confirmation Order states that "[n]o claimant having an Administrative Claim that is currently Allowed or that becomes Allowed shall have any recourse to the [SGM Deposit, the source of the SGM Settlement Funds] to satisfy any portion of such Allowed Administrative Claim."[22]

RPHE maintains that notwithstanding the provision in the Confirmation Order to the contrary, the SGM Settlement Funds, or a portion thereof, can be used to pay administrative creditors. According to RPHE, the Plan's provisions regarding the timing of payment to administrative claimants and the allocation of funds to the Administrative Claims Reserve take precedence over the provisions entitling the 2005 Bondholders to 95% of the SGM Settlement Funds.[23]

RPHE's argument overlooks the fact that but for the Plan Settlement entered into by the 2005 Bondholders, the Debtors would not have had sufficient cash on hand as of the Effective Date to fund the Administrative Claims Reserve. As set forth in the Plan Settlement, the 2005 Bondholders hold a secured claim of $259,445,000 plus post-petition interest and attorneys' fees.[24] The 2005 Bondholders agreed to defer payment of $133,473,278 of their secured claim so that cash would be available to fund the Administrative Claims Reserve. Part of the consideration for this deferral was that the 2005 Bondholders would be entitled to receive at least 95% of future proceeds collected by the Liquidating Trustee, including 95% of the SGM Settlement Funds.

---

[21] *See* Doc. No. 95, Case No. 2:20-cv-00613-DSF (stipulation authorizing disbursement of the SGM Settlement Funds) and Doc. No. 96, Case No. 2:20-cv-00613-DSF (order authorizing disbursement of the SGM Settlement Funds).

[22] Confirmation Order at ¶ 24.

[23] At the hearing, in response to the Court's questioning regarding the entitlement of the 2005 Bondholders to the SGM Settlement Funds, RPHE's counsel stated: "Well, the bondholders signed up to an agreement that included these express terms of the plan [regarding the Administrative Claims Reserve], so it's not improper to hold them to that agreement and allow the express terms of the Plan to be enforced and fulfilled. And what you have is a conflict of sorts. I think it's a false conflict, a conflict between the terms I've just articulated and the term that says ninety-five percent of the funds going into the [Liquidating Trust] go to the bondholders. I don't think things are in conflict, because the bondholders have already waived that right, because they agreed to the plan, and the plan requires the [Administrative Claims Reserve]. And having agreed to that, it's improper to underfund the reserve and only enforce the Plan to the extent it relates to the ninety-five percent." Hearing Transcript [Doc. No. 6603] at 12:17–13:4.

[24] Plan Settlement [Doc. No. 6043, Ex. A] at ¶ 5.

It is important to note that the 2005 Bondholders were not required to agree to carve out and defer the payment of a portion of their secured claim to facilitate the funding of the Administrative Claims Reserve. The claim of the 2005 Bondholders has priority to the claims of RPHE and other administrative creditors. *See Rus, Miliband & Smith, APC v. Yoo (In re Dick Cepek, Inc.)*, 339 B.R. 730, 737 (B.A.P. 9th Cir. 2006) ("As a general rule, *expenses of administration must be satisfied from assets of the estate not subject to liens* .... Only surplus proceeds are available for distribution to creditors of the estate and administrative claimants. Therefore, absent equity in the collateral, administrative claimants cannot look to encumbered property to provide a source of payment for their claims.") (emphasis in original; internal citation omitted).

Standing alone, the priority status of the 2005 Bondholders' claim does not mean that the bondholders were required to be paid sooner than junior administrative creditors. "It must be remembered that the absolute priority rule does not require sequential distributions (i.e., cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan." *Mercury Cap. Corp. v. Milford Connecticut Assocs., L.P.*, 354 B.R. 1, 13 (D. Conn. 2006). However, because the Plan funded the Administrative Claims Reserve using cash in which the 2005 Bondholders held a security interest, it could not have been confirmed over the bondholders' objection.

To have been confirmed over the 2005 Bondholders' objection, the Plan would have been required to have either (1) allowed the bondholders to retain their liens, § 1129(b)(2)(A)(i)(I), or (2) provided the 2005 Bondholders the "indubitable equivalent" of their claim, § 1129(b)(2)(A)(iii).[25] The first option—allowing the bondholders to retain their liens in the cash used to fund the Administrative Claims Reserve—was not a possibility because it would be pointless to distribute encumbered cash to administrative creditors. The second option—providing the 2005 Bondholders the "indubitable equivalent" of their secured interest in the cash used to fund the Administrative Claims Reserve—was likewise not a possibility. The Debtors had no other assets which could have been used to provide the 2005 Bondholders a security interest that would have been the "indubitable equivalent" of their security interest in the cash used to fund the Administrative Claims Reserve. A security interest in the Liquidating Trust's future recoveries would not have sufficed for this purpose, because the amount of those future recoveries was far too uncertain at the time the Plan was confirmed. As the Ninth Circuit has explained, "'[i]ndubitable' means 'too evident to be doubted.'" *Arnold & Baker Farms v. United States (In re Arnold & Baker Farms)*, 85 F.3d 1415, 1421 (9th Cir. 1996). Nor did the Debtors have any other unencumbered collateral which would have come anywhere close to meeting the "indubitable equivalence" standard with respect to the claim of the 2005 Bondholders.

The bottom line is that the Administrative Claims Reserve could not have been funded unless the 2005 Bondholders had consented to the use of cash in which they held a security interest to fund that reserve—and the 2005 Bondholders were not required to provide such consent given that the Plan could not have been confirmed over their objection. Having agreed to fund the Administrative Claims Reserve, the 2005 Bondholders cannot now be deprived of the benefit of their bargain—the right to receive 95% of the SGM Settlement Funds.

---

[25] Section 1129(b)(2)(A)(ii), which sets forth the treatment required where a secured creditor's collateral is sold, does not apply because at the time the Plan was confirmed, substantially all of the Debtors' assets had already been sold.

  RPHE next accuses the Liquidating Trustee of having grossly mismanaged the Administrative Claims Reserve by continuing to pay 100% of administrative claims subsequent to the December Status Report, after it became clear that the reserve was underfunded. RPHE demands that the Liquidating Trustee be ordered to provide an accounting of all payments made from the Administrative Claims Reserve subsequent to the December Status Report.

  It is difficult to fathom what such an accounting would accomplish. An accounting will not change the fact that the Administrative Claims Reserve is underfunded and that not all administrative creditors will be paid in full. The April Status Report cast doubt upon whether the Liquidating Trust has sufficient funds to carry out its remaining obligations. *See* April Status Report at 8 ("The Liquidating Trust anticipates it will spend an additional potential $8 million to fulfill its remaining obligations under the Plan and is in discussions with the 2005 Bondholders regarding funding of these efforts."). The Court will not order an expensive accounting that would do nothing other than potentially supply RPHE with additional information to use in possible future litigation against the Liquidating Trust.

  Finally, RPHE requests an order directing payment in full of the $862,910 August 2020 installment payment portion of RPHE's administrative claim. Peter C. Chadwick, the Debtors' Chief Financial Officer, represented in a declaration filed in support of confirmation of the Plan that the installment payment would be "funded in the ordinary course prior to the Effective Date" from "Effective Date Cash."[26] As defined in Chadwick's Declaration, "Effective Date Cash" means the "$445.5 million" in "immediately available funds" that the Debtors anticipated having on the Effective Date of the Plan.[27]

  In the papers filed in response to the Plan Enforcement Motion, the Liquidating Trustee and the Post-Effective Date Debtors did not explain why the August 2020 installment payment was not made as represented in the Chadwick Declaration. At the August 4, 2021 hearing, the Court placed Chadwick under oath and took testimony regarding the non-payment of the installment payment. Chadwick testified that as of August 2020, the Debtors had the full intention of making the August 2020 installment payment.[28] He stated that in the weeks leading up to the Effective Date, the Debtors experienced a significant liquidity drain, and eliminated any disbursements outside of employee wages and other critical payments to ensure that there would be sufficient funds available on the Effective Date to pay secured lenders and fund the reserves required under the Plan.[29] Chadwick could not recall a specific conversation he had regarding the August 2020 installment payment, but testified that he had no doubt that at the time, the Debtors believed that the August 2020 installment payment would ultimately be paid using funds set aside in the Administrative Claims Reserve.[30] In this respect, Chadwick noted that $2.363 million had been earmarked within the Administrative Claims Reserve to make the August 2020 installment payment and the two subsequent installment payments owed to RPHE.[31]

  While the non-payment of the August 2020 installment is of concern, the issue of the feasibility of the remedy advocated by RPHE remains. As discussed, RPHE has not identified any source of funds from which the August 2020 payment could plausibly be made. The

---

[26] Chadwick Decl. [Doc. No. 5385] at ¶ 35.
[27] *Id.* at ¶ 22.
[28] Hearing Transcript [Doc. No. 6603] at 15:12–17.
[29] *Id.* at 15:18–24.
[30] *Id.* at 15:25–16:10.
[31] *Id.* at 16:3–10.

Administrative Claims Reserve is insolvent, and as stated above the Court has already explained in the Memorandum why it is not appropriate to subject other administrative creditors to disgorgement. All of the Effective Date Cash from which the installment payment was supposed to have been made has been paid to other creditors, most of whose claims have priority over the RPHE's claim. It is also worth emphasizing that RPHE's situation is not materially different from that of other administrative creditors, who are also receiving only partial payment of their administrative claims under the Distribution Program. For these reasons, the Court declines to order payment in full of the $862,910 August 2020 installment payment.

### III. Conclusion

Based upon the foregoing, the Court (1) finds that the RPHE's underfunding liabilities are not allowable as an administrative expense and (2) denies the relief requested by RPHE in its combined motion to (a) alter or amend the Distribution Order and (b) enforce the Confirmation Order. The Court will enter an order consistent with this Amended Memorandum.

###

Date: September 14, 2021

Ernest M. Robles
United States Bankruptcy Judge