

**FILED & ENTERED**

**OCT 21 2021**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA—LOS ANGELES DIVISION

| | |
|---|---|
| In re: Verity Health System of California, Inc., *et al.*,<br><br>　　　Debtors and Debtors in Possession.<br><br>☒ Affects All Debtors<br><br>☐ Affects Verity Health System of California, Inc.<br>☐ Affects O'Connor Hospital<br>☐ Affects Saint Louise Regional Hospital<br>☐ Affects St. Francis Medical Center<br>☐ Affects St. Vincent Medical Center<br>☐ Affects Seton Medical Center<br>☐ Affects O'Connor Hospital Foundation<br>☐ Affects Saint Louise Regional Hospital Foundation<br>☐ Affects St. Francis Medical Center of Lynwood Medical Foundation<br>☐ Affects St. Vincent Foundation<br>☐ Affects St. Vincent Dialysis Center, Inc.<br>☐ Affects Seton Medical Center Foundation<br>☐ Affects Verity Business Services<br>☐ Affects Verity Medical Foundation<br>☐ Affects Verity Holdings, LLC<br>☐ Affects De Paul Ventures, LLC<br>☐ Affects De Paul Ventures - San Jose Dialysis, LLC<br><br>　　　Debtors and Debtors in Possession. | Lead Case No.:　2:18-bk-20151-ER<br>Chapter:　11<br><br>Jointly Administered With:<br>Case No. 2:18-bk-20162-ER;<br>Case No. 2:18-bk-20163-ER;<br>Case No. 2:18-bk-20164-ER;<br>Case No. 2:18-bk-20165-ER;<br>Case No. 2:18-bk-20167-ER;<br>Case No. 2:18-bk-20168-ER;<br>Case No. 2:18-bk-20169-ER;<br>Case No. 2:18-bk-20171-ER;<br>Case No. 2:18-bk-20172-ER;<br>Case No. 2:18-bk-20173-ER;<br>Case No. 2:18-bk-20175-ER;<br>Case No. 2:18-bk-20176-ER;<br>Case No. 2:18-bk-20178-ER;<br>Case No. 2:18-bk-20179-ER;<br>Case No. 2:18-bk-20180-ER;<br>Case No. 2:18-bk-20181-ER;<br><br>Chapter 11 Cases.<br><br>**MEMORANDUM OF DECISION GRANTING IN PART PRIME HEALTHCARE SERVICES, INC.'S MOTION TO ENFORCE ASSET PURCHASE AGREEMENT**<br><br>**[RELATES TO DOC. NO. 6645]**<br><br>Date:　　October 19, 2021<br>Time:　　10:00 a.m.<br>Location:　Ctrm. 1568<br>　　　　　Roybal Federal Building<br>　　　　　255 East Temple Street<br>　　　　　Los Angeles, CA 90012 |

**I. Introduction**

At the above-captioned date and time, the Court conducted a hearing on the *Motion to Enforce Provisions of the Asset Purchase Agreement Pertaining to Accounts Receivable Adjustment* [Doc. No. 6645] (the "Motion") filed by Prime Healthcare Services, Inc. ("Prime").[1] For the reasons set forth below, the Court finds that trauma payments of approximately $11.9 million collected by Prime do not qualify as Accounts Receivable and are not properly credited toward the Final A/R Collected.[2] The dispute concerning the approximately $5.1 million that the Liquidating Trustee contends should be withheld from Prime on account of its alleged failure to exercise commercially reasonable efforts to collect the Accounts Receivable shall be referred to mediation. The Court will enter an interlocutory order authorizing Prime to retain $23,157,581 in QAF VI Seller Net Payments pursuant to the Reconciliation Process.

---

[1] The Court considered the following pleadings in adjudicating this matter:
1) Prime Healthcare Services, Inc.'s Motion to Enforce Provisions of the Asset Purchase Agreement Pertaining to Accounts Receivable Adjustment [Doc. No. 6645] (the "Motion");
2) Post-Effective Date Debtors and Liquidating Trustee's Memorandum in Opposition to Prime Healthcare Services, Inc.'s Motion to Enforce Provisions of the Asset Purchase Agreement Pertaining to Accounts Receivable Adjustment [Doc. No. 6662] (the "Opposition");
3) Prime Healthcare Services, Inc.'s Reply to Post-Effective Date Debtors and Liquidating Trustee's Memorandum in Opposition to Prime Healthcare Services, Inc.'s Motion to Enforce Provisions of the Asset Purchase Agreement Pertaining to Accounts Receivable Adjustment [Doc. No. 6669] (the "Reply");
   a) Prime Healthcare Services, Inc.'s Evidentiary Objections [Doc. No. 6669-10];
4) Order Approving Stipulation Consenting to Sur-Reply, Withdrawing Motion to Strike, and Continuing Hearing on Prime Healthcare Services, Inc.'s Motion to Enforce Provisions of the Asset Purchase Agreement Pertaining to Accounts Receivable Adjustment [Doc. No. 6676];
   a) Stipulation Consenting to Sur-Reply, Withdrawing Motion to Strike, and Continuing Hearing on Prime Healthcare Services, Inc.'s Motion to Enforce Provisions of the Asset Purchase Agreement Pertaining to Accounts Receivable Adjustment [Doc. No. 6675];
   b) Post-Effective Date Debtors and Liquidating Trustee's Evidentiary Objection and Motion to Strike New Evidence Presented in Reply; Alternatively, Request for Sur-Reply [Doc. No. 6674];
5) Post-Effective Date Debtors and Liquidating Trustee's Sur-Reply in Opposition to Prime Healthcare Services, Inc.'s Reply to Post-Effective-Date Debtors and Liquidating Trustee's Memorandum in Opposition to Prime Healthcare Services, Inc.'s Motion to Enforce Provisions of the Asset Purchase Agreement Pertaining to Accounts Receivable Adjustment [Doc. No. 6682]; and
6) Prime Healthcare Services, Inc.'s Evidentiary Objections to Supplemental Declaration of Peter Chadwick, and Motion to Strike and Evidentiary Objections to Declaration of Regina Hernandez [Doc. No. 6684].

[2] Capitalized terms not defined within this introductory section are defined below.

## I. Facts and Summary of Pleadings
### A. Background

On August 31, 2018 (the "Petition Date"), Verity Health System of California, Inc. ("VHS") and certain affiliated entities (collectively, the "Debtors") each filed voluntary Chapter 11 petitions. The Debtors' cases are being jointly administered.

On August 14, 2020, the Court entered an order confirming the *Modified Second Amended Joint Chapter 11 Plan (Dated July 2, 2020) of the Debtors, the Committee, and the Prepetition Secured Creditors* [Doc. No. 5468, Ex. A] (the "Plan"). *See* Doc. No. 5504 (the "Confirmation Order"). The Plan established a Liquidating Trust to wind down the Debtors' business and make payments to creditors. Howard Grobstein has been appointed as the Liquidating Trustee responsible for administering the Plan.

On April 9, 2020, the Court entered an order authorizing the Debtors to sell St. Francis Medical Center and related assets (collectively, "SFMC") to Prime. *See* Doc. No. 4511 (the "Sale Order," and the sale approved by the Sale Order, the "SFMC Sale"). Among other things, the Sale Order approved the terms of an Asset Purchase Agreement (the "APA") negotiated and entered into by the Debtors and Prime. The Closing Date[3] of the SFMC Sale occurred on August 13, 2020.

Pursuant to § 1.1(a)(iii) of the APA, Prime paid $61 million (the "A/R Target Amount") "as consideration for the Accounts Receivable transferred at Closing," subject to a post-closing reconciliation process under § 1.12 of the APA (the "Reconciliation Process"). During the 135-day period immediately following the Closing Date (the "Reconciliation Period"), the APA required Prime to "use good faith, commercially reasonable best efforts to collect the Accounts Receivable (including at least the efforts used by [Prime] to collect its other receivables" (the Accounts Receivable so collected, the "Final A/R Collected"). *Id.* at § 1.12(e).

To the extent the Final A/R Collected is less than the $61 million A/R Target Amount, the APA requires the Liquidating Trust, as successor-in-interest to the Debtors, to pay Prime the difference. *Id.* at § 1.12. If the parties cannot agree upon the amount required to be paid under the APA's Reconciliation Process, the APA states that the disagreement "shall be submitted to the Bankruptcy Court for resolution." *Id.* at § 1.12(c). To the extent that Prime is owed funds under the Reconciliation Process that remain unpaid, the APA authorizes Prime to offset such amounts from quality assurance fund payments (the "QAF VI Seller Net Payments") that would otherwise be the property of the Liquidating Trust.[4] *Id.* at § 1.12(d)(ii).

//
//

---

[3] Capitalized terms not defined herein have the meaning set forth in the APA.

[4] As a result of state and federal regulations, the quality assurance fund payments can only be made to Prime, the current owner of SFMC. *See* Chadwick Decl. [Doc. No. 6662] at ¶ 7 ("On February 7, 2021, Prime took over the SFMC lockbox account. QAF and Medi-Cal payments can only be made to the entity that possesses the provider number and the lockbox has to stay in the possession of the entity that holds the provider number. Consequently, the Department of Health Care Services and various managed healthcare plans deposit QAF into this lockbox account controlled by Prime, but the QAF funds specifically related to service periods when the Debtors owned SFMC."). The APA requires Prime to turn over quality assurance fund payments that are the property of the Liquidating Trust within ten business days of receipt. APA at § 10.1.

The APA defines "Accounts Receivable" as follows[5]:

> all accounts and interest thereupon, notes and interest thereupon and other receivables of Sellers, including, without limitation, accounts, notes or other amounts receivable, and all claims, rights, interests and proceeds related thereto, including all accounts and other receivables, , [sic] in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital, billed and unbilled, recorded and unrecorded (including any such amounts that were written-off by Sellers for any reason), for services, goods, products and supplies provided by Sellers prior to the Licensure Date whether payable by Medicare, Medi-Cal, Medicaid, or any other payor (including an insurance company), or any health care provider or network (such as a health maintenance organization, preferred provider organization or any other managed care program) or any fiscal intermediary of the foregoing, private pay patients, private insurance or by any other source and all claims, rights, interests and proceeds relating to any grant or governmental awards directly or indirectly related to COVID-19 (collectively, "**Accounts Receivable**"); and (ii) trauma payments, disproportionate share payments (subject to Section 1.8(c)), California Health Foundation & Trust payments, cost report, claim, EHR or other similar appeals and Seller Cost Report settlements in each case arising from the rendering of services or provision of goods, products or supplies to inpatients and outpatients at the Hospital (the "Other Receivables" and together with the Accounts Receivable, the "Receivables").

APA at § 1.7(p).

**B. Summary of Papers Filed in Connection with Prime's Motion to Enforce the APA**

Prime, on the one hand, and the Liquidating Trustee and the Post-Effective Date Debtors, on the other hand, have been unable to agree upon the amount owed to Prime under the Reconciliation Process. (For simplicity, the Liquidating Trustee and the Post-Effective Date Debtors are collectively referred to as the "Liquidating Trustee," unless the context requires otherwise.) Prime seeks an order requiring the Liquidating Trustee to pay it approximately $28.3 million; in the alternative, Prime seeks authorization to recover the $28.3 million by offsetting against the QAF VI Seller Net Payments.

The Liquidating Trustee's position is that Prime is entitled to only approximately $11.3 million of the $28.3 million it requests. The $17 million in dispute falls into two categories. First, the Liquidating Trustee asserts that $11.9 million in trauma payments that Prime has collected constitute Accounts Receivable that should be included in the calculation of the Final A/R Collected. Prime disagrees, arguing that the APA expressly excludes trauma payments from the definition of "Accounts Receivable," and that e-mails exchanged during the negotiation of the APA establish that the exclusion was intentional. The Liquidating Trustee argues that the documentation of the negotiations submitted by Prime does not demonstrate that an exclusion of trauma payments was specifically negotiated.

Second, the Liquidating Trustee argues that Prime failed to employ commercially reasonable efforts to collect the Accounts Receivable, and that as a result of such failure, Prime collected $5.1 million less than would have been the case had Prime devoted sufficient resources to

---

[5] To provide context for the instant dispute, it is necessary to quote the paragraph in its entirety.

collection. The Liquidating Trustee derives the alleged $5.1 million deficiency from the difference between SFMC's historical collection rate and Prime's collection rate. According to the Liquidating Trustee, SFMC's historical collection rate was 90.3%, but Prime's collection rate was only 78.1%.

Prime argues that its efforts to collect the Accounts Receivable were commercially reasonable. Prime first contends that the Liquidating Trustee's assertion that Prime's collection rate was only 78.1% is not sufficiently substantiated. Prime next argues that the Liquidating Trustee's comparison of SFMC's and Prime's collection rates changes the goalposts, because the APA requires only that Prime use commercially reasonable collection efforts, not that Prime achieve a collection rate equal to or exceeding SFMC's historical collection rate.

## II. Findings of Fact and Conclusions of Law

For the reasons set forth below, the Court finds that the trauma payments of approximately $11.9 million collected by Prime do not qualify as Accounts Receivable and are not properly credited toward the Final A/R Collected. Therefore, the amount to which Prime is entitled under the Reconciliation Process is not subject to a reduction of $11.9 million on account of the trauma payments.

At this time, the Court will not rule upon the dispute concerning the approximately $5.1 million that the Liquidating Trustee contends should be withheld from Prime on account of its alleged failure to exercise commercially reasonable efforts to collect the Accounts Receivable. Instead, such dispute shall be referred to mediation.

### A. The $11.9 Million in Trauma Payments Collected by Prime Are Not Properly Included in the Final A/R Collected

The approximately $11.9 million in trauma payments collected by Prime are not properly included in the Final A/R Collected. This finding is supported by both the plain language of the APA and the extrinsic evidence of the parties' intent.

*1. The Plain Language of the APA Requires Excluding "Trauma Payments" from "Accounts Receivable"*

Under the plain language of § 1.7(p) of the APA, "trauma payments" are excluded from the definition of "Accounts Receivable." Section 1.7(p)(i) of the APA contains a lengthy list of the receivables that constitute "Accounts Receivable." That list does *not* include trauma payments. Section 1.7(p)(ii) of the APA sets forth additional receivables that the APA defines as "Other Receivables." Trauma payments *are* included in the list of receivables qualifying as "Other Receivables." The separateness of "Other Receivables" and "Accounts Receivable" is further underscored by the fact that § 1.7(p) defines "Receivables" to mean "Accounts Receivable" *and* "Other Receivables."

There is no merit to the Liquidating Trustee's contention that the APA is ambiguous with respect to the question of whether "trauma payments" fall within the definition of "Accounts Receivable." In support of this alleged ambiguity, the Liquidating Trustee argues that the undefined phrase "other receivables"—which is included among the receivables that comprise the "Accounts Receivable"—is broad enough to encompass "trauma payments." That argument might have some plausibility if § 1.7(p)(ii) of the APA did not make it crystal clear that "trauma payments" falls within the definition of "Other Receivables," and that "Other Receivables" are a

separate category from "Accounts Receivable." Adopting the Liquidating Trustee's argument would read the defined term "Other Receivables" out of the APA.

The Liquidating Trustee's next argument is that no harm would be done if the Court were to read "Other Receivables" out of the APA: "But what Prime does not tell the Court is that 'Other Receivables' is actually a defined term that is used *nowhere else in the APA* and that it serves no apparent purpose at all. The definition on its face is effectively a nullity, and reading it into or out of the APA should change nothing, and it certainly should not be used to justify providing Prime a nearly $12 million windfall." Doc. No. 6662 at 14.[6]

The Liquidating Trustee's argument is misdirected. Whether the defined term "Other Receivables" is used elsewhere in the APA has no bearing upon the question of whether "trauma payments" fall within the definition of "Accounts Receivable." The significance of the separately-defined "Other Receivables" category is that it shows that certain items—including trauma payments—were *not* among the Accounts Receivable. That is, the use within § 1.7 of two separately defined terms—Accounts Receivable and Other Receivables—underscores that items falling within the scope of "Other Receivables" cannot be conflated with items falling within the scope of "Accounts Receivable." To hold otherwise would be to ignore the parties' decision to separate § 1.7(p) into two distinct subclauses—subclause § 1.7(p)(i), which defines "Accounts Receivable," and subclause § 1.7(p)(ii), which defines "Other Receivables."

*2. Consideration of Extrinsic Evidence Demonstrates that the Parties Intended to Exclude "Trauma Payments" from "Accounts Receivable"*

Having failed to show that § 1.7(p) is ambiguous, the Liquidating Trustee argues that the parties' intent in drafting the APA was that trauma payments be included within "Accounts Receivable." As evidence of this alleged intent, the Liquidating Trustee points to a spreadsheet the parties exchanged during the negotiation of the APA (the "Spreadsheet") [Doc. No. 6682, Ex. C-1]. As part of a table captioned "Sum of Net AR," the Spreadsheet contains a line item reading "S-9 COUNTY TRAMA" [sic]. The "Sum of Net AR" as of February 29, 2020 is $60,743,638—which is approximately the same amount allocated to Prime's purchase of the Accounts Receivable in the APA. The Liquidating Trustee cites the Spreadsheet's inclusion of trauma payments in the computation of accounts receivable as evidence that the parties intended that the APA's definition of "Accounts Receivable" also include trauma payments.

The Liquidating Trustee's argument fails for several reasons. First, the APA contains the following integration clause:

> This Agreement, the Disclosure Schedule, the exhibits and schedules, and the documents referred to in this Agreement contain the entire understanding between the Parties with respect to the transactions contemplated hereby and supersede all prior or contemporaneous agreements, understandings, representations and statements, oral or written, between the Parties on the subject matter hereof (the "**Superseded Agreements**"), which Superseded Agreements shall be of no further force or effect.

APA at § 12.14.

---

[6] Page citations are to the CM/ECF pagination appearing at the top of each page, not the pagination used by the document's preparer.

The Spreadsheet is not an exhibit to the APA and is not referenced in the APA. Therefore, resort to the Spreadsheet to interpret the APA is barred by the integration clause.

The APA's integration clause and its unambiguous definition of "Accounts Receivable" are dispositive of the issue. However, as this matter has been heavily contested and will likely be subject to an appeal, the Court wishes to emphasize that the evidence extrinsic to the APA does not support the Liquidating Trustee's contention that the parties intended Accounts Receivable to include trauma payments. The voluminous evidence before the Court shows that the APA was the product of intense negotiations that involved multiple drafts, the exchange of numerous e-mails, and discussions concerning a variety of issues. Throughout the entire process the Debtors and Prime were both advised by sophisticated counsel. Against this backdrop, the Liquidating Trustee's focus upon a single line-item in one Spreadsheet says very little about what the parties may or may not have intended when drafting the APA. In particular, it is significant that the negotiations that produced the Reconciliation Process and the current version of § 1.7(p) occurred *after* the Spreadsheet had been created, as reflected by the testimony of Joel Richlin ("Richlin"), Prime's general counsel:

> To address the uncertainty caused by the pandemic, Prime and Sellers engaged in extensive negotiations to allocate risk between the parties and to adjust to the new economic environment. In particular, Prime sought various items from Sellers in the final week of negotiations that would assuage Prime's concerns and provide it the comfort necessary to close the SFMC Sale. Prime sought these modifications to the APA in exchange for Prime's agreement not to decrease the agreed upon $200 million purchase price, thereby rendering a benefit to the Debtors and their estates. These negotiated modifications to the APA included the creation of the Accounts Receivable Reconciliation in section 1.12 of the APA and the exclusion of certain items from the definition of the term "Accounts Receivable" in section 1.7(p).

Richlin Decl. [Doc. No. 6669] at ¶ 5.

In addition, contrary to the Liquidating Trustee's contention, the parol evidence shows that the parties carefully considered and negotiated the provisions of the APA pertaining to the treatment of trauma payments. On March 26, 2020, the parties exchanged a redlined draft of the APA (the "3/26/2020 Redline") [Doc. No. 6669, Ex. 8] that for the first time included the Reconciliation Process. The Reconciliation Process provided additional certainty to Prime by giving it the opportunity to recover funds from the Debtor in the future if the Accounts Receivable that Prime was purchasing proved to be less valuable than projected. The 3/26/2020 Redline broadly defined all receivables, including trauma payments, as "Accounts Receivable," and credited all such receivables toward the Final A/R Collected.[7]

On April 1, 2020, Prime sent the Debtors a redlined draft of the APA containing further revisions (the "4/1/2020 Redline") [Doc. No. 6669, Ex. 10]. The 4/1/2020 Redline excluded certain receivables from the definition of "Accounts Receivable," and further provided that those excluded receivables would *not* be credited toward the Final A/R Collected. Among the excluded

---

[7] In all drafts of the APA, the definition of "Final A/R Collected" references the definition of "Accounts Receivable." As a result, changes to the receivables included in the definition of "Accounts Receivable" flow through to receivables credited towards achieving the Final A/R Collected.

receivables were trauma payments and payments made by the government related to COVID-19. The effect of these exclusions was favorable to Prime: the exclusions decreased the overall pool of receivables credited toward the Final A/R Collected, making it more likely that the Final A/R Collected would be less than the A/R Target Amount, thereby triggering the Liquidating Trustee's obligation to make a payment to Prime pursuant to the Reconciliation Process.

On April 1, 2020, Richlin and Elspeth Paul ("Paul"), the Debtors' general counsel, held a phone conference during which the parties discussed the 4/1/2020 Redline's changes to the definition of "Accounts Receivable." Richlin Decl. at ¶ 10. Later that day, Richlin sent Paul an e-mail requesting an additional phone conference:

> Elspeth, I spoke to management and have feedback on our discussion. Let me know once you have feedback on your end and can talk. I think we need to have a discussion about AR [Accounts Receivable] where I need Steve to join and we probably need BRG [Berkeley Research Group, the Debtors' financial advisors] on your end, or whoever you deem best.

Doc. No. 6669, Ex. 12.

The parties conducted the group phone conference that Richlin had requested on April 2, 2020. Richlin Decl. at ¶ 11. Later that day, Paul sent Richlin an e-mail containing proposed modifications to the definition of "Accounts Receivable" (the "Accounts Receivable E-mail") [Doc. No. 6669, Ex. 13]. Paul proposed removing the exclusion of COVID-related government payments from the definition of "Accounts Receivable," such that COVID-related government payments *would* be credited toward the Final A/R Collected. However, Paul's proposed language continued to exclude trauma payments from "Accounts Receivable," consistent with the language proposed by Prime in the 4/1/2020 Redline. Paul's changes therefore amounted to a compromise—one exclusion favorable to Prime (the COVID-related government payments) was removed, but another exclusion favorable to Prime (the trauma payments) was maintained.

On April 2, 2020, Richlin replied to the Accounts Receivable E-mail and stated that Prime accepted the proposed changes. Doc. No. 6669, Ex. 13. On April 3, 2020, the Debtors circulated a revised redline of the APA (the "4/3/2020 Redline") that incorporated the changes proposed by Paul in the Accounts Receivable E-mail. The APA that the parties ultimately signed maintained the language in the 4/3/2020 Redline with respect to the definition of "Accounts Receivable" and the treatment of trauma payments.

This record of the negotiations shows that both sides understood and deliberately considered which receivables would be credited toward the Final A/R Collected. To sum up the progression of the negotiations: When the Reconciliation Process was first introduced in the 3/26/2020 Redline, *all* receivables were credited toward the Final A/R Collected. On April 1, 2020, Prime proposed removing trauma payments and COVID-related government payments from the receivables credited toward the Final A/R Collected. The Debtors responded by proposing that only COVID-related government payments, but not trauma payments, be credited toward the Final A/R Collected. The parties ultimately adopted this compromise.

In a further attempt to bolster his contention that the parties intended Accounts Receivable to include trauma payments, the Liquidating Trustee points to a statement allegedly made by Prime's CFO in negotiations that occurred only after the dispute over the Reconciliation Process
//

had arisen. Specifically, Peter Chadwick, the Debtors' Chief Financial Officer, testifies as follows:

> In negotiations between the parties to resolve this dispute, a telephone conversation that Prime indicates occurred on February 18, 2021, Steve Aleman, Prime's CFO conceded that if LA County Trauma payments were included in the A/R Target Amount then that should be dispositive of whether they should be included in the Final A/R Collected. Afterwards, Prime and its counsel have denied that Aleman made such a representation, but I stand by what I heard him say in that telephone conversation.

Chadwick Decl. [Doc. No. 6662] at ¶ 14.[8]

What Aleman may or may not have said in a settlement negotiation that occurred nearly a year after the APA had been executed, and only after the instant dispute had arisen, is entitled to very little if any evidentiary weight in ascertaining the parties' state of mind during APA negotiations. Moreover, Aleman denies Chadwick's characterization of the comments he made in the February 18, 2021 meeting:

> [The Debtors'] 3/12 Correspondence also alleged that I made a statement during the Meet and Confer that amounts collected for trauma services provided pursuant to the Trauma Agreement should not be included in the Final A/R Collected. I reviewed [the Debtors'] 3/12 Correspondence and can confirm that the characterization of my comments during the Meet and Confer is inaccurate. I remember the discussion during the Meet and Confer clearly and know that I did not make any statement during the Meet and Confer that amounts collected for trauma services provided pursuant to the Trauma Agreement should be included in the Final A/R Collected. Furthermore, I would not have made any such statement because the language in the APA is clear and expressly excludes amounts collected for trauma services from the definition of Accounts Receivable.

Aleman Decl. [Doc. No. 6645] at ¶ 12.

**B. The Dispute Concerning the $5.1 Million that the Liquidating Trustee Contends Should be Withheld on Account of Prime's Alleged Failure to Exercise Commercially Reasonable Efforts to Collect the Accounts Receivable Shall Be Referred to Mediation**

The Liquidating Trustee argues that the sum owed to Prime under the Reconciliation Process should be reduced by $5,105,731 on account of Prime's alleged failure to employ commercially reasonable efforts to collect the Accounts Receivable.[9]

The dispute concerning Prime's alleged failure to diligently collect the Accounts Receivable shall be referred to formal mediation. The parties shall have completed one day of mediation by

---

[8] Prime asserts that this testimony is inadmissible under Evidence Rule 408 because the statements were made during settlement negotiations. Prime's objection is overruled. The evidence is admissible because it is not offered to prove the validity or amount of the sums allegedly owed under the Reconciliation Process; it is instead offered to demonstrate Prime's state of mind during the APA negotiations.

[9] The derivation of the $5,105,731 figure is set forth in ¶ 19 of the Declaration of Peter Chadwick [Doc. No. 6662].

no later than **November 19, 2021**. The manner in which the mediation is conducted—whether in-person or by videoconference—shall be at the discretion of the Mediator. To the extent the mediation does not result in a settlement, by no later than **December 3, 2021**, each party shall file a statement setting forth the (1) the issues that remain in dispute and (2) the party's position with respect to each remaining disputed issue. A continued hearing on the Motion shall be held on **December 8, 2021 at 10:00 a.m.**

### C. The Court Will Enter an Interlocutory Order With Respect to Prime's Rights Under the Reconciliation Process

Because the Court's ruling does not resolve all issues set forth in the Motion, it is the Court's intent that its order with respect to Prime's rights under the Reconciliation Process be interlocutory.[10]

Under the APA, Prime is entitled to a recovery to the extent that the A/R Target Amount of $61,000,000 exceeds the Final A/R Collected. During the Reconciliation Period, Prime collected (a) $32,736,688 in Accounts Receivable and (b) $11,974,080 in trauma payments.[11] For the reasons set forth in Section II.A., above, the trauma payments are not properly considered for purposes of tabulating the Final A/R Collected.

Were it not for the dispute regarding the alleged $5,105,731 deficiency in Prime's collections of the Accounts Receivable, Prime would be entitled to a recovery of $28,263,312 (calculated by subtracting the $32,736,688 of Accounts Receivable that Prime collected from the A/R Target Amount of $61,000,000). As stated in Section II.B., above, the Court is referring the dispute concerning the alleged $5,105,731 deficiency to mediation. To preserve the status quo, Prime's immediate recovery must be reduced by the $5,105,731 in dispute. Therefore, Prime is entitled to an immediate recovery of $23,157,581 ($28,263,312 less $5,105,731).

As of September 28, 2021, Prime was holding $24,100,380 in QAF VI Seller Net Payments[12] that would have been the property of the Liquidating Trust had Prime not been entitled to a recovery under the Reconciliation Process.[13] The Court will enter an order authorizing Prime to retain $23,157,581 of the $24,100,380 in QAF VI Seller Net Payments that Prime was holding as of September 28, 2021. The Court makes no ruling with respect to whether it is appropriate for Prime to retain QAF VI Seller Net Payments in excess of $23,157,581, as that issue is not properly before the Court.[14]

---

[10] This statement is made with the understanding that the appellate court has the ultimate authority to determine whether an order is final or interlocutory.

[11] Declaration of Steve Aleman [Doc. No. 6645] at ¶ 5.

[12] Supplemental Declaration of Steve Aleman [Doc. No. 6669] (the "Supplemental Aleman Decl.") at ¶ 7.

[13] As explained in footnote 4, as a result of state and federal regulations, Prime is the initial recipient of all quality assurance fund payments, even those quality assurance fund payments that are the property of the Liquidating Trust under the APA.

[14] The quality assurance fund payments received by Prime fall into two categories: QAF VI Seller Net Payments and QAF V Payments (both terms as defined in the APA). The APA provides that under certain circumstances, Prime may offset QAF VI Seller Net Payments, but the APA contains no provision authorizing Prime to offset QAF V Payments. In the Opposition, the Liquidating Trustee stated that Prime had improperly offset QAF V Payments. Doc. No. 6662 at 12. On September 21, 2021, Prime wired $6,987,948.56 of QAF V Payments to the

## III. Conclusion

Based upon the foregoing, the Court will prepare and enter an order (1) authorizing Prime to retain $23,157,581 in QAF VI Seller Net Payments (as defined in the APA); (2) requiring the parties to have completed, by no later than **November 19, 2021**, one day of mediation with respect to the dispute concerning Prime's alleged failure to collect $5,105,731 in Accounts Receivable; and (3) setting a continued hearing regarding the alleged deficiency in the collection of the Accounts Receivable for **December 8, 2021 at 10:00 a.m.**

---

Liquidating Trust, *see* Supplemental Aleman Decl. at ¶ 6. As a result, the issue of Prime's retention of the QAF V Payments is now moot. The Liquidating Trustee's objection was limited to Prime's retention of the QAF V Payments; he has not asserted an objection to Prime's retention of the QAF VI Seller Net Payments. Therefore, it is not appropriate for the Court to make any determination with respect to the propriety of Prime's retention of QAF VI Seller Net Payments in excess of $23,157,581.

###

Date: October 21, 2021

Ernest M. Robles
United States Bankruptcy Judge